IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

JACKSONVILLE DIVISION

CASE NO. 3:04 CV-146-J-99HTS

SEA STAR LINE, LLC,
a limited liability company,

        Plaintiff,

-vs-

EMERALD EQUIPMENT LEASING,
INC., a corporation,

        Defendant.

_____/

**DEFENDANT EMERALD EQUIPMENT LEASING INC.'S,
MOTION TO DISMISS COMPLAINT FOR DECLARATORY JUDGMENT
AND FOR DAMAGES, OR ALTERNATIVELY TO TRANSFER VENUE
OR ABSTAIN, AND MEMORANDUM OF LAW IN SUPPORT THEREOF**

        Defendant, Emerald Equipment Leasing Inc., by and through its undersigned

counsel, moves to dismiss the complaint filed by the Plaintiff, Sea Star Line, LLC, or in

the alternative to transfer venue of this action or to abstain, and as grounds therefore,

states as follows:

## I.      STATEMENT OF NATURE AND STAGE OF THE PROCEEDING

        On March 21, 2001 (the "Petition Date"), Emerald Equipment Leasing, Inc.

("Emerald") filed a voluntary petition for relief under Chapter 11 in the United States

Bankruptcy Court for the District of Delaware (the "Delaware Bankruptcy Court"), along

with various affiliated entities (collectively, the "Jointly Administered Debtors"). Since

then, Emerald has been operating and conducting its business as a Debtor-in-Possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

Emerald is in the process of formulating a liquidating plan of reorganization in its Chapter 11 proceedings, which Emerald believes will provide for a distribution to its unsecured creditors.  The Debtor's primary asset is its claim against Sea Star Line, LLC ("Sea Star") in an amount in excess of $4,000,000.00 arising from various rental charges due pursuant to a valid post-petition lease agreement (the "Equipment Rental Agreement") entered into between Emerald and Sea Star.

In order to liquidate this claim, Emerald attempted to amicably resolve the dispute by inviting Sea Star to attend a settlement conference.  After this invitation was ignored, Emerald filed a Summons and Complaint on March 17, 2004, instituting an adversary proceeding in the Delaware Bankruptcy Court against Sea Star (the "Bankruptcy Court Litigation" attached hereto as Exhibit "A").  Unknown to Emerald, however, Sea Star, in a transparent "race to the courthouse", instituted the within proceeding by filing a Summons and Complaint in the United States District Court for the Middle District of Florida (the "Florida District Court") against Emerald (the "Florida Litigation"), seeking in main part, a declaratory judgment as to the parties' rights and liabilities under the Equipment Rental Agreement made the subject of the Bankruptcy Court Litigation and a declaration of its rights under the Bankruptcy Court's final sale order.

Sea Star has filed a Motion to Dismiss, Stay or Abate Complaint of Emerald in the Bankruptcy Court Litigation (the "Sea Star Motion to Dismiss") in which it requests the Delaware Bankruptcy Court to decline jurisdiction of the Bankruptcy Court Litigation to permit the issues raised in its "declaratory judgment action" to be resolved in the

2

Florida Litigation. In so doing, Sea Star invoked the "First-Filed Rule" contending that the prior Florida Litigation (filed on March 1, 2004) should proceed rather than the Bankruptcy Court Litigation (filed on March 17, 2004).[1] Emerald, however, contends that the Florida Litigation was instituted by Sea Star in bad faith, solely as a pre-emptive maneuver in furtherance of its "forum shopping" goal. Emerald has filed its opposition to the Sea Star Motion to Dismiss and that matter is pending in the Delaware Bankruptcy Court. Emerald now brings before this Court its Motion to Dismiss, and/or to Transfer Venue of the Florida Litigation.

## II. SUMMARY OF ARGUMENT

The Declaratory Judgment Action instituted by Sea Star in the Florida District Court is wholly inappropriate and should be dismissed since it serves no legitimate purpose. This is so since it seeks a declaration of Sea Star's rights under a terminated lease agreement, as well as under a bankruptcy court order rendered by the Delaware Bankruptcy Court which has long ago been effectuated. As such, at the time the Florida Litigation was instituted, there was no danger of any further accrual of avoidable damages justifying the use of declaratory relief as a remedy. Instead, the sole purpose of Sea Star's institution of the Florida Litigation must be viewed only as a pre-emptive measure in a clear and unmistakable instance of forum shopping. This procedural trickery should not be countenanced and the Florida Litigation should be dismissed allowing the Bankruptcy Court Litigation to proceed without any interference as it is the appropriate forum for the litigation of the issues between Emerald and Sea Star.

---

[1] Although the Florida Litigation was filed on approximately March 1, 2004, it was not served on the Debtor until March 25, 2004. As such, the Debtor was unaware of the Florida Litigation when it filed and served Sea Star with the Bankruptcy Court Litigation on March 17, 2004.

## III.   STATEMENT OF FACTS

Prior to the Petition Date, Emerald leased all of its equipment to NPR, Inc. and Holt Cargo Systems, Inc. (two of the Jointly Administered Debtors). Said lease with NPR, Inc. and Holt Cargo Systems, Inc. was rejected by a Consent Order entered by the Delaware Bankruptcy Court dated May 10, 2002 (the "Consent Order"), but effective as of April 18, 2002. On or about April 26, 2002, an Order was entered by the Delaware Bankruptcy Court authorizing the sale of NPR assets (the "Sale") to Sea Star (the "Sale Order"). Since the entry of the Sale Order, Sea Star continued to use in its business substantially all of the Emerald equipment which, at the time of the Sale, either had remained at Sea Star terminals, was aboard Sea Star ships, or was in use at various other locations, pursuant to the terms of an oral lease between Emerald and Sea Star (the "Oral Lease"). The Oral Lease was effective as of May 1, 2002, and was applicable to any cargo worthy Emerald equipment, which Sea Star dispatched out of any port terminal or in-land depot for customer use at agreed upon per diems. The leasing arrangements under the Oral Lease with respect to Sea Star's continued use of Emerald's equipment were thereafter formalized in the Equipment Rental Agreement dated as of July 31, 2002, between Emerald and Sea Star, but applicable to equipment used as of and since April 29, 2002.

During the course of the Oral Lease and the Equipment Rental Agreement (the "Leases"), Sea Star made lease payments to Emerald based on its own "self-billing reports". Upon investigation, Emerald discovered that the "self-billing reports" were grossly understated, and failed to account for numerous pieces of Emerald equipment, which Sea Star had been using. The rentals and other charges due and unpaid under the

terms of the leases amount to in excess of $4,000,000.00. These claims were first brought to the attention of Sea Star in or about the summer of 2003. Commencing in September, 2003, counsel for Emerald corresponded with counsel for Sea Star in a series of letters in an effort to exchange information so that the parties may attempt to amicably resolve their dispute.

On October 31, 2003, Emerald's counsel sent a letter to Sea Star terminating the Equipment Rental Agreement effective as of November 30, 2003, and requiring redelivery of all Emerald equipment in Sea Star's possession as of December 1, 2003. By letter dated February 19, 2004, counsel for Emerald advised counsel for Sea Star that, "short of litigation", it would be necessary for the parties to immediately arrange a meeting to review the issues in an effort to resolve the dispute over the then terminated Equipment Rental Agreement. Rather than reply to that letter, Sea Star commenced the within the Florida Litigation on March 1, 2004, primarily seeking a declaratory judgment. Prior to service of the Declaratory Judgment Complaint in the Florida Litigation, Emerald, having had no response from Sea Star as to its intentions (and not yet having been served the Complaint in the Florida Litigation), commenced the Bankruptcy Court Litigation by filing an adversary proceeding on March 17, 2004, in the Delaware Bankruptcy Court.

g:\393\10\pleading\sea star brief-florida

## IV.     ARGUMENT AND AUTHORITY

### A.     The Florida Litigation Should Be Dismissed Because It Constitutes an Improper Use of The Declaratory Judgment Act And Was Filed Solely As a Pre-Emptive Measure In A Clear and Unmistakable Instance of Forum Shopping

Sea Star's Complaint in the Florida Litigation primarily[2] seeks declaratory judgment relief against Emerald, the primary purpose of which is for a determination of legal rights and obligations of Sea Star under the Equipment Rental Agreement, which was terminated by letter dated October 31, 2003, and is no longer in force, as well as under a Sale Order which was entered by the Delaware Bankruptcy Court and which has long ago been effectuated.  Since the substantial damage claim asserted by Emerald against Sea Star relates to a lease no longer in effect and there is no danger of any further accrual of avoidable damages in this case, declaratory judgment relief in connection with this dispute serves no useful purpose and is wholly inappropriate.  Under such circumstances, Sea Star's institution of the Florida Litigation can only be viewed as a pre-emptive measure in a clear and unmistakable instance of forum shopping. Accordingly, the Florida Litigation should be dismissed so that the pending Bankruptcy Court Litigation can proceed without interference.

---

[2] The Florida Litigation also includes a claim by Sea Star against Emerald based upon contracts of carriage for shipment of goods in late 2003 and early 2004.  This claim is for the sum of $92,318.05 (this amount is disputed, Emerald believing the amount of the claim to be below the sum in controversy necessary to support diversity jurisdiction) and at the time incurred was understood between the parties to be treated as an offset to the much more substantial claim Emerald has asserted against Sea Star in this matter in excess of Four Million Dollars ($4,000,000.00).

g:\393\10\pleading\sea star brief-florida

1.   **The Declaratory Judgment Action Embodied By The Florida Litigation Instituted by Sea Star is Inappropriate and Although Filed First Should Not Be Allowed to Interfere With The Appropriately Filed Bankruptcy Court Litigation**

Emerald asserts a claim against Sea Star in excess of $4,000,000.00 in connection with accrued rental and other charges due and owing under the terminated Equipment Rental Agreement.  When Emerald brought this claim to the attention of Sea Star and began, what it thought was a good faith process to avoid the cost and associated delay of time-consuming litigation it had asserted, Sea Star, rather than respond to Emerald's last correspondence (in a series of correspondence between the parties), chose to pre-emptively file the Florida Litigation.  In reality, Sea Star is the "natural" defendant in the Florida Litigation.  It is precisely such a posture which raises a warning flag as to the appropriateness of declaratory judgment relief.

The district court is not required to hear a declaratory judgment action. Rather, the decision as to whether or not to hear a declaratory judgment action is discretionary, even where appropriately invoked.  See El Dia, Inc. v. Hernandex Colen, 963 F.2d 488 (1st Cir. 1992), Sierra Club v. Yeutter, 911 F.2d 1405 (10th Cir. 1990). Under the circumstance presented here, the inappropriateness of the use of a declaratory judgment action in the Florida Litigation is apparent.  In such cases, a court should refuse to proceed with a declaratory action if it finds that it does not serve a useful purpose or is otherwise undesirable.  Home Indemnity Co., N.Y. v. Lechner, et al., 191 F.Supp. 116, 199 (S.D. Ca. 1961).  Such is the case here.

The Federal Declaratory Judgment Act, 28 U.S.C. Sections 2201 and 2202 (the "Act"), states in relevant part, specifically 28 U.S.C. 2201(a), as follows:

g:\393\10\pleading\sea star brief-florida

> In a case of actual controversy within its jurisdiction…any court of the United
> States, upon the filing of an appropriate pleading, may declare the rights and other
> legal relations of any interested party seeking such declaration, whether or not
> further relief is or could be sought. Any such declaration shall have the force and
> effect of a final judgment or decree and shall be reviewable as such.

The primary purpose of the Act is to afford an early adjudication of a party's rights to

avoid accruing avoidable damages while waiting until his adversary sees fit to begin a

suit. Cunningham Brothers, Inc. v. Bail, 407 F.2d 1165, 1167-68 (7th Cir. 1969); Sarafin

v. Sears, Roebuck and Co., Inc., 446 F. Supp. 611, 615 (N.D. Ill 1978). Where avoidable

damages are accruing, relief is proper either "1) where the judgment will serve a useful

purpose in clarifying and settling the legal relations in issue; or 2) when it will terminate

and afford relief from the uncertainty, insecurity and controversy giving rise to the

proceedings." Sarafin, 446 F. Supp. at 615 (quoting Maryland Casualty Co. v. Rosen,

445 F.2d 1012, 1014 (2d Cir. 1971)).

In this case, Sea Star seeks a declaration of its rights and other legal relations

under the Equipment Rental Agreement and the Sale Order entered by the Delaware

Bankruptcy Court (see ¶ 21 of the Sea Star Complaint in the Florida Litigation). The

Equipment Rental Agreement was terminated by letter dated October 30, 2003. Sea Star

has since returned the equipment it had under the Equipment Rental Agreement. No

further rental charges are accruing. The Bankruptcy Court Sale Order has long ago been

effectuated. Any of the damages which Emerald asserts in its claim against Sea Star arise

from Sea Star's actions in the past. There is therefore clearly no further accrual of

avoidable damages.

The use of a declaratory judgment action is not meant to be applicable where a

breach or violation has already occurred. See Crown Cork & Seal Co., Inc. v. Borden,

g:\393\10\pleading\sea star brief-florida

Inc., 779 F.Supp. 33 (E.D. Pa. 1991) (citing A. Cands v. Aetna Cas. & Sur. Co., 666 F.2d

819, 823 (3d Cir. 1981)) (holding that since a declaratory judgment was intended to avoid

the "accrual of avoidable damages," it was appropriate only where judgment "would

strongly affect present behavior, present consequences and resolve a present dispute"). In

Crown Cork, supra, the Court found that the use of a declaratory judgment action was

inappropriate since the parties' contract dealings were over and that therefore there was

no "present behavior" to affect regarding the rights or future conduct of either of the

parties under the contract. See also, Cunningham Bros., Inc. v. Bail, 407 F.2d 1165 (7th

Cir. 1969) (where the 7th Circuit upheld the District Court's ruling dismissing a

declaratory judgment action stating that the primary purpose of the Declaratory Judgment

Act was to avoid the accrual of avoidable damages to one not certain of his rights and

that where such purpose is not served, declaratory judgment relief is not appropriate).

Indeed, the Court in Cunningham, supra, in finding that the declaratory judgment plaintiff

seemed to be attempting to "try issues or determine the validity of defenses in pending

cases", found such an effort to be a "perversion" of the Declaratory Judgment Act.

Moreover, the declaratory relief sought by Sea Star in the Florida Litigation

involves a determination of the parties rights and obligations under the Sale Order

entered by the Delaware Bankruptcy Court. Again, the inappropriateness of the use of

the Declaratory Judgment Act in seeking a Florida district court determination of the

rights and obligations of parties under an order entered by the Delaware Bankruptcy

Court is obvious. Among the factors a court should consider in determining whether to

refuse declaratory relief is: (1) whether the declaratory action would serve a useful

purpose in clarifying legal relations in issue; (2) whether the declaratory remedy is being

g:\393\10\pleading\sea star brief-florida

used merely for the purpose of "procedural fencing" or to provide an arena for a race for res judicata; and (3) whether there is an alternative remedy which is better or more effective. State Farm Mutual Automobile Insurance Company v. Brewer, 778 F.Supp. 925, 928 (E.D. Ky. 1991). In this case, the pending Bankruptcy Litigation in the Delaware Bankruptcy Court would clearly provide the most appropriate forum to clarify the legal relations at issue here, allowing for an effective remedy, rather than engaging in "procedural fencing". Where warranted, as here, a court should decline to hear a declaratory judgment action, even, where it has diversity of jurisdiction, by deferring to another federal court suit, despite the declaratory judgment suit being filed first. Koch Engineering Co., Inc. v. Monsanto, 621 F.Supp. 1204 (E.D. Mo. 1985).

Since there is no accrual of avoidable damages given that the Equipment Rental Agreement is no longer in force, the Florida Litigation seeking declaratory judgment in this case serves no legitimate purpose. The breach has already occurred. There is no "present behavior" to affect. Moreover, seeking a determination by this court of rights and obligations pursuant to an order entered by another court where pending litigation is ongoing is inappropriate. The issues raised by Sea Star in the Florida Litigation may be asserted as defenses to the Bankruptcy Court Litigation, which should be permitted to proceed. Accordingly, the Florida Litigation should be dismissed.

### 2. The Sole Purpose of The Florida Litigation Was as a Pre-Emptive Measure in a Clear and Unmistakable Instance of Forum Shopping

Since the Florida Declaratory Judgment Action serves no legitimate purpose, it is obvious that Sea Star's institution of such action is aimed solely at wresting the choice of forum from Emerald as the "natural" plaintiff as a "pre-emptive strike". On February 19,

10                                    g:\393\10\pleading\sea star brief-florida

2004, Emerald advised Sea Star that "short of litigation" an immediate meeting was

necessary. Rather than respond to that letter, 10 days later, Sea Star instituted the Florida

Litigation seeking declaratory relief. Prior to service of the Florida Litigation, Emerald,

hearing no response from Sea Star, instituted the Bankruptcy Court action on March 17,

2004.

The circumstances in this case are similar to those presented to the Court in Essex

Group, Inc. v. Cobra Wire & Cable, Inc., 100 F.Supp. 2d 912 (N.D. Ind. 2000); where,

within seven days of receiving a letter from its adversary threatening litigation, the

"threatened" party filed an action seeking declaratory relief. In that instance, the Court

found that the declaratory judgment plaintiff "raced to the courthouse and forum

shopped" and held that dismissal of the first-filed declaratory judgment action was

appropriate. Two policy arguments were cited by the Court in Essex Group, supra, at

page 915, supporting the dismissal of the declaratory action brought solely in anticipation

of a lawsuit: (1) allowing a potential defendant to make a procedural pre-emptive strike

robs the natural plaintiff of his ability to select his forum, Eli's Chicago Finest, Inc. v.

The Cheesecake Factory, Inc., 23 F.Supp. 2d 906, 909 (N.D. Ill. 1998) (citing, Allendale,

10F3d at 431; Publications International, Ltd. v. McRae, 953 F.Supp. 223 (N.D. Ill. 1996)

and (2) prohibiting a "race to the courthouse" encourages settlement and discourages

costly duplicate litigation". Id., (citing, Leaf, Inc. v. Clay White Associates, Inc., 1996

W.L. 580876 (N.D. Ill.). In Essex Group, supra, at page 915, the Court also noted "if the

Court were to allow such maneuvering, litigants would have no alternative but to quickly

file suit in the forum of their choice. Delay caused by a good faith effort at negotiation

could deprive a litigant of a favorable venue. Such an incentive system would be highly

inefficient." The public policy reasoning cited in the above line of cases is wholly applicable in this case warranting a determination that the Bankruptcy Court Litigation be permitted to proceed.

It is recognized that a suit for declaratory judgment aimed solely at wresting the choice of forum from the "natural" plaintiff should normally be dismissed and the second filed case allowed to proceed in the usual way. Allendale Mut. Ins. Co. v. Bull Data Sys., Inc., 10 F.3d 425, 431 (7th Cir. 1993). Sea Star's sole purpose for its filing of the Florida Declaratory Judgment Action was to wrest control of the choice of forum from the "natural" Plaintiff, Emerald. Such an effort by Sea Star should not be rewarded by allowing it to interfere with the action properly brought by Emerald in the Bankruptcy Court. The Sea Star action brought in this Court should be dismissed.

> **3.    The "First-Filed Rule" is Inapplicable Where Certain Factors Are Present Such as Forum Shopping, Public Policy Considerations and Pending Related Proceedings, as Exists in This Case**

Although the general rule favors recognition of the court that first obtains jurisdiction of a case involving identical parties and the same dispute, as opposed to the subsequently filed case (commonly known as the "First-Filed Rule" as followed by the Third Circuit, see, Crosley Corp. v. Hazeltime Corp., 122 F.2d 925, 929-30 (3d Cir. 1941), the just and effective disposition of disputes may, in appropriate cases, require otherwise. Indeed, the United States Supreme Court has made clear that the "First-Filed Rule" is not entitled to "mechanical application. Kerotest Mfg. Co. v. L-O-Two Co., 342 U.S. 180, 72 S.Ct. 219, 96 L.Ed. 200 (1952). Instead, courts have always examined the circumstances in each case to determine the applicability of the "First-Filed Rule".

Many different factors are taken into consideration when courts are confronted with the issue of whether or not to follow the "First-Filed Rule". In conducting such an analysis, a number of courts have determined that the "First-Filed Rule" should not be followed. See, e.g., Serco Services Co., L.P. v. Kelley Co., Inc., 51 F.3d 1037, 1039 (Fed. Cir. 1995) (where the Fed. Circuit upheld the district court's dismissal of a declaratory judgment action in favor of a later filed action given its findings that the first suit was instituted in anticipation of the second suit and upon a consideration of the availability of witnesses and documents in each forum). See also, Genetech, Inc. v. Eli Lilly & Co., 998 F.2d 931, 938 (Fed. Cir. 1993) which held that reasons to yield to a later-filed suit "may be the convenience and availability of witnesses, or absence of jurisdiction over all necessary or desirable parties, or the possibility of consolidation with related litigation, or consideration relating to the real party in interest". In EEOC v. University of Pa., 850 F.2d 969 (3d Cir. 1988), the Third Circuit held that since the First-Filed Rule is based on principles of comity and equity, there should not be a wooden application of the rule without regard to rare or extraordinary circumstances, inequitable conduct, bad faith or forum shopping. Finally, in Orthmann v. Apple River Campground, 765 F.2d 119 (8th Cir. 1985), the 8th Circuit Court, stating that the First-Filed Rule is not intended to be rigid, mechanical or inflexible, but rather should be applied in a manner serving some judicial administration, held that a second filed suit should go forward rather than the first filed suit, since the second filed suit was further developed. Given the public policy considerations discussed supra, the transparent attempt at forum shopping and the existence of pending related proceedings in the Delaware Bankruptcy Court filed at about the same time as the Delaware Litigation, the inappropriateness of

proceeding with the Florida Litigation is clear.  The Florida Litigation should be dismissed.

**B.      The Issues in This Litigation Are Core Bankruptcy Issues, The Determination of Which Are Essential to Emerald's Contemplated Liquidating Plan of Reorganization.  As Such, to the Extent Not Dismissed, the Florida Litigation Should Be Transferred to the Delaware Bankruptcy Court Because the Delaware Bankruptcy Court is the Most Appropriate Forum for This Litigation**

An analysis of the subject matter of the litigation between the parties and surrounding circumstances, makes abundantly clear that the most appropriate forum for resolution of this dispute is in the Delaware Bankruptcy Court.  Accordingly, to the extent this Court declines to dismiss the Florida Litigation, venue of such proceedings should be transferred to the Florida Bankruptcy Court to be consolidated with the Florida Litigation.  As noted earlier, the declaratory judgment action instituted by Sea Star in Florida seeks a declaration of its rights and obligations under the Equipment Rental Lease and the Sale Order.  The Equipment Rental Lease arose out of a transaction between Emerald and Sea Star post-petition and subsequent to Sea Star's purchase of assets of one of the Jointly Administered Debtors in the Delaware Bankruptcy Court.  The Sale Order for which Sea Star seeks a declaration of rights in the Florida Litigation is an Order entered by the Delaware Bankruptcy Court.  The claim of Emerald against Sea Star, which is the subject matter of the dispute between the parties is the sole asset of Emerald which offers the possibility for a distribution to its creditors in its bankruptcy proceedings pending in the Delaware Bankruptcy Court.  Under such circumstances, it would appear clear that the Bankruptcy Court, not a district court in Florida, is the appropriate forum for litigating this dispute.

The district court for the Middle District of Florida has the capacity to transfer this matter to the district court for the District of Delaware. A federal district court may transfer a civil action pursuant to 28 U.S.C. § 1404(a), which provides:

> For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

Factors to consider in transferring a case include the convenience of parties, the convenience of witnesses and the interests of justice. See Ricoh Co., Ltd. v. Honeywell, Inc., 817 F. Supp. 473 (D.N.J. 1993). The analysis under § 1404 is flexible and must be performed with a focus on the unique facts of each case. See Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 29 (1988); Ricoh Co., Ltd., 817 F. Supp. at 479.

Over time, courts have come to group factors in the consideration of a venue transfer into two broad categories – private interests and public interests. See Gulf Oil Corp. v. Gilbert, 330 U.S. 501, (1947); Ricoh Co. Ltd., 817 F. Supp. at 480-81. Among the private interest factors to consider are the plaintiff's choice of forum; ease of access to sources of proof; availability of compulsory process over unwilling witnesses; the cost of attendance of willing witnesses; and obstacles to a fair trial, including financial ability to bear the costs of trial and all other practical problems that make trial of the case easy, expeditious and inexpensive. See Gulf Oil, 330 U.S. at 508; Ricoh Co. Ltd., 817 F. Supp. at 481; Tampa Bay Storm, 932 F. Supp. at 282. Public interest factors, i.e., interests of justice include the forum court's familiarity with applicable law, trying related litigation together, ensuring speedy trials, court congestion and other administrative difficulties. See Tampa Bay Storm, 932 F. Supp. at 282; Ricoh Co. Ltd., 817 F. Supp. at 481; Continental Bank N.A. v. Modansky, 755 F. Supp. 812, 815 (N.D. Ill. 1991).

g:\393\10\pleading\sea star brief-florida

Public policy clearly favors the centralization of bankruptcy proceedings in the bankruptcy court where the bankruptcy case is pending. In re Wheeling-Pittsburgh Steel Corp., 108 B.R. 82, 85 (Bkrtcy. W.D. Ca. 1989); In re National Sugar Refinery Co., 26 B.R. 762, 765 (Bankr. S.D.N.Y. 1982) ("There is a general preference to try all matters involving bankruptcy in the court in which the bankruptcy is pending"). An important factor underlying such public policy is the speedy and economic administration of a bankruptcy case. See In re South Winds Associates Ltd., 115 B.R. 857, 862 (Bkrtcy. W.D. Ca. 1990). In this case, public policy would be well served by transferring venue to the Delaware Bankruptcy Court.

The adjudication of state law contract claims, when the contract was entered into post-petition, is an essential part of administering a bankruptcy estate and, therefore, a bankruptcy court has core jurisdiction over such claims. In re Ben Cooper, Inc., 896 F.2d 1394 (2nd Cir. 1990). See also, In re Arnold Print Works, Inc., 815 F.2d 165 (1st Cir. 1987). Clearly, then, the dispute in this case involving the Equipment Rental Lease (a post-petition contract) for which Sea Star seeks a declaration of rights and obligations in the Florida District Court, is a core bankruptcy issue which should be determined by the Delaware Bankruptcy Court.

Moreover, the Sale Order for which Sea Star seeks a declaration of rights is an Order entered by the Bankruptcy Court. It would appear wholly inappropriate for the Florida District Court to make a determination as to rights and obligations of a party or parties under an Order entered by another court (i.e., the Delaware Bankruptcy Court), especially where proceedings are still pending in the Delaware Bankruptcy Court. Even more, paragraphs 4 through 9 of the Complaint filed by Sea Star in the Florida Litigation

specifically makes reference to various proceedings which took place in the Delaware Bankruptcy Court. Again, to the extent those proceedings may be germane to this action, it would appear to be wholly inappropriate to have the Florida District Court make determinations with respect to the effect of those proceedings on this dispute, particularly when those proceedings are still pending in the Delaware Bankruptcy Court.

The goal of judicial economy would also be served by transferring the Florida Litigation to the Delaware Bankruptcy Court since the Delaware Bankruptcy Court is already familiar with the parties and many of the issues. The Court in Capitol Records, Inc. v. Optical Recording Corp., 810 F. Supp. 1350 (S.D.N.Y. 1992), decided the public interest of judicial economy would best be served by transferring the case to a court already familiar with the issues because it recently handled a nearly identical matter.

The minimal difference in time of filings should also be taken into account. In Riviera Trading Corp. v. Oakley, Inc., 944 F. Supp. 1150 (S.D.N.Y. 1996), as well as Capitol Records, supra, competing actions were filed within a short period of time. The importance of timing was consequently diminished. In Capitol Records, only twenty days elapsed between the first and second filing. Emerald, in the current action, filed its suit only nineteen days after Sea Star filed its action. In addition, when filing, Emerald did not even know that Sea Star had filed a separate action for declaratory judgment. As such, it weighs in favor of either allowing Emerald's action to proceed or transferring the instant action so it can be consolidated with Emerald's action.

Finally, where the current action has not progressed, no judicial inefficiency will occur. See Riviera Trading, 944 F. Supp. at 1159 ; Capitol Records, 810 F. Supp. at 1355. In this case, the current action has not progressed. Only the complaint and with

this, the Motion to Dismiss or Transfer Venue, have been filed. Consequently, no judicial inefficiency would result in transferring the case to the Bankruptcy Court.

Taking into account the foregoing considerations, district courts have transferred venue and declined to mechanically apply the first-filed rule, even where the convenience of the parties and witnesses are not overwhelmingly in favor of the movant. For example, in Subaru of New England, Inc. v. Subaru of Augusta, Inc., 121 F.R.D. 1 (1988), the Court held that transfer to another district court where litigation raising the same issues was pending was appropriate in the interests of justice, *"even if the convenience of the parties and witnesses are in balance as between the two districts."* (emphasis added). Similarly, in Capitol Records, the Court found the conveniences to be evenly balanced between the two jurisdictions. The interests of justice, however, "strongly favor[ed]" a transfer to the second-filed jurisdiction. Capitol Records, 810 F. Supp. at 1355.

Finally, while the Plaintiff's choice of forum is entitled to great weight, it is neither dispositive of the transfer analysis nor is it the only factor worth considering. See Ricoh, 817 F. Supp. at 480 (citing AT&T v. MCI Communications Corp., 736 F. Supp. 1294, 1305 (D.N.J. 1990)). A court's preference in honoring a plaintiff's choice of forum is simply that, a preference. It is not a right. See Ricoh, 817 F. Supp. at 480 (citing E.I. Du Pont de Nemours & Co. v. Diamond Shamrock Corp., 522 F. Supp. 588, 592 (D. Del. 1981). When transfer would aid the movant and not disadvantage the opponent, transfer is appropriate. See Ricoh, 817 F.Supp. at 485.

The history of this dispute shows that Sea Star has taken advantage of the forum of the Delaware Bankruptcy Court. A court should take into account the Plaintiff's

resorting to the Defendant's choice of forum as part of the venue transfer determination. See Rhodes v. Barnett, 117 F. Supp. 312 (S.D.N.Y. 1953). Here, Sea Star appeared in the Delaware Bankruptcy Court to purchase assets of one of the Jointly Administered Debtors and utilized the Bankruptcy Court to enforce its rights in connection therewith. Sea Star has demonstrated that the Delaware Bankruptcy Court is not an inhospitable or "foreign" forum. To the contrary, it is familiar with this forum and has affirmatively used it.

The inverse is not true. Emerald would be severely disadvantaged by having to try its case in the Florida District Court. The relative financial strength of the parties should be taken into account. See Ashmore v. Northeast Petroleum Division of Cargill, Inc., 925 F. Supp. 36, 39 (D. Me. 1996). Emerald is a debtor in a bankruptcy proceeding and can ill afford the added expenses of travel of parties and witnesses, transporting documents and hiring local counsel. These additional expenses would be prohibitive to the bankruptcy estate. As one bankruptcy court has declared, "forcing the estate to prosecute this action [in Florida] will increase administrative expenses...and sap the temporal and financial resources of the Debtor." In re Stone & Webster, Inc., 2003 WL 21356088 (Bankr. D. Del. 2003) (determining that transfer of venue under Section 1412, the bankruptcy venue transfer statute, hinges on the same issues as a determination under Section 1404(a)).

The Defendant has met its burden of demonstrating why this case, if not dismissed (or at the very least abstained) ought to be transferred to the Delaware Bankruptcy Court. The two remaining counts for damages can easily be handled by the Delaware Bankruptcy Court in conjunction with Emerald's claims and should properly be

transferred to that court. The foregoing considerations clearly militate transferring the action to the Delaware District Court for referral to the Delaware Bankruptcy Court. The pending Bankruptcy Court Litigation affords Sea Star the opportunity and ability to raise all of the issues it has included in the Florida Litigation. Accordingly, to the extent the Florida Litigation is not dismissed, its venue should be transferred to the Delaware Bankruptcy Court.

## V.   RELIEF REQUESTED

Based on the foregoing reasoning and legal authorities, Emerald respectfully requests that this Court dismiss Sea Star's Complaint for declaratory judgment and damages, or alternatively, transfers venue to the District Court for the State of Delaware for referral to the Delaware Bankruptcy Court, or abstains.

SHUTTS & BOWEN LLP

By: _Michael L. Gore_ FBN: 441252
Michael L. Gore, Esquire
Lincoln Plaza, Suite 1000
P.O. Box 4956
Orlando, Florida 32802-4956
Phone:  407-835-6905
Fax:     407-425-8316

and

Gary M. Schildhorn, Esquire
Alan I. Moldoff, Esquire
ADELMAN LAVINE GOLD AND LEVIN,
A Professional Corporation
Suite 900, Four Penn Center
Philadelphia, PA  19103-2808
Phone:  215-568-7515
Fax:     215-557-7922

Counsel to Debtor Emerald Equipment
Leasing, Inc.

g:\393\10\pleading\sea star brief-florida

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served this _28th_ day of April, 2004, via facsimile ((305) 442-4300) and U.S. Mail:

Timothy J. Armstrong, Esq.
Armstrong & Mejer
2600 Douglas Road
Suite 1111, Douglas Center
Coral Gables, FL 33134

_____
Michael L. Gore

g:\393\10\pleading\sea star brief-florida

IN THE United States Bankruptcy Court
FOR The District of Delaware

| | | | |
|---|---|---|---|
| In re: | EMERALD EQUIPMENT LEASING, INC., | ) | Case No. 01-934 (MFW) |
| | Debtor | ) | Chapter: 11 |
| | | ) | |
| | EMERALD EQUIPMENT LEASING, INC., | ) | Case No. 01-934 (MFW) |
| | | ) | |
| | Plaintiff | ) | Chapter: 11 |
| | v. | ) | |
| | | ) | |
| | SEA STAR LINE, LLC | ) | |
| | | ) | Adv. Proc. No.: |
| | | ) | |
| | Defendant | ) | |

SUMMONS AND NOTICE OF PRETRIAL
CONFERENCE IN AN ADVERSARY PROCEEDING

YOU ARE SUMMONED and required to file a motion or answer to the complaint which is attached to this summons with the clerk of the bankruptcy court within 30 days after the date of issuance of this summons, except that the United States and its offices and agencies shall file a motion or answer to the complaint within 35 days.

Address of Clerk:
824 Market Street, 3rd Floor
Wilmington, DE 19801

At the same time, you must also serve a copy of the motion or answer upon the plaintiff's attorney.

ADELMAN LAVINE GOLD AND LEVIN,
a Professional Corporation
Bradford J. Sandler, Esquire
919 Market Street, Suite 710
Wilmington, DE 19801

If you make a motion, your time to answer is governed by Fed. R. Bankr. P. 7012.

YOU ARE NOTIFIED that a pretrial conference of the proceeding commenced by the filing of the complaint will be held at the following time and place.

Address: United States Bankruptcy Court
824 Market Street, 6th Floor
Wilmington, DE 19801

Room: Court Room No. 1

Date and Time: April 28, 2004 at 9:30 a.m (ET)

IF YOU FAIL TO RESPOND TO THIS SUMMONS, YOUR FAILURE WILL BE DEEMED TO BE YOUR CONSENT TO ENTRY OF A JUDGMENT BY THE BANKRUPTCY COURT AND JUDGMENT BY DEFAULT MAY BE TAKEN AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT.

United States Bankruptcy
Court for the District
of Delaware

Date: March 17, 2004

/s/ David D. Bird
Clerk of the Bankruptcy Court

EXHIBIT A

## CERTIFICATE OF SERVICE

I, Sandi Van Dyk, certify that I am, and at all times during the service of process was, not less than 18 years of age and not a party to the matter concerning which service of process was made. I further certify that the service of this summons and a copy of the complaint were made March 17, 2004 by:

X

    Mail Service: Regular, first class United States mail, postage fully pre-paid, addressed to:

    Sea Star Line LLC
    100 Bell Tel Way, Suite 300
    Jacksonville, FL 32216-7202
    Attn: Michael D Shea, President

Personal Service: By leaving the process with defendant or with an officer or agent of defendant at:


Residence Service: By leaving the process with the following adult at:


Certified Mail Service on an Insured Depository Institution: By sending the process by certified mail addressed to the following officer of the defendant at:


Publication: The defendant was served as follows: [Describe briefly]


State Law: The defendant was served pursuant to the laws of the State of _____,
    as follows: [Describe briefly]                      (name of state)


Under penalty of perjury, I declare that the foregoing is true and correct.


March 17, 2004
Date                                    Signature


       Print Name.    Sandi Van Dyk

       Business Address:    Adelman Lavine Gold and Levin, a Professional Corporation
                         919 Market Street, Suite 710
                         Wilmington, DE     19801

## NOTICE OF DISPUTE RESOLUTION ALTERNATIVES

As party to litigation you have a right to adjudication of your matter by a judge of this Court. Settlement of your case, however, can often produce a resolution more quickly than appearing before a judge. Additionally, settlement can also reduce the expense, inconvenience, and uncertainty of litigation.

There are dispute resolution structures, other than litigation, that can lead to resolving your case. Alternative Dispute Resolution (ADR) is offered through a program established by this Court. The uses of these services are often productive and effective in settling disputes. **The purpose of this Notice is to furnish general information about ADR.**

The ADR structures used most often are mediation, early-neutral evaluation, mediation/arbitration and arbitration. In each, the process is presided over by an impartial third party, called the "neutral".

In mediation and early neutral evaluation, an experienced neutral has no power to impose a settlement on you. It fosters an environment where offers can be discussed and exchanged. In the process, together, you and your attorney will be involved in weighing settlement proposals and crafting a settlement. The Court in its Local Rules requires all ADR processes, except threat of a potential criminal action, to be confidential. You will not be prejudiced in the event a settlement is not achieved because the presiding judge will not be advised of the content of any of your settlement discussions.

Mediation/arbitration is a process where you submit to mediation and, if it is unsuccessful, agree that the mediator will act as an arbitrator. At that point, the process is the same as arbitration. You, through your counsel, will present evidence to a neutral, who issues a decision. If the matter in controversy arises in the main bankruptcy case or arises from a subsidiary issue in an adversary proceeding, the arbitration, though voluntary, may be binding. If a party requests *de novo* review of an arbitration award, the judge will rehear the case.

**Your attorney can provide you with additional information about ADR and advise you as to whether and when ADR might be helpful in your case.**

Dated: March 17, 2004

_____
/s/ David D. Bird
*Clerk of Court*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| EMERALD EQUIPMENT LEASING, INC. | : | |
| | : | |
| Debtor | : | No. 01-934(MFW) |

| | | |
|---|---|---|
| EMERALD EQUIPMENT LEASING, INC. | : | |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | Adv. No. |
| | : | |
| SEA STAR LINE, LLC | : | |
| 100 Bell Tel Way | : | |
| Suite 300 | : | |
| Jacksonville, FL 32216 | : | |
| | : | |
| Defendant | : | |

## COMPLAINT OF DEBTOR FOR RECOVERY OF
## POST-PETITION ACCOUNT RECEIVABLE AND FOR
## TURNOVER OF PROPERTY PURSUANT TO 11 U.S.C. SECTION 542

Emerald Equipment Leasing, Inc., by and through its undersigned counsel, files

this Complaint against Sea Star Line, LLC, and in support, avers as follows:

## JURISDICTION AND VENUE

1.    This Court has jurisdiction over this adversary proceeding pursuant to 28

U.S.C. Sections 1334 and 157 and Sections 542 of Title 11 of the United States Code (the

"Bankruptcy Code"). This adversary proceeding is a "core" proceeding to be heard and

determined by the Bankruptcy Court pursuant to 28 U.S.C. Sections 157(b)(2)(A)(E) and

(O).

2.     Venue is appropriate before this Court by virtue of, and in accordance with,
28 U.S.C. Section 1409.

## PARTIES

3.     Plaintiff is Emerald Equipment Leasing, Inc. ("Emerald"), a Debtor-in-
Possession having filed a voluntary petition for relief under Chapter 11 of the United
States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the
District of Delaware (the "Bankruptcy Court") on March 21, 2001 (the "Petition Date").
Emerald remains in possession of its assets and continues to operate its business under
the applicable provisions of the Bankruptcy Code.

4.     Emerald was organized in October 1997 under the laws of the State of New
Jersey and is engaged in business as a lessor of various equipment used in the ocean
going transportation business.

5.     Defendant is Sea Star Line, LLC ("Sea Star"), a company engaged in the
shipping business with a place of business located at 100 Bell Tel Way, Suite 300,
Jacksonville, Fl. 32216.

## BACKGROUND

6.     Prior to the Petition Date, Emerald leased all of its equipment to NPR, Inc.
and Holt Cargo Systems, Inc.  Said lease with NPR, Inc. and Holt Cargo Systems, Inc. of
Emerald's equipment was rejected by a Consent Order entered by this Court dated May
10, 2002 (the "Consent Order"), but effective as of April 18, 2002.

7.     On or about April 26, 2002, an Order was entered by the Bankruptcy Court
authorizing the sale of NPR assets (the "Sale") to Sea Star (the "Sale Order").

g:\3973\10\pleadings\sea star complaint

8.    Since the entry of the Sale Order, substantially all of the Emerald equipment which, at the time of the Sale, either had remained at Sea Star terminals, were aboard Sea Star ships, or were in use at various other locations, have been used by Sea Star in the operation of its business pursuant to the terms of an oral lease between Emerald and Sea Star (the "Oral Lease").

9.    The Oral Lease was effective as of May 1, 2002 and was applicable to any cargo worthy Emerald equipment which Sea Star dispatched out of any port terminal or inland depot for customer use at agreed upon per diems. The per diems, under the Oral Lease, were to continue for each piece of equipment until Sea Star ceased use of that equipment and notified Emerald thereof, as well as the port location of such equipment (Jacksonville, San Juan or Philadelphia) or, alternatively, until Sea Star reached an agreement to purchase said piece of equipment.

10.    The leasing arrangements under the Oral Lease with respect to Sea Star's continued use of Emerald's equipment were thereafter formalized in a written lease dated as of July 31, 2002 between Emerald and Sea Star (the "Equipment Rental Agreement"), but applicable to equipment used as of and since April 29, 2002. A copy of the Equipment Rental Agreement is attached hereto as Exhibit "A" and made part hereof.

11.    The Equipment Rental Agreement set forth the terms for Sea Star's continued use of the Emerald equipment.

12.    During the course of the Oral Lease and the Equipment Rental Agreement, Sea Star made lease payments to Emerald based on its own "self billing reports".

g:\393\10\pleadings\sea star complaint

13.     Upon investigation, Emerald discovered that the "self billing reports" were grossly understated, failing to account for numerous pieces of Emerald equipment which Sea Star had been using without paying rental charges to Emerald.

14.     On or about October 31, 2002, Emerald exercised its rights to terminate the Equipment Rental Agreement in accordance with its terms.

### COUNT I
### (Post-Petition Account Receivable/Breach of Lease)

15.     Plaintiff incorporates paragraph 1 through 14 set forth above, as fully as if set forth herein in their entirety.

16.     Sea Star is in breach of its obligations under the Oral Lease and under the terms of the Equipment Rental Agreement as a result of its failure to pay the following:

      (a)     Rent due to Emerald;

      (b)     Loss incurred as a result of the loss, damage, theft or destruction of certain equipment.

17.     In addition, after the termination of the Equipment Rental Agreement, Sea Star was required to re-deliver the equipment to Emerald at certain designated terminals. Despite this, Sea Star has failed to deliver numerous chassis, gen sets and containers at lease termination, as provided for in the Equipment Rental Agreement.

18.     As a result of Sea Star's breach of the Oral Lease and Equipment Rental Agreement, Emerald has incurred damages in excess of $4,000,000.00.

19.     Emerald has provided detailed invoices to Sea Star setting forth the amounts owed to Emerald under the Oral Lease and Equipment Rental Agreement. Emerald's work on these invoices continues as it continues its investigation and discovers other Emerald equipment which Sea Star has used, or has not returned, and has not

compensated Emerald under the terms of the Oral Lease and the Equipment Rental Agreement.

WHEREFORE, Emerald requests the entry of an Order in an amount in excess of $4,000,000.00, plus interest at the rate set forth in the Equipment Rental Agreement, attorneys' fees and other charges.

**COUNT II**
**(Post-Petition Quantum Meruit)**

20.    Plaintiff incorporates paragraph 1 through 19 set forth above, as fully as if set forth herein in their entirety.

21.    Sea Star has utilized property of Emerald and has received the economic benefit of that use without compensating Emerald.

22.    Sea Star's use of Emerald's equipment resulted in harm to Emerald and actual and material gain and benefit to Sea Star.

23.    To the extent Sea Star's use of Emerald's equipment occurred during any period not covered by a written lease agreement, Emerald is entitled to collect damages from Sea Star under the theory of quantum meruit.

24.    WHEREFORE, Emerald requests the entry of an Order in an amount in excess of $4,000,000.00 as damages, plus interest, attorneys' fees and other charges.

**COUNT III**
**(Turnover Action/Conversion)**

25.    Plaintiff incorporates paragraph 1 through 24 set forth above, as fully as if set forth herein in their entirety.

26.    By letter dated October 31, 2003, Emerald gave Sea Star thirty (30) days prior written notice of its termination of the Equipment Rental Agreement and demanded

that Sea Star redeliver all Emerald equipment to Emerald on or before December 1, 2003 in accordance with the provisions of paragraph 10 of the Equipment Rental Agreement.

27.     Upon investigation, Emerald has determined that numerous chassis, gen sets and containers have not been returned by Sea Star to Emerald pursuant to Emerald's demand in accordance with the Equipment Rental Agreement.

28.     Sea Star has refused, and still refuses, to return said equipment and has wrongfully and unlawfully converted the same to its own use.

WHEREFORE, Emerald, pursuant to 11 U.S.C. Section 342, requests the entry of an Order providing for the turnover of damages equaling unpaid rent, and the value of the equipment, together with interest and costs of suit.

## COUNT IV
### (Accounting)

29.     Plaintiff incorporates paragraph 1 through 28 set forth above, as fully as if set forth herein in their entirety.

30.     Certain information pertaining to the usage of Emerald equipment while in the possession of Sea Star remains solely in the possession of Sea Star.

31.     Emerald has requested that Sea Star provide a full accounting of Sea Star's usage of all Emerald equipment.

32.     Sea Star, to date, has failed to provide such accounting.

g:\393\10\pleading\sea star complaint

WHEREFORE, Emerald requests an Order requiring that Sea Star provide to

Emerald a full accounting of all Sea Star's usage of Emerald equipment.

Bradford J. Sandler, Esq. (No. 4142)
ADELMAN LAVINE GOLD AND LEVIN,
A Professional Corporation
919 North Market Street, Suite 710
Wilmington, DE 19801
(302) 654-8200

and

Gary M. Schildhorn, Esq.
Alan I. Moldoff, Esq.
ADELMAN LAVINE GOLD AND LEVIN,
A Professional Corporation
Suite 900, Four Penn Center
Philadelphia, PA 19103-2808
(215) 568-7515

Counsel to Debtor Emerald Equipment
Leasing, Inc.

g:\393\10\pleadings\sea star complaint

EQUIPMENT RENTAL AGREEMENT *pls.*

AS OF 3|

This Agreement is made and executed this 3| day of July, 2002 between EMERALD EQUIPMENT LEASING, INC., a Delaware corporation having its principal place of business at 101 South King Street, Gloucester City, New Jersey 08030 ("Lessor"), and SEA STAR LINE, LLC, a Delaware limited liability company having its principal place of business at 100 Bell Tel Way, Suite 300, Jacksonville, Florida 32216 ("Lessee").  Terms and conditions of this Agreement cover equipment in use at various times commencing April 29, 2002.  Such equipment is of the types, at daily lease rates, and with damage exclusions and stipulated loss values delineated on Schedule "A", which is attached to and incorporated into this Agreement ("Equipment").  In consideration of the mutual covenants and conditions delineated below, the Parties agree:

1.  **Equipment.**  Lessor agrees to lease to Lessee, and Lessee agrees to lease from Lessor, the Equipment.  Delivery of all Equipment to Lessee or its agents by Lessor shall be affected and evidenced by signed and dated equipment interchange receipts and shall be subject to the terms and conditions of this Agreement.

2.  **Term.**  The lease term for each item of Equipment shall begin on the date when such Equipment is delivered to Lessee or its agent and shall end on the date when such Equipment is taken off hire pursuant to section 10 below.  Unless the parties otherwise agree in writing, the minimum rental period for each item of Equipment shall be thirty (30) days.  All provisions of this Agreement shall apply during any extension or renewal period.  Either party may terminate this Agreement on thirty (30) days' prior written notice to the other party.

3.  **Rental.**  Lessee shall pay rent and all other charges under this Agreement on a monthly basis.  Each payment for particular Equipment will become due on the tenth day of the month following the month of use, unless the parties otherwise agree in writing. In the event Lessee fails to make timely payment, interest shall be due on any overdue amount at a rate of eighteen percent (18%) per annum, commencing ten (10) days after Lessee receives Lessor's invoice for such overdue amount.  With respect to particular Equipment, Lessee's obligation to pay rent and other charges shall terminate immediately if Lessee purchases and pays for such Equipment.

4.  **Ownership; Sublease; Substitution; Encumbrances.**

Exhibit A

(a)   This Agreement shall be deemed a lease for all purposes. The Equipment shall remain Lessor's property; and Lessee shall acquire no title, ownership, or purchase rights of any nature by virtue of this Agreement.  In the event that notwithstanding the express intent of the parties, a court of competent jurisdiction determines that this Agreement is not a true lease but is rather a sale and extension of credit, a lease intended for security, a loan secured by the Equipment or other similar arrangement, the parties agree: (i) (A) to secure the prompt payment and performance as and when due of all Lessee's obligations (both now existing and hereafter arising) under this Agreement, Lessee shall be deemed to have granted, and it hereby grants, to Lessor a first priority security interest in the following (whether now existing or hereafter created): the Equipment, all replacements, substitutions, attachments, accessions, and additions thereto, all warranties and licenses relating thereto and all proceeds (cash and non-cash but without power of sale), including the proceeds of all insurance policies, insuring the Equipment;  (B) with respect to the Equipment, in addition to all other rights and remedies available to Lessor under this Agreement upon the occurrence of an event of default, Lessor shall have all of the rights and remedies of a first priority secured party under the Uniform Commercial Code; and (ii) (A) the principal amount of any such loan shall be an amount equal to the aggregate of the "Stipulated Loss Values" of all outstanding Equipment;  (B) the term of any such loan shall be co-extensive with the term of this Agreement; and (C) the loan payments under any such loan shall be the rental payments specified in this Agreement.

(b)   This Agreement shall be subject and subordinate to any lease or security interest in favor of a third-party lessor or lender to Lessor.  In the event any such third party becomes entitled to possession of any Equipment, Lessee shall return the Equipment to such third party at the or more delivery locations specified in paragraph 20.

(c)   Lessee shall not pledge, hypothecate, mortgage, create any security interest in, or otherwise encumber or permit the encumbrance of any Equipment.  At its own expense, Lessee promptly shall take action necessary to discharge any lien, charge, or other encumbrance asserted against any Equipment arising after delivery of such Equipment to Lessee and as a result of Lessee's act or omission.

(d) Each item of Equipment shall have Lessor's serial number and other identifying marks affixed. Lessee shall not obliterate, alter, conceal, or otherwise change or hide such number or marks.

(e) Without Lessor's prior written consent, Lessee shall not assign any right or interest in this Agreement or any Equipment and shall not sublet or otherwise relinquish possession of any Equipment, except to other carriers as evidenced by interchange agreements. Lessor may assign all or any part of its obligations, right, title, or interest in this Agreement, including all rental charges due or to become due. Lessee expressly consents to Lessor's application of any payment credits to which it is entitled under this Agreement to payment obligations of Lessee under this Agreement.

5. **Equipment Delivery and Interchange.** Lessor shall make the Equipment available for delivery to Lessee at the locations agreed by the parties. The signature of Lessee's representative on an equipment interchange receipt shall constitute conclusive evidence that the Equipment to which the receipt relates has been delivered to Lessee.

6. **Maintenance and Repairs.**

(a) At its own cost and expense, Lessee shall keep the Equipment in operating condition. Lessee shall be responsible for all damages and changes in the condition of the Equipment after delivery by Lessor, subject to section 10 below and Schedule "A". Lessee's maintenance and repair obligations include washing and cleaning the Equipment regularly to prevent corrosion, spot painting, and replacing of parts as necessary. Lessee shall comply with all loading limitations, handling procedures, and operating instructions to prevent excessive impact or unbalanced loading. Lessee shall not use any Equipment for storage or transportation of cargo which may damage the Equipment, including but not limited to unprotected corrosive substances, poorly secured materials, or bulk commodities which may corrode, oxidize, severely dent, puncture, contaminate, stain, or damage the Equipment.

(b) Lessee shall make no modifications, improvements, or replacements and shall not attach accessories or additions to any Equipment, without Lessor's prior written consent, which shall not be unreasonably withheld, except as necessary to comply with this Agreement. All improvements, repairs, accessories, and replacements made or attached to any Equipment by Lessee shall become part of the Equipment and Lessor's property without Lessor incurring any liability or, at Lessor's option, shall be removed

and the Equipment restored to its original condition at Lessee's expense. Absent written agreement, Lessee shall not change or supplement identification marks on any Equipment.

(c) Lessee shall comply with all conventions, laws, regulations, or orders of federal, state, foreign, and local governments and agencies having jurisdiction over the Equipment or its use, operation, or storage and shall be liable for all fines, penalties, and fees for failure to comply.

7. **Warranties.** Equipment subject to this Agreement is leased "AS IS", and Lessor warrants only that Lessee shall have quiet possession against any person claiming through Lessor. LESSOR MAKES NO EXPRESSED OR IMPLIED WARRANTY OF QUALITY, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR USE WITH RESPECT TO ANY EQUIPMENT AND HAS NOT MADE, AND SHALL NOT BE BOUND BY, ANY STATEMENT, AGREEMENT, OR REPRESENTATION NOT SPECIFIED IN A WRITING SIGNED BY LESSOR.

8. **Taxes and Other Expenses.** Lessee agrees to pay all sales, use, excise, property, gross income, gross receipts, stamp, or other taxes; levies; import duties; charges; or withholdings of any nature (together with any penalties, fines, or interest) imposed against Lessor, Lessee, or the Equipment by any governmental or taxing authority with respect to any Equipment; upon the leasing, delivery, possession, use, operation, redelivery, or other disposition of such Equipment; or upon the rentals, receipts, or earnings arising from such Equipment; excluding, however, any such taxes, levies, import duties, charges, and withholdings that are imposed or accrued with respect to any Equipment prior to its delivery to Lessee and any taxes measured by Lessor's income. Lessee shall pay all other expenses relating to Equipment arising during the rental period and resulting from Lessee's acts or omissions, including but not limited to expenses incurred in ports, depots, or storage areas.

9. **Risk of Loss.**

(a) During the term of this Agreement, Lessee shall bear all risk of loss, damage, theft, or destruction to the Equipment. No such loss, damage, theft, or destruction of Equipment, in whole or part, shall impair Lessee's obligations under this Agreement, all of which shall continue in full force and effect. At Lessor's option and subject to Schedule "A", Lessee shall (i) put the affected Equipment in the condition that existed upon delivery to Lessee or (ii) pay Lessor an amount equal to all accrued and unpaid rent due under this Agreement, together with the Stipulated Loss

Value, with respect to the affected Equipment, less the amount of all recoveries by Lessor from parties other than Lessee for such loss, damage, theft, or destruction.

(b)   Upon compliance with subparagraph (a), Lessee shall be subrogated to Lessor's rights with respect to any insurance policies and claims for reimbursement by third parties in connection with such loss, damage, theft, or destruction.

10.   **Redelivery of Equipment.**

(a)   At its sole expense, Lessee shall redeliver Equipment to Lessor at Greenwich Terminal, Philadelphia, Pennsylvania, Sea Star Terminal, Puerto Nuevo, San Juan, Puerto Rico, Greenwich Terminal, Port of Jacksonville, Florida, or any other location as to which the parties have agreed in writing.   Each redelivery shall be subject to Schedule "A".   At least seventy-two (72) hours prior to actual redelivery, Lessee shall give Lessor a written estimate of types and quantities of Equipment which Lessee intends to redeliver at particular ports.

(b)   Upon redelivery of particular Equipment, the receiving terminal will execute an equipment interchange receipt.   Subject to Schedule "A", Lessee shall return all Equipment to Lessor in the condition that existed upon delivery to Lessee.

(c)   Lessee shall return such Equipment with tires equal in value and condition to those delivered with the Equipment, normal wear and tear excepted.   The value of any tire damage at the time of return is included in the damage exclusion value for such Equipment, as specified in Schedule "A".

(d)   Lessor shall have the right to inspect Equipment leased under this Agreement at reasonable times during normal business hours.   Upon Lessor's reasonable request, Lessee shall furnish a list of all locations of Equipment as of the most recent date possible and take reasonable steps to make Equipment available for inspection.   On or before the seventh day of each month, Lessee shall furnish a list of all locations of Equipment as of the end of the previous month.

(e)   At the time of return, Equipment will be taken off hire; and rental charges will cease.   If Equipment is returned to a terminal with damage exceeding the damage exclusion specified in Schedule "A", Lessor will inform Lessee within seven (7) days after return.   Lessor shall have the right to require Lessee to repair Equipment or to authorize repairs at Lessee's expense.   If Lessee

fails to authorize repairs for which Lessor claims Lessee is responsible within ten (10) days after notification of damage, Lessor may promptly authorize such repair and rental charges will cease on completion of such repairs (no later than 10 business days after authorization). Lessee agrees to pay for required repairs no later than ten (10) days after receipt of invoice.

(f)  If Lessee fails to return any Equipment for more than sixty (60) days after the return date specified in a Lessor notice, Lessor may elect to treat such Equipment as lost, and Lessee shall pay Lessor the Stipulated Loss Value of such Equipment, together with all accrued rental charges at the contractual daily rate within fifteen (15) days.

11.  **Indemnification and Expenses.**

(a)  Lessee shall defend, indemnify and hold Lessor, its agents and employees, harmless from all claims, causes of action, liability damage or loss (including expenses in connection with any claim or suit, such as reasonable attorneys' fees and court costs) arising out of (a) failure by Lessee to comply with its obligations under this Agreement or any attempt by a third party to impose on Lessor liability for Lessee's acts or omissions; (b) any claim for personal injury or death or for property loss or damage (including but not limited to any products liability claim) arising out of possession, leasing, operation, control, use, storage, loading, unloading, moving, maintenance, delivery, or return of any Equipment; and (c) any forfeiture, seizure, impounding of, or charge or lien imposed or asserted against any Equipment as a result of Lessee's acts or omissions.

(b)  Except for Lessee's obligation to pay interest on delinquent rent, neither party shall be liable to the other party or any other person for delay not to exceed sixty (60) days in the performance of any obligation due to events beyond its reasonable control, including but not limited to fire; storm; flood; earthquake; explosion; accidents; acts of God, governmental agencies, or public enemies; sabotage; riots; civil disorders; strikes, lockouts, and other work stoppages; labor disputes; and failure of repair facilities to complete repairs timely. Under no circumstances shall either party be liable to the other party for exemplary damages.

12.  **Insurance.**  Lessee will carry and maintain insurance on the Equipment. Upon execution of this Agreement, Lessee shall furnish Lessor with insurance certificates evidencing (a) all-risk loss and damage insurance (including mysterious disappearance,

unexplained loss, war risks, strikes, riots, and civil commotions) on land, afloat, or airborne, in transit or at rest anywhere in the world, in an amount equal to the Stipulated Loss Value of all Equipment leased pursuant to this Agreement; (b) comprehensive general liability insurance, including contractual liability and broad form property damage, with combined single limits of $2,000,000; (c) automobile liability and property damage with combined single limits of $2,000,000; (d) deductibles applicable to each coverage. Each insurance coverage shall (a) name Lessor and its assigns as additional assureds, as their interests may appear; (b) include a loss payable clause in favor of Lessor and its assigns; and (c) include the insurer's undertaking to send Lessor and its assigns written notice at least thirty (30) days prior to any expiration or cancellation of such insurance. If Lessee defaults in payment of any premium under any such insurance policies, Lessor may but shall not be obliged to pay such premium; and Lessee shall repay the premium on demand. Lessee assigns to Lessor all right to insurance proceeds payable to Lessee for damage to or loss of the Equipment.

13. **Events of Default.**

(a) The following shall be events of default under this Agreement:

(i) Continuing failure to pay rent for thirty (30) days after its due date under this Agreement;

(ii) Continuing default in performance of any of Lessee's obligations under this Agreement for thirty (30) days after written notice thereof from Lessor to Lessee;

(iii) Lessee is a party to a merger or consolidation or sells, conveys, or transfers all or a substantial part of its assets or becomes insolvent or admits in writing its inability to pay its debts as they mature or applies for, consents to, or acquiesces in appointment of a trustee or a receiver for Lessee or any subsidiary or any property of either; or, in the absence of such application, consent, or acquiescence, a trustee or receiver is appointed for Lessee or any subsidiary or for a substantial part of the property of either and is not discharged within sixty (60) days; or under bankruptcy or insolvency law, any dissolution or liquidation proceeding is instituted against Lessee or any subsidiary with Lessee's or such subsidiary's consent or acquiescence or remains undismissed for sixty (60) days.

(b)  Upon the occurrence of any default by Lessee under this Agreement, Lessor shall (except to the extent otherwise required by law) be entitled to:

(i) Proceed by appropriate court action or actions to enforce performance by Lessee of the applicable covenants and terms of the Agreement or to recover damages for breach;

(ii) Terminate Lessee's right to possession of, demand return of, or repossess at Lessee's expense any or all of the Equipment without prejudice to any other remedy or claim;

(iii) Elect to sell any or all Equipment after giving thirty (30) days' notice to Lessee at one or more public or private sales and recover the sum of the Stipulated Loss Values of such Equipment, all rent owed through the rent payment immediately preceding the date of such notice, all costs and expenses incurred in searching for, taking, removing, keeping, storing, repairing and restoring and selling such Equipment, all other amounts owed by Lessee under this Agreement, whether as additional rent, indemnification, or otherwise, and all costs and expenses, including reasonable legal fees, incurred by Lessor as a result of Lessee's default under this Agreement after deducting all amounts received by Lessor in connection with such public or private sales;

(iv) Upon notice to Lessee, receive prompt payment from Lessee of an amount equal to the Stipulated Loss Values of all Equipment not sold by Lessor pursuant to clause (iii) above plus, to the extent not otherwise recovered from Lessee pursuant to clause (ii) above, any rent owed through the rent payment date preceding the date of such notice, all costs and expenses incurred in searching for, taking, removing, keeping, storing, repairing, and restoring such Equipment, all other amounts owed by Lessee under this Agreement, whether as additional rent, indemnification, or otherwise, and all reasonable fees and expenses incurred by Lessor as a result of Lessee's default, provided that upon receipt of payment in full of such amount, Lessor shall transfer title to such Equipment to Lessee;

(v) By notice to Lessee, declare this Agreement terminated without prejudice to Lessor's rights in respect of obligations then accrued and remaining unsatisfied; or

(vi) Avail itself of any other remedy or remedies provided by statute or otherwise available at law, in equity, or in bankruptcy or insolvency proceedings.

(c) The remedies set forth in this Agreement are cumulative. References to additional rent in clause (iii) and (iv) of subparagraph (b) shall include interest at the rate of eighteen percent (18%) per annum to the date Lessor receives any amount payable under said clause from the due date to and including the rent payment date immediately preceding the date on which notice is given under said clause and interest at the same rate on all other costs, expenses, and losses for which Lessor is entitled to payment under said clause to the date Lessor receives any reimbursement from the respective dates Lessor incurs such costs, expenses, and losses.

14. **Applicable Law.** This Agreement shall be interpreted and the rights, liabilities and duties of the parties determined in accordance with the laws of the State of Maryland.

15. **Miscellaneous.**

(a) This Agreement is binding upon the parties and their respective legal representatives, successors and assigns. This Agreement contains the entire agreement between the parties and, subject to the provisions of section 1, may not be amended, altered, or modified, except by a writing signed by the party to be bound.

(b) All notices under this Agreement, including but not limited to billing by Lessor for rental charges and payments by Lessee shall be addressed as follows, unless or until either party gives written notice to the contrary to the other party:

Lessor: Emerald Equipment Leasing, Inc.
101 South King Street
Gloucester City, NJ 08030
Attn.: Arthur Davis
Telefax: 856-742-3250

Lessee: Sea Star Line, LLC
100 Bell Tel Way, Suite 300
Jacksonville, FL 32216
Attn.: Philip V. Bates
Telefax No.: 904-734-3011

All notices shall be in writing and delivered by hand delivery, registered or certified mail, or confirmed telex or telefax.

(c) The provisions of this Agreement are separable and any provisions found upon judicial interpretation or construction to be

prohibited by law shall be ineffective to the extent of such prohibition without invalidating the remaining provisions of this Agreement.

(d) No waiver of any remedy or other right under this Agreement shall operate as a waiver of any other remedy or right nor shall any single or partial exercise of any remedy or right preclude any other or further exercise thereof or any other remedy or right.

IN WITNESS WHEREOF, the parties have executed this Equipment Rental Agreement as of the day and year first written above.

LESSEE:
Sea Star Line, LLC

By: _____
       EVP - Operations
       Title

LESSOR:
Emerald Equipment Leasing, Inc.

By: _____
       Title

02-3523-001e

## EQUIPMENT SCHEDULE "A"

**EMERALD EQUIPMENT LEASING, INC.**

| EQUIPMENT TYPE | DAILY LEASE RATE | DAMAGE EXCLUSION | STIPULATED LOSS VALUE |
|---|---|---|---|
| | $1.00 | $850.00 | $1,000.00 |
| 25' DV | $1.00 | $1,200.00 | $1,500.00 |
| 40' DV | $1.25 | $900.00 | $1,500.00 |
| 45' HV | $1.50 | $950.00 | $1,500.00 |
| 48' HV | $2.00 | $14,100.00 | $4,000.00 |
| 40' RV | $3.00 | | |
| 25' CH | $2.20 | $850.00 | $2,000.00 |
| 40' CH | $3.30 | $850.00 | $2,200.00 |
| 45' CH | $2.40 | $850.00 | $2,300.00 |
| Gen Set | $4.50 | $850.00 | $2,300.00 |

TOTAL P.02