UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

JACKSONVILLE DIVISION

CASE NO. 3:04-CV-146-99HTS

SEA STAR LINE, LLC,
a limited liability company,

    Plaintiff,

-vs-

EMERALD EQUIPMENT LEASING, INC.,
a corporation,

    Defendant.
_____/

**MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

    Filed on March 1, 2004, the Complaint of SEA STAR LINE, LLC ("SEA STAR") against EMERALD EQUIPMENT LEASING, INC. ("EMERALD"), seeks a declaratory judgment with respect to rights and liabilities under an Equipment Rental Agreement dated as of July 31, 2002. Complaint Ex. "G". In its pleading SEA STAR also states claims based on breach of other maritime contracts, open account, and goods delivered and services provided. EMERALD moved to dismiss the Complaint, to transfer venue, or to abstain, arguing that SEA STAR's Complaint is an improper use of the Declaratory Judgment Act, 28 U.S.C.A. §§2201 and 2202, and solely a pre-emptive maneuver in furtherance of SEA STAR's "forum shopping" goal. EMERALD's motion remains pending.

    On March 17, 2004, EMERALD initiated an adversary

proceeding predicated on the Equipment Rental Agreement attached to SEA STAR's Complaint.  SEA STAR then moved to dismiss, stay or abate EMERALD's Complaint in the adversary proceeding.  When the bankruptcy judge heard SEA STAR's motion, she stated:

> I think the initial issue is what jurisdiction the Court has over the current adversary whether it's core or non-core .... And I think that it's clear that this contract dispute, essentially a contract dispute between the parties is not something that arises under Title 11 or could only arise in the context of a bankruptcy case. So it's not a core proceeding, I would have related to jurisdiction over the adversary because it does involve property rights of the debtor but contrasted with that is also a specific provision, 28 U.S.C. 959 that provides that a party that does business with a debtor-in-possession or trustee has the right to file suit regarding that dispute in any jurisdiction.  So it's clear that there is concomitant jurisdiction and I'll assume for the purposes of this decision that Florida has that jurisdiction.  So the question is given that there are two pending cases dealing with the same dispute, one filed by Sea Star in Florida on March 1st, and one filed by the debtor in this court on March 17th, whether or not I should abstain from hearing this dispute, and I think that under the 3rd Circuit's articulation of the first filed rule, that in all cases of concurrent jurisdiction, the Court would first--has possession of the subject must decide it. ...[A]lthough there is discretion in the second court, not to apply that rule, it should be limited to rare or extraordinary circumstances inequitable conduct, bad faith or forum shopping.  There are no allegations of bad faith or inequitable conduct, but there is an allegation of forum shopping.  The debtor asserts that Sea Star, in essence, filed the suit in Florida not because it has a legitimate claim against the debtor, but

> simply to forestall the filing of a complaint by the debtor here and that this is clearly a case of forum shopping. Without going into the merits of the complaint, I don't think facially it is a case of forum shopping, again, because 28 U.S.C. 959 allows Sea Star to commence an action if there's a dispute in any jurisdiction in the country. So on the face of it--and again, given that there is concurrent jurisdiction, I will apply the first filed rule and I will dismiss this action and let the Florida court decide it.

Transcript of Hearing 4-5 (May 27, 2004)(citations omitted)(Dkt. 24, Ex. "A"). On May 27 the bankruptcy court also issued an Order granting SEA STAR's Motion and dismissing the adversary proceeding, as well as EMERALD's Complaint, without prejudice. Subsequently SEA STAR filed a copy of the Order in this case. Dkts. 11, 14.

## UNDISPUTED MATERIAL FACTS

For purposes of SEA STAR's summary judgment motion, the following facts are undisputed:

1. SEA STAR, a Delaware limited liability company, is headquartered in Jacksonville, Florida. As an ocean carrier, SEA STAR transports cargo in interstate commerce. Complaint para. 2.

2. EMERALD, a Delaware corporation, is a named Debtor under Chapter 11 of the United States Bankruptcy Code. At all material times, EMERALD has done substantial business with SEA STAR in the State of Florida, including but not limited to delivery and return of equipment in the Port of Jacksonville, Florida, as well as carriage of equipment as cargo between the Port of San Juan, Puerto Rico and the Port of Jacksonville, Florida and Port

3

Everglades, Florida. Complaint para. 3.

3. In April 2002 SEA STAR entered into an Asset Purchase Agreement, as amended, with NPR, INC. ("NPR"), an EMERALD affiliate, and other named Debtors in proceedings pending under Chapter 11 of the United States Bankruptcy Code. EMERALD and MBC Leasing Corp. ("MBC"), its secured lender, objected to the proposed sale. Among expressed concerns were payments for equipment leased to NPR that would be used for cargo shipments in process at the time of and after closing of the asset purchase ("shipments in process") and storage charges. Having heard arguments on April 26, 2002, the bankruptcy court overruled "the Emerald entities" objections and said any arguable rights would be preserved against the sale proceeds. Complaint para. 4.

4. SEA STAR and NPR representatives agreed to payment and claim procedures and deadlines with respect to shipments in process. When NPR's counsel outlined the plan to the bankruptcy court, he confirmed that components of SEA STAR payments included NPR's projected equipment leasing and financing costs, labor, materials, and other factors involved in transporting shipments in process from origin to destination points. The attorney further acknowledged that NPR might be subject to administrative claims, filed by owners and lessors of equipment used for shipments in process. Complaint para. 5.

5. On April 26, 2002, the bankruptcy court issued an

4

Order Authorizing Sale of the NPR Assets Free and Clear of All Liens, Claims and Encumbrances ("Sale Order"). Overruling all objections that had not been withdrawn, the Sale Order authorized SEA STAR's acquisition of specific NPR assets. SEA STAR had refused to acquire, assume, or accept assignment of any equipment agreements between EMERALD and NPR. As to equipment not purchased or leased by SEA STAR, the Sale Order states in part:

> Buyer [SEA STAR] shall cooperate in removing any such equipment from vessels in transit and store such equipment on leased premises at the final port of destination, to the extent such final destination is a leased premises sold and assigned to the Buyer under the Asset Purchase Agreement. Nothing contained in this Order shall prejudice any of Emerald's rights to seek disgorgement of funds based on any of its claims.
> ...
> After closing of the sale to Buyer, all creditors of the Debtors, whether known or unknown, are hereby enjoined from asserting or prosecuting any claim or cause of action against Buyer or the Purchased Assets to recover on account of any liability owed by the Debtors.

Complaint para. 6, Ex. "A".

6. Closing of the asset purchase occurred early on April 27, 2002. In compliance with the Sale Order, SEA STAR stored equipment located on or returned to premises acquired and leased by SEA STAR at final ports of destination pursuant to the Asset Purchase Agreement. SEA STAR and MBC agreed to a thirty (30) day grace period before storage charges would begin to accrue with respect to MBC and EMERALD equipment. Complaint para. 7.

7. The bankruptcy court later issued an Order allowing MBC to foreclose its security interest in EMERALD equipment. Dated July 22, 2002 but effective as of April 29, 2002, the Order terminated the automatic stay in regard to certain equipment. The Order also authorized MBC to remove equipment from EMERALD's possession and to sell equipment, applying the proceeds to EMERALD's indebtedness to MBC. Complaint para. 9, Ex. "B".

8. Throughout the remainder of 2002 and 2003, MBC controlled decisions communicated to SEA STAR concerning EMERALD equipment. A June 10, 2002 letter from Scott Krieger of MBC to Thomas Holt, Sr. of EMERALD confirmed:

> Any money due from Sea Star for use of any of containers, gensets, and chassis previously leased by Emerald Equipment Leasing to NPR, Inc. and Holt Cargo Systems for a purpose other than completing shipments in progress on April 27 when Sea Star purchased certain assets of NPR and Holt Cargo shall be paid directly to MBC Leasing. Any money due from Sea Star for use of any of the Emerald Equipment to complete shipments in progress on April 27 shall be paid in accordance with the Memorandum that MBC understands exists between Sea Star and NPR, Holt Cargo, and possibly other affiliates to be allocated in accordance with the Bankruptcy Court's ruling on the allocation of proceeds of sale to Sea Star.

Complaint para. 10, Ex. "C". The following day Thomas Holt, Jr. requested that SEA STAR "remit a check in accordance with the attached letter from MBC Leasing, Corp." Complaint para. 10, Ex. "D".

9. In a June 19, 2002 letter, MBC's attorney wrote:

6

> At the hearing on the approval of the sale of assets of Holt Cargo and NPR to Sea Star, MBC sought a temporary restraining order to stop Sea Star from using any of the Emerald Equipment after closing. The Court, however, ruled that as long as Sea Star compensated the Debtors for such use and cooperated with Lessors and secured creditors in recovering their equipment once shipments in progress at the time of closing were completed, Sea Star would be permitted to use assets that it was not purchasing for purposes of completing shipments in process. Lessors and secured creditors were directed to assert their claims for use of their equipment after closing against the monies paid by Sea Star in the hands of Debtors.
> ...
> ...[F]unds due for use of the Emerald Equipment to complete shipments in process at the time of closing should be remitted to the Debtors and any additional funds due for use of the Emerald Equipment after closing should be remitted directly to MBC ....

Complaint para. 11, Ex. "E".

10. In accordance with procedures approved by the bankruptcy court, SEA STAR paid NPR for shipments in process, including equipment expenses. NPR submitted no additional reimbursement claims. In Answers to Interrogatories dated July 9, 2002, NPR acknowledged that "[n]o amount is due to NPR from Sea Star for use of Emerald Equipment being used at the time of Closing" or "for the use of Emerald Equipment located on a vessel purchased by Sea Star at the time of Closing." Complaint para. 8.

11. To induce SEA STAR to pay MBC for use of EMERALD equipment, MBC executed an Indemnity Agreement on September 28, 2002. Complaint para. 12, Ex. "F". SEA STAR then sent MBC a check

7

in the amount of $184,084.93 for *per diem* use of EMERALD equipment from April 27 through July 31, 2002, less storage and handling. Enclosed with the payment were *per diem* self-billing report summaries, corresponding to detailed self-billing reports previously submitted, and detailed invoices for storage and handling. Complaint para. 13, Ex. "F". For succeeding months beginning August 31, 2002, SEA STAR sent MBC and EMERALD self-billing reports reflecting use and purchases of EMERALD Equipment, as well as storage and handling charges. Complaint Ex. "F".

12. After MBC approved the contract form and substance, SEA STAR and EMERALD signed an Equipment Rental Agreement, dated as of July 31, 2002 ("EMERALD Agreement"). Complaint para. 14, Ex. "G"; Emerald Equipment Leasing, Inc. Deposition 106-07 (Dec. 8, 2004)("EMERALD Deposition"). The EMERALD Agreement is a maritime contract pertaining to equipment used in connection with carriage of cargo onboard vessels in maritime commerce. Complaint para. 14.

13. Terms and conditions of the EMERALD Agreement, "cover equipment in use at various times commencing April 29, 2002." Complaint Ex. "G". For each item of equipment, the EMERALD Agreement provides in pertinent part:

> (a) "The lease term for each item of Equipment shall begin on the date when such Equipment is delivered to [SEA STAR] or its agent and shall end on the date when such Equipment is taken off hire pursuant to section 10 ...."
>
> (b) Delivery "shall be effected and evidenced

8

> by signed and dated equipment interchange receipts ...."
>
> (c) SEA STAR shall redeliver equipment to EMERALD at Greenwich terminal, Philadelphia, Pennsylvania; SEA STAR terminal, Puerto Nuevo, San Juan, Puerto Rico; Greenwich terminal, Port of Jacksonville, Florida; or any other location as to which the parties have agreed in writing. At least 72 hours prior to actual redelivery, SEA STAR shall give EMERALD a written estimate of types and quantities of equipment which SEA STAR intends to redeliver at particular ports.
>
> (d) "Upon redelivery of particular Equipment, the receiving terminal will execute an equipment interchange receipt."
>
> (e) "At the time of return, Equipment will be taken off hire; and rental charges will cease." If Equipment is returned with damage exceeding the damage exclusion specified in Schedule "A", EMERALD will inform SEA STAR within 7 days after return.

Complaint Ex. "G", paras. 1, 2, 5, 10(a), 10(b), 10(e); EMERALD Deposition 107-11.

14. After the closing with NPR, SEA STAR on-hired EMERALD equipment not involved in shipments in process on the date SEA STAR's use began. SEA STAR on-hired EMERALD equipment delivered to SEA STAR's premises after shipments in process on the date SEA STAR's use for a new cargo movement began. SEA STAR redelivered on-hired EMERALD equipment in the following manner:

> (a) Philadelphia, PA: On return to the Greenwich receiving terminal and execution of an equipment interchange receipt, also known as a trailer interchange receipt ("TIR"), after SEA STAR's use;

9

(b) <u>San Juan, P.R.</u>: On return to the SEA STAR receiving terminal and execution of an equipment interchange receipt, or TIR, after SEA STAR's use;

(c) <u>Jacksonville, FL</u>: On return to the SEA STAR receiving terminal and execution of an equipment interchange receipt, or TIR, after SEA STAR's use prior to August 1, 2002, as shown by self-billing reports delivered to MBC and EMERALD; on return to the Greenwich receiving terminal and execution of an equipment interchange receipt, or TIR, after SEA STAR's use on and after August 1, 2002;

(d) <u>Other Designated Terminals</u>: On return to the receiving terminal and execution of an equipment interchange receipt, or TIR, after SEA STAR's use or on EMERALD's request to release for sale at inland depots.

<u>Complaint</u> paras. 16, 17; <u>EMERALD Deposition</u> 114-15.

15. In the Port of Jacksonville, no Greenwich terminal existed before August 1, 2002, since Jaxport had seized and locked the terminal after NPR ceased operations. SEA STAR arranged with Jaxport, and MBC paid, to rent acreage for temporary storage of redelivered EMERALD equipment. As of August 1, 2002, Greenwich occupied the former NPR terminal, where EMERALD equipment could be redelivered and stored. <u>EMERALD Deposition</u> 111. EMERALD equipment previously redelivered by SEA STAR and stored on the rented acreage was moved to the Greenwich terminal. <u>Complaint</u> para. 18; <u>EMERALD Deposition</u> 63, 112.

16. EMERALD equipment located on SEA STAR's premises but not on-hired by SEA STAR remained in storage pursuant to the Sale Order and SEA STAR'S agreement with MBC. Throughout 2002 and 2003,

10

MBC and EMERALD continued to utilize SEA STAR facilities for storage of EMERALD equipment that they were trying to sell to third parties. Despite demand EMERALD still has not removed all equipment from SEA STAR's terminal in Puerto Nuevo, San Juan, Puerto Rico. Complaint para. 19. EMERALD has continued to sell equipment located in SEA STAR's terminal during 2004. EMERALD Deposition 257-62 & Exs. 62, 63, 64.

## GOVERNING LAW

Referencing the transcript of the May 27, 2004 bankruptcy court hearing, the Magistrate Judge has observed that "it is far from clear that the [EMERALD] Motion to Dismiss will be granted." Order 2 (Oct 29, 2004)(Dkt. 29). Nonetheless, EMERALD has chosen not to file an Answer *sub judice.* EMERALD's strategy does not preclude the Court's consideration of SEA STAR's summary judgment motion. Fed. R. Civ. P. 56(a).

A.  **Summary Judgment Standard**.

In regard to summary judgment, Rule 56(c) provides in pertinent part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed. R. Civ. P. 56(c).

Applicable substantive law determines what facts are

material.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  *Accord*, Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11 Cir. 1993).  Once SEA STAR has satisfied the movant's initial burden under Rule 56(c), EMERALD must submit evidentiary material showing specific facts as to which genuine issues remain for trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11 Cir. 1997); Lowe v. Aldridge, 958 F.2d 1565, 1569 (11 Cir. 1992).  The Court's focus is on "whether the evidence presents a sufficient disagreement to require submission to a [fact finder] or whether it is so one-sided that one party must prevail as a matter of law."  Allen v. Tyson Foods, Inc., *supra,* at 646, *quoting* Anderson v. Liberty Lobby, Inc., *supra*, at 248.

    B. **Declaratory Judgment**.

Long after EMERALD allegedly terminated the Equipment Rental Agreement, SEA STAR has continued to receive invoices, revised invoices, and re-revised invoices for amounts allegedly due.  Indeed, EMERALD alleges that SEA STAR self-billing reports were grossly understated, and failed to account for numerous pieces of EMERALD equipment.  SEA STAR remains exposed to liability and damage claims for EMERALD equipment outside SEA STAR's possession, as well as equipment left on SEA STAR's premises that is not "on-hire" but that EMERALD has failed to remove.  Complaint para. 19.

Furthermore, the dispute over such equipment affects SEA STAR's affirmative damage claims against EMERALD and its recoupment of overpayments. Complaint paras. 21(d), 21(e).

In regard to declaratory relief, the Supreme Court has explained:

> Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment....

Maryland Cas. Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273 (1941)(citations omitted). *Accord,* Lake Carriers' Ass'n v. MacMullan, 406 U.S. 498, 506 (1972); *see* GTE Directories Publishing Corp. v. Trimen America, Inc., 67 F.3d 1563, 1567 (11 Cir. 1995). Within the ambit of 28 U.S.C.A. §2201, Count I of SEA STAR's Complaint is ripe for a declaratory decision. SEA STAR has alleged

> "facts from which the continuation of the dispute may be reasonably inferred. Additionally, the continuing controversy [is not] conjectural, hypothetical, or contingent; it [is] real and immediate, and create[s] a definite, rather than speculative threat of future injury."

Malowney v. Federal Collection Deposit Group, 193 F.3d 1342, 1347 (11 Cir. 1999), *quoting* Emory v. Peeler, 756 F.2d 1547, 1552 (11 Cir. 1985).

Given the substantial sums in dispute and the parties' contradictory contractual interpretations, the controversy between

13

SEA STAR and EMERALD is indeed "live". United States Fire Ins. Co. v. Caulkins Indiantown Citrus Co., 931 F.2d 744, 747 (11 Cir. 1991). Moreover, as the bankruptcy court already has indicated, SEA STAR's Complaint does not portend piecemeal litigation. Certainly this Court is the appropriate forum to try all issues and to adjudicate the entire controversy. Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Haydu, 675 F.2d 1169, 1173 (11 Cir. 1982).

C.  **Substantive Law**.

"The very underpinning of contract law is the desire to bring certainty to commercial transactions." Institutional & Supermarket Equipment, Inc. v. C&S Refrigeration, Inc., 609 So.2d 66, 69 (Fla. 4 DCA 1992). Thus, the test is objective: "The making of a contract depends not on the agreement of two minds in one intention, but on the agreement of two sets of external signs-- not on the parties having meant the same thing but on their having said the same thing." Robbie v. City of Miami, 469 So.2d 1384, 1385 (Fla. 1985), *quoting* Blackhawk Heating & Plumbing Co. v. Data Lease Fin. Corp., 302 So.2d 404, 407 (Fla. 1974), *and* Gendzier v. Bielecki, 97 So.2d 604, 608 (Fla. 1957). Reading the EMERALD Agreement as a whole, "crystalline and unambiguous language is controlling as to the intention of the parties and thus to the legal effect of the contract provisions...regardless of intention existing in the minds of parties." International Erectors, Inc. v. Wilhoit Steel Erectors & Rental Serv., 400 F.2d 465, 467-68, 469 (5

Cir. 1968), *quoting* Durham Tropical Land Corp. v. Sun Garden Sales Co., 138 So. 21, 23 (Fla. 1931). *Accord,* Robbinson v. Central Properties, Inc., 468 So.2d 986, 988 (Fla. 1985).

Under such circumstances extrinsic evidence is inadmissible: "[T]he intention as expressed by the language employed in the agreement[]...governs, not the after-the-fact testimony of the parties." Bill Heard Chevrolet Corp., Orlando v. Wilson, 877 So.2d 15, 18 (Fla. 5 DCA 2004)(citation omitted). *Accord,* Bombardire Capital, Inc. v. Progressive Mkting. Group, Inc., 801 So.2d 131, 134 (Fla. 4 DCA 2001), *review denied*, 828 So.2d 388 (Fla. 2002) (citations omitted); *see* Rose v. M/V "Gulf Stream Falcon", 186 F.3d 1345, 1350 (11 Cir. 1999)(best evidence of parties' intent); International Erectors, Inc. v. Wilhoit Steel Erectors & Rental Serv., *supra,* 400 F.2d at 469-70 (parol testimony inadmissible). Recently a Florida appellate court summarized:

> It is fundamental that where a contract is clear and unambiguous in its terms, the court may not give those terms any meaning beyond the plain meaning of the words contained therein.... Where the terms are unambiguous, the parties' intent must be discerned from the four corners of the document.... In the absence of ambiguity, the language itself is the best evidence of the parties' intent and the plain meaning controls.

Dows v. Nike, Inc., 846 So.2d 595, 601 (Fla. 4 DCA 2003)(citations omitted); *see* Institutional & Supermarket Equipment, Inc. v. C&S Refrigeration, Inc., *supra* 609 So.2d at 68 (requirement to construe definite words according to their ordinary meaning).

15

Although a party's expectations may have been extant, "expectations do not make contracts." International Erectors, Inc. v. Wilhoit Steel Erectors & Rental Serv., *supra,* 400 F.2d at 469. A court is powerless to rewrite a clear and unambiguous contract, adding terms which the parties expressly omitted or making the agreement more reasonable or advantageous for one of the parties. *Id.;* Dows v. Nike, Inc., *supra,* 846 So.2d at 601. *Accord*, Ernie Haire Ford, Inc. v. Ford Motor Co., 260 F.3d 1285, 1290-91 (11 Cir. 2001). "To hold otherwise would be to do violence to the most fundamental principle of contracts." Institutional & Supermarket Equipment, Inc. v. C&S Refrigeration, Inc., *supra,* 609 So.2d at 69, *quoting* Hamilton Const. Co. v. Board of Public Instruction of Dade County, 65 So.2d 729, 731 (Fla. 1953).

In International Erectors the Fifth Circuit rejected an argument that an agreement inadvertently omitted a requirement that a party fabricate and deliver materials according to certain specifications and in a particular sequence, stating:

> Prudence and perhaps foresight might have insisted that a provision creating such an obligation be included in the written contract but the written memorial of the parties' intention expressly and unequivocally negated any such obligation. This was an armslength transaction between contractors of considerable experience in such matters and we cannot rewrite the contract just because one of the parties would in retrospection had written it differently. The Supreme Court of Florida has frequently and strongly stated that courts are not to rewrite contracts so as to include terms which they think the parties

should have included. International Erectors, Inc. v. Wilhoit Steel Erectors & Rental Serv., *supra,* 400 F.2d at 470.

Examined in light of applicable precepts for contract construction under Florida law, pertinent provisions of the EMERALD Agreement are clear:

1. The Equipment Rental Agreement's terms and conditions "cover **equipment in use** at various times commencing April 29, 2002." Complaint Ex. "G" at 1 (emphasis added).

2. For each item of equipment, the lease term begins on the date when such equipment is delivered to SEA STAR or its agent and ends on the date when such equipment is taken off-hire pursuant to section 10 of the EMERALD Agreement. Complaint Ex. "G", para. 2.

3. Delivery of all equipment "shall be effected and evidenced by signed and dated equipment interchange receipts". The signature of SEA STAR's representative "shall constitute conclusive evidence" that EMERALD has delivered the particular equipoment to which the receipt relates. Complaint Ex. "G", paras. 1, 5.

4. SEA STAR shall redeliver equipment to EMERALD at Greenwich terminal, Philadelphia, Pennsylvania; SEA STAR terminal, Puerto Nuevo, San Juan, Puerto Rico; Greenwich terminal, Port of Jacksonville, Florida; or any other location as to which the parties have agreed in writing. Complaint Ex. "G", para. 10(a).

17

5. "Upon redelivery of particular Equipment, the receiving terminal will execute an equipment interchange receipt." Complaint Ex. "G", para. 10(b). SEA STAR's terminal in Puerto Nuevo, San Juan, Puerto Rico, is a designated receiving terminal. Complaint Ex. "G", para. 10(a).

6. "At the time of return, Equipment will be taken off hire; and rental charges will cease." If equipment is returned with damage exceeding the damage exclusion specified in Schedule "A" to the EMERALD Agreement, EMERALD will inform SEA STAR within 7 days after return. Complaint Ex. "G", para. 10(e).

Thomas J. Holt, Sr., who has testified that he is owner and president of EMERALD, acknowledges that the written EMERALD Agreement governs the contractual relationship between SEA STAR and EMERALD. Thomas J. Holt, Sr. Deposition 15-16, 127 (Jan. 25, 2005). Therefore, SEA STAR is entitled to judgment as a matter of law, holding that the above-described clear and unambiguous provisions bind EMERALD and prohibit efforts to impose duties and conditions other than those specified in the EMERALD Agreement. SEA STAR further requests that the Court declare the contractual rights and obligations outlined in paragraphs 1 through 12 of its Motion for Partial Summary Judgment.

**CERTIFICATE OF SERVICE**

WE HEREBY CERTIFY that a true and correct copy of the foregoing was mailed this 1st day of March, 2005 to **MICHAEL L.**

18

**GORE, ESQ.**, Shutts & Bowen LLP, P.O. Box 4956, Orlando, FL 32802-4956 and **ALAN I. MOLDOFF, ESQ.**, Adelman Lavine Gold and Levin, Suite 900, Four Penn Center, Philadelphia, PA 19103-2808.

S/*Timothy J. Armstrong*

_____
TIMOTHY J. ARMSTRONG
Fla. Bar. No 135859
Armstrong & Mejer, P.A.
Douglas Centre, Suite 1111
2600 Douglas Road
Coral Gables, FL 33134
Telephone 305-444-3355
Telefax 305-442-4300
E-mail amesq@aol.com

liz\05pldgs\03-3621-008