IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

JACKSONVILLE DIVISION

CASE NO. 3:04 CV-146-V-99HTS

SEA STAR LINE, LLC,
a limited liability company,

       Plaintiff,

-vs-

EMERALD EQUIPMENT LEASING,
INC., a corporation,

       Defendant.

_____/

## DEFENDANT EMERALD EQUIPMENT LEASING INC.'S, MEMORANDUM OF LAW IN OPPOSITION TO SEA STAR LINE, LLC'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendant, Emerald Equipment Leasing Inc., by and through its undersigned counsel, hereby files its Memorandum of Law in opposition to Sea Star Line, LLC's Motion For Partial Summary Judgment, stating as follows:

## I.    STATEMENT OF NATURE AND STAGE OF THE PROCEEDING

On March 21, 2001 (the "Petition Date"), Emerald Equipment Leasing, Inc. ("Emerald") filed a voluntary petition for relief under Chapter 11 in the United States Bankruptcy Court for the District of Delaware (the "Delaware Bankruptcy Court"), along with various affiliated entities (collectively, the "Jointly Administered Debtors"). Emerald's primary asset is its interest in a claim against Sea Star Line, LLC ("Sea Star") in an amount in excess of $4,000,000.00 arising from unpaid rental charges due pursuant to a post-petition written lease agreement (the "Rental Agreement") entered into between

Emerald and Sea Star. Sea Star admits that it owes rent to Emerald, but disputes the amount. The Rental Agreement was properly terminated as of November 30, 2003.

In an effort to amicably resolve the dispute over the amount of rent owed by Sea Star, Emerald suggested that the parties attend a settlement meeting. Failing to get any response, Emerald filed a Summons and Complaint on March 17, 2004, instituting an adversary proceeding in the Delaware Bankruptcy Court against Sea Star (the "Bankruptcy Court Litigation"). Unknown to Emerald, however, Sea Star, in a transparent "race to the courthouse", instituted the within proceeding by filing a Summons and Complaint in the United States District Court for the Middle District of Florida (the "Florida District Court") against Emerald (the "Florida Litigation"), seeking in main part, a "declaratory judgment" as to the parties' rights and liabilities under the Rental Agreement and a "declaration of its rights" under a Sale Order entered by the Delaware Bankruptcy Court. At the time the Florida Litigation was commenced, all business dealings between Sea Star and Emerald had ceased.

Sea Star filed a Motion to Dismiss, Stay or Abate Complaint of Emerald in the Bankruptcy Court Litigation (the "Sea Star Motion to Dismiss") invoking the Third Circuit's "first-filed rule" which mandates that an appropriately filed first-filed complaint (i.e., the Florida Litigation filed on March 1, 2004) should proceed rather than a subsequent Complaint (i.e., the Bankruptcy Court Litigation filed on March 17, 2004).[1] Emerald responded to the Florida Litigation by promptly filing a Motion to Dismiss Sea Star's Complaint For Declaratory Judgment, or Alternatively to Transfer Venue or Abstain (the "Emerald Motion to Dismiss"). In its pleading, Emerald disputes the Florida

---

[1] Although the Florida Litigation was filed on approximately March 1, 2004, it was not served on Emerald until March 25, 2004. As such, Emerald was unaware of the Florida Litigation when it filed and served Sea Star with the Bankruptcy Court Litigation on March 17, 2004.

Court's jurisdiction because Sea Star's complaint seeking a "declaratory judgment" is inappropriate since the "declaration of rights" sought by Sea Star pertains to a <u>terminated</u> Rental Agreement and a <u>prior</u> Sale Order. All business activity under the Rental Agreement and Sale Order have long since terminated and therefore there is no danger of further accrual of avoidable damages which would justify a declaratory relief action. The Delaware Bankruptcy Court granted the Sea Star Motion to Dismiss, without prejudice, by Order entered on May 27, 2004, based solely on the Third Circuit's articulation of the "first filed rule", noting that it would "<u>assume</u> for purposes of this decision that Florida has jurisdiction", and that therefore, the Court who "first has possession of the subject must decide it." [emphasis added]. The Bankruptcy Court further agreed that entry of the Order granting the Sea Star Motion to Dismiss based on the "first filed rule" should be <u>without prejudice</u> so that "if the Florida Court determines that it doesn't have jurisdiction or its action should be dismissed, the debtor is free to file here".[2]

Although the Emerald Motion to Dismiss was filed in this Court on April 28, 2004, there has been no disposition of this Motion. Emerald has filed a Notice to the Court Pursuant to Local Rule 3.01(h) and a Second Notice to the Court Pursuant to Local Rule 3.01(h) advising the Court of the outstanding Emerald Motion to Dismiss. Since Emerald has challenged the jurisdiction of this Court, Emerald has not yet been required to file an Answer to the Complaint or its Counterclaim. Within this somewhat unusual procedural context, the pleadings not having been closed (only a Complaint and an unresolved Motion to Dismiss the Complaint having been filed), Sea Star now seeks to proceed with its Motion For Partial Summary Judgment.

---

[2] Clearly, the Delaware Bankruptcy Court made no independent analysis of the merits of the Emerald Motion to Dismiss filed in the Florida District Court, deferring any judgment on that score to the Florida District Court.

3

## II.   COUNTERSTATEMENT OF FACTS

Prior to April 26, 2002, Emerald leased thousands of pieces of equipment used to transport cargo (i.e., containers, chassis and gen sets) to NPR, Inc. (one of the Jointly Administered Debtors). Sea Star purchased certain ships and other assets of NPR, Inc., including NPR's bookings (the "NPR Sale") (Bates 33-35)[3], which sale was approved by an Order entered by the Bankruptcy Court (the "Sale Order") on April 26, 2002 (Complaint Para. 6). As a result of Sea Star's purchase of the NPR assets, Sea Star needed additional equipment to move cargo (Bates 33; 41-48). Accordingly, on or about May 1, 2002, Sea Star and Emerald entered into an agreement (the "e-mail agreement") whereby Sea Star agreed to lease much of the same Emerald Equipment previously leased by Emerald to NPR (Bates 48-52; 62-63). The e-mail agreement was effective as of May 1, 2002, and was applicable to any cargo worthy Emerald equipment (the "Emerald Equipment"), which Sea Star dispatched out of any port terminal or in-land depot for customer use at agreed upon per diems (Bates 50-51). Sea Star commenced using the Emerald Equipment pursuant to the e-mail agreement for a number of months, before the leasing arrangement was formalized in the Rental Agreement executed by the end of September, 2002 (Bates 60-61; 78-79). According to Sea Star's own records, between April, 2002 and August, 2003, Sea Star used 5,482 pieces of Emerald Equipment. (Rooks 47-48).[4]

At the inception of the leasing arrangement between Emerald and Sea Star, the Emerald Equipment was not in Emerald's possession; instead, all of this equipment was in terminals, out to a shipper, or at inland depots or NPR vessels purchased by Sea Star

---

[3] The reference to "Bates ____" is to the deposition transcript of Philip Bates, the Senior Vice President of Operation for Sea Star. The excerpts are attached as Exhibit "A".

[4] The reference to "Rooks ____" is to the deposition transcript of Andrew Rooks, Director of Equipment for Sea Star. The excerpts are attached as Exhibit "B".

4

(Bates 61-63; 102; Florence 40[5]). Moreover, Emerald was not notified when Sea Star commenced using the equipment since no receipt or other document was needed from Emerald before Sea Star could use the Emerald Equipment (Bates 99-100). Under these circumstances, in order to ascertain rental payments due for the Emerald Equipment, Sea Star provided Emerald with monthly "self-billing reports", reporting to Emerald its "usage" of the Emerald Equipment. This was recognized by Sea Star as an unusual procedure made necessary since Sea Star was the only party initially in a position to identify the equipment which it used (Bates 111-112).

Sea Star's obligation to begin paying rent to Emerald for any piece of Emerald Equipment began at the time Sea Star first started to use that equipment, or the "on hire" date (Bates 84, 85, 92; Rooks 8). The only exception to this was with respect to certain equipment which was "in transit" at the time of the NPR Sale. The "in transit" equipment was the Emerald Equipment which was on the NPR ships at sea when the NPR Sale occurred (Bates 62). As part of the closing with respect to the NPR Sale, Sea Star made a payment to NPR for the use of the Emerald Equipment which was in transit on the ships at the time of the NPR Sale (64-65). However, if Sea Star used the "in transit" equipment after the initial transaction, Sea Star was obligated to pay Emerald for that subsequent use (Bates 76-77).

Sea Star has identified the "in-transit" equipment for which it paid NPR (Florence 18-19). Emerald is not charging Sea Star for the rental of this equipment.

Whenever a piece of equipment moves in or out of a terminal gate, a "TIR" or "terminal interchange receipt" should be prepared. A TIR is a type of receipt to be filled

---

[5] The reference to "Florence ____" is to the deposition transcript of Lisa Florence, Fleet Assistant of the Equipment Control Group for Sea Star. The excerpts are attached as Exhibit "C".

out by clerks at the gates of the port terminals. The TIRs were to be given to the port offices at the Sea Star terminal and Sea Star or Sea Star Agency employees were supposed to enter the information into the Sea Star computer system (Bates 87-90; Florence 8). TIRs, however, are not the only document used to evidence "moves" of equipment. Documents other than TIRs that evidence equipment moves include cargo discharge documents, gate logs, ship manifests, and faxes or e-mails from in land depots that would show in bound and out bound gate activity (Rooks 15-18). Any "moves" of equipment, other than return of equipment to Emerald, evidence usage of the Emerald Equipment by Sea Star.

Once a piece of equipment was first used by Sea Star, Sea Star's obligation to make rental payments for that piece of equipment (subject to a 30 day minimum)(Bates 51) continued until that piece of equipment was returned (Rental Agreement at para. 10(e)). Redelivery of the Emerald Equipment under the Rental Agreement was to be made at the following locations: at Greenwich Terminal, Philadelphia, Pennsylvania; Sea Star Terminal, Puerto Nuevo, San Juan, Puerto Rico; Greenwich Terminal, Port of Jacksonville, Florida, or any other location as to which the parties have agreed in writing (Rental Agreement at para. 10(a)). In Puerto Rico, a special section of the Sea Star Terminal was set up for the return and redelivery of the Emerald Equipment. This section was known as the J Lot and/or the "Showroom" (Rooks 11-12).

This procedure in San Juan, Puerto Rico was adopted by Sea Star in order to distinguish between Emerald Equipment still being utilized by Sea Star and equipment it was returning to Emerald. Emerald Equipment utilized by Sea Star at the San Juan terminal moved in and out of the terminal. Emerald Equipment was continually moved to the J Lot when Sea Star determined that they were not going to reuse the equipment

6

(Rooks 11). Once into the J Lot, it was Sea Star's intent not to reuse the equipment (Rooks 12). When Sea Star made a determination not to reuse the equipment and to move said equipment to the J Lot, Sea Star prepared TIRs to be executed by Emerald (Rooks 54-57). According to Sea Star, the movement to the J Lot or the Showroom was so that Emerald could be properly notified of the return of the equipment (Rooks 56-57; 62).

All of the information with respect to the "moves" of the Emerald Equipment was supposedly entered into the Sea Star computer system, known as IQ Ship (Rooks 85-86; 91-92). Sea Star's representatives testified that the date entered into IQ Ship as the "off hire" date for a piece of Emerald Equipment was the date that piece of equipment was actually returned to Emerald (Florence 23, 116). Although the information inputted into IQ Ship was supposedly used for Sea Star's self-billing reports, numerous pieces of Emerald Equipment which should have appeared in IQ Ship, were never inputted. For example, investigations have disclosed that various equipment used by Sea Star as evidenced by ship manifests were not inputted in IQ Ship (Rooks 19-20). Various movement of Emerald Equipment located at inland depots also never appeared on self-billing reports (Rooks 22). Moreover, even when move histories were entered into IQ Ship rental obligations for that equipment did not always appear on self-billing reports (Rooks 40-41). Sea Star, was surprised by the number of errors and omissions in IQ Ship and "self billing" reports (Rooks 49-50).

Sea Star has been conducting an analysis regarding additional money owed to Emerald for Sea Star's use of Emerald Equipment. This effort is ongoing (Rooks 34). An early analysis prepared by Sea Star indicated that it owed approximately an additional $180,000.00 to Emerald for use of Emerald Equipment which did not appear on its self-

7

billing reports (Rooks 34). Interestingly, Sea Star's continuing analysis involves simply a review of its records to locate TIRs which would support only its self-billing reports (Rooks 25; Florence 62-72). Emerald has reviewed the records reflecting "moves" of the equipment which it was able to gather from Sea Star and third parties. These records support Emerald's invoices for unpaid rent and charges owed for equipment used and/or never returned in excess of $4,000,000.00 (Holt Affidavit, para. 4).

## III. ARGUMENT AND AUTHORITY

### A. Sea Star's Partial Summary Judgment Motion Should Be Denied Because This Court Lacks Jurisdiction to Consider The Underlying Complaint And Accordingly The Motion

Emerald filed a Motion to Dismiss the Sea Star Complaint which has not yet been determined. In the Emerald Motion to Dismiss, Emerald argues that Sea Star's Complaint constituted an improper use of the Declaratory Judgment Act and was a clear and unmistakable instance of forum shopping. Declaratory judgment is appropriate only to avoid a situation of continuing avoidable damages. Here, the dispute between Emerald and Sea Star concerns the amount of rent already owed under a leasing arrangement which had been terminated, and therefore does not involve any continuing avoidable damages.

Under such circumstances, an action seeking declaration judgment relief should be dismissed. See Casad Ry. Services, Inc. v. Union Pacific R. Co., 659 F.Supp. 123, 126 (N.D. Ind. 1987), holding that a declaratory judgment action brought by repairer of railroad tracks, rails and accessories, seeking a determination of the parties' rights when the railroad rejected certain repaired equipment, failed to state a cause of action under the Declaratory Judgment Act, and thus required dismissal, where the repairer had been paid

8

for work which it had completed, and <u>no damages were accruing</u> for which repairer might later be held liable.

In an effort to convince this Court that it is seeking a declaratory judgment so as to avoid further accrual of avoidable damages, Sea Star states that it "has continued to receive invoices, revised invoices, and re-revised invoices for amounts allegedly due" under the terminated Rental Agreement (see page 12 of Sea Star's Memorandum in Support of Partial Summary Judgment). Sea Star is well aware, however, that Emerald is revising its invoices as it reviews recently received documents (many of which were exclusively in the possession of Sea Star and only produced as a result of discovery requests) relating to Sea Star's undisclosed use of the Emerald Equipment during the time the Rental Agreement was in effect. In fact, Sea Star itself is accumulating information and re-revising its documentation with respect to the amount of unpaid rent owed to Emerald. Whatever determination is made with respect to the amount of rent owed for Sea Star's use of Emerald Equipment, that obligation has already occurred. It is only the calculation of the rent that is changing, not their accrual.

District Courts are not bound to grant declaratory relief every time it is sought, but instead must carefully weigh equitable considerations, such as whether the suit first filed was initiated merely in anticipation of filing by a defendant in another forum, and determine if the purposes behind the enactment of the Declaratory Judgment Act are served by maintaining the suit at hand. <u>Stack v. Whitney Nat. Bank,</u> 789 F.Supp. 753, 756 (S.D. Miss. 1991), <u>aff'd</u> 958 F.2$^d$ 1078. Where declaratory relief is sought to anticipate trial of an issue in a court of coordinate jurisdiction, the court's discretion to entertain such action should not be exercised. <u>Twin City Feder. Sav. and Loan Ass'n v. Gelhar,</u> 525 F.Supp. 802, 804 (D. Minn. 1981), <u>aff'd</u> 681 F.2d 528.

9

Sea Star's prosecution of this declaratory judgment action is improper and its filing of Partial Motion For Summary Judgment is merely a continuation of Sea Star's inappropriate use of the Florida courts in an action which was wrongfully instituted. Since there is no accrual of avoidable damages, given that the Rental Agreement is no longer in force, this action seeking declaratory judgment serves no legitimate purpose. For the reasons stated in the Emerald Motion to Dismiss, this action should be dismissed. Certainly, and in any event, prior to any consideration of the Sea Star Motion For Partial Summary Judgment, this Court must first dispose of the Emerald Motion to Dismiss. See, Bagwell v. Brannum, 533 F.Supp. 362 (D.C. Ga. 1982). To do otherwise, would only further Sea Star's improper use of this Court.

    **B.**     **Assuming Arguendo That The Sea Star Declaratory Judgment Action Should Not Be Dismissed, Sea Star's Motion For Summary Judgment At This Juncture Should Be Denied As Premature Since The Pertinent <u>Issues Have Not Yet Been Framed By The Pleadings</u>**

In the present procedural posture of this case, the issues between Sea Star and Emerald have not been joined. Since Emerald has questioned the jurisdiction of this Court, Emerald has not yet been required to file an Answer to the Complaint or its Counterclaim. As such, within this framework, Sea Star's Motion For Partial Summary Judgment is, at best, premature.

Sea Star seeks to "frame" the issues for this Court relating to what it perceives to be "Emerald's claims". In so doing, Sea Star presents a myriad of "uncontested facts" and "declarations" which it asserts are germane to Emerald's claims. Of course, all of this is done in a virtual vacuum since no Answer or Counterclaim which would frame the pertinent issues has been filed. Under such a circumstance, consideration of Sea Star's Motion For Partial Summary Judgment should not be given, at least not until the

pleadings are closed. To do otherwise requires this Court to make rulings on Sea Star's request for a declaration of rights and obligations pertaining to a controversy which has not yet been fully articulated or pled. Accordingly, Sea Star's Motion For Partial Summary Judgment is, at best, premature, and should be denied at this time.

> **C.    Assuming Arguendo That The Sea Star Declaratory Judgment Action Should Not Be Dismissed, At The Very Least, Material Issues Of Fact Exist Precluding Sea Star's Motion For Partial Summary Judgment**

The "declarations" Sea Star seeks in its Motion For Partial Summary Judgment are simply its own characterizations of the facts of this case and amount to nothing more than posturing. Sea Star's Motion and supporting Memorandum represent an array of alleged "undisputed material facts", eighteen separate requests for "declarations" of rights and obligations, and a section encaptioned "governing law", none of which appear to be connected in any coherent way. The "undisputed material facts" are for the most part not germane to the "declarations" Sea Star seeks by way of summary judgment. Moreover, the "governing law" which Sea Star refers to in support of its Motion seeking a declaration of rights under the Rental Agreement cites to Florida law when, in fact, the Rental Agreement itself states in paragraph 14 that: "This Agreement shall be interpreted and the rights, liabilities and duties of the parties determined in accordance with the laws of the State of Maryland." In short, Sea Star's Motion, ostensibly filed to clarify the issues, does more to obfuscate than to elucidate.

The primary issue between Sea Star and Emerald relates solely to a determination of rental payments owed for Sea Star's use of the Emerald Equipment. The Rental Agreement involves over 5,000 pieces of equipment. Issues of material fact exist for hundreds, if not thousands, of pieces of equipment regarding the date Sea Star began

using a piece of equipment and the date Sea Star's use of that piece of equipment terminated by its return to Emerald. These factual disputes are easily apparent when Sea Star's self-billing reports are compared to Emerald's invoices and clearly preclude the entry of summary judgment. The "declarations" sought by Sea Star are simply an effort on Sea Star's part to prejudice pertinent findings of fact which must ultimately be made by having this Court now make rulings on perceived rights and obligations in a vacuum totally isolated from the factual background which must necessarily be developed for a complete understanding of the issues presented.

With the foregoing as a backdrop, Emerald responds to each corresponding "request" set forth in Sea Star's Motion[6], as follows:

1. Sea Star seeks a declaration that Emerald's claims are "limited" by the Rental Agreement and the Sale Order. First, there is no dispute whatsoever involving the Sale Order. Sea Star paid NPR for in-transit equipment and Emerald is not charging Sea Star for its use of this equipment. Further, neither party has disputed that the written Rental Agreement is a binding document. Of course, parties to a contract may modify its terms as may be evidenced by their conduct or admissions. Evidence of the parties' course of dealing or admissions except as set forth herein have not been presented as the pleadings remain open. The calculation of Emerald's claims under the Rental Agreement is a factual determination which must be made in a proper factual context. This declaration sought by Sea Star appears to be an improper attempt to limit the contents of Emerald's anticipated Answer and Counterclaim.

---

[6] Sea Star's Motion sets forth twelve separate "requests" that it seeks the Court to "declare". Each separate "request" set forth in the Sea Star Motion will be responded to by their corresponding numbers.

12

2.      Sea Star seeks a declaration with respect to equipment that Sea Star did not use pursuant to the Emerald Agreement after closing of the NPR Sale. Emerald has never invoiced Sea Star for equipment Sea Star never used. This requested declaration is simply irrelevant.

3.      The declaration requested in number 3 of the Sea Star Motion is two fold. First, Sea Star seeks a declaration asserting that it has no responsibility to pay rent while Emerald Equipment was involved in "shipments in process," Assuming the parties are in agreement with respect to the term "shipments in process," Emerald agrees. In that case, there is nothing for the Court to declare. With respect to the commencement date of Sea Star's "on hire" and "rental obligation" for the Emerald Equipment, Sea Star's requested declaration differs both from the testimony of its witnesses, and from the "declarations" it sought in its Complaint.[7] The Motion seeks a declaration that Sea Star's "on hire and rental obligation began when Sea Star signed a TIR for use after completion of a shipment in process." Sea Star's Complaint, however, states that Sea Star's "on hire and rental obligation began when Sea Star signed an equipment interchange receipt or TIR for use – or other written evidence disclosing Sea Star's use at a particular time –after completion of a shipment in process" (emphasis added). Sea Star's witnesses and self-billing reports admit that its obligations to pay rent for Emerald Equipment began whenever it "used" the Emerald Equipment (Bates 84, 85; Rooks 8). Sea Star's requested declaration is wholly disingenuous. Although the Rental Agreement speaks of "delivery" of Equipment to Sea Star at locations agreed to by the parties (see paragraph 5 of the Rental Agreement), in fact, none of the Emerald Equipment was "delivered" to Sea Star. Rather, all of the Emerald Equipment was situated at various locations throughout the

---

[7] See paragraphs 21(b) and 21(c) in the Sea Star Complaint.

13

United States when Sea Star entered into an agreement with Emerald to use that equipment (Bates 61-63). The execution of an equipment interchange receipt or TIR is just one means by which "use" may be evidenced, not the "exclusive" means (Rooks 15-18). Indeed, much of the Emerald Equipment used by Sea Star was located at inland depots (Bates 77) which do not use TIRs. Since Sea Star has admitted that its obligation to pay is determined by Sea Star's use of the equipment and not solely dependent on their unilateral issuance of TIRs, this request for a declaration is a clear example of Sea Star's bad faith.

4.     The comments made with respect to number 3 above are equally applicable to the declaration which Sea Star request this Court to declare in paragraph 4 regarding the commencement date of Sea Star's "on hire" and "rental obligation" for the Emerald Equipment. Emerald's response in paragraph 3 above is incorporated herein. In short, Sea Star's request for declaration of rights set forth in paragraph 4 of its Motion does not accord with the facts of this case, the testimony of its own witnesses or even of its own Complaint.

5.     The declaration that Sea Star seeks in this paragraph has nothing to do with the dispute between the parties which will be apparent to the Court when the pleadings are closed. The dispute between the parties is about Emerald Equipment which Sea Star used and did not pay for. If Emerald Equipment was not used by Sea Star, Sea Star has no responsibility or liability to pay rent for that equipment. Compensation for storage after expiration of a 30 day grace period with respect to Emerald Equipment located and stored in a Sea Star terminal would apply only where Sea Star continued to store the Emerald Equipment and Emerald had notice of the equipment which was being

14

stored. Emerald disputes that it is responsible for the storage of any equipment which it was not aware was being stored by Sea Star.

6.     The declarations sought in paragraph 6 also relate to Sea Star's "on hire" and "rental obligation" for Emerald Equipment.  As previously stated, Sea Star's obligation to pay rent commences when it begins to use the equipment, regardless of where the equipment is located, even if such use includes a return to third parties, such as non-Sea Star depots, shipper pools or shipper warehouses.  Sea Star's efforts to manipulate this Court by confusing the issues with extraneous matters should not be countenanced. If Sea Star used Emerald Equipment, it is liable for the rental obligation for that piece of equipment until returned to Emerald.

7.     The declarations sought by Sea Star in paragraph 7 of its Motion relate to the date on which Sea Star's obligation to pay rent terminates (i.e., the "off hire" date). Emerald would assert in its pleadings that Sea Star's obligation to pay rent terminates when it ceases its use of, and returns the, Emerald Equipment to Emerald. This is in accord with the Rental Agreement, and is consistent with the conduct of the parties and common sense.  To cease its rental obligations, Sea Star had to return the Emerald Equipment to Emerald which could be accomplished at terminals operated by Emerald's agent, being the Greenwich Terminal in Philadelphia, Pennsylvania and the Greenwich Terminal in the Port of Jacksonville, Florida.  In San Juan, Puerto Rico, however, the receiving terminal was Sea Star itself. Sea Star knew that it could not merely deliver the Emerald Equipment to itself, and then claim it was returned to Emerald, so as to terminate rental charges pursuant to paragraph 10(e) of the Rental Agreement. It is for that reason that, in Puerto Rico, a special section of the Sea Star Terminal was set up for the return and redelivery of the Emerald Equipment (the areas known to the parties as the

15

J Lot and/or the Showroom (Bates 168-169; Rooks 11-12). Emerald Equipment was moved to the J Lot when Sea Star determined that they were not going to reuse the equipment (Rooks 11). Once moved into the J Lot, it was Sea Star's intent not to reuse the equipment (Rooks 12). Moreover, when Sea Star made a determination not to reuse the equipment and to move said equipment to the J Lot, Sea Star prepared TIRs to be executed by Emerald (Rooks 54-57). The movement of the Emerald Equipment to the J Lot or the Showroom was so that Emerald could be properly notified of the return of their equipment (Rooks 56-57; 62). Ignoring all of this, Sea Star seeks a declaration from this Court that its obligations to pay rent for Emerald Equipment ended when the equipment was brought into the Sea Star Terminal in San Juan (in effect delivering the equipment to itself, rather than when it was actually returned to Emerald as required by paragraph 10(e) of the Rental Agreement and as recognized by Sea Star's own conduct in setting up the J Lot/Showroom areas for the return of the Emerald Equipment and the preparation of TIRs in connection therewith.) Finally, the request for declaration found in paragraph 7(d) of the Sea Star Motion, is not supported by Sea Star cites to either the Rental Agreement or the record. This requested declaration has no basis either in the record currently before the Court.

8.      In paragraph 8 of its Motion, Sea Star asks this Court for a declaration that it has no responsibility or liability for equipment damage claims not reported by Emerald within seven days after redelivery. Under Sea Star's current interpretation of the Rental Agreement, Sea Star could "redeliver" the Emerald Equipment to itself at the Sea Star Terminal in San Juan, Puerto Rico, thereby triggering the seven day period for Emerald to notify Sea Star of damage claims on equipment which Sea Star redelivered to itself. Paragraph 10(e) states that the lessor (Emerald) will inform lessee (Sea Star) of damage

16

claims within seven days after "return" of the equipment. Any common sense reading of this provision requires a finding that the equipment be returned to Emerald, not simply redelivery to Sea Star itself.

9. In paragraph 9, Sea Star asks this Court to declare that it has no responsibility or liability for "lost equipment claims", unless such equipment was not involved in shipments in process and a signed equipment interchange receipt or TIR discloses Sea Star's use on or after April 29, 2002. Sea Star provides no support in either the Rental Agreement or the record for seeking such a declaration. If Sea Star used Emerald Equipment (regardless of a TIR being completed) and failed to return that equipment, such non-returned equipment constitutes "lost equipment" entitling Emerald to make a claim for the stipulated loss value.

10. The issues in paragraph 10 of Sea Star's Motion are identical to the issue raised in paragraph 3 of Sea Star's Motion and Emerald's response is the same. The issue regarding "shipments in process" is simply not relevant to this dispute.

11. In paragraph 11 of Sea Star's Motion, Sea Star asks this Court to declare that Emerald is liable to pay Sea Star for storage of Emerald Equipment on Sea Star premises. This bare assertion makes no reference to what equipment Sea Star is referring. All of the equipment should have been returned by Sea Star to Emerald at the time the Rental Agreement was terminated. Emerald denies it is liable to pay Sea Star for storage of Emerald Equipment on Sea Star premises, except to the extent that Emerald was made aware that such equipment was being stored by Sea Star prior to termination of the Rental Agreement.

12. In paragraph 12 of Sea Star's Motion, Sea Star asks this Court to declare that Emerald is obligated to effect immediate removal of all Emerald Equipment from

Sea Star's premises. Sea Star has provided no support for such a declaration, either in the record or in fact. As stated above, Sea Star should have returned to Emerald all of the Emerald equipment at the time the Rental Agreement was terminated. If such equipment was not returned, Emerald contends that such equipment may be treated at this time as "lost equipment" for which Sea Star owes Emerald the stipulated loss value (see paragraph 10(f) of the Rental Agreement).

Finally, Sea Star asks this Court for judgment, as a matter of law, holding that six separate provisions of the Rental Agreement identified in pages 17-18 of Sea Star's Memorandum are clear and unambiguous provisions which bind Emerald and prohibit efforts to impose duties and conditions other than those specified in the Rental Agreement. To the extent the provisions are construed in the manner set forth above by Emerald in the preceding sections of this Memorandum, Emerald would agree that those Rental Agreement provisions are clear and unambiguous which bind Sea Star and should prevent Sea Star from an interpretation different from their clear meaning; i.e., that equipment is "on hire" by Sea Star when it commences use of that equipment and "off hire" when that equipment is returned to Emerald. Those "on hire" dates and "off hire" dates define and set the parameters for Sea Star's obligation to pay rent to Emerald. Any other reading of the Rental Agreement would produce an absurd result defying common sense.

Under Maryland law[8], courts should avoid reading a contract in a way that produces an absurd result, especially when a reasonable interpretation is available. Acarom, PLC v. Howard County, Md., 981 F.Supp. 379, 386 (D.Md. 1997). Where one

---

[8] The Rental Agreement provides that it should be interpreted in accordance with the laws of Maryland. Sea Star's Memorandum improperly cites only to Florida law in its analysis of the Rental Agreement provisions.

18

construction makes provisions of an agreement unusual or extraordinary and another construction which is equally consistent with the language employed, would make it reasonable, fair and just, the latter construction must prevail. FDIC v. Prince George Corp., 58 F.3d 1041, 1046 (4th Cir. 1995). At bottom, common sense underlies principals of contract construction under Maryland law. B&P Enterprises v. Overland Equipment Company, 133 Md. App. 583, 758 A.2d 1026 (2000). Accordingly, just as courts seek to avoid far fetched interpretations of statutes, courts also wish to avoid interpreting contract language in a manner that is void of a common sensible prospective. Estate of Fister v. Allstate Life Insurance Company, 366 Md. 201, 783 A.2d 194 (2001). As such, a court's interpretation of a contract should not permit an absurd or unreasonable result. Middlebrook Tech, LLC v. Moore, 157 Md. App. 40, 849 A.2d 63 (2004).

Moreover, to the extent that the cited provisions from the Rental Agreement may be vulnerable to more than one meaning by a reasonably prudent person, such contract is deemed ambiguous under Maryland law. In re Ashby Enterprises Ltd., 250 B.R. 69, 73 (Bkrtcy D.Md. 2000). Under such circumstances, when a question arises as to the intent of the parties to the contract, a court, in attempting to resolve this question, may consider various extrinsic evidence including the circumstances surround the execution of the contract, the parties' own construction of the contract, and the conduct of the parties. In re Ashby Enterprises, supra at page 73. Accordingly, a court, under Maryland law, in construing a contract must first determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated; where the language is ambiguous, a court must then determine the intent and purpose of the parties at the time the contract was made, considering the circumstances

19

and conditions affecting the parties at that time, and their subsequent conduct and construction of the contract. <u>Anne Arundel County v. Crofton Corporation</u>, 286 Md. 666, 410 A.2d 228 (1980).

In this case, Sea Star's pleadings assert that the parties differ in their interpretation of the contract provisions. Although their witnesses and documents evidence no material difference from Emerald's understanding of the Rental Agreement. In determining a motion for summary judgment, the district court must view all evidence most favorably toward the non-moving party, and all justifiable inferences are to be drawn in the non-moving party's favor. <u>Whatley v. CNA Ins. Cos.</u>, 189 F.3d 1310, 1313 (11th Cir. 1999). the Court may not decide a genuine factual dispute at the summary judgment stage. <u>Fernandez v. Bankers National Life Ins. Co.</u>, 906 F.2d 559, 564 (11th Cir. 1990). At best, at this juncture of the case, this Court can only deny Sea Star's Motion For Summary Judgment.

## V.   RELIEF REQUESTED

Based on the foregoing reasoning and legal authorities, Emerald respectfully requests that this Court deny Sea Star's Motion For Partial Summary Judgment in all respects.

**SHUTTS & BOWEN LLP**
300 S. Orange Ave., Suite 1000
Orlando, Florida 32801-3373

Mailing Address:
P.O. Box 4956
Orlando, Florida 32802-4956
Phone: (407) 423-3200
Fax: (407) 425-8316

By:  /s/ Michael L. Gore
     Michael L. Gore
     Florida Bar No. 441252
     Joey E. Schlosberg
     Florida Bar No. 0079685

          - and -

     Gary M. Schildhorn, Esq.
     Alan I. Moldoff, Esq.
     **ADELMAN LAVINE GOLD AND
     LEVIN**
     A Professional Corporation
     Suite 900, Four Penn Center
     Philadelphia, PA 19103-2808
     Phone: (215) 568-7515
     Fax: (215) 557-7922
     **Attorneys for Defendants**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 9th of March, 2005, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Timothy J. Armstrong, Esq.
Armstrong & Mejer
2600 Douglas Road
Suite 1111, Douglas Center
Coral Gables, FL 33134

                                        /s/ Michael L. Gore
                                        Of counsel

ORLDOCS 10310471 1