**EXHIBIT "B"**

```
 1              IN THE UNITED STATES DISTRICT COURT
                   MIDDLE DISTRICT OF FLORIDA
 2

 3                    CASE NO.:  3:04-CV-146-V-99HTS

    SEA STAR LINE, LLC,
 4  a limited liability company,
                                    ORIGINAL
 5              Plaintiff,
           vs.
 6

    EMERALD EQUIPMENT LEASING, INC.,
 7  a corporation,

 8              Defendant.
    -------------------------------
 9

10              Deposition of ANDREW ROOKS, taken on behalf

11  of the Defendant, pursuant to Notice of Taking Deposition

12  in the above-entitled action, on Friday, January 14,

13  2005, at 9:10 a.m., at the office of Powers Reporting,

14  220 East Forsyth Street, Jacksonville, Florida, before

15  Susan Taylor, a Court Reporter and a Notary Public in and

16  for the State of Florida at Large.

17

18

19

20

21

22

23

24

25
```

1    taking any particular equipment as an example?

2              MR. ARMSTRONG:  Object to the form.

3         A    Well, the date of the agreement, I think, was

4    effective April 29th of 2002.

5         Q    And when would you begin incurring rental

6    charges with respect to any particular piece of

7    equipment?

8              MR. ARMSTRONG:  Object to the form.

9         A    Once we -- under the terms of the agreement,

10   once we used the equipment to move cargo is when we

11   consider the equipment to start -- you know, coming on

12   the clock.

13        Q    Does the term on-hire, is that meaningful to

14   you?

15        A    Yes.

16        Q    Okay.  And is that what you mean when you say

17   on the clock, on-hire?

18        A    Yes.

19        Q    If you move the equipment for reasons other

20   than to move cargo, repositioning empties, would that

21   start the on-hire period?

22        A    If we move the equipment and reposition an

23   empty after we had on-hired it, used it, we would be

24   responsible for that per diem on that equipment till we

25   terminated -- until it was terminated.

1    A  In general, yes.

2    Q  Is it a term that you use in your business?

3    A  Yes.

4    Q  With respect to this lease if any of the

5 Emerald equipment was idle, did that impact on the

6 charges being incurred by Sea Star for use of the

7 equipment?

8       MR. ARMSTRONG:  Object to the form.

9    A  Not necessarily.

10    Q  Does the term J lot mean anything to you?

11    A  Yes.

12    Q  What does that mean to you?

13    A  The J lot was an area on our terminal in San

14 Juan where we would reposition and store the Emerald

15 equipment after it came in our gate once we determined we

16 were not going to reuse it.

17    Q  Does the term showroom lot mean anything to

18 you?

19    A  Yes.

20    Q  What does that mean?

21    A  The showroom was a lot just adjacent to our

22 terminal in San Juan where we returned Emerald equipment.

23    Q  Is there a difference between the J lot and

24 the showroom lot other than the physical -- physically

25 where they are?

```
 1          A    No, not really.

 2          Q    Is it your testimony that all equipment that

 3     went into the J lot once it went there was never again

 4     used by Sea Star?

 5               MR. ARMSTRONG:  Object to the form.

 6          A    That was the intent.

 7          Q    Do you know if in practice that was what

 8     occurred?

 9          A    The intent was to move the equipment over to

10     the J lot and the intent was not to use it again.

11          Q    I'll show you a document that was marked as

12     Defendant's Exhibit 14.  This is an e-mail from Lisa

13     Florence to you.

14          A    Okay.

15          Q    The list of equipment -- assume that the list

16     of equipment that's here had been used by Sea Star.  When

17     she says these should be moved to J lot for off-hire,

18     does the movement to J lot in and of itself terminate Sea

19     Star's obligation to pay rent for the equipment?

20               MR. ARMSTRONG:  Object to the form.

21          A    If we had used this equipment and were

22     responsible for per diem charges then by moving to the J

23     lot would nothing more -- would mean nothing more than

24     just moving it off of our main terminal and getting it

25     over to the J lot to ensure that we wouldn't use it
```

1    because of the sequence of the -- the way the IQSHIP

2    program is configurated.

3        Q    So what would happen to a piece coming into

4    the gate that -- where there wasn't an on-hire move

5    preceding it?

6        A    Well, we had to force an on-hire move and

7    then a minute later force the received -- empty order

8    receive, full move, into the computer.

9        Q    What type of moves would create an entry into

10   the IQSHIP system?

11       A    A received empty move, a received full move.

12       Q    How about the other way, gate outs?

13       A    Yes, a gate out move, sent out, empty, sent

14   out full move.

15       Q    With respect to just the gates in, gates out,

16   would there be a TIR for each of those moves?

17       A    There should be, yes.

18       Q    Are there other documents other than TIRs

19   that evidence equipment moves?

20       A    Yes.

21       Q    I'm going to show you a document and ask you

22   if you can tell me what that is.

23       A    This is a cargo discharge document from one

24   of the stevedore's in San Juan.

25       Q    Is that a document that would be created for

```
 1   Sea Star's usage?

 2        A    Yes.

 3        Q    And does that document indicate Emerald

 4   equipment being used?

 5        A    Yes.  I see some Emerald equipment on here.

 6        Q    And is that the type of document that could

 7   also evidence the usage of Emerald equipment by Sea Star?

 8        A    Yes.

 9        Q    How would that information be inputted into

10   the IQSHIP?

11        A    Well, without looking at the individual

12   history of these units, hopefully, if these units were --

13   hopefully, these units were on-hired in our system before

14   the -- if they, indeed, were used by Sea Star, but before

15   they were discharged off this vessel.  And then the

16   particular move whether it's a discharge or sent forward

17   or a reposition move would be subsequent to that based on

18   this document.

19        Q    Is there a procedure established at Sea Star

20   to review these documents as they're received in order to

21   assure that the equipment usage has been recorded in the

22   IQSHIP system?

23        A    Yes.

24        Q    Who at Sea Star would be obligated to make

25   that review?
```

1        A    For this particular document, it would have

2  been our equipment folks in San Juan.

3        Q    Who is there?

4        A    It's headed up by Ricardo Diaz.

5        Q    Do you recall ever receiving reports from

6  Mr. Diaz indicating that he is located equipment, that it

7  was being moved, but not in the IQSHIP system?

8        A    I can't recall.

9        Q    We have looked at TIRs and we've looked at

10  load discharge summaries, are there -- is there any other

11  type of document that Sea Star would receive which would

12  indicate a move of equipment?

13        A    Yes.

14        Q    What other documents might there be?

15        A    We were using gate logs, for example, out of

16  our facility up in Elizabeth, New Jersey.

17        Q    Was there a person responsible for inputting

18  the information from gate logs into the IQSHIP system?

19        A    Yes.

20        Q    Who was that?

21        A    Early on George Cervone was at that facility

22  and also Frank Pagano, P-a-g-a-n-o.

23        Q    Were there other documents used by Sea Star

24  to evidence usage of equipment?

25        A    We would receive faxes or e-mails from our

1  inland depots that would show inbound and outbound gate

2  activity for that particular day.

3       Q    Any other documents?

4       A    I can't think of any more.

5       Q    Would a ship manifest indicate usage of

6  Emerald equipment?

7       A    Sure.

8       Q    And did Sea Star regularly review ship

9  manifests to determine whether the equipment recorded on

10 the manifest was in the IQSHIP system?

11      A    If it was on the manifest it would have been

12 in the IQSHIP system.

13      Q    Could you explain -- if I showed you examples

14 where they're on the manifest but not in the self-billing

15 reports, would you have an explanation for that?

16      A    Possibly.  I'd have to look at them.

17      Q    I'll show you what was marked as Florence 10,

18 11, 12, and 13.  It's at the bottom of the pile right in

19 front of you.

20      A    10 --

21      Q    11, 12, and 13.

22      A    Thank you.  Okay.

23      Q    And I will represent to you, so that I can

24 save you some time, that this is a ship manifest.  The

25 highlighted items are Emerald equipment that appear on

1   the ship manifest for both the northbound and southbound

2   voyage of the ship in question.  And behind that are your

3   self-billing reports for the two-month period covered by

4   the ship manifest.

5       A   Okay.

6       Q   If you'll assume for me that we have

7   accurately reviewed these and that these pieces of

8   equipment are not on the self-billing report, even though

9   they are on the ship manifest, could you tell me how that

10  could have occurred?

11          MR. ARMSTRONG:  Object to the form.

12      A   Again, without looking at the history of the

13  unit and assuming that you guys have done that research,

14  I don't have a particular explanation on this other than

15  it possibly was missed.

16      Q   Well, how could it be missed?  Because wasn't

17  your testimony that any piece of equipment that got on a

18  ship would have to have an entry into the IQSHIP system?

19      A   Could have had an entry into IQSHIP if it was

20  inputted in the IQSHIP system at the time of on-hire

21  improperly.  The proper documentation required for the

22  inputting of the on-hire wasn't done properly, then that

23  unit would not have, for lack of a better word, spit out

24  when the self-billing report was run against Emerald.

25      Q   Any other explanation?

1           MR. ARMSTRONG:  Object to the form.

2      A    No, not that I can think of.

3      Q    Have you or anyone under your command going

4  through ship manifest to see if Emerald equipment has

5  been -- let me rephrase that.

6           Have you personally or have you directed

7  anyone to review ship manifests for the period covered by

8  the equipment rental agreement to see if the IQSHIP

9  system has included all usage of Emerald equipment?

10     A    Yes.

11     Q    When was that done?

12     A    We did -- I did an analysis and it was in the

13  fall of '03.  I can't recall the exact date.

14     Q    What exactly was done?

15     A    We had run load summaries from April 27th

16  through, I believe, August -- April 27th of '02 through

17  August of '03, and tried to determine which Emerald-owned

18  units were on those manifests -- excuse me, on those load

19  summaries.  And we did a little analysis to determine if

20  there were units that we missed, if there's units that we

21  didn't pay for that we possibly should have, things of

22  that nature.

23     Q    What did the analysis reveal?

24     A    There were some monies owed based on our

25  findings.  I'm not sure what the final dollar amount was,

1  you have it somewhere.

2      Q    You've used the term load summary and ship

3  manifest almost interchangeably in your answer, is there

4  a difference between those documents?

5      A    You said ship manifest, I was saying load

6  summary.  There's a slight different, yes.  The load

7  summaries -- yes, there's a difference.

8      Q    What is the difference?

9      A    The load summaries are an equipment report

10  that shows all the equipment whether it's empty or load

11  moved on those particular vessels.  It's more of a

12  condensed version of a manifest that's used by

13  equipment --

14      Q    What was it that you reviewed, the load

15  summary or the ship manifest?

16      A    The load summaries.

17      Q    I'll show you what was marked as Florence 1.

18  It's right there.

19      A    Yes.

20      Q    Do you recognize this document?  I will tell

21  you that Lisa Florence identified this as summary sheets

22  from a self-billing report.

23      A    Yes.  These are the front page of the

24  detailed self-billing report that we sent to you.

25      Q    Would you look at the third page, please.

1          A     Yes.

2          Q     Do you see the last entry, inland depots?

3          A     Yes.

4          Q     Can you explain why no inland depot moves

5     appear on any of the preceding summary pages?

6          A     No, I cannot.

7          Q     From your experience, were there inland depot

8     moves between the period of April 27th through May 31st

9     with respect to Emerald equipment?

10              MR. ARMSTRONG:   Object to the form.

11         A     I would presume there would have been.

12         Q     Is this another example where IQSHIP may not

13    have had the information in order to create a

14    self-billing report?

15         A     That could be one example.  Another -- that

16    could be one example.  I don't know if this inland depot

17    on June -- I don't know if this was -- these amounts, if

18    it's -- if it -- if the summary -- if the actual billing

19    period is June 1st or June 30th.  Any one of these units,

20    whether it's inland depots or other locations, could be

21    dollars that are owed going back to when we realized we

22    did on-hired in the middle of May or end of May or

23    something like that, that would be in the detail.

24         Q     In any of your reviews of your self-billing,

25    did you find examples where inland depot moves had not

1      A     We had asked him to find the supporting

2 documents for the equipment that constituted our on-hire

3 and/or our off-hire report.

4      Q     Do you know what he's been doing in order to

5 accomplish that task?

6      A     He's been going through our TIR files in our

7 office in Jacksonville to try to find these documents.

8      Q     Anything else?

9      A     No.

10      Q     Does he have access to IQSHIP?

11      A     No.

12      Q     Does he -- is he reviewing documents that are

13 located anywhere else other than Jacksonville?

14      A     We had the TIR documents in San Juan sent to

15 Jacksonville, so he was reviewing those TIR files. We

16 had the gate logs from Elizabeth, New Jersey sent down to

17 us, so he's been reviewing the gate logs. We had the --

18 the e-mail notification from the inland depots or the

19 faxes from the depots, he's been reviewing those -- those

20 documents.

21      Q     At the time of the MPR acquisition, you held

22 the same position with Sea Star that you do today?

23      A     Yes.

24      Q     Were you asked to consider how much equipment

25 Sea Star would need in order to operate the ships it was

1   that you've learned from your review of your own

2   documents?

3             MR. ARMSTRONG:  Object to the form.

4      A   No.  I mean, it's what we think is factual

5   information.

6      Q   Do you recall whether the report reached the

7   conclusion as to whether or not additional money was owed

8   to Emerald?

9      A   Yes, it did.

10     Q   Do you recall how much?

11     A   No, I do not.  It's still actually ongoing,

12   but, no, I do not recall.

13     Q   Do you recall your last -- let me rephrase

14   that.

15            What was the last amount you recall seeing as

16   being owed to Emerald?

17             MR. ARMSTRONG:  Object to the form.

18     A   If I'm -- if -- if it's something I'm doing

19   on behalf of counsel, am I allowed -- can I state that?

20   Okay.  I want to say --

21             MR. ARMSTRONG:  Don't guess.  If you recall,

22         don't guess.

23     A   I want to say I saw a number of $180,000.

24     Q   Has the updated version of Florence 7 been

25   produced in response to discovery requests?

1   was there a conclusion that an additional $157,215 was

2   due and owing?

3          A      Yes.

4          Q      There's a report that's part of this Exhibit

5   that comes right behind the first report, do you see

6   that?

7          A      Yes.

8          Q      And at the bottom it says page 1 of 12?

9          A      Yes.

10         Q      What is this report?

11         A      This was the more detailed report listing.

12  The actual unit number showing the number of days and the

13  per diem and the total amount.

14         Q      Would it be fair to say each and every piece

15  of equipment that's on this portion of the Exhibit was

16  not found in IQSHIP?

17         A      It was in IQSHIP, it was not on self-billing

18  reports.

19         Q      Can you explain how these units could have

20  been in IQSHIP and not appear on the self-billing

21  reports?

22         A      Yes.  Again, as I mentioned earlier, when we

23  on-hire a document -- excuse me.  When we on-hire a piece

24  of equipment certain information has to be inputted into

25  IQSHIP that refers to the leasing company, a release

1  reference code, things of that nature.  If that -- if
2  that information is not input correctly, when the
3  self-billing report is run, you're asking for that
4  particular companies account code, if it was not on-hired
5  properly, then when the self-billing report is generated,
6  it's going to miss units that were brought into the
7  system against a flawed or a wrong reference code.

8      Q    Are you're talking about a release reference?

9      A    Yes, thank you.  Yes.

10          MR. SCHILDHORN:  Off the record.

11          (Off-the-record discussion.)

12  BY MR. SCHILDHORN:

13      Q    Have you seen an updated version of this

14  portion of Cervone 16?

15      A    No, this is the only one we ran.

16      Q    Was there a minimum time period for the

17  rental of each piece of Emerald equipment pursuant to the

18  equipment rental agreement?

19      A    Yes.

20      Q    Was that 30 days?

21      A    Yes.

22      Q    Do you know why in calculating the amount

23  owed for certain pieces of equipment a period of time of

24  less than 30 days was used?

25      A    No.

```
 1    above and beyond what they had claimed on their
 2    spreadsheets.  We did an analysis and determined that,
 3    yes, we possibly owe you -- them X amount of dollars more
 4    on the claim analysis.  We did the -- the study on the
 5    load summaries to determine was there possibly more money
 6    we would owe them that -- that had not been claimed by
 7    Emerald on their claim analysis, so we were kind of
 8    separating the two.  We knew we possibly owed money under
 9    the claim analysis above and beyond that we provided this
10    report internally to see if there was more money that
11    would be due to them that had not already been reported
12    under the claim analysis.
13         Q    Okay.  And after the 70 page, there's another
14    chart, what does that show?
15         A    That's a chart that showed a breakdown by
16    unit -- excuse me, by comments with the amount of units
17    that were represented on those comments.
18         Q    There's a total units of 5,482.
19         A    Yes.
20         Q    Does that represent the total units on all --
21    of everyone's units on the ship or just the Emerald
22    equipment?
23         A    Just the Emerald equipment that sailed on
24    those vessels from April of '02 to August of '03.
25         Q    What does the next report show, 1 of 84?
```

1    A    This was the actual analysis.  There was a

2    breakdown by voyage and it listed the unit numbers, the

3    Emerald units that sailed on that voyage, and then out to

4    the right, the comment's that represented those units.

5    This was more of an analysis done by voyage with the unit

6    numbers in the comments.

7        Q    Okay.  In the middle of the page, there's an

8    indication that there's an amount due, but there's no

9    comments to the right, do you see that?

10       A    Yes.

11       Q    What does that indicate?

12       A    I believe you're referring to PRMU, the unit

13   number on the Giam (phonetic) of 583 North.

14       Q    Yes.

15       A    PRME 220058, check 2.  There's an on-hire day

16   of April 30th, off-hire date of July 3rd.  We indicated

17   no amount was due, under comments indicated first voyage

18   paid to MPR.

19       Q    I'm actually looking down further where you

20   show an amount due but no comments.

21       A    Okay.

22       Q    What does -- what do those entries indicate?

23       A    There's a total amount due.  We didn't put a

24   comment, but basically that meant that we owed that money

25   to Emerald.

1      Q    Does it mean it was on the self-billing

2  report or not on the self-billing report?

3      A    It was not on the self-billing report.

4      Q    Was it on the claims analysis or not on the

5  claims analysis?

6      A    It was not on the claims analysis.

7      Q    And if you show less than 30 days usage,

8  that's in error and should be corrected?

9      A    That's an error and it should have been

10  corrected, yes.

11      Q    Looking at page 3 of 84. And there's a large

12  number of units that were not on a self-billing report,

13  were not on the claims analysis, are these units that

14  were in IQSHIP?

15      A    Yes.

16      Q    And is your explanation as to why they are

17  not on the self-billing report what you said there, was

18  an input error when the information was being put into

19  IQSHIP?

20      A    I believe that's the case.

21      Q    Are you surprised by the number of units that

22  were not in your self-billing reports?

23      A    I was -- yes, I was a little surprised,

24  especially this one voyage. I do remember seeing --

25  there's a lot of reefers on here and I was fairly

1   surprised that a lot of these reefers did not show up.

2   If you look at the on-hire dates, it's May 1st, May 2nd,

3   May 3rd when we had a -- just a huge influx of equipment

4   coming in and being utilized.  So possibly through input

5   error and keypunch error a lot of that stuff was not

6   input correctly and, therefore, not submitted on the

7   self-billing reports.

8       Q    Did you come up with any other explanation as

9   to why so many units were not included?

10      A    No.

11      Q    At the conclusion of that report, page 84 of

12  84, there's a grand total number of units, 5,482 --

13      A    Yes.

14      Q    -- that's the number of Emerald units that

15  were on those ships; is that correct?

16      A    Yes.

17      Q    And the total is what this report at this

18  time shows might be due and owing for -- with respect to

19  uses of equipment not appearing on the self-billing

20  report or the Emerald claim analysis?

21      A    That's correct.

22      Q    Would you look at Florence 14.  Can you

23  identify that?

24      A    Yes.  This is another -- we didn't already do

25  this?  This isn't 7 also?  Sorry.

```
 1    serious effort in off-hiring the equipment, what were
 2    they supposed to do?
 3         A    Locate the equipment on the facility, advise
 4    me that they had it, and, in turn, I would advise Emerald
 5    that we were going to return the equipment to the agreed
 6    upon facilities per the contract.
 7         Q    And were they also to get an executed TIR
 8    upon the return to Emerald?
 9         A    Yes, that was the intent.
10              MR. SCHILDHORN:  Off the record for a minute.
11              (Off-the-record discussion.)
12    BY MR. SCHILDHORN:
13         Q    Going back to Exhibit 3, the last page,
14    there's a grand total of units of 1,362, do you see that?
15         A    Yes.
16         Q    How does that compare with the figure you had
17    in your e-mail?
18         A    I state in my e-mail, today we have
19    approximately 2,000 units, to be quite truthful, I'm not
20    sure where I came or why I came up with that number of
21    2,000 units.
22         Q    What is this exhibit that's attached?
23         A    This is a cover page for a self-billing
24    report that we sent to Emerald in July of '02.
25         Q    And this was --
```

1      A    For a period in July of '02.

2      Q    You're talking about the -- just the page

3  with the figure of 1,364?

4      A    Yes.

5      Q    The pages that precede that with the

6  equipment numbers on them --

7      A    Yes.

8      Q    -- what's that supposed to be?

9      A    This is the -- a listing of units that we had

10  purchased or were in the process of purchasing from

11  Emerald, so I believe I included this in the e-mail just

12  so they wouldn't obviously try to terminate this

13  equipment because we were in the process of buying it.

14      Q    Under the equipment rental agreement, was Sea

15  Star under an obligation to return to certain ports

16  equipment you no longer wanted to use?

17      A    Yes.

18      Q    Did there come a point in time when Emerald

19  offered to relieve Sea Star of that obligation with

20  respect to certain units they thought they could sell?

21      A    Yes.

22      Q    And, in fact, did Emerald sell units from

23  locations other than the locations they were supposed to

24  be returned to?

25      A    Yes.

1        Q       And did that effort by Emerald save Sea Star

2    money?

3                MR. ARMSTRONG:   Object to the form.

4        A       Yes.

5        Q       I'll show you what was marked as Bates -- I

6    think I'm going to show it to you,  Okay.  It's Bates 13.

7        A       I'm familiar with this, yes.

8        Q       Can you identify this for me, please.

9        A       It's an e-mail -- a series of e-mails, it's

10   an e-mail to my folks -- you know, Sea Star employees

11   discussing enclosed e-mails that Emerald representatives

12   that were in San Juan had made some comments in some

13   instances, so I forwarded these e-mails to our San Juan

14   folks and our local Jacksonville folks to have them

15   review and, you know, take notice of.

16       Q       You used language that says, "This has become

17   a very serious, critical, and sensitive issue;" is that

18   correct?

19       A       Yes.

20       Q       Why was it serious, critical, and sensitive?

21       A       It was serious that we wanted to get rid of

22   the equipment, we did not want to use this equipment, we

23   wanted it returned to Emerald.  And, frankly, because of

24   the insinuations by Emerald on the prior e-mails, I

25   wanted to make sure that everyone understood that we did

```
 1    not want to keep any of this equipment, we wanted to

 2    return it properly and move it over to the respective

 3    areas.

 4         Q    Did you receive responses to this e-mail?

 5         A    I can't recall.

 6         Q    Did you learn whether or not Emerald had

 7    stopped paying rental for equipment that was not

 8    returned?

 9         A    Sea Star.

10         Q    I'm sorry.  Yes.  Did you learn that Sea Star

11    had stopped paying rental?

12         A    I can't recall the outcome of these

13    particular units that Emerald had --

14         Q    Do you know whether Sea Star was using some

15    of the units for fences?

16         A    I firsthand didn't see it.  I know we were

17    storing equipment at our facility in San Juan, but I

18    can't be sure if it would be used as fences.

19         Q    Did anyone tell you that that was an

20    incorrect or correct statement?

21         A    I really truly don't recall.

22         Q    What occurred as a result of you sending this

23    e-mail?

24         A    I'd have to look at the attachments that

25    Loraine sent.  I really don't recall.  I believe -- I
```

```
 1    was still trying to claim that we were using and actually

 2    had been stored at the facility whether it be the

 3    showroom lot or our J lot and Marty had signed off on it.

 4         Q    Was this equipment that had never been used

 5    and had been sitting there, is that what this is

 6    referring to?

 7         A    It could have been a little of both, we used,

 8    we never used.

 9         Q    Right.  I'll show you what's been marked as

10    Bates 16.  Did you prepare any reports regarding the

11    number -- at the time of the MPR acquisition, regarding

12    the number of units of equipment you thought had to be

13    added to Sea Star?

14         A    I didn't -- no, I don't recall preparing any

15    type of report of how much more equipment we would need.

16         Q    I'll show you what was marked as Bates 16.

17    Can you identify that for me, please.

18         A    Okay.  I recall this.

19         Q    Do you recall why you sent this e-mail?

20         A    Just a reminder to our San Juan folks to help

21    me be a little more communicative and responsive to

22    equipment that we were going to move over to the showroom

23    or to the J lot to return to Emerald, so, therefore, I

24    can notify Emerald properly.

25         Q    You refer -- you use the phrase, we would
```