**FILED**

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

JACKSONVILLE DIVISION  2004 MAR 11 A 10: 47

CASE NO. 3:04-cv-246 CLERK, US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE, FLORIDA

SEA STAR LINE, LLC,
a limited liability company,

    Plaintiff,

-vs-

EMERALD EQUIPMENT LEASING, INC.,
a corporation,

    Defendant.

_____/

## COMPLAINT

    Plaintiff, SEA STAR LINE, LLC ("SEA STAR"), sues Defendant, EMERALD EQUIPMENT LEASING, INC. ("EMERALD"), and states:

    1.  This is an action for declaratory judgment and other relief pursuant to 28 U.S.C.A. §§2201 and 2202 and for damages. The matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs. Federal jurisdiction exists pursuant to 28 U.S.C.A. §§1333, 1337, and 1367.

    2.  SEA STAR is a limited liability company organized and existing under the laws of the State of Delaware. At all material times, SEA STAR has maintained its principal place of business in Jacksonville, Florida. As an ocean carrier, SEA STAR transports cargo in interstate commerce.

    3.  EMERALD, a Delaware corporation, is a named Debtor

1

under Chapter 11 of the United States Bankruptcy Code. At all material times, EMERALD has done substantial business with SEA STAR in the State of Florida. Such business includes but is not limited to delivery and return of equipment in the Port of Jacksonville, Florida, as well as carriage of equipment as cargo from the Port of San Juan, Puerto Rico to the Port of Jacksonville, Florida and Port Everglades, Florida.

4. In April 2002 SEA STAR entered into an Asset Purchase Agreement, as amended, with NPR, INC. ("NPR"), a Delaware corporation, and other named Debtors in proceedings pending under Chapter 11 of the United States Bankruptcy Code. Subsequently EMERALD and MBC Leasing Corp. ("MBC"), its secured lender, objected to the proposed sale. Among expressed concerns were payments for equipment leased to NPR and used for cargo shipments that would be in process at the time of and after closing of the asset purchase ("shipments in process") and storage charges. Having heard arguments on April 26, 2002, the bankruptcy court overruled "the Emerald entities" objections and said that any rights would be preserved to argue against the sale proceeds.

5. SEA STAR and NPR representatives agreed to payment and claim procedures and deadlines with respect to shipments in process. When NPR's counsel outlined the plan to the bankruptcy court, he confirmed that components of SEA STAR payments included NPR's projected equipment leasing and financing costs, labor, materials, and other factors involved in transporting shipments in

2

process from origin to destination points.  Further, the attorney acknowledged that NPR might be subject to administrative claims, filed by owners and lessors of equipment used for shipments in process.

6.  On April 26, 2002, the bankruptcy court issued an Order Authorizing Sale of the NPR Assets Free and Clear of All Liens, Claims and Encumbrances ("Sale Order").  Overruling all objections that had not been withdrawn, the Sale Order authorized SEA STAR's acquisition of specific NPR assets.  SEA STAR had refused to acquire, assume, or accept assignment of any equipment agreements between EMERALD and NPR.  As to equipment not purchased or leased by SEA STAR, the Sale Order states in part:

> Buyer [SEA STAR] shall cooperate in removing any such equipment from vessels in transit and store such equipment on leased premises at the final port of destination, to the extent such final destination is a leased premises sold and assigned to the Buyer under the Asset Purchase Agreement.  Nothing contained in this Order shall prejudice any of Emerald's rights to seek disgorgement of funds based on any of its claims.
> ...
> After closing of the sale to Buyer, all creditors of the Debtors, whether known or unknown, are hereby enjoined from asserting or prosecuting any claim or cause of action against Buyer or the Purchased Assets to recover on account of any liability owed by the Debtors.

A copy of the Sale Order is attached as Exhibit "A".

7.  Closing of the asset purchase occurred on April 27, 2002 at 3:00 a.m.  In compliance with the Sale Order, SEA STAR

3

stored equipment located on or returned to premises acquired and leased by SEA STAR at final ports of destination pursuant to the Asset Purchase Agreement. SEA STAR and MBC agreed to a thirty (30) day grace period before storage charges would begin to accrue with respect to MBC and EMERALD equipment.

8. In accordance with procedures approved by the bankruptcy court, SEA STAR paid NPR all amounts due for shipments in process, including equipment expenses. NPR submitted no additional reimbursement claims. In Answers to Interrogatories dated July 9, 2002, NPR acknowledged that "[n]o amount is due to NPR from Sea Star for use of Emerald Equipment being used at the time of Closing" or "for the use of Emerald Equipment located on a vessel purchased by Sea Star at the time of Closing."

9. The bankruptcy court later issued an Order allowing MBC to foreclose its security interest in EMERALD equipment. Dated July 22, 2002 but effective as of April 29, 2002, the Order terminated the automatic stay in regard to certain equipment. The Order also authorized MBC to remove equipment from EMERALD's possession and to sell equipment, applying the proceeds to EMERALD's indebtedness to MBC. A copy of the Order is attached as Exhibit "B".

10. Throughout the remainder of 2002 and 2003, MBC controlled decisions communicated to SEA STAR concerning EMERALD equipment. A June 10, 2002 letter from Scott Krieger of MBC to Thomas Holt, Sr. of EMERALD confirmed:

4

> Any money due from Sea Star for use of any of
> containers, gensets, and chassis previously
> leased by Emerald Equipment Leasing to NPR,
> Inc. and Holt Cargo Systems for a purpose
> other than completing shipments in progress on
> April 27 when Sea Star purchased certain
> assets of NPR and Holt Cargo shall be paid
> directly to MBC Leasing. Any money due from
> Sea Star for use of any of the Emerald
> Equipment to complete shipments in progress on
> April 27 shall be paid in accordance with the
> Memorandum that MBC understands exists between
> Sea Star and NPR, Holt Cargo, and possibly
> other affiliates to be allocated in accordance
> with the Bankruptcy Court's ruling on the
> allocation of proceeds of sale to Sea Star.

A copy of the letter is attached as Exhibit "C". The following day Thomas Holt, Jr. requested that SEA STAR "remit a check in accordance with the attached letter from MBC Leasing, Corp." A copy of the letter is attached as Exhibit "D".

11. In a June 19, 2002 letter, MBC's attorney wrote:

> At the hearing on the approval of the
> sale of assets of Holt Cargo and NPR to Sea
> Star, MBC sought a temporary restraining order
> to stop Sea Star from using any of the Emerald
> Equipment after closing. The Court, however,
> ruled that as long as Sea Star compensated the
> Debtors for such use and cooperated with
> Lessors and secured creditors in recovering
> their equipment once shipments in progress at
> the time of closing were completed, Sea Star
> would be permitted to use assets that it was
> not purchasing for purposes of completing
> shipments in process. Lessors and secured
> creditors were directed to assert their claims
> for use of their equipment after closing
> against the monies paid by Sea Star in the
> hands of Debtors.
> ...
> ...[F]unds due for use of the Emerald
> Equipment to complete shipments in process at
> the time of closing should be remitted to the
> Debtors and any additional funds due for use

5

of the Emerald Equipment after closing should
be remitted directly to MBC ....

A copy of the letter is attached as Exhibit "E".

12.  On September 28, 2002, MBC and SEA STAR entered into
an Indemnity Agreement, which provides in part:

>   (a)  "MBC is willing to indemnify SEA STAR against
> claims by COMPETING CLAIMANTS [defined to include
> EMERALD] on the terms and conditions set forth in this
> AGREEMENT to induce SEA STAR to pay MBC for the use of
> the EMERALD EQUIPMENT...on or after April 27, 2002
> immediately."

>   (b)  Upon execution of the Agreement, SEA STAR would
> remit to MBC payment "for each item of the EMERALD
> EQUIPMENT used during the period of April 27, 2002
> through and including July 31, 2002...after deduction of
> such reasonable charges as are due to SEA STAR for
> storage and handling of EMERALD EQUIPMENT ...."

>   (c)  Beginning August 31, 2002 and continuing on the
> last day of each succeeding month, "SEA STAR shall remit
> to MBC for each item of EMERALD EQUIPMENT in SEA STAR'S
> possession during that month or portion thereof
> compensation of the daily rates specified on the EMERALD
> SCHEDULE from the first day of the month through and
> including the earliest of: (a) the day on which SEA STAR
> purchases such item and pays the purchase price therefor;
> (b) the day on which SEA STAR makes such item available
> for removal from SEA STAR'S possession by MBC; or (c) the
> last day of the month after deduction of such reasonable
> charges as are due to SEA STAR for storage and handling
> of EMERALD EQUIPMENT...."

>   (d)  "MBC acknowledges and agrees that the
> compensation rates set forth in 'Equipment Schedule
> A'...represent fair and reasonable compensation for the
> use of the EMERALD EQUIPMENT...and that provided SEA STAR
> pays the amounts specified in Section 1 of this AGREEMENT
> for each item of EMERALD EQUIPMENT...that it has used
> during the applicable period when and as due, subject to
> deductions specified in Section 1, MBC will assert no
> further claims against SEA STAR for compensation for the
> use of the EMERALD EQUIPMENT...by SEA STAR."

>   (e)  "MBC acknowledges and agrees that if SEA STAR

6

> enters into a Rental Agreement with EMERALD which is approved by MBC, in writing, MBC shall not interfere with SEA STAR'S right to use or possession of any EMERALD EQUIPMENT that is the subject of such agreement so long as SEA STAR complies with the terms and conditions of such agreement."

A copy of the Indemnity Agreement is attached as Exhibit "F".

13. On October 4, 2002, SEA STAR sent MBC a check in the amount of $184,084.93 for *per diem* use of EMERALD equipment from April 27 through July 31, 2002, less storage and handling. Enclosed with the payment were *per diem* self-billing report summaries, corresponding to detailed self-billing reports previously submitted. Also enclosed were detailed invoices for storage and handling.

14. After MBC approved the contract form and substance, SEA STAR and EMERALD signed an Equipment Rental Agreement ("EMERALD Agreement"). The EMERALD Agreement is a maritime contract pertaining to equipment used in connection with carriage of cargo onboard vessels in maritime commerce. A copy of the EMERALD Agreement is attached as Exhibit "G".

15. Terms and conditions of the EMERALD Agreement, dated as of July 31, 2002, "cover equipment in use at various times commencing April 29, 2002." For each item of equipment, the EMERALD Agreement provides in pertinent part:

> (a) The lease term "shall begin on the date of delivery to SEA STAR and ends on the date of off-hire ...."

> (b) Delivery "shall be effected and evidenced by signed and dated equipment interchange receipts".

ARMSTRONG & MEJER, P.A., ATTORNEYS, 2600 DOUGLAS ROAD, SUITE 1111, CORAL GABLES, FLORIDA 33134 • TEL (305) 444-3355

(c)  SEA STAR shall redeliver equipment to EMERALD at Greenwich terminal, Philadelphia, Pennsylvania; SEA STAR terminal, Puerto Nuevo, San Juan, Puerto Rico; Greenwich terminal, Port of Jacksonville, Florida; or any other location as to which the parties have agreed in writing.  At least 72 hours prior to actual redelivery, SEA STAR shall give EMERALD a written estimate of types and quantities of equipment which SEA STAR intends to redeliver at particular ports.

(d)  Upon redelivery the receiving terminal will execute an equipment interchange receipt.  Equipment will be taken off hire, and rental charges will cease.  If equipment is returned with damage exceeding the damage exclusion specified in Schedule "A", EMERALD will inform SEA STAR within 7 days after return.

16.  After the closing with NPR, SEA STAR on-hired EMERALD equipment not involved in shipments in process on the date SEA STAR's use began.  SEA STAR on-hired EMERALD equipment delivered to SEA STAR's leased premises after shipments in process on the date SEA STAR's use for a new cargo movement began.

17.  SEA STAR redelivered on-hired EMERALD equipment in the following manner:

(a)  Philadelphia, PA: Upon return to the Greenwich receiving terminal and execution of an equipment interchange receipt, also known as a trailer interchange receipt ("TIR"), after SEA STAR's use;

(b)  San Juan, P.R.: Upon return to the SEA STAR receiving terminal and execution of an equipment interchange receipt or TIR after SEA STAR's use;

(c)  Jacksonville, FL: Upon return to the SEA STAR receiving terminal and execution of an equipment interchange receipt or TIR after SEA STAR's use prior to August 1, 2002, as shown by self-billing reports delivered to MBC and EMERALD; upon return to the Greenwich receiving terminal and execution of an equipment interchange receipt or TIR after SEA STAR's use on and after August 1, 2002;

8

(d)  <u>Other Designated Terminals</u>: Upon return to the receiving terminal and execution of an equipment interchange receipt or TIR after SEA STAR's use.

18.  In the Port of Jacksonville, no Greenwich terminal existed before August 1, 2002, since Jaxport had seized and locked the terminal after NPR ceased operations. SEA STAR arranged with Jaxport, and MBC paid, to rent acreage for temporary storage of redelivered EMERALD equipment. As of August 1, 2002, Greenwich occupied the former NPR terminal, where EMERALD equipment could be redelivered and stored. EMERALD equipment previously redelivered by SEA STAR and stored on the rented acreage eventually was moved to the Greenwich terminal.

19.  EMERALD equipment located on SEA STAR's premises but not on-hired by SEA STAR remained in storage pursuant to the Sale Order and SEA STAR'S agreement with MBC. Throughout 2002 and 2003, MBC and EMERALD continued to utilize SEA STAR facilities for storage of EMERALD equipment that they were trying to sell to third parties. Despite demand EMERALD still has not removed all equipment from SEA STAR's terminal in Puerto Nuevo, San Juan, Puerto Rico.

20.  SEA STAR has performed all conditions precedent required to initiate and maintain this action, or all such conditions have occurred.

<u>COUNT I</u>

SEA STAR reiterates its allegations in paragraphs 1

9

through 20 above and further states:

21.  A dispute has arisen between SEA STAR and EMERALD as to the parties' rights and obligations under the EMERALD Agreement and the Sale Order.  SEA STAR seeks a declaration of its rights and other legal relations under the EMERALD Agreement and the Sale Order.  In particular, SEA STAR requests that the Court declare:

(a)  SEA STAR has no responsibility or liability for rental, damage, or loss of equipment subject to previous agreements between EMERALD and NPR that SEA STAR did not use pursuant to the EMERALD Agreement after closing of the asset purchase.

(b)  SEA STAR has no responsibility or liability to pay rent while EMERALD equipment was involved in shipments in process. For such equipment any SEA STAR on-hire and rental obligation began when SEA STAR signed an equipment interchange receipt or TIR for use--or other written evidence discloses SEA STAR's use at a particular time--after completion of a shipment in process.

(c)  Any SEA STAR on-hire and rental obligation for EMERALD equipment not involved in shipments in process began when SEA STAR signed an equipment interchange receipt or TIR for use--or other written evidence discloses SEA STAR's use at a particular time--on or after April 29, 2002.

(d)  SEA STAR has no responsibility or liability to pay rent for EMERALD equipment located and stored in a SEA STAR terminal as of or after closing and is entitled to compensation for storage after expiration of the 30-day grace period afforded for

10

EMERALD equipment.

(e) **Any SEA STAR on-hire and rental obligation for EMERALD equipment in the possession of** or returned to third **parties, such as non-SEA STAR depots,** shipper pools, or shipper **warehouses, as of and after closing** began when SEA STAR signed an equipment interchange receipt, TIR, or other written order, removing such **equipment** from a depot or shipper pool or acknowledging **receipt from a customer** or delivering carrier for SEA STAR's use.  Otherwise, SEA STAR has no responsibility and is not obligated to pay **rent** for such equipment.

(f) SEA STAR's obligation to pay rent for EMERALD equipment on-hired by SEA STAR ended at the following times:

(i)  Philadelphia, PA:  Upon return to the Greenwich receiving terminal at Packer Avenue and execution of an equipment interchange receipt or TIR after SEA STAR's use of particular equipment;

(ii) San Juan, P.R.: Upon return to the SEA STAR receiving **terminal and** execution of an equipment interchange receipt or TIR **after SEA** STAR's use of particular equipment;

(iii) Jacksonville, FL: Upon return to the SEA STAR receiving **terminal and** execution of an equipment interchange receipt or TIR **after SEA** STAR's use prior to August 1, 2002, as shown by **self-billing reports** delivered to MBC and EMERALD; or upon return to the **Greenwich** receiving terminal on or after August 1, 2002 and execution of equipment interchange receipt or TIR after

11

SEA STAR's use of particular equipment;

   (iv) <u>Other Designated Terminals</u>: Upon return to the receiving terminal and execution of an equipment interchange receipt or a TIR after SEA STAR's use of particular equipment.

   (g) **In regard** to EMERALD equipment shipped to or located in the Dominican Republic, SEA STAR is not obligated:

   (i) **To** accept responsibility or pay rent for EMERALD equipment involved in shipments in process;

   (ii) **To** accept responsibility or pay rent for EMERALD equipment stored or seized by third parties as of the closing;

   (iii) **To** accept responsibility or pay rent for EMERALD equipment stored or seized by third parties after the closing, unless a signed equipment interchange receipt or TIR discloses SEA STAR's use on or after April 29, 2002.

   (h) SEA STAR has no responsibility or liability for equipment damage claims not reported by EMERALD within seven (7) days after redelivery.

   (i) SEA STAR has no responsibility or liability for EMERALD lost equipment claims unless such equipment was not involved in shipments in process and a signed equipment interchange receipt or TIR discloses SEA STAR's use on or after April 29, 2002.

   22. SEA STAR further requests that the Court declare:

   (a) EMERALD's monetary claims are limited by the terms of the Sale Order and the EMERALD Agreement.

12

(b)  SEA STAR is entitled to reimbursement or credit for rent paid or credited with respect to EMERALD equipment while such equipment was involved in shipments in process.

(c)  EMERALD is liable to pay SEA STAR for storage of EMERALD equipment on SEA STAR's premises.

(d)  EMERALD is liable to pay SEA STAR for carriage of EMERALD equipment onboard SEA STAR vessels at EMERALD's request.

(e)  EMERALD is liable to pay SEA STAR for goods and services provided in connection with EMERALD equipment.

(f)  EMERALD is obligated to effect immediate removal of all EMERALD equipment from SEA STAR's premises.

WHEREFORE, Plaintiff demands judgment against Defendant for declaratory and other relief, together with costs of Court.

## COUNT II

SEA STAR reiterates its allegations in paragraphs 1 through 20 above and further states:

23.  During 2003 and 2004, EMERALD entered into contracts of carriage with SEA STAR with respect to shipment of goods onboard SEA STAR vessels.  SEA STAR issued and delivered bills of lading for such shipments.

24.  EMERALD breached its maritime contracts by failing and refusing to pay amounts due.

25.  As a result of such breaches, SEA STAR has sustained damage.

WHEREFORE, Plaintiff demands judgment against Defendant

13

for actual damages, together with prejudgment and postjudgment interest, and costs of Court.

### COUNT III

SEA STAR reiterates its allegations in paragraphs 1 through 20 above and further states:

26. EMERALD owes SEA STAR $92,318.05 that is due with interest commencing on the date of each bill of lading and invoice included in the SEA STAR account with EMERALD.

WHEREFORE, Plaintiff demands judgment for damages against Defendant.

### COUNT IV

SEA STAR reiterates its allegations in paragraphs 1 through 20 above and further states:

27. EMERALD owes SEA STAR $92,318.05 that is due with interest commencing on the date of each bill of lading and invoice for goods delivered and services provided to EMERALD.

WHEREFORE, Plaintiff demands judgment for damages against Defendant.

ARMSTRONG & MEJER, P.A.
Suite 1111, Douglas Centre
2600 Douglas Road
Coral Gables, FL 33134
Telephone: (305) 444-3355
Telefax:   (305) 442-4300

By: _____
    TIMOTHY J. ARMSTRONG

14

ORIGINAL

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MURPHY MARINE SERVICES, | ) | Case Nos. 01-00926 |
| INC., et al.[1] | ) | through 01-00950 (MFW) |
| | ) | (Jointly Administered) |
| Debtors | ) | |

CERTIFIED:
AS A TRUE COPY:
ATTEST:
DAVID D. BIRD, CLERK
U.S. BANKRUPTCY COURT
BY: _____
Deputy Clerk

## ORDER AUTHORIZING SALE OF THE NPR ASSETS
## FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES

Upon the Debtors' Motion for Order Authorizing Sale of the NPR Assets (as

defined and described in the Sale Motion) Free and Clear of All Liens, Claims and

Encumbrances (the "Sale Motion"), and due and adequate notice having been given under the

circumstances; it appearing that the relief requested is in the best interest of the Debtors[2], their

estates and their creditors; and, after due deliberation and sufficient cause appearing therefore,

the Court hereby FINDS, DETERMINES AND CONCLUDES THAT:

1.      The Court has jurisdiction to hear and determine the Sale Motion and all

related matters pursuant to 28 U.S.C. §§ 1334 and 157. Venue of this proceeding in this district

is proper pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (N) and (O).

---

[1] The Debtors are Murphy Marine Services, Inc., The Holt Group, Inc., B.H. Sobelman & Co., Inc., Borinquen Maintenance, Inc., Broadway Equipment Leasing Corp., C.R.T., Inc., Dockside International Fish Co., Dockside Refrigerated Warehouse, Inc., Emerald Equipment Leasing, Inc., Holt Cargo Systems, Inc., Holt Hauling & Warehousing System, Inc., New Port Stevedores, Inc. (f/k/a S.J.I.T., Inc.), NPR Holding Corporation, NPR, Inc., NPR-Navieras Receivables, Inc., NPR S.A., Inc., Oregon Avenue Enterprises, Incorporated, Pattison Avenue Warehousing Corp., Refrigerated Distribution Center, Inc., Refrigerated Enterprises, Inc., The Riverfront Development Corporation, San Juan International Terminals, Inc., 777 Pattison Ave., Inc., Triple Seven Ice, Inc., and Wilmington Stevedores, Inc. Dockside Refrigerated Warehouse, Inc. and Emerald Equipment Leasing, Inc. are not parties to the Bidding Procedures Motion or the Sale Motion.

[2] Capitalized terms not defined herein shall take the meaning ascribed thereto in the Sale Motion

EXHIBIT "A"

2.      The findings and conclusions contained herein constitute the findings of fact and conclusions of law required to be entered by this Court with respect to the Sale Motion pursuant to Fed.R.Civ.P. 52, as made applicable herein by Fed.R.Bankr.P. 7052 and 9014.

3.      Notice of the Sale Motion was timely, properly given in compliance with the Bankruptcy Code and Rules, and reasonable and appropriate under the circumstances.

4.      The Debtors have demonstrated that the sale of the assets, which includes the M/V CAROLINA, No. 53099, M/V MAYAGUEZ, No. 517450, M/V HUMACAO, No. 514261, and the M/V GUAYAMA, No. 520694, (the "Vessels") (and collectively, the "Purchased Assets") to Sea Star Line, LLC, and its permitted assignees ("Buyer") pursuant to the Asset Purchase Agreement, dated April 1, 2002 (the "Asset Purchase Agreement") is based on sound business justifications, and such sale is in the best interest of the Debtors' estates.

5.      Buyer is a third party purchaser unrelated to any of the Debtors.

6.      Failure to approve the Sale Motion will cause irreparable damage to the Debtors and their estates.

7.      The sale of the Purchased Assets has been proposed and, if consummated, will have been consummated in good faith in accordance with Section 363(m) of the Bankruptcy Code.  Buyer is entitled to the protections afforded under Section 363(m) of the Bankruptcy Code.

8.      The sale of the Purchased Assets, as provided in this Order, is in compliance with the provisions of Sections 363(b), 363(f) and 365 of the Bankruptcy Code.

2

9.     The negotiations between Buyer and the Debtors have been in good faith, and the consideration being paid is fair value for the Purchased Assets.

10.     The Debtors have demonstrated sufficient justification to sell a substantial portion of their assets outside of the confirmation of a plan of reorganization.

11.     The Debtors have made significant and satisfactory efforts to realize the highest or best value for the Purchased Assets.

12.     The Debtors, in compliance with the Bidding Procedures Order, dated April 12, 2002 (the "Bidding Procedures Order"), solicited bids for the Purchased Assets in order to conduct an auction on April 24, 2002 (the "Auction").  Buyer's bid was the sole Qualifying Bid, as defined by the Bidding Procedures Order, received by the Bid Deadline.  Accordingly, Buyer was determined to have submitted the highest and best offer for the Purchased Assets. Debtors have determined that the Buyer's bid for the Purchased Assets is the Successful Bid, as defined in the Bidding Procedures Order.

13.     The sale process was open and complete and reasonably calculated to yield the highest or otherwise best offer for the Purchased Assets.

14.     The consideration to be received by the Debtors from Buyer is fair and reasonable.

15.     The sale of assets does not amount to a consolidation, merger, *de facto* merger or similar restructuring of either or both of Buyer and the Debtors.

3

16.     Buyer is only buying the Purchased Assets and is not a successor in interest to Debtors, nor does Buyer's acquisition of the Purchased Assets reflect a substantial continuity of the operations of the Debtors' business.

17.     The Debtors have satisfied the standard set forth in Section 363(f) for selling the Purchased Assets free and clear of all liens, as (a) applicable non-bankruptcy law permits the sale of such property free and clear of such interests; (b) any secured lender so affected by the sale has consented to the asset sale; (c) any applicable lien on the Purchased Assets is in bona fide dispute, or (d) the proceeds of the sale of any property alleged to be subject to a trust fund claim of CSX Intermodal, Inc. shall be placed in a segregated interest-bearing account pending the determination of such trust fund claim pursuant to paragraph 7 of this Order.

18.     The sale of the Purchased Assets constitutes a sale in furtherance of effectuating a plan of reorganization, and all transfers in connection therewith shall be exempt from any and all stamp, value-added, transfer, recording, and other similar taxes (other than income taxes) and any transfer or recording fees or other similar costs incurred or assessed by any federal, state, local, or foreign taxing authority (including interest and penalties, if any) in connection with the sale or transfer of the Purchased Assets.

19.     Consummation of the Asset Purchase Agreements is in the best interests of the Debtor, its estate, all creditors, equity security holders and other parties in interest.

**IT IS HEREBY ORDERED THAT:**

1.     Except as modified by this Order, the Sale Motion is granted and approved in its entirety.

4

2.      All objections to the sale of the Purchased Assets that have not been withdrawn are overruled.  The Debtors are authorized pursuant to Sections 105(a) and 363(b) and (f) of the Bankruptcy Code to sell the Purchased Assets to the Buyer in accordance with the Asset Purchase Agreement and this Order.

3.      The Debtors are hereby authorized and directed to take any and all actions necessary or appropriate to:  (a) consummate the sale of the Purchased Assets in accordance with the terms and conditions set forth in the Asset Purchase Agreement, including, without limitation, to convey to Buyer the Purchased Assets; (b) execute any document or take any action necessary or appropriate to consummate the sale to the Buyer of the Purchased Assets without further order of this Court; and (c) take any action to remove any liens of record against the Purchased Assets.

4.      Except as otherwise provided in this Order, the sale of the Purchased Assets, including the Vessels, shall be free and clear of all claims, charges, security interests, mortgages, liens, maritime liens, (whether recorded or not), encumbrances arising by operation of law or otherwise, options, pledges, conditional sales, rights of others, or restrictions, whether imposed by agreement, law, or otherwise.  All rights, liens, and interests alleged in the Purchased Assets shall attach to the proceeds from the sale of those Purchased Assets, including the Vessels, with the same priority, dignity, and effect such rights, liens, and interests had in the Purchased Assets pursuant to maritime or any other applicable law immediately prior to the sale of the Purchased Assets, *including the rights, liens and interests of Wells Fargo Business Credit, Inc. ("Wells Fargo").*

5

5.     Except as provided in paragraphs 6, 7 and 8 of this Order, the Debtors shall hold all proceeds from the sale of the Purchased Assets in a segregated interest-bearing account pending further Order of this Court, which shall determine the proper allocation of the proceeds from sale of the Purchased Assets, including the Vessels, valued at the time of the sale.

6.     Subject to disgorgement after notice and a hearing, on April 29, 2002, the Debtors are authorized and directed to pay all Obligations, as such term is defined in that certain Credit and Security Agreement dated January 23, 2002 ("Credit Agreement") by and between the Debtors and Wells Fargo from the proceeds received on account of the sale of the Purchased Assets.  Notwithstanding anything to the contrary in this Order, Wells Fargo reserves all rights, including, without limitation, the right to seek any deficiency, as a result of disgorgement or otherwise, of the payment of the Obligations under the Credit Agreement from any other proceeds from the sale of the Purchased Assets or other property of the Debtors subject to the liens and security interests of Wells Fargo under the Credit Agreement.  Notwithstanding any distribution of proceeds to Wells Fargo, nothing contained in this Order or payment of proceeds to Wells Fargo will alter the validity, extent, or priority of any liens and security interests of the creditors of the Debtors as they existed prior to the date of the entry of this Order.

7.     The Debtors shall deposit the actual amount owed up to a maximum of $800,000.00 ("Trust Fund Account") from the proceeds from sale of the Purchased Assets into a segregated interest-bearing account subject to any alleged trust fund claim of CSX Intermodal, Inc.  The funds held in the Trust Fund Account shall continue to be subject to the rights, liens

6

and interests of other creditors in the Purchased Assets to the extent that the funds are determined to be property of the Debtors and not trust fund property of CSX Intermodal, Inc.

       8.    To the extent that the Debtors do not have sufficient funds in their operating account to pay all earned and unpaid wages, withholding taxes, vacation, and current due employee related obligations through and including the date of closing on sale of the Purchased Assets, then the Debtors shall be authorized to use up to $1,900,000.00 of the proceeds from sale of the Purchased Assets, after payment of the Obligations to Wells Fargo under paragraph 6 of this Order, to pay such claims.

       9.    To the extent that Purchased Assets subject to the liens and security interests of the Bank of Gloucester, CIT, GECC, or GE Capital are excluded from the sale, the purchase price of the Purchased Assets may be adjusted downward up to a maximum amount of $1,600,000.00 on an aggregate basis, or such lesser amount reasonably related to the value of any such assets excluded from the sale.

      10.    The payment of claims under paragraphs 6, 7 and 8 of this Order out of proceeds from sale of certain of the Purchased Assets shall not prejudice the rights of the pre-petition secured lenders for which First Union National Bank is agent (the "First Union Bank Group") to argue that such claims also would be payable from other proceeds from sale of the Purchased Assets and seek a reallocation of such proceeds applied under paragraphs 6, 7 and 8, including the right to seek a replacement lien in accordance with existing orders entered in favor of the First Union Bank Group or otherwise on such other proceeds from sale of the Purchased

7

Assets. Nothing contained in this Order will alter the priorities of the liens and security interests of the creditors of the Debtors as they existed prior to the date of the entry of this Order.

11.     All liens recorded against the Purchased Assets shall, upon Closing, be deemed released and discharged as against the Purchased Assets with all such liens and interests to attach to the proceeds of the sale pursuant Paragraph 4 above, and all parties and other entities, including filing agents and officers, title agents and companies, recorders of mortgages and deeds of trust, administrative agencies, governmental units and other state, federal and local officers are authorized and specifically directed to remove any recorded liens against the Purchased Assets from their records without the presentation of any affidavits, instruments, or returns otherwise required for recording, other than this Order.

12.     To the extent that General Electric Capital Corporation ("GECC") is determined to be an undersecured creditor with respect to the liens, claims, or encumbrances of GECC in the Purchased Assets or the proceeds from the sale of the Purchased Assets, GECC reserves all rights to seek to enforce any cross-collateralization provision of any loan or security agreement to which it and any of the Sellers are a party, subject to the liens of Wells Fargo granted in the Final DIP Order.

13.     Notwithstanding anything to the contrary in the Asset Purchase Agreement, to the extent that any equipment of Emerald Equipment Leasing, Inc. ("Emerald"), or any other lien or lessor creditor whose property is not being sold or transferred to Buyer,  is located on property sold and assigned to the Buyer under the Asset Purchase Agreement, the Buyer shall cooperate in allowing Emerald or such other creditors to remove such property

8

during normal business hours as long as such removal will not unreasonably disrupt operations

of the Buyer. In addition, the Buyer shall cooperate in removing any such equipment from

Vessels in transit and store such equipment on leased premises at the final port of destination, to

the extent such final destination is a leased premises sold and assigned to the Buyer under the

Asset Purchase Agreement. Nothing contained in this Order shall prejudice any of Emerald's

rights to seek disgorgement of funds based on any of its claims, as well as to seek the creation of

a constructive trust in the proceeds from the sale of the Purchased Assets, nor the rights of the

Debtors or any other party to contest such constructive trust.

       14.     Closing of the sale of the Purchased Assets shall occur as set forth in the

Asset Purchase Agreement approved by the Court herein. Debtors and Buyer may, by mutual

agreement, transfer title or possession of any asset at a time subsequent to closing of the sale.

All parties and other entities, including all filing agents and officers, administrative agencies,

governmental units and other state, federal and local officers shall effect all transfers of the

Purchased Assets without further order of the Court.

       15.     Except as expressly provided in the Asset Purchase Agreement, Buyer has

not assumed or otherwise become obligated for any of the Debtors' liabilities. Consequently,

after closing of the sale to Buyer, all creditors of the Debtors, whether known or unknown, are

hereby enjoined from asserting or prosecuting any claim or cause of action against Buyer or the

Purchased Assets to recover on account of any liability owed by the Debtors.

9

16.     The Asset Purchase Agreement:  (i) was proposed, negotiated, and entered into in good faith after arms-length bargaining of the parties; and (ii) provides the Debtors with the highest or otherwise best offer received for the Purchased Assets.

17.     The Buyer is a good faith purchaser entitled to the protections afforded a purchaser pursuant to 11 U.S.C. § 363(m).

18.     Pursuant to Section 1146(c) of the Bankruptcy Code, the making, delivery, filing or recording of any and all other instruments of conveyance or transfer of the Purchased Assets to evidence, effectuate or perfect the rights, transfers and interest contemplated by the Asset Purchase Agreement (the "Conveyances"), are exempt from and shall not be taxed under any federal, state or local law imposing a recording tax, stamp tax, transfer tax or similar tax (collectively, "Transfer Taxes").  Such instruments, orders and agreements transferring the Purchased Assets to Buyer shall contain the following endorsement:

> Because this [instrument] has been authorized pursuant to an order
> of the United States Bankruptcy Court for the District of Delaware,
> in contemplation of a plan of reorganization of the Grantor, it is
> exempt from transfer taxes, stamp taxes or similar taxes pursuant
> to 11 U.S.C. § 1146(c).

All filing and recording officers are hereby authorized and directed to accept for recording or filing, and to record or file immediately upon presentation thereof, the Conveyances, without the payment of any such Transfer Taxes and without the requirement or presentation of any affidavit or form with respect to any Transfer Tax regarding the Conveyances.  All governmental authorities or taxing authorities shall be permanently enjoined from commencing or maintaining

10

36905.001\DOCS_DE:45595.5

any action to collect from the Debtors, the Buyer or the Purchased Assets any Transfer Taxes arising from the transfers to be effectuated pursuant to the Asset Purchase Agreement, and this Court retains jurisdiction to enforce the foregoing.

19.     The stay referenced in Rule 6004(g) of the Federal Rules of Bankruptcy Procedure shall not be imposed and, to the extent imposed as a matter of law, is hereby lifted. The Debtors and the Buyer are authorized to consummate the transactions described in the Asset Purchase Agreement.

20.     The terms and provisions of the Asset Purchase Agreement, and all collateral documents, together with the terms and provisions of this Order, shall be binding in all respects upon the Debtors, their estates, their creditors, lienholders against the Purchased Assets and all parties in interest and shall inure to the benefit of any successors and assigns of the Buyer and the Debtors, including without limitation, any trustee appointed in the Debtors' Chapter 11 case or subsequent Chapter 7 case.

21.     The sale of the Purchased Assets approved by this Order is not subject to avoidance under Section 363(n) of the Bankruptcy Code.

22.     Nothing contained in any plan of reorganization (or liquidation) confirmed in the Debtors' Chapter 11 cases, any order of confirmation confirming any plan of reorganization (or liquidation), or any other order of any type or kind entered in the Debtors' Chapter 11 cases or any related proceeding shall conflict with or derogate from the provisions of the Asset Purchase Agreements, or the terms of this Order.  Further, nothing contained in this Order shall affect the rights of creditors whose liens have attached to the proceeds of the sale of

11

the Purchased Assets to argue their rights to the proceeds of the sale and the manner in which the proceeds of the sale should be allocated.

23. Nothing in this Order shall be deemed to modify or impair any right or claim among the estates of the Debtors, including, but not limited to (a) any claims to the sale proceeds, and (b) any payment of the Obligations to Wells Fargo under the Credit Agreement.

24. This Court retains jurisdiction to:

(a) Interpret, implement and enforce the terms and provisions of this Order and the terms of the Asset Purchase Agreement, all amendments thereto and any waivers and consents thereunder and of each of the agreements executed in connection therewith;

(b) Compel delivery of the Purchased Assets to the Buyer;

(c) Resolve any disputes arising under or related to the sale of the Purchased Assets to the Buyer, subject to the provisions of the Asset Purchase Agreement;

(d) Protect Buyer, or any of the Purchased Assets, against any liens of any kind, including maritime liens, against the Purchased Assets after the transfer of the Purchased Assets to Buyer; and

(e) Adjudicate any issue that may arise by any person or entity asserting a claim or cause of action against Buyer arising from Debtors' use of the Purchased Assets prior to the Closing Date, which shall include, but shall not be limited to, successor claims.

25. This Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing.

12

Dated:    Wilmington, Delaware
          April 26 , 2002

                              _____
                              The Honorable Mary F. Walrath
                              United States Bankruptcy Judge

13

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

IN RE:        &ast;  Chapter 11

MURPHY MARINE SERVICES, &ast;  Case Nos.: 01-00926 through
INC., et al.,        01-00950 (MFW)
    Debtors.   &ast;  (Jointly Administered)

&ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast;

### ORDER TERMINATING THE AUTOMATIC STAY AS TO MBC LEASING CORP. AND CERTAIN ASSETS OF THE DEBTORS

Upon consideration of the Second Motion of MBC Leasing Corp. for Relief from the

Automatic Stay ("Motion") filed herein by MBC Leasing Corp. ("MBC"), and any opposition

thereto, and good cause having been shown, it is this 72 day of ＿＿＿＿＿＿＿, 2002, by the

United States Bankruptcy Court for the District of Delaware,

ORDERED, that the Motion is hereby GRANTED in its entirety effective as of April 29,

2002; and it is further

ORDERED, that the automatic stay of 11 U.S.C. § 362 is hereby terminated in the above-

captioned bankruptcy case effective as of April 29, 2002 as to MBC and the 426 twenty foot steel

dry van containers, 990 Onan refrigerator "gensets," 910 forty foot steel dry van containers,

1,147 forty foot steel high cube dry van containers, 945 forty-five foot steel dry van containers,

396 forty-five foot aluminum dry van containers, 972 refrigerated containers, and 6,741 chassis

described in the Loan and Security Agreement dated as of November 20, 1997 by and between

Emerald Equipment Leasing, Inc. and MBC described in the Motion (the "Equipment"), and it is

further

ORDERED, that MBC is immediately entitled to exercise and enforce all of its rights and

remedies against the Equipment pursuant to the terms and conditions of the Loan and Security



EXHIBIT "B"

Agreement dated as of November 20, 1997 and the various related loan documents referenced in MBC's Motion (collectively, the "Loan Documents") and applicable law, including, without limitation, removing the Equipment from the possession of Emerald Equipment Leasing, Inc. ("Emerald"), NPR, Inc., and Holt Cargo Systems, Inc., selling the Equipment, and applying the proceeds arising therefrom to reduce the indebtedness that is owed by Emerald to MBC under the Loan Documents, and it is further

ORDERED, that MBC shall deposit any proceeds of sale of the Equipment in excess of the amount necessary to satisfy the outstanding balance due under the Loan Documents, if any, to Emerald Equipment Leasing, Inc. to be held pending further Order of this Court; and it is further

ORDERED, that the effect of this Order shall not be stayed until the expiration of ten (10) days after the entry thereof pursuant to Rule 4001(a)(3) of the Federal Rules of Bankruptcy Procedure, but shall be effective immediately upon entry.


MARY F. WALRATH,
JUDGE, UNITED STATES BANKRUPTCY
COURT FOR THE DISTRICT OF DELAWARE

MBC LEASING CORP.

June 10, 2002

Mr. Thomas Holt, Sr., President
Emerald Equipment Leasing Company
101 S. King Street
Gloucester City, New Jersey 08030

Dear Tom:

Any money due from Sea Star for use of any of containers, gensets, and chassis previously leased by Emerald Equipment Leasing to NPR, Inc. and Holt Cargo Systems for a purpose other than completing shipments in progress on April 27 when Sea Star purchased certain assets of NPR and Holt Cargo should be paid directly to MBC Leasing.  Any money due from Sea Star for use of any of the Emerald equipment to complete shipments in progress on April 27 should be paid in accordance with the memorandum that MBC understands exists between Sea Star and NPR, Holt Cargo, and possibly other affiliates to be allocated in accordance with the Bankruptcy Court's ruling on the allocation of the proceeds of sale to Sea Star.

Any money due from Sea Star for use of any of the 700 forty foot dry van containers and the 283 forty-five foot dry van containers MBC previously leased to NPR and Holt Cargo after May 15, 2002 for a purpose other than completing shipments in progress on April 27 should also be paid directly to MBC.  Note that MBC believes it is entitled to money due from Sea Star for any use of the MBC equipment on or after April 27, 2002 through May 15, 2002 for a purpose other than completing shipments in progress on April 27.  However, NPR and Holt Cargo may disagree because rejection of the MBC lease was effective May 15, 2002.  Consequently, MBC is not insisting that money due from Sea Star for any use of the MBC equipment on or after April 27, 2002 through May 15, 2002 for a purpose other than completing shipments in progress on April 27 be paid to it at this time, but reserves all claims to that money.

Payments to MBC should be sent to me at 2 Hopkins Plaza, 5th Floor, Baltimore, Maryland 21201.

Sincerely,

Scott H. Krieger
Treasurer & Assistant Secretary

SHK:sw
E:1

Two Hopkins Plaza / P.O. Box 1451 / Baltimore, Maryland 21203 / (410) 237-5855
Affiliate Maryland National Bank / Member FDIC

EXHIBIT "C"

# GREENWICH TERMINALS, LLC

Post Office Box 42550
Philadelphia, PA 19101-2550

FAX:  904-724-3007                                                June 11, 2002

Mr. Phil Bates
SEA STAR
100 Bell Tel Way, Suite 300
Jacksonville, FL  32216

Dear Mr. Bates:

Please remit a check in accordance with the attached letter from MBC Leasing, Corp.

                                        Regards,

                                        GREENWICH TERMINALS LLC


                                        Thomas J. Holt, Jr.

TJH,JR/MKC
Enclosure (2 pages)

EXHIBIT "D"

LAW OFFICES

# GEBHARDT & SMITH LLP

NINTH FLOOR
THE WORLD TRADE CENTER
BALTIMORE, MARYLAND 21202-3064

BALTIMORE:   (410) 752-5830
WASHINGTON:   (301) 470-7468

WRITER'S DIRECT DIAL NUMBER:

FACSIMILE
(410) 385-5119

June 19, 2002

(410) 385-5015
Writer's E-Mail Address:
bhall@gebsmith.com

## VIA FEDERAL EXPRESS

Timothy Armstrong, Esquire
Armstrong and Mejer P.A.
Suite 1111
2600 Douglas Road
Coral Gables, Florida 33134

> Re:   MUMA Services, Inc., et al.
> Case Nos.: 01-00926 through 01-00950 (MFW)

Dear Tim:

This will confirm our telephone conversations of June 11 and June 18, 2002.

I represent MBC Leasing Corp. ("MBC") in the above-captioned matter. MBC extended various credit accommodations to Holt Cargo Systems, Inc. ("Holt Cargo"), NPR, Inc. ("NPR") and various affiliates. The most important of these for present purposes are a term loan in the stated principal amount of Thirty-Five Million Dollars ($35,000,000.00) that MBC extended to Emerald Equipment Leasing, Inc. ("Emerald") and an Equipment Lease dated as of March 18, 1999 by and between MBC, as lessor, and Holt Cargo and NPR, as lessees (the "MBC Lease").

MBC made its loan to Emerald to enable Emerald to purchase containers, chassis, and gensets (collectively, the "Emerald Equipment") from Holt Cargo and NPR. Emerald then leased the Emerald Equipment back to Holt Cargo and NPR pursuant to an Equipment Lease Agreement made as of November 18, 1997, as amended (the "Emerald Lease"). In addition to granting MBC a security interest in the Emerald Equipment and all "accounts, ... contract rights, [and] general intangibles arising from" the Emerald Equipment, Emerald assigned the Emerald Lease to MBC pursuant to an Assignment of Lease as Security made as of November 20, 1997 (the "Lease Assignment"). A copy of the Lease Assignment is enclosed. Holt Cargo and NPR acknowledged the Lease Assignment in a Lessees' Notice, Consent, and Acknowledgment made as of November 20, 1997 (the "Acknowledgment"). A copy of the Acknowledgment is also enclosed.

U:\WLH\18750LTR.043.wpd



EXHIBIT "E"

## GEBHARDT & SMITH LLP

Timothy Armstrong, Esquire
June 19, 2002
Page 2

As we discussed during our telephone conversation of June 18, 2002, the MBC Lease consists of a Master Lease and three (3) Equipment Schedules. A complete copy of the MBC Lease with all Schedules is enclosed. The equipment that is the subject of the MBC Lease will be referred to as the "MBC Equipment."

After Emerald, Holt Cargo, NPR and affiliates (collectively, the "Debtors") filed for Chapter 11 relief, the Debtors sought to assume the Emerald Lease and the MBC Lease. The Official Committee of Unsecured Creditors (the "Committee") objected on the grounds that the Emerald Lease and the MBC Lease might not be "true leases" subject to assumption and MBC responded by filing a Motion for Relief from Automatic Stay.

The Debtors, the Committee, and MBC resolved their differences on an interim basis by entering into a Stipulation Between MBC Leasing Corp. and Debtors With Respect to Adequate Protection of Property (the "MBC Stipulation"). The MBC Stipulation was approved by the Court on June 13, 2001. A copy of the MBC Stipulation, as approved, is enclosed.

Once the Debtors decided to sell substantially all of their assets to your client, Sea Star Line, LLC ("Sea Star"), the Debtors sought to reject the Emerald Lease. The Committee again objected on the grounds that the Emerald Lease was not a "true lease." This dispute was partially resolved by a Consent Order Authorizing Return of Equipment to Emerald Equipment Leasing, Inc. (the "Emerald Rejection Order") which was entered by the Court on May 10, 2002. A copy of the Emerald Rejection Order is enclosed. As you can see, it provides in the last paragraph that the Emerald Lease is rejected as of April 18, 2002 to the extent that it is a "true lease." It provides in the first paragraph that the Debtors are to convey their right, title, and interest in and to the Emerald Equipment to Emerald. A copy of the Bill of Sale conveying the Emerald Equipment as required by the Emerald Rejection Order is enclosed. As a consequence of the rejection of the Emerald Lease and the conveyance of the Emerald Equipment to Emerald by the Debtors, whether or not the Emerald Lease was a "true lease," the Emerald Equipment now is property of Emerald.

Subsequently, the Debtors filed a Motion for Order Approving Rejection of Leases of Non-Residential Real Property and Equipment Pursuant to 11 U.S.C. § 365 seeking to reject, among other things, the MBC Lease. The Debtors, however, sought to reserve the right to argue after rejection that the MBC Lease is not, in fact, a "true lease."

MBC objected on the grounds that if the Debtors were not prepared to characterize the MBC Lease as "true lease," they could not reject it. This dispute was partially resolved by an Order Rejecting MBC Equipment Lease (the "MBC Rejection Order") which was entered by the Court on or about May 20, 2002. A copy of the MBC Rejection Order is also enclosed. It provides in paragraph 2 that the MBC Lease is rejected effective as of May 15, 2002 to the extent that it is a

U:\WLH\18750LTR.043.wpd

**GEBHARDT & SMITH LLP**

Timothy Armstrong, Esquire
June 19, 2002
Page 3

"true lease." The MBC Rejection Order provides in paragraph 4 that the Debtors are to convey all their right, title, and interest in and to the MBC Equipment to MBC effective as of May 15, 2002. A copy of the Bill of Sale executed and delivered as required by the MBC Rejection Order is also enclosed. Once again, the MBC Equipment is clearly MBC's property as of May 15, 2002 whether or not the MBC Lease was a "true lease."

At the hearing on the approval of the sale of the assets of Holt Cargo and NPR to Sea Star, MBC sought a temporary restraining order to stop Sea Star from using any of the Emerald Equipment after closing. The Court, however, ruled that as long as Sea Star compensated the Debtors for such use and cooperated with lessors and secured creditors in recovering their equipment once shipments in progress at the time of closing were completed, Sea Star would be permitted to use assets that it was not purchasing for purposes of completing shipments in process. Lessors and secured creditors were directed to assert their claims for use of their equipment after closing against the monies paid by Sea Star in the hands of the Debtors.

At a hearing on April 29, 2002, the first business day after approval of the sale to Sea Star, the Court held a hearing on a Motion by MBC seeking relief from the automatic stay with respect to the enforcement of MBC's rights against Emerald and the Emerald Equipment. Although, as I told you, I recently realized that the written Order still has not been entered, as you can see from the enclosed portion of the transcript, Emerald, the Committee and the Debtors agreed that MBC should be granted relief from the stay and the Court agreed to enter an appropriate Order upon its submission.

Based upon all of the foregoing, it is MBC's position that:

1.      Since: (a) the Emerald Lease was rejected effective prior to the closing on the sale to Sea Star; (b) amounts payable by Sea Star for use of the Emerald Equipment are accounts receivable arising out of the Emerald Equipment; (c) all parties have agreed that MBC should have relief from the stay; and (d) the Court directed MBC to assert any claim for use of the Emerald Equipment to complete shipments in process at the time of closing against funds in the hands of the Debtors, funds due for the use of the Emerald Equipment to complete shipments in process at the time of closing should be remitted to the Debtors and any additional funds due for use of the Emerald Equipment after closing should be remitted directly to MBC; and

2.      As the MBC Lease was not rejected until May 15, 2002, any monies due from Sea Star for use of any item of MBC Equipment from the date of closing through the later of completion of the use of that equipment to complete shipments in process at the time of closing or May 15, 2002 should be remitted to the Debtors. MBC reserves the right to contend that such funds, in the hands of the Debtors, are held in constructive trust for its benefit. Any sums payable for use of any item

# GEBHARDT & SMITH LLP

Timothy Armstrong, Esquire
June 19, 2002
Page 4

of MBC Equipment after May 15, 2002, unless such use related to completion of a shipment in process at the time of closing, should be remitted directly to MBC.

Based upon our telephone conversations, it is my understanding that Sea Star believes that it may be difficult to differentiate between monies due for use of Emerald Equipment or MBC Equipment to complete shipments in process at the time of closing and monies due for use of such equipment in shipments commenced after closing. It is also my understanding that Sea Star would prefer to remit to MBC directly only funds due for use of Emerald Equipment and MBC Equipment on or after May 16, 2002 in part because Sea Star believes that all shipments in process at the time of closing should have been completed by that date. As we discussed, so long as the remittance of funds by Sea Star to the Debtors is without prejudice to MBC's right to seek to recover from the Debtors such portions of those funds as MBC believes are due to MBC, MBC has no objection to the use of May 16, 2002 as the line of demarcation as requested by Sea Star.

Once you have had the opportunity to review this letter and the enclosed materials, please advise me as to Sea Star's position on the remittance of funds to MBC.

Sincerely,

William L. Hallam

WLH:clw
Enclosures

cc:     Scott H. Krieger, Senior Vice President (with enclosures)

U:\WLH\18750LTR.043.wpd

## INDEMNITY AGREEMENT

This Indemnity Agreement ("AGREEMENT") is made of this 24th day of September, 2002 by and between MBC LEASING CORP., a Maryland corporation ("MBC"), and SEA STAR LINE, LLC, a Delaware limited liability company ("SEA STAR").

## EXPLANATORY STATEMENT

EMERALD EQUIPMENT LEASING, INC. ("EMERALD") leased 426 twenty foot steel dry van containers, 990 Onan refrigerator "gensets," 910 forty foot steel dry van containers, 1,457 forty foot steel high cube dry van containers, 945 forty-five foot steel dry van containers, 396 forty-five foot aluminum dry van containers, 972 refrigerated containers, and 6,741 chassis (the "EMERALD EQUIPMENT") to NPR, INC. and HOLT CARGO SYSTEMS, INC. ("HOLT CARGO") pursuant to an Equipment Lease Agreement made as of November 18, 1997.

MBC leased 700 forty foot dry van containers and 283 forty-five foot dry van containers (the "MBC EQUIPMENT") to NPR, INC. and HOLT CARGO pursuant to an Equipment Lease Agreement dated as of March 18, 1999.

EMERALD, NPR, INC., and HOLT CARGO are all the subject of proceedings under the United States Bankruptcy Code pending in the United States Bankruptcy Court for the District of Delaware (the "BANKRUPTCY COURT") and known as "In re MUMA Services, Inc. (f/k/a Murphy Marine Services, Inc), Case Nos. 01-00926 through 01-00950 (Jointly Administered)" (the "BANKRUPTCY CASE").

On or about April 27, 2002, pursuant to an Order entered by the BANKRUPTCY COURT in the BANKRUPTCY CASE, SEA STAR purchased certain assets of NPR, INC. and HOLT CARGO, which assets did not include any of the EMERALD EQUIPMENT or the MBC EQUIPMENT. At the time that SEA STAR purchased assets, NPR, INC. and HOLT CARGO delivered certain of the EMERALD EQUIPMENT and the MBC EQUIPMENT into the possession of SEA STAR.

MBC has demanded that SEA STAR pay MBC for the use by SEA STAR of any EMERALD EQUIPMENT or MBC EQUIPMENT on or after April 27, 2002. Although SEA STAR is willing to pay for the use of such of the EMERALD EQUIPMENT and the MBC EQUIPMENT as SEA STAR has used on or after April 27, 2002 at the rates specified below, SEA STAR is unwilling to pay MBC unless it is assured that it will not be required to pay for the same use by any trustee appointed in the BANKRUPTCY CASE, any party named as a defendant in any interpleader action instituted by SEA STAR in the BANKRUPTCY CASE, the Official Committee of Unsecured Creditors in the BANKRUPTCY CASE (the "COMMITTEE"), EMERALD, NPR, INC., HOLT CARGO, or any party claiming through or under them (jointly and severally, "COMPETING

1


EXHIBIT "E"

CLAIMANTS"). MBC is willing to indemnify SEA STAR against claims by COMPETING CLAIMANTS on the terms and conditions set forth in this AGREEMENT to induce SEA STAR to pay MBC for the use of the EMERALD EQUIPMENT and the MBC EQUIPMENT on or after April 27, 2002 immediately.

NOW, THEREFORE, in consideration of the premises, the parties hereto agree as follows:

1.    <u>Agreement to Pay for Use of Equipment</u>. Upon execution of this AGREEMENT, SEA STAR will remit to MBC by certified check, cashier's check, or wire transfer: (a) for each item of the EMERALD EQUIPMENT used during the period of April 27, 2002 through and including July 31, 2002, the amount determined by multiplying the applicable daily rate specified on "Equipment Schedule A" attached hereto and incorporated herein (the "EMERALD SCHEDULE") by the number of days during that period in which such item of EMERALD EQUIPMENT was used; plus (b) for each item of the MBC EQUIPMENT used during the period of April 27, 2002 through and including July 31, 2002, the amount determined by multiplying the applicable daily rate specified on "Equipment Schedule B" attached hereto and incorporated herein (the "MBC SCHEDULE") by the number of days during that period in which such item of MBC EQUIPMENT was used after deduction of such reasonable charges as are due to SEA STAR for storage and handling of EMERALD EQUIPMENT and MBC EQUIPMENT. Beginning on August 31, 2002 and continuing on the last day of each month thereafter, SEA STAR shall remit to MBC for each item of EMERALD EQUIPMENT in SEA STAR'S possession during that month or portion thereof compensation at the daily rates specified on EMERALD SCHEDULE from the first day of the month through and including the earliest of: (a) the day on which SEA STAR purchases such item and pays the purchase price therefor; (b) the date on which SEA STAR makes such item available for removal from SEA STAR'S possession by MBC; or (c) the last day of that month after deduction of such reasonable charges as are due to SEA STAR for storage and handling of EMERALD EQUIPMENT. Beginning on August 31, 2002 and continuing on the last day of each month thereafter, SEA STAR shall remit to MBC for each item of MBC EQUIPMENT in SEA STAR'S possession during that month or portion thereof compensation at the daily rates specified on the MBC SCHEDULE from the first day of the month through and including the earliest of: (a) the day on which SEA STAR purchases such item and pays the purchase price therefor; (b) the date on which SEA STAR makes such item available for removal from SEA STAR'S possession by MBC; or (c) the last day of that month after deduction of such reasonable charges as are due to SEA STAR for storage and handling of MBC EQUIPMENT.

2.    <u>Waiver of Further Claims By MBC for Use of Equipment</u>. MBC acknowledges and agrees that the compensation rates set forth in "Equipment Schedule A" and "Equipment Schedule B" represent fair and reasonable compensation for the use of the EMERALD EQUIPMENT and the MBC EQUIPMENT by SEA STAR and that provided SEA STAR pays the amounts specified in Section 1 of this AGREEMENT for each item

2

of EMERALD EQUIPMENT and MBC EQUIPMENT that it has used during the applicable period when and as due, subject to deductions specified in Section 1, MBC will assert no further claims against SEA STAR for compensation for the use of the EMERALD EQUIPMENT or the MBC EQUIPMENT by SEA STAR.

3.    Effect of Agreement On Sea Star's Right to Possession.    SEA STAR acknowledges and agrees that nothing in this AGREEMENT is intended to or shall confer on SEA STAR the right to possess or use any EMERALD EQUIPMENT or MBC EQUIPMENT and that MBC reserves such rights, if any, as MBC may have to take possession of the EMERALD EQUIPMENT and the MBC EQUIPMENT.  MBC acknowledges and agrees that nothing in this AGREEMENT shall constitute an acknowledgment by SEA STAR of MBC'S right to take possession of the EMERALD EQUIPMENT and the MBC EQUIPMENT.  Notwithstanding the foregoing, MBC acknowledges and agrees that if SEA STAR enters into a Rental Agreement with EMERALD which is approved by MBC, in writing, MBC shall not interfere with SEA STAR'S right to use or possession of any EMERALD EQUIPMENT that is the subject of such agreement so long as SEA STAR complies with the terms and conditions of such agreement. MBC acknowledges and agrees that if SEA STAR and MBC enter into an Equipment Lease Agreement for the MBC EQUIPMENT or any portion thereof, MBC will not interfere with SEA STAR'S use or possession of any MBC EQUIPMENT that is the subject of such Equipment Lease Agreement so long as SEA STAR complies with the terms and conditions of such Equipment Lease Agreement.  Furthermore, MBC shall not interfere with SEA STAR'S right to use or possession of any EMERALD EQUIPMENT or MBC EQUIPMENT purchased by SEA STAR from MBC or from EMERALD with MBC'S consent.

4.    Agreement to Indemnify and Defend.  Provided that SEA STAR provides MBC with prompt written notice of any claims, causes of action, liabilities, or damages asserted against SEA STAR by any COMPETING CLAIMANT relating to any COMPETING CLAIMANT'S alleged entitlement to compensation for use of EMERALD EQUIPMENT or MBC EQUIPMENT during any period for which SEA STAR has paid MBC pursuant to this AGREEMENT (a "PROCEEDING"), MBC will defend the PROCEEDING at its expense.   MBC acknowledges and agrees that if the BANKRUPTCY COURT or any other court of competent jurisdiction (a "COURT") determines in a PROCEEDING that a COMPETING CLAIMANT is entitled to be compensated for use of any EMERALD EQUIPMENT or MBC EQUIPMENT for any period for which SEA STAR has paid MBC pursuant to this AGREEMENT, within five (5) business days after receipt by MBC of written demand by SEA STAR, MBC will remit to SEA STAR by certified check, cashier's check, or wire transfer the lesser of: (a) the amount to which the COURT determined the COMPETING CLAIMANT is entitled for that period; or (b) the amount, net of deductions specified in Section 1, paid by SEA STAR to MBC pursuant to this AGREEMENT for use of the pertinent item or items of EMERALD EQUIPMENT and/or MBC EQUIPMENT during that period (the "INDEMNITY PRINCIPAL AMOUNT").   In addition, if the COURT orders SEA STAR to pay interest on any amount that it determines is due to a COMPETING CLAIMANT,

3

MBC shall remit to SEA STAR interest on the INDEMNITY PRINCIPAL AMOUNT calculated at the annual rate at which SEA STAR'S obligation to pay interest is to be calculated under the terms of the COURT'S order. Each party agrees to give the other party written notice of any proceeding before a COURT in which a COMPETING CLAIMANT is asserting a claim for compensation for use of any EMERALD EQUIPMENT and/or MBC EQUIPMENT by SEA STAR as soon as practicable after said party receives notice of such proceeding.

5.    Remedy of Sea Star In Event of Breach.    MBC acknowledges and agrees that if it fails to remit to SEA STAR any amount due under this AGREEMENT when and as due, interest shall accrue on the unpaid amount at an annual rate of ten percent (10%) from the date payment was due hereunder until the date of payment and that, in the event SEA STAR retains counsel to enforce rights and remedies against MBC as a result of MBC'S breach of this AGREEMENT, SEA STAR shall be entitled to recover from MBC in addition to all other amounts due hereunder all reasonable attorneys' fees and expenses incurred by SEA STAR as a result of MBC's breach.

6.    Amendment.    This AGREEMENT shall not be amended changed or modified except by an agreement in writing, signed by the party against whom enforcement of the change is sought.

7.    Governing Law.    This AGREEMENT shall be governed by and construed in accordance with the laws of the State of Delaware.

8.    Counterparts.    This AGREEMENT may be executed in counterparts, all of which when taken together, shall constitute one and the same AGREEMENT.

9.    Headings.    The headings in this AGREEMENT are solely for convenience and are not intended to define, limit, or describe the scope of this AGREEMENT.

10.    Waiver of Jury Trial.    The parties hereto agree that any suit, action, or proceeding, whether claim or counterclaim, brought or instituted by any party to this AGREEMENT, or any of their successors or assigns, on or with respect to this AGREEMENT or which in any way relates, directly or indirectly, to the obligations of any of the parties hereto under this AGREEMENT, or the dealings of the parties with respect thereto, shall be tried only by a court and not by a jury. **THE PARTIES EXPRESSLY WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY SUCH ACTION OR PROCEEDINGS.** The parties acknowledge and agree that this provision is a specific and material aspect of the agreement between the parties and that the parties would not enter into this AGREEMENT if this provision, or any other provision of this AGREEMENT, were not contained herein.

IN WITNESS WHEREOF, the parties have executed this AGREEMENT as of the date first above written with the specific intention of creating a document under seal.

4

**WITNESS/ATTEST:**

**MBC:**

MBC LEASING CORP.,
A Maryland Corporation

By: _____ (SEAL)
Scott H. Krieger,
Treasurer and Assistant Secretary

**SEA STAR:**

SEA STAR LINE, LLC,
A DELAWARE Limited Liability Company

By: _____ (SEAL)
Name: PHILIP V. BAXES
Title: SVP Operations

5

## ACKNOWLEDGEMENTS

STATE OF MARYLAND, CITY/COUNTY OF _Baltimore_, TO WIT:

    I HEREBY CERTIFY that on this _20th_ day of _September_, 2002, before me, the undersigned Notary Public of the State of Maryland, personally appeared Scott H. Krieger, and acknowledged himself to be a Treasurer and Assistant Secretary of MBC LEASING CORP., a Maryland corporation, and that he, as such Treasurer and Assistant Secretary, being authorized so to do, executed the foregoing instrument for the purposes therein contained by signing the name of MBC LEASING CORP., by himself as Treasurer and Assistant Secretary.

    IN WITNESS MY Hand and Notarial Seal.

                        (SEAL)
                NOTARY PUBLIC

                                LAURA D. RUTHERFORD
                                NOTARY PUBLIC
                                BALTIMORE COUNTY, MD.

My Commission Expires: _5-5-03_

STATE OF FLORIDA, COUNTY OF DUVAL, TO WIT:

    I HEREBY CERTIFY that on this _3_ day of _October_, 2002, before me, the undersigned Notary Public of the State and subdivision aforesaid, personally appeared _Philip V. Bates_, and acknowledged himself to be the _SVP Operations_ of SEA STAR LINE, LLC, a Delaware limited liability company, and that he, as such _SVP Operations_ being authorized so to do, executed the foregoing instrument for the purposes therein contained by signing the name of SEA STAR LINE, LLC, by himself as _SVP Operations_.

    IN WITNESS MY Hand and Notarial Seal.

                        _Karen Nedd_ (SEAL)
                NOTARY PUBLIC

My Commission Expires: _8/25/03_

KAREN NEDD
Notary Public - State of Florida
My Commission Expires Aug 25, 2003
Commission # CC866224

6

# EQUIPMENT SCHEDULE A

EMERALD EQUIPMENT LEASING, INC.

| EQUIPMENT TYPE | DAILY LEASE RATE | DAMAGE EXCLUSION | STIPULATED LOSS VALUE |
|---|---|---|---|
| 20' DV | $1.00 | $285.00 | $1,000.00 |
| 40' DV | $1.25 | $1,200.00 | $1,000.00 |
| 40' HV | $1.50 | $800.00 | $1,000.00 |
| 45' HV | $2.00 | $800.00 | $1,000.00 |
| 40' RV | $8.00 | $16,480.00 | $4,000.00 |
| 20' CH | $2.20 | $640.00 | $2,200.00 |
| 40' CH | $2.20 | $640.00 | $2,200.00 |
| 45' CH | $2.40 | $640.00 | $2,200.00 |
| Gen Sets | $4.50 | $640.00 | $2,200.00 |

19

## EXHIBIT "A"

**Equipment Type:**
Up to 664 40' High Cube Containers: 1999 Hyundai (NPRU 675 series).

**Per Diem Rent:**
$1.15 *per diem* rate during initial five (5) year term (August 1, 2002-July 30, 2007).
Options out for any selected units: August 2005 with retroactive *per diem* rate increase @ $0.25; August 2006 with retroactive *per diem* rate increase @ $0.20.
*Per diem* rate @ $0.90 for each unit kept at Lessee's option during lease extension from August 1, 2007 to July 30, 2008.

**Damage Exclusion:**
Lessee is not responsible for the first $500.00 of repairs per unit at redelivery.

**Stipulated Loss Value:**
$1,850.00 for each unit prior to end of first five (5) years of Lease; $1,300.00 for each unit at conclusion of fifth (5th) or sixth (6th) year of Lease.  Payment of Stipulated Loss Value to Lessor for any unit terminates *per diem* rent for that unit.

**Redelivery:**
*Per diem* rate after Wind-Down Period increases an additional $0.35 to *per diem* rate of $1.50.

**Off-Hire Depot Fee:**
$25.00 per unit redelivered to Lessor's designated depots at Jacksonville, San Juan, or other mutually agreed locations.

*PVB.*

## EXHIBIT "B"

**Equipment Types**:
Up to 264 45' High Cube Containers:
    163 UXXU 480, 481 series – 1997 SHUNDE
    101 SCSU 450 series – 1997 DAWANG

**Per Diem Rent**:
$1.40 *per diem* rate during initial five (5) year term (August 1, 2002-July 30, 2007).
Options out for any selected units: August 2005 with retroactive *per diem* rate increase @ $0.15; August 2006 with retroactive *per diem* rate increase @ $0.10.
*Per diem* rate $1.10 for each unit kept during lease extension from August 1, 2007 to July 30, 2008.

**Damage Exclusion**:
Lessee is not responsible for the first $650.00 of repairs per unit at redelivery.

**Stipulated Loss**:
$1,850.00 for each unit prior to end of first (5) years of Lease; $1,300.00 for each unit at conclusion of fifth (5th) or sixth (6th) year of lease.  Payment of Stipulated Loss Value to Lessor for any unit terminates *per diem* rent for that unit.

**Redelivery**:
*Per diem* rate after Wind-Down Period increases an additional $0.35 to *per diem* rate of $1.75.

**Off-Hire Depot Fee**:
$25.00 per unit redelivered to Lessor's designated depots at Jacksonville, San Juan, or other mutually agreed locations.

$\rho \sqrt{B}$.

## EQUIPMENT RENTAL AGREEMENT

As of ~ P/3

This Agreement is made and executed this ___ day of July, 2002 between EMERALD EQUIPMENT LEASING, INC., a Delaware corporation having its principal place of business at 101 South King Street, Gloucester City, New Jersey 08030 ("Lessor"), and SEA STAR LINE, LLC, a Delaware limited liability company having its principal place of business at 100 Bell Tel Way, Suite 300, Jacksonville, Florida 32216 ("Lessee"). Terms and conditions of this Agreement cover equipment in use at various times commencing April 29, 2002. Such equipment is of the types, at daily lease rates, and with damage exclusions and stipulated loss values delineated on Schedule "A", which is attached to and incorporated into this Agreement ("Equipment"). In consideration of the mutual covenants and conditions delineated below, the Parties agree:

**1. Equipment.** Lessor agrees to lease to Lessee, and Lessee agrees to lease from Lessor, the Equipment. Delivery of all Equipment to Lessee or its agents by Lessor shall be effected and evidenced by signed and dated equipment interchange receipts and shall be subject to the terms and conditions of this Agreement.

**2. Term.** The lease term for each item of Equipment shall begin on the date when such Equipment is delivered to Lessee or its agent and shall end on the date when such Equipment is taken off hire pursuant to section 10 below. Unless the parties otherwise agree in writing, the minimum rental period for each item of Equipment shall be thirty (30) days. All provisions of this Agreement shall apply during any extension or renewal period. Either party may terminate this Agreement on thirty (30) days' prior written notice to the other party.

**3. Rental.** Lessee shall pay rent and all other charges under this Agreement on a monthly basis. Each payment for particular Equipment will become due on the tenth day of the month following the month of use, unless the parties otherwise agree in writing. In the event Lessee fails to make timely payment, interest shall be due on any overdue amount at a rate of eighteen percent (18%) per annum, commencing ten (10) days after Lessee receives Lessor's invoice for such overdue amount. With respect to particular Equipment, Lessee's obligation to pay rent and other charges shall terminate immediately if Lessee purchases and pays for such Equipment.

**4. Ownership; Sublease; Substitution; Encumbrances.**


EXHIBIT "G"

(a)   This Agreement shall be deemed a lease for all purposes. The Equipment shall remain Lessor's property; and Lessee shall acquire no title, ownership, or purchase rights of any nature by virtue of this Agreement.   In the event that notwithstanding the express intent of the parties, a court of competent jurisdiction determines that this Agreement is not a true lease but is rather a sale and extension of credit, a lease intended for security, a loan secured by the Equipment or other similar arrangement, the parties agree: (i) (A) to secure the prompt payment and performance as and when due of all Lessee's obligations (both now existing and hereafter arising) under this Agreement, Lessee shall be deemed to have granted, and it hereby grants, to Lessor a first priority security interest in the following (whether now existing or hereafter created): the Equipment, all replacements, substitutions, attachments, accessions, and additions thereto, all warranties and licenses relating thereto and all proceeds (cash and non-cash but without power of sale), including the proceeds of all insurance policies, insuring the Equipment; (B) with respect to the Equipment, in addition to all other rights and remedies available to Lessor under this Agreement upon the occurrence of an event of default, Lessor shall have all of the rights and remedies of a first priority secured party under the Uniform Commercial Code; and (ii) (A) the principal amount of any such loan shall be an amount equal to the aggregate of the "Stipulated Loss Values" of all outstanding Equipment; (B) the term of any such loan shall be co-extensive with the term of this Agreement; and (C) the loan payments under any such loan shall be the rental payments specified in this Agreement.

(b)   This Agreement shall be subject and subordinate to any lease or security interest in favor of a third-party lessor or lender to Lessor.   In the event any such third party becomes entitled to possession of any Equipment, Lessee shall return the Equipment to such third party at one or more delivery locations specified in paragraph 10.

(c)   Lessee shall not pledge, hypothecate, mortgage, create any security interest in, or otherwise encumber or permit the encumbrance of any Equipment.   At its own expense, Lessee promptly shall take action necessary to discharge any lien, charge, or other encumbrance asserted against any Equipment arising after delivery of such Equipment to Lessee and as a result of Lessee's act or omission.

(d)   Each item of Equipment shall have Lessor's serial number and other identifying marks affixed.  Lessee shall not obliterate, alter, conceal, or otherwise change or hide such number or marks.

(e)   Without Lessor's prior written consent, Lessee shall not assign any right or interest in this Agreement or any Equipment and shall not sublet or otherwise relinquish possession of any Equipment, except to other carriers as evidenced by interchange agreements.  Lessor may assign all or any part of its obligations, right, title, or interest in this Agreement, including all rental charges due or to become due.  Lessee expressly consents to Lessor's application of any payment credits to which it is entitled under this Agreement to payment obligations of Lessee under this Agreement.

**5.  Equipment Delivery and Interchange.**  Lessor shall make the Equipment available for delivery to Lessee at the locations agreed by the parties.  The signature of Lessee's representative on an equipment interchange receipt shall constitute conclusive evidence that the Equipment to which the receipt relates has been delivered to Lessee.

**6.  Maintenance and Repairs.**

(a)   At its own cost and expense, Lessee shall keep the Equipment in operating condition.  Lessee shall be responsible for all damages and changes in the condition of the Equipment after delivery by Lessor, subject to section 10 below and Schedule "A". Lessee's maintenance and repair obligations include washing and cleaning the Equipment regularly to prevent corrosion, spot painting, and replacing of parts as necessary.  Lessee shall comply with all loading limitations, handling procedures, and operating instructions to prevent excessive impact or unbalanced loading. Lessee shall not use any Equipment for storage or transportation of cargo which may damage the Equipment, including but not limited to unprotected corrosive substances, poorly secured materials, or bulk commodities which may corrode, oxidize, severely dent, puncture, contaminate, stain, or damage the Equipment.

(b)   Lessee shall make no modifications, improvements, or replacements and shall not attach accessories or additions to any Equipment, without Lessor's prior written consent, which shall not be unreasonably withheld, except as necessary to comply with this Agreement.   All improvements, repairs, accessories, and replacements made or attached to any Equipment by Lessee shall become part of the Equipment and Lessor's property without Lessor incurring any liability or, at Lessor's option, shall be removed

and the Equipment restored to its original condition at Lessee's expense.  Absent written agreement, Lessee shall not change or supplement identification marks on any Equipment.

(c)  Lessee shall comply with all conventions, laws, regulations, or orders of federal, state, foreign, and local governments and agencies having jurisdiction over the Equipment or its use, operation, or storage and shall be liable for all fines, penalties, and fees for failure to comply.

7.  **Warranties**.  Equipment subject to this Agreement is leased "AS IS", and Lessor warrants only that Lessee shall have quiet possession against any person claiming through Lessor. **LESSOR MAKES NO EXPRESSED OR IMPLIED WARRANTY OF QUALITY, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR USE WITH RESPECT TO ANY EQUIPMENT AND HAS NOT MADE, AND SHALL NOT BE BOUND BY, ANY STATEMENT, AGREEMENT, OR REPRESENTATION NOT SPECIFIED IN A WRITING SIGNED BY LESSOR.**

8.  **Taxes and Other Expenses**.  Lessee agrees to pay all sales, use, excise, property, gross income, gross receipts, stamp, or other taxes; levies; import duties; charges; or withholdings of any nature (together with any penalties, fines, or interest) imposed against Lessor, Lessee, or the Equipment by any governmental or taxing authority with respect to any Equipment; upon the leasing, delivery, possession, use, operation, redelivery, or other disposition of such Equipment; or upon the rentals, receipts, or earnings arising from such Equipment; excluding, however, any such taxes, levies, import duties, charges, and withholdings that are imposed or accrued with respect to any Equipment prior to its delivery to Lessee and any taxes measured by Lessor's income.  Lessee shall pay all other expenses relating to Equipment arising during the rental period and resulting from Lessee's acts or omissions, including but not limited to expenses incurred in ports, depots, or storage areas.

9.  **Risk of Loss**.

(a)  During the term of this Agreement, Lessee shall bear all risk of loss, damage, theft, or destruction to the Equipment.  No such loss, damage, theft, or destruction of Equipment, in whole or part, shall impair Lessee's obligations under this Agreement, all of which shall continue in full force and effect. At Lessor's option and subject to Schedule "A", Lessee shall (i) put the affected Equipment in the condition that existed upon delivery to Lessee or (ii) pay Lessor an amount equal to all accrued and unpaid rent due under this Agreement, together with the Stipulated Loss

Value, with respect to the affected Equipment, less the amount of all recoveries by Lessor from parties other than Lessee for such loss, damage, theft, or destruction.

(b)   Upon compliance with subparagraph (a), Lessee shall be subrogated to Lessor's rights with respect to any insurance policies and claims for reimbursement by third parties in connection with such loss, damage, theft, or destruction.

### 10.   Redelivery of Equipment.

(a)   At its sole expense, Lessee shall redeliver Equipment to Lessor at Greenwich Terminal, Philadelphia, Pennsylvania, Sea Star Terminal, Puerto Nuevo, San Juan, Puerto Rico, Greenwich Terminal, Port of Jacksonville, Florida, or any other location as to which the parties have agreed in writing.   Each redelivery shall be subject to Schedule "A".   At least seventy-two (72) hours prior to actual redelivery, Lessee shall give Lessor a written estimate of types and quantities of Equipment which Lessee intends to redeliver at particular ports.

(b)   Upon redelivery of particular Equipment, the receiving terminal will execute an equipment interchange receipt.   Subject to Schedule "A", Lessee shall return all Equipment to Lessor in the condition that existed upon delivery to Lessee.

(c)   Lessee shall return such Equipment with tires equal in value and condition to those delivered with the Equipment, normal wear and tear excepted.   The value of any tire damage at the time of return is included in the damage exclusion value for such Equipment, as specified in Schedule "A".

(d)   Lessor shall have the right to inspect Equipment leased under this Agreement at reasonable times during normal business hours.   Upon Lessor's reasonable request, Lessee shall furnish a list of all locations of Equipment as of the most recent date possible and take reasonable steps to make Equipment available for inspection.   On or before the seventh day of each month, Lessee shall furnish a list of all locations of Equipment as of the end of the previous month.

(e)   At the time of return, Equipment will be taken off hire; and rental charges will cease.   If Equipment is returned to a terminal with damage exceeding the damage exclusion specified in Schedule "A", Lessor will inform Lessee within seven (7) days after return.   Lessor shall have the right to require Lessee to repair Equipment or to authorize repairs at Lessee's expense.   If Lessee

fails to authorize repairs for which Lessor claims Lessee is responsible within ten (10) days after notification of damage, Lessor may promptly authorize such repair and rental charges will cease on completion of such repairs (no later than 10 business days after authorization). Lessee agrees to pay for required repairs no later than ten (10) days after receipt of invoice.

(f) If Lessee fails to return any Equipment for more than sixty (60) days after the return date specified in a Lessor notice, Lessor may elect to treat such Equipment as lost; and Lessee shall pay Lessor the Stipulated Loss Value of such Equipment, together with all accrued rental charges at the contractual daily rate within fifteen (15) days.

## 11. **Indemnification and Expenses.**

(a) Lessee shall defend, indemnify and hold Lessor, its agents and employees, harmless from all claims, causes of action, liability damage or loss (including expenses in connection with any claim or suit, such as reasonable attorneys' fees and court costs) arising out of (a) failure by Lessee to comply with its obligations under this Agreement or any attempt by a third party to impose on Lessor liability for Lessee's acts or omissions; (b) any claim for personal injury or death or for property loss or damage (including but not limited to any products liability claim) arising out of possession, leasing, operation, control, use, storage, loading, unloading, moving, maintenance, delivery, or return of any Equipment; and (c) any forfeiture, seizure, impounding of, or charge or lien imposed or asserted against any Equipment as a result of Lessee's acts or omissions.

(b) Except for Lessee's obligation to pay interest on delinquent rent, neither party shall be liable to the other party or any other person for delay not to exceed sixty (60) days in the performance of any obligation due to events beyond its reasonable control, including but not limited to fire; storm; flood; earthquake; explosion; accidents; acts of God, governmental agencies, or public enemies; sabotage; riots; civil disorders; strikes, lockouts, and other work stoppages; labor disputes; and failure of repair facilities to complete repairs timely. Under no circumstances shall either party be liable to the other party for exemplary damages.

12. **Insurance.** Lessee will carry and maintain insurance on the Equipment. Upon execution of this Agreement, Lessee shall furnish Lessor with insurance certificates evidencing (a) all-risk loss and damage insurance (including mysterious disappearance,

unexplained loss, war risks, strikes, riots, and civil commotions) on land, afloat, or airborne, in transit or at rest anywhere in the world, in an amount equal to the Stipulated Loss Value of all Equipment leased pursuant to this Agreement; (b) comprehensive general liability insurance, including contractual liability and broad form property damage, with combined single limits of $2,000,000; (c) automobile liability and property damage with combined single limits of $2,000,000; (d) deductibles applicable to each coverage. Each insurance coverage shall (a) name Lessor and its assigns as additional assureds, as their interests may appear; (b) include a loss payable clause in favor of Lessor and its assigns; and {c) include the insurer's undertaking to send Lessor and its assigns written notice at least thirty (30) days prior to any expiration or cancellation of such insurance. If Lessee defaults in payment of any premium under any such insurance policies, Lessor may but shall not be obliged to pay such premium; and Lessee shall repay the premium on demand. Lessee assigns to Lessor all right to insurance proceeds payable to Lessee for damage to or loss of the Equipment.

13. **Events of Default.**

(a) The following shall be events of default under this Agreement:

(i) Continuing failure to pay rent for thirty (30) days after its due date under this Agreement;

(ii) Continuing default in performance of any of Lessee's obligations under this Agreement for thirty (30) days after written notice thereof from Lessor to Lessee;

(iii) Lessee is a party to a merger or consolidation or sells, conveys, or transfers all or a substantial part of its assets or becomes insolvent or admits in writing its inability to pay its debts as they mature or applies for, consents to, or acquiesces in appointment of a trustee or a receiver for Lessee or any subsidiary or any property of either; or, in the absence of such application, consent, or acquiescence, a trustee or receiver is appointed for Lessee or any subsidiary or for a substantial part of the property of either and is not discharged within sixty (60) days; or under bankruptcy or insolvency law, any dissolution or liquidation proceeding is instituted against Lessee or any subsidiary with Lessee's or such subsidiary's consent or acquiescence or remains undismissed for sixty (60) days.

(b)   Upon the occurrence of any default by Lessee under this Agreement, Lessor shall (except to the extent otherwise required by law) be entitled to:

(i) Proceed by appropriate court action or actions to enforce performance by Lessee of the applicable covenants and terms of the Agreement or to recover damages for breach;

(ii) Terminate Lessee's right to possession of, demand return of, or repossess at Lessee's expense any or all of the Equipment without prejudice to any other remedy or claim;

(iii) Elect to sell any or all Equipment after giving thirty (30) days' notice to Lessee at one or more public or private sales and recover the sum of the Stipulated Loss Values of such Equipment, all rent owed through the rent payment immediately preceding the date of such notice, all costs and expenses incurred in searching for, taking, removing, keeping, storing, repairing and restoring and selling such Equipment, all other amounts owed by Lessee under this Agreement, whether as additional rent, indemnification, or otherwise, and all costs and expenses, including reasonable legal fees, incurred by Lessor as a result of Lessee's default under this Agreement after deducting all amounts received by Lessor in connection with such public or private sales;

(iv) Upon notice to Lessee, receive prompt payment from Lessee of an amount equal to the Stipulated Loss Values of all Equipment not sold by Lessor pursuant to clause (iii) above plus, to the extent not otherwise recovered from Lessee pursuant to clause (ii) above, any rent owed through the rent payment date preceding the date of such notice, all costs and expenses incurred in searching for, taking, removing, keeping, storing, repairing, and restoring such Equipment, all other amounts owed by Lessee under this Agreement, whether as additional rent, indemnification, or otherwise, and all reasonable fees and expenses incurred by Lessor as a result of Lessee's default, provided that upon receipt of payment in full of such amount, Lessor shall transfer title to such Equipment to Lessee;

(v) By notice to Lessee, declare this Agreement terminated without prejudice to Lessor's rights in respect of obligations then accrued and remaining unsatisfied; or

(vi) Avail itself of any other remedy or remedies provided by statute or otherwise available at law, in equity, or in bankruptcy or insolvency proceedings.

(c)  The remedies set forth in this Agreement are cumulative.
References to additional rent in clause (iii) and (iv) of
subparagraph (b) shall include interest at the rate of eighteen
percent (18%) per annum to the date Lessor receives any amount
payable under said clause from the due date to and including the
rent payment date immediately preceding the date on which notice is
given under said clause and interest at the same rate on all other
costs, expenses, and losses for which Lessor is entitled to payment
under said clause to the date Lessor receives any reimbursement
from the respective dates Lessor incurs such costs, expenses, and
losses.

**14.  Applicable Law.**  This Agreement shall be interpreted and
the rights, liabilities and duties of the parties determined in
accordance with the laws of the State of Maryland.

**15.  Miscellaneous.**

(a)  This Agreement is binding upon the parties and their
respective legal representatives, successors and assigns. This
Agreement contains the entire agreement between the parties and,
subject to the provisions of section 1, may not be amended,
altered, or modified, except by a writing signed by the party to be
bound.

(b)  All notices under this Agreement, including but not
limited to billing by Lessor for rental charges and payments by
Lessee shall be addressed as follows, unless or until either party
gives written notice to the contrary to the other party:

        Lessor: Emerald Equipment Leasing, Inc.
                101 South King Street
                Gloucester City, NJ 08030
                Attn.: Arthur Davis
                Telefax: 856-742-3250

        Lessee: Sea Star Line, LLC
                100 Bell Tel Way, Suite 300
                Jacksonville, FL 32216
                Attn.: Philip V. Bates
                Telefax No.: 904-724-3011

All notices shall be in writing and delivered by hand delivery,
registered or certified mail, or confirmed telex or telefax.

(c)  The provisions of this Agreement are separable and any
provisions found upon judicial interpretation or construction to be

prohibited by law shall be ineffective to the extent of such prohibition without invalidating the remaining provisions of this Agreement.

(d)  No waiver of any remedy or other right under this Agreement shall operate as a waiver of any other remedy or right nor shall any single or partial exercise of any remedy or right preclude any other or further exercise thereof or any other remedy or right.

IN WITNESS WHEREOF, the parties have executed this Equipment Rental Agreement as of the day and year first written above.

LESSEE:                          LESSOR:
Sea Star Line, LLC               Emerald Equipment Leasing, Inc.

By: _____            By: _____
    SVP - Operations
         Title                            Title

02-3523-001e

# EQUIPMENT SCHEDULE A

EMERALD EQUIPMENT LEASING, INC.

| EQUIPMENT TYPE | DAILY LEASE RATE | DAMAGE EXCLUSION | STIPULATED LOSS VALUE |
|---|---|---|---|
| 20' DV | $1.00 | $285.00 | $1,000.00 |
| 40' DV | $1.25 | $1,200.00 | $1,000.00 |
| 40' HV | $1.50 | $800.00 | $1,000.00 |
| 45' HV | $2.00 | $800.00 | $1,000.00 |
| 40' RV | $8.00 | $16,480.00 | $4,000.00 |
| 20' CH | $2.20 | $640.00 | $2,200.00 |
| 40' CH | $2.20 | $840.00 | $2,200.00 |
| 45' CH | $2.40 | $640.00 | $2,200.00 |
| Gen Sets | $4.50 | $640.00 | $2,200.00 |

19