IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

JACKSONVILLE DIVISION

CASE NO. 3:04 CV-146-V-99HTS

SEA STAR LINE, LLC,
a limited liability company,

        Plaintiff,

-vs-

EMERALD EQUIPMENT LEASING,
INC., a corporation,

        Defendant.

_____/

## EMERALD'S ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIM[1]

Defendant, Emerald Equipment Leasing, Inc. ("Emerald"), by way of Answer to

the Complaint filed by Sea Star Line, LLC ("Sea Star"), states as follows:

1.     The allegations set forth in paragraph 1 state a legal conclusion to which

no response is required. It is specifically denied that declaratory judgment relief pursuant

to 28 U.S.C.A. Sections 2201 and 2202 is appropriate in this case. It is further denied

that federal jurisdiction exists pursuant to 28 U.S.C.A. Sections 1337 and 1367.

2.     Emerald has insufficient knowledge and information upon which to form a

belief as to the truth of the allegations in paragraph 2, and leaves Sea Star to its proofs.

3.     Emerald admits that it is a Delaware corporation and a named Debtor

under Chapter 11 of the United States Bankruptcy Code. Emerald further admits that it

---

[1] An Order was entered on April 20, 2005 transferring this case to the United States District Court for the District of Delaware (the "Delaware Court") for potential referral to the United States Bankruptcy Court for the District of Delaware. This Answer, Affirmative Defenses and Counterclaim is being filed herein with the Clerk's Office in the United States District Court for the Middle District of Florida pending transfer of this case to the Delaware Court so as to avoid running afoul of any pertinent statute of limitations.

has done business with Sea Star in the State of Florida. Emerald denies the remaining allegations contained in paragraph 3, as stated.

4.      Emerald admits that Sea Star entered into an Asset Purchase Agreement, as amended, with NPR, Inc. ("NPR"), and other named Debtors, in proceedings pending under Chapter 11 of the United States Bankruptcy Code. Any concerns or objections raised by Emerald or MBC Leasing Corp. ("MBC") and the Bankruptcy Court's rulings thereon as set forth in paragraph 4 are contained in transcripts and are made a part of the Bankruptcy Court records, which speak for themselves. To the extent the allegations in this paragraph state otherwise, they are denied.

5.      Emerald has insufficient knowledge and information upon which to form a belief as to the truth of the allegations in paragraph 5, and leaves Sea Star to its proofs. Furthermore, the court proceedings in the Bankruptcy Court made reference to in paragraph 5 are or may be contained in transcripts and are made a part of the Bankruptcy Court records, which speak for themselves. To the extent the allegations in this paragraph state otherwise, they are denied.

6.      Emerald admits that on April 26, 2002, the Bankruptcy Court issued an Order authorizing the sale of the NPR assets free and clear of all liens, claims and encumbrances (the "Sale Order"). The Sale Order is a written document which speaks for itself. Any remaining allegations otherwise are denied.

7.      Emerald admits that closing of the asset purchase occurred on April 27, 2002 at 3:00 a.m. Emerald denies the remaining allegations contained in paragraph 7, as stated, except that it is admitted that Sea Star agreed to a thirty (30) day grace period before storage charges would begin to accrue with respect to Emerald equipment.

2

8. Emerald has insufficient knowledge and information upon which to form a belief as to the truth of the allegations in paragraph 8, and leaves Sea Star to its proofs. Further, the Answers to Interrogatories dated July 9, 2002 constitute a writing, which speaks for itself. To the extent the allegations in this paragraph state otherwise, they are denied.

9. Emerald admits that an Order was entered by the Bankruptcy Court dated July 22, 2002, but effective as of April 29, 2002, terminating the automatic stay, which Order is attached as Exhibit "B" to the Complaint. Said Order is a writing which speaks for itself. To the extent the allegations in this paragraph state otherwise, they are denied.

10. Emerald denies the allegations contained in paragraph 10, as stated. MBC's rights as to the Emerald equipment are controlled, inter alia, by the Bankruptcy Court Order attached as Exhibit "B" to the Complaint. Further, the June 10, 2002 letter referred to in paragraph 10 attached as Exhibit "C" to the Complaint is a written document which speaks for itself. In addition, the letter attached as Exhibit "D" to the Complaint is a writing which speaks for itself. To the extent the allegations in this paragraph state otherwise, they are denied.

11. The June 19, 2002 letter attached as Exhibit "E" to the Complaint is a writing which speaks for itself. To the extent the allegations in this paragraph state otherwise, they are denied.

12. The Indemnity Agreement made reference to in paragraph 12, attached as Exhibit "F" to the Complaint, is a writing which speaks for itself. To the extent the allegations in this paragraph state otherwise, they are denied.

3

13.    Emerald has insufficient knowledge and information upon which to form a belief as to the truth of the allegations in paragraph 13, and leaves Sea Star to its proofs.

14.    The Emerald Agreement attached as Exhibit "G" is a writing which speaks for itself.  To the extent the allegations in this paragraph state otherwise, they are denied. Further, to the extent the allegations contained in paragraph 14 constitute a legal conclusion, no response is required.

15.    The Emerald Agreement is a writing which speaks for itself.  To the extent the allegations in this paragraph state otherwise, they are denied.

16.    Emerald admits the allegations contained in the first sentence of paragraph 16. Emerald denies that Sea Star on-hired Emerald equipment <u>delivered to Sea Star's leased premises</u> after shipments in process on the date Sea Star's use for a new cargo movement began [emphasis added].  Rather, Sea Star on-hired Emerald equipment after shipments in process on the date Sea Star's use for a new cargo movement began, whether or not the equipment was "delivered" to Sea Star's leased premises".

17.    Emerald denies the allegations contained in paragraph 17, as stated.

18.    Emerald admits that no Greenwich terminal was operating before August 1, 2002 in the Port of Jacksonville and that as of August 1, 2002, Greenwich occupied the former NPR terminal, where Emerald equipment could be returned by Sea Star and stored.  Emerald has insufficient knowledge and information upon which to form a belief as to the truth of the remaining allegations in paragraph 18, and leaves Sea Star to its profs.

19.    Emerald has insufficient knowledge and information upon which to form a belief as to the truth of the allegation that Emerald equipment located on Sea Star's

4

premises, but not on-hired by Sea Star, remained in storage pursuant to the Sale Order and Sea Star's agreement with MBC, and leaves Sea Star to its proofs. Emerald admits that throughout 2002 and 2003, MBC and/or Emerald utilized Sea Star facilities for storage of certain Emerald equipment that they were trying to sell to third parties. Emerald denies the remaining allegations contained in paragraph 19, to the extent that said allegations imply an obligation upon Emerald to remove any remaining equipment from Sea Star's terminal as set forth in paragraph 19.

20.     Emerald denies the allegations contained in paragraph 20.

## COUNT I

Emerald reiterates its answers to the allegations in paragraphs 1 through 20 above, and fully incorporate the same herein as if set forth at length.

21.     Emerald admits only that a dispute exists between Sea Star and Emerald as to the extent of Sea Star's underpayment of rent owed to Emerald, as well as damages to Emerald for non-return of equipment or otherwise. Emerald further admits that Sea Star seeks a declaration of its rights and other legal obligations under the Emerald Agreement and the Sale Order, as set forth in paragraph 21; however, Emerald denies Sea Star's entitlement to such a declaration of rights and obligations as a declaratory judgment action.

22.     Emerald admits that Sea Star makes further requests for "declarations" to be made by this Court; however, Emerald denies that Sea Star is entitled to such a declaration in the manner set forth in these proceedings.

WHEREFORE, Emerald demands judgment against Sea Star dismissing the Complaint, together with an award of costs of court.

**COUNT II**

Emerald reiterates its answers to the allegations in paragraphs 1 through 20 above, and fully incorporate the same herein as if set forth at length.

23.    Emerald denies the allegations contained in paragraph 23, except to admit that it entered into an agreement with Sea Star for the shipment of certain equipment on board Sea Star vessels.

24.    Emerald denies the allegations contained in paragraph 24.

25.    Emerald denies the allegations contained in paragraph 25.

WHEREFORE, Emerald demands judgment against Sea Star dismissing the Complaint, together with an award of costs of court.

**COUNT III**

Emerald reiterates its answers to the allegations in paragraphs 1 through 20 above, and fully incorporate the same herein as if set forth at length.

26.    Emerald denies the allegations contained in paragraph 26.

WHEREFORE, Emerald demands judgment against Sea Star dismissing the Complaint, together with an award of costs of court.

**COUNT IV**

Emerald reiterates its answers to the allegations in paragraphs 1 through 20 above, and fully incorporate the same herein as if set forth at length.

27.    Emerald denies the allegations contained in paragraph 27.

WHEREFORE, Emerald demands judgment against Sea Star dismissing the Complaint, together with an award of costs of court.

6

## FIRST AFFIRMATIVE DEFENSE

Sea Star's Complaint, and all the Counts contained therein, fail to state a cause of action as against Emerald, upon which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE

Declaratory judgment relief sought by Sea Star is inappropriate under the circumstances of this case. Accordingly, the Complaint should be dismissed.

## THIRD AFFIRMATIVE DEFENSE

The relief requested in the Complaint is barred, in whole or in part, by Emerald's rights of setoff and/or recoupment.

## FOURTH AFFIRMATIVE DEFENSE

The relief requested in the Complaint is barred in whole or in part by the doctrines of estoppel and/or waiver.

## FIFTH AFFIRMATIVE DEFENSE

The relief requested in the Complaint is barred, in whole or in part, due to Sea Star's breach of and/or failure to perform under applicable contracts between the parties.

## SIXTH AFFIRMATIVE DEFENSE

Emerald breached no duty owed to Sea Star.

## SEVENTH AFFIRMATIVE DEFENSE

Sea Star, by its course of conduct, is barred from recovery against Sea Star in this action.

## EIGHTH AFFIRMATIVE DEFENSE

Any losses allegedly suffered by Sea Star were caused by its own negligence.

## NINTH AFFIRMATIVE DEFENSE

Sea Star is barred from asserting any claims against Emerald under the doctrine of unclear hands. Sea Star is not permitted to benefit from its own wrongdoing.

## TENTH AFFIRMATIVE DEFENSE

Venue is improper in this case. These proceedings should be transferred to the United States Bankruptcy Court for the District of Delaware which is the most appropriate forum for this litigation.

## COUNTERCLAIM OF EMERALD

Emerald Equipment Leasing, Inc., by and through its undersigned counsel, files this Counterclaim against Sea Star Line, LLC, and in support, avers as follows:

## JURISDICTION AND VENUE

1.     This Court has jurisdiction over this Counterclaim pursuant to 28 U.S.C. Sections 1334 and 157 and Sections 542 of Title 11 of the United States Code (the "Bankruptcy Code"). It is further asserted that this adversary proceeding is a "core" proceeding to be heard and determined by a bankruptcy court pursuant to 28 U.S.C. Sections 157(b)(2)(A)(C)(E) and (O). In addition, this Court has jurisdiction over this Counterclaim pursuant to 28 U.S.C.A. Section 1333.

2.     Venue is appropriate before this Court by virtue of, and in accordance with, inter alia, 28 U.S.C. Section 1409.

## PARTIES

3.     Counterclaimant is Emerald Equipment Leasing, Inc. ("Emerald"), a Debtor-in-Possession having filed a voluntary petition for relief under Chapter 11 of the United

8

States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") on March 21, 2001 (the "Petition Date"). Emerald remains in possession of its assets and continues to operate its business under the applicable provisions of the Bankruptcy Code.

4.   Emerald was organized in October, 1997 under the laws of the State of New Jersey and was engaged in business as a lessor of various equipment used in the ocean going transportation business.

5.   Defendant on the Counterclaim is Sea Star Line, LLC ("Sea Star"), a company engaged in the shipping business, inter alia, as an ocean carrier transporting cargo, with a place of business located at 100 Bell Tel Way, Suite 300, Jacksonville, FL 32216.

## BACKGROUND

6.   Prior to the Petition Date, Emerald leased all of its equipment to NPR, Inc. and Holt Cargo Systems, Inc.  Said lease with NPR, Inc. and Holt Cargo Systems, Inc. of Emerald's equipment was rejected by a Consent Order entered by this Court dated May 10, 2002 (the "Consent Order"), but effective as of April 18, 2002.

7.   On or about April 26, 2002, an Order was entered by the Bankruptcy Court authorizing the sale of certain NPR assets (the "Sale") to Sea Star (the "Sale Order").  As part of the Sale, Sea Star purchased certain ships and other assets of NPR, Inc., including NPR's bookings.

8.   As a result of Sea Star's purchase of the NPR assets, Sea Star needed additional equipment to move cargo in the course of its business.

9

9.     Accordingly, on or about May 1, 2002, Sea Star and Emerald entered into an agreement (the "E-Mail Agreement" attached hereto as Exhibit "A"), whereby Sea Star agreed to lease Emerald equipment previously leased by Emerald to NPR.

10.    The E-Mail Agreement was effective as of May 1, 2002 and was applicable to any cargo worthy Emerald equipment, which Sea Star dispatched out of any port terminal or inland depot for customer use at agreed upon per diems (the "Emerald Equipment").

11.    Sea Star used the Emerald Equipment pursuant to the E-Mail Agreement for a number of months, before the leasing arrangement was more formally documented in a written agreement executed by Sea Star and Emerald in the later part of September, 2002 (the "Equipment Rental Agreement" attached hereto as Exhibit "B").

12.    At the inception of the lease between Emerald and Sea Star, the Emerald Equipment was not in Emerald's possession; instead all of the equipment was, inter alia, in terminals, in the possession of shippers, at inland depots or on board NPR vessels purchased by Sea Star.

13.    Emerald was not notified when Sea Star commenced using any particular piece of the Emerald Equipment and no receipt or other document was needed from Emerald acknowledging Sea Star's use of the Emerald Equipment before Sea Star could use that equipment.

14.    Under these circumstances, in order to ascertain rental payments due for the Emerald Equipment, Sea Star provided Emerald with monthly "self-billing reports", whereby Sea Star undertook the obligation to report to Emerald its "usage" of the Emerald Equipment.

10

15. Upon later investigation, Emerald discovered that the "self billing reports" prepared by Sea Star were grossly understated, failing, inter alia, to account for numerous pieces of Emerald Equipment which Sea Star had been using without paying rental charges to Emerald and failing to pay the appropriate amounts for usage of equipment contained in the "self-billing reports".

16. On or about October 31, 2003, Emerald exercised its rights to terminate the Equipment Rental Agreement in accordance with its terms.

## COUNT I
## (Post-Petition Account Receivable/Breach of Lease)

17. Plaintiff incorporates paragraph 1 through 16 set forth above, as fully as if set forth herein in their entirety.

18. Sea Star is in breach of its obligations under the E-Mail Agreement and under the terms of the Equipment Rental Agreement as a result of its failure to pay the following:

(a)     Rent due to Emerald;

(b)     Loss incurred as a result of the loss, damage, theft or destruction of certain equipment.

19. In addition, after the termination of the Equipment Rental Agreement, Sea Star was required to return the equipment to Emerald at certain designated terminals. Despite this, Sea Star has failed to return numerous chassis, gen sets and containers at lease termination, as provided for in the Equipment Rental Agreement.

20. As a result of Sea Star's breach of the E-Mail Agreement and Equipment Rental Agreement, Emerald has incurred damages in excess of $4,000,000.00.

21.     Emerald has provided detailed invoices to Sea Star setting forth the amounts

owed to Emerald under the E-Mail Agreement and Equipment Rental Agreement.

Emerald's work on these invoices is ongoing as it continues its investigation and

discovers other Emerald Equipment which Sea Star has used, or has not returned, and has

not compensated Emerald under the terms of the E-Mail Agreement and the Equipment

Rental Agreement.

WHEREFORE, Emerald requests the entry of an Order in an amount in excess of

$4,000,000.00, plus interest at the rate set forth in the Equipment Rental Agreement,

attorneys' fees and other charges.

### COUNT II
### (Post-Petition Quantum Meruit)

22.     Plaintiff incorporates paragraph 1 through 21 set forth above, as fully as if

set forth herein in their entirety.

23.     Sea Star has utilized property of Emerald and has received the economic

benefit of that use without compensating Emerald.

24.     Sea Star's use of Emerald's equipment resulted in harm to Emerald and

actual and material gain and benefit to Sea Star.

25.     To the extent Sea Star's use of Emerald's equipment occurred during any

period not covered by a written lease agreement, Emerald is entitled to collect damages

from Sea Star under the theory of quantum meruit.

WHEREFORE, Emerald requests the entry of an Order in an amount in excess of

$4,000,000.00 as damages, plus interest, attorneys' fees and other charges.

## COUNT III
### (Turnover Action)

26.     Plaintiff incorporates paragraph 1 through 25 set forth above, as fully as if set forth herein in their entirety.

27.     By letter dated October 31, 2003, Emerald gave Sea Star thirty (30) days prior written notice of its termination of the Equipment Rental Agreement and demanded that Sea Star return all Emerald equipment to Emerald on or before December 1, 2003 in accordance with the provisions of paragraph 10 of the Equipment Rental Agreement.

28.     Upon investigation, Emerald has determined that numerous chassis, gen sets and containers have not been returned by Sea Star to Emerald pursuant to Emerald's demand in accordance with the Equipment Rental Agreement.

WHEREFORE, Emerald, pursuant to 11 U.S.C. Section 342, or otherwise, requests the entry of an Order providing for the turnover of damages equaling unpaid rent, and the value of the equipment, together with interest and costs of suit.

## COUNT IV
### (Accounting)

29.     Plaintiff incorporates paragraph 1 through 28 set forth above, as fully as if set forth herein in their entirety.

30.     Certain information pertaining to the usage of Emerald Equipment while in the possession of Sea Star remains solely in the possession of Sea Star.

31.     Emerald has requested that Sea Star provide a full accounting of Sea Star's usage of all Emerald Equipment.

32.     Sea Star, to date, has failed to provide such accounting.

13

WHEREFORE, Emerald requests an Order requiring that Sea Star provide to Emerald a full accounting of all Sea Star's usage of Emerald Equipment.

## COUNT IV
### (Fraud)

33.    Plaintiff incorporates paragraphs 1 through 32 set forth above, as fully as if set forth herein in their entirety.

34.    The information (or lack thereof) provided by Sea Star on its "self-billing reports" was false and/or misleading.

35.    Sea Star prepared the "self billing reports" knowing that the information contained on those reports was false and misleading or prepared the reports with reckless indifference as to the veracity of the information contained in the "self billing reports".

36.    Sea Star prepared the inaccurate "self billing reports" with the intention of defrauding Emerald.

37.    Emerald, as per the terms of the E-Mail Agreement and Equipment Rental Agreement, had a right to and did in fact rely on the misrepresentations made by Sea Star in the "self billing reports".

38.    As a result of Emerald's reliance on the fraudulent misrepresentation of Sea Star in the "self billing reports", Emerald suffered damages in excess of $4,000,000.00.

WHEREFORE, Emerald requests the entry of an order in an amount in excess of $4,000,000.00 plus interest at the rate set forth in the Equipment Rental Agreement, attorneys fees, punitive damages and other charges.

14

## COUNT VI
### (Constructive Fraud)

39.    Plaintiff incorporates paragraphs 1 through 38 set forth above, as fully as if set forth herein in their entirety.

40.    Sea Star, in undertaking the obligation of providing "self-billing reports", had a duty to accurately account for the use of Emerald's Equipment and to ensure that it accurately reported and compensated Emerald for the use of the equipment.

41.    Sea Star breached its duty to Emerald in that it failed to accurately account for the usage of Emerald's Equipment and properly reimburse Emerald for that use.

42.    As a result of Sea Star's inaccurate reporting of its use of the Emerald Equipment, whether intended to deceive Emerald or not, Sea Star has made representations which have a tendency to deceive and undermine confidence and are injurious to the public interest.

WHEREFORE, Emerald requests the entry of an order in an amount in excess of $4 million plus interest at the rate set forth in the Equipment Rental Agreement, attorneys fees, punitive damages and other charges.

## COUNT VII
### (Fraudulent Concealment)

43.    Plaintiff incorporates paragraphs 1 through 42 set forth above, as fully as if set forth herein in their entirety.

44.    Sea Star owed a duty to Emerald to disclose its use of the Emerald's Equipment.

45.    Sea Star failed to accurately disclose its use of the Emerald's Equipment.

15

46.     Sea Star intended to defraud Emerald when it provided Emerald with the "self billing reports" grossly under reporting Sea Star's use of the Emerald Equipment.

47.     Emerald justifiably relied upon the fraudulently prepared "self billing reports".

48.     As a result of Emerald's reliance upon Sea Star's fraudulently prepared "self billing reports", Emerald suffered damages in excess of $4,000,000.00.

WHEREFORE, Emerald requests the entry of an order in an amount in excess of $4 million plus interest at the rate set forth in the Equipment Rental Agreement, attorneys fees, punitive damages and other charges.

### COUNT VIII
### (Negligent Misrepresentation; Breach of Fiduciary Duty)

49.     Plaintiff incorporates paragraphs 1 through 48 set forth above, as fully as if set forth herein in their entirety.

50.     Sea Star, pursuant to the terms of the E-Mail Agreement and Equipment Rental Agreement had a fiduciary duty to accurately report to Emerald the equipment usage and the costs incurred as a result of said usage.

51.     Sea Star's actions in preparing "self-billing reports" which were false and/or misleading acted in a negligent and undue manner, thereby breaching its fiduciary duty to Emerald.

52.     Sea Star knew that Emerald relied upon Sea Star to accurately report the usage of the Emerald Equipment and the costs incurred.

53.     Sea Star was aware that not only would Emerald rely on the "self billing reports" to determine the rental fees for the Emerald Equipment but was also aware that

16

an accurate report from Sea Star was the only reasonably available method for Emerald to
determine the actual usage of the Emerald Equipment.

54.    Emerald's reliance upon Sea Star's "self billing reports" was not only
justified it was necessary to maintain the relationship between the parties as provided for
in the E-Mail Agreement and the Equipment Rental Agreement.

55.    Emerald, having relied upon the "self billing reports" provided by Sea Star
was damaged in that it was unable to collect the actual rents earned based on Sea Star's
usage of the Emerald Equipment.

WHEREFORE, Emerald requests the entry of an order in an amount in excess of
$4 million plus interest at the rate set forth in the Equipment Rental Agreement, attorneys
fees, punitive damages and other charges.

|  | **SHUTTS & BOWEN LLP** |
|---|---|
|  | 300 S. Orange Ave., Suite 1000 |
|  | Orlando, Florida 32801-3373 |
| Mailing Address: | P.O. Box 4956 |
|  | Orlando, Florida 32802-4956 |
|  | Phone: (407) 423-3200 |
|  | Fax: (407) 425-8316 |

By:    /s/ Michael L. Gore
Michael L. Gore
Florida Bar No. 441252
Joey E. Schlosberg
Florida Bar No. 0079685

- and -

Gary M. Schildhorn, Esq.
Alan I. Moldoff, Esq.
**ADELMAN LAVINE GOLD AND
LEVIN**
 A Professional Corporation
Suite 900, Four Penn Center
Philadelphia, PA 19103-2808
Phone: (215) 568-7515
Fax: (215) 557-7922
**Attorneys for Defendants**

17

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 21st of April, 2005, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Timothy J. Armstrong, Esq.
Armstrong & Mejer
2600 Douglas Road
Suite 1111, Douglas Center
Coral Gables, FL 33134

/s/ Michael L. Gore
Of counsel

ORLDOCS 10315765 1

The damage exclusion amount for each type will apply before SSL pays for any additional damage during usage. In the event of total loss of any equipment, proposed D.V. value would be payable to Emerald.

The minimum usage period for any unit is 30 days, and any equipment may be returned to any of the 3 port locations at anytime. This agreement can be terminated by either party on 30 days notice, with an additional 30 day wind down at the same rates.

(See attached file: Equipment User Agreement.xls)

(C)

 - Equipment User Agreement.xls

----- Forwarded by Tom HoltJR/holtoversight on 01/20/2004 11:53 AM -----

PBates@seastarline.com
Sent by:
MAhmed@SEASTARLINE.COM

To: tholtjr@holtmarine.com

cc: ARooks@seastarline.com, brian@saltchuk.com

Subject: Agreement for Short-Term Usage of Emerald Equipment.

05/02/2002 03:14 PM

As agreed today, this user agreement is effective 5/1/02 and applicable to any cargo worthy Emerald equipment which SSL dispatches out of any port terminal or inland depot for customer use. Agreed per diems will continue for each unit until SSL ceases to use it and notifies Emerald thereof, as well as the port location of that unit (JAX, SJU, PHL) or SSL reaches agreement to purchase of said L/T lease unit.

(SSL will make a best effort to return any Emerald equipment used under this agreement to any off-dock depot designated by Emerald near the three port locations, as long as SSL does not incur additional expense.)

The damage exclusion amount for each type of equipment defines the average estimated IICL damages which are currently on each type of equipment before SSL uses any of it. The equipment dispatched out from each of the port terminals (including Packer Avenue and inland depots) is expected to be in running condition as evidenced by the outbound TIR. Any equipment returned by SSL to Packer Avenue, any other terminal or depot should be in running condition, unless noted on the TIR. Emerald/Holt must notify SSL immediately of any equipment which is damaged at the time of return to the terminal, as noted on the inbound TIR. SSL will rebill the responsible party, and repair or pay Emerald for the repair cost of this type of new damage during SSL usage. In the event of total loss of any equipment, the agreed D.V. value will be payable to Emerald.

The minimum usage period for any unit is 30 days, and any equipment may be returned to any of the 3 port locations at anytime or any designated Emerald depot (on a best efforts basis, without additional expense to SSL). This agreement can be terminated by either party on 30-days notice, with an additional 30-days wind down at the same rates.
(See attached file: Equipment User Agreement.xls)

Phil Bates

D)

 - Equipment User Agreement.xls
----- Forwarded by Tom HoltJR/holtoversight on 01/20/2004 11:53 AM -----

EXHIBIT A

EQUIPMENT RENTAL AGREEMENT   *P1/5.*

This Agreement is made and executed this *As of* 3/ day of July, 2002 between EMERALD EQUIPMENT LEASING, INC., a Delaware corporation having its principal place of business at 101 South King Street, Gloucester City, New Jersey 08030 ("Lessor"), and SEA STAR LINE, LLC, a Delaware limited liability company having its principal place of business at 100 Bell Tel Way, Suite 300, Jacksonville, Florida 32216 ("Lessee"). Terms and conditions of this Agreement cover equipment in use at various times commencing April 29, 2002.

Such equipment is of the types, at daily lease rates, and with damage exclusions and stipulated loss values delineated on Schedule "A", which is attached to and incorporated into this Agreement ("Equipment"). In consideration of the mutual covenants and conditions delineated below, the Parties agree:

1. **Equipment.** Lessor agrees to lease to Lessee, and Lessee agrees to lease from Lessor, the Equipment. Delivery of all Equipment to Lessee or its agents by Lessor shall be effected and evidenced by signed and dated equipment interchange receipts and shall be subject to the terms and conditions of this Agreement.

2. **Term.** The lease term for each item of Equipment shall begin on the date when such Equipment is delivered to Lessee or its agent and shall end on the date when such Equipment is taken off hire pursuant to section 10 below. Unless the parties otherwise agree in writing, the minimum rental period for each item of Equipment shall be thirty (30) days. All provisions of this Agreement shall apply during any extension or renewal period. Either party may terminate this Agreement on thirty (30) days' prior written notice to the other party.

3. **Rental.** Lessee shall pay rent and all other charges under this Agreement on a monthly basis. Each payment for particular Equipment will become due on the tenth day of the month following the month of use, unless the parties otherwise agree in writing. In the event Lessee fails to make timely payment, interest shall be due on any overdue amount at a rate of eighteen percent (18%) per annum, commencing ten (10) days after Lessee receives Lessor's invoice for such overdue amount. With respect to particular Equipment, Lessee's obligation to pay rent and other charges shall terminate immediately if Lessee purchases and pays for such Equipment.

4. **Ownership; Sublease; Substitution; Encumbrances.**

EXHIBIT B

(a)  This Agreement shall be deemed a lease for all purposes. The Equipment shall remain Lessor's property; and Lessee shall acquire no title, ownership, or purchase rights of any nature by virtue of this Agreement.  In the event that notwithstanding the express intent of the parties, a court of competent jurisdiction determines that this Agreement is not a true lease but is rather a sale and extension of credit, a lease intended for security, a loan secured by the Equipment or other similar arrangement, the parties agree: (i) (A) to secure the prompt payment and performance as and when due of all Lessee's obligations (both now existing and hereafter arising) under this Agreement, Lessee shall be deemed to have granted, and it hereby grants, to Lessor a first priority security interest in the following (whether now existing or hereafter created): the Equipment, all replacements, substitutions, attachments, accessions, and additions thereto, all warranties and licenses relating thereto and all proceeds (cash and non-cash but without power of sale), including the proceeds of all insurance policies, insuring the Equipment; (B) with respect to the Equipment, in addition to all other rights and remedies available to Lessor under this Agreement upon the occurrence of an event of default, Lessor shall have all of the rights and remedies of a first priority secured party under the Uniform Commercial Code; and (ii) (A) the principal amount of any such loan shall be an amount equal to the aggregate of the "Stipulated Loss Values" of all outstanding Equipment; (B) the term of any such loan shall be co-extensive with the term of this Agreement; and (C) the loan payments under any such loan shall be the rental payments specified in this Agreement.

(b)  This Agreement shall be subject and subordinate to any lease or security interest in favor of a third-party lessor or lender to Lessor.  In the event any such third party becomes entitled to possession of any Equipment, Lessee shall return the Equipment to such third party at one or more delivery locations specified in paragraph 10.

(c)  Lessee shall not pledge, hypothecate, mortgage, create any security interest in, or otherwise encumber or permit the encumbrance of any Equipment.  At its own expense, Lessee promptly shall take action necessary to discharge any lien, charge, or other encumbrance asserted against any Equipment arising after delivery of such Equipment to Lessee and as a result of Lessee's act or omission.

(d)    Each item of Equipment shall have Lessor's serial number and other identifying marks affixed.  Lessee shall not obliterate, alter, conceal, or otherwise change or hide such number or marks.

(e)    Without Lessor's prior written consent, Lessee shall not assign any right or interest in this Agreement or any Equipment and shall not sublet or otherwise relinquish possession of any Equipment, except to other carriers as evidenced by interchange agreements.   Lessor may assign all or any part of its obligations, right, title, or interest in this Agreement, including all rental charges due or to become due.   Lessee expressly consents to Lessor's application of any payment credits to which it is entitled under this Agreement to payment obligations of Lessee under this Agreement.

5.    **Equipment Delivery and Interchange.**    Lessor shall make the Equipment available for delivery to Lessee at the locations agreed by the parties.   The signature of Lessee's representative on an equipment interchange receipt shall constitute conclusive evidence that the Equipment to which the receipt relates has been delivered to Lessee.

6.    **Maintenance and Repairs.**

(a)    At its own cost and expense, Lessee shall keep the Equipment in operating condition.   Lessee shall be responsible for all damages and changes in the condition of the Equipment after delivery by Lessor, subject to section 10 below and Schedule "A".  Lessee's maintenance and repair obligations include washing and cleaning the Equipment regularly to prevent corrosion, spot painting, and replacing of parts as necessary.   Lessee shall comply with all loading limitations, handling procedures, and operating instructions to prevent excessive impact or unbalanced loading.  Lessee shall not use any Equipment for storage or transportation of cargo which may damage the Equipment, including but not limited to unprotected corrosive substances, poorly secured materials, or bulk commodities which may corrode, oxidize, severely dent, puncture, contaminate, stain, or damage the Equipment.

(b)    Lessee shall make no modifications, improvements, or replacements and shall not attach accessories or additions to any Equipment, without Lessor's prior written consent, which shall not be unreasonably withheld, except as necessary to comply with this Agreement.     All     improvements,     repairs,    accessories,    and replacements made or attached to any Equipment by Lessee shall become part of the Equipment and Lessor's property without Lessor incurring any liability or, at Lessor's option, shall be removed

and the Equipment restored to its original condition at Lessee's expense. Absent written agreement, Lessee shall not change or supplement identification marks on any Equipment.

(c) Lessee shall comply with all conventions, laws, regulations, or orders of federal, state, foreign, and local governments and agencies having jurisdiction over the Equipment or its use, operation, or storage and shall be liable for all fines, penalties, and fees for failure to comply.

7. **Warranties**. Equipment subject to this Agreement is leased "AS IS", and Lessor warrants only that Lessee shall have quiet possession against any person claiming through Lessor. LESSOR MAKES NO EXPRESSED OR IMPLIED WARRANTY OF QUALITY, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR USE WITH RESPECT TO ANY EQUIPMENT AND HAS NOT MADE, AND SHALL NOT BE BOUND BY, ANY STATEMENT, AGREEMENT, OR REPRESENTATION NOT SPECIFIED IN A WRITING SIGNED BY LESSOR.

8. **Taxes and Other Expenses**. Lessee agrees to pay all sales, use, excise, property, gross income, gross receipts, stamp, or other taxes; levies; import duties; charges; or withholdings of any nature (together with any penalties, fines, or interest) imposed against Lessor, Lessee, or the Equipment by any governmental or taxing authority with respect to any Equipment; upon the leasing, delivery, possession, use, operation, redelivery, or other disposition of such Equipment; or upon the rentals, receipts, or earnings arising from such Equipment; excluding, however, any such taxes, levies, import duties, charges, and withholdings that are imposed or accrued with respect to any Equipment prior to its delivery to Lessee and any taxes measured by Lessor's income. Lessee shall pay all other expenses relating to Equipment arising during the rental period and resulting from Lessee's acts or omissions, including but not limited to expenses incurred in ports, depots, or storage areas.

9. **Risk of Loss**.

(a) During the term of this Agreement, Lessee shall bear all risk of loss, damage, theft, or destruction to the Equipment. No such loss, damage, theft, or destruction of Equipment, in whole or part, shall impair Lessee's obligations under this Agreement, all of which shall continue in full force and effect. At Lessor's option and subject to Schedule "A", Lessee shall (i) put the affected Equipment in the condition that existed upon delivery to Lessee or (ii) pay Lessor an amount equal to all accrued and unpaid rent due under this Agreement, together with the Stipulated Loss

Value, with respect to the affected Equipment, less the amount of all recoveries by Lessor from parties other than Lessee for such loss, damage, theft, or destruction.

(b)   Upon compliance with subparagraph (a), Lessee shall be subrogated to Lessor's rights with respect to any insurance policies and claims for reimbursement by third parties in connection with such loss, damage, theft, or destruction.

10.   Redelivery of Equipment.

(a)   At its sole expense, Lessee shall redeliver Equipment to Lessor at Greenwich Terminal, Philadelphia, Pennsylvania, Sea Star Terminal, Puerto Nuevo, San Juan, Puerto Rico, Greenwich Terminal, Port of Jacksonville, Florida, or any other location as to which the parties have agreed in writing.   Each redelivery shall be subject to Schedule "A".   At least seventy-two (72) hours prior to actual redelivery, Lessee shall give Lessor a written estimate of types and quantities of Equipment which Lessee intends to redeliver at particular ports.

(b)   Upon redelivery of particular Equipment, the receiving terminal will execute an equipment interchange receipt.   Subject to Schedule "A", Lessee shall return all Equipment to Lessor in the condition that existed upon delivery to Lessee.

(c)   Lessee shall return such Equipment with tires equal in value and condition to those delivered with the Equipment, normal wear and tear excepted.   The value of any tire damage at the time of return is included in the damage exclusion value for such Equipment, as specified in Schedule "A".

(d)   Lessor shall have the right to inspect Equipment leased under this Agreement at reasonable times during normal business hours.   Upon Lessor's reasonable request, Lessee shall furnish a list of all locations of Equipment as of the most recent date possible and take reasonable steps to make Equipment available for inspection.   On or before the seventh day of each month, Lessee shall furnish a list of all locations of Equipment as of the end of the previous month.

(e)   At the time of return, Equipment will be taken off hire; and rental charges will cease.   If Equipment is returned to a terminal with damage exceeding the damage exclusion specified in Schedule "A", Lessor will inform Lessee within seven (7) days after return.   Lessor shall have the right to require Lessee to repair Equipment or to authorize repairs at Lessee's expense.   If Lessee

fails to authorize repairs for which Lessor claims Lessee is responsible within ten (10) days after notification of damage, Lessor may promptly authorize such repair and rental charges will cease on completion of such repairs (no later than 10 business days after authorization). Lessee agrees to pay for required repairs no later than ten (10) days after receipt of invoice.

(f)   If Lessee fails to return any Equipment for more than sixty (60) days after the return date specified in a Lessor notice, Lessor may elect to treat such Equipment as lost; and Lessee shall pay Lessor the Stipulated Loss Value of such Equipment, together with all accrued rental charges at the contractual daily rate within fifteen (15) days.

## 11.   Indemnification and Expenses.

(a)   Lessee shall defend, indemnify and hold Lessor, its agents and employees, harmless from all claims, causes of action, liability damage or loss (including expenses in connection with any claim or suit, such as reasonable attorneys' fees and court costs) arising out of (a) failure by Lessee to comply with its obligations under this Agreement or any attempt by a third party to impose on Lessor liability for Lessee's acts or omissions; (b) any claim for personal injury or death or for property loss or damage (including but not limited to any products liability claim) arising out of possession, leasing, operation, control, use, storage, loading, unloading, moving, maintenance, delivery, or return of any Equipment; and (c) any forfeiture, seizure, impounding of, or charge or lien imposed or asserted against any Equipment as a result of Lessee's acts or omissions.

(b)   Except for Lessee's obligation to pay interest on delinquent rent, neither party shall be liable to the other party or any other person for delay not to exceed sixty (60) days in the performance of any obligation due to events beyond its reasonable control, including but not limited to fire; storm; flood; earthquake; explosion; accidents; acts of God, governmental agencies, or public enemies; sabotage; riots; civil disorders; strikes, lockouts, and other work stoppages; labor disputes; and failure of repair facilities to complete repairs timely. Under no circumstances shall either party be liable to the other party for exemplary damages.

12.   Insurance.   Lessee will carry and maintain insurance on the Equipment. Upon execution of this Agreement, Lessee shall furnish Lessor with insurance certificates evidencing (a) all-risk loss and damage insurance (including mysterious disappearance,

unexplained loss, war risks, strikes, riots, and civil commotions) on land, afloat, or airborne, in transit or at rest anywhere in the world, in an amount equal to the Stipulated Loss Value of all Equipment leased pursuant to this Agreement; (b) comprehensive general liability insurance, including contractual liability and broad form property damage, with combined single limits of $2,000,000; (c) automobile liability and property damage with combined single limits of $2,000,000; (d) deductibles applicable to each coverage. Each insurance coverage shall (a) name Lessor and its assigns as additional assureds, as their interests may appear; (b) include a loss payable clause in favor of Lessor and its assigns; and (c) include the insurer's undertaking to send Lessor and its assigns written notice at least thirty (30) days prior to any expiration or cancellation of such insurance. If Lessee defaults in payment of any premium under any such insurance policies, Lessor may but shall not be obliged to pay such premium; and Lessee shall repay the premium on demand. Lessee assigns to Lessor all right to insurance proceeds payable to Lessee for damage to or loss of the Equipment.

13. Events of Default.

(a) The following shall be events of default under this Agreement:

(i) Continuing failure to pay rent for thirty (30) days after its due date under this Agreement;

(ii) Continuing default in performance of any of Lessee's obligations under this Agreement for thirty (30) days after written notice thereof from Lessor to Lessee;

(iii) Lessee is a party to a merger or consolidation or sells, conveys, or transfers all or a substantial part of its assets or becomes insolvent or admits in writing its inability to pay its debts as they mature or applies for, consents to, or acquiesces in appointment of a trustee or a receiver for Lessee or any subsidiary or any property of either; or, in the absence of such application, consent, or acquiescence, a trustee or receiver is appointed for Lessee or any subsidiary or for a substantial part of the property of either and is not discharged within sixty (60) days; or under bankruptcy or insolvency law, any dissolution or liquidation proceeding is instituted against Lessee or any subsidiary with Lessee's or such subsidiary's consent or acquiescence or remains undismissed for sixty (60) days.

(b)  Upon the occurrence of any default by Lessee under this Agreement, Lessor shall (except to the extent otherwise required by law) be entitled to:

(i) Proceed by appropriate court action or actions to enforce performance by Lessee of the applicable covenants and terms of the Agreement or to recover damages for breach;

(ii) Terminate Lessee's right to possession of, demand return of, or repossess at Lessee's expense any or all of the Equipment without prejudice to any other remedy or claim;

(iii) Elect to sell any or all Equipment after giving thirty (30) days' notice to Lessee at one or more public or private sales and recover the sum of the Stipulated Loss Values of such Equipment, all rent owed through the rent payment immediately preceding the date of such notice, all costs and expenses incurred in searching for, taking, removing, keeping, storing, repairing and restoring and selling such Equipment, all other amounts owed by Lessee under this Agreement, whether as additional rent, indemnification, or otherwise, and all costs and expenses, including reasonable legal fees, incurred by Lessor as a result of Lessee's default under this Agreement after deducting all amounts received by Lessor in connection with such public or private sales;

(iv) Upon notice to Lessee, receive prompt payment from Lessee of an amount equal to the Stipulated Loss Values of all Equipment not sold by Lessor pursuant to clause (iii) above plus, to the extent not otherwise recovered from Lessee pursuant to clause (ii) above, any rent owed through the rent payment date preceding the date of such notice, all costs and expenses incurred in searching for, taking, removing, keeping, storing, repairing, and restoring such Equipment, all other amounts owed by Lessee under this Agreement, whether as additional rent, indemnification, or otherwise, and all reasonable fees and expenses incurred by Lessor as a result of Lessee's default, provided that upon receipt of payment in full of such amount, Lessor shall transfer title to such Equipment to Lessee;

(v) By notice to Lessee, declare this Agreement terminated without prejudice to Lessor's rights in respect of obligations then accrued and remaining unsatisfied; or

(vi) Avail itself of any other remedy or remedies provided by statute or otherwise available at law, in equity, or in bankruptcy or insolvency proceedings.

(c)   The remedies set forth in this Agreement are cumulative. References to additional rent in clause (iii) and (iv) of subparagraph (b) shall include interest at the rate of eighteen percent (18%) per annum to the date Lessor receives any amount payable under said clause from the due date to and including the rent payment date immediately preceding the date on which notice is given under said clause and interest at the same rate on all other costs, expenses, and losses for which Lessor is entitled to payment under said clause to the date Lessor receives any reimbursement from the respective dates Lessor incurs such costs, expenses, and losses.

14.   Applicable Law.   This Agreement shall be interpreted and the rights, liabilities and duties of the parties determined in accordance with the laws of the State of Maryland.

15.   Miscellaneous.

(a)   This Agreement is binding upon the parties and their respective legal representatives, successors and assigns. This Agreement contains the entire agreement between the parties and, subject to the provisions of section 1, may not be amended, altered, or modified, except by a writing signed by the party to be bound.

(b)   All notices under this Agreement, including but not limited to billing by Lessor for rental charges and payments by Lessee shall be addressed as follows, unless or until either party gives written notice to the contrary to the other party:

       Lessor: Emerald Equipment Leasing, Inc.
               101 South King Street
               Gloucester City, NJ 08030
               Attn.: Arthur Davis
               Telefax: 856-742-3250

       Lessee: Sea Star Line, LLC
               100 Bell Tel Way, Suite 300
               Jacksonville, FL 32216
               Attn.: Philip V. Bates
               Telefax No.: 904-724-3011

All notices shall be in writing and delivered by hand delivery, registered or certified mail, or confirmed telex or telefax.

(c)   The provisions of this Agreement are separable and any provisions found upon judicial interpretation or construction to be

prohibited by law shall be ineffective to the extent of such prohibition without invalidating the remaining provisions of this Agreement.

(d)   No waiver of any remedy or other right under this Agreement shall operate as a waiver of any other remedy or right nor shall any single or partial exercise of any remedy or right preclude any other or further exercise thereof or any other remedy or right.

IN WITNESS WHEREOF, the parties have executed this Equipment Rental Agreement as of the day and year first written above.

LESSEE:                                    LESSOR:
Sea Star Line, LLC                         Emerald Equipment Leasing, Inc.

By: _____                By: _____
    SVP - Operations
    _____                    _____
          Title                                       Title

02-3523-001e

# EQUIPMENT SCHEDULE A

EMERALD EQUIPMENT LEASING, INC.

| EQUIPMENT TYPE | DAILY LEASE RATE | DAMAGE EXCLUSION | STIPULATED LOSS VALUE |
|---|---|---|---|
| 20' DV | $1.00 | $285.00 | $1,000.00 |
| 40' DV | $1.25 | $1,200.00 | $1,000.00 |
| 40' HV | $1.50 | $800.00 | $1,000.00 |
| 45' HV | $2.00 | $800.00 | $1,000.00 |
| 40' RV | $8.00 | $16,480.00 | $4,000.00 |
| 20' CH | $2.20 | $640.00 | $2,200.00 |
| 40' CH | $2.20 | $640.00 | $2,200.00 |
| 45' CH | $2.40 | $640.00 | $2,200.00 |
| Gen Sets | $4.50 | $840.00 | $2,200.00 |

19