IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

SEA STAR LINE, LLC,
a limited liability company,

Plaintiff,                                        CASE NO. 05-CV-00245 (JJF)
-vs-

EMERALD EQUIPMENT LEASING, INC.,
a corporation,

Defendant.

_____

## EXHIBITS TO SEA STAR LINES, LLC'S OPENING BRIEF IN SUPPORT OF ITS MOTION TO DISMISS EMERALD EQUIPMENT LEASING, INC.'S COUNTERCLAIM

SMITH, KATZENSTEIN & FURLOW, LLP
Kathleen M. Miller (I.D. No. 2898)
800 Delaware Avenue, 7th Floor
P.O. Box 410
Wilmington, DE  19899 (courier 19801)
Phone: (302) 652-8400
Fax: (302) 652-8405
E-mail: Kmiller@skfdelaware.com

Of Counsel:
Charles C. Robinson
Garvey Schubert Barer
1191 Second Avenue, #1800
Seattle, WA 98101-2939

Timothy J. Armstrong
Armstrong & Mejer, P.A.
Suite 1111 Douglas Centre
2600 Douglas Road
Coral Gables, FL 33134               *Attorneys for Sea Star Line LLC*

May 11, 2005

PLAINTIFF SEA STAR LINES LLC'S                    EXHIBIT 1
OPENING BRIEF IN SUPPORT OF ITS
MOTION TO DISMISS THE COUNTERCLAIM

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
1994 WL 315365 (Del.Super.)
**(Cite as: 1994 WL 315365 (Del.Super.))**
<KeyCite History>
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Superior Court of Delaware.
Eugene N. STERLING, Annabel W. Sterling, Bryan
K. Sterling and C. Keith
Sterling, Plaintiffs,
v.
BENEFICIAL NATIONAL BANK, N.A., a National
Banking Association, Defendant.
No. 91C-12-005.

Submitted Dec. 3, 1993.
Decided April 13, 1994.

Thomas C. Jackson, Dover, for plaintiffs Eugene N.
Sterling, Annabel W. Sterling, Bryan K. Sterling, and
C. Keith Sterling.

Melvyn I. Monzack and Joseph J. Bodnar, of Walsh
and Monzack, P.A., Wilmington, for defendant
Beneficial Nat. Bank.

MEMORANDUM OPINION

RIDGELY, President Judge.

**\*1** On December 4, 1991, Plaintiffs Eugene N.
Sterling, Annabel W. Sterling, Bryan K. Sterling, and
C. Keith Sterling (collectively, "Sterlings") filed this
action against Defendant Beneficial National Bank
("Beneficial") alleging fraud, misrepresentation,
breach of contract, negligence and breach of fiduciary
relationship, in connection with a Loan and
Subordination Agreement entered into among the
parties. The Sterlings allege that in connection with
this transaction, they invested Thirty Thousand
Dollars ($30,000.00) and suffered loss caused by
Beneficial. They now seek compensatory and
punitive damages in this Court.

On September 18, 1992, Beneficial moved for
summary judgment on the ground that the Sterlings
had allegedly failed to respond in a timely fashion to
Beneficial's Request for Admissions. After further
discovery, Beneficial has renewed its motion for
summary judgment. This is the Court's ruling on the
motion.

I. FACTS

The Sterlings are four Delaware residents who lent
$30,000 to Madison & Co. of New York, Inc.
("Madison") via promissory notes in May 1991.
[FN1] The promissory notes were issued in two
increments of $10,000 and two increments of $5,000.
Each was a 90-day note, bearing 20% interest (80%
annualized return). Madison had been experiencing
a capital shortage and was in need of a loan. In order
to facilitate the loan, Beneficial, one of Madison's
regular secured creditors, agreed to subordinate its
security interest in certain inventory and accounts
receivable of Madison's to that of the new lenders, the
Sterlings. The accounts receivable were those of one
of Madison's steady customers, A.R.A. Services
("A.R.A.").

> FN1. The Sterlings contend the loan was in
> the amount of $30,000, while Beneficial
> states at one point the loan was for $25,000.
> On a motion for summary judgment, the
> facts must be viewed in the light most
> favorable to the nonmoving party.
> *Hammond v. Colt. Ind. Operating Corp.,*
> Del.Super., 565 A.2d 558, 560 (1989).
> Because of this, the Court will use $30,000
> as the proper figure for purposes of this
> motion.

Paragraph 5 of the Loan and Subordination
Agreement (the "Agreement") between Madison,
Beneficial, and the Sterlings is the focal point of this
suit. This paragraph delineates the terms under
which the loan is to be repaid. Because the alleged
obligations flowing from the paragraph are in dispute,
the entire paragraph is reprinted here:

*Payment Procedures*
Madison covenants and agrees with Beneficial and
the Lender [the Sterlings] that the invoices and
statements rendered by Madison relating to the
Accounts Receivable shall direct payment to a lock
box in the name of Madison but under the sole
supervision and control, subject to the terms of this
Agreement, of Beneficial. Beneficial covenants
and agrees with the Lender and Madison that
collections which constitute Subordinated
Collateral hereunder ("Collections") received by
Beneficial under the foregoing system shall be
segregated for accounting purposes (while retaining
their character as Collections, nevertheless) as

follows:  Lender shall receive funds sufficient to repay the loan in full with the applicable interest thereon;  of the balance, 45% shall be for the benefit of Beneficial, and 55% for the benefit of and use by Madison.    From the accounts so established and maintained, Beneficial shall make remittances at intervals to be determined by agreement of the parties hereto or, in the absence of such agreement, at weekly intervals.    Amounts remitted to Beneficial for its benefit shall be applied by Beneficial to reduce obligations of Madison to Beneficial under existing loans.  Amounts remitted to the Lender shall be applied by the Lender to satisfy principal and interest obligations of Madison to the Lender under the Loan.

**\*2** The loan, Agreement, and payment arrangement can be illustrated by the following diagram:

```
        $30k
       pr/note        invoices      payments
Sterlings -----> Madison -------> A.R.A. -------->      Lock Box
   :              :                           (controlled by
   :              :                            Beneficial)
   :              :        Second Payment Obligation
   :                                  :     :
   :           _____        :
   :              After pr/note is repaid, 55% of proceeds    :
   :              are then paid to Madison, 45% to be         :
   :              retained by Beneficial as payment           :
   :              for existing loans                    :
   :                                       :
   :              First Payment Obligation                :
-----------------------------------------------------------------------------
       Repayment of pr/note and interest until paid in full
```

The current dispute arose when the Sterlings failed to receive all the payments due under the contract.   The Sterlings allege certain payments were never sent to the lock box, but rather, were diverted directly to Madison and have since been used by Madison improperly.    Beneficial disputes that any payments went directly to Madison.    But this dispute is irrelevant for the purposes of this motion.   What is relevant and undisputed is that not all required payments were made by A.R.A. directly to the lock box.   This is the subject of the current lawsuit.

## II. CONTENTIONS OF THE PARTIES

The Sterlings contend Beneficial owed a duty to the Sterlings to ensure that all payments were made by A.R.A. to the lock box for subsequent distribution by Beneficial.   Beneficial contends it owed no such duty to the Sterlings, and that its only obligations were to maintain control and supervision of the lock box and to distribute payments received there in accordance with the formula mandated by Paragraph 5 above.  Although a vague allegation is made in the Complaint, the Sterlings have not put forth any evidence to substantiate the contention that any payments which were deposited into the lock box were misappropriated or mishandled by Beneficial.  Thus, there is no genuine issue of material fact that Beneficial did not breach its duty to properly distribute the payments which were received at the lock box.   The focal point of this suit is Sterlings' claim that Beneficial is liable for *A.R.A.'s failure to make all required payments to the lock box.*

III. THE LEGAL STANDARD FOR SUMMARY
JUDGMENT

A motion for summary judgment requires the Court to examine the record to determine whether there are any genuine issues of material fact or whether the evidence is so one-sided that one party should prevail as a matter of law. *Burkhart v. Davies,* Del.Supr., 602 A.2d 56, 59 (1991), *cert. denied,* 112 S.Ct. 1946 (1992). The court will consider the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits in making its determination. Super.Ct.Civ.R. 56(c). If, after viewing the record in the light most favorable to the nonmoving party, the Court finds no genuine issue of material fact, summary judgment is appropriate. *Hammond v. Colt Ind. Operating Corp.,* Del.Super., 565 A.2d 558, 560 (1989). However, summary judgment may not be granted when the record indicates a material fact is in dispute or if it seems desirable to inquire more thoroughly into the facts in order to clarify the application of law to the circumstances. *Wilson v. Triangle Oil Co.,* Del.Super., 566 A.2d 1016, 1018 (1989).

**\*3** The moving party initially bears the burden of showing a genuine issue of material fact does not exist. *Moore v. Sizemore,* Del.Supr., 405 A.2d 679, 680 (1979) ("*Moore* "). If a properly supported motion for summary judgment shows no genuine issue of material fact, the burden shifts to the nonmoving party to prove material issues of fact exist. *Id.* at 681. To carry its burden, the nonmovant must produce specific facts which would sustain a verdict in its favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248- 49 (1986). [FN2] The nonmovant cannot create a genuine issue for trial through bare assertions or conclusory allegations. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986); *Martin v. Nealis Motors,* Del.Supr., 247 A.2d 831, 833 (1968).

> FN2. Because the Federal Rules of Civil Procedure and the Delaware Superior Court Civil Rules are similar, construction of the Federal Rules is persuasive concerning the construction of Superior Court Rules. *Hoffman v. Cohen,* Del.Supr., 538 A.2d 1096, 1097-98 (1988).

IV. ANALYSIS

The Sterlings have pled the following causes of action against Beneficial: fraud, misrepresentation, negligence, breach of fiduciary relationship, and breach of contract. In its renewed motion for summary judgment, Beneficial contends there are insufficient facts to support a claim under any of these theories. Each theory, along with its relevant facts, is analyzed below:

A. Fraud/Misrepresentation

Beneficial contends the Sterlings have not established a prima facie case for fraud or misrepresentation. The elements required for a claim of fraud are: (1) a false representation, usually of fact, (2) made either with knowledge or belief, or with reckless indifference to its falsity, (3) with an intent to induce the plaintiff to act or refrain from acting, (4) plaintiff's action or inaction in reasonable reliance thereof, and (5) damages caused by such reliance. *Browne v. Robb,* Del.Supr., 583 A.2d 949, 955 (1990), *cert. denied,* 111 S.Ct. 1425 (1991) ("*Browne* ").

Actionable misrepresentation is closely related to a claim for fraud. An action may arise for misrepresentation with only a false impression as to the true state of affairs, with the actor failing to provide qualifying information to cure the mistaken belief. *Norton v. Poplos,* Del.Supr., 443 A.2d 1, 5 (1982). Thus, it can be characterized as fraud without the element of deception.

Plaintiff must allege with particularity "the time, place and contents of the false representations ..." *Browne,* 583 A.2d at 955. The complaint in this case makes the general allegation that Beneficial assured the Sterlings "that repayment was assured due the Defendant Beneficial's control, supervision and monitoring of payment by customer and repayment to [the Sterlings]." Complaint at 2. However, no date or time is ascribed to these broad representations, nor do the Sterlings raise the necessary facts in their response to the motion for summary judgment. For these reasons, the necessary elements for claims of fraud and misrepresentation simply have not been shown. Therefore, the claims fail.

B. Negligence

Under Delaware tort law, purely economic losses are unrecoverable, notwithstanding the existence of privity of contract. *Danforth v. Acorn Structures, Inc.,* Del.Supr., No. 479, 1991, (June 18, 1992) at 17. Because no personal injury or property damage has been alleged here, the Sterlings' cause of action for negligence rests entirely upon an economic loss theory, and thus, fails as a matter of law. *Id.*

C. Breach of Fiduciary Relationship

**\*4** In its renewed motion for summary judgment, Beneficial contends the Sterlings have not amply supported their claim for breach of fiduciary relationship. The Sterlings do not address this issue in their answering brief. Additionally, there is a

jurisdiction question which must be addressed first and which neither party has discussed in any pleading or motion.

Delaware maintains separate courts for law and equity, with the Superior Court having general jurisdiction over the former, and the Court of Chancery the latter. Del. Const. art. IV, §§ 7, 10; 10 *Del.C.* §§ 341, 542. Although, as a general rule, "Chancery takes jurisdiction over 'fiduciary' relationships because equity, not law, is the source of the right asserted," *McMahon v. New Castle Associates,* Del.Ch., 532 A.2d 601, 604 (1987) ( "*McMahon* "), its exclusive jurisdiction is not determined by the labels the parties apply. *McMahon* involved a dispute between a tenant and his landlord. In the context of that case Chancellor Allen stated:

> Here the relationships is not "fiduciary" in the traditional sense; it is wholly commercial and recourse for violation of the duties assumed by the parties is, in my opinion, in the law court, not in Chancery.
> *Id.* at 605.

Here, the relationships were commercial and the remedy sought by the Sterlings--compensatory and punitive damages--is legal in nature. Reduced to its essence, the Sterlings' claim is one for breach of a commercial contract and it will be addressed as such, *infra.*

### D. Breach of Contract

The crux of this claim is the Sterlings' contention that Paragraph 5 of the Agreement, *see, supra,* at 3-4, combined with the lay person's general "common knowledge" and "common sense" about banking practices, created a duty on the part of Beneficial to ensure that all payments were made by A.R.A. to the lock box. To quote from the Sterlings' brief:

> As between Madison and Beneficial, Plaintiffs [the Sterlings] expected Defendant Beneficial to have the greater incentive and responsibility because they stood to get a fair amount of money out of this payment, and it's common knowledge that Banks in general are always very attentive to the details and documents that secure and protect their interests. This belief and expectation on Plaintiffs' part was entirely reasonable.... Common sense also supports Plaintiffs' belief in this regard also; after all, with that much at stake for the Defendant Bank, why would they not take all reasonable action to protect their interest, and thus protect Plaintiffs in the process?

> Plaintiffs' Answering Brief to Defendant's [Renewed] Motion for Summary Judgment at 3

("Answer Brief").

Additionally, the Sterlings argue Beneficial's duty under Paragraph 5 to be ambiguous (subject to two or more reasonable interpretations) as a matter of law, thereby requiring extrinsic evidence to be introduced and a factual determination to be made as to the true scope of Beneficial's duty. In support of this theory, the Sterlings introduce three pieces of evidence: (1) A July 10, 1991 letter from Beneficial's attorney to Madison's attorney, discussing the Agreement (the "Letter"), (2) the minutes of Beneficial's Loan Committee meeting, at which the Agreement was discussed and approved (the "Meeting Minutes"), and (3) the deposition testimony of Beneficial's attorney, Melvyn Monzack ("Monzack") (of Walsh and Monzack, P.A.).

**\*5** The Sterlings contend certain language in the Letter and Meeting Minutes which states that Monzack would "remain actively involved in the structuring and monitoring of the proposed arrangement" indicates that Monzack's (and thus, Beneficial's) duty under the Agreement was to ensure that A.R.A. made all necessary payments to the lock box. Monzack stated in his deposition that he never understood his role to include such a duty. Thus, the Sterlings argue this uncertainty about the extent of Monzack's (and by extension, Beneficial's) duty is proof positive that the language of Paragraph 5 is ambiguous.

The Sterlings believe the key question to ask in this claim is "What did the parties *intend* Paragraph 5 to mean?" *See* Answer Brief at 5. Thus, because summary judgment is "inappropriate" where the ultimate fact is one of "intention," *Murphy v. Godwin,* Del.Super., 303 A.2d 668, 672 (1973), the Sterlings believe summary judgment should be denied here.

While it is true that summary judgment is improper where the ultimate question is one of subjective intent, the Sterlings rely only upon extrinsic evidence in support of their argument. However, the agreement must *first* be shown to be ambiguous before extrinsic evidence may be introduced for the purposes of shedding light upon the meaning of an agreement. *Citadel Holding Corp. v. Roven,* Del.Super., 603 A.2d 818, 822 (1992) (holding that if a writing is plain and clear on its face, the writing itself is the sole source for gaining an understanding of intent). Instead, the Sterlings have attempted to "bootstrap" their argument by: (1) using extrinsic evidence to create the ambiguity, and (2) then avoiding summary judgment by arguing the ambiguity goes to the issue of intent. This is

impermissible. If the agreement is clear on its face, no extrinsic evidence may be considered. *Id.*

Moreover, even if the Letter and Meeting Minutes are considered, they do not support the Sterlings' contention that Beneficial assumed a broad duty of ensuring A.R.A.'s payment. All they indicate is that Monzack (Beneficial's attorney) will "remain actively involved in the structuring and monitoring of the agreement." At most, assuming a valid agency relationship between Beneficial and Monzack, this statement is merely a reaffirmation of Beneficial's duty announced in Paragraph 5 of the Agreement--to continually receive payments at the lock box and distribute the funds according to the schedule provided in the Agreement. The language of the Letter and Meeting Minutes hint at nothing about Monzack (Beneficial) having a duty to ensure A.R.A. makes its payments on time.

The language on the face of the Agreement [FN3] is clear--Beneficial has a duty to disburse monies received at the lock box, according to the formula prescribed in the Agreement. Contrary to the Sterlings' contentions, nothing in the Agreement imposes upon Beneficial a duty to *insure payment by A.R.A. to the lock box.* Any subjective beliefs or expectations the Sterlings may have harbored regarding Beneficial's duty goes only to the issue of unilateral mistake, which is a legal theory applicable in only very limited circumstances. *See Matter of Enstar Corp.,* Del.Supr., 604 A.2d 404, 411 (1990) (delineating the following requirements for recision of a contract on the ground of unilateral mistake: (1) an unconscionable agreement, (2) a mistake relating to the substance of consideration, (3) occurrence of the mistake regardless of the exercise of ordinary care, and (4) the possibility of restoring the aggrieved party to the status quo). However, unilateral mistake is not alleged here.

> FN3. The Agreement contains an integration clause at Paragraph 15, which states that the "Agreement contains the entire understanding of the parties hereto with respect to the subject matter of the Agreement ... and can be amended, modified or canceled only by a written instrument executed by all parties hereto." This further supports a refusal to consider extrinsic evidence for the purpose of determining the parties' obligations.

**\*6** Therefore, because the Agreement is not ambiguous on its face, no extrinsic evidence may be considered. And, because no evidence indicates

Beneficial improperly handled whatever monies which were in fact deposited in the lock box, there is no material issue of fact concerning whether Beneficial breached its only duty under terms of the Agreement. Thus, the cause of action for breach of contract fails.

### V. CONCLUSION

Based upon the evidence submitted, the Court finds no genuine issue of material fact regarding any of the causes of action alleged by the Sterlings against Beneficial. There have been no particularized facts shown which would indicate a *prima facie* case for the claims of fraud or misrepresentation. The claim for negligence is legally insufficient because only economic damages are claimed.

The final claim--breach of contract--depends entirely upon a finding by the Court that Beneficial's duty owed to the Sterlings included a duty of insuring payment by A.R.A. to the lock box--a finding which the Court cannot reasonably make. The only duty specified in the Agreement is that of Beneficial's proper handling and disbursing of funds which were deposited in the lock box. The Sterlings have not put forth facts which could reasonably substantiate a breach of the duty specified.

For the foregoing reasons, the Court finds the existence of no genuine issues of material fact with respect to any of the claims presented in this action. Consequently, Beneficial's Renewed Motion for Summary Judgment is GRANTED.

IT IS SO ORDERED.

1994 WL 315365 (Del.Super.)

END OF DOCUMENT

PLAINTIFF SEA STAR LINES LLC'S                    EXHIBIT 2
OPENING BRIEF IN SUPPORT OF ITS
MOTION TO DISMISS THE COUNTERCLAIM

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2005 WL 790821 (Del.Ch.)
**(Cite as: 2005 WL 790821 (Del.Ch.))**
<KeyCite History>
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.
WAL-MART STORES, INC., and Wachovia Bank
of Georgia, N.A., in its capacity as
Trustee of the Wal-Stores, Inc. Corporation
Grantor Trust, Plaintiffs,
v.
AIG LIFE INSURANCE COMPANY; Hartford Life
Insurance Company; Westport
Management Services, Inc.; International Corporate
Marketing Group, LLC;
National Benefits Group, Inc., d/b/a Marsh Financial
Services; Seabury & Smith,
Inc., Marsh, Inc., and Marsh & McLennan National
Marketing Corporation, now
known as J & H Marsh & McLennan Private Client
Services, Inc., Defendants.
No. Civ.A. 19875.

Submitted Feb. 24, 2005.
Decided April 1, 2005.

Robert K. Payson, Gregory A. Inskip, Potter Anderson & Corroon LLP, Wilmington, Delaware; Michael Y. Horton, David S. Cox, Morgan Lewis & Bockius LLP, Los Angeles, California; Paul A. Zevnik, Morgan Lewis & Bockius LLP, Washington, D.C., for Plaintiffs.

Richard D. Heins, Carolyn Hake, Ashby & Geddes, Wilmington, Delaware; James F. Jorden, Paul A. Fischer, Kristin A. Shepard, Jorden Burt LLP, Washington, D.C., for Defendant AIG Life Insurance Co.

Harry Tashjian, IV, Richards Layton & Finger, Wilmington, Delaware; Barry A. Chasnoff, John Gillard, Akin Gump Strauss Hauer & Feld LLP, San Antonio, Texas; Michael Quigley, Jeffrey P. Kehne, Akin Gump Strauss Hauer & Feld LLP, Washington, D.C., Michael Small, Akin Gump Strauss Hauer & Feld LLP, Los Angeles, California, for Hartford Life Insurance Company and International Corporate Marketing Group.

Elizabeth A. Wilburn, Blank Rome LLP, Wilmington, Delaware; Ian M. Comisky, Roger F. Cox, Blank Rome LLP, Philadelphia, Pennsylvania, for Defendant National Benefits Group, Inc.

Edward P. Welch, Seth M. Beausang, Skadden Arps Slate Meagher & Flom LLP, Wilmington, Delaware; Marco E. Schnabl, Michael S. Davi, Skadden Arps Slate Meagher & Flom LLP, New York, New York, for Defendants Marsh Financial Services, Seabury & Smith, Inc., Marsh, Inc., and Marsh & McLennan National Marketing Corporation, formerly known as J & H Marsh & McLennan Private Client Services, Inc.

*MEMORANDUM OPINION AND ORDER*

LAMB, Vice Chancellor.

I.

**\*1** In the early 1990s, a large national retailer embarked on a plan to acquire corporate-owned life insurance ("COLI") policies covering an enormous number of its employees. The principal purpose of this plan was to generate substantial federal income tax benefits for the retailer. Working with a number of insurance brokers and insurers, the retailer began purchasing blocks of policies in 1993 and continued these purchases until 1995. By then, the retailer owned life insurance policies covering hundreds of thousands of its employees.

In 1996, Congress enacted legislation that effectively eliminated the future tax benefits associated with all but a few of the retailer's COLI policies. Soon thereafter, the Internal Revenue Service (the "IRS") began to bring enforcement actions claiming that employers participating in COLI plans, including the retailer, underpaid past taxes. Moreover, employees and the estates of deceased employees filed litigation claiming that the proceeds of any policies should be paid to them, rather than to the retailer. In the face of these developments, the retailer began to unwind its insurance policies in 1996. In 2002, it settled with the IRS.

In September of 2002, nearly a decade after making its first COLI investment, the retailer brought suit against all the parties involved in its purchase of these policies. Its complaint alleges a broad range of legal and equitable claims against the insurance brokers and providers--all seeking to recover from them the losses it incurred in connection with this risky tax

avoidance scheme. On consolidated motions to dismiss brought by the insurers and brokers, the court concludes that the retailer has failed to state a claim upon which relief can be granted. The court, therefore, grants the defendants' motions to dismiss.

II.

A. *The Parties*

Plaintiff Wal-Mart Stores, Inc. ("Wal-Mart Stores"), a Delaware corporation, is a "large and sophisticated" retail sales company with over 1 million employees. [FN1] Plaintiff Wachovia Bank of Georgia, N.A. is the trustee of the Wal-Mart Stores, Inc. Corporation Grantor's Trust (the "Wal-Mart Trust"). [FN2] The Wal-Mart Trust was set up in December of 1993 for the sole purpose of facilitating the COLI plans that are at the heart of this case. Starting in December of 1993, Wal-Mart purchased COLI policies from defendants AIG Life Insurance Company ("AIG") and Hartford Life Insurance Company ("Hartford") (collectively, the "Insurers").

> FN1. Am. Compl. ¶¶ 1, 29. For the purposes of the pending motions to dismiss, the court takes the well-pleaded factual allegations of the complaint as true.

> FN2. For simplicity, the court refers to plaintiffs Wal-Mart Stores and the Wal-Mart Trust collectively as "Wal-Mart."

Defendant Westport Management Services, Inc. ("Westport"), a Delaware corporation, and defendant International Corporate Marketing Group, LLC ("ICMG"), a Delaware limited liability company acted, respectively, as representatives of AIG and Hartford in connection with the COLI policies that are the subject of this action.

Defendants Seabury & Smith, Inc., Marsh Financial Services, Marsh, Inc., and Marsh & McLennan National Marketing Corporation [FN3] (collectively, the "Marsh Entities") and National Benefits Group, Inc. ("NBG," together with the Marsh Entities, the "broker-defendants") are insurance brokers who worked with Wal-Mart in soliciting and evaluating COLI proposals from a number of insurance companies. [FN4]

> FN3. On September 20, 2002, J & H Marsh & McLennan Private Client Services, formerly known as Marsh & McLennan National Marketing Corporation, was dissolved.

> FN4. The Marsh Entities are Delaware corporations with their principal places of business in New York, New York. NBG is a Minnesota corporation with its principal place of business in Minneapolis, Minnesota.

B. *The COLI Policies*

*2 In the early 1990s, Wal-Mart Stores, like other large employers at that time, began considering the acquisition of broad-based COLI plans. Broad-based COLI plans are life insurance policies purchased by a corporate employer covering the lives of a large number of employees. [FN5] The fundamental purposes of the COLI plans, according to Wal-Mart, were: (i) to provide certain free death benefits to classes of employees at Wal-Mart; (ii) to provide financial benefits to Wal-Mart in order to compensate the company for costs related to the death of employees; and (iii) to provide tax benefits to the company in connection with funding the premiums and other costs of the policies. [FN6] Under the COLI plans, the corporate employer secures loans from the insurers to fund the insurance premiums and then deducts the interest paid on those loans from its income taxes, thereby enjoying the investment return on these policies tax-free.

> FN5. The COLI plans are modeled on "key man" life insurance policies used by corporations for decades to lessen the costs incurred when key employees died. The broad-based COLI plans extend the practice to insure broader classes of corporate employees. Am. Compl. ¶ 21.

> FN6. *Id.* ¶ 3.

In mid-1993, Wal-Mart hired the broker-defendants to advise the company in connection with the purchase of the COLI policies. Specifically, Wal-Mart alleges that it hired the broker-defendants to "oversee[ ] the design and structure of an appropriate broad-based COLI plan for Wal-Mart, prepare [ ] questions for, and solicit[ ] proposals from, insurance companies involved in such COLI plans, select[ ] the appropriate insurance company or companies to underwrite the COLI plans, and negotiate[ ] the best available terms and conditions for Wal-Mart." [FN7] Wal-Mart eventually entered into written agreements with the broker-defendants "to administer and service the [COLI plans] and provide certain other [s]ervices." [FN8]

> FN7. *Id.* ¶ 29.

FN8. *Id.* ¶¶ 39, 43.

On December 28, 1993, after working with the defendant-brokers for several months, Wal-Mart purchased a block of more than 20,000 COLI policies from Hartford [FN9] and a block of nearly 200,000 COLI policies from AIG. The initial premium payments for these two blocks of COLI policies exceeded $800 million. Wal-Mart made five subsequent purchases from AIG, from June of 1994 through July of 1995, adding approximately 135,000 policies and approximately $300 million in initial premium payments. In total, Wal-Mart acquired approximately 350,000 COLI policies. Wal-Mart acquired these policies through the Wal-Mart Trust, a Georgia entity that was created specifically to take advantage of Georgia law that recognize employers' "insurable interests" in the lives of corporate employees. [FN10]

FN9. These policies covered the "managerial group" and provided higher policy limits than the policies purchased from AIG. *Id.* ¶ 42(a).

FN10. *Id.* ¶ 37.

C. *Congress Changes The Law And The IRS Acts*

In August 1996, Congress enacted the Heath Insurance Portability and Accountability Act ("HIPAA") which, among other things, eliminated interest deductions (as of January 1, 1996) on COLI loans and on borrowings to fund COLI plans adopted after June 20, 1986, with transitional relief provided for 1997 and 1998 for up to 20,000 policies. [FN11] Within a few months, Wal-Mart began unwinding the COLI plans and, by January of 2000, its last COLI policies were canceled.

FN11. Am. Compl. ¶ 46.

**\*3** In 1997, the IRS initiated enforcement actions against a number of employers who had claimed tax deductions for interest on loans under COLI plans for tax periods before 1996. [FN12] Additionally, in 1998 and 1999, the IRS issued Technical Advisory Memoranda presenting its legal opinion on COLI plans and declaring that the interest deductions should be disallowed because they lack economic substance. [FN13] The IRS challenged the Wal-Mart COLI program, and Wal-Mart settled with the IRS in August of 2002. [FN14]

FN12. *See Am. Elec. Power Co., Inc. v. United States,* 136 F.Supp.2d 762 (S.D.Ohio

2001), *aff'd,* 326 F.3d. 737 (6th Cir.2003) (upholding IRS disallowance of interest deductions on loans made against COLI policies); *In re CM Holdings, Inc.,* 254 B.R. 578 (D.Del.2000), *aff'd,* 301 F.3d 96 (3d Cir.2002) (upholding bankruptcy claim for unpaid taxes); *Winn-Dixie Stores, Inc. v. Comm.,* 113 T.C. 254 (1999), *aff'd,* 254 F.3d 1313 (11th Cir.2001) (upholding disallowance of interest and administrative expense deductions).

FN13. Tech. Adv. Mem. 9812005 (Mar. 20, 1998) (available without pagination at 1998 WL 123675); Tech. Adv. Mem. 199901005 (Jan. 8, 1999) (available without pagination at 1999 WL 5679).

FN14. Wal-Mart claims that it is not seeking recovery for the "substantial unanticipated tax liability" from its settlement with the IRS. Am. Compl. ¶ 49.

Also, starting in 2001, employees and estates of deceased employees began challenging the COLI plans, arguing that employers do not have "insurable interests" in their lives under applicable state law. [FN15] Several actions were filed challenging the notion that Wal-Mart has an "insurable interest" in the lives of its deceased employees and demanding that courts impose a constructive trust on death benefits that Wal-Mart may have received under the COLI policies. In at least one action, a federal court in Texas applied Texas law instead of Georgia law in holding that Wal-Mart did not have an "insurable interest" in the lives of its Texas employees. [FN16]

FN15. *Id.* ¶ 7.

FN16. *Mayo v. Hartford Life Ins. Co.,* 220 F.Supp.2d 794 (S.D.Tex. Aug. 8, 2002), *aff'd,* 2004 WL 14654 (5th Cir. Jan. 5, 2004).

D. *Wal-Mart's Claims*

On September 3, 2002, nearly nine years after it began purchasing COLI policies, Wal-Mart filed this action to recover its losses resulting from the failed COLI program. Wal-Mart claims that since the COLI policies "failed in their fundamental purpose," namely, to secure substantial financial benefits for Wal-Mart, the parties involved in Wal-Mart's purchase of the COLI policies should share in the loss. Wal-Mart does not argue that the failure of its COLI program is due to the 1996 change in the tax

code. Instead, Wal-Mart alleges that the failure of the COLI program is:

> [T]he product of risks never contemplated by the parties, *i.e.:* (i) the disallowance of interest deductions under pre-HIPAA federal tax law and (ii) attacks on the COLI plans mounted by the estates of insured that have been predicated on Wal-Mart's alleged lack of "insurable interest" in the lives of its employees.... [FN17]

> FN17. Answering Br. of Wal-Mart Stores, Inc. in Opp'n to AIG's and Hartford's Mot. to Dismiss the Am. Compl. ¶ 11.

Wal-Mart asserts that the defendants owed it the "highest duties of care, including a duty of good faith, a duty of full disclosure, a duty of loyalty, and a duty to meet the exacting standards of their respective professions." [FN18] Wal-Mart alleges that the defendants breached their fiduciary duties in "developing, promoting, recommending, advising, selling, and administering" the COLI plans. [FN19] Furthermore, Wal-Mart argues that had certain disclosures been made it would not have entered into the COLI plans. Predictably, Wal-Mart alleges that the defendants did not disclose the "full range and magnitude" of the risks involved in the COLI plans. [FN20] Wal-Mart complains that it relied to its detriment on the defendants in their alleged roles as fiduciaries, experts, advisors, agents, and providers of the COLI plans.

> FN18. Am. Compl. ¶ 54.

> FN19. *Id.*

> FN20. *Id.* ¶¶ 80(a)-(c).

**\*4** The Amended Complaint is set out in seven counts. Count 1 alleges unjust enrichment and restitution against all the defendants. Count 2 alleges breach of fiduciary duty against all the defendants. Count 3 alleges equitable fraud against all the defendants. Count 4 alleges breach of contract against all the defendants. Count 5 alleges negligence against the broker-defendants. Count 6 alleges violation of the Delaware Consumer Fraud Act against all the defendants. Finally, Count 7 seeks a declaration against all the defendants requiring the defendants to compensate Wal-Mart for any future losses incurred due to the failed COLI plans, including the costs that may be incurred from the "insurable interest" litigation.

In November of 2003, the defendants moved to dismiss the Amended Complaint based on (i) failure

to state a claim upon which relief can be granted, and (ii) that the claims were untimely. This court dismissed all claims in the Amended Complaint as time-barred, without addressing the remaining arguments. [FN21] On November 4, 2004, the Delaware Supreme Court reversed and remanded. [FN22] The defendants have now renewed their motion to dismiss for failure to state a claim. On February 24, 2004, the court heard oral arguments.

> FN21. *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.,* 2004 Del. Ch. LEXIS 19, at \*3-4 (Del. Ch. Mar. 2, 2004).

> FN22. *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.,* 860 A.2d 312, 314 (Del.2004) (per curiam).

### III.

The standard for dismissal pursuant to Court of Chancery Rule 12(b)(6) for failure to state a claim upon which relief can be granted is well established. The motion will be granted if it appears with reasonable certainty that the plaintiff could not prevail on any set of facts that can be inferred from the pleading. [FN23] In considering a motion to dismiss under Rule 12(b)(6), the court is required to assume the truthfulness of all well-pleaded allegations of fact in the complaint. [FN24] All facts of the pleadings and inferences that can reasonably be drawn therefrom are accepted as true. [FN25] However, neither inferences nor conclusions of fact unsupported by allegations of specific fact are accepted as true. [FN26] That is, a trial court need not blindly accept as true all allegations, nor must it draw all inferences from them in the plaintiffs' favor unless they are reasonable inferences. [FN27]

> FN23. *Kohls v. Kenetech Corp.,* 791 A.2d 763, 767 (Del. Ch.2000).

> FN24. *Grobow v. Perot,* 539 A.2d 180, 188 n. 6 (Del.1988).

> FN25. *Id.*

> FN26. *Id.*

> FN27. *In re Lukens Inc. S'holders Litig.,* 757 A.2d 720, 727 (Del. Ch.1999).

### IV.

A. *Unjust Enrichment*

Wal-Mart's first claim is based in quasi-contract for unjust enrichment and restitution. Wal-Mart claims

that the COLI plans failed in their fundamental purpose and that, as a result, Wal-Mart suffered substantial losses. Wal-Mart also contends that the defendants made substantial profits from the premiums and service fees Wal-Mart paid, and that it would be "unjust and unconscionable for the defendants to continue to retain the benefits conferred on them by Wal-Mart." [FN28] In other words, because the 2002 IRS settlement caused Wal-Mart to lose the benefit of most of the tax deductions it took in the early years of its COLI program, it now seeks to shift to the defendants its COLI-related losses--at least to the extent of the defendants' profits from the COLI contracts. The question presented is whether theories of unjust enrichment or quasi-contract are available to Wal-Mart to reallocate the risk among parties to the COLI contracts. Because Wal-Mart's failure to gain the advantages it sought when it entered into the COLI contracts was the result of obvious risks, plainly known to the parties at the time of contracting, Wal-Mart's complaint does not state a claim for relief under those theories. Instead, the risk of loss must remain where it began, with Wal-Mart.

> FN28. Am. Compl. ¶ 85.

**\*5** Wal-Mart, in the alternative, pleads both a claim for breach of contract and a claim for unjust enrichment. In some circumstances, alternative pleading allows a party to seek recovery under theories of contract or quasi-contract. This is generally so, however, only when there is doubt surrounding the enforceability or the existence of the contract. Courts generally dismiss claims for *quantum meruit* on the pleadings when it is clear from the face of the complaint that there exists an express contract that clearly controls. [FN29] It is undisputed that a written contract existed between Wal-Mart and the Insurers to provide the COLI policies. The COLI policies, like all insurance policies, were reduced to written documents. Furthermore, the case for dismissing Wal-Mart's unjust enrichment claim is bolstered by the fact that the written contract contains a merger clause, expressly disavowing that any additional promises or agreements exist between the parties. [FN30]

> FN29. *Rossdeutscher v. Viacom, Inc.,* 768 A.2d 8, 24 (Del.2001) (applying New York law); *ID Biomedical Corp. v. TM Technologies, Inc.,* 1995 WL 130743, at \*15 (Del. Ch. Mar. 16, 1995) (applying Delaware law).

> FN30. *See* Letter of Understanding at 2, Ex. 1 to Def.'s Joint Supplemental Br. The

complaint makes reference to the Letter of Understanding, Am. Compl. ¶ 80(e), so this document is properly before the court on a motion to dismiss.

Notwithstanding the existence of these contractual relationships, Wal-Mart attempts to plead facts sufficient to show that, in light of the doctrine of commercial frustration, no valid or enforceable contracts govern its relations with the defendants. Under that doctrine, after a contract is made, if a party's principal purpose is substantially frustrated (without its fault) by the occurrence of an event, the non-occurrence of which was a basic assumption on which the contract was made, then the party's remaining duties to render performance are discharged, unless the language or the circumstances indicate the contrary. [FN31] Wal-Mart pleads that the primary purpose of the COLI contract was to provide tax benefits to Wal-Mart through, *inter alia,* the deductibility of "interest payments made by Wal-Mart on policy-based loans from the insurer defendants[.]" [FN32] Wal-Mart also pleads that this purpose was frustrated by the IRS's disallowance of the deductions associated with the COLI plans. [FN33]

> FN31. *Williams Nat. Gas Co. v. Amoco Prod. Co.,* 1991 Del. Ch. LEXIS 73, at \*40-\*41 (Del. Ch. Apr. 16, 1991) (applying Kansas law and quoting *Columbian Nat'l Title Ins. Co. v. Township Title Serv., Inc.,* 659 F.Supp. 796, 804 (D.Kan.1987)).

> FN32. Am. Compl. ¶¶ 3-4.

> FN33. Am. Compl. ¶ 7.

### 1. *Commercial Frustration*

The Delaware Supreme Court has adopted the doctrine of commercial frustration, but has not clearly defined its contours. [FN34] From a review of cases from other jurisdictions, however, several broad generalizations can be made. First, the defense of commercial frustration is very difficult to invoke, as courts have been extremely reluctant to allow parties to disavow obligations that they have agreed to. [FN35] Second, commercial frustration is a question of law that is to be determined by the court. [FN36] Third, the party's main purpose must be completely, or nearly completely, frustrated. [FN37] Fourth, the doctrine of commercial frustration operates to excuse the performance of a contract, *not* to compel performance by another party; i.e. the doctrine can only be used as a shield, and not as a sword. [FN38]

Fifth, the doctrine of commercial frustration does not apply if at the time of contracting the supervening event was reasonably foreseeable, and could (and should) have been anticipated by the parties and provided for in the contract. [FN39]

> FN34. *Martin v. Star Pub'g Co.,* 126 A.2d 238, 242 (Del.1956).

> FN35. *See, e.g., Sage Realty Corp. v. Jugobanka, D.D.,* 1997 U.S. Dist. LEXIS 9301, at *6 (S.D.N.Y. July 2, 1997) ("Application of the commercial frustration doctrine has been limited to instances where a virtually cataclysmic, wholly unforeseeable event renders the contract valueless to one party.") (applying New York Law) (quotations omitted); *Bartlett Commons Shopping Ctr. v. Schultz Sav-O-Stores, Inc.,* 1992 U.S. Dist. LEXIS 17334, at *2 (D.Ill. Nov. 12, 1992) ("[T]he doctrine of 'commercial frustration' or 'commercial impracticability' as an extension of the contract defense of impossibility of performance ... is not to be applied liberally....").

> FN36. *See Peoplesoft U.S.A., Inc. v. Softeck, Inc.,* 227 F.Supp.2d 1116, 1119 (N.D.Cal.2002) ("The excuse of commercial frustration is a question of law, to be determined by the court from the facts of the case."); *Scottsdale v. Plitt Theatres, Inc.,* 1999 U.S. Dist. LEXIS 7785, at *9-*10 (N.D.Ill. Mar. 31, 1999) ("The foreseeability of the frustrating event is a question of law to be resolved by the court.... The court must also determine whether the value of counter-performance has been destroyed by the frustrating event."); *Voyager Communications V, Inc. v. HMW Communications,* 1996 U.S. Dist. LEXIS 14447, at *6-*7 (E.D.N.C. Aug. 21, 1996) (dismissing a claim for restitution based on commercial frustration on the pleadings).

> FN37. *Peoplesoft,* 227 F.Supp.2d at 1119 ("In applying the frustration excuse, courts look first to see whether the *fundamental reason* of both parties for entering into the contract has been frustrated by an unanticipated supervening circumstance ....) (emphasis added); *Scottsdale,* 1999 U.S. Dist. LEXIS 7785, at *9 ("To successfully plead commercial frustration, a defendant must allege that ... the value of counter-

performance had been totally or nearly totally destroyed by the frustrating cause."); *Sage Realty,* 1997 U.S. Dist. LEXIS 9301, at *6 ("Application of the commercial frustration doctrine has been limited to instances where a virtually cataclysmic, wholly unforeseeable event renders the contract valueless to one party.") (quotations omitted).

> FN38. *See Voyager,* 1996 U.S. Dist. Lexis 14447, at *5; *see also* Restatement (2d) of Contracts, § 265 ("Where, after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, *his remaining duties to render performance are discharged,* unless the language or the circumstances indicate the contrary.") (emphasis added).

> FN39. *Williams Nat. Gas,* 1991 Del. Ch. LEXIS 73, at *43 (citations omitted); *see also Peoplesoft,* 227 F.Supp.2d at 1119 ("To excuse nonperformance of a contract on the ground of commercial frustration ... the event must be of a nature not reasonably to have been foreseen...."); *Scottsdale,* 1999 U.S. Dist. LEXIS 7785, at *9 ("To successfully plead commercial frustration, a defendant must allege that the frustrating event was not reasonably foreseeable and that the value of counter-performance had been totally or nearly totally destroyed by the frustrating cause."); *Sage Realty,* 1997 U.S. Dist. LEXIS 9301, at *6 ("If a contingency is reasonably foreseeable and the agreement nonetheless fails to provide protection in the event of its occurrence, the defense of commercial frustration is not available.").

**\*6** The court concludes that the doctrine of commercial frustration does not apply in this case. First, Wal-Mart does not plead sufficient facts from which the court may reasonably infer that the main purpose of the COLI plans has been substantially frustrated. Wal-Mart alleges that there were three fundamental purposes of the COLI plans: (i) to provide certain free death benefits to classes of employees of Wal-Mart; (ii) to provide financial benefits to Wal-Mart in order to compensate the company for costs related to the death of employees; and (iii) to provide tax benefits to the company in

connection with funding the premiums and other costs of the plans . [FN40] Wal-Mart alleges that that the second and third purposes, providing Wal-Mart with financial benefits and with tax breaks, failed. However, Wal-Mart does not allege that the first purpose failed. In fact, Wal-Mart specifically alleges that due to the COLI plans, Wal-Mart's employees have received substantial death benefits . [FN41] Therefore, the invalidation of the tax deductions was not a "cataclysmic" event that rendered the policies "valueless" and the doctrine of commercial frustration does not apply.

> FN40. Am. Compl. ¶ 3.

> FN41. *Id.* ¶ 7.

Second, Wal-Mart is *not* attempting to use the doctrine of commercial frustration to excuse its non-performance. Wal-Mart is either attempting to compel some different performance or, more exactly, avoid the contract all together, due to commercial frustration. In either instance, the doctrine is inapplicable. It *only* applies to excuse future non-performance.

Third, both the invalidation of the tax deduction by the IRS and the invalidation of Wal-Mart's claim to having an insurable interest were both decidedly foreseeable events. Although the COLI plans were not prohibited by the Internal Revenue Code as it existed at the time the plans were created, there were well-known concerns about potential legal objections by the IRS to such plans under federal tax law. [FN42] For decades the IRS has had the power to look beyond the form of a transaction to its economic or business purpose. When a transaction exploits a feature of the tax code without the attendant economic risk, the IRS may label the transaction a sham and disallow the tax benefits claimed by the taxpayer. [FN43] All taxpayers considering the use of a tax shelter to avoid tax liability are in a position to foresee that the IRS might determine that the desired tax benefits are unavailable. This is especially true when the taxpayer is one of the largest, most sophisticated companies in the world and is trying to avoid hundreds of millions of dollars in taxes.

> FN42. "From the beginning of its exploration of COLI plans, Wal-Mart recognized that continued favorable tax treatment was essential to the viability of the plans." Am. Compl. ¶ 40.

> FN43. *Neonatology Assocs., P.A. v. Comm'r,* 299 F.3d 221, 231 n. 12 (3d Cir.2002)

(citing *Horn v. Comm'r,* 968 F.2d 1229, 1236 n. 8 (D.C.Cir.1992)); see also *Higgins v. Smith,* 308 U.S. 473, 477-78 (1940) ("The Government may look at actualities and upon determination that the form employed for doing business or carrying out the challenged tax event is unreal or a sham may sustain or disregard the effect of the fiction as best serves the purposes of the tax statute. To hold otherwise would permit the schemes of taxpayers to supersede legislation in the determination of the time and manner of taxation.").

There was also an obvious and known risk that Wal-Mart would be found to lack an insurable interest in the lives of its rank-and-file employees. Wal-Mart used a Georgia trust to purchase the policies specifically to take advantage of Georgia law that allowed it to have an insurable interest in its employees. [FN44] To make such a decision, Wal-Mart must have been aware that other states (such as Texas) do not allow employers to have an insurable interest in their employees. Given that knowledge, the risk of a court in such a state applying its own law and finding that Wal-Mart did not have an insurable interest in its employees was eminently foreseeable.

> FN44. *Id.* ¶ 37.

**\*7** Wal-Mart's awareness of, and concern about, these risks is reflected in the very application it filed for the AIG policies. Wal-Mart and AIG executed a Letter of Understanding as part of that application process that specifically addresses Wal-Mart's concerns with "the tax consequences of loans and/or withdrawals from the Policies and the deductibility thereof." [FN45] An exhibit to this letter deals with the possibility that Wal-Mart might be found to lack an "insurable interest" in the lives of its employees. [FN46]

> FN45. Letter of Understanding at 2, Ex. 1 to Def.'s Joint Supplemental Br.

> FN46. *Id.*

To avoid this outcome, Wal-Mart cites two Ninth Circuit Court of Appeals decisions allowing rescission of a tax shelter contract because the tax avoidance purpose of the transaction was frustrated. [FN47] However, the Ninth Circuit based both decisions on the fact that the contracts involved in those cases allocated the risk of an adverse tax ruling to the defendants. In *Mayer,* based on Oregon's doctrine of commercial frustration, stockholders were

excused from performance of an agreed-upon stock transfer after an IRS ruling which rejected the tax premise upon which the stock transfer was based. [FN48] The Ninth Circuit stated:

> FN47. *Walker v. Cont'l Life & Accident Co.,* 445 F.2d 1072 (9th Cir.1971); *W. L.A. Inst. for Cancer Research v. Mayer,* 366 F.2d 220 (9th Cir.1966).

> FN48. *Id.* at 225-26.

The [District C]ourt credited testimony that [the taxpayer] did not accept the default provisions as adequate protection against an adverse tax ruling but requested assurances that the property would be returned if the tax assumptions underlying the transaction were challenged, and that he was given such assurances by representatives of the Institute. In the light of these circumstances, it would be untenable to conclude that the parties intended that the [taxpayers] should assume the risk of an adverse tax ruling.... [FN49]

> FN49. *Id.*

In *Walker,* the court sustained the rescission of certain annuity loan transactions on the ground of commercial frustration after a Supreme Court decision eliminated the tax benefits of the contract. The court in *Walker* recognized that no claim for frustration exists when there is risk allocation in the contract, but did not reach the issue because the insurer did not raise it at trial. "[T]he general rule is that this Court will not reverse the trial court on a contention that was never presented to it." [FN50]

> FN50. *Walker,* 445 F.2d at 1074 (citations omitted).

In contrast, Wal-Mart does not allege facts from which this court could reasonably infer that the parties to the COLI contracts ever agreed to shift the risk of an adverse tax ruling, or an adverse ruling as to Wal-Mart's insurable interest in its employees, onto the defendants. In fact, the opposite is true. As discussed above, the Letter of Understanding clearly places the risk of loss, vis-a-vis the insurable interest, on Wal-Mart. Furthermore, the contract is silent as to the risk of loss with respect to an adverse tax ruling. Absent a contractual provision shifting the risk of loss, the risk clearly remained where it began--with the taxpayer, Wal-Mart. [FN51]

> FN51. The court made essentially the same point in its earlier opinion. *Wal-Mart,* 2004

Del. Ch. LEXIS 19, at *27 n. 53. The Delaware Supreme Court expressly acknowledged and left undisturbed this finding. *See Wal-Mart,* 860 A.2d at 318 n. 13.

Moreover, to the extent that these Ninth Circuit cases can stand for the broader proposition that commercial frustration allows a party to rescind a contract, they are of doubtful continuing vitality. The doctrine of commercial frustration has developed relatively recently, as an offshoot of the more established doctrine of impossibility. The decisions in *Mayer* and *West* are early decisions, and contradict the overwhelming weight of modern authority that restricts commercial frustration to excusing failure of future performance. [FN52] These cases also contradict more modern cases from the same jurisdiction. [FN53]

> FN52. *See, e.g., Voyager,* 1996 U.S. Dist. Lexis 14447, at *5 ("Here, Voyager is not using the doctrine of frustration of purpose to excuse performance. Rather, Voyager is attempting to use the doctrine to compel HMW to pay an additional $250,000 for the radio stations. The doctrine, however, is a shield, not a sword."); *Plitt Theatres,* 1999 U.S. Dist. LEXIS 7785, at *9 (characterizing commercial frustration as a viable defense, albeit a disfavored one, to a breach of contract claim); *Sage Realty,* 1997 U.S. Dist. LEXIS 9301, at *6 (stating that commercial frustration operates to discharge duties under a contract).

> FN53. *See FDIC v. Sahni,* 1997 U.S.App. LEXIS 2058, at *7 (9th Cir. Feb. 5, 1997) (characterizing commercial frustration as a defense to a breach of contract claim); *Peoplesoft,* 227 F.Supp.2d at 1119 (same).

**\*8** In addition, allowing rescission of contracts due to commercial frustration would interfere with the valid expectations of parties to commercial transactions. The proper way to allocate risks in a contract is through bargaining between parties. It is not the court's role to rewrite the contract between sophisticated market participants, allocating the risk of an agreement after the fact, to suit the court's sense of equity or fairness. Given the additional fact that, even as a defense, the doctrine is disfavored, the court holds that the doctrine of commercial frustration in Delaware only functions to excuse future performance of a contract, at least among sophisticated parties, and cannot serve as a basis to

reallocate known, or obviously foreseeable, risk of loss post-contractually.

 The court finds that the doctrine of commercial frustration is inapplicable and the written contracts govern the dispute between the parties. The court must therefore dismiss Wal-Mart's claim for unjust enrichment.

B. *Breach Of Fiduciary Duty*

 Wal-Mart's second claim is for breach of fiduciary duty. Fiduciary relationships have often been described as "special relationships," for good reason. Generally, "[a] fiduciary relationship is a situation where one person reposes special trust in another or where a special duty exists on the part of one person to protect the interests of another." [FN54] A fiduciary relationship implies a dependence, and a condition of superiority, of one party to another. [FN55] A fiduciary relationship exists where one party places a special trust in another and relies on that trust, or where a special duty exists for one party to protect the interests of another. [FN56] It generally requires "confidence reposed by one side and domination and influence exercised by the other." [FN57]

> FN54. *Cheese Shop Int'l, Inc. v. Steele,* 303 A.2d 689, 690 (Del. Ch.1973), *rev'd on other grounds,* 311 A.2d 870 (1973).

> FN55. *Lank v. Steiner,* 213 A.2d 848, 852 (Del.Ch.1965); *Peyton v. William C. Peyton Corp.,* 7 A.2d 737, 747 (Del.1939).

> FN56. *Goodrich v. E.F. Hutton Group, Inc.,* 1991 Del. Ch. LEXIS 93, at *3 (Del. Ch.1991); *Cheese Shop,* 303 A.2d at 690.

> FN57. *BAE Sys. N. Am. Inc. v. Lockheed Martin Corp.,* 2004 Del. Ch. LEXIS 119, at *39 (Del. Ch. Aug. 3, 2004) (quoting *Gross v. Univ. of Chi.,* 302 N.E.2d 444, 453-54 (Ill.App.Ct.1973)).

 The Delaware courts have been reluctant to extend too broadly the applicability of fiduciary duties. As Justice (then-Vice Chancellor) Jacobs stated:

> Our courts have been cautious when evaluating entreaties to expand the number and kinds of relationships that are denominated as "fiduciary".... [A] special relationship must exist between the parties, but the term "special relationship" cannot "be thought to describe too broadly chancery's concerns with relationships where an element of

trust, as commonly understood, is present. One may place trust in a workman of any sort and does place trust in one's physician, but it would hardly be contended that such trust would warrant chancery's assuming jurisdiction over a claim that a workman or physician caused injury by want of due care." [FN58]

> FN58. *Bird's Constr. v. Milton Equestrian Ctr.,* 2001 Del. Ch. LEXIS 140, at *13-*14 (Del. Ch. Nov. 16, 2001) (quoting *McMahon v. New Castle Assocs.,* 532 A.2d 601, 604 (Del. Ch.1987)).

 Furthermore, while some cases in Delaware have found certain aspects of a commercial relationship to implicate fiduciary duties, these cases should not be read so broadly as to engulf in fiduciary duties ordinary commercial relationships. For instance, in *O'Malley v. Boris,* the Delaware Supreme Court held that a stockbroker was liable to his client for breach of fiduciary duties when the broker had engaged in self-dealing with the client's money. [FN59] The Court relied upon *NYSE v. Pickard & Co.,* [FN60] in which former Chancellor Duffy stated that a stockbroker/client relationship is often a principal/agent relationship, thereby giving rise to certain particularized fiduciary duties. As Chancellor Duffy said:

> FN59. 742 A.2d 845, 849 (Del.1999).

> FN60. 274 A.2d 148, 150 (Del. Ch.1971).

**\*9** Speaking generally, the position of a stockbroker is often twofold: (a) when he buys or sells a security upon the order of a customer he is the agent of that customer in that transaction; (b) when he provides his own money to complete the order by paying for the security he is a principal *vis-a-vis* the customer in that phase of the transaction. As an agent he owes a fiduciary duty to his customer; as a principal he is a creditor of the customer, holding the security purchased as collateral for the debt (i.e., with a lien thereon) and the relationship is thus that of pledgor and pledgee. The pledge relationship applies equally to securities deposited by a customer with a broker as part of a marginal transaction, or to secure purchase of other securities on margin. [FN61]

> FN61. *Id.*

 Instructively, the former Chancellor looked at the particular circumstances of the stockbroker/client relationship in determining whether, and to what

extent, a fiduciary relationship existed.

This court is similarly mindful that, in examining whether (and to what extent) a relationship may be alleged to have involved fiduciary relations, the reliance on labels is inappropriate. Because the alleged factual circumstances of Wal-Mart's dealing with the Insurers and the broker-defendants are different, the court addresses them separately.

### 1. *Fiduciary Duty Claims Against The Insurers*

It is settled law that an insurer does not generally owe a fiduciary duty to its insured because this relationship is usually an arm's-length contractual relationship. [FN62] In *Crosse,* the Delaware Supreme Court held that even the additional fact that the insurer was a not-for-profit organization that operated for the benefit of its policyholders did not give rise to fiduciary duties. [FN63] The Supreme Court stated: "the concept of a fiduciary relationship, which derives from the law of trusts, is more aptly applied in legal relationships where the interests of the fiduciary and the beneficiary incline toward a common goal in which the fiduciary is required to pursue solely the interests of the beneficiary in the property." [FN64] It next explained that an insurance policy does not give rise to fiduciary duties "because the interests of the plan participants and those of [the insurer] are not perfectly aligned." [FN65]

> FN62. *Crosse v. BCBSD, Inc.,* 836 A.2d 492, 497 (Del.2003); *see also Corrado Bros. v. Twin City Fire Ins. Co.,* 562 A.2d 1188, 1192 (Del.1989).

> FN63. 836 A.2d at 497.

> FN64. *Id.* at 495 (quoting *Corrado Bros.,* 562 A.2d at 1192).

> FN65. *Crosse,* 836 A.2d at 495.

Wal-Mart argues that, in this case, the COLI "relationship" is a "partnership" or "joint venture," thereby giving rise to fiduciary duties. In support of this proposition, Wal-Mart cites only *American Electric,* [FN66] which merely quotes an insurance broker as describing COLI policies as a "partnership." However, the court in *American Electric* does not hold that COLI plans are a partnership and Wal-Mart cites no cases holding that COLI plans are some super-contractual "partnership" arrangement. Instead, the law is clear that the insurer/insured relationship is one of contract that does not give rise to a fiduciary relationship. [FN67] Here, as in most cases between

insurer and insured, the relationship between Wal-Mart and the Insurers is a straightforward commercial relationship arising from contract. It is in all of its aspects an arm's-length relationship. It involves no element of confidentiality, joint undertaking, or trust and dependence.

> FN66. 136 F.Supp.2d 777.

> FN67. *Corrado Bros.,* 562 A.2d at 1192; *Abex Inc. v. Koll Real Estate Group, Inc.,* 1994 Del. Ch. LEXIS 213, at *46-*47 (Del. Ch. Dec. 22, 1994).

**\*10** Since Wal-Mart alleges no facts from which the court could infer that the relationship between it and the Insurers was anything but an arm's-length business relationship, the court must dismiss the fiduciary duty claim against the Insurers.

### 2. *Fiduciary Duty Claims Against The Broker-Defendants*

Wal-Mart alleges that it hired the broker-defendants to advise it in the potential purchase of COLI policies based on their self-professed expertise and experience in the COLI field. [FN68] It alleges that the broker-defendants designed the COLI policies for Wal-Mart, solicited proposals from insurance companies involved in COLI plans, selected the insurance companies to underwrite the COLI plans, and negotiated the terms and conditions of the insurance policies for Wal-Mart. [FN69] Wal-Mart also alleges that it relied upon the assurances and expertise of the broker-defendants. It does not allege, however, that the broker-defendants were empowered to purchase the policies on Wal-Mart's behalf or otherwise engaged in self-dealing with Wal-Mart's property.

> FN68. Am. Compl. ¶ 30.

> FN69. *Id.*

The question presented on this motion to dismiss is whether these allegations of fact are sufficient to support an inference that a fiduciary relationship arose between Wal-Mart, one of the nation's largest, most successful corporations, and the defendant insurance brokers. The court is mindful of the fact that normal business dealings (such as that of an insurance broker and its client) can sometimes take on certain aspects of a fiduciary relationship, as, for example, where the broker agrees to act as agent for the customer with power to bind the customer contractually. [FN70] At the same time, however, for the reasons described by Justice Jacobs in *Bird's*

*Construction,* [FN71] it is vitally important that the exacting standards of fiduciary duties not be extended to quotidian commercial relationships. This is true both to protect participants in such normal market activities from unexpected sources of liability against which they were unable to protect themselves and, perhaps more important, to prevent an erosion of the exacting standards applied by courts of equity to persons found to stand in a fiduciary relationship to others.

> FN70. *See, e.g., Pickard,* 274 A.2d at 150.

> FN71. 2001 Del. Ch. LEXIS 140, at *13-*14.

In this light, while Wal-Mart alleges that it placed trust in the broker-defendants, it does not allege sufficient facts that, if proven to be true, demonstrate that its relationship with the broker-defendants went beyond that occurring in normal commercial transactions, or otherwise justify imposing on the broker-defendants the scrupulous obligations of fiduciaries. On the contrary, the facts that are apparent from the face of the Amended Complaint show that Wal-Mart's relationship with the broker-defendants was an ordinary commercial relationship and not a fiduciary relationship.

First, there is no alignment of interests between Wal-Mart and the broker-defendants as there was no "common goal" of the COLI plans. [FN72] Wal-Mart was trying to avoid paying the taxes it owed, while the broker-defendants were trying to make money by brokering the sale of the COLI policies to Wal-Mart and entering into contracts with Wal-Mart to service those contracts.

> FN72. *Crosse,* 836 A.2d at 495.

**\*11** Second, Wal-Mart does not allege any facts from which the court could reasonably infer that the broker-defendants exerted control or domination over Wal-Mart. [FN73] Wal-Mart does not allege that it was coerced by the broker-defendants to purchase the COLI policies. On the contrary, it is evident from the Amended Complaint that Wal-Mart made the decision to purchase the COLI policies on its own, and *sought out* the broker-defendants to facilitate those purchases. [FN74] Moreover, as counsel for Wal-Mart candidly admitted at oral argument, Wal-Mart sought the advice of its own legal and financial advisors before purchasing the COLI policies. In addition, the broker-defendants acted only as advisors to Wal-Mart; they had no power to purchase COLI policies on Wal-Mart's behalf. [FN75] In light of

these circumstances, the court is unwilling to infer for the purposes of this motion to dismiss that Wal-Mart, one of the largest, most sophisticated companies in the world, advised by its own professionals, so "depended" on the broker-defendants as to invoke this court's equitable powers to regulate relationships between fiduciaries and their *cestui que trusts.*

> FN73. *Lank,* 213 A.2d at 852.

> FN74. Am. Compl. ¶ 29 ("Like many companies in the early 1990s, Wal-Mart began exploring ways to adapt to changes in accounting for and funding health and death benefits for its associates.... Accordingly, in or about August 1993, Wal-Mart's director of benefits design, Thomas Emerick, selected the broker defendants ... to *advise* Wal-Mart in connection with the *potential purchase* of broad based COLI plans ....") (emphasis added).

> FN75. Am. Compl. ¶ 29.

Third, Wal-Mart does not allege facts from which the court could infer self-dealing. [FN76] The broker-defendants did not have the *power* to engage in self-dealing. Again, Wal-Mart does not allege that the broker-defendants could do anything except *advise* Wal-Mart on the purchase of the COLI policies.

> FN76. *See O'Malley,* 742 A.2d at 849 (holding that a stockbroker violated his fiduciary duties to his client by engaging in self-dealing).

In sum, the relationship that is alleged to have existed between Wal-Mart and the broker-defendants was merely a normal, arm's-length business relationship. The facts that there were hundreds of millions of dollars at stake and that there were substantial known risks posed by principles of both tax and insurance law do not transform this commercial relationship into one based on fiduciary duties. In the end, Wal-Mart cannot show the existence of a fiduciary relationship by alleging simply that it relied on or "trusted in" the assurances and expertise of the broker-defendants. To rule otherwise would threaten to interject the law of fiduciary duty into a wide range of ordinary commercial relationships generally understood to be governed by the norms of the marketplace, not the scrupulous concerns of equity for persons in special relationships of trust and confidence.

For these reasons, the court dismisses Wal-Mart's

claim for breach of fiduciary duty against the broker-defendants.

C. *Equitable Fraud*

Wal-Mart's third claim is for equitable fraud. Wal-Mart alleges that an agent of Hartford provided Wal-Mart with detailed cash flow and earnings illustrations depicting annual tax savings and annual positive cash flows. [FN77] Wal-Mart also alleges that the Insurers made specific assurances that the COLI plans were compliant with the Internal Revenue Code. [FN78] In addition, Wal-Mart alleges that all the defendants failed to disclose material information regarding the COLI plans, even though they had a duty to disclose this information . [FN79]

> FN77. Am. Compl. ¶ 35.

> FN78. Am. Compl. ¶¶ 40-41.

> FN79. Am. Compl. ¶ 80.

**\*12** Common law fraud in Delaware requires that: (1) a false representation, usually one of fact, made by the defendant, exists; (2) the defendant had knowledge or belief that the representation was false, or made the representation with requisite indifference to the truth; (3) the defendant had the intent to induce the plaintiff to act or refrain from acting; (4) the plaintiff acted or did not act in justifiable reliance on the representation; and (5) the plaintiff suffered damages as a result of such reliance. [FN80] In addition to overt representations, fraud may also occur through deliberate concealment of material facts, or by silence in the face of a duty to speak. [FN81] To state a claim for equitable fraud under Delaware law, a plaintiff must satisfy all the elements of common law fraud with the exception that the plaintiff need not demonstrate that the misstatement or omission was made knowingly or recklessly. [FN82] However, equitable fraud does not swallow common law fraud because it can only be applied in those cases in which one of the two fundamental sources of equity jurisdiction exists: (1) an equitable right founded upon a special relationship over which equity takes jurisdiction, or (2) where equity affords a special remedy (e.g. rescission or cancellation). [FN83]

> FN80. *Stephenson v. Capano Dev., Inc.,* 462 A.2d 1069, 1074 (Del.1983).

> FN81. *Id.*

> FN82. *Id.*

> FN83. *U.S. WEST, Inc. v. Time Warner Inc.,* 1996 Del. Ch. LEXIS 55, at \*83 (Del. Ch. June 6, 1996).

Wal-Mart's allegation that the Insurers assured it that the COLI plans were compliant with the Internal Revenue Code does not state a claim upon which relief can be granted. It is an opinion as to a matter of law. A misrepresentation as to a matter of law is a statement of opinion only and cannot afford a basis for a charge of fraud or deceit in the making of the contract. [FN84] This is because all persons are presumed to know the law and therefore cannot be deceived by erroneous statements of law. [FN85]

> FN84. *Lakeside Invs. Group, Inc. v. Allen,* 559 S.E.2d 491, 493 (Ga.Ct.App.2002); *Great Lakes Chem. Corp. v. Pharmacia Corp.,* 788 A.2d 544, 554 (Del. Ch.2001) ("Predictions about the future cannot give rise to actionable common law fraud. Nor can expressions of opinion.") (citations omitted).

> FN85. *Lakeside,* 559 S.E.2d at 493.

With respect to Wal-Mart's allegations that the illustrations of cash flow were false, this is not a "fact" actionable for fraud. The law has always been skeptical about grounding fraud claims in projections of future events for the obvious reason that the fact that a prediction might not come true does not mean the projection was not made in good faith and also because it is unreasonable to place much weight on such statements. [FN86] Moreover, the cash flow projections alleged in Wal-Mart's complaint were made on the assumption, held by all parties at the time, that the loans payments on the COLI polices would be tax deductible. This assumption proved false. But the Amended Complaint does not allege, and it is not reasonable to infer, that the Insurers knew their projections were incorrect or acted to deceive Wal-Mart. Therefore, the cash flow projections cannot be the basis for a claim of fraud.

> FN86. *See Consol. Fisheries Co. v. Consol. Solubles Co.,* 112 A.2d 30, 37 (Del.1955) ("[M]ere expressions of opinion as to probable future events, when clearly made as such, cannot be deemed fraud or misrepresentations."); *Great Lakes,* 788 A.2d at 554.

Wal-Mart's allegation that the defendants committed fraud through silence is only viable if the defendants

had a duty to speak. As discussed, *supra*, the Insurers and the broker-defendants did not owe fiduciary duties to Wal-Mart. They, therefore, had no duty to speak and this claim should be dismissed.

### D. *Breach Of Contract*

**\*13** Wal-Mart's fourth claim is for breach of contract. Wal-Mart alleges that all defendants breached the express terms of the COLI policies and breached the duty of fair dealing implicit in every contract. Wal-Mart asserts that the agreement placed the risk on the defendants that the contract's basic objective would be achieved. In addition, Wal-Mart claims that the defendants acted in bad faith by making both misrepresentations and material omissions in connection with the purchase of the COLI policies.

None of these claims is legally sufficient. First, Wal-Mart does not cite a specific provision of the contract that places the risk of loss on the defendants. In fact, Wal-Mart makes scant reference to any actual contract provision in support of its "breach of contract" claim. This is for good reason--the contract specifically places the risk of loss, at least for the lack of an insurable interest in its employees, on Wal-Mart. The Letter of Understanding states that:

As part of its application for coverage ... Wachovia Bank of Georgia, N.A., as Trustee of the Wal-Mart Stores Inc. Corporation Grantor Trust ("Client"), a trust established in Georgia for the benefit of Wal-Mart Stores, Inc., hereby certifies the following: ... Client has an insurable interest in each of the employees named on the final list census listing ... *Client understands and agrees that [the Insurer] neither warrants nor represents that insurable interest exists.* (Emphasis added).

Similarly, there is no express provision alleged in any contract shifting the risk of loss on the tax issues from Wal-Mart (the taxpayer) to any of the defendants.

Second, "to state a claim for breach of an implied covenant of good faith and fair dealing, a plaintiff must identify a specific implied contractual obligation." [FN87] Wal-Mart fails to do so. In addition, at the time the alleged misrepresentations and omissions were made, there was no contractual relationship between the parties. Therefore, the court must dismiss Wal-Mart's claim that the alleged misrepresentations or omissions made in connection with the sale of the COLI policies violated a contractually based "implied covenant." [FN88]

FN87. *Moore Bus. Forms v. Cordant*

*Holdings Corp.,* 1995 Del. Ch. LEXIS 134, at \*23 (Del. Ch. Nov. 2, 1995).

FN88. *See Sanders v. Devine,* 1997 Del. Ch. LEXIS 131, at \*19 (Del. Ch. Sept. 24, 1997) (holding that since there was no contractual relationship between the plaintiff and any of the defendants, allegations that the alleged misrepresentations or omissions made in connection with the formation of the contract violate the covenant of good faith "does not bear analysis.").

### E. *Professional Negligence*

Wal-Mart's fifth claim is for professional negligence against the broker-defendants. To state a claim for negligence, a plaintiff must allege: (1) that the defendant owed the plaintiff a duty of care; (2) that the defendant breached that duty; and (3) that the defendant's breach was the proximate cause of the plaintiff's injury . [FN89]

FN89. *New Haverford P'ship v. Stroot,* 772 A.2d 792, 798 (Del.2001). Delaware case law is silent as to whether insurance brokers are "professionals" for malpractice purposes and other States are divided on this issue. *See, e.g., Chase Sci. Research, Inc. v. NIA Group, Inc.,* 749 N.E.2d 161, 167 (N.Y.2001) (stating that New York does not recognize suits for professional misconduct against insurance agents and brokers); *Flemens v. Harris,* 915 S.W.2d 685, 688 (Ark.1996) (applying the statute of limitations for professional malpractice to an insurance agent). This issue is relevant because "professionals" are held to a higher standard of care, and expert testimony is required in a malpractice case.

At root, Wal-Mart's claim for professional negligence is dependent on its claim that a fiduciary relationship existed between it and the broker-defendants and fails for that reason. In the Amended Complaint, Wal-Mart alleges that "[t]he broker-defendants owed Wal-Mart the highest duties of care, including a duty of good faith, a duty of full disclosure, a duty of loyalty, and a duty to meet the exacting standards of their respective professions." [FN90] These allegations do not state a claim for mere negligence. The Amended Complaint alleges that the broker-defendants negligently failed to disclose material information regarding the COLI plans, even though they had a duty to disclose this information. [FN91] However, generally, there is no

duty to speak and, as discussed *supra,* the broker-defendants did not owe Wal-Mart fiduciary duties. Therefore, Wal-Mart's negligence claims must fail as a matter of law.

FN90. Am. Compl. ¶ 105.

FN91. Am. Compl. ¶ 80.

F. *The Delaware Consumer Fraud Act*

**\*14** Wal-Mart's sixth claim is for violation of the Delaware Consumer Fraud Act, 6 *Del. C.* §§ 2511-2526. In most respects, the Consumer Fraud Act must be interpreted in light of established common law definitions and concepts of fraud and deceit. [FN92] Therefore, the discussion of Wal-Mart's equitable fraud claim, *supra,* is equally applicable here. However, claims under the Delaware Consumer Fraud Act do differ in several ways from the traditional legal and equitable actions sounding in fraud. Most important, relief can only be granted under the Consumer Fraud Act for unlawful practices occurring or performed partly or wholly within Delaware. [FN93] Wal-Mart does not allege any facts which, if true, could constitute unfair or deceptive conduct occurring within Delaware. There are no allegations that any misrepresentations were made in Delaware or that the COLI policies were contracted in Delaware. In fact, the Amended Complaint specifically states that the policies were purchased in Georgia, by a trust Wal-Mart organized under Georgia law. [FN94] Because no transaction occurred in Delaware, the Delaware Consumer Fraud Act cannot apply. Therefore, Wal-Mart's claims based on the Delaware Consumer Fraud Act must be dismissed.

FN92. *Stephenson,* 462 A.2d at 1074.

FN93. *Goodrich v. E.F. Hutton Group, Inc.,* 542 A.2d 1200, 1203 (Del. Ch.1988).

FN94. Am. Compl. ¶¶ 37-38.

G. *Declaratory Relief*

Wal-Mart's seventh claim is for a declaratory judgment that the defendants are responsible for future losses incurred through the failure of the COLI plans. The purpose of the statute on declaratory judgments is to afford relief from uncertainty with respect to rights. [FN95] A court will, however, exercise its discretion to grant declaratory relief when the benefit outweighs the risk of premature judgment. [FN96] Declaratory judgment is appropriate only if there is an actual controversy between the parties. [FN97] One of the determining factors is the dispute's ripeness for adjudication. [FN98] If future events may obviate the need for declaratory relief, then the dispute is not ripe, and declaratory relief should not be granted. [FN99]

FN95. 10 *Del. C.* § 6512; *Dana Corp. v. LTV Corp.,* 668 A.2d 752, 755 (Del. Ch.1995).

FN96. *Id.*

FN97. *Stroud v. Milliken Enter., Inc.,* 552 A.2d 476, 479 (Del.1989).

FN98. *Schick Inc. v. ACTWU,* 533 A.2d 1235, 1238 (Del Ch.1987).

FN99. *See, e.g., General DataComm Indus. v. Wisconsin Inv. Bd.,* 731 A.2d 818, 822 (Del. Ch.1999) (citing *Stroud,* 552 A.2d at 479 and stating that the Declaratory Judgment Act should not to be used as a means of obtaining advisory rulings from Delaware courts).

This dispute is not ripe for adjudication. Wal-Mart, in essence, seeks indemnification in the event it has to pay the death benefits it received under the COLI policies over to the estates of its deceased employees. This is not a proper claim for declaratory relief. "Courts have declined to enter a declaratory judgment with respect to indemnity until there is a judgment against the party seeking it." [FN100] As such, Wal-Mart's claim for declaratory relief should be dismissed.

FN100. *Dana Corp.,* 668 A.2d at 756 (citing *Cunningham Bros., Inc. v. Bail,* 407 F.2d 1165 (7th Cir.1969)).

V.

For the above reasons, the defendants' motion to dismiss is GRANTED. IT IS SO ORDERED.

2005 WL 790821 (Del.Ch.)

END OF DOCUMENT

PLAINTIFF SEA STAR LINES LLC'S                    EXHIBIT 3
OPENING BRIEF IN SUPPORT OF ITS
MOTION TO DISMISS THE COUNTERCLAIM

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2001 WL 641737 (D.Del.)
**(Cite as: 2001 WL 641737 (D.Del.))**
<KeyCite Citations>
Only the Westlaw citation is currently available.

United States District Court, D. Delaware.
Michael S. PINKERT and Eleanor A. Pinkert,
Plaintiffs,
v.
John J. OLIVIERI, P.A., Brosnahan Builders, Inc.,
Kevin Brosnahan and Linda
Brosnahan, Defendants and Third-Party Plaintiffs,
v.
REEF INDUSTRIES, INC., Facilities Restoration
Supply, Inc. and Preservation &
Protection Systems, Inc., Third-Party Defendants,
v.
Ocean DESIGNS, Ocean Designs LLC and Paul
Rouchard D/B/A Ocean Designs, Inc.;
C. Joseph Couchman Tile Inc.; Doug Griffith
Drywall; W.M. Plumbing & Heating,
Inc. A/K/A and/or D/B/A Wm Plumbing & Heating,
Inc.; and Advance Fiberglass
Technologies, LLC, Additional Third-Party
Defendants.
No. CIV. A. 99-380-SLR.

May 24, 2001.

Daniel B. Rath, Esquire of Klett, Rooney, Lieber &
Schorling, P.C. , Wilmington, Delaware. Counsel for
Plaintiffs. Of Counsel: Michael A. Gatje, Esquire of
Wickwire Gavin, P.C., Vienna, Virginia.

Adam Balick, Esquire of Balick & Balick,
Wilmington, Delaware. Counsel for Defendant and
Third-Party Plaintiff John J. Olivieri, P.A.

Neal C. Belgam, Esquire of Blank, Rome, Comisky
& McCauley, Wilmington, Delaware. Benjamin C.
Wetzel, III, Esquire and Natalie M. Ippolito, Esquire
of Bailey & Wetzel, P.A., Wilmington, Delaware.
Counsel for Defendants and Third-Party Plaintiffs
Brosnahan Builders, Inc., Kevin Brosnahan and
Linda Brosnahan.

Loreto P. Rufo, Esquire of The Bayard Firm,
Wilmington, Delaware. Counsel for Third-Party
Defendants Reef Industries, Inc., Facilities
Restoration Supply, Inc. and Preservation &
Protection Systems, Inc.

Richard W. Pell, Esquire and Jennifer L. Gioia,
Esquire of Tybout, Redfearn & Pell, Wilmington,

Delaware. Counsel for Additional Third-Party
Defendants Ocean Designs, Ocean Designs LLC and
Paul Rouchard D/B/A Ocean Designs, Inc.

MEMORANDUM OPINION

ROBINSON, Chief J.

I. INTRODUCTION

**\*1** Plaintiffs Michael and Eleanor Pinkert filed this
action on June 16, 1999 claiming damages arising out
of the construction of their home in Bethany Beach,
Delaware. Plaintiffs' complaint alleges breach of
contract and various counts of fraud against
defendants Brosnahan Builders, Inc., Kevin
Brosnahan and Linda Brosnahan ("the Brosnahan
defendants"), as well as breach of contract,
professional negligence and negligent
misrepresentation against defendant John J. Olivieri,
P.A. ("Olivieri"). (D.I.1) On July 23, 1999, Olivieri
filed a third-party complaint for indemnification and
contribution against Reef Industries, Inc. ("Reef
Industries") and Facilities Restoration Supply, Inc.
("Facilities Restoration"), which the court dismissed
on September 29, 2000. (D.I.115) On August 21,
2000, the court granted the Brosnahan defendants
leave to file a third-party complaint against Ocean
Designs, Ocean Designs LLC and Paul Rouchard
("Ocean Designs"), W.M. Plumbing & Heating, Inc.,
and Advance Fiberglass Technologies, LLC, alleging
breach of contract and negligence, and seeking
indemnity and contribution. (D.I.101) On October 10,
2000, Ocean Designs filed a third-party complaint
against Taco Metal, Inc. ("Taco Metal") for
indemnification and contribution. (D.I.123) On
November 20, 2000, the Brosnahan defendants filed a
third-party complaint against Reef Industries,
Facilities Restoration, and Preservation & Protection
Systems, Inc. ("Preservation Systems"), alleging
claims of negligence, breach of the implied warranty
of fitness, and indemnification and contribution.
(D.I.157) The court has jurisdiction pursuant to 28
U.S.C. § 1332.

Currently before the court are the Brosnahan
defendants' motion for summary judgment on all
claims against them (D.I.124), the Brosnahan
defendants' motion for partial summary judgment that
plaintiffs are not entitled to recover attorney's fees

(D.I.221), the Brosnahan defendants' motion for protective order respecting pre-judgment discovery in aid of execution (D.I.218), Reef Industries' motion for summary judgment on all claims against it (D.I.225), Preservation Systems' motion for summary judgment on all claims against it (D.I.228), Facilities Restoration's motion for summary judgment on all claims against it (D.I.230), and Ocean Designs' motion for summary judgment on all claims against it. (D.I.233) For the following reasons, the court shall grant in part and deny in part the Brosnahan defendants' motion for summary judgment on claims against them; grant the Brosnahan defendants' motions for summary judgment that plaintiffs are not entitled to attorney's fees under paragraph 16(b) of the Construction Contract and for a protective order limiting discovery; grant in part and deny in part Reef Industries' motion for summary judgment on claims against it; grant Facilities Restoration's and Preservation Systems' motions for summary judgment on claims against them; and deny Ocean Designs' motion for summary judgment on claims against it.

II. BACKGROUND

A. Relevant Parties

**\*2** Plaintiffs are husband and wife who reside in McLean, Virginia. Defendant Brosnahan Builders, Inc. ("Brosnahan Builders") is a corporation organized under the laws of Delaware, with its principal place of business in Frankford, Delaware. Brosnahan Builders is primarily engaged in the business of constructing single family homes. Defendant Kevin Brosnahan is the president of Brosnahan Builders, and his wife, defendant Linda Brosnahan, is an employee of Brosnahan Builders. Kevin and Linda Brosnahan are Delaware residents and are sued in their individual capacities. Olivieri is a professional association organized under the laws of New Jersey, with its principal place of business in New Jersey. Olivieri is primarily engaged in the business of providing architectural services. (D.I.1) Reef Industries is a Texas corporation that manufactures vapor barriers used as siding in buildings. Facilities Restoration and Preservation Systems, Pennsylvania corporations, are distributors of Reef Industries' products. (D.I.157) Ocean Designs, a Maryland limited liability company, is a supplier and installer of aluminum railings. (D.I.240, Ex. A) Taco Metal is a Florida corporation that manufactures aluminum used in railings. (D.I.123)

B. Facts

In 1995, plaintiffs purchased a beachfront property

(the "Property") in Bethany Beach, Delaware to construct a three-story home (the "Residence"). On October 30, 1995, plaintiffs entered into an "Architecture Contract" with Olivieri that required Olivieri to create designs and plans, review shop drawings, provide specifications to the contractor and subcontractors, and meet with contractors on-site. (D.I.126, Ex. A)

On September 30, 1997, plaintiffs and Brosnahan Builders entered into a "Construction Contract" for the construction of the Residence for a price of approximately \$1.5 million. (D.I.126, Ex. B) The Construction Contract provides, in pertinent part:

3. *Plans and Specifications.* (a) The Home shall be constructed and completed substantially in accordance with those certain plans and specifications more particularly identified by Exhibit "A" attached hereto and incorporated herein by reference ... [FN1]

> FN1. The parties have not submitted "Exhibit 'A' '' to the court, but the Brosnahan defendants allege that Olivieri's "Project Manual" is incorporated into the referenced "Plans and Specifications." (D.I.154, Ex. 2) The Project Manual in turn incorporates the "General Conditions of the Contract for Construction" published by the American Institute of Architects ("AIA"), which describes the AIA standard forms for progress payments (the G703 Continuation Sheet and G702 Application for Certification and Payment). (D.I.154, Ex. 3)

10. Changes in Plans and Specifications....
(b) Owner may, at any time and from time to time prior to the Completion Date without invalidating this Agreement, require changes to the Work. Such changes may consist of additions, deletions, or modifications to the Plans and Specifications, with the Contract Sum and completion Date being adjusted accordingly. Such changes in the Work shall be authorized by written Change Order signed by Owner, Contractor and Architect, or by written Construction Change Directive signed by Owner and Architect. The Contract Sum and the Completion Date shall be changed only by Change Order....
(c) Contractor shall be under no obligation to implement any change nor shall Owner [be] under any obligation to pay for the same unless and until the same is documented by such a change order. Likewise, no change in the Work shall be authorized absent a change order for same signed by Owner and no change order shall be [in] effect

unless the same is signed by Owner.

**\*3** ...

12. *Payment.* (a)(i) Payments to the Contractor shall be paid in accordance with Exhibit B. [FN2]

> FN2. "Exhibit B" is the AIA standard G703 Continuation Sheet ("Continuation Sheet"), a list of the work that Brosnahan Builders was contracted to perform with a scheduled price for each item. Each Continuation Sheet references the AIA standard G702 Application and Certification for Payment ("Application and Certification for Payment"). (D.I.154, Ex. 4)

(ii) Progress invoices shall be accompanied by such documentation as Owner and/or Architect may reasonably require to verify the propriety of such request for payment. Following review of each such invoice (and its supporting documentation) by Owner, Architect and Owner's lender, and acceptance of the same, Owner shall, in exchange for appropriate mechanics' lien releases, satisfy such invoice.

...

16. *Indemnification.* (a) Owner agrees to defend, indemnify and hold Contractor harmless from and against any and all loss, cost, expense, liability, actions, and claims for injury suffered by Owner or others, including reasonable attorneys fees, or for harm caused to the Lot or the Home, due solely to inspections of the Home by Owner or Owner's invitees prior to Settlement.

(b) Contractor agrees to defend, indemnify and hold Owner harmless from and against any and all loss, cost, expense, liability, actions, and claims whatsoever (including, without limitation, reasonable attorneys fees and court costs) incurred by Owner incident to any malfeasance or nonfeasance by Contractor with respect to Contractor's responsibilities under the terms of this Agreement.

...

19. *Governing Law.* This Agreement shall be governed, construed and enforced in accordance with Delaware law.

(D.I.126, Ex. B)

Brosnahan Builders began construction of the Residence in September 1997 and completed the project in April 1999. (D.I.1) Brosnahan Builders subcontracted with Ocean Designs to deliver and install the exterior aluminum railings on the Residence, and with Reef Industries to deliver the vapor barrier used in the exterior siding. [FN3] On fifteen occasions during construction, Brosnahan Builders submitted to Olivieri an AIA standard Application and Certification for Payment. [FN4] Each was signed by Linda Brosnahan and provided:

> FN3. Olivieri's Plans and Specifications required the "VAPORguard wrap," which Brosnahan Builders ordered from Reef Industries. Reef Industries instead delivered the "T-65G wrap," which Brosnahan Builders installed onto the Residence. Reef Industries fully admits the delivery error, but claims that because of their similarity, there was no damage caused to the Residence by the T-65G wrap that would not have been caused by the VAPORguard wrap. (D.I.226)

> FN4. A Continuation Sheet with a list of services performed was appended to each Application and Certification for Payment. (D.I.144, Ex. 4)

The undersigned Contractor certifies that to the best of the Contractor's knowledge, information and belief the Work covered by this Application for Payment has been completed in accordance with the Contract Documents, that all amounts have been paid by the Contractor for Work for which previous Certificates for Payment were issued and payments received from the Owner, and that current payment shown herein is now due.

(D.I.144, Ex. 4) Olivieri made several visits to the construction site and approved each Application and Certification for Payment, which also provided:

In accordance with the Contract Documents, based on on-site observations and the data comprising the application, the Architect certifies to the Owner that to the best of the Architect's knowledge, information and belief the Work has progressed as indicated, the quality of the Work is in accordance with the Contract Documents, and the Contractor is entitled to payment of the AMOUNT CERTIFIED.

(D.I.144, Ex. 4) (emphasis in original)

**\*4** In November 1998, with construction substantially completed, plaintiffs and their family moved into the Residence. After a rainstorm in January, plaintiffs noticed water leaks around windows, doors and ceiling fixtures. Plaintiffs retained an independent moisture consultant, who concluded that the wrong building wrap had been installed, there was no aluminum flashing around doors and windows, and there were no roof vents as provided by the Plans and Specifications. (D.I.1) Plaintiffs have since discovered other deficiencies, including corrosion of exterior railings, cracks in the marble tile floor, flaws in the drywall installation and

finishing, leaking showers, defectively installed shower panes, and improperly installed fiberglass roofing. (D.I. 126, Ex. 1; D.I. 240, Ex. A) As of October 2000, plaintiffs have spent over $650,000 in remedial architectural and construction costs. (D.I.144, Ex. 3) Plaintiffs allege that when they confronted Kevin Brosnahan with the construction defects, he responded by asserting that he did not have the "manpower" or the "money" to remedy the problems, and that if pursued, he would "go bankrupt." (D.I.1)

C. Plaintiffs' Complaint

Count I of plaintiffs' complaint alleges breach of contract by Brosnahan Builders for failing to perform work in accordance with general industry standards and the Plans and Specifications provided by Olivieri. Count V alleges that Brosnahan Builders committed fraud by requesting payment for work that plaintiffs claim was not properly performed.

Count VI asserts that Kevin Brosnahan committed fraud in his individual capacity by requesting payments on behalf of Brosnahan Builders for work that plaintiffs claim was not performed in accordance with the Plans and Specifications and general industry standards. Counts VII and VIII allege that Linda Brosnahan committed fraud and equitable fraud in her individual capacity by signing payment requests on behalf of Brosnahan Builders for the work performed.

Counts IX, X, and XI assert that the Brosnahan defendants violated Delaware's Consumer Fraud Act, 6 Del. C. § 2513, by submitting payment requests on behalf of the Brosnahan Builders for work plaintiffs claim was not performed in accordance with the Plans and Specifications and general industry standards. [FN5]

> FN5. The Consumer Fraud Act provides, in pertinent part:
> The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale, lease or advertisement of any merchandise, whether or not any person has in fact been misled, deceived or damaged thereby, is an unlawful practice.
> 6 Del. C. § 2513(a).

Counts II, III and IV allege breach of contract, professional negligence and negligent misrepresentation by Olivieri for failure to adequately inspect and monitor the construction work, and for approving payment requests by the Brosnahan defendants for defective work.

III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 n. 10 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co.,* 57 F.3d 300, 302 n. 1 (3d Cir.1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.' " *Matsushita,* 475 U.S. at 587 (quoting Fed.R.Civ.P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt,* 63 F.3d 231, 236 (3d Cir.1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

IV. DISCUSSION

A. Plaintiffs' Fraud Claims Against the Brosnahan Defendants

**\*5** As a general rule under Delaware law, where an action is based entirely on a breach of the terms of a contract between the parties, and not on a violation of an independent duty imposed by law, a plaintiff must sue in contract and not in tort. *See Garber v. Whittaker,* 174 A. 34, 36 (Del.Super.1934). "[A

breach of contract claim] cannot be 'bootstrapped' into a fraud claim merely by adding the words 'fraudulently induced' or alleging that the contracting parties never intended to perform." *Iotex Communications, Inc. v. Defries,* 1998 WL 914265, at *5 (Del. Ch. Dec. 21, 1998). *See also Dann v. Chrysler Corp.,* 174 A.2d 696, 700 (Del. Ch.1961) ("Using the word 'fraud' or its equivalent in any form is just not a substitute for the statement of sufficient facts to make the basis of the charge reasonably apparent.").

Plaintiffs allege that the Brosnahan defendants: (1) contracted to perform construction services; (2) failed to perform the services in the manner called for by the Construction Contract; and (3) submitted payment applications indicating the services had been performed according to the Construction Contract. The gravamen of plaintiffs' common law fraud, equitable fraud, and Consumer Fraud Act claims is that the Brosnahan defendants knowingly misrepresented the nature of their work each time they submitted an Application and Certification for Payment. These alleged misrepresentations were not collateral to the Construction Contract, but rather memorialized as some of the Brosnahan defendants' principal obligations under their agreement with plaintiffs. The duty to submit periodic payment applications existed solely by reason of the Construction Contract. Neither Brosnahan Builders, Kevin Brosnahan nor Linda Brosnahan violated any common law duty independent of the Construction Contract between Brosnahan Builders and plaintiffs. *See, e.g., Feinberg v. Saunders Karp & Megrue, L.P.,* No. 97-297-SLR, 1998 WL 863284, at *17 (D.Del. Nov. 13, 1998) (dismissing fraud action under New York law where breached promise was incorporated into written agreement); *Richmond Metro. Auth. v. McDevitt St. Bovis, Inc.,* 507 S.E.2d 344, 348 (Va.1998) (dismissing fraud claims based on contractor's alleged misrepresentations in submissions of applications for payment because no independent duty existed apart from construction contract).

Plaintiffs have also failed to present evidence that they were fraudulently induced into the Construction Contract. Such evidence may, in certain cases, give rise to an action in fraud. *See, e.g., Tam v. Spitzer,* No. 12538, 1995 WL 510043, at *6 (Del. Ch. Aug. 17, 1995). Here, plaintiffs' allegations arise solely from the Brosnahan defendants' performance of their contractual duties and are, therefore, insufficient to support a fraud claim. Thus, the court dismisses all of the fraud claims against the Brosnahan defendants (Counts V through XI) in plaintiffs' complaint. [FN6]

FN6. The Brosnahan defendants also argue that plaintiffs' fraud claims are barred by the economic loss doctrine. *See Danforth v. Acorn Structures, Inc.,* 608 A.2d 1194, 1195 (Del.1992) ("The economic loss doctrine is a judicially created doctrine that prohibits recovery in tort where a product has damaged only itself (i.e., has not caused personal injury or damage to other property) and, the only losses suffered are economic in nature.") (emphasis in original). The 1996 Delaware Home Owner's Protection Act, however, has banned the application of the economic loss doctrine to certain residential construction cases:

No action based in tort to recover damages resulting from negligence in the construction or manner of construction of an improvement to residential real property and/or in the designing, planning, supervision and/or observation of any such construction or manner of construction shall be barred solely on the ground that the only losses suffered are economic in nature.

6 Del. C. § 3652. Based on the record presented, the court finds that if plaintiffs had alleged fraud claims based on duties apart from the Construction Contract, those claims would not be barred by the economic loss doctrine.

B. Plaintiffs' Breach of Contract Claim Against the Brosnahan Defendants

**\*6** The Brosnahan defendants also argue that they are not liable for breach of the Construction Contract because they were acting under the direction of Olivieri. *See Ridley Inv. Co. v. Croll,* 192 A.2d 925, 927 (Del.1963) ("[A] contractor is not liable for any damage occasioned by a defect in plans and specifications furnished by the owner if he performs his work without neglect and in a workmanlike manner."). The Brosnahan defendants claim that any deviations from the Plans and Specifications that were approved by Olivieri and, therefore, they are not liable for damage that resulted from those changes.

Based on the record presented, the court finds genuine issues of material fact as to whether the deviations from the Plans and Specifications that resulted in damage to plaintiffs' Residence were approved by Olivieri, as well as whether the Brosnahan defendants' work was performed "without neglect and in a workmanlike manner." Thus, summary judgment that the Brosnahan defendants are not liable to plaintiffs because they were acting as

agents of Olivieri is denied.

C. Attorney's Fees Pursuant to Paragraph 16(b) of the Construction Contract

Plaintiffs allege that they are entitled to recover their attorney's fees from the Brosnahan defendants pursuant to paragraph 16(b) of the Construction Contract. The Construction Contract is governed by Delaware law, which states that "apart from statute or contract a litigant must pay his [own] counsel fees." *Maurer v. Int'l Re-Insurance Corp.,* 95 A.2d 827, 830 (Del.1953). The Delaware Code, which allows recovery of attorney's fees when a lawsuit is based on a written instrument, states that "counsel fees shall not be entered as part of such judgment unless the note, bond, mortgage, invoice or other instrument of writing sued upon, by the terms thereof, expressly provides for the payment and allowance thereof ..." 10 Del. C. § 3912.

The court must determine, therefore, whether paragraph 16(b) of the Construction Contract expressly provides for the recovery of plaintiffs' attorney's fees. Paragraph 16(b) provides:

Contractor agrees to defend, indemnify and hold Owner harmless from and against any and all loss, cost, expense, liability, actions, and claims whatsoever (including, without limitation, reasonable attorneys fees and court costs) incurred by Owner incident to any malfeasance or nonfeasance by Contractor with respect to Contractor's responsibilities under the terms of this Agreement.

(Emphasis added) The language "defend, indemnify and hold Owner harmless" clearly renders Paragraph 16(b) an indemnification provision which acts to protect plaintiffs from liability if they are sued by a third party for damage caused by "malfeasance or nonfeasance" by the Brosnahan defendants. Plaintiffs' belief that they are entitled to attorney's fees based on this indemnification provision is irreconcilable with the terms of the provision. The Brosnahan defendants cannot agree to "defend, indemnify and hold [plaintiffs] harmless" from a lawsuit filed against the Brosnahan defendants by plaintiffs themselves. Other Delaware courts have held that similar indemnification provisions are not applicable to claims between contracting parties; they are intended to protect one contracting party against liability from third party claims when the other contracting party is at fault. *See, e.g., DRR, L.L.C. v. Sears, Roebuck and Co.,* 949 F.Supp. 1132, 1142 (D.Del.1996); *Cannon and Son v. Dorr-Oliver,* 394 A.2d 1160, 1165 (Del.1978). Therefore, the Brosnahan defendants' motion that plaintiffs are not entitled to attorney's fees

pursuant to Paragraph 16(b) of the Construction Contract is granted.

D. Pre-Judgment Discovery of the Brosnahan Defendants' Assets

**\*7** The Brosnahan defendants have requested a protective order preventing pre-judgment discovery of their assets. The Federal Rules of Civil Procedure do not permit pre-trial discovery of a defendant's finances. *See Gangemi v. Moor,* 268 F.Supp. 19, 21-22 (D.Del.1967); *McCurdy v. Wedgewood Capital Mgmt. Co.,* No. 97-4304, 1998 WL 964185, at \*10 (E.D.Pa. Nov. 16, 1998) ("Rule 26 will not permit the discovery of facts concerning a defendant's financial status, or ability to satisfy a judgment, since such matters are not relevant, and cannot lead to the discovery of admissible evidence."). Two exceptions to this general rule have been recognized by Delaware courts, namely, if there is a "factual basis rising to the level of a triable issue for punitive damages," or if a plaintiff "can prove by a preponderance of the evidence that a defendant made a negligent misrepresentation of a material fact with the intent that a consumer rely upon it" under the Delaware Consumer Fraud Act. *State ex rel. Brady, State of Delaware v. Wellington Homes,* No. 99C-09-168-JTV, 2001 WL 238125, at \* 1 (Del.Super.Jan. 23, 2001).

The court is dismissing plaintiffs' fraud claims against the Brosnahan defendants, thereby rendering punitive damages unrecoverable from them. *See E.I. DuPont de Nemours and Co. v. Pressman,* 679 A.2d 436, 445 (Del.1996) ( "[P]unitive damages are not recoverable for breach of contract unless the conduct also amounts independently to a tort."). Thus, the court finds no basis to deviate from the general rule prohibiting pre-trial discovery of the Brosnahan defendants' assets. The Brosnahan defendants' request for a protective order is granted.

E. The Brosnahan Defendants' Claims Against Reef Industries

The Brosnahan defendants filed a third-party complaint against Reef Industries, alleging negligence, breach of the implied warranty of fitness for a particular purpose, and indemnification and contribution. The Brosnahan defendants do not oppose Reef Industries' motion for summary judgment as to the implied warranty claim, which is therefore dismissed.

Regarding the remaining negligence claim and indemnification and contribution claim, the court

concludes that there exist genuine issues of material fact as to Reef Industries' liability. Reef Industries admits that it delivered the T-65G wrap instead of the VAPORguard wrap requested by Brosnahan Builders, and the parties appear to agree that all cited experts acknowledge that either wrap would have caused damage to the Residence. However, the record is unclear as to the difference in extent of damage caused by one type over the other type. Therefore, the court finds there are triable issues of fact on this issue, and declines to grant summary judgment on the remaining claims against Reef Industries.

F. The Brosnahan Defendants' Claims Against Facilities Restoration and Preservation Systems

The Brosnahan defendants do not oppose motions for summary judgment by Facilities Restoration and Preservation Systems on all claims against them. Therefore, the court grants their motions for summary judgment and dismisses them from the case.

G. The Brosnahan Defendants' Claims Against Ocean Designs

**\*8** Ocean Designs argues for summary judgment that it is not liable for the corrosion of plaintiffs' aluminum railings because if the corrosion was in fact due to a defect in the railings and not poor maintenance by plaintiffs, that defect was caused by Taco Metal, Ocean Designs' aluminum supplier. The court finds that there exists a genuine issue of material fact as to whether Ocean Designs is responsible for the defective aluminum railings. Although Ocean Designs may ultimately be found not to be at fault, Ocean Designs contracted with Brosnahan Builders to supply and install quality aluminum railings. To the extent that Taco Metal is responsible for the corroded aluminum, Ocean Designs is seeking indemnification and contribution from it. Based on the record presented, therefore, Ocean Designs' motion for summary judgment is denied.

V. CONCLUSION

For the reasons stated, the court shall grant in part and deny in part the Brosnahan defendants' motion for summary judgment on claims against them; grant the Brosnahan defendants' motions for summary judgment that plaintiffs are not entitled to attorney's fees under paragraph 16(b) of the Construction Contract and for a protective order limiting discovery; grant in part and deny in part Reef Industries' motion for summary judgment on claims against it; grant Facilities Restoration's and Preservation Systems'

motions for summary judgment on claims against them; and deny Ocean Designs' motion for summary judgment on claims against it. An appropriate order shall issue.

ORDER

At Wilmington, this 24th day of May, 2001;

IT IS ORDERED that:

1. The Brosnahan defendants' motion for summary judgment on the claims (D.I.124) is granted in part and denied in part.

2. The Brosnahan defendants' motion for partial summary judgment that plaintiffs are not entitled to attorney's fees pursuant to paragraph 16(b) of the Construction Contract (D.I.221) is granted.

3. The Brosnahan defendants' motion for a protective order respecting pre-judgment discovery in aid of execution (D.I.218) is granted.

4. Reef Industries' motion for summary judgment (D.I.225) is granted in part and denied in part.

5. Preservation Systems's motion for summary judgment (D.I.228) and Facilities Restoration's motion for summary judgment (D.I.230) are granted.

6. Ocean Designs' motion for summary judgment (D.I.233) is denied.

2001 WL 641737 (D.Del.)

END OF DOCUMENT

PLAINTIFF SEA STAR LINES LLC'S                    EXHIBIT 4
OPENING BRIEF IN SUPPORT OF ITS
MOTION TO DISMISS THE COUNTERCLAIM

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
1979 WL 174446 (Del.Ch.)
**(Cite as: 1979 WL 174446 (Del.Ch.))**
<KeyCite Citations>
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.
Alberta R. HESTON
v.
Albert MILLER et ux
No. CIV.A.5820.

submitted: 24 Sept. 1979.
Oct. 11, 1979.

Motion to Dismiss: Denied.

 James A. Walsh, Esquire, Walsh & McBride,
Wilmington.

 Vance A. Funk, III, Esquire, Franta & Funk,
Newark.

 HARTNETT, Vice-Chancellor.

 **\*1** Gentlemen:

 This is my decision on defendants' Motion To
Dismiss the complaint for lack of subject matter
jurisdiction in this Court. For the reasons stated, the
Motion is denied.

 Plaintiff-Alberta Heston (Mrs. Heston) brought an
action against her daughter and son-in-law (the
Millers) seeking to set aside alleged oral contracts
calling for the loan by Mrs. Heston to the Millers of
$25,500. The complaint alleges breach of contract,
failure of consideration, failure to comply with the
Statute of Frauds, and actual fraud on the part of the
defendants. The complaint also alleges facts which
could be construed as alleging the existence of
constructive fraud and the existence of a constructive
trust. The complaint alleges the following facts which
must be accepted as true for the purpose of the
Motion To Dismiss.

 Mrs. Heston is 72 years old, in poor health, with a
fear of lone-liness, and without experience in or
knowledge of the law concerning this type of
transaction. She gave or lent the Millers $5,500 for
use as a down payment by the Millers on a house they
were to purchase, repayment to be made to her on the
sale of the house theretofore occupied by the Millers.
Although the Millers have sold their old house, there
has been no repayment of that sum. Mrs. Heston also
lent the Millers $20,000 without interest or security
for their use in purchasing the new house, in
exchange for their agreement to care for and support
her in their house for the remainder of her lifetime.
The $20,000 was the bulk of the proceeds from the
sale of Mrs. Heston's house. The Millers were to be
permitted to deduct $100 per month from the
principal in further payment for their support.

 Mrs. Heston moved in with the Millers pursuant to
an oral agreement, but in very short time
disagreements arose between the parties, resulting in
Mrs. Heston's expulsion from the house by her
daughter. Mrs. Heston has lived in an apartment
since, and has demanded, without favorable result,
the return of her $25,500. The Millers refuse to return
the money on the basis that it is invested in their new
house.

 The Millers' Motion To Dismiss the complaint is
based on their claim that there is an adequate remedy
at law for Mrs. Heston. Chancery Court Rule 12(b)(1)
and 10 *Del. C.* § 342. They contend that Mrs. Heston
seeks only damages for breach of contract in a sum
certain, that the damages will make her whole, that
the remedy sought as well as the cause of action
supporting it are cognizable by a law court, and that
the remainder of the Millers' demands seeking an
accounting, imposition of a trust, and an injunction
against alienation or encumbrance of the property are
merely sham demands intended to vest this Court
with jurisdiction it would not otherwise possess.

 The allegations of the complaint taken together with
the remedy plaintiff seeks ordinarily determine this
Court's jurisdiction. *Hughes Tool Co. v. Fawcett
Publications, Inc.,* Del. Ch., 297 A.2d 428, 431
(1972), *rev'd on other grounds,* 315 A.2d 577 (1974).
Where the complaint merely seeks damages for
breach of contract, the law courts provide a complete
and adequate remedy precluding this Court's
jurisdiction. *Hughes Tool Co. v. Fawcett
Publications, Inc.,* supra; *Illinois Finance Co. v.
Interstate Rural Credit Ass'n.,* Del. Ch., 101 A. 870
(1917); *Cochran v. F.H. Smith Co.,* Del. Ch., 174 A.
119 (1934). It is therefore the duty of this Court to

examine the allegations and prayers for relief of the complaint to determine whether the Court has jurisdiction, and, in the event it determines jurisdiction not to exist in this Court, to permit transfer of the cause pursuant to 10 *Del. C.* § 1902 to a court having jurisdiction.

**\*2** The complaint here seeks the equitable remedy of rescission. In the absence of additional basis for equitable jurisdiction, however, a prayer for rescission does not automatically vest this Court with jurisdiction. *Gaskewicz v. Spear,* Del. Ch., 125 A.2d 269, 270 (1965). The prayer for rescission is supported by the allegations of fraud in the complaint. Fraud is a matter subject to the concurrent jurisdiction of law and equity. *John Julian Const. Co. v. Monarch Builders, Inc.,* Del.Super., 306 A.2d 29, 34, *aff'd,* 324 A.2d 208 (1974); *Bovay v. H.M. Byllesby & Co.,* Del. Ch., 12 A.2d 178, 187 (1940); *Flaherty v. Industrial Trust Co.,* Del. Ch., 178 A. 586 (1935). Thus fraud, standing alone, in the face of a complaint seeking money damages for breach of contract, even though the prayer is for rescission, is not enough to vest this Court with jurisdiction.

Where, however, the complaint alleges fraud within the framework of a fiduciary relationship, equity has jurisdiction to determine the cause. *McKnatt v. McKnatt,* Del. Ch., 93 A. 367, 380 (1915). The complaint alleges sufficient facts to show, if they are true, that the relationship between Mrs. Heston and the Millers was a fiduciary one. Mrs. Heston is an aged widow, living alone, and seeking some comfort and security in her old age. It is alleged that the Millers offered her company, care and support for the remainder of her lifetime, for which they demanded a loan of $25,500. Mrs. Heston is not knowledgeable in the practices of money lending and evidently refrained from seeking legal advice at the behest of the Millers. She, trusting her own daughter and son-in-law, lent them money so that they could buy a house in which she was to live with them. Their position in the dealings and relationship to her is clearly one of superiority. These facts are in many respects similar to those in *Swain v. Moore,* Del. Ch., 71 A.2d 264 (1950), and *McKnatt v. McKnatt,* supra.

Additionally, equity seeks to protect the aged and infirm from the designs of others and from their own improvidence. *Atkins v. Foreaker,* 114 A. 173, 176 (1921); *McKnatt v. McKnatt,* supra. It therefore has the power to set aside deeds improvidently entered into, and to require the repayment of loans made by the aged to those in a fiduciary relationship to him.

The allegations of the complaint also support a claim of constructive fraud and for the imposition of a constructive trust, although the prayer for relief does not set forth such a demand. The pleadings are, however, sufficient to place defendants upon notice of these claims. See *Michelson v. Duncan,* Del.Supr., ___ A.2d ___ (Oct.1979). The existence of facts to support a claim of constructive fraud or the imposition of a constructive trust are traditional grounds for Chancery jurisdiction.

Because the complaint states a cause of action arising from facts indicating the breach of a fiduciary relationship, or which would support the imposition of a constructive trust, I conclude that the complaint states a cause of action over which this Court has jurisdiction. Defendants' Motion To Dismiss pursuant to Chancery Court Rule 12(b)(1) is therefore denied. So ordered.

1979 WL 174446 (Del.Ch.)

END OF DOCUMENT

PLAINTIFF SEA STAR LINES LLC'S                    EXHIBIT 5
OPENING BRIEF IN SUPPORT OF ITS
MOTION TO DISMISS THE COUNTERCLAIM

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
1998 WL 914265 (Del.Ch.), RICO Bus.Disp.Guide 9699, 24 Del. J. Corp. L. 718
**(Cite as: 1998 WL 914265 (Del.Ch.))**

<KeyCite History>

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.
IOTEX COMMUNICATIONS, INC., a Delaware
corporation, Plaintiff and Counterclaim
Defendant,
v.
Anthony DEFRIES and David Bayendor,
Defendants,
and
IOTA, INC., a Delaware corporation, Defendant and
Counterclaim and Third-Party
Plaintiff,
v.
ioWAVE, INC., Third-Party Defendant.
No. 15817.

Dec. 21, 1998.

Grover C. Brown, Esquire, Michael J. Maimone,
Esquire and Joseph C. Schoell, Esquire, of Morris,
James, Hitchens & Williams, Wilmington, Delaware,
Attorneys for Plaintiff and Counterclaim Defendant
Iotex Communications, Inc.

Iota, Inc., Defendant and Counterclaim and Third-
Party Plaintiff (C.A. No. 15817); Anthony Defries
and David Bayendor, Defendants (C.A. No. 15817);
Urs Maag, Plaintiff and Counterclaim Defendant
(C.A. No. 16082); Neosoft, A.G., Plaintiff
(C.A.16036). [FN*]

> FN* On December 18, 1998, an Order was
> entered permitting counsel for these parties
> to withdraw his representation and allowing
> 60 days for Iota, Inc. to secure new counsel.

Allen M. Terrell, Jr., Esquire and Srinivas M. Raju,
Esquire, of Richards, Layton & Finger, P.A.,
Wilmington, Delaware; Of Counsel: Blair G. Brown,
Esquire and Lynn F. Kaumann, Esquire, of
Zuckerman, Spaeder, Goldstein, Taylor & Kolker,
L.L.P., Washington, D.C., Attorneys for
Counterclaim Defendant ioWave, Inc.

MEMORANDUM OPINION

LAMB, Vice Chancellor.

I. INTRODUCTION

**\*1** These motions arise out of a complex, multi-
party, multi-suit [FN1] litigation begun in July 1997.
Various motions to dismiss were filed by several of
the parties and oral argument on these motions was
held on November 10, 1998. At the conclusion of the
hearing held in these consolidated matters, I reserved
decision on the motion of David Bayendor to dismiss
the complaint against him in C.A. No. 15817 for want
of personal jurisdiction, the motions of David
Bayendor ("Bayendor") and Anthony Defries
("Defries") to dismiss the Eighth Claim for Relief
alleged by counterclaim in C.A. No. 15817 for failure
to state a claim (as well as the motion of Defries to
dismiss for lack of personal jurisdiction over the
Eighth Claim for Relief), and the motion of Urs Maag
("Maag") to dismiss the counterclaims filed against
him in C.A. No. 16082 for failure to state a claim
upon which relief may be granted. For the reasons
that follow, these motions will be granted.

> FN1. Three actions have been consolidated
> for all purposes, C.A. Nos. 15817-NC,
> 16036-NC, and 16082-NC.

A. Background [FN2]

> FN2. Except as otherwise noted, the facts
> recited herein are taken from the Amended
> Complaint in C.A. No. 15817 and the
> counterclaim in C.A. No. 16082.

In 1991, Defries caused the formation of Iota, Inc.
("Iota"), a Delaware corporation, to serve as a vehicle
for continuing research into certain wireless
communications technology ("Technology") under
development since the late 1980s. In 1993, Iota
succeeded in inventing the Technology and undertook
further development work in order to create a
commercially viable product. That same year, Defries
caused Iota to transfer its rights to all of the
intellectual property associated with the Technology
to NeoSoft, A.G. ("Neosoft"), a Swiss company he
created for that purpose.

In 1994, Defries entered into discussions with Peter
Friedli ("Friedli") concerning a commitment to invest
$5.4 million in the further development of the
Technology. On July 22, 1994, a certificate of
incorporation was filed with the Delaware Secretary
of State organizing a corporation that is now known

as IOTEX COMMUNICATIONS, INC. ("IOTEX"). Defries and Maag were named as directors of IOTEX. It is not alleged that Defries, or persons or entities affiliated or associated with him, controlled IOTEX. Rather, it appears from one or more pleadings that a majority of the shares of IOTEX were issued to Friedli or persons associated with him.

In July 1994, IOTEX began negotiations over a License Agreement with NeoSoft whereby NeoSoft would grant IOTEX restricted rights to certain applications of the Technology in North America for a fifteen year term. In return, IOTEX would pay NeoSoft royalties based on a percentage of revenues from the use of these applications. As part of these discussions, IOTEX also negotiated a Project Management Agreement with Iota, whereby Iota would agree to act as project manager for IOTEX's research and development of the Technology licensed from NeoSoft.

Maag resigned as a director of IOTEX on October 24, 1994. There is no allegation of fact in the counterclaims filed in C.A. No. 16082 that Maag participated in the negotiation of either of these agreements. Nor is there any allegation that Maag did anything, while he was an IOTEX director or afterward, in furtherance of or in connection with either of them.

**\*2** The License Agreement and Project Management Agreement (collectively, the "Agreements") were executed on or about November 2, 1994. Under the terms of the Project Management Agreement, IOTEX agreed to fund the costs and expenses associated with the development of the Technology in accordance with a detailed, four-page document (the "Budget") establishing the amounts, timing and manner in which all of the money invested by IOTEX would be spent by Iota. Iota agreed to comply with the provisions of the Budget and further agreed that no material changes would be made to the Budget without first submitting a variance report and obtaining IOTEX's approval for the change. Iota was also required to submit written reports detailing its expenditures to IOTEX. The Budget provided for an 18-month development period that was to be continued only if the parties were satisfied with the progress in the development of the Technology.

In late 1995 and early 1996, IOTEX became concerned that Iota was not complying with the provisions of the Budget and was not developing the Technology as required under the Agreements. Allegedly having concluded that Iota breached the Project Management Agreement, IOTEX stopped

making payments to Iota in February 1996. Iota then terminated the Project Management Agreement. Thereafter, IOTEX transferred all of its employees and operations to ioWave, Inc. ("ioWave"), also a Delaware corporation.

On July 18, 1997, IOTEX filed C.A. No. 15817 against Defries, David Bayendor, [FN3] and Iota, alleging claims of breach of fiduciary duty, fraud, aiding and abetting and civil conspiracy arising out of the negotiation and performance of the Project Management Agreement. IOTEX amended its complaint on November 7, 1997, *inter alia,* to add claims against Defries and Bayendor under the federal Racketeer Influenced and Corrupt Organization Act (RICO"), 18 U.S.C. § 1961, *et seq.* Iota answered and counterclaimed against IOTEX on August 19, 1997. On October 27, 1997, Iota amended its counterclaims to assert claims against ioWave, as an additional third-party defendant.

> FN3. Bayendor is Defries' nephew. Bayendor was a former President of IOTEX, resigning his position on October 14, 1994, and a former director and Vice President of Iota. He resigned from these latter position on June 18, 1997.

On November 13, 1997, NeoSoft filed C.A. No. 16036 against IOTEX for failure to make payments as required by the License Agreement. On December 10, 1997, Maag, as a stockholder of IOTEX, filed C.A. No. 16082, a derivative suit on behalf of IOTEX against Friedli, alleged to be the sole director of IOTEX, Taher Behbehani, the former CEO of IOTEX, and ioWave, alleging that they wrongfully transferred the business of IOTEX to ioWave. In response, IOTEX brought five counterclaims against Maag, alleging essentially the same claims it set forth in its July 18, 1997 complaint against Defries, Bayendor and Iota.

## II. DISCUSSION

A. Standard

A claim will be dismissed where it fails to allege facts that entitle plaintiff to relief. *See* Ch. Ct. R. 12(b)(6); *Rabkin v. Philip A. Hunt Chem. Corp.,* Del.Supr., 498 A.2d 1099, 1104 (1985). In evaluating a motion to dismiss, the allegations of fact must be construed in the light most favorable to the plaintiff and all well-pleaded facts must be accepted as true. *In re Tri-Star Pictures, Inc., Lit.,* Del.Supr., 634 A.2d 319, 326 (1993). Conclusions "will not be accepted as true without specific allegations of fact to support them." *Id.*

**\*3** Where a complaint alleges fraud or conspiracy to commit fraud, the Rules of this Court call for a higher pleading standard, requiring the circumstances constituting the fraud or conspiracy to "be pled with particularity." *Atlantis Plastics Corp. v. Sammons,* Del. Ch., 558 A.2d 1062, 1066 (1989) (citing Court of Chancery Rule 9(b), which states: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."). The particularity requirements will be met where the complaint "specif[ies] the time, place, speaker, and sometimes even the content of the alleged mi srepresentations...." *Luce v. Edelstein,* 2d Cir., 802 F.2d 49, 54 (1986).

B. The Maag Motion

In the counterclaim filed in C.A. No. 16082, IOTEX alleges that Maag (plaintiff in that derivative action), together with Defries, Bayendor, Iota and NeoSoft "devised, agreed upon and pursued a scheme" to defraud IOTEX and its stockholders that has resulted in a loss of over $5.2 million and forced IOTEX to abandon its operations. IOTEX alleges that Maag and the others fraudulently induced IOTEX to "(i) incur significant expenses in becoming a newly-created entity to invest funds in connection with the Technology, (ii) realize substantial costs in negotiating and entering into the License Agreement with NeoSoft and the Project Management Agreement with Iota, and operating as an on-going entity, and (iii) raise funds from individual investors and forward an amount greater that $5.2 million to Iota in accordance with the terms of the Budget." IOTEX's Answering Br. at 12 (citations omitted). IOTEX also alleges that monies contributed by IOTEX according to the Agreements have been misappropriated by various individuals associated with Iota and NeoSoft, including, "possibly" Maag.

In his Motion to Dismiss, Maag attacks each of the five counterclaim allegations alleged by IOTEX, which are: (1) breach of fiduciary duty, (2) breach of duty of disclosure, (3) aiding and abetting breach of another's fiduciary duty, (4) common law fraud and (5) civil conspiracy. I will address allegations (1), (2) and (3) together and will do the same for allegations (4) and (5).

*1. Breach of Fiduciary Duty, Duty of Disclosure and Aiding and Abetting Breach of Fiduciary Duty*

IOTEX claims Maag breached his fiduciary duties, owed in his capacity as an IOTEX director, by allowing IOTEX to negotiate and enter into the Agreements and further, to invest funds over the course of performance of the Project Management Agreement, *knowing* that NeoSoft and Iota "would not satisfy their respective contractual obligations" and would use the Agreements to "fraudulently induce IOTEX to forward funds to Iota," and in failing to inform the IOTEX board of directors of this knowledge. [FN4] Further, IOTEX claims that Maag aided and abetted a breach of Defries' fiduciary duties, owed by Defries in his capacity as an IOTEX director, by failing to prevent Defries from "causing and permitting" IOTEX to enter into the Agreements, when Maag *knew* that Iota and NeoSoft would not meet their contractual obligations. [FN5] In support of these claims, IOTEX alleges with particularity the following: (1) Maag was a director of IOTEX during the negotiation of the Agreements (but had resigned before the Agreements were approved), (2) Maag was a director of NeoSoft during the negotiation of the Agreements, (3) Maag was associated with Defries and (4) Iota, it is alleged, breached the Project Management Agreement.

> FN4. For the purpose of this motion, I accept as true IOTEX's averment that Maag was a director of IOTEX between July and October 1994. I do note, however, that this is a disputed fact.

> FN5. IOTEX contends that Maag's actions must be evaluated under the entire fairness standard, since he was a director of both IOTEX and NeoSoft between July 22, 1994 and October 24, 1994, the period in which the Agreements were negotiated. I do not reach this issue, as I find IOTEX's claims are not adequately substantiated by specific allegations of fact.

**\*4** Thus, a central element of the claims against Maag for breach of fiduciary duty rests on the general allegation that he "knew" as a "fact" (and failed to disclose) something about the state of mind of Defries and others during the period of negotiation of the Agreements. The "fact" that he is alleged to have known is not itself alleged with particularity but, rather, as a conclusion based on events which transpired during the course of performance of the Project Management Agreement. There are also no allegations of fact that Maag played any substantial role in the negotiation or execution of the Agreements, as a director of IOTEX or otherwise. [FN6] Finally, there is no allegation that he profited from the alleged misapplication of the development funds. The best IOTEX is able to say is that funds were transferred to a Swiss bank where it is "possible" that Maag has an account.

FN6. IOTEX's only claim of Maag's participation in the negotiation or approval of the Agreements is made by reference to an October 27, 1994 letter from Defries, on behalf of Iota, addressed to Maag, which states: "Enclosed find three copies of the Project Management Agreement that we have signed on behalf of Iota Inc. Please have Peter Friedli sign and date yellow tabs where indicated on behalf of [IOTEX] retaining one copy for your records and returning one copy to us for our files." Of course, IOTEX concedes that Maag resigned as an IOTEX director on October 24, 1994. Moreover, it makes no allegation of fact that Maag either obtained Friedli's signature or otherwise participated in securing IOTEX's approval of the Project Management Agreement.

While recognizing that Court of Chancery Rule 9(b) provides that "knowledge ... may be averred generally," where pleading a claim of fraud or breach of fiduciary duty that has at its core the charge that the defendant knew something, there must, at least, be sufficient well-pleaded facts from which it can reasonably be inferred that this "something" was knowable and that the defendant was in a position to know it. IOTEX contends the scant well-pleaded facts in its counterclaim support the conclusion that Maag knew that Defries and Iota were not acting in good faith in negotiating the Agreements. I cannot agree. Speculative conclusions unsupported by fact do not allege breaches of fiduciary duty. *See In re Tri-Star*, Del.Supr., 634 A.2d at 326 (conclusions "will not be accepted as true without specific allegations of fact to support them."). For the same reasons, I reject IOTEX's argument that Maag aided and abetted Defries alleged breach of duty.

My decision in this regard is premised importantly on the general rule of law that one cannot "bootstrap" a claim of breach of contract into a claim of fraud merely by alleging that a contracting party never intended to perform its obligations. *See* discussion pages 11 to 12, *infra*. The same considerations lead me to conclude that one cannot, ordinarily, premise a claim for breach of fiduciary duty on the assertion that a director knew and failed to disclose that a party negotiating a contractual arrangement with the corporation did not intend to perform its obligations under the contract. I do recognize that there are rare circumstances in which this general rule should not apply. This is not one of them. Here, there is no allegation that the Technology was not valuable at the time the Agreements were executed. Indeed, it is

alleged that Defries had been working on the Technology for some years and it is clear from the positions of the parties that they all regard the Technology as having substantial value. There also is no allegation that Iota failed to begin its performance under the Project Management Agreement and continue rendering some performance for more than a year. In short, despite the conclusory allegations of fraud and breach of fiduciary duty, the dispute between the parties is essentially one for breach of contract, and the well-pleaded facts alleged in that regard do not support the inference that Defries and Iota did not intend to perform the Agreements. In the circumstances, the claims for breach of fiduciary duty against Maag must be dismissed.

### 2. Fraud and Conspiracy to Commit Fraud

**\*5** IOTEX's final two counterclaim allegations contend that Maag committed fraud and conspired to commit fraud. Again, these charges are predicated on the allegations that Maag *knew* that Defries and Iota did not intend to meet their contractual obligations and were "merely using the [Agreements] to fraudulently induce IOTEX to forward funds to Iota." In failing to disclose this *knowledge,* IOTEX argues, Maag participated in a scheme to defraud IOTEX, as it "would not have expended the time and resources negotiating, entering into and satisfying its obligations under the [Agreements] had it been aware of the actual intent of NeoSoft, Iota, Defries and Maag." Further, IOTEX argues that Maag's knowledge and participation in the scheme to defraud IOTEX makes him liable as a conspirator for any other wrongful acts committed in furtherance of the conspiracy.

Under New York law, [FN7] a scheme to defraud is shown where the complaint asserts facts that demonstrate: (1) a scheme, (2) involving defendants (3) directed against the interests of plaintiffs and (4) defendant's conduct in connection with the scheme. *See Shearson Lehman Bros. Inc. v. Bagley,* N.Y.App. Div., 614 N .Y.S.2d 5, 6 (1994). Fraudulent misrepresentation is shown where facts are alleged that "(1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." *Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank,* 2d Cir., 57 F.3d 146, 153 (1995). The courts have noted that "[i]t is almost impossible to state in detail the circumstances constituting a fraud where those circumstances are peculiarly within the knowledge of the party against whom the (fraud) is

being asserted." *CPC Int'l Inc. v. McKesson Corp.,* N .Y., 519 N.Y.S.2d 804, 812 (1987) (quoting *Jered Contracting Corp. v. New York City Transit Auth.,* N.Y., 292 N.Y.S.2d 98, 104 (1968)). However, a complaint must "allege the misconduct complained of in sufficient detail to inform the defendants of the substance of the claims." *Bernstein v. Kelso & Co., Inc.,* N.Y.App. Div., 659 N.Y.S.2d 276, 280 (1997).

FN7. The parties are in agreement that New York law governs these claims for fraud.

IOTEX's fraud claims suffer from the same defect as its breach of fiduciary duty claims. Moreover, IOTEX has failed to allege sufficient facts to establish that, even if there was fraud, Maag participated in it. *See In re Tri-Star,* Del.Supr., 634 A.2d at 326 (Conclusions "will not be accepted as true without specific allegations of fact to support them.").

IOTEX does allege the elements of a claim for breach of contract against Iota. That claim, however, cannot be "bootstrapped" into a fraud claim merely by adding the words "fraudulently induced" or alleging that the contracting parties never intended to perform. *See Dann v. Chrysler Corp.,* Del. Ch., 174 A.2d 696, 700 (1961) ("Using the word 'fraud' or its equivalent in any form is just not a substitute for the statement of sufficient facts to make the basis of the charge reasonably apparent.").

**\*6** New York law is decisively to the same effect: "It is well settled under New York law that 'a contract action cannot be converted to one for fraud merely by alleging that the contracting party did not intend to meet its contractual obligations." ' *International CableTel Inc. v. Le Group Videotron LTEE,* S.D.N.Y., 978 F.Supp. 483, 486 (1997) (quoting *Rocanova v. Equitable Life Assurance Soc'y of the U.S.,* N.Y., 612 N.Y.S.2d 339, 343 (1994)). New York law does recognize that a promise made "with a preconceived and undisclosed intention" of non-performance "constitutes a misrepresentation of a 'material existing fact." ' *Id.* at 487 (quoting *Sabo v. Delman,* N.Y., 164 N.Y.S.2d 714, 716 (1957). Nevertheless, this rule is limited by the requirement that "a false promise can support a claim of fraud only where that promise was 'collateral or extraneous' to the terms [of] an enforceable agreement in place between the parties." *Id.* IOTEX has alleged no facts showing that Maag was aware or participated in a "false promise" that was "collateral or extraneous" to the terms of the Agreements. On the contrary, the false promise alleged by IOTEX goes to the heart of the Agreements. Therefore, I do not find IOTEX to have met the requirements for pleading a fraud claim

where, as is true here, the underlying action is for breach of contract.

Since I find IOTEX has failed to meet the pleading requirements for fraud, I need not address the conspiracy claim, as there is no underlying independent claim of fraud sufficient to withstand a motion to dismiss. *See Demalco Ltd. v. Feltner,* S.D.N.Y, 588 F.Supp. 1277, 1278 (1984) ("It is well settled in New York that 'civil conspiracy to commit fraud, standing alone, is not actionable .' Instead, the gravamen of a claim of conspiracy is the underlying independent tort, and if the independent tort has not been adequately pleaded, the conspiracy claim will also fail." (quoting *Cullen v. BMW of North Am., Inc.,* E.D.N.Y., 490 F.Supp. 249, 254 (1980) and citing *Danahy v. Meese,* N.Y.App. Div., 446 N.Y.S .2d 611, 614 (1981))).

**B. The Bayendor Motion**

The complaint in C.A. No. 15817 was served on Bayendor in the manner described in 10 *Del. C.* § 3114, the Delaware director service statute. Apparently, IOTEX relied on that statute due to Bayendor's status as a director of Iota, his co-defendant. On August 19, 1997, Bayendor moved to dismiss for lack of personal jurisdiction and insufficiency of service of process, contending that Section 3114 was unavailable for use by IOTEX as its complaint was unrelated to Bayendor's fiduciary duties to Iota. In response, IOTEX served Bayendor again, this time under 10 *Del. C.* § 3104, the general long-arm service statute, and directed certain discovery at him in connection with his motion to dismiss. On November 21, 1997, IOTEX filed an amended complaint that added claims against Bayendor for civil conspiracy and violations of the federal Racketeer Influenced and Corrupt Organization Act ("RICO"). That amended complaint was served in reliance on Section 3104.

**\*7** As a result of the briefing on Bayendor's motion, the issue has narrowed to whether or not IOTEX is entitled to rely on the "civil conspiracy" theory of personal jurisdictional to obtain jurisdiction over Bayendor in Delaware. That is, I understand IOTEX fairly to concede that Section 3114 has no application to its claim and that no other head of jurisdiction under Section 3104 is available in this case.

The civil conspiracy theory of personal jurisdiction was recognized by the Delaware Supreme Court in *Istituto Bancario Italiano SpA v. Hunter Eng'g Co.,* Del.Supr., 449 A.2d 210, 225 (1982), but, because it affords "an easy technique to evade the thrust of the

*International Shoe* holding," it has been narrowly construed by this Court. *Carlton Invs. v. TLC Beatrice Int'l Holdings, Inc.,* Del. Ch., C.A. No. 13950, Allen, C., slip op. at 29 (Nov. 21, 1995). In *Istituto Bancario,* the Supreme Court surveyed the law from other jurisdictions regarding the conspiracy theory of jurisdiction and determined to adopt what it characterized as the "strict test" requiring a plaintiff to satisfy each of five elements:

> (1) a conspiracy to defraud existed; (2) the defendant was a member of that conspiracy; (3) a substantial act or substantial effect in furtherance of the conspiracy occurred in the forum state; (4) the defendant knew or had reason to know of the act in the forum state or that acts outside the forum state would have an effect in the forum state; and (5) the act in, or effect on, the forum state was a direct and foreseeable result of the conduct in furtherance of the conspiracy.

*Istituto Bancario,* Del.Supr., 449 A.2d at 225. While not conceding the existence of elements (1) and (2), Bayendor's argument focuses on the final three elements, and in particular on the absence of any allegation of an act or effect in Delaware in furtherance of the alleged conspiracy.

IOTEX cites three matters that it characterizes as "substantial acts and effects in the State of Delaware." None of these bear analysis.

IOTEX argues that the "principal effect involving Delaware" was "the use of a Delaware corporation--Iota--as the vehicle through which the fraud was committed." Mere use of a Delaware corporate entity in connection with a civil conspiracy has never been held to satisfy this element of the *Istituto Bancario* test. In support of this position, IOTEX cites to *Hercules, Inc. v. Leu Trust & Banking (Bahamas) Ltd.,* Del.Supr., 611 A.2d 476 (1992); *Istituto Bancario,* Del.Supr., 449 A.2d 210; and *Macklowe v. Planet Hollywood, Inc.,* Del. Ch., C.A. No. 13689, Steele, V.C. (Oct. 13, 1994). I do not read any of these cases to hold that "use" of a Delaware corporation in furtherance of a civil conspiracy can alone be found to have a substantial effect in Delaware sufficient to satisfy the "strict" test of *Istituto Bancario.* In *Hercules,* of course, the plaintiff corporation was headquartered in Delaware. *Hercules,* Del.Supr., 611 A.2d at 478. Thus, the effect of the conspiracy was actually felt in this State. In *Istituto Bancario,* a substantial act in furtherance of the civil conspiracy--the filing of a certificate of amendment with the Delaware Secretary of State authorizing the issuance of the shares there in question--actually took place in the Delaware. *Istituto Bancario,* Del.Supr., 449 A.2d at 226-27.

*8 *Macklowe* held that personal jurisdiction over a Florida limited partnership could be obtained in Delaware by service on its Delaware incorporated general partner. *Macklowe,* Del. Ch., C.A. No. 13689, slip op. at 11. This result was not followed by Chancellor Allen in *Carlton* in relation to a New York limited partnership. *Carlton Invs.,* Del. Ch., C.A. No. 13950, slip op. at 27. Moreover, while *Macklowe* also discusses the applicability of the civil conspiracy of jurisdiction, nothing in that opinion suggests that persons affiliated with a Delaware corporation who are alleged to "use" that corporation to the injury of a third party by actions wholly outside of Delaware thereby subject themselves to the jurisdiction of our courts. *Macklowe,* Del. Ch., C.A. No. 13689, slip op. at 14-17.

The second and third arguments are that Defries' alleged breach of his fiduciary duties as one of IOTEX's directors caused a "substantial effect" in Delaware simply by virtue of IOTEX's incorporation in this State and that Bayendor's alleged breach of fiduciary while he was President of IOTEX's predecessor (Iotel, Inc.) caused injury in this State. Indeed, IOTEX goes so far as to describe Bayendor's alleged breach of fiduciary (which is not alleged to have happened physically in Delaware) as an "additional act in Delaware [that] supports the assertion of jurisdiction here." These alleged "effects" add nothing to the analysis because they have only a metaphysical connection with this jurisdiction. In my judgment, as a general rule, in the case of Delaware corporations having no substantial physical presence in this State, an allegation that a civil conspiracy caused injury to the corporation by actions wholly outside this States will not satisfy the requirement found in the Supreme Court's opinion in *Istituto Bancario* of a "substantial effect ... in the forum state. *Istituto Bancario,* Del.Supr., 449 A.2d at 225.

For these reasons, I conclude that IOTEX cannot satisfy elements (3), (4) or (5) of the *Istituto Bancario* test for the assertion of personal jurisdiction over persons alleged to be participants in a civil conspiracy. Thus, service under 10 *Del. C.* § 3104 was improper and the amended complaint must be dismissed as to defendant Bayendor.

C. Defries and Bayendor's Motions to Dismiss the Eighth Claim for Relief (RICO) [FN8]

> FN8. Since I have dismissed the amended complaint as it pertains to defendant Bayendor, my discussion of the RICO claim applies only to defendant Defries.

In the amended complaint in C.A. No. 15817, IOTEX alleges that Defries and Bayendor engaged in a pattern of racketeering activity in violation of RICO. Specifically, Defries and Bayendor are alleged to have schemed (through Iota) "to defraud (among others) IOTEX and its stockholders of approximately [$5.2 million] and in devising, agreeing upon and pursuing such scheme to have: (i) misappropriated the approximately $5.2 million that IOTEX invested in connection with the Technology, (ii) forced IOTEX to abandon its operations, (iii) forced IOTEX to defend itself--and expend significant funds--in a recent action concerning the Technology brought against IOTEX by a former employee of Iota, and (iv) forced IOTEX to defend itself in connection with the unmeritorious counterclaim brought by Iota, and in the unmeritorious claims brought by another entity (Neosoft, A.G.) and individual (Urs Maag) controlled by Defries and Bayendor." IOTEX's Answering Br. at 3-4.

**\*9** The RICO statute provides for civil damages for any person or entity injured in his, her or its business or property by reason of a violation of 18 U.S.C. § 1962. *See* 18 U.S.C. § 1964(c). The statute is violated where the injured party demonstrates that defendants are engaged in a "pattern of racketeering activity." *See H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229 (1989). A pattern is defined as "requiring 'at least two acts of racketeering activity within a ten year period.'" *Tabas v. Tabas,* 3d Cir., 47 F.3d 1280, 1290 (1995) (quoting 18 U.S.C. § 1961(5)). Racketeering activity is defined as, *inter alia,* any act that is indictable under 18 U.S.C. § 1961(1), and includes wire fraud and mail fraud, the specific acts alleged to have occurred by IOTEX. *See* 18 U.S.C. §§ 1341 (mail), 1343 (wire), 1961(1)(B) (definition); *Tabas,* 47 F.3d at 1290.

Courts have held that a "pattern of racketeering activity" is shown where the plaintiff has alleged two or more acts of an indictable offense and further shown "that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." [FN9] *H.J. Inc.,* 492 U.S. at 239. "[P]redicate acts are related if they 'have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'" *Tabas,* 47 F.3d at 1292 (quoting *H.J. Inc.,* 492 U.S. at 240). Continued criminal activity, i.e., continuity, may be one of two types: closed-end, referring to "a closed period of repeated conduct"; or open-ended, referring to "past conduct that by its nature projects into the future with a threat of repetition." *Id.* (quoting *H.J. Inc.,* 492 U.S. at 241).

Analysis of either of the two types is temporal, so "a party may establish continuity as a closed-ended concept by 'proving series of related predicates extending over a substantial period of time.'" *Id.* (quoting *H.J. Inc.,* 492 U.S. at 242).

> FN9. The pleading requirements to allege a violation of RICO are the same as previously discussed, see *supra,* p 5-6.

IOTEX contends that both items necessary to establish a pattern of racketeering activity have been met; pointing first to Defries and Bayendor's allegedly false statements made during the IOTEX/Iota negotiations concerning the Project Management Agreement and to Iota's allegedly false status reports as the related predicate acts; and second, to the fact that the conduct "intended to defraud IOTEX had occurred over several years, continues through the present, and represents the normal course of doing business for defendant Defries and defendant Bayendor," as evidence of a continued threat of criminal activity.

In addressing IOTEX's argument, I focus on the latter aspect of the United States Supreme Court's RICO analysis, that the defendants' acts "amount to or pose a threat of continued criminal activity." *H.J. Inc.,* 492 U.S. at 239. [FN10] IOTEX argues that both types of continuing criminal activity (open-ended and closed-ended) are present in this instant case.

> FN10. Defendants apparently concede that IOTEX has plead sufficiently to meet the requirement that "the racketeering predicates are related," as they do not address this aspect of the *H.J. Inc.* test in their brief. *See H.J. Inc.,* 492 U.S. at 239.

**\*10** Defendants contend that the allegedly criminal activities (if at all) could in no event have lasted past February 1996 (the last date that IOTEX made payments to Iota) thereby making an open-ended analysis inapplicable. In response, IOTEX cites three events alleged to meet the open-ended standard: (1) Iota's assertion of contract claims in this Court, (2) Iota's alleged refusal to provide an accounting of the funds IOTEX has paid to Iota and (3) Defries alleged grant of an option in IOTEX stock to a former Iota employee. [FN11] In my judgment, these mere conclusory allegations do not evidence continuing fraudulent conduct and require no further discussion. *See Continental Realty Corp. v. J.C. Penney Co., Inc.,* S.D.N.Y., 729 F.Supp. 1452, 1455 (1990) ("[The plaintiff's] conclusory allegations fail to satisfy

Fed.R.Civ.P. 9(b)'s requirement that averments of fraud be stated with particularity and therefore cannot be relied upon to demonstrate a continuing pattern of fraudulent acts.").

> FN11. The option arises out of a Separation Agreement between Iota and Andrew Denis, which grants Denis the choice of either, "shares equal and equivalent to two hundred and fifty shares of Series A Preferred Stock in Iota, or: b) Shares in Iotex, Incorporated equal and equivalent to that percentage as may be represented by the like number and proportion of shares issued in Iota pursuant to paragraph 6.C.a above when calculated against the Iotex shares which Iota or its associates may hold or control following the initial public offering of Iotex as such offering is defined by the Securities and Exchange Commission.
> Defendants argue persuasively that the quoted provision obligates only Iota (and not IOTEX) to perform and, in any event, relates to shares of IOTEX owned or to be owned by Iota.

In the alternative, IOTEX contends that defendants' actions have met the closed-ended requirement of continuing criminal activity, i.e., a "series of related predicates extending over a substantial period of time." *H.J. Inc.,* 492 U.S. at 242. In making this determination, courts look to a number of factors, which can include: the number and variety of predicate acts and the length of time over which they were committed, the number of victims, the number of schemes involved and the occurrence of distinct injuries. *Vicom, Inc. v. Harbridge Merchant Services,* 7th Cir., 20 F.3d 771, 781-82 "(1) the number of unlawful acts; (2) the length of time over which the acts were committed; (3) the similarity of the acts; (4) the number of victims; (5) the number of perpetrators; and (6) the character of the unlawful activity." (citing *Barticheck v. Fidelity Union Bank/First Nat'l State,* 3d Cir., 832 F.2d 36 (1987))).

IOTEX relies primarily on the Third Circuit's decision in *Tabas* as support for its argument. In *Tabas,* the plaintiff alleged that two brothers formed a partnership to conduct real estate and other business ventures. *Id.* at 1282. In the event of the death of either partner, the partnership agreement provided that the surviving partner would distribute partnership income jointly to himself and the estate of the deceased partner. *Id.* One of the partners died, and the surviving partner began making partnership income payments to the deceased partner's estate. *Id.*

Some years thereafter, the estate filed a civil RICO claim, alleging misappropriation based on its contention that the surviving partner was not allocating an equal share to the deceased partner's estate, in violation of the partnership agreement. *Id.* at 1282-83. The Third Circuit agreed, reversing the district court and finding that the RICO continuity requirement was satisfied. *Id.* at 1281. In its assessment of whether or not continuing criminal activity was shown, the Court focused on "the duration of the underlying scheme," noting that plaintiffs had provided evidence tending to show that the alleged acts of mail fraud began on November 10, 1987 and ended in July 1991, a period of three and a half years. *Id.* at 1294. The Court found a three and a half year period constituted a "substantial" period of time, and comported with the type of "long-term criminal conduct that RICO was enacted to address." *Id.* [FN12]

> FN12. IOTEX makes further argument as evidence of the applicability of the closed-ended type by contending that defendants' criminal conduct "began on or before July 20, 1994 (the date IOTEX was formed for the sole purpose of investing capital in connection with the Technology)". Even if this were true, the resulting period is still substantially shorter than that addressed in *Tabas,* and the multi-factor analysis would lead me to conclude that the element of continuity is not present.

**\*11** *Tabas* is distinguishable from the instant case. While *Tabas* involved conduct occurring over a three and a half year period, the activities here lasted only 15 months, a decidedly shorter period, and one that, alone, will not satisfy the RICO continuity requirement. *See Vemco, Inc. v. Camardella,* 3d Cir., 23 F.3d 129, 135 (1994) ("We cannot conclude that [defendant's] alleged actions here, involving a single victim and single scheme for a single purpose over seventeen months, constitute the type of 'long-term criminal conduct' Congress sought to prohibit with RICO." (quoting *H.J. Inc.,* 492 U.S. at 241-42)). The other factors identified in the case law lead me to conclude that the RICO claim is not properly plead.

First, the predicate acts that IOTEX rely on all arise out of or are related to the same transaction, the Project Management Agreement. This Agreement required periodic status reports and such reports, while independent of each other, were all dependent on and related to the Agreement. Commonsense, which the Supreme Court mandates be used in a RICO analysis, requires a finding that these reports

are not separate predicate acts as contemplated by the RICO statute, but are mutually dependent on the Agreement. *See H.J. Inc .,* 492 U.S. at 241 (promulgating an approach to analyzing the continuity requirement that is based on a "commonsense, everyday understanding of RICO's language and Congress' gloss on it"). As one court has stated, "courts must take care to ensure that the plaintiff is not artificially fragmenting a single act into multiple acts simply to invoke RICO." *Schlaifer Nance & Co. v. Estate of Andy Warhol,* 2d Cir., 119 F.3d 91, 98 (1997). [FN13]

> FN13. This same analysis applies to the other predicate acts attacked by IOTEX, that the defendants made fraudulent communications during the negotiation of the Project Management Agreement that led to IOTEX's payments to Iota. These payments were directly related to the Budget and are an integral part of the Project Management Agreement. They cannot be segmented to create the predicate acts necessary to meet the RICO continuity requirement.

 Second, notwithstanding IOTEX's footnote argument to the contrary, the predicate acts allegedly injure only one party, IOTEX itself. IOTEX contends that in addition to itself, allegedly injured by defendants' misappropriation of its funds and fraudulent status reports, its stockholders have also been injured, since the corporation was formed specifically for the purpose of investing in the Technology and by misappropriating funds paid by IOTEX to Iota for the Technology, the defendants injured the stockholders investing in IOTEX. I reject this argument because it would require me to disregard the existence of IOTEX as a legal entity. IOTEX alone experiences any effect of defendants' allegedly fraudulent acts. The shareholders do not suffer any injury separate from or unrelated to that alleged to be experienced by IOTEX. *See Kramer v. Western Pac. Indus., Inc.,* Del.Supr., 546 A.2d 348, 351 (1988) (by analogy in derivative standing cases, "[p]laintiff must allege more than an injury resulting from a wrong to the corporation").

 Lastly, the alleged injury itself is a single injury. If defendants, through Iota, did breach the Project Management Agreement by sending false status reports and not complying with the Budget's directives regarding the allocation of the IOTEX funds, then the end result of Iota's noncompliance is a single injury to IOTEX, not multiple injuries based on each allegedly fraudulent communication. To find

otherwise would fragment the Project Management Agreement, which is contrary to law and commonsense.

 **\*12** For all of the foregoing reasons, I find that IOTEX has failed to meet the continuity requirement necessary to show a pattern of racketeering activity under the RICO statute. Therefore, defendant Defries and Bayendor's Motions to Dismiss the Eighth Claim for Relief are hereby granted. [FN14]

> FN14. Having reached this conclusion, I do not address Defries' argument that the consent to jurisdiction under 10 *Del. C.* § 3114 is not broad enough to subject him to the personal jurisdiction of this Court for the purpose of adjudicating the RICO claim.

### III. CONCLUSION

 For all of the foregoing reasons, the motions to dismiss addressed in this Memorandum Opinion, i.e., (1) Urs Maag's Motion to Dismiss for Failure to State a Claim upon which Relief can be Granted (C.A. No. 16082), (2) David Bayendor's Motion to Dismiss for Lack of Personal Jurisdiction (C.A. No. 15817), and (3) Anthony Defries and David Bayendor's Motions to Dismiss the Eighth Claim for Relief (C.A. No. 15817), are all GRANTED. IT IS SO ORDERED.

 1998 WL 914265 (Del.Ch.), RICO Bus.Disp.Guide 9699, 24 Del. J. Corp. L. 718

END OF DOCUMENT

PLAINTIFF SEA STAR LINES LLC'S                    EXHIBIT 6
OPENING BRIEF IN SUPPORT OF ITS
MOTION TO DISMISS THE COUNTERCLAIM

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2005 WL 445710 (Del.Super.)
**(Cite as: 2005 WL 445710 (Del.Super.))**

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Superior Court of Delaware.
MIDLAND RED OAK REALTY, INC. and Mro
Southwest, Inc. Plaintiffs,
v.
FRIEDMAN, BILLINGS & RAMSEY & CO., INC.
and Velasco Group, L.L.C. Defendants.
No. Civ.A.04C05091CLS.

Submitted Nov. 15, 2004.
Decided Feb. 23, 2005.

Upon Consideration of Defendants' Motion To
Dismiss. Denied in Part. Granted in Part.

Jonathan L. Parshall, Murphy Spadaro & Landon,
Wilmington, Delaware, Shawn L. Raymond, J. Hoke
Peacock III, Susman Godfrey LLP, Houston, Texas,
for Plaintiffs Midland Red Oak Realty, Inc. and MRO
Southwest, Inc.

Arthur G. Connolly, III, Connolly Bove Lodge &
Hutz, LLP, Wilmington, Delaware, Howard W.
Gutman, William B. Pittard, IV, Williams &
Connolly LLP, Washington, D.C., for Defendant
Friedman, Billings & Ramsey, Co., Inc.

Judith M. Kinney, Reed Smith, Wilmington,
Delaware, Richard C. Sullivan, Jr., Anne M. Devens,
Falls Church, Virginia, for Defendant Velasco Group,
L.L.C.

*ORDER*

SCOTT, J.

I. Facts

**\*1** In this action, Plaintiffs Midland Oak Realty, Inc.
and MRO Southwest, Inc. ("MRO") are suing
Defendants Friedman, Billings, Ramsey & Co., Inc.
("FBR") and Velasco Group, L.L.C. ("Velasco") over
a real-estate financing contract. MRO is a Delaware
corporation with its principal office in Midland,
Texas. FBR is a Delaware corporation with its
principal office in Arlington, Virginia. Velasco is a
limited liability Virginia corporation.

MRO is a real-estate investment firm engaged in
buying, developing, and managing undervalued
commercial properties in Texas, Oklahoma, and
Arizona. In June 1999, MRO entered into a three-year
financing contract with Lehman Brothers. The
financing was to cover fifteen properties. MRO was
required to pay the principal balance and a $5.275
million exit fee when the credit facility expired on
July 1, 2002.

During the summer of 2001, MRO began to search
for financing to replace the Lehman contract. MRO
was put in touch with FBR to discuss possible
financing options. In the beginning of 2002, MRO
also interviewed other financing consultants.
Ultimately, MRO chose FBR and Holliday Fenoglio
Fowler ("Holliday") to discuss financing options.
MRO informed each of the firms that it needed to re-
finance before the Lehman contract expired. FBR and
Holliday suggested that the financing be split into an
"A" piece and a "B" piece in order to optimize
financing.

FBR made its pitch to MRO on January 28, 2002.
Jeff McClure, then vice-president of FBR, made
several representations to MRO. He first stated that
FBR had expertise in real estate financing,
specifically, it was their specialty and they knew the
market "better than anyone." McClure also
represented to MRO that $24 million was a
reasonable amount for financing of the "B" piece.
McClure was confident in "B" piece financing. He
suggested that MRO find the cheapest price for the
"A" piece.

In February, 2002, MRO assigned the "B" piece to
FBR and the "A" piece to Holliday. MRO told
Lehman about the re-financing effort. Lehman agreed
in front of a Velasco representative to waive the
$5.275 million fee if MRO re-financed the "A" and
"B" pieces before the Lehman contract expired. While
FBR had already begun work on financing, its
contract with MRO had not been signed. The contract
was not signed until May 6, 2002. The terms of
engagement specified that FBR would find financing
on "a best efforts basis."

Holliday secured financing for the "A" piece with

Greenwich Corporate Products. FBR, however, had not found financing as of April, 2002. In mid-April, McClure left FBR to start his own consulting group, Velasco. FBR assured MRO that McClure departure would not affect the "B" piece financing.

At a May 1, 2002 status conference between MRO, FBR and Holliday, FBR notified the parties that it had enlisted the help of Velasco to obtain financing. MRO was not a party to this contract. McClure attended the meeting on behalf of Velasco and stated that "I have the deal done" in regard to the "B" piece. MRO informed Velasco that a Texas financier, Smith Brownlie, wanted to underwrite the transaction, but would need at least sixty days. McClure responded that the "B" piece was done, and did not need Brownlie's money.

**\*2** On June 4, 2002, Holliday, Velasco, FBR, and MRO met in Texas. Brownlie was also present. Brownlie asked McClure about the status of the "B" piece. McClure responded that he had not finalized any financing. In addition, he stated that MRO's "B" piece financing was "in good shape." Brownlie became agitated because he had wished to finance the project but was told that the financing was already completed. Velasco and FBR indicated to MRO after the meeting that they had sent several proposals to different sources.

When asked to provide evidence of potential financers, Velasco provided MRO and Holliday with a list of people not regularly in the real estate finance market. This caused MRO and Holliday to be alarmed. A lack of pitch book for the real estate financing also alarmed MRO. When Velasco finally did produce offers they had received for the "B" piece, MRO realized that they were well below the price needed to replace the Lehman contract. FBR assured MRO that "the deal would get done" and "not to worry."

Ultimately, the Lehman contract expired without financing for the "B" piece. Holliday had tried at the last minute to obtain financing, but was unsuccessful. As a result of not obtaining re-financing, MRO became in default to Lehman. Subsequently, MRO and Lehman entered into a forbearance agreement. MRO has liquidated the vast majority of its portfolio holdings.

## II. Standard of Review

Delaware has clear standards for granting a Rule 12(b)(6) Motion to Dismiss. The Court must accept all well-pled allegations as true. [FN1] The Court must then apply a broad sufficiency test: "whether a plaintiff may recover under any reasonable conceivable set of circumstances susceptible of proof under the complaint." [FN2] Dismissal will not be granted if the complaint "gives general notice as to the nature of the claim asserted against the defendant." [FN3] Further, a complaint "will not be dismissed unless it is clearly without merit, which may be either a matter of law or of fact." [FN4] "Vagueness or lack of detail," standing alone, is insufficient to dismiss a claim. [FN5]

> FN1. *Spence v. Funk,* 396 A.2d 967, 968 (Del.Supr.1978).
>
> FN2. *Id.* (Internal citation omitted).
>
> FN3. *Diamond State Tel. Co. v. Univ. of Delaware,* 269 A.2d 52, 58 (Del.Supr.1970).
>
> FN4. *Id.*
>
> FN5. *Id.*

## III. Discussion

In determining how to rule on the Motion, this Court must look to the contract between FBR and MRO. FBR contends that the contract language permits recovery only for "willful misconduct or gross negligence." It is their position that the Motion to Dismiss should be granted because MRO has failed to plead either willful misconduct or gross negligence in their First Amended Complaint. MRO counters that the Motion should not be dismissed because the indemnity provision does not apply until this Court issues a final ruling on the merits.

The Indemnity Provision of the FBR/MRO contract states in pertinent part:
> The Company agrees to indemnify and hold harmless FBR and its affiliates ... and their respective directors, officers, employees, agents and controlling persons ... The Company will not be liable to any Indemnified Party under the foregoing indemnification and reimbursement provisions ... to the extent that any loss, claim, damage or liability is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted primarily from FBR's *willful misconduct or gross negligence.* (emphasis added) ...
> **\*3** The Company also agrees that no Indemnified Party shall have any liability (whether direct or indirect, in contract or tort or otherwise) to the Company or its security holders or creditors related

to or arising out of this engagement of FBR pursuant to, or the performance by FBR of the services contemplated by, this Agreement except to the extent that any loss, claim, damage or liability is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted primarily from FBR's *willful misconduct or gross negligence*. (emphasis added).

A. *Plain Meaning Rule*

In Delaware, the principles governing contract interpretation are well settled. [FN6] "Where the contract language is clear and unambiguous, the parties' intent is ascertained by giving the language its ordinary and usual meaning." [FN7] If the parties disagree as to the proper interpretation of the contract, the disagreement does not automatically create an ambiguity. [FN8] Instead, "a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." [FN9]

> FN6. *Northwestern Nat'l Ins. Co., v. Esmark, Inc.,* 672 A.2d 41, 43 (Del.Supr.1995).
>
> FN7. *Id.* (Internal citation omitted).
>
> FN8. *Id.*
>
> FN9. *Id.* (citing *Rhone-Poulenc Basic Chemicals Co., Inc. v. Am. Motorists Ins. Co.,* 616 A.2d 1192, 1195 (Del.Supr.1992)).

In the case *sub judice,* the express language of the FBR/MRO agreement reserves Plaintiff's right to deny indemnification to Defendant if a court has rendered a final judgment holding that FBR acted with willful misconduct or gross negligence. By employing the Plain Meaning Rule, this Court agrees with MRO that a determination of indemnification cannot be made with respect to the parties, on at least a few of the claims, until after this case has gone to trial and been decided.

B. *Recovery of Breach of Contract in Tort Law*

FBR asserts that Counts III and IV must be dismissed against them because a plaintiff may not recover in tort for breaches of contract agreements. This Court agrees.

"As a general rule under Delaware law, where an action is based entirely on a breach of the terms of a contract between the parties, and not on a violation of an independent duty imposed by law, a plaintiff must sue in contract and not in tort." [FN10] In both *Pinkert v. Olivieri* and *Tristate Courier and Carriage, Inc. v. Berryman,* [FN11] the Delaware courts held that a breach of contract claim could not be "bootstrapped into a fraud claim merely by adding the words 'fraudulently induced' or alleging that the contracting parties never intended to perform." [FN12]

> FN10. *Pinkert v. Olivieri,* 2001 WL 641737 *5 (D.Del.2001).
>
> FN11. 2004 WL 835886 *11 (Del.Ch.2004). (Internal citation omitted).
>
> FN12. *Pinkert,* 2001 WL 641737 at *5; *Tristate Courier and Carriage, Inc.,* 2004 WL 835886 at *11.

MRO's claims of Fraud and Negligence are based entirely on obligations owed by FBR under the contractual agreement. The alleged material misrepresentations made by FBR are not collateral issues in this case. FBR has not violated any common law duty independent of the financing contract terms. In addition, MRO has not pointed to a representation or obligation other than the existence of the financing agreement upon which it can base a fraud or negligence claim. FBR's Motion to Dismiss is Granted as to Counts III and IV.

C. *Willful Conduct and Gross Negligence May be Averred Generally*

**\*4** Moreover, FBR argues that MRO has failed to sufficiently plead a cause of action because MRO's First Amended Complaint does not use the word "willful." This Court disagrees.

Delaware Superior Court Rule 9(b) describes the causes of actions that are to be pled with particularity. It reads:
*(b) Fraud, negligence, mistake, condition of mind.* In all averments of fraud, negligence or mistake, the circumstances constituting fraud, negligence or mistake should be stated with particularity. Malice, intent, knowledge and other condition of mind of a person may be averred generally.

Willful and wanton each refer to a "distinct state of mind." [FN13] Accordingly, willful and wanton need only be averred generally as required in Rule 9(b).

> FN13. *Johnson v. Pritchett,* 2001 WL 1222100 *3 (Del.Super.) (citing *Jardel Co.,*

*Inc. v. Hughes,* 523 A.2d 528, 529-30 (Del.Supr.1987)).

In *Hedrick v. Webb,* [FN14] the Court held that "the term aver [ ] implies that there must be at least a positive assertion of the state of mind." [FN15] There, the plaintiffs failure to mention wanton negligence or willful intent in their Complaint was fatal. [FN16] The Court held that the plaintiffs had no cause of action under the Tort Claims Act because they failed to mention the state of mind. [FN17]

FN14. 2004 WL 2735517 (Del.Super.).

FN15. *Id.* at *7.

FN16. *Id.*

FN17. *Id.*

While Plaintiffs do not use the word "willful" in their Complaint, this Court does not find the omission to be fatal. As discussed below, Plaintiffs have alleged sufficient facts to withstand a Motion to Dismiss.

### D. Wanton Conduct is a Question for the Jury

Generally, the issue of whether facts and circumstances amount to willful conduct or gross negligence is a fact question for the jury. [FN18] It is a matter of law when the "conduct in question falls short of gross negligence, the case is entirely free from doubt, and no reasonable jury could find gross negligence." [FN19]

FN18. *Eustice v. Rupert,* 460 A.2d 507, 509 (Del.Supr.1983); *Nicholson v. Mount Airy Lodge, Inc.,* 1997 WL 805185 *4 (E.D.Pa.). (Internal citations omitted).

FN19. *Id.* (citing *Albright v. Abington Mem'l Hosp.,* 548 Pa. 268, 696 A.2d 1159, 1165 (Pa.1997)).

Willful conduct has been defined as a "conscious indifference" or "I don't care attitude which is the prerequisite of wanton behavior." [FN20] Wanton conduct is a "conscious indifference to consequences in circumstances where [the] probability of harm to another within the circumference of the conduct is reasonably apparent, although harm to such others in not intended." [FN21]

FN20. *Eustice,* 460 A.2d 509. (Internal citations omitted).

FN21. *Id.* (citing *Law v. Gallegher,* 197 A. 479, 482 (Del.Supr.1938)).

### 1. Breach of Contract

This Court finds that there is evidence from which a reasonable jury could find that FBR was grossly negligent or engaged in willful conduct in breaching the financing contract with MRO. First, the contract language stated that FBR conduct the Offering on a "best efforts basis only after execution of an underwriting agreement." As of May 1, 2002, FBR contended that the "deal was done." The deal, however, was not done and these representations were made merely three months before the expiration of the Lehman credit facility. In addition, the statements that led MRO to believe that the B piece was proceeding to the underwriting stage may not have been boasting. Finally, the issue of whether FBR was grossly negligent when they told Brownlie, who wanted to secure financing for the Lehman project, that he need not finance the project because it was done is best suited for a determination by the fact-finder.

### 2. Breach of Covenant of Good Faith and Fair Dealing

**\*5** The concept that a covenant of good faith and fair dealing is implied in a contractual relationship is well accepted in Delaware. [FN22] Good faith has been defined as "faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." [FN23] Although MRO's allegations of the breach of covenant of good faith are vague at best, this Court does not believe that the count is so clearly without merit that it be dismissed. Accepting all well-pled allegations as true, FBR may have acted in disregard to MRO's expectations that financing be obtained when it told a possible financier that the "deal was done," when in fact, it was not.

FN22. *Merrill v. Crothall-American, Inc.,* 606 A.2d 96, 101 (Del.Supr.1992). At common law, fair dealing and good faith was impliedly a part of every kind of contract. *See* Restatement (Second) of Contracts § 204 (1979).

FN23. Restatement (Second) of Contracts § 205, cmt. a. (1979).

This Court DENIES FBR's Motion to Dismiss Counts I and II because it cannot be concluded as a matter of law that FBR's conduct was not willful or

grossly negligent.

*E. Velasco's Relationship with FBR*

FBR and Velasco both asserted at the Motion that Velasco was in fact FBR's agent under the FBR/MRO contract. It is FBR's position that MRO must concede that Velasco is an agent of FBR because some of the causes of action against FBR stem from Velasco's actions. In contrast, MRO contends that previous to the hearing, FBR would not admit that Velasco was its agent. This Court believes that at this stage in the proceedings, there is a basis upon which the Plaintiffs may recover against Velasco. Velasco's Motion to Dismiss Counts III, IV, and V of the First Amended Complaint is DENIED.

"Agency is the relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." [FN24] On the other hand, if the agent is an independent contractor, and the employer does not retain control over him, the employer is not liable for the independent contractor's negligent actions. [FN25]

> FN24. Restatement (First) of Agency § 1(1) (1933).

> FN25. Restatement (Second) of Torts § 414 (1977).

In the pleadings before the Court, there is insufficient evidence to determine if Velasco was an agent or an independent contractor for purposes of this Motion. This Court is cognizant that FBR enlisted the help of Velasco, however, the status of their relationship remains an issue to be determined. This Court, with so little information, cannot conclude as a matter of law what Velasco's status was in the contract. The Motion, therefore, will not be dismissed with regard to the claims against Velasco.

IV. Conclusion

Based on the foregoing reasons, Counts III and IV are DISMISSED against FBR. Counts I and II remain against FBR. Counts III, IV, and V remain against Velasco.

IT IS SO ORDERED.

2005 WL 445710 (Del.Super.)

END OF DOCUMENT