# EXHIBIT 1

Westlaw.

Not Reported in F.Supp.
1994 WL 136962 (E.D.Pa.)
(Cite as: 1994 WL 136962 (E.D.Pa.))

## H

### Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court,
E.D. Pennsylvania.
UNITED STATES of America, on behalf of its
Agency, the Small Business
Administration, Plaintiff,
v.
Ronald C. STANKO and Patricia A. Stanko,
Defendants.
No. CIV. A. 92-7206.

April 18, 1994.

MEMORANDUM

HUYETT.

*1 The Small Business Administration ("Plaintiff") and Ronald and Patricia Stanko ("Defendants") have filed cross motions for summary judgment in this mortgage foreclosure action. For the reasons set forth below, Plaintiff's motion is GRANTED and Defendants' motion is DENIED.

### A. Factual Background

The uncontested facts are as follows. [FN1] On May 21, 1981, the Stankos, the original principle shareholders of Berkshire Sports Ltd. ("BSL"), executed a promissory notice (the "Promissory Note") in the amount of $250,000 in favor of American Bank & Trust Co. ("ABT") to secure a loan from ABT ("ABT Loan"). To secure the Promissory Note, Defendants granted ABT a mortgage (the "Mortgage") on property owned by the Stankos in Flying Hills, Pennsylvania. ("44 Winged Foot Drive"). The SBA also guaranteed the ABT Loan.

In the fall of 1981 and spring of 1982 BSL experienced difficulty in meeting the ABT Loan payments. Accordingly, the Stankos. Martin Liquori ("Liquori"), an associate of the Stankos, and ABT undertook a series of restructuring negotiations. By letter dated May 14. 1982 ("Letter"). ABT notified Liquori of a debt restructuring proposal. According to Defendants' interpretation of the letter, ABT agreed to release its mortgage on 44 Winged Foot Drive.

On October 27, 1982 Liquori, Ronald Stanko and ABT executed a new loan agreement ("Loan Agreement") which detailed the terms of the restructuring. Because BSL failed to meet its debt obligation under the Loan Agreement. ABT and Liquori, who had become the principal shareholder pursuant to the restructuring, liquidated BSL. On November 11, 1983, ABT assigned the mortgage and its rights under the Promissory Note to the SBA. The SBA now seeks to foreclose the mortgage.

### B. *Summary Judgment Standard*

Summary judgment is proper when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). This Court's role is to determine "whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Josey v. John R. Hollingworth Corp.*, 996 F.2d 632, 637 (3d Cir.1993). The moving party has the burden of demonstrating that no genuine issue of fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Further, the evidence must be viewed in the light most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). However, if the non-moving party fails to adduce sufficient evidence in connection with an essential element of the case for which it has the burden of proof, the moving party is entitled to summary judgment as a matter of law. *Celotex*, 477 U.S. at 322.

### C. *Discussion*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1994 WL 136962 (E.D.Pa.)
(Cite as: 1994 WL 136962 (E.D.Pa.))

Defendants maintain that the Letter constituted a release by ABT of the mortgage it held on the 44 Winged Foot Drive property. Consequently, ABT could not have assigned the mortgage. The SBA argues that the Letter was simply a preliminary restructuring proposal which was reduced to writing in the Loan Agreement. Because the Loan Agreement did not release the mortgage, the assignment was valid and binding.

*2 The parol evidence rule bars the use of extrinsic evidence of prior agreements or negotiations that contradict. *Tigg Corp. v. Dow Corning Corp.*, 822 F.2d 358, 363 (3d Cir.1987); *Kane Gas Light & Heating Co.*, 587 F.Supp. 910, 911 (W.D. Pa.1984). To determine whether extrinsic evidence contradicts a final agreement, courts consider whether the subject matter of that evidence is covered by the subsequent writing. If it is, the subsequent writing was meant to represent all of the transaction on that element. *Bradney v. Sakelson*, 473 A.2d 189, 192 (Pa.Super.1984); *McFadden v. American Oil Co.*, 257 A.2d 283, 287 (Pa.Super.1969).

If the matter proposed to be shown by parol evidence is addressed by the final agreement, parol evidence may be admitted only if the proponent of the parol evidence establishes, by clear and convincing evidence, that the other parties admit the incompleteness of the final writing or that fraud or mistake occurred. *Manley v. Manley*, 357 A.2d 641, 645. (Pa.Super.1976); *Beckman v. Vassall-Dillworth Lincoln-Mercury, Inc.*, 468 A.2d 784, 789 (Pa.Super.1983). Defendants offer the terms of the Letter to contradict the terms of the subsequent Loan Agreement. The Loan Agreement addressed the issue of release of collateral. The Loan Agreement, however, only offered release of a lien on Wyomissing property and such release was conditional upon the investment of sale proceeds of the property into BSL. [FN2]

Defendant does not allege fraud or mistake or that the ABT or the SBA admit that the Loan Agreement was not the final expression of the restructuring agreement between the Stankos and ABT. Indeed, the subsequent conduct of the parties suggest that no release was

contemplated.     No mortgage release was ever executed, no recordation was made on the deed releasing a mortgage. ABT executed an assignment of the mortgage. The SBA and the Stankos exchanged numerous correspondence discussing release of the 44 Winged Foot Drive mortgage.

Because the Letter is inadmissible evidence on the issue of release, the Court may consider only the terms of the Loan Agreement to determine the intent of the parties with respect to that issue. Nothing in the Loan Agreement purports to release the mortgage on the 44 Winged Foot Drive Property. Accordingly, the Court is constrained to find that no release occurred.

For all of these reasons it is clear that assignment of the mortgage by ABT to the SBA was valid.     An appropriate Order granting the relief sought by Plaintiff is attached.

ORDER

Upon consideration of Plaintiff's Renewed Motion for Summary Judgment and the responses thereto:

1. Plaintiff's Motion for Summary Judgment is GRANTED and Defendants' Motion for Summary Judgment is DENIED.

2. The mortgage on 44 Winged Foot Drive, Flying Hills, Pa. is foreclosed.

3. The United States Marshal for the Eastern District of Pennsylvania is directed to sell the real property specified in the mortgage and identified in the Complaint for cash to the highest bidder at a public, judicial sale pursuant to Title 28 U.S.C. § 2001. Notice must be given in accordance with 28 U.S.C. § 2002, once a week for four (4) consecutive weeks prior to the sale in one newspaper regularly issued and of general circulation in the County and judicial district where the real estate is situated.

*3 4. Ten percent (10%) of the highest bid must be deposited, in cash, with the United States Marshal by the bidder immediately upon the property being struck down to him.     The balance of the purchase money

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                           Page 3
1994 WL 136962 (E.D.Pa.)
(Cite as: 1994 WL 136962 (E.D.Pa.))

must be paid in cash or by certified check by the highest bidder to the Marshal within ten (10) days after the sale is confirmed by the Court, without demand for the same being made by the Marshal. It is the highest bidder's responsibility to ascertain the date of confirmation. If the highest bidder fails to settle, all his rights in the real estate shall cease and be completely void and the property may be readvertised and sold

### ORDER

Upon consideration of Plaintiff's Renewed Motion for Summary Judgment and the responses thereto:

1. Plaintiff's Motion for Summary Judgment is GRANTED and Defendants' Motion for Summary Judgment is DENIED.

2. Judgment in mortgage foreclosure is GRANTED in favor of the United States of America and against the Defendants, Ronald C. Stanko and Patricia Stanko.

3. The mortgage on 44 Winged Foot Drive, Flying Hills, Pa. is foreclosed.

4. The United States Marshal for the Eastern District of Pennsylvania is directed to sell the real property specified in the mortgage and identified in the Complaint for cash to the highest bidder at a public, judicial sale pursuant to Title 28 U.S.C. § 2001. Notice must be given in accordance with 28 U.S.C. § 2002, once a week for four (4) consecutive weeks prior to the sale in one newspaper regularly issued and of general circulation in the County and judicial district where the real estate is situated.

5. Ten percent (10%) of the highest bid must be deposited, in cash, with the United States Marshal by the bidder immediately upon the property being struck down to him. The balance of the purchase money must be paid in cash or by certified check by the highest bidder to the Marshal within ten (10) days after the sale is confirmed by the Court, without demand for the same being made by the Marshal. It is the highest bidder's responsibility to ascertain the date of confirmation. If the highest bidder fails to settle, all

his rights in the real estate shall cease and be completely void and the property may be readvertised and sold by the Marshal without further order of the Court, at the risk of the defaulting bidder, whose deposit shall be forfeited; and in case of a deficiency on such resale, he shall make good the same to the person thereby injured. The highest bidder shall take the real estate subject to and is to pay all taxes, water rents, sewer charges, municipal claims, and any other claims, charges, and liens against the property which are not divested by the sale, and shall pay all state, local and federal transfer taxes and stamps.

6. The Motion for confirmation of the public sale shall be made to the Court thirty (30) days after the date of sale.

7. A true copy of this Order and Decree shall be delivered to the United States Marshal by the Clerk.

*4 8. That jurisdiction is retained over this matter for the granting of such Orders and Decrees as the circumstances may require.

IT IS SO ORDERED.

> FN1. Most of the relevant facts are also set forth in the Findings of Fact and Conclusions of Law of this Court in No. 90-7250.

> FN2. Section 8.8 of the Agreement states: Upon the fulfillment, by the Company and the Shareholders of all of the terms, conditions and provisions set forth in Section 4 hereof, [ABT] agrees to release its lien on the Wyomissing lot owned by Ronald C. Stanko at the time of the sale thereof, but only on the condition that Ronald C. Stanko invest the proceeds of such sale into the Company.

1994 WL 136962 (E.D.Pa.)


**Motions, Pleadings and Filings (Back to top)**

· 2:92CV07206 (Docket)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                Page 4
1994 WL 136962 (E.D.Pa.)
**(Cite as: 1994 WL 136962 (E.D.Pa.))**

(Dec. 16, 1992)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 2

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 1994 WL 315365
(Cite as: Not Reported in A.2d)

**H**
Not Reported in A.2d, 1994 WL 315365
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT RULES
BEFORE CITING.
Superior Court of Delaware.
Eugene N. STERLING, Annabel W. Sterling, Bryan
K. Sterling and C. Keith Sterling, Plaintiffs,
v.
BENEFICIAL NATIONAL BANK, N.A., a National
Banking Association, Defendant.
No. 91C-12-005.

Submitted Dec. 3, 1993.
Decided April 13, 1994.

Thomas C. Jackson, Dover, for plaintiffs Eugene N.
Sterling, Annabel W. Sterling, Bryan K. Sterling, and
C. Keith Sterling.
Melvyn I. Monzack and Joseph J. Bodnar . of Walsh
and Monzack, P.A., Wilmington, for defendant
Beneficial Nat. Bank.

MEMORANDUM OPINION

RIDGELY, President Judge.
*1 On December 4, 1991, Plaintiffs Eugene N.
Sterling, Annabel W. Sterling, Bryan K. Sterling, and
C. Keith Sterling (collectively, "Sterlings") filed this
action against Defendant Beneficial National Bank
("Beneficial") alleging fraud, misrepresentation, breach
of contract, negligence and breach of fiduciary
relationship, in connection with a Loan and
Subordination Agreement entered into among the
parties. The Sterlings allege that in connection with
this transaction, they invested Thirty Thousand Dollars
($30,000.00) and suffered loss caused by Beneficial.
They now seek compensatory and punitive damages in
this Court.

On September 18, 1992, Beneficial moved for
summary judgment on the ground that the Sterlings had

allegedly failed to respond in a timely fashion to
Beneficial's Request for Admissions. After further
discovery, Beneficial has renewed its motion for
summary judgment. This is the Court's ruling on the
motion.

I. FACTS

The Sterlings are four Delaware residents who lent
$30,000 to Madison & Co. of New York, Inc.
("Madison") via promissory notes in May 1991. FN1
The promissory notes were issued in two increments of
$10,000 and two increments of $5,000. Each was a
90-day note, bearing 20% interest (80% annualized
return). Madison had been experiencing a capital
shortage and was in need of a loan. In order to
facilitate the loan, Beneficial, one of Madison's regular
secured creditors, agreed to subordinate its security
interest in certain inventory and accounts receivable of
Madison's to that of the new lenders, the Sterlings.
The accounts receivable were those of one of
Madison's steady customers, A.R.A. Services
("A.R.A.").

> FN1. The Sterlings contend the loan was in
> the amount of $30,000, while Beneficial states
> at one point the loan was for $25,000. On a
> motion for summary judgment, the facts must
> be viewed in the light most favorable to the
> nonmoving party. *Hammond v. Colt. Ind.*
> *Operating Corp.,* Del.Super., 565 A.2d 558,
> 560 (1989). Because of this, the Court will
> use $30,000 as the proper figure for purposes
> of this motion.

Paragraph 5 of the Loan and Subordination Agreement
(the "Agreement") between Madison, Beneficial, and
the Sterlings is the focal point of this suit. This
paragraph delineates the terms under which the loan is
to be repaid. Because the alleged obligations flowing
from the paragraph are in dispute, the entire paragraph
is reprinted here:

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                              Page 2
Not Reported in A.2d, 1994 WL 315365
(Cite as: Not Reported in A.2d)

*Payment Procedures*

Madison covenants and agrees with Beneficial and
the Lender [the Sterlings] that the invoices and
statements rendered by Madison relating to the
Accounts Receivable shall direct payment to a lock
box in the name of Madison but under the sole
supervision and control, subject to the terms of this
Agreement, of Beneficial. Beneficial covenants and
agrees with the Lender and Madison that collections
which constitute Subordinated Collateral hereunder
("Collections") received by Beneficial under the
foregoing system shall be segregated for accounting
purposes (while retaining their character as
Collections, nevertheless) as follows: Lender shall
receive funds sufficient to repay the loan in full with
the applicable interest thereon; of the balance, 45%
shall be for the benefit of Beneficial, and 55% for
the benefit of and use by Madison.    From the
accounts so established and maintained, Beneficial
shall make remittances at intervals to be determined
by agreement of the parties hereto or, in the absence
of such agreement, at weekly intervals. Amounts
remitted to Beneficial for its benefit shall be applied
by Beneficial to reduce obligations of Madison to
Beneficial under existing loans. Amounts remitted
to the Lender shall be applied by the Lender to
satisfy principal and interest obligations of Madison
to the Lender under the Loan.

*2 The loan, Agreement, and payment arrangement can
be illustrated by the following diagram:

```
            $30
            k
            pr/n invopayme
            ote  ices nts
Sterlin----- Ma ------- A.R.A -------->              Lock
gs     >    diso>    .                               Box
            n
  :       : (con
            troll
            ed
            by
```

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1994 WL 315365
(Cite as: Not Reported in A.2d)

:　　:　Ben
　　　　efici
　　　　al)
:　　:　*Sec* :　　:
　　　　*ond*
　　　　*Pay*
　　　　*men*
　　　　*t*
　　　　*Obli*
　　　　*gati*
　　　　*on*
:　　_　:
:　　　　:
　　　　Afte
　　　　r
　　　　pr/n
　　　　ote
　　　　is
　　　　repa
　　　　id,
　　　　55
　　　　%
　　　　of
　　　　proc
　　　　eeds
:　　are:
　　　　then
　　　　paid
　　　　to
　　　　Ma
　　　　diso
　　　　n,
　　　　45
　　　　%
　　　　to
　　　　be

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1994 WL 315365
(Cite as: Not Reported in A.2d)

| : | : | |
|---|---|---|
| | retained by Beneficial as payment | |
| : | for: | existing loans |
| : | : | |
| : | : | *First Payment Obligation* |
| | Repayment of pr/note and interest until paid in full | |

The current dispute arose when the Sterlings failed to receive all the payments due under the contract. The Sterlings allege certain payments were never sent to the lock box, but rather, were diverted directly to Madison and have since been used by Madison improperly. Beneficial disputes that any payments went directly to Madison. But this dispute is irrelevant for the purposes of this motion. What is relevant and undisputed is that not all required payments were made by A.R.A. directly to the lock box. This is the subject of the current lawsuit.

## II. CONTENTIONS OF THE PARTIES

The Sterlings contend Beneficial owed a duty to the Sterlings to ensure that all payments were made by A.R.A. to the lock box for subsequent distribution by Beneficial. Beneficial contends it owed no such duty to the Sterlings, and that its only obligations were to maintain control and supervision of the lock box and to distribute payments received there in accordance with the formula mandated by Paragraph 5 above. Although a vague allegation is made in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                          Page 5
Not Reported in A.2d, 1994 WL 315365
(Cite as: Not Reported in A.2d)

the Complaint, the Sterlings have not put forth any evidence to substantiate the contention that any payments which were deposited into the lock box were misappropriated or mishandled by Beneficial. Thus, there is no genuine issue of material fact that Beneficial did not breach its duty to properly distribute the payments which were received at the lock box. The focal point of this suit is Sterlings' claim that Beneficial is liable for *A.R.A.'s failure to make all required payments to the lock box.*

## III. THE LEGAL STANDARD FOR SUMMARY JUDGMENT

A motion for summary judgment requires the Court to examine the record to determine whether there are any genuine issues of material fact or whether the evidence is so one-sided that one party should prevail as a matter of law. *Burkhart v. Davies,* Del.Supr., 602 A.2d 56, 59 (1991), *cert. denied,* 112 S.Ct. 1946 (1992). The court will consider the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits in making its determination. Super.Ct.Civ.R. 56(c). If, after viewing the record in the light most favorable to the nonmoving party, the Court finds no genuine issue of material fact, summary judgment is appropriate. *Hammond v. Colt Ind. Operating Corp.,* Del.Super., 565 A.2d 558, 560 (1989). However, summary judgment may not be granted when the record indicates a material fact is in dispute or if it seems desirable to inquire more thoroughly into the facts in order to clarify the application of law to the circumstances. *Wilson v. Triangle Oil Co.,* Del.Super., 566 A.2d 1016, 1018 (1989).

*3 The moving party initially bears the burden of showing a genuine issue of material fact does not exist. *Moore v. Sizemore,* Del.Supr., 405 A.2d 679, 680 (1979) (*"Moore"*). If a properly supported motion for summary judgment shows no genuine issue of material fact, the burden shifts to the nonmoving party to prove material issues of fact exist. *Id.* at 681. To carry its burden, the nonmovant must produce specific facts which would sustain a verdict in its favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248-49 (1986). FN2 The nonmovant cannot create a genuine issue for trial through bare assertions or conclusory allegations. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324

(1986); *Martin v. Nealis Motors,* Del.Supr., 247 A.2d 831, 833 (1968).

> FN2. Because the Federal Rules of Civil Procedure and the Delaware Superior Court Civil Rules are similar, construction of the Federal Rules is persuasive concerning the construction of Superior Court Rules. *Hoffman v. Cohen,* Del.Supr., 538 A.2d 1096, 1097-98 (1988).

## IV. ANALYSIS

The Sterlings have pled the following causes of action against Beneficial: fraud, misrepresentation, negligence, breach of fiduciary relationship, and breach of contract. In its renewed motion for summary judgment, Beneficial contends there are insufficient facts to support a claim under any of these theories. Each theory, along with its relevant facts, is analyzed below:

### A. Fraud/Misrepresentation

Beneficial contends the Sterlings have not established a prima facie case for fraud or misrepresentation. The elements required for a claim of fraud are: (1) a false representation, usually of fact, (2) made either with knowledge or belief, or with reckless indifference to its falsity, (3) with an intent to induce the plaintiff to act or refrain from acting, (4) plaintiff's action or inaction in reasonable reliance thereof, and (5) damages caused by such reliance. *Browne v. Robb,* Del.Supr., 583 A.2d 949, 955 (1990), *cert. denied,* 111 S.Ct. 1425 (1991) (*"Browne"*).

Actionable misrepresentation is closely related to a claim for fraud. An action may arise for misrepresentation with only a false impression as to the true state of affairs, with the actor failing to provide qualifying information to cure the mistaken belief. *Norton v. Poplos,* Del.Super., 443 A.2d 1, 5 (1982). Thus, it can be characterized as fraud without the element of deception.

Plaintiff must allege with particularity "the time, place and contents of the false representations ..." *Browne,* 583 A.2d at 955. The complaint in this case makes the general

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1994 WL 315365
(Cite as: Not Reported in A.2d)

Page 6

allegation that Beneficial assured the Sterlings "that repayment was assured due the Defendant Beneficial's control, supervision and monitoring of payment by customer and repayment to [the Sterlings]." Complaint at 2. However, no date or time is ascribed to these broad representations, nor do the Sterlings raise the necessary facts in their response to the motion for summary judgment. For these reasons, the necessary elements for claims of fraud and misrepresentation simply have not been shown. Therefore, the claims fail.

### B. Negligence

Under Delaware tort law, purely economic losses are unrecoverable, notwithstanding the existence of privity of contract. *Danforth v. Acorn Structures, Inc.,* Del.Supr., No. 479, 1991, (June 18, 1992) at 17. Because no personal injury or property damage has been alleged here, the Sterlings' cause of action for negligence rests entirely upon an economic loss theory, and thus, fails as a matter of law. *Id.*

### C. Breach of Fiduciary Relationship

*4 In its renewed motion for summary judgment, Beneficial contends the Sterlings have not amply supported their claim for breach of fiduciary relationship. The Sterlings do not address this issue in their answering brief. Additionally, there is a jurisdiction question which must be addressed first and which neither party has discussed in any pleading or motion.

Delaware maintains separate courts for law and equity, with the Superior Court having general jurisdiction over the former, and the Court of Chancery the latter. Del. Const. art. IV, §§ 7 , 10 ; 10 *Del.C.* §§ 341 , 542. Although, as a general rule, "Chancery takes jurisdiction over 'fiduciary' relationships because equity, not law, is the source of the right asserted," *McMahon v. New Castle Associates,* Del.Ch., 532 A.2d 601, 604 (1987) ( "*McMahon* "), its exclusive jurisdiction is not determined by the labels the parties apply. *McMahon* involved a dispute between a tenant and his landlord. In the context of that case Chancellor Allen stated:

Here the relationships is not "fiduciary" in the traditional sense; it is wholly commercial and recourse for violation of the duties assumed by the parties is, in my opinion. in the law court, not in Chancery.
*Id.* at 605.

Here. the relationships were commercial and the remedy sought by the Sterlings-compensatory and punitive damages-is legal in nature. Reduced to its essence, the Sterlings' claim is one for breach of a commercial contract and it will be addressed as such, *infra.*

### D. Breach of Contract

The crux of this claim is the Sterlings' contention that Paragraph 5 of the Agreement, *see, supra,* at 3-4, combined with the lay person's general "common knowledge" and "common sense" about banking practices, created a duty on the part of Beneficial to ensure that all payments were made by A.R.A. to the lock box. To quote from the Sterlings' brief:

As between Madison and Beneficial, Plaintiffs [the Sterlings] expected Defendant Beneficial to have the greater incentive and responsibility because they stood to get a fair amount of money out of this payment, and it's common knowledge that Banks in general are always very attentive to the details and documents that secure and protect their interests. This belief and expectation on Plaintiffs' part was entirely reasonable.... Common sense also supports Plaintiffs' belief in this regard also; after all, with that much at stake for the Defendant Bank, why would they not take all reasonable action to protect their interest, and thus protect Plaintiffs in the process?

Plaintiffs' Answering Brief to Defendant's [Renewed] Motion for Summary Judgment at 3 ("Answer Brief").

Additionally, the Sterlings argue Beneficial's duty under Paragraph 5 to be ambiguous (subject to two or more reasonable interpretations) as a matter of law. thereby requiring extrinsic evidence to be introduced and a factual determination to be made as to the true scope of Beneficial's duty. In support of this theory, the Sterlings introduce three pieces of evidence: (1) A July 10, 1991 letter from Beneficial's attorney to Madison's attorney, discussing the Agreement (the "Letter"), (2) the minutes of Beneficial's

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                              Page 7
Not Reported in A.2d, 1994 WL 315365
(Cite as: Not Reported in A.2d)

Loan Committee meeting, at which the Agreement was discussed and approved (the "Meeting Minutes"), and (3) the deposition testimony of Beneficial's attorney, Melvyn Monzack ("Monzack") (of Walsh and Monzack, P.A.).

*5 The Sterlings contend certain language in the Letter and Meeting Minutes which states that Monzack would "remain actively involved in the structuring and monitoring of the proposed arrangement" indicates that Monzack's (and thus, Beneficial's) duty under the Agreement was to ensure that A.R.A. made all necessary payments to the lock box. Monzack stated in his deposition that he never understood his role to include such a duty. Thus, the Sterlings argue this uncertainty about the extent of Monzack's (and by extension, Beneficial's) duty is proof positive that the language of Paragraph 5 is ambiguous.

The Sterlings believe the key question to ask in this claim is "What did the parties *intend* Paragraph 5 to mean?" *See* Answer Brief at 5. Thus, because summary judgment is "inappropriate" where the ultimate fact is one of "intention," *Murphy v. Godwin,* Del.Super., 303 A.2d 668, 672 (1973), the Sterlings believe summary judgment should be denied here.

While it is true that summary judgment is improper where the ultimate question is one of subjective intent, the Sterlings rely only upon extrinsic evidence in support of their argument. However, the agreement must *first* be shown to be ambiguous before extrinsic evidence may be introduced for the purposes of shedding light upon the meaning of an agreement. *Citadel Holding Corp. v. Roven,* Del.Supr., 603 A.2d 818, 822 (1992) (holding that if a writing is plain and clear on its face, the writing itself is the sole source for gaining an understanding of intent). Instead, the Sterlings have attempted to "bootstrap" their argument by: (1) using extrinsic evidence to create the ambiguity, and (2) then avoiding summary judgment by arguing the ambiguity goes to the issue of intent. This is impermissible. If the agreement is clear on its face, no extrinsic evidence may be considered. *Id.*

Moreover, even if the Letter and Meeting Minutes are considered, they do not support the Sterlings' contention that Beneficial assumed a broad duty of ensuring A.R.A.'s payment. All they indicate is that Monzack (Beneficial's

attorney) will "remain actively involved in the structuring and monitoring of the agreement." At most, assuming a valid agency relationship between Beneficial and Monzack, this statement is merely a reaffirmation of Beneficial's duty announced in Paragraph 5 of the Agreement-to continually receive payments at the lock box and distribute the funds according to the schedule provided in the Agreement. The language of the Letter and Meeting Minutes hint at nothing about Monzack (Beneficial) having a duty to ensure A.R.A. makes its payments on time.

The language on the face of the Agreement FN3 is clear-Beneficial has a duty to disburse monies received at the lock box, according to the formula prescribed in the Agreement. Contrary to the Sterlings' contentions, nothing in the Agreement imposes upon Beneficial a duty to *insure payment by A.R.A. to the lock box.* Any subjective beliefs or expectations the Sterlings may have harbored regarding Beneficial's duty goes only to the issue of unilateral mistake, which is a legal theory applicable in only very limited circumstances. *See Matter of Enstar Corp.,* Del.Supr., 604 A.2d 404, 411 (1990) (delineating the following requirements for recision of a contract on the ground of unilateral mistake: (1) an unconscionable agreement, (2) a mistake relating to the substance of consideration, (3) occurrence of the mistake regardless of the exercise of ordinary care, and (4) the possibility of restoring the aggrieved party to the status quo). However, unilateral mistake is not alleged here.

> FN3. The Agreement contains an integration clause at Paragraph 15, which states that the "Agreement contains the entire understanding of the parties hereto with respect to the subject matter of the Agreement ... and can be amended, modified or canceled only by a written instrument executed by all parties hereto." This further supports a refusal to consider extrinsic evidence for the purpose of determining the parties' obligations.

*6 Therefore, because the Agreement is not ambiguous on its face, no extrinsic evidence may be considered. And, because no evidence indicates Beneficial improperly handled whatever monies which were in fact deposited in the lock box, there is no material issue of fact concerning

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 8
Not Reported in A.2d, 1994 WL 315365
(Cite as: Not Reported in A.2d)

whether Beneficial breached its only duty under terms of the
Agreement.      Thus, the cause of action for breach of
contract fails.

### V. CONCLUSION

Based upon the evidence submitted, the Court finds no
genuine issue of material fact regarding any of the causes of
action alleged by the Sterlings against Beneficial. There
have been no particularized facts shown which would
indicate a *prima facie* case for the claims of fraud or
misrepresentation.    The claim for negligence is legally
insufficient because only economic damages are claimed.

The final claim-breach of contract-depends entirely upon a
finding by the Court that Beneficial's duty owed to the
Sterlings included a duty of insuring payment by A.R.A. to
the lock box-a finding which the Court cannot reasonably
make. The only duty specified in the Agreement is that of
Beneficial's proper handling and disbursing of funds which
were deposited in the lock box. The Sterlings have not put
forth facts which could reasonably substantiate a breach of
the duty specified.

For the foregoing reasons, the Court finds the existence of
no genuine issues of material fact with respect to any of the
claims presented in this action. Consequently, Beneficial's
Renewed Motion for Summary Judgment is GRANTED.

IT IS SO ORDERED.

Del.Super.,1994.
Sterling v. Beneficial Nat. Bank, N.A.
Not Reported in A.2d, 1994 WL 315365

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 3

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 1970 WL 458
(Cite as: Not Reported in A.2d)

**C**
Not Reported in A.2d, 1970 WL 458
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT RULES
BEFORE CITING.
Court of Chancery of Delaware.
WESTERN ELECTRIC COMPANY
v.
COMPONENTS, INC.
Dec. 7, 1970.

Edmund D. Lyons.
E. Norman Veasey.

WILLIAM MARVEL, Vice-Chancellor.
*1 Plaintiff seeks an accounting for royalties allegedly
due it from defendant under the terms of a patent
licensing agreement entered into on June 27, 1960,
which, as later amended, provided that defendant
would pay plaintiff stipulated royalties for the use of
the latter's patents for several purposes, including the
manufacture of solid electrolytic capacitors.

The action at bar was stayed in limine pending
determination of an application of the plaintiff
Components, Inc. to the United States District Court
for the District of New Jersey for a ruling on the
former's alleged rights under the terms of a 1956
consent decree FN1 entered under the terms of the
Sherman Act, 15 U.S.C. §§ 1 -3, which decree
purported to bind Western Electric to prescribed
general conduct in respect to its general license
agreements. The decision handed down by the trial
court was adverse to Components which ruling was
affirmed by the Court of Appeals, the opinion of which
is reported in 409 F.2d 1377. Thereupon, the stay of
proceedings in this Court was lifted.

Filed with Components' motion to dismiss was its
answer which included a counterclaim consisting of six
counts as well as six affirmative defenses. Plaintiff
has moved to dismiss counts one, two, four, five and

six of the counterclaim as well as to strike defendant's
fifth and sixth affirmative defenses. Such motions as
well as defendant's renewed motion to dismiss the
complaint for lack of jurisdiction of the subject matter
of this action have been briefed and argued and this is
the Court's opinion on such motions.

Count one of defendant's counterclaim alleges that
plaintiff has misused the patents referred to in the
parties' contract in violation of the antitrust laws of the
United States and seeks treble damages under the terms
of the Sherman Act for such alleged misuse, 15 U.S.C.
§§ 1 -3. Count two of such counterclaim charges that
the license agreement in issue is in itself an integral
part of a violation of the Sherman Act and is therefore
unenforceable.

In moving to dismiss such counts of the counterclaim,
plaintiff argues that such pleadings do not state claims
upon which relief can be granted in that this Court is
without jurisdiction of a claim which seeks
enforcement of the Sherman Act, a counterclaim for
treble damages being a separate cause of action or case
arising under the Sherman Act which is not
maintainable in a state court.

Defendant's reply to such argument is to the effect that
plaintiff having been charged with misuse of its patents
in violation of the antitrust laws in a suit which not
only questions the validity of such patents but also the
enforceability of the license agreement of the parties,
that the claim of misuse of the patents in question is
accordingly a collateral question which this Court
should decide.

I am satisfied, however, that a counterclaim for treble
damages sought under the antitrust laws, when brought,
as is the case here, as a separate case or cause, is not
sustainable, particularly in view of the limited scope of
the relief sought by plaintiff, Joseph Bancroft & Sons
Co. v. M. Lowenstein & Sons, Inc. (D.C.Del.) 303
F.Supp. 310, and it is firmly established that in matters
directly concerned with the antitrust laws of the United
States, the federal courts have exclusive jurisdiction.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1970 WL 458
(Cite as: Not Reported in A.2d)

Page 2

See 15 U.S.C. § 15 , 28 U.S.C. § 1337 , and Williamson v. Columbia Gas and Electric Corp. (D.C. Del.) 27 F.Supp. 198 aff'd (CA 3) 110 F.2d 15, cert. den. 310 U.S. 639. FN2

*2 In other words, I am of the opinion that the antitrust claims set forth in counts one and two of defendant's counterclaim do not in fact so arise out of the same subject matter as the matter complained of as to constitute a collateral question. Furthermore, a charge of antitrust violation by its very nature is concerned with a continuing course of conduct which is not in any way akin to the relief sought in the complaint which is concerned solely with rights under an uncomplicated patent license agreement.

Finally, even though an antitrust violation on the part of plaintiff might be established in a proper case, I am satisfied that the claims here made in counts one and two are triable only in the federal courts because the allegations therein made are not so intertwined with the matters complained of by plaintiff as to bring such charges made by counterclaim within a state court's jurisdiction.    Counts one and two of defendant's counterclaim will be dismissed.

Count four of the counterclaim seeks an order for the assessment of reasonable royalties by the Court for past use by defendant of the patents covered by the patent license agreement. Plaintiffs contend that this Court is without jurisdiction to decide such a claim. However, defendant, as noted above, sought and failed to have this issue decided in the federal courts on the basis of a consent decree entered by that Court against the plaintiff in 1956 (see footnote # 1), and no sound reason is advanced why the relief sought should not be considered in this Court. I am of the opinion that the issue of reasonable past royalties is a question which should be decided in this Court in order to avoid a multiplicity of suits, Virden v. Board of Pilot Commissioners, 8 Del. Ch. 1, 67 A. 975, which should be decided in this Court. FN3 Plaintiff's motion to dismiss count four of the counterclaim is denied.

Count five of defendant's counterclaim seeks a declaratory judgment to the effect that plaintiff's

patents are invalid and that there has been no infringement. However, the issue of infringement not having been affirmatively raised. I am satisfied that a counterclaim for a declaratory judgment as to the invalidity of a patent is clearly a pleading involving patents and is not a matter incident or a corollary to the present suit.    Count five of the counterclaim will be dismissed as I am satisfied that had this case been instituted by Components, this Court would clearly lack jurisdiction to grant the relief now sought by way of counterclaim.   See 28 U.S.C. § 1338.

Count six of the defendant's counterclaim asks the Court to declare that plaintiff's patents have been misused in various ways including violations of the Sherman Act, the prayer for relief being for a declaratory judgment of patent misuse.    For the reasons heretofore given in dismissing counts one, two, and five plaintiff's motion to dismiss count six of the counterclaim will be granted.

Defendant's fifth and sixth affirmative defense of Components, Inc. to the effect that the various patents which are the subject of the parties' contract are unenforceable on behalf of plaintiff in that they have been misused in violation of the antitrust laws, and that plaintiff's very action is part and parcel of a scheme to violate the Sherman Act are largely a repetition of what was earlier alleged by way of counterclaim.    I am satisfied however, that alleged violations of the antitrust laws are not appropriate here as affirmative defenses, there being no violation of the Sherman Act demonstrable on the face of the contract sued upon, Bruce's Juices, Inc. v. American Can Co., 330 U.S. 743, and Kelly v. Kosuga, 358 U.S. 516. FN4 If, on the other hand, defendant were able to demonstrate that the patents here in issue have been misused in ways other than through violation of the antitrust laws, it would, of course, have a remedy.    For the reasons stated defendant's fifth and sixth affirmative defense will be ordered stricken.

*3 Finally, it is noted by defendant that the Supreme Court in handing down its ruling which affirmed denial of defendant's motion to dismiss the complaint, stated in reference to the counterclaims and affirmative

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1970 WL 458
(Cite as: Not Reported in A.2d)

defenses of Components, Inc.:

> "We therefore do not reach the merits of any of the defenses advanced by Components in its answer and counterclaims, even though Components has argued them before us. This is not to say that Components will not have its day in court upon these matters, because upon remand the case will then be tried on the merits." Components, Inc. v. Western Electric Company, Inc. Del.Supr., 267 A.2d 579, 582 (1970).

It is accordingly argued by the defendant that the Supreme Court intended, in so stating, that these defenses and counterclaims must go to trial in this Court. However, in my opinion, the Court's comment was merely to the effect that Components would, of course, be given an opportunity to argue such claims and defenses in this Court and such an opportunity has been afforded.

Also before the Court at this time, is defendant's renewed motion to dismiss the complaint on the ground that this Court lacks jurisdiction over an action for a simple accounting, it being contended that this action is no more than one to recover moneys due the plaintiffs, and that the accounting sought by the plaintiffs is not complicated.

What, in effect, the defendant is arguing is that if this Court decides that there has been a breach of contract then all that remains to be done is to add up the royalties due from it and enter a money judgment, a type of remedy which would clearly be within the jurisdiction of the Superior Court. In other words, it is contended that what is really a mere complaint for damages does not become a complaint for an accounting merely because it is so characterized, Dairy Queen v. Wood, 369 U.S. 469.

In point of fact, the case at bar has to do with a complex effort to recover royalties due under a patent license agreement, and should it be here decided that the defendant is required to pay such royalties, the Court will be required to consider the many provisions of the license agreement here in issue. Royalties due plaintiffs will have to be computed for a period up to ten years at rates which have to be applied to the "net

selling price," and such price will have to be computed by taking the gross selling price and deducting from it, trade discounts, packing costs, shipping costs, taxes and duties, insurance costs, etc., under the specific terms of the contract. In addition to this, interest must be computed on late payments. Accordingly, plaintiff's action would clearly appear to be a complicated accounting over which equity traditionally has had jurisdiction, Pan American Trade and Investment Corporation v. Commercial Metals Co., 33 Del. Ch. 425, 94 A.2d 700, and 4 Pomeroy's Equity Jurisprudence, § 1421 (4th Ed.). Finally, assuming that a law court is capable of granting adequate damages in this case, it would not be appropriate for this Court, at this juncture, to relinquish its concurrent jurisdiction.

> *4 "The jurisdiction of the courts of law and equity, with respect to complicated accounts, is so far concurrent, that when parties have elected to proceed at law, a court of equity would not stay such proceedings simply on the ground that it could more conveniently dispose of the suit; nor would a court of equity refuse its aid when invoked, because a court of law would completely settle the whole of the disputed account."

Scott v. Liverpool Corporation, 5 Jur., N.S., 105, 28 L.J. Ch., 230, see also Glanding v. Industrial Trust Co. 29 Del. Ch. 125, 45 A.2d 553 (Del.Supr.1945). Electropure Sales Corporation v. Foremost Dairies, 27 Del. Ch. 118, 31 A.2d 792, and McDaniel v. Franklin Railway Supply Co., 20 Del. Ch. 327, 174 A. 375.

Defendant's motion to dismiss the complaint for lack of jurisdiction is denied.

Order on notice.

> FN1. United States of America v. Western Electric Co., Inc. and American Telephone and Telegraph Co., Civil Action 17-19 (D.C.N.J.).

> FN2. "The interpretation of a federal statute is federal business."

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1970 WL 458
(Cite as: Not Reported in A.2d)

FN3. It is decided later in this opinion that this Court has jurisdiction over plaintiff's claim for an accounting.

FN4. "As a defense to an action based on contract the plea of illegality based on violation of the Sherman Act has not met with much favor in this court.   This has been notably the case where the plea has been made by a purchaser in an action to recover from him the agreed price of goods sold."

Del.Ch.,1970.
Western Elec. Co. v. Components, Inc.
Not Reported in A.2d, 1970 WL 458

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 4

Westlaw.

Not Reported in F.Supp.2d
2001 WL 641737 (D.Del.)
(Cite as: 2001 WL 641737 (D.Del.))

C
Only the Westlaw citation is currently available.

United States District Court, D. Delaware.
Michael S. PINKERT and Eleanor A. Pinkert,
Plaintiffs,
v.
John J. OLIVIERI, P.A., Brosnahan Builders, Inc.,
Kevin Brosnahan and Linda
Brosnahan, Defendants and Third-Party Plaintiffs,
v.
REEF INDUSTRIES, INC., Facilities Restoration
Supply, Inc. and Preservation &
Protection Systems, Inc., Third-Party Defendants,
v.
Ocean DESIGNS, Ocean Designs LLC and Paul
Rouchard D/B/A Ocean Designs, Inc.;
C. Joseph Couchman Tile Inc.; Doug Griffith
Drywall: W.M. Plumbing & Heating,
Inc. A/K/A and/or D/B/A Wm Plumbing & Heating,
Inc.: and Advance Fiberglass
Technologies, LLC., Additional Third-Party
Defendants.
No. CIV. A. 99-380-SLR.

May 24, 2001.
Daniel B. Rath, Esquire of Klett, Rooney, Lieber &
Schorling, P.C. , Wilmington, Delaware. Counsel for
Plaintiffs. Of Counsel: Michael A. Gatje, Esquire of
Wickwire Gavin, P.C., Vienna, Virginia.

Adam Balick, Esquire of Balick & Balick,
Wilmington, Delaware. Counsel for Defendant and
Third-Party Plaintiff John J. Olivieri, P.A.

Neal C. Belgam, Esquire of Blank, Rome, Comisky &
McCauley, Wilmington, Delaware. Benjamin C.
Wetzel, III, Esquire and Natalie M. Ippolito, Esquire of
Bailey & Wetzel, P.A., Wilmington, Delaware.
Counsel for Defendants and Third-Party Plaintiffs
Brosnahan Builders, Inc., Kevin Brosnahan and Linda
Brosnahan.

Loreto P. Rufo, Esquire of The Bayard Firm,
Wilmington, Delaware. Counsel for Third-Party
Defendants Reef Industries, Inc., Facilities Restoration
Supply, Inc. and Preservation & Protection Systems,
Inc.

Richard W. Pell, Esquire and Jennifer L. Gioia,
Esquire of Tybout, Redfearn & Pell, Wilmington,
Delaware. Counsel for Additional Third-Party
Defendants Ocean Designs, Ocean Designs LLC and
Paul Rouchard D/B/A Ocean Designs, Inc.

MEMORANDUM OPINION

ROBINSON, Chief J.

I. INTRODUCTION

*1 Plaintiffs Michael and Eleanor Pinkert filed this
action on June 16, 1999 claiming damages arising out
of the construction of their home in Bethany Beach,
Delaware. Plaintiffs' complaint alleges breach of
contract and various counts of fraud against defendants
Brosnahan Builders, Inc., Kevin Brosnahan and Linda
Brosnahan ("the Brosnahan defendants"), as well as
breach of contract, professional negligence and
negligent misrepresentation against defendant John J.
Olivieri, P.A. ("Olivieri"). (D.I.1) On July 23, 1999,
Olivieri filed a third-party complaint for
indemnification and contribution against Reef
Industries, Inc. ("Reef Industries") and Facilities
Restoration Supply, Inc. ("Facilities Restoration"),
which the court dismissed on September 29, 2000.
(D.I.115) On August 21, 2000, the court granted the
Brosnahan defendants leave to file a third-party
complaint against Ocean Designs, Ocean Designs LLC
and Paul Rouchard ("Ocean Designs"), W.M.
Plumbing & Heating, Inc., and Advance Fiberglass
Technologies, LLC, alleging breach of contract and
negligence, and seeking indemnity and contribution.
(D.I.101) On October 10, 2000, Ocean Designs filed a
third-party complaint against Taco Metal, Inc. ("Taco
Metal") for indemnification and contribution. (D.I.123)
On November 20, 2000, the Brosnahan defendants

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2001 WL 641737 (D.Del.)
(Cite as: 2001 WL 641737 (D.Del.))

Page 2

filed a third-party complaint against Reef Industries, Facilities Restoration, and Preservation & Protection Systems, Inc. ("Preservation Systems"), alleging claims of negligence, breach of the implied warranty of fitness, and indemnification and contribution. (D.I.157) The court has jurisdiction pursuant to 28 U.S.C. § 1332.

Currently before the court are the Brosnahan defendants' motion for summary judgment on all claims against them (D.I.124), the Brosnahan defendants' motion for partial summary judgment that plaintiffs are not entitled to recover attorney's fees (D.I.221), the Brosnahan defendants' motion for protective order respecting pre-judgment discovery in aid of execution (D.I.218), Reef Industries' motion for summary judgment on all claims against it (D.I.225), Preservation Systems' motion for summary judgment on all claims against it (D.I.228), Facilities Restoration's motion for summary judgment on all claims against it (D.I.230), and Ocean Designs' motion for summary judgment on all claims against it. (D.I.233) For the following reasons, the court shall grant in part and deny in part the Brosnahan defendants' motion for summary judgment on claims against them; grant the Brosnahan defendants' motions for summary judgment that plaintiffs are not entitled to attorney's fees under paragraph 16(b) of the Construction Contract and for a protective order limiting discovery; grant in part and deny in part Reef Industries' motion for summary judgment on claims against it; grant Facilities Restoration's and Preservation Systems' motions for summary judgment on claims against them; and deny Ocean Designs' motion for summary judgment on claims against it.

II. BACKGROUND

A. Relevant Parties

*2 Plaintiffs are husband and wife who reside in McLean, Virginia. Defendant Brosnahan Builders, Inc. ("Brosnahan Builders") is a corporation organized under the laws of Delaware, with its principal place of business in Frankford, Delaware. Brosnahan Builders is primarily engaged in the business of constructing single family homes. Defendant Kevin Brosnahan is the president of Brosnahan Builders, and his wife, defendant Linda Brosnahan, is an employee of Brosnahan Builders. Kevin and Linda Brosnahan are Delaware residents and are sued in their individual capacities. Olivieri is a professional association organized under the laws of New Jersey, with its principal place of business in New Jersey. Olivieri is primarily engaged in the business of providing architectural services. (D.I.1) Reef Industries is a Texas corporation that manufactures vapor barriers used as siding in buildings. Facilities Restoration and Preservation Systems, Pennsylvania corporations, are distributors of Reef Industries' products. (D.I.157) Ocean Designs, a Maryland limited liability company, is a supplier and installer of aluminum railings. (D.I.240, Ex. A) Taco Metal is a Florida corporation that manufactures aluminum used in railings. (D.I.123)

B. Facts

In 1995, plaintiffs purchased a beachfront property (the "Property") in Bethany Beach, Delaware to construct a three-story home (the "Residence"). On October 30, 1995, plaintiffs entered into an "Architecture Contract" with Olivieri that required Olivieri to create designs and plans, review shop drawings, provide specifications to the contractor and subcontractors, and meet with contractors on-site. (D.I.126, Ex. A)

On September 30, 1997, plaintiffs and Brosnahan Builders entered into a "Construction Contract" for the construction of the Residence for a price of approximately $1.5 million. (D.I.126, Ex. B) The Construction Contract provides, in pertinent part:
   3. *Plans and Specifications.* (a) The Home shall be constructed and completed substantially in accordance with those certain plans and specifications more particularly identified by Exhibit "A" attached hereto and incorporated herein by reference ... [FN1]

> FN1. The parties have not submitted "Exhibit 'A' " to the court, but the Brosnahan defendants allege that Olivieri's "Project

Not Reported in F.Supp.2d
2001 WL 641737 (D.Del.)
(Cite as: 2001 WL 641737 (D.Del.))

Page 3

Manual" is incorporated into the referenced "Plans and Specifications." (D.I.154, Ex. 2) The Project Manual in turn incorporates the "General Conditions of the Contract for Construction" published by the American Institute of Architects ("AIA"), which describes the AIA standard forms for progress payments (the G703 Continuation Sheet and G702 Application for Certification and Payment). (D.I.154, Ex. 3)

10. Changes in Plans and Specifications....
(b) Owner may, at any time and from time to time prior to the Completion Date without invalidating this Agreement, require changes to the Work. Such changes may consist of additions, deletions, or modifications to the Plans and Specifications, with the Contract Sum and completion Date being adjusted accordingly. Such changes in the Work shall be authorized by written Change Order signed by Owner, Contractor and Architect, or by written Construction Change Directive signed by Owner and Architect. The Contract Sum and the Completion Date shall be changed only by Change Order....
(c) Contractor shall be under no obligation to implement any change nor shall Owner [be] under any obligation to pay for the same unless and until the same is documented by such a change order. Likewise, no change in the Work shall be authorized absent a change order for same signed by Owner and no change order shall be [in] effect unless the same is signed by Owner.
*3 ...
12. Payment. (a)(i) Payments to the Contractor shall be paid in accordance with Exhibit B. [FN2]

> FN2. "Exhibit B" is the AIA standard G703 Continuation Sheet ("Continuation Sheet"), a list of the work that Brosnahan Builders was contracted to perform with a scheduled price for each item. Each Continuation Sheet references the AIA standard G702 Application and Certification for Payment ("Application and Certification for Payment"). (D.I.154, Ex. 4)

(ii) Progress invoices shall be accompanied by such documentation as Owner and/or Architect may reasonably require to verify the propriety of such request for payment. Following review of each such invoice (and its supporting documentation) by Owner, Architect and Owner's lender, and acceptance of the same, Owner shall, in exchange for appropriate mechanics' lien releases, satisfy such invoice.
...
16. Indemnification. (a) Owner agrees to defend, indemnify and hold Contractor harmless from and against any and all loss, cost, expense, liability, actions, and claims for injury suffered by Owner or others, including reasonable attorneys fees, or for harm caused to the Lot or the Home, due solely to inspections of the Home by Owner or Owner's invitees prior to Settlement.
(b) Contractor agrees to defend, indemnify and hold Owner harmless from and against any and all loss, cost, expense, liability, actions, and claims whatsoever (including, without limitation, reasonable attorneys fees and court costs) incurred by Owner incident to any malfeasance or nonfeasance by Contractor with respect to Contractor's responsibilities under the terms of this Agreement.
...
19. Governing Law. This Agreement shall be governed, construed and enforced in accordance with Delaware law.
(D.I.126, Ex. B)

Brosnahan Builders began construction of the Residence in September 1997 and completed the project in April 1999. (D.I.1) Brosnahan Builders subcontracted with Ocean Designs to deliver and install the exterior aluminum railings on the Residence, and with Reef Industries to deliver the vapor barrier used in the exterior siding. [FN3] On fifteen occasions during construction, Brosnahan Builders submitted to Olivieri an AIA standard Application and Certification for Payment. [FN4] Each was signed by Linda Brosnahan and provided:

> FN3. Olivieri's Plans and Specifications required the "VAPORguard wrap," which

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Brosnahan Builders ordered from Reef Industries. Reef Industries instead delivered the "T-65G wrap," which Brosnahan Builders installed onto the Residence. Reef Industries fully admits the delivery error, but claims that because of their similarity, there was no damage caused to the Residence by the T-65G wrap that would not have been caused by the VAPORguard wrap. (D.I.226)

FN4. A Continuation Sheet with a list of services performed was appended to each Application and Certification for Payment. (D.I.144, Ex. 4)

The undersigned Contractor certifies that to the best of the Contractor's knowledge, information and belief the Work covered by this Application for Payment has been completed in accordance with the Contract Documents, that all amounts have been paid by the Contractor for Work for which previous Certificates for Payment were issued and payments received from the Owner, and that current payment shown herein is now due.
(D.I.144, Ex. 4) Olivieri made several visits to the construction site and approved each Application and Certification for Payment, which also provided:
In accordance with the Contract Documents, based on on-site observations and the data comprising the application, the Architect certifies to the Owner that to the best of the Architect's knowledge, information and belief the Work has progressed as indicated, the quality of the Work is in accordance with the Contract Documents, and the Contractor is entitled to payment of the AMOUNT CERTIFIED.
(D.I.144, Ex. 4) (emphasis in original)

*4 In November 1998, with construction substantially completed, plaintiffs and their family moved into the Residence. After a rainstorm in January, plaintiffs noticed water leaks around windows, doors and ceiling fixtures. Plaintiffs retained an independent moisture consultant, who concluded that the wrong building wrap had been installed, there was no aluminum flashing around doors and windows, and there were no roof vents as provided by the Plans and Specifications.

(D.I.1) Plaintiffs have since discovered other deficiencies, including corrosion of exterior railings, cracks in the marble tile floor, flaws in the drywall installation and finishing, leaking showers, defectively installed shower panes, and improperly installed fiberglass roofing. (D.I. 126, Ex. 1; D.I. 240, Ex. A) As of October 2000, plaintiffs have spent over $650,000 in remedial architectural and construction costs. (D.I.144, Ex. 3) Plaintiffs allege that when they confronted Kevin Brosnahan with the construction defects, he responded by asserting that he did not have the "manpower" or the "money" to remedy the problems, and that if pursued, he would "go bankrupt." (D.I.1)

C. Plaintiffs' Complaint

Count I of plaintiffs' complaint alleges breach of contract by Brosnahan Builders for failing to perform work in accordance with general industry standards and the Plans and Specifications provided by Olivieri. Count V alleges that Brosnahan Builders committed fraud by requesting payment for work that plaintiffs claim was not properly performed.

Count VI asserts that Kevin Brosnahan committed fraud in his individual capacity by requesting payments on behalf of Brosnahan Builders for work that plaintiffs claim was not performed in accordance with the Plans and Specifications and general industry standards. Counts VII and VIII allege that Linda Brosnahan committed fraud and equitable fraud in her individual capacity by signing payment requests on behalf of Brosnahan Builders for the work performed.

Counts IX, X, and XI assert that the Brosnahan defendants violated Delaware's Consumer Fraud Act, 6 Del. C. § 2513, by submitting payment requests on behalf of the Brosnahan Builders for work plaintiffs claim was not performed in accordance with the Plans and Specifications and general industry standards. [FN5]

FN5. The Consumer Fraud Act provides, in pertinent part:
The act, use or employment by any person of any deception, fraud, false pretense, false

Not Reported in F.Supp.2d
2001 WL 641737 (D.Del.)
(Cite as: 2001 WL 641737 (D.Del.))

Page 5

promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale, lease or advertisement of any merchandise, whether or not any person has in fact been misled, deceived or damaged thereby, is an unlawful practice.
6 Del. C. § 2513(a).

Counts II, III and IV allege breach of contract, professional negligence and negligent misrepresentation by Olivieri for failure to adequately inspect and monitor the construction work, and for approving payment requests by the Brosnahan defendants for defective work.

III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n. 10 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." Horowitz v. Fed. Kemper Life Assurance Co., 57 F.3d 300, 302 n. 1 (3d Cir.1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.' " Matsushita, 475 U.S. at 587 (quoting Fed.R.Civ.P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir.1995). The mere existence of some evidence in support of the nonmoving party,

however, will not be sufficient for denial of a motion for summary judgment: there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

IV. DISCUSSION

A. Plaintiffs' Fraud Claims Against the Brosnahan Defendants

*5 As a general rule under Delaware law, where an action is based entirely on a breach of the terms of a contract between the parties, and not on a violation of an independent duty imposed by law, a plaintiff must sue in contract and not in tort. See Garber v. Whittaker, 174 A. 34, 36 (Del.Super.1934). "[A breach of contract claim] cannot be 'bootstrapped' into a fraud claim merely by adding the words 'fraudulently induced' or alleging that the contracting parties never intended to perform." Iotex Communications, Inc. v. Defries, 1998 WL 914265, at *5 (Del. Ch. Dec. 21, 1998). See also Dann v. Chrysler Corp., 174 A.2d 696, 700 (Del. Ch.1961) ("Using the word 'fraud' or its equivalent in any form is just not a substitute for the statement of sufficient facts to make the basis of the charge reasonably apparent.").

Plaintiffs allege that the Brosnahan defendants: (1) contracted to perform construction services; (2) failed to perform the services in the manner called for by the Construction Contract; and (3) submitted payment applications indicating the services had been performed according to the Construction Contract. The gravamen of plaintiffs' common law fraud, equitable fraud, and Consumer Fraud Act claims is that the Brosnahan defendants knowingly misrepresented the nature of their work each time they submitted an Application and Certification for Payment. These alleged misrepresentations were not collateral to the Construction Contract, but rather memorialized as some

Not Reported in F.Supp.2d
2001 WL 641737 (D.Del.)
(Cite as: 2001 WL 641737 (D.Del.))

Page 6

of the Brosnahan defendants' principal obligations under their agreement with plaintiffs. The duty to submit periodic payment applications existed solely by reason of the Construction Contract. Neither Brosnahan Builders, Kevin Brosnahan nor Linda Brosnahan violated any common law duty independent of the Construction Contract between Brosnahan Builders and plaintiffs. *See, e.g., Feinberg v. Saunders Karp & Megrue, L.P.,* No. 97-297-SLR, 1998 WL 863284, at *17 (D.Del. Nov. 13, 1998) (dismissing fraud action under New York law where breached promise was incorporated into written agreement); *Richmond Metro. Auth. v. McDevitt St. Bovis, Inc.,* 507 S.E.2d 344, 348 (Va.1998) (dismissing fraud claims based on contractor's alleged misrepresentations in submissions of applications for payment because no independent duty existed apart from construction contract).

Plaintiffs have also failed to present evidence that they were fraudulently induced into the Construction Contract. Such evidence may, in certain cases, give rise to an action in fraud. *See, e.g., Tam v. Spitzer,* No. 12538, 1995 WL 510043, at *6 (Del. Ch. Aug. 17, 1995). Here, plaintiffs' allegations arise solely from the Brosnahan defendants' performance of their contractual duties and are, therefore, insufficient to support a fraud claim. Thus, the court dismisses all of the fraud claims against the Brosnahan defendants (Counts V through XI) in plaintiffs' complaint. [FN6]

> FN6. The Brosnahan defendants also argue that plaintiffs' fraud claims are barred by the economic loss doctrine. *See Danforth v. Acorn Structures, Inc.,* 608 A.2d 1194, 1195 (Del.1992) ("The economic loss doctrine is a judicially created doctrine that prohibits recovery in tort where a product has damaged only itself (i.e., has not caused personal injury or damage to other property) and, the only losses suffered are economic in nature.") (emphasis in original). The 1996 Delaware Home Owner's Protection Act, however, has banned the application of the economic loss doctrine to certain residential construction cases:
>
> No action based in tort to recover damages

resulting from negligence in the construction or manner of construction of an improvement to residential real property and/or in the designing, planning, supervision and/or observation of any such construction or manner of construction shall be barred solely on the ground that the only losses suffered are economic in nature.

> 6 Del. C. § 3652. Based on the record presented, the court finds that if plaintiffs had alleged fraud claims based on duties apart from the Construction Contract, those claims would not be barred by the economic loss doctrine.

B. Plaintiffs' Breach of Contract Claim Against the Brosnahan Defendants

*6 The Brosnahan defendants also argue that they are not liable for breach of the Construction Contract because they were acting under the direction of Olivieri. *See Ridley Inv. Co. v. Croll,* 192 A.2d 925, 927 (Del.1963) ("[A] contractor is not liable for any damage occasioned by a defect in plans and specifications furnished by the owner if he performs his work without neglect and in a workmanlike manner."). The Brosnahan defendants claim that any deviations from the Plans and Specifications were approved by Olivieri and, therefore, they are not liable for damage that resulted from those changes.

Based on the record presented, the court finds genuine issues of material fact as to whether the deviations from the Plans and Specifications that resulted in damage to plaintiffs' Residence were approved by Olivieri, as well as whether the Brosnahan defendants' work was performed "without neglect and in a workmanlike manner." Thus, summary judgment that the Brosnahan defendants are not liable to plaintiffs because they were acting as agents of Olivieri is denied.

C. Attorney's Fees Pursuant to Paragraph 16(b) of the Construction Contract

Plaintiffs allege that they are entitled to recover their attorney's fees from the Brosnahan defendants pursuant

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2001 WL 641737 (D.Del.)
(Cite as: 2001 WL 641737 (D.Del.))

Page 7

to paragraph 16(b) of the Construction Contract. The Construction Contract is governed by Delaware law, which states that "apart from statute or contract a litigant must pay his [own] counsel fees." *Maurer v. Int'l Re-Insurance Corp.*, 95 A.2d 827, 830 (Del.1953). The Delaware Code, which allows recovery of attorney's fees when a lawsuit is based on a written instrument, states that "counsel fees shall not be entered as part of such judgment unless the note, bond, mortgage, invoice or other instrument of writing sued upon, by the terms thereof, expressly provides for the payment and allowance thereof ..." 10 Del. C. § 3912.

The court must determine, therefore, whether paragraph 16(b) of the Construction Contract expressly provides for the recovery of plaintiffs' attorney's fees. Paragraph 16(b) provides:

> Contractor agrees to defend, indemnify and hold Owner harmless from and against any and all loss, cost, expense, liability, actions, and claims whatsoever (including, without limitation, reasonable attorneys fees and court costs) incurred by Owner incident to any malfeasance or nonfeasance by Contractor with respect to Contractor's responsibilities under the terms of this Agreement.

(Emphasis added) The language "defend, indemnify and hold Owner harmless" clearly renders Paragraph 16(b) an indemnification provision which acts to protect plaintiffs from liability if they are sued by a third party for damage caused by "malfeasance or nonfeasance" by the Brosnahan defendants. Plaintiffs' belief that they are entitled to attorney's fees based on this indemnification provision is irreconcilable with the terms of the provision. The Brosnahan defendants cannot agree to "defend, indemnify and hold [plaintiffs] harmless" from a lawsuit filed against the Brosnahan defendants by plaintiffs themselves. Other Delaware courts have held that similar indemnification provisions are not applicable to claims between contracting parties; they are intended to protect one contracting party against liability from third party claims when the other contracting party is at fault. *See, e.g.*, *DRR, L.L.C. v. Sears, Roebuck and Co.*, 949 F.Supp. 1132, 1142 (D.Del.1996); *Cannon and Son v. Dorr-Oliver*, 394 A.2d 1160, 1165 (Del.1978). Therefore, the Brosnahan defendants' motion that

plaintiffs are not entitled to attorney's fees pursuant to Paragraph 16(b) of the Construction Contract is granted.

D. Pre-Judgment Discovery of the Brosnahan Defendants' Assets

*7 The Brosnahan defendants have requested a protective order preventing pre-judgment discovery of their assets. The Federal Rules of Civil Procedure do not permit pre-trial discovery of a defendant's finances. *See Gangemi v. Moor*, 268 F.Supp. 19, 21-22 (D.Del.1967); *McCurdy v. Wedgewood Capital Mgmt. Co.*, No. 97-4304, 1998 WL 964185, at *10 (E.D.Pa. Nov. 16, 1998) ("Rule 26 will not permit the discovery of facts concerning a defendant's financial status, or ability to satisfy a judgment, since such matters are not relevant, and cannot lead to the discovery of admissible evidence."). Two exceptions to this general rule have been recognized by Delaware courts, namely, if there is a "factual basis rising to the level of a triable issue for punitive damages," or if a plaintiff "can prove by a preponderance of the evidence that a defendant made a negligent misrepresentation of a material fact with the intent that a consumer rely upon it" under the Delaware Consumer Fraud Act. *See State ex rel. Brady, State of Delaware v. Wellington Homes*, No. 99C-09-168-JTV, 2001 WL 238125, at * 1 (Del.Super.Jan. 23, 2001).

The court is dismissing plaintiffs' fraud claims against the Brosnahan defendants, thereby rendering punitive damages unrecoverable from them. *See E.I. DuPont de Nemours and Co. v. Pressman*, 679 A.2d 436, 445 (Del.1996) ( "[P]unitive damages are not recoverable for breach of contract unless the conduct also amounts independently to a tort."). Thus, the court finds no basis to deviate from the general rule prohibiting pre-trial discovery of the Brosnahan defendants' assets. The Brosnahan defendants' request for a protective order is granted.

E. The Brosnahan Defendants' Claims Against Reef Industries

The Brosnahan defendants filed a third-party complaint against Reef Industries, alleging negligence,

Not Reported in F.Supp.2d
2001 WL 641737 (D.Del.)
(Cite as: 2001 WL 641737 (D.Del.))

Page 8

breach of the implied warranty of fitness for a particular purpose, and indemnification and contribution. The Brosnahan defendants do not oppose Reef Industries' motion for summary judgment as to the implied warranty claim, which is therefore dismissed.

Regarding the remaining negligence claim and indemnification and contribution claim, the court concludes that there exist genuine issues of material fact as to Reef Industries' liability. Reef Industries admits that it delivered the T-65G wrap instead of the VAPORguard wrap requested by Brosnahan Builders, and the parties appear to agree that all cited experts acknowledge that either wrap would have caused damage to the Residence. However, the record is unclear as to the difference in extent of damage caused by one type over the other type. Therefore, the court finds there are triable issues of fact on this issue, and declines to grant summary judgment on the remaining claims against Reef Industries.

F. The Brosnahan Defendants' Claims Against Facilities Restoration and Preservation Systems

The Brosnahan defendants do not oppose motions for summary judgment by Facilities Restoration and Preservation Systems on all claims against them. Therefore, the court grants their motions for summary judgment and dismisses them from the case.

G. The Brosnahan Defendants' Claims Against Ocean Designs

*8 Ocean Designs argues for summary judgment that it is not liable for the corrosion of plaintiffs' aluminum railings because if the corrosion was in fact due to a defect in the railings and not poor maintenance by plaintiffs, that defect was caused by Taco Metal, Ocean Designs' aluminum supplier. The court finds that there exists a genuine issue of material fact as to whether Ocean Designs is responsible for the defective aluminum railings. Although Ocean Designs may ultimately be found not to be at fault, Ocean Designs contracted with Brosnahan Builders to supply and install quality aluminum railings. To the extent that Taco Metal is responsible for the corroded aluminum,

Ocean Designs is seeking indemnification and contribution from it. Based on the record presented, therefore, Ocean Designs' motion for summary judgment is denied.

V. CONCLUSION

For the reasons stated, the court shall grant in part and deny in part the Brosnahan defendants' motion for summary judgment on claims against them; grant the Brosnahan defendants' motions for summary judgment that plaintiffs are not entitled to attorney's fees under paragraph 16(b) of the Construction Contract and for a protective order limiting discovery; grant in part and deny in part Reef Industries' motion for summary judgment on claims against it; grant Facilities Restoration's and Preservation Systems' motions for summary judgment on claims against them; and deny Ocean Designs' motion for summary judgment on claims against it. An appropriate order shall issue.

ORDER
At Wilmington, this 24th day of May, 2001:

IT IS ORDERED that:

1. The Brosnahan defendants' motion for summary judgment on the claims (D.I.124) is granted in part and denied in part.

2. The Brosnahan defendants' motion for partial summary judgment that plaintiffs are not entitled to attorney's fees pursuant to paragraph 16(b) of the Construction Contract (D.I.221) is granted.

3. The Brosnahan defendants' motion for a protective order respecting pre-judgment discovery in aid of execution (D.I.218) is granted.

4. Reef Industries' motion for summary judgment (D.I.225) is granted in part and denied in part.

5. Preservation Systems's motion for summary judgment (D.I.228) and Facilities Restoration's motion for summary judgment (D.I.230) are granted.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2001 WL 641737 (D.Del.)
(Cite as: 2001 WL 641737 (D.Del.))

6. Ocean Designs' motion for summary judgment
(D.I.233) is denied.

2001 WL 641737 (D.Del.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# **EXHIBIT 5**

Westlaw.

Not Reported in F.Supp.
1994 WL 594592 (D.N.J.), RICO Bus.Disp.Guide 8705
(Cite as: 1994 WL 594592 (D.N.J.))

C

**Motions, Pleadings and Filings**

United States District Court, D. New Jersey.
F/V ROBINS NEST, INC., et al., Plaintiffs,
v.
ATLANTIC MARINE DIESEL, INC., et al.,
Defendants.
v.
ATLANTIC EMPLOYERS INSURANCE
COMPANY, Third-Party Defendant.
Civ. A. No. 92-3900 (JEI).

Oct. 24, 1994.
Clark, Ladner, Fortenbaugh & Young by Lynne M.
Parker, Cherry Hill, NJ, for plaintiffs.

Archer & Greiner, P.C. by Steven J. Fram,
Haddonfield, NJ, for defendants.

OPINION GRANTING IN PART AND DENYING
IN PART DEFENDANTS' MOTION FOR
PARTIAL
SUMMARY JUDGMENT

IRENAS, District Judge:

*1 Defendants brought this motion for partial summary
judgment pursuant to Fed.R.Civ.P. 56(e). Defendants
seek summary judgment on: (1) certain of plaintiffs'
breach of contract claims; (2) plaintiffs' claims under
the Racketeer Influenced and Corrupt Organizations
Act of 1970 ("RICO"), 18 U.S.C. §§ 1961-68; (3)
plaintiffs' claims under the New Jersey Consumer
Fraud Act, N.J.S.A. 56:8-1 to 8-20; (4) plaintiffs'
common law fraud claims; and (5) plaintiffs' claims
under the Federal Ship Mortgage Act ("FSMA"), 46
U.S.C. § 31309. Defendants' motion as to the RICO
and FSMA claims is granted. Because material issues
of fact remain as to the breach of contract, Consumer
Fraud Act, and fraud claims, defendants' motion for

summary judgment on these claims is denied.

I. BACKGROUND

Plaintiffs F/V Robins Nest Inc., Boat Easy Rider, Inc.,
Boat Sons of Thunder, Inc., Boat Gulf Air, Inc., and
Boat Valerie E, Inc., are New Jersey corporations that
each own one commercial fishing vessel (collectively
the "corporate plaintiffs"). Plaintiff Charles
McCollough was the President and a shareholder of
each of the corporate plaintiffs.

Defendant Atlantic Marine Diesel, Inc. ("AMD"), is a
corporation that conducts marine engine repairs and
overhauls. Defendant Engines, Inc., is a corporation
that furnishes fuel for marine engines. Defendant L &
H Marine Electronics, Inc., is a corporation that repairs
electronic navigation equipment. (Collectively the
"corporate defendants"). Defendant Lawrence Pecan,
Sr., was the President of AMD and L & H Marine,
defendant Brenda C. Pecan was the President of
Engines, Inc., and defendant Lawrence Pecan, Jr., was
an officer of AMD and an employee of L & H Marine.
(Collectively the "individual defendants").

Plaintiff McCollough and defendant Lawrence Pecan,
Sr., entered into an oral agreement in October, 1990,
whereby defendants agreed to perform repairs and
services for plaintiffs' commercial fishing boats.
Plaintiffs' claims stem from repairs and services that
defendants performed on plaintiffs boats between
October, 1990 and September, 1991. Plaintiffs allege,
*inter alia*, that defendants repeatedly presented
plaintiffs with inflated bills, charged plaintiffs for
non-existent expenses, misrepresented the actual
services provided, and filed false notices of maritime
liens. Plaintiffs brought this case alleging negligence,
breach of contract, breach of warranty, common law
fraud, conversion, and violations of the New Jersey
Consumer Fraud Act, RICO, and FSMA.

II. JURISDICTION AND CHOICE OF LAW

Plaintiffs allege admiralty jurisdiction over all their

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                  Page 2
1994 WL 594592 (D.N.J.), RICO Bus.Disp.Guide 8705
(Cite as: 1994 WL 594592 (D.N.J.))

claims pursuant to 28 U.S.C. § 1333, federal question jurisdiction over the RICO and FSMA claims pursuant to 28 U.S.C. § 1331. and supplemental jurisdiction over the remaining state law claims pursuant to 28 U.S.C. § 1367. The court must decide whether it has jurisdiction over these claims, and if it does. what law applies.

Courts have consistently held that contracts to repair a ship, such as that at issue in this case, are "maritime contracts" within federal admiralty jurisdiction. *See, e.g.,  Kossick v. United Fruit Co., 365 U.S. 731, 735 (1961).* Fraud claims arising out of a maritime contract are also subject to admiralty jurisdiction. *Black Gold Marine, Inc. v. Jackson Marine Co., 759 F.2d 466, 470 (5th Cir.1985); Jose v. M/V Fir Grove, 765 F.Supp. 1015, 1021 (D.Or.1990).* Because a litigant in an admiralty case may also invoke federal question jurisdiction, Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 3-2 at 60 (West 1994), admiralty does not preempt plaintiffs' RICO or FSMA claim.

*2 The court must next decide what law to apply to plaintiffs' common law claims. Federal courts sitting in admiralty usually apply general principles of common law, rather than the law of any particular state, in order to foster the uniformity of maritime law. Schoenbaum, *Admiralty Law* § 4-4 at 143. *See also Black Gold Marine, 759 F.2d at 470; M/V Fir Grove, 765 F.Supp. at 1021.* In some cases, however, a federal court may apply state law to an admiralty claim. In deciding to do so, the court should consider: (1) whether there is applicable federal maritime law; (2) whether the state has a substantial, legitimate interest in application of its law; and (3) whether the application of state law threatens the interest of uniformity. Schoenbaum, *Admiralty Law* § 4-4 at 143-44; *New Hampshire Ins. Co. v. Martech USA, Inc., 993 F.2d 1195, 1198 (5th Cir.1993).*

In this case, while there are numerous federal decisions discussing contract and fraud law in admiralty, New Jersey's interest in regulating the contractual obligations of ship repairmen on its shores is both substantial and legitimate. Furthermore, the

application of state law here does not pose a threat to uniformity. The Uniform Commercial Code ("UCC") is indicative of federal admiralty law, *Interpool Ltd. v. Char Yigh Marine (Panama) S.A., 890 F.2d 1453, 1458-59 (9th Cir.1989),* and New Jersey has adopted the UCC. *N.J.S.A. 12A:1-101 et seq.* Nor does the New Jersey law of fraud appear to differ from the common law. Therefore, we will apply the law of New Jersey to the common law claims in this case. *See McConnell v. Caterpillar Tractor Co., 646 F.Supp. 1520, 1527 (D.N.J.1986)* (applying New Jersey law to a maritime breach of warranty claim).

Finally, we must decide whether admiralty law preempts the New Jersey Consumer Fraud Act. One court has recognized the potential conflict between admiralty and a state consumer fraud statute, but did not resolve the issue. *See Certain Underwriters Subscribing to the Institute of London Underwriters Policy No. MB7092 AOO v. Apwel, Inc., No. 90-C-4769, 1991 WL 86117 (N.D.Ill. May 17, 1991)* (not resolving the conflict between admiralty law and the Illinois Consumer Fraud Act because of the lack of admiralty jurisdiction). Generally, state statutory law is preempted by federal maritime law "if it contravenes the essential purpose expressed by an act of Congress, or works material prejudice to the characteristic features of the maritime law, or interferes with the proper harmony and uniformity of that law in its international and interstate relations." *Southern Pacific Co. v. Jensen, 244 U.S. 205, 216 (1917),* reaffirmed in *American Dredging Co. v. Miller, 114 S.Ct. 981, 985 n. 1 (1994).*

In *Miller,* the Court held that a doctrine is not a "characteristic feature" of admiralty unless it "originated in admiralty" or "has exclusive application here." *Id.* at 987. Therefore, admiralty does not preempt "a doctrine of general applicability." *Id.*

*3 To determine whether preemption is necessary to protect the "proper harmony" of maritime law, a court must balance the state's interest in the regulation against the federal need for harmony and uniformity. *Ballard Shipping Co. v. Beach Shellfish, 32 F.3d 623, 1994 WL 424736 (1st Cir. Aug. 18, 1994).* In *Ballard,*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1994 WL 594592 (D.N.J.), RICO Bus.Disp.Guide 8705
(Cite as: 1994 WL 594592 (D.N.J.))

the First Circuit applied this test and found that admiralty did not preempt the Rhode Island Environmental Compensation Act ("RIECA"). The RIECA allowed the recovery of purely economic loss stemming from a tort, a principle rejected by admiralty law. *See Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303 (1927). The *Ballard* court found that the matter was of "great and legitimate state concern," and that imposing these damages did not unduly burden maritime commerce. 1994 WL 424736, at *8. Therefore, the court found that admiralty did not preempt the RIECA. *Id.*

In light of *Miller* and *Ballard,* we find that admiralty does not preempts the New Jersey Consumer Fraud Act. The Consumer Fraud Act allows those who fall victim to deceptive business practices to recover treble damages and attorney's fees. *N.J.S.A.* § 56:8-19. Although these remedies are not normally present in admiralty, their exclusion neither originated in admiralty nor is exclusively present there. Thus, the Consumer Fraud Act does not contradict a "characteristic feature" of admiralty.

Furthermore, the state interest at stake here outweighs the need for uniformity in maritime law. The Consumer Fraud Act gives New Jersey " 'one of the strongest consumer protection laws in the country.' " *Cox v. Sears, Roebuck & Co.,* 1994 WL 517945, at *5 (N.J. Sept. 15, 1994) (*quoting* Governor's Press Release for Assembly Bill No. 2402, at 1 (Apr. 19, 1971)). Therefore, New Jersey has obviously taken a strong interest in preventing consumer fraud. Furthermore, while the Consumer Fraud Act provides additional penalties for fraud, it does regulate "primary conduct," but rather provides additional penalties for unlawful activity. Therefore, it poses a minimal threat to the proper harmony of maritime law, and is not preempted. *See Ballard,* 1994 WL 424736, at *7.

III. STANDARD OF REVIEW

Under Fed.R.Civ.P. 56(c), a court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, [FN1] show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The non-moving party may not simply rest on its pleadings to oppose a summary judgment motion, but must affirmatively come forward with admissible evidence establishing a genuine issue of fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986).

In deciding a motion for summary judgment, the court must construe the facts and inferences in a light most favorable to the nonmoving party. *Pollock v. American Tel. & Tel. Long Lines,* 794 F.2d 860, 864 (3d Cir.1986). The role of the court is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). There is no issue for trial unless there is sufficient evidence favoring the nonmoving party such that a reasonable jury could return a verdict for that party. *Id.* If the nonmoving party's evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Bixler v. Central Penn. Teamsters Health & Welfare Fund,* 12 F.3d 1292 (3d Cir.1993); *Trap Rock Indus. Inc. v. Local 825, Int'l Union of Operating Engineers,* 982 F.2d 884, 980-91 (3d Cir.1992).

IV. DISCUSSION

*A. Breach of Contract Claim*

*4 Defendants first ask the court to dismiss plaintiffs' breach of contract claims to the extent that they allege breaches of warranties to: (1) perform repairs within a reasonable time; (2) not charge plaintiffs more than the suggested list price for parts supplied; and (3) bill plaintiffs for services rendered within a reasonable time. Defendants argue that these claims should be dismissed because plaintiffs do not allege that these terms were part of the oral agreement reached between McCollough and Lawrence Pecan, Sr., in October, 1990.

Defendants correctly state that plaintiffs present no evidence that such express contractual terms existed. Nonetheless, it is well-established that under New

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1994 WL 594592 (D.N.J.), RICO Bus.Disp.Guide 8705
(Cite as: 1994 WL 594592 (D.N.J.))

Jersey law, courts will imply contractual terms where "the parties must have intended them because they are necessary to give business efficacy to the contract as written." _Glenside West Corp. v. Exxon Co._, 761 F.Supp. 1100, 1112 (D.N.J.1991) (internal quotations omitted). Thus, where the time for the performance of the contract is not fixed, the court will imply a reasonable time. _Ridge Chevrolet-Oldsmobile, Inc. v. Scarano_, 238 N.J.Super. 149, 155, 569 A.2d 296 (App.Div.1990) (_citing Becker v. Sunrise at Elkridge_, 226 N.J.Super. 119, 129, 543 A.2d 977 (App.Div.), _certif. denied_ 113 N.J. 356, 550 A.2d 465 (1988). Courts will also imply a reasonable price where the contract does not contain a price term. _Mantell v. International Plastic Harmonica Corp._, 141 N.J.Eq. 379, 387, 55 A.2d 250 (1947).

In this case, plaintiffs present evidence showing that the defendants took over six months to make repairs, took over six months to send invoices for completed work, and charged more than list price for certain parts. Viewing the evidence in the light most favorable to plaintiffs, the fact finder could conclude that these acts were "unreasonable." Therefore, defendants may have violated these implied terms of the contract.

Furthermore, New Jersey courts have held that every contract contains an implied covenant of good faith and fair dealing. _Association Group Life, Inc. v. Catholic War Veterans of the U.S._, 61 N.J. 150, 153, 293 A.2d 382 (1972); _Bak-A-Lum Corp. v. Alcoa Building Products_, 69 N.J. 123, 129-30, 351 A.2d 349 (1976); _Noye v. Hoffman-La Roche Inc._, 238 N.J.Super. 430, 432, 570 A.2d 12 (App.Div.), _certif. denied_, 122 N.J. 146, 584 A.2d 218 (1990). A reasonable fact finder could find that defendants' actions, if undertaken in bad faith, violated the implied warranty of good faith and fair dealing. _See Noye_, 238 N.J.Super. at 433. Thus, defendants' motion for summary judgment on this claim is denied. [FN2]

_B. The RICO Counts_

Defendants next request summary judgment on plaintiffs' RICO claims. Plaintiffs claim that defendants' allegedly fraudulent practices constituted a "pattern of racketeering activity" in violation of Sections 1962(a-c) of the RICO. Because plaintiffs lack standing to bring a civil RICO claim under subsections (a) and (b), and because their claim under subsection (c) fails on its merits, the RICO claims are dismissed.

_1. Section 1962(a)_

\*5 Section 1962(a) of the RICO provides, in relevant part:

It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through the collection of an unlawful debt ... to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise....

18 U.S.C. § 1962(a).

The legislative purpose of _Section 1962(a)_ was primarily to halt the investment of racketeering proceeds, including money laundering, into legitimate businesses. _Brittingham v. Mobil Corp._, 943 F.2d 297, 303 (3d Cir.1991). Therefore, to have standing under _Section 1962(a)_, a plaintiff must show that she suffered injury "caused by the use or investment of income in the enterprise, rather than by the predicate acts or pattern." _Rose v. Bartle_, 871 F.2d 331, 357 (3d Cir.1989). At the summary judgment stage, a plaintiff "must allege and prove more than a remote connection between the use or investment of racketeering income and the injury suffered." _Brittingham_, 943 F.2d at 304.

In support of their _Section 1962(a)_ claim, plaintiffs contend that in September, 1992, Lawrence Pecan, Sr., used the proceeds of the alleged unlawful activity to purchase the outstanding 50% of the stock of L & H Marine, making him the sole shareholder in the company. Plaintiffs have not, however, proffered any facts that would support a connection between this purchase and their injury, or even between any income defendants earned from their relationship with plaintiffs and the funds used the purchase the business. Plaintiffs admit that their business dealings with defendants ended in September, 1991, and do not point

Not Reported in F.Supp.
1994 WL 594592 (D.N.J.), RICO Bus.Disp.Guide 8705
(Cite as: 1994 WL 594592 (D.N.J.))

Page 5

out any allegedly fraudulent invoices or repairs performed after Lawrence Pecan, Sr., obtained sole control of L & H Marine. Thus, plaintiffs lack standing under Section 1962(a).

### 2. *Section 1962(b)*

Section 1962(b) of the RICO makes it unlawful "for any person through a pattern of racketeering activity ... to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1962(b). To state a claim under Section 1962(b), a plaintiff must show "a specific nexus between control of a named enterprise and the alleged racketeering activity." *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1411 (3d Cir.), *cert. denied*, 501 U.S. 1222 (1991). This requires a plaintiff to show injury from the defendant's acquisition or control of an interest in the RICO enterprise, in addition to injury from the predicate acts. *Casper v. Paine Webber Group, Inc.*, 787 F.Supp. 1480, 1494 (D.N.J.1992). The classic example of such an injury is where the owner of a legitimate business is injured by the infiltration of the business through racketeering activity, such as loansharking or extortion. *See U.S. Concord, Inc. v. Harris Graphics Corp.*, 757 F.Supp. 1053, 1060 n. 12 (N.D.Cal.1991).

*6 In this case, plaintiffs contend that the corporate defendants comprise the enterprise, while the individual defendants perpetrated the fraudulent scheme. Plaintiffs do not, however, allege that the individual defendants' fraudulent scheme caused them to gain control of the enterprise to plaintiffs' detriment, but rather claim injury from the fraudulent scheme itself. This type of injury is not redressable under Section 1962(b).

### 3. *Section 1962(c)*
#### a) Standing

Section 1962(c) of the RICO makes it unlawful for any person "employed by or associated with any enterprise ... to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). To have standing under this section, a plaintiff must show injury

to its business or property as a consequence of the racketeering activity. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985). Because plaintiffs adequately show that their business was injured by defendants' allegedly fraudulent scheme of overbilling, they have standing under Section 1962(c).

#### b) Enterprise

In a claim based upon Section 1962(c), the same entity cannot be both an enterprise and a defendant. *Kehr*, 926 F.2d at 1411; *Banks v. Wolf*, 918 F.2d 418, 421 (3d Cir.1990); *B.F. Hirsch v. Enright Refining Co.*, 751 F.2d 628 (3d Cir.1984). In this case, plaintiffs allege two possible RICO enterprises: one consisting of the corporate defendants, *see* Amended Complaint at ¶ 556; and another consisting of all defendants, *see* Amended Complaint at ¶ 557.

The alleged enterprise consisting of all defendants cannot support a Section 1962(c) claim, because no defendants exist separate from the alleged enterprise. Therefore, we focus on the first enterprise, consisting of the corporate defendants. The Third Circuit has held that Section 1962(c) "was intended to govern only those instances in which an 'innocent' or 'passive' corporation is victimized by the RICO 'persons,' and either drained of its own money or used as a passive tool to extract money from third parties." *Petro-Tech, Inc. v. Western Co.*, 824 F.2d 1349, 1359 (3d Cir.1987). The Third Circuit has held that in an alleged fraudulent loan scheme where a bank was the "enterprise," bank officials who made loans were adequately distinct "persons." *Kehr*, 926 F.2d at 1410-11. Given the obvious close identity between the corporate and individual defendants in this case, however, we express doubt as to whether the corporate defendants acted as "passive tools" to extract money from the plaintiffs. In any case, the court need not to resolve this issue, because plaintiffs have not adequately shown a "pattern of racketeering activity."

#### c) Merits

In an attempt to show a "pattern of racketeering activity," plaintiffs present evidence of violations of the federal mail and wire fraud statutes. 18 U.S.C. §§ 1341 and 1343. [FN3] A violation of the mail and wire fraud

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                            Page 6
1994 WL 594592 (D.N.J.), RICO Bus.Disp.Guide 8705
(Cite as: 1994 WL 594592 (D.N.J.))

statutes requires proof of: (1) a scheme or artifice to
defraud; (2) use of the mails or interstate wires in
furtherance of the scheme; and (3) participation by the
defendant in the scheme or artifice. *See Schmuck v.
United States*, 489 U.S. 705 (1989). Even if we
assume for the purpose of this motion that plaintiffs
have shown violations of the federal mail and wire
fraud statutes, they have not presented sufficient
evidence to establish a "pattern of racketeering
activity."

*7 To establish a "pattern" of fraudulent conduct, the
plaintiff in a civil RICO case must show that the
alleged predicate acts were both (1) related and (2)
continuous. *H.J. Inc. v. Northwestern Bell Telephone
Co.*, 492 U.S. 229, 239 (1989). Continuity refers
"either to a closed period of repeated conduct, or to
past conduct that by its nature projects into the future
with a threat of repetition." *Id.* at 241. Thus, "a
short-term scheme threatening no future criminal
activity will not suffice." *Kehr*, 926 F.2d at 1412.

In determining whether a close-ended scheme
constitutes a "pattern," "duration is the *sine qua non* of
continuity." *Hindes v. Castle*, 937 F.2d 868, 873 (3d
Cir.1991). The alleged racketeering activity must last
for a "substantial period of time." *Hughes v.
Consol-Pennsylvania Coal Co.*, 945 F.2d 594, 611 (3d
Cir.1991), *cert. denied*, 112 S.Ct. 2300 (1992). In a
RICO claim alleging mail and wire fraud, the court
should consider the duration of the deceptive or
fraudulent activity, not the duration of the otherwise
innocent mailings. *Kehr*, 926 F.2d at 1418.

In this case, the underlying fraud relates to the repair
agreement between plaintiffs and defendants. The
parties agree that this relationship lasted for eleven
months, between October, 1990, and September, 1991.
The Third Circuit has never found adequate continuity
where the alleged racketeering activity in a close-ended
scheme occurred over a period of one year or less. *See
United States v. Pelullo*, 964 F.2d 193, 209 (3d
Cir.1992) (citing cases). [FN4] Because the
defendants' alleged fraudulent conduct lasted for less
than one year, plaintiffs have not established a
close-ended "pattern" of racketeering activity.

Plaintiffs also argue that on January 16, 1992,
defendants informed plaintiffs' insurers of a lien filed
against the F/V Valerie E. That vessel had been lost at
sea, and defendants' lien claim delayed plaintiffs'
recovery of insurance funds and caused plaintiffs to
incur attorney's fees in contesting the lien. Plaintiffs
argue that notifying the insurer of this "false lien"
continued defendants' fraudulent scheme.

This argument fails for two reasons. First, plaintiffs
have not shown that the lien was deceptive. To qualify
as a predicate act under the mail fraud statute, a mailing
" 'must involve some sort of misrepresentations or
omissions reasonably calculated to deceive persons of
ordinary prudence and comprehension.' " *Kehr*, 926
F.2d at 1415 (*quoting United States v. Pearlstein*, 576
F.2d 531, 535 (3d Cir.1978)). Plaintiffs, however,
claim only that the lien delayed their recovery of
insurance funds and that they incurred attorney's fees in
contesting it. Plaintiffs also admit that defendants
withdrew the lien before it was paid. Therefore,
although the lien may have been inaccurate and may
have caused plaintiffs damages, it was not intended to
invoke reliance [FN5] and did not constitute fraud.

*8 Second, the lien is exactly the type of "innocent
mailing" that the Third Circuit discussed in *Kehr*. In
*Kehr*, the alleged predicate acts were loan invoices
allegedly sent to force the plaintiff into bankruptcy.
The court held that while the underlying loan itself may
have been fraudulent, the invoices sent for payment of
the loan did not prolong the fraudulent scheme. 926
F.2d at 1417.

*Kehr* is analogous to the facts presented here. The
court's review of the record shows that the amount
owed to the defendants by F/V Valerie E was disputed.
Even if defendants fraudulently inflated this amount,
the lien merely stated the amount allegedly owed by
plaintiffs, as it did in *Kehr*. Thus, this mailing did not
continue the alleged fraudulent scheme.

Plaintiffs have also failed to provide adequate
evidence of an open-ended scheme. A plaintiff may
prove an open-ended "pattern" by showing that "the
predicate acts or offenses are part of an ongoing entity's

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1994 WL 594592 (D.N.J.), RICO Bus.Disp.Guide 8705
(Cite as: 1994 WL 594592 (D.N.J.))

Page 7

regular way of doing business." *H.J. Inc.*, 492 U.S. at 242. The alleged conduct must "by its nature project[ ] into the future with a threat of repetition." *Id.* at 241.

The Third Circuit has required "some further indication that the defendant's fraudulent activities are likely to continue" before finding an open-ended scheme. *Kehr,* at 1413. Generally, this requires evidence that either: (1) the defendant made other false statements to the plaintiff; or (2) the defendants treated other customers in a similar manner. *Id.* at 1418.

Plaintiffs have presented no evidence on either theory. Instead, plaintiffs simply assert that the alleged fraudulent acts are part of defendants' "regular way of doing business." Such an allegation, without any supporting evidence, is inadequate to withstand a summary judgment motion. *See Hindes,* 937 F.2d at 874 (mere allegation that mail fraud scheme by its "very nature" is open-ended is inadequate to withstand even a motion to dismiss for failure to state a claim). Thus, defendants' motion for summary judgment on plaintiffs' RICO claims is granted.

### C. Claims under the New Jersey Consumer Fraud Act

Defendants next ask the court to dismiss plaintiffs' claims under the New Jersey Consumer Fraud Act (the "Act"), *N.J.S.A.* § 56:8-1 *et seq.* Because plaintiffs qualify for the protection provided by the Act, defendants' motion as to this claim is denied.

The Act makes unlawful the "use or employment by any person of any unconscionable commercial practice ... in connection with the sale or advertisement of any merchandise or real estate...." *N.J.S.A.* 56:8-2. The Act allows "any person" who suffers "any ascertainable loss of moneys or property" as a result of a violation of the Act to recover treble damages and reasonable attorney's fees. *N.J.S.A.* 56:8-19.

A "person" under the Act includes a corporation. *N.J.S.A.* 56:8-1(d). The term "merchandise" encompasses standard commercial services such as boat repairs. *See N.J.S.A.* 56:8-1(c) ("The term 'merchandise' shall include any ... services ... offered, directly or indirectly to the public for sale.") *See also*

*Levin v. Lewis,* 179 N.J.Super. 193, 200, 431 A.2d 157 (1981) (protections of the Act extend to automotive repairs); *Vort v. Hollander,* 257 N.J.Super. 56, 62, 607 A.2d 1339 (App.Div.), *certif. denied,* 130 N.J. 599, 617 A.2d 1221 (1992) (the Act includes "purveyors of products or services") (quoting *Neveroski v. Blair,* 141 N.J.Super. 365, 368, 358 A.2d 473 (App.Div.1976)). An "unconscionable business practice" is one that violates "the standard of conduct contemplating good faith, honesty in fact and observance of fair dealing." *Meshinsky v. Nichols Yacht Sales, Inc.,* 110 N.J. 464, 472, 541 A.2d 1063 (1988).

*9 Defendants' primary argument for summary judgment is that the Act does not extend to commercial transactions such as the one at issue here. Although the New Jersey Supreme Court has not resolved this issue, the Appellate Division of the Superior Court recently held that a commercial plaintiff may maintain a claim under the Act relating to the purchase of merchandise for business use, and reversed a lower court's grant of summary judgment on that issue. *Coastal Group, Inc. v. Dryvit Sys., Inc.,* 274 N.J.Super. 171, 179-80, 643 A.2d 649 (App.Div.1994). In doing so, the Appellate Division disapproved of *Werner & Pfleiderer Corp. v. Gary Chem. Corp.,* 697 F.Supp. 808, 814-15 (D.N.J.1988), upon which defendants rely. [FN6] Furthermore, recent federal decisions interpreting the Act have disagreed with *Werner. See First Valley Leasing, Inc. v. Goushy,* 795 F.Supp. 693, 700 (D.N.J.1992). Thus, in light of the recent decision in *Dryvit,* [FN7] defendants' motion for summary judgment on this issue is denied. [FN8]

Defendants also argue that the New Jersey "Deceptive Practices Concerning Watercraft Repair" regulations, *N.J.A.C.* § 13:45A-23.1 *et seq.,* show a legislative intent to exclude commercial ship repair contracts from the Act. These regulations, which require written estimates for watercraft repairs, do not apply to repairs performed for "commercial or industrial establishments." *N.J.A.C.* § 13:45A-23.1. The regulations, however, specifically provide remedies "[w]ithout limiting the prosecution of any other practices which may be unlawful under the Consumer Fraud Act." *N.J.A.C.* § 13:45A-23.2(a). The

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 8
1994 WL 594592 (D.N.J.), RICO Bus.Disp.Guide 8705
(Cite as: 1994 WL 594592 (D.N.J.))

exclusion of "commercial establishments" from the regulations, therefore, does not equal exclusion from the Act. Indeed, the need to exclude these establishments from the regulations suggests that they are covered by the Act.

### D. Common Law Fraud

A plaintiff must plead the circumstances constituting fraud with particularity. Fed.R.Civ.P. 9(b). To establish a claim of fraudulent misrepresentation under New Jersey law, a plaintiff must show: (1) a material misrepresentation of a presently existing or past fact; (2) made with knowledge of its falsity; (3) with the intention that the other party rely thereon; (4) reasonable reliance by the plaintiff; and (5) resulting damage to the plaintiff. Nappe v. Anschelewitz, Barr, Ansell & Bonello, 97 N.J. 37, 51-52, 477 A.2d 1224 (1984); Jewish Center of Sussex County v. Whale, 86 N.J. 619, 624, 432 A.2d 521 (1981); First Valley Leasing, Inc. v. Goushy, 795 F.Supp. 693, 701 (D.N.J.1992).

In support of their fraud claim, plaintiffs allege that defendants fraudulently misrepresented the amounts owed for services rendered, fraudulently filed false lien claims, fraudulently misrepresented that they used new parts in repairs when in fact they used old parts or parts provided by plaintiffs, and misrepresented the services actually rendered. Plaintiffs claim they relied on these statements in paying defendants for their services. [FN9]

*10 The Supreme Court has observed that the application of tort principles to what are in substance contract disputes creates the risk that "contract law would drown in a sea of tort." East River Steamship Corp. v. Transamerica Delaval, 476 U.S. 858, 866 (1986) (citing G. Gilmore, The Death of Contract 87-94 (1974)). In a contract such as the one at bar, however, true fraudulent misrepresentations may occur. This contract has no specific price term, and grants the shipyard broad latitude in carrying out repairs. Thus, the vessel owner must rely on the integrity of the shipyard to honestly report the parts and labor used, the work actually performed, and the costs incurred.

Misrepresenting any of these items in order to inflate the amount owed by the vessel owner might constitute actionable fraud.

We must clarify, however, what type of misrepresentations are actionable as fraud. Evidence that defendants "fraudulently misrepresented" that they would perform repairs properly and then did not, or that they "fraudulently" spent too much time on repairs because they lacked the skill and expertise necessary to do them quickly, are mere breach of contract or warranty claims and are not actionable as fraud. Evidence that defendants used old parts in repairs and misrepresented that new parts were used, misrepresented the number of hours of labor spent in making the repairs, or misrepresented the cost of the parts used are the type of fraudulent misrepresentations that may be actionable as fraud. [FN10] Because the plaintiffs present evidence showing this type of behavior, their fraud claims on these grounds may proceed.

The defendants argue that regardless of the facts alleged, this claim should proceed under a contract theory. In support of this argument, defendants rely on Unifoil Corp. v. Cheque Printers and Encoders Ltd., 622 F.Supp. 268 (D.N.J.1985). In Unifoil, the court held that New Jersey law barred fraud claims where "the 'fraud contemplated by the plaintiff ... does not seem to be extraneous to the contract, but rather on fraudulent performance of the contract itself.' " Id. at 271 (quoting Foodtown v. Sigma Marketing Systems, Inc., 518 F.Supp. 485, 490 (D.N.J.1990)). Because the fraud here is not "extraneous to the contract," defendants argue, summary judgment should be granted.

We agree with Unifoil that fraudulent performance usually is best regarded as a breach of contract rather than a tort. Nonetheless, as discussed above, the nature of this contract presents unique opportunities for fraud. Furthermore, recent cases interpreting New Jersey law have allowed fraud claims originating out of commercial contracts. See Dryvit, 643 A.2d at 650-52 (allegedly false representation by commercial seller to commercial buyer that panel system "was both

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

inexpensive and easy to install" actionable as fraud); *First Valley*, 795 F.Supp. at 701 (allegation that commercial defendant submitted invoice to commercial plaintiff containing items that defendant did not own, and therefore could not sell, actionable as fraud). Because material issues of fact remain as to the merits of plaintiffs' fraud claims, defendants' motion for summary judgment on these claims is denied.

### E. Federal Ship Mortgage Act

*11 Finally, plaintiffs request that this court, pursuant to Section 31309 of the Federal Ship Mortgage Act ("FSMA"), 46 U.S.C. § 31309, award them penalties of up to $10,000 for each of eight alleged "false lien claims" filed by the defendants. Defendants motion for summary judgment on these claims is granted.

Section 31309 states:
 Except as otherwise provided in this chapter, a person violating this chapter or a regulation prescribed under this chapter is liable to the United States Government for a civil penalty of not more than $10,000.

46 U.S.C. § 31309. Even if the filing of the lien violated the relevant chapter of the FSMA, 46 U.S.C. §§ 31301-31343, [FN11] Section 31309 by its terms provides a civil penalty only in favor of the United States Government, and not in favor of plaintiffs.

Plaintiffs ask the court to imply a private right of action in their favor from Section 31309. The court declines. In determining whether to imply a private right of action, a court should consider several factors:
 First was the plaintiff one of the class for whose *especial* benefit that statute was enacted--that is does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or deny one? Third, is it consistent with the underlying purpose of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?

*Cort v. Ash*, 422 U.S. 66, 78 (1975) (emphasis in original) (internal citations omitted). In applying this test, the first two factors are critical. If they do not point toward a private right of action, none will be found; if they reveal congressional intent to imply a private right of action, the court need not consider the final two factors. *American Tel. & Tel. Co. v. M/V Cape Fear*, 967 F.2d 864, 866-67 (3d Cir.1992).

First, we doubt that plaintiffs are within the class protected by the FSMA. As noted above, the FSMA primarily protects the creditors of shipowners, not shipowners themselves.

Second, and most importantly, we believe Congress did not intend an implied cause of action in Section 31309. The Supreme Court has stated that in discerning congressional intent, courts must "look first, of course, to the statutory language, particularly the provisions made therein for enforcement and relief." *Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n*, 453 U.S. 1, 13 (1981). The plain language of the Section 31309 clearly creates a civil penalty to be enforced by the United States Government, and the United States Government only. Implying a right of action from the statute would run afoul of this plain language and the intent of Congress.

Because the first two factors do not point toward a private remedy, we could grant summary judgment without addressing the final two. Nonetheless, even if we were to consider these factors, we would find them ambiguous at best. In considering the third factor, the remedial scheme envisioned by Congress, we must take care not to " 'place the judiciary in the role of enunciating or modifying policy decisions properly the preserve of the legislature.' " *M/V Cape Fear*, 967 F.2d at 866 (*quoting United States v. FMC Corp.*, 717 F.2d 775, 780 (3d Cir.1983)). Implying a private right of action could interfere with the remedial scheme envisioned by Congress.

*12 Plaintiffs argue that the court should imply a private right of action in their favor because the United States Government has not enforced Section 31309.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1994 WL 594592 (D.N.J.), RICO Bus.Disp.Guide 8705
(Cite as: 1994 WL 594592 (D.N.J.))

This argument, if anything, weighs against implying a private right of action.    The Third Circuit has repeatedly stated that " 'the apparent necessity of an implied private remedy will not justify a private remedy unless Congress intended to authorize it." " *M/V Cape Fear,* 967 F.2d at 874 (*quoting FMC,* 717 F.2d at 783).  Thus, the "fulfillment of a statute's purpose is entitled to substantially less weight than the text and legislative history of a statute." *Id.* (*citing Touche Ross & Co. v. Redington,* 442 U.S. 560, 575-79 (1979)).

The fourth factor, whether the matter is traditionally of a local nature, is indecisive. Although there is a strong interest in uniformity of maritime liens, it appears that plaintiffs would have a valid state-law action for slander of title. [FN12] In any case, the text of Section 31309 clearly indicates that only the United States Government may bring a civil action under that section, and defendants' motion for summary judgment on plaintiffs' claims under the FSMA is therefore granted.

V. CONCLUSION

Defendants' motion for summary judgment as to plaintiffs' RICO and FSMA claims is granted. Defendants' motion as to certain of plaintiffs' breach of contract claims, and plaintiffs' New Jersey Consumer Fraud Act and common law fraud claims, is denied.

An appropriate order will be entered on even date herewith.

FN1. In opposition to defendants' motion for summary judgment, plaintiffs have submitted affidavits of Charles McCollough, Winfield Downs, and Charles Eckel.    Defendants correctly point out that these affidavits are inadmissible because they are neither notarized nor under penalty of perjury. *See Wright, Miller & Kane, Federal Practice and Procedure § 2738 at 499-500* (West 2d Ed.1983).    Nonetheless, both McCollough and Downs gave lengthy deposition testimony containing the facts the court relies on in deciding this motion.        Therefore, the inadmissibility of plaintiffs' affidavits is irrelevant.

FN2. Plaintiffs also argue that these same acts violate the implied warranty of workmanlike service under federal admiralty law.    This warranty covers defects in equipment and repairs.    *See Little Beaver Enterprises v. Humphreys Railways,* 719 F.2d 75, 78 (4th Cir.1983).  While the complaint sets out facts that may constitute a violation of the warranty of workmanlike service, defendants do not request summary judgment on the issue. Instead, defendants request summary judgment only on matters relating to overcharges and delays in service and billing.   These matters are outside the warranty of workmanlike service.

FN3. In their Amended Complaint, plaintiffs also allege that defendants violated the Hobbs Act, 18 U.S.C. §§ 1951-52. *See* Amended Complaint at ¶ 553.        Furthermore. the corporate plaintiffs each allege that defendants conducted a pattern of racketeering activity through "unlawful debt collection." *See, e.g.,* Amended Complaint at ¶ 76.      Plaintiffs do not advance these arguments here, however, and in any case, they clearly fail on their merits. *See Rothman v. Vedder Park Management,* 912 F.2d 315 (9th Cir.1990) (plaintiff in a civil RICO case must show "wrongful use of force or fear" to utilize Hobbs Act violation as a predicate offense); 18 U.S.C. § 1961(6) ("unlawful debt" under RICO limited to gambling debts in violation of state law).

FN4. The mailings themselves extended only from October, 1990, to November, 1991, a period of just more than one year.    Even if we were to find that the mailings were not "innocent," and accept the period of mailings as the duration of the fraudulent scheme, we would not find adequate continuity. *See Pelullo,* 964 F.2d at 209 ("most courts that have found continuity in a closed period did

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1994 WL 594592 (D.N.J.), RICO Bus.Disp.Guide 8705
(Cite as: 1994 WL 594592 (D.N.J.))

Page 11

so in cases involving periods of several
years.").

FN5. Indeed, by the time the lien was filed,
the parties were in open conflict. Therefore,
plaintiff cannot contend that it relied on this
lien filing or, for that matter, any other claims
or assertions made by defendants after the
termination of their business relationship.

FN6. In *Werner,* the district court predicted
that in light of *Spring Motors Distributors,
Inc. v. Ford Motor Co.,* 98 N.J. 555 (1985),
the New Jersey Supreme Court would not
allow commercial parties to recover under the
Act.   In *Spring Motors,* the New Jersey
Supreme Court held that a commercial buyer
seeking damages for economic losses
resulting from a defective good may recover
solely for breach of warranty under the UCC,
and not for negligence or strict liability.

FN7. We recognize that state intermediate
appellate court decisions are not automatically
controlling on a federal court's analysis of
state law where the highest court of the state
has not spoken on the issue. *See First Valley,*
795 F.Supp. at 698.    Nonetheless, such
decisions "should be examined as indicia of
how the state's highest court might decide' the
issue." *Id.* (internal quotation omitted).
Because we believe that *Dryvit* is a reasonable
indication of how the New Jersey Supreme
Court would resolve the issue, we will follow
it here.

FN8. Defendants also rely on *BOC Group,
Inc. v. Lummus Crest, Inc.,* 251 N.J.Super.
271, 597 A.2d 1109 (Law Div.1990). That
case is inapposite for two reasons. First, the
*BOC* court found that the "complex petroleum
refining process" at issue in that case was not
a "service." 251 N.J.Super. at 278. Second,
the court found that the defendant was not a
"consumer" because the process was not
"available to the public at large" or "sold in

large quantities." *Id.* at 279. Defendants here,
however, provide a standard commercial
service, not a complex, unique process.
Furthermore, this process is available to a
large, primarily fungible market of potential
consumers. Thus, *BOC* does not apply.

FN9. Although neither side has presented
evidence on the issue, it appears that plaintiffs
have paid for some, but not all, of the repairs
performed by defendants.    This inquiry is
important, because only those statements that
plaintiffs actually relied upon through
payment are actionable as fraud.

FN10. A helpful analogy may be made to the
billing practices of the legal profession.
Assume that an attorney and a client enter into
an agreement whereby the attorney will
represent the client for an undetermined
hourly rate plus reasonable costs.
Allegations that the attorney rendered poor
legal counsel, charged an unduly high hourly
rate, or incurred unnecessary costs would be
mere contract claims.    Claims that the
attorney misrepresented the number of hours
spent on a particular matter or billed the client
for costs that were never incurred, however,
would be actionable as fraud.

FN11. In the Joint Final Pretrial Order,
plaintiffs appear to allege that defendants
have violated the provisions of the FSMA
governing maritime liens. 46 U.S.C. §§
31341-43. (Joint Final Pretrial Order at 2).
Nonetheless, plaintiffs do not explain how
defendants' actions violate these provisions.
We need not resolve this issue, however,
because we hold that plaintiffs do not have a
private right of action under Section 31309,
even if a violation of these provisions
occurred.

FN12. *See, e.g., Peters Well Drilling Co. v.
Hanzula,* 242 N.J.Super. 16, 575 A.2d 1375
(App.Div.1990).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1994 WL 594592 (D.N.J.), RICO Bus.Disp.Guide 8705
(Cite as: 1994 WL 594592 (D.N.J.))

1994 WL 594592 (D.N.J.), RICO Bus.Disp.Guide 8705

Motions, Pleadings and Filings (Back to top)

• 1:92CV03900 (Docket)
                          (Sep. 15, 1992)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.