UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SEA STAR LINE, LLC,<br>a limited liability company, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | |
| | : | |
| -v- | : | |
| | : | |
| EMERALD EQUIPMENT LEASING,<br>INC., a corporation, | : | |
| | : | |
| Defendant/Plaintiff<br>on the Counterclaim | : | Case No. 05-CV-00245-(JJF) |
| | : | |
| -v- | : | |
| | : | |
| SEA STAR LINE, LLC | : | |
| | : | |
| Defendant on the<br>Counterclaim | : | |
| | : | |

**EMERALD EQUIPMENT LEASING, INC.'S OPENING BRIEF IN
SUPPORT OF EMERALD'S MOTION FOR PARTIAL SUMMARY
JUDGMENT ON COUNT III OF THE AMENDED COUNTERCLAIM
OF EMERALD SEEKING AN ACCOUNTING AND FOR FURTHER RELIEF
APPOINTING A MASTER PURSUANT TO FED. RULE CIV. PROC. 53**

ECKERT SEAMANS CHERIN & MELLOTT,
LLC
Tara Lattomus, Esq. (No. 3515)
Ronald S. Gellert, Esq. (No. 4259)
300 Delaware Avenue
Suite 1210
Wilmington, DE 19801
302-425-0430

-and-

Gary M. Schildhorn, Esq.
Alan I. Moldoff, Esq.
Two Liberty Place
50 South 16th Street, 22nd Floor
Philadelphia, PA 19102
215-851-8400
Counsel for Emerald Equipment Leasing, Inc.

May 25, 2007

## TABLE OF CONTENTS

TABLE OF CITATIONS .................................................................................... ii

INTRODUCTION ............................................................................................1

I.  STATEMENT OF NATURE AND
    STAGE OF THE PROCEEDING ...........................................................1

II.  SUMMARY OF ARGUMENT ...............................................................6

III.  STATEMENT OF FACTS ......................................................................8

IV.  LEGAL ARGUMENT...........................................................................14

      A.    SUMMARY JUDGMENT SHOULD BE GRANTED
           IN FAVOR OF EMERALD ON COUNT III OF THE
           COUNTERCLAIM COMPELLING SEA STAR TO
           PROVIDE AN ACCOUNTING FOR ITS USAGE OF
           THE EMERALD EQUIPMENT ...........................................................14

           1.    Summary Judgment Standard ....................................................14

           2.    Where Facts and Records Upon Which Obligations
                Are Based Are Known and Kept Exclusively By One
                Party (In This Case, Sea Star), Where Sea Star Undertook
                the Obligation to Accurately Report Its Usage of the
                Emerald Equipment Creating a Fiduciary Relationship
                With Emerald and Where the Accounts Are Complicated,
                Sea Star Owes A Duty to Provide an Accounting of Such
                Usage as Demanded in Count III of the Amended
                Counterclaim.........................................................................15

      B.    IN ADDITION TO AN ACCOUNTING TO BE
           PERFORMED BY SEA STAR, OR ALTERNATIVELY,
           A MASTER SHOULD BE APPOINTED TO CONDUCT
           AN ACCOUNTING NECESSARY FOR A PROPER
           DISPOSITION OF THIS CASE; SUCH AN
           APPOINTMENT IS AUTHORIZED BY FED. RULE
           CIV. PROC. RULE 53 ...........................................................19

      C.    THE APPOINTMENT OF A MASTER IS APPROPRIATE AT
           THIS JUNCTURE IN THESE PROCEEDINGS. ..................................24

V.  CONCLUSION....................................................................................... 25

## TABLE OF CITATIONS

**CASE AUTHORITY**

Americana of Puerto Rico, Inc. v. Transocean Tankers Corp.,
317 F.Supp. 798 (D.C. Puerto Rico 1970)....................................................22

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986))............................................15, 16

Anderson v. Watson, 141 Md. 217, 118 A. 569 (1922).............................................16, 17

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) ...........................................14, 15

Complaint of Great Lakes Dredge & Docks Co.,
895 F.Supp. 604 (SDNY 1995)....................................................22

In re Deltacorp., Inc. 179 B.R. 773 (Bankr.S.D.N.Y. 1995)...............................................1

P.V. Properties, Inc. v. Rock Creek Village
Associates Ltd. Partnership, 549 A.2d 403 (Md. App. 1988)....................................17, 18

Southern Agency Company v. LaSalle Casualty Company,
393 F.2d 907 (8th Cir. 1968) ....................................................23

US v. Real Property Located at 2101, 2280, 2401
and 2501 Maple Street, City of Saginaw,
Saginaw County, Mich., 750 F.Supp. 817 (E.D. Mich. 1990).........................................22

Vassalos v. Hellenic Lines, Ltd., 482 F.Supp. 906 (D.C. Pa. 1979)..............................22

William P. Brooks Const. Co., Inc. v. Guthrie,
614 F.2d 509 (C.A. Tex. 1980)....................................................22

Wyler v. United States, 725 F.2d 156 (2d Cir. 1983) ....................................................15

**SECONDARY AUTHORITY**

1 Am.Jur.2d Accounts and Accounting §54 (1994 & Supp. 2002) ................................14

# INTRODUCTION

Procedurally, this dispute has followed a tortuous path. The proceeding has involved three (3) different courts and has entered its fourth year in actual litigation. Remarkably and surprisingly in light of the foregoing, the dispute itself is not complex. The dispute involves the amount of rent and other damages owed under a written binding equipment lease. At its essence, the dispute entails little more than a detailed accounting reflecting the use, including the days of use, for the thousands of pieces of equipment (the "Emerald Equipment") owned by Emerald Equipment Leasing Company ("Emerald"), the Defendant/Plaintiff on the Counterclaim, and leased by Sea Star Line LLC ("Sea Star"), the Plaintiff/Defendant on the Counterclaim. In the first instance, this accounting should be provided by Sea Star. This accounting was demanded in Count III of the Amended Counterclaim of Emerald Equipment Leasing, Inc. Further, at the very least, in addition to or alternatively, the time is now ripe for the appointment of a neutral party - a master appointed pursuant to Rule 53 of the Federal Rules of Civil Procedure to either conduct the accounting Sea Star refuses to provide based on the voluminous documents in Sea Star's possession or to reconcile the accounts as presented by the parties.

## I. STATEMENT OF NATURE AND STAGE OF THE PROCEEDING

On March 21, 2001 (the "Petition Date"), Emerald filed a voluntary petition for relief under Chapter 11 (See Voluntary Petition at A-1)[1] in the United States Bankruptcy Court for the District of Delaware (the "Delaware Bankruptcy Court"), along with various affiliated entities (collectively, the "Jointly Administered Debtors"). Emerald's primary remaining asset is its interest in claims against Sea Star Line, LLC ("Sea Star")

---

[1] Emerald's Appendix filed concurrently with this Brief shall be designated as "A ____".

in an amount in excess of $4,700,000.00 arising from unpaid rental and other charges due pursuant to a post-Petition Date valid, written lease agreement (the "Equipment Rental Agreement" at A-8) entered into between Emerald and Sea Star as of April 29, 2002 and which was terminated as of November 30, 2003. The Equipment Rental Agreement pertained to the rental by Sea Star of thousands of pieces of the Emerald Equipment, which included containers, chassis and gen sets, used to transport cargo.[2] During the lease term, Sea Star undertook the obligation to prepare and deliver self-billing reports accounting for its usage of the Emerald Equipment.

Shortly after termination of the Equipment Rental Agreement, Emerald invited Sea Star to attend a settlement meeting to discuss Emerald's assertions that Sea Star had vastly underreported its usage of the Emerald Equipment and that as a result Sea Star owed Emerald substantial unpaid rent, as well as stipulated loss values for equipment used by Sea Star and not returned. Failing to receive any response from Sea Star, Emerald filed, on March 17, 2004, a Summons and Complaint instituting an adversary proceeding in the Delaware Bankruptcy Court against Sea Star (the "Bankruptcy Court Litigation") asserting claims for the unpaid rent, stipulated loss values and other charges. Unknown to Emerald, however, Sea Star, in a transparent "race to the courthouse", instituted its own proceedings by filing a Summons and Complaint (D.I. 1) in the United States District Court for the Middle District of Florida (the "Florida District Court") against Emerald (the "Florida Litigation"), seeking in main part, a "declaratory

---

[2]  The equipment itself, owned by Emerald and which constituted Emerald's sole tangible asset was collateral for a substantial loan by MBC Leasing Corporation ("MBC") to Emerald. MBC had obtained relief from the automatic stay in Emerald's bankruptcy proceedings, allowing MBC to take back the equipment through foreclosure. Following the grant of that relief, MBC allowed Emerald to lease the equipment to Sea Star, with the rental proceeds to be paid to MBC to pay down the loan balance. If equipment was returned to Emerald, it was sold by MBC to further pay down the MBC loan. The MBC loan has since been sold to Storage Transfer, Inc.

judgment" as to the parties' rights and liabilities under the Equipment Rental Agreement and a "declaration of its rights" under a Sale Order entered by the Delaware Bankruptcy Court. As a result, two actions involving the same subject matter, i.e., the Bankruptcy Court Litigation filed in the Delaware Bankruptcy Court and the Florida Litigation filed in the Florida District Court, were proceeding simultaneously.

In the Bankruptcy Court Litigation, Sea Star filed a Motion to Dismiss, Stay or Abate Complaint of Emerald (the "Sea Star Motion to Dismiss") invoking the Third Circuit's "first-filed rule" which generally mandates that a first-filed complaint (i.e., the Florida Litigation filed on March 1, 2004) should proceed rather than a subsequent Complaint (i.e., the Bankruptcy Court Litigation filed on March 17, 2004).[3] In the Florida Litigation, Emerald promptly filed a Motion to Dismiss Sea Star's Complaint For Declaratory Judgment, or Alternatively to Transfer Venue or Abstain (the "Emerald Motion to Dismiss or Transfer Venue") (D.I. 9).

The Delaware Bankruptcy Court granted the Sea Star Motion to Dismiss, without prejudice, by Order entered on May 27, 2004 (see Transcript of Hearing at A-19), based solely on the Third Circuit's articulation of the "first filed rule", with the Delaware Bankruptcy Court, specifically noting that it would "assume for purposes of this decision that Florida has jurisdiction", and that therefore, the court who "first has possession of the subject must decide it." [emphasis added]. The Delaware Bankruptcy Court further ruled that entry of the Order granting the Sea Star Motion to Dismiss based on the "first filed

---

[3] Although the Florida Litigation was filed on approximately March 1, 2004, it was not served on Emerald until March 25, 2004. As such, Emerald was unaware of the Florida Litigation when it filed and served Sea Star with the Bankruptcy Court Litigation on March 17, 2004.

rule" should be <u>without prejudice</u> so that "if the Florida Court determines that it doesn't have jurisdiction or its action should be dismissed, the debtor is free to file here."[4]

Meanwhile, a Scheduling Order (D.I. 44) was entered in the Florida Court, pending its disposition of the Emerald Motion to Dismiss or Transfer Venue. The Scheduling Order set deadlines for discovery, and scheduled April 29, 2005, as the date for a final pre-trial conference. While the Emerald Motion to Dismiss or Transfer remained undecided, Sea Star and Emerald proceeded with and completed discovery (at Sea Star's insistence over Emerald's objections). Depositions and document production occurred over approximately a nine month period pursuant to the Scheduling Order. Just prior to the final pre-trial conference, the Florida District Court granted Emerald's Motion to Dismiss or Transfer Venue, in part, by transferring the case to this Court (the "Delaware District Court") by Order dated April 20, 2005 (the "April 20, 2005 Order" at A-26; D.I. 45). This litigation was then transferred to this Court where it presently resides.

Once the Florida District Court decided the Emerald Motion to Dismiss or Transfer Venue (now more than one year after the initial Complaint was filed), Emerald promptly filed its Answer and Affirmative Defenses to the Sea Star Complaint, (the "Emerald Answer"), together with a Counterclaim (the "Emerald Counterclaim") (D.I. 53). Rather than filing an Answer to the Emerald Counterclaim, Sea Star filed a Motion to Dismiss the Counterclaim (the "Sea Star Dismissal Motion") (D.I. 56) challenging the sufficiency of the Emerald Counterclaim. For the reasons stated in the Memorandum Opinion (D.I. 56) and by Order (D.I. 76) entered on or about January 26, 2006, the Sea

---

[4] The Delaware Bankruptcy Court made no independent analysis of the merits of the Emerald Motion to Dismiss filed in the Florida District Court, deferring any judgment on that score to the Florida District

Star Dismissal Motion was granted in part and denied in part. Emerald immediately filed its Amended Counterclaim (the "Amended Counterclaim" at A-32) (D.I. 79). Sea Star met this filing with yet another Motion to Dismiss (D.I. 80). This time, Sea Star's efforts failed and the Sea Star Motion to Dismiss the Amended Counterclaim was denied for the reasons stated in the Memorandum Opinion (D.I. 86) and by Order (D.I. 87) entered on or about April 13, 2006. Finally, more than two (2) years after Sea Star refused to meet with Emerald to attempt to amicably resolve this dispute and this litigation began, Sea Star was forced to, at last respond to Emerald's charges and file an Answer (D.I 90) to Emerald's claims set forth in the Amended Counterclaim.

The Amended Counterclaim (D.I. 79) (A-32) asserts, <u>inter alia</u>, that Sea Star substantially underreported the amount of its usage of the Emerald Equipment and that, as a result, rent and other charges in excess of Four Million Dollars (S4,000,000.00) are owed by Sea Star to Emerald. The Amended Counterclaim states causes of action for: (i) post-petition accounts receivable/breach of lease; (ii) turnover action; (iii) an accounting; (iv) fraud; (v) constructive fraud; (vi) fraudulent concealment; and (vii) negligent misrepresentation/breach of fiduciary duty.

Significantly, Sea Star does not deny it underreported its usage of the Emerald Equipment. Rather, Sea Star readily admits it used the Emerald Equipment for various time periods which were not included in the self-billing reports it prepared (<u>See</u> Sea Star's Response to Request For Admission No. 33 at A-42). The only dispute between Emerald and Sea Star, then, entails the degree of this under-reportage and the corresponding amount of rent and other charges owed.

---

Court.

The parties have already conducted extensive discovery (consisting of approximately fourteen (14) depositions and the exchange of tens of thousands of pages of documents). Interrogatories and Requests For Admissions have been propounded and answered. The primary remaining task, factually (leaving aside the tort claims which may give rise to punitive or exemplary damages), is an accounting which initially is owed by Sea Star as a fiduciary to Emerald and then a further accounting by an impartial fact finder which would independently verify Sea Star's use of each piece of the Emerald Equipment. Such an independent accounting to be performed by a special master is necessary to determine: (i) when Sea Star first started using each piece of equipment; (ii) when it stopped using each piece of equipment; (iii) the date returned to Emerald; and/or (iv) whether pieces of equipment were never returned to Emerald and are now missing or lost. Once Sea Star provides its initial accounting as demanded in Count III of the Amended Counterclaim, then the appointment of a Master, pursuant to Rule 53 of the Federal Rules of Civil Procedure is ideally suited for providing a final accounting in this non-jury action.

## II.     SUMMARY OF ARGUMENT

1.     Summary Judgment should be granted in favor of Emerald Equipment Leasing, Inc. ("Emerald") on Count III of the Emerald Amended Counterclaim compelling Sea Star Line LLC ("Sea Star") to provide an accounting for its usage of the equipment of Emerald (the "Emerald Equipment").

   a.   Pursuant to Federal Rule of Civil Procedure 56(c), Summary Judgment is appropriate if the court determines that the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

b.  Where facts and records upon which obligations are based are known and kept exclusively by one party (in this case, Sea Star), where Sea Star undertook the obligation to accurately report its usage of the Emerald Equipment creating a fiduciary relationship with Emerald and where the accounts are complicated, Sea Star owes a duty to provide an accounting of such usage as demanded in Count III of the Amended Counterclaim.

c.  Equitable jurisdiction for an accounting is usually involved in cases where: (1) there is a fiduciary relationship between the parties, accompanied by a duty on the part of the defendant to render an account; (2) there are mutual accounts or, if the account is all on one side, the account is complicated; and (3) there is a need for discovery. All of these elements exist in this case. Accordingly, Summary Judgment on Count III of the Amended Counterclaim seeking such an accounting should be granted. Sea Star should be compelled to account now for its usage of the Emerald Equipment.

2.  In addition to an accounting to be performed by Sea Star, or in the alternative, a master should be appointed to conduct an accounting necessary for a proper disposition of this case; such an appointment is authorized by Fed. Rule Civ. Proc. 53.

a.  Rule 53(a)(1)(B), providing for the appointment of a master to hold trial proceedings, essentially sets forth two prerequisites; (1) the factual issues which the master is to make or recommend are issues to be decided by the Court without a jury; and (2) the matter involves an accounting or a difficult

computation of damages.  Both of these prerequisites are met here.  As such,

the appointment of a master is appropriate at this juncture in these

proceedings.

3.      This dispute has been litigated between the parties since April of 2004.  Pre-trial

proceedings and discovery were completed in the Florida District Court prior to the

transfer of the case to this Court on the eve of the final pre-trial conference.  Since then

additional discovery has been conducted after this case was transferred to this Court.  As

Rule 53 makes clear, the appointment of a master may be done at any stage of the

proceedings.  The time is now ripe for the appointment of a master pursuant to Fed. Rule

Civ. Proc. 53.

## III.     STATEMENT OF FACTS

Prior to April 26, 2002, Emerald leased the Emerald Equipment to NPR, Inc. (one

of the Jointly Administered Debtors), used to transport cargo.  On April 26, 2002, Sea

Star purchased certain ships and other assets of NPR, Inc. ("NPR"), including NPR's

receivables or bookings (the "NPR Sale") (Bates 33-35) (A-53-55)[5], which sale was

approved by an Order entered by the Bankruptcy Court (the "Sale Order").  Although Sea

Star did not assume the NPR lease of the Emerald Equipment, Sea Star recognized that in

order to continue the business, Sea Star had an immediate need for equipment with which

to move cargo (Bates 33; 41-48) (A-53, A-56-63).  Accordingly, on or about May 1,

2002, Sea Star and Emerald entered into an agreement (the "e-mail agreement" at A-91)

whereby Sea Star agreed to lease much of the same equipment (i.e., the Emerald

Equipment) previously leased by Emerald to NPR (Bates 48-52; 62-63) (A-64-69, 70-

---

[5] The reference to "Bates ____ " is to the pages of the deposition transcript of Philip Bates, the Senior Vice President of Operation for Sea Star.  The Bates deposition excerpts are attached at A-52.

71).  The e-mail agreement was, by its terms, applicable to any cargo worthy Emerald

Equipment, which Sea Star dispatched out of any port terminal or in-land depot for

customer use at agreed upon per diems (Bates 50-51)(A-65-66).

Sea Star commenced using the Emerald Equipment pursuant to the e-mail

agreement for a number of months, until the leasing arrangement was formalized in a

written agreement (the Equipment Rental Agreement at A-8) executed by the parties

toward the end of September, 2002 (Bates 60-61; 78-79) (A-68-69; 76-77).  According to

Sea Star's own records, between April, 2002 and August, 2003, Sea Star used 5,482

pieces of Emerald Equipment. (Rooks 47-48) (A-108-09).[6]

Significantly, at the inception of the leasing arrangement between Emerald and

Sea Star, the Emerald Equipment was not in Emerald's possession (since it had been in

NPR's possession when Sea Star purchased the NPR assets); instead, this equipment was

located either in terminals, out to a shipper, at inland depots or on board the NPR vessels

purchased by Sea Star (Bates 61-63; 102) (A-68-70, 88); (Florence 40) (A-22).[7]

Moreover, Emerald was not notified when Sea Star commenced using the equipment

since no receipt or other document was needed from Emerald before Sea Star could use

the Emerald Equipment (Bates 99-100) (A-88-89).  Due to these circumstances, where

only Sea Star knew which equipment it was using, Sea Star agreed to provide Emerald

with monthly "self-billing reports" (the "Sea Star Self-Billing Reports"), which it

prepared, reporting to Emerald its "usage" of the Emerald Equipment.  Sea Star paid for

its reported usage of the Emerald Equipment as set forth in the Sea Star Self-Billing

---

[6] The reference to "Rooks ___ " is to the pages of the deposition transcript of Andrew Rooks, Director of
Equipment for Sea Star.  The Rooks deposition excerpts are attached at A-92.
[7] The reference to "Florence ___ " is to the deposition transcript of Lisa Florence, Fleet Assistant of the
Equipment Control Group for Sea Star.  The Florence deposition excerpts are attached at A-117.

Reports. This was recognized by Sea Star as an unusual procedure made necessary since Sea Star was the only party in a position to identify the equipment which it used (Bates 111-112) (A-89-90).

Sea Star's obligation to begin paying rent to Emerald for any piece of Emerald Equipment began at the time Sea Star first started to use that equipment, which constituted the "on hire" date (Bates 84, 85, 92) (A-77,78, 84); (Rooks 8) (A-93).[8] The only exception to this was with respect to certain equipment which was "in transit" at the time of the NPR Sale. The "in transit" equipment was the Emerald Equipment which was on the NPR ships at sea when the NPR Sale occurred (Bates 62) (A-70). As part of the closing with respect to the NPR Sale, Sea Star made a payment to NPR for the use of the Emerald Equipment which was in transit on the ships at the time of the NPR Sale (Bates 64-65) (A-72-73). However, if Sea Star used the "in transit" equipment after the initial transaction, Sea Star was obligated to pay Emerald for that subsequent use (Bates 76-77) (A-74-75).[9]

Theoretically, Sea Star's use of the Emerald Equipment can be tracked by a number of different documents evidencing the movement of the Emerald Equipment. For example, whenever a piece of equipment moves in or out of a terminal gate at a port, a document known in the industry as a "TIR" or "terminal interchange receipt" should be prepared. A TIR is a type of receipt to be filled out by union clerks (hired by the port

---

[8]  Paragraph 2 of the Equipment Rental Agreement provides that "The lease term for each item of equipment shall begin on the date when such equipment is delivered to Lessee or its agent...". As stated above, however, given the unique circumstances which occurred at the inception of the leasing arrangement between Sea Star and Emerald, the Emerald Equipment was "never" delivered by Emerald to Sea Star. Rather, Sea Star began using the Emerald Equipment at whichever location it found that equipment, i.e. in terminals, with a shipper, at inland depots, on board NPR vessels which Sea Star purchased, etc.
[9]  Sea Star has identified the "in-transit" equipment for which it paid NPR (Florence 18-19) (A-119-20). Emerald is not charging Sea Star for the rental of this equipment during the transit period.

operators) who report or track the entry or exit of equipment at the gates of the port terminals. The TIRs were then to be given to the port offices at the Sea Star terminals in Florida and San Juan, Puerto Rico, and Sea Star or Sea Star Agency employees were supposed to enter the information into the Sea Star computer system known as "IQ Ship" (Bates 87-90) (A-80-83); (Florence 8) (A-118).[10] TIRs are not the only document used to evidence "moves" of equipment. Documents other than TIRs that evidence equipment moves include cargo discharge documents, gate logs, ship manifests, and faxes or e-mails from in land depots that would show in bound and out bound gate activity (Rooks 15-18) (A-96-99). Any initial "moves" of equipment (other than "in-transit" moves as stated above) would commence Sea Star's lease of that piece of Emerald Equipment.

Once a piece of Emerald Equipment was first used by Sea Star, Sea Star's obligation to make rental payments for that piece of equipment (subject to a 30 day minimum)(see para. 2 of the Equipment Rental Agreement at A-66 and Bates 51) continued until that piece of equipment was returned (Equipment Rental Agreement at para. 10(e) at A-12). Redelivery of the Emerald Equipment under the Equipment Rental Agreement was to be made at the following location at: (1) Greenwich Terminal, Philadelphia, Pennsylvania; (2) Sea Star Terminal, Puerto Nuevo, San Juan, Puerto Rico; (3) Greenwich Terminal, Port of Jacksonville, Florida, or (4) any other location as to which the parties have agreed in writing (See Equipment Rental Agreement at para. 10(a) at A-12).

All of the information with respect to the "moves" of the Emerald Equipment was supposedly entered into the Sea Star IQ Ship computer system ("IQ Ship") (Bates 85-86;

---

[10] At least, this is what is supposed to happen. This system of tracking equipment is only as accurate as the people preparing the TIRs and inputting the information. In this case, Sea Star itself has admitted to major

91-92) (A-78-79, 84-85).  Although the information inputted into IQ Ship was supposedly used for the Sea Star Self-Billing Reports, numerous pieces of Emerald Equipment which should have appeared in IQ Ship, were never inputted.  For example, Sea Star's own investigations have disclosed that various equipment used by Sea Star as evidenced by ship manifests were not inputted in IQ Ship (Rooks 19-21) (A-100-02). Various movement of Emerald Equipment located at inland depots never appeared on Self-Billing Reports and apparently were not entered into IQ Ship (Rooks 22) (A-103). Moreover, even when "moves" were entered into IQ Ship, rental obligations for that equipment did not always appear on Self-Billing Reports (Rooks 40-41) (A-106-07). Further, although Sea Star's representatives testified that the date entered into IQ Ship as the "off hire" date for a piece of Emerald Equipment was the date that piece of equipment was actually returned to Emerald (Florence 23, 116) (A-121,134), documents Emerald has received through discovery indicate that Sea Star used that equipment after the "off hire" date.  Sea Star's "Director of Equipment" was "surprised" by the number of errors and omissions in IQ Ship and "self billing" reports (Rooks 49-50) (A-121-22).

Sea Star has been conducting an ongoing analysis regarding its failure to accurately report its usage of the Emerald Equipment (Rooks 34) (A-105).  An early analysis prepared by Sea Star indicated that it underreported and accordingly failed to pay to Emerald approximately $180,000.00 for its use of Emerald Equipment (Rooks 34) (A-105).[11]  Pointedly, Sea Star's analysis involved simply a review of its records to locate only those TIRs which would  support its own self-billing reports (Rooks 25) (A-104); (Florence 62-72) (A-122-32), rather than an overall encompassing accounting of Sea

---

failures of reporting in this regard (see infra).

Star's use of Emerald Equipment for which it did not make any rental payments. Emerald, on the other hand, has reviewed the documents obtained through discovery from Sea Star and third parties (whose depositions were taken in this matter) consisting of TIRs, gate receipts, ship manifests, inventories and other similar documents which indisputably reflect Sea Star's "use" of Emerald Equipment for which Sea Star has failed to account. These records, produced in this litigation, have been ignored by Sea Star. These records support Emerald's claim for unpaid rent and charges owed for equipment used and/or never returned in excess of $4,700,000.00 as shown on Emerald's analysis provided to Sea Star (See the "Emerald Equipment Analysis" at A-135).

There are thousands of pieces of equipment scheduled on the Emerald Equipment Analysis with corresponding notes reflecting the sources of information supporting each entry. To date, Sea Star has refused to provide its own piece by piece analysis in response to the Emerald Equipment Analysis.[12] Such an accounting is demanded in Count III of the Amended Complaint. While Sea Star has assiduously avoided providing such an accounting, it has essentially forced Emerald to play a "cat and mouse" game of trying to uncover the appropriate information which would reveal the true extent of Sea Star's use of Emerald's equipment for which Sea Star failed to pay rent, and in many instances, failed to return to Emerald after its use. The law does not permit an adverse party to conceal from the Court and from Emerald its answer to the fundamental question in the case, "How much rent do you owe?" For the past four (4) years, Sea Star's answer has been "We're working on it, show us what you think we owe." Emerald believes an

---

[11] By Order (D.I. 74) entered on January 4, 2006, this Court granted Sea Star's request to deposit funds with the Clerk of the Court in the amount of $534,000.00 pursuant to Fed. R. Civ. P. 67.

[12] Emerald has requested such an accounting from Sea Star. Sea Star has refused to respond to this interrogatory request (See Sea Star Response to Interrogatory No. 1 at A-258).

accounting of Sea Star's use of the Emerald Equipment should be performed by Sea Star now, followed by the appointment of a "master" to reconcile the accounts and make findings to be submitted to the Court pursuant to Fed. Rule Civ. Proc. Rule 53.

## IV.    LEGAL ARGUMENT

### A.    SUMMARY JUDGMENT SHOULD BE GRANTED IN FAVOR OF EMERALD ON COUNT III OF THE COUNTERCLAIM COMPELLING SEA STAR TO PROVIDE AN ACCOUNTING FOR ITS USAGE OF THE EMERALD EQUIPMENT

Whether equitable jurisdiction to compel an accounting should be exercised is a decision committed to the sound discretion of the Court. 1 <u>Am.Jur.2d Accounts and Accounting</u> §54 (1994 & Supp. 2002). Equitable jurisdiction for an accounting is usually involved in cases where: (1) there is a fiduciary relationship between the parties, accompanied by a duty on the part of the defendant to render an account; (2) there are mutual accounts or, if the account is all on one side, the account is complicated; and (3) there is a need for discovery. <u>Id</u>. A court may also assume jurisdiction where other grounds for involving equity, such as fraud....are present. <u>Id</u>. All of these elements exist in this case. Accordingly, Summary Judgment on Count III of the Amended Counterclaim seeking such an accounting should be granted. Sea Star should be compelled to account now for its usage of the Emerald Equipment.

### 1.    **Summary Judgment Standard**

Federal Rule of Civil Procedure 56(c), provides that summary judgment is appropriate if the court determines that the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322

(1986). A fact is considered material if it might affect the outcome of the suit under governing law. See In re Deltacorp., Inc. 179 B.R. 773, 780 (Bankr.S.D.N.Y. 1995) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

The moving party bears the initial burden of establishing the absence of a genuine issue as to any material fact; however, that burden is satisfied by demonstrating the absence of evidence supporting the non-movant's position. See id. (citing Celotex, 477 U.S. at 322-23). The non-moving party must set forth specific facts demonstrating that genuine issues of material fact exist; the non-movant may not defeat a properly supported motion for summary judgment by relying on self-servicing and conclusory statements concerning the true nature of the facts. Wyler v. United States, 725 F.2d 156, 160 (2d Cir. 1983). Emerald believes that, given the deposition transcript excerpts constituting admissions made by Sea Star's representatives, together with the pleadings, discovery and other documents submitted herewith, it has borne its initial burden of establishing the absence of a genuine issue as to any material fact pertaining to Sea Star's obligation to provide an accounting as demanded in County III of the Amended Counterclaim forthwith.

2.      **Where Facts and Records Upon Which Obligations Are Based Are Known and Kept Exclusively By One Party (In This Case, Sea Star), Where Sea Star Undertook The Obligation to Accurately Report Its Usage of the Emerald Equipment Creating a Fiduciary Relationship With Emerald and Where the Accounts Are Complicated, Sea Star Owes A Duty to Provide an Accounting of Such Usage as Demanded in Count III of the Amended Counterclaim**

The dispute between Sea Star and Emerald centers on a correct and honest accounting of Sea Star's usage of the Emerald Equipment under the Equipment

Lease Agreement. As made clear by the deposition testimony of Sea Star's own employees, the facts in this case compel a finding of a fiduciary duty on the part of Sea Star to provide an accounting as demanded in Count III of the Amended Counterclaim. At the inception of the leasing arrangement between Emerald and Sea Star, the Emerald Equipment was not in Emerald's possession (since it had been in NPR, Inc.'s possession when Sea Star purchased the NPR assets); instead, this equipment was located either in terminals, out to a shipper, at inland depots or on board the NPR vessels purchased by Sea Star (Bates 61-63, 102) (A-69-71, 88); (Florence 40) (A-122). Moreover, Emerald was not notified when Sea Star commenced using the Emerald Equipment since no receipt or other document was needed from Emerald before Sea Star could use the Emerald Equipment (Bates 99-100) (A-86-87). Due to these circumstances, where only Sea Star knew which pieces of Emerald Equipment it was using, Sea Star agreed to provide Emerald with monthly "self-billing reports", which it prepared, reporting to Emerald its "usage" of the Emerald Equipment. This was recognized by Sea Star as an unusual procedure made necessary since Sea Star was the only party initially in a position to identify the Emerald Equipment which it used (Bates 111-112) (A-89-90).

Under these circumstances, where the facts and records upon which the obligation to pay rent is determined are held exclusively by Sea Star and where Sea Star undertook the obligation to accurately report its usage of the Emerald Equipment, a fiduciary relationship is created with Sea Star acting in a fiduciary capacity to Emerald. See Anderson v. Watson, 141 Md. 217, 118 A. 569 (1922).[13] In Anderson, the Court of Appeals of Maryland found that a fiduciary and confidential relationship was

created where employees were compensated based on the amount of coal they had mined

and the employers had the exclusive means of weighing the coal.  As a result, the

Maryland Court held that the group of coal miners who sued the employer for an

accounting of the coal they had mined, were entitled to such relief, and an accounting

was ordered.  The rationale provided by the <u>Anderson</u> Court, at 118A.575-576 is

instructive:

> [W]e cannot say that a court of law can, under the circumstances of this
> case, afford the complainants an adequate and complete remedy, for while
> it may be true that, in the exercise of the powers conferred by sections 99
> and 200, article 75, Code Pub.Gen.Laws, such a court could effectually
> solve the account between the parties, yet the powers thus conferred are
> not called into existence until after a suit has actually been brought, and
> unless the plaintiff is informed of the extent of his claim he cannot
> properly bring an action at law upon it, … In this case the complainants
> do not know how many cars of coal they mined, nor the rate of
> compensation agreed upon from time to time for their labor, and until they
> receive that information they cannot properly present their claim in a court
> of law.
>
> Nor can there be any real question that there was a fiduciary and
> confidential relation, between the parties to this proceeding. The coal
> which measured the compensation to be paid to the men who mined it was
> weighed by the company on its own scales and by its own agents, out of
> the presence of the miners, who were, by the necessities of the case,
> precluded from witnessing the operation of weighing, and who were as a
> practical matter obliged to rely on the good faith of the company.  Under
> such circumstances the miners naturally and necessarily trusted and relied
> upon the company's good faith, and the company assumed the duty of
> dealing fairly with them.  For these reasons, in our opinion, the
> complainants are entitled to the accounting prayed in their bill.

Such reasoning was more recently adopted in <u>P.V. Properties, Inc. v. Rock</u>

<u>Creek Village Associates Ltd. Partnership</u>, 549 A.2d 403 (Md. App. (1988).  In <u>P.V.</u>

<u>Properties, Inc.</u>, the Court citing approvingly the rationale of <u>Anderson, supra</u>, held that a

---

[13] The Equipment Lease Agreement at paragraph 14 provides that this Agreement shall be interpreted and
the rights, liabilities and duties of the parties determined in accordance with the laws of the State of

confidential and fiduciary relationship exists between parties where one party maintains and exclusively controls the records upon which an obligation is determined, and the other party is forced to rely on the good faith and fair dealing of the other party in accurately determining the extent of the obligation. In P.V. Properties, Inc., supra, a landlord was required to render an accounting to its tenant of shopping mall by providing itemization as to category and amount of actual costs within an annual common area maintenance assessment where the tenant which had a contractual obligation to pay pro rata share of common area maintenance costs but had no means of determining whether annual statement reflected actual expenses incurred by the landlord as the landlord had exclusive control over the records but refused to render an itemized bill.

This case is no different. As a fiduciary, Sea Star owes Emerald a duty to honestly account for its usage of the Emerald Equipment. The fullest disclosure should be compelled.

So far, Emerald playing a "cat and mouse" game forced upon it by Sea Star has had to rely on Sea Star's good faith in providing discoverable documents which would evidence Sea Star's usage of the Emerald Equipment. This means that Emerald has been forced to spend countless hours pouring over whatever documentation Sea Star has deigned to produce in response to Emerald's discovery demands, in order to identify pieces of Emerald's equipment which turns up on various documentation, such as TIRs, etc., which shows the movement (i.e., use) of such equipment.[14] Through this process,

---

Maryland.

[14] Sea Star has refused to produce documents which would show Sea Star's use of all equipment, whether or not Emerald Equipment, which are loaded on ships and contained in ship "manifests". Instead, Sea Star has only agreed to produce "load summaries" which appear to constitute compiled documents which collates and separates at the Emerald Equipment. As such, Emerald has been forced to rely on Sea Star's "good faith", or other parties, in accurately preparing these "summaries". Emerald has filed a Motion to Compel Sea Star's Production of Certain Documents on May 16, 2007 (D.I. 115).

Emerald has managed to put together a piece by piece identification of Emerald Equipment noting when Emerald believes the equipment was first used by Sea Star, when Sea Star returned the equipment, or if never returned, the stipulated loss value as set forth in the Equipment Lease Agreement (See Emerald Equipment Analysis at A-135). Essentially, Emerald has been forced to perform its own accounting based on the piece meal information provided by Sea Star or obtained from third parties.

Emerald has repeatedly asked Sea Star to provide a similar analysis; in short, its "accounting" of the Emerald information as set forth in the Emerald Equipment Analysis. Clearly, by Sea Star's own admission, its Self-Billing Reports are not accurate. Sea Star's further "accounting" of its use of the Emerald Equipment must be compelled.

After three full years of litigation (instituted only after Sea Star's refusal to sit down with Emerald to reconcile the accounting provided), Sea Star has yet to provide an analysis which details its "accounting" of its usage of the Emerald Equipment, recognizing that its original reporting of that usage on the Self-Billing Reports is not accurate. The burden is on Sea Star; not Emerald. Enough is enough. Summary judgment should be granted in favor of Emerald and against Sea Star on Count III of the Amended Counterclaim ordering that Sea Star immediately provide an "accounting" of its use of the Emerald Equipment.

**B.    IN ADDITION TO AN ACCOUNTING TO BE PERFORMED BY SEA STAR, OR ALTERNATIVELY, A MASTER SHOULD BE APPOINTED TO CONDUCT AN ACCOUNTING NECESSARY FOR A PROPER DISPOSITION OF THIS CASE; SUCH AN APPOINTMENT IS AUTHORIZED BY FED. RULE CIV. PROC. 53**

As stated above, thousands of pieces of equipment were leased by Sea Star from Emerald. Since, at the inception of this leasing arrangement, this equipment was

scattered at different sites in the United States, as well as in Puerto Rico and the

Dominican Republic, Emerald had no way of knowing which of its pieces of equipment

were being used by Sea Star. Rather, Emerald was induced to rely upon Self-Billing

Reports prepared by Sea Star which were submitted to Emerald monthly, indicating

which pieces of Emerald Equipment Sea Star was using during each particular month.

Sea Star has admitted, in the course of this litigation, that it has used Emerald

Equipment for time periods not included in the Self-Billing Reports which it prepared

and submitted to Emerald. See Request For Admission No. 33, which states as follows:

> 33.    Admit that Sea Star used Emerald Equipment for time
>        periods not included in the self-billing reports prepared by
>        Sea Star.
>
> ANSWER:
> Sea Star admits Request No. 33.

Moreover, Sea Star has provided in discovery certain internal preliminary analyses

prepared by Sea Star before this litigation began which showed that hundreds of pieces of

equipment which Sea Star used nonetheless never appeared on the Sea Star Self-Billing

Reports. This underreporting, by Sea Star's own admission early on, totaled

approximately $180,000.00 of rental payments which Sea Star never made. Emerald's

analysis based on all of the documentation provided in this case, shows a more massive

underreporting of use of the Emerald Equipment by Sea Star which, together with the

failure to return various pieces of equipment, amount to rental and stipulated loss values

owed in excess of $4,700,000.00. Although it appears Sea Star believes its

underpayments are more than they initially indicated by its early analysis (Sea Star has

since deposited with the Court the sum of $534,000.00), there is still a huge gap between

the Emerald accounting and what appears to be Sea Star's position based on their own ongoing but never completed or produced analysis. To date, despite Emerald's discovery requests to Sea Star asking for an equipment piece accounting of Sea Star's usage of the Emerald Equipment, such an accounting has never been made.

This case, when all is said and done, involves an accounting to be performed by an experienced and fair and impartial arbitrator. Fed. Rules.Civ. Proc. 53(a)(1) provides as follows:

> Rule 53.  Masters
>
> (a)      Appointment.
>
> (1)      Unless a statute provides otherwise, a court may appoint a master only to:
>
> (A)      perform duties consented to by the parties;
>
> (B)      hold trial proceedings and make or recommend findings of fact on issues to be decided by the court without a jury if appointment is warranted by
>
> (i)      some exceptional condition, or
>
> (ii)      the need to perform an accounting or resolve a difficult computation of damages; or
>
> (C)      address pretrial and post-trial matters that cannot be addressed effectively and timely by an available district judge or magistrate judge of the district.

If any case cries out for the appointment of a master pursuant to Rule 53, it is this case. At issue, are tens of thousands of documents relating to thousands of pieces of equipment traced over a period of approximately 19 months, which must be referenced to determine the amount of rental and other charges owed for Sea Star's use of Emerald Equipment.

Rule 53(a)(1)(B), providing for the appointment of a master to hold trial proceedings, essentially sets forth two prerequisites; (1) the factual issues which the master is to make or recommend are issues to be decided by the Court without a jury; and (2) the matter involves an accounting or a difficult computation of damages. Both of these prerequisites are met here.

This action, which Sea Star instituted by invoking the admiralty jurisdiction of this Court, is a non-jury proceeding. It is well accepted that there is no right to jury trial in actions instituted in admiralty. See, Complaint of Great Lakes Dredge & Docks Co., 895 F.Supp. 604 (SDNY 1995); William P. Brooks Const. Co., Inc. v. Guthrie, 614 F.2d 509 (C.A. Tex. 1980); US v. Real Property Located at 2101, 2280, 2401 and 2501 Maple Street, City of Saginaw, Saginaw County, Mich., 750 F.Supp. 817 (E.D. Mich. 1990); Vassalos v. Hellenic Lines, Ltd., 482 F.Supp. 906 (D.C. Pa. 1979); Americana of Puerto Rico, Inc. v. Transocean Tankers Corp., 317 F.Supp. 798 (D.C. Puerto Rico 1970). Also, see, Fed. Rules.Civ. Proc. Rule 38 which specifically states that the Federal Rules of Civil Procedure shall not be construed to create a right to trial by jury on the issues in an admiralty or maritime claim within the meaning of Rule 9(h). Further, and in any event, neither party has requested a jury trial.

As to the second prerequisite, it is undoubtedly clear that the dispute between these parties essentially involves an accounting which would identify: (1) each piece of Emerald Equipment used by Sea Star; (2) the time period each piece of Emerald Equipment was used by Sea Star; (3) the total rent owed for each piece of Emerald Equipment used by Sea Star which was not paid; (4) each piece of equipment used by Sea Star which was never returned to Emerald; and (5) the amount of stipulated loss value for

these unreturned pieces of Emerald Equipment. Such an accounting involves an analysis of tens of thousands of documents consisting of TIRs, MITs (or "Move Histories"), inventories, cargo discharge documents, gate logs, ship manifests, and faxes and e-mails from various parties including, but not limited to, in land depots that would show inbound and outbound gate activity of the Emerald Equipment.

Where difficult accounting problems are involved, the Court has broad discretion to refer the matter to a master. Southern Agency Company v. LaSalle Casualty Company, 393 F.2d 907, 914 (8th Cir. 1968). In United States of America v. Wilson, 21 F.R.D. 173, while noting that to determine whether or not to appoint a master under Rule 53(b) of the Federal Rules of Civil Procedure, the facts and circumstances of each case must be considered in the light of a reading of Rule 53 and the judicial interpretations thereof, the Court granted a motion for the appointment of a master in that case involving an action brought by the United States for the conversion of beans, where there was voluminous evidence to be sifted regarding the quantity, percentages, market values and ownership at the time of the alleged conversion and which involved a great number of separate transactions over a 21 month period. Under such circumstances, the Court readily recognized the efficacy of the assistance of a master to wade through and sort out the details of the required accounting.

The situation confronting this Court in this case is not unlike the circumstances in the Wilson, supra, case. Here, the evidence consists of a numerous transactions occurring over a period of approximately 20 months. Whereas in the Wilson case the plaintiff's evidence involved many transactions of beans going into and being shipped out of the elevators of the warehousemen in question; here the evidence at issue involves the

movement of thousands of pieces of equipment being moved in and out of ports, terminals and depots.

As was recognized in <u>Wilson</u>, <u>supra</u>, a master, with the appropriate expertise, and given time to study and analyze the evidence submitted by both plaintiff and defendant is best able to clarify and simply any remaining factual or legal issues, if any, which may be left for the court.  In such manner, a master's detailed accounting would aid the court in arriving at a just determination.

C.    **The Appointment of a Master is Appropriate at This Juncture in These Proceedings**

This dispute has been litigated between the parties since April of 2004.  Pre-trial proceedings and discovery were completed in the Florida District Court prior to the transfer of the case to this Court on the eve of the final pre-trial conference.

As Rule 53 makes clear, the appointment of a master may be done at any stage of the proceedings.  While Rule 53(a)(1)(B) contemplates a master holding <u>trial proceedings</u> and making or recommending findings of fact on issues to be decided by the Court, Rule 53(a)(1)(C) specifically contemplates the appointment of a master to address <u>pre-trial</u> matters, as well.  Given the protracted procedural meandering of this case between Florida and Delaware and the voluminous discovery already conducted, the appointment of a master at this time should not be delayed.  The issues in dispute have been known by the parties since the filing of the two complaints in March, 2004 and have been the subject matter of extensive discovery.  To the extent any further discovery is needed for the purpose of conducting such an accounting, the master who is appointed could regulate the additional discovery he may need.

Given the lengthy delay in bringing this matter to a conclusion and the voluminous web of documents to be sifted and examined, the appointment of a master at this juncture would seem to be most appropriate. Rule 53(b) specifically contemplates that an Order appointing a master encompass various duties, including investigation or enforcement duties. Rule 53(c) provides that a master has the authority to regulate all proceedings and take all appropriate measures to perform fairly and efficiently the assigned duties. Finally, Rule 53(d) provides that a master may conduct evidentiary hearings and may exercise the power of the appointing court to compel, take, and record evidence. All of this can be done in the nature of pre-trial proceedings and/or trial proceedings. The appointment of a master at this time would finally move this case on to its conclusion.

This matter is just sitting waiting for an impartial party to sift through the voluminous documents, to weigh the evidence, to determine what, if any, other discovery may be necessary, to take whatever testimony may be deemed required, and to perform whatever other investigation essential for a just determination of this dispute. A master, as contemplated by Rule 53, would be ideal for this purpose and should be appointed forthwith.

## VI.    CONCLUSION

Based on the foregoing reasoning and legal authorities, Emerald respectfully requests: (a) Summary Judgment granted in favor of Emerald on Count III of the Emerald Amended Counterclaim compelling Sea Star to provide an accounting for its usage of the Emerald Equipment and (b) a master be appointed pursuant to Fed. Rule Civ. 53.

Respectfully Submitted,


ECKERT SEAMANS CHERIN & MELLOTT, LLC


By:    /s/ Ronald S. Gellert, Esq.
            Tara Lattomus, Esq. (No. 3515)
            Ronald S. Gellert, Esq. (No. 4259)
            300 Delaware Avenue
            Suite 1210
            Wilmington, DE  19801
            302-425-0430

                    -and-

            Gary M. Schildhorn, Esq.
            Alan I. Moldoff, Esq.
            Two Liberty Place
            50 South 16th Street, 22nd Floor
            Philadelphia, PA  19102
            215-851-8400

May 25, 2007            Counsel for Emerald Equipment Leasing, Inc.

    G:\393\10\pleading\sea star brief-mtn appoint sp master.doc