# APPENDIX

# PART 1 OF 7

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SEA STAR LINE, LLC,<br>a limited liability company, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | |
| | : | |
| -v- | : | |
| | : | |
| EMERALD EQUIPMENT LEASING,<br>INC., a corporation, | : | |
| | : | |
| Defendant/Plaintiff<br>on the Counterclaim | : | Case No. 05-CV-00245-(JJF) |
| | : | |
| -v- | : | |
| | : | |
| SEA STAR LINE, LLC | : | |
| | : | |
| Defendant on the<br>Counterclaim | : | |

## **APPENDIX**

ECKERT SEAMANS CHERIN &
MELLOTT, LLC
Tara Lattomus, Esq. (No. 3515)
Ronald S. Gellert, Esq. (No. 4259)
300 Delaware Avenue
Suite 1210
Wilmington, DE  19801
302-425-0430

-and-

Gary M. Schildhorn, Esq.
Alan I. Moldoff, Esq.
Two Liberty Place
50 South 16th Street, 22nd Floor
Philadelphia, PA  19102
215-851-8400

May 25, 2007                Counsel for Emerald Equipment Leasing, Inc.

# APPENDIX

Voluntary Petition of Emerald ........................................................................ A-1

Equipment Rental Agreement ........................................................................ A-8

Excerpts of Transcript of Hearing................................................................... A-19

Order to Dismiss the Complaint ..................................................................... A-26

Amended Counterclaim of Emerald ................................................................ A-32

Sea Star's Response to Request for Admissions................................................ A-42

Excerpts of Deposition of Philip Bates ............................................................ A-52

Email Agreement ........................................................................................ A-91

Excerpts of Deposition of Andrew Rooks ......................................................... A-92

Excerpts of Deposition of Lisa Florence .......................................................... A-117

Emerald Equipment Analysis ........................................................................ A-135

Sea Star Response to Interrogatories .............................................................. A-285

03/29/2001 11:46 FAX 6524132    Cannon Laser E    Ø010/026

BK    C1-0934

## United States Bankruptcy Court
### District of Delaware

**Voluntary Petition**

| Name of Debtor (if individual, enter Last, First Middle):<br>**EMERALD EQUIPMENT LEASING, INC.** | Name of Joint Debtor (Spouse) (Last, First, Middle):<br>**NONE** |
|---|---|
| All Other Names used by the Debtor in the last 6 years<br>(include married, maiden, and trade names): | All Other Names used by the Joint Debtor in the last 6 years<br>(include married, maiden, and trade names): |
| Soc. Sec./ Tax I.D. No. (if more than one, state all):<br>**52-2063877** | Soc. Sec./Tax I.D. No. (if more than one, state all): |
| Street Address of Debtor (No. & Street, City, State & Zip Code):<br>**101 SOUTH KING STREET**<br>**GLOUCESTER CITY, NJ  08030** | Street Address of Joint Debtor (No. & Street, City, State & Zip Code): |
| County of Residence or of the<br>Principal Place of Business: **CAMDEN** | County of Residence or of the<br>Principal Place of Business: |
| Mailing Address of Debtor (if different from street address):<br>P.O. Box 8698<br>PHILADELPHIA, PA 19101 | Mailing Address of Joint Debtor (if different from street address): |

Location of Principal Assets of Business I
(if different from street address above):
**SAN JUAN, PR; PHILADELPHIA, PA**

*(handwritten notes across form:)*
1 - copy not bound
   w/ stickers/numbers

5 - copies band
   w/ ~~stickers~~ numbers

you may sticker the
original

→ lower right

Information Regar...

**Venue** (Check any applicable box)
- ☐ Debtor has been domiciled or has had a residence, principa petition or for a longer part of such 180 days than in any othe
- ☒ There is a bankruptcy case concerning debtor's affiliate, ge

**Type of Debtor** (Check all boxes that apply)
- ☐ Individual(s)
- ☒ Corporation
- ☐ Partnership
- ☐ Other

- ☐ Railroad
- ☐ Stockbroker
- ☐ Commodity B

**Nature of Debts** (Check one box)
- ☐ Consumer/Non-business
- ☒ Business

**Chapter 11 Small Business** (Check all boxes that ...
- ☐ Debtor is a small business as defined in 11 U.S.C. § 101
- ☐ Debtor is and elects to be considered a small business under 11 U.S.C. § 1121(e) (Optional)

immediately preceding the date of this

...rptcy Code Under Which
(Check one box)
- 11    ☐ Chapter 13
- 12
- ...eeding

...ck one box)

...plicable to individuals only) Must attach
...tion certifying that the debtor is unable
to pay fee except in installments. Rule 1006(b). See Official Form No. 3.

**Statistical/Administrative Information** (Estimates only)
- ☒ Debtor estimates that value will be available for distribution to unsecured creditors
- ☐ Debtor estimates that, after any exempt property is excluded and administrative expenses paid, there will be no funds available for distribution to unsecured creditors.

| Estimated Number of Creditors<br>(on a consolidated basis) | 1-15 | 16-49 | 50-99 | 100-199 | 200-999 | 1000-over |
|---|---|---|---|---|---|---|
| | ☐ | ☐ | ☐ | ☐ | ☐ | ☒ |

| Estimated Assets* | $0 to $50,000 | $50,001 to $100,000 | $100,001 to $500,000 | $500,001 to $1 million | $1,000,001 to $10 million | $10,000,001 to $50 million | $50,000,001 to $100 million | More than $100 million |
|---|---|---|---|---|---|---|---|---|
| | ☐ | ☐ | ☐ | ☐ | ☐ | ☒ | ☐ | ☐ |

| Estimated Debts* | $0 to $50,000 | $50,001 to $100,000 | $100,001 to $500,000 | $500,001 to $1 million | $1,000,001 to $10 million | $10,000,001 to $50 million | $50,000,001 to $100 million | More than $100 million |
|---|---|---|---|---|---|---|---|---|
| | ☐ | ☐ | ☐ | ☐ | ☐ | ☒ | ☐ | ☐ |

* May reflect material intercompany assets and liabilities.

*(stamp:)* U.S. CLERK BANKRUPTCY COURT DISTRICT OF DELAWARE    MAR 21    8 00 AM '01    FILED/RECEIVED

**A-1**

**Voluntary Petition**
*(This page must be completed and filed in every case)*

Name of Debtor(s): **Page 2**

**Emerald Equipment Leasing, Inc.**

**Prior Bankruptcy Case Filed Within Last 6 Years** (If more than one, attach additional sheets)

| Location where Filed: **NONE** | Case Number: | Date Filed: |
| --- | --- | --- |

**Pending Bankruptcy Case Filed by any Spouse, Partner, or Affiliate of this Debtor** (If more than one, attach additional sheet).

| Name of Debtor: **SEE ATTACHMENT B** | Case Number: | Date Filed |
| --- | --- | --- |
| District: | Relationship: | Judge: |

## Signatures

### Signature(s) of Debtor(s) (Individual/Joint)

I declare under penalty of perjury that the information provided in this petition is true and correct.

[If petitioner is an individual whose debts are primarily consumer debts and has chosen to file under chapter 7] I am aware that I may proceed under chapter 7, 11, 12 or 13 of title 11, United States Code, understand the relief available under each such chapter, and choose to proceed under chapter 7.

I request relief in accordance with the chapter of title 11, United States Code, specified in this petition.

X **Not Applicable**
Signature of Debtor

X **Not Applicable**
Signature of Joint Debtor

Telephone Number (If not represented by attorney)

Date

### Signature of Attorney

X *[signature]*
Signature of Attorney for Debtor(s)

**Laura Davis Jones, Esq.**
Printed Name of Attorney for Debtor(s)

**Pachulski, Stang, Ziehl, Young & Jones P.C.**
Firm Name

**919 North Market Street**
Address

**Wilmington, Delaware 19801**

**(302) 652-4100**
Telephone Number

**March 21, 2001**
Date

### Exhibit A

(To be completed if debtor is required to file periodic reports (e.g. forms 10K and 10Q) with the Securities and Exchange Commission pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 and is requesting relief under chapter 11)

☒ Exhibit A is attached and made a part of this petition.

### Exhibit B

(To be completed if debtor is an individual whose debts are primarily consumer debts)
I, the attorney for the petitioner named in the foregoing petition, declare that I have formed the petitioner that [he or she] may proceed under chapter 7, 11, 12, or 13 of title 11, United States Code, and have explained the relief available under each such chapter.

X _____
Signature of Attorney for Debtor(s)          Date

### Signature of Debtor (Corporation/Partnership)

I declare under penalty of perjury that the information provided in this petition is true and correct, and that I have been authorized to file this petition on behalf of the debtor.

The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

X *[signature]*
Signature of Authorized Individual

**John A. Evans**
Printed Name of Authorized Individual

**Corporate General Counsel**
Title of Authorized Individual

**March 20 2001**
Date

### Signature of Non-Attorney Petition Preparer

I certify that I am a bankruptcy petition preparer as defined in 11 U.S.C. § 110, that I prepared this document for compensation, and that I have provided the debtor with a copy of this document.

**Not Applicable**
Printed Name of Bankruptcy Petition Preparer

_____
Social Security Number

_____
Address

Names and Social Security numbers of all other individuals who prepared or assisted in preparing this document:

If more than one person prepared this document, attach additional sheets conforming to the appropriate official form for each person.

X **Not Applicable**
Signature of Bankruptcy Petition Preparer

_____
Date

A bankruptcy petition preparer's failure to comply with the provisions of title 11 and the Federal Rules of Bankruptcy Procedure may result in fines or imprisonment or both 11 U.S.C. § 110; 18 U.S.C. § 156.

**A-2**

# United States Bankruptcy Court
## District of Delaware

In re Emerald Equipment Leasing, Inc.                    Case No.
                                    Debtor

                                                         Chapter 11

## Exhibit "A" to Voluntary Petition

1.    If any of the debtor's securities are registered under Section 12 of the Securities Exchange Act of 1934, the SEC file number is _____.  N/A

2.    The following financial data is the latest available information and refers to the debtor's condition on September 30, 2000.  As of September 30, 2000, Holt and certain of its affiliates including Murphy Marine had, on a combined basis, assets of approximately $364.2 million and liabilities of approximately $391.4 million.  The Combined Financial Statements dated September 30, 2000 include not only Holt, but also Holt's wholly-owned subsidiaries (1) Holt Hauling and Warehousing System, Inc., (2) Holt Cargo Systems, Inc., (3) The Riverfront Development Corporation, and (4) Murphy Marine Services, Inc.  Also included are additional Holt subsidiaries: (5) San Juan International Terminals, Inc., (6) New-Port Stevedores, Inc. (formerly known as S.J.I.T., Inc.), (7) Borinquen Maintenance, Inc. and (8) NPR Holding Corporation ("NPR Holding") and NPR Holding's subsidiaries (9) NPR, Inc., (10) NPR-Navieras Receivables, and (11) NPR S.A., Inc.  A final Holt affiliate included is (12) Emerald Equipment Leasing, Inc., which owns certain cranes and other equipment that it leases to other Debtors.  This financial information, although the most recent available, is dated as of September 30, 2000 and also is unaudited.  This information reflects book values as at the date it was prepared, and thus it may not reflect actual market value or realizable value.  This information also may not reflect certain off-book or contingent liabilities that may be material.

| | | | |
|---|---|---|---|
| a. | Total assets | | $28,936,626* |
| | Total debts (including debts listed in 2.c., below) | | $22,714,391* |
| | | | Approximate number of holders |
| c. | Debt securities held by more than 500 holders | 0 | 0 |
| d. | Number of shares of preferred stock | 0 | 0 |
| e. | Number of shares common stock | 6 | 6 |
| | Comments, if any: N/A | | |

3.    Brief description of debtor's business: Emerald Equipment Leasing, Inc., a Delaware corporation, is an equipment leasing company which leases its port-related equipment to certain Debtors.

4.    List the names of any person who directly or indirectly owns, controls, or holds, with power to vote, 5% or more of the voting securities of debtor:

**Thomas J. Holt, Sr.**

* May reflect material intercompany assets and liabilities.

**A-3**

Attachment "B"

Pending Bankruptcy Cases Filed by **CURRENT** Spouse, Partner, or Affiliate of This Debtor

Name of Debtor: Murphy Marine Services, Inc.
Case Number:
Date Filed:      same as petitioner
District:        same as petitioner
Relationship:
Judge:           same as petitioner

Name of Debtor: The Holt Group, Inc.
Case Number:
Date Filed:      same as petitioner
District:        same as petitioner
Relationship:
Judge:           same as petitioner

Name of Debtor: B.H. Sobelman & Co., Inc.
Case Number:
Date Filed:      same as petitioner
District:        same as petitioner
Relationship:
Judge:           same as petitioner

Name of Debtor: Borinquen Maintenance, Inc.
Case Number:
Date Filed:      same as petitioner
District:        same as petitioner
Relationship:
Judge:           same as petitioner

Name of Debtor: Broadway Equipment Leasing Corp.
Case Number:
Date Filed:      same as petitioner
District:        same as petitioner
Relationship:
Judge:           same as petitioner

Name of Debtor: C.R.T., Inc.
Case Number:
Date Filed:      same as petitioner
District:        same as petitioner
Relationship:
Judge:           same as petitioner

**A-4**

Name of Debtor: Dockside International Fish Co., Inc.
Case Number:
Date Filed:        same as petitioner
District:          same as petitioner
Relationship:
Judge:             same as petitioner


Name of Debtor: Dockside Refrigerated Warehouse, Inc.
Case Number:
Date Filed:        same as petitioner
District:          same as petitioner
Relationship:
Judge:             same as petitioner


Name of Debtor: Holt Cargo Systems, Inc.
Case Number:
Date Filed:        same as petitioner
District:          same as petitioner
Relationship:
Judge:             same as petitioner


Name of Debtor: Holt Hauling and Warehousing System, Inc.
Case Number:
Date Filed:        same as petitioner
District:          same as petitioner
Relationship:
Judge:             same as petitioner


Name of Debtor: New-Port Stevedores, Inc.
Case Number:
Date Filed:        same as petitioner
District:          same as petitioner
Relationship:
Judge:             same as petitioner


Name of Debtor: NPR Holding Corporation
Case Number:
Date Filed:        same as petitioner
District:          same as petitioner
Relationship:
Judge:             same as petitioner

Name of Debtor: NPR, Inc.
Case Number:
Date Filed:      same as petitioner
District:        same as petitioner
Relationship:
Judge:           same as petitioner


Name of Debtor: NPR-Navieras Receivables, Inc.
Case Number:
Date Filed:      same as petitioner
District:        same as petitioner
Relationship:
Judge:           same as petitioner


Name of Debtor: NPR S.A., Inc.
Case Number:
Date Filed:      same as petitioner
District:        same as petitioner
Relationship:
Judge:           same as petitioner


Name of Debtor: Oregon Avenue Enterprises, Incorporated
Case Number:
Date Filed:      same as petitioner
District:        same as petitioner
Relationship:
Judge:           same as petitioner


Name of Debtor: Pattison Avenue Warehousing Corp.
Case Number:
Date Filed:      same as petitioner
District:        same as petitioner
Relationship:
Judge:           same as petitioner


Name of Debtor: Refrigerated Distribution Center, Inc.
Case Number:
Date Filed:      same as petitioner
District:        same as petitioner
Relationship:
Judge:           same as petitioner

**A-6**

Name of Debtor: Refrigerated Enterprises, Inc.
Case Number:
Date Filed:      same as petitioner
District:        same as petitioner
Relationship:
Judge:           same as petitioner

Name of Debtor: The Riverfront Development Corporation
Case Number:
Date Filed:      same as petitioner
District:        same as petitioner
Relationship:
Judge:           same as petitioner

Name of Debtor: San Juan International Terminals, Inc.
Case Number:
Date Filed:      same as petitioner
District:        same as petitioner
Relationship:
Judge:           same as petitioner

Name of Debtor: 777 Pattison Ave., Inc.
Case Number:
Date Filed:      same as petitioner
District:        same as petitioner
Relationship:
Judge:           same as petitioner

Name of Debtor: Triple Seven Ice, Inc.
Case Number:
Date Filed:      same as petitioner
District:        same as petitioner
Relationship:
Judge:           same as petitioner

Name of Debtor: Wilmington Stevedores, Inc.
Case Number:
Date Filed:      same as petitioner
District:        same as petitioner
Relationship:
Judge:           same as petitioner

A-7

*SIGNED LEASE*

## EQUIPMENT RENTAL AGREEMENT  *pub.*

This Agreement is made and executed this *As of 31* day of July, 2002 between EMERALD EQUIPMENT LEASING, INC., a Delaware corporation having its principal place of business at 101 South King Street, Gloucester City, New Jersey 08030 ("Lessor"), and SEA STAR LINE, LLC, a Delaware limited liability company having its principal place of business at 100 Bell Tel Way, Suite 300, Jacksonville, Florida 32216 ("Lessee"). Terms and conditions of this Agreement cover equipment in use at various times commencing April 29, 2002. Such equipment is of the types, at daily lease rates, and with damage exclusions and stipulated loss values delineated on Schedule "A", which is attached to and incorporated into this Agreement ("Equipment"). In consideration of the mutual covenants and conditions delineated below, the Parties agree:

1. **Equipment.** Lessor agrees to lease to Lessee, and Lessee agrees to lease from Lessor, the Equipment. Delivery of all Equipment to Lessee or its agents by Lessor shall be effected and evidenced by signed and dated equipment interchange receipts and shall be subject to the terms and conditions of this Agreement.

2. **Term.** The lease term for each item of Equipment shall begin on the date when such Equipment is delivered to Lessee or its agent and shall end on the date when such Equipment is taken off hire pursuant to section 10 below. Unless the parties otherwise agree in writing, the minimum rental period for each item of Equipment shall be thirty (30) days. All provisions of this Agreement shall apply during any extension or renewal period. Either party may terminate this Agreement on thirty (30) days' prior written notice to the other party.

3. **Rental.** Lessee shall pay rent and all other charges under this Agreement on a monthly basis. Each payment for particular Equipment will become due on the tenth day of the month following the month of use, unless the parties otherwise agree in writing. In the event Lessee fails to make timely payment, interest shall be due on any overdue amount at a rate of eighteen percent (18%) per annum, commencing ten (10) days after Lessee receives Lessor's invoice for such overdue amount. With respect to particular Equipment, Lessee's obligation to pay rent and other charges shall terminate immediately if Lessee purchases and pays for such Equipment.

4. **Ownership; Sublease; Substitution; Encumbrances.**

**A-8**

(a)    This Agreement shall be deemed a lease for all purposes. The Equipment shall remain Lessor's property; and Lessee shall acquire no title, ownership, or purchase rights of any nature by virtue of this Agreement.  In the event that notwithstanding the express intent of the parties, a court of competent jurisdiction determines that this Agreement is not a true lease but is rather a sale and extension of credit, a lease intended for security, a loan secured by the Equipment or other similar arrangement, the parties agree: (i) (A) to secure the prompt payment and performance as and when due of all Lessee's obligations (both now existing and hereafter arising) under this Agreement, Lessee shall be deemed to have granted, and it hereby grants, to Lessor a first priority security interest in the following (whether now existing or hereafter created): the Equipment, all replacements, substitutions, attachments, accessions, and additions thereto, all warranties and licenses relating thereto and all proceeds (cash and non-cash but without power of sale), including the proceeds of all insurance policies, insuring the Equipment; (B) with respect to the Equipment, in addition to all other rights and remedies available to Lessor under this Agreement upon the occurrence of an event of default, Lessor shall have all of the rights and remedies of a first priority secured party under the Uniform Commercial Code; and (ii) (A) the principal amount of any such loan shall be an amount equal to the aggregate of the "Stipulated Loss Values" of all outstanding Equipment; (B) the term of any such loan shall be co-extensive with the term of this Agreement; and (C) the loan payments under any such loan shall be the rental payments specified in this Agreement.

(b)    This Agreement shall be subject and subordinate to any lease or security interest in favor of a third-party lessor or lender to Lessor.  In the event any such third party becomes entitled to possession of any Equipment, Lessee shall return the Equipment to such third party at one or more delivery locations specified in paragraph 10.

(c)    Lessee shall not pledge, hypothecate, mortgage, create any security interest in, or otherwise encumber or permit the encumbrance of any Equipment.  At its own expense, Lessee promptly shall take action necessary to discharge any lien, charge, or other encumbrance asserted against any Equipment arising after delivery of such Equipment to Lessee and as a result of Lessee's act or omission.

A-9

(d)   Each item of Equipment shall have Lessor's serial number and other identifying marks affixed.  Lessee shall not obliterate, alter, conceal, or otherwise change or hide such number or marks.

(e)   Without Lessor's prior written consent, Lessee shall not assign any right or interest in this Agreement or any Equipment and shall not sublet or otherwise relinquish possession of any Equipment, except to other carriers as evidenced by interchange agreements.  Lessor may assign all or any part of its obligations, right, title, or interest in this Agreement, including all rental charges due or to become due.  Lessee expressly consents to Lessor's application of any payment credits to which it is entitled under this Agreement to payment obligations of Lessee under this Agreement.

5.   <u>Equipment Delivery and Interchange</u>.  Lessor shall make the Equipment available for delivery to Lessee at the locations agreed by the parties.  The signature of Lessee's representative on an equipment interchange receipt shall constitute conclusive evidence that the Equipment to which the receipt relates has been delivered to Lessee.

6.   <u>Maintenance and Repairs</u>.

(a)   At its own cost and expense, Lessee shall keep the Equipment in operating condition.  Lessee shall be responsible for all damages and changes in the condition of the Equipment after delivery by Lessor, subject to section 10 below and Schedule "A".  Lessee's maintenance and repair obligations include washing and cleaning the Equipment regularly to prevent corrosion, spot painting, and replacing of parts as necessary.  Lessee shall comply with all loading limitations, handling procedures, and operating instructions to prevent excessive impact or unbalanced loading. Lessee shall not use any Equipment for storage or transportation of cargo which may damage the Equipment, including but not limited to unprotected corrosive substances, poorly secured materials, or bulk commodities which may corrode, oxidize, severely dent, puncture, contaminate, stain, or damage the Equipment.

(b)   Lessee shall make no modifications, improvements, or replacements and shall not attach accessories or additions to any Equipment, without Lessor's prior written consent, which shall not be unreasonably withheld, except as necessary to comply with this Agreement.   All improvements, repairs, accessories, and replacements made or attached to any Equipment by Lessee shall become part of the Equipment and Lessor's property without Lessor incurring any liability or, at Lessor's option, shall be removed

and the Equipment restored to its original condition at Lessee's expense.  Absent written agreement, Lessee shall not change or supplement identification marks on any Equipment.

(c) Lessee shall comply with all conventions, laws, regulations, or orders of federal, state, foreign, and local governments and agencies having jurisdiction over the Equipment or its use, operation, or storage and shall be liable for all fines, penalties, and fees for failure to comply.

7.  <u>Warranties</u>.  Equipment subject to this Agreement is leased "AS IS", and Lessor warrants only that Lessee shall have quiet possession against any person claiming through Lessor. LESSOR MAKES NO EXPRESSED OR IMPLIED WARRANTY OF QUALITY, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR USE WITH RESPECT TO ANY EQUIPMENT AND HAS NOT MADE, AND SHALL NOT BE BOUND BY, ANY STATEMENT, AGREEMENT, OR REPRESENTATION NOT SPECIFIED IN A WRITING SIGNED BY LESSOR.

8.  <u>Taxes and Other Expenses</u>.  Lessee agrees to pay all sales, use, excise, property, gross income, gross receipts, stamp, or other taxes; levies; import duties; charges; or withholdings of any nature (together with any penalties, fines, or interest) imposed against Lessor, Lessee, or the Equipment by any governmental or taxing authority with respect to any Equipment; upon the leasing, delivery, possession, use, operation, redelivery, or other disposition of such Equipment; or upon the rentals, receipts, or earnings arising from such Equipment; excluding, however, any such taxes, levies, import duties, charges, and withholdings that are imposed or accrued with respect to any Equipment prior to its delivery to Lessee and any taxes measured by Lessor's income.  Lessee shall pay all other expenses relating to Equipment arising during the rental period and resulting from Lessee's acts or omissions, including but not limited to expenses incurred in ports, depots, or storage areas.

9.  <u>Risk of Loss</u>.

(a)  During the term of this Agreement, Lessee shall bear all risk of loss, damage, theft, or destruction to the Equipment.  No such loss, damage, theft, or destruction of Equipment, in whole or part, shall impair Lessee's obligations under this Agreement, all of which shall continue in full force and effect. At Lessor's option and subject to Schedule "A", Lessee shall (i) put the affected Equipment in the condition that existed upon delivery to Lessee or (ii) pay Lessor an amount equal to all accrued and unpaid rent due under this Agreement, together with the Stipulated Loss

A-11

Value, with respect to the affected Equipment, less the amount of all recoveries by Lessor from parties other than Lessee for such loss, damage, theft, or destruction.

(b)   Upon compliance with subparagraph (a), Lessee shall be subrogated to Lessor's rights with respect to any insurance policies and claims for reimbursement by third parties in connection with such loss, damage, theft, or destruction.

10.   __Redelivery of Equipment.__

(a)   At its sole expense, Lessee shall redeliver Equipment to Lessor at Greenwich Terminal, Philadelphia, Pennsylvania, Sea Star Terminal, Puerto Nuevo, San Juan, Puerto Rico, Greenwich Terminal, Port of Jacksonville, Florida, or any other location as to which the parties have agreed in writing.   Each redelivery shall be subject to Schedule "A".   At least seventy-two (72) hours prior to actual redelivery, Lessee shall give Lessor a written estimate of types and quantities of Equipment which Lessee intends to redeliver at particular ports.

(b)   Upon redelivery of particular Equipment, the receiving terminal will execute an equipment interchange receipt.   Subject to Schedule "A", Lessee shall return all Equipment to Lessor in the condition that existed upon delivery to Lessee.

(c)   Lessee shall return such Equipment with tires equal in value and condition to those delivered with the Equipment, normal wear and tear excepted.   The value of any tire damage at the time of return is included in the damage exclusion value for such Equipment, as specified in Schedule "A".

(d)   Lessor shall have the right to inspect Equipment leased under this Agreement at reasonable times during normal business hours.   Upon Lessor's reasonable request, Lessee shall furnish a list of all locations of Equipment as of the most recent date possible and take reasonable steps to make Equipment available for inspection.   On or before the seventh day of each month, Lessee shall furnish a list of all locations of Equipment as of the end of the previous month.

(e)   At the time of return, Equipment will be taken off hire; and rental charges will cease.   If Equipment is returned to a terminal with damage exceeding the damage exclusion specified in Schedule "A", Lessor will inform Lessee within seven (7) days after return.   Lessor shall have the right to require Lessee to repair Equipment or to authorize repairs at Lessee's expense.   If Lessee

**A-12**

fails to authorize repairs for which Lessor claims Lessee is responsible within ten (10) days after notification of damage, Lessor may promptly authorize such repair and rental charges will cease on completion of such repairs (no later than 10 business days after authorization). Lessee agrees to pay for required repairs no later than ten (10) days after receipt of invoice.

(f)  If Lessee fails to return any Equipment for more than sixty (60) days after the return date specified in a Lessor notice, Lessor may elect to treat such Equipment as lost; and Lessee shall pay Lessor the Stipulated Loss Value of such Equipment, together with all accrued rental charges at the contractual daily rate within fifteen (15) days.

11.  Indemnification and Expenses.

(a)  Lessee shall defend, indemnify and hold Lessor, its agents and employees, harmless from all claims, causes of action, liability damage or loss (including expenses in connection with any claim or suit, such as reasonable attorneys' fees and court costs) arising out of (a) failure by Lessee to comply with its obligations under this Agreement or any attempt by a third party to impose on Lessor liability for Lessee's acts or omissions; (b) any claim for personal injury or death or for property loss or damage (including but not limited to any products liability claim) arising out of possession, leasing, operation, control, use, storage, loading, unloading, moving, maintenance, delivery, or return of any Equipment; and (c) any forfeiture, seizure, impounding of, or charge or lien imposed or asserted against any Equipment as a result of Lessee's acts or omissions.

(b)  Except for Lessee's obligation to pay interest on delinquent rent, neither party shall be liable to the other party or any other person for delay not to exceed sixty (60) days in the performance of any obligation due to events beyond its reasonable control, including but not limited to fire; storm; flood; earthquake; explosion; accidents; acts of God, governmental agencies, or public enemies; sabotage; riots; civil disorders; strikes, lockouts, and other work stoppages; labor disputes; and failure of repair facilities to complete repairs timely.  Under no circumstances shall either party be liable to the other party for exemplary damages.

12.  Insurance.  Lessee will carry and maintain insurance on the Equipment. Upon execution of this Agreement, Lessee shall furnish Lessor with insurance certificates evidencing (a) all-risk loss and damage insurance (including mysterious disappearance,

A-13

unexplained loss, war risks, strikes, riots, and civil commotions) on land, afloat, or airborne, in transit or at rest anywhere in the world, in an amount equal to the Stipulated Loss Value of all Equipment leased pursuant to this Agreement; (b) comprehensive general liability insurance, including contractual liability and broad form property damage, with combined single limits of $2,000,000; (c) automobile liability and property damage with combined single limits of $2,000,000; (d) deductibles applicable to each coverage. Each insurance coverage shall (a) name Lessor and its assigns as additional assureds, as their interests may appear; (b) include a loss payable clause in favor of Lessor and its assigns; and (c) include the insurer's undertaking to send Lessor and its assigns written notice at least thirty (30) days prior to any expiration or cancellation of such insurance. If Lessee defaults in payment of any premium under any such insurance policies, Lessor may but shall not be obliged to pay such premium; and Lessee shall repay the premium on demand. Lessee assigns to Lessor all right to insurance proceeds payable to Lessee for damage to or loss of the Equipment.

13. <u>Events of Default</u>.

(a) The following shall be events of default under this Agreement:

(i) Continuing failure to pay rent for thirty (30) days after its due date under this Agreement;

(ii) Continuing default in performance of any of Lessee's obligations under this Agreement for thirty (30) days after written notice thereof from Lessor to Lessee;

(iii) Lessee is a party to a merger or consolidation or sells, conveys, or transfers all or a substantial part of its assets or becomes insolvent or admits in writing its inability to pay its debts as they mature or applies for, consents to, or acquiesces in appointment of a trustee or a receiver for Lessee or any subsidiary or any property of either; or, in the absence of such application, consent, or acquiescence, a trustee or receiver is appointed for Lessee or any subsidiary or for a substantial part of the property of either and is not discharged within sixty (60) days; or under bankruptcy or insolvency law, any dissolution or liquidation proceeding is instituted against Lessee or any subsidiary with Lessee's or such subsidiary's consent or acquiescence or remains undismissed for sixty (60) days.

(b)  Upon the occurrence of any default by Lessee under this Agreement, Lessor shall (except to the extent otherwise required by law) be entitled to:

(i) Proceed by appropriate court action or actions to enforce performance by Lessee of the applicable covenants and terms of the Agreement or to recover damages for breach;

(ii) Terminate Lessee's right to possession of, demand return of, or repossess at Lessee's expense any or all of the Equipment without prejudice to any other remedy or claim;

(iii) Elect to sell any or all Equipment after giving thirty (30) days' notice to Lessee at one or more public or private sales and recover the sum of the Stipulated Loss Values of such Equipment, all rent owed through the rent payment immediately preceding the date of such notice, all costs and expenses incurred in searching for, taking, removing, keeping, storing, repairing and restoring and selling such Equipment, all other amounts owed by Lessee under this Agreement, whether as additional rent, indemnification, or otherwise, and all costs and expenses, including reasonable legal fees, incurred by Lessor as a result of Lessee's default under this Agreement after deducting all amounts received by Lessor in connection with such public or private sales;

(iv) Upon notice to Lessee, receive prompt payment from Lessee of an amount equal to the Stipulated Loss Values of all Equipment not sold by Lessor pursuant to clause (iii) above plus, to the extent not otherwise recovered from Lessee pursuant to clause (ii) above, any rent owed through the rent payment date preceding the date of such notice, all costs and expenses incurred in searching for, taking, removing, keeping, storing, repairing, and restoring such Equipment, all other amounts owed by Lessee under this Agreement, whether as additional rent, indemnification, or otherwise, and all reasonable fees and expenses incurred by Lessor as a result of Lessee's default, provided that upon receipt of payment in full of such amount, Lessor shall transfer title to such Equipment to Lessee;

(v) By notice to Lessee, declare this Agreement terminated without prejudice to Lessor's rights in respect of obligations then accrued and remaining unsatisfied; or

(vi) Avail itself of any other remedy or remedies provided by statute or otherwise available at law, in equity, or in bankruptcy or insolvency proceedings.

**A-15**

03/10/03  MON 13:24 FAX 4102375152          MSD&T ILA                          @010

(c)  The remedies set forth in this Agreement are cumulative. References to additional rent in clause (iii) and (iv) of subparagraph (b) shall include interest at the rate of eighteen percent (18%) per annum to the date Lessor receives any amount payable under said clause from the due date to and including the rent payment date immediately preceding the date on which notice is given under said clause and interest at the same rate on all other costs, expenses, and losses for which Lessor is entitled to payment under said clause to the date Lessor receives any reimbursement from the respective dates Lessor incurs such costs, expenses, and losses.

14.  <u>Applicable Law</u>.  This Agreement shall be interpreted and the rights, liabilities and duties of the parties determined in accordance with the laws of the State of Maryland.

15.  <u>Miscellaneous</u>.

(a)  This Agreement is binding upon the parties and their respective legal representatives, successors and assigns. This Agreement contains the entire agreement between the parties and, subject to the provisions of section 1, may not be amended, altered, or modified, except by a writing signed by the party to be bound.

(b)  All notices under this Agreement, including but not limited to billing by Lessor for rental charges and payments by Lessee shall be addressed as follows, unless or until either party gives written notice to the contrary to the other party:

        Lessor: Emerald Equipment Leasing, Inc.
                101 South King Street
                Gloucester City, NJ 08030
                Attn.: Arthur Davis
                Telefax: 856-742-3250

        Lessee: Sea Star Line, LLC
                100 Bell Tel Way, Suite 300
                Jacksonville, FL 32216
                Attn.: Philip V. Bates
                Telefax No.: 904-724-3011

All notices shall be in writing and delivered by hand delivery, registered or certified mail, or confirmed telex or telefax.

(c)  The provisions of this Agreement are separable and any provisions found upon judicial interpretation or construction to be

**A-16**

03/10/03  MON 13:29 FAX 4102373132        MSD&T TLA                          ⓦ011

prohibited by law shall be ineffective to the extent of such
prohibition without invalidating the remaining provisions of this
Agreement.

    (d) No waiver of any remedy or other right under this
Agreement shall operate as a waiver of any other remedy or right
nor shall any single or partial exercise of any remedy or right
preclude any other or further exercise thereof or any other remedy
or right.

    IN WITNESS WHEREOF, the parties have executed this Equipment
Rental Agreement as of the day and year first written above.

LESSEE:                              LESSOR:
Sea Star Line, LLC                   Emerald Equipment Leasing, Inc.

By: _____            By: _____
    EVP - Operation
       Title                                   Title

02-3523-001e

A-17

03/10/03  MON 13:25 FAX 4102375152      MSD&T ILA
10/03/02    11:21    HOLT 7 919047243011                        NO.200  002
SEP-27-2002  11:17                                     9047243011   P.02/02

# EQUIPMENT SCHEDULE A

EMERALD EQUIPMENT LEASING, INC.

| EQUIPMENT TYPE | DAILY LEASE RATE | DAMAGE EXCLUSION | STIPULATED LOSS VALUE |
|---|---|---|---|
| 20' DV | $1.00 | $285.00 | $1,000.00 |
| 40' DV | $1.25 | $1,200.00 | $1,000.00 |
| 40' HV | $1.50 | $800.00 | $1,000.00 |
| 45' HV | $2.00 | $800.00 | $1,000.00 |
| 40' RV | $8.00 | $16,480.00 | $4,000.00 |
| 20' CH | $2.20 | $640.00 | $2,200.00 |
| 40' CH | $2.20 | $840.00 | $2,200.00 |
| 45' CH | $2.40 | $640.00 | $2,200.00 |
| Gen Sets | $4.50 | $640.00 | $2,200.00 |

A-18

TOTAL P.02

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

EMERALD EQUIPMENT,                    . Case No.  01-934  (MFW)
                                      . Adv. No.  04-53071
        v.                            .
                                      .
SEA STAR,                             .
                                      . 824 Market Street
                                      . Wilmington, Delaware 19801
                Debtors,              .
. . . . . . . . . . . . . . . .       . May 27, 2004
                                      . 9:00 a.m.

TRANSCRIPT OF HEARING
BEFORE HONORABLE MARY F. WALRATH
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:                 Adelman Lavine
                                By:  ALAN MOLDOFF, ESQ.
                                919 North Market Street
                                Suite  710
                                Wilmington, DE 19801


For the Debtor:                 Adelman Lavine Gold and Levin
                                By:  BRADFORD J. SANDLER, ESQ.
                                919 North Market Street
                                Suite 710
                                Wilmington, DE  19801


For Sea Star:                   Bifferato, Bifferato & Gentilotti
                                By:  IAN CONNOR BIFFERATO, ESQ.
                                Buckner Building
                                1308 Delaware Avenue
                                P.O. Box 2165
                                Wilmington, DE  19899


Audio Operator:                 Jennifer M. Patone

Proceedings recorded by electronic sound recording, transcript
            produced by transcription service.

---

J&J COURT TRANSCRIBERS, INC.
268 Evergreen Avenue
Hamilton, New Jersey 08619
E-Mail:  jjcourt@optonline.net

(609) 586-2311  Fax No.  (609) 587-3599

2

1    THE COURT:  Good morning.

2    MR. MOLDOFF:  Good morning, Your Honor.  Alan Moldoff

3 appearing first in connection with the Dockside case.

4    THE COURT:  Yes.

5    MR. MOLDOFF:  The only thing that's on the agenda

6 today for Dockside is our eighth interim fee application.

7 Yesterday I can report to the Court that we filed an amended

8 plan and amended disclosure statement in an intent to have a

9 hearing on the disclosure statement scheduled for the July

10 omnibus hearing date.

11    THE COURT:  Okay.

12    MR. MOLDOFF:  With respect to the fee application

13 it's seeking fees for the month of October, November, December

14 2003.  Fee is in the amount of $4,765, cost, $993.22, there's

15 been no objections filed, CNO was filed and we'd just ask that

16 an order be entered.

17    THE COURT:  All right, I have no problems with that,

18 and I will enter the order.

19    MR. MOLDOFF:  Next, on Emerald, I have a form of

20 order --

21    THE COURT:  You can hand it up, that's easier.

22 Thank you.

23    All right, on Emerald.

24    MR. MOLDOFF:  Emerald, the first matter on the agenda

25 is the application of Emerald to retain Schuts & Bowen

**J&J COURT TRANSCRIBERS, INC.**

3

1 (phonetic), they are counsel in Florida, in connection with the

2 Sea Star litigation.  As Your Honor knows, we had filed the

3 complaints here and they filed a complaint in Florida.

4          THE COURT:  Well, I've got a CNO on that and entered

5 the order?

6          MR. MOLDOFF:  The order has been entered?

7          THE COURT:  Yes.

8          MR. MOLDOFF:  Thank you, Your Honor.

9          Next on the agenda is our fee application.  This also

10 is for October, November and December, fees sought in the

11 amount of $5,210.50, cost in the amount of $404.01, again,

12 there have been no objections, and we have filed a CNO, and I

13 have a form of order.

14          THE COURT:  Let me look at that.  I have no problem

15 with that one either.

16          MR. MOLDOFF:  May I hand this up?

17          THE COURT:  You may.

18          MR. MOLDOFF:  The last matter is just, again, the

19 pretrial conference.  I think the last time Your Honor

20 indicated that we would continue it, I think, until there is

21 some disposition.  One, the motion to dismiss that was filed in

22 this Court, of course, we argued against that.

23          THE COURT:  Well, I have taken a look at the papers

24 and if the parties want, I can issue my ruling on the bench

25 rather than take the time to write an opinion, if that's all

4

1  right.

2          MR. MOLDOFF:  That's fine.

3          THE COURT:  I think the initial issue is what

4  jurisdiction the Court has over the current adversary whether

5  it's core or non-core and while many courts have held that the

6  determination is only whether or not it's a post petition

7  contract dispute, which would make it core, I think the 3rd

8  Circuit has a tougher standard as articulated in <u>Halper v.</u>

9  <u>Halper</u> at 164 Fed. 3rd, 830, where I have to determine whether

10 -- to determine if it's core, whether invokes a substantive

11 right provided by Title 11 or if it is a proceeding that by its

12 nature could only arise in the context of a bankruptcy case.

13 And I think that it's clear that this contract dispute,

14 essentially a contract dispute between the parties is not

15 something that arises under Title 11 or could only arise in the

16 context of a bankruptcy case.  So it's not a core proceeding, I

17 would have related to jurisdiction over the adversary because

18 it does involve property rights of the debtor but contrasted

19 with that there is also a specific provision, 28 U.S.C. 959

20 that provides that a party that does business with a debtor-in-

21 possession or trustee has the right to file suit regarding that

22 dispute in any jurisdiction.  So it's clear that there is

23 concomitant jurisdiction and I'll assume for the purposes of

24 this decision that Florida has that jurisdiction.  So the

25 question is given that there are two pending cases dealing with

5

1 the same dispute, one filed by Sea Star in Florida on March

2 1st, and one filed by the debtor in this court on March 17th,

3 whether or not I should abstain from hearing this dispute, and

4 I think that under the 3rd Circuit's articulation of the first

5 filed rule, that in all cases of concurrent jurisdiction, the

6 Court would first -- has possession of the subject must decide

7 it.  And that's Crosley v. Hazeltine Corporation, case, 122

8 Fed. 2d, 925.  In this the court, the 3rd Circuit says this

9 rule should apply, although there is discretion in the second

10 court, not to apply that rule, it should be limited to rare or

11 extraordinary circumstances inequitable conduct, bad faith or

12 forum shopping.  There are no allegations of bad faith or

13 inequitable conduct, but there is an allegation of forum

14 shopping.  The debtor asserts that Sea Star, in essence, filed

15 the suit in Florida not because it has a legitimate claim

16 against the debtor, but simply to forestall the filing of a

17 complaint by the debtor here and that this is clearly a case of

18 forum shopping.  Without going into the merits of the

19 complaint, I don't think facially it is a case of forum

20 shopping, again, because 28 U.S.C. 959 allows Sea Star to

21 commence an action if there's a dispute in any jurisdiction in

22 the country.  So on the face of it -- and again, given that

23 there is concurrent jurisdiction, I will apply the first filed

24 rule and I will dismiss this action and let the Florida court

25 decide it.

A-23

6

1          MR. MOLDOFF:  Your Honor, may I just ask is that

2   dismissal is without prejudice because you know we have filed a

3   motion to dismiss in Florida pending whatever happens there, I

4   think that --

5          THE COURT:  All right, yes, it is without prejudice

6   if the Florida court determines that it doesn't have

7   jurisdiction or its action should be dismissed, the debtor is

8   free to file here.

9          MR. MOLDOFF:  Thank you.

10         All right, I'll grant the motion.  Did the order say

11  without prejudice?

12         MR. MOLDOFF:  I believe it did.

13         THE COURT:  Yes, it does.  So I'll enter the order

14  that was submitted with the motion.

15         All right.

16         MR. MOLDOFF:  Thank you, Your Honor.

17         THE COURT:  Thank you, we'll stand adjourned.

18

7

# C E R T I F I C A T I O N

I, Johanna LiMato, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

Date:  July 1, 2004

J&J COURT TRANSCRIBERS, INC.

J&J COURT TRANSCRIBERS, INC.

**A-25**

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

**SEA STAR LINE, LLC,**
a limited liability company,

      Plaintiff,

v.                                                    CASE NO.   3:04-CV-146-J-99HTS

**EMERALD EQUIPMENT LEASING, INC.,**
a corporation,

      Defendant.

 

## O R D E R

This Cause is before the Court on Emerald's Motion to Dismiss Complaint or

Alternatively to Transfer Venue or Abstain (Dkt. 9) and Plaintiff's response thereto.  Upon

consideration, the Court finds as follows:

**Background**

Emerald Equipment Leasing, Incorporated (Emerald) is a debtor in a pending Chapter 11

bankruptcy case in Delaware. The instant case revolves around the parties' dealings regarding a

post petition Equipment Rental Lease Agreement (Lease Agreement).  Evidently, the Lease

Agreement arose out of a transaction between Emerald and Sea Star Line, LLC (Sea Star)

subsequent to Sea Star's purchase of the assets of one of the Jointly Administered Debtors in

Emerald's bankruptcy.  According to Emerald, it has a four million dollar claim against Sea Star

for unpaid rental charges and its claim against Sea Star is the sole asset of the bankruptcy estate

that offers a distribution to creditors in its pending bankruptcy.

On March, 1, 2004, Sea Star filed a Complaint in this Court (Florida Complaint) against

Emerald. The Complaint primarily seeks a declaratory judgment as to the parties' rights and liabilities under the aforementioned Lease Agreement and a Sale Order entered by the Delaware bankruptcy court. The Complaint also claims breach of a maritime contract, seeking damages of $92,318.05. Emerald asserts that these damages, if owed, would simply amount of an offset on its four million dollar claim against Sea Star for unpaid equipment rental charges.

On March 17, 2004, Emerald filed an adversary proceeding regarding Sea Star's alleged breach of the Leasing Agreement in the Delaware bankruptcy court (Delaware Complaint). Emerald asserts that at that time it had not been served with the Florida Complaint. As mentioned, Emerald states that its four million dollar claim against Sea Star is the primary asset of its bankruptcy estate.

On May 28, 2004, the Delaware bankruptcy court dismissed Emerald's adversary proceeding without prejudice. According to a transcript of the hearing, the Court's decision was based solely on the first filed rule.

Emerald urges the Court to dismiss or transfer the instant case primarily because: (1) it seeks a declaration of rights under an undisputed lease agreement which was terminated months before the Complaint was initiated; (2) the suit was filed solely to preempt Emerald's forthcoming litigation; and, (3) the case relates to an ongoing bankruptcy proceeding and therefore venue properly lies in the Delaware bankruptcy court.

<u>Analysis</u>

Emerald first seeks to transfer this case, pursuant to 28 U.S.C. § 1404(a). In determining whether to transfer venue, a court must first determine whether the action may have been brought in the proposed transferee court, and then it must decide whether the action should be transferred.

2

**A-27**

The parties do not contest that this action may have been properly brought in Delaware. Consequently, the first step in the change of venue analysis is satisfied.

Turning to the second step in the analysis, the Court begins with the understanding that "federal courts traditionally have accorded a plaintiff's choice of forum considerable deference." *In re Ricoh Corp.*, 870 F.2d 570, 573 (11th Cir. 1989)(citing *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947)).

Several different factors are taken into consideration when a Court considers a request to transfer a case. *Robinson v. Giarmarco & Bill, P.C.*, 74 F.3d 253, 260 (11th Cir.1996); 28 U.S.C. § 1404(a)("For the convenience of the parties and witnesses, in the interest of justice." a district court may transfer any civil action to any other district or division where it might have been brought).

Convenience of non-party witnesses, for example, is a weighty consideration. *Confederation Des Brasseries De Belgique v. Coors Brewing Co.*, 2000 WL 88847, *5 (N.D. Ill. January 20, 2000); *Insuracorp, Inc. v. American Fidelity Assur. Co.*, 914 F. Supp. 504, 506 (M.D. Ala. 1996); *Gundle Lining Constr. v. Fireman's Fund Ins.*, 844 F. Supp. 1163 (S.D. Tex.1994). In contrast, convenience of parties and parties' executives and employees carries less weight as it is presumed parties and employees will voluntarily appear as witnesses. *Central Money Mortg. Co. [IMC], Inc. v. Holman*, 122 F. Supp. 2d 1345, 1346 (M.D. Fla. 2000)(convenience of the parties is irrelevant); *Confederation Des Brasseries De Belgique v. Coors Brewing Co.*, 2000 WL 88847, *5 (N.D. Ill. January 20, 2000)(convenience of a party's employees is irrelevant as it is presumed employees will voluntarily appear as witnesses).

This Court notes the ongoing bankruptcy litigation would make Delaware a more

3

**A-28**

convenient forum for Emerald's witnesses. However, Sea Star argues that most of the witnesses and documents it needs to prosecute this litigation are in Jacksonville. Thus, the convenience factor does not weigh in favor of the action being transferred to Delaware.

In addition to weighing the convenience of the parties and witnesses, the Court must weigh the costs, judicial economy and efficiency, expeditious discovery and trial process. *Tingley Systems, Inc. v. Bay State HMO Mgt.*, 833 F. Supp. 882, 887 (M.D. Fla.1993) (citing *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501 (1947)). Emerald also asserts that its financial strength, or lack thereof, should be taken into consideration.

In addition, Emerald notes that Sea Star's Complaint references proceedings that took place in the Delaware Bankruptcy Court. Therefore, Emerald asserts that judicial economy would be served by transfer; that court is already familiar with the parties and many of the issues. *Capitol Records Inc. v. Optical Recording Corp.*, 810 F. Supp. 1350 (S.D.N.Y. 1992). Emerald asserts that this Court should take into account that Sea Star has appeared in the Delaware Bankruptcy Court and utilized that Court to enforce its rights. Emerald asserts that the issues involved in the instant case are core bankruptcy issues and asserts that the determinations of these issues are "essential to Emerald's contemplated liquidating plan of reorganization."

The Court notes that Sea Star's Complaint references proceedings that took place in the Delaware bankruptcy Court. This Court agrees that judicial economy would be best served by this Court transferring this action to Delaware and thus this factor weighs strongly in favor of this Cause being transferred.

Besides the enumerated factors that a court usually considers when deciding whether to transfer a case, this Court also considers other arguments that Emerald makes in its motion to

4

**A-29**

dismiss regarding the appropriateness of retaining this case here. Although these considerations are not necessary to the Court's ruling on the transfer motion, they also weigh in favor of Emerald's transfer request.

Emerald asserts that the instant action constitutes an improper use of the declaratory judgment act; it was filed solely as a preemptive measure and amounts to forum shopping. Regarding the appropriateness of a declaratory judgment action, Emerald notes that there is no danger of additional accrual of avoidable damages because the instant Complaint seeks a determination of rights under an agreement that was terminated in October of 2003.[1] Emerald also notes that it invited Sea Star by letter to discuss settlement of its four million dollar claim but instead of responding Sea Star filed this litigation.

Considering the transfer factors, the Court finds that Delaware offers the most appropriate forum for efficient use of judicial resources. In addition, the Court notes this case's relationship to Emerald's pending bankruptcy proceeding and the fact that the instant case is a declaratory judgment action at least arguably commenced as an attempt to preempt Emerald's proposed adversary filing. Accordingly, it is **ORDERED**:

---

[1] Sea Star asserts that it "remains exposed to liability and damage claims for Emerald equipment outside Sea Star's possession, as well as equipment left on Sea Star's premises.... that Emerald failed to remove." Thus, Sea Star asserts that damages continue to accrue.

Emerald's Motion to Dismiss or Transfer Case (Dkt. 9) is **GRANTED in Part.** This

Case is **Transferred** to the United States District Court for the District of Delaware for potential

referral to the United States Bankruptcy Court for the District of Delaware.   All pending motions

are **MOOT.**


**DONE AND ORDERED** at Jacksonville, Florida this **20** day of April , 2005.

HENRY LEE ADAMS, JR.
United States District Judge

Copies to:
Counsel of Record

6

**A-31**

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SEA STAR LINE, LLC,<br>a limited liability company, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | |
| | : | |
| -vs- | : | |
| | : | |
| EMERALD EQUIPMENT LEASING,:<br>INC., a corporation, | : | |
| | : | |
| Defendant/Plaintiff<br>on the Counterclaim | : | Case No. 05-CV-00245-(JJF) |
| | : | |
| -vs- | : | |
| | : | |
| SEA STAR LINE, LLC | : | |
| | : | |
| Defendant on the<br>Counterclaim | : | |
| | : | |

## AMENDED COUNTERCLAIM OF EMERALD

Emerald Equipment Leasing, Inc., by and through its undersigned counsel, files this

Amended Counterclaim against Sea Star Line, LLC, and in support, avers as follows:

## JURISDICTION AND VENUE

1.    This Court has jurisdiction over this Counterclaim pursuant to 28 U.S.C. Sections 1334

and 157 and Sections 542 of Title 11 of the United States Code (the "Bankruptcy Code"). In

addition, this Court has jurisdiction over this Counterclaim pursuant to 28 U.S.C.A. Section 1333.

2.    Venue is appropriate before this Court by virtue of, and in accordance with, inter alia, 28

U.S.C. Section 1409.

**A-32**

**PARTIES**

3.    Counterclaimant is Emerald Equipment Leasing, Inc. ("Emerald"), a Debtor-in-Possession having filed a voluntary petition for relief under Chapter 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") on March 21, 2001 (the "Petition Date"). Emerald remains in possession of its assets and continues to operate its business under the applicable provisions of the Bankruptcy Code.

4.    Emerald was organized in October, 1997 under the laws of the State of New Jersey and was engaged in business as a lessor of various equipment used in the ocean going transportation business.

5.    Defendant on the Counterclaim is Sea Star Line, LLC ("Sea Star"), a company engaged in the shipping business, inter alia, as an ocean carrier transporting cargo, with a place of business located at 100 Bell Tel Way, Suite 300, Jacksonville, FL 32216.

**BACKGROUND**

6.    Prior to the Petition Date, Emerald leased all of its equipment to NPR, Inc. and Holt Cargo Systems, Inc. Said lease with NPR, Inc. and Holt Cargo Systems, Inc. of Emerald's equipment was rejected by a Consent Order entered by this Court dated May 10, 2002 (the "Consent Order"), but effective as of April 18, 2002.

7.    On or about April 26, 2002, an Order was entered by the Bankruptcy Court authorizing the sale of certain NPR assets (the "Sale") to Sea Star (the "Sale Order"). As part of the Sale, Sea Star purchased certain ships and other assets of NPR, Inc., including NPR's bookings.

8.    As a result of Sea Star's purchase of the NPR assets, Sea Star needed additional equipment to move cargo in the course of its business.

9.    Accordingly, on or about May 1, 2002, Sea Star and Emerald entered into an agreement (the "E-Mail Agreement" attached hereto as Exhibit "A"), whereby Sea Star agreed to lease Emerald equipment previously leased by Emerald to NPR.

G:\393\10\pleading\ss-amended answer to complaint.doc

**A-33**

10.    The E-Mail Agreement was effective as of May 1, 2002 and was applicable to any cargo worthy Emerald equipment, which Sea Star dispatched out of any port terminal or inland depot for customer use at agreed upon per diems (the "Emerald Equipment").

11.    Sea Star used the Emerald Equipment pursuant to the E-Mail Agreement for a number of months, before the leasing arrangement was more formally documented in a written agreement executed by Sea Star and Emerald in the later part of September, 2002 (the "Equipment Rental Agreement" attached hereto as Exhibit "B").

12.    At the inception of the lease between Emerald and Sea Star, the Emerald Equipment was not in Emerald's possession; instead all of the equipment was, inter alia, in terminals, in the possession of shippers, at inland depots or on board NPR vessels purchased by Sea Star.

13.    Emerald was not notified when Sea Star commenced using any particular piece of the Emerald Equipment and no receipt or other document was needed from Emerald acknowledging Sea Star's use of the Emerald Equipment before Sea Star could use that equipment.

14.    Under these circumstances, in order to ascertain rental payments due for the Emerald Equipment, Sea Star provided Emerald with monthly "self-billing reports", whereby Sea Star undertook the obligation to report to Emerald its "usage" of the Emerald Equipment.

15.    Upon later investigation, Emerald discovered that the "self billing reports" prepared by Sea Star were grossly understated, failing, inter alia, to account for numerous pieces of Emerald Equipment which Sea Star had been using without paying rental charges to Emerald and failing to pay the appropriate amounts for usage of equipment contained in the "self-billing reports".

16.    On or about October 31, 2003, Emerald exercised its rights to terminate the Equipment Rental Agreement in accordance with its terms.

G:\393\10\pleading\ss-amended answer to complaint.doc

**A-34**

## COUNT I
### (Post-Petition Account Receivable/Breach of Lease)

17.     Plaintiff incorporates paragraph 1 through 16 set forth above, as fully as if set forth herein in their entirety.

18.     Sea Star is in breach of its obligations under the terms of the Equipment Rental Agreement as a result of its failure to pay the following:

(a) Rent due to Emerald;

(b) Loss incurred as a result of the loss, damage, theft or destruction of certain equipment.

19.     In addition, after the termination of the Equipment Rental Agreement, Sea Star was required to return the equipment to Emerald at certain designated terminals. Despite this, Sea Star has failed to return numerous chassis, gen sets and containers at lease termination, as provided for in the Equipment Rental Agreement.

20.     As a result of Sea Star's breach of the Equipment Rental Agreement, Emerald has incurred damages in excess of $4,000,000.00.

21.     Emerald has provided detailed invoices to Sea Star setting forth the amounts owed to Emerald under the Equipment Rental Agreement. Emerald's work on these invoices is ongoing as it continues its investigation and discovers other Emerald Equipment which Sea Star has used, or has not returned, and has not compensated Emerald under the terms of the Equipment Rental Agreement.

WHEREFORE, Emerald requests the entry of an Order in an amount in excess of $4,000,000.00, plus interest at the rate set forth in the Equipment Rental Agreement, attorneys' fees and other charges.

## COUNT II
### (Turnover Action)

22.     Plaintiff incorporates paragraph 1 through 21 set forth above, as fully as if set forth herein in their entirety.

G:\393\10\pleading\ss-amended answer to complaint.doc

**A-35**

23.    By letter dated October 31, 2003, Emerald gave Sea Star thirty (30) days prior written notice of its termination of the Equipment Rental Agreement and demanded that Sea Star return all Emerald equipment to Emerald on or before December 1, 2003 in accordance with the provisions of paragraph 10 of the Equipment Rental Agreement.

24.    Upon investigation, Emerald has determined that numerous chassis, gen sets and containers have not been returned by Sea Star to Emerald pursuant to Emerald's demand in accordance with the Equipment Rental Agreement.

WHEREFORE, Emerald, pursuant to 11 U.S.C. Section 342, or otherwise, requests the entry of an Order providing for the turnover of damages equaling the value of the unreturned equipment, together with interest and costs of suit.

## COUNT III
### (Accounting)

25.    Plaintiff incorporates paragraph 1 through 24 set forth above, as fully as if set forth herein in their entirety.

26.    Certain information pertaining to the usage of Emerald Equipment while in the possession of Sea Star remains solely in the possession of Sea Star.

27.    Emerald has requested that Sea Star provide a full accounting of Sea Star's usage of all Emerald Equipment.

28.    Sea Star, to date, has failed to provide such accounting.

WHEREFORE, Emerald requests an Order requiring that Sea Star provide to Emerald a full accounting of all Sea Star's usage of Emerald Equipment.

## COUNT IV
### (Fraud)

29.    Plaintiff incorporates paragraphs 1 through 28 set forth above, as fully as if set forth herein in their entirety.

30.    The total rent payments made by Sea Star for its use of Emerald Equipment from April 29, 2002 through December 31, 2003 totaled $683,686.85.

31.    The information (or lack thereof) provided by Sea Star on its "self-billing reports", upon which Sea Star based its rental payments, was false and/or misleading.

32.    Specifically, the self-billing reports grossly underreported Sea Star's usage of the Emerald Equipment on diverse dates between April 29, 2002 and December 31, 2003, by (i) failing to properly account for the full period of time Sea Star was responsible for rental payments for numerous items of Emerald Equipment which Sea Star acknowledged using; and (ii) by failing to account, at all, for various items of Emerald Equipment which Sea Star used, but which it never acknowledged using.

33.    Emerald's investigation, which is continuing, has determined that it believes the extent of rental charges owed by Sea Star for Emerald Equipment it used, but for which it failed to accurately report on its self-billing report, total in excess of $3,000,000.00. In addition, Emerald believes, based upon its continuing investigation, that Sea Star used various pieces of Emerald Equipment which it never returned to Emerald, for which Sea Star owes Emerald a stipulated loss value and certain additional rental totaling approximately $1,800,000.00.

34.    The shear magnitude of the huge discrepancy between Sea Star's reported usage of the Emerald Equipment (as shown on the Sea Star "self- billing reports") and what Emerald contends was the actual Sea Star usage of Emerald Equipment, evidences an intent to defraud Emerald, or at the very least, a reckless indifference as to the truth of the matters contained in the "self-billing reports".

35.    Attached hereto and marked as Exhibit "C" is a schedule of certain Emerald Equipment used by Sea Star (in this case, 40 foot chassis) specifically identifying each item of equipment, the dates of usage reported by Sea Star for that specific piece of equipment, Emerald's contention as to the actual dates of Sea Star's usage of that particular piece of equipment, and the amount of rent

owed, but unpaid, for each said specific piece of equipment. Similar schedules (which are voluminous), based upon Emerald's investigation to date, have been supplied to Sea Star for other types of Emerald Equipment used by Sea Star, which includes 20 foot chassis, 45 foot chassis, 20 foot DV containers, 40 foot DV containers, 40 foot reefer containers, 40 foot HC containers, 45 foot HC containers, and gen sets. These schedules specifically set forth the relevant equipment pieces, dates of usage, and other related information identifying the nature of the defective information contained in the Sea Star "self-billing reports".

36.    Other indicia of fraudulent and/or misleading information supplied by Sea Star include, but is not limited to the following:

(a) Sea Star appears to have backdated certain "terminal inter-change receipts"(known as "TIRs"). Attached hereto and marked as Exhibit "D" is a schedule identifying certain of those backdated TIRs;

(b) Sea Star subleased to a third party, CSX Line, from May 15, 2002 to July 17, 2002 various pieces of Emerald Equipment, which sublease activities were not permitted by the Equipment Rental Agreement. Further, most of the equipment pieces subleased to CSX Line were never included on Sea Star's "self-billing reports". Attached hereto and marked as Exhibit "E" is a copy of Sea Star invoice to CSX Line and schedules identifying the equipment pieces involved;

(c) certain documentation indicates that duplicate "self-billing reports" were prepared by Sea Star for the month of September, 2002 indicating different amounts for the same month. (see Exhibit "F");

(d) Emerald believes that other information pertinent to Sea Star's fraudulent conduct may be within Sea Star's exclusive control, and, as such, subject to further investigation.

37.    Sea Star prepared the "self billing reports" knowing that the information contained on those reports was false and misleading or prepared the reports with reckless indifference as to the veracity of the information contained in the "self billing reports".

G:\393\10\pleading\ss-amended answer to complaint.doc

**A-38**

38.    Sea Star prepared the inaccurate "self billing reports" with the intention of defrauding Emerald.

39.    Emerald had a right to and did in fact rely on the misrepresentations made by Sea Star in the "self billing reports".

40.    As a result of Emerald's reliance on the fraudulent misrepresentation of Sea Star in the "self billing reports", Emerald suffered damages in excess of $4,000,000.00.

WHEREFORE, Emerald requests the entry of an order in an amount in excess of $4,000,000.00 plus interest at the rate set forth in the Equipment Rental Agreement, attorneys fees, punitive damages and other charges.

## COUNT V
## (Constructive Fraud)

41.    Plaintiff incorporates paragraphs 1 through 40 set forth above, as fully as if set forth herein in their entirety.

42.    Sea Star, in undertaking the obligation of providing "self-billing reports", had a duty to accurately account for the use of Emerald's Equipment and to ensure that it accurately reported and compensated Emerald for the use of the equipment.

43.    Sea Star breached its duty to Emerald in that it failed to accurately account for the usage of Emerald's Equipment and properly reimburse Emerald for that use.

44.    As a result of Sea Star's inaccurate reporting of its use of the Emerald Equipment, whether intended to deceive Emerald or not, Sea Star has made representations which have a tendency to deceive and undermine confidence and are injurious to the public interest.

WHEREFORE, Emerald requests the entry of an order in an amount in excess of $4,000,000.00 plus interest at the rate set forth in the Equipment Rental Agreement, attorneys fees, punitive damages and other charges.

## COUNT VI
### (Fraudulent Concealment)

45.    Plaintiff incorporates paragraphs 1 through 44 set forth above, as fully as if set forth herein in their entirety.

46.    Sea Star owed a duty to Emerald to disclose its use of the Emerald's Equipment.

47.    Sea Star failed to accurately disclose its use of the Emerald's Equipment.

48.    Sea Star intended to defraud Emerald when it provided Emerald with the "self billing reports" grossly under reporting Sea Star's use of the Emerald Equipment.

49.    Emerald justifiably relied upon the fraudulently prepared "self billing reports".

50.    As a result of Emerald's reliance upon Sea Star's fraudulently prepared "self billing reports", Emerald suffered damages in excess of $4,000,000.00.

WHEREFORE, Emerald requests the entry of an order in an amount in excess of $4,000,000.00 plus interest at the rate set forth in the Equipment Rental Agreement, attorneys fees, punitive damages and other charges.

## COUNT VII
### (Negligent Misrepresentation; Breach of Fiduciary Duty)

51.    Plaintiff incorporates paragraphs 1 through 50 set forth above, as fully as if set forth herein in their entirety.

52.    Sea Star had a fiduciary duty to accurately report to Emerald the equipment usage and the costs incurred as a result of said usage.

53.    Sea Star's actions in preparing "self-billing reports" which were false and/or misleading acted in a negligent and undue manner, thereby breaching its fiduciary duty to Emerald.

54.    Sea Star knew that Emerald relied upon Sea Star to accurately report the usage of the Emerald Equipment and the costs incurred.

55.    Sea Star was aware that not only would Emerald rely on the "self billing reports" to determine the rental fees for the Emerald Equipment but was also aware that an accurate report from

G:\393\10\pleading\ss-amended answer to complaint.doc

**A-40**

Sea Star was the only reasonably available method for Emerald to determine the actual usage of the Emerald Equipment.

56.    Emerald's reliance upon Sea Star's "self billing reports" was not only justified, it was necessary to maintain the relationship between the parties as provided for in the Equipment Rental Agreement.

57.    Emerald, having relied upon the "self billing reports" provided by Sea Star was damaged in that it was unable to collect the actual rents earned based on Sea Star's usage of the Emerald Equipment.

WHEREFORE, Emerald requests the entry of an order in an amount in excess of $4,000,000.00 plus interest at the rate set forth in the Equipment Rental Agreement, attorneys fees, punitive damages and other charges.

ADELMAN LAVINE GOLD AND LEVIN, A
Professional Corporation

By:

Bradford J. Sandler, Esq. (No. 4142)
919 North Market Street, Suite 710
Wilmington, DE  19801
302-654-8200
Counsel for Emerald Equipment Leasing, Inc.

-and-

ADELMAN LAVINE GOLD AND LEVIN,
A Professional Corporation
Gary M. Schildhorn, Esq.
Alan I. Moldoff, Esq.
Suite 900, Four Penn Center
Philadelphia, PA  19103-2808
215-568-7515
Counsel for Emerald Equipment Leasing,
Inc.

G:\393\10\pleading\ss-amended answer to complaint.doc

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

JACKSONVILLE DIVISION

CASE NO. 3:04-CV-146-99HTS

SEA STAR LINE, LLC,
a limited liability company,

     Plaintiff,

-vs-

EMERALD EQUIPMENT LEASING, INC.,
a corporation,

     Defendant.

_____/

## SEA STAR LINE, LLC RESPONSE TO DEFENDANT'S FIRST REQUEST FOR ADMISSIONS

Pursuant to the applicable Federal Rules of Civil Procedure, Plaintiff, SEA STAR LINE, LLC ("Sea Star"), in response to the Request for Admissions served by Defendant, EMERALD EQUIPMENT LEASING, INC. ("Emerald"), says:

1. Admit that a binding agreement existed between Sea Star and Emerald relating to the equipment made the subject matter of this litigation (hereinafter the "Emerald Equipment") that was agreed to by Sea Star and Emerald on or about May 2, 2002 (the "Oral Agreement").

**ANSWER:** Sea Star admits that a binding agreement relating to Emerald equipment exists between Sea Star and Emerald but denies the agreement was an "Oral Agreement" that "was agreed to by Sea Star and Emerald on or about May 2, 2002."

**A-42**

2.   Admit that the document attached hereto as Exhibit "A" is a true and correct copy of an e-mail communication between Sea Star and Emerald relating to the Oral Agreement.

**ANSWER:**   Sea Star denies Request No. 2.

3.   Admit that Exhibit "A" reflects the basic terms and conditions of the Oral Agreement.

**ANSWER:**    Sea Star denies Request No. 3.   The e-mail does outline some of the written terms incorporated in the Equipment Rental Agreement dated as of July 31, 2002, which expressly states that it contains the entire agreement between the parties.

4.   Admit that, pursuant to the Oral Agreement, Sea Star used the Emerald Equipment.

**ANSWER:**    Sea Star denies Request No. 4.

5.   Admit that Sea Star and NPR, Inc. ("NPR") entered into an agreement for the sale of NPR assets to Sea Star, which sale took place on or about April 26, 2002.

**ANSWER:**    Sea Star admits that Sea Star and NPR entered into an agreement for sale of certain NPR assets to Sea Star pursuant to an Order Authorizing Sale of the NPR Assets Free and Clear of all Liens, Claims and Encumbrances, dated April 26, 2002 but denies that closing occurred on April 26, 2002.

6.   Admit that, pursuant to the sale of assets by NPR to Sea Star on or about April 26, 2002 (the "NPR Sale"), Sea Star came into possession of the Emerald Equipment located on vessels

**A-43**

formerly owned by NPR, and which vessels were sold to Sea Star.

ANSWER:    Sea Star admits that Sea Star came into possession
of certain Emerald equipment on vessels formerly owned by NPR
pursuant to an Order Authorizing Sale of the NPR Assets Free and
Clear of all Liens, Claims and Encumbrances, dated April 26,
2002, when closing occurred on April 27, 2002.  Sea Star denies
Request No. 6 to the extent that Emerald intends any other
meaning for "NPR Sale".

7.   Admit that Sea Star did not notify Emerald in writing at
any time within thirty (30) days after the NPR Sale of any Emerald
Equipment that Sea Star had stored, which equipment Emerald had
previously been leasing to NPR just prior to the NPR Sale.

ANSWER:    Sea Star admits Request No. 7.   To Sea Star's
knowledge, however, Emerald representatives received notifications
as to storage of Emerald equipment in bankruptcy court hearings and
orders and through representatives of other Debtors, such as NPR,
Inc.

8.   Admit that Sea Star and Emerald entered into a written
agreement relating to the Emerald Equipment that was executed on or
about July 31, 2002 (the "Equipment Rental Agreement").

ANSWER:    Sea Star admits that Sea Star and Emerald entered
into a written agreement relating to Emerald equipment but denies
that the parties executed the document on or about July 31,
2002.  The Equipment Rental Agreement is dated as of July 31, 2002 but
was executed in September 2002.

**A-44**

9.  Admit that the Equipment Rental Agreement related to the use of the Emerald Equipment by Sea Star beginning on or about April 29, 2002.

**ANSWER:**    Sea Star admits Request No. 9, subject to NPR-Sea Star agreements, MBC-Sea Star agreements, and court orders.

10.  Admit that Sea Star was responsible for payments to Emerald for the use of any Emerald Equipment pursuant to the Equipment Rental Agreement and the Oral Agreement for any month that Sea Star first used such piece of equipment and for all months thereafter until said piece of equipment was redelivered to Emerald.

**ANSWER:**    Sea Star denies Request No. 10.

11.  Admit that Sea Star was permitted to return or redeliver Emerald Equipment to Emerald to the following locations only: Greenwich Terminal, Philadelphia, Pennsylvania; Sea Star Terminal, Puerto Nuevo, San Juan, Puerto Rico; Greenwich Terminal, Port of Jacksonville, Florida; and any other location as to which the parties have agreed in writing.

**ANSWER:**    Sea Star admits Request No. 11 for the period after July 31, 2002 but denies Request No. 11 for the period before August 1, 2002.  To Sea Star's knowledge, Greenwich Terminal had no agreement with Jaxport for space allocation at the Port of Jacksonville, Florida before August 1, 2002.  Furthermore, Sea Star and Emerald executed the Equipment Rental Agreement dated as of July 31, 2002 in September 2002.

**A-45**

12.  Admit that Sea Star and Emerald did not agree in

writing to the return or redelivery of Emerald Equipment to any location other than the specific locations referenced in Paragraph 11, *supra,* except when the parties agreed that a specific piece of Emerald Equipment would be sold to a third party at a specific location.

ANSWER:   Sea Star admits Request No. 12 for the period after July 31, 2002 but denies Request No. 12 for the period before August 1, 2002.

13.   Admit that Sea Star's obligation to pay for the use of Emerald Equipment, after Sea Star's use of such equipment, did not end upon Sea Star's (re)delivery of the Emerald Equipment to third parties.

ANSWER:   Sea Star objects to Request No. 13.   Said Request is overbroad and does not disclose Emerald's meaning of  "Sea Star's (re)delivery of the Emerald Equipment to third parties".

14.   Admit that Sea Star attempted to redeliver and/or did redeliver Emerald Equipment that Sea Star used for less than thirty (30) days.

ANSWER:   Sea Star admits Request No. 14.

15.   Admit that Sea Star was permitted to return or redeliver Emerald Equipment only by way of a written document executed by both Sea Star and Emerald.

ANSWER:   Sea Star denies Request No. 15.

**A-46**

16.   Admit that on or about November 1, 2003, counsel for Sea Star received notice from Emerald's counsel that Emerald intended to

terminate the Equipment Rental Agreement, effective as of November 30, 2003 (the "Termination Letter").

ANSWER:    Sea Star admits Request No. 16.

17. Admit that, pursuant to the Termination Letter, Sea Star was required to redeliver all Emerald Equipment in its possession no later than December 1, 2003.

ANSWER:    Sea Star denies Request No. 17.

18. Admit that manifests were prepared by or on behalf of Sea Star for shipments of equipment and/or cargo by Sea Star vessels.

ANSWER:    Sea Star admits Request No. 18.

19. Admit that manifests were prepared by or on behalf of Sea Star for shipments of equipment and/or cargo by vessels chartered by Sea Star.

ANSWER:    Sea Star admits Request No. 19.

20. Admit that the manifests prepared by or on behalf of Sea Star for shipments of equipment and/or cargo on Sea Star vessels, vessels chartered by Sea Star, and/or slots chartered by Sea Star on other vessels would reflect usage of the Emerald Equipment by Sea Star.

ANSWER:    Sea Star denies Request No. 20.  Manifests prepared by or on behalf of Sea Star would reflect not only usage of equipment by Sea Star but also shipments of equipment for Emerald or for third parties.

21. Admit that Sea Star purchased slot charters onboard vessels from April 26, 2002 through December 1, 2003.

**A-47**

ANSWER:    Sea Star denies Request No. 21.    Sea Star entered into transportation services agreements with other ocean carriers but did not purchase slot charters onboard vessels.

22.    Admit that manifests or other records were prepared by or on behalf of Sea Star relating to all equipment shipped aboard vessels on which Sea Star purchased slot charters.

ANSWER:    Sea Star denies Request No. 22.

23.    Admit that beginning on April 26, 2002 and ending on December 1, 2003, when Emerald Equipment appeared on a manifest prior to its redelivery to Emerald or sale to a third party, it evidenced use of Emerald Equipment by Sea Star.

ANSWER:    Sea Star objects to Request No. 23.    Said Request is overbroad and does not specify any equipment or identify any "sale" or "third party" to which the Request refers.    Without waiving its objection, Sea Star denies Request No. 23.

24.    Admit that beginning on April 26, 2002 and ending on December 1, 2003, when Emerald Equipment appeared on a gate record prior to its redelivery to Emerald or sale to a third party, it evidenced use of Emerald Equipment by Sea Star.

ANSWER:    Sea Star objects to Request No. 24.    Said Request is overbroad; fails to identify the type of "gate record", the issuer, or any "third party" to which it refers; and fails to specify a proper beginning date.    Sea Star gate records beginning April 29, 2002 could evidence not only use of Emerald equipment by Sea Star but also receipt of equipment from third parties, delivery of

**A-48**

equipment, or movement of equipment held in storage.

25. Admit that when Emerald Equipment appeared on a Sea Star "Self Billing Report", it evidenced use of Emerald Equipment by Sea Star.

ANSWER:    Sea Star admits Request No. 25 to the extent the Report shows a charge to Sea Star, not a charge by Sea Star.

26. Admit that Sea Star inputted "move histories" directly into the Holt Oversight computer for purposes of tracking Sea Star's use of equipment, including Emerald Equipment.

ANSWER:    Sea Star objects to Request No. 26, which fails to identify the "Holt Oversight computer".  Without waiving said objection, Sea Star admits that for a short time after the NPR closing, Sea Star purchased Holt Oversight computer services primarily to track and facilitate intermodal shipments and movements of containerized cargo and equipment through certain automated gates.

27. Admit that where the movement of Emerald Equipment between April 26, 2002 and December 1, 2003, was input into the computer application referred to by both Sea Star and Emerald as Emerald Equipment Move History, it evidenced use of Emerald Equipment by Sea Star.

ANSWER:    Sea Star denies Request No. 27.  Sea Star computer inputs beginning April 29, 2002 could evidence not only use of Emerald equipment by Sea Star but also receipt of Emerald equipment from third parties, delivery of equipment, or movement of

equipment held in storage.   Further, Sea Star does not refer to its computer application as "Emerald Equipment Move History".

28.  Admit that Sea Star caused Emerald Equipment to be moved, directly or indirectly, to railroad depots.

ANSWER:    Sea Star admits Request No. 28.

29.  Admit that Sea Star caused Emerald Equipment to be moved, directly or indirectly, to railroad yards.

ANSWER:    Sea Star admits Request No. 29.

30.  Admit that Sea Star caused Emerald Equipment to be moved, directly or indirectly, to customer pools.

ANSWER:    Sea Star admits Request No. 30.

31.  Admit that Sea Star caused Emerald Equipment to be moved, directly or indirectly, to truck yards.

ANSWER:    Sea Star admits Request No. 31.

32.  Admit that any Emerald Equipment that was moved from April 26, 2002 through December 1, 2003 prior to its redelivery to Emerald or sale to a third party, was caused to be moved by Sea Star.

ANSWER:    After reasonable inquiry information known or readily obtainable by Sea Star is insufficient to enable Sea Star to admit or deny this Request.   Therefore, Sea Star denies Request No. 32.

33.  Admit that Sea Star used Emerald Equipment for time periods not included in the self-billing reports prepared by Sea Star.

**A-50**

<u>ANSWER:</u>    Sea Star admits Request No. 33.

34.    Admit that at no time within thirty (30) days after the NPR Sale did Sea Star notify Emerald that certain Emerald Equipment was seized by third parties in the Dominican Republic.

<u>ANSWER:</u>    After reasonable inquiry information known or readily obtainable by Sea Star is insufficient to enable Sea Star to admit or deny this Request at present.

<u>CERTIFICATE OF SERVICE</u>

WE HEREBY CERTIFY that a true and correct copy of the foregoing was mailed this _29_ day of October, 2004 to **MICHAEL L. GORE, ESQ.**, Shutts & Bowen LLP, P.O. Box 4956, Orlando, FL 32802-4956 and mailed to **GARY M. SCHILDHORN, ESQ.** and **ALAN I. MOLDOFF, ESQ.**, Adelman Lavine Gold and Levin, Suite 900, Four Penn Center, Philadelphia, PA 19103-2808.

ARMSTRONG & MEJER, P.A.
Suite 1111, Douglas Centre
2600 Douglas Road
Coral Gables, FL 33134
Telephone: (305) 444-3355
Telefax:   (305) 442-4300

By: _____
TIMOTHY J. ARMSTRONG
Florida Bar No. 135859

liz\04pldgs\03-3621-025a

**A-51**