# APPENDIX

# PART 2 OF 7

1

```
 1            IN THE UNITED STATES DISTRICT COURT
                MIDDLE DISTRICT OF FLORIDA
 2
                  JACKSONVILLE DIVISION
 3
              CASE NO. 3:04 CV-146-V-99-HTS
 4
    Sea Star Line, LLC
 5  a limited liability company,        ORIGINAL

 6       Plaintiff,

 7  vs.

 8  EMERALD EQUIPMENT LEASING,
    INC., a corporation,
 9
         Defendant.
10

11  _____

12            Deposition of PHILIP BATES, taken on behalf

13  of the Defendant, pursuant to Notice of Taking

14  Deposition in the above-entitled action, on Monday,

15  January, 10th, 2005, at 9:45 a.m., at the offices of

16  Powers Reporting, Inc., 220 East Forsyth Street,

17  Jacksonville, Florida, before Sherry Brazier, a Notary

18  Public in and for the State of Florida at Large.

19

20

21

22

23

24

25
```

1     A    Correct.

2     Q    And you had more than that at the time of

3  the NPR aquisition mostly due to the --

4     A    NPR aquisition, yes.

5     Q    NPR aquisition.  And because of the

6  short-term usage agreement with Emerald?

7           MR. ARMSTRONG:  Object to the form.

8     A    Can you repeat that?  I didn't understand

9  that.

10     Q    That the reason why you had more at the time

11  of the NPR aquisition was due to the fact that you had

12  additional equipment from short-term -- that

13  short-term usage agreement with Emerald and other

14  leases at the time, well, if that's what you said?

15     A    We were operating more ships right after the

16  NPR aquisition.

17     Q    And that's because you acquired ships from

18  the NPR aquisition?

19     A    Yes.

20     Q    Okay.  Does -- did Sea Star Line purchase

21  certain assets from NPR, Inc., in April of 2002?  I

22  believe you just indicated that there was an NPR

23  aquisition?

24     A    We purchased certain assets from NPR.

25     Q    And are you somewhat familiar with that

34

1    transaction?

2        A    Yes.

3        Q    Did you have any involvement in it?

4        A    I spent some time in Philadelphia doing due

5    diligence.

6        Q    And who else was involved in that

7    transaction on behalf of Sea Star Line?

8        A    From an equipment standpoint, Andy Rooks was

9    with me.

10       Q    And could you generally describe the

11   transaction and in particular what assets were

12   purchased?

13       A    Okay.  There were four ships.

14       Q    That were purchased?

15       A    Yes.

16       Q    Do you know the names of those?

17       A    Some terminal equipment.

18       Q    Do you know the names of those ships at this

19   time?

20       A    From memory the Humacao, Mayaguez and two

21   others.

22       Q    Okay.  All right.  I'm sorry.  So you

23   purchased some ships, you, Sea Star, and what were the

24   other assets purchased?

25       A    A terminal lease in San Juan and a long list

35

1  of office equipment, office leases, some terminal

2  equipment --

3      Q    When you say --

4      A    -- receivables, terminal equipment.

5      Q    Yeah, what is terminal equipment?

6      A    That would be terminal handling equipment.

7      Q    In terms of equipment, did you purchase

8  any -- the containers, the reefers, chassis?

9      A    In general, no.

10     Q    Did you purchase the bookings of NPR, it's

11 customers?

12     A    Yes.  When I said receivables, that would

13 be -- well, the receivables would be shipments that

14 had taken place where money was due.

15     Q    Right.

16     A    We also purchased shipments in progress at

17 the time of closing.

18     Q    Any contracts with customers that --

19     A    My understanding is no.

20     Q    All right.  As a result of this aquisition,

21 the aquisition of those assets of NPR, Inc., that you

22 mentioned, did Sea Star Line determine that it needed

23 to either lease or purchase equipment along the lines

24 of containers and gensets and reefers and chassis?

25     A    Can you repeat that, please?

41

1         MR. MOLDOFF:  Mark it Bates 1.

2         (Bates Exhibit 1 was marked for

3    identification.)

4    Q     This is a document that was produce by Sea

5    Star, Bates stamped SE50012 and it goes to SE50013 and

6    then there's an attachment at SE500015 which runs

7    through SE50020 and just ask if you can just take a

8    look at that.  If you need some time to review it,

9    that's fine.  And it's really two parts.  There's the

10   first part, which is a handwritten three pages and

11   then there's an attachment, separate questions about

12   each.

13   A     Okay.  And what's your question?

14   Q     All right.  Just with respect to the

15   handwritten portion of that, are you familiar with

16   that document?

17   A     Yes.  This document was my notes.

18   Q     Is this your handwriting?

19   A     Most of it.  There's some other handwriting

20   on the edges.

21   Q     And what was the purpose of this document?

22   A     This was prior to the closing and this was

23   some of my notes on the transition schedule and

24   issues.

25   Q     Does any of this pertain to the issue of

1  what equipment you may or may not need in connection

2  with this aquisition?

3      A     The first three pages does not, the

4  handwritten.

5      Q     The handwritten portion does not?

6      A     Right.

7      Q     Okay.  The attachment, does that pertain to

8  that issue?

9      A     There's a lot of different attachments.

10  There's one dated 4/9/02.

11     Q     Which one is that?

12     A     The first one.

13     Q     Oh, I see.  That's at SE50015.

14     A     This is from the due diligence period and

15  it's -- it's a listing of the NPR equipment on their

16  leases and a lot of notes --

17     Q     I see.

18     A     -- details about when it was built and --

19     Q     Is this document a document that was

20  prepared by NPR or Sea Star or someone else?

21     A     I'm not sure who prepared it.

22     Q     Do you think Sea Star may have prepared

23  this?

24           MR. ARMSTRONG:  Object to the form.

25     A     I don't know exactly who prepared this.

43

```
 1        Q      Okay.  With respect to the part of that page
 2   that refers to Emerald --
 3        A      Yes.
 4        Q      -- there is a handwritten note next to that,
 5   do you see that?  It's at number 5300 it looks like.
 6        A      I see that.
 7        Q      Is that your handwriting?
 8        A      I don't think so.
 9        Q      Do you know what that signifies?
10        A      No.
11        Q      Do you know what is being shown with respect
12   to Emerald on this page?
13        A      It's a listing of the NPR equipment, a list
14   of Emerald's equipment.  I can't read the top headings
15   but it seems to be grouped by type.
16        Q      I see.  Okay.  Do you see the notes on the
17   bottom?
18        A      Note one and note two?
19        Q      Yes.
20        A      Okay.
21        Q      Do you know what either of those notes mean?
22   Note one says offer and acceptance letter.
23        A      Something about a letter in 5/30/97.
24        Q      That has nothing to do with Emerald?
25        A      I don't know exactly what that means.
```

1    Q    Okay.

2    A    There's another note.

3    Q    If you turn to the next page, which is

4  SE500016, could you tell me what that document is?

5    A    This lists some of the groups of Emerald

6  equipment.

7    Q    When you say Emerald equipment, is that

8  equipment NPR was leasing from Emerald as far as you

9  know?

10    A    As far as I know, yes, and some estimates of

11  sales.

12    Q    And do you know who prepared that document?

13    A    No.

14    Q    And where it says a column requirement, do

15  you know what that means?

16    A    That would have been an estimate of a

17  possible requirement under one of the many scenarios.

18    Q    And when you say an estimate of a

19  projection, you mean a projection by Sea Star Line?

20         MR. ARMSTRONG:  Object to the form.

21    A    I think so.

22    Q    Okay.  And go a couple of more pages in,

23  which is SE50018, up at the top --

24    A    You're skipping one.

25    Q    Yes.

```
 1       A      Okay.  Yes.

 2       Q      It says NPR purchased equipment.

 3       A      Uh-huh.

 4       Q      Do you know, would that have anything to do

 5   with any equipment that was Emerald equipment?

 6       A      This is handling equipment.

 7       Q      Okay.

 8       A      Mostly handling equipment.  There are a few

 9   gensets.

10       Q      Yeah, I see that.  On the next page, which

11   is SE50019, it says equipment for model volumes-NPR

12   and then it has container requirement and chassis

13   requirement, does that -- do you know what that --

14   what this pertains to?

15       A      This looks like another estimate of possible

16   requirements.

17       Q      Requirements of Sea Star?

18       A      Yeah.

19       Q      And it's dated April 19th, 2002?

20       A      Yes.

21       Q      And does it show the requirement from

22   Emerald --

23       A      It shows possible requirements from Emerald

24   and other leasing companies.

25       Q      If you just turn to the next page, which is
```

46

1    the last, it says container and chassis requirements,

2    Dominican Republic interport.    Could you tell me what

3    this document is?

4         A    Yeah.    This is an another estimate sheet

5    estimating the amount of equipment that may be

6    required based on the amount of cargo that may be

7    available for Dominican Republic.

8         Q    And, again, this is an estimate of

9    requirements by Sea Star?

10        A    Yes.

11        Q    Would Andy Rooks have been the one that

12   would have prepared these documents, if you know?

13        A    I think so.

14        Q    All right.    Is it fair to say that at the

15   time of the aquisition Sea Star determined that it

16   needed some equipment?    And when I say equipment,

17   again, I'm talking about containers and gensets, and

18   chassis, et cetera.

19        A    Very short term Sea Star required additional

20   equipment.

21        Q    And why was it only short term at that time?

22        A    Because we didn't know how much cargo we

23   would carry or how many ships we would be able to

24   operate.    The three NPR ships that were deployed

25   operated less than one month.

47

1      Q      All right.  In some point in time did Sea

2  Star Line have a better idea of how much equipment it

3  needed?

4      A      Over time certainly.

5      Q      Within the first few months did it make any

6  determination as how much equipment it needed?

7      A      After the first three NPR ships laid off

8  there was excess equipment, so we determined we needed

9  less.

10     Q      Okay.  Before that time was there a

11 determination of how much equipment you needed?

12     A      I'm sorry, what's your question?

13     Q      Before those ships that you had purchased

14 from NPR you later sold those?

15     A      Yes.

16     Q      And that was within what period of time that

17 they were sold?

18     A      Approximately a month.

19     Q      Well, you bought four ships, right?

20     A      Yes.

21     Q      Did you sell all four?

22     A      We sold all four.

23     Q      And when were they sold?

24     A      Approximately a month, maybe a little longer

25 after the aquisition.

48

1      Q     But you determined that there was some

2   short-term need for equipment, is that correct, as you

3   indicated at the time of the aquisition of the NPR

4   assets?

5      A     I told you already that prior to the

6   aquisition we had a lot estimates of cargo and we made

7   estimates of equipment use that we might require and

8   with the operation of the additional ships we didn't

9   require additional equipment.

10     Q     And were any arrangements made with Emerald

11  for the leasing of equipment at that time?

12     A     At what time?

13     Q     At the -- just after the NPR aquisition

14  which was at or about the end of April, correct, of

15  2002?

16     A     Yes, we made -- we made a user agreement.

17     Q     With --

18     A     -- by e-mail --

19     Q     With Emerald?

20     A     -- in early May.

21     Q     And did you have any involvement in that?

22     A     Yes.

23     Q     And that was early May 2002?

24     A     Yes.

25     Q     And did you have any discussions with

1    someone at Emerald about that?

2        A    I particularly remember Tom Holt, Jr.

3        Q    And what were the nature of your

4    discussions?

5        A    That even though we had not assumed the NPR

6    lease for Emerald equipment that we would pay for

7    equipment we used.

8        Q    Okay.  And you mentioned an e-mail or maybe

9    some e-mails about that in connection with that user

10   agreement, correct?

11       A    Yes.

12       Q    Other than that was there, any formal

13   writing at that time with respect to that agreement

14   that Sea Star would pay for any equipment it used?

15       A    What does formal writing mean?

16       Q    Well, like the -- a -- an actual lease

17   agreement.

18       A    No, there was no lease agreement at that

19   time.

20       Q    Let me show you what we -- what I'm going to

21   have marked as Bates 2.

22            (Bates Exhibit 2 was marked for

23   identification.)

24       A    Okay.

25       Q    Can you identify this document?

50

```
 1        A     This is my e-mail of May 2nd to Tom Holt,

 2   Jr.

 3        Q     And does it pertain to that short-term user

 4   agreement you just mentioned?

 5        A     It pertains to the short-term usage of

 6   Emerald equipment, yes.

 7        Q     And does it generally state the terms of

 8   what your agreement was at that time?

 9        A     Yes.

10        Q     And this is based on your conversations with

11   Tom Holt, Jr.?

12        A     Yes.

13        Q     And the user agreement that you mention

14   there says that it's effective May 1st, 2002?

15        A     Yes.

16        Q     And that it pertains to Emerald equipment

17   which Sea Star dispatches out of any port terminal or

18   inland depot for customer use; is that correct?

19        A     Yes.

20        Q     And there are agreed upon per diems for Sea

21   Star's use of that equipment until it ceases to use it

22   and notifies --

23        A     Yes, that's the attached sheet, it includes

24   per diems.

25        Q     Okay.  That's the per diems for the time
```

51

```
 1   that Sea Star uses the equipment and then ceases to
 2   use it and then notifies them of that, of the
 3   termination, I guess; is that correct?
 4        A    Yes.
 5        Q    And on the bottom of that last paragraph it
 6   says the minimum usage period for any unit is 30 days,
 7   what -- what does that mean?
 8        A    That we agreed that -- that if we use the
 9   equipment that we would have a minimum usage period of
10   30 days.
11        Q    So that -- if you use it only for three days
12   you couldn't just pay for three days you had to pay
13   for 30 days?
14        A    That's right.
15        Q    If you used it for more than 30 days, you
16   used it for, say, 40 days, would you have to pay for
17   60 days or for only 40 days?
18        A    40 days.
19        Q    And the attachment that's the equipment user
20   agreement, did you prepare that or somebody at Sea
21   Star?
22        A    Yes.
23        Q    And what does the column on the
24   attachment -- it says S/T market per diem, what does
25   that mean?
```

52

1      A      This was an attachment to the e-mail and it

2   came from our discussion.  We had proposed rates and

3   we had shown a column for our estimate of what market

4   value may be.

5      Q      I see.  Do you recall -- what does S/T stand

6   for, short term?

7      A      Yes.

8      Q      And what were the -- what were the values

9   that were agreed to, which column would that be, if

10  any, of these columns as to the agreed to rates?

11     A      The Sea Star proposed short-term rate which

12  is in bold.

13     Q      Okay.  And your position is that that's

14  the -- that was the agreed to rates --

15     A      Yes.

16     Q      -- for the short-term user agreement?

17     A      Yes.

18     Q      Okay.  All right.  Did the parties at this

19  time contemplate a more normal writing to govern their

20  lease arrangements?

21            MR. ARMSTRONG:  Objection to form.

22     A      I'm sorry?

23     Q      Did the parties, did Sea Star and Emerald,

24  do you know whether they contemplated -- that there

25  was contemplated there would be some more formal

```
 1              MR. ARMSTRONG:  Object to the form.

 2        Q    Why wouldn't you know?

 3              MR. ARMSTRONG:  Object to the form.

 4        Q    In what instances --

 5        A    Well, one of the terminals was

 6   Philadelphia --

 7        Q    Yes.

 8        A    -- operated by the Holt group.  I don't know

 9   if they had access to all that information, for

10   instance.

11        Q    What about the other terminals where that

12   equipment might have been located?

13        A    Well, at least in San Juan we were using a

14   whole computer system at the gate particularly in the

15   beginning and, again, I don't know if they had access

16   to that or not to the Holt group.

17        Q    How about Jacksonville?

18        A    Jacksonville was primarily operating under

19   our computer --

20        Q    And what about --

21        A    -- so they may not have.

22        Q    -- Port Everglades?

23        A    Same as Jax, our computer.

24        Q    All right.  Prior to a -- was there actually

25   a more formal writing or a lease that was entered into
```

61

1    between Sea Star and Emerald with respect to use of

2    Emerald equipment?

3        A    There was a short-term usage agreement that

4    was written and signed later in 2002.

5        Q    Okay.  But prior to that more formal

6    agreement did Sea Star begin to use Emerald equipment

7    under the short-term user agreement?

8        A    Yes, after 5/02 --

9        Q    Okay.

10       A    -- we used some equipment that was

11   Emerald's.

12       Q    And where was Emerald's equipment which Sea

13   Star began using located on or about May 2nd, 2002?

14       A    Some of it might have been out to a shipper

15   at the time of transition.  Some equipment --

16       Q    When you say a shipper, what do you mean by

17   a shipper, for example?

18       A    A customer that is shipping cargo.

19       Q    All right.

20       A    Some equipment was in the terminals.

21       Q    When you say the terminals, you mean --

22       A    Any of the three --

23       Q    Right.

24       A    -- terminals, Jacksonville NPR terminal to

25   San Juan NPR terminal and the Philadelphia terminal.

62

```
 1        Q    Okay.

 2        A    In addition there was equipment at inland

 3   depots --

 4        Q    Right.

 5        A    -- for NPR.

 6        Q    Right.

 7        A    There was equipment in Dominican Republic.

 8        Q    Okay.  At the time of the aquisition, the

 9   NPR aquisition, was there also certain equipment that

10   was in transit?

11        A    Yes.

12        Q    What does that mean?

13        A    That the NPR vessels sailed by Friday and

14   were at sea at the time of the transition.  So there

15   was containers on -- equipment on those ships.

16        Q    Was any of the equipment at that time in

17   Emerald's possession, to your knowledge?

18             MR. ARMSTRONG:  Object to the form.

19        A    Can you explain that?

20        Q    Yeah.  Specifically I'm talking about any of

21   the equipment that Sea Star may have used at or just

22   shortly after the NPR aquisition, was any of that

23   equipment actually in Emerald's possession so that Sea

24   Star called up Emerald and said, you know, we need

25   these containers?
```

1            MR. ARMSTRONG:  Object to the form.

2        A    The -- my understanding is that the Emerald

3    equipment was on hire to NPR.

4        Q    Right.

5        A    Yeah.

6        Q    And therefore NPR at the time of the

7    aquisition was using that equipment or it made in

8    storage somewhere or whatever, but that that equipment

9    wasn't in Emerald's possession, is that your

10   understanding?

11           MR. ARMSTRONG:  Object to the form.

12       A    It was in NPR's possession.

13       Q    Okay.  Did Sea Star have any way to know

14   where this equipment was at the time of the

15   aquisition, the locations of all the NPR equipment

16   that -- all the Emerald equipment that NPR was using

17   or that it had -- NPR had pursuant to the lease with

18   NPR?

19       A    The only thing we had was the NPR status

20   reports prior to aquisition.

21       Q    Was there -- was there some sort of an

22   inventory that George Cervone had either prepared or

23   brought with him when he came to work for Sea Star?

24       A    That's the status report I'm speaking of.

25       Q    Okay.  And that status report, would that

64

1   have indicated the locations of the various equipment?

2       A     It would -- it listed NPR's input as to

3   their understanding of --

4       Q     Right.

5       A     -- the location of equipment.

6       Q     Right.  Do you know if -- do you know

7   whether or not Emerald knew where this equipment was?

8       A     I don't know.

9       Q     All right.  We did discuss briefly just

10  before about, quote, in transit equipment, correct?

11      A     Yes.

12      Q     Was there some arrangement with NPR --

13  between NPR and Sea Star regarding equipment that was

14  being used by NPR at the time of Sea Star's purchase

15  of the NPR assets?

16      A     Yes.

17      Q     And can you describe what that arrangement

18  or agreement was?

19          MR. ARMSTRONG:  Object to the form.

20      A     Yeah.  There was a -- as part of the closing

21  my understanding from the CFO was that there was a

22  payment included for the use of equipment relating to

23  the equipment in use at that time of transition which

24  would be in transit on the ships.

25      Q     And when you say equipment, some of this was

65

```
 1    equipment that Emerald had been leasing to NPR; is

 2    that correct?

 3         A    Yes.

 4         Q    And do you know what that agreement was?

 5    Specifically was there -- specifically what the

 6    outcome of that agreement was?

 7         A    After the fact I saw some stuff from our CFO

 8    that described it.

 9         Q    And that was an agreement that Sea Star was

10    to pay NPR for the usage of that equipment that was in

11    transit; is that correct?

12         A    Yes.

13              MR. MOLDOFF:  Mark this as Bates 3.

14              (Bates Exhibit 3 was marked for

15    identification.)

16              MR. MOLDOFF:  Off the record.

17              (Off-the-record discussion.)

18              (Brief recess.)

19    BY MR. MOLDOFF:

20         Q    Okay.

21         A    You gave me this document.

22         Q    Yeah.  It's been marked Bates 3.  Are you

23    familiar with this at all?

24         A    Yeah, I just read it.

25         Q    Did you see it before today?
```

1  me.  You said that Emerald would request information

2  about equipment and we would then tell them where it

3  was.  On what occasions would that occur?

4      A    One occasion was our self billing reports

5  that we provided to them for the activity during any

6  month, that would include information about their

7  equipment.  They at different times asked for

8  different kinds of information and we tried to provide

9  anything we could.

10     Q    Okay.  But other than that, there was no

11 mass notification of we've now tracked all of your

12 equipment and here's where all of your equipment is at

13 any point in time; is that correct?

14     A    I don't remember that that question was

15 asked.  We provided a lot of information.  We provided

16 inventories to help them.

17     Q    And pursuant to this short-term usage

18 agreement that you had that was agreed to pursuant to

19 your, I think, May 1st e-mail, Sea Star began using

20 some of this equipment; is that correct?

21     A    Some of this equipment being equipment that

22 had been in transit or this equipment being any other

23 Emerald equipment which --

24     Q    Let's take both.  Some of the in transit

25 equipment.

1    A    Yes.  If it -- in some cases if equipment

2    was reloaded by a customer and used again, then we

3    recognize that as use and listed it and paid for it.

4    If it wasn't used again, it came back in empty, we

5    parked it.

6    Q    And if it went to an inland depot it just

7    maybe sat there?

8    A    I believe that a lot of the equipment that

9    went to inland depots was reused.

10    Q    Reused by whom?

11    A    It could be reused by Sea Star.

12    Q    Well would it have been reused by anybody

13    else?  Would anyone else have had the right to use

14    that equipment?

15    A    I don't --

16    MR. ARMSTRONG:  Object to the form.

17    A    -- know.

18    Q    The answer is no, no one else would have

19    been --

20    A    Repeat that question.

21    Q    Would anybody else have had the right to use

22    that equipment?

23    MR. ARMSTRONG:  Object to the form.

24    Q    If you know.

25    A    Maybe Emerald.

78

```
 1        Q     Because Emerald owned that equipment?

 2        A     I think that -- that we were the more likely

 3    user.

 4        Q     Okay.  And you don't know of any other

 5    leasing arrangement that Emerald had with anybody else

 6    for this equipment, do you?

 7        A     I only know they had an agreement with NPR.

 8        Q     And then with Sea Star?

 9        A     It would be user agreement --

10        Q     Yes.

11        A     -- for equipment we used.

12        Q     Right.

13        A     Yes.

14              MR. MOLDOFF:  Let's mark this Bates 4.

15              (Bates Exhibit 4 was marked for

16    identification.)

17    BY MR. MOLDOFF:

18        Q     All right.  I would ask you to take a look

19    at Bates 4.

20        A     Okay.

21        Q     Can you identify this?

22        A     Yeah.  This is the equipment rental

23    agreement between Emerald Leasing and Sea Star.

24        Q     And did you sign this document on behalf of

25    Sea Star Line, LLC?
```

79

```
 1        A    Yes.

 2        Q    Is that your signature on the back next to

 3   the last page?

 4        A    Yes, it is.

 5        Q    And is this document dated?

 6        A    It says as of blank day of July on the front

 7   page.

 8        Q    July of --

 9        A    2002.

10        Q    Do you know when it was executed by both

11   sides?

12        A    I believe the end of September 2002.

13        Q    Do you know why there was a lapse of time?

14        A    There were several drafts prior to the

15   final.

16        Q    Did you participate at all in negotiating

17   the terms of this equipment rental agreement?

18        A    Yes.

19        Q    And with whom?

20        A    Art Davis was involved in the discussion.

21        Q    Anyone else?

22        A    Maybe Tom Holt, Jr., but I'm not sure.

23        Q    Do you recall if there were any terms in

24   particular that were the subject of negotiation?

25        A    Not specifically.
```

85

1       Q    Pay Emerald for?

2       A    Yes.

3       Q    And in various documents the term on hire is

4  used and would that be the same thing as the on hire

5  date as your initial use?

6            MR. ARMSTRONG:   Object to the form.

7       A    I think that's a term that's used in our

8  industry to indicate the start date of a payment --

9       Q    Okay.

10      A    -- period.

11      Q    Could you go through the process of on

12 hiring equipment what -- what would take place, if

13 anything?  And, again, I'm talking about in connection

14 with the transaction or with the use of Emerald

15 equipment.

16      A    Only Emerald?

17      Q    Yes.

18      A    No other leasing company?

19      Q    Right.

20      A    Okay.  Okay.  With normal leasing companies

21 we would inspect equipment, accept it, and have a very

22 clear on hire date.  In this case with Emerald since

23 we were also acting as a depot for Emerald and we're

24 required initially by the bankruptcy court to receive

25 all the NPR equipment that was -- that appeared at our

1    terminals, the on hire terminology is more confusing

2    because in order to receive anything through our

3    terminals our computer system requires that we enter

4    something in on hire.  So in order to receive an empty

5    Emerald unit that came in from a trucker, we would

6    have to make an on hire entry in the computer system

7    to be able to receive it and have the information.  So

8    on hire for the computer system didn't mean

9    necessarily on hire under the equipment rental

10   agreement.

11        Q    And you talk about computer system, is this

12   what has been referred to in previous depositions as

13   IQ System -- IQSHIP I mean?

14        A    The Sea Star equipment system is called

15   IQSHIP.

16        Q    Okay.  In connection with the Emerald

17   Equipment then, what would -- how would Emerald first

18   signify its -- I'm sorry.  How would see Sea Star

19   first document its initial use of the equipment?

20        A    We enter all TIR movements into our computer

21   system in the initial period right after the

22   aquisition of some of the assets of NPR, we also use

23   NPR computer system at some of the terminals, San Juan

24   and Packer continued to use its system -- I'm sorry,

25   what was your question?

1    Q    My question was, how would you go about the

2    process of documenting Sea Star's initial use of the

3    Emerald equipment?

4    A    Okay.  Based on the TIR information that we

5    were able to collect and put into IQSHIP we were able

6    to identify units that we had used.

7    Q    Now, the TIR system, that's a type of a

8    receipt that is used when a piece of equipment moves

9    in or out of the gate; is that correct?

10    A    Yes.

11    Q    And who is responsible for the preparation

12    of TIRs when a piece of equipment moves in or out of

13    the gate?

14        MR. ARMSTRONG:  Object to the form.

15    Q    If you know.

16    A    TIRs are filled out by clerks at the gates

17    at all the terminals.

18    Q    So if it's a Sea Star terminal would they be

19    Sea Star clerks?

20    A    They would normally be union members

21    employed by a stevedore terminal vendor that we would

22    have a contract with.

23    Q    Okay.  That TIR would then be filled out and

24    that equipment moved in or out of the gate, correct?

25    A    Uh-huh.

1    Q    And then how would Sea Star know about that

2    movement?

3    A    All the TIRs went into the port offices in

4    our terminals at Jax and San Juan and Port Everglades

5    and Sea Star or Sea Star agency employees would enter

6    that information into our computer system.

7    Q    Is there a particular individual at each of

8    those ports that has the responsibility of doing that

9    or could it be a number of people?

10   A    Each port has an equipment control manager

11   and they may or may not have additional people working

12   for them.

13   Q    Could you just briefly tell me, if you know,

14   in Jacksonville who that person would be?

15   A    At what time, what period of time, today?

16   Q    No.  During the -- subsequent to April 2002

17   when -- through 2003.

18   A    During that period I believe in Jacksonville

19   it would be James Lee.

20   Q    And how about Port Everglades, if you know?

21   A    I can't remember his name.

22   Q    San Juan?

23   A    I can't remember his name either right now.

24   Q    Are there -- okay.  Are there -- did I miss

25   any ports?

89

1      A      We have -- we have one fellow named Pagano

2  in New York, Port Elizabeth.

3      Q      In Port Elizabeth.  And he was the guy --

4  what's -- do you know his first name?

5      A      Frankie.  Frankie Pagano in Elizabeth, we

6  have Diaz, he was in San Juan.

7      Q      Diaz.  Okay.  When -- when equipment was

8  returned to Port Elizabeth, would that equipment

9  somehow find its way down to Packer Avenue in

10  Philadelphia, do you know?

11      A      Yes.  If we had equipment to turn into

12  Emerald in the Northeast we would send it to Packer

13  Avenue.

14      Q      Directly to Packer Avenue or would it go to

15  Port Elizabeth and then truck down?

16      A      The ship went to Port Elizabeth, so after

17  it -- get off the ship and complete its move we would

18  have to track it to Packer Avenue.

19      Q      Okay.  All right.  And so you have

20  individuals whose responsibility is to take those TIRs

21  and what do they do with those TIRs?

22      A      They input pertinent data into the IQSHIP

23  system.

24      Q      And is that done all the time?

25      A      Yeah, every day.

1   Q  Is a TIR the same thing as an equipment

2 interchange receipt?

3   A  Yes.  A TIR is a trailer interchange receipt

4 which is used as terminology in many ports and EIR is

5 an equipment interchange receipt which is the same

6 thing.

7   Q  Are there other types of receipts in and out

8 of port terminals or would they be the TIRs or EIRs?

9   A  As far as containers and trailers --

10   Q  That's --

11   A  -- it's TIRs.

12   Q  What about an inland depot, do they use the

13 same terminology or is there some other terminology?

14   A  I believe they normally use the same

15 terminology.

16   Q  Is there such a thing as a gate log?  If you

17 know.

18   A  A gate log?

19   Q  Yes.

20   A  A gate log may be a listing of all the

21 movements in a day or period of time.

22   Q  Is there such a thing as a gate receipt

23 other than a TIR or an EIR, some other form of

24 document that is used other than what's normally used

25 at port terminals?

1    A    We use dock receipts, a different kind of

2  form for cars, bull dozers, self-propelled cargos.

3    Q    Right.  But what about containers, as far as

4  you know?

5    A    As far as I know, it's all TIRs or EIRs.

6    Q    Okay.  With respect to IQSHIP could you just

7  describe what you know about that?

8    A    About that?

9    Q    About that system, how that works.

10    MR. ARMSTRONG:  Object to the form.

11    A    It's a very broad question.  You're asking

12  me how IQSHIP works?

13    Q    Well -- okay.  I'm sorry.  You're right.

14  What is the purpose of IQSHIP?

15    MR. ARMSTRONG:  Object to the form.  Do you

16    want to limit it to equipment or do you want to

17    be broad?

18    Q    Well, is IQSHIP used for more than just

19  equipment?

20    A    Yes.

21    Q    What other things is IQSHIP used for?

22    A    Taking booking, creating documentation for

23  shipments.

24    Q    It kind of helps you track it, doesn't it?

25    A    It's all related.

92

1     Q    IQSHIP's a computer program of some sort?

2     A    Yes, it is.  It's a software.

3     Q    And is that -- is that something special

4   that only Sea Star uses?

5     A    No.  It's a -- IQSHIP has been used by a

6   number of other lines in the world.  In addition to

7   the others obviously we also use it to track

8   equipment.

9     Q    Do you know if Sea Star Line used any

10   Emerald equipment that wasn't documented by a TIR?

11     A    I don't know of any that would be used

12   without a TIR.

13     Q    If -- is it possible that equipment was

14   being used without a TIR?

15         MR. ARMSTRONG:  Object to the form.

16     Q    If you know.

17     A    No.

18     Q    If Sea Star used certain equipment for which

19   a TIR was not prepared, do you believe that Sea Star

20   would be obligated to pay for that equip- -- the use

21   of that equipment if it actually used it?

22         MR. ARMSTRONG:  Object to the form.

23     A    If we used equipment we agreed to pay.  I

24   also just said that I don't think there could be

25   equipment used without a TIR.

1      A    Okay.  When you asked me how it was prepared

2  I told you that we punch a button in the computer and

3  it prints it out from the database.

4      Q    Okay.  Based on what you just said about how

5  all this information gets inputted into the

6  computer --

7      A    Yeah, that's how it gets into the database.

8      Q    So -- and the equipment list is just a

9  function -- or this load summary's a function of

10  just -- is just punching the right keys and then the

11  computer pops it out for each ship's --

12      A    It's a report, yes.

13      Q    Report.  Okay.  When Sea Star first used any

14  equipment that was equipment that had been in transit

15  and then Sea Star determined that it wanted to use

16  some of that equipment later after the in transit

17  period was over --

18      A    Okay.

19      Q    -- was Emerald notified at that time that

20  that piece of equipment was going to be used?

21      A    Was Emerald notified -- this is in relation

22  to equipment that was in transit?

23      Q    Yes.

24      A    If something after the initial voyage if we

25  had used it again --

Q    Yeah.

A    -- did we notify them?  No.  We put it on the -- we tracked it and added it to the self billing report.

Q    Through the TIRs or the IQSHIP and then a self billing report?

A    Yes.

Q    But would Emerald have any way of knowing what equipment was being used other than through that process?

MR. ARMSTRONG:  Object to the form.

A    I don't know.

Q    There was no document or receipt that you needed to get from Emerald in order to use any of that equipment, was there?

A    No.

Q    Okay.  And equipment other than -- that was in transit, Sea Star at some point in time in or about the beginning of May 2002 began using some of Emerald's equipment; is that correct?

A    Sometime in May of 2002, yes.

Q    And where was this equipment located, the equipment now that wasn't in transit?

A    Again, there are many cases.  There may have been a customer who then sent it in loaded and we

102

1    Q    Any of the equipment that Sea Star started

2  to use in or about May of 2002 that wasn't in transit,

3  was any of that equipment in Emerald's possession --

4          MR. ARMSTRONG:   Object to the form.

5    Q    -- at the time that it wanted to use that

6  equipment -- that Sea Star wanted to use that

7  equipment?

8    A    You asked me that before.   It had been in

9  use by NPR.

10    Q    Okay.   And when Sea Star used any of this

11  equipment that wasn't in transit, whether it was in

12  inland depot or some other port, again, that same

13  process with the TIRs would have been executed before

14  Sea Star used that equipment or at the time Sea Star

15  used that equipment?

16    A    Yeah.   Every load that we received at any

17  terminal had a TIR.   If we received it at Jacksonville

18  a TIR was issued and that would tell us it was a load.

19    Q    Okay.   And in the course of the arrangements

20  between Sea Star and Emerald, when would Sea Star's

21  obligation to stop paying rent on a particular piece

22  of equipment occur?

23          MR. ARMSTRONG:   Object to the form.

24    A    After we used a piece of equipment --

25    Q    Yes.

1    reports to check the invoices of leasing --

2        Q    Yeah, I understand that.

3        A    Most leasing companies produce invoices to

4    us.

5        Q    Right.

6        A    Okay.  As far as a self billing report we

7    produced a spreadsheet to support the Emerald activity

8    for the equipment that we used.

9        Q    And to support your payments?

10       A    And to support our payments to them.  We

11   also used initially our reports to MBC to designate

12   the equipment that was MBC and had nothing to do with

13   Emerald that we agreed to honor.

14       Q    Right.  You didn't receive any invoices from

15   Emerald or MBC with respect to the Emerald equipment,

16   did you?

17       A    I didn't receive any invoices from Emerald.

18   I'm not sure if we started to receive invoices from

19   MBC later.

20       Q    When you say with MBC, do you mean with

21   respect to the separate lease --

22       A    To their own equipment.

23       Q    But the arrangement whereby you're using the

24   self billing report for the purpose of supporting

25   payments and you're not receiving invoices from the

1    leasing company, how usual is that?

2        A    Unusual.

3        Q    It's unusual.  And why was this system used

4    in this case?

5            MR. ARMSTRONG:  Object to the form.

6        Q    This system being the self billing reports

7    to support the payments where you're not receiving

8    invoices from the leasing company.

9        A    Well, we said we'd pay for equipment we

10   used, so we identified the equipment that we used so

11   that we could pay for it.

12       Q    Did Emerald have any way of knowing what

13   equipment it is you were using?

14           MR. ARMSTRONG:  Object to the form.

15       A    You asked that before and I don't know.

16       Q    Okay.  Do you remember who you discussed the

17   self billing report mechanism to support payments as

18   opposed to receiving invoices from Emerald or MBC who

19   you discussed that with at either MBC or Emerald?

20       A    I recall discussing some details with --

21   with Art Davis of Emerald and I remember discussing

22   some details with Scott Cregor (Phonetic) of MBC.

23       Q    Okay.  And are self billing reports prepared

24   from the IQ system, IQSHIP system?

25       A    The normal self billing reports that are

The damage exclusion amount for each type will apply before SSL pays for any additional damage during usage. In the event of total loss of any equipment, proposed D.V. value would be payable to Emerald.

The minimum usage period for any unit is 30 days, and any equipment may be returned to any of the 3 port locations at anytime. This agreement can be terminated by either party on 30 days notice, with an additional 30 day wind down at the same rates.

(See attached file: Equipment User Agreement.xls)



(c)   - Equipment User Agreement.xls
····· Forwarded by Tom HoltJR/holtoversight on 01/20/2004 11:53 AM ·····

| | |
|---|---|
| PBates@seastarline.com<br>Sent by:<br>MAhmed@SEASTARLINE.COM | To: tholtjr@holtmarine.com<br><br>cc: ARooks@seastarline.com, brian@saltchuk.com |
| 05/02/2002 03:14 PM | Subject: Agreement for Short-Term Usage of Emerald Equipment |

As agreed today, this user agreement is effective 5/1/02 and applicable to any cargo worthy Emerald equipment which SSL dispatches out of any port terminal or inland depot for customer use. Agreed per diems will continue for each unit until SSL ceases to use it and notifies Emerald thereof, as well as the port location of that unit (JAX, SJU, PHL) or SSL reaches agreement to purchase of said L/T lease unit.

(SSL will make a best effort to return any Emerald equipment used under this agreement to any off-dock depot designated by Emerald near the three port locations, as long as SSL does not incur additional expense.)

The damage exclusion amount for each type of equipment defines the average estimated IICL damages which are currently on each type of equipment before SSL uses any of it. The equipment dispatched out from each of the port terminals (including Packer Avenue and inland depots) is expected to be in running condition as evidenced by the outbound TIR. Any equipment returned by SSL to Packer Avenue, any other terminal or depot should be in running condition, unless noted on the TIR. Emerald/Holt must notify SSL immediately of any equipment which is damaged at the time of return to the terminal, as noted on the inbound TIR. SSL will rebill the responsible party, and repair or pay Emerald for the repair cost of this type of new damage during SSL usage. In the event of total loss of any equipment, the agreed D.V. value will be payable to Emerald.

The minimum usage period for any unit is 30 days, and any equipment may be returned to any of the 3 port locations at anytime or any designated Emerald depot (on a best efforts basis, without additional expense to SSL). This agreement can be terminated by either party on 30-days notice, with an additional 30-days wind down at the same rates.
(See attached file: Equipment User Agreement.xls)

Phil Bates

 - Equipment User Agreement.xls
····· Forwarded by Tom HoltJR/holtoversight on 01/20/2004 11:53 AM ·····

**A-91**