# APPENDIX

# PART 3 OF 7

1          IN THE UNITED STATES DISTRICT COURT
             MIDDLE DISTRICT OF FLORIDA

2

3             CASE NO.:  3:04-CV-146-V-99HTS

SEA STAR LINE, LLC,

4  a limited liability company,     **ORIGINAL**

5          Plaintiff,

      vs.

6

EMERALD EQUIPMENT LEASING, INC.,

7  a corporation,

8          Defendant.

    - - - - - - - - - - - - - - - - - - - - - - - - -

9

10           Deposition of **ANDREW ROOKS**, taken on behalf

11  of the Defendant, pursuant to Notice of Taking Deposition

12  in the above-entitled action, on Friday, January 14,

13  2005, at 9:10 a.m., at the office of Powers Reporting,

14  220 East Forsyth Street, Jacksonville, Florida, before

15  Susan Taylor, a Court Reporter and a Notary Public in and

16  for the State of Florida at Large.

17

18

19

20

21

22

23

24

25

1   taking any particular equipment as an example?

2             MR. ARMSTRONG:  Object to the form.

3        A     Well, the date of the agreement, I think, was

4   effective April 29th of 2002.

5        Q     And when would you begin incurring rental

6   charges with respect to any particular piece of

7   equipment?

8             MR. ARMSTRONG:  Object to the form.

9        A     Once we -- under the terms of the agreement,

10  once we used the equipment to move cargo is when we

11  consider the equipment to start -- you know, coming on

12  the clock.

13       Q     Does the term on-hire, is that meaningful to

14  you?

15       A     Yes.

16       Q     Okay.  And is that what you mean when you say

17  on the clock, on-hire?

18       A     Yes.

19       Q     If you move the equipment for reasons other

20  than to move cargo, repositioning empties, would that

21  start the on-hire period?

22       A     If we move the equipment and reposition an

23  empty after we had on-hired it, used it, we would be

24  responsible for that per diem on that equipment till we

25  terminated -- until it was terminated.

1    A    In general, yes.

2    Q    Is it a term that you use in your business?

3    A    Yes.

4    Q    With respect to this lease if any of the

5  Emerald equipment was idle, did that impact on the

6  charges being incurred by Sea Star for use of the

7  equipment?

8         MR. ARMSTRONG:  Object to the form.

9    A    Not necessarily.

10    Q    Does the term J lot mean anything to you?

11    A    Yes.

12    Q    What does that mean to you?

13    A    The J lot was an area on our terminal in San

14  Juan where we would reposition and store the Emerald

15  equipment after it came in our gate once we determined we

16  were not going to reuse it.

17    Q    Does the term showroom lot mean anything to

18  you?

19    A    Yes.

20    Q    What does that mean?

21    A    The showroom was a lot just adjacent to our

22  terminal in San Juan where we returned Emerald equipment.

23    Q    Is there a difference between the J lot and

24  the showroom lot other than the physical -- physically

25  where they are?

12

1          A    No, not really.

2          Q    Is it your testimony that all equipment that

3     went into the J lot once it went there was never again

4     used by Sea Star?

5               MR. ARMSTRONG:  Object to the form.

6          A    That was the intent.

7          Q    Do you know if in practice that was what

8     occurred?

9          A    The intent was to move the equipment over to

10    the J lot and the intent was not to use it again.

11         Q    I'll show you a document that was marked as

12    Defendant's Exhibit 14.  This is an e-mail from Lisa

13    Florence to you.

14         A    Okay.

15         Q    The list of equipment -- assume that the list

16    of equipment that's here had been used by Sea Star.  When

17    she says these should be moved to J lot for off-hire,

18    does the movement to J lot in and of itself terminate Sea

19    Star's obligation to pay rent for the equipment?

20              MR. ARMSTRONG:  Object to the form.

21         A    If we had used this equipment and were

22    responsible for per diem charges then by moving to the J

23    lot would nothing more -- would mean nothing more than

24    just moving it off of our main terminal and getting it

25    over to the J lot to ensure that we wouldn't use it

1    because of the sequence of the -- the way the IQSHIP

2    program is configured.

3        Q    So what would happen to a piece coming into

4    the gate that -- where there wasn't an on-hire move

5    preceding it?

6        A    Well, we had to force an on-hire move and

7    then a minute later force the received -- empty order

8    receive, full move, into the computer.

9        Q    What type of moves would create an entry into

10   the IQSHIP system?

11       A    A received empty move, a received full move.

12       Q    How about the other way, gate outs?

13       A    Yes, a gate out move, sent out, empty, sent

14   out full move.

15       Q    With respect to just the gates in, gates out,

16   would there be a TIR for each of those moves?

17       A    There should be, yes.

18       Q    Are there other documents other than TIRs

19   that evidence equipment moves?

20       A    Yes.

21       Q    I'm going to show you a document and ask you

22   if you can tell me what that is.

23       A    This is a cargo discharge document from one

24   of the stevedore's in San Juan.

25       Q    Is that a document that would be created for

16

1    Sea Star's usage?

2         A    Yes.

3         Q    And does that document indicate Emerald

4    equipment being used?

5         A    Yes.   I see some Emerald equipment on here.

6         Q    And is that the type of document that could

7    also evidence the usage of Emerald equipment by Sea Star?

8         A    Yes.

9         Q    How would that information be inputted into

10   the IQSHIP?

11        A    Well, without looking at the individual

12   history of these units, hopefully, if these units were --

13   hopefully, these units were on-hired in our system before

14   the -- if they, indeed, were used by Sea Star, but before

15   they were discharged off this vessel.  And then the

16   particular move whether it's a discharged or sent forward

17   or a reposition move would be subsequent to that based on

18   this document.

19        Q    Is there a procedure established at Sea Star

20   to review these documents as they're received in order to

21   assure that the equipment usage has been recorded in the

22   IQSHIP system?

23        A    Yes.

24        Q    Who at Sea Star would be obligated to make

25   that review?

17

1      A     For this particular document, it would have

2  been our equipment folks in San Juan.

3      Q     Who is there?

4      A     It's headed up by Ricardo Diaz.

5      Q     Do you recall ever receiving reports from

6  Mr. Diaz indicating that he is located equipment, that it

7  was being moved, but not in the IQSHIP system?

8      A     I can't recall.

9      Q     We have looked at TIRs and we've looked at

10  load discharge summaries, are there -- is there any other

11  type of document that Sea Star would receive which would

12  indicate a move of equipment?

13     A     Yes.

14     Q     What other documents might there be?

15     A     We were using gate logs, for example, out of

16  our facility up in Elizabeth, New Jersey.

17     Q     Was there a person responsible for inputting

18  the information from gate logs into the IQSHIP system?

19     A     Yes.

20     Q     Who was that?

21     A     Early on George Cervone was at that facility

22  and also Frank Pagano, P-a-g-a-n-o.

23     Q     Were there other documents used by Sea Star

24  to evidence usage of equipment?

25     A     We would receive faxes or e-mails from our

18

1    inland depots that would show inbound and outbound gate

2    activity for that particular day.

3          Q     Any other documents?

4          A     I can't think of any more.

5          Q     Would a ship manifest indicate usage of

6    Emerald equipment?

7          A     Sure.

8          Q     And did Sea Star regularly review ship

9    manifests to determine whether the equipment recorded on

10   the manifest was in the IQSHIP system?

11         A     If it was on the manifest it would have been

12   in the IQSHIP system.

13         Q     Could you explain -- if I showed you examples

14   where they're on the manifest but not in the self-billing

15   reports, would you have an explanation for that?

16         A     Possibly.  I'd have to look at them.

17         Q     I'll show you what was marked as Florence 10,

18   11, 12, and 13.  It's at the bottom of the pile right in

19   front of you.

20         A     10 --

21         Q     11, 12, and 13.

22         A     Thank you.  Okay.

23         Q     And I will represent to you, so that I can

24   save you some time, that this is a ship manifest.  The

25   highlighted items are Emerald equipment that appear on

19

1    the ship manifest for both the northbound and southbound

2    voyage of the ship in question.  And behind that are your

3    self-billing reports for the two-month period covered by

4    the ship manifest.

5        A    Okay.

6        Q    If you'll assume for me that we have

7    accurately reviewed these and that these pieces of

8    equipment are not on the self-billing report, even though

9    they are on the ship manifest, could you tell me how that

10   could have occurred?

11           MR. ARMSTRONG:  Object to the form.

12       A    Again, without looking at the history of the

13   unit and assuming that you guys have done that research,

14   I don't have a particular explanation on this other than

15   it possibly was missed.

16       Q    Well, how could it be missed?  Because wasn't

17   your testimony that any piece of equipment that got on a

18   ship would have to have an entry into the IQSHIP system?

19       A    Could have had an entry into IQSHIP if it was

20   inputted in the IQSHIP system at the time of on-hire

21   improperly.  The proper documentation required for the

22   inputting of the on-hire wasn't done properly, then that

23   unit would not have, for lack of a better word, spit out

24   when the self-billing report was run against Emerald.

25       Q    Any other explanation?

20

1              MR. ARMSTRONG:  Object to the form.

2         A    No, not that I can think of.

3         Q    Have you or anyone under your command going

4    through ship manifest to see if Emerald equipment has

5    been -- let me rephrase that.

6              Have you personally or have you directed

7    anyone to review ship manifests for the period covered by

8    the equipment rental agreement to see if the IQSHIP

9    system has included all usage of Emerald equipment?

10        A    Yes.

11        Q    When was that done?

12        A    We did -- I did an analysis and it was in the

13   fall of '03.  I can't recall the exact date.

14        Q    What exactly was done?

15        A    We had run load summaries from April 27th

16   through, I believe, August -- April 27th of '02 through

17   August of '03, and tried to determine which Emerald-owned

18   units were on those manifests -- excuse me, on those load

19   summaries.  And we did a little analysis to determine if

20   there were units that we missed, if there's units that we

21   didn't pay for that we possibly should have, things of

22   that nature.

23        Q    What did the analysis reveal?

24        A    There were some monies owed based on our

25   findings.  I'm not sure what the final dollar amount was,

1   you have it somewhere.

2        Q    You've used the term load summary and ship

3   manifest almost interchangeably in your answer, is there

4   a difference between those documents?

5        A    You said ship manifest, I was saying load

6   summary.  There's a slight different, yes.  The load

7   summaries -- yes, there's a difference.

8        Q    What is the difference?

9        A    The load summaries are an equipment report

10  that shows all the equipment whether it's empty or load

11  moved on those particular vessels.  It's more of a

12  condensed version of a manifest that's used by

13  equipment --

14       Q    What was it that you reviewed, the load

15  summary or the ship manifest?

16       A    The load summaries.

17       Q    I'll show you what was marked as Florence 1.

18  It's right there.

19       A    Yes.

20       Q    Do you recognize this document?  I will tell

21  you that Lisa Florence identified this as summary sheets

22  from a self-billing report.

23       A    Yes.  These are the front page of the

24  detailed self-billing report that we sent to you.

25       Q    Would you look at the third page, please.

1        A        Yes.

2        Q        Do you see the last entry, inland depots?

3        A        Yes.

4        Q        Can you explain why no inland depot moves

5   appear on any of the preceding summary pages?

6        A        No, I cannot.

7        Q        From your experience, were there inland depot

8   moves between the period of April 27th through May 31st

9   with respect to Emerald equipment?

10              MR. ARMSTRONG:  Object to the form.

11        A        I would presume there would have been.

12        Q        Is this another example where IQSHIP may not

13   have had the information in order to create a

14   self-billing report?

15        A        That could be one example.  Another -- that

16   could be one example.  I don't know if this inland depot

17   on June -- I don't know if this was -- these amounts, if

18   it's -- if it -- if the summary -- if the actual billing

19   period is June 1st or June 30th.  Any one of these units,

20   whether it's inland depots or other locations, could be

21   dollars that are owed going back to when we realized we

22   did on-hired in the middle of May or end of May or

23   something like that, that would be in the detail.

24        Q        In any of your reviews of your self-billing,

25   did you find examples where inland depot moves had not

1          A     We had asked him to find the supporting

2    documents for the equipment that constituted our on-hire

3    and/or our off-hire report.

4          Q     Do you know what he's been doing in order to

5    accomplish that task?

6          A     He's been going through our TIR files in our

7    office in Jacksonville to try to find these documents.

8          Q     Anything else?

9          A     No.

10         Q     Does he have access to IQSHIP?

11         A     No.

12         Q     Does he -- is he reviewing documents that are

13   located anywhere else other than Jacksonville?

14         A     We had the TIR documents in San Juan sent to

15   Jacksonville, so he was reviewing those TIR files.  We

16   had the gate logs from Elizabeth, New Jersey sent down to

17   us, so he's been reviewing the gate logs.  We had the --

18   the e-mail notification from the inland depots or the

19   faxes from the depots, he's been reviewing those -- those

20   documents.

21         Q     At the time of the MPR acquisition, you held

22   the same position with Sea Star that you do today?

23         A     Yes.

24         Q     Were you asked to consider how much equipment

25   Sea Star would need in order to operate the ships it was

**A-104**

34

1    that you've learned from your review of your own

2    documents?

3                  MR. ARMSTRONG:  Object to the form.

4         A     No.  I mean, it's what we think is factual

5    information.

6         Q     Do you recall whether the report reached the

7    conclusion as to whether or not additional money was owed

8    to Emerald?

9         A     Yes, it did.

10        Q     Do you recall how much?

11        A     No, I do not.  It's still actually ongoing,

12   but, no, I do not recall.

13        Q     Do you recall your last -- let me rephrase

14   that.

15               What was the last amount you recall seeing as

16   being owed to Emerald?

17               MR. ARMSTRONG:  Object to the form.

18        A     If I'm -- if -- if it's something I'm doing

19   on behalf of counsel, am I allowed -- can I state that?

20   Okay.  I want to say --

21               MR. ARMSTRONG:  Don't guess.  If you recall,

22        don't guess.

23        A     I want to say I saw a number of $180,000.

24        Q     Has the updated version of Florence 7 been

25   produced in response to discovery requests?

40

1    was there a conclusion that an additional $157,215 was

2    due and owing?

3            A    Yes.

4            Q    There's a report that's part of this Exhibit

5    that comes right behind the first report, do you see

6    that?

7            A    Yes.

8            Q    And at the bottom it says page 1 of 12?

9            A    Yes.

10           Q    What is this report?

11           A    This was the more detailed report listing.

12    The actual unit number showing the number of days and the

13    per diem and the total amount.

14           Q    Would it be fair to say each and every piece

15    of equipment that's on this portion of the Exhibit was

16    not found in IQSHIP?

17           A    It was in IQSHIP, it was not on self-billing

18    reports.

19           Q    Can you explain how these units could have

20    been in IQSHIP and not appear on the self-billing

21    reports?

22           A    Yes.  Again, as I mentioned earlier, when we

23    on-hire a document -- excuse me.  When we on-hire a piece

24    of equipment certain information has to be inputted into

25    IQSHIP that refers to the leasing company, a release

1    reference code, things of that nature.  If that -- if

2    that information is not input correctly, when the

3    self-billing report is run, you're asking for that

4    particular companies account code, if it was not on-hired

5    properly, then when the self-billing report is generated,

6    it's going to miss units that were brought into the

7    system against a flawed or a wrong reference code.

8             Q    Are you're talking about a release reference?

9             A    Yes, thank you.  Yes.

10             MR. SCHILDHORN:  Off the record.

11             (Off-the-record discussion.)

12    BY MR. SCHILDHORN:

13             Q    Have you seen an updated version of this

14    portion of Cervone 16?

15             A    No, this is the only one we ran.

16             Q    Was there a minimum time period for the

17    rental of each piece of Emerald equipment pursuant to the

18    equipment rental agreement?

19             A    Yes.

20             Q    Was that 30 days?

21             A    Yes.

22             Q    Do you know why in calculating the amount

23    owed for certain pieces of equipment a period of time of

24    less than 30 days was used?

25             A    No.

1   above and beyond what they had claimed on their

2   spreadsheets.  We did an analysis and determined that,

3   yes, we possibly owe you -- them X amount of dollars more

4   on the claim analysis.  We did the -- the study on the

5   load summaries to determine was there possibly more money

6   we would owe them that -- that had not been claimed by

7   Emerald on their claim analysis, so we were kind of

8   separating the two.  We knew we possibly owed money under

9   the claim analysis above and beyond that we provided this

10  report internally to see if there was more money that

11  would be due to them that had not already been reported

12  under the claim analysis.

13       Q    Okay.  And after the 70 page, there's another

14  chart, what does that show?

15       A    That's a chart that showed a breakdown by

16  unit -- excuse me, by comments with the amount of units

17  that were represented on those comments.

18       Q    There's a total units of 5,482.

19       A    Yes.

20       Q    Does that represent the total units on all --

21  of everyone's units on the ship or just the Emerald

22  equipment?

23       A    Just the Emerald equipment that sailed on

24  those vessels from April of '02 to August of '03.

25       Q    What does the next report show, 1 of 84?

1          A       This was the actual analysis.  There was a

2    breakdown by voyage and it listed the unit numbers, the

3    Emerald units that sailed on that voyage, and then out to

4    the right, the comment's that represented those units.

5    This was more of an analysis done by voyage with the unit

6    numbers in the comments.

7          Q       Okay.  In the middle of the page, there's an

8    indication that there's an amount due, but there's no

9    comments to the right, do you see that?

10         A       Yes.

11         Q       What does that indicate?

12         A       I believe you're referring to PRMU, the unit

13   number on the Giam (phonetic) of 583 North.

14         Q       Yes.

15         A       PRME 220058, check 2.  There's an on-hire day

16   of April 30th, off-hire date of July 3rd.  We indicated

17   no amount was due, under comments indicated first voyage

18   paid to MPR.

19         Q       I'm actually looking down further where you

20   show an amount due but no comments.

21         A       Okay.

22         Q       What does -- what do those entries indicate?

23         A       There's a total amount due.  We didn't put a

24   comment, but basically that meant that we owed that money

25   to Emerald.

49

1    Q    Does it mean it was on the self-billing

2  report or not on the self-billing report?

3    A    It was not on the self-billing report.

4    Q    Was it on the claims analysis or not on the

5  claims analysis?

6    A    It was not on the claims analysis.

7    Q    And if you show less than 30 days usage,

8  that's in error and should be corrected?

9    A    That's an error and it should have been

10  corrected, yes.

11    Q    Looking at page 3 of 84.  And there's a large

12  number of units that were not on a self-billing report,

13  were not on the claims analysis, are these units that

14  were in IQSHIP?

15    A    Yes.

16    Q    And is your explanation as to why they are

17  not on the self-billing report what you said there, was

18  an input error when the information was being put into

19  IQSHIP?

20    A    I believe that's the case.

21    Q    Are you surprised by the number of units that

22  were not in your self-billing reports?

23    A    I was -- yes, I was a little surprised,

24  especially this one voyage.  I do remember seeing --

25  there's a lot of reefers on here and I was fairly

1    surprised that a lot of these reefers did not show up.

2    If you look at the on-hire dates, it's May 1st, May 2nd,

3    May 3rd when we had a -- just a huge influx of equipment

4    coming in and being utilized.  So possibly through input

5    error and keypunch error a lot of that stuff was not

6    input correctly and, therefore, not submitted on the

7    self-billing reports.

8         Q    Did you come up with any other explanation as

9    to why so many units were not included?

10        A    No.

11        Q    At the conclusion of that report, page 84 of

12   84, there's a grand total number of units, 5,482 --

13        A    Yes.

14        Q    -- that's the number of Emerald units that

15   were on those ships; is that correct?

16        A    Yes.

17        Q    And the total is what this report at this

18   time shows might be due and owing for -- with respect to

19   uses of equipment not appearing on the self-billing

20   report or the Emerald claim analysis?

21        A    That's correct.

22        Q    Would you look at Florence 14.  Can you

23   identify that?

24        A    Yes.  This is another -- we didn't already do

25   this?  This isn't 7 also?  Sorry.

54

```
 1    serious effort in off-hiring the equipment, what were

 2    they supposed to do?

 3         A    Locate the equipment on the facility, advise

 4    me that they had it, and, in turn, I would advise Emerald

 5    that we were going to return the equipment to the agreed

 6    upon facilities per the contract.

 7         Q    And were they also to get an executed TIR

 8    upon the return to Emerald?

 9         A    Yes, that was the intent.

10              MR. SCHILDHORN:  Off the record for a minute.

11              (Off-the-record discussion.)

12    BY MR. SCHILDHORN:

13         Q    Going back to Exhibit 3, the last page,

14    there's a grand total of units of 1,362, do you see that?

15         A    Yes.

16         Q    How does that compare with the figure you had

17    in your e-mail?

18         A    I state in my e-mail, today we have

19    approximately 2,000 units, to be quite truthful, I'm not

20    sure where I came or why I came up with that number of

21    2,000 units.

22         Q    What is this exhibit that's attached?

23         A    This is a cover page for a self-billing

24    report that we sent to Emerald in July of '02.

25         Q    And this was --
```

1      A      For a period in July of '02.

2      Q      You're talking about the -- just the page

3  with the figure of 1,364?

4      A      Yes.

5      Q      The pages that precede that with the

6  equipment numbers on them --

7      A      Yes.

8      Q      -- what's that supposed to be?

9      A      This is the -- a listing of units that we had

10  purchased or were in the process of purchasing from

11  Emerald, so I believe I included this in the e-mail just

12  so they wouldn't obviously try to terminate this

13  equipment because we were in the process of buying it.

14      Q      Under the equipment rental agreement, was Sea

15  Star under an obligation to return to certain ports

16  equipment you no longer wanted to use?

17      A      Yes.

18      Q      Did there come a point in time when Emerald

19  offered to relieve Sea Star of that obligation with

20  respect to certain units they thought they could sell?

21      A      Yes.

22      Q      And, in fact, did Emerald sell units from

23  locations other than the locations they were supposed to

24  be returned to?

25      A      Yes.

56

1          Q     And did that effort by Emerald save Sea Star

2     money?

3                MR. ARMSTRONG:   Object to the form.

4          A     Yes.

5          Q     I'll show you what was marked as Bates -- I

6     think I'm going to show it to you.  Okay.  It's Bates 13.

7          A     I'm familiar with this, yes.

8          Q     Can you identify this for me, please.

9          A     It's an e-mail -- a series of e-mails, it's

10    an e-mail to my folks -- you know, Sea Star employees

11    discussing enclosed e-mails that Emerald representatives

12    that were in San Juan had made some comments in some

13    instances, so I forwarded these e-mails to our San Juan

14    folks and our local Jacksonville folks to have them

15    review and, you know, take notice of.

16         Q     You used language that says, "This has become

17    a very serious, critical, and sensitive issue;" is that

18    correct?

19         A     Yes.

20         Q     Why was it serious, critical, and sensitive?

21         A     It was serious that we wanted to get rid of

22    the equipment, we did not want to use this equipment, we

23    wanted it returned to Emerald.  And, frankly, because of

24    the insinuations by Emerald on the prior e-mails, I

25    wanted to make sure that everyone understood that we did

57

1    not want to keep any of this equipment, we wanted to

2    return it properly and move it over to the respective

3    areas.

4         Q    Did you receive responses to this e-mail?

5         A    I can't recall.

6         Q    Did you learn whether or not Emerald had

7    stopped paying rental for equipment that was not

8    returned?

9         A    Sea Star.

10        Q    I'm sorry.  Yes.  Did you learn that Sea Star

11   had stopped paying rental?

12        A    I can't recall the outcome of these

13   particular units that Emerald had --

14        Q    Do you know whether Sea Star was using some

15   of the units for fences?

16        A    I firsthand didn't see it.  I know we were

17   storing equipment at our facility in San Juan, but I

18   can't be sure if it would be used as fences.

19        Q    Did anyone tell you that that was an

20   incorrect or correct statement?

21        A    I really truly don't recall.

22        Q    What occurred as a result of you sending this

23   e-mail?

24        A    I'd have to look at the attachments that

25   Loraine sent.  I really don't recall.  I believe -- I

1   was still trying to claim that we were using and actually

2   had been stored at the facility whether it be the

3   showroom lot or our J lot and Marty had signed off on it.

4        Q    Was this equipment that had never been used

5   and had been sitting there, is that what this is

6   referring to?

7        A    It could have been a little of both, we used,

8   we never used.

9        Q    Right.   I'll show you what's been marked as

10  Bates 16.   Did you prepare any reports regarding the

11  number -- at the time of the MPR acquisition, regarding

12  the number of units of equipment you thought had to be

13  added to Sea Star?

14       A    I didn't -- no, I don't recall preparing any

15  type of report of how much more equipment we would need.

16       Q    I'll show you what was marked as Bates 16.

17  Can you identify that for me, please.

18       A    Okay.   I recall this.

19       Q    Do you recall why you sent this e-mail?

20       A    Just a reminder to our San Juan folks to help

21  me be a little more communicative and responsive to

22  equipment that we were going to move over to the showroom

23  or to the J lot to return to Emerald, so, therefore, I

24  can notify Emerald properly.

25       Q    You refer -- you use the phrase, we would

1        IN THE UNITED STATES DISTRICT COURT
         MIDDLE DISTRICT OF FLORIDA
2           JACKSONVILLE DIVISION

3       CASE NO.: 3:04 CV-146-V-99HTS

4

5 SEA STAR LINE, LLC.,
  a limited liability company,
6

7        Plaintiff,

8 vs.

9 EMERALD EQUIPMENT LEASING,
  INC., a corporation,
10

11        Defendant.
  _____
12

13       Deposition of LISA FLORENCE, taken on behalf

14 of the Plaintiff, on Thursday, January 13th, 2005,

15 beginning at 9:44 a.m., pursuant to Renotice of Taking

16 Deposition in the above-entitled action, at the offices

17 of Powers Reporting, 220 East Forsyth Street,

18 Jacksonville, Florida, as recorded by Jennifer

19 Alligood, a Court Reporter and Notary Public in and for

20 the State of Florida at Large.

21

22

23                    **A-117**

24                **CERTIFIED COPY**

25

8

1     A     Well, of course, an agreement would be

2   prepared and then a list of the documents or equipment

3   that they were subleasing.

4     Q     Would TIRs be prepared?

5     A     A TIR would be prepared when the equipment

6   goes out to them.

7     Q     How about when it's returned by them?

8     A     And also when it's returned.

9     Q     And you know what I mean when I say TIR?

10    A     Yeah.

11    Q     Well, that makes one of us.  Can you tell me

12  what you believe a TIR to be?

13    A     It's a trailer interchange receipt.  It's a

14  signed receipt.  It's a document showing that the

15  equipment has either gone out or come back in the gate.

16    Q     Is your employer Sea Star Line, L.L.C?

17    A     Yes.

18    Q     Are you familiar with something called Sea

19  Star Agency?

20    A     Yes.

21    Q     What is that, if you know?

22    A     Well, the only thing I know about it is that

23  it is an agency that handles the Puerto Rico Equipment

24  that goes in or out the gate in Puerto Rico.

25    Q     Do you distinguish in your job whether or not

18

1    mark it as Florence 2, hold on.  I ask this to be

2    marked as Florence 2 and ask if you can identify it for

3    me.

4            (Florence Exhibit Number 2 was marked for

5    identification.)

6        Q    Can you identify Florence 2?

7        A    Okay.  This a report that I created.  It's an

8    Excel spreadsheet and it's a list of Emerald Equipment

9    that were on the first voyages.  And what we did was go

10   through the manifests, pull out just the Emerald

11   Equipment and then look at our -- look at IQ Ship to

12   see when we used this equipment a second time and then

13   I calculated what per diem we would owe for the second

14   trip for this equipment, from the time we used it until

15   it was off-hired.

16       Q    Okay.  Looking at Florence 2 was it your job

17   to find each and every piece of Emerald Equipment in

18   preparing -- let me rephrase that question.

19            In preparing Florence 2 did you first attempt

20   to determine each and every piece of Emerald Equipment

21   that was in transit at the time of the NPR acquisition?

22       A    Yes.

23       Q    And is it your testimony that Florence 2

24   would identify each and every piece of Emerald

25   Equipment that was in transit at the time of the NPR

1    acquisition?

2           MR. ARMSTRONG:  Object to the form.

3       A   Yes.

4       Q   Okay.  You talked about calculations that you

5    looked at and you said you looked at this then and then

6    you looked at the second time that Sea Star used the

7    equipment?

8       A   For a booking.

9       Q   So tell me what you mean when you did that,

10   you knew it was on the ship?

11      A   Right.

12      Q   And then the second time you used it for a

13   booking what did you use that date to do?  How did you

14   use that date in preparing this report?

15      A   Okay.  Well, for example, you'll see the

16   column that says second trip from and there's a date,

17   that would be the date that the equipment went out,

18   that it was sent out on the booking.

19      Q   Right.

20      A   After it came back from that first trip.

21      Q   Does this then show -- this report then show

22   monies that would be owed to someone other than NPR

23   because it shows the use after it came off the first

24   ship?

25           MR. ARMSTRONG:  Object to the form.

23

1    for the last time.  So it probably sat on the yard from

2    June 24th until July 17th when it went back to Emerald.

3        Q    Did IQ Ship provide the date of the return to

4    Emerald?

5            MR. ARMSTRONG:  Object to the form.

6        Q    Let me rephrase that question.  Were you able

7    to get from IQ Ship the date that piece of equipment

8    was returned to Emerald?

9            MR. ARMSTRONG:  Object to the form.

10       A    Yeah, usually in IQ Ship the date they would

11   put in for the off-hire is the date it actually goes to

12   the Emerald -- returned to them but not the last date

13   we used it.

14       Q    Can you explain that answer?

15           MR. ARMSTRONG:  Object to the form.

16       A    Well, for example, the equipment in

17   Jacksonville would be sitting on the yard and then it

18   would go over to GTS is where it would be returned for

19   Emerald to pick it up, so when it went out the gate to

20   GTS is usually when the equipment group would input it

21   as an off-hire.

22       Q    Let's talk a little bit about input into the

23   IQ Ship system, you used the term off-hire?

24       A    Uh-huh.

25       Q    What information -- strike that.

1    back or it could be on our side if it wasn't -- if it's

2    not showing up on the report, I need to look and find

3    out why and make sure it's correct in the system.

4        Q    And when you've done that has the primary

5    reason it's not been on your report been the reference

6    number issue that you've referred to before?

7        A    Yes.

8        Q    I'm sorry, the release reference.

9        A    Correct.

10           MR. SCHILDHORN:  Let's go ahead and take a

11       five minute break here.

12           (Brief recess.)

13   BY MR. SCHILDHORN:

14       Q    At the time of the NPR acquisition, were the

15   containers and equipment all in one spot?

16       A    No.

17       Q    Would you agree with me that they were all

18   over the place, they were in ports, they were on ships,

19   they were in inland depots?

20       A    Correct.

21       Q    If a container in the inland depot was

22   repositioned from one inland depot from another inland

23   depot at the request of Sea Star, would Sea Star have

24   any record of that?

25           MR. ARMSTRONG:  Object to the form.

62

1          A      I don't want to guess.

2          Q      Okay.  Well, on the date -- whatever date it

3     was -- on the date that you assisted in preparing this,

4     what did you do that caused Sea Star to conclude that

5     the equipment was returned on 7/15/02?

6          A      At the time I created this document, the

7     second page, that would have been the last move

8     July 15th, '02, where it came in empty and sat waiting

9     to go back to Emerald.

10         Q      How do you know it came in empty and sat

11    waiting to go back to Emerald?

12         A      Because of the TIR on that date.

13         Q      Are you aware of the existence of the 7/15 --

14         A      Unless it's this one.  It could be this 53730

15    but I can't see the date.

16         Q      When you said this may have been old has it

17    ever been corrected?

18         A      Yes, it's been updated.

19         Q      Has the updated -- has the updated Rooks'

20    response been provided to Emerald?

21         A      I don't know the latest one that you have.

22         Q      What's the latest one that you've prepared?

23         MR. ARMSTRONG:  If you know?

24         A      The last time we updated it was about three

25    months ago, based on the last claim form that they

63

1    sent.  We went through and reevaluated the whole thing.

2         Q    Right.  Did you reach a conclusion as a

3    result of that evaluation?

4              MR. ARMSTRONG:  Object to the form.

5         A    Yeah, we changed a lot of data.

6         Q    Did the change in data result in an amount

7    either due to or due from Emerald?

8              MR. ARMSTRONG:  Object to the form.  If you

9         know.

10        A    I don't know.

11        Q    Well, doesn't all these reports end up with

12   the conclusion as to amounts owed and amounts paid?

13        A    Yes, it does.

14        Q    And do you recall whether the last report you

15   did came to the conclusion as to the amounts owed as to

16   the amounts paid?

17             MR. ARMSTRONG:  Object to the form.

18        A    I don't remember the amount.

19        Q    But you do recall it did reflect an amount

20   either do or owed from Emerald?

21        A    Yes.

22        Q    Do you recall producing that report in

23   response to discovery, the last report that you did?

24             MR. ARMSTRONG:  It has not been produced in

25        any response to any requests for discovery because

64

```
1         it is part work product in the ongoing litigation,

2         and when the document is complete at the

3         appropriate time I'm sure we'll exchange

4         production.

5              MR. SCHILDHORN:  Have you indicated a work

6         product privilege as a -- in response to document

7         production?

8              MR. ARMSTRONG:  This is a report that we're

9         preparing for the litigation, for your

10        information, it is not complete.  It's not a

11        "report" that was prepared in business.  It's

12        prepared in this lawsuit at my direction and for

13        purposes of evaluation and it's in process.

14             MR. SCHILDHORN:  My only question,

15        Mr. Armstrong, was have you notified us in any

16        way, shape, or form that there was a report being

17        prepared or had been prepared that you are not

18        producing as the result of the assertion

19        privilege?

20             MR. ARMSTRONG:  There is no report that has

21        been prepared.  There is a report in the process

22        and preparation and when it is complete then we

23        will deal with it.

24   BY MR. SCHILDHORN:

25        Q    Lisa, have you worked on updating the Rooks'
```

65

1    report in the last 90 days?

2          MR. ARMSTRONG:  Don't testify about anything

3    that you've done for me.  If you can answer that

4    question, go ahead and answer it.

5    A    Yes.

6    Q    When was the last time you updated the

7    report?

8    A    I'd say within the last 60 days.

9    Q    Have you updated during the month of January?

10   A    No.

11   Q    Did you update it within the month of

12   December?

13   A    Yes.

14   Q    Do you currently have documents that you are

15   reviewing for the purpose of updating the report?

16   A    Yes.

17   Q    Do you intend to update the report again

18   within next -- strike that.

19         Are you in the process of updating the report

20   again?

21   A    Yes.

22   Q    Do you anticipate a date by which you will

23   have completed updating the report?

24   A    I don't have an answer for that one.

25   Q    Do you have deadline that has been imposed on

```
 1    you or that your boss has told you they want the report

 2    completed by?

 3         A    No.

 4         Q    In reviewing the Rooks' report since it was

 5    originally prepared, have had you found other instances

 6    where mistakes were made in the Rooks' response?

 7         A    Well, I wouldn't call them mistakes, but

 8    we've changed if the equipment was reused or something

 9    like that.  We have changed some of the dates and

10    numbers.

11         Q    Is anyone else working with you in updating

12    the Rooks' report?

13              MR. ARMSTRONG:  Object to the form.

14         A    Yes.

15         Q    Who is assisting you?

16         A    Well, we hired a contractor to come in to

17    look for the documents, but as far as updating the form

18    I'm doing that.

19         Q    Who is the contractor that was hired?

20              MR. ARMSTRONG:  Object.  Go ahead and answer,

21         if you know.

22         A    His name is Bill Lauderdale.

23         Q    Does he work for a company?

24         A    No, he's a contractor.

25         Q    What is his job, to the extent that you know
```

67

1   it, what's he supposed to do?

2       A    He's helping us go through boxes of TIRs to

3   look for documentation supporting this -- the

4   equipment.

5       Q    Are these -- have these boxes of TIRs been

6   produced?

7       A    Yes, the ones pertaining to the claim have

8   been produced.

9       Q    How long has he been involved in his task?

10      A    I don't remember exactly when he started.

11      Q    Has it been --

12      A    In the past year.

13      Q    Over the past year.  Does he produce reports

14  to you?

15      A    No.

16      Q    Does he produce any reports at all?

17      A    No.

18      Q    When he reviews something does he input the

19  information into the IQ Ship?

20      A    No.

21      Q    What does he do?

22      A    I give him the claim form that was supplied

23  from Emerald --

24      Q    Right.

25      A    -- I give him lists of the ones that we're

1   looking for, he goes through boxes of TIRs that include

2   Emerald Equipment and other equipment too, and he's

3   looking for these TIRs.

4       Q     And when -- if he finds them what does he do

5   with them?

6       A     He gives them to me.

7           MR. SCHILDHORN:   Mr. Armstrong, is

8           Mr. Lauderdale identified as a witness in this

9           case?

10          MR. ARMSTRONG:   No, he has not been

11          identified as a witness.

12  BY MR. SCHILDHORN:

13      Q     Has he been instructed to pull any TIR with

14  respect to Emerald Equipment or only TIRs that appear

15  on the invoices?

16          MR. ARMSTRONG:   Object to the form.

17      A     Only the TIRs pertaining the date, the first

18  time we used the equipment for a booking and the last

19  time it was used.

20      Q     And how does he know that?

21          MR. ARMSTRONG:   Object to the form.

22      A     Because I look it up first and give him the

23  TIR number that I'm looking for.

24      Q     Would it be accurate then to say that he's

25  just trying to determine facts with respect to when

69

1    equipment was on-hired and off-hired -- when Emerald

2    Equipment was on-hired and off-hired?

3         MR. ARMSTRONG:  Object to the form.

4    A    He's trying to find our back-up documentation

5    to support the on-hired and off-hired dates.

6    Q    And that would determine what Sea Star does

7    or does not owe under the lease, correct?

8    A    Correct.

9    Q    Is he being asked to give an opinion with

10   respect to the work he's doing?

11        MR. ARMSTRONG:  Object to the form.

12   A    No.

13   Q    And when you get these TIRs that he may find

14   you simply input it into IQ Ship, correct?

15   A    They're already in IQ Ship.

16   Q    Well, with respect to Florence 6, was the

17   subsequent usage dates already in IQ Ship?

18   A    At what point?

19   Q    At the point in time that the second page was

20   created?

21   A    No, it wouldn't have been in there at that

22   time.

23        MR. SCHILDHORN:  Okay.  I'm going to take a

24        two-minute break.

25        (Brief recess.)

BY MR. SCHILDHORN:

    Q    Is it accurate to say that the only TIRs that he's reviewing are ones that have been produced in response to discovery?

    MR. ARMSTRONG:  Object to the form.

    A    Yes.

    Q    So --

    MR. ARMSTRONG:  Gary, Gary, I'll tell you that they have been produced or are being produced as to complete the review of the August -- what was the August amended claims that were produced in August or September.  We have not -- I have not completely gone through those yet, so there is a possibility that there could be a few more TIRs in completing the review of the claim.  But the TIRs, as John Evans knows, have been produced a multitude have been produced, and I'm hoping that I'm at the bitter end on those and the answer is there maybe more produced.

    MR. SCHILDHORN:  So Bill Lauderdale is looking for TIRs that have not yet been produced?

    MR. ARMSTRONG:  There's a possibility that there would be more located.

    MR. SCHILDHORN:  But is he under instruction to find only additional TIRs that support the

71

1    defense as opposed --

2         MR. ARMSTRONG:  My instructions to him are my

3    instructions to him.  I'm just --

4         MR. SCHILDHORN:  I don't mean to get into

5    litigation strategy.

6         MR. ARMSTRONG:  You asked whether all TIRs

7    had been produced, I think that --

8         MR. SCHILDHORN:  The answer is possibly not.

9         MR. ARMSTRONG:  -- I've answered that.

10         MR. SCHILDHORN:  You answered possibly not.

11         MR. ARMSTRONG:  There maybe possibly more.

12         MR. SCHILDHORN:  Okay.  So here's my next

13    question, how do we know that the universe of TIRs

14    that are being reviewed don't include TIRs that

15    support the Emerald claim and have not been

16    inputted in IQ Ship?

17         MR. ARMSTRONG:  I don't quite understand

18    you're question, but I don't think it's anything

19    that this witness can answer, but you can ask her

20    whatever you want to ask her.

21    BY MR. SCHILDHORN:

22         Q    In providing TIRs to you has Mr. Lauderdale

23    come up with any TIRs that show additional usage of

24    Emerald Equipment but not reflected on Emerald's

25    invoice?

72

1          MR. ARMSTRONG:  Object to the form.

2      A    No.

3      Q    Do you know whether he's been asked to pull

4  TIRs that may reflect additional usage of Emerald

5  Equipment even if it does not appear on the Emerald

6  invoice?

7          MR. ARMSTRONG:  Object to the form.

8      A    No.

9      Q    No, he hasn't been asked to do that or no,

10  you don't know whether he's been asked to do that?

11          MR. ARMSTRONG:  Object to the form.

12      A    He's only pulling the numbers that I give him

13  for the claim forms.

14      Q    And so if he -- okay.  So we don't have a

15  completely confused record let's mark as Florence 7

16  this document.

17          (Florence Exhibit Number 7 was marked for

18  identification.)

19          MR. ARMSTRONG:  What is that?  May I see

20      that?

21      Q    Lisa, I'm going to show you what's been

22  marked as Florence 7, can you identify this document?

23      A    Yes.

24      Q    What is this document?

25      A    This is an Excel spreadsheet I had combined

```
 1        Q     If it was not in use -- not in use, does that
 2   equate to the same date as the off-hire date?
 3        A     Not always.
 4        Q     Okay.  This is what I'm trying to understand,
 5   when would the off-hire date and the not-in-use date
 6   not be the same?
 7              MR. ARMSTRONG:  Objection to the form.
 8        Q     What's the difference?  When can there be a
 9   difference between the off-hire date and the not in use
10   date?
11              MR. ARMSTRONG:  Object to the form.
12        A     Because for example, in answer San Juan it
13   could be out of service when it goes to the J lot, but
14   it may not be off-hired for a week or a month until
15   Emerald picks it up.  It might be a month later.
16        Q     Do rental charges only terminate on your
17   self-billing report when Emerald picks up a piece of
18   equipment?
19              MR. ARMSTRONG:  Object to the form.
20        A     Yes.
21        Q     And to the extent that the self-billing
22   report shows that charges to Emerald -- strike that.
23              To the extent the self-billing report
24   reflects that rental charges terminate at a date
25   earlier than the return of the equipment to Emerald the
```