## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

SEA STAR LINE, LLC,                              )
a limited liability company,                     )
                                                 )   C.A. No. 05-CV-245 JJF
          Plaintiff,                             )
                                                 )
-vs-                                             )
                                                 )
EMERALD EQUIPMENT LEASING, INC.,                 )
a corporation,                                   )
                                                 )
          Defendant/Counter-Plaintiff,           )
                                                 )
-vs-                                             )
                                                 )
SEA STAR LINE, LLC,                              )
                                                 )
          Counter-Defendant.                     )
                                                 )

---

### COMBINED APPENDIX TO SEA STAR'S RESPONSE TO EMERALD'S MOTION TO COMPEL PRODUCTION OF CERTAIN DOCUMENTS AND SEA STAR'S RESPONSE TO EMERALD'S MOTION TO COMPEL <u>RESPONSES TO CERTAIN INTERROGATORIES</u>

SMITH, KATZENSTEIN & FURLOW LLP
Kathleen M. Miller (I.D. No. 2898)
800 Delaware Avenue, 10th Floor
P.O. Box 410
Wilmington, DE 19899 (Courier 19801)
Telephone: 302-652-8400
Telecopy: 302-652-8405
Email: <u>kmiller@skfdelaware.com</u>

Co-Counsel:
Timothy J. Armstrong, Esq.
Armstrong & Mejer, P.A.
2600 Douglas Road
Suite 1111
Coral Gables, FL 33134

Attorneys for Sea Star Line LLC

May 29, 2007

05130|MOT|10026254.WPD

## TABLE OF CONTENTS

**Description**                                                                                           **Page(s)**

Equipment Rental Agreement
    (attached as Exhibit B to Emerald's Answer/Counterclaim (D.I. 53)) . . . . . . . . B1 - B11

Memorandum Opinion January 26, 2006 (D.I. 75) . . . . . . . . . . . . . . . . . . . . . . . . . . . B12 - B40

Page 1 of NPR, Inc.'s Report of Equipment Location/Status [SE41400] . . . . . . . . . . . . . . . . B41

Experts from deposition of Arthur Davis, pp. 34, 55-57, 70-73 . . . . . . . . . . . . . . . . . B42 - B51

Bankruptcy Court Order Authorizing Sale of the NPR, Inc's Assets
    Apr. 26, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B52 - B63

Expert from transcript of Bankruptcy Court Approval of Sale of NPR, Inc.'s Assets
    Apr. 26, 2002, pp. 56-61 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B64 - B70

Indemnity Agreement between MBC Leasing Corp. and Sea Star
    and letters from 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B71 - B82

February 25, 2004 letter from Schildhorn to Robbins . . . . . . . . . . . . . . . . . . . . . . . . B83 - B84

September 24, 2003 fax sheet from Krieger to Davis . . . . . . . . . . . . . . . . . . . . . . . . . . . B85

Exert from deposition of Lorraine Robbins, p. 63 . . . . . . . . . . . . . . . . . . . . . . . . . B86 - B88

Letters from counsel forwarding document production . . . . . . . . . . . . . . . . . . . . . . . . B89 - B107

Amended Emerald Equipment Leasing Invoices to Sea Star Line Inc. . . . . . . . . . . . B108 - B110

Sea Star Line, LLC Rule 26(a)(1) Initial Disclosures . . . . . . . . . . . . . . . . . . . . . . . . B111 - B117

## EQUIPMENT RENTAL AGREEMENT

This Agreement is made and executed this 3] day of July, 2002 between EMERALD EQUIPMENT LEASING, INC., a Delaware corporation having its principal place of business at 101 South King Street, Gloucester City, New Jersey 08030 ("Lessor"), and SEA STAR LINE, LLC, a Delaware limited liability company having its principal place of business at 100 Bell Tel Way, Suite 300, Jacksonville, Florida 32216 ("Lessee"). Terms and conditions of this Agreement cover equipment in use at various times commencing April 29, 2002. Such equipment is of the types, at daily lease rates, and with damage exclusions and stipulated loss values delineated on Schedule "A", which is attached to and incorporated into this Agreement ("Equipment"). In consideration of the mutual covenants and conditions delineated below, the Parties agree:

1. **Equipment.** Lessor agrees to lease to Lessee, and Lessee agrees to lease from Lessor, the Equipment. Delivery of all Equipment to Lessee or its agents by Lessor shall be effected and evidenced by signed and dated equipment interchange receipts and shall be subject to the terms and conditions of this Agreement.

2. **Term.** The lease term for each item of Equipment shall begin on the date when such Equipment is delivered to Lessee or its agent and shall end on the date when such Equipment is taken off hire pursuant to section 10 below. Unless the parties otherwise agree in writing, the minimum rental period for each item of Equipment shall be thirty (30) days. All provisions of this Agreement shall apply during any extension or renewal period. Either party may terminate this Agreement on thirty (30) days' prior written notice to the other party.

3. **Rental.** Lessee shall pay rent and all other charges under this Agreement on a monthly basis. Each payment for particular Equipment will become due on the tenth day of the month following the month of use, unless the parties otherwise agree in writing. In the event Lessee fails to make timely payment, interest shall be due on any overdue amount at a rate of eighteen percent (18%) per annum, commencing ten (10) days after Lessee receives Lessor's invoice for such overdue amount. With respect to particular Equipment, Lessee's obligation to pay rent and other charges shall terminate immediately if Lessee purchases and pays for such Equipment.

4. **Ownership; Sublease; Substitution; Encumbrances.**

(a)  This Agreement shall be deemed a lease for all purposes. The Equipment shall remain Lessor's property; and Lessee shall acquire no title, ownership, or purchase rights of any nature by virtue of this Agreement.  In the event that notwithstanding the express intent of the parties, a court of competent jurisdiction determines that this Agreement is not a true lease but is rather a sale and extension of credit, a lease intended for security, a loan secured by the Equipment or other similar arrangement, the parties agree: (i) (A) to secure the prompt payment and performance as and when due of all Lessee's obligations (both now existing and hereafter arising) under this Agreement, Lessee shall be deemed to have granted, and it hereby grants, to Lessor a first priority security interest in the following (whether now existing or hereafter created): the Equipment, all replacements, substitutions, attachments, accessions, and additions thereto, all warranties and licenses relating thereto and all proceeds (cash and non-cash but without power of sale), including the proceeds of all insurance policies, insuring the Equipment; (B) with respect to the Equipment, in addition to all other rights and remedies available to Lessor under this Agreement upon the occurrence of an event of default, Lessor shall have all of the rights and remedies of a first priority secured party under the Uniform Commercial Code; and (ii) (A) the principal amount of any such loan shall be an amount equal to the aggregate of the "Stipulated Loss Values" of all outstanding Equipment; (B) the term of any such loan shall be co-extensive with the term of this Agreement; and (C) the loan payments under any such loan shall be the rental payments specified in this Agreement.

(b)  This Agreement shall be subject and subordinate to any lease or security interest in favor of a third-party lessor or lender to Lessor.  In the event any such third party becomes entitled to possession of any Equipment, Lessee shall return the Equipment to such third party at one or more delivery locations specified in paragraph 10.

(c)  Lessee shall not pledge, hypothecate, mortgage, create any security interest in, or otherwise encumber or permit the encumbrance of any Equipment.  At its own expense, Lessee promptly shall take action necessary to discharge any lien, charge, or other encumbrance asserted against any Equipment arising after delivery of such Equipment to Lessee and as a result of Lessee's act or omission.

(d)  Each item of Equipment shall have Lessor's serial number and other identifying marks affixed.  Lessee shall not obliterate, alter, conceal, or otherwise change or hide such number or marks.

(e)  Without Lessor's prior written consent, Lessee shall not assign any right or interest in this Agreement or any Equipment and shall not sublet or otherwise relinquish possession of any Equipment, except to other carriers as evidenced by interchange agreements.  Lessor may assign all or any part of its obligations, right, title, or interest in this Agreement, including all rental charges due or to become due.  Lessee expressly consents to Lessor's application of any payment credits to which it is entitled under this Agreement to payment obligations of Lessee under this Agreement.

5.  Equipment Delivery and Interchange.  Lessor shall make the Equipment available for delivery to Lessee at the locations agreed by the parties.  The signature of Lessee's representative on an equipment interchange receipt shall constitute conclusive evidence that the Equipment to which the receipt relates has been delivered to Lessee.

6.  Maintenance and Repairs.

(a)  At its own cost and expense, Lessee shall keep the Equipment in operating condition.  Lessee shall be responsible for all damages and changes in the condition of the Equipment after delivery by Lessor, subject to section 10 below and Schedule "A".  Lessee's maintenance and repair obligations include washing and cleaning the Equipment regularly to prevent corrosion, spot painting, and replacing of parts as necessary.  Lessee shall comply with all loading limitations, handling procedures, and operating instructions to prevent excessive impact or unbalanced loading.  Lessee shall not use any Equipment for storage or transportation of cargo which may damage the Equipment, including but not limited to unprotected corrosive substances, poorly secured materials, or bulk commodities which may corrode, oxidize, severely dent, puncture, contaminate, stain, or damage the Equipment.

(b)  Lessee shall make no modifications, improvements, or replacements and shall not attach accessories or additions to any Equipment, without Lessor's prior written consent, which shall not be unreasonably withheld, except as necessary to comply with this Agreement.  All improvements, repairs, accessories, and replacements made or attached to any Equipment by Lessee shall become part of the Equipment and Lessor's property without Lessor incurring any liability or, at Lessor's option, shall be removed

B3

and the Equipment restored to its original condition at Lessee's expense. Absent written agreement, Lessee shall not change or supplement identification marks on any Equipment.

(c) Lessee shall comply with all conventions, laws, regulations, or orders of federal, state, foreign, and local governments and agencies having jurisdiction over the Equipment or its use, operation, or storage and shall be liable for all fines, penalties, and fees for failure to comply.

7. <u>Warranties</u>. Equipment subject to this Agreement is leased "AS IS", and Lessor warrants only that Lessee shall have quiet possession against any person claiming through Lessor. LESSOR MAKES NO EXPRESSED OR IMPLIED WARRANTY OF QUALITY, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR USE WITH RESPECT TO ANY EQUIPMENT AND HAS NOT MADE, AND SHALL NOT BE BOUND BY, ANY STATEMENT, AGREEMENT, OR REPRESENTATION NOT SPECIFIED IN A WRITING SIGNED BY LESSOR.

8. <u>Taxes and Other Expenses</u>. Lessee agrees to pay all sales, use, excise, property, gross income, gross receipts, stamp, or other taxes; levies; import duties; charges; or withholdings of any nature (together with any penalties, fines, or interest) imposed against Lessor, Lessee, or the Equipment by any governmental or taxing authority with respect to any Equipment; upon the leasing, delivery, possession, use, operation, redelivery, or other disposition of such Equipment; or upon the rentals, receipts, or earnings arising from such Equipment; excluding, however, any such taxes, levies, import duties, charges, and withholdings that are imposed or accrued with respect to any Equipment prior to its delivery to Lessee and any taxes measured by Lessor's income. Lessee shall pay all other expenses relating to Equipment arising during the rental period and resulting from Lessee's acts or omissions, including but not limited to expenses incurred in ports, depots, or storage areas.

9. <u>Risk of Loss</u>.

(a) During the term of this Agreement, Lessee shall bear all risk of loss, damage, theft, or destruction to the Equipment. No such loss, damage, theft, or destruction of Equipment, in whole or part, shall impair Lessee's obligations under this Agreement, all of which shall continue in full force and effect. At Lessor's option and subject to Schedule "A", Lessee shall (i) put the affected Equipment in the condition that existed upon delivery to Lessee or (ii) pay Lessor an amount equal to all accrued and unpaid rent due under this Agreement, together with the Stipulated Loss

Value, with respect to the affected Equipment, less the amount of all recoveries by Lessor from parties other than Lessee for such loss, damage, theft, or destruction.

(b)   Upon compliance with subparagraph (a), Lessee shall be subrogated to Lessor's rights with respect to any insurance policies and claims for reimbursement by third parties in connection with such loss, damage, theft, or destruction.

10.   Redelivery of Equipment.

(a)   At its sole expense, Lessee shall redeliver Equipment to Lessor at Greenwich Terminal, Philadelphia, Pennsylvania, Sea Star Terminal, Puerto Nuevo, San Juan, Puerto Rico, Greenwich Terminal, Port of Jacksonville, Florida, or any other location as to which the parties have agreed in writing.   Each redelivery shall be subject to Schedule "A".   At least seventy-two (72) hours prior to actual redelivery, Lessee shall give Lessor a written estimate of types and quantities of Equipment which Lessee intends to redeliver at particular ports.

(b)   Upon redelivery of particular Equipment, the receiving terminal will execute an equipment interchange receipt.   Subject to Schedule "A", Lessee shall return all Equipment to Lessor in the condition that existed upon delivery to Lessee.

(c)   Lessee shall return such Equipment with tires equal in value and condition to those delivered with the Equipment, normal wear and tear excepted.   The value of any tire damage at the time of return is included in the damage exclusion value for such Equipment, as specified in Schedule "A".

(d)   Lessor shall have the right to inspect Equipment leased under this Agreement at reasonable times during normal business hours.   Upon Lessor's reasonable request, Lessee shall furnish a list of all locations of Equipment as of the most recent date possible and take reasonable steps to make Equipment available for inspection.   On or before the seventh day of each month, Lessee shall furnish a list of all locations of Equipment as of the end of the previous month.

(e)   At the time of return, Equipment will be taken off hire; and rental charges will cease.   If Equipment is returned to a terminal with damage exceeding the damage exclusion specified in Schedule "A", Lessor will inform Lessee within seven (7) days after return.   Lessor shall have the right to require Lessee to repair Equipment or to authorize repairs at Lessee's expense.   If Lessee

fails to authorize repairs for which Lessor claims Lessee is responsible within ten (10) days after notification of damage, Lessor may promptly authorize such repair and rental charges will cease on completion of such repairs (no later than 10 business days after authorization). Lessee agrees to pay for required repairs no later than ten (10) days after receipt of invoice.

(f)  If Lessee fails to return any Equipment for more than sixty (60) days after the return date specified in a Lessor notice, Lessor may elect to treat such Equipment as lost; and Lessee shall pay Lessor the Stipulated Loss Value of such Equipment, together with all accrued rental charges at the contractual daily rate within fifteen (15) days.

## 11.  Indemnification and Expenses

(a)  Lessee shall defend, indemnify and hold Lessor, its agents and employees, harmless from all claims, causes of action, liability damage or loss (including expenses in connection with any claim or suit, such as reasonable attorneys' fees and court costs) arising out of (a) failure by Lessee to comply with its obligations under this Agreement or any attempt by a third party to impose on Lessor liability for Lessee's acts or omissions; (b) any claim for personal injury or death or for property loss or damage (including but not limited to any products liability claim) arising out of possession, leasing, operation, control, use, storage, loading, unloading, moving, maintenance, delivery, or return of any Equipment; and (c) any forfeiture, seizure, impounding of, or charge or lien imposed or asserted against any Equipment as a result of Lessee's acts or omissions.

(b)  Except for Lessee's obligation to pay interest on delinquent rent, neither party shall be liable to the other party or any other person for delay not to exceed sixty (60) days in the performance of any obligation due to events beyond its reasonable control, including but not limited to fire; storm; flood; earthquake; explosion; accidents; acts of God, governmental agencies, or public enemies; sabotage; riots; civil disorders; strikes, lockouts, and other work stoppages; labor disputes; and failure of repair facilities to complete repairs timely.  Under no circumstances shall either party be liable to the other party for exemplary damages.

12.  Insurance.  Lessee will carry and maintain insurance on the Equipment.  Upon execution of this Agreement, Lessee shall furnish Lessor with insurance certificates evidencing (a) all-risk loss and damage insurance (including mysterious disappearance,

unexplained loss, war risks, strikes, riots, and civil commotions) on land, afloat, or airborne, in transit or at rest anywhere in the world, in an amount equal to the Stipulated Loss Value of all Equipment leased pursuant to this Agreement; (b) comprehensive general liability insurance, including contractual liability and broad form property damage, with combined single limits of $2,000,000; (c) automobile liability and property damage with combined single limits of $2,000,000; (d) deductibles applicable to each coverage.  Each insurance coverage shall (a) name Lessor and its assigns as additional assureds, as their interests may appear; (b) include a loss payable clause in favor of Lessor and its assigns; and (c) include the insurer's undertaking to send Lessor and its assigns written notice at least thirty (30) days prior to any expiration or cancellation of such insurance.  If Lessee defaults in payment of any premium under any such insurance policies, Lessor may but shall not be obliged to pay such premium; and Lessee shall repay the premium on demand. Lessee assigns to Lessor all right to insurance proceeds payable to Lessee for damage to or loss of the Equipment.

13.  **Events of Default.**

(a)  The following shall be events of default under this Agreement:

(i) Continuing failure to pay rent for thirty (30) days after its due date under this Agreement;

(ii) Continuing default in performance of any of Lessee's obligations under this Agreement for thirty (30) days after written notice thereof from Lessor to Lessee;

(iii) Lessee is a party to a merger or consolidation or sells, conveys, or transfers all or a substantial part of its assets or becomes insolvent or admits in writing its inability to pay its debts as they mature or applies for, consents to, or acquiesces in appointment of a trustee or a receiver for Lessee or any subsidiary or any property of either; or, in the absence of such application, consent, or acquiescence, a trustee or receiver is appointed for Lessee or any subsidiary or for a substantial part of the property of either and is not discharged within sixty (60) days; or under bankruptcy or insolvency law, any dissolution or liquidation proceeding is instituted against Lessee or any subsidiary with Lessee's or such subsidiary's consent or acquiescence or remains undismissed for sixty (60) days.

(b)   Upon the occurrence of any default by Lessee under this Agreement, Lessor shall (except to the extent otherwise required by law) be entitled to:

(i) Proceed by appropriate court action or actions to enforce performance by Lessee of the applicable covenants and terms of the Agreement or to recover damages for breach;

(ii) Terminate Lessee's right to possession of, demand return of, or repossess at Lessee's expense any or all of the Equipment without prejudice to any other remedy or claim;

(iii) Elect to sell any or all Equipment after giving thirty (30) days' notice to Lessee at one or more public or private sales and recover the sum of the Stipulated Loss Values of such Equipment, all rent owed through the rent payment immediately preceding the date of such notice, all costs and expenses incurred in searching for, taking, keeping, storing, repairing and restoring and selling such Equipment, all other amounts owed by Lessee under this Agreement, whether as additional rent, indemnification, or otherwise, and all costs and expenses, including reasonable legal fees, incurred by Lessor as a result of Lessee's default under this Agreement after deducting all amounts received by Lessor in connection with such public or private sales;

(iv) Upon notice to Lessee, receive prompt payment from Lessee of an amount equal to the Stipulated Loss Values of all Equipment not sold by Lessor pursuant to clause (iii) above plus, to the extent not otherwise recovered from Lessee pursuant to clause (ii) above, any rent owed through the rent payment date preceding the date of such notice, all costs and expenses incurred in searching for, taking, removing, keeping, storing, repairing, and restoring such Equipment, all other amounts owed by Lessee under this Agreement, whether as additional rent, indemnification, or otherwise, and all reasonable fees and expenses incurred by Lessor as a result of Lessee's default, provided that upon receipt of payment in full of such amount, Lessor shall transfer title to such Equipment to Lessee;

(v) By notice to Lessee, declare this Agreement terminated without prejudice to Lessor's rights in respect of obligations then accrued and remaining unsatisfied; or

(vi) Avail itself of any other remedy or remedies provided by statute or otherwise available at law, in equity, or in bankruptcy or insolvency proceedings.

B8

(c)  The remedies set forth in this Agreement are cumulative. References to additional rent in clause (iii) and (iv) of subparagraph (b) shall include interest at the rate of eighteen percent (18%) per annum to the date Lessor receives any amount payable under said clause from the due date to and including the rent payment date immediately preceding the date on which notice is given under said clause and interest at the same rate on all other costs, expenses, and losses for which Lessor is entitled to payment under said clause to the date Lessor receives any reimbursement from the respective dates Lessor incurs such costs, expenses, and losses.

14.  **Applicable Law.**  This Agreement shall be interpreted and the rights, liabilities and duties of the parties determined in accordance with the laws of the State of Maryland.

15.  **Miscellaneous.**

(a)  This Agreement is binding upon the parties and their respective legal representatives, successors and assigns. This Agreement contains the entire agreement between the parties and, subject to the provisions of section 1, may not be amended, altered, or modified, except by a writing signed by the party to be bound.

(b)  All notices under this Agreement, including but not limited to billing by Lessor for rental charges and payments by Lessee shall be addressed as follows, unless or until either party gives written notice to the contrary to the other party:

Lessor: Emerald Equipment Leasing, Inc.
        101 South King Street
        Gloucester City, NJ 08030
        Attn.: Arthur Davis
        Telefax: 856-742-3250

Lessee: Sea Star Line, LLC
        100 Bell Tel Way, Suite 300
        Jacksonville, FL 32216
        Attn.: Philip V. Bates
        Telefax No.: 904-724-3011

All notices shall be in writing and delivered by hand delivery, registered or certified mail, or confirmed telex or telefax.

(c)  The provisions of this Agreement are separable and any provisions found upon judicial interpretation or construction to be

prohibited by law shall be ineffective to the extent of such prohibition without invalidating the remaining provisions of this Agreement.

(d)  No waiver of any remedy or other right under this Agreement shall operate as a waiver of any other remedy or right nor shall any single or partial exercise of any remedy or right preclude any other or further exercise thereof or any other remedy or right.

IN WITNESS WHEREOF, the parties have executed this Equipment Rental Agreement as of the day and year first written above.

LESSEE:                                    LESSOR:
Sea Star Line, LLC                         Emerald Equipment Leasing, Inc.

By: _____               By: _____
    EVP - Operations
    ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾                             ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
         Title                                       Title

02-3523-001e

**B10**

## EQUIPMENT SCHEDULE "A"

**EMERALD EQUIPMENT LEASING, INC.**

| EQUIPMENT TYPE | DAILY LEASE RATE | DAMAGE EXCLUSION | STIPULATED LOSS VALUE |
|---|---|---|---|
| 20' DV | $1.00 | $285.00 | $1,000.00 |
| 40' DV | $1.25 | $1,200.00 | $1,000.00 |
| 40' HV | $1.50 | $800.00 | $1,000.00 |
| 45' HV | $2.00 | $800.00 | $1,000.00 |
| 40' RV | $8.00 | $16,480.00 | $4,000.00 |
| 20' CH | $2.20 | $640.00 | $2,200.00 |
| 40' CH | $2.20 | $840.00 | $2,200.00 |
| 45' CH | $2.40 | $640.00 | $2,200.00 |
| Gen Sets | $4.50 | $840.00 | $2,200.00 |

19

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

SEA STAR LINE, LLC, a limited          :
liability company,                     :
                                       :
            Plaintiff,                 :
                                       :
      v.                               :    Civ. Act. No. 05-245-JJF
                                       :
EMERALD EQUIPMENT LEASING, INC.,:
a corporation,                         :
                                       :
            Defendant.                 :

---

Kathleen M. Miller, Esquire of SMITH, KATZENSTEIN & FURLOW, LLP,
Wilmington, Delaware.
Of Counsel:  Charles C. Robinson, Esquire of GARVEY SCHUBERT
BARER, Seattle, Washington.
Timothy J. Armstrong, Esquire of ARMSTRONG & MEJER, P.A., Coral
Gables, Florida.
Attorneys for Plaintiff.

Bradford J. Sandler, Esquire and Jonathan M. Stemerman, Esquire
of ADELMAN LAVINE GOLD AND LEVIN, A Professional Corporation,
Wilmington, Delaware.
Of Counsel:  Gary M. Schildhorn, Esquire and Alan I. Moldoff,
Esquire of ADELMAN LAVINE GOLD AND LEVIN, A Professional
Corporation, Philadelphia, Pennsylvania.
Attorneys for Defendant.

---

### MEMORANDUM OPINION

January 26, 2006
Wilmington, Delaware

*Joseph J. Farnan, Jr.*

**Farnan, District Judge.**

Pending before the Court is a Motion To Dismiss Emerald Equipment Leasing, Inc.'s Counterclaim (D.I. 56) filed by Plaintiff, Sea Star Line, LLC ("Sea Star"). For the reasons discussed, Sea Star's Motion To Dismiss will be granted with respect to Count I of the Counterclaim to the extent it alleges a breach of the E-Mail Agreement, Count II pertaining to quantum meruit, Count III alleging turnover to the extent that rent is sought, and Counts V through VIII alleging tort claims for failure to plead in accordance with the requirements of Federal Rule of Civil Procedure 9(b). The Motion To Dismiss will be denied in all other respects. Emerald Equipment Leasing, Inc. will be granted leave to file an Amended Counterclaim.

## BACKGROUND

On March 1, 2004, Sea Star filed a Complaint against Defendant, Emerald Equipment Leasing, Inc. ("Emerald"), in the United States District Court for the Middle District of Florida seeking declaratory judgment as to the parties' rights and liabilities under an Equipment Rental Agreement dated September 28, 2002 (the "Equipment Rental Agreement"). Sea Star also asserted claims for breach of other maritime contracts and for money owed as a result of goods delivered and services provided to Emerald.

1

Emerald is a debtor-in-possession in a pending Chapter 11 case in the United States Bankruptcy Court for the District of Delaware.  Unaware of the action Sea Star filed in the Middle District of Florida, Emerald filed an adversary proceeding against Sea Star in the United States Bankruptcy Court for the District of Delaware on March 17, 2004.  In the adversary proceeding, Emerald asserted claims against Sea Star based on the Equipment Rental Agreement for (1) post-petition account receivable/breach of lease, (2) post-petition quantum meruit, (3) turnover/conversion, and (4) accounting.  Sea Star moved to dismiss, stay or abate the adversary proceeding.

The Bankruptcy Court held a hearing on May 27, 2004, and concluded that Emerald's adversary proceeding was a non-core proceeding and that the Bankruptcy Court had "related to" jurisdiction over the action.  D.I. 59 at A11.  However, the Bankruptcy Court acknowledged that under 28 U.S.C. § 959, concomitant jurisdiction existed with the federal district court, because a party doing business with a debtor-in-possession has the right to file suit regarding that dispute in any jurisdiction.  Id.  For purposes of its decision, the Bankruptcy Court assumed that the Florida District Court had jurisdiction, and the Bankruptcy Court applied the "first filed rule" to conclude that the adversary proceeding should be dismissed.  Id. at A12.  However, the Bankruptcy Court's dismissal was without

2

prejudice so that "if the Florida Court determines that it doesn't have jurisdiction or its action should be dismissed, the debtor is free to file here." Id. at A13.

In the meantime, in the Florida action, Emerald had moved to dismiss the Complaint, to transfer venue or to abstain. Emerald disputed the Florida District Court's jurisdiction on the grounds that a declaratory judgment was inappropriately sought by Sea Star because the Equipment Rental Agreement had been terminated. The Florida District Court concluded that this case should be transferred to Delaware, primarily because Sea Star's Complaint references proceedings that took place in the Delaware Bankruptcy Court, the Delaware Bankruptcy Court was familiar with the parties, and Emerald is a debtor undergoing reorganization in the Delaware Bankruptcy Court. D.I. 59 at A18-19.

On April 25, 2005, Emerald filed an Answer, Affirmative Defenses and Counterclaim in this action. D.I. 53. Emerald admits jurisdiction under 28 U.S.C. § 1333 (admiralty jurisdiction), but denies federal jurisdiction under 28 U.S.C. §§ 1337 (commerce and antitrust regulations) and 1367 (supplemental jurisdiction). Emerald asserts a Counterclaim against Sea Star alleging eight causes of action: (1) post-petition account receivable/breach of lease, (2) post-petition quantum meruit, (3) turnover, (4) accounting, (5) fraud, (6) constructive fraud, (7) fraudulent concealment, and (8) negligent

3

misrepresentation/breach of fiduciary duty.  Emerald contends

that the Court has jurisdiction over its counterclaims pursuant

to 28 U.S.C. §§ 1334 (original jurisdiction of bankruptcy cases

in the district court) and 157 (referral to bankruptcy court of

cases arising under or related to a case under Title 11) and 11

U.S.C. § 542 (turnover of property to the estate).  Emerald also

contends that this action is a "core" proceeding that should be

heard and determined by the Bankruptcy Court under 28 U.S.C. §

157(b)(2)(A),(C),(E) and (O).[1]  D.I. 53, Counterclaim at ¶ 1.

---

[1]     Core proceedings include, but are not limited to:

(A) matters concerning the administration of
the estate;
                     * * *

(C) counterclaims by the estate against
persons filing claims against the estate;

                     * * *

(E) orders to turn over property of the
estate;

                     * * *

(O) other proceedings affecting the
liquidation of the assets of the estate or
the adjustment of the debtor-creditor or the
equity security holder relationship, except
personal injury tort or wrongful death claims
. . . .

28 U.S.C. § 157(b)(2)(A), (C), (E) and (O).

4

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) governs Sea Star's Motion To Dismiss Emerald's Counterclaim.  The purpose of a motion to dismiss is to test the sufficiency of a complaint, or in this case, a counterclaim, and not to resolve disputed facts or decide the merits of the case.  <u>Kost v. Kozakiewicz</u>, 1 F.3d 176, 183 (3d Cir. 1993).  When considering a motion to dismiss, a court must accept as true all allegations in the counterclaim and must draw all reasonable factual inferences in the light most favorable to the non-moving party.  <u>Neitzke v. Williams</u>, 490 U.S. 319, 326 (1989); <u>Piecknick v. Pennsylvania</u>, 36 F.3d 1250, 1255 (3d Cir. 1994).  The Court is "not required to accept legal conclusions either alleged or inferred from the pleaded facts."  <u>Kost</u>, 1 F.3d at 183.  Dismissal is only appropriate when it appears beyond doubt that the movant can prove no set of facts in support of its claims entitling it to relief.  <u>Conley v. Gibson</u>, 355 U.S. 41, 45 (1957).  The burden of demonstrating that the counterclaim fails to state a claim upon which relief may be granted rests on the movant.  <u>Young v. West Coast Industrial Relations Assoc., Inc.</u>, 763 F. Supp. 64, 67 (D. Del. 1991) (citations omitted).

As a general matter, a court may not consider matters outside the pleadings when adjudicating a motion to dismiss. However, a court may consider "document[s] integral to or

5

explicitly relied upon" in the pleadings without converting a
motion to dismiss to a motion for summary judgment.  In re
Rockefeller Center Properties, Inc. Securities Litigation, 184
F.3d 280, 287 (3d Cir. 1999).

## DISCUSSION

As a threshold matter, Emerald appears to raise a
jurisdictional issue.  Specifically, Emerald contends that this
case implicates the "core" jurisdiction of the Bankruptcy Court
and that this case should be referred to the Bankruptcy Court
under the Bankruptcy Court's "related to" jurisdiction under 28
U.S.C. § 1334.  D.I. 66 at X (discussing core jurisdiction) & n.6
(requesting referral to the Bankruptcy Court).  Emerald contends
that its counterclaim is a "core" matter, because it is a
"counterclaim by the estate against persons filing claims against
the estate" under 28 U.S.C. § 157(b)(2)(C).

In response, Sea Star contends that the Court should not
refer this case to the Bankruptcy Court under its "related to"
jurisdiction because Sea Star did not consent to that
jurisdiction.  In addition, Sea Star contends that the Bankruptcy
Court already concluded that this matter was "non-core" when it
dismissed Emerald's adversary proceeding, and in any event, Sea
Star has not filed a proof of claim against Emerald, and
therefore, core jurisdiction under 28 U.S.C. § 157(b)(2)(C) is
not implicated.

6

A proceeding is a core proceeding, if it invokes a substantive right provided by Title 11 or is a proceeding, which by its nature, could only arise in the context of a bankruptcy case. Halper v. Halper, 164 F.3d 830, 836 (3d Cir. 1999). The Bankruptcy Court has already concluded that similar claims alleged by Emerald in the context of its adversary proceeding were "non-core." However, Emerald contends that the Bankruptcy Court's decision should not be considered the law of the case, because that decision was made in a different procedural context. Specifically, Emerald contends that the Bankruptcy Court was only dealing with claims made by Emerald against Sea Star based on post-petition activities when it addressed Emerald's adversary proceeding. In contrast, Emerald contends that this case now involves claims asserted by Sea Star against the Emerald estate, and therefore, the proceeding is core under Section 157(b)(2)(C). However, Emerald has not advanced any case law supporting its assertion that its Counterclaim is core.

In considering the question of core jurisdiction under Section 157(b)(2)(C), it appears to the Court that the case law involves situations in which the debtor has filed a counterclaim in response to a proof of claim filed by a creditor. Sea Star has not filed a proof of claim against Emerald in the Bankruptcy Court, and therefore, the Court is not persuaded that Section 157(b)(2)(C) is applicable here. In addition, the Court notes

7

that the exercise of "related to" jurisdiction is not mandated in this case, particularly where, as here, Sea Star has not consented to such jurisdiction.  28 U.S.C. § 157(c)(2), (d).[2] However, the Court does have subject matter jurisdiction over this action, because it arises in connection with a maritime contract over which this Court has admiralty jurisdiction. Indeed, the parties agree that the exercise of the Court's

---

[2]    In pertinent part, 28 U.S.C. § 157(c)(2) and (d) provides:

(c)(1) A bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise related to a case under title 11. In such proceeding, the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected.

(2) Notwithstanding the provisions of paragraph (1) of this subsection, the district court, with the consent of all the parties to the proceeding, may refer a proceeding related to a case under title 11 to a bankruptcy judge to hear and determine and to enter appropriate orders and judgments, subject to review under section 158 of this title.

(d) The district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown. The district court shall, on timely motion of a party, so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce.

8

jurisdiction is appropriate under 28 U.S.C. § 1333.  D.I. 53, Counterclaim at ¶ 1; D.I. 57 at 1, 6.  Accordingly, the Court declines to refer this case to the Bankruptcy Court as requested by Emerald in Footnote 6 of its Answering Brief.

I.    **Whether Emerald's Counterclaims Based On Contract Law State A Claim Upon Which Relief May Be Granted**

    A.    <u>Emerald's Counterclaim for Breach of Contract</u>

In Count I of its Counterclaim, Emerald alleges that Sea Star breached its obligations under two agreements:  (1) the E-Mail Agreement, and (2) the Equipment Rental Agreement.  Emerald contends that Sea Start failed to pay Emerald rent due for the use of the equipment and for the loss incurred as a result of damage, theft, destruction or other loss of the equipment. Emerald contends that its Counterclaim appropriately refers to breach of the E-Mail Agreement, because the parties operated under the E-Mail Agreement for more than five months while the formal Equipment Rental Agreement was being finalized.  To the extent Sea Star seeks dismissal of its Counterclaim based on the E-Mail Agreement, Emerald contends that such a claim is premature, because there has been no factual development regarding whether the parties intended the Equipment Rental Agreement to supersede and cancel the E-Mail Agreement.

Sea Star contends that dismissal of Emerald's Counterclaim as it applies to the E-Mail Agreement is appropriate in light of the Integration Clause contained in the Equipment Rental

9

Agreement.  Although executed on July 31, 2002, the Equipment
Rental Agreement indicates that it "cover[s] equipment in use at
various times commencing April 29, 2002." A40.  The E-Mail
Agreement did not commence until May 2, 2002, and thus, Sea Star
contends that the Equipment Rental Agreement supersedes the E-
Mail Agreement.  Sea Star also contends that extrinsic evidence
is not required to determine the parties' intent, because the
Equipment Rental Agreement is clear, and therefore, parol
evidence is inadmissible.

     The parties appear to agree that Maryland law governs the
contracts at issue.  D.I. 57 at 8; D.I. 66 at n.7.  In
determining whether a contract is ambiguous, Maryland law uses an
"objective interpretation of contracts."  <u>Calomiris v. Woods</u>, 727
A.2d 358, 363 (Md. 1999).  Under this view, a written contract is
ambiguous if it is susceptible to more than one meaning when it
is read by a reasonably prudent person.  <u>Id.</u>  The determination
of whether language is susceptible to more than one meaning
includes a consideration of "'the character of the contract, its
purpose and the fact and circumstances of the parties at the time
of execution.'"  <u>Id.</u> (citations omitted).  The test for whether
the contract is plain and unambiguous is "not what the parties to
the contract intended it to mean, but what a reasonable person in
the position of the parties would have thought it meant."  <u>Id.</u>
(citations omitted).  Prior evidence of the parties' intentions

                                                              10

and negotiations is not admissible; however, the court may
consider the context of the transaction or the custom of the
trade in determining whether an ambiguity exists.  Id.

In its Counterclaim, Emerald makes the following allegations
regarding the E-Mail Agreement:

> 9.   . . . [O]n or about May 1, 2002, Sea Star and
> Emerald entered into an agreement (the "E-Mail
> Agreement" attached hereto as Exhibit "A"), whereby Sea
> Star agreed to lease Emerald equipment previously
> leased by Emerald to NPR.
>
> 10.  The E-Mail Agreement was effective as of May
> 1, 2002 and was applicable to any cargo worthy Emerald
> equipment, which Sea Star dispatched out of any port
> terminal or inland depot for customer use at agreed
> upon per diems (the "Emerald Equipment").
>
> 11.  Sea Star used the Emerald Equipment pursuant
> to the E-Mail Agreement for a number of months, before
> the leasing arrangement was more formally documented in
> a written agreement executed by Sea Star and Emerald in
> the later part of September, 2002 (the "Equipment
> Rental Agreement" attached hereto as Exhibit "B").

D.I. 53, Counterclaim at ¶ 9-11 (emphasis added).

Reviewing Emerald's allegations in light of the terms of the
Equipment Rental Agreement which is attached to the pleadings,
the Court concludes that Emerald has failed to state a claim for
breach of the E-Mail Agreement.  The Equipment Rental Agreement
"cover[s] equipment in use at various times commencing April 29,
2002."  D.I. 53, Exh. B at introductory paragraph.  It also
contains an Integration Clause which states that "[t]his
Agreement contains the entire agreement between the parties and
subject to the provisions of section 1, may not be amended,

11

altered, or modified, except by a writing signed by the party to be bound." <u>Id.</u>, Exh. B at ¶ 15(a). Based on this language, the Court concludes that a reasonable person reading the Equipment Rental Agreement would not find any ambiguity in its terms. The Equipment Rental Agreement covers the period for which the E-Mail Agreement had applied, and as Emerald acknowledges, the Equipment Rental Agreement constituted the parties more formal documentation of the earlier E-Mail Agreement. <u>Id.</u> at ¶ 11.

Emerald contends that extrinsic evidence is required to determine the parties' intent as to whether the Equipment Rental Agreement was meant to supersede the E-Mail Agreement, because the Equipment Rental Agreement does not expressly reference the E-Mail Agreement. Relying on <u>Bradney v. Sakelson</u>, 473 A.2d 189, 199 (Pa. Super. 1984) and <u>Franz Tractor Co. v. J.I. Case Co.</u>, 566 So.2d 524 (Fla. App. 2 Dist. 1990), Emerald contends that factual discovery is needed because the doctrine of integration turns on the parties' intentions. In the Court's view, however, both <u>Bradney</u> and <u>Franz</u> are distinguishable from the circumstances in this case. As the court in <u>Bradney</u> noted, the termination agreement at issue did not contain an integration clause, did not encompass the same obligations and did not involve the same parties that were bound by the oral agreement. 473 A.2d at 192. In light of these circumstances, the <u>Bradney</u> court concluded that

12

they could not discern any intention by the parties that the oral contract be merged into the termination agreement.  Id.

Similarly, in Franz Tractor Co., the court concluded that a modification contract was not merged into the dealer contract, because references in the modification to the dealer contract demonstrated that the parties intended the two agreements to remain separate.  In addition, the modification expressly provided that it was to "supplement" the dealer contract.  566 So. 2d at 526.

In this case, the Court concludes that extrinsic evidence is not required to illuminate the meaning of the Equipment Rental Agreement because it is not ambiguous when viewed from the standpoint of a reasonable person.  Unlike the circumstances in Bradney and Franz, the Equipment Rental Agreement here covers the same subject matter as the E-Mail Agreement for the same time period that the E-Mail Agreement had been in effect.  As Emerald acknowledges in its Counterclaim, the Equipment Rental Agreement was the parties' formal documentation of the leasing arrangement that had existed previously under the E-Mail Agreement.  Further, the Equipment Rental Agreement has an Integration Clause expressing the parties' intent that the Equipment Rental Agreement be "the entire agreement between the parties."  See e.g., ARB (American Research Bureau), Inc. v. E-Systems, Inc., 663 F.2d 189 (D.C. Cir. 1980) (applying Maryland law and

13

concluding that written contract was intended to be exclusive statement of the parties' agreement based primarily on presence of an integration clause).  In these circumstances, the Court concludes that extrinsic evidence is not required to determine the meaning of the Equipment Rental Agreement, and Emerald cannot maintain its Counterclaim to the extent that it alleges a breach of the E-Mail Agreement because the E-Mail Agreement was subsumed by the Equipment Rental Agreement entered into by the parties. Calomiris, 727 A.2d at 361-362 (recognizing that "[u]nder the parol evidence rule, a written agreement 'discharges prior agreements' thereby rendering legally inoperative communications and negotiations leading up to the written contract.") (quoting Restatement (Second) of Contracts § 213 (1979)).  Accordingly, the Court will grant Sea Star's motion to the extent that it seeks dismissal of Emerald's claim alleging breach of the E-Mail Agreement.[3]

---

[3]    Emerald also directs the Court to two Delaware cases for the proposition that "a new contract relating to the subject matter of a former agreement does not destroy the obligations of the former agreement, except as it is inconsistent therewith, unless it is shown that the parties intend that the new contract supersede the old contract entirely."  D.I. 66 at 2 (citing Lee Builders, Inc. v. Wells, 92 A.2d 710, 715 (Del. Ch. 1952); Jefferson Island Salt Min. Co. v. Empire Box Corp., 23 A.2d 106 (Del. Super. 1941)).  However, Delaware law does not govern the contract at issue here.

14

B.    Emerald's Counterclaim For Quantum Meruit

In Count II of its Counterclaim, Emerald alleges a claim for post-petition quantum meruit.  Emerald alleges that Sea Star has used Emerald's property and has failed to compensate Emerald for that use resulting in harm to Emerald and actual material gain to the benefit of Sea Star.  Emerald seeks damages under the theory of quantum meruit, to the extent that Sea Star's use of Emerald's equipment occurred during any period not covered by the written lease agreement.  Thus, Emerald contends that its quantum meruit claim is properly pled in the alternative to its contract claim.

Sea Star contends that dismissal of Emerald's quantum meruit claim is warranted.  Sea Star contends that Count II is not properly pled in the alternative to Count I, because it expressly "incorporates" the paragraphs of Count I, "as fully as if set forth herein in their entirety."  D.I. 53, Counterclaim at ¶ 22. Sea Star further contends that quantum meruit does not apply for matters covered by a written contract, and Emerald has failed to allege any time period for which the Equipment Rental Agreement would not have applied.

Under Maryland law, quantum meruit is not available "when there is an express contract dealing specifically with the services rendered."  See e.g., First Nat'l Bank v. Burton, Parsons & Co., 470 A.2d 822, 829 (Md. Ct. Spec. App. 1984). Emerald contends that an action for quantum meruit may

15

appropriately lie if Sea Star contends that it is not liable to Emerald for compensation under the written agreement. However, Maryland courts have rejected the use of quantum meruit in such circumstances. As the Court in <u>Mass Transit Admin. v. Granite Constr. Co.</u>, 471 A.2d 1121, 1126 (Md. Ct. Spec. App. 1984) stated:

> The general rule is that no quasi-contractual claim can arise when a contract exists between the parties concerning the same subject matter on which the quasi-contractual claim rests. The reason for this rule is not difficult to discern. When parties enter into a contract they assume certain risks with an expectation of a return. <u>Sometimes, their expectations are not realized, but they discover that under the contract they have assumed the risk of having those expectations defeated. As a result, they have no remedy under the contract for restoring their expectations. In desperation, they turn to quasi-contract for recovery. This the law will not allow.</u>

(emphasis added).

In this case, Emerald has pled the existence of a written contract governing its claims, and the contract contains an integration clause. <u>County Comm'rs of Caroline County v. J. Roland Dashiell & Sons, Inc.</u>, 747 A.2d 600, 607-608 (Md. 2000); <u>see also Wal-Mart Stores, Inc. v. AIG Life Ins. Co.</u>, 872 A.2d 611, 620 (Del. Ch. 2005) (recognizing that dismissal of quantum meruit claim is appropriate where it is clear from face of complaint that written contract exists and controls). Accordingly, the Court will dismiss Count II of the Complaint alleging recovery under the theory of quantum meruit.

16

C.   <u>Emerald's Counterclaim For Turnover</u>

In Count III of its Counterclaim, Emerald alleges a claim for turnover pursuant to 11 U.S.C. § 342.  In its briefing, Emerald alleges that its reference to Section 342 is a typographical error, and that the appropriate reference should be to 11 U.S.C. § 542.  Emerald contends that Section 542 permits it to seek the return of the equipment or the value of the equipment, and therefore, it has appropriately alleged a claim for turnover.

Sea Star contends that dismissal of Count III is warranted, because Count III alleging turnover is essentially a rephrasing of Count I's breach of contract allegations.  Specifically, Sea Star contends that Emerald does not demand turnover of the equipment, but only "damages equaling unpaid rent, and the value of the equipment together with interest and costs of suit."

In its Counterclaim, Emerald does not specify under which paragraph of Section 542 it is seeking relief.  However, in its briefing it asserts Section 542(a).  It appears to the Court, that two paragraphs of Section 542 may be applicable, paragraph (a) and paragraph (b).  In full, 11 U.S.C. § 542(a) and (b) provides:

> (a)  Except as provided in subsection (c) or (d) of this section, an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under section 522 of this title, shall deliver

17

to the trustee, and account for, such property <u>or the value of such property</u>, unless such property is of inconsequential value or benefit to the estate.

(b)  Except as provided in subsection (c) or (d) of this section, an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debts to, or on the order of the trustee, except to the extent that such debt may be offset under section 553 of this title against a claim against the debtor.

(emphasis added).

To the extent Emerald seeks rent in its claim for turnover, the Court concludes that Emerald fails to state a claim for turnover.  Under Section 542(b), turnover is required for amounts that are "matured, payable on demand, or payable on order." Active disputes over the amount owed take an action outside the realm of a turnover action.  See <u>J.T. Moran Fin. Corp. v. American Consol. Fin. Corp.</u>, 124 B.R. 931, 938 (S.D.N.Y. 1991) ("Where as here, the court must resolve whether or not the debt claimed is due, the action to collect the disputed funds cannot be regarded as a turnover proceeding under the core jurisdiction of the bankruptcy court."); <u>In re Teligent, Inc.</u>, 325 B.R. 134, 137-138 (Bankr. S.D.N.Y. 2005) (recognizing that turnover provisions cannot be used to liquidate contract disputes or demand assets whose title is in dispute and collecting cases). Rather, the action is simply a claim for breach of contract.  <u>In re National Audit Defense Network</u>, 332 B.R. 896 (Bankr. D. Nev. 2005) ("Settled and controlling law holds that the presence of an

18

active dispute over the amount owed takes the action out of the turnover area; one cannot shortcut a breach of contract action with a turnover demand.") . In this case, it appears to the Court that the rental amount is in dispute, and therefore, the Court concludes that a turnover action is not properly sustained as to the rental amounts.

However, Emerald also alleges that Sea Star has failed to return numerous chassis, gen sets and containers under the Equipment Rental Agreement. The Equipment Rental Agreement does not give Sea Star any title, ownership or property rights in this equipment, and pursuant to paragraph 10 of the Equipment Rental Agreement, Sea Star is required to redeliver the equipment to certain locations identified in the contract or agreed to by the parties. The Court understands Sea Star to base its motion to dismiss this claim on the sole fact that Emerald seeks the value of the Equipment rather than the return of the Equipment itself. However, the Equipment Rental Agreement provides that if the equipment is not returned within 60 days, Emerald may elect to treat the Equipment at a loss and seek the value of the equipment, together with all accrued rental charges. Further, it appears that Section 542(a) permits Sea Star to seek the value of the equipment, and not just the return of the equipment, in a turnover action. In light of the express language of both the applicable contract and Section 542(a), Sea Star has not

19

explained why dismissal of this Count is warranted.  Accordingly, the Court concludes at this juncture, that Emerald has pled a claim for turnover to the extent that it seeks the value of certain property belonging to Emerald which Sea Star is alleged to have failed to return.

     D.   Emerald's Counterclaim For An Accounting

In Count IV of its Counterclaim, Emerald seeks an accounting of all Sea Star's usage of Emerald's equipment.  Emerald contends that an accounting is a proper remedy regardless of whether this action is an action at law or equity, because the accounts are complex and Sea Star had a fiduciary relationship with Emerald as a result of Sea Star's obligation to produce self-billing reports.

Sea Star seeks dismissal of this claim contending that the equitable relief of an accounting is not appropriate because there is an adequate remedy at law for Emerald, namely the recovery of money damages.  Because Emerald's counterclaim seeks damages for breach of contract, and such damages are an adequate remedy at law, Sea Star contends that the Court lacks equity jurisdiction to award an accounting.

"The necessary prerequisite to the right to maintain a suit for an equitable accounting, like all other equitable remedies, is . . . the absence of an adequate remedy at law." Dairy Queen, Inc. v. Wood, 369 U.S. 469, 478 (1962).  Whether equitable

20

jurisdiction should be exercised is a decision committed to the sound discretion of the Court.  1 Am. Jur. 2d, Accounts and Accounting § 54 (1994 & Supp. 2002).

Actions for an accounting are not available when the amount in question is readily ascertainable; however, such an action may be maintained when the facts create a reasonable doubt as to whether an adequate remedy at law may be obtained.  Id. Equitable jurisdiction for an accounting is typically invoked in three circumstances:  "(1) there is a fiduciary relationship between the parties, accompanied by a duty on the part of the defendant to render an account; (2) there are mutual accounts, or, if the account is all on one side, the account is complicated; and (3) there is a need for discovery."  Id.  An action for an accounting may also be appropriate when there are allegations of fraud.  Id.

At this juncture, Emerald has alleged that Sea Star had an obligation to produce self-billing reports which created an independent fiduciary relationship.  Emerald has also alleged that Sea Star has used over 5,000 pieces of Emerald equipment and that the information regarding Sea Star's use of this equipment is only within the knowledge of Sea Star.  Given the complexities alleged by Emerald as a result of Sea Star's self-billing, the apparent need for discovery, and the allegations of fraud and a fiduciary relationship, all of which must be taken as true at

21

this juncture, the Court declines to dismiss Emerald's claim for
an accounting.

## II. Whether Emerald's Counterclaims Based On Tort Law State A Claim Upon Which Relief May Be Granted

In Counts V through VIII of its Counterclaim, Emerald
alleges fraud (Count V)[4], constructive fraud (Count VI),
fraudulent concealment (Count VII), and negligent
misrepresentation/breach of fiduciary duty (Count VIII). Sea
Star contends that these claims should be dismissed, because
Emerald's tort claims do not exist independently, but instead are
woven into the contract. Sea Star contends that the economic
loss doctrine prohibits Emerald from recovering in tort, because
its economic losses flow only from Sea Star's alleged breaches of
a contract. Sea Star also contends that, even if Emerald's tort
claims withstand dismissal under the economic loss doctrine, the
allegations of fraud are not pled with particularity as required
by Federal Rule of Civil Procedure 9(b), and therefore, dismissal
of Emerald's tort claims is warranted.

In response, Emerald contends that the Equipment Rental
Agreement is silent as to Sea Star's obligations to create self-
billing reports. Emerald further contends that it was not
notified when Sea Star began using a piece of Emerald Equipment

---

[4]    The Counterclaim refers to the fraud count as Count IV,
but this appears to be an error. Given the sequence of the other
counts asserted, the fraud count should be labeled Count V.

22

and no receipt or document was required to be executed in order for Sea Star to begin using that equipment. Because Emerald was relying on Sea Star's honesty to report its usage of equipment, Emerald contends that the circumstances were rife with the opportunity for fraud. Emerald contends that Sea Star took advantage of this self-billing to under-report its usage of Emerald's equipment. Emerald also contends that this self-billing arrangement resulted in a fiduciary relationship between the parties created based on the "relationship of inequality" between the parties. Specifically, Emerald contends that it placed particular reliance and confidence in Sea Star to report its usage accurately.

As for Sea Star's arguments under Rule 9(b), Emerald contends that its counterclaim is properly pled. However, Emerald contends that, to the extent the Court concludes that further particularity is required, Emerald should have the opportunity to amend its Counterclaim.[5]

_____

[5]    As a threshold matter, the parties have not specifically alleged which state's substantive law applies to Emerald's tort claims. Sea Star alleges that the claims are non-maritime, and therefore, Delaware's conflict of law rules apply to determine which state's substantive law applies. Although Sea Star identifies the "most significant relationship test" as the appropriate test, it is unclear which state Sea Star alleges has the most significant relationship to the occurrences and the parties. In a footnote, Emerald alleges that federal common law should apply, because courts sitting in admiralty strive for uniformity. In the alternative, Emerald identifies Delaware choice of law rules and contends that the law of the place of injury would apply, because this is a diversity action. However,

23

A.   Whether Emerald Has Pled Torts Existing Independently
     From The Contract

Stated generally, the economic loss doctrine prohibits a
party from recovering in tort economic losses, the entitlement of
which, flows only from a contract.  Werwinski v. Ford Motor
Company, 286 F.3d 661, 671 (3d Cir. 2002) (predicting how the
Pennsylvania Supreme Court would rule on the viability of the
economic loss doctrine).  It appears to the Court that the
formulation of the economic loss doctrine varies depending on
which state law applies.  For example, under Delaware law, the
economic loss doctrine "'prohibits recovery in tort where a
product has damaged only itself (i.e., has not caused personal
injury or damage to other property) and, the only losses suffered
are economic in nature.'"  Pinkert v. Olivieri, 2001 WL 641737,
*5 n.6 (D. Del. May 24, 2001) (quoting Danforth v. Acorn
Structures, Inc., 608 A.2d 1194, 1195 (Del. 1992)).  However,
Delaware courts have also recognized that "where an action is
based entirely on a breach of the terms of a contract between the

_____

it is also unclear which state Emerald alleges as the specific
place of injury.

       In the Court's view, the choice of law issue is not
sufficiently briefed for the Court to make a final decision as to
which law applies to the tort claims in this case.  The parties
cite case law from Florida, Virginia, Iowa, Georgia, Delaware and
New Jersey.  Accordingly, at this juncture, the Court will work
within the confines of the law that has been presented in the
briefing to make a determination as to whether Emerald's claims
can withstand a motion to dismiss.

parties and not on a violation of an independent duty imposed by law, a plaintiff must sue in contract and not in tort." Id. at *5 (dismissing fraud claims where plaintiff alleged that defendants knowingly misrepresented the nature of their work each time they submitted an application and certification for payment where duty to submit these periodic payment applications existed solely by reason of construction contract and defendant had not violated any common law duty independent of the construction contract).

Exceptions to the economic loss doctrine have also been recognized where the claim arises independently from the contract. See e.g., HTP, Ltd. v. Lineas Aereas Constarricenses, S.A., 685 So. 2d 1238, 1239 (Fla. 1996). Further, in the case of allegations of fraud resulting from circumstances involving self-billing type reports, courts in other jurisdictions have permitted such claims to proceed in tort. See e.g., Insteel Indus., Inc. v. Costanza Contracting Co., Inc., 276 F. Supp. 2d 479, 484-486 (E.D. Va. 2003) (allowing claim based on false invoices to proceed in tort as a fraud claim where duty to submit invoice stemmed from contract, but contract did not require sworn and truthful statements in the invoices); F/V Robins Nest, Inc. v. Atlantic Marine Diesel, Inc., 1994 WL 594592, *10 (D.N.J. Oct. 24, 1994) (allowing fraud claim to proceed where vessel owner had to rely on integrity of shipyard to honestly report parts and

25

labor used and work actually performed, contract had no specific price term, and shipyard had wide latitude in carrying out repairs).

Reviewing the circumstances alleged in this case in light of the case law cited by the parties, the Court concludes that dismissal of Emerald's fraud claims is not appropriate at this juncture. As Emerald points out, the Equipment Rental Agreement makes no provisions for self-billing. Rather, under the Equipment Rental Agreement, the lease term begins on the date when the equipment is delivered to the Lessee and ends when the equipment is returned pursuant to section 10. Emerald has alleged, however, that the equipment was already in place at the time Sea Star purchased the assets of NPR, Inc. Emerald has further alleged that Sea Star's usage was determined by self-billing and that Emerald relied on Sea Star to accurately report its usage. Emerald has also alleged that Sea Star intentionally under-reported its usage of Emerald's equipment. At this juncture, the Court concludes that Emerald has pled sufficient facts to establish distinct torts arising independently of the contractual obligations such that the claims are not definitively barred by the economic loss doctrine. Accordingly, the Court will deny Sea Star's Motion To Dismiss Emerald's tort claims on this ground.

26

B.    <u>Whether Emerald Has Satisfied The Pleading Requirements</u>
      <u>Under Rule 9(b)</u>

Sea Star contends that Emerald has failed to plead its fraud charges with particularity as required by Rule 9(b).  With respect to the self-billing allegations which form the basis of its fraud claim, Emerald has pled that (1) in order to ascertain rental payments due for equipment, Sea Star provided Emerald with monthly self-billing reports; and (2) "upon later investigation, Emerald discovered that the 'self-billing reports' prepared by Sea Star were grossly understated, failing, <u>inter alia</u>, to account for numerous pieces of Emerald Equipment which Sea Star has been using without paying rental charges to Emerald and failing to pay the appropriate amounts for usage of equipment contained in the 'self-billing reports.'"  D.I. 53, Counterclaim at ¶ 14, 15.  Emerald has not pled any specific dates of the alleged fraud and to the extent Emerald is aware from the further investigation it alleges it conducted in its Counterclaim, Emerald has not disclosed which invoices were defective or which pieces of equipment were implicated.  In these circumstances, the Court concludes that additional facts are required to establish the pleading requirements of Rule 9(b), if those facts are within Emerald's knowledge.  To the extent that some or all of this information is within Sea Star's exclusive control, Emerald should reflect that allegation in any amended pleadings it submits.  Accordingly, the Court will dismiss Emerald's fraud

27

claims, Counts V through VIII, with leave to amend to more particularly state the allegations relevant to Emerald's fraud claims.

### CONCLUSION

For the reasons discussed, Emerald's Motion To Dismiss will be granted as it pertains to (1) Count I, to the extent Count I alleges a breach of the E-Mail Agreement, (2) Count II alleging quantum meruit, (3) Count III alleging turnover to the extent that rent is sought, and (4) Counts V through VIII alleging tort claims for failure to satisfy the pleading requirements under Rule 9(b). In all other respects, the Motion To Dismiss will be denied. Emerald will be granted leave to file an Amended Counterclaim.

An appropriate Order will be entered.

28

PAGE 1

EQUIPMENT TRACING REPORT - TOTAL
AS OF 04/29/02

| CLOC | UNIT | TYPE | LTYP | STATUS | TLOC | SHIPPER | CONSIGNEE | DATE | DAYS | REM |
|------|------|------|------|--------|------|---------|-----------|------|------|-----|
| PHI | HOLT000001 | DV20 | SO | DSFIMP | | NAVIERAS NPR IN | NAVIERAS NPR IN | 01/18/02 | 101 | COBIZ |
| PHI | HOLT000002 | DV40 | SO | DSFIMP | | NAVIERAS NPR IN | NAVIERAS NPR IN | 01/18/02 | 101 | COBIZ |
| SJU | PLGU000061 | TV20 | SO | OGFIMP | SJU | GULBRANDSEN CO | PRASA | 04/26/02 | 3 | -- |
| SJU | PLGU000062 | TV20 | SO | OGFIMP | SJU | GULBRANDSEN CO | OCHOA INDUSTRIA | 03/28/02 | 32 | -- |
| SJU | PLGU000064 | TV20 | SO | OGFIMP | | GULBRANDSEN CO | OCHOA INDUSTRIA | 04/23/02 | 6 | -1789 HYDROCHLORIC ACID |
| SJU | PLGU000066 | TV20 | SO | OGFIMP | | GULBRANDSEN CO | OCHOA INDUSTRIA | 04/17/02 | 12 | -- |
| SJU | MULT000250 | TV20 | SO | OGFIMP | SJU | MULTIQUIMICA DO | ICI MFG CORP | 04/24/02 | 5 | -- |
| SJU | MULT000260 | TV20 | SO | OGFIMP | SJU | MULTIQUIMICA DO | ICI PAINTS | 04/23/02 | 6 | -- |
| HMR | MULT000270 | TV20 | SO | IGEAVA | | | | 04/23/02 | 7 | |
| HMR | MULT000310 | TV20 | SO | IGEAVA | | | | 04/22/02 | 27 | |
| HMR | MULT000320 | TV20 | SO | IGEAVA | | | | 02/26/02 | 62 | |
| HMR | MULT000340 | TV20 | SO | IGEAVA | | | | 04/10/02 | 19 | |
| ETH | MULT000350 | TV20 | SO | IGEAVA | ETH | MULTIQUIMICA | MULTIQUIMICA | 12/21/01 | 129 | |
| ETH | MULT000360 | TV20 | SO | OGEEXP | ETH | MULTIQUIMICA | ICI PAINTS | 03/14/02 | 46 | |
| SJU | MULT000380 | TV20 | SO | DSFIMP | | MULTIQUIMICA DO | NAVIERAS NPR IN | 04/26/02 | 3 | SS CARLINA - FUEL |
| @SEA | TK 000483 | TV20 | SO | SAFEXP | DDK | | | 11/17/00 | 526 | |
| RHA | PRGS001000 | GS40 | PR | IGEAVA | | | | 04/25/02 | 4 | |
| SJU | DPCU001000 | GS40 | PR | IGFIMP | SJU | DANA CONTAINERS | DUPONT AGRICULT | 03/11/02 | 49 | 3/27FAXLSTCTRS/GLENDA |
| BAL | PRGS001001 | GS40 | PR | IGEAVA | | | | 04/22/02 | 7 | |
| SJU | PRGS001002 | GS40 | PR | OGESHU | SJU | | | 04/26/02 | 5 | |
| PHI | PRGS001003 | GS40 | PR | OGESHU | | | | 04/26/02 | 5 | |
| NAH | PRGS001004 | GS40 | PR | OGESHU | NOL | | | 04/26/02 | 3 | |
| SJU | PRGS001005 | GS40 | PR | IGEAVA | | | | 04/26/02 | 3 | |
| JAC | PRGS001006 | GS40 | PR | OGFIMP | SJU | | | 04/26/02 | 3 | |
| JAC | DPCU001007 | GS40 | PR | OGESHU | CCZ | DANA CONTAINERS | DUPONT AGRICULT | 01/16/02 | 103 | 3/27FAXLSTCTRS/GLENDA |
| JAC | PRGS001007 | GS40 | PR | OGESHU | CCZ | | | 04/26/02 | 3 | |
| JAC | PRGS001008 | GS40 | PR | IGEAVA | | | | 04/26/02 | 3 | |
| SJU | PRGS001009 | GS40 | PR | IGFIMP | SJU | | | 04/22/02 | 7 | |
| SJU | PRGS001010 | GS40 | PR | IGEAVA | SJU | DANA CONTAINERS | DUPONT AGRICULT | 01/23/02 | 96 | 3/27FAXLSTCTRS/GLENDA |
| SJU | PRGS001011 | GS40 | PR | IGEAVA | | | | 04/26/02 | 6 | |
| JAC | DPCU001011 | GS40 | PR | OGESHU | CCZ | DANA CONTAINERS | DUPONT AGRICULT | 04/17/02 | 12 | -- |
| JAC | PRGS001012 | GS40 | PR | IGEAVA | | | | 04/26/02 | 3 | |
| JAC | PRGS001013 | GS40 | PR | IGEAVA | | | | 04/12/02 | 17 | |
| SJU | PRGS001014 | GS40 | PR | OGFIMP | SJU | | | 04/23/02 | 7 | |
| SJU | DPCU001015 | GS40 | PR | IGEAVA | | DANA CONTAINERS | DUPONT AGRICULT | 01/18/02 | 101 | 3/27FAXLSTCTRS/GLENDA |
| @SEA | PRGS001015 | GS40 | PR | OGFIMP | SJU | | | 04/19/02 | 10 | |
| PHI | DPCU001016 | GS40 | PR | SAFEXP | | DANA CONTAINERS | DUPONT AGRICULT | 04/26/02 | 3 | -2478 ISOCYAN SOL FLM/TOX |
| JAC | PRGS001016 | GS40 | PR | IGEAVA | SJU | | | 04/25/02 | 4 | |
| @SEA | DPCU001017 | GS40 | PR | SAFEXP | SJU | DANA CONTAINERS | DUPONT AGRICULT | 04/26/02 | 3 | -2478 ISOCYAN SOL FLM/TOX |
| JAC | PRGS001017 | GS40 | PR | DSEREP | | | | 04/09/02 | 20 | |
| JAC | PRGS001018 | GS40 | PR | IGEAVA | | | | 04/22/02 | 5 | |
| SJU | PRGS001019 | GS40 | PR | OGFIMP | SJU | DANA CONTAINERS | DUPONT AGRICULT | 03/08/02 | 52 | 3/27FAXLSTCTRS/GLENDA |
| CHI | PRGS001020 | GS40 | PR | IGEAVA | CHI | | | 04/22/02 | 7 | |
| NAH | PRGS001021 | GS40 | PR | OGESHU | NOL | | | 04/08/02 | 21 | |
| JAC | PRGS001022 | GS40 | PR | OGESHU | CCZ | | | 04/21/02 | 8 | |
| SJU | PRGS001023 | TV20 | SO | OGFIMP | SJU | | | 05/27/01 | 306 | |
| SJU | DPCU001023 | GS40 | PR | IGEAVA | | DANA CONTAINERS | DUPONT AGRICULT | 03/18/02 | 42 | 3/27FAXLSTCTRS/GLENDA |
| JAC | PRGS001024 | GS40 | PR | IGEAVA | | | | 04/25/02 | 13 | -- |

SE41000

1

1     IN THE UNITED STATES DISTRICT COURT

2     FOR THE MIDDLE DISTRICT OF FLORIDA

3          JACKSONVILLE DIVISION

4       CASE NO. 3:04-CV-146-99HTS

5

6              - - -

7     SEA STAR LINE, LLC,                    :
      a limited liability company,          :
8       Plaintiff,                          :
          V.                                :
9     EMERALD EQUIPMENT LEASING, INC.,       :
      a corporation,                        :
10      Defendant.                          :

11

12

              - - -
13          December 8, 2004
              - - -
14

      Oral deposition of ARTHUR
15    B. DAVIS, held in the offices of Adelman
      Lavine Gold and Levin, Four Penn Center,
16    Philadelphia, Pennsylvania, 19103, commencing
      at 10:00 a.m., on the above date, before
17    Joseph Calavetta, a Federally-Approved
      Registered Professional Reporter and
18    Commissioner for the Commonwealth of
      Pennsylvania.

19
              - - -
20

21

22    ESQUIRE DEPOSITION SERVICES
      Fifteenth Floor
23    1880 John F. Kennedy Boulevard
      Philadelphia, Pennsylvania  19103
24    (215) 988-9191

          ESQUIRE DEPOSITION SERVICES

2

```
1                   - - -
          A P P E A R A N C E S :
2
              ARMSTRONG & MEJER, P.A.
3              BY:  TIMOTHY J. ARMSTRONG, ESQUIRE
             Suite 1111 Douglas Centre.
4             2600 Douglas Road
             Coral Gables, Florida  33134
5             305-444-3355
             Counsel for the Plaintiff
6

7              ADELMAN LAVINE GOLD AND LEVIN
             BY:  ALAN I. MOLDOFF, ESQUIRE
8             Four Penn Center, Suite 900
             Philadelphia, Pennsylvania  19103
9             215-568-7515
             Counsel for the Defendant
10

11          ALSO PRESENT:  JOHN EVANS AND
                  ANDY ROOKS
12

13                  - - -

14

15

16

17

18

19

20

21

22

23

24
```

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                34

1    were any pieces lost by NPR,

2    Incorporated?

3         A.    I am sure that there were.

4         Q.    If pieces were lost, did

5    NPR, Incorporated continue to pay rent?

6         A.    If they didn't pay for the

7    equipment, yes.

8         Q.    Who would do the financial

9    calculations with respect to how much

10   NPR, Incorporated owed for lost

11   equipment?

12        A.    It was part of the

13   agreement.  There was a stipulated loss

14   value as part of the agreement.

15        Q.    Would NPR, Incorporated

16   determine what equipment was lost?

17        A.    That would be something

18   they would have to do, yes.

19        Q.    While NPR, Incorporated was

20   using the equipment, was any damaged, to

21   your knowledge?

22        A.    Yes.

23        Q.    Who was responsible for

24   calculating any amounts due for damaged

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                55

1    you with an inventory or a copy of an

2    inventory?

3         A.    I am sure at some point he

4    did.

5         Q.    Did you review the

6    inventory?

7         A.    I am sure I did.

8         Q.    For what purpose did you

9    review the inventory?

10        A.    To see where equipment was

11   located.

12        Q.    Did you compare the

13   inventory with Emerald records as to

14   equipment on lease to NPR, Incorporated?

15        A.    No.

16        Q.    Have you ever compared NPR,

17   Incorporated inventories with Emerald

18   records as to equipment on lease to NPR,

19   Incorporated?

20        A.    No.

21        Q.    Did Emerald ever maintain

22   records as to equipment on lease to NPR,

23   Incorporated?

24        A.    As I said before that was

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                56

1    done by NPR, Incorporated.

2        Q.    Did you ever ask Mr.

3    Cervone for any lists of lost Emerald

4    equipment on lease to NPR, Incorporated,

5    by lost I mean lost or missing?

6        A.    Not that I recall.

7        Q.    How could you determine

8    exactly what Emerald equipment was on

9    lease to NPR, Incorporated as of April 26

10   of 2002?

11       A.    It was all of the

12   equipment.

13       Q.    By all of the

14   equipment, you are referring to equipment

15   whether it was actually in place or was

16   lost or missing?

17       A.    It was all of the equipment

18   that was in the schedules.

19       Q.    In what schedules?

20       A.    That were part of the

21   agreement.

22       Q.    What agreement?

23       A.    The agreement between

24   Emerald NPR, Incorporated and Holt Cargo

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                57

1    Systems.

2         Q.    Of that equipment, you have

3    no knowledge as to what pieces were

4    missing, is that correct?

5              MR. MOLDOFF:  If any.

6    I don't know we have established --

7    Object to the form of the question.

8              MR. ARMSTRONG:  Okay.

9    You may objection to the form.  Go

10    ahead and answer.

11        A.    Repeat the question.

12             MR. ARMSTRONG:  Go

13    ahead and repeat the question.

14             - - -

15             (Whereupon, the

16    pertinent portion of the record was

17    read.)

18             - - -

19        A.    Yes.

20        Q.    Have you ever attempted to

21    gain knowledge as to what pieces of

22    equipment, subject to an agreement

23    between Emerald and NPR, Incorporated or

24    an agreement between Emerald and Holt

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                70

1    Incorporated?

2         A.    Not that I recall.

3         Q.    Did you ever tell anyone at

4    MBC Leasing, Incorporated that you didn't

5    know what Emerald equipment used by NPR,

6    Incorporated might have been missing on

7    or before April 26 of 2002?

8         A.    I don't believe so.

9         Q.    Did you ever tell Tom Holt,

10   Sr what Emerald equipment used by NPR,

11   Incorporated might have been missing on

12   or before April 26th of 2002?

13        A.    No.

14        Q.    Did he ever ask you whether

15   all of the Emerald equipment for which

16   NPR, Incorporated was paying was actually

17   in place on April 26th of 2002?

18        A.    No.  It is just not an

19   unusual situation that a leasing company

20   would have equipment with a lessee that

21   they may have misplaced, may have had

22   damaged, that they continued to pay for

23   the lease payment on the piece of

24   equipment and never report that it was

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                71

1     lost, stolen, damaged or whatever.  It is

2     not an unusual thing.

3          Q.     Is that your understanding

4     of what NPR was doing?

5          A.     That is my understanding in

6     the industry.

7          Q.     Is that your understanding

8     of what NPR was doing?

9          A.     I don't know that NPR lost

10     any equipment.

11          Q.     Did you ever investigate

12     whether NPR, Incorporated lost any

13     equipment?

14          A.     I did not.

15          Q.     As president of Emerald you

16     were never asked to investigate whether

17     NPR lost any equipment?

18          A.     That is correct.

19          Q.     Now, did you ever

20     investigate after April 26th of 2002

21     whether NPR, Incorporated lost any

22     equipment?

23          A.     I did not.

24          Q.     What does the term POS mean

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                72

1       if you know?

2              A.      Permanently out of service.

3              Q.      Have you seen that term in

4       connection with Emerald equipment on

5       lease to NPR?

6              A.      Yes.

7              Q.      What does that mean in the

8       industry?

9              A.      To me it would mean that a

10      piece of equipment, that that particular

11      piece of equipment might require more

12      money to repair to put it back into

13      proper working order than the company

14      would want to spend at that time.

15             Q.      Do you know whether NPR,

16      Incorporated paid rent for equipment that

17      was POS?

18             A.      They did.

19             Q.      Do you know what happened

20      to the Emerald equipment that was POS

21      after April 26th of 2002?

22             A.      I couldn't say on a general

23      basis.

24             Q.      Did you ever inventory

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis          73

1    equipment that had been identified as POS

2    in the NPR documents?

3        A.    No.

4        Q.    I will show you a copy of a

5    document consisting of e-mails dated June

6    4th through June 7th of 2002, which I

7    will ask the court reporter to mark as

8    exhibit 9 for identification.

9                - - -

10               (Whereupon, Exhibit

11          Number 9 was marked for

12          identification.)

13               - - -

14   BY MR. ARMSTRONG:

15       Q.    Have you ever seen those

16   e-mails before or any of them before?

17       A.    I don't think so.  I don't

18   remember seeing these e-mails.

19       Q.    Look at the e-mail from

20   Bill Hallam on the second page, do you

21   see that?

22       A.    I do.

23       Q.    It is to T. Holt, Jr at

24   holt marine dot com.  Do you know who T.

ESQUIRE DEPOSITION SERVICES