UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

SEA STAR LINE, LLC,
a limited liability company,

      Plaintiff,

-vs-

EMERALD EQUIPMENT LEASING, INC.,
a corporation,

      Defendant,

-vs-

SEA STAR LINE, LLC,

      Counter-Defendant.
_____/

Civil Action No. 05-CV-245-JJF

## RESPONSE TO EMERALD'S SUBMISSION REGARDING BAXTER HEALTH CARE, INC.

Sea Star Line, LLC ("SSL") filed this action against Emerald Equipment Leasing, Inc. ("EEL") in the Middle District of Florida in 2004. EEL filed a motion to dismiss or transfer the case to this Court. The Middle District granted the motion to transfer, based upon EEL's representation as to the nature and extent of its claims against SSL. The transfer order provides, in part: "According to Emerald, it has a four million dollar claim against Sea Star for unpaid rental charges and its claim against Sea Star is the sole asset of the bankruptcy estate that offers a distribution to creditors in its pending bankruptcy." *See* Order at 1 (D.I. 45); EEL motion to dismiss or transfer at 2 (D.I. 9) (Exhibit A).

Undisclosed by EEL were the actual nature, extent, and limitations of its interest in

any claims against SSL. Recently SSL discovered that EEL knew long before moving to dismiss or transfer the case to this Court that:

    1.    EEL's purported $4,000,000 claim against SSL never existed. At most, the EEL bankruptcy estate acquired "15% of any proceeds, net of expenses or other amounts disbursed to third parties, [Storage Transfer, L.L.C. ("Storage")] would otherwise receive on account of its secured claim as a result of any settlement of the Sea Star claim or the collection of any judgment obtained upon prosecution of this claim." Schildhorn Letter E68500 (Feb. 25, 2004)(Exhibit B). As Storage's "Sole Member", Lorraine Robins "AGREED TO AND ACCEPTED" this "carveout". *Id.* at E68501.

    2.    A Loan Sale and Assignment Agreement ("Loan Sale Agreement"), dated as of November 1, 2003, expressly proscribes EEL's "claims that Sea Star used Emerald equipment to ship goods for its customers without reporting to Emerald on its 'self-billing reports' its use of such equipment and paying the appropriate rental and other charges due in connection with those pieces of equipment." Moldoff Letter (Oct. 24, 2007)(D.I. 143). Only after MBC Leasing Corp. ("MBC"), EEL's secured creditor, produced the Loan Sale Agreement[1] pursuant to subpoena in September 2007 did SSL learn what express limitations and conditions MBC had imposed on the "claim" assigned to Storage. Loan Sale Agreement 3-5, ¶¶ 3, 5, 6 (Exhibit C). Pertinent to, and dispositive of, EEL's assertions *sub judice*, the Loan Sale Agreement clearly and unambiguously provides:

> ASSIGNEE agrees not to assert any entitlement to compensation
> from SEA STAR for use of EMERALD EQUIPMENT during any

---

[1] SSL does not understand why this document was not produced by EEL, as it was included in the scope of the document requests served on EEL.

period in which SEA STAR has paid ASSIGNOR pursuant to the SEA STAR INDEMNITY.

Ex. "C" at 5, ¶. 6.3.[2]  Paragraph 3 of the Loan Sale Agreement states in part:

> ...ASSIGNOR contends that all accounts, chattel paper, contract rights, documents, general intangibles, and instruments arising from any of the EMERALD EQUIPMENT, including any amount due from SEA STAR to the BORROWER ("RENT") is ASSIGNOR'S collateral as well. ASSIGNEE agrees to remit to ASSIGNOR as additional consideration for the sale of the LOAN ASSETS twenty percent (20%) of the net amount, after deduction of reasonable attorney's fees and other reasonable collection expenses, of any RENT collected from SEA STAR or any amount paid by SEA STAR in settlement of claims for RENT and received by ASSIGNEE ("SEA STAR PORTION"). Payments of the SEA STAR PORTION to ASSIGNOR shall be made within five (5) business days after receipt by ASSIGNEE of any payment of RENT or payment in settlement of RENT. The ASSIGNEE'S obligation to pay the SEA STAR PORTION...shall continue for so long as any claims for RENT remain outstanding and unresolved.

Ex. "C" at 3, ¶ 3. As discussed in more detail below, EEL does not have the right to assert a claim for usage of the Emerald Equipment and thus, its request for additional discovery should be denied on that ground alone. Additionally, even assuming that EEL can show that it has a cognizable claim, the scope of proposed discovery is not warranted.

## BACKGROUND

### EEL's Bankruptcy

On March 21, 2001, EEL and various affiliated entities filed petitions in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") under Chapter 11 of the Bankruptcy Code. Initially the EEL Chapter 11 case was jointly administered with the Chapter

---

[2]This provision is consistent with and amplifies a telefax dated September 24, 2003 from Krieger of MBC to Mr. Davis (E006788) (Exhibit D); *see* letter dated July 19, 2002 from Krieger of MBC to Mr. Bates (SE50578) (Exhibit E).

11 cases of the affiliated entities (Case No. 01-926). However, on July 25, 2002, the Chapter 11 cases of most affiliated debtors were converted to cases under Chapter 7 of the Bankruptcy Code (Bk. Dkt. 2265). EEL's case remains in Chapter 11 (Case No. 01-934) and as of May 23, 2003 is no longer jointly administered.

EEL was in the business of leasing cargo handling equipment, including cargo containers, chassis, and gensets to its affiliates, primarily NPR, Inc. ("NPR"). In 1997 EEL obtained a $35 million term loan from MBC to enable EEL to purchase equipment from affiliated companies NPR and Holt Cargo Systems, Inc. (Bk. Dkt. 1671 ¶ 4). To secure its repayment obligations to MBC, EEL granted MBC a security interest in all of the purchased equipment, together with accounts, contract rights, and other general intangibles arising from the equipment. *Id.* EEL entered into equipment leases with NPR and Holt Cargo Systems, Inc., then assigned the leases to MBC as additional security for its repayment obligation. *Id.* at ¶¶ 5, 6).

On April 26, 2002, the Bankruptcy Court entered an Order Authorizing Sale of NPR, Inc.'s Assets Free and Clear of Liens, Claims and Encumbrances to SSL (the "Sale Order")(Bk. Dkt. 1728). SSL did not assume the equipment leases between EEL and NPR and Holt Cargo Systems, Inc. Those leases were rejected as of April 18, 2002 by Order entered by the Bankruptcy Court on May 10, 2002 (Bk. Dkt. 1802). The closing in connection with the Sale Order occurred on April 27, 2002.

On July 22, 2002, the Bankruptcy Court issued an Order allowing MBC to foreclose its security interest in the EEL's equipment, effective as of April 29, 2002. (Exhibit F). The Order also authorized MBC to remove and sell the equipment described in a November 20, 1997 Loan and Security Agreement between MBC and EEL, applying the proceeds to EEL's indebtedness to MBC.

MBC, however, did not immediately move to foreclose its interest in the EEL equipment.

Subsequent to SSL's purchase of assets from the bankruptcy estate in April 2002, SSL and EEL negotiated an Equipment Rental Agreement ("Rental Agreement"), pursuant to which SSL rented certain equipment for use in its operations ("Emerald Equipment"). (Exhibit I). MBC required that it approve the Rental Agreement prior to the parties' execution. After MBC approved, SSL and EEL entered into the Rental Agreement as of July 31, 2002.

To induce SSL's direct payment to MBC for its use of Emerald Equipment,[3] MBC executed an Indemnity Agreement in favor of SSL on September 28, 2002. (Exhibit H). SSL paid MBC pursuant to the Sea Star Indemnity through late 2003 and furnished self-billing reports through early 2004. The documented chronology further confirms:

    1.    SSL sent MBC a check for *per diem* use of Emerald Equipment from April 27 thru July 31, 2002, less storage and handling. Enclosed with the payment were *per diem* self-billing report summaries, corresponding to detailed self-billing reports previously submitted, and detailed invoices for storage and handling. For succeeding months SSL sent MBC and EEL self-billing reports reflecting use and purchases of Emerald Equipment, as well as storage and handling charges. This procedure continued through early 2004.

    2.    The Rental Agreement "cover[ed] equipment in use at various times commencing April 29, 2002. Ex. I at 1. Under the Rental Agreement, "the lease term for each item of Equipment shall begin on the date when such Equipment is delivered to Lessee [SSL] or its agent and shall end on the date when such Equipment is taken off-hire pursuant to section 10 below." *Id.*

---

[3]In letters dated June 10 and 11, 2002, MBC had instructed EEL and EEL had informed SSL that payments for equipment use would be to MBC. (Exhibit "G").

at 1, ¶ 2. "Delivery of all Equipment to Lessee or its agents by Lessor shall be effected and evidenced by signed and dated interchange receipts and shall be subject to the terms and conditions of this Agreement." *Id.* at 1, ¶ 1. The Rental Agreement was expressly "subject and subordinate to any lease or security interest in favor of a third-party lessor or lender to Lessor." Id. at 2, ¶ 4(b).

3. SSL has produced thousands of Bates-stamped documents relating to Emerald Equipment. Moreover, in January 2005 SSL sent EEL's attorneys a disk showing the Emerald Equipment moves that had been input into its IQ Ship computer system.

### The Discovery Dispute

On May 15, 2007, EEL filed a Motion to Compel Certain Documents (D.I. 115) and a Motion to Compel Responses to Certain Interrogatories (D.I. 114) ("Discovery Motions"). EEL also filed a Motion for Protective Order relating to SSL's Notice of 30(b)(6) deposition of EEL ("Motion for Protective Order"). SSL filed responses to the motions (D.I. 118, 119, 123).

The Court held a hearing on August 22, 2007 on, among other things, the Discovery Motions. With respect to the discovery sought by EEL, the Court stated:

> What I want [EEL] to do, before I order [SSL] to do all the things you want [SSL] to do, which I may do, I think that [EEL] ought to come to me and be able to establish that, for instance, through bills of lading, that they short-changed [EEL] but because I already agree with you, so you've won me over, you're persuasive, that they're incompetent at keeping documents, I want you to pick a customer, go to the customer for payments made to Sea Star, and establish that their customer has better records than they do to demonstrate that your records are correct. Just a little slice. And what I would do is I'd pick the smallest customer.
>
> Now if you establish that representatively, the argument you're making, on this broader scale, I'm gonna allow you to go after them and I'm gonna make them do a lot of work in their documents and that this path of Discovery you've chosen has some merit to it, in other words, it's gonna give us a fruitful result so you'll get some

> evidence for trial, I'm not gonna order them to respond to the kind of broad questions you've asked for....
>
> \* \* \*
>
> ...But I'm saying show it to me by vendor. That's all I'm asking you to do. If you show me what you're saying here today by a vendor in an isolated time frame, I'm going to allow you to have at them as broadly as you're asking.
>
> \* \* \*
>
> The way I like, so the way I'd probably do it if I were you, is a vendor because it's gonna tell me something. I'm expecting to get a dramatic result from this effort by you on a vendor. I'm expecting to see, like, a 50 percent deviation.

Transcript at 20-24 (Exhibit J). On August 23, 2007, the Court entered an Order denying the Discovery Motions without prejudice (D.I. 130).

Later the parties entered a Confidentiality Agreement, pursuant to which SSL furnished EEL with a list of its customers in the relevant time period. EEL then selected and subpoenaed Baxter Healthcare, Inc. An EEL letter dated October 24, 2007 provided the Court with what EEL believed the discovery revealed. On October 31, 2007, the Court denied EEL's Motion for Protective Order (D.I. 139). Thus, no outstanding discovery motions remain.

On November 2, 2007, the Court issued an Order referring EEL's Amended Counterclaim to Magistrate Stark (D.I. 142). In its Amended Counterclaim, EEL asserts the right to payment for use of certain Emerald Equipment and for the loss of certain Emerald Equipment. One of the issues for decision is whether EEL has satisfied its burden to show that it should be permitted to renew its Discovery Motions, which clearly relate to EEL's claim for payment for use of certain Emerald Equipment.

## ARGUMENT

The "test" described in the October 24, 2007 letter from EEL's attorney to Judge Farnan must relate to Request No. 10, referenced in a May 2007 Motion to Compel Production of

Documents, which "seeks 'invoices' and 'bills of lading' issued by Sea Star to its customers for the period of April 27, 2002 through September 30, 2002." D.I. 115 at 4, ¶ 11. It is axiomatic that the discovery sought by EEL must be "reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1). Furthermore, "[a]ll discovery remains subject to limitations imposed by Rule 26(b)(2)(C)." Fed. R. Civ. P. 26(b)(1). "A party need not provide discovery of electronically stored information from sources that the party identifies as not reasonably accessible because of undue burden or cost" under Rule 26(b)(2)(B).

Indisputably the "carveout" granted to EEL by Storage cannot encompass a greater claim – or interest – than that assigned to Storage by MBC. In particular, EEL may not "assert any entitlement to compensation from SEA STAR for use of EMERALD EQUIPMENT during any period in which SEA STAR has paid ASSIGNOR pursuant to the SEA STAR INDEMNITY." Ex. C at 5, ¶ 6.3. Manifestly, EEL cannot be a real party in interest in regard to claims within the purview of paragraph 6.3 of the Loan Sale Agreement. Under Maryland law, which governs the Loan Sale Agreement and the Rental Agreement, a "'real party in interest' must have 'an actual, real and justiciable interest susceptible of protection through litigation.'" *Akparewa v. Amoco Oil Co.*, 771 A.2d 508, 519 (Md. Ct. Spec. App. 2001), *quoting Boyd v. Hickman*, 689 A.2d 106 (1997); *see LaSalle Bank, N.A. v. Lehman Bros. Holdings, Inc.*, 237 F. Supp.2d 618, 632 (D. Md. 2002); Fed. R. Civ. P. 17(a). *See also* Ex. C at 10, ¶ 18. Moreover, as a matter of contract and law, EEL never has had the requisite "personal stake in the outcome" of any controversy and has "no standing to sue", much less demand discovery, with respect to any matter covered by paragraph 6.3. *Baker vs. Carr*, 369 U.S. 186, 204 (1962). *Accord, Warth v. Seldin*, 422 U.S. 490, 498-99 (1975); *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 117-18 (2 Cir. 1991); *see Caplin v. Marine Midland*

*Grace Trust Co.*, 406 U.S. 416, 428-32 (1972); *General Motors Acceptance Corp. v. Dykes (In re Dykes)*, 10 F.3d 184, 188 (3 Cir. 1993)(focus on party); *National City Bank of Minneapolis v. Lapides (In re Transcolor Corp.)*, 296 B.R. 343, 360 (Bankr. D. Md. 2003); *In re ANC Rental Corp.*, 278 B.R. 714, 719 (Bankr. D. Del. 2002) ("general principle of standing that a party may assert only its own legal interest and not the interest of another").

MBC's production of the Loan Sale Agreement has mooted any EEL "claim...that Sea Star's self-billing reports were false, inaccurately reporting the Emerald equipment it used." Moldoff Letter. To grant any relief demanded by EEL would violate the clear and unambiguous contractual proscription of paragraph 6.3 and could not lead to discovery of admissible evidence. Indeed, the Court must act to curtail EEL's playing "fast and loose with the courts", as well as SSL. *See Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 358 (3 Cir. 1996); *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 419-20 (3 Cir. 1988). Having accepted "carveout" benefits derived from the Loan Sale Agreement, EEL, like Storage, is estopped from disregarding the explicit contractual limitations and prohibitions.

Even assuming *arguendo* that EEL could fashion any claim based on the Baxter "test" and "Sea Star's self-billing reports", the Court must question why EEL only "identified 12 bills of lading which identified 12 separate pieces of Emerald equipment which were used by Sea Star to ship freight from or to Baxter" produced in response to the EEL subpoena and why EEL noted that "Equipment piece PRMU 650582 is not on the Emerald invoices since Emerald does not dispute the Sea Star self-billing reports for this particular piece of equipment." Moldoff Letter. The Court also might ask why EEL did not report that Baxter actually produced documents pertaining to at least 70 pieces of EEL equipment involved in shipments between April 29 and September 30, 2002, of which

67 are included in EEL claims. (Exhibit K). With respect to 30 of the units, SSL is seeking reimbursement for overpayments.

EEL identified only 5 pieces of equipment omitted from SSL self-billing reports. These units were located in a San Juan terminal formerly operated by NPR, Inc., an EEL affiliate from which SSL acquired certain assets pursuant to an April 26, 2002 bankruptcy order. According to SSL computer records furnished to EEL, 3 of the units were erroneously input into the system as shipper-owned on April 29, May 7, and May 18, 2002. EEL's *per diem* rental claims for the 3 units, which total $1,108.00, violate paragraph 6.3 of the Loan Sale Agreement. For the 2 other pieces of equipment on-hired but not included in self-billing reports, SSL long ago recognized responsibility to pay the stipulated loss value in the Rental Agreement but has contested EEL's *per diem* rental claims.

Contrary to intimations in EEL's October 24 letter that SSL falsified the self-billing reports, confusion and mistakes as to equipment ownership in the NPR terminal area were rampant before SSL purchased certain NPR assets. <u>Francisco Gonzalez Deposition</u> 176-77 (Exhibit L). Francisco Gonzalez, an MBC employee who had worked at the San Juan pier for several years, testified that he and other workers recognized equipment marked with certain prefix lettering as belonging to "Navieras" or "NPR". *Id.* at 17, 74, 174, 175-76. EEL was unknown. After the asset purchase, Gonzalez reminded his MBC supervisors

> that gonna be a lot of trouble, because we don't know what kind of equipment is belongs to us or belongs to Sea Star, because Sea Star purchased a lot of equipment. Because sometime we buy, I checked some numbers. No, that belongs to Sea Star. No, that belongs to me. And gets crazy sometimes.

*Id.* at 71-72.

Contravening the Rental Agreement and the Bankruptcy Court's April 26, 2002 Order, Exhibit B to the Moldoff letter alleges that the on-hire date as to 10 of the 12 units was April 29, 2002 and the on-hire date as to 1 other unit was April 30, 2002. Likewise, EEL persistently has disregarded express provisions in the Rental Agreement, together with operative interchange documents, in "disput[ing] the termination date of Sea Star's use of that equipment" included in "the Sea Star self-billing reports". Moldoff Letter. In light of paragraph 6.3 of the Loan Sale Agreement, any EEL "dispute" concerning on-hire and off-hire dates, as well as *per diem* claims, clearly becomes immaterial and cannot support EEL's discovery demands.

No "Discovery Motions" are pending; and EEL's allusion to "necessary discovery" in the October 24 letter leaves definitions, scope, and time-frame to conjecture. Nonetheless, EEL has no legal right to any relief. Since EEL lacks standing and is not a real party in interest, none of its demands could lead to discovery of admissible evidence. In any event more reams of paper would not compel EEL to read and adhere to the Rental Agreement, the Loan Sale Agreement, or any other contract by which it is bound. Even if EEL could establish a legitimate basis for discovery, Rule 26(b)(2)(B) and (C) would bar its overbearing demands: Compliance with EEL's new demands for electronically stored information five years after transactions occurred would be unduly burdensome and costly. Fed. R. Civ. P. 26(b)(2)(B). Moreover, the discovery sought is "unreasonably cumulative or duplicative", imposing undue burden and expense that "outweighs its likely benefit". Fed. R. Civ. P. 26(b)(2)(C).

SMITH, KATZENSTEIN & FURLOW LLP

_____
Kathleen M. Miller (I.D. No. 2898)
800 Delaware Avenue, 10th Floor
P.O. Box 410
Wilmington, DE 19899
Telephone: 302-652-8400
Facsimile: 302-652-8405
E-mail: Kmiller@skfdelaware.com

OF COUNSEL:
Timothy J. Armstrong
Armstrong & Mejer, P.A.
Suite 1111 Douglas Centre
2600 Douglas Road
Miami, FL 33134
Telephone: 305-444-3355

*Attorneys for Sea Star Line LLC*