# EXHIBIT C

## LOAN SALE AND ASSIGNMENT AGREEMENT

This Loan Sale and Assignment Agreement ("AGREEMENT") is effectively dated as of November 1, 2003, by and between MBC Leasing Corp., a Maryland corporation ("ASSIGNOR"), and Storage Transfer, LLC, a Pennsylvania limited liability company ("ASSIGNEE"). The ASSIGNOR, pursuant to this AGREEMENT, has agreed to assign, transfer and set over to the ASSIGNEE, without recourse, warranty, representation or guaranty of any kind except as set forth below, all of the ASSIGNOR'S rights, title and interest in and to the "ASSIGNED DOCUMENTS, as defined in Recital 5 below and the loan evidenced thereby ("LOAN") and the ASSIGNEE has agreed to purchase the ASSIGNED DOCUMENTS and the LOAN on the terms and conditions set forth below.

## R E C I T A L S:

R1. Pursuant to a $35,000,000.00 Term Loan Promissory Note dated as of November 20, 1997 from Emerald Equipment Leasing, Inc. ("BORROWER") to the order of the ASSIGNOR (the "NOTE") and a Loan and Security Agreement dated as of November 20, 1997 by and between the BORROWER and the ASSIGNOR (the "LOAN AGREEMENT"), as amended by an Amendment to Loan and Security Agreement made as of December 31, 1997 by and between the BORROWER and the ASSIGNOR ("FIRST LOAN AMENDMENT") and a Second Amendment to Loan and Security Agreement made as of August 26, 1998 by and between the BORROWER and the ASSIGNOR ("SECOND LOAN AMENDMENT"), the ASSIGNOR extended a loan ("LOAN") in the maximum principal amount of Thirty-Five Million Dollars ($35,000,000.00) to the BORROWER.

R2. The indebtedness owed under the LOAN is secured by: (a) the liens and security interests granted by the BORROWER to the ASSIGNOR pursuant to the LOAN AGREEMENT; and b) the liens and security interests granted by the BORROWER to the ASSIGNOR in an Assignment of Lease As Security made as of November 20, 1997 by and between the BORROWER and the ASSIGNOR ("LEASE ASSIGNMENT").

R3. To perfect the security interests granted by the BORROWER in the LOAN AGREEMENT, ASSIGNOR had its lien noted on the titles to approximately six thousand (6,000) chassis. In addition, ASSIGNOR filed:

   a.   Personal Property Mortgages and Affidavits ("MORTGAGES") in Puerto Rico;
   b.   Financing Statement No. 199739486 filed on November 19, 1997 with the Delaware Secretary of State listing Emerald as Debtor and MBC as Secured Party;
   c.   Financing Statement No. 1803975 filed on November 26, 1997 with the New Jersey Secretary of State listing Emerald as Debtor and MBC as Secured Party;
   d.   Financing Statement No. 1804536 filed on December 3, 1997 with the New

1

Jersey Secretary of State listing Emerald as Debtor and MBC as Secured Party;

e. Financing Statement No. 28240001 filed on November 19, 1997 with the Pennsylvania Secretary of the Commonwealth listing Emerald as Debtor and MBC as Secured Party;

f. Financing Statement No. 97 6000 filed on November 19, 1997 with the Philadelphia County Prothonotary listing Emerald as Debtor and MBC as Secured Party; and

g. Financing Statement No. ST97-3760 filed on November 19, 1997 with the Chester County, PA Prothonotary listing Emerald as Debtor and MBC as Secured Party (collectively, "FINANCING STATEMENTS").

R4.  To perfect the security interests granted by the BORROWER in the LEASE ASSIGNMENT, ASSIGNOR: (a) filed the FINANCING STATEMENTS; (b) maintained continuous possession of the original Equipment Lease Agreement made as of November 18, 1997 by and between BORROWER, as lessor, and NPR, Inc. and Holt Cargo Systems, Inc., as lessees, the Amendment to Equipment Lease Agreement made as of December 31, 1997 by and among the BORROWER, NPR, Inc. ("NPR"), Holt Cargo Systems, Inc. ("CARGO"), the ASSIGNOR, The Holt Group, Inc. ("HGI"), Holt Hauling and Warehousing Systems, Inc. ("HAULING"), Wilmington Stevedores, Inc. ("WILMINGTON"), Murphy Marine Services, Inc. ("MURPHY"), The Riverfront Development Corporation ("RIVERFRONT"), NPR Holding Corporation ("HOLDING"), NPR-Navieras Receivables, Inc. ("NAVIERAS"), and NPR S.A., Inc. ("NSI"), and the Second Amendment to Equipment Lease Agreement made as of August 26, 1998 by and among the BORROWER, NPR, CARGO, the ASSIGNOR, HGI, HAULING, WILMINGTON, MURPHY, RIVERFRONT , HOLDING, NAVIERAS, NSI, NPR S.A., Inc., San Juan International Terminals, Inc., and SJIT, Inc.(collectively, "LEASE"); and (c) obtained NPR's and CARGO's acknowledgment of the assignment of the LEASE in a Lessees' Notice, Consent, and Acknowledgment made as of November 20, 1997 ("LESSEE'S CONSENT"), and an Acknowledgment and Ratification By Lessees dated ____ August, 1998 ("LESSEE'S RATIFICATION").

R5.  The NOTE, the LOAN AGREEMENT, the FIRST LOAN AMENDMENT, the SECOND LOAN AMENDMENT, the LEASE ASSIGNMENT, the MORTGAGES, the FINANCING STATEMENTS, the LESSEES' CONSENT, and the LESSEES' RATIFICATION are hereafter referred to collectively as the "ASSIGNED DOCUMENTS."

## WITNESSETH:

NOW, THEREFORE, in consideration of these premises, the terms and conditions contained herein, and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, the parties hereto, intending to be legally bound, agree as follows:

1.    Recitals.  The Recitals set forth above are true and accurate in every respect and are hereby incorporated into this AGREEMENT by reference.

S:\WLH\18750.Emerald.Loan.Sale.Agr.11.wpd                    2

2.    <u>Assignee's Agreement To Purchase The Loans And The Loan Documents</u>.    The ASSIGNEE agrees to purchase the LOAN and the ASSIGNED DOCUMENTS from the ASSIGNOR on the date of execution of this AGREEMENT, which date shall be no later than November __, 2003 ("CLOSING DEADLINE"), for the sum of: (a) Six Hundred Fifty Thousand Dollars ($650,000.00) ("CASH PORTION"); plus (b) the "SEA STAR PORTION," as defined in Section 3 (collectively, "PURCHASE PRICE").    By executing this AGREEMENT, the ASSIGNEE confirms its agreement to purchase the LOAN and the ASSIGNED DOCUMENTS from the ASSIGNOR, prior to the CLOSING DEADLINE, for a sum equal to the PURCHASE PRICE and pursuant to the other terms and conditions set forth herein.

3.    <u>Sea Star Portion</u>.    The BORROWER alleges that Sea Star Lines, LLC ("SEA STAR") is indebted to the BORROWER for the use of certain equipment securing payment of the LOAN ("EMERALD EQUIPMENT"). ASSIGNOR contends that all accounts, chattel paper, contract rights, documents, general intangibles, and instruments arising from any of the EMERALD EQUIPMENT, including any amounts due from SEA STAR to the BORROWER ("RENT") is ASSIGNOR'S collateral as well. ASSIGNEE agrees to remit to ASSIGNOR as additional consideration for the sale of the LOAN ASSETS twenty percent (20%) of the net amount, after deduction of reasonable attorneys' fees and other reasonable collection expenses, of any RENT collected from SEA STAR or any amount paid by SEA STAR in settlement of claims for RENT and received by ASSIGNEE ("SEA STAR PORTION"). Payments of the SEA STAR PORTION to ASSIGNOR shall be made within five (5) business days after receipt by ASSIGNEE of any payment of RENT or payment in settlement of RENT. The ASSIGNEE'S obligation to pay the SEA STAR PORTION shall not terminate on the maturity date of the PURCHASE NOTE, but shall continue for so long as any claims for RENT remain outstanding and unresolved.

4.    <u>Examination Of Assigned Documents</u>.    The ASSIGNEE acknowledges that it has examined, or had an opportunity to and chose not to examine, copies of each of the ASSIGNED DOCUMENTS prior to the execution of this AGREEMENT.

5.    <u>Sale Of Loans And Assigned Documents To ASSIGNEE</u>.    If: (i) this AGREEMENT is appropriately executed, and acknowledged by the ASSIGNEE and delivered to the ASSIGNOR; (ii) the ASSIGNEE remits to ASSIGNOR by certified check or wire transfer the sum of Two Hundred Fifty Thousand Dollars ($250,000.00) on or before the CLOSING DEADLINE to be applied to the CASH PORTION of the PURCHASE PRICE; and (iii) the ASSIGNEE delivers a promissory note in the amount of Four Hundred Thousand Dollars ($400,000.00) in the form attached hereto as Exhibit A ("PURCHASE NOTE") to ASSIGNOR to evidence ASSIGNEE'S obligation to pay the balance of the CASH PORTION of the PURCHASE PRICE on or before the CLOSING DEADLINE, the ASSIGNOR shall be deemed to have sold, assigned, and transferred to the ASSIGNEE, without recourse, warranty, representation, or guaranty of any kind, other than as specifically provided for in Section 7 of this AGREEMENT, all of the ASSIGNOR's right, title, and interest in and to the LOAN, the ASSIGNED DOCUMENTS, all of ASSIGNOR'S existing property and interests in collateral securing the LOAN (excluding, however, ASSIGNEE'S interest in the collateral that is the subject of "PENDING SALES"

as hereafter defined) and the proceeds of such PENDING SALES), and all existing claims against the BORROWER (collectively, "LOAN ASSETS"). If, however, the ASSIGNEE fails to remit to ASSIGNOR by certified check or wire transfer the sum of Two Hundred Fifty Thousand Dollars ($250,000.00) on or before the CLOSING DEADLINE or fails to deliver the PURCHASE NOTE on or before the CLOSING DEADLINE, then the ASSIGNOR's agreement to sell the LOAN ASSETS to the ASSIGNEE pursuant to the terms and conditions of this AGREEMENT shall be null, void, and of no further force and effect. As used herein, the term "PENDING SALES" means, collectively: (a) the sales of EMERALD EQUIPMENT listed on Exhibit B-1 in which the bill of sale or schedule thereto is dated on or before October 31, 2003, but the proceeds were received by the ASSIGNOR after October 31, 2003; and (b) the sales of EMERALD EQUIPMENT listed on Exhibit B-2 for which the ASSIGNOR received the proceeds on or before October 31, 2003, but for which the ASSIGNOR had not yet delivered certificates of title or other documents necessary to convey the EMERALD EQUIPMENT to the purchasers prior to the November 1, 2003 effective date of this AGREEMENT.

6. Indemnification; Expense Allocation; Sea Star Claims.

6.1. Sea Star Indemnification. Pursuant to an Indemnity Agreement dated as of September 20, 2002 ("SEA STAR INDEMNITY"), ASSIGNOR agreed that if any trustee appointed in the case under the United States Bankruptcy Code pending in the United States Bankruptcy Court for the District of Delaware (the "BANKRUPTCY COURT") and known as "In re MUMA Services, Inc. (f/k/a Murphy Marine Services, Inc), Case Nos. 01-00926 through 01-00950 (Jointly Administered)" ("BANKRUPTCY CASE"), any party named as a defendant in any interpleader action instituted by SEA STAR in the BANKRUPTCY CASE, the Official Committee of Unsecured Creditors in the BANKRUPTCY CASE, BORROWER, NPR, CARGO, or any party claiming through or under them (jointly and severally, "COMPETING CLAIMANTS") asserted any claim, cause of action, liability, or damages against SEA STAR relating to any COMPETING CLAIMANT'S alleged entitlement to compensation for use of EMERALD EQUIPMENT during any period for which SEA STAR had paid ASSIGNOR pursuant to the SEA STAR INDEMNITY (a "PROCEEDING"), ASSIGNOR would defend the PROCEEDING at its expense. ASSIGNOR further agreed that if the BANKRUPTCY COURT or any other court of competent jurisdiction (a "COURT") determined in a PROCEEDING that a COMPETING CLAIMANT was entitled to be compensated for use of any EMERALD EQUIPMENT for any period for which SEA STAR had paid ASSIGNOR pursuant to the SEA STAR INDEMNITY, within five (5) business days after receipt by ASSIGNOR of written demand by SEA STAR, ASSIGNOR would remit to SEA STAR by certified check, cashier's check, or wire transfer: (a) the lesser of: (i) the amount to which the COURT determined the COMPETING CLAIMANT was entitled for that period; or (ii) the amount paid by SEA STAR to ASSIGNOR pursuant to the SEA STAR INDEMNITY for use of the pertinent item or items of EMERALD EQUIPMENT during that period (the "INDEMNITY PRINCIPAL AMOUNT"); plus (b) any interest on any INDEMNITY PRINCIPAL AMOUNT that a COURT determined was due to a COMPETING CLAIMANT. ASSIGNEE agrees that only in the event that MBC is obligated to indemnify SEA STAR under the SEA STAR INDEMNITY as a result of a PROCEEDING in which the COMPETING CLAIMANT is the ASSIGNEE, EMERALD or a

successor or assign of the ASSIGNEE or EMERALD (an "EMERALD CLAIMANT"), within five (5) business days after written demand by ASSIGNOR, ASSIGNEE will remit to ASSIGNOR by certified check or wire transfer the sum of: (a) any amount due from ASSIGNOR to SEA STAR under the SEA STAR INDEMNITY; plus (b) the amount of any costs or expenses, including reasonable attorneys' fees, incurred by ASSIGNOR in defending against any claim by such EMERALD CLAIMANT or in defending any claim asserted by SEA STAR under the SEA STAR INDEMNITY arising out of the claim of such EMERALD CLAIMANT; minus (c) the amount of any SEA STAR PORTION attributable to use of the pertinent item or items of EMERALD EQUIPMENT during the period that is the subject of such EMERALD CLAIMANT'S claim, if any, that the ASSIGNEE has paid to the ASSIGNOR.  For purposes of illustration, if a COURT awards a particular EMERALD CLAIMANT One Hundred Fifty Dollars ($150.00) for use of container number XXX for the period of May 1, 2001 through May 4, 2001, ASSIGNEE has collected One Hundred Dollars ($100.00) in RENT from SEA STAR, net of collection expenses, for use of that same container during the same period and has remitted Twenty Dollars ($20.00) to ASSIGNOR, within five (5) business days after demand by ASSIGNOR, ASSIGNEE shall remit to ASSIGNOR One Hundred Thirty Dollars ($130.00) plus the amount of any costs or expenses, including reasonable attorneys' fees, incurred by ASSIGNEE in defending against the claim by such EMERALD CLAIMANT or in defending any claim asserted by SEA STAR under the SEA STAR INDEMNITY arising out of the claim of such EMERALD CLAIMANT.

      6.2.    <u>Miscellaneous Indemnification</u>.  The ASSIGNEE shall pay, within five (5) business days after demand by ASSIGNOR, and shall indemnify and hold the ASSIGNOR harmless against, all costs and expenses of storing, insuring, maintaining, repairing, selling, or preparing for sale any of the EMERALD EQUIPMENT, including, without limitation, charges of Greenwich Terminals, LLC, incurred on or after November 1, 2003.  ASSIGNOR shall use reasonable efforts  to deliver: (a) Maine registrations; or (b) certificates of title or other documents necessary to convey the EMERALD EQUIPMENT to the purchaser in any transaction listed on Exhibit B-2. If the ASSIGNOR is: (a) unable to deliver Maine registrations or certificates of title or other documents necessary to convey the EMERALD EQUIPMENT to the purchaser in any transaction listed on Exhibit B-2; or (b) is able to deliver only Maine registrations and Maine registrations are not acceptable to the purchaser, the ASSIGNEE shall, upon request of the purchaser or the ASSIGNOR, either: (a) refund to the purchaser the purchase price previously paid to the ASSIGNOR as reflected on Exhibit B-2; or (b) deliver to such purchaser certificates of title or other documents necessary to convey to the purchaser substitute EMERALD EQUIPMENT acceptable to the purchaser. The ASSIGNEE shall indemnify and hold the ASSIGNOR harmless against, any and all claims asserted against the ASSIGNOR by purchasers in transactions listed on Exhibit B-2 and all costs and expenses incurred by the ASSIGNOR in connection with such claims, including reasonable attorneys' fees.

      6.3.    <u>No Competing Claim Against Sea Star</u>.  ASSIGNEE agrees not to assert any entitlement to compensation from SEA STAR for use of EMERALD EQUIPMENT during any period for which SEA STAR had paid ASSIGNOR pursuant to the SEA STAR INDEMNITY.

7. <u>Representations And Warranties By ASSIGNOR</u>. The ASSIGNOR represents and warrants to the ASSIGNEE as follows:

a. According to the ASSIGNOR'S books and records, as of October 31, 2003, the amount of advanced and unpaid principal due and owing by the BORROWER in connection with the LOAN is Two Million Eight Hundred Ninety-Two Thousand Six Hundred Sixty-Two Dollars and Sixteen Cents ($2,892,662.16), the amount of late charges due is Eight Hundred Twenty-One Thousand Nine Hundred Sixty-Nine Dollars and Seventy-Three Cents ($821,969.73), and the amount of accrued and unpaid interest due and owing is Nine Hundred Fifteen Thousand Five Hundred Thirty-Two Dollars and Sixty-One Cents ($915,532.61). The interest per diem for the LOAN is Seven Hundred Thirty-Four Dollars and Fifty-Six Cents ($734.56). However, the BORROWER may make additional payments on account of the LOAN after the date of this AGREEMENT and prior to the purchase of the LOAN ASSETS by the ASSIGNEE or ASSIGNOR may receive proceeds of PENDING SALES which will affect both the principal balance due and the rate at which interest accrues thereon. Furthermore, the ASSIGNOR is holding unapplied proceeds of sale of EMERALD EQUIPMENT pending receipt and payment of bills for expenses incurred before the November 1, 2003 effective date of this AGREEMENT that are the responsibility of the ASSIGNOR under this AGREEMENT and the responsibility of the BORROWER under the ASSIGNED DOCUMENTS. Following receipt and payment of such bills, the ASSIGNOR shall report to the ASSIGNEE the amount of the remaining unapplied cash, which ASSIGNOR warrants will not exceed Ninety Thousand Dollars ($90,000.00), and that amount shall be deemed to have been received by the ASSIGNEE and applied to reduce the balance due on the LOAN. At the time of the purchase of the LOAN ASSETS by the ASSIGNEE, the ASSIGNOR shall provide the ASSIGNEE with a further representation as to the balance due on the LOAN as of the date of such representation.

b. The ASSIGNOR has good title to, and is the sole owner of, each of the LOAN ASSETS, and the ASSIGNOR has not transferred, assigned, or hypothecated its interest in any of the LOAN ASSETS except that ASSIGNOR has sold participations in the LOAN to parties who have authorized ASSIGNOR to transfer the LOAN ASSETS to the ASSIGNEE on the terms and conditions set forth in this AGREEMENT.

c. The ASSIGNOR has full power and authority to execute, deliver, and perform its obligations under this AGREEMENT and all documents executed in connection herewith, and to sell the LOAN ASSETS to the ASSIGNEE, and the officer executing and delivering this AGREEMENT and any other documents in connection herewith on behalf of the ASSIGNOR has been duly authorized to do so, and this AGREEMENT and all such documents are (or shall be, upon execution and delivery) valid and binding obligations of the ASSIGNOR, enforceable against the ASSIGNOR in accordance with their respective terms.

d. Exhibits B-1, B-2, and C are, collectively, a true, complete, and accurate generic listing of all equipment in which EMERALD granted the ASSIGNOR security interests in the LOAN

AGREEMENT that ASSIGNOR has sold or agreed to sell pursuant to Article 9 of the <u>Uniform Commercial Code</u>.

   e.  Exhibit D is a true, complete, and accurate list of all items of equipment in which EMERALD granted the ASSIGNOR security interests in the LOAN AGREEMENT for which ASSIGNOR had original certificates of title reflecting EMERALD as owner and the ASSIGNOR as lienholder in its possession as of October 31, 2003. Since October 31, 2003, the ASSIGNOR has relinquished or agreed to relinquish certificates of title to items of equipment listed on Exhibit D only in sale transactions, the proceeds of which will be applied to the CASH PORTION of the PURCHASE PRICE.

  8. <u>Representations And Warranties By ASSIGNEE</u>. In addition to the representations and warranties in Sections 11 and 22 of this AGREEMENT, the ASSIGNEE represents and warrants to the ASSIGNOR as follows:

   a.  The ASSIGNEE has full power and authority to execute, deliver, and perform its obligations under this AGREEMENT and all documents executed in connection herewith, and to purchase the LOAN ASSETS from the ASSIGNOR, and this AGREEMENT and all such documents are (or shall be, upon execution and delivery) valid and binding obligations of the ASSIGNEE, enforceable against the ASSIGNEE in accordance with their respective terms.

   b.  The ASSIGNEE is represented by counsel of its choice and has exercised its own independent judgment, as determined by it to be necessary and advisable, in its decision to enter into this AGREEMENT.

   c.  The ASSIGNEE has reviewed copies of each of the ASSIGNED DOCUMENTS prior to executing this AGREEMENT or has been afforded an opportunity to review such documents and elected not to do so.

   d.  The ASSIGNEE has not relied on any representations or warranties by the ASSIGNOR regarding the enforceability of the ASSIGNED DOCUMENTS, the creditworthiness of the BORROWER, the existence, nature, or value of any collateral for the LOAN, the existence, validity, or priority of any liens securing the LOAN, or any other matter not specifically set forth in Section 5 above.

   e.  The ASSIGNEE (either alone or with the ASSIGNEE's attorneys, accountants, or other advisors) possesses the requisite business and investment knowledge and experience to evaluate the potential risks and merits of its purchase of the LOAN ASSETS.

   f.  The ASSIGNEE has sufficient financial ability and net worth to bear the economic risk of its investment in the LOAN ASSETS for an indefinite period of time and to withstand a total loss of such investment.

g.      The ASSIGNEE is purchasing the LOAN ASSETS for his own account and not with a view toward transferring the LOAN ASSETS to any other party.

h.      The ASSIGNEE acknowledges that none of the LOAN ASSETS has been registered under any securities laws and agrees that he will not sell or transfer any of the LOAN ASSETS except in accordance with any applicable securities laws or in a transaction exempt from all securities laws.

9.      Closing. The parties hereto agree that they shall do the following things in the following order:

a.      Prior to the CLOSING DEADLINE, the ASSIGNEE shall execute and deliver the original AGREEMENT to the ASSIGNOR;

b.      The ASSIGNEE shall pay the CASH PORTION of the PURCHASE PRICE by remitting the sum of Two Hundred Fifty Thousand Dollars ($250,000.00) to ASSIGNOR by certified check or wire transfer and delivering to the ASSIGNOR the PURCHASE NOTE;

c.      The ASSIGNEE shall then execute and deliver to the ASSIGNOR a Security Agreement in the form attached hereto as Exhibit "E" and incorporated by reference herein and such other documents as the ASSIGNOR may require to secure the ASSIGNEE'S obligations to the ASSIGNOR under the PURCHASE NOTE and authorize ASSIGNOR to file Financing Statements in the form attached hereto as Exhibit "F" and incorporated by reference herein;

d.      The ASSIGNOR shall execute and deliver to the ASSIGNEE, on or before the CLOSING DEADLINE, a fully executed copy of the AGREEMENT and the original NOTE endorsed as follows:

> "For value received, pay to the order of Storage Transfer, LLC, without recourse, representation, warranty, or guaranty of any kind, other than as set forth in Section 7 of the Loan Sale and Assignment Agreement dated as of November 1, 2003 by and between MBC Leasing Corp., a Maryland corporation, and Storage Transfer, LLC."

> MBC LEASING CORP.,
> A Maryland Corporation

> By: _____(SEAL)
> Name: _____
> Title: _____
> Date: _____

e.    The ASSIGNOR shall execute and deliver to the ASSIGNEE such additional documents as are reasonably necessary to transfer ownership of the LOAN ASSETS to the ASSIGNEE, including UCC-3 assignments of the FINANCING STATEMENTS, provided, however, that nothing in this AGREEMENT shall require the ASSIGNOR to release its lien on any piece of EMERALD EQUIPMENT that is titled except upon: (a) payment in full of the CASH PORTION of the PURCHASE PRICE; (b) sale of such EMERALD EQUIPMENT by the ASSIGNEE; or (c) (i) sale of such EMERALD EQUIPMENT by the BORROWER; and (ii) the written request of the ASSIGNEE.

f.    The ASSIGNOR shall deliver to the ASSIGNEE all executed originals of the ASSIGNED DOCUMENTS; and

g.    The ASSIGNEE shall then execute and deliver to the ASSIGNOR a fully executed original Acknowledgment of Receipt of Original Loan Documents.

The occurrence of all of the events listed in this Section 9 shall be referred to as the "CLOSING."

10.    <u>Agreement to Pay Assignor's Expenses</u>.  The ASSIGNEE shall pay all out-of-pocket expenses or costs incurred by the ASSIGNOR arising out of, pertaining to, or in any way connected with this AGREEMENT, any documents executed in connection herewith or transactions hereunder, or the purchase of the ASSIGNED DOCUMENTS and the LOAN by the ASSIGNEE including, without limitation, attorneys' fees and expenses incurred by the ASSIGNOR in obtaining advice or the services of its attorneys with respect to the structuring, drafting, negotiating, reviewing, amending, terminating, enforcing or defending of this AGREEMENT, or any portion hereof or any agreement or matter related hereto.

11.    <u>No Brokerage Fee</u>.  The ASSIGNOR and the ASSIGNEE represent and warrant to one another that they have not employed the services of any broker or agent in connection with this transaction and that neither has any knowledge of any commission payable as a result this transaction.

12.    <u>Notices</u>.  Any notice required or permitted by or in connection with this AGREEMENT shall be in writing and shall be made by facsimile (confirmed on the date the facsimile is sent by one of the other methods of giving notice provided for in this Section) or by hand delivery, by Federal Express, or other similar overnight delivery service, or by certified mail, unrestricted delivery, return receipt requested, postage prepaid, addressed to the respective parties at the appropriate addresses set forth below or to such other address as may be hereafter specified by written notice by the respective parties. Notice shall be considered given as of the date of the facsimile or the hand delivery, one (1) calendar day after delivery to Federal Express or similar overnight delivery service, or three (3) calendar days after the date of mailing, independent of the date of actual delivery or whether delivery is ever in fact made, as the case may be, provided the giver of notice can establish the fact that notice was sent as provided herein.  If notice is tendered pursuant to the provisions of this Section and is refused by the intended recipient thereof, the notice, nevertheless, shall be considered to have been given and shall be effective as of the date herein provided.

If to the ASSIGNOR:

    MBC LEASING CORP.
    2 Hopkins Plaza, 5th Floor
    Baltimore, Maryland 21201
    Attention: Scott H. Krieger

If to the ASSIGNEE:

    STORAGE TRANSFER, LLC
    7900 Old York Road, A12B
    Elkins Park, Pennsylvania 19027

13.    <u>Waivers</u>. No waiver or indulgence by the ASSIGNOR or the ASSIGNEE at any time and from time to time shall constitute, unless specifically so expressed by the that party in writing, a future waiver of performance or exact performance by the other party.

14.    <u>No Third Party Beneficiary Rights</u>. No person not a party to this AGREEMENT shall have any benefit hereunder nor have third party beneficiary rights as a result of this AGREEMENT.

15.    <u>Binding Obligation</u>. This AGREEMENT shall be binding upon the parties hereto and their respective heirs, personal representatives, successors, and assigns.

16.    <u>Final Agreement</u>. This AGREEMENT and the various documents executed and delivered by the ASSIGNOR or the ASSIGNEE pursuant to this AGREEMENT contain the final and entire agreement and understanding of the parties with respect to the matters addressed herein or therein, and any terms and conditions not set forth in this AGREEMENT or the various documents executed and delivered by the ASSIGNOR or the ASSIGNEE pursuant to this AGREEMENT are not a part of the agreement and understanding of the parties hereto.

17.    <u>Amendment</u>. This AGREEMENT may be amended or altered only by a writing signed by the party to be bound by the change or alteration.

18.    <u>Choice Of Law</u>. The laws of the State of Maryland (excluding, however, conflict of law principles) shall govern and be applied to determine all issues relating to this AGREEMENT and the rights and obligations of the parties hereto, including the validity, construction, interpretation, and enforceability of this AGREEMENT and its various provisions and the consequences and legal effect of all transactions and events which resulted in the execution of this AGREEMENT or which occurred or were to occur as a direct or indirect result of this AGREEMENT having been executed.

19.    <u>Invalidity Of Any Part</u>. If any provision or part of any provision of this AGREEMENT shall

for any reason be held invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provisions of this AGREEMENT, and this AGREEMENT shall be construed as if such invalid, illegal, or unenforceable provision or part thereof had never been contained herein, but only to the extent of its invalidity, illegality, or unenforceability.

20.     Time.  Time is of the essence with respect to this AGREEMENT and the terms and conditions hereof.

21.     Tense, Gender, Defined Terms, Captions, Effective Dates, Execution in Counterparts and Via Facsimile; Miscellaneous.  As used herein, the plural shall refer to and include the singular, and the singular the plural, and the use of any gender shall include and refer to any other gender.  All defined terms are completely capitalized throughout this AGREEMENT.  All captions are for the purpose of convenience only.  This AGREEMENT may be executed and delivered in counterparts, and signed counterparts may be delivered via facsimile, with all executed counterparts delivered via facsimile to be deemed to have the same force and effect as if bearing original signatures.

22.     Effect of Bankruptcy of the Borrower and Lessees.  The ASSIGNEE acknowledges that he is aware that the BORROWER is the subject of a case under Chapter 11 of the United States Bankruptcy Code in the BANKRUPTCY COURT ("EMERALD CASE") and that NPR, CARGO, HGI, HAULING, WILMINGTON, MURPHY, RIVERFRONT , HOLDING, NAVIERAS, NSI, NPR S.A., Inc., San Juan International Terminals, Inc., and SJIT, Inc. are the subject of the BANKRUPTCY CASE.  The ASSIGNEE further acknowledges that, as a result of the EMERALD CASE and the BANKRUPTCY CASE (collectively, "CASES"), some or all of the rights and remedies afforded by the ASSIGNED DOCUMENTS may be extinguished and that deadlines may be or may have been established in the BANKRUPTCY CASES for the filing of Proofs of Claim, the filing of Complaints seeking denial of discharge or a determination of dischargeability of debts, or other matters which, if not met, also may extinguish or impair rights and remedies afforded by the ASSIGNED DOCUMENTS.  The ASSIGNEE acknowledges and agree that the ASSIGNOR has made no representations or warranties of any kind with respect to: (a) the ability of the ASSIGNEE to enforce any rights or remedies afforded by the ASSIGNED DOCUMENTS in the CASES or as a consequence thereof; (b) any action or failure to act by the ASSIGNOR in the CASES or as a consequence thereof; or (c) the likely effect of the CASES on the LOAN ASSETS.  The ASSIGNEE has had the opportunity to conduct such investigations and examinations as he deems appropriate to assess the effect of the CASES on the LOAN ASSETS and the transactions contemplated in this AGREEMENT and agrees that the CASES shall not impair or affect his obligations to the ASSIGNOR under this AGREEMENT or any related document or agreement.  The ASSIGNOR agrees that, notwithstanding the transfer of the ASSIGNED DOCUMENTS to the ASSIGNEE, the ASSIGNOR shall remain responsible for performing, and shall perform, any obligation to report or account to the debtor-in-possession or trustee, as applicable, in the CASES for any activity relating to the ASSIGNED DOCUMENTS or the collateral securing EMERALD'S obligations thereunder that occurred prior to November 1, 2003.    The ASSIGNEE agrees that it shall be responsible for performing, and shall perform, any obligation to report or account to the debtor-in-possession or trustee,

S:\WLH\18750.Emerald.Loan.Sale.Agr.11.wpd                    11

as applicable, in the CASES for any activity relating to the ASSIGNED DOCUMENTS or the collateral securing EMERALD'S obligations thereunder that occurs on or after November 1, 2003 for which the ASSIGNOR otherwise would have been responsible had it continued to hold the ASSIGNED DOCUMENTS.

23.    Release.  The ASSIGNEE releases, acquits, exonerates and forever discharges the ASSIGNOR, all of the INDEMNIFIED LENDER PARTIES from any and all claims, causes of action, suits and damages (including claims for attorneys' fees) which the ASSIGNEE, jointly or severally, ever had or now have against any or all of the INDEMNIFIED LENDER PARTIES, jointly or severally, including, without limitation, all claims arising out of or related to the LOAN, the ASSIGNED DOCUMENTS, the administration thereof, or any acts or omissions of the ASSIGNOR relating thereto.

24.    Waiver Of Trial By Jury.  Each party to this AGREEMENT agrees that any suit, action, or proceeding, whether claim or counterclaim, brought or instituted by or against either party hereto or any successor or assign of any party on or with respect to this AGREEMENT or any of the LOAN ASSETS or which in any way relates, directly or indirectly, to the sale of the LOAN ASSETS (or any of them) or any event, transaction, or occurrence arising out of or in any way connected with the sale of the LOAN ASSETS (or any of them), or the dealings of the parties with respect thereto, shall be tried only by a court and not by a jury. **EACH PARTY HERETO EXPRESSLY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY SUCH SUIT, ACTION, OR PROCEEDING.**  The ASSIGNOR and the ASSIGNEE acknowledge and agree that this provision is a specific and material aspect of the agreement among the parties hereto and that none of the parties hereto would enter into the transactions contemplated by this AGREEMENT if this provision were not part of their agreement.

IN WITNESS WHEREOF, the parties hereto have executed this AGREEMENT under seal as of date first above written.

WITNESS/ATTEST:                ASSIGNOR:

                               MBC LEASING CORP.,
                               A Maryland Corporation

                               By: _____ (SEAL)
                               Name: _Scott H. Kriage_____
                               Title: _Treasurer / Asst Sec._

**ASSIGNEE:**

STORAGE TRANSFER, LLC,
A Pennsylvania Limited Liability Company

By: _____ (SEAL)
Name: _____
Title: _____


## ACKNOWLEDGMENTS

STATE OF MARYLAND, CITY/COUNTY OF _Baltimore_, TO WIT:

I HEREBY CERTIFY that on this _15th_ day of _December_____, 2003, before me, the undersigned Notary Public of the State of Maryland, personally appeared _Scott H. Kniger_, and acknowledged himself to be a _Treas/Ass. Sec._, of MBC LEASING CORP., a Maryland corporation, and that he, as such _Treas/Ass Sec_, being authorized so to do, executed the foregoing instrument for the purposes therein contained by signing the name of MBC LEASING CORP. by himself as _Treas/Ass Sec._.

IN WITNESS MY Hand and Notarial Seal.

_____ (SEAL)
NOTARY PUBLIC

My Commission Expires:
_5-1-07_

STATE OF _Pa_____, CITY/COUNTY OF _Montgomery_ TO WIT:

    I HEREBY CERTIFY that on this _4th_ day of _December_____, 2003, before me, the undersigned Notary Public of the State of _____, personally appeared _____, and acknowledged himself to be a _____, of STORAGE TRANSFER, LLC, a Pennsylvania limited liability company, and that he, as such _____, being authorized so to do, executed the foregoing instrument for the purposes therein contained by signing the name of STORAGE TRANSFER, LLC by himself as _____.

    IN WITNESS MY Hand and Notarial Seal.

_____(SEAL)
NOTARY PUBLIC

My Commission Expires:

> Notarial Seal
> Miriam Baroff, Notary Public
> Jenkintown Boro, Montgomery County
> My Commission Expires Sept. 9, 2004
> Member, Pennsylvania Association of Notaries

## Exhibit B-1

| Buyer | Bill of Sale Date | Funds Received | Amount Received |
|---|---|---|---|
| Jose Lorenzame | October 16, 2003 | November 10, 2003 | $650.00 |
| Jorge Diaz | October 22, 2003 | November 10, 2003 | $1,200.00 |
| Green Hills Spring Water | October 9, 2003 | November 10, 2003 | $2,850.00 |
| J. Maqueda & Associates, Inc. | October 8, 2003 | November 10, 2003 | $3,950.00 |
| J. Maqueda & Associates, Inc. | October 17, 2003 | November 10, 2003 | $13,200.00 |
| | | November 24,2003 | $100.00 |
| Action Trophy | October 9, 2003 | November 24,2003 | $400.00 |
| H-K Orintal | ?/ck dated 10/30/03 | November 24,2003 | $1,500.00 |

# EXHIBIT D

09/24/2003 16:25 FAX 4102375319    COLLATERAL REVIEW    ☐ 001

# TELECOPY COVER SHEET



## MERCANTILE-SAFE DEPOSIT AND TRUST COMPANY
### 2 HOPKINS PLAZA/P.O. BOX 1451
### BALTIMORE, MARYLAND 21203
### (410) 237-5784
### (410) 237-5319 (FAX)

DATE:  9/24/03

TO:  Art Davis

FAX NUMBER:  856 - 742 - 9401

FROM:  Scott Krieger    (410) 237-

NUMBER OF PAGES:    (Including cover sheet)

MESSAGE:  Draft of Hallam's Response. Just please make sure you are not claiming payment for units and time periods covered under self billing reports from Sea Star. Thanks, Scott

## CONFIDENTIALITY NOTICE

The documents accompanying this telecopy transmission contain confidential information belonging to the sender which is legally privileged. The information is intended only for the use of the individual or entity named above. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or the taking of any action in reliance on the contents of this telecopied information is strictly prohibited. If you have received this telecopy in error, please immediately notify us by telephone to arrange for return of the original documents to us.

## WARNING

Interception of telephonic communications could be a violation of Maryland and Federal laws.

E 006788

# EXHIBIT E

MERCANTILE-SAFE DEPOSIT & TRUST COMPANY

Scott H. Krieger
Senior Vice President
(410) 237-5694
Fax: (410) 237-5319

July 19, 2002

Mr. Phil Bates
Sea Star Line, LLC
100 Bell Tel Way
Suite 300
Jacksonville, FL 32216

Dear Phil:

Please be advised that Greenwich Terminals, LLC is authorized as MBC Leasing Corp.'s agent for the following purposes:

    1.   Assembling and storing Emerald Leasing's equipment

    2.   Soliciting purchasers and selling the Emerald Leasing equipment

The authorized representatives of Greenwich Terminals, LLC are:

                      Thomas Holt, Jr.
                      Arthur Davis
                      Martin McDonald

Please feel free to call me with any questions you may have. Thank you.

Sincerely,

Scott H. Krieger
Senior Vice President

cc:    Thomas Holt, Jr.

SHK:swl
S:1

Two Hopkins Plaza / P.O. Box 1451 / Baltimore, Maryland 21203
Affiliate Mercantile Bankshares Corporation / Member FDIC

SE50578

# EXHIBIT F

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

IN RE:                                    *    Chapter 11

MURPHY MARINE SERVICES,                   *    Case Nos.: 01-00926 through
INC., et al.,                                  01-00950 (MFW)
                    Debtors.              *    (Jointly Administered)

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

### ORDER TERMINATING THE AUTOMATIC STAY AS TO MBC LEASING CORP. AND CERTAIN ASSETS OF THE DEBTORS

Upon consideration of the Second Motion of MBC Leasing Corp. for Relief from the Automatic Stay ("Motion") filed herein by MBC Leasing Corp. ("MBC"), and any opposition thereto, and good cause having been shown, it is this 72 day of _____, 2002, by the United States Bankruptcy Court for the District of Delaware,

ORDERED, that the Motion is hereby GRANTED in its entirety effective as of April 29, 2002; and it is further

ORDERED, that the automatic stay of 11 U.S.C. § 362 is hereby terminated in the above-captioned bankruptcy case effective as of April 29, 2002 as to MBC and the 426 twenty foot steel dry van containers, 990 Onan refrigerator "gensets," 910 forty foot steel dry van containers, 1,147 forty foot steel high cube dry van containers, 945 forty-five foot steel dry van containers, 396 forty-five foot aluminum dry van containers, 972 refrigerated containers, and 6,741 chassis described in the Loan and Security Agreement dated as of November 20, 1997 by and between Emerald Equipment Leasing, Inc. and MBC described in the Motion (the "Equipment"), and it is further

ORDERED, that MBC is immediately entitled to exercise and enforce all of its rights and remedies against the Equipment pursuant to the terms and conditions of the Loan and Security

Agreement dated as of November 20, 1997 and the various related loan documents referenced in

MBC's Motion (collectively, the "Loan Documents") and applicable law, including, without

limitation, removing the Equipment from the possession of Emerald Equipment Leasing, Inc.

("Emerald"), NPR, Inc., and Holt Cargo Systems, Inc., selling the Equipment, and applying the

proceeds arising therefrom to reduce the indebtedness that is owed by Emerald to MBC under the

Loan Documents, and it is further

ORDERED, that MBC shall deposit any proceeds of sale of the Equipment in excess of

the amount necessary to satisfy the outstanding balance due under the Loan Documents, if any, to

Emerald Equipment Leasing, Inc. to be held pending further Order of this Court; and it is further

ORDERED, that the effect of this Order shall not be stayed until the expiration of ten

(10) days after the entry thereof pursuant to Rule 4001(a)(3) of the Federal Rules of Bankruptcy

Procedure, but shall be effective immediately upon entry.


MARY F. WALRATH,
JUDGE, UNITED STATES BANKRUPTCY
COURT FOR THE DISTRICT OF DELAWARE

# EXHIBIT G

Post Office Box 42550
Philadelphia, PA 19101-2550

FAX:  904-724-3007                                        June 11, 2002

Mr. Phil Bates
SEA STAR
100 Bell Tel Way, Suite 300
Jacksonville, FL  32216

Dear Mr. Bates:

Please remit a check in accordance with the attached letter from MBC Leasing, Corp.

                                        Regards,

                                        GREENWICH TERMINALS LLC

                                        Thomas J. Holt, Jr.

TJH,JR/MKC
Enclosure (2 pages)

Telephone 856-742-3000 · Telefax 856-742-3291

EXHIBIT "D"

 MBC LEASING CORP.

June 10, 2002

Mr. Thomas Holt, Sr., President
Emerald Equipment Leasing Company
101 S. King Street
Gloucester City, New Jersey 08030

Dear Tom:

Any money due from Sea Star for use of any of containers, gensets, and chassis previously leased by Emerald Equipment Leasing to NPR, Inc. and Holt Cargo Systems for a purpose other than completing shipments in progress on April 27 when Sea Star purchased certain assets of NPR and Holt Cargo should be paid directly to MBC Leasing. Any money due from Sea Star for use of any of the Emerald equipment to complete shipments in progress on April 27 should be paid in accordance with the memorandum that MBC understands exists between Sea Star and NPR, Holt Cargo, and possibly other affiliates to be allocated in accordance with the Bankruptcy Court's ruling on the allocation of the proceeds of sale to Sea Star.

Any money due from Sea Star for use of any of the 700 forty foot dry van containers and the 283 forty-five foot dry van containers MBC previously leased to NPR and Holt Cargo after May 15, 2002 for a purpose other than completing shipments in progress on April 27 should also be paid directly to MBC. Note that MBC believes it is entitled to money due from Sea Star for any use of the MBC equipment on or after April 27, 2002 through May 15, 2002 for a purpose other than completing shipments in progress on April 27. However, NPR and Holt Cargo may disagree because rejection of the MBC lease was effective May 15, 2002. Consequently, MBC is not insisting that money due from Sea Star for any use of the MBC equipment on or after April 27, 2002 through May 15, 2002 for a purpose other than completing shipments in progress on April 27 be paid to it at this time, but reserves all claims to that money.

Payments to MBC should be sent to me at 2 Hopkins Plaza, 5th Floor, Baltimore, Maryland 21201.

Sincerely,

Scott H. Krieger
Treasurer & Assistant Secretary

SHK:sw
E:1

EXHIBIT "C"

# EXHIBIT H

## INDEMNITY AGREEMENT

This Indemnity Agreement ("AGREEMENT") is made of this 29th day of September, 2002 by and between MBC LEASING CORP., a Maryland corporation ("MBC"), and SEA STAR LINE, LLC, a Delaware limited liability company ("SEA STAR").

## EXPLANATORY STATEMENT

EMERALD EQUIPMENT LEASING, INC. ("EMERALD") leased 426 twenty foot steel dry van containers, 990 Onan refrigerator "gensets," 910 forty foot steel dry van containers, 1,457 forty foot steel high cube dry van containers, 945 forty-five foot steel dry van containers, 396 forty-five foot aluminum dry van containers, 972 refrigerated containers, and 6,741 chassis (the "EMERALD EQUIPMENT") to NPR, INC. and HOLT CARGO SYSTEMS, INC. ("HOLT CARGO") pursuant to an Equipment Lease Agreement made as of November 18, 1997.

MBC leased 700 forty foot dry van containers and 283 forty-five foot dry van containers (the "MBC EQUIPMENT") to NPR, INC. and HOLT CARGO pursuant to an Equipment Lease Agreement dated as of March 18, 1999.

EMERALD, NPR, INC., and HOLT CARGO are all the subject of proceedings under the United States Bankruptcy Code pending in the United States Bankruptcy Court for the District of Delaware (the "BANKRUPTCY COURT") and known as "In re MUMA Services, Inc. (f/k/a Murphy Marine Services, Inc), Case Nos. 01-00926 through 01-00950 (Jointly Administered)" (the "BANKRUPTCY CASE").

On or about April 27, 2002, pursuant to an Order entered by the BANKRUPTCY COURT in the BANKRUPTCY CASE, SEA STAR purchased certain assets of NPR, INC. and HOLT CARGO, which assets did not include any of the EMERALD EQUIPMENT or the MBC EQUIPMENT. At the time that SEA STAR purchased assets, NPR, INC. and HOLT CARGO delivered certain of the EMERALD EQUIPMENT and the MBC EQUIPMENT into the possession of SEA STAR.

MBC has demanded that SEA STAR pay MBC for the use by SEA STAR of any EMERALD EQUIPMENT or MBC EQUIPMENT on or after April 27, 2002. Although SEA STAR is willing to pay for the use of such of the EMERALD EQUIPMENT and the MBC EQUIPMENT as SEA STAR has used on or after April 27, 2002 at the rates specified below, SEA STAR is unwilling to pay MBC unless it is assured that it will not be required to pay for the same use by any trustee appointed in the BANKRUPTCY CASE, any party named as a defendant in any interpleader action instituted by SEA STAR in the BANKRUPTCY CASE, the Official Committee of Unsecured Creditors in the BANKRUPTCY CASE (the "COMMITTEE"), EMERALD, NPR, INC., HOLT CARGO, or any party claiming through or under them (jointly and severally, "COMPETING

1



CLAIMANTS"). . MBC is willing to indemnify SEA STAR against claims by COMPETING
CLAIMANTS on the terms and conditions set forth in this AGREEMENT to induce SEA
STAR to pay MBC for the use of the EMERALD EQUIPMENT and the MBC
EQUIPMENT on or after April 27, 2002 immediately.

NOW, THEREFORE, in consideration of the premises, the parties hereto agree
as follows:

1.      Agreement to Pay for Use of Equipment.  Upon execution of this
AGREEMENT, SEA STAR will remit to MBC by certified check, cashier's check, or wire
transfer: (a) for each item of the EMERALD EQUIPMENT used during the period of
April 27, 2002 through and including July 31, 2002, the amount determined by
multiplying the applicable daily rate specified on "Equipment Schedule A" attached
hereto and incorporated herein (the "EMERALD SCHEDULE") by the number of days
during that period in which such item of EMERALD EQUIPMENT was used; plus (b) for
each item of the MBC EQUIPMENT used during the period of April 27, 2002 through
and including July 31, 2002, the amount determined by multiplying the applicable daily
rate specified on "Equipment Schedule B" attached hereto and incorporated herein (the
"MBC SCHEDULE") by the number of days during that period in which such item of
MBC EQUIPMENT was used after deduction of such reasonable charges as are due to
SEA STAR for storage and handling of EMERALD EQUIPMENT and MBC
EQUIPMENT.  . Beginning on August 31, 2002 and continuing on the last day of each
month thereafter, SEA STAR shall remit to MBC for each item of EMERALD
EQUIPMENT in SEA STAR'S possession during that month or portion thereof
compensation at the daily rates specified on EMERALD SCHEDULE from the first day
of the month through and including the earliest of: (a) the day on which SEA STAR
purchases such item and pays the purchase price therefor; (b) the date on which SEA
STAR makes such item available for removal from SEA STAR'S possession by MBC;
or (c) the last day of that month after deduction of such reasonable charges as are due
to SEA STAR for storage and handling of EMERALD EQUIPMENT. Beginning on
August 31, 2002 and continuing on the last day of each month thereafter, SEA STAR
shall remit to MBC for each item of MBC EQUIPMENT in SEA STAR'S possession
during that month or portion thereof compensation at the daily rates specified on the
MBC SCHEDULE from the first day of the month through and including the earliest of:
(a) the day on which SEA STAR purchases such item and pays the purchase price
therefor; (b) the date on which SEA STAR makes such item available for removal from
SEA STAR'S possession by MBC; or (c) the last day of that month after deduction of
such reasonable charges as are due to SEA STAR for storage and handling of MBC
EQUIPMENT.

2.      Waiver of Further Claims By MBC for Use of Equipment.  MBC acknowledges
and agrees that the compensation rates set forth in "Equipment Schedule A" and
"Equipment Schedule B" represent fair and reasonable compensation for the use of the
EMERALD EQUIPMENT and the MBC EQUIPMENT by SEA STAR and that provided
SEA STAR pays the amounts specified in Section 1 of this AGREEMENT for each item

2

of EMERALD EQUIPMENT and MBC EQUIPMENT that it has used during the applicable period when and as due, subject to deductions specified in Section 1, MBC will assert no further claims against SEA STAR for compensation for the use of the EMERALD EQUIPMENT or the MBC EQUIPMENT by SEA STAR.

3.    <u>Effect of Agreement On Sea Star's Right to Possession</u>.    SEA STAR acknowledges and agrees that nothing in this AGREEMENT is intended to or shall confer on SEA STAR the right to possess or use any EMERALD EQUIPMENT or MBC EQUIPMENT and that MBC reserves such rights, if any, as MBC may have to take possession of the EMERALD EQUIPMENT and the MBC EQUIPMENT.  MBC acknowledges and agrees that nothing in this AGREEMENT shall constitute an acknowledgment by SEA STAR of MBC'S right to take possession of the EMERALD EQUIPMENT and the MBC EQUIPMENT.  Notwithstanding the foregoing, MBC acknowledges and agrees that if SEA STAR enters into a Rental Agreement with EMERALD which is approved by MBC, in writing, MBC shall not interfere with SEA STAR'S right to use or possession of any EMERALD EQUIPMENT that is the subject of such agreement so long as SEA STAR complies with the terms and conditions of such agreement. MBC acknowledges and agrees that if SEA STAR and MBC enter into an Equipment Lease Agreement for the MBC EQUIPMENT or any portion thereof, MBC will not interfere with SEA STAR'S use or possession of any MBC EQUIPMENT that is the subject of such Equipment Lease Agreement so long as SEA STAR complies with the terms and conditions of such Equipment Lease Agreement.  Furthermore, MBC shall not interfere with SEA STAR'S right to use or possession of any EMERALD EQUIPMENT or MBC EQUIPMENT purchased by SEA STAR from MBC or from EMERALD with MBC'S consent.

4.    <u>Agreement to Indemnify and Defend</u>.  Provided that SEA STAR provides MBC with prompt written notice of any claims, causes of action, liabilities, or damages asserted against SEA STAR by any COMPETING CLAIMANT relating to any COMPETING CLAIMANT'S alleged entitlement to compensation for use of EMERALD EQUIPMENT or MBC EQUIPMENT during any period for which SEA STAR has paid MBC pursuant to this AGREEMENT (a "PROCEEDING"), MBC will defend the PROCEEDING at its expense.  MBC acknowledges and agrees that if the BANKRUPTCY COURT or any other court of competent jurisdiction (a "COURT") determines in a PROCEEDING that a COMPETING CLAIMANT is entitled to be compensated for use of any EMERALD EQUIPMENT or MBC EQUIPMENT during that period for which SEA STAR has paid MBC pursuant to this AGREEMENT, within five (5) business days after receipt by MBC of written demand by SEA STAR, MBC will remit to SEA STAR by certified check, cashier's check, or wire transfer the lesser of: (a) the amount to which the COURT determined the COMPETING CLAIMANT is entitled for that period; or (b) the amount, net of deductions specified in Section 1, paid by SEA STAR to MBC pursuant to this AGREEMENT for use of the pertinent item or items of EMERALD EQUIPMENT and/or MBC EQUIPMENT during that period (the "INDEMNITY PRINCIPAL AMOUNT").  In addition, if the COURT orders SEA STAR to pay interest on any amount that it determines is due to a COMPETING CLAIMANT,

3

MBC shall remit to SEA STAR interest on the INDEMNITY PRINCIPAL AMOUNT calculated at the annual rate at which SEA STAR'S obligation to pay interest is to be calculated under the terms of the COURT'S order. Each party agrees to give the other party written notice of any proceeding before a COURT in which a COMPETING CLAIMANT is asserting a claim for compensation for use of any EMERALD EQUIPMENT and/or MBC EQUIPMENT by SEA STAR as soon as practicable after said party receives notice of such proceeding.

5.   Remedy of Sea Star In Event of Breach.   MBC acknowledges and agrees that if it fails to remit to SEA STAR any amount due under this AGREEMENT when and as due, interest shall accrue on the unpaid amount at an annual rate of ten percent (10%) from the date payment was due hereunder until the date of payment and that, in the event SEA STAR retains counsel to enforce rights and remedies against MBC as a result of MBC'S breach of this AGREEMENT, SEA STAR shall be entitled to recover from MBC in addition to all other amounts due hereunder all reasonable attorneys' fees and expenses incurred by SEA STAR as a result of MBC's breach.

6.   Amendment.   This AGREEMENT shall not be amended changed or modified except by an agreement in writing, signed by the party against whom enforcement of the change is sought.

7.   Governing Law.   This AGREEMENT shall be governed by and construed in accordance with the laws of the State of Delaware.

8.   Counterparts.   This AGREEMENT may be executed in counterparts, all of which when taken together, shall constitute one and the same AGREEMENT.

9.   Headings.   The headings in this AGREEMENT are solely for convenience and are not intended to define, limit, or describe the scope of this AGREEMENT.

10.   Waiver of Jury Trial.   The parties hereto agree that any suit, action, or proceeding, whether claim or counterclaim, brought or instituted by any party to this AGREEMENT, or any of their successors or assigns, on or with respect to this AGREEMENT or which in any way relates, directly or indirectly, to the obligations of any of the parties hereto under this AGREEMENT, or the dealings of the parties with respect thereto, shall be tried only by a court and not by a jury. **THE PARTIES EXPRESSLY WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY SUCH ACTION OR PROCEEDINGS.** The parties acknowledge and agree that this provision is a specific and material aspect of the agreement between the parties and that the parties would not enter into this AGREEMENT if this provision, or any other provision of this AGREEMENT, were not contained herein.

IN WITNESS WHEREOF, the parties have executed this AGREEMENT as of the date first above written with the specific intention of creating a document under seal.

**WITNESS/ATTEST:**

**MBC:**

MBC LEASING CORP.,
A Maryland Corporation

By: _____ (SEAL)
Scott H. Krieger,
Treasurer and Assistant Secretary

**SEA STAR:**

SEA STAR LINE, LLC,
A _Delaware_ Limited Liability Company

By: _____ (SEAL)
Name: _PHILIP V. BAKES_
Title: _SVP Operations_

5

May 29 07 09:35a    Tim Armstrong                              9042808098                    p.6

## ACKNOWLEDGEMENTS

STATE OF MARYLAND, CITY/COUNTY OF _Baltimore_, TO WIT:

I HEREBY CERTIFY that on this _20th_ day of _September_, 2002, before me, the undersigned Notary Public of the State of Maryland, personally appeared Scott H. Krieger, and acknowledged himself to be a Treasurer and Assistant Secretary of MBC LEASING CORP., a Maryland corporation, and that he, as such Treasurer and Assistant Secretary, being authorized so to do, executed the foregoing instrument for the purposes therein contained by signing the name of MBC LEASING CORP., by himself as Treasurer and Assistant Secretary.

IN WITNESS MY Hand and Notarial Seal.

_____ (SEAL)
NOTARY PUBLIC

LAURA D. RUTHERFORD
NOTARY PUBLIC
BALTIMORE COUNTY, MD.

My Commission Expires:
_5-5-03_

STATE OF FLORIDA, COUNTY OF DUVAL, TO WIT:

I HEREBY CERTIFY that on this _3_ day of _October_, 2002, before me, the undersigned Notary Public of the State and subdivision aforesaid, personally appeared _Philip V. Bates_, and acknowledged himself to be the _SVP Operations_ of SEA STAR LINE, LLC, a Delaware limited liability company, and that he, as such _SVP Operations_ being authorized so to do, executed the foregoing instrument for the purposes therein contained by signing the name of SEA STAR LINE, LLC, by himself as _SVP Operations_.

IN WITNESS MY Hand and Notarial Seal.

_Karen Nedd_ (SEAL)
NOTARY PUBLIC

My Commission Expires:
_8/25/03_

KAREN NEDD
Notary Public - State of Florida
My Commission Expires Aug 25, 2003
Commission # CC866224

6

EQUIPMENT SCHEDULE

EMERALD EQUIPMENT LEASING, INC.

| EQUIPMENT TYPE | DAILY LEASE RATE | DAMAGE EXCLUSION | STIPULATED LOSS VALUE |
|---|---|---|---|
| 20' DV | $1.00 | $285.00 | $1,000.00 |
| 40' DV | $1.25 | $1,200.00 | $1,000.00 |
| 40' HV | $1.50 | $800.00 | $1,000.00 |
| 45' HV | $2.00 | $800.00 | $1,000.00 |
| 40' RV | $8.00 | $16,480.00 | $4,000.00 |
| 20' CH | $2.20 | $640.00 | $2,200.00 |
| 40' CH | $2.20 | $640.00 | $2,200.00 |
| 45' CH | $2.40 | $840.00 | $2,200.00 |
| Gen Sets | $4.50 | $840.00 | $2,200.00 |

TOTAL P.02

## EXHIBIT "A"

**Equipment Type:**
Up to 664 40' High Cube Containers: 1999 Hyundai (NPRU 675 series).

**Per Diem Rent:**
$1.15 per diem rate during initial five (5) year term (August 1, 2002-July 30, 2007).
Options out for any selected units: August 2005 with retroactive per diem rate increase @ $0.25; August 2006 with retroactive per diem rate increase @ $0.20.
Per diem rate @ $0.90 for each unit kept at Lessee's option during lease extension from August 1, 2007 to July 30, 2008.

**Damage Exclusion:**
Lessee is not responsible for the first $500.00 of repairs per unit at redelivery.

**Stipulated Loss Value:**
$1,850.00 for each unit prior to end of first five (5) years of Lease; $1,300.00 for each unit at conclusion of fifth (5th) or sixth (6th) year of Lease. Payment of Stipulated Loss Value to Lessor for any unit terminates per diem rent for that unit.

**Redelivery:**
Per diem rate after Wind-Down Period increases an additional $0.35 to per diem rate of $1.50.

**Off-Hire Depot Fee:**
$25.00 per unit redelivered to Lessor's designated depots at Jacksonville, San Juan, or other mutually agreed locations.

pVB.

## EXHIBIT "B"

**Equipment Types:**
Up to 264 45' High Cube Containers:
    163 UXXU 480, 481 series - 1997 SHUNDE
    101 SCSU 450 series - 1997 DAWANG

**Per Diem Rent:**
$1.40 *per diem* rate during initial five (5) year term (August 1, 2002-July 30, 2007).
Options out for any selected units: August 2005 with retroactive *per diem* rate increase @ $0.15; August 2006 with retroactive *per diem* rate increase @ $0.10.
*Per diem* rate $1.10 for each unit kept during lease extension from August 1, 2007 to July 30, 2008.

**Damage Exclusion:**
Lessee is not responsible for the first $650.00 of repairs per unit at redelivery.

**Stipulated Loss:**
$1,850.00 for each unit prior to end of first (5) years of Lease; $1,300.00 for each unit at conclusion of fifth (5th) or sixth (6th) year of lease.  Payment of Stipulated Loss Value to Lessor for any unit terminates *per diem* rent for that unit.

**Redelivery:**
*Per diem* rate after Wind-Down Period increases an additional $0.35 to *per diem* rate of $1.75.

**Off-Hire Depot Fee:**
$25.00 per unit redelivered to Lessor's designated depots at Jacksonville, San Juan, or other mutually agreed locations.

PVB.

# EXHIBIT I

Rx Date/Time    JUN-26-2007(TUE) 17:41    9042808098    P. 001
Jun 26 07 05:43p    Tim Armstrong    9042808098    p.1

## EQUIPMENT RENTAL AGREEMENT

*As of 3/Dvs.*

This Agreement is made and executed this 3ʳᵈ day of July, 2002 between EMERALD EQUIPMENT LEASING, INC., a Delaware corporation having its principal place of business at 101 South King Street, Gloucester City, New Jersey 08030 ("Lessor"), and SEA STAR LINE, LLC, a Delaware limited liability company having its principal place of business at 100 Bell Tel Way, Suite 300, Jacksonville, Florida 32216 ("Lessee"). Terms and conditions of this Agreement cover equipment in use at various times commencing April 29, 2002. Such equipment is of the types, at daily lease rates, and with damage exclusions and stipulated loss values delineated on Schedule "A", which is attached to and incorporated into this Agreement ("Equipment"). In consideration of the mutual covenants and conditions delineated below, the Parties agree:

1. **Equipment**. Lessor agrees to lease to Lessee, and Lessee agrees to lease from Lessor, the Equipment. Delivery of all Equipment to Lessee or its agents by Lessor shall be effected and evidenced by signed and dated equipment interchange receipts and shall be subject to the terms and conditions of this Agreement.

2. **Term**. The lease term for each item of Equipment shall begin on the date when such Equipment is delivered to Lessee or its agent and shall end on the date when such Equipment is taken off hire pursuant to section 10 below. Unless the parties otherwise agree in writing, the minimum rental period for each item of Equipment shall be thirty (30) days. All provisions of this Agreement shall apply during any extension or renewal period. Either party may terminate this Agreement on thirty (30) days' prior written notice to the other party.

3. **Rental**. Lessee shall pay rent and all other charges under this Agreement on a monthly basis. Each payment for particular Equipment will become due on the tenth day of the month following the month of use, unless the parties otherwise agree in writing. In the event Lessee fails to make timely payment, interest shall be due on any overdue amount at a rate of eighteen percent (18%) per annum, commencing ten (10) days after Lessee receives Lessor's invoice for such overdue amount. With respect to particular Equipment, Lessee's obligation to pay rent and other charges shall terminate immediately if Lessee purchases and pays for such Equipment.

4. **Ownership; Sublease; Substitution; Encumbrances.**



(a)   This Agreement shall be deemed a lease for all purposes.
The Equipment shall remain Lessor's property; and Lessee shall
acquire no title, ownership, or purchase rights of any nature by
virtue of this Agreement.   In the event that notwithstanding the
express intent of the parties, a court of competent jurisdiction
determines that this Agreement is not a true lease but is rather a
sale and extension of credit, a lease intended for security, a loan
secured by the Equipment or other similar arrangement, the parties
agree: (i) (A) to secure the prompt payment and performance as and
when due of all Lessee's obligations (both now existing and
hereafter arising) under this Agreement, Lessee shall be deemed to
have granted, and it hereby grants, to Lessor a first priority
security interest in the following (whether now existing or
hereafter created): the Equipment, all replacements, substitutions,
attachments, accessions, and additions thereto, all warranties and
licenses relating thereto and all proceeds (cash and non-cash but
without power of sale), including the proceeds of all insurance
policies, insuring the Equipment; (B) with respect to the
Equipment, in addition to all other rights and remedies available
to Lessor under this Agreement upon the occurrence of an event of
default, Lessor shall have all of the rights and remedies of a
first priority secured party under the Uniform Commercial Code; and
(ii) (A) the principal amount of any such loan shall be an amount
equal to the aggregate of the "Stipulated Loss Values" of all
outstanding Equipment; (B) the term of any such loan shall be co-
extensive with the term of this Agreement; and (C) the loan
payments under any such loan shall be the rental payments specified
in this Agreement.

(b)   This Agreement shall be subject and subordinate to any
lease or security interest in favor of a third-party lessor or
lender to Lessor.   In the event any such third party becomes
entitled to possession of any Equipment, Lessee shall return the
Equipment to such third party at one or more delivery locations
specified in paragraph 10.

(c)   Lessee shall not pledge, hypothecate, mortgage, create
any security interest in, or otherwise encumber or permit the
encumbrance of any Equipment.   At its own expense, Lessee promptly
shall take action necessary to discharge any lien, charge, or other
encumbrance asserted against any Equipment arising after delivery
of such Equipment to Lessee and as a result of Lessee's act or
omission.

Rx Date/Time    JUN-26-2007(TUE) 17:41    9042808098    P. 003
Jun 26 07 05:43p    Tim Armstrong    9042808098    p.3

(d)   Each item of Equipment shall have Lessor's serial number and other identifying marks affixed.   Lessee shall not obliterate, alter, conceal, or otherwise change or hide such number or marks.

(e)   Without Lessor's prior written consent, Lessee shall not assign any right or interest in this Agreement or any Equipment and shall not sublet or otherwise relinquish possession of any Equipment, except to other carriers as evidenced by interchange agreements.   Lessor may assign all or any part of its obligations, right, title, or interest in this Agreement, including all rental charges due or to become due.   Lessee expressly consents to Lessor's application of any payment credits to which it is entitled under this Agreement to payment obligations of Lessee under this Agreement.

5.   **Equipment Delivery and Interchange.**   Lessor shall make the Equipment available for delivery to Lessee at the locations agreed by the parties.   The signature of Lessee's representative on an equipment interchange receipt shall constitute conclusive evidence that the Equipment to which the receipt relates has been delivered to Lessee.

6.   **Maintenance and Repairs.**

(a)   At its own cost and expense, Lessee shall keep the Equipment in operating condition.   Lessee shall be responsible for all damages and changes in the condition of the Equipment after delivery by Lessor, subject to section 10 below and Schedule "A".   Lessee's maintenance and repair obligations include washing and cleaning the Equipment regularly to prevent corrosion, spot painting, and replacing of parts as necessary.   Lessee shall comply with all loading limitations, handling procedures, and operating instructions to prevent excessive impact or unbalanced loading.   Lessee shall not use any Equipment for storage or transportation of cargo which may damage the Equipment, including but not limited to unprotected corrosive substances, poorly secured materials, or bulk commodities which may corrode, oxidize, severely dent, puncture, contaminate, stain, or damage the Equipment.

(b)   Lessee shall make no modifications, improvements, or replacements and shall not attach accessories or additions to any Equipment, without Lessor's prior written consent, which shall not be unreasonably withheld, except as necessary to comply with this Agreement.   All improvements, repairs, accessories, and replacements made or attached to any Equipment by Lessee shall become part of the Equipment and Lessor's property without Lessor incurring any liability or, at Lessor's option, shall be removed

and the Equipment restored to its original condition at Lessee's
expense. Absent written agreement, Lessee shall not change or
supplement identification marks on any Equipment.

(c) Lessee shall comply with all conventions, laws,
regulations, or orders of federal, state, foreign, and local
governments and agencies having jurisdiction over the Equipment or
its use, operation, or storage and shall be liable for all fines,
penalties, and fees for failure to comply.

7. __Warranties__. Equipment subject to this Agreement is
leased "AS IS", and Lessor warrants only that Lessee shall have
quiet possession against any person claiming through Lessor. LESSOR
MAKES NO EXPRESSED OR IMPLIED WARRANTY OF QUALITY, MERCHANTABILITY,
FITNESS FOR A PARTICULAR PURPOSE OR USE WITH RESPECT TO ANY
EQUIPMENT AND HAS NOT MADE, AND SHALL NOT BE BOUND BY, ANY
STATEMENT, AGREEMENT, OR REPRESENTATION NOT SPECIFIED IN A WRITING
SIGNED BY LESSOR.

8. __Taxes and Other Expenses__. Lessee agrees to pay all
sales, use, excise, property, gross income, gross receipts, stamp,
or other taxes; levies; import duties; charges; or withholdings of
any nature (together with any penalties, fines, or interest)
imposed against Lessor, Lessee, or the Equipment by any
governmental or taxing authority with respect to any Equipment;
upon the leasing, delivery, possession, use, operation, redelivery,
or other disposition of such Equipment; or upon the rentals,
receipts, or earnings arising from such Equipment; excluding,
however, any such taxes, levies, import duties, charges, and
withholdings that are imposed or accrued with respect to any
Equipment prior to its delivery to Lessee and any taxes measured by
Lessor's income. Lessee shall pay all other expenses relating to
Equipment arising during the rental period and resulting from
Lessee's acts or omissions, including but not limited to expenses
incurred in ports, depots, or storage areas.

9. __Risk of Loss__.

(a) During the term of this Agreement, Lessee shall bear all
risk of loss, damage, theft, or destruction to the Equipment. No
such loss, damage, theft, or destruction of Equipment, in whole or
part, shall impair Lessee's obligations under this Agreement, all
of which shall continue in full force and effect. At Lessor's
option and subject to Schedule "A", Lessee shall (i) put the
affected Equipment in the condition that existed upon delivery to
Lessee or (ii) pay Lessor an amount equal to all accrued and unpaid
rent due under this Agreement, together with the Stipulated Loss

Rx Date/Time        JUN-26-2007(TUE) 17:41        9042808098                    P. 005
Jun 26 07 05:44p      Tim Armstrong                              9042808098            p.5

Value, with respect to the affected Equipment, less the amount of all recoveries by Lessor from parties other than Lessee for such loss, damage, theft, or destruction.

(b)    Upon compliance with subparagraph (a), Lessee shall be subrogated to Lessor's rights with respect to any insurance policies and claims for reimbursement by third parties in connection with such loss, damage, theft, or destruction.

10.    Redelivery of Equipment.

(a)    At its sole expense, Lessee shall redeliver Equipment to Lessor at Greenwich Terminal, Philadelphia, Pennsylvania, Sea Star Terminal, Puerto Nuevo, San Juan, Puerto Rico, Greenwich Terminal, Port of Jacksonville, Florida, or any other location as to which the parties have agreed in writing.    Each redelivery shall be subject to Schedule "A".    At least seventy-two (72) hours prior to actual redelivery, Lessee shall give Lessor a written estimate of types and quantities of Equipment which Lessee intends to redeliver at particular ports.

(b)    Upon redelivery of particular Equipment, the receiving terminal will execute an equipment interchange receipt.    Subject to Schedule "A", Lessee shall return all Equipment to Lessor in the condition that existed upon delivery to Lessee.

(c)    Lessee shall return such Equipment with tires equal in value and condition to those delivered with the Equipment, normal wear and tear excepted.    The value of any tire damage at the time of return is included in the damage exclusion value for such Equipment, as specified in Schedule "A".

(d)    Lessor shall have the right to inspect Equipment leased under this Agreement at reasonable times during normal business hours.    Upon Lessor's reasonable request, Lessee shall furnish a list of all locations of Equipment as of the most recent date possible and take reasonable steps to make Equipment available for inspection.    On or before the seventh day of each month, Lessee shall furnish a list of all locations of Equipment as of the end of the previous month.

(e)    At the time of return, Equipment will be taken off hire; and rental charges will cease.    If Equipment is returned to a terminal with damage exceeding the damage exclusion specified in Schedule "A", Lessor will inform Lessee within seven (7) days after return.    Lessor shall have the right to require Lessee to repair Equipment or to authorize repairs at Lessee's expense.    If Lessee

fails to authorize repairs for which Lessor claims Lessee is responsible within ten (10) days after notification of damage, Lessor may promptly authorize such repair and rental charges will cease on completion of such repairs (no later than 10 business days after authorization). Lessee agrees to pay for required repairs no later than ten (10) days after receipt of invoice.

(f)   If Lessee fails to return any Equipment for more than sixty (60) days after the return date specified in a Lessor notice, Lessor may elect to treat such Equipment as lost; and Lessee shall pay Lessor the Stipulated Loss Value of such Equipment, together with all accrued rental charges at the contractual daily rate within fifteen (15) days.

11.   Indemnification and Expenses.

(a)   Lessee shall defend, indemnify and hold Lessor, its agents and employees, harmless from all claims, causes of action, liability damage or loss (including expenses in connection with any claim or suit, such as reasonable attorneys' fees and court costs) arising out of (a) failure by Lessee to comply with its obligations under this Agreement or any attempt by a third party to impose on Lessor liability for Lessee's acts or omissions; (b) any claim for personal injury or death or for property loss or damage (including but not limited to any products liability claim) arising out of possession, leasing, operation, control, use, storage, loading, unloading, moving, maintenance, delivery, or return of any Equipment; and (c) any forfeiture, seizure, impounding of, or charge or lien imposed or asserted against any Equipment as a result of Lessee's acts or omissions.

(b)   Except for Lessee's obligation to pay interest on delinquent rent, neither party shall be liable to the other party or any other person for delay not to exceed sixty (60) days in the performance of any obligation due to events beyond its reasonable control, including but not limited to fire; storm; flood; earthquake; explosion; accidents; acts of God, governmental agencies, or public enemies; sabotage; riots; civil disorders; strikes, lockouts, and other work stoppages; labor disputes; and failure of repair facilities to complete repairs timely.  Under no circumstances shall either party be liable to the other party for exemplary damages.

12.   Insurance.   Lessee will carry and maintain insurance on the Equipment.  Upon execution of this Agreement, Lessee shall furnish Lessor with insurance certificates evidencing (a) all-risk loss and damage insurance (including mysterious disappearance,

unexplained loss, war risks, strikes, riots, and civil commotions)
on land, afloat, or airborne, in transit or at rest anywhere in the
world, in an amount equal to the Stipulated Loss Value of all
Equipment leased pursuant to this Agreement; (b) comprehensive
general liability insurance, including contractual liability and
broad form property damage, with combined single limits of
$2,000,000; (c) automobile liability and property damage with
combined single limits of $2,000,000; (d) deductibles applicable to
each coverage.  Each insurance coverage shall (a) name Lessor and
its assigns as additional assureds, as their interests may appear;
(b) include a loss payable clause in favor of Lessor and its
assigns; and (c) include the insurer's undertaking to send Lessor
and its assigns written notice at least thirty (30) days prior to
any expiration or cancellation of such insurance.  If Lessee
defaults in payment of any premium under any such insurance
policies, Lessor may but shall not be obliged to pay such premium;
and Lessee shall repay the premium on demand. Lessee assigns to
Lessor all right to insurance proceeds payable to Lessee for damage
to or loss of the Equipment.

13.  Events of Default.

(a)  The following shall be events of default under this
Agreement:

(i) Continuing failure to pay rent for thirty (30) days
after its due date under this Agreement;

(ii) Continuing default in performance of any of Lessee's
obligations under this Agreement for thirty (30) days after written
notice thereof from Lessor to Lessee;

(iii) Lessee is a party to a merger or consolidation or
sells, conveys, or transfers all or a substantial part of its
assets or becomes insolvent or admits in writing its inability to
pay its debts as they mature or applies for, consents to, or
acquiesces in appointment of a trustee or a receiver for Lessee or
any subsidiary or any property of either; or, in the absence of
such application, consent, or acquiescence, a trustee or receiver
is appointed for Lessee or any subsidiary or for a substantial part
of the property of either and is not discharged within sixty (60)
days; or under bankruptcy or insolvency law, any dissolution or
liquidation proceeding is instituted against Lessee or any
subsidiary with Lessee's or such subsidiary's consent or
acquiescence or remains undismissed for sixty (60) days.

Rx Date/Time        JUN-26-2007(TUE) 17:41              9042808098              P. 008
Jun 26 07 05:44p     Tim Armstrong                                    9042808098     p.8

(b)  Upon the occurrence of any default by Lessee under this Agreement, Lessor shall (except to the extent otherwise required by law) be entitled to:

(i) Proceed by appropriate court action or actions to enforce performance by Lessee of the applicable covenants and terms of the Agreement or to recover damages for breach;

(ii) Terminate Lessee's right to possession of, demand return of, or repossess at Lessee's expense any or all of the Equipment without prejudice to any other remedy or claim;

(iii) Elect to sell any or all Equipment after giving thirty (30) days' notice to Lessee at one or more public or private sales and recover the sum of the Stipulated Loss Values of such Equipment, all rent owed through the rent payment immediately preceding the date of such notice, all costs and expenses incurred in searching for, taking, removing, keeping, storing, repairing and restoring and selling such Equipment, all other amounts owed by Lessee under this Agreement, whether as additional rent, indemnification, or otherwise, and all costs and expenses, including reasonable legal fees, incurred by Lessor as a result of Lessee's default under this Agreement after deducting all amounts received by Lessor in connection with such public or private sales;

(iv) Upon notice to Lessee, receive prompt payment from Lessee of an amount equal to the Stipulated Loss Values of all Equipment not sold by Lessor pursuant to clause (iii) above plus, to the extent not otherwise recovered from Lessee pursuant to clause (ii) above, any rent owed through the rent payment date preceding the date of such notice, all costs and expenses incurred in searching for, taking, removing, keeping, storing, repairing, and restoring such Equipment, all other amounts owed by Lessee under this Agreement, whether as additional rent, indemnification, or otherwise, and all reasonable fees and expenses incurred by Lessor as a result of Lessee's default, provided that upon receipt of payment in full of such amount, Lessor shall transfer title to such Equipment to Lessee;

(v) By notice to Lessee, declare this Agreement terminated without prejudice to Lessor's rights in respect of obligations then accrued and remaining unsatisfied; or

(vi) Avail itself of any other remedy or remedies provided by statute or otherwise available at law, in equity, or in bankruptcy or insolvency proceedings.

(c)  The remedies set forth in this Agreement are cumulative. References to additional rent in clause (iii) and (iv) of subparagraph (b) shall include interest at the rate of eighteen percent (18%) per annum to the date Lessor receives any amount payable under said clause from the due date to and including the rent payment date immediately preceding the date on which notice is given under said clause and interest at the same rate on all other costs, expenses, and losses for which Lessor is entitled to payment under said clause to the date Lessor receives any reimbursement from the respective dates Lessor incurs such costs, expenses, and losses.

14.  <u>Applicable Law</u>.  This Agreement shall be interpreted and the rights, liabilities and duties of the parties determined in accordance with the laws of the State of Maryland.

15.  <u>Miscellaneous</u>.

(a)  This Agreement is binding upon the parties and their respective legal representatives, successors and assigns. This Agreement contains the entire agreement between the parties and, subject to the provisions of section 1, may not be amended, altered, or modified, except by a writing signed by the party to be bound.

(b)  All notices under this Agreement, including but not limited to billing by Lessor for rental charges and payments by Lessee shall be addressed as follows, unless or until either party gives written notice to the contrary to the other party:

    Lessor: Emerald Equipment Leasing, Inc.
            101 South King Street
            Gloucester City, NJ 08030
            Attn.: Arthur Davis
            Telefax: 856-742-3250

    Lessee: Sea Star Line, LLC
            100 Bell Tel Way, Suite 300
            Jacksonville, FL 32216
            Attn.: Philip V. Bates
            Telefax No.: 904-724-3011

All notices shall be in writing and delivered by hand delivery, registered or certified mail, or confirmed telex or telefax.

(c)  The provisions of this Agreement are separable and any provisions found upon judicial interpretation or construction to be

Rx Date/Time      JUN-26-2007(TUE) 17:41              9042808098                    P. 010
Jun 26 07 05:45p      Tim Armstrong                        9042808098              p.10

prohibited by law shall be ineffective to the extent of such prohibition without invalidating the remaining provisions of this Agreement.

(d)  No waiver of any remedy or right under this Agreement shall operate as a waiver of any other remedy or right nor shall any single or partial exercise of any remedy or right preclude any other or further exercise thereof or any other remedy or right.

IN WITNESS WHEREOF, the parties have executed this Equipment Rental Agreement as of the day and year first written above.

LESSEE:                                    LESSOR:
Sea Star Line, LLC                         Emerald Equipment Leasing, Inc.

By: _____             By: _____
    SVP - Operations
    _____                   _____
            Title                                     Title

02-3523-001e

Rx Date/Time    JUN-26-2007(TUE) 17:41    9042808098    P. 011
Jun 26 07 05:45p    Tim Armstrong    9042808098    p.11
SEP-27-2002  11:17

# EQUIPMENT SCHEDULE

## EMERALD EQUIPMENT LEASING, INC.

| EQUIPMENT TYPE | DAILY LEASE RATE | DAMAGE EXCLUSION | STIPULATED LOSS VALUE |
|---|---|---|---|
| 20' DV | $1.00 | $285.00 | $1,000.00 |
| 40' DV | $1.25 | $1,200.00 | $1,000.00 |
| 40' HV | $1.50 | $800.00 | $1,000.00 |
| 45' HV | $2.00 | $800.00 | $1,000.00 |
| 40' RV | $8.00 | $16,480.00 | $4,000.00 |
| 20' CH | $2.20 | $640.00 | $2,200.00 |
| 40' CH | $2.30 | $640.00 | $2,200.00 |
| 45' CH | $2.40 | $640.00 | $2,200.00 |
| Gen Sets | $4.50 | $640.00 | $2,200.00 |

19