IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SEA STAR LINE, LLC | : | |
| | : | |
| Plaintiff/ | : | |
| Counterclaim Defendant, | : | |
| | : | |
| v. | : | Civ. No. 05-245-JJF-LPS |
| | : | |
| EMERALD EQUIPMENT LEASING, INC. | : | |
| | : | |
| Defendant/ | : | |
| Counterclaim Plaintiff, | : | |

**EMERALD'S REPLY TO SEA STAR LINE, LLC RESPONSE TO EMERALD'S
SUBMISSION REGARDING BAXTER HEALTHCARE, INC.**

Sea Star Line, LLC ("SSL"), by its Response to Emerald's Submission Regarding Baxter Healthcare, Inc. (the "SSL Response"), has filed a pleading which is replete with meritless assertions and wholly unwarranted and inappropriate accusations. Even more, the bulk of the SSL Response addresses issues, which not only are meritless, but fail to address the issue which the Court ordered the parties to address, i.e., the significance of the Baxter documents. In this Reply, Emerald Equipment Leasing, Inc. ("EEL") will initially deal briefly with the extraneous issues raised by SSL (apparently in an effort to divert the Court's attention from the Baxter documents), and then will again address the significance of the Baxter documents, especially with regard to the additional information now supplied by SSL regarding these documents.

First, SSL boldly asserts that "EEL's purported $4,000,000.00 claim against SSL never existed" since EEL's bankruptcy estate received a "carveout" of 15% of any proceeds from its secured creditor.[1] This assertion is simply astounding. The carevout, if anything, enhances Emerald's interests. The purpose of the carevout is to protect EEL's bankruptcy estate, ensuring

---

[1] The pages of the SSL Response are not numbered; however, this assertion is first made by SSL on the second page of the SSL Response.

that the proceeds of this litigation will go not just to pay EEL's secured creditor[2], but also to ensure that funds will be preserved (i.e., the 15% carveout) for distribution to the estate's other claimants. The fact that EEL's claim ($4.7 million plus interest which continues to accrue) is subject to the lien of its secured creditor does not, in any way, diminish EEL's claim. Many claims are subject to the liens of secured creditors. That doesn't mean those claims do not exist. Such an assertion by SSL is ridiculous and the Court's time should not be wasted on such a frivolous contention.

The further assertion made by SSL that the Loan and Assignment Agreement (the "Loan Sale Agreement" attached as Exhibit "B" to the SSL Response)[3] dated as of November 1, 2003 "expressly prescribes EEL's claims" in this case is perhaps even more astounding than its prior assertion stated above.[4] This SSL contention is based on SSL's reading of the provision in the Loan Sale Agreement which states:

> ASSIGNEE agrees not to assert any entitlement to compensation from SEA STAR for use of EMERALD EQUIPMENT during any period in which SEA STAR has paid ASSIGNOR pursuant to the SEA STAR INDEMNITY.

SSL is apparently asking this Court to believe that this provision means that "EEL does not have the right to assert a claim for usage of the Emerald Equipment" and that therefore "its request for additional discovery, should be denied on that ground alone" (see third page of the SSL Response). The Sea Star Indemnity (attached as Exhibit "C" to the SSL Response) referred to in

---

[2] Initially, MBC Leasing Corp. and now Storage Transfer, Inc.
[3] SSL intimates that EEL tried to hide this document. The Loan Sale Agreement is a document between MBC and Storage Transfer; it is not an EEL document and it is wholly irrelevant to this dispute. Furthermore, SSL was well aware of this document as far back as December 29, 2003 as evidenced by a letter from MBC's counsel to SSL's counsel (see Exhibit "A" attached hereto).
[4] This assertion first appears on the second and third pages of the SSL Response and is repeated throughout the SSL Response.

paragraph 6.3 of the Loan Sale Agreement between SSL and MBC Leasing Corp. ("MBC") was meant to ensure that no other parties would make a claim against SSL for SSL's use of the Emerald Equipment for which SSL <u>paid</u> MBC. MBC was being paid rental charges for SSL's reported use of the Emerald Equipment under the Equipment Rental Agreement between SSL and Emerald since MBC was Emerald's secured lender and had an assignment of rents. The Indemnity Agreement was to protect SSL so that SSL would not have to pay twice. This is made clear in an e-mail dated 8/21/02 (Exhibit "B" attached hereto) from MBC's counsel to SSL's counsel during the negotiations of the Indemnity Agreement stating in the third paragraph:

> As Sea Star would have to defend, at its expense, a suit brought by a creditor who had not been named as a defendant in any interpleader action, if MBC agreed to provide a defense at its expense to claims by "any secured creditor" as you proposed, Sea Star would fare better than if it had never entered into the Indemnity Agreement. <u>The concept was simply that Sea Star not have to pay twice</u>. I have substituted interpleader defendants for secured creditors. [emphasis added].

This is also made clear by a letter dated April 23, 2003 from MBC to SSL (Exhibit "C" attached hereto) whereby MBC reiterates that a claim for which MBC would be responsible to provide indemnity was only to ensure that SSL would not have to pay twice, stating in the second paragraph:

> MBC's initial obligation under the Indemnity Agreement, assuming that Sea Star provides it with prompt written notice, is an obligation to "defend" any "Proceeding" brought by a Competing Claimant against Sea Star. While the term "Proceeding" is defined broadly in the Indemnity Agreement, a "Proceeding" still <u>must involve an effort by a Competing Claimant to make Sea Star pay for use of Emerald Equipment for which it has already paid MBC</u>. The e-mails attached to the letter all relate to claims that Sea Star used Emerald Equipment after April 27, 2002 and failed to pay MBC or anyone else for that use. [emphasis added]

A subsequent letter from MBC's counsel to SSL's counsel dated September 25, 2003 again clearly restated this concept (see Exhibit "D" attach hereto), stating in part:

> The mere fact that Emerald Equipment Leasing, Inc. ("Emerald") has asserted a claim against Sea star for use of "Emerald Equipment" does not necessarily mean that the claim is a "competing claim."
>
> . . .
>
> What you omitted from your letter, of course, is that you acknowledged that Sea Star does not dispute that it has used Emerald Equipment, albeit less than Emerald claims, and not paid for that use. Consequently, Sea Star has breached the Indemnity Agreement. You also failed to mention that you declined to provide documentation concerning what Sea Star acknowledges it owes or documentation demonstrating why the claims asserted by sea Star are not valid or are "competing claims."

There has never been produced any document (to EEL's knowledge) where SSL has ever taken any other position with respect to the Indemnity Agreement nor has SSL ever (to EEL's knowledge) expressed any other position to date.

Paragraph 6.3 of the Loan Sale Agreement with a heading "No Competing Claims Against Sea Star" (which SSL now says bars EEL's claims) simply reiterates the concept of "no double payment" contained in the Indemnity Agreement so that Storage Transfer, Inc. (to whom MBC sold its loan) would not assert a "competing claim" against SSL, i.e., a claim for Sea Star's use of Emerald Equipment for which SSL already paid MBC. Of course, Emerald's claims are for SSL's use of Emerald Equipment for which it did not pay MBC or anyone else. SSL knows this and is simply wasting the Court's time with assertions that are wholly devoid of any merit. These assertions are bogus arguments which SSL raises to divert the attention of the Court from the real issue, i.e., SSL's use of Emerald Equipment for which it did not pay rent, and in many instances, did not return the equipment to EEL.

As to the specific issue to be addressed by these submissions, i.e., the Baxter documents and what they show regarding SSL's use of Emerald Equipment for which SSL has not paid rent, SSL is even more disingenuous, if that is possible. The documents, in their entirety, are attached hereto as Exhibit "E". The bulk of these documents consist of approximately 200 bills of lading and invoices supplied by Baxter. Of these approximately 20 bills and invoices, Emerald was able to identify (by the identification numbers accompanying Emerald Equipment which include specific prefixes unique to Emerald Equipment) only 12 pieces of Emerald Equipment. SSL, in its Response, disingenuously states, however, that:

> Even assuming arguendo that EEL could fashion any claim based on the Baxter "test" and "Sea Star's self-billing reports", the Court must question why EEL only "identified 12 pieces of lading which identified 12 separate pieces of Emerald Equipment which were used by Sea Star to ship freight from or to Baxter" produced in response to the EEL subpoena and why EEL noted that "equipment piece PRMU650582 is not on the Emerald invoices since Emerald does not dispute the Sea Star self-billing reports for this particular piece of equipment." Moldoff Letter. The Court also might ask why EEL did not report that Baxter actually produced documents pertaining to at least 70 pieces of EEL equipment involved in shipments between April 29 and September 30, 2002, of which 67 are included in EEL's claims (Exhibit "K"). With respect to 30 of the units, SSL is seeking reimbursement for overpayments.

The clear impression which SSL, of course, means to convey by the foregoing is that Emerald intentionally did not fully disclose what was in the Baxter documents. Why does SSL say there are 70 pieces of Emerald Equipment, when EEL identified only 12 equipment pieces?

In analyzing Exhibit "K" attached to the SSL Response, which identifies 70 pieces of Emerald Equipment, it appears that (and what SSL does not tell this Court) SSL is able to "translate" a code on a schedule provided by Baxter in its document production (appearing on

the 10th to the 20th pages of Exhibit "E" attached hereto). That "code" set forth under a heading encaptioned "Pro Number" apparently can be converted to equipment piece identification numbers.[5] When EEL reviewed the Baxter documents, it could only identify the specific equipment pieces noted on the invoices and bills of lading themselves. The information to convert the "Pro Numbers" to equipment piece numbers is available only to SSL. It was not information available to Emerald. SSL knows Emerald did not have this information and its sly innuendo that Emerald somehow intentionally failed to disclose something which SSL knew Emerald could not have known in the first place is nothing but misleading.

That said, Emerald is quite pleased that SSL has now provided this additional information (assuming it is accurate). With these 70 pieces of Emerald Equipment which SSL has now disclosed it used for the movement of Baxter cargo, Emerald has been able to identify 24 of those pieces which were not included in SSL's self-billing reports (see Exhibit "F" attached hereto).[6] This represents a 34.2% discrepancy. This means that more than one out of every three Emerald containers used to move Baxter cargo were never included in SSL's self-billing reports and therefore rent for those pieces of equipment were never paid by SSL to MBC or anyone else.

How much more evidence must Emerald produce to show that SSL has not accurately reported its usage of the Emerald Equipment on its self-billing reports, is resisting production of documents which would disclose such use, and, in EEL's view is not now being honest with this Court. Evidence of SSL's use of the Emerald Equipment for which it did not pay rent (and in

---

[5] Although a cover letter sent by Baxter with the Baxter documents explained that the "Pro Number" was a "carrier code number" for equipment pieces, when EEL examined the Baxter documents, it did not understand that the schedule containing the Pro Numbers" provided information different than the actual invoices and bills of lading provided. In its analysis of these invoices and outstanding bills of lading, EEL was able to identify only the 12 pieces of Emerald Equipment it reported to the Court.
[6] Exhibit "G" attached hereto consists of EEL invoices provided to SSL pertaining to 20' containers, 40' containers, 40' HC containers and 45' HC containers. The equipment pieces designated by an "x" are the equipment pieces identified by SSL used to move Baxter goods which equipment pieces are included on the EEL invoices.

many instances never returned to Emerald) is contained in many documents, such as the Baxter documents. This is just the tip of the iceberg. The Baxter documents are just one small snapshot of evidence of SSL's use of Emerald Equipment.

Accordingly, EEL hereby again renews its Motion to Compel Sea Star Line L.L.C.'s Responses to Certain Interrogatories (D.I. 114) and the Motion of Emerald Equipment Leasing, Inc. to Compel Sea Star Line L.L.C.'s Production of Certain Documents (D.I. 115). EEL believes that the documents produced by Baxter meet the test set by Judge Farnan. Throughout this case, EEL has attempted to procure from SSL relevant documents which will evidence SSL's use of the Emerald Equipment for which SSL has not paid rent. Before this litigation began, EEL requested that SSL permit EEL representatives to inspect "vessel manifests" which would identify the Emerald Equipment on board vessels which SSL used to transport cargo. Rather than allowing that inspection to occur, SSL responded by filing a suit against EEL for a "declaratory judgment". Ever since, SSL has steadfastly refused to provide EEL access to the manifests. These manifests were requested in Emerald's Document Request No. 5, as well as other relevant documents which should provide information identifying the Emerald Equipment used by SSL (see, e.g., Emerald Document Request Nos. 6, 8 and 10).

Moreover, based on the information obtained from the Baxter documents, EEL believes a tailored document request will disclose pertinent information which relates to the "chassis" used, which comprise a large portion of the Emerald claim. EEL's claims involve SSL's use of containers, chassis and gen sets (refrigerated units). The Baxter documents identified only the "containers" used. The Baxter documents do not contain any information relating to the "chassis" used to move the containers. This information must come from invoices, bills of lading, or other similar documents between SSL and the trucking companies used to move the

"containers". Accordingly, based on the results obtained from the Baxter documents, EEL seeks as additional tailored requests, the following:

    1.    SSL should produce the invoices or other similar documents between SSL and trucking companies used for the movement of the containers to or from Baxter. These bills should not just pertain to the specific Emerald Equipment identified in the Baxter documents, but to all equipment. This is so since Emerald chassis could be used to move any containers, not only Emerald's containers.

    2.    SSL should identify its five largest trucking companies (by volume) used by SSL in the United States and the three largest trucking companies (by volume) used by SSL in Puerto Rico. As to those five largest trucking companies in the United States and the three largest in Puerto Rico, SSL should provide copies of all invoices from those trucking companies during the relevant time period.

    3.    SSL should provide copies of all invoices from ET Heinsen, its stevedoring company, used in the Dominican Republic, as well as any and all invoices from any company involved with loading, discharge or movement of any containers and/or chassis and/or gen sets.

These documents should provide a wealth of information relating to Emerald Equipment used by SSL.

On a final note, it is again reiterated EEL has provided SSL detailed "invoices" specifying each piece of Emerald Equipment EEL contends SSL used without paying the appropriate rent, and which, in many instances, were never returned, thereby obligating SSL to pay the stipulated loss values for that equipment. SSL has never provided a response, equipment piece by equipment piece, as requested in Interrogatory No. 1. This is what this case is about. SSL should be directed to provide such an accounting.

In conclusion, EEL respectfully requests an opportunity to discuss the issues raised in these latest submissions and the specific document requests made by EEL, either telephonically

8

or in person with all counsel present. Discovery must be completed no later than March 1, 2008 as the District Court has indicated that the matter will be tried some time in April, 2008. In order to accomplish this, EEL has agreed to complete discovery on or before March 1, 2008. Such a deadline, however, will depend upon the timely responses to the various document requests set forth in the discovery motions and as specified herein.

                              Respectfully submitted,

                              ECKERT SEAMANS CHERIN & MELLOTT, LLC

By: _____
      Michael Busenkell, Esquire (No. 3933)
      Ronald S. Gellert, Esquire (No. 4259)
      300 Delaware Avenue, Suite 1210
      Wilmington, De 19801
      Phone: 302-425-0430
      Fax:    302-425-0432

                      and

      Gary M. Schildhorn, Esquire
      Alan I. Moldoff, Esquire
      Eckert Seamans Cherin & Mellott, LLC
      Two Liberty Place
      50 South 16th Street, 22nd Floor
      Philadelphia, PA 19102
      Phone: 215-851-8400
      Fax:    215-851-8383

December 7, 2007

## CERTIFICATE OF SERVICE

I, Michael G. Busenkell certify that on December 7, 2007, I caused copies of the foregoing Emerald's Reply To Sea Star Line, LLC Response To Emerald's Submission Regarding Baxter Healthcare, Inc. to be served in the manner indicated on:

The Honorable Leonard P. Stark
United States District Court
844 N. King Street
Lockbox 26, Room 2325
Wilmington, DE 19801
**By Hand Delivery**

Kathleen M. Miller, Esq.
Smith, Katzenstein & Furlow, LLP
800 Delaware Avenue, 10th Floor
P.O. Box 410
Wilmington, DE 19899
**By Hand Delivery**

Timothy J. Armstrong, Esq.
Armstrong & Mejer, P.A.
Suite 1111 Douglas Centre
2600 Douglas Road
Miami, FL 33134
**By First Class Mail**

_____
Michael G. Busenkell (No. 3933)