# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

- - -

COPY

SEA STAR LINE, LLC,                   :
                                      :
            Plaintiff,                : C.A. No. 1:05-CV-00245-JJF
                                      :
      v.                              :
                                      :
EMERALD EQUIPMENT LEASING,            :
INC.,                                 :
                                      :
            Defendant.                :

United States District Court
844 King Street
Wilmington, Delaware

**Wednesday, August 22, 2007**
2:20 p.m.

BEFORE:   THE HONORABLE JOSEPH J. FARNAN, JR.
          United States District Court Judge

   APPEARANCES:

          ROBERT K. BESTE, ESQ.
            SMITH KATZENSTEIN FURLOW LLP
               - **and** -
          TIMOTHY J. ARMSTRONG, ESQ.
            ARMSTRONG & MEJER, P.A.
               on behalf of Plaintiff

          ALAN I. MOLDOFF, ESQ.
          BRYA KEILSON, ESQ.
            ECKERT SEAMANS CHERIN & MELLOTT, LLC
               on behalf of Defendant

          **Evidentiary Hearing**

Hawkins Reporting Service
715 N. King Street, Ste. 3 - Wilmington, Delaware  19801
(302) 658-6697  Fax (302) 658-8418

2

```
 1              THE CLERK:  All rise.

 2              THE COURT:  All right.  Be seated, please.

 3              ALL COUNSEL:  Good afternoon, Your Honor.

 4              THE COURT:  Good afternoon.

 5         Do you want to announce you appearances, please.

 6              MR. MOLDOFF:  Alan Moldoff appearing on behalf of

 7    Emerald Equipment Leasing, Inc., movant, with respect to the

 8    various motions.

 9              MR. BESTE:  Good afternoon, Your Honor.  Robert

10    Beste on behalf of Sea Star Line, LLC, and I'm pleased to

11    introduce Timothy Armstrong to the Court.

12              THE COURT:  Mr. Armstrong, good afternoon.

13              MR. ARMSTRONG:  Good afternoon, Your Honor.

14              MS. KEILSON:  And Brya Keilson on behalf of

15    Emerald.

16              THE COURT:  Good afternoon.

17         All right.  I took a look at your papers and I

18    would in the first instance characterize your dispute as one of

19    breadth.  Both sides, in my view -- well -- have a view of the

20    case that is, depending on the request, expansive, and I think

21    that -- the equipment at issue as I read the papers is --

22         What you're seeking to know about the equipment

23    and the documents is interesting, but I don't know if it's

24    relevant to the subject matter of this lawsuit, and so what I
```

3

1    wanted to get from both of you today is, at the heart of this

2    lawsuit what do you understand to be the subject issues that

3    are being litigated, and that pretty much will drive these

4    Discovery requests, and then I can narrow them so that each

5    side can get what it needs to go to trial.  Do you want to

6    start, Mr. Armstrong?

7                 MR. ARMSTRONG:  Yes, Your Honor.

8                 As I understand the situation, we have three

9    motions pending.

10                THE COURT:  Right.

11                MR. ARMSTRONG:  One is Emerald's Motion for a

12   Protective Order with respect to the Rule 30(b)(6) deposition

13   of Emerald.

14                The second would be Emerald's Motion to Compel

15   production of certain documents.

16                THE COURT:  Let's start with the Interrogatory,

17   the last motion, because that's the one I think that drives --

18                MR. ARMSTRONG:  The Interrogatories?

19                THE COURT:  Yes.  At least in my view that's the

20   one that's gonna drive the decision.

21                Protective Order is pretty easy to resolve once

22   we --

23                MR. ARMSTRONG:  This is a lawsuit dealing with an

24   equipment rental agreement.  It is a written equipment rental

4

1  agreement.  It provides for certain documentation that would

2  signify commencement of the rental period and it provides for

3  re-delivery at certain points, terminals or depots, but

4  generally terminals, where the equipment rented would be

5  accepted and a document called a TIR, trailer interchange

6  receipt, would be issued.

7          Now there's one depot or terminal of which I'm

8  aware, the Grenich Depot in Philadelphia, that probably has an

9  electronic gate system, so this TIR would be electronic.

10          Sea Star bought certain assets from NPR, a

11  bankrupt ocean carrier between the mainland and Puerto Rico.

12  The assets were brought in the Bankruptcy Court and Judge

13  Walrath issued an Order with respect to the purchase of the

14  assets.  Emerald Equipment Leasing, Inc. was a house company,

15  so to speak, NPR and its family affiliates, that leased

16  cargo-carrying equipment, such as containers, chassis and

17  generators, or what we call gen sets, to NPR.

18          Emerald leased only within the family and Emerald

19  essentially was the conduit between NPR and the lenders, the

20  equipment lender, MBC Leasing, Inc., a bank headquartered in

21  Baltimore.

22          NPR fell on hard times, so all of these

23  companies, 26 or so whole family companies, went into

24  bankruptcy in March, 2001.  The end of April, 2002 Judge

5

1    Walrath approved the purchase of certain assets and issued an

2    Order.  Part of that Order and a complicating part of this

3    situation is that -- I believe it's Paragraph 13 toward the end

4    of the Order provides that Sea Star has agreed that Sea Star

5    will hold equipment that comes into its terminal, NPR

6    equipment, or other lessors' equipment, coming into its

7    terminals that were acquired as part of this transaction for

8    pickup by the lessors.

9              And so we had Sea Star performing a storage

10   function in its terminal that's completely outside the scope of

11   any equipment rental agreement.

12             We also had Sea Star entering into an agreement

13   with MBC Leasing Corp., letting MBC Leasing Corp. use space in

14   its terminal in San Juan to store this equipment that it was

15   trying to sell, and MBC at that time had taken control over all

16   of the Emerald equipment.  Although Emerald held legal title,

17   the Bankruptcy Court gave MBC, the secured creditor, the

18   controlling and beneficial interest in the equipment.  So MBC

19   was really dictating or controlling the equipment from the end

20   of April of 2002 through, let's say, the end of October at

21   least 2003.

22             The people who now appear as Emerald

23   representatives, not the lawyers, but the people who now

24   identify themselves as Emerald representatives were actually

6

1    working for MBC during that period.

2              Sea Star -- that's the background of this.  There

3    were two functions and the only function with which this Court

4    would be concerned is the equipment rental agreement.  It's a

5    contract case.  There are tort claims that are made, but they

6    all reallege and reassert everything in the breach of contract

7    count, so when all is said and done, if the basis of the claim

8    would be the same and if the damages claims are the same, we

9    have a contract case.

10             You look at the Interrogatories.  You look at the

11   Motions to Compel.  The basis of all of this is that Emerald

12   suspects or Emerald believes, so we're going to --

13             We say although you've provided thousands of

14   pages of documents, there must be more, we don't know what they

15   are, but we suspect and believe that there must be more.

16   Although you've answered the Interrogatories giving names,

17   referring to testimony, referring to agreements, referring to

18   Rule 33(d) which references back to these documents, and the

19   documents are all indexed and Bates numbered, so there can't be

20   any question.  In fact, in its motions Emerald has admitted

21   that tens of thousands of pages of documents have been produced

22   by Sea Star.

23             Under those circumstances what is the basis for

24   these Interrogatories?  What is the basis, for example, of

7

1    Interrogatory No. 1 which says, "As to each piece of Emerald

2    equipment for which Emerald has made a claim as alleged in the

3    counterclaim, please state whether Sea Star admits using such

4    piece of Emerald equipment and, if so, the date Sea Star first

5    used the equipment; the date the piece of Emerald equipment was

6    returned by Sea Star to Emerald and identify for each such

7    piece of equipment any document which evidences Sea Star's

8    initial use of that piece of equipment and return of such piece

9    of equipment to Emerald."

10            Emeralds's claims in the Amended Counterclaim

11    relate to over 6,000 pieces of equipment, some of which may or

12    may not exist, some of which may or may not be redundant or

13    incorrect equipment numbers, so essentially although the Court

14    told us that we might serve ten Interrogatories, Emerald starts

15    with 6,000, multiplied by parts and subparts, and we get 30,000

16    Interrogatories let's say, or 25,000.  It really doesn't

17    matter.  Emerald is seeking much more than you seek in an

18    Interrogatory.  Emerald is essentially seeking its accounting

19    which it hasn't even begun to prove.

20            We can go through the others, the -- "Identify

21    all Sea Star representatives."  Well, we pointed out, as is

22    customary in the business, union checkers, not Sea Star

23    employees, ordinarily would sign TIRs for equipment that

24    entered or exited Sea Star's terminal in San Juan whether or

1  not Sea Star had used such equipment.  To my knowledge there's

2  no issue as to the authenticity of any particular TIR.  Under

3  the circumstances, what is the basis for asking such a

4  question?  I mean, we don't know all of the union checkers who

5  may have worked on one day versus another.  What is the purpose

6  of going through that exercise?  We can go to Interrogatory No.

7  5 in which it says "If a --" I'm sorry.

8          "Do you contend that --" Interrogatory No. 4:

9  "Do you contend that the documents referred to by Emerald in

10 this litigation as, quote, 'move histories' unquote, do not

11 accurately reflect the movement of Emerald equipment?  If so,

12 please state in complete and full detail your contentions as to

13 why such move histories are not reliable."  I assume in this

14 regard that Emerald is referring to documents that are called

15 MIT histories, Marine Information Technology history I believe

16 the title would be.

17          And these documents or these, quote, "histories,"

18 unquote, were developed by a computer programmer in one of the

19 Holt companies and these histories are essentially secondary

20 documents.  They're a compilation of documents or of

21 information received from various sources, not all of which

22 Emerald can identify.  They also have handwriting on them.

23 And, finally, they didn't implement the move histories until

24 May or June, 2002, so they are essentially histories.  They are

9

1   secondary documents.   They are source documents.

2           You're asking me whether or you're asking Sea

3   Star whether Sea Star contends that the move histories do not

4   accurately reflect the movement of Emerald equipment.   The

5   question must be *what* move histories?   *Which* move histories?

6           Some may; some may not.   Some may have attached

7   source materials; some may not.   If they don't have attached

8   source materials and you have not produced the source materials

9   so that an independent examination of the move history may be

10  made, then how would you expect one to respond and how do you

11  expect to introduce such documents into evidence?

12          We believe that essentially this is a request for

13  admission but there's no identification of the particular

14  documents that the other side is asked to admit or deny.

15          No. 6:   "Identify each and every inventory --" we

16  produced the inventories "-- stating the date or dates, the

17  locations, names and addresses of the persons who took, the

18  reasons for such inventories and if such inventories were

19  provided to Emerald, the dates such inventories were provided."

20          There are inventories that are Bates-stamped

21  documents that were taken, especially during the Summer of

22  2002, that were signed by persons who represented it to

23  MBC/Emerald.   There's no question about that.   We've also

24  produced inventories taken by third parties in other locations

1    that Sea Star received during its efforts to deal with all

2    lessors' equipment.  Those have been Bates stamped.  What is

3    the purpose of such an Interrogatory and why would not the

4    reference to Rule 33(d) satisfy the answer?

5              I should say also that there had been depositions

6    that have been involved, testimony regarding the inventories

7    and how they were taken and what representatives were there.

8              No. 8:  "Does Sea Star contend that its liability

9    for rental payments for the use of Emerald Equipment terminated

10   at any time prior to the date on which the said piece of

11   equipment was returned to Emerald?"  And the answer to that

12   would be yes.  But there's a dichotomy in definition of

13   "returned to Emerald."

14             Emerald -- in the Equipment Rental Agreement you

15   have definitive times for commencement of rental and return.

16   Also in the Storage category you can identify equipment that

17   was on Sea Star's premises at particular times when inventories

18   were taken, but then you review Emerald's claims and Emerald

19   says oh, yes, well, there was a beginning trailer interchange

20   receipt and there was an ending trailer interchange receipt and

21   this piece of equipment was in Sea Star's terminal in San Juan

22   on July 1st, 2002; however on August 1st, 2002 the equipment

23   was not on an inventory in San Juan so, Sea Star, you must have

24   taken it back out and lost it and you owe us rental through the

1  end of the rental agreement period through November 30th, 2003

2  and you owe us the stipulated loss value.

3          It's very difficult to deal with a situation

4  where someone says well, you must have done this because we

5  can't find our equipment, especially when you have the

6  representatives testify that well, they moved it. They could

7  move it to a lot in the port of San Juan that Sea Star had

8  acquired for MBC/Emerald's use and was charging rental for

9  without going through a gate. I mean, Emerald could move that

10 equipment over into its own lot without going through the gate.

11 The problem with this lot was that it didn't have any gate.

12          There were concrete barriers that sort of closed

13 the entrance, and on at least one occasion a security guard

14 notified a fellow working for MBC/Emerald that some folks had

15 been in there the night before and had borrowed some equipment

16 permanently.

17          You also have situations where equipment was not

18 returned to Emerald, so to speak, but was sold by MBC Leasing

19 and Emerald still claims that the equipment was not returned.

20          Under these circumstances Emerald has to tell us

21 which pieces of equipment are involved in the answer to this

22 Interrogatory. In other words, specify what equipment is

23 really at issue in regard to the answer to this Interrogatory.

24          Under the circumstances we've also produced the

1    TIRs.  We produced the inventories.  Those documents are as

2    available for examination and have been examined by Emerald

3    representatives as they would be available for examination by

4    Sea Star representatives.

5              Overbroad.  Harassing.  What can I say?  I've

6    never seen a set of ten Interrogatories that you could

7    extrapolate so far, given the definitions of the Federal Rules

8    of Civil Procedure.

9              THE COURT:  All right.  Let me hear from your

10   friend for Emerald.

11             MR. MOLDOFF:  Thank you, Your Honor.

12             The basis of facts of this case are not complex.

13   Emerald agreed to lease thousands of pieces of equipment.

14   These are containers, chassis, and gen sets which are

15   refrigerated units for the movement of cargo on ships

16   primarily, and they agreed to lease them to Sea Star for its

17   use of that equipment on a per diem basis.

18             Since this equipment was situated at the time of

19   this agreement all over the country and in Puerto Rico and in

20   the Dominican Republic, was scattered all over, terminals, in

21   depots, et cetera, Emerald had no way of knowing where this

22   equipment was when Sea Star started to use it or when Sea Star

23   started to use this equipment.  As a result, Sea Star, and they

24   have admitted this in Request for Admissions, undertook the

1    obligation to accurately self-report and issue, quote,

2    "self-billing" reports whereby it was to accurately record the

3    use of this equipment and pay for that use.  That was the

4    agreement.

5    Those self-billing reports were not accurate.

6    Sea Star has admitted in Request for Admissions that those

7    self-billing reports were not accurate, that what they reported

8    they used was not accurate, that many pieces of equipment they

9    used not appear on the self-billing report.

10    Emerald throughout the course of this litigation

11    and through the Discovery that we have so far been able to

12    obtain and through the documents which we have obtained from

13    Sea Star -- Sea Star again --

14    You know, Mr. Armstrong speaks about these TIRs.

15    These TIRs are documents that Sea Star produces.  These are

16    documents -- these are Sea Star documents.  Whether they did or

17    didn't produce them all is really what's at issue here.  But

18    Emerald has taken all of the information that it has been able

19    to acquire through various sources and has prepared

20    spreadsheets for each piece of equipment, itemizing for each

21    piece of equipment, based on the documentation, when Sea Star

22    first used the equipment, how long they used the equipment,

23    when it was returned, if it was returned, and it has the days,

24    it has the amount that Sea Star reported on its self-billing

14

1   report and the amounts that are due for the non-report of their

2   use of the equipment and it includes comments for each piece of

3   equipment with Bates numbers referring to the various

4   documentation.  These reports have been supplied to Sea Star.

5            The issue in this case as it has been from the

6   very beginning is Sea Star's use of this equipment and whether

7   they paid for the use of this equipment.  While Sea Star admits

8   that its self-billing reports were inaccurate, Sea Star has

9   never after three years of litigation provided what they

10  believe to be their now official version of their use of this

11  equipment.

12           Remember ... it was their obligation in the first

13  place to report this accurately.  They didn't do it.  We've

14  been asking for three years:  Tell us why we're wrong and tell

15  us when you used the equipment.  What's the right information?

16  That's what this case is about.  They won't give us that

17  information.

18           THE COURT:  What are they looking for from you in

19  this lawsuit?  What's Sea Star looking for?

20           MR. MOLDOFF:  This lawsuit and the peculiar

21  procedural morass -- the reason why this lawsuit and how it

22  began was, is that I wrote a letter to Mr. Armstrong saying we

23  have this dispute.  We'd like to resolve it.  We'd like to have

24  our representatives come down to Jacksonville and review your

15

1   manifests.

2            Rather than respond to that letter -- and we said
3   we'd like to see if we can resolve this.  Rather than respond
4   to that letter, Sea Star immediately instituted suit against
5   Emerald in Florida on a, quote, "declaratory judgment action"
6   with respect to a lease that we had terminated three months
7   previously.  We terminated it because we had this dispute.
8   There was no lease for any Court to declare what the rights or
9   remedies are under that lease.  It died.  It was a terminated
10  lease.  They did it we say to pick a forum.

11           We sued in Delaware not even knowing that they
12  had sued us in Florida.  Because of the First File Rule, the
13  bankruptcy judge, Judge Walrath, said she has to dismiss our
14  suit but without prejudice and let's see what happens in
15  Florida.

16           We had filed a Motion to Dismiss.  Sea Star sued
17  in Florida and/or to transfer venue.  We went through
18  approximately a year of Discovery in Florida without us filing
19  an Answer before the Florida Court finally just before the
20  final pretrial decided our Motion and said yes, we believe
21  you're right.  You should transfer the case up to Delaware, and
22  that's why it's now in this court.  So the suit --

23           THE COURT:  Here's the question again:  What are
24  they looking for from you?

16

1          MR. MOLDOFF:  They're looking for a declaration

2    of what the rights and remedies are under the lease.

3          THE COURT:  Which is a legal question.

4          MR. MOLDOFF:  And we counter -- yes.

5          THE COURT:  Now in this lawsuit you

6    counterclaimed for what you originally were writing to

7    Mr. Armstrong about, which was money.

8          MR. MOLDOFF:  Correct.

9          THE COURT:  How much money do you think you're

10   owed?

11         MR. MOLDOFF:  Our documents show $4.7 million.

12         THE COURT:  And your position is that because of

13   their inadequate reporting, at least as I understand it, you

14   have the need in this lawsuit to make the kind of inquiries

15   that Mr. Armstrong is complaining about.  In other words, you

16   feel that the breadth of those inquiries is reasonable in this

17   lawsuit because you need to establish your claim from documents

18   only been given by them.

19         MR. MOLDOFF:  Correct.  And these documents that

20   we're asking for will clearly evidence use of the equipment

21   pieces because on the documents that we've requested, the

22   equipment piece numbers are all identified.

23         THE COURT:  Now do you think that they're just

24   incompetent in the self-reporting or do you think that --

1          MR. MOLDOFF:  We have alleged that because of the
2     magnitude of the problem -- the situation is that Sea Star
3     purchased, as Mr. Armstrong --
4          THE COURT:  Let me ask you this question:  Do you
5     think that they're incompetent or do you think that they're
6     cheating you?
7          MR. MOLDOFF:  We think that they're --
8          THE COURT:  In other words, they know they're
9     using the equipment and not reporting it.
10          MR. MOLDOFF:  We think that they knew they were
11     using it and not reporting it.  Now whether that was because
12     they were so overwhelmed --
13          THE COURT:  Okay.  That's the point about
14     incompetent.  So you have sort of a combination thing.
15          MR. MOLDOFF:  Absolutely.
16          THE COURT:  You think you're being short-changed
17     but your premise of why you're being short-changed is because
18     they're so overwhelmed with volume that their system failed
19     them.
20          MR. MOLDOFF:  Their system failed them.  Let me
21     just --
22          THE COURT:  Now how do you establish at a
23     trial -- because they're incompetent.  How are you going to
24     establish that through the documents you're seeking in this

1   broad Discovery that they owe you for the use that you claim

2   that they're not reporting?

3               MR. MOLDOFF:  Because the documents will show

4   their use of this equipment.  The documents --

5               THE COURT:  Mr. Armstrong told me that it won't

6   show their use.  It may show that they're parking, for

7   instance.

8               MR. MOLDOFF:  We have asked for -- the documents

9   that we've asked for are, for example, the bills of lading to

10  their customers.  Bills of lading to their customers --

11              THE COURT:  Now you're getting to it.  Go ahead.

12              MR. MOLDOFF:  -- will show on the bills of lading

13  the equipment pieces used for the shipping of whatever the

14  cargo is that their customers wanted to ship and it will

15  identify all of that equipment.

16              THE COURT:  So, see ... they're incompetent.

17  Can't you by sample go to a third-party customer and slice out

18  a representative claim?

19              MR. MOLDOFF:  First of all, I'm not certain why

20  we should have to do that.

21              THE COURT:  Because you've got the burden of

22  proof.  You're the one that alleges they owe you money.

23              MR. MOLDOFF:  I understand that, but why is --

24              THE COURT:  Because you've told me --

1          MR. MOLDOFF:  If we accept the fact that they're

2    incompetent, why can't they show us their invoice?

3          THE COURT:  Because you've told me and you've

4    told me again today -- you told me in the papers and you told

5    me again today they're incompetent.  So all you're gonna do is

6    make them spin wheels around their paper and you're gonna get

7    the same kind of bad result.  They don't have good documents.

8          MR. MOLDOFF:  They can give us their bills of

9    lading.  It's not a matter of whether they have them or not.

10   They haven't said that we don't have them.  They said we don't

11   want to give them to you.

12         THE COURT:  Did you tell me that the enormity of

13   their volume has led them to be incapable -- I shouldn't use

14   the word "incompetent" -- incapable of reporting accurately to

15   you?

16         MR. MOLDOFF:  No.  What I'm saying is, is that

17   Mr. Armstrong is basing his case on these documents called

18   TIRs.  They're certain receipts that are within their control

19   that show movement of equipment in and out of a terminal gate.

20         THE COURT:  And you say those documents don't

21   report all of the use that you're entitled to be paid for.

22         MR. MOLDOFF:  What I'm saying is --

23         THE COURT:  Are you saying that or not?

24         MR. MOLDOFF:  I'm saying that so far they have

1    not shown all of the movements that we have other documentation
2    to --

3            You know, Mr. Armstrong again talked about this
4    electronic input and he tells Your Honor that sorry, they're
5    secondary; that's a secondary piece of evidence.  You don't
6    have the primary piece of evidence for that.  That's what we're
7    looking for.  That's what we're searching for.  On the one hand
8    he says sorry, even though that entry shows --

9            THE COURT:  Let me tell you what's gonna happen
10   here.  See, in some of these -- I had a case with the DuPont
11   Company.  They couldn't find out how many telephones they
12   purchased in a calendar year.  They got sued by AT&T or Bell
13   South or somebody and they couldn't figure out how many
14   telephones.  To me that was incompetent.  A company couldn't
15   tell how many telephones they bought from another company.
16   That wasn't bad enough.  The other company couldn't tell how
17   many they sold to DuPont.

18           MR. MOLDOFF:  But they can tell.  Let me just --
19           THE COURT:  No, no, no.  What I want you to do,
20   before I order him to do all the things you want him to do,
21   which I may do, I think that you ought to come to me and be
22   able to establish that, for instance, through bills of lading,
23   that they short-changed you, but because I already agree with
24   you, so you've won me over, you're persuasive, that they're

1    incompetent at keeping documents, I want you to pick a

2    customer, go to the customer for payments made to Sea Star, and

3    establish that their customer has better records than they do

4    to demonstrate that your records are correct.  Just a little

5    slice.  And what I would do is I'd pick the smallest customer.

6                Now if you establish that representatively, the

7    argument you're making, on this broader scale, I'm gonna allow

8    you to go after them and I'm gonna make them do a lot of work

9    in their documents, but until I'm convinced that it's in their

10   documents and that this path of Discovery you've chosen has

11   some merit to it, in other words, it's gonna give us a fruitful

12   result so you'll get some evidence for the trial, I'm not gonna

13   order them to respond to the kind of broad questioning you've

14   asked for.  Now this is a pretty simple task.  You know their

15   customers.

16                MR. MOLDOFF:  Just let me ask.  Could I at least

17   consult with my client to tailor some sort of a narrow

18   inspection that perhaps if we can't agree we'll submit it to

19   Your Honor --

20                THE COURT:  That will demonstrate to me --

21                MR. MOLDOFF:  -- because I don't know exactly

22   what that might be.

23                THE COURT:  -- that their, for instance, bills of

24   lading are going to be helpful in establishing your claim and

22

1  in moving you forward on your burden of proof.

2  Now if you fail with the customer to come up with

3  evidence that -- see ... here's what I'm hoping, unlike the

4  other case, that the customer is gonna say oh, yeah, we paid

5  these guys this amount of goods and these containers for X

6  amount of time.  You can narrow it by volume and time.  And

7  their records are going to show oh, no, we only held that

8  customer's product, whatever it is, for about 60 percent of the

9  time.  Right?

10  MR. MOLDOFF:  Well --

11  THE COURT:  Then why did the customer pay them

12  for the other 40 percent?  That's gonna cause me to really

13  agree with you and make them do a lot of work to get into their

14  files, their invoicing, their accounting records.  I'm gonna

15  allow you to get all that Discovery, because you've shown me

16  that there's some merit to what you're arguing here.

17  MR. MOLDOFF:  Quite frankly, I don't have them

18  here, but I know we have numerous instances.  The fact of the

19  matter is, Your Honor, Sea Star will admit that there were many

20  pieces that were not included that we have uncovered, many,

21  many pieces that they never --

22  THE COURT:  There's a vehicle to prove that

23  company-wide and the best way to do that --

24  MR. MOLDOFF:  I thought that our Interrogatories

23

1   at least some of them-- some of them are different.  Some of

2   them are tailored.  Some of them are industry-wide; some of

3   them are not.

4              THE COURT:  I gotta agree with him.  See ... he's

5   persuasive that your Interrogatories are awfully broad.

6              MR. MOLDOFF:  Let me, Your Honor, just make one

7   more comment if I could --

8              THE COURT:  Sure.

9              MR. MOLDOFF:  -- with respect to these TIRs again

10   which Mr. Armstrong has brought up which is quite interesting

11   because again he says these are really the controlling

12   documents and we have been seeking these documents for three

13   years now.  What's interesting is is that within the last

14   month, within the last month, I have the cover letters from

15   Mr. Armstrong, he has submitted four submissions, four separate

16   cover letters, including more than 500 TIRs we have never seen

17   before.  The question is, where were they?  Are there more

18   TIRs?  Are they lost somewhere?  Are they still looking for

19   more TIRs?  He says that controls this case.  We're still

20   getting them three years into this case.

21              THE COURT:  Well, that's not good.

22              MR. MOLDOFF:  That's why he can't rely on them

23   giving us TIRs and that's why we need this other information,

24   because this other information will show us what equipment is

24

1    moving and where it's moving and we know that it's moving by

2    Sea Star. Equipment doesn't move by itself. When we showed

3    this equipment moving in and out of a gate, they say sorry, you

4    don't have an underlying document. Quite frankly, we think --

5                    THE COURT: You're arguing what you've already

6    won. I'm agreeing with you. But I'm saying show it to me by a

7    vendor. That's all I'm asking you to do. If you show me what

8    you're saying here today by a vendor in an isolated time frame,

9    I'm going to allow you to have at them as broadly as you're

10   asking.

11                   MR. MOLDOFF: Or perhaps could it be by ship? If

12   I remember correctly, another way to do it would be to say tell

13   us, you know, that their ship --

14                   THE COURT: The way I like, so the way I'd

15   probably do it if I were you, is a vendor because it's gonna

16   tell me something. I'm expecting to get a dramatic result from

17   this effort by you on a vendor. I'm expecting to see, like, a

18   50 percent deviation.

19                   MR. MOLDOFF: And Mr. Armstrong is gonna tell us

20   who those vendors are? How do we get to pick a vendor?

21                   THE COURT: You pick it.

22                   MR. MOLDOFF: I don't have a list of who their

23   vendors are.

24                   THE COURT: You don't?

25

1          Give him a list of your vendors.

2          MR. ARMSTRONG:  For the period April 29, 2002

3     through November --

4          THE COURT:  The relevant time frame from the

5     agreement.

6          MR. ARMSTRONG:  -- through September 1st, 2002

7     which is the time frame that he wants these bills of lading.

8          THE COURT:  Yeah.  That's fine.  Give him your

9     list of vendors.

10         MR. ARMSTRONG:  Your Honor, you're not really

11    talking about vendors.  You're talking about shippers and

12    consignees.

13         THE COURT:  I call them vendors.

14         MR. ARMSTRONG:  That's sort of a customer list,

15    proprietary, but -- how do I handle that?

16         THE COURT:  Like we do in every case.  You give

17    it to him under a Protective Order, for counsel's eyes, and

18    then he goes to the customer/vendor/shipper and gets the

19    information under the Protective Order or the protective

20    provision and then he analyzes it and submits it to me under

21    seal.

22         MR. ARMSTRONG:  All right.

23         THE COURT:  And if there's a big deviation, you

24    got a problem.

26

1          MR. ARMSTRONG:  Well, if there's not then counsel

2   has a problem because counsel has said certain things.

3          THE COURT:  Well, he's gonna pay the cost of this

4   motion and, on the other hand, if he's right, you're gonna pay

5   the cost of the motion.  It's a Motion to Compel.

6          MR. ARMSTRONG:  Uh-huh.

7          THE COURT:  But I gotta get a handle on whose got

8   the right breadth to this lawsuit and I only know one way to do

9   it, test the movant's theory.

10          MR. ARMSTRONG:  All right, Your Honor.

11          THE COURT:  I'm gonna ask that you give me a

12   status report.  You ought to be able to get this done in six

13   weeks or so?

14          MR. MOLDOFF:  We have a pretrial scheduled for

15   September the 6th.

16          THE COURT:  Right.  If you really want this

17   information -- that's why I keep telling you about the trial.

18   If you really want this -- I mean, I assume it's gonna take you

19   some time to get the third-party vendor to produce it to you.

20   We may have to move the pretrial, but --

21          MR. MOLDOFF:  My client would not be happy with

22   that.  My client has been waiting for three years.

23          THE COURT:  But you'll still get the same trial

24   date.

27

1          MR. ARMSTRONG:  Your Honor, in that regard I have

2     not been able to take the 30(b)(6) deposition of Emerald.  I

3     understand that there are objections to at least one subpoena

4     that I had served.

5          We also have a pending Motion for Partial Summary

6     Judgment and a response is not due until I've taken the

7     30(b)(6) Emerald deposition and we've dealt with that, so under

8     the circumstances moving the pretrial a couple of months

9     forward seems the most reasonable way to proceed given your

10    ruling today.

11         THE COURT:  Right.  I'll address all that.  I

12    want to get -- in other words, if he's right and you've got

13    information that proofs up his claim or supports his claim and

14    it's accessible through your records and you haven't provided

15    that in Discovery over all this time, this case is gonna have a

16    different complexion that it has today.

17         If he's wrong we'll move quickly to get your

18    30(b)(6) which you're entitled to.  I can't imagine -- your

19    subject area might have to be limited, but I think that's the

20    basis of the opposition from what I read, but we'll get you

21    that 30(b)(6) and we'll get a pretrial and you'll be in trial

22    by the end of the year.

23         MR. ARMSTRONG:  Can I take the 30(b)(6) now?

24         THE COURT:  Nope.  I want to find out who it is

1   that doesn't understand the case and once I understand that,

2   then my rulings can be consistent.  Until I get that

3   information I can't be consistent.

4           MR. ARMSTRONG:  My understanding is that when he

5   does this sample, he'll also have to show you that if there's a

6   piece of equipment that moved from Point A to Point B on a bill

7   of lading and it was an Emerald piece of equipment and it was

8   not under the in-transit exception carved out by the Bankruptcy

9   Court, then he's also going to have to show that that piece of

10  equipment was not in any of these equipment manifests and other

11  documents that Sea Star has produced.

12          THE COURT:  He won't be able to show that from

13  the test he's gonna perform.

14          MR. ARMSTRONG:  Pardon?

15          THE COURT:  He won't be able to show that from

16  the test he's gonna perform.

17          MR. ARMSTRONG:  He won't be able to show --

18          THE COURT:  In other words, you have a vendor

19  that you reported to him that used your equipment for so much

20  time.

21          MR. ARMSTRONG:  Right.  You're asking for --

22          THE COURT:  So you already said that you have a

23  vendor and they used your equipment.  The vendor --

24          MR. ARMSTRONG:  Wait ... wait.  The vendor -- oh.

29

1    I see ... you're talking about a shipper who loads cargo into a

2    piece of my equipment and moves it from, say, Wilmington to San

3    Juan.

4         THE COURT:  And pays you for the container.

5         MR. ARMSTRONG:  And pays me for the freight.

6    Right.  Okay.

7         THE COURT:  He's not gonna be able to show those

8    other things in that test.  He's going to be able to show --

9    and then we're gonna find out what the vendor paid you and what

10   you reported to Emerald.

11        MR. ARMSTRONG:  But if it shows on the manifest

12   that he's already received, then how does it prove anything

13   with respect to his claim, because he had that document.

14        THE COURT:  It proves that there is an ability

15   through records to establish what he's claiming you did, and

16   the records will be independent because they're from the

17   shipper.

18        MR. ARMSTRONG:  But if the records corroborate my

19   records --

20        THE COURT:  If the vendor paid exactly what your

21   records said, then he's on a fishing expedition.  If they show

22   a deviation, then you're not being candid in Discovery, and

23   you'll get hurt here.

24        MR. MOLDOFF:  It's not a question of payment.

30

1    It's a question of equipment pieces that are moving.

2            THE COURT:  Right.  I understand that.  And I'm

3    trying to shorthand this because I got other proceedings that

4    go on.  You two can't be this thick.  You just aren't getting

5    along.  But what will happen is you run that test and show me

6    what deviates from the vendor's records to his records and

7    you'll either get a lot more information or you'll have a lot

8    narrower scope of proof.

9            MR. MOLDOFF:  Further Discovery.  We already have

10   a large amount of documentation.  We're looking for more.

11           THE COURT:  One of you don't get this case.  I

12   don't know which one it is but I'll find out.

13           All right.  We'll be in recess.

14           MR. ARMSTRONG:  Your Honor, one question.  Is the

15   pretrial off then?

16           THE COURT:  I'm gonna go look at the calendar.

17           MR. ARMSTRONG:  It's set for two weeks.  It's set

18   for the 6th.

19           THE COURT:  I know.  I think it's gonna be off

20   but I want to look at some dates because I don't want to put it

21   off without another date out in front.  I'm gonna give you the

22   six weeks which is the end of September to get this information

23   and if I don't get the information, then all bets are off.

24   We're gonna go right to a pretrial and trial.  If I get the

1    information, there may be some time required for you to produce

2    additional information and then we'll go to a pretrial maybe

3    about a month later than I would anticipate.

4                    All right.  We're in recess.

5                    MR. MOLDOFF:  Just if I may.  Again, my client

6    was very concerned about the trial date.  I think Your Honor

7    indicated on the record the trial date would not be different.

8                    THE COURT:  We have a trial date in this case --

9                    MR. MOLDOFF:  I don't think we have a trial date.

10                   THE COURT:  -- of ninety days --

11                   MR. MOLDOFF:  To a hundred and twenty days.

12                   THE COURT:  -- to a hundred and twenty days from

13   September 6.  That's not gonna change.

14                   MR. MOLDOFF:  Thank you.

15                   THE COURT:  That's what you can tell your client.

16   From that 90 to a hundred and twenty.

17                   All right.  This matter is in recess.

18                        -   -   -

19                   (Court recessed at 2:52 p.m.)

20

21

22

23

24

32

```
 1   STATE OF DELAWARE        )
                              :  SS.
 2   NEW CASTLE COUNTY        )

 3

 4                      CERTIFICATION

 5

 6          I, CAROL DiSERAFINO, Professional Reporter

 7   and Notary Public, do hereby certify that the foregoing

 8   record is a true and accurate transcript of my

 9   stenographic notes taken on Wednesday, August 22, 2007,

10   in the above-captioned matter.

11

12          WITNESS my hand at Wilmington, Delaware,

13   this 27th day of August, 2007.

14

15          Carol Di Serafino
            _____

16          CAROL DiSERAFINO, CSR
            COURT REPORTER-NOTARY PUBLIC
17          Cert. No. 182-PS

18

19

20

21

22

23

24
```