# EXHIBIT A

# ADELMAN LAVINE GOLD AND LEVIN

A PROFESSIONAL CORPORATION

ATTORNEYS AND COUNSELORS AT LAW

LEWIS H. COLD
ROBERT H. LEVIN
CARY M. SCHILDHORN
BARRY D. KLEBAN
CARY D. KRESSLER
STEVEN D. USDIN
RAYMOND H. LEMISCH
LEON R. BARSON
ALAN I. MOLDOFF
KATHLEEN E. TORBIT
WILLIAM K. HINCHMAN
VICTORIA ENDRISS SHISLER
ROBERT J. LENAHAN
BRADFORD J. SANDLER
MARK PFEFFER
D. ANDREW BERTORELLI JR.
JENNIFER R. HOOVER

SUITE 900
FOUR PENN CENTER
PHILADELPHIA, PA 19103-2808
(215) 568-7515

FACSIMILE (215) 557-7922
law@cn@adelmanlaw.com

SUITE 710
919 NORTH MARKET STREET
WILMINGTON, DE 19801
302-654-8200

February 25, 2004

## BY TELECOPIER (215-635-4771)

Storage Transfer L.L.C.
c/o Lorraine Robins
7900 Old York Road
Unit 812B
Elkins Park, PA 19027

**Re:    Contribution to the Emerald Estate**

Dear Ms. Robins:

I am advised that Storage Transfer L.L.C. ("Storage") has acquired the secured position of MBC Leasing Company in the Estate of Emerald Equipment Leasing, Inc. ("Emerald"). Emerald currently intends to prosecute certain substantial claims against Sea Star Lines, LLC. Storage has agreed to contribute to the Emerald estate 15% of any proceeds, net of expenses or other amounts disbursed to third parties, it would otherwise receive on account of its secured claim as a result of any settlement of the Sea Star claim or the collection of any judgment obtained upon prosecution of this claim. Storage has further agreed that these funds may be used by Emerald to fund a plan of reorganization and that Storage will not assert a deficiency claim against Emerald with respect to any proceeds contributed by Storage to the Emerald estate.

**EXHIBIT S.T.-10**
ROBINS – 1/2/08 - gli

www.DeposDE.com

E68500

215 635 2351;    FEB-25-04 17:27;

Storage Transfer L.L.C.
February 25, 2004
Page 2

Please execute this letter on the space provided below to indicate
Storage's agreement to the carveout from its secured claim in accordance with the terms
set forth above.

Very truly yours,

GARY M SCHILDHORN

GMS.md
cc:    Mr. Thomas Holt, Sr.

p:\393\10\letters\storage transfer2

AGREED TO AND ACCEPTED BY:
STORAGE TRANSFER L.L.C.

By: _____

Lorraine Robins,
Its Sole Member

E68501

# **EXHIBIT B**

# ADELMAN LAVINE GOLD AND LEVIN

A PROFESSIONAL CORPORATION

ATTORNEYS AND COUNSELORS AT LAW

LEWIS H. COLD
ROBERT H. LEVIN
GARY M. SCHILDHORN
BARRY D. KLEBAN
CARY D. BRESSLER
STEVEN D. USDIN
RAYMOND H. LEMISCH
LEON R. BARSON
ALAN I. MOLDOFF
KATHLEEN E. TORBIT
WILLIAM R. HINCHMAN
VICTORIA ENDRISS SHISLER
ROBERT J. LENAHAN
BRADFORD J. SANDLER
MARK PFEIFFER
D. ANDREW BERTORELLI JR.
JENNIFER R. HOOVER

SUITE 900
FOUR PENN CENTER
PHILADELPHIA, PA 19103-2808
(215) 568-7515

FACSIMILE (215) 557-7922
lawyers@adelmanlaw.com

SUITE 710
919 NORTH MARKET STREET
WILMINGTON, DE 19801
302-654-8200

February 25, 2004

## BY TELECOPIER (215-635-4771)

Storage Transfer L.L.C.
c/o Lorraine Robins
7900 Old York Road
Unit 812B
Elkins Park, PA 19027

Re:    **Curveout**

Dear Ms. Robins:

You have advised us that Storage Transfer L.L.C. ("Storage") has acquired the claim of MBC Leasing Company, which claim is secured by a first lien on substantially all of the assets of Emerald Equipment Leasing, Inc. ("Emerald"). Adelman Lavine Gold and Levin, a Professional Corporation ("Adelman") serves as counsel to Emerald in Emerald's ongoing Chapter 11 proceeding.

This firm has been requested to perform additional services for Emerald, including, but not limited to, the prosecution of a claim against Sea Star Lines, L.L.C. and the preparation and filing of a liquidating plan of reorganization for Emerald. Adelman is unwilling to undertake this continuing representation, unless adequate provisions are made for the payment of this firm's allowed fees and costs. Storage has agreed to provide such assurances.

By executing this letter on the space provided, Storage agrees to carve out from the proceeds of its collateral an amount sufficient to pay fees earned and costs incurred by Adelman in the Emerald Chapter 11 proceeding. This agreement is without prejudice to Storage's right to object to any fee application as may be submitted by Adelman in the Emerald Chapter 11 proceeding. Adelman will be able to seek

**EXHIBIT S.T.-11**
ROBINS – 1/2/08 - gli

www.DeposDE.com

Storage Transfer L.L.C.
February 25, 2004
Page 2

reimbursement from the carveout upon the filing of Certificates of No Objection to any monthly fee requests and the entry of an Order approving any quarterly fee application, if at such times the Emerald estate does not have the funds to pay amounts owed to Adelman.

Please execute this letter on the space provided and return a copy to me in the enclosed envelope evidencing Storage's agreement to the carveout.

Very truly yours,

GARY M. SCHILDHORN

GMS:md
cc:    Mr. Thomas Holt, Sr.

g:\393\10\letters\storage transfer

AGREED TO AND ACCEPTED BY:
STORAGE TRANSFER L.L.C.

By: _____
       Lorraine Robins,
       Its Sole Member

# EXHIBIT C

**ECKERT SEAMANS**

Eckert Seamans Cherin & Mellott, LLC
Two Liberty Place
50 South 16th Street
22nd Floor
Philadelphia, PA 19102

TEL 215 851 8400
FAX 215 851 8383
www.eckertseamans.com

Gary M. Schildhorn
Direct Dial: 215-851-8465
E-Mail: gschild@adelmanlaw.com

August 15, 2007

### BY FIRST-CLASS MAIL AND E-MAIL

Lorraine Robins
2700 Atlantic Avenue
Longport, NJ 08403

**Re:    Carveout in Emerald Bankruptcy Case Docket No. 01-00934 (BLS)**

Dear Ms. Robins:

As you know, the attorneys at Adelman Lavine Gold Schildhorn and Kleban ("Adelman") who had been employed as counsel for Emerald Equipment Leasing, Inc. ("Emerald") in the Emerald bankruptcy proceedings have left the Adelman law firm as of March 31, 2007 and are now employed by Eckert Seamans Cherin & Mellott, LLC ("Eckert Seamans"). In that regard, Eckert Seamans has filed an Application to be employed as counsel for Emerald in place of the Adelman law firm, as of April 1, 2007. The services Eckert Seamans is providing are the same that Adelman was providing, and include but are not limited to the prosecution of Emerald's claim against Sea Star Lines, L.L.C. and (based upon the results of that litigation) the preparation and filing of a liquidating plan of reorganization for Emerald.

You had previously executed a Carveout Agreement dated February 25, 2004 (see attached) wherey Storage Transfer L.L.C. ("Storage") had agreed to a carevout from the proceeds of its collateral in an amount sufficient to pay fees earned and costs incurred by the Adelman law firm in the Emerald Chapter 11 proceeding. Pursuant to our discussions, Storage has agreed to allow a similar carveout from the proceeds of its collateral in an amount sufficient to pay fees earned and costs incurred by Eckert Seamans in the Emerald Chapter 11 proceeding (including prosecution of Emerald's claim against Sea Star Lines, LLC. This agreement, like the agreement with the Adelman law firm is without prejudice to Storage's right to object to any fee application as may be submitted by Eckert Seamans in the Emerald Chapter 11 proceedings. Eckert Seamans will be able to seek reimbursement from the carevout upon the filing of certificates of no objection to any monthly fee requests and the entry of an Order approving any quarterly fee application, if at such time the Emerald estate does not have the funds to pay amounts owed to Eckert Seamans.

**EXHIBIT S.T.-12**
ROBINS – 1/2/08 - gli

www.DeposDE.com



# ECKERT SEAMANS

Eckert Seamans Cherin & Mellott, LLC
Two Liberty Place
50 South 16th Street
22nd Floor
Philadelphia, PA 19102

TEL 215 851 8400
FAX 215 851 8383
www.eckertseamans.com

Lorraine Robins
August 15, 2007
Page #

Please execute this letter on the space provided and return a copy to me in the enclosed envelope evidencing Storage's agreement to the carevout.

Very truly yours,

GARY M. SCHILDHORN

GMS/md

cc:     Thomas Holt, Sr.

AGREED TO AND ACCEPTED BY:
STORAGE TRANSFER L.L.C.

BY: _____
        Lorraine Robins,
        Its Sole Member

# EXHIBIT D

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

IN RE:                 *      Chapter 11

MUMA SERVICES, INC (f/k/a MURPHY *     Case Nos.: 01-00926 through
MARINE SERVICES, INC.), et al.,              01-00950 (MFW)
       Debtors.                  *      (Jointly Administered)

    *         *        *         *        *        *        *         *        *        *

## MOTION OF MBC LEASING CORP.
## FOR ALLOWANCE AND PAYMENT OF ADMINISTRATIVE PRIORITY
## CLAIMS PURSUANT TO 11 U.S.C. §§ 365(d)(10), 503(b) AND 507(a)(1)

Leasing Corp. ("MBC"), by and through its attorneys, moves this Court for an

(a) Allowing MBC a claim in the amount of Thirteen Thousand Six Hundred Sixty-Seven Dollars and Ten Cents ($13,667.10) pursuant to 11 U.S.C. § 365(d)(10) representing: (i) the amount of rent that accrued under the Equipment Lease Agreement dated as of March 18, 1999 by and between MBC, as lessor, and NPR, Inc. and Holt Cargo Systems, Inc. as lessees, (the "MBC Lease") during the period that commenced on the 60th day after NPR, Inc. and Holt Cargo Systems, Inc. (collectively, the "Lessee Debtors") filed their petitions for relief under Chapter 11 and ended on the date on which rejection of the MBC Lease was effective; (the "MBC 365 Period") minus (ii) the amount paid by the Lessee Debtors to MBC during the MBC 365 Period;

(b) Allowing MBC a claim in the amount of Eighty-Seven Thousand Six Hundred Fourteen Dollars and Forty-One Cents ($87,614.41) pursuant to 11 U.S.C. §§ 503(b) and 507(a)(1) representing unpaid rent that accrued under the MBC Lease between the date on which the Lessee Debtors filed their petitions for relief under Chapter 11 and the commencement of the MBC 365 Period;

EXHIBIT S.T.-14
ROBINS – 1/2/08 - gli

www.DeposDE.com

(c) Allowing MBC a claim in the amount of One Hundred Fifteen Thousand Eight Hundred Twenty-Nine Dollars and Twenty-Two Cents ($115,829.22) pursuant to 11 U.S.C. §§ 503(b) and 507(a)(1) representing the actual and necessary unpaid cost to the Lessee Debtors' estates of continued use of the equipment that was the subject of the MBC Lease after the MBC 365 Period;

(d) Allowing MBC a claim in the amount of Two Million Three Hundred Ninety-Seven Thousand Two Hundred Thirty-One Dollars and Twenty-Eight Cents ($2,397,231.28) pursuant to 11 U.S.C. § 365(d)(10) representing: (i) the amount of rent that accrued under the Equipment Lease Agreement made as of November 18, 1997 by and between Emerald Equipment Leasing, Inc. ("Emerald"), as lessor, and the Lessee Debtors, as lessees (the "Emerald Lease") during the period that commenced on the 60th day after the Lessee Debtors filed their petitions for relief under Chapter 11 and ended on the date on which rejection of the Emerald was effective (the "Emerald 365 Period"); minus (ii) the amount paid by the Lessee Debtors to or for the benefit of Emerald during the Emerald 365 Period;

(e) Allowing MBC a claim in the amount of One Million Five Hundred Sixty-Seven Thousand Four Hundred Eleven Dollars and Eleven Cents ($1,567,411.11) pursuant to 11 §§ 503(b) and 507(a)(1) representing unpaid rent that accrued under the Emerald Lease between the date on which the Lessee Debtors filed their petitions for relief under Chapter 11 and the commencement of the Emerald 365 Period; and

(f) Allowing MBC a claim in the amount of One Million Four Hundred Thirty-Four Thousand Five Hundred Seventy-Nine Dollars and Sixty-Six Cents ($1,434,579.66) pursuant to U.S.C. §§ 503(b) and 507(a)(1) representing a portion of the actual and necessary

unpaid cost to the Lessee Debtors' estates of continued use of the equipment that was the subject

of the Emerald Lease after the Emerald 365 Period and for reasons states:

### Claims Under MBC Lease

Pursuant to the MBC Lease, MBC leased to the Lessee Debtors 700 forty foot dry van containers and the 283 forty-five foot dry van containers (the "MBC Equipment").

2.     At the time that the Lessee Debtors filed their petitions for relief under Chapter 11, the MBC Lease had not expired, had not been terminated, and was in full force and effect and the Lessee Debtors were in possession of the MBC Equipment.

3.     Following the filing of their petitions, the Lessee Debtors continued to use the MBC Equipment and to derive revenues from the use thereof including, without limitation, funds paid by Sea Star Line, LLC ("Sea Star") to purchase the Lessee Debtors' accounts receivable which were generated, in part, by using the MBC Equipment.

4.     On or about May 15, 2002, the Debtors filed a Motion for Order Approving Rejection of Leases of Non-Residential Real Property and Equipment Pursuant to 11 U.S.C. § 365 (the "Omnibus Rejection Motion") seeking to reject multiple leases, including the MBC Lease, effective as of May 15, 2002.

5.     The Omnibus Rejection Motion insofar as it pertained to the MBC Equipment was resolved by an Order Rejecting MBC Equipment Lease (the "MBC Rejection Order") entered on June 3, 2002.

6.     The MBC Rejection Order provided that, to the extent that the MBC Lease as a "true lease," it was rejected effective as of May 15, 2002. The Lessee Debtors were also directed to convey all of their right, title, and interest in and to the MBC Equipment to MBC effective as of May 15, 2002. The MBC Rejection Order also granted MBC relief from the automatic stay to enforce its rights and remedies under the MBC Lease.

7.    Pursuant to 11 U.S.C. § 365(d)(10), the Lessee Debtors were obligated to "timely perform all of the obligations of the debtor, except those specified in section 365(b)(2), first arising from or after 60 days after the order for relief... under an unexpired lease of personal property... until such lease is assumed or rejected notwithstanding section 503(b)(1) of this title, unless the court, after notice and a hearing and based on the equities of the case, orders otherwise with respect to the obligations or timely performance thereof."

8.    As this Court has never "ordered otherwise," the Lessee Debtors were obligated to perform all obligations that came due under the MBC Lease during the MBC 365 Period.

9.    During the MBC 365 Period, Five Hundred Thirty-Six Thousand Eighty-One Dollars and Thirty-Nine Cents ($536,081.39) in rent came due under the MBC Lease.

10.    The Lessee Debtors paid Five Hundred Twenty-Two Thousand Four Hundred Fourteen Dollars and Twenty-Nine Cents ($522,414.29) to MBC on account of rent that came due during the MBC 365 Period under the MBC Lease and a Stipulation Between MBC Leasing Corp. and Debtors With Respect to Adequate Protection of Property (the "MBC Stipulation") which was approved by this Court on June 13, 2001[1].

11.    The unpaid balance of the rent that came due under the MBC Lease during the MBC 365 Period, Thirteen Thousand Six Hundred Sixty-Seven Dollars and Ten Cents ($13,667.10), remains due and payable.

12.    In addition, pursuant to 11 U.S.C. §§ 503(b) and 507(a)(1), MBC is entitled to an allowed claim for the actual, necessary costs and expenses of preserving the Lessee Debtors'

---

[1]    As MBC's claim under 11 U.S.C. § 365(d)(10) is entitled to the highest priority of the claims held by MBC, to avoid overstating its claim, MBC has applied all payments made by the Debtors on account of their obligations under the MBC Lease after the filing of their petitions, whether or not made during the MBC 365 Period, to rent that accrued under the MBC Lease during the MBC 365 Period.

estates, including the costs incurred  in using the MBC Equipment both before and after the 365 Period.

13.    Between the date of the filing of the Lessee Debtors' petitions and the commencement of the MBC 365 Period, the Lessee Debtors used the MBC Equipment in the operation of their businesses.

14.    Between the date of the filing of the Lessee Debtors' petitions and the commencement of the MBC 365 Period,  Eighty-Seven Thousand Six Hundred Fourteen Dollars and Forty-One Cents ($87,614.41) in rent accrued under the MBC Lease.

15.    No part of the rent that accrued under the MBC Lease between the date of the filing of the Lessee Debtors' petitions and the commencement of the MBC 365 Period has been

16.    The Lessee Debtors did not return the MBC Equipment to MBC at the conclusion of the MBC 365 Period.

7.    Certain of the MBC Equipment, as yet unidentified, (the "Sea Star MBC Equipment") was delivered by the Lessee Debtors into the possession of Sea Star upon the sale of certain of the assets of the Lessee Debtors, but not including the Sea Star MBC Equipment, to Sea Star.

18.    At a hearing on approval of the sale to Sea Star on April 26, 2002, counsel to the Lessee Debtors represented to the Court that a "memorandum agreement" between the Lessee Debtors and Sea Star existed pursuant to which the "estates are being compensated" by Sea Star for the Lessee Debtors' costs for the use of any equipment that Sea Star was not purchasing to complete shipments in process at the time of closing.  Transcript of April 26, 2002 hearing on Motion to Sell ("April 26 Transcript), p. 55, line 25, to p. 56, line 24.

19.    According to counsel, that memorandum agreement was based upon a model developed by "one or our people, the president-- or, the Executive VP of MPR (sic), Carl Fox, and Mr. Leach from Sea Star." April 26 Transcript, p. 56, line 25, to p. 57, line 3. The model was based on "the last quarter's costs of shipping, costs of delivering the service, on average." April 26 Transcript, p. 57, lines 3-5. According to the representation of Debtors' counsel, "there is an imputed number that we'll get paid at closing, and then it's subject to true up post closing based on the *actual cost of the voyage, or the trips to MPR* (sic)." April 26 Transcript, p. 57, lines 10-12 (Emphasis added).

20.    In response to a specific question by the Court as to whether the costs for which the Debtors would be paid by Sea Star included rental costs, whether or not the applicable lease had been rejected, counsel to the Lessee Debtors stated:

> We understand that there may be an administrative expense claim accruing until we can get these boxes out of service. That's understood. Again, Sea Star will hopefully correct me if I— if I am wrong, but I believe that the model, which is complicated and has a lot of factors in it, does include the total rental costs as one of the cost factors imputed to the box moving in interstate and international commerce.

April 26 Transcript, p. 58, lines 5-11.

21.    Despite the representations made by their counsel, in response to Interrogatories subsequently served on the Lessee Debtors by MBC, both Lessee Debtors stated that nothing was due from Sea Star for use of the Sea Star MBC Equipment.

22.    Sea Star subsequently leased the MBC Equipment from MBC effective as of August 1, 2002 pursuant to an Equipment Lease Agreement dated as of August 1, 2002 by and between MBC, as lessor, and Sea Star, as lessee (the "Sea Star MBC Lease").

23.    Between the date on which rejection of the MBC Lease was effective and the date on which the Sea Star MBC Lease became effective, One Hundred Fifteen Thousand Eight

Hundred Twenty-Nine Dollars and Twenty-Two Cents ($115,829.22) in rent attributable to the MBC Equipment accrued under the MBC Lease calculated at the rates specified therein.

24.    The rent attributable to the MBC Equipment that came due under the MBC Lease between the date on which rejection of the MBC Lease was effective and the date on which the Sea Star MBC Lease became effective constitutes an actual, necessary cost and expense of preserving the Lessee Debtors' estates as the use of at least a portion of such equipment was essential to the consummation of the sale of the Lessee Debtors's assets to Sea Star and counsel to the Lessee Debtors acknowledged that a continuing administrative expense obligation was likely to be incurred until the MBC Equipment was returned.

25.    No portion of the rent that accrued under the MBC Lease between the date on which rejection of the MBC Lease was effective and the date on which the Sea Star MBC Lease became effective has been paid.

WHEREFORE, MBC respectfully requests that this Court enter an Order:

1.    Allowing MBC a claim in the amount of Thirteen Thousand Six Hundred Sixty-Seven Dollars and Ten Cents ($13,667.10) pursuant to 11 U.S.C. § 365(d)(10) representing the amount of unpaid rent that accrued under the MBC Lease during the period that commenced on the 60th day after the Lessee Debtors filed their petitions for relief under Chapter 11 and ended on May 15, 2002;

2.    Allowing MBC a claim in the amount of Eighty-Seven Thousand Six Hundred Fourteen Dollars and Forty-One Cents ($87,614.41) pursuant to 11 U.S.C. §§ 503(b) and 507(a)(1) representing unpaid rent that accrued under the MBC Lease between the date on which the Lessee Debtors filed their petitions for relief under Chapter 11 and the commencement of the MBC 365 Period;

3.      Allowing MBC a claim in the amount of One Hundred Fifteen Thousand Eight Hundred Twenty-Nine Dollars and Twenty-Two Cents ($115,829.22) pursuant to 11 U.S.C. §§ 503(b) and 507(a)(1) representing the actual and necessary unpaid cost to the Lessee Debtors' estates of continued use of the Sea Star MBC Equipment after the MBC 365 Period until the commencement of the term of the Sea Star MBC Lease;

4.      Authorizing and directing the trustee of the estates of the Lessee Debtors (the "Trustee") to pay the aforesaid claims immediately; and

5.      Granting to MBC such other and further relief as the case may require.

### Claims Under Emerald Lease

26.      In 1997, Emerald requested that MBC provide a term loan (the "Purchase Money Loan") to Emerald in the amount of Thirty-Five Million Dollars ($35,000,000.00) to enable Emerald to purchase 426 twenty foot steel dry van containers, 990 Onan refrigerator "gensets," 910 forty foot steel dry van containers, 1,457 forty foot steel high cube dry van containers, 945 forty-five foot steel dry van containers, 396 forty-five foot aluminum dry van containers, 972 refrigerated containers, and 6,741 chassis (the "Emerald Equipment") from the Lessee Debtors and to enter into a long term lease of the Emerald Equipment to the Lessee Debtors.      MBC agreed to provide the Purchase Money Loan.

27.      To evidence its obligations with respect to the Purchase Money Loan, Emerald executed and delivered to MBC a Loan and Security Agreement dated as of November 20, 1997 by and between Emerald and MBC, as subsequently amended, (the "Loan Agreement"), and a $35,000,000.00 Term Loan Promissory Note dated as of November 20, 1997 from Emerald to MBC. 28.      To secure its obligations to MBC with respect to the Purchase Money Loan, Emerald granted MBC a security interest in the Emerald Equipment and all "accounts, chattel

paper, contract rights, documents, general intangibles, and instruments arising from" the Emerald Equipment.

29.    Emerald leased the Emerald Equipment to the Lessee Debtors pursuant to the Emerald Lease.

30.    As additional security for its obligations to MBC with respect to the Purchase Money Loan, Emerald assigned the Emerald Lease to MBC pursuant to the Loan Agreement and an Assignment of Lease As Security made as of November 20, 1997 by and between Emerald and MBC (the "Lease Assignment"). MBC perfected its security interests in all of the collateral granted by Emerald by taking possession of the original Emerald Lease and by appropriate filings.

31.    In the Emerald Lease, as a precaution in the event that the Emerald Lease was ever determined to constitute a financing transaction instead of a true lease, the Lessee Debtors granted Emerald a security interest in the Emerald Equipment. Emerald perfected its security interest in the Emerald Equipment by appropriate filings and assigned its security interests to MBC as additional collateral.

32.    At the time that the Lessee Debtors filed their petitions for relief under Chapter 11, the Emerald Lease had not expired, had not been terminated, and was in full force and effect and the Lessee Debtors were in possession of the Emerald Equipment.

33.    Following the filing of the Lessee Debtors' petitions, the Lessee Debtors continued to use the Emerald Equipment and to derive revenues from the use thereof including, without limitation, funds paid by Sea Star to purchase the Lessee Debtors' accounts receivable which were generated, in part, by using the Emerald Equipment.

34.    On or about April 18, 2002, the Lessee Debtors filed a Motion for Order Approving Rejection of Equipment Lease With Emerald Equipment Leasing, Inc. Pursuant to 11 U.S.C. § 365 (the "Emerald Rejection Motion") seeking authorization to reject the Emerald Lease as of an unspecified date, but requesting a hearing on April 22, 2002.

35.    The Emerald Rejection Motion was resolved by a Consent Order Authorizing Return of Equipment to Emerald Equipment Leasing, Inc. (the "Emerald Rejection Order") entered on May 10, 2002.

36.    The Emerald Rejection Order provided that, to the extent that the Emerald Lease was a "true lease," it was rejected effective as of April 18, 2002, the date on which the Emerald Rejection Motion was filed. The Lessee Debtors were also ordered to execute a bill of sale conveying all of the Lessee Debtors' right, title, and interest in and to the Emerald Equipment to Emerald. By separate Order, MBC was granted relief from the automatic stay, effective as of April 29, 2002, to enforce its rights and remedies under the Loan Agreement.

37.    By virtue of the assignment of the Emerald Lease to MBC pursuant to the Loan Agreement and the Lease Assignment and the granting of relief from the automatic stay to MBC to enforce its rights and remedies thereunder, MBC is entitled to assert and enforce any claims that Emerald may have under the Emerald Lease or arising from the use of the Emerald Equipment.

38.    Pursuant to 11 U.S.C. § 365(d)(10), the Lessee Debtors were obligated to "timely perform all of the obligations of the debtor, except those specified in section 365(b)(2), first arising from or after 60 days after the order for relief... under an unexpired lease of personal property... until such lease is assumed or rejected notwithstanding section 503(b)(1) of this title,

unless the court, after notice and a hearing and based on the equities of the case, orders otherwise with respect to the obligations or timely performance thereof."

39.     As this Court has never "ordered otherwise," the Lessee Debtors were obligated to perform all obligations that came due under the Emerald Lease during the Emerald 365 Period.

40.     During the Emerald 365 Period, Eight Million Eight Hundred Seventy-Three Thousand One Hundred Forty Dollars and Eighty-Six Cents ($8,873,140.86) in rent came due under the Emerald Lease.

41.     The Lessee Debtors paid Six Million Four Hundred Seventy-Five Thousand Nine Hundred Nine Dollars and Fifty-Eight Cents ($6,475,909.58) to MBC on account of rent that accrued during the Emerald 365 Period under the Emerald Lease and the MBC Stipulation[2].

42.     The unpaid balance of the rent that came due under the Emerald Lease during the Emerald 365 Period, Two Million Three Hundred Ninety-Seven Thousand Two Hundred Thirty-One Dollars and Twenty-Eight Cents ($2,397,231.28), remains due and payable.

43.     In addition, pursuant to 11 U.S.C. §§ 503(b) and 507(a)(1), as Emerald's assignee, MBC is entitled to an allowed claim for the actual, necessary costs and expenses of preserving the Lessee Debtors' estates, including the costs incurred in using the Emerald Equipment both before and after the Emerald 365 Period.

44.     Between the date of the filing of the Lessee Debtors' petitions and the commencement of the Emerald 365 Period, the Lessee Debtors used the Emerald Equipment in the operation of their businesses.

---

[2]     As in the case of the MBC Lease, MBC has applied all post-petition payments to obligations under the Emerald Lease that came due during the Emerald 365 Period.

45      Between the date of the filing of the Lessee Debtors' petitions and the commencement of the Emerald 365 Period, One Million Five Hundred Sixty-Seven Thousand Four Hundred Eleven Dollars and Eleven Cents ($1,567,411.11) in rent accrued under the Emerald Lease.

46.      No part of the rent that accrued under the Emerald Lease between the date of the filing of the Lessee Debtors' petitions and the commencement of the Emerald 365 Period has been paid.

47.      The Lessee Debtors did not return the Emerald Equipment to Emerald or MBC at the conclusion of the Emerald 365 Period.

48.      Over the objection of MBC who sought a temporary restraining order to stop such delivery, certain as yet unidentified Emerald Equipment (the "Sea Star Emerald Equipment") was delivered by the Lessee Debtors into the possession of Sea Star upon the sale of certain of the assets of the Lessee Debtors, but not including the Sea Star Emerald Equipment, to Sea Star.

49.      At a hearing on approval of the sale to Sea Star on April 26, 2002, counsel to the Lessee Debtors represented to the Court that a "memorandum agreement" between the Lessee Debtors and Sea Star existed pursuant to which the "estates are being compensated" by Sea Star for the Lessee Debtors' costs for the use of any equipment that Sea Star was not purchasing to complete shipments in process at the time of closing. April 26 Transcript, p. 55, line 25, to p. 56, line 24.

50.      According to counsel, that memorandum agreement was based upon a model developed by "one or our people, the president-- or, the Executive VP of MPR (sic), Carl Fox, and Mr. Leach from Sea Star." April 26 Transcript, p. 56, line 25, to p. 57, line 3. The model was based on "the last quarter's costs of shipping, costs of delivering the service, on average."

April 26 Transcript, p. 57, lines 3-5   According to the representation of Debtors' counsel, "there
is an imputed number that we'll get paid at closing, and then it's subject to true up post closing
based on the *actual cost of the voyage, or the trips to MPR* (sic)." April 26 Transcript, p. 57,
lines 10-12 (Emphasis added).

51      In response to a specific question by the Court as to whether the costs for which
the Debtors would be paid by Sea Star included rental costs, whether or not the applicable lease
had been rejected, counsel to the Lessee Debtors stated:

> We understand that there may be an administrative expense claim accruing until
> we can get these boxes out of service. That's understood. Again, Sea Star will
> hopefully correct me if I— if I am wrong, but I believe that the model, which is
> complicated and has a lot of factors in it, does include the total rental costs as one
> of the cost factors imputed to the box moving in interstate and international
> commerce.

April 26 Transcript, p. 58, lines 5-

52      Despite the representations made by their counsel, in response to Interrogatories
subsequently served on the Lessee Debtors by MBC, both Lessee Debtors stated that nothing
was due from Sea Star for use of the Sea Star Emerald Equipment.

53.      Commencing on June 11, 2002, MBC began effecting sales of specific items of
Emerald Equipment pursuant to Article 9 of the Uniform Commercial Code.

54.      Between the date on which rejection of the Emerald Lease was effective and the
first date on which MBC sold any Emerald Equipment, One Million Four Hundred Thirty-Four
Thousand Five Hundred Seventy-Nine Dollars and Sixty-Six Cents ($1,434,579.66) in rent
attributable to the Emerald Equipment accrued under the Emerald Lease calculated at the rates
specified therein[3]

---

[3]      Rent has continued to accrue under the Emerald Lease attributable to Emerald
Equipment that remains in the possession of the Lessee Debtors after June 11, 2002. However,

55.    The rent attributable to the Emerald Equipment that came due under the Emerald Lease between the date on which rejection of the Emerald Lease was effective and the date on which MBC first sold an item of Emerald Equipment constitutes an actual, necessary cost and expense of preserving the Lessee Debtors' estates as the use of at least a portion of such equipment was essential to the consummation of the sale of the Lessee Debtors's assets to Sea Star and counsel to the Lessee Debtors acknowledged that a continuing administrative expense obligation was likely to be incurred until the Emerald Equipment was returned.

56.    No portion of the rent attributable to the Emerald Equipment that accrued under the Emerald Lease between the date on which rejection of the Emerald Lease was effective and the date on which MBC first sold an item of Emerald Equipment has been paid.

WHEREFORE, MBC respectfully requests that this Court enter an Order:

1.    Allowing MBC a claim in the amount of Two Million Three Hundred Ninety-Seven Thousand Two Hundred Thirty-One Dollars and Twenty-Eight Cents ($2,397,231.28) pursuant to 11 U.S.C. § 365(d)(10) representing the amount of unpaid rent that accrued under the Emerald Lease during the period that commenced on the 60th day after the Lessee Debtors filed their petitions for relief under Chapter 11 and ended on April 18, 2002;

---

as MBC has sold, and is continuing to sell, items of Emerald Equipment as they are located and recovered, the universe of Emerald Equipment remaining in the possession of the Lessee Debtors has changed multiple times one MBC started selling Emerald Equipment and will continue to change each time that MBC recovers another item of Emerald Equipment from the Lessee Debtors. Because of the difficulty of recalculating the rent due on the changing universe of Emerald Equipment remaining in the possession of the Lessee Debtors each time that an item of Emerald Equipment is recovered, for administrative convenience, although it results in the understatement of MBC's administrative expense claim, MBC has elected to assert an administrative claim for the actual and necessary cost of continued use of the Emerald Equipment by the Lessee Debtors after the date on which rejection of the Emerald Lease became effective for the period in which the Debtors and Sea Star, with the Lessee Debtors' consent, used all of the Emerald Equipment.

2    Allowing MBC a claim in the amount of One Million Five Hundred Sixty-Seven Thousand Four Hundred Eleven Dollars and Eleven Cents ($1,567,411.11) pursuant to 11 U.S.C. §§ 503(b) and 507(a)(1) representing unpaid rent that accrued under the Emerald Lease between the date on which the Lessee Debtors filed their petitions for relief under Chapter 11 and the commencement of the Emerald 365 Period;

3.    Allowing MBC a claim in the amount of One Million Four Hundred Thirty-Four Thousand Five Hundred Seventy-Nine Dollars and Sixty-Six Cents ($1,434,579.66) pursuant to 11 U.S.C. §§ 503(b) and 507(a)(1) representing the actual and necessary unpaid cost to the Lessee Debtors' estates of continued use of the Sea Star Emerald Equipment after the Emerald 365 Period until MBC first sold an item of Emerald Equipment;

4.    Authorizing and directing the Trustee to pay the aforesaid claims immediately; and

5    Granting to MBC such other and further relief as the case may require.

Respectfully submitted.

NEAL J. LEVITSKY
Bar No.: 2092
FOX, ROTHSCHILD, O'BRIEN &FRANKEL, LLP
824 North Market Street, Suite 810
P.O. Box 2323
Wilmington, Delaware 19899-2323
Telephone: (302) 654-7444
Fax: (302) 656-8920

and

WILLIAM L. HALLAM
Federal Bar. No.: 00057
GEBHARDT & SMITH LLP
The World Trade Center, 9th Floor
401 East Pratt Street
Baltimore, Maryland 21202
Telephone: (410) 752-5830
Fax: (410) 385-5119

Attorneys for MBC Leasing Corp.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY, that on this 20th day of January, 2003 copies of the foregoing

Motion of MBC Leasing Corp. For Allowance and Payment of Administrative Priority Claims

Pursuant to 11 U.S.C. §§ 365(d)(10), 503(b) and 507(a)(1) were sent via facsimile to: Daniel K.

Astin, Esquire, The Bayard Firm, 222 Delaware Avenue, 9th Floor, Wilmington, Delaware 19801

and Donald J. Crecca, Esquire, Schwartz, Tobia, Stanziale. Sedita & Campisano, P.A., 22

Cresmont Road, Montclair, New Jersey 07042, attorneys for Charles A. Stanziale, Jr., Trustee;

Gary M. Schildhorn, Esquire, Adelman Lavine Gold and Levin, P.C., 1900 Two Penn Center

Plaza, Philadelphia, Pennsylvania 19102 (Fax No. 215-557-7922), attorney for Emerald

Equipment Leasing, Inc.; and Frank J. Perch, III, Esquire, Office of the United States Trustee, J

Caleb Boggs Federal Building, 844 King Street, Suite 2313 - Lockbox 35, Wilmington,

Delaware 19801 (Fax No. 302-573-6497).

NEIL J. LEVITSKY

# EXHIBIT E

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

EMERALD EQUIPMENT,                    . Case No.   01-934 (MFW)
                                      . Adv. No.   04-53071
        v.                            .
                                      .
SEA STAR,                             .
                                      . 824 Market Street
                                      . Wilmington, Delaware 19801
                    Debtors,          .
                                      . May 27, 2004
    . . . . . . . . . . . . . . . .   . 9:00 a.m.

TRANSCRIPT OF HEARING
BEFORE HONORABLE MARY F. WALRATH
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:              Adelman Lavine
                             By:   ALAN MOLDOFF, ESQ.
                             919 North Market Street
                             Suite  710
                             Wilmington, DE 19801

For the Debtor:              Adelman Lavine Gold and Levin
                             By:   BRADFORD J. SANDLER, ESQ.
                             919 North Market Street
                             Suite 710
                             Wilmington, DE  19801

For Sea Star:                Bifferato, Bifferato & Gentilotti
                             By:   IAN CONNOR BIFFERATO, ESQ.
                             Buckner Building
                             1308 Delaware Avenue
                             P.O. Box 2165
                             Wilmington, DE  19899

Audio Operator:              Jennifer M. Patone

Proceedings recorded by electronic sound recording, transcript
                produced by transcription service.

J&J COURT TRANSCRIBERS, INC.
268 Evergreen Avenue
Hamilton, New Jersey 08619
E-Mail:  jjcourt@optonline.net

(609) 586-2311  Fax No.  (609) 587-3599

2

1             THE COURT:  Good morning.

2             MR. MOLDOFF:  Good morning, Your Honor.  Alan Moldoff

3  appearing first in connection with the Dockside case.

4             THE COURT:  Yes.

5             MR. MOLDOFF:  The only thing that's on the agenda

6  today for Dockside is our eighth interim fee application.

7  Yesterday I can report to the Court that we filed an amended

8  plan and amended disclosure statement in an intent to have a

9  hearing on the disclosure statement scheduled for the July

10 omnibus hearing date.

11            THE COURT:  Okay.

12            MR. MOLDOFF:  With respect to the fee application

13 it's seeking fees for the month of October, November, December

14 2003.  Fee is in the amount of $4,765, cost, $993.22, there's

15 been no objections filed, CNO was filed and we'd just ask that

16 an order be entered.

17            THE COURT:  All right, I have no problems with that,

18 and I will enter the order.

19            MR. MOLDOFF:  Next, on Emerald, I have a form of

20 order --

21            THE COURT:  You can hand it up, that's easier.

22 Thank you.

23            All right, on Emerald.

24            MR. MOLDOFF:  Emerald, the first matter on the agenda

25 is the application of Emerald to retain Schuts & Bowen

1  (phonetic), they are counsel in Florida, in connection with the

2  Sea Star litigation.  As Your Honor knows, we had filed the

3  complaints here and they filed a complaint in Florida.

4         THE COURT:  Well, I've got a CNO on that and entered

5  the order?

6         MR. MOLDOFF:  The order has been entered?

7         THE COURT:  Yes.

8         MR. MOLDOFF:  Thank you, Your Honor.

9         Next on the agenda is our fee application.  This also

10  is for October, November and December, fees sought in the

11  amount of $5,210.50, cost in the amount of $404.01, again,

12  there have been no objections, and we have filed a CNO, and I

13  have a form of order.

14         THE COURT:  Let me look at that.  I have no problem

15  with that one either.

16         MR. MOLDOFF:  May I hand this up?

17         THE COURT:  You may.

18         MR. MOLDOFF:  The last matter is just, again, the

19  pretrial conference.  I think the last time Your Honor

20  indicated that we would continue it, I think, until there is

21  some disposition.  One, the motion to dismiss that was filed in

22  this Court, of course, we argued against that.

23         THE COURT:  Well, I have taken a look at the papers

24  and if the parties want, I can issue my ruling on the bench

25  rather than take the time to write an opinion, if that's all

4

1   right.

2           MR. MOLDOFF:   That's fine.

3           THE COURT:   I think the initial issue is what
4   jurisdiction the Court has over the current adversary whether
5   it's core or non-core and while many courts have held that the
6   determination is only whether or not it's a post petition
7   contract dispute, which would make it core, I think the 3rd
8   Circuit has a tougher standard as articulated in <u>Halper v.</u>
9   <u>Halper</u> at 164 Fed. 3rd, 830, where I have to determine whether
10  -- to determine if it's core, whether invokes a substantive
11  right provided by Title 11 or if it is a proceeding that by its
12  nature could only arise in the context of a bankruptcy case.
13  And I think that it's clear that this contract dispute,
14  essentially a contract dispute between the parties is not
15  something that arises under Title 11 or could only arise in the
16  context of a bankruptcy case.  So it's not a core proceeding, I
17  would have related to jurisdiction over the adversary because
18  it does involve property rights of the debtor but contrasted
19  with that there is also a specific provision, 28 U.S.C. 959
20  that provides that a party that does business with a debtor-in-
21  possession or trustee has the right to file suit regarding that
22  dispute in any jurisdiction.  So it's clear that there is
23  concomitant jurisdiction and I'll assume for the purposes of
24  this decision that Florida has that jurisdiction.  So the
25  question is given that there are two pending cases dealing with

1 the same dispute, one filed by Sea Star in Florida on March
2 1st, and one filed by the debtor in this court on March 17th,
3 whether or not I should abstain from hearing this dispute, and
4 I think that under the 3rd Circuit's articulation of the first
5 filed rule, that in all cases of concurrent jurisdiction, the
6 Court would first -- has possession of the subject must decide
7 it.   And that's Crosley v. Hazeltine Corporation, case, 122
8 Fed. 2d, 925.   In this the court, the 3rd Circuit says this
9 rule should apply, although there is discretion in the second
10 court, not to apply that rule, it should be limited to rare or
11 extraordinary circumstances inequitable conduct, bad faith or
12 forum shopping.   There are no allegations of bad faith or
13 inequitable conduct, but there is an allegation of forum
14 shopping.   The debtor asserts that Sea Star, in essence, filed
15 the suit in Florida not because it has a legitimate claim
16 against the debtor, but simply to forestall the filing of a
17 complaint by the debtor here and that this is clearly a case of
18 forum shopping.   Without going into the merits of the
19 complaint, I don't think facially it is a case of forum
20 shopping, again, because 28 U.S.C. 959 allows Sea Star to
21 commence an action if there's a dispute in any jurisdiction in
22 the country.   So on the face of it -- and again, given that
23 there is concurrent jurisdiction, I will apply the first filed
24 rule and I will dismiss this action and let the Florida court
25 decide it.

1          MR. MOLDOFF:  Your Honor, may I just ask is that

2    dismissal is without prejudice because you know we have filed a

3    motion to dismiss in Florida pending whatever happens there. I

4    think that --

5          THE COURT:  All right, yes, it is without prejudice

6    if the Florida court determines that it doesn't have

7    jurisdiction or its action should be dismissed, the debtor is

8    free to file here.

9          MR. MOLDOFF:  Thank you.

10          All right, I'll grant the motion.  Did the order say

11   without prejudice?

12          MR. MOLDOFF:  I believe it did.

13          THE COURT:  Yes, it does.  So I'll enter the order

14   that was submitted with the motion.

15          All right.

16          MR. MOLDOFF:  Thank you, Your Honor.

17          THE COURT:  Thank you, we'll stand adjourned.

18                         * * * * *

19

20

21

22

23

24

25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

C E R T I F I C A T I O N

     I, Johanna LiMato, court approved transcriber,
certify that the foregoing is a correct transcript from the
official electronic sound recording of the proceedings in the
above-entitled matter.

Date:   July 1, 2004

_____

J&J COURT TRANSCRIBERS, INC.