**ECKERT SEAMANS**

Eckert Seamans Cherin & Mellott, LLC
300 Delaware Avenue, Suite 1210
Wilmington, DE 19801

TEL 302 425 0430
FAX 302 425 0432
www.eckertseamans.com

*Ronald S. Gellert*
*Direct Dial: 215-569-8506*
*E-Mail: rgellert@eckertseamans.com*

April 30, 2008

Honorable Leonard P. Stark
J. Caleb Boggs Federal Building
844 N. King Street
Lockbox 26, Room 2325
Wilmington, DE 19801

Re:   **Sea Star Line, LLC v. Emerald Equipment Leasing, Inc.**
      **Case No. 05-CV-00245-(JJF)**

Dear Magistrate Judge Stark:

This letter is respectfully submitted on behalf of Emerald Equipment Leasing, Inc. ("Emerald") in accordance with the procedural guidelines set forth in paragraph 4 of Your Honor's Order dated November 19, 2007 in the above-referenced matter.

**Background**

This dispute arises out of the discovery which this Court ordered Sea Star Line, LLC ("Sea Star") to produce in accordance with its Memorandum Order dated December 28, 2007 (Exhibit "A"). The Memorandum Order required that certain discovery including trucker invoices, vessel manifests and a response to Interrogatory No. 1, be provided within 20 days of the date of the Memorandum Order. Rather than provide the discovery, Sea Star filed an Objection to the Memorandum Order (the "Objection"). After considering Emerald's Reply to the Objection and Request For The Imposition of Sanctions, the Objection was overruled by Order of Judge Farnan dated February 21, 2008. A further Memorandum Order (the "Second Memorandum Order") was then issued on March 3, 2008 by Your Honor again ordering Sea Star to produce the requested discovery, this time within 10 days of the date of the second Memorandum Order. The Second Memorandum reserved the issues of sanctions for further proceedings. By cover letter dated March 3, 2008, and subsequently, Sea Star produced certain of the discovery as ordered. However, upon review, and after further various communications (Exhibit "B" is a series of e-mail exchanges between the parties outlining the efforts of the parties to resolve the discovery issues), certain issues still remain.

**Trucker Invoices**

The Memorandum Order provided that Sea Star was to produce, inter alia, various trucker invoices. Disputes as to the trucker invoices remain as follows:

1.      In its initial March 3, 2008 document production, Sea Star copied only the front page of the invoices and did not supply attachments which Sea Star would have received from the truckers to show both the container and chassis identification numbers underlying the invoices. Importantly, identification of the equipment pieces was the whole purpose of the discovery request as Emerald's counsel made clear at the December 20, 2007 hearing on this matter (see Exhibit "C"). The partial invoices Sea Star provided, as it had to have known, were useless without this accompanying documentation. After an exchange of e-mails and discussion, Sea Star finally agreed to provide the additional documents.

*Honorable Leonard P. Stark*
*April 30, 2008*
*Page 2*

However, when this additional information was received, Emerald discovered that only about 20% of the invoices in question had the requested backup documentation. Sea Star has responded that it provided the information in its files; however, no reasonable explanation is given as to why it would have the accompanying documentation for 20% of the invoices provided and not for the remaining 80% of the invoices. The additional information for the remaining 80% of the invoices is either in Sea Star's possession or is available to Sea Star and should be provided.

2.      Sea Star states it made a determination of the five largest truckers (by volume) used by Sea Star in the United States based on the dollar amount of the invoices as opposed to the number of loads moved and equipment pieces involved. As Sea Star is well aware, it is the number of loads moved and equipment pieces involved (rather than dollar amount) which would provide the most relevant information in this case. In fact, this, again, was specifically made clear by Emerald's counsel at the hearing in this matter (see Exhibit "C"). Rather than make an issue of this, however, Emerald reserved its right to further address this issue until after its analysis of the documents. Upon further review, Emerald has now become suspect about the selection of truckers made by Sea Star. As shown by the attached schedule prepared by Emerald of the trucking invoices received from Sea Star (Exhibit "D"), the amount of total invoices of Eagle Systems (459) is substantially less than that of the three larger truckers whose invoices were supplied by Sea Star, namely, All Coast (1938); Carolina National (1833) and H&M Trucking (1332). Moreover, there were no invoices from Eagle Systems for either August or September, 2002. Given the huge disparity in terms of number of Eagle Systems invoices provided as compared to the other trucker invoices, it appears suspect that Eagle Systems would be among Sea Star's five largest United States truckers, whether by dollar amount or otherwise.

3.      Emerald's suspicions about Sea Star's good faith increased even more when it reviewed the "fifth trucker" submitted by Sea Star. Sea Star provided invoices from only four United States truckers in its initial production. After Emerald complained, Sea Star provided "invoices" for its "fifth trucker", namely, Caribbean Shipping Service. It is Emerald's understanding that Caribbean is known in the industry as a "non vessel owner container carrier" which acts as a "freight forwarder". Such an entity is not a "trucker" in the traditional sense that it "trucks" goods; rather it contracts for the ocean shipment of goods and then usually engages a "trucker" to move the goods. Caribbean invoices, then, would not generally show any specific equipment, such as containers or chassis used to move the goods in question and were therefore useless. As such, Emerald does not believe Sea Star acted in good faith when it named Caribbean as one of its five largest "truckers". In order to resolve this dispute, Emerald would suggest Sea Star should provide at least two additional set of trucker invoices, which "truckers" Emerald will identify rather than leaving it to Sea Star's discretion.

**Vessel Manifests**

With its March 3, 2008 production, Sea Star provided Emerald a computer disk which contained a number of the vessel manifests requested. After review, however Emerald complained that: (1) it appeared a number of the manifests were "blank"; (2) certain manifests were missing; (3) certain manifests did not appear to be completed; and (4) at least one manifest could not be accessed (opened up") from the disk. In response, Sea Star advised there was some glitch with respect to the initial disk and, accordingly, provided a new manifest computer disk on April 8, 2008. Upon review of the new disk,



*Honorable Leonard P. Stark*
*April 30, 2008*
*Page 3*

although the identified "missing manifests" were produced and the other deficiencies apparently cured, there still appeared numerous "blank manifests". Specifically, at least the following vessel manifests were "blank": "Producer" – 5 blank manifests; "Humac" – 2 blank manifest; "Hawaii" – 4 blank manifests; "Guaya" - 5 blank manifests; "Simone J" – 13 blank manifests; "Discoverer" – 3 blank manifests; "Sunshine 2" – 3 blank manifests; and "Island Traider" – 7 blank manifests. In response to Emerald's complaints, Sea Star stated that Emerald did not identify the blank manifests in question (all Sea Star had to do was look at the disk they provided) and then stated that as to the "Simone J" and "Island Trader", the blank manifests are not in Sea Star's computer system (whatever that means). Respectfully, Emerald should not have to "beg" for this information. If Sea Star does not have these "blank" manifests, at the very least, Sea Star should explain why that is so. Moreover, as far as completeness of the manifests are concerned, it is noted that the manifests provided generally, but not always, show a "north" and "south" voyage. Where this is not so, Sea Star should provide an explanation.

### Interrogatory No. 1

Sea Star provided a response to Interrogatory No. 1 by providing three schedules: one schedule listed information pertaining to equipment Sea Star admits using; one schedule identified equipment Sea Star says it never used; and a third schedule identifying equipment which Sea Star says it is still investigating (this schedule identifies thousands of pieces of equipment which Sea Star asserts amounts to only $450,000.00 of Emerald's claim). Putting aside the issue of Sea Star's incomplete response, Emerald has repeatedly asked that Sea Star provide its schedules in either "word" or "excel" format. They are unworkable in present form (see first page of each schedule attached as Exhibit "E"). Emerald is still waiting.

### Conclusion

Out of the approximately 500 trucker invoices which Emerald identified as disclosing Sea Star's use of Emerald's equipment, approximately 223 of these invoices included Emerald chassis which were never shown on Sea Star's self-billing reports. Moreover, approximately 28 of the chassis which appeared on the trucker invoices involved Emerald equipment which Emerald had not previously identified as equipment used by Sea Star and now must be added to Emerald's claim. The documentation sought from Sea Star is not only highly relevant, it also indicates the "catch me if you can" nature of Sea Star's defense. These continuing discovery requests should be compelled. Furthermore, in light of the foregoing, Emerald again renews its request for the imposition of sanctions.

Respectfully,

Ronald S. Gellert

RSG/md
Encls.
cc:   Timothy J. Armstrong, Esquire (w/encls.)
      Kathleen M. Miller, Esquire (w/encls.)