UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SEA STAR LINE, LLC,<br>a limited liability company, | ) | Civil Action No. 05-CV-245-JJF |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | |
| | ) | |
| EMERALD EQUIPMENT LEASING, INC.,<br>a corporation, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| -vs- | ) | |
| | ) | |
| SEA STAR LINE, LLC, | ) | |
| | ) | |
| Counter-Defendant. | ) | |

## SEA STAR LINE, LLC'S OPENING BRIEF IN SUPPORT OF <u>MOTION FOR PARTIAL SUMMARY JUDGMENT</u>

Smith, Katzenstein & Furlow LLP
Kathleen M. Miller (I.D. No. 2898)
800 Delaware Avenue
P.O. Box 410
Wilmington, DE 19899
Telephone: 302-652-8400
Facsimile: 302-652-8405
E-mail: <u>Kmiller@skfdelaware.com</u>

*Attorneys for Sea Star Line, LLC*

OF COUNSEL:
Timothy J. Armstrong
Armstrong & Mejer, P.A.
2222 Ponce de Leon Boulevard
Penthouse Suite
Miami, FL 33134
Telephone: 305-444-3355

June 10, 2008

## TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

NATURE AND STAGE OF PROCEEDINGS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SUMMARY OF ARGUMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF UNDISPUTED MATERIAL FACTS . . . . . . . . . . . . . . . . . . . . . . . . 5

      A.      The Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      B.      Approval of Asset Purchase . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      C.      Post-Closing Transactions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

      D.      MBC-SEA STAR Indemnity Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . 10

      E.      EEL-SEA STAR Rental Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

      F.      MBC-Storage Loan Sale & Assignment Agreement . . . . . . . . . . . . . . . . . . 15

      G.      "Carveouts" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

      H.      Heinsen Maritime Lien Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

      I.      EEL Equipment **Sales** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

      J.      Storage & Handling; Carriage of EEL Equipment . . . . . . . . . . . . . . . . . . . 18

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

      A.      Summary Judgment Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

      B.      Declaratory Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

            (a)      Real Party in Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

            (b)      Declaratory Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

            (c)      Storage & Handling; Carriage of EEL Equipment . . . . . . . . . . . . . . 32

## **TABLE OF AUTHORITIES**

**Cases**                                                                 **Page(s)**

*Akparewa v. Amoco Oil Co.,*
    771 A.2d 508 (Md. Ct. Spec. App. 2001) ................................... 29

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) ................................................. 20

*Boyd v. Hickman,*
    689 A.2d 106 (Md. App. 1997) ....................................... 29

*Caplin v. Marine Midland Grace Trust Co.,*
    406 U.S. 416 (1972) ................................................. 29

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) ................................................. 20

*Cochran v. Norkunas,*
    919 A.2d 700 (Md. App. 2007) ....................................... 28

*Dici v. Commonwealth of Pa.,*
    91 F.3d 542 (3d Cir. 1996) ........................................... 20

*Discovery Bank v. Vaden,*
    489 F.3d 594 (4th Cir. 2007) ...................................... 28, 29

*First Nat'l Bank of Md. v. DiDomenico,*
    487 A.2d 646 (Md. App. 1985) ....................................... 32

*General Motors Acceptance Corp. v. Dykes (In re Dykes),*
    10 F.3d 184 (3d Cir. 1993) ........................................... 29

*Gambo v. Bank of Md.,*
    648 A.2d 1105 (Md. Ct. Spec. App. 1994) ............................. 32

*Krauss Bros. Lumber Co. v. Dimon S.S. Corp.,*
    290 U.S. 117 (1933) ................................................. 32

*Lake Carriers' Ass'n v. MacMullan,*
    406 U.S. 498 (1972) ................................................. 21

*LaSalle Bank, N.A. v. Lehman Bros. Holdings, Inc.,*
    237 F. Supp.2d 618 (D. Md. 2002) ................................... 29

*Maryland Cas. Co. v. Pacific Coal & Oil Co.,*
    312 U.S. 270 (1941) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Maryland Nat'l Bank v. Wathen,*
    414 A.2d 1261 (Md. App. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Norfolk Southern Ry. v. James N. Kirby Pty, Ltd.,*
    543 U.S. 14 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Shearson Lehman Hutton, Inc. v. Wagoner,*
    944 F.2d 114 (2d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29

*Southern Pacific Transp. Co. v. Commercial Metals Co,*
    456 U.S. 336 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Surrick v. Killion,*
    449 F.3d 520 (3d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Town of Piscataway v. Duke Energy,*
    488 F.3d 203 (3d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Tse v. Ventana Medical Sys., Inc.,*
    297 F.3d 210 (3d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States v. Gov't of Virgin Is.,*
    363 F.3d 276 (3d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Warth v. Seldin,*
    422 U.S. 490 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29

## Statutes and Other Authorities

28 U.S.C. § 2201 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Fed. R. Civ. P. 17(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29

Fed. R. Civ. P. 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Fed. R. Civ. P. 9(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

## NATURE AND STAGE OF PROCEEDINGS

SEA STAR LINE, LLC ("SEA STAR") filed its Complaint against defendant, EMERALD EQUIPMENT LEASING, INC. ("EEL"), a Chapter 11 debtor-in possession, in the United States District Court for the Middle District of Florida on March 1, 2004. SEA STAR seeks declaratory judgment as to rights and liabilities under the Equipment Rental Agreement, dated as of July 31, 2002 ("Rental Agreement") and an order of the Bankruptcy Court approving the sale of assets to SEA STAR. SEA STAR also claims monetary damages, based on EEL's breaches of other maritime contracts, open account, and goods delivered and services provided. After SEA STAR effected service, EEL moved to dismiss the Complaint, to transfer venue, or to abstain.

A Case Management and Scheduling Order issued by the Florida District Court set trial on a calendar commencing June 6, 2005. Several days before the pretrial conference, however, the court granted EEL's Motion to Dismiss or Transfer Case "in part." The district judge invoked 28 U.S.C. §1404(a) to transfer the case to this Court.

On April 21, 2005, EEL filed an Answer, Affirmative Defenses, and Counterclaim in the Florida District Court. EEL's Counterclaim included claims against SEA STAR for "Post-Petition Account Receivable/Breach of Lease," "Post-Petition Quantum Meruit," "Turnover Action," "Accounting," "Fraud," "Constructive Fraud," "Fraudulent Concealment," "Negligent Misrepresentation; Breach of Fiduciary Duty."

SEA STAR moved to dismiss the Counterclaim. On January 26, 2006, this Court granted SEA STAR's motion to dismiss to the extent that Count I of the Counterclaim asserted a breach of the E-Mail Agreement and as to Counts II, III, V, VI, VII and VIII for failure to pled in accordance with Fed. R. Civ. P. 9(b). The Court denied the remainder of the motion. The Court also

05130|BRF|10045474.WPD                              1

granted EEL leave to amend its Counterclaim. D.I. 75, 76.

On February 15, 2006, EEL filed an Amended Counterclaim, which re-asserted the same counts as the original Counterclaim, except the count for Post-Petition Quantum Meruit, which was dropped. D.I. 79. SEA STAR moved to dismiss the Amended Counterclaim. D.I. 80, 81.

On April 13, 2006, the Court denied SEA STAR's second motion to dismiss. D.I. 86, 87.

At the pre-trial conference on November 1, 2007, the Court severed the Complaint from the Amended Counterclaim and referred all pre-trial matters relating to the Amended Counterclaim to Magistrate Judge Stark. D.I. 142.

Trial on SEA STAR's Complaint is set for July 7, 2008 at 9:30 a.m. Trial on the Amended Counterclaim is set for September 15, 2008; a pre-trial conference is set for August 29, 2008.

This is SEA STAR's opening brief in support of its Motion for Partial Summary Judgment on its Complaint.

## SUMMARY OF ARGUMENTS

1.      Because of the substantial sums in dispute and the contradictory interpretations of the Rental Agreement and the Bankruptcy Court's Order Authorizing Sale of the NPR, Inc. Assets Free and Clear of All Liens, Claims and Encumbrances, the controversy between SEA STAR and EEL clearly is "live" and ripe for a declaratory decree.

2.      The Rental Agreement, which EEL has acknowledged is the formal documented contractual arrangement between the parties, constitutes their "entire agreement" and no modifications have occurred.  The Rental Agreement, as this Court has found, is not ambiguous.

3.      When MBC assigned its secured interest to Storage Transfer, LLC ("Storage"), the agreement clearly and unambiguously proscribed assertion by Storage of any entitlement to compensation from SEA STAR for use of EEL equipment during any period in which SEA STAR paid MBC.  Because EEL's "carveout" rights are derivative and can be no greater than Storage's rights, EEL is not a real party in interest and lacks the requisite "personal stake in the outcome" of any controversy to sue SEA STAR with respect to any matter covered by paragraph 6.3 of the Loan Sale and Assignment Agreement between MBC and Storage, including a claim for *per diem* rent.  EEL's alleged interest is confined to an undefined, indeterminate "carveout" of Storage's claim.

4.      The clear terms of the Rental Agreement and the Bankruptcy Court sale order define the parties' rights and obligations.  EEL has ignored their specified requirements and limitations and has asserted claims which contravene the Rental Agreement's and the sale order's terms.  SEA STAR is entitled to the declarations of the parties' rights and obligations under the Rental Agreement and the sale order, as discussed in detail below.

5.      EEL is liable to SEA STAR for use of its San Juan terminal facilities to store EEL equipment, for equipment handling services, for carriage of EEL equipment onboard SEA STAR vessels at EEL's request and for goods and services in connection with EEL equipment, including chains and binders provided at EEL's request.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

For purposes of SEA STAR's motion, the following material facts are undisputed:

### A.    The Parties

SEA STAR, a Delaware limited liability company, is headquartered in Jacksonville, Florida. As an ocean carrier, SEA STAR transports cargo in interstate commerce (D.I. 137 ¶ 3(a)(Joint Proposed Pretrial Stipulation and Order - Statement of Admitted Facts); (A-316 ¶ 2).

EEL, a Delaware corporation, is a Debtor under Chapter 11 of the United States Bankruptcy Code, having filed a voluntary petition for relief in the United States Bankruptcy Court for the District of Delaware (Jointly Administered under Case No. 01-926[1])("Bankruptcy Action") (D.I. 137 ¶ 3(b)). From its inception EEL's sole business had been to serve as named lessor of cargo transportation equipment – containers, chassis, and gen sets – for its affiliated and co-debtors, NPR, Inc. ("NPR"), an ocean carrier, and Holt Cargo Systems, Inc. ("Holt Cargo"), as lessees (*Id.* ¶¶ 3(c), (d), (e)).

In 1997, EEL had obtained a $35 million loan from MBC Leasing Corp. ("MBC") to purchase equipment from NPR and Holt Cargo (A-4 to A-5 ¶ 4). To secure its repayment obligations, EEL granted MBC a security interest in all the purchased equipment, together with accounts, contract rights, and other general intangibles arising from the equipment (*Id.*). EEL then assigned the equipment leases with NPR and Holt Cargo to MBC (A-5 at ¶¶ 5, 6).

---

[1]On July 25, 2002, the Bankruptcy Court granted the Motion of the United States Trustee to Convert the Cases of the Jointly Administered Debtors under Chapter 11 to Cases under Chapter 7 of the Bankruptcy Code. The Order excluded only EEL and Dockside Refrigerated Warehouse, Inc., which remained Chapter 11 debtors (A-131 to A-132). On May 23, 2003, the Bankruptcy Court severed the EEL case from the joint administration of the converted Chapter 7 proceedings (A-268 to A-270). EEL's case proceeded under Case No. 01-934.

B.    **Approval of Asset Purchase**

In April 2002, SEA STAR entered into an Asset Purchase Agreement, as amended, with NPR and other EEL affiliates, in the Bankruptcy Action (D.I. 137 ¶ 3(f)). When NPR sought the Bankruptcy Court's approval of the proposed sale [D.I. 137 ¶ 3(g)], EEL and MBC objected. Among their concerns were payments for equipment leased to NPR that would be used in connection with cargo shipments in transit or in process ("Shipments in Process") at the time of and after the asset purchase and for storage charges that SEA STAR would impose (A-49, A-53 to A-62). The Bankruptcy Court overruled "the Emerald entities" objections and held that any arguable rights would be preserved against the sale proceeds (A-62).

After SEA STAR and NPR representatives agreed to payment and claim procedures and deadlines with respect to Shipments in Process, NPR's counsel outlined the plan to the Bankruptcy Court. He confirmed that components of SEA STAR payments included NPR's projected equipment leasing and financing costs, labor, materials, and other factors involved in transporting shipments in transit from origin to destination points. NPR further acknowledged that it might be subject to administrative claims, filed by owners and lessors of equipment used for Shipments in Process (A-78 to A-80).

On April 26, 2002, the Bankruptcy Court issued an Order Authorizing Sale of the NPR Assets Free and Clear of All Liens, Claims and Encumbrances (the "Sale Order") (A-83 to A-94). Overruling all objections that had not been withdrawn, the Sale Order authorized SEA STAR's acquisition of specified NPR assets (A-87 ¶ 2,3). The Court found and determined:

> The sale of assets does not amount to a consolidation, merger, *de facto* merger or similar restructuring of either or both of the Buyer and the Debtors.

> Buyer is only buying the Purchased Assets and is not a successor in interest to Debtors, nor does Buyer's acquisition of the Purchased Assets reflect a substantial continuation of the operations of the Debtors' business.

(A-85 to A-86 ¶¶ 15, 16).

SEA STAR refused to acquire, assume, or accept assignment of any equipment agreements between EEL and NPR or Holt Cargo (D.I. 137 ¶ 3(h)). As to equipment not purchased or leased by SEA STAR, the Bankruptcy Court ordered:

> [T]o the extent that any equipment of Emerald Equipment Leasing, Inc. ("Emerald"), or any other lien or lessor creditor whose property is not being sold or transferred to Buyer, is located on property sold or assigned to Buyer under the Asset Purchase Agreement, the Buyer shall cooperate in allowing Emerald...to remove such property during normal business hours as long as such removal will not unreasonably disrupt operations of the Buyer. In addition, the Buyer shall cooperate in removing any such equipment from Vessels in transit and store such equipment on leased premises at the final port of destination, to the extent such final destination is a leased premises sold and assigned to the Buyer under the Asset Purchase Agreement....
>
> ...
>
> [A]fter closing of the sale to Buyer, all creditors of the Debtors, whether known or unknown, are hereby enjoined from asserting or prosecuting any claim or cause of action against Buyer or the Purchased Assets to recover on account of any liability owed by the Debtors.

(A-90 to A-91 ¶¶ 13, 15). The Bankruptcy Court retained jurisdiction to "[i]nterpret, implement and enforce the terms and provisions of this [Sale] Order and the terms of the Asset Purchase Agreement, all amendments thereto and any waivers and consents thereunder and of each of the agreements executed in connection therewith" and to adjudicate certain other issues, including but not limited to "successor claims" (A-93 ¶ 25(a)(c)).

### C.    Post-Closing Transactions

The asset purchase closed at 3 a.m. on April 27, 2002 (D.I. 137 ¶ 3(j)). In compliance with the Sale Order, SEA STAR stored equipment located on or returned to its leased property, which had been sold or assigned under the Asset Purchase Agreement. EEL knew that EEL equipment that had been leased to NPR remained in the San Juan terminal and that EEL equipment would be stored on SEA STAR's premises after the asset purchase (EEL I[2] A-388 to A-392, A-544 to A-545). According to Thomas Holt, Sr., "[a]ll the equipment belonged to Emerald that Navieras [NPR] had on the terminal in that [April 2002] time frame" (Holt A-773). Mr. Holt, Sr. was, and remains, EEL's sole stockholder and president; he also had been owner and president of NPR (Holt A-629 to A-630; EEL I A-365 to A-366, A-432 to A-433).

By letter dated June 11, 2002, Thomas Holt, Jr., on behalf of EEL, requested that SEA STAR "remit a check in accordance with the attached letter from MBC Leasing, Corp." for equipment used by SEA STAR (A-97). Attached to Mr. Holt, Jr.'s letter was a letter dated June 10, 2002 from Scott Krieger of MBC to Mr. Holt, Sr. of EEL (A-98). In regard to EEL equipment, Mr. Krieger wrote:

> Any money due from Sea Star for use of any of containers, gensets, and chassis previously leased by Emerald Equipment Leasing to NPR, Inc. and Holt Cargo Systems for a purpose other than completing shipments in progress on April 27 when Sea Star purchased certain assets of NPR and Holt Cargo shall be paid directly to MBC Leasing.

---

[2]Deposition transcripts references are: The December 8, 2004 deposition of Emerald Equipment Leasing, Inc. (A-347 to A-614) is abbreviated as "EEL I"; the February 12, 2008 deposition of Emerald Equipment Leasing, Inc. (A-987 to A-1017) is abbreviated as "EEL II"; the January 25, 2008 deposition of Storage Transfer, LLC (A-965 to A-986) is abbreviated as "Storage"; the January 26, 2005 deposition of Lorraine Robins (A-779 to A-951) is abbreviated as "Robins"; the January 25, 2005 deposition of Thomas Holt, Sr. (A-615 to A-778) is abbreviated as "Holt."

> Any money due from Sea Star for use of any of the Emerald equipment
> to complete shipments in progress on April 27 should be paid in
> accordance with the memorandum that MBC understands exists
> between Sea Star and NPR, Holt Cargo, and possibly other affiliates
> to be allocated in accordance with the Bankruptcy Court's ruling on
> the allocation of proceeds of sale to Sea Star.

*Id.*. Mr. Holt, Sr. has stated that MBC "held the financial interests on the equipment" titled in the

name of EEL (Holt A-648).

Following procedures approved by the Bankruptcy Court, SEA STAR paid NPR for

the Shipments in Process, including equipment expenses (EEL I A-422). Later NPR confirmed: "No

amount is due to NPR from Sea Star for use of Emerald Equipment being used at the time of Closing"

or "for the use of Emerald Equipment located on a vessel purchased by Sea Star at the time of

Closing." (EEL I A-117). Thus, SEA STAR has owed no rent for EEL equipment involved in

Shipments in Process (D.I. 137 ¶ 3(s)); (A-278; EEL I A-435, A-442, A-518, A-521).

In a letter dated July 19, 2002, Mr. Krieger of MBC informed SEA STAR:

> Please be advised that Greenwich Terminals, LLC is authorized as
> MBC Leasing Corp.'s agent for the following purposes:
>
> > 1.    Assembling and storing Emerald Leasing's
> > equipment.
> >
> > 2.    Soliciting purchasers and selling the Emerald
> > Leasing equipment.
>
> The authorized representatives of Greenwich Terminals, LLC are:
>
> > Thomas Holt, Jr.
> > Arthur Davis
> > Martin McDonald

( A-99 to A-107; A-128; EEL I A-470 to A-471,). In addition, Francisco Gonzalez represented EEL

in San Juan (EEL I A-504; Robins A-869; EEL II A-990 to A-991). MBC paid all the bills, including

invoices for agency services and expenses of Greenwich Terminals (Mr. Holt, Jr.'s company) and the individuals (A-99 to A-107; A-240 to A-241;  A-250 to A-265; A-275 to A-276; Holt A-756 to A-757; EEL I A-496 to A-504).

On July 22, 2002, the Bankruptcy Court issued an Order Terminating the Automatic Stay, effective April 29, 2002 (A-129 to A-130).  That order allowed MBC to foreclose its security interest against certain EEL equipment.  *Id.*  Moreover, the order authorized MBC to remove from EEL's possession and sell equipment, applying the proceeds to EEL's indebtedness to MBC (*Id.*; D.I. 137 ¶ 3(o)).

**D.    MBC-SEA STAR Indemnity Agreement**

To induce SEA STAR to pay MBC directly for use of EEL equipment, MBC agreed to indemnify and defend SEA STAR "against claims of COMPETING CLAIMANTS [specifically including EEL[3]] on the terms and conditions set forth" in an Indemnity Agreement dated September 28, 2002 (D.I. 137 ¶ 3(p));(A-173 to A-181).  The Indemnity Agreement further states:

> 1. Agreement to Pay for Use of Equipment. ...SEA STAR will remit to MBC...(a) for each item of the EMERALD EQUIPMENT used during the period of April 27, 2002 through and including July 31, 2002, the amount determined by multiplying the applicable daily rate specified on "Equipment Schedule A"...by the number of days during that period in which such item of EMERALD EQUIPMENT was used...after deduction of such reasonable charges as are due to SEA STAR for storage and handling of EMERALD EQUIPMENT.... Beginning on August 31, 2002 and continuing on the last day of each month thereafter, SEA STAR shall remit to MBC for each item of EMERALD EQUIPMENT in SEA STAR'S possession during that month or portion thereof compensation of the daily rates specified on the EMERALD SCHEDULE from the first day of the month through and including the earliest of: (a) the day on which SEA STAR purchases such item and pays the purchase price therefor; (b) the day

---

[3]"COMPETING CLAIMANTS" is defined in the Indemnity Agreement to include EEL.

on which SEA STAR makes such item available for removal from SEA STAR'S possession by MBC; or (c) the last day of the month after deduction of such reasonable charges as are due to SEA STAR for storage and handling of EMERALD EQUIPMENT....

2. _Waiver of Further Claims by MBC for Use of Equipment_. MBC acknowledges and agrees that the compensation rates set forth in "Equipment Schedule A"...represent fair and reasonable compensation for the use of the EMERALD EQUIPMENT...by SEA STAR and that provided SEA STAR pays the amounts specified in Section 1 of this AGREEMENT for each item of EMERALD EQUIPMENT...that it has used during the applicable period when and as due, subject to deductions specified in Section 1, MBC will assert no further claims against SEA STAR for compensation for the use of the EMERALD EQUIPMENT...by SEA STAR.

3. _Effect of Agreement on Sea Star's Right to Possession_. ... MBC acknowledges and agrees that if SEA STAR enters into a Rental Agreement with EMERALD which is approved by MBC, in writing, MBC shall not interfere with SEA STAR'S right to use or possession of any EMERALD EQUIPMENT that is the subject of such agreement so long as SEA STAR complies with the terms and conditions of such agreement....

...

6. _Amendment_. This AGREEMENT shall not be amended changed or modified, except by an agreement in writing, signed by the party against whom enforcement of the change is sought.

(A-174 to A-176 ¶¶ 1-3, 6).

On October 4, 2002, SEA STAR sent MBC a check for _per diem_ use of EEL equipment from April 27 through July 31, 2002, less storage and handling. Enclosed with its letter were self-billing report summaries, corresponding to detailed self-billing reports previously submitted, and detailed storage and handling invoices (A-322 ¶ 13; A-189 to A-217). Beginning August 31, 2002, SEA STAR sent monthly self-billing reports reflecting equipment purchases and use, as well as storage and handling charges (A-173 ¶ 1). This practice continued through early 2004

(D.I. 149 at 5) (SEA STAR's Response to Baxter Letter); (A-311 to A-312). SEA STAR never consented to any change or assignment of the Indemnity Agreement.

### E. EEL-SEA STAR Rental Agreement

After MBC gave requisite approval to the contract form and substance, SEA STAR and EEL signed the Rental Agreement, dated as of July 31, 2002 (D.I. 137 ¶ 3(q)); EEL I A-450 to A-453; Holt A-729 to A-730). Terms and conditions of the Rental Agreement "cover equipment in use at various times commencing April 29, 2002" (A-133 ). In part, the Rental Agreement provides:

> 1. Equipment. ...Delivery of all equipment to Lessee [SEA STAR] or its agents by Lessor [EEL] shall be effected and evidenced by signed and dated equipment interchange receipts and shall be subject to the terms and conditions of this Agreement.
>
> 2. Term. The lease term for each item of Equipment shall begin on the date when such Equipment is delivered to Lessee or its agent and shall end on the date when such Equipment is taken off hire pursuant to section 10 below. Unless the parties otherwise agree in writing, the minimum rental period for each item of Equipment shall be thirty (30) days....
>
> ...
>
> 5. Equipment Delivery and Interchange. Lessor shall make the Equipment available for delivery to Lessee at the locations agreed by the parties. The signature of Lessee's representative on an equipment interchange receipt shall constitute conclusive evidence that the Equipment to which the receipt relates has been delivered to Lessee.
>
> ...
>
> 10. Redelivery of Equipment.
> (a) At its sole expense, Lessee shall redeliver Equipment to Lessor at Greenwich terminal, Philadelphia, Pennsylvania; SEA STAR terminal, Puerto Nuevo, San Juan, Puerto Rico; Greenwich terminal, Port of Jacksonville, Florida; or any other location as to which the parties have agreed in writing....
>
> (b)   Upon redelivery of particular Equipment, the receiving terminal will execute an equipment interchange receipt....

...

(e)     At the time of return, Equipment will be taken off hire; and rental charges will cease.  If Equipment is returned to a terminal with damage exceeding the damage exclusion specified in Schedule "A", Lessor will inform Lessee within seven (7) days after return....

...

13.  Events of Default.

...

(b) Upon the occurrence of any default by Lessee under this Agreement, Lessor shall (except to the extent otherwise required by law) be entitled to:

(i) Proceed by appropriate court action...to recover damages for breach;

(ii) Terminate Lessee's right to possession of, demand return of, or repossess at Lessee's expense any or all of the Equipment without prejudice to any other remedy or claim;

(iii) Elect to sell any or all Equipment after giving thirty (30) days notice to Lessee at one or more public or private sales and recover the sum of the Stipulated Loss Values of such Equipment, all rent owed through the rent payment immediately preceding the date of such notice,...all costs and expenses, including reasonable legal fees, incurred by Lessor as a result of Lessee's default under this Agreement after deducting all amounts received by Lessor in connection with such public or private sales;

(iv) Upon notice to Lessee, receive prompt payment from Lessee of an amount equal to the Stipulated Loss Values of all Equipment not sold by Lessor pursuant to clause (iii) above plus, to the extent not otherwise recovered from Lessee pursuant to clause (ii) above, any rent owed through the rent payment date preceding the date of such notice, all costs and expenses,...and all reasonable fees and expenses incurred by Lessor as a result of Lessee's default, provided that upon receipt of payment in full of such amount, Lessor shall transfer title to such Equipment to Lessee ....

(A-133 to A-140 ¶¶ 1, 2, 5, 10(a), 10(b), 10(e), 13(b)).[4]

---

[4]An equipment interchange receipt "is a document that the parties execute to show that a piece of equipment was delivered or seized" (EEL I A-454).  It "is a document traditionally prepared

Expressly "subject and subordinate to any lease or security interest in favor of a third-party lessor or lender to Lessor" [A-134 ¶ 4(b)], the Rental Agreement further requires:

> 14. <u>Applicable Law</u>. This Agreement shall be interpreted and the rights, liabilities and duties of the parties determined in accordance with the laws of the State of Maryland.
>
> 15. <u>Miscellaneous</u>. ...This Agreement contains the entire agreement between the parties and, subject to the provisions of section 1, may not be amended, altered or modified, except by a writing signed by the party to be bound.

(A-141 ¶¶ 14, 15(a)). The Rental Agreement also provides "[u]nder no circumstances shall either party be liable to the other party for exemplary damages." (A-138 ¶ 11(b)). No amendments, modifications, or alterations of the Rental Agreement occurred (<u>EEL I</u> A-466, A-468).

As this Court has stated, "the Equipment Rental Agreement was the parties' formal documentation of the leasing arrangement ...." (D.I. 75 at 13). Pursuant to the terms of the Rental Agreement, SEA STAR on-hired specific EEL equipment that was not involved in Shipments in Process on the date SEA STAR's use began and on-hired specific EEL equipment that had been involved in Shipments in Process on the date SEA STAR's use for a new cargo movement began. (D.I. 137 ¶¶ 3(k), (l)). EEL has acknowledged that SEA STAR returns of equipment – *i.e.,* off-hire of individual units, "effected and evidenced" by equipment interchange receipts ("TIRs") signed and dated by the receiving terminal, occurred when equipment comes through the terminal gate and that the SEA STAR terminal in San Juan was a designated receiving terminal, where TIRs signed by SEA STAR effected return of EEL equipment (<u>EEL I</u> A-460 to A-461).

---

by a marine terminal for when a piece of equipment goes in or out of that marine terminal" (<u>Holt</u> A-734). In the Rental Agreement, an "equipment interchange receipt" would be a "TIR" (<u>EEL I</u> A-460 to A-461). A TIR would be issued at the time equipment entered the terminal ("gate in") or exited the terminal ("gate out") (<u>EEL I</u> A-461 to A-462).

In the Port of Jacksonville, no Greenwich terminal existed before August 1, 2002; Jaxport had seized and locked the terminal after NPR ceased operations (<u>EEL I</u> A-457). SEA STAR arranged with Jaxport – and MBC paid – to rent acreage for temporary storage of redelivered EEL equipment (<u>EEL I</u> A-457 to A-458, A-525). As of August 1, 2002, Greenwich occupied the former NPR terminal, where EEL equipment could be redelivered and stored (A-168 to A-172; <u>EEL I</u> A-457, A-475 to A-476). EEL equipment previously redelivered by SEA STAR and stored on the rented acreage was moved to the Greenwich terminal (A-324 ¶ 18; <u>EEL I</u> A-409, A-458; <u>Robins</u> A-845).

MBC, not EEL, was entitled to receive – and did receive – the payments for use of EEL equipment during the period covered by the Rental Agreement and SEA STAR self-billing reports (A-133 to A-143; A-173 to A-181; <u>EEL I</u> A-437; A-97; <u>EEL II</u> A-998; <u>D.I.</u> 158 at 15 (transcript of 12-20-07 hearing)).[5] In January 2003, MBC also filed a Motion for Allowance and Payment of Administrative Priority Claims in the NPR Bankruptcy Action (A-223 to A-239). MBC's motion covers "continued use of the Sea Star Emerald Equipment" through June 11, 2002.

### F.    MBC-Storage Loan Sale & Assignment Agreement

Effective November 1, 2003, MBC, as assignor, executed a Loan Sale and Assignment Agreement (the "Assignment Agreement") with Storage, as assignee (A-280 to A-294; <u>Storage</u> A-968). The outstanding balance of MBC's loan to EEL consisted of $2,892,662.16 principal; $821,969.73 late

---

[5]EEL's attorney has admitted:

> Sea Star prepared these self-billing reports. They sent them to MPC (*sic*) because they had an assignment of lease. They had relief from stay.
>     They [MBC] were entitled to the proceeds....

(D.I. 158 at 15).

charges; and $915,532.61 interest (A-285 ¶ 7a). Storage agreed to purchase the MBC loan for

$650,000.00, plus 20% "of the net amount, after deduction of reasonable attorneys' fees and other

reasonable collection expenses" of any amount received from SEA STAR by Storage (A-282 ¶¶ 2, 3).[6]

Entitled "No Competing Claim Against Sea Star," paragraph 6.3 of the Assignment

Agreement states:

> ASSIGNEE [Storage] agrees not to assert any entitlement to
> compensation from SEA STAR for use of EMERALD EQUIPMENT
> during any period for which SEA STAR has paid ASSIGNOR [MBC]
> pursuant to the SEA STAR INDEMNITY [the MBC-SEA STAR
> Indemnity Agreement].

(A-284 ¶ 6.3). The Assignment Agreement defines "EMERALD EQUIPMENT" as "certain

equipment securing payment of the LOAN" from MBC to EEL, which is evidenced by "the

'ASSIGNED DOCUMENTS,' as defined in Recital 5 ...." (A-282 ¶ 3). Storage received no other

assignments from MBC (Storage A-971).

**G.    "Carveouts"**

In a letter dated February 25, 2004, Gary M. Schildhorn, an EEL attorney, wrote Ms.

Robins:

> I am advised that Storage Transfer, L.L.C. ("Storage") has acquired
> the secured position of MBC Leasing Company in the Estate of
> Emerald Equipment Leasing, Inc. ("Emerald"). Emerald currently
> intends to prosecute certain substantial claims against Sea Star Lines
> LLC. Storage has agreed to contribute to the Emerald estate 15% of
> any proceeds, net of expenses or other amounts disbursed to third
> parties, it would otherwise receive on account of its secured claim as

---

[6]On October 30, 2003, the eve of the Assignment Agreement, MBC had informed Mr. Holt,
Jr. of its "deal in principle" to sell the EEL loan documents to Mr. Holt, Sr. (A-279). However,
Lorraine Robins, an assistant to Mr. Holt, Sr. and an employee of various Holt companies for 45
years, formed Storage. Ms. Robins then signed the Assignment Agreement on behalf of Storage (A-
280 to A-294; Holt A-635; Robins A-789 to A-790; A-793; Storage A-970).

a result of any settlement of the Sea Star claim or the collection of
any judgment obtained upon prosecution of this claim....

(A-314 to A-315). As Storage's "Sole Member," Ms. Robins "AGREED TO AND ACCEPTED" this
"carveout" by signing the letter (*Id.*).

EEL's dealings with SEA STAR has been "on behalf of the creditors." Presently,
EEL's secured creditor is Storage, which expects to collect the money (<u>Storage</u> A-973 to A-974, A-
981). According to Ms. Robins, Storage's expenses will include not only amounts paid to third parties
but also telephone, office equipment and rent, contract employees, and her unspecified salary (<u>Storage</u>
A-977). Any carveout in favor of EEL also is subject to another carveout for EEL's legal fees, which
Storage began paying after execution of the Assignment Agreement (A-314 to A-315; A-963 to A-964;
<u>Storage</u> A-973 to A-974, A-977). Storage cannot calculate whether EEL would receive any carveout
until collections are complete, all expenses and legal fees are paid, and MBC receives its 20 percent.
Unlike Storage, MBC is not a party to any "carveout agreement" with EEL or its attorneys (<u>Storage</u>
A-982).

**H.    Heinsen Maritime Lien Claim**

At the time of the Sale Order, EEL and its attorneys knew E.T. Heinsen, C. por A.,
("E.T. Heinsen"), a former NPR agent in the Dominican Republic, was holding EEL equipment and
had filed a maritime lien claim in the Bankruptcy Action (A-18 to A-20; <u>EEL II</u> A-1014). When
Arthur Davis and Martin McDonald met with E.T. Heinsen, he refused to release the EEL equipment
(<u>EEL I</u> A-568; <u>EEL II</u> A-1012, A-1013). Subsequently, Storage recovered and sold EEL equipment
to E.T. Heinsen (A-330 to A-343; <u>Storage</u> A-968, A-974 to A-975). EEL billed SEA STAR for rent
and "adjusted" Stipulated Loss Values (<u>EEL I</u> A-568).

### I.    EEL Equipment Sales

EEL admittedly did not give SEA STAR any notice specified in paragraph 13(b)(iii) of the Rental Agreement prior to sales of EEL equipment for which EEL alleges SEA STAR is responsible.   Nevertheless, EEL has asserted claims against SEA STAR for rent and "adjusted" Stipulated Loss Values of such equipment (Storage A-983; Robins A-853).

### J.    Storage & Handling; Carriage of EEL Equipment

EEL equipment that SEA STAR had not on-hired or had off-hired remained on SEA STAR's premises, particularly the San Juan terminal, pursuant to the Sale Order and SEA STAR's agreement with MBC.  While they were trying to sell to third parties, EEL, together with MBC – and later Storage, continued to use SEA STAR's facilities to store EEL equipment.  Despite demand, EEL did not remove all equipment from SEA STAR's San Juan terminal.  EEL continued to use SEA STAR's terminal for storage and sales of EEL equipment during 2004 and 2005 ( A-344; A-345; A-346; EEL I A-488 to A-493, A-603 to A-608; Storage A-978).  On May 11, 2004, for example, Arthur Davis instructed SEA STAR Agency personnel: "Please do not release any of the Emereld (sic) equipment from your location in San Juan without my specific release by either e-mail or fax." (A-344).  Mr. Davis had authority to give such instructions on behalf of Storage and EEL (Storage A-978).

After SEA STAR filed a motion in the Bankruptcy Court, EEL finally entered into a Stipulation Regarding Disposition of Certain Equipment.   The Bankruptcy Court approved the Stipulation and issued an Order dated September 26, 2005 (EEL II A-1011 to A-1012; A-952 to A-962).  Storage and EEL representatives later removed most of the EEL equipment from SEA STAR's terminal.  However, EEL has not paid SEA STAR for use of its terminal facilities to store EEL equipment and for handling EEL equipment (A-247 to A-248; A-249; A-266 to A-267; A-271 to A-

274; A-295; A-296; A-313; <u>EEL I</u> A-593 to A-594, A-596 to A-597, A-607 to A-608).  In addition,

EEL has not paid SEA STAR for carriage of EEL equipment onboard SEA STAR vessels at EEL's

request and for goods and services provided in connection with EEL equipment, including chains and

binders (A-221 to A-222; A-247 to A-248; A-266 to A-267; A-295; A-296; A-297 to A-310; A-313;

<u>EEL I</u> A-588 to A-590, A-596 to A-597, A-599 to A-601).

**ARGUMENT**

A.    **Summary Judgment Standard**

Setting the summary judgment standard, Fed. R. Civ. P. 56(c) provides in pertinent part:

> The judgment [sought] shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  Applicable substantive law determines what facts are material.  *Id.* at 248.

Once SEA STAR has satisfied its initial burden under Rule 56(c), EEL must submit evidence showing specific facts as to which genuine issues remain for trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The Court's focus is on "whether the evidence presents a sufficient disagreement to require submission to a [fact finder] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 243.  *Accord, Dici v. Commonwealth of Pa.*, 91 F.3d 542, 547 (3d Cir. 1996).  If EEL fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, SEA STAR is entitled to judgment as a matter of law.  *Celotex Corp.*, 477 U.S. at 322; *Tse v. Ventana Medical Sys., Inc.*, 297 F.3d 210, 218 (3d Cir. 2002).

B.    **Declaratory Judgment**

In regard to declaratory relief, the Supreme Court has explained:

> Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment....

*Maryland Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941)(citations omitted). *Accord,*

*Lake Carriers' Ass'n v. MacMullan*, 406 U.S. 498, 506 (1972). Within the ambit of 28 U.S.C. § 2201,

Count I of SEA STAR's Complaint is ripe for a declaratory decision. Given the substantial sums in

dispute and the parties' contradictory contractual interpretations, the controversy is indeed "live." *See,*

*e.g., Surrick v. Killion,* 449 F.3d 520, 527-29 (3d Cir. 2006); *United States v. Gov't of Virgin Is.,* 363

F.3d 276, 285-86 (3d Cir. 2004).

   When SEA STAR moved to dismiss EEL's Counterclaim, this Court examined the

Rental Agreement and held:

> The Equipment Rental Agreement "cover[s] equipment in use at
> various times commencing April 29, 2002."... It also contains an
> Integration Clause which states that "[t]his Agreement contains the
> entire agreement between the parties and subject to the provisions of
> section 1, may not be amended, altered, or modified, except by a
> writing signed by the party to be bound."... Based on this language, the
> Court concludes that a reasonable person reading the Rental Agreement
> would not find any ambiguity in its terms....
>
> ...
>
> [E]xtrinsic evidence is not required to illuminate the meaning
> of the Equipment Rental Agreement because it is not ambiguous when
> viewed from the standpoint of a reasonable person.... As Emerald
> acknowledges in its Counterclaim, the Equipment Rental Agreement
> was the parties' formal documentation of the leasing arrangement that
> had existed previously.... Further, the Equipment Rental Agreement has
> an Integration Clause expressing the parties' intent that the Equipment
> Rental Agreement be "the entire agreement between the parties."

(D.I. 75 at 11-13) (references & citations omitted). No modifications or alterations of the Rental

Agreement have occurred (EEL I A-268).

   EEL's execution of the Rental Agreement required authorization by MBC, EEL's

secured lender (EEL I A-452; Holt A-729 to A-730). Paragraph 4(b) provides that the Rental

Agreement is "subject and subordinate to any lease or security interest in favor of a third-party lessor

or lender to Lessor." (A-134 ¶ 4(b)). Thus, two other MBC contracts become pertinent:

First, as a condition to authorization of the Rental Agreement, MBC required the Indemnity Agreement. In consideration for SEA STAR's direct payment for use of EEL equipment covered by the Rental Agreement, MBC contracted to indemnify and defend SEA STAR "against claims by COMPETING CLAIMANTS [specifically including EEL] on the terms and conditions set forth" in the Indemnity Agreement. *See supra* p. 10-11; (D.I. 137 ¶ 3(p)); (A-174). EEL was not privy to agreements between MBC and SEA STAR (EEL II A-996).

Second, as a condition to Storage's purchase of the EEL loan, MBC required inclusion of paragraph 6.3 in the Assignment Agreement. Entitled "No Competing Claim Against Sea Star," paragraph 6.3 states:

> ASSIGNEE [Storage] agrees not to assert any entitlement to compensation from SEA STAR for use of EMERALD EQUIPMENT during any period for which SEA STAR has paid ASSIGNOR [MBC] pursuant to the SEA STAR INDEMNITY [the MBC-SEA STAR Indemnity Agreement].

(A-284 ¶ 6.3).[7]  Storage received no other assignments from MBC. *See supra* p. 16.

The Sale Order prohibits claims that SEA STAR is successor in interest to NPR or any of the other Holt-related Debtors; that acquisition of the Purchased Assets reflects substantial continuation of the Debtors' business operations; or that SEA STAR acquired, assumed, or accepted assignment of any equipment agreements between EEL and NPR or Holt Cargo (A-85 to A-86; D.I.

---

[7]Paragraph 6.3 is consistent with a September 24, 2003 telefax from Scott Krieger of MBC, instructing Mr. Davis: "Just please make sure you are not claiming payments for units and time periods covered under self billing reports from Sea Star"(A-278 to A-279). In January 2003 MBC filed a Motion for Allowance and Payment of Administrative Priority Claims in the NPR Bankruptcy proceeding (A-223 to A-239). Since paragraph 4(b) of the Rental Agreement expressly subordinated any EEL to MBC's interest as "lender to Lessor," the Motion proscribed any EEL claim concerning "continued use of the Sea Star Emerald Equipment" through June 11, 2002 (*Id.* at A-236 to A-238).

137 ¶ 3(h)).  To the extent any EEL equipment was "located on property sold or assigned to Buyer

under the Asset Purchase Agreement," the Sale Order obligated SEA STAR to

> cooperate in allowing Emerald...to remove such property during normal
> business hours as long as such removal will not unreasonably disrupt
> operations of the Buyer. [And to] cooperate in removing any such
> equipment from Vessels in transit and store such equipment on leased
> premises at the final port of destination, to the extent such final
> destination is a leased premises sold and assigned to the Buyer under
> the Asset Purchase Agreement....

(A-90 to A-91 ¶ 13). The Sale Order enjoined EEL, as well as other NPR creditors, "from asserting

or prosecuting any claim or cause of action against Buyer or the Purchased Assets to recover on

account of any liability owed by the Debtors" (A-91 ¶ 15).

Mr. Holt, Sr. has admitted that the Rental Agreement "refers to all equipment that Sea

Star had of Emerald's" and governs the contractual relationship between SEA STAR and EEL (Holt

A-740 to A-741).  Whatever the Rental Agreement says is what the agreement was "[a]s far as

Emerald is concerned, yes" (Holt A-739).  Moreover, Mr. Holt, Sr. has testified:

> The documents speak for themselves.... [w]hat I understand is whatever
> the document says, it says.... I'm talking about the equipment rental
> agreement.
> ...
> The agreement was the agreement.  Whatever it was, it was

(Holt A-643 to A-645, A-671).

As described by Mr. Holt, Sr., EEL "assisted MBC in trying to collect monies anywhere

they could, including from Sea Star, attempting to properly invoice the leasing of the equipment to Sea

Star and the liquidation of equipment that Sea Star was not using so the money could flow to MBC"

(Holt A-649).  When EEL needed to cover office activities in the summer 2002, Mr. Holt, Sr. enlisted

Mr. Davis, a former EEL president and stockholder, and Ms. Robins (Holt A-632, A-637; EEL II A-

994;).  Mr. Holt, Sr. "requested Lorraine [Ms. Robins] to try to resolve the differences between Sea Star and Emerald and all the documentation that that ensued" (<u>Holt</u> A-635).  At the time Ms. Robins and Mr. Davis were employed and paid by Holt Logistics, the logistical arm of a company that provides backroom services for Holt companies (<u>Holt</u> A-731).  Both had held positions in various Holt companies for many years (<u>Robins</u> A-789 to A-790, A-793, A-808).

Ms. Robins' primary function was assisting Mr. Davis "in trying to get the invoicing resolved between Emerald and Sea Star...and assisting in all the paperwork that that demands" (<u>Holt</u> 634).  When Ms. Robins testified in January 2005, however, she had not seen the Sale Order, and no one had advised her of its provisions (Robins A-860).  Furthermore, Ms. Robins admittedly had read "just sections" of the Rental Agreement - "[t]he charges, the rates, per diems, redelivery," and "the Schedule A, which gives you the lease rate, the stipulated loss rate and the damage" (A-133 to A-143; <u>Robins</u> A-851, A-862, A-866).  When Ms. Robins testified on behalf of Storage in January 2008, she equivocated about whether she still had "[n]ot really" read the complete Rental Agreement (<u>Storage</u> A-984).

Regarding the spreadsheet "invoices" that she prepared, Ms. Robins stated: "When I billed, I didn't bill anything to Sea Star unless I had a movement of some kind that they had touched it.  If they had it, I billed it" (<u>Robins</u> A-841).  Examples are:

1.    <u>Sale Order</u>.  While Mr. Holt, Sr. deemed paragraph 13 of the Sale Order "self-explanatory," Ms. Robins had not seen the document (<u>Holt</u> A-772; <u>Robins</u> A-860).  To bill SEA STAR, EEL "did not" differentiate between EEL equipment in use and in storage, particularly in San Juan, as of April 29, 2002 (<u>Holt</u> A-735).

2.    <u>Shipments in Process</u>.  After learning of the "in-transit clause from the Court"

– *i.e.,* the Shipment in Process provision – Mr. Holt, Sr. told Ms. Robins and Mr. Davis "to make sure you don't bill for that period of time" (Holt A-742). Allegedly, EEL "did not invoice for that in-transit period" (Holt A-765). However, when Ms. Robins found out about "the in-transit" or Shipment in Process provision in January 2004, she merely "adjusted the billing from the containers on that list for 14 days credit on each unit" (Robins A-826 to A-827; A-836). Ms. Robins limited any adjustments to certain loaded containers onboard the ex-NPR vessels on April 27, 2002. She testified that if she knew "the equipment was on the vessel,...I gave Sea Star Line 4/29 as an on-hire date [and] gave them credit for two weeks" (Robins A-837 to A-838). Moreover, Ms. Robins billed SEA STAR for equipment involved in Shipments in Process that were en route overland to NPR customers, before and after the closing (A-218 to A-220; A-242 to A-244; A-245 to A-246; A-277; Robins A-888, A-890 to A-891, A-894 to A-895, A-901 to A-904, A-918 to A-921).

        3.    Third-Party Claimants. Mr. Holt, Sr. had admitted that EEL equipment located in depots, repair yards, and other inland facilities would not be SEA STAR's responsibility "[i]f it's not covered" under the Rental Agreement (Holt A-769). He knew: "[t]here was equipment that was held by vendors on monies that NPR owed to them. They were not aware that it was not NPR's equipment; it was Emerald's equipment.... There were more than several ...." (Holt A-694 to A-695). "[W]hether there was equipment that was being held by people that was not turned over to Sea Star because of it being held, the answer is yes" (Holt A-696 to A-697).

        Ms. Robins was not involved in any effort to determine what units were in SEA STAR's possession, in inland depots, or elsewhere as of April 27, 2002 (Robins A-846 to A-847). While Ms. Robins unquestionable knew that inland depots would not allow SEA STAR to take possession of EEL equipment, she inexplicably denied that third parties held any EEL equipment as

of April 27, 2002 (Robins A-849). Ms. Robins billed SEA STAR for EEL equipment that depots and truckers having claims against NPR retained and refused to release but that she had "released."(A-95 to A-96; A-127; A-182 to A-186; Robins A-871 to A-873, A-881 to A-882.) She also billed SEA STAR for EEL equipment that Mr. Davis instructed depots not to release to SEA STAR or asked SEA STAR to reserve for his prospective sales (A-218 to A-220; Robins A-917). Furthermore, at the time of the Sale Order, EEL and its attorneys knew E.T. Heinsen, C. por A. ("E.T. Heinsen") was holding EEL equipment in the Dominican Republic and had filed a maritime lien claim in the Bankruptcy Action (A-330 to A-343; EEL I A-568; EEL II A-1012 to A-1014). After recovery and sale of the EEL equipment, Ms. Robins charged SEA STAR for rent and adjusted Stipulated Loss Values (EEL I A-568).

    4.    On-Hire TIRs. EEL has made pretense of compliance with on-hire requirements of the Rental Agreement: "Delivery of all Equipment to [SEA STAR] shall be effected and evidenced by signed and dated equipment interchange receipts;" "[t]he lease term for each item of Equipment shall begin on the date when such Equipment is delivered" to SEA STAR (A-83 to A-84 ¶¶ 1, 2; EEL I A-565; Holt A-691, A-693 to A-694, A-735). On the one hand, Mr. Holt, Sr. understands that the EEL-NPR lease and the EEL-SEA STAR Rental Agreement were fundamentally different: The EEL-NPR lease was not "a specific unit per-diem lease that was entered into with Sea Star and Emerald" (EEL II A-993). The EEL-NPR lease "was a grossed-up lease..., where the total fleet of Emerald would be leased by NPR for a period of time" (EEL II A-994). In fact, Mr. Holt, Sr. knew SEA STAR had rejected such a total-fleet proposal before closing the asset purchase (A1 to A-3; Holt A-710 to A-712). Mr. Holt, Sr.'s "whole theory was you were going to take the entire fleet, but it just wasn't going to be. You didn't need the entire fleet" (Holt A-720). On the other hand, Mr. Holt, Sr. now

asserts: "You took over Emerald's equipment as of the closing. You either would return it within two weeks after the closing or you were using it. If you returned it, you would not be charged" (EEL II A-1012). Ms. Robins' "touch" test for determining whether and when SEA STAR on-hired EEL equipment ignored the explicit on-hire provisions in the Rental Agreement.

        5.    Off-Hire TIRs. EEL has acknowledged that SEA STAR returns of EEL equipment – *i.e.,* off-hire of individual units – were "effected and evidenced" by TIRs signed and dated by SEA STAR, when the equipment came through the terminal gate (EEL I A-460 to A-461). Though Ms. Robins was aware that the Rental Agreement identified SEA STAR's San Juan terminal as a designated redelivery location, she decided that a TIR signed by SEA STAR when EEL equipment entered the terminal "wasn't a redelivery document unless a representative from Emerald signed it," disregarding paragraph 10 of the Rental Agreement (Robins A-925 to A-926). For instance, after SEA STAR agreed to reposition equipment stored by EEL in its San Juan terminal to EEL's Jaxport terminal [A-295], Mr. Davis signed a TIR to confirm condition before loading onboard SEA STAR's vessel. Ms. Robins knew SEA STAR had asked EEL to clear its equipment out of the San Juan terminal, yet she billed SEA STAR *per diem* rental for the equipment that EEL had stored. Inexplicably, she rationalized: "We may have charged per diem for the equipment if it was on hire prior to the shipping.... It was taken off hire when it was given to Arthur [Davis] with a TIR and he signed it" (Robins A-924 to A-925, A-931).

        6.    EEL Equipment Sales. EEL admittedly did not give SEA STAR notice specified in paragraph 13(b)(iii) of the Rental Agreement prerequisite to sales of EEL equipment for which EEL alleges SEA STAR is responsible. Nevertheless, EEL has asserted claims against SEA STAR for rent and "adjusted" Stipulated Loss Values of such equipment (Robins A-853; Storage A-

983).  For instance, after recovery of the EEL equipment that E.T. Heinsen had held in the Dominican
Republic, EEL sold the equipment without notice.  Ms. Robins then charged SEA STAR for rent and
adjusted Stipulated Loss Values (EEL I A-568).

**(a)**    **Real Party in Interest**

Regarding claims under the Rental Agreement, the threshold issue is whether EEL is
a real party in interest.  *See Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 111 (1998).
Generally, a party must assert its own legal rights and interests, not third parties' legal rights and
interests.  *Warth v. Seldin,* 422 U.S. 490, 499 (1975); *Discovery Bank v. Vaden,* 489 F.3d 594, 601-02
(4th Cir. 2007); *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 117-18 (2d Cir. 1991).  To
function as the real party in interest for purposes of Fed. R. Civ. P. 17(a), EEL must hold the
substantive legal rights sought to be enforced.  The Rental Agreement is expressly "subject and
subordinate to any lease or security interest in favor of a third-party lessor or lender to Lessor" (A-134
¶ 4(b)).  Thus, any interest of EEL under the Rental Agreement remains subordinate to that of MBC,
its secured lender.

Furthermore, the Assignment Agreement clearly and unambiguously proscribes
assertion by Storage of "any entitlement to compensation from SEA STAR for use of EMERALD
EQUIPMENT during any period in which SEA STAR has paid ASSIGNOR pursuant to the SEA
STAR INDEMNITY" (A-284 ¶ 6.3).  Adhering to the principle of objective contractual interpretation,
the provision is unambiguous; the Court gives effect to its plain meaning and does not contemplate
any alleged subjective intent at the time of formation.  *Cochran v. Norkunas,* 919 A.2d 700, 709 (Md.
App. 2007).  Under the Indemnity Agreement, compensation from SEA STAR for use of EEL
equipment was payable to MBC.  SEA STAR and MBC exchanged payments and credits throughout

the term of the Rental Agreement. Self-billing reports reflecting their mutual dealings continued into 2004, after EEL terminated the Rental Agreement.

The undefined, indeterminate "carveout" granted EEL by Storage cannot encompass a greater claim – or interest – than that specifically assigned to Storage by MBC. Under Maryland law, which governs the Rental Agreement and the Assignment Agreement, a "'real party in interest' must have 'an actual, real and justiciable interest susceptible of protection through litigation.'" *Akparewa v. Amoco Oil Co.*, 771 A.2d 508, 519 (Md. Ct. Spec. App. 2001), *quoting Boyd v. Hickman*, 689 A.2d 106, 116 (Md. App. 1997); *see Discovery Bank v. Vaden,* 489 F.3d at 601-03; *LaSalle Bank, N.A. v. Lehman Bros. Holdings, Inc.*, 237 F. Supp.2d 618, 626, 632 (D. Md. 2002); Fed. R. Civ. P. 17(a); (*see also* A-141 ¶ 14; A-289 ¶ 18). The Assignment Agreement *sub judice* prohibits assertion of a compensation claim for use of EEL equipment during any period in which SEA STAR has paid MBC. Contractually and legally, EEL lacks the requisite "personal stake in the outcome" of any controversy or standing to sue SEA STAR with respect to any matter covered by paragraph 6.3, including a claim for *per diem* rent. *Warth v. Seldin,* 422 U.S. 490, 498-99 (1975); *Accord, Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 117-18 (2d Cir. 1991); *see Caplin v. Marine Midland Grace Trust Co.,* 406 U.S. 416, 428-33 (1972); *Town of Piscataway v. Duke Energy*, 488 F.3d 203, 208-09 (3d Cir. 2007); *General Motors Acceptance Corp. v. Dykes (In re Dykes)*, 10 F.3d 184, 187-88 (3d Cir. 1993). EEL, like Storage, is estopped from disregarding the explicit contractual limitations and prohibitions.

### (b) Declaratory Relief

The continuing dispute between SEA STAR and EEL remains live and ripe for disposition. SEA STAR seeks a declaration of rights and other legal relations under the Rental Agreement and the Sale Order. In particular, SEA STAR requests that the Court declare:

1.     SEA STAR has no responsibility or liability for EEL equipment subject to previous agreements between EEL and NPR that SEA STAR did not use pursuant to the Rental Agreement after closing of the asset purchase.

2.     EEL's delivery of each piece of EEL equipment must have been effected and evidenced by an equipment interchange receipt – a TIR – signed and dated on or after April 29, 2002 (A-133 ¶ 1).

3.     "Redelivery of equipment [subject to the Rental Agreement may be] at Greenwich terminal, Philadelphia, Pennsylvania; SEA STAR terminal, Puerto Nuevo, San Juan, Puerto Rico; Greenwich terminal, Port of Jacksonville, Florida; or any other location as to which the parties have agreed in writing" (A-137 ¶ 10(a)).

4.     Redelivery of EEL equipment subject to the Rental Agreement may have been effected and evidenced by a TIR signed by the SEA STAR San Juan terminal, a designated receiving terminal at which time EEL was required to off-hire the equipment (A-137 to A-138 ¶¶ 10(b), 10(e)).

5.     SEA STAR has no responsibility or liability to compensate for use of EEL equipment prior to or during Shipments in Process.

6.     The Sale Order imposes no obligation with respect to any lessor's equipment that on April 27, 2002, was not located on leased property acquired under the Asset Purchase Agreement; that was not involved in shipment to a "final port of destination" where SEA STAR leased premises acquired under the Asset Purchase Agreement and Sale Order; or that was returned to port or inland facilities by third parties, such as consignees, which had received shipments at final destinations outside ports.

7.     SEA STAR has had no duty to "redeliver" or pay compensation for EEL

equipment that SEA STAR "touched" but did not use, including, but not limited to, EEL equipment which was involved in Shipments in Process or held by third parties, such as E.T. Heinsen and inland depots, and was returned to port terminals or inland depots where SEA STAR leased premises; EEL equipment which entered NPR terminals prior to closing of the asset purchase; and EEL equipment for which delivery under the Rental Agreement is not evidenced by a TIR, signed and dated by SEA STAR for use on or after April 29, 2002.

8.    SEA STAR has had no duty to "redeliver" or pay for EEL equipment involved in Shipments in Process that third parties, such as consignees, did not return to port terminals or inland depots where SEA STAR leased premises. Any EEL recourse would be to the NPR bankruptcy estate.

9.    For EEL equipment involved in Shipments in Process, any SEA STAR on-hire obligation would begin when SEA STAR signed a TIR for use after completion of a Shipment in Process.

10.    Any SEA STAR on-hire obligation for EEL equipment in the possession of third parties, such as depots, shipper pools, or shipper warehouses, as of and after closing would begin when Sea Star signed a TIR removing such EEL equipment from a depot or shipper pool or acknowledging receipt from a customer or delivering carrier for SEA STAR's use. Otherwise, SEA STAR would have no responsibility for such equipment.

11.    SEA STAR has no obligation to EEL for *per diem* rent.

12.    SEA STAR has no obligation for EEL Stipulated Loss Value claims unless a signed TIR discloses SEA STAR's use of such EEL equipment on or after April 29, 2002 and there is no evidence of redelivery.

13.    SEA STAR has no obligation for EEL's adjusted Stipulated Loss Value claims pertaining to EEL equipment recovered and sold.  EEL admittedly did not give SEA STAR notice required by paragraph 13(b)(iii) of the Rental Agreement prior to sales of EEL equipment for which EEL alleges SEA STAR is responsible.  *Maryland Nat'l Bank v. Wathen,* 414 A.2d 1261, 1263-65 (Md. App. 1980).  *Accord, First Nat'l Bank of Md. v. DiDomenico*, 487 A.2d 646, 649-50 (Md. App. 1985); *see Gambo v. Bank of Md.*, 648 A.2d 1105, 1113 (Md. Ct. Spec. App. 1994).

### (c)    **Storage & Handling; Carriage of EEL Equipment**

As a matter of law, EEL is liable to SEA STAR for use of its San Juan terminal facilities to store EEL equipment and for handling services relating to EEL equipment.  EEL also is liable to SEA STAR for carriage of EEL equipment onboard SEA STAR vessels and for goods and services in connection with EEL equipment, including chains and binders, provided at EEL's request.  *Southern Pacific Transp. Co. v. Commercial Metals Co,* 456 U.S. 336, 342-44 (1982); *see Norfolk Southern Ry. v. James N. Kirby Pty, Ltd.,* 543 U.S. 14, 24 (2004); *Krauss Bros. Lumber Co. v. Dimon S.S. Corp.,* 290 U.S. 117, 122 (1933).  *See also supra* p. 18-19.

## CONCLUSION

Because there are no material facts in dispute, SEA STAR requests that the Court grant summary judgment in its favor and declare the parties' rights and obligations under the Rental Agreement and Sale Order, consistent with the arguments above. Further, because EEL lacks standing to pursue certain claims, SEA STAR requests that the Court declare that EEL has no right to pursue those claims. Finally, SEA STAR requests that the Court find that EEL is liable on the monetary damage claims asserted in the Complaint.

June 10, 2008

SMITH, KATZENSTEIN & FURLOW LLP

/s/ Kathleen M. Miller
Kathleen M. Miller (I.D. No. 2898)
800 Delaware Avenue
P.O. Box 410
Wilmington, DE 19899
Telephone:  302-652-8400
Facsimile: 302-652-8405
E-mail: Kmiller@skfdelaware.com

*Attorneys for Sea Star Line LLC*

OF COUNSEL:
Timothy J. Armstrong
Armstrong & Mejer, P.A.
2222 Ponce de Leon Boulevard
Penthouse Suite
Miami, FL 33134
Telephone: 305-444-3355