

FAX: 904-724-3011                              April 11, 2002

Mr. Robert Leetch
Chief Financial Officer
SEASTAR LINES, LLC
100 Bell Tel Way, Suite 300
Jacksonville, FL 32216

Re:    **Emerald Equipment Leasing, Inc.**
       **Proposal for Equipment Leases to Seastar Navieras**

Dear Bob:

Thank you for the time you gave to Leo on Tuesday regarding the Emerald Equipment Leasing, Inc. equipment currently leased to NPR, Inc. After reporting the meeting to our financier, MBC Leasing, we felt it might be more productive to start a dialogue that works for Emerald and them rather than wait for a proposal from yourselves.

We listened carefully to the issues regarding the need for smooth transition, issues raised by Phil Bates with some of the equipment and the current market. We believe that the active equipment population can be reconciled fairly easily and the attached spreadsheet reflects what we feel is the correct reconciliation. That is the Emerald base. Depending on the outcome and payments from NPR, the cure of the Emerald leases can be dealt with.

The attached spreadsheet also reflects the additional container equipment leased directly to NPR by MBC Leasing. From our discussion with MBC it makes sense to treat the two groups of equipment as linked. They are willing to permit NPR to assign those leases to Sea Star as long as they are cured, which I understand is not a major amount of money. This is contingent upon Emerald and Seastar coming to terms on the Emerald Equipment.

Emerald would propose to provide the fleet adjustment on the basis that the POS equipment that is in San Juan or elsewhere can at Emerald's option be relocated to a Sea Star port facility is relocated to Philadelphia for disposition free of charge for delivery or storage. Additionally, as and if container and genset equipment is turned in pursuant to our agreement, Emerald would want that equipment repositioned pursuant to our direction, subject to standard off hire terms and procedures for inspection and repair if not purchased. Chassis, of course, would be treated on the basis of being roadable and FHWA inspected.

**E 005932**

A-1

Mr. Robert Leetch
Seastar Lines. LLC
April 12, 2002
Page 2


The proposal attached provides for a turnback or purchase of the Emerald containers and gensets after the end of the first year. The purchase prices are noted on the spreadsheets. If you elect to turn back equipment after the end of the first year the periods may be broken on ninety day increments. The terms of this are subject to MBC Leasing obtaining the consent of their participants and their credit review and approval of the company taking on the lease obligations.

We believe that the enclosed represents a way to transition the operation smoothly and provides relief once things are up and running. We look forward to discussing this further with you.

Sincerely,

EMERALD EQUIPMENT LEASING, INC.


Thomas J. Holt, Sr.
President

TJH,SR/mkc

Enclosures

E 005933

EMERALD EQUIPMENT PROPOSAL to SEA STAR LINES - 4/12/02

| Description | Number of Units | Per Diem Rate | Monthly Payment | Annual Payment | Market per Diem Rates |
|---|---|---|---|---|---|
| Present Emerald Equipment Fleet 4/12/02 | 12,837 | 2.06 | $804,000.00 | $9,648,000.00 | |
| | | | | | |
| Equipment Lease proposal to Sea Star - 4/12/02 | | | | | |
| Refrigerated Containers | 899 | $4.50 | $123,050.63 | $1,476,607.50 | $9.00 |
| Dry Containers | 3,764 | $0.80 | $91,590.67 | $1,099,088.00 | $0.90 |
| Generator Sets | 968 | $3.75 | $110,412.50 | $1,324,950.00 | $8.50 |
| | | | | | |
| Chassis | 6,511 | $1.70 | $336,672.96 | $4,040,075.50 | $2.25 |
| | | | | | |
| Totals under 4/12/02 Emerald Proposal | 12,142 | $1.79 | $561,726.75 | $7,940,721.00 | |
| Note: | | | | | |

The above proposal provides for a sale option of the following equipment to Sea Star after Year 1 under the following conditions.

| Equipment Sale Option | Units | Price per Unit | Total Cost | Market Cost New |
|---|---|---|---|---|
| Sale of Reefer Containers | 899 | $600.00 | $539,400.00 | $22,000.00 |
| Sale of Dry Containers | 4,663 | $300.00 | $1,398,900.00 | $2,750.00 |
| Sale of Generators | 968 | $900.00 | $871,200.00 | $8,500.00 |
| Total Purchase Cost | 5,631 | | $2,270,100.00 | |

E 005934

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | * | Chapter 11 |
| MURPHY MARINE SERVICES, INC., et al., | * | Case Nos.: 01-00926 through 01-00950 (MFW) |
| Debtors. | * | (Jointly Administered) |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

### SECOND MOTION OF MBC LEASING CORP.
### FOR RELIEF FROM THE AUTOMATIC STAY

MBC Leasing Corp. ("MBC"), by and through its attorneys, hereby moves, pursuant to 11 U.S.C. § 362, for the entry of an Order terminating the automatic stay in the above-captioned bankruptcy case as to MBC and certain assets or possessory interests in and to such assets of Emerald Equipment Leasing, Inc. ("Emerald"), NPR, Inc. ("NPR"), and Holt Cargo Systems, Inc. ("Cargo"), and in support thereof, states as follows:

1.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157(a). This is a core proceeding.

2.    Emerald, NPR, Cargo, and various affiliates (collectively, the "Debtors") filed voluntary petitions for relief (collectively, the "Petitions") under Chapter 11 of the United States Bankruptcy Code ("Bankruptcy Code") in this Court on March 21, 2001.

3.    The Debtors have remained in possession of their assets and have continued to operate their businesses as debtors-in-possession. The cases initiated by the filing of the Petitions are being jointly administered.

4    In 1997, Emerald requested that MBC provide a term loan (the "Purchase Money Loan") to Emerald in the amount of Thirty-Five Million Dollars ($35,000,000.00) to enable Emerald to purchase 426 twenty foot steel dry van containers, 990 Onan refrigerator "gensets," 910 forty foot

A:\419MotRelStay.wpd

steel dry van containers, 1,147 forty foot steel high cube dry van containers, 945 forty-five foot steel

dry van containers, 396 forty-five foot aluminum dry van containers, 972 refrigerated containers, and

6,741 chassis (collectively, the "Equipment") from NPR and Cargo and to enter into a long term lease

of the Equipment to NPR and Cargo.

     5.     To evidence its obligations with respect to the Purchase Money Loan, Emerald

executed and delivered to MBC a Loan and Security Agreement dated as of November 20, 1997 by

and between Emerald and MBC (the "Loan Agreement"), and a $35,000,000.00 Term Loan

Promissory Note dated as of November 20, 1997 from Emerald to MBC (the "Note").

     6.     To secure its obligations to MBC with respect to the Purchase Money Loan, Emerald

granted MBC a security agreement in the Equipment and assigned to MBC an Equipment Lease

Agreement made as of November 18, 1997 by and between Emerald, as lessor, and NPR and Cargo,

as lessees (the "Lease") pursuant to the Loan Agreement and Assignment of Lease As Security made

as of November 20, 1997 by and between Emerald and MBC (the "Lease Assignment").

     7.     The Note and the Loan Agreement have been amended by: (a) an Amendment to Loan

and Security Agreement made as of December 31, 1997 by and between Emerald and MBC (the

"First Loan Amendment"); and (b) a Second Amendment to Loan and Security Agreement made as

of August 26, 1998 by and between Emerald and MBC (the "Second Loan Amendment").

     8.     The Lease has been amended by: (a) an Amendment to Equipment Lease Agreement

made as of December 31, 1997 by and among Emerald, NPR, Cargo, MBC, The Holt Group, Inc.,

Holt Hauling and Warehousing Systems, Inc., Wilmington Stevedores, Inc., Murphy Marine Services,

Inc., The Riverfront Development Corporation, NPR Holding Corporation, NPR-Navieras

Receivables, Inc., and NPR S.A., Inc. (the "First Lease Amendment"); and (b) a Second Amendment

to Equipment Lease Agreement made as of August 26, 1998 by and among Emerald, NPR, Cargo,

MBC, The Holt Group, Inc., Holt Hauling and Warehousing Systems, Inc., Wilmington Stevedores, Inc., Murphy Marine Services, Inc., The Riverfront Development Corporation, NPR Holding Corporation, NPR-Navieras Receivables, Inc., NPR S.A., Inc., San Juan International Terminals, Inc., and SJIT, Inc. (the "Second Lease Amendment").

9.    In the Lease, as a precaution in the event that the Lease was ever determined to constitute a financing transaction instead of a true lease, NPR and Cargo granted Emerald a security interest in the Equipment.

10.    MBC perfected its security interest in the Equipment by, among other things, insuring that each chassis was titled in the name of Emerald and that MBC's lien was noted on each title before making an advance under the Purchase Money Loan against such chassis and by filing:

    a.    Personal Property Mortgages and Affidavits (the "Mortgages") in Puerto Rico;

    b.    Financing Statement No. 199739486 filed on November 19, 1997 with the Delaware Secretary of State listing Emerald as Debtor and MBC as Secured Party;

    c.    Financing Statement No. 1803975 filed on November 26, 1997 with the New Jersey Secretary of State listing Emerald as Debtor and MBC as Secured Party;

    d.    Financing Statement No. 1804536 filed on December 3, 1997 with the New Jersey Secretary of State listing Emerald as Debtor and MBC as Secured Party;

    e.    Financing Statement No. 28240001 filed on November 19, 1997 with the Pennsylvania Secretary of the Commonwealth listing Emerald as Debtor and MBC as Secured Party;

A:\419MotRelStay.wpd

3

     f.     Financing Statement No. 97 6000 filed on November 19, 1997 with the
Philadelphia County Prothonotary listing Emerald as Debtor and MBC as
Secured Party; and

     g.     Financing Statement No. ST97-3760 filed on November 19, 1997 with the
Chester County, PA Prothonotary listing Emerald as Debtor and MBC
as Secured Party (collectively, the "Financing Statements").

11.     MBC perfected its security interest in the Lease by maintaining continuous possession
of the original Lease, the First Lease Amendment, and the Second Lease Amendment, by including
the Lease and all accounts and general intangibles relating thereto in the description of MBC's
collateral in the Financing Statements, and by obtaining NPR's and Cargo's acknowledgment of the
assignment of the Lease in a Lessees' Notice, Consent, and Acknowledgment made as of November
20, 1997 (the "Lessee's Consent"), and an Acknowledgment and Ratification By Lessees dated ___
August, 1998 (the "Lessee's Ratification"). The Loan Agreement, the Note, the Lease Assignment,
the Mortgages, the First Loan Amendment, the Second Loan Amendment, the Lessee's Consent,
the Lessee's Ratification, and all documents relating thereto or executed in connection therewith shall
be referred to collectively as the "Loan Documents."

12.     Emerald perfected its precautionary security interest in the Equipment by filing:

     a.     Personal Property Mortgages and Affidavits (the "Emerald Mortgages") in
Puerto Rico;

     b.     Financing Statement No.199739487 filed on November 19, 1997 with the
Delaware Secretary of State listing NPR and Cargo as Debtors, Emerald as
Secured Party, and MBC as assignee;

c.    Financing Statement No. 1804526 filed on November 26, 1997 with the New Jersey Secretary of State listing NPR and Cargo as Debtors, Emerald as Secured Party, and MBC as assignee;

d.    Financing Statement No. 1804537 filed on December 3, 1997 with the New Jersey Secretary of State listing NPR and Cargo as Debtors, Emerald as Secured Party, and MBC as assignee;

e.    Financing Statement No. 28231479 filed on November 19, 1997 with the Pennsylvania Secretary of the Commonwealth listing NPR and Cargo as Debtors, Emerald as Secured Party, and MBC as assignee; and

f.    Financing Statement No. 97 6001 filed on November 19, 1997 with the Philadelphia County Prothonotary listing NPR and Cargo as Debtors, Emerald as Secured Party, and MBC as assignee (collectively, the "Emerald Financing Statements").

13.    On the day before the filing of the Petitions, Emerald defaulted under the Loan Documents by failing to make the regular instalment payment due thereunder when and as due and has made no payments to MBC since the filing of the Petitions.

14.    As a result of Emerald's defaults, MBC had the right to accelerate the entire balance due under the Loan Documents.

15.    The Debtors filed a Debtors' Motion for Entry of an Order Pursuant to Section 364(a) of the Bankruptcy Code Authorizing NPR, Inc. and Holt Cargo Systems, Inc. to Assume the Unexpired Emerald Equipment Lease (the "Assumption Motion") seeking to assume the Lease pursuant to Section 364 of the Bankruptcy Code.

16.    However, the Official Committee of Unsecured Creditors (the "Committee") objected to the granting of the Assumption Motion on the grounds that, among other things, the Lease is not a "true lease," but a financing arrangement characterized as a lease.

17.    Because of the Committee's opposition to the Assumption Motion, MBC filed a Motion seeking relief from the automatic stay of Section 362 of the Bankruptcy Code in May of 2001 (the "First 362 Motion"), requesting that this Court lift the stay as it applied to the rights of Emerald, NPR, and Holt Cargo to continue in possession of the Equipment to permit MBC to enforce its available rights and remedies under the Loan Documents.

18.    In connection with the First 362 Motion, MBC obtained an appraisal of the Equipment (the "Appraisal") from Independent Equipment Company (the "Appraiser") which indicated that the orderly liquidation value of the chassis as of May 25, 2001 was $9,383,200.00 and that the orderly liquidation value of the remaining Equipment as of that date was $10,089,400.00.    As required by this Court's procedures, copies of the Appraisal were served upon counsel to the Debtors and counsel to the Committee prior to the hearing on the First 362 Motion.

19.    Because NPR and Cargo had indicated their intention to continue to use the Equipment and their willingness to pay amounts due under the Lease by filing the Assumption Motion, the Appraisal indicated that there was substantial equity in the Equipment, and the Committee had asserted that NPR and Cargo owned, rather than leased, the Equipment, MBC agreed to settle the Assumption Motion and the First 362 Motion and to defer any determination as to whether the Lease was a true lease by entering into a Stipulation Between MBC Leasing Corp. and Debtors With Respect to Adequate Protection of Property (the "MBC Stipulation") which was approved by this Court on June 13, 2001.

A:\419MotRelStay.wpd

6

20.     The MBC Stipulation required that all instalments that had come due on the Purchase Money Loan after the date of the filing of the Petitions be paid upon approval of the MBC Stipulation and that all instalments coming due thereafter be paid when and as such instalments came due.

21.     Since the date of the filing of the Petitions, instalments totaling $9,563,864.52 have come due under the Purchase Money Loan. Notwithstanding the MBC Stipulation, however, the Debtors have paid only $6,475,909.58 of instalments that have come due under the Purchase Money Loan since the date of the filing of the Petitions.

22.     Because of the failure of the Debtors to comply with the MBC Stipulation, Emerald filed a Motion of Emerald Equipment Leasing, Inc. To Enforce The Order Of This Court Dated June 13, 2001, Or In The Alternative, To Grant Relief From The Automatic Stay And To Compel The Debtors, Holt Cargo Systems, Inc. and NPR, Inc. To Reject Their Lease With Emerald Equipment Leasing, Inc. (the "Emerald Motion") seeking to compel NPR and Cargo either to reject the Lease or to comply with the MBC Stipulation.

23.     The Committee and NPR and Cargo, acting through counsel to the Committee, opposed the Emerald Motion, again contending that the Lease is not a true lease and further contending that MBC's interests in the Equipment had been adequately protected by the partial payments made pursuant to the MBC Stipulation.

24.     After the filing of the Emerald Motion, NPR and Cargo proposed to sell many of their assets, but not including the Equipment, to Sea Star Line, LLC ("Sea Star"). A hearing on a Motion by the Debtors seeking approval of the bidding procedures to be used in connection with the proposed sale to Sea Star was scheduled for April 8, 2002.

25.     At the hearing on April 8, 2002, despite having raised the issue of whether the Lease was a true lease nearly a full year before, the Committee asserted that it was not prepared to litigate

A:\419MotRelStay.wpd                                         7

the issue of whether the Lease was a true lease as part of the resolution of the Emerald Motion. Emerald, NPR, and Cargo suggested that a ruling on the characterization of the Lease be deferred pending a determination as to whether Sea Star wished to purchase the Equipment. Although MBC argued that the Sea Star would not know whether it should negotiate with Emerald or NPR and Holt Cargo and thus was unlikely to purchase the Equipment if ownership of the Equipment was not resolved, MBC had no Motion pending on April 8, 2002 and could not force Emerald to prosecute the Emerald Motion.

26.     The Court ordered NPR and Cargo to make the instalment payment that had come due on the Purchase Money Loan in March of 2002, ordered NPR and Cargo to make the instalment payment that would come due on the Purchase Money Loan in April of 2002, and deferred any further ruling on the Emerald Motion.

27.     NPR and Cargo have not paid the March instalment on the Purchase Money Loan. Moreover, no sale of the Equipment to Sea Star or any other purchaser has been negotiated. Rather, NPR and Cargo, who contended in response to the Emerald Motion that the Lease was not a lease at all, have filed a Motion for Order Approving Rejection of Equipment Lease With Emerald Equipment Leasing, Inc. Pursuant to 11 U.S.C. § 365 (the "Rejection Motion").

28.     In response to the Rejection Motion, the Committee is expected to purport to reserve its rights with respect to the characterization of the Lease.

29.     According to the Appraiser, the orderly liquidation value of the chassis is now approximately $7,506,560.00 and the orderly liquidation value of the other Equipment is approximately $6,725,594.00. As the balance due on the Purchase Money Loan, excluding attorneys' fees and expenses, is now approximately $10,900,000.00, there still is apparently equity

in the Equipment. However, even assuming no further decline in the value of the Equipment, that equity is being eroded at a rate of more than $2,600.00 per day by the accrual of interest.

30.    NPR and Cargo have announced publicly their intent to cease all operations upon what is expected to be an imminent sale of their assets to Sea Star. Moreover, they have attempted to relinquish any interest in the Equipment by filing the Rejection Motion. Thus, it is clear that NPR and Cargo have no need for the Equipment and no intention of liquidating it to generate value for MBC or any other creditor.

31.    Upon information and belief, Emerald's sole function is to serve as an equipment lessor. Consequently, the Equipment can be necessary to an effective reorganization by Emerald only if Emerald is able to sell or lease the Equipment. However, any purported reservation of rights by the Committee with respect to the characterization of the Lease will cast Emerald's title to the Equipment into doubt and impair, if not destroy, Emerald's ability to sell or lease the Equipment.

32.    Because it perfected its security interests in the Equipment in the hands of Emerald and obtained assignments of the Emerald Financing Statements perfecting Emerald's precautionary security interests in the Equipment in the hands of NPR and Cargo in the event that the Lease was deemed not to constitute a lease, only MBC is in a position to sell the Equipment and prevent any further depletion of any equity therein without regard to whether the Lease is a lease or a secured financing transaction.

33.    The continued disputes among the Committee, Emerald, NPR, and Cargo prevent a prompt disposition of the Equipment by any party other than MBC. Moreover, continued retention of the Equipment by Emerald, NPR, and/or Cargo because of their refusal or inability to resolve the ownership of the Equipment threatens to subject their respective estates to a "superpriority" claim by MBC pursuant to 11 U.S.C. § 507(b) to the detriment of all parties, including professionals

A:\419MotR elStay.wpd                                        9

retained by the Debtors and the Committee. Consequently, cause exists for terminating the automatic stay of 11 U.S.C. § 362 in the above-captioned bankruptcy case as to MBC and the Equipment so as to permit MBC to exercise and enforce its various rights and remedies under the Loan Documents and applicable law with respect to the Equipment.

WHEREFORE, Movant, MBC, respectfully requests that this Honorable Court enter the attached Order:

(a)    terminating the automatic stay of 11 U.S.C. § 362 in the above-captioned bankruptcy case as to MBC and the Equipment;

(b)    permitting MBC to exercise and enforce its various rights and remedies against the Equipment pursuant to the terms and conditions of the Loan Documents and applicable law, including, without limitation, removing the Equipment from the possession of Emerald, NPR, and Cargo, selling the Equipment, and applying the proceeds arising therefrom to reduce the indebtedness that is owed by Emerald to MBC under the Loan Documents;

(c)    Directing MBC to pay into the registry of this Court or such other account as the Court deems appropriate any proceeds of sale, if any, in excess of the balance due under the Loan Documents to be held pending a determination by this Court as to whether Emerald or NPR and Cargo owned the Equipment; and

(d)   Directing that the ten (10) day stay afforded by Rule 4001(a)(3) of the <u>Federal Rules</u>

<u>of Bankruptcy Procedure</u> shall not apply to said order.

Respectfully submitted,

_____
NEAL J. LEVITSKY
Bar No.:
AGOSTINI, LEVITSKY, ISAACS & KULESZA
824 North Market Street, Suite 810
P.O. Box 2323
Wilmington, Delaware 19899-2323
Telephone: (302) 654-7444
Fax: (302) 656-8920


and

WILLIAM L. HALLAM
Federal Bar. No.: 00057
GEBHARDT & SMITH LLP
The World Trade Center, 9th Floor
401 East Pratt Street
Baltimore, Maryland 21202
Telephone: (410) 752-5830
Fax: (410) 385-5119

Attorneys for MBC Leasing Corp.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY, that on this ____ day of April, 2002 copies of the foregoing Second Motion of MBC Leasing Corp. For Relief From The Automatic Stay and attached proposed Order and Notice, were sent via facsimile to: Laura Davis Jones, Esquire, Pachulski, Stang, Ziehl, Young & Jones, P.C., 919 North Market Street, 16th Floor, Wilmington, Delaware 19899-8705 (Fax No. 302-652-4400) and Richard L. Epling, Esquire, Pillsbury Winthrop LLP, One Battery Park Plaza, New York, New York 10004 (Fax No. 212-858-1500), attorney for Debtors; Gary M. Schildhorn, Esquire, Adelman Lavine Gold and Levin, P.C., 1900 Two Penn Center Plaza, Philadelphia, Pennsylvania 19102 (Fax No. 215-557-7922), attorney for Emerald Equipment Leasing, Inc.; Frank J. Perch, III, Esquire, Office of the United States Trustee, J. Caleb Boggs Federal Building, 844 King Street, Suite 2313 - Lockbox 35, Wilmington, Delaware 19801 (Fax No. 302-573-6497); and Teresa K.D. Currier, Esquire, Klett, Rooney Lieber & Schorling, The Brandywine Building, 1000 West Street, Suite 1410, Wilmington, Delaware 19801 (Fax No. 302-552-4295) and Michael B. Fisco, Esquire, Faegre & Benson LLP, 90 South Seventh Street, Minneapolis, Minnesota 55402-3901 (Fax No. 612-336-3026), attorneys for the Official Committee of Unsecured Creditors.

NEIL J. LEVITSKY

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | * | Chapter 11 |
| | | |
| MURPHY MARINE SERVICES, INC., et al., | * | Case Nos.: 01-00926 through 01-00950 (MFW) |
| Debtors. | * | (Jointly Administered) |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## ORDER TERMINATING THE AUTOMATIC STAY AS TO MBC LEASING CORP. AND CERTAIN ASSETS OF THE DEBTORS

Upon consideration of the Second Motion of MBC Leasing Corp. for Relief from the Automatic Stay ("Motion") filed herein by MBC Leasing Corp. ("MBC"), and any opposition thereto, and good cause having been shown, it is this _____ day of _____, 2002, by the United States Bankruptcy Court for the District of Delaware,

ORDERED, that the Motion is hereby GRANTED in its entirety; and it is further

ORDERED, that the automatic stay of 11 U.S.C. § 362 is hereby terminated in the above-captioned bankruptcy case as to MBC and the 426 twenty foot steel dry van containers, 990 Onan refrigerator "gensets," 910 forty foot steel dry van containers, 1,147 forty foot steel high cube dry van containers, 945 forty-five foot steel dry van containers, 396 forty-five foot aluminum dry van containers, 972 refrigerated containers, and 6,741 chassis described in the Loan and Security Agreement dated as of November 20, 1997 by and between Emerald Equipment Leasing, Inc. and MBC described in the Motion (the "Equipment"), and it is further

ORDERED, that MBC is immediately entitled to exercise and enforce all of its rights and remedies against the Equipment pursuant to the terms and conditions of the Loan and Security Agreement dated as of November 20, 1997 and the various related loan documents referenced in MBC's Motion (collectively, the "Loan Documents") and applicable law, including, without

limitation, removing the Equipment from the possession of Emerald Equipment Leasing, Inc.

("Emerald"), NPR, Inc., and Holt Cargo Systems, Inc., selling the Equipment, and applying the

proceeds arising therefrom to reduce the indebtedness that is owed by Emerald to MBC under the

Loan Documents, and it is further

ORDERED, that MBC shall deposit any proceeds of sale of the Equipment in excess of the

amount necessary to satisfy the outstanding balance due under the Loan Documents, if any, into

_____ to be held pending further Order of this

Court; and it is further

ORDERED, that the effect of this Order shall not be stayed until the expiration of ten (10)

days after the entry thereof pursuant to Rule 4001(a)(3) of the <u>Federal Rules of Bankruptcy</u>

<u>Procedure</u>, but shall be effective immediately upon entry.


_____
MARY F. WALRATH,
JUDGE, UNITED STATES BANKRUPTCY
COURT FOR THE DISTRICT OF DELAWARE


A:\419MotRelStay.wpd

2

A-17

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | : | Chapter 11 |
| MURPHY MARINE SERVICES, INC.,<br>et al., | : | Case Nos. 01-00926 through<br>01-00950 (MFW) |
| Debtors. | : | Jointly Administered |

### NOTICE OF MARITIME LIENS ASSERTED BY
### E.T. HEINSEN C POR A AND NAVES Y TERMINALES, S.A.

E.T. Heinsen C por A (hereinafter "Heinsen") and Naves y Terminales, S.A. (hereinafter "Naves"), by and through its undersigned counsel Obermayer Rebmann Maxwell & Hippel, LLP, hereby asserts a maritime lien against those assets of NPR, Inc. (hereinafter "NPR Assets") that are the subject of the Debtors' Motion for Order Authorizing Sale of NPR Assets Free and Clear of all Liens, Claims and Encumbrances and states:

1.    Prior to and following the filing of the bankruptcy petitions of NPR, Inc. and the other debtors in this jointly-administered proceeding, Heinsen and Naves provided stevedoring, port security and other related services to the vessels of NPR in connection with the discharge and loading of commercial cargo in the Dominican Republic.

2.    A maritime lien is created upon the furnishing of repairs or necessaries to any vessel. Pursuant to 46 U.S.C. §31342 (Establishing Maritime Liens):

> (a) Except as provided in subsection (b) of this section, a person providing necessaries to a vessel on the order of an owner or a person authorized by the owner--
> > (1) has a maritime lien on the vessel;
> > (2) may bring a civil action in rem to enforce the lien; and
> > (3) is not required to allege or prove in the action that credit was given to the vessel.
>
> (b) This section does not apply to a public vessel.

379458

A-18

3.    Stevedoring and related services fall squarely within the notion of "necessaries" giving rise to maritime liens. See gen. Ceres Marine Terminals, Inc. v. M/V Harmen Oldendorf, et al., 913 F. Supp. 919 (D. Md. 1995); Bermuda Express N.V. v. M/V Litsa, 872 F.2d 554 (3rd Cir. 1989).  Maritime liens arise automatically upon the provision of necessities and there is no recording requirement for such maritime liens to be valid and enforceable. See gen. Bay State Yacht Sales, 117 B.R. 16, 19-20 (Bankr. D.Mass. 1990) (Federal maritime liens are created automatically upon the furnishing of repairs, supplies or other necessaries and are not avoidable by a trustee in bankruptcy unless he is able to establish a defense that would prevent the maritime lien claimant from asserting the lien against a bona fide purchaser.)

4.    As of April 23, 2002, the unpaid balance of the stevedoring and related services provided at the request of NPR by Heinsen to and for the benefit of the vessels of NPR total $1,169,889.37.  A true and correct copy of the Statement of Account dated April 23, 2002 is made a part hereof and is attached hereto as Exhibit "A."  Such services constitute necessaries within the context of the Federal Maritime Lien Act (46 U.S.C. §31341, et seq.) and Heinsen possesses a valid maritime lien against the NPR Assets in the amount of $1,169,889.37.

5.    As of April 23, 2002, the unpaid balance of the stevedoring and related services provided at the request of NPR by Naves to and for the benefit of the vessels of NPR total $492,204.14.  A true and correct copy of the Statement of Account dated April 23, 2002 is made a part hereof and is attached hereto as Exhibit "B."  Such services constitute necessaries within the context of the Federal Maritime Lien Act (46 U.S.C. §31341, et seq.) and Naves possesses a valid maritime lien against the NPR Assets in the amount of $492,204.14.

6.    Since April 23, 2002, Heinsen and Naves have continued to provide stevedoring and related services to NPR for which they have submitted invoices for payment, and have

received and will continue to receive payment for past invoices. Heinsen and Naves have been designated critical vendors of the Debtors.

7.    Accordingly, Heinsen and Naves reserve the right to adjust the amount of the maritime liens asserted herein on further review or upon the receipt of further payments from the Debtors.

8.    Therefore, Heinsen asserts a maritime lien against the NPR Assets in the amount of $1,169,889.37 and Naves asserts a maritime lien against the NPR Assets in the amount of $492,204.14.

Dated: April 25, 2002

By: /S/ Steven T. Davis
Steven T. Davis (Del. Bar No. 2731)
OBERMAYER REBMANN MAXWELL & HIPPEL LLP
716 Tatnall Street
Wilmington, Delaware 19801
Telephone: (302) 655-9094

-and-

Edmond M. George, Esquire
D. Alexander Barnes, Esquire
OBERMAYER REBMANN MAXWELL & HIPPEL LLP
One Penn Center, 19th Floor
1617 John F. Kennedy Blvd.
Philadelphia, PA 19103-1895
Telephone:   (215) 665-3000
Facsimile:   (215) 665-3165

Counsel to E.T. Heinsen C por A and
Naves y Terminales, S.A.

379458

3

A-20

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                          . Case Nos. 01-00926 thru
                                .            01-00950 (MFW)
                                .
MURPHY MARINE SERVICES,         .
  INC., et al,                  . 824 Market Street
                                . Wilmington, Delaware 19801
                Debtor,         .
                                . April 26, 2002
. . . . . . . . . . . . . . . . . 9:37 a.m.


TRANSCRIPT OF OMNIBUS MOTION HEARINGS
BEFORE HONORABLE MARY F. WALRATH
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor:              Pillsbury Winthrop LLP
                             By:  RICHARD L. EPLING, ESQ.
                                  JESSICA FINK, ESQ.
                             One Battery Park Plaza
                             New York, New York 10004

For the Debtor:              Pachulski, Stang, Ziehl, Young &
                                  Jones
                             By:  CHRISTOPHER LHULIER, ESQ.
                                  HARRY GARNER, ESQ.
                             919 N. Market St., 16th Floor
                             P. O. Box 8705
                             Wilmington, DE 19899

Audio Operator:              Donna Brown

Proceedings recorded by electronic sound recording, transcript
        produced by transcription service.

_____

J&J COURT TRANSCRIBERS, INC.
268 Evergreen Avenue
Hamilton, New Jersey 08619
E-Mail:  jjcourt@optonline.net

(609) 586-2311  Fax No.  (609) 587-3599

2

APPEARANCE CONT'D:

For the Committee:          Klett, Rooney, Lieber & Schorling
                            By:  ERIC LOPEZ SCHNABEL, ESQ.
                            The Brandywine Building
                            1000 West Street, Ste. 1410
                            Wilmington, DE 19801

                            Faegre & Benson
                            By:  MICHAEL FISCO, ESQ.
                            2200 Wells Fargo Center
                            90 South Seventh Street
                            Minneapolis, MN 55402

For MBC Leasing:            Gebhardt & Smith
                            By:  WILLIAM HALLAM, ESQ.
                            401 E. Pratt Street, 9th Floor
                            World Trade Center
                            Baltimore, MD 21201

For Emerald Equipment:      Adelman, Lavine, Gold & Levin
                            By:  GARY SCHILDHORN, ESQ.
                                 RAYMOND LEMISCH, ESQ.
                            Two Penn Center Plaza, Ste. 900
                            Philadelphia, PA 19102

For Related entities:       Dilworth Paxson LLP
                            By:  PETER HUGHES, ESQ.
                            3200 Mellon Bank Center
                            1735 Market Street
                            Philadelphia, PA 19103

For First Union:            Duane Morris, LLP
                            By:  RICHARD RILEY, ESQ.
                                 JOHN HORSTMANN, ESQ.
                            1100 N. Market St., Ste. 1200
                            Wilmington, DE 19801

For Wells Fargo:            Greenberg Traurig
                            By:  JEFFREY ROSENTHAL, ESQ.
                                 WILLIAM CHIPMAN, ESQ.
                                 VICTORIA COUNIHAN, ESQ.
                            Philadelphia, PA

For MEBA:                   Beins, Axelrod & Kraft, P.C.
                            By:  ED GLEASON, ESQ.
                            Washington, D.C.

3

APPEARANCES CONT'D:

| | |
|---|---|
| For Sea Star Lines: | CHARLES ROBINSON, ESQ.<br>KEN EDELBERG, ESQ. |
| For Sea Star Lines: | Phillips Goldman & Spence, P.A.<br>By:  JACK PHILLIPS, ESQ.<br>1200 North Broom Street<br>Wilmington, DE  19806 |
| For SC Engineering: | Buchanan Ingersoll, P.C.<br>By:  JAMI NIMEROFF, ESQ.<br>Eleven Penn Center, 14th Floor<br>18335 Market Street<br>Philadelphia, PA  19103 |
| For GECC: | Blank, Rome, Comisky & McCauley<br>By:  ELIO BATTISTE, ESQ.<br>Chase Manhattan Center, Suite 800<br>1201 Market Street<br>Wilmington, DE  19801 |
| For the Bank of Gloucester: | The Bayard Firm<br>By:  ASHLEY STITZER, ESQ.<br>222 Delaware Avenue, Suite 900<br>Wilmington, DE  19899 |
| For Brady Marine and<br>Transamerica: | The Bayard Firm<br>By:  CHRIS WARD, ESQ.<br>222 Delaware Avenue, Suite 900<br>Wilmington, DE  19899 |
| For Cebcor Service Corp.: | Elzufon Austin Reardon Tarlov &<br>Mondell, P.A.<br>By:  WILLIAM SULLIVAN, ESQ.<br>300 Delaware Avenue, Suite 1700<br>Wilmington, DE  19899 |
| For CIT and GE Capital: | Walsh Monzack & Monaco, P.A.<br>By:  KEVIN J. MANGAN, ESQ.<br>400 Commerce Center<br>Twelfth & Orange Streets<br>Wilmington, DE  19899 |
| For Moran Towing, Inc.: | Healey & Baillie, LLP<br>By:  JEREMY J. O. HARWOOD, ESQ.<br>29 Broadway<br>New York, NY  10006 |

4

1        THE CLERK:   You may be seated.

2        THE COURT:   Good morning.

3        MR. EPLING:   Good morning, Your Honor.

4        THE COURT:   Where are we?

5        MR. EPLING:   That's a very good question, Your Honor.

6   Richard Epling for the debtors.   Your Honor, since we left here

7   yesterday at two o'clock the debtors sat in the Pachulski

8   firm's conference room with any interested parties and some

9   people on the phone and tried to resolve a form of order.

10  After everybody left last night about 7:30 we turned all the

11  changes that we felt we could accept or that were consistent

12  with what happened here yesterday and circulated that last

13  night, and I believe chambers got a copy of that order this

14  morning.

15        Since that time we've had more people having input

16  into the order, and we have another black line version of it

17  here this morning.   I won't tell the Court that I think that's

18  final or that everybody who wants to be a word smith here has

19  had his or her shot at this.   What I will say is that if we try

20  to do draft this for very much longer by Committee we're not

21  going to get there because our time is running out.

22        Let me tell you where I think we are with the

23  principal objections yesterday, just summarize it if I may

24  rather than try to take you through the language.

25        THE COURT:   All right.

**J&J COURT TRANSCRIBERS, INC.**

5

1          MR. EPLING:  First of all, CSX, let me just start
2    with them, I believe we have an agreement with them that their
3    alleged inner line claim is preserved, and that the debtors
4    will agree with CSX that the total and maximum sum of that
5    claim will be segregated from the sales proceeds in a separate
6    escrow to be established pursuant to the order so that to the
7    extent accounts are being sold money is being reserved and they
8    can come in and show us what they're owed and they can show us
9    their interline or freight forward agreement, and parties can
10   be satisfied that their claim is valid.  So I think that one is
11   now checked off.

12          THE COURT:  Okay.

13          MR. EPLING:  People will correct me if I'm wrong, but
14   that's what -- that's what I think the situation is.  We had a
15   number of objectors that had secured claims in the equipment.
16   We've had a number of discussions with them about who's in and
17   who's out.  I think the present state of play on that is that
18   the Bank of Gloucester's equipment is out, they wish to be
19   removed from the sale, that's agreeable.  There is one -- there
20   is one piece of equipment on our list that they think they have
21   a lien and that we don't show them having a lien, and we'll
22   resolve that, but whatever they have a valid lien in we will
23   take out of the sale.

24          CIT wishes to have their equipment removed from the
25   sale.  I think their counsel said that yesterday.  That's fine.

6

1  We'll pull theirs out again.  They have the equipment list.

2  They know what's in and what's out.

3         SC Engineering wishes to have its spare parts

4  included in the sale.  We've been trying to satisfy them with

5  language that their possessory lien right isn't lost by virtue

6  of the fact that they give up possession.  It is the debtors'

7  intention to preserve the possessory lien right and its

8  priority.

9         THE COURT:  In the sale --

10        MR. EPLING:  In the sales proceeds, correct.  And the

11 lawyers are trying to figure out the best way to say that, but

12 I think the meeting of the minds is there.

13        GECC, GE Capital, has told us a number of different

14 things but as of this morning I believe they wish to have their

15 equipment included in the sale, but Ms. Boswell and I spoke

16 again this morning an hour ago and I think her view on this was

17 that they may wish to have some but not all the equipment

18 included in the sale now, and that we should work with them up

19 to the point of closing to leave whatever they consent to in

20 the sale and whatever they want out of the sale out of the

21 sale, and we'll make appropriate closing adjustments.  Now, I

22 haven't had time to work on that with Sea Star, so either

23 they're -- either they'll -- will agree -- we and Sea Start and

24 they will agree to a partial in and partial out arrangement or

25 we'll take them all out of the sale.  One way or another they

7

1  will not be impacted by this, unless they consent.

2          THE COURT:  Okay.

3          MR. EPLING:  The Sea Star -- I'm sorry, the MBC-

4  Emerald saga continues.  We -- where we left this yesterday was

5  that boxes, Emerald boxes, as they come off ships today or

6  tomorrow would be stacked and stored in Packer Avenue, which is

7  here and is controlled by Holt family interests, or San Juan or

8  Jacksonville, and they would not be reloaded on the ships, and

9  that Sea Star through its counsel I believe agreed that Sea

10  Star would make those boxes available, they would not -- they

11  would give peaceful possession of those boxes to Emerald or its

12  secured lender, MBC, whenever that -- whenever the Court -- I

13  think the stay is still in effect as to MBC -- whenever it's

14  appropriate for those to be picked up.  That's where I think we

15  left this at two o'clock yesterday.

16          There has been a lot of discussion, and I think

17  Emerald's counsel will want to make some comments about how we

18  need to pay for the repatriation of those boxes out of the

19  asset sales proceeds, which I don't think the Court was

20  prepared to order yesterday.  However, we are certainly

21  prepared to preserve and have agreed with Emerald's counsel

22  that he can preserve whatever rights he has in the sales

23  proceeds, and I think his claims sound in constructive trust

24  now, if I understood what he -- what his position is, that his

25  constructive trust or other claims to the sales proceeds are

8

1  preserved, and we've given him reservation of rights language

2  in the order.  That's in this morning's draft, not last night's

3  draft.

4          THE COURT:  -- yes.

5          MR. EPLING:  Sorry, things keep moving.  And that's

6  about as far as we got with Emerald.

7          Now, when I walked into the courtroom this morning I

8  was handed a motion for a temporary restraining order and

9  preliminary injunction by MBC's counsel seeking, I think, I

10 haven't had a chance to read it thoroughly because it was

11 handed to me when I came in here, I think their contention

12 here, as near as I can make it out, is that Emerald's boxes, or

13 the Emerald boxes, are still being reloaded onto Sea Star

14 ships, or ships that will be Sea Star ships if this closes.  I

15 don't know anything about that and I'm going to have to

16 investigate it.  I didn't think we were doing that, but I'll

17 inquire, because I don't know what this is based on, and I had

18 no knowledge that this was coming when I walked in here this

19 morning so I can't really respond to it.  So that, I think,

20 Your Honor, is the status of Emerald so far as I can tell.

21         The DIP lender and First Union, and I guess also the

22 Committee, have been trying to figure out the best way to pay

23 the DIP lender at -- well, whether to pay the DIP lender at

24 closing and which proceeds to pay the DIP lender from so that

25 we can stop negative arbitrage from the running of interest.  I

**J&J COURT TRANSCRIBERS, INC.**

9

1  think all agree that if the DIP lender is paid there -- it will

2  be subject to whatever carve-out rights the estate and other

3  parties may have to the sales proceeds.  I don't think that's

4  the issue for today.

5          What seems to be the problem is that the Court seemed

6  inclined yesterday to order the payment out of the accounts

7  receivable proceeds since there are only two parties claiming

8  those, First Union and Wells Fargo.  And if that happens First

9  Union would have a pool of collateral that it has a second lien

10  on dissipated and have to argue with maritime claimants about

11  the rest of the money.

12          So what we had tried to work out in concept, and I'm

13  not sure if it is acceptable to all three, Wells, First Union

14  and the Committee, but what we have tried to work out in

15  concept here is a situation that says, let's pay Wells subject

16  to a full claw-back but let's treat the payment as though it

17  came from the general asset proceeds, the -- just the pool, at

18  -- with everyone's lien rights intact, in other words, create a

19  legal fiction that allowed people to make whatever marshaling

20  arguments they wanted to make when we -- when the Court

21  actually hears the lien rights.  We're going to need a process

22  for that, too but let me get to that later, so that we could

23  pay Wells, that we wouldn't have -- we wouldn't have people

24  arguing, or we wouldn't -- we wouldn't prejudice First Union or

25  any other party to this case to make whatever marshaling

**J&J COURT TRANSCRIBERS, INC.**

1   arguments that we want -- or that they want.  We were trying to

2   work language out, and we were still working on that when we

3   came over here this morning.  The parties are certainly

4   represented by able counsel and we'll tell you where we think

5   things are on that.

6           With respect to the maritime liens, Your Honor, we

7   have tried to deal with the maritime claimants, which are

8   principally Moran Towing and the two unions, and I think it's

9   fair to say that the issue that -- this issue did not come up

10  yesterday but it has come up -- it came up last night as people

11  began rethinking their positions, what we are prepared to do in

12  the order that you saw this morning, and --

13                          (Pause)

14          MR. EPLING:  Now I'm -- now I'm not finding the

15  reference here, but what we are prepared to do, and certainly

16  we were agreeable to do yesterday, is to preserve all maritime

17  lien rights in all the proceeds of the sale without allocation

18  of those proceeds.  And since the payments that Wells Fargo

19  will be subject to claw-back in the event that something gets

20  paid that was subject to a prior maritime lien that shouldn't

21  have been, we think their rights are preserved.  I think that

22  what they have said to us is that they want an immediate

23  allocation of certain proceeds with respect to the ships.  We

24  are not in a position to do that factually today, Your Honor.

25  There just isn't evidence of value.  That needs to be brought

11

1 on on a subsequent hearing where people can marshal their facts

2 and their evidence. So we felt that the best way to deal with

3 this was to leave their -- leave their lien claim into the --

4 in the undifferentiated pot, not distribute that money but

5 leave it subject to further order of the Court. And since

6 there is claw-back against Wells Fargo if we paid too much to

7 Wells something that was subject to a maritime lien it would

8 come back, so that all we're doing by paying Wells is cutting

9 off the negative arbitrage of having DIP loan interest accruing

10 while this lien -- or while disputed liens get resolved before

11 Your Honor.

12        I don't think, just to be fair, I don't think the

13 maritime lien claimants accept that. I think they want an

14 immediate allocation today. I don't see -- the debtor is not

15 in a position to agree to that, nor is -- nor is there a

16 factual record that I think we could develop today to do that.

17 So the best solution that we could come up with under the

18 circumstances was to leave the lien -- the lien claims against

19 the entire pot of assets and devise the claw-back from Wells so

20 that nobody is prejudiced by the fact that we paid the DIP

21 lender if they think we paid them something that later turns

22 out to be subject to a maritime lien.

23        Your Honor, that's where we are. I think it's plain

24 that the best result here for the estate at least would be to

25 order the sale to create some value for people to fight over

12

1   rather than having nothing to fight over, that we want to

2   preserve everybody's rights in the money.  We do not wish to

3   prejudice anybody's ability to come in and prove a lien or

4   later argue that they should -- that they're entitled to

5   whatever sum they feel they're entitled to in the pot, but we

6   do need to close our deal.

7           So we've been working with anybody who's asked us

8   about reserving their rights, and I think we've done quite a

9   bit in the order to reserve rights, but obviously we're happy

10  to continue to work with the parties to make sure that we

11  didn't miss anything or forget anything about any individual.

12          THE COURT:  All right.  Does anybody else wish to be

13  heard, then, on the --

14          MR. SCHILDHORN:  Yes, Your Honor.

15          THE COURT:  -- procedures?

16          MR. SCHILDHORN:  Good morning, Your Honor.  Gary

17  Schildhorn for Emerald Equipment Leasing, Inc.  As Your Honor

18  is aware, Emerald does not wish to interfere with the sale of

19  the MPR assets.  On the other hand, there are some very

20  significant issues that solely relate to the estate of Emerald

21  that are not being addressed, and I can understand why they're

22  not being addressed.  It's not in the interests of any of the

23  lenders or creditors of this debtor to address them.

24          It is not the monetary claims, Your Honor.  They are

25  being addressed by the establishment of the rights of Emerald

**J&J COURT TRANSCRIBERS, INC.**

13

1  to seek disgorgement, to argue a constructive trust, and I

2  briefly just saw the order, and I think we're close to language

3  that will accomplish that.

4          Our problem is as follows, Your Honor, and I've

5  suggested an offer of proof to Mr. Fisco and I don't believe he

6  has any objection to this.  Our problem is as follows.  The

7  equipment, most of the equipment, is going to be dropped off at

8  either San Juan or the Jacksonville Terminal.  There are normal

9  and customary industry charges that Sea Star has told they will

10 -- told us they will charge us for things that are called

11 container and chassis storage, something called TRI charges,

12 something called stacking charges, which in a very short period

13 of time will more than -- more than overwhelm the value of the

14 collateral.

15         This problem was not caused by Emerald.  It was

16 caused by the debtors.  They came to this Court on 4/18 with an

17 expedited motion to reject the lease.  On 4/22 Your Honor

18 entered an order, April 22nd, authorizing them and directing

19 them to reject the lease and turn over possession.  They've

20 specifically testified through Mr. Hayes yesterday that in fact

21 they have not turned over possession.  They continue to use the

22 equipment and intend to turn over the equipment to Sea Star at

23 three a.m. Saturday morning.

24         Sea Star will take most of that equipment off of the

25 ships and put it wherever it might be, if it's Packer Avenue

**J&J COURT TRANSCRIBERS, INC.**

14

1  it's not a problem.  If it's Jacksonville or San Juan it is a

2  problem.  And if we -- if we recalled Mr. Holt to testify he

3  would testify as to what these charges were, and it would

4  result in a very short time to the entire value of the assets

5  of the Emerald estate being consumed by the charges that were

6  necessary for the -- that are going to be incurred by Emerald

7  for the storage of these containers.

8      We've made several suggestions to resolve this that

9  will not interfere with the sale.  The first suggestion we made

10  was to Sea Star, and we said, please let us leave our

11  containers there without charges for a six-month period, if we

12  haven't disposed of it by then we'll be -- we'll be obligated

13  to remove it.  They have rejected that.  I have no power to

14  cause them to accept it.

15      The second suggestion we made to resolve it was to

16  have either Sea Star or the debtor transport the containers and

17  equipment back to Packer Avenue, which the Holt family now

18  controls and there will be no charges.  If Sea Star would be

19  willing to do it they could deduct the cost from the sale

20  proceeds, or the debtor could use some of the sale proceeds to

21  transport it back.  They have the ships that would be needed to

22  transport, we don't.

23      The third suggestion I made was provide some money to

24  Emerald so that we can undertake to hire people to bring it

25  back out of the sale proceeds.  The lease which was in -- which

15

1  was testified about yesterday require them to do that.

2       THE COURT:  Well, but -- to the extent you have any

3  claim for damages, isn't that similar to any other claim you

4  have, and you can reserve your right?

5       MR. SCHILDHORN:  I think it's somewhat different on

6  the equipment, Your Honor, because the --

7       THE COURT:  Why --

8       MR. SCHILDHORN:  -- ongoing damage, and my claim for

9  past violations of the lease are set, that's a number I can

10 quantify, it's failure to pay monthly charges, the claims going

11 forward I'm trying to avoid in -- being incurred to this

12 estate.  It will be the entire value of the Emerald equipment

13 and will harm, if I'm correct that those damages can be

14 asserted against the sales proceeds, will harm this debtor,

15 because it is their breach and their failure to comply with the

16 Court orders that is going to cause -- as part of the order of

17 proof Mr. Holt would testify in the last year he got a 14

18 million dollar offer for this equipment -- there's 14 million

19 dollars' value, or some number like that, in this equipment

20 which will be dissipated through ongoing charges.

21       I have asked for any practical solution to be worked

22 out by anybody that would allow this equipment to be at Packer

23 Avenue where no charges will be incurred, or to stop the debtor

24 from using it the day after -- the day that they filed their

25 motion to abandon.  We sent them instruction -- I

**J&J COURT TRANSCRIBERS, INC.**

16

1 mischaracterized that, their motion to reject the lease which

2 was authorized, it was not a motion to abandon -- we sent them

3 instructions saying, stop using it, deliver it to Packer

4 Avenue, which they ignored.

5        So we think that the Court as a Court of equity needs

6 to address this equitable concern in considering this sale.  We

7 are trying to stop harm to the creditors of Emerald, and we ask

8 the Court to condition her approval of the sale on some

9 equitable relief in -- for the benefit of the Emerald estate --

10        THE COURT:  Well --

11        MR. SCHILDHORN:  -- it's creditors.

12        THE COURT:  -- I am sure the debtor will argue that

13 to the extent you have a claim for return of the equipment,

14 that's just the rejection damages claim, and it is not entitled

15 to either administrative, or certainly not secured status.

16        MR. SCHILDHORN:  That would be correct, but the

17 failure to comply with Court orders creates --

18        THE COURT:  -- Court orders were to pay.

19        MR. SCHILDHORN:  And there was a Court order

20 authorizing rejection and return.  The motion to reject --

21        THE COURT:  No, it said rejection.

22        MR. SCHILDHORN:  It said rejection, and they agreed

23 to deliver possession, which they didn't.  They kept it and

24 continued to use it, which they knew they were going to do when

25 they filed their motion.

17

1          THE COURT:  They're delivering possession tomorrow at

2   three a.m.

3          MR. SCHILDHORN:  Well, they're delivering possession

4   to a buyer, not to us.

5          THE COURT:  And the buyer's making it available to

6   you.

7          MR. SCHILDHORN:  The buyer's making it available

8   subject to its charges, which will -- which will in effect take

9   the entire value out.

10         THE COURT:  Well, presumably if you pick it up

11  tomorrow at three a.m. there will be no charges.

12         MR. SCHILDHORN:  And the violation of the prior

13  orders --

14         THE COURT:  And in fact, as -- if I understand the

15  debtor, all of the equipment will be off the -- well, will be

16  off the ships before tomorrow at three a.m.

17         MR. SCHILDHORN:  No, that's not correct.

18         THE COURT:  Well, the debtor says they're downloading

19  the containers off the ships.

20         MR. EPLING:  Your Honor, we're -- checking -- there

21  are 12,000 containers.  It's possible we missed something

22  because there are so many pieces -- we're generally offloading

23  the ships.

24         MR. SCHILDHORN:  The ships that are on the water will

25  have or containers on it, and they'll be two or three days, I

18

1  understood, before they get back to port and can unload.

2        THE COURT:   I understood that they would be in port

3  between yesterday and tomorrow at three a.m.

4        MR. SCHILDHORN:  Yes, but they've refused to take it

5  off during that period of time.  They have told us that they

6  are going to send the ships back out onto the water with our

7  containers --

8        THE COURT:   Well, that's different from what debtors'

9  counsel is telling us.

10       MR. EPLING:  This is news to me, Your Honor.   If

11  there's some confusion on this I'll go back and ask the

12  question again.

13       MR. SCHILDHORN:  We were told as of yesterday that

14  indeed the ships will sail with our containers on them, and

15  it's only after they come back to port -- I asked them to do

16  that, that exact -- that exact remedy.

17       THE COURT:   Well, let's -- this is a factual dispute.

18  Let's resolve that before I rule on your motion.

19       MR. EPLING:  Your Honor, Mr. Hayes is -- checking --

20       THE COURT:   All right.

21       MR. EPLING:   -- I'm just repeating what I was told by

22  my client.

23       THE COURT:   Let me hear from Moran in the meantime.

24       MR. HARWOOD:  Good morning, Your Honor, Jeremy

25  Harwood for Moran Towing.  Your Honor, Moran provided tug

**J&J COURT TRANSCRIBERS, INC.**

19

1  services yesterday and is being asked to provide them tomorrow

2  and on Saturday.  Moran is, as we said yesterday, willing to

3  cooperate and withdraw its objection.  I was disappointed that

4  CSX got a carve-out.  I attended at debtors' offices for two

5  hours and wasn't asked what Moran would accept -- 100,000, CSX

6  got a carve-out of 350.

7        THE COURT:  Well, CSX has an argument that the funds

8  are held in trust.  Maritime liens are different.  They are

9  simply liens.  There's a significant difference.

10       MR. HARWOOD:  Correct, Your Honor, but they attach to

11  the proceeds.  And if I may approach the bench and show you the

12  order that was originally drafted?

13       THE COURT:  I have the one from yesterday.

14       MR. HARWOOD:  Is that the one with the black --

15       THE COURT:  Yes.

16       MR. HARWOOD:  -- line.  That --

17       THE COURT:  What page -- paragraph?

18       MR. HARWOOD:  Paragraph six on page six, Your Honor.

19       THE COURT:  Yes.

20       MR. HARWOOD:  That language is gone, Your Honor, from

21  the proposed order today.

22       THE COURT:  Yes, the only, any valid maritime liens,

23  et cetera?

24       MR. HARWOOD:  Yeah.

25       THE COURT:  Yes.  Why is that excised?

**J&J COURT TRANSCRIBERS, INC.**

A-39

20

1          MR. EPLING:  Your Honor -- I may ask Mr. Fisco to do

2 that -- he could address that, because he is the one who --

3          MR. FISCO:  Your Honor, in place of -- because the

4 Court concern -- was concerned yesterday about all parties that

5 were alleging liens and we didn't have any specific creditor

6 mentioned, all of them are protected under paragraph four and

7 five, which says that anyone who has an interest in it their

8 lien will be protected, and under paragraph five it says

9 nothing's going to be disbursed except as provided in the

10 order.  I didn't want somebody who wasn't -- came up later on

11 -- thought the Court was expressing a concern that they weren't

12 represented here, that they were also be protected.

13          MR. HARWOOD:  Your Honor, there's much more to it

14 than that.  Very easily Mr. Fisco could have said any valid

15 maritime liens, and then struck out the parties that are

16 actually named, but what he's done instead is word smithed it

17 to our detriment, contrary to Mr. Epling said about protecting

18 rights of any party to prove a lien.  He's now taken out the

19 applicable maritime law section in that paragraph six and

20 referred to liens pursuant to section 363(f) of the Bankruptcy

21 Code as opposed to what was originally stated by Mr. Fisco,

22 with the ranking to be determined by applicable maritime law,

23 and most importantly, and it's something that Mr. Hayes could

24 not address yesterday, that the liens would attach to the

25 vessels -- "shall attach to the proceeds of the sale of the

21

1  vessels, and to the extent such maritime liens are determined

2  to be valid the maritime liens shall be accorded proper

3  priority under applicable maritime law and principles."

4        Now, if Mr. Fisco's really being candid about saying

5  that he's protecting maritime lienors by taking out that

6  language then he is not so acting in accordance with protecting

7  -- rights under maritime law.  He's making those liens subject

8  to any 363(f) arguments.  And he's not segregating the

9  proceeds, either.

10        So we would -- certainly on behalf of Moran we would

11  like that language back in there, and --

12        THE COURT:  Well, I think 36(f) doesn't deal with

13  what the priorities are, it simply states that whatever they

14  are if you can sell and have them attach to proceeds or

15  otherwise sell and have a party who has a lien --

16        MR. HARWOOD:  If you're entitled to under non-

17  applicable bankruptcy law.

18        THE COURT:  -- be compelled to accept money

19  satisfaction --

20        MR. HARWOOD:  Yes, Your Honor.

21        THE COURT:  -- for your interests pursuant to a

22  judicial sale.

23        MR. HARWOOD:  Yes, Your Honor, but it --

24        THE COURT:  I don't think it deals with priorities.

25        MR. HARWOOD:  Well, the -- I think the fact that --

**J&J COURT TRANSCRIBERS, INC.**

22

1  if Mr. Fisco's statement was that he was -- by deleting that
2  language he was acting to protect all maritime lienors, then he
3  shouldn't have any problem in reinserting that language, just
4  taking out the names of the parties that he supposedly -- was
5  supposed to be protecting there and is now seeking to protect.
6  That language should be back in the order, and I don't see why
7  it was taken out in the first place, because it was not
8  inclusive -- or rather, exclusive, it was inclusive with the
9  any valid maritime liens.  And that is a concern, and also
10 along with the proceeds of the sale shall be segregated and
11 reserved pending a determination, which it was -- quote,
12 unquote, which was also the point yesterday.  And we said that
13 we would work with, and subject to that those proceeds being
14 determined.
15        We think that language should be taken -- put back
16 in.  If Mr. Fisco wants to take out the reference to specific
17 parties then as a reference to any valid maritime liens and
18 Moran having stated one, we don't have a problem with that.
19 But taking that language out in its entirety we do have a
20 problem with.  Thank you, Your Honor.
21        THE COURT:  Thank you.
22              (Pause)
23        MS. NIMEROFF:  Your Honor, good morning.  Jami
24 Nimeroff for SC Engineering.  Briefly with respect to the
25 argument that was just made, when we rose to spoke yesterday

**J&J COURT TRANSCRIBERS, INC.**

23

1  our concern was that to the extent proceeds are going to be

2  escrowed, because there's been no allocation at this point and

3  there's not a clear indiction that there's enough proceeds to

4  go around to everybody, that the notion was going to be that

5  proceeds were going to be escrowed and the parties would fight

6  out the priorities later.

7          So with respect to the language that was originally

8  in this order about preserving the maritime lien claims, m

9  party does not have a maritime lien, it has a possessory lien

10 on a piece of equipment that's going to be sold, a statutory

11 lien, something like that.  And we think it's best the language

12 that's been put in the order as modified for today, which

13 preserves all lien claims in accordance with the priorities

14 that are otherwise set and that to say that maritime lien --

15 maritime lien claims are going to have a certain amount of

16 proceeds segregated for them, unless we know that there's

17 enough money for everybody, you know, then everybody should get

18 a certain amount of proceeds escrowed for them.  And as I

19 understand it that's not really --

20          THE COURT:  All right.

21          MS. NIMEROFF:  -- possible at this time, so --

22          THE COURT:  Well, what is wrong with inserting a

23 provision that says that all rights, liens and interests

24 alleged in the purchased asset shall attach to the proceeds

25 from the sale, those assets with the same priority, dignity and

**J&J COURT TRANSCRIBERS, INC.**

24

1  effect, such rights, liens and interests had in the purchased
2  -- pursuant to maritime or any other applicable law?
3          MS. NIMEROFF:  I don't -- I don't have a problem with
4  that, but the language that was -- that was discussed by
5  Moran--
6          THE COURT:  All right.  Well, let me see if Moran has
7  a problem with that.
8          MS. NIMEROFF:  And by the way, Your Honor, I think
9  that the change that's for today, the order that's set for
10 today, has language specific to that.  What we added in was to
11 say that the liens shall have the same dignity, effect, et
12 cetera, as they existed prior to the sale hearing.  So I think
13 that those --
14         THE COURT:  okay.
15         MS. NIMEROFF:  -- that there is similar language to
16 that in what's being proposed today.
17         THE COURT:  In the revised paragraph four, striking,
18 reference to section 363(f), which is not a priority section,
19 and inserting instead, pursuant to maritime or any applicable
20 law.
21         MR. HARWOOD:  As -- maritime and -- yes, Your Honor,
22 if we could also say, pursuant -- excuse me, such rights, liens
23 and interests had in the purchased assets -- sorry, backing up
24 there a second, that -- all rights, liens and interests alleged
25 in the purchased asset shall attach to the proceeds --

**J&J COURT TRANSCRIBERS, INC.**

25

1          THE COURT:  From the sale of those assets.

2          MR. HARWOOD:  -- of the -- from the -- or of the sale

3    of those assets, including the vessels, because the --

4          THE COURT:  Um-hmm.

5          MR. HARWOOD:  -- as we went over yesterday, and as I

6    know you're aware, Your Honor, from your previous cases, the

7    liens attach to the individual proceeds, they can't attach --

8    they are -- they are lost if they don't --

9          THE COURT:  Attach specifically to --

10         MR. HARWOOD:  Yeah.

11         THE COURT:  What's wrong with that language?

12         MR. FISCO:  Your Honor, the reason that it was

13   changed -- every creditor had a little different variation and

14   we tried to say, whatever the law says it's's all preserved.

15   That's the only purpose it wasn't intended to offend or --

16         THE COURT:  All right.

17         MR. FISCO:  -- rights --

18         THE COURT:  Well, if that resolves the objection I

19   think it should be included, then.

20         MR. HARWOOD:  Thank you, Your Honor, but it's -- and

21   it goes some way, and --

22         MR. FISCO:  What was the exact language, Your Honor?

23         THE COURT:  After sale --

24         MR. FISCO:  Yeah.

25         THE COURT:  -- attach to the proceeds from the sale

**J&J COURT TRANSCRIBERS, INC.**

26

1  of those assets, including the vessels, then continues on with,

2  the same priority, dignity, et cetera --

3          MR. HARWOOD:  And, Your Honor, and --

4          THE COURT:  -- had in the purchased assets, I guess

5  as of the moment immediately prior to the closing, pursuant to

6  maritime or any other applicable law, including the rights,

7  liens, et cetera, of Wells Fargo.

8          MR. HARWOOD:  Your Honor, there has to be some method

9  for the proceeds of the -- as was originally proposed to us,

10 the proceeds of the vessel -- of the sale of the vessels shall

11 be segregated and reserved pending a determination as to the

12 extent, validity and priority of the maritime liens.  There

13 shouldn't be any --

14         THE COURT:  But we don't know what they are.

15         MR. HARWOOD:  Well, that's -- they have to be

16 determined at some stage because if they say, fine, Wells

17 Fargo's got a deficiency, we take the lot, it's -- the --

18 they're -- it's the debtors' onus to segregate the proceeds.

19 The proceeds.

20         THE COURT:  All assets are being segregated.

21         MR. HARWOOD:  Yes, yes, all the purchase price assets

22 -- the equipment assets are being segregated, but if they say

23 fine, the San Juan lease was 14 million and the vessels were

24 zero --

25         THE COURT:  Well, I have to make that determination.

**J&J COURT TRANSCRIBERS, INC.**

27

1    MR. HARWOOD:  Well --

2    THE COURT:  And once I -- my contemplation is I don't

3 know that we have a procedure that we've all agreed to, but my

4 contemplation is I'm not going to make one determination

5 without everybody having input.  I don't think I can determined

6 the value of the San Juan lease in the absence of determining

7 the value of everything else sold.

8    MR. HARWOOD:  Well, may I suggest this language then?

9 The proceeds of the sale of the vessels shall be determined by

10 the Court.

11    MR. FISCO:  Your Honor, paragraph --

12    THE COURT:  Do we have that somewhere else?

13    MR. FISCO:  -- paragraph five deals with holding all

14 of the proceeds pending further order of the Court.

15    MR. HARWOOD:  Fine.  Then we can add to that language

16 the proceeds of the sale of the vessels shall be determined by

17 the Court.

18    THE COURT:  Pending further of this Court which shall

19 determine the proper allocation of the proceeds among the

20 assets sold --

21    MR. HARWOOD:  Correct, Your Honor.

22    THE COURT:  -- including the vessels.  That's fine.

23              (Pause)

24    MR. HARWOOD:  And -- we need -- as -- determine the

25 value of the assets as of -- as at the time of closing or

**J&J COURT TRANSCRIBERS, INC.**

28

1  immediately prior to the closing, because if the determination

2  of the asset value in six months time when the ship is being

3  scrapped or something is something different.

4          MR. FISCO:  That -- I think that has been added in

5  paragraph --

6          MR. HARWOOD:  I'm trying to catch up these -- the

7  lien value, not the asset value.

8          MR. FISCO:  You want to determine the asset values as

9  of --

10          MR. HARWOOD:  Yes.

11          THE COURT:  Shall determine the proper allocation of

12  the proceeds based on the asset value at the time of sale?

13          MR. HARWOOD:  Correct, Your Honor.  Thank you.

14          THE COURT:  Okay.

15          MR. HARWOOD:  Thank you, Your Honor.  On that basis I

16  think Moran can live with the order.

17          THE COURT:  All right.  Have we resolved the Emerald

18  issue?

19          MR. SCHILDHORN:  Yeah.  If the Court please, I just

20  asked Mr. Tom Hayes to come back in.  There is no dispute, as I

21  understand it, that there will be Emerald equipment on the

22  ships as they're going out, and they're all through the

23  country, you know, being loaded in warehouses and things like

24  -- as goods are being transferred, and then they get onto the

25  ships.  But I did want to point out one other fact, Your Honor,

**J&J COURT TRANSCRIBERS, INC.**

29

1  or actually, argument.

2        I am not asking for this equitable relief based on

3  the rejection of the lease.  I believe that MPR, and I think

4  the testify established that MPR knew when Your Honor entered

5  its order in March directing the April payment that it was not

6  going to make the Emerald payment and it was going to abandon

7  the equipment, reject the lease.  By failing to make the

8  payments ordered by the Court, and by concealing from Emerald

9  and the Court that it had no intention of making the payment,

10 it's depleted Emerald of all funds.  Emerald doesn't have the

11 money to go back and take possession of its equipment.  And the

12 reason Emerald doesn't have the money is because of the debtor,

13 MPR's, intentional violation of two orders of this Court and

14 365(d)(10).  They knew that they were going to violate the

15 orders.  They knew --

16        THE COURT:  Well, isn't this an argument you can make

17 when we decide how to divvy up the proceeds?

18        MR. SCHILDHORN:  I'm not sure, Your Honor, because

19 once the money goes -- once the proceeds are created I am not

20 sure whose rights are superior.  Is it Wells Fargo's rights?

21 Is it First Union's rights that are superior because they're

22 secured creditors?  If Your Honor conditions the sale on

23 providing some funds to remedy what were intentional violations

24 of a Court order then I avoid the issue of as between competing

25 creditors, who wins?  And I respect Mr. Rosenthal and his

**J&J COURT TRANSCRIBERS, INC.**

A-50

30

1  argument that he's got a DIP order and everybody knew about it,

2  he raises serious points.  I believe that, you know, I have two

3  orders and a Code section, he has one order and a Code section.

4  Who wins?  I don't know who wins in that argument.  I know that

5  it's confusing.

6         But if Your Honor's orders meant anything when you

7  directed them to pay and they intentionally violated the order,

8  and the testimony of Mr. Hayes was he knew he wasn't going to

9  have money, he knew he was going to go out of business, he knew

10 that as of January, if Your Honor orders mean anything and

11 we're entitled to rely on them we need some relief so that we

12 can get our equipment back, and we are -- we have no cash

13 because of their intentional violations of the order.

14         So my equitable rights --

15         THE COURT:  Well, you'd be in the same boat mid

16 January that you are today if they had told you, we don't have

17 the ability to pay and we're not going to return your

18 equipment, we're rejecting.

19         MR. SCHILDHORN:  Perhaps, or I would have had the

20 chance to seek an order from this Court directing them to come

21 back to Packer Avenue when the ships visited.  If they -- if

22 they would have dropped it off, there wasn't a third party

23 coming in, Sea Star, who could charge me -- who could charge --

24 there's no jurisdiction of this Court over Sea Star of charging

25 my client for the charges.  Perhaps the Court could have

**J&J COURT TRANSCRIBERS, INC.**

31

1  fashioned a different remedy if it was other debtors that had

2  possession of this debtor's collateral. It's different. Sea

3  Star can charge. In fact, there not -- there's no contract

4  with Sea Star. They could charge whatever they want for the --

5  for the storage of our collateral at -- on their locations.

6          And so it's a different set of parties and a

7  different set of circumstances. My relief comes out of the

8  equity that I think my client is entitled to, having sought

9  orders of the Court, having obtained orders of the Court and

10 having the debtor, what appears to be a scheme to intentionally

11 violate the order --

12         THE COURT:  Does Sea Star go to Packer Avenue?

13         MR. SCHILDHORN:  Sea Star -- I believe the answer to

14 that is yes, Sea Star will be visiting Packer Avenue. I don't

15 know the answer to that. I should --

16         MR. ROBINSON:  Good morning, Your Honor.

17         THE COURT:  Good morning.

18         MR. ROBINSON:  Charles Robinson, attorney for Sea

19 Star. The answer to the Court's question is no.

20         THE COURT:  I didn't think --

21         MR. SCHILDHORN:  I was glad I reserved my -- so

22 they're going to go back and forth between San Juan and

23 Jacksonville and not go to Packer Avenue. So my relief comes

24 from the equities of this Court entering orders, my client, the

25 debtor, relying on those orders, and what appears to have been

**J&J COURT TRANSCRIBERS, INC.**

A-52

32

1  an intentional act by the other debtors to transfer value to

2  their estates to pay of their creditors to the detriment of the

3  creditors of the Emerald estate.

4        THE COURT:  There's a lot of that being alleged in

5  this case.

6        MR. FISCO:  Would you like me to address any of this,

7  Your Honor -- not agreement because there's a lot of factual

8  issues that are being -- argument being presented that's just

9  not factually correct.

10       THE COURT:  No.

11       MR. FISCO:  I'm sorry, Your Honor.  Michael Fisco for

12  the Committee --

13       THE COURT:  All right.

14       MR. HALLAM:  Your Honor, William Hallam for MBC

15  Leasing Corp.  This is not really a sale issue but it dovetails

16  with Mr. Schildhorn's position, so I just wanted to -- it

17  seemed to fit in logically.  As Mr. Epling said, we did file an

18  adversary proceeding this morning, adversary number 0203049,

19  and have asked -- have a motion for a temporary restraining

20  order, which I would hope the Court would consider, because we

21  have a three a.m. situation where our collateral, based on Mr.

22  Hayes' testimony yesterday, is being placed on ships and

23  removed from port.  All we're asking is that the debtor not

24  deliver things that Sea Star is not buying to Sea Star, and Sea

25  Star not take things that Sea Star isn't buying.

33

1          So -- I -- well, I'll let you get through the sale

2    thing, but I just -- so you have the full picture of what the

3    issues are, my relief is a lot narrower than Mr. Schildhorn's.

4    All I'm saying is if you're not buying it don't take it, if

5    you're not selling it don't deliver it to them.  And that's the

6    relief we're asking based on Mr. Hayes's testimony yesterday

7    where the ships were inbound, didn't have on them the

8    containers that were going to be on them when they left -- when

9    they leave at three a.m. tomorrow, were going to be loaded

10   between yesterday and three a.m. tomorrow with the equipment,

11   including some of the Emerald equipment, we face a very serious

12   situation where this collateral is going to be taken to

13   wherever.  And it appears from the assets of the debtor and the

14   liens on the assets of the debtor that we will have no remedy

15   for that, whatever additional cost, inconvenience is caused by

16   having now go to find it wherever Sea Star, as Mr. Robinson put

17   it, he said it'll end up where it ends up were his words when

18   you asked how -- they would protect --

19          THE COURT:  Well, he also --

20          MR. HALLAM:  -- Emerald.

21          THE COURT:  -- stated that he would advise you where

22   it was and cooperate with your efforts to pick it up.

23          MR. HALLAM:  When he's finished delivering it to the

24   customer so he can get paid by the customer --

25          THE COURT:  Well, you're free to go pick it up at

**J&J COURT TRANSCRIBERS, INC.**

A 54

34

1  three a.m. --

2          MR. HALLAM:  Well, we --

3          THE COURT:  -- on the high seas, aren't you?

4          MR. HALLAM:  Well, Your Honor, we don't have --

5          THE COURT:  That -- is that where you're suggesting?

6          MR. HALLAM:  No, I'm saying that the -- that the

7  seller, knowing that they're not selling this equipment,

8  shouldn't be putting it on the ship for the express purpose of

9  ensuring that it is on the high seas at three a.m. tomorrow

10 morning.  That was -- on my cross examination, that's what Mr.

11 Hayes said they were doing.  He said, yes, we know we're not

12 selling it; yes, we know that ship's going to be at sea at

13 three a.m., and yes, we the debtors are loading that equipment

14 onto the ships.  That's what we're asking to stop.  It's on

15 land now.  There is no reason, other than Sea Star getting free

16 use of equipment between here and the -- wherever the ultimate

17 destination is, that Sea Star will graciously tell us what that

18 was once they're finished getting it to that destination so

19 that customer is happy and pays Sea Star --

20         THE COURT:  I assume they knew where the ships are

21 going after three a.m., and I'm sure they can give you that

22 list.  The only -- the only prejudice to you is whether it's in

23 San Juan, Texas or Packer Avenue today, or whether it's in

24 Jacksonville --

25         MR. HALLAM:  No, but --

                **J&J COURT TRANSCRIBERS, INC.**

35

1            THE COURT:  -- on Sunday.

2            MR. HALLAM:  Well, that's fine.  If Sea Star will

3     say, when the ship gets to whatever the port is it's going to

4     the stuff will stay there and you can come get it, that's

5     fine--

6            THE COURT:  I heard them say that yesterday.

7            MR. HALLAM:  No.  No.  They're going to -- after it

8     gets there it's going to be put on trucks and trains and it's

9     going to be taken to various customers, and then  that will be

10    where it ends up and Sea Star will say, MBC, this container is

11    at the loading dock in Cleveland and this container is at the

12    loading dock in Denver and this container is in -- and that's

13    what we're going to have here.  If they're just going to move

14    it from one port to another, I agree.  If Sea Star is agreeable

15    to saying when that ships arrives with things they didn't buy

16    at the other end, they will then simply unload it from the ship

17    and keep it there, then we're no worse off, it's just in a

18    different port.  I completely agree that -- if that's what

19    we're doing.  But you're not going to get Sea Star to say that.

20            THE COURT:  Well, let me hear from Sea Star on that.

21            MR. ROBINSON:  Thank you, Your Honor.  We -- Sea Star

22    is here to purchase assets, and we certainly understand that

23    the parties -- there are many competing parties here that have

24    -- excuse me, Charles Robinson on behalf of Sea Star -- and we

25    understand that there are problems with this.  But what is

**J&J COURT TRANSCRIBERS, INC.**

36

1  happening is there is a vessel, there's a vessel being loaded.

2  It's being loaded by MPR.  It's MPR's vessel.  Until this Court

3  signs and order and until we are able to close this deal if the

4  Court does sign an order, we have no interest, we have no

5  control over these vessels.  These operations are ongoing.

6        Cargo is being loaded in containers onto vessels.

7  There are people waiting for that cargo at the other end.  All

8  of this cargo is generating accounts receivable of which they

9  are being paid for.  It's money coming into the estate, and

10  it's -- and it's part of the purchase price that we are paying.

11  When the vessels arrive at where they're getting to this cargo

12  in this container will be delivered to the customer at the

13  place that the customer is at.  The payment for the shipment

14  will be made.  At that point in time those containers will be

15  returned by the customer to the closest terminal.  So sometime

16  as each one of these -- as these -- each one of these movements

17  finishes there will be a container that will be returned to the

18  -- by the customer to the nearest terminal.  Those items, to

19  the extent that they are Emerald items, will be gathered at

20  that yard and they will be free for Emerald to pick up.

21        It's not a free -- it's not a free move in the sense

22  that this cargo is being paid for by a customer and this is

23  generating an account receivable for which we are paying cash

24  today for that account receivable in the hopes that we can

25  collect that in the next week or so.  What it seems that

**J&J COURT TRANSCRIBERS, INC.**

37

1   counsel is requesting here this morning is that that account

2   receivable be -- basically be stopped in its track, that that

3   ship be stopped in its track so that the debtor does not have

4   the opportunity to generate this account receivable.

5        Frankly, we don't care, and we have -- we have bent

6   over backwards to try to work with these guys to -- and we have

7   told them that we are going to -- we are going to, when these

8   moves come back to the terminal, we are going to segregate the

9   collateral.  We have even offered to them, and I can tell the

10  Court we have talked out in the hall, we have even offered them

11  that we are not going to charge the storage charges for 30

12  days.  They have 30 days to come and get all of their equipment

13  -- all of their equipment out.  We've been trying to work with

14  them on this, even though we don't believe that we have an

15  obligation, being a purchaser of assets at a bankruptcy.  And I

16  think that something more is going on here, and I'm going to

17  leave it at that.  But we certainly want to cooperate, but this

18  is in a sense not our battle to fight.  Thank you, Your Honor.

19       THE COURT:  The debtor agrees that the containers,

20  the Emerald containers, are being loaded back up?

21       MR. EPLING:  Your Honor, maybe the best way --

22       THE COURT:  You need to approach the --

23       MR. EPLING:  -- I'm sorry.  Your Honor, Richard

24  Epling.  The best way to do this I think is to just let Mr.

25  Hayes give a brief report at what he found out --

**J&J COURT TRANSCRIBERS, INC.**

38

1           THE COURT:  All right.

2           MR. EPLING:  -- he did an investigation, if I may.

3           THE COURT:  You may.

4    THOMAS D. HAYES, III, DEBTOR'S WITNESS, PREVIOUSLY SWORN

5           MR. HAYES:  Good morning, Your Honor.

6           THE COURT:  Good morning.

7           MR. HAYES:  Did you want me to --

8           THE COURT:  You are still under oath, but I'll allow

9    you to stand at the podium.

10          THE WITNESS:  I talked to Walter Curran, who's our

11   director of operations, this morning.  Walter yesterday put out

12   -- order regarding the movement of all the Emerald containers.

13   The programming to flag the Emerald containers was completed

14   late yesterday afternoon.

15          Curran's order with regard to the Packer Avenue

16   location is that if cargo is already loaded it will go onto the

17   ship even if it's on an Emerald container.  They are not

18   dispatching any new empties that are Emerald equipment.  Loads

19   coming off the ship, they're dispatched, if it's an Emerald

20   container -- that there are orders to return it empty to Packer

21   Avenue.  And Emerald empties are not going anywhere at Packer

22   Avenue.  And he has also told truckers to take non-Emerald

23   chasses wherever possible.

24          With regard to Jacksonville, they were also given the

25   same orders but we do not have the same sophisticated software,

**J&J COURT TRANSCRIBERS, INC.**

39

1  and so that's a little less able to control than in Packer

2  Avenue.  And in San Juan he told them to load nothing other

3  than for domestic use and to use nothing for domestic use or

4  going back to the United States.  That's --

5           THE COURT:  What does that mean?

6           THE WITNESS:  We've got service between San Juan and

7  the Dominican Republic, and there are also -- there's also the

8  possibility that a container could be loaded for an

9  international ship.

10          THE COURT:  So you're directing not to use Emerald

11 for the international?

12          THE WITNESS:  That's correct.

13          THE COURT:  All right.

14          THE WITNESS:  Thank you, Your Honor.

15          MS. BOSWELL:  Your Honor -- for General Electric

16 Capital Corporation.

17          THE COURT:  Yes.

18          MS. BOSWELL:  I guess I have a question with regard

19 to that because there are a number of leases which General

20 Electric, and I assume other equipment lessors have, that are

21 not being assumed that are indeed chasses and other things like

22 that.  I have assumed, and perhaps erroneously, since those --

23 since that equipment is not subject -- is not -- that is

24 subject to the leases is not being assumed that Sea Star will

25 not have possession, control or use of that equipment unless

**J&J COURT TRANSCRIBERS, INC.**

40

1 separate arrangements are being made with the lessors. I

2 simply would like confirmation of that from the debtor.

3       MR. EPLING: Your Honor, I think I'm going to have

4 investigate where Ms. Boswell's boxes are. I suspect that when

5 we do that we're going to find that some of them are still in

6 service because they have containers in them. And I don't -- I

7 don't -- I don't have an answer to that at the moment. I will

8 have to just do another factual investigation.

9       THE COURT: I assume you'll be in the same boat as

10 Emerald, no pun intended.

11       MR. EPLING: I should --

12       MS. BOSWELL: -- I did not take it as a pun, Your

13 Honor. And again, for the record, Susan Boswell. I guess that

14 is an issue that we will have to sort out, but I do want to put

15 on the record that those leases are not being assumed and

16 therefore -- and there has been no rejection, so they are still

17 in the controlling custody of the debtor with whatever rights

18 and obligations the debtor has with respect to those.

19       MR. EPLING: Your Honor, we did place in the order

20 paragraph 12, which was amended after the time you saw it this

21 morning, specifically to take into account a comment by Ms.

22 Boswell that "notwithstanding anything to the contrary in the

23 asset purchase agreement," that is with Sea Star, "to the

24 extent that any equipment of Emerald Equipment Leasing or

25 Emerald or any other lienor or lessor or creditor whose

41

1  property is not being sold or transferred to buyer is located

2  on property sold and assigned to the buyer under the asset

3  purchase agreement.  The buyer shall cooperate in allowing

4  Emerald to remove such property.  Emerald," I need to insert or

5  other lien creditor, "to remove such property during normal

6  business hours as long as such removal will not unreasonably

7  disrupt operations of the buyer.  In addition, buyer shall

8  cooperate in removing any such equipment from vessels" -- "from

9  vessels in transit and store such equipment on leased premises

10 at the final port of designation to the extent such final

11 designation is a leased premises sold and assigned to buyer

12 under the asset purchase agreement."  And then there's a

13 reservation of rights for Emerald to seek your creation of a

14 constructive trust, which Mr. Schildhorn requested.

15         That's what -- that's what the order says as it's

16 presently drafted.

17         THE COURT:  All right.  Well, I'm going to overrule

18 the objections of Emerald, the Emerald entities.  To the extent

19 that they have any rights I think they're preserved by

20 preserving any right to argue against the proceeds of the sale,

21 and I'm satisfied that the buyer -- the buyer's comments that

22 it will cooperate and will return the containers once empty at

23 the port of destination should protect them.  It protects them

24 as much as if the debtor still had them and had to return them.

25         MR. EPLING:  Thank you, Your Honor.  I think we have

**J&J COURT TRANSCRIBERS, INC.**

A-62

42

1   some other objectors.

2        THE COURT:  All right.

3        MR. GLEASON:  Good morning, Your Honor.

4        THE COURT:  Good morning.

5        MR. GLEASON:  My name is Ed Gleason.  I am here --

6   again, I represent the Marine Engineers Beneficial Association,

7   and also this morning the American Radio Association.

8        Your Honor, when I first came into court this morning

9   I -- and was presented with this proposal -- like Mr. Harwood I

10  had certain concerns with respect to the changes that had been

11  made concerning the maritime liens.  And like you, no pun

12  intended, I think Mr. Harwood's done an admirable job in trying

13  to protect the interests of the maritime lienors.

14       The -- we have -- and I think that Mr. Harwood we'll

15  be able to state shortly that we are satisfied with the changes

16  that have been made subject to certain perhaps clarifications.

17  And one, Your Honor, I must apologize, I believe that there was

18  a colloquy between the Court and Mr. Harwood but I didn't hear

19  it necessarily correctly with respect to the valuation date of

20  the vessels.  I --

21       THE COURT:  As of the date of sale, and I don't know

22  whether that -- date of closing or --

23       MR. FISCO:  I can -- I can -- I got the language

24  written down, Your Honor, if you --

25       THE COURT:  Okay.

**J&J COURT TRANSCRIBERS, INC.**

43

1          MR. FISCO:  -- read it into the record.  Michael

2    Fisco on behalf of the Committee.  Paragraph five will be

3    revised to say, except as provided in paragraphs six, seven and

4    eight of this order the debtor shall hold all proceeds of the

5    sale of the purchased assets in a segregated interest bearing

6    account pending further order of this Court which shall

7    determine the proper allocation of the proceeds of the asset

8    value -- proceeds -- in the proceeds of the asset value at the

9    time of sale, including the vessels.  I think it did bring that

10   valuation concept in.

11         MR. GLEASON:  Your Honor, yeah.  My point had been --

12   was going to be that assuming in the vessels would be in the

13   vessels as they are currently used in the trade, as opposed to

14   laid up.  We have a concern, I think we just heard this morning

15   that right now the schedules for these vessels are -- they hit

16   San Juan, Puerto Rico, the call San Juan, Puerto Rico, the call

17   Jacksonville, they call Packer Avenue, and now we're being told

18   that the vessels will not call Packer Avenue.  We have concerns

19   that not all these vessels will stay in use as of the closing

20   date.  So we would --

21         THE COURT:  Well, the closing is tomorrow at three

22   a.m.  They'll all be on -- well, four of them will be on the

23   seas, so the value will be as of that --

24         MR. GLEASON:  As they're being --

25         THE COURT:  -- moment.

**J&J COURT TRANSCRIBERS, INC.**

44

1          MR. GLEASON:  -- used.  All right.  My other

2  question, or point, Your Honor, was with respect to paragraph

3  seven, the CSX clause -- paragraph, I believe.  And my question

4  -- perhaps again it's raised more appropriately to counsel for

5  the debtors and the Unsecured Creditors Committee, it would

6  appear, with respect to the $350,000, currently, the way I

7  understand it, it would come from the proceeds of the sale of

8  the purchased assets, and my concern would be that that would

9  -- could potentially come from the -- the proceeds of the

10  vessels when at some point they are in fact valued.  Our

11  position would be that they should not come from the -- that

12  $350,000 shouldn't come from the -- whatever ultimately is

13  determined to be the proceeds of the sale of the vessels.

14          THE COURT:  That -- no, that 350,000 will be coming

15  from the trust fund.  To the extent it goes to CSX it's only

16  because it's their trust funds.

17          MR. GLEASON:  So that it'll have no negative or

18  adverse consequences with respect to the proceeds obtained from

19  the sale of the vessels, Your Honor, that's --

20          THE COURT:  If CSX wins it means that it's their

21  money, not anybody else's, and not allocable to any of the

22  other assets.

23          MR. GLEASON:  So -- it would again have no impact as

24  to what the ultimate valuation of the vessels would be --

25          THE COURT:  It should not.

**J&J COURT TRANSCRIBERS, INC.**

45

1          MR. GLEASON:  Because again, our position would be
2   that --
3          THE COURT:  If they lose on that then obviously it's
4   something else.  All right.
5          MR. GLEASON:  Your Honor, again, we had certainly
6   been of the view that the language presented to us in
7   yesterday's proposed order was stronger than what we have
8   today.  Nevertheless, with certain trepidations again I think
9   we've articulated those quite extensively at this point between
10  the three objecting maritime lienors with respect to the
11  failure of the debtor to allocate now with respect to the value
12  of vessels.  We do have those trepidations, but not such that
13  we are any longer going to object to the sale provided, of
14  course, you know, we have our rights to file an adversary
15  proceeding, which we anticipate doing very, very shortly, to
16  move the proceedings further along with respect to the --
17         THE COURT:  Well, we can talk about the procedure,
18  because I don't know that I'll -- I would require everybody to
19  file an adversary proceeding seeking allocation.  And again, I
20  would like to allocate all.  I don't think I can allocate one
21  in the absence of allocating the proceeds among all assets.
22  So.
23         MR. GLEASON:  Okay.
24         THE COURT:  We'll talk about that, and maybe I'll ask
25  for a scheduling order with respect to that --

46

1           MR. GLEASON:  Thank you --

2           THE COURT:  -- separately.

3           MR. GLEASON:  Thank you, Your Honor.

4           THE COURT:  All right.

5           MR. EPLING:  -- Your Honor, Richard Epling, I would

6    like to address --

7           THE COURT:  You need to -- you need to talk into the

8    mike.

9           MR. EPLING:  Your Honor, Richard Epling.  I would

10   like to address the scheduling of that and the issues that

11   we're going to have to ask the Court to address when we're

12   through the --

13          THE COURT:  All right.

14          MR. EPLING:  -- this part of the hearing, if I may

15   just reserve it.

16          THE COURT:  All right.  I think I've overruled or the

17   debtors have settled all objections, am I wrong?

18          MR. KAMINSKI:  I think you're correct, Your Honor,

19   but I wanted to do one point of clarification.  I talked to Mr.

20   Epling before the hearing this morning, and I think the amount

21   that's going to be segregated for CSX pending determination is

22   the amount that they're owed, and it won't be limited to the

23   350.

24          MR. EPLING:  Your Honor, that's acceptable to the

25   debtor as long as we know what the amount is, and I think that

47

1   their maximum plan was -- thousand or thereabouts --

2          MR. KAMINSKI:  Somewhere around that amount -- and

3   we'll provide invoices to them, but it's still in flux because

4   there's still transportation going on today.

5          THE COURT:  Okay.

6          MS. BOSWELL:  Your Honor, Susan Boswell, again, for

7   General Electric Capital Corporation.  In paragraph six, since

8   the distribution to Wells Fargo is now going to be from the

9   proceeds of the purchased assets, and while I realize that the

10  -- that the added language at the bottom of that paragraph,

11  nothing contained in this order will alter the priorities, I

12  would simply ask that there be additional language added that

13  says, notwithstanding any distribution to Wells Fargo from the

14  proceeds of the purchased assets, just to make clear that --

15  and I understand that it is subject to disgorgement, but in the

16  event that the accounts receivable collected are indeed less

17  than the amount of the DIP loan, if the Court will recall,

18  under the DIP order Wells Fargo does not prime existing first

19  priority liens in assets, including equipment.

20         MR. EPLING:  Your Honor, could I interrupt for just a

21  minute --

22         THE COURT:  Yes.

23         MR. EPLING:  -- Richard Epling.  I think I --

24         THE COURT:  -- speak into the --

25         MR. EPLING:  -- yeah, I'm coming over.  I think I

48

1  understand why you're looking confused.  Ms. Boswell is reading

2  off the black line we did this morning, and I think you're the

3  only person in the courtroom who doesn't have it.  May I

4  approach?

5          THE COURT:  You may.  You may have to start over

6  again.  What paragraph are we on?  Paragraph 12?

7          MS. BOSWELL:  Paragraph six, Your Honor.

8          THE COURT:  Six.

9                    (Pause)

10          THE COURT:  And what language do you want added?

11          MS. BOSWELL:  Your Honor, I would just like to make

12  it clear that notwithstanding the payment to Wells Fargo from

13  the purchased -- from the proceeds of the purchased assets,

14  because essentially what I understand is going to happen is as

15  accounts receivable are collected they will be paid to the

16  debtor.  On the other hand, Wells Fargo will be paid initially

17  from proceeds of the sale, which are indeed proceeds from the

18  sale of equipment and other assets, subject to disgorgement.

19          THE COURT:  So what do you want added?

20          MS. BOSWELL:  Before the -- at the beginning of the

21  last sentence I would like, notwithstanding the payment to

22  Wells Fargo from the proceeds of the purchases assets, and then

23  continuing on, nothing contained in this order will alter.

24          THE COURT:  Any objection to that?

25          AN ATTORNEY:  No, Your Honor.

**J&J COURT TRANSCRIBERS, INC.**

48

1  understand why you're looking confused.  Ms. Boswell is reading

2  off the black line we did this morning, and I think you're the

3  only person in the courtroom who doesn't have it.  May I

4  approach?

5          THE COURT:  You may.  You may have to start over

6  again.  What paragraph are we on?  Paragraph 12?

7          MS. BOSWELL:  Paragraph six, Your Honor.

8          THE COURT:  Six.

9                    (Pause)

10         THE COURT:  And what language do you want added?

11         MS. BOSWELL:  Your Honor, I would just like to make

12 it clear that notwithstanding the payment to Wells Fargo from

13 the purchased -- from the proceeds of the purchased assets,

14 because essentially what I understand is going to happen is as

15 accounts receivable are collected they will be paid to the

16 debtor.  On the other hand, Wells Fargo will be paid initially

17 from proceeds of the sale, which are indeed proceeds from the

18 sale of equipment and other assets, subject to disgorgement.

19         THE COURT:  So what do you want added?

20         MS. BOSWELL:  Before the -- at the beginning of the

21 last sentence I would like, notwithstanding the payment to

22 Wells Fargo from the proceeds of the purchases assets, and then

23 continuing on, nothing contained in this order will alter.

24         THE COURT:  Any objection to that?

25         AN ATTORNEY:  No, Your Honor.

**J&J COURT TRANSCRIBERS, INC.**

49

1       THE COURT:  All right.  We'll add that language.

2       MR. SULLIVAN:  Your Honor,  Bill Sullivan on behalf

3 of Cebcor Services Corporation.  Your Honor, Cebcor has a

4 substantial administrative claim against the MPR debtors.  And

5 given that these estates have not been substantively

6 consolidated and there's been no allocation Cebcor in its

7 objection did not object to payment to Wells Fargo of the

8 portion of the DIP that would be attributable to the MPR -- to

9 the MPR debtors.  My understanding is that the disgorgement

10 language in paragraph six is not limited to lien creditors, and

11 therefore if there is an allocation of the DIP a disgorgement

12 could be made on that basis as well, and therefore I haven't --

13 with that understanding we have no objection to the order in

14 the present state.

15       THE COURT:  That's agreeable?

16       MR. ROSENTHAL:  I believe so, Your Honor.  I just

17 want to check --

18       THE COURT:  I don't know if we heard you.

19       THE CLERK:  No.

20       THE COURT:  You were not picked up at all, so you'd

21 better approach the mike.

22       MR. ROSENTHAL:  Jeff Rosenthal for Wells Fargo, Your

23 Honor.  That's acceptable.

24       THE COURT:  All right.

25       MR. FISCO:  Your Honor, Michael Fisco.  We also added

50

1 paragraph 22, which kinds of states that the rights of the

2 estates aren't affected by the sale, either.

3          THE COURT:  I had remembered that.  All right.

4          MR. LEMISCH:  Your Honor, Ray Lemisch for Emerald

5 Leasing.  In reviewing the order Emerald Leasing had a couple

6 of, I consider, minor comments to paragraph 12.  We'd like the

7 addition of certain language, and I can read it or I can

8 discuss it with counsel separately.  I don't know how you want

9 to do that.

10          MR. EPLING:  Your Honor, I'd like to come away with

11 an order, because -- Your Honor, Richard Epling.  I'd like to

12 come away with an order because I need to close the deal this

13 afternoon, or start closing it.  So let's try and finish what

14 we can, and --

15          MR. LEMISCH:  That's fine.

16          THE COURT:  All right.

17          MR. LEMISCH:  In the last sentence we would request

18 the addition of certain language.  The order as read -- as

19 drafted now says, nothing contained in this order shall

20 prejudice any of Emerald's rights to seek, and it says, the

21 creation of a constructive trust.  Between the word seek and

22 the word the we'd like to add the following language,

23 disgorgement of funds based on any of its claims, as well as,

24 and then go back to, the creation of a constructive trust.  We

25 don't want any other rights we may have for super priority

**J&J COURT TRANSCRIBERS, INC.**

51

1  claims to be wiped out by this. I don't think anyone intended

2  that to happen, and I just want to preserve that.

3       THE COURT: I think it's preserved elsewhere, but any

4  objection? I see everyone shaking their heads no, so.

5       (Pause)

6       MR. LEMISCH: And the other -- the other part of

7  paragraph 12 was, we believe it appropriate that we be able to

8  retain our rights to assert claims, including maritime lien

9  claims, against the buyer for the use of our equipment after

10  three a.m. on Saturday. And think according this order our --

11  any rights we would have against the buyer get wiped out. I

12  don't know that we have any rights, but I think that we should

13  be entitled to preserve rights against the buyer under those

14  circumstances, since I think it's been made abundantly clear

15  that our equipment will be used by the buyer post three a.m.

16       THE COURT: Well, I won't preserve it to the extent

17  that it's the use from three a.m. to delivery to final

18  destination after delivery to customer, because as I understand

19  it that is -- the debtors' estates are being compensated for

20  that in the form of the accounts receivable. So the extent you

21  have any interest or claim for that you can assert it against

22  the proceeds. But certainly there should be, and I don't know

23  if the order need do it, but certainly I am relying on Sea

24  Star's representation that post delivery to final destination

25  and emptying that those containers will not be used by it, and

52

1  that it has no title or other legal right to use those

2  containers.  So I think the language of this order, free and

3  clear of any claims, does not include any claims that Emerald

4  may have if Sea Star in fact does use the equipment after that

5  moment.

6          MR. LEMISCH:  Is it Your Honor's position that to the

7  extent that Emerald's equipment by lost or destroyed in the

8  process of getting to final delivery that that would also be

9  subsumed under the analysis you just made, that that's just

10 part of the claim that we would have against the proceeds?

11          THE COURT:  The debtor, yes.

12          MR. LEMISCH:  Then I would -- if you makes the

13 representation on the record that any subsequent use would be

14 subject to any claim we would have, and that that's not being

15 wiped out by this order, I can accept that -- saying after the

16 delivery, I just want to make it clear that we have those

17 rights and again, I have not been as familiar with this case as

18 probably everyone else sitting in this courtroom, but I'm -- if

19 I'm correct everyone is telling me that in fact that the buyer

20 has -- is compensating the seller for the use of the equipment

21 all the way through to the final destination.  If that's

22 correct, and I think what you're saying is correct, that that's

23 not correct, then I think your analysis is not correct, so I

24 just would assume that what you're saying is correct.

25          THE COURT:  Well, I'm assuming what Sea Star and the

**J&J COURT TRANSCRIBERS, INC.**

A-74

53

1  debtors have said are correct, and that is that the accounts

2  receivable being purchase represent delivery to the customer of

3  the containers that will be on board the ship at three a.m.

4  MR. LEMISCH:  I guess the question I would have is --

5  Sea Star is not being paid anything -- anything that Sea Star

6  is getting they're paying over to the estate, I assume, for the

7  use of that --

8  THE COURT:  No, they're buying the accounts

9  receivable, and the accounts receivable being purchased include

10  accounts receivable represented by the delivery after three

11  a.m., is that correct?

12  (Pause)

13  MR. EPLING:  Your Honor, Richard Epling.  I am

14  advised that the loadings today, the ones that are going on

15  this afternoon, will be billed by Sea Star.  So those are --

16  that is their asset.  That's what I just got told.

17  THE COURT:  Well, that's something different.

18  MR. EPLING:  Yeah, it is.  I agree with you.  And I'm

19  going to have to talk to Sea Star's counsel here for a minute

20  because --

21  THE COURT:  Let's take a break and resolve that,

22  because that is different from what Sea Star --

23  MR. EPLING:  I understand.  I appreciate that, Your

24  Honor.

25  MR. HARWOOD:  Your Honor, just before the break,

**J&J COURT TRANSCRIBERS, INC.**

54

1    could I -- read that -- paragraph five again --

2           AN ATTORNEY:  I'll read it.

3           MR. HARWOOD:  -- on the record?

4           THE COURT:  All right.  Well --

5           AN ATTORNEY:  So that we --

6           THE COURT:  Yes.

7           MR. EPLING:  Ten minutes, Your Honor?

8           AN ATTORNEY:  -- revised paragraph --

9           THE COURT:  We're going to read paragraphs four and

10   five first for the record.

11          MR. FISCO:  Your Honor, Michael Fisco for the

12   Committee.  Paragraph four reads, except as otherwise provided

13   in this order the proceeds of the purchased assets shall be

14   free and clear of all claims; charges' security interests;

15   mortgages; liens; maritime liens, whether recorded or not;

16   encumbrances arising by operation of law or otherwise; options;

17   pledges; conditional sales; rights of others or restrictions,

18   whether imposed by agreement, law or otherwise.  All rights,

19   liens and interests alleged in the purchased assets shall

20   attach to the proceeds from the sale of those purchased assets,

21   including the vessels, with the same priority, dignity and

22   effect such liens, rights and interests had in the purchased

23   assets pursuant to maritime or any other applicable law

24   immediately prior to the sale of the purchased assets,

25   including the rights -- deleting the rest of that, period.  The

**J&J COURT TRANSCRIBERS, INC.**

55

1  Court -- to strike the language, pursuant to section 365.

2        THE COURT:  Correct.

3        AN ATTORNEY: 363.

4        MR. FISCO:  363.

5        THE COURT:  363.

6        MR. FISCO:  363?  Okay.  That's paragraph four, Your

7  Honor.

8                      (Pause)

9        MR. FISCO:  Paragraph five says, except as provided

10 in paragraphs six, seven and eight of this order the debtors

11 shall hold all proceeds from the sale of the purchased assets

12 in a segregated interest bearing account pending further order

13 of this Court which shall determine the proper allocation of

14 the proceeds in the assets valued at the time of time of sale,

15 including the vessels.

16       THE COURT:  All right?  Let's take a break or --

17       MR. EPLING:  Your Honor, I think we might -- let's

18 take a break.  We'll be back in ten minutes.

19       THE COURT:  All right.  We'll take a ten-minute

20 break.

21                      (Recess)

22       THE CLERK:  You may be seated.

23       MR. EPLING:  Your Honor --

24       THE COURT:  You may proceed.

25       MR. EPLING:  -- Richard Epling again.  Like

**J&J COURT TRANSCRIBERS, INC.**

1  everything in life, nothing is quite -- is quite as simple as

2  it seems.  There is more to the story than what I just told

3  you, which is -- the short answer of which is we are being

4  compensated, the estates are being compensated, for the goods

5  in transit, for the costs of transporting the goods.  The ships

6  that are being loaded today, when the account receivable is

7  generated, as I said a few minutes ago, will be a Sea Star

8  receivable and will be billed and collected by Sea Star.

9  However, Sea Star recognizes, and we have a memorandum

10 agreement with them to this effect, Sea Star recognizes that

11 there are goods that are in transit today.

12         So let's take the example, if you will, of a box or a

13 load that began in Chicago sometime this week, got -- was put

14 on a railroad or on a track chassis, brought to Philadelphia

15 and loaded on a ship at Packer Avenue today, and then is going

16 on to Puerto Rico and will be delivered to a customer somewhere

17 on the island tomorrow or next week.

18         We have incurred costs for that transportation up to

19 this point and we would -- we would if we were still owning the

20 business continue to incur those costs right up to the end

21 destination.  Sea Star is prepared to pay us as a closing

22 adjustment for the entire direct cost -- for our entire cost, I

23 should say, internal cost, of transporting that box and that

24 cargo from Chicago to the end destination in San Juan.

25         How did that get resolved -- or, how did that get

57

1  arrived at?  One of our people, the president -- or, the

2  executive VP of MPR, Carl Fox, and Mr. Leach from Sea Star sat

3  down and developed a model.  And that model has essentially, I

4  think, I'm told, it's the last quarter's costs of shipping,

5  costs of delivering the service, on an average.  It's not Sea

6  Star's costs, it's not anybody else's costs but MPR's.  And

7  that was deemed to be the costs that were imputed to these

8  voyages, or these trips, that are still ongoing in the middle

9  of the closing -- I don't know what the number is exactly but

10  there is -- there is an imputed number that we'll get paid at

11  closing, and then it's subject to true up post closing based on

12  the actual cost of the voyages, or the trips to MPR.

13        Included -- the point to be made here is that

14  included in those -- in those costs of supplying services to

15  the goods are of course things like leasing costs and financing

16  costs as well as labor, materials and other things that go into

17  getting goods from, you know, a place -- a point in Chicago to

18  a point in San Juan.  And so while we're not getting the

19  receivable, the profit, if you will, from the load, we are in

20  fact getting compensated for the costs, which is I think what

21  the concern of Emerald and the others, the other equipment

22  lessors and lenders were of using that box, or using their box

23  to get -- to get a load from point A to point B.

24        THE COURT:  Well, does the cost include the rental of

25  the containers, whether or not the debtor has rejected those

58

1    containers or not?  Because I think the debtor acknowledged

2    that, for example, with respect to Emerald, to the extent the

3    debtor's still using it post rejection it may be obligated for

4    the rental cost of those.

5        MR. EPLING:  We understand that there may be an

6    administrative claim accruing until we can get these boxes out

7    of service.  That's understood.  Again, Sea Star will hopefully

8    correct me if I -- if I am wrong, but I believe the model,

9    which is complicated and it has a lot of factors in it, does

10   include rental costs as one of the cost factors imputed to the

11   box moving in interstate and international commerce.

12       THE COURT:  All right.

13       MR. EPLING:  Your Honor, I had one other thing, as

14   long as I have the podium, that I wanted to bring to your

15   attention in the black line of the order.  You may remember

16   from yesterday, this is -- this is paragraph eight of the order

17   on, I know the pages aren't numbered, but it's on the carryover

18   on top of the next page --

19       THE COURT:  On --

20       MR. EPLING:  -- paragraph --

21       THE COURT:  -- today's or yesterday's?

22       MR. EPLING:  On the -- on the black line I handed you

23   a little while ago.

24       THE COURT:  Today's.  All right.

25       MR. EPLING:  That's the one I'm working on, today.

**J&J COURT TRANSCRIBERS, INC.**

A-80

59

1            THE COURT:  All right.  What page are you on again?

2            MR. EPLING:  Unfortunately, what I have isn't

3 numbered.  It's paragraph eight, ordering paragraph eight.

4            THE COURT:  Have it.

5            MR. EPLING:  There's a blank -- there was a blank in

6 there.  Mr. Hayes testified yesterday that we want to be sure

7 that we cover our payroll and our final day's expenses today

8 from the proceeds of sale in the event we can't do it from cash

9 flows.  We've essentially got our cash report in this morning,

10 and I can put him on the stand and he can testify as to this

11 but the number we need to carve out to be safe, to make sure we

12 cover our payroll taxes is a million four.

13            THE COURT:  Is a million four?

14            MR. EPLING:  Yes, ma'am.

15            THE COURT:  All right.

16            MR. EPLING:  That's all I have, Your Honor.

17            MR. HALLAM:  Your Honor, William Hallam for MBC

18 leasing.  I just want to get clarification.  On the -- on the

19 additional compensation that's to be paid by Sea Star, I just

20 want to be clear, that's going to be considered proceeds of

21 sale, so all this language in this order about interest

22 attaching -- called something else, some kind of adjustment

23 that's not dealt with, it's considered part of the purchase

24 price, is that correct?

25            MR. EPLING:  The debtors certainly consider it to be

**J&J COURT TRANSCRIBERS, INC.**

60

1   so, Your Honor.  Richard Epling.

2          THE COURT:  Okay.

3          MR. HALLAM:  One other thing, Your Honor, we filed

4   last week on Friday a motion for relief from stay.  We're gong

5   to face a point where even if the 30-day mark that Sea Star's

6   talking about, some of this equipment, my understanding in the

7   turnover in the industry is there will be equipment that's not

8   back by then.  And certainly at some point we're going to face

9   storage charges by Sea Star, and we're not in a position to

10  stop those -- stop those by going and taking our collateral.  I

11  had asked for -- filed an emergency motion to shorten time

12  earlier this week asking that we set our motion for relief from

13  stay and for Monday when we're back here on the Murphy Marine

14  sale.

15         There's really no evidence that the Court needs to

16  hear.  It knows all that there is to know, and I really would

17  ask the Court to grant that motion so that we can get in a

18  position where we can cut off any claim by Sea Star for storage

19  of things that -- I mean, we understand that these are going to

20  use till destination we aren't going to interfere with but

21  there's a lot of this that they aren't planning to use till

22  destination that's sitting in places that they're going to take

23  over effective three o'clock tomorrow morning, so I'd ask the

24  Court to grant the motion to shorten time.

25         THE COURT:  Any objection to that?

**J&J COURT TRANSCRIBERS, INC.**

A 82

# ORIGINAL



IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

In re:                                    )        Chapter 11
                                          )
MURPHY MARINE SERVICES,                   )        Case Nos. 01-00926
INC., *et al.*[1]                         )        through 01-00950 (MFW)
                                          )        (Jointly Administered)
                            Debtors       )

## ORDER AUTHORIZING SALE OF THE NPR ASSETS
### FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES

Upon the Debtors' Motion for Order Authorizing Sale of the NPR Assets (as

defined and described in the Sale Motion) Free and Clear of All Liens, Claims and

Encumbrances (the "Sale Motion"), and due and adequate notice having been given under the

circumstances; it appearing that the relief requested is in the best interest of the Debtors[2], their

estates and their creditors; and, after due deliberation and sufficient cause appearing therefore,

the Court hereby FINDS, DETERMINES AND CONCLUDES THAT:

1.      The Court has jurisdiction to hear and determine the Sale Motion and all

related matters pursuant to 28 U.S.C. §§ 1334 and 157. Venue of this proceeding in this district

is proper pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (N) and (O).

---

[1] The Debtors are Murphy Marine Services, Inc., The Holt Group, Inc., B.H. Sobelman & Co., Inc., Burinquen Maintenance, Inc., Broadway Equipment Leasing Corp., C.R.T., Inc., Dockside International Fish Co., Dockside Refrigerated Warehouse, Inc., Emerald Equipment Leasing, Inc., Holt Cargo Systems, Inc., Holt Hauling & Warehousing System, Inc., New Port Stevedores, Inc. (f/k/a S.I.I.T., Inc.), NPR Holding Corporation, NPR, Inc., NPR-Navieras Receivables, Inc., NPR S.A., Inc., Oregon Avenue Enterprises, Incorporated, Pattison Avenue Warehousing Corp., Refrigerated Distribution Center, Inc., Refrigerated Enterprises, Inc., The Riverfront Development Corporation, San Juan International Terminals, Inc., 777 Pattison Ave., Inc., Triple Seven Ice, Inc., and Wilmington Stevedores, Inc. Dockside Refrigerated Warehouse, Inc. and Emerald Equipment Leasing, Inc. are not parties to the Bidding Procedures Motion or the Sale Motion.

[2] Capitalized terms not defined herein shall take the meaning ascribed thereto in the Sale Motion

2.      The findings and conclusions contained herein constitute the findings of fact and conclusions of law required to be entered by this Court with respect to the Sale Motion pursuant to Fed.R.Civ.P. 52, as made applicable herein by Fed.R.Bankr.P. 7052 and 9014.

3.      Notice of the Sale Motion was timely, properly given in compliance with the Bankruptcy Code and Rules, and reasonable and appropriate under the circumstances.

4.      The Debtors have demonstrated that the sale of the assets, which includes the M/V CAROLINA, No. 53099, M/V MAYAGUEZ, No. 517450, M/V HUMACAO, No. 514261, and the M/V GUAYAMA, No. 520694, (the "Vessels") (and collectively, the "Purchased Assets") to Sea Star Line, LLC, and its permitted assignees ("Buyer") pursuant to the Asset Purchase Agreement, dated April 1, 2002 (the "Asset Purchase Agreement") is based on sound business justifications, and such sale is in the best interest of the Debtors' estates.

5.      Buyer is a third party purchaser unrelated to any of the Debtors.

6.      Failure to approve the Sale Motion will cause irreparable damage to the Debtors and their estates.

7.      The sale of the Purchased Assets has been proposed and, if consummated, will have been consummated in good faith in accordance with Section 363(m) of the Bankruptcy Code. Buyer is entitled to the protections afforded under Section 363(m) of the Bankruptcy Code.

8.      The sale of the Purchased Assets, as provided in this Order, is in compliance with the provisions of Sections 363(b), 363(f) and 365 of the Bankruptcy Code.

9.    The negotiations between Buyer and the Debtors have been in good faith, and the consideration being paid is fair value for the Purchased Assets.

10.   The Debtors have demonstrated sufficient justification to sell a substantial portion of their assets outside of the confirmation of a plan of reorganization.

11.   The Debtors have made significant and satisfactory efforts to realize the highest or best value for the Purchased Assets.

12.   The Debtors, in compliance with the Bidding Procedures Order, dated April 12, 2002 (the "Bidding Procedures Order"), solicited bids for the Purchased Assets in order to conduct an auction on April 24, 2002 (the "Auction").  Buyer's bid was the sole Qualifying Bid, as defined by the Bidding Procedures Order, received by the Bid Deadline.  Accordingly, Buyer was determined to have submitted the highest and best offer for the Purchased Assets. Debtors have determined that the Buyer's bid for the Purchased Assets is the Successful Bid, as defined in the Bidding Procedures Order.

13.   The sale process was open and complete and reasonably calculated to yield the highest or otherwise best offer for the Purchased Assets.

14.   The consideration to be received by the Debtors from Buyer is fair and reasonable.

15.   The sale of assets does not amount to a consolidation, merger, *de facto* merger or similar restructuring of either or both of Buyer and the Debtors.

3

E 005953

A-85

16.    Buyer is only buying the Purchased Assets and is not a successor in interest to Debtors, nor does Buyer's acquisition of the Purchased Assets reflect a substantial continuity of the operations of the Debtors' business.

17.    The Debtors have satisfied the standard set forth in Section 363(f) for selling the Purchased Assets free and clear of all liens, as (a) applicable non-bankruptcy law permits the sale of such property free and clear of such interests; (b) any secured lender so affected by the sale has consented to the asset sale; (c) any applicable lien on the Purchased Assets is in bona fide dispute, or (d) the proceeds of the sale of any property alleged to be subject to a trust fund claim of CSX Intermodal, Inc. shall be placed in a segregated interest-bearing account pending the determination of such trust fund claim pursuant to paragraph 7 of this Order.

18.    The sale of the Purchased Assets constitutes a sale in furtherance of effectuating a plan of reorganization, and all transfers in connection therewith shall be exempt from any and all stamp, value-added, transfer, recording, and other similar taxes (other than income taxes) and any transfer or recording fees or other similar costs incurred or assessed by any federal, state, local, or foreign taxing authority (including interest and penalties, if any) in connection with the sale or transfer of the Purchased Assets.

19.    Consummation of the Asset Purchase Agreements is in the best interests of the Debtor, its estate, all creditors, equity security holders and other parties in interest.

IT IS HEREBY ORDERED THAT:

1.    Except as modified by this Order, the Sale Motion is granted and approved in its entirety.

2.      All objections to the sale of the Purchased Assets that have not been withdrawn are overruled. The Debtors are authorized pursuant to Sections 105(a) and 363(b) and (f) of the Bankruptcy Code to sell the Purchased Assets to the Buyer in accordance with the Asset Purchase Agreement and this Order.

3.      The Debtors are hereby authorized and directed to take any and all actions necessary or appropriate to: (a) consummate the sale of the Purchased Assets in accordance with the terms and conditions set forth in the Asset Purchase Agreement, including, without limitation, to convey to Buyer the Purchased Assets; (b) execute any document or take any action necessary or appropriate to consummate the sale to the Buyer of the Purchased Assets without further order of this Court; and (c) take any action to remove any liens of record against the Purchased Assets.

4.      Except as otherwise provided in this Order, the sale of the Purchased Assets, including the Vessels, shall be free and clear of all claims, charges, security interests, mortgages, liens, maritime liens, (whether recorded or not), encumbrances arising by operation of law or otherwise, options, pledges, conditional sales, rights of others, or restrictions, whether imposed by agreement, law, or otherwise. All rights, liens, and interests alleged in the Purchased Assets shall attach to the proceeds from the sale of those Purchased Assets, including the Vessels, with the same priority, dignity, and effect such rights, liens, and interests had in the Purchased Assets pursuant to maritime or any other applicable law immediately prior to the sale of the Purchased Assets, *including the rights, liens and interests of Wells Fargo Business Credit, Inc ("Wells Fargo").*

5.      Except as provided in paragraphs 6, 7 and 8 of this Order, the Debtors shall hold all proceeds from the sale of the Purchased Assets in a segregated interest-bearing account pending further Order of this Court, which shall determine the proper allocation of the proceeds from sale of the Purchased Assets, including the Vessels, valued at the time of the sale.

6.      Subject to disgorgement after notice and a hearing, on April 29, 2002, the Debtors are authorized and directed to pay all Obligations, as such term is defined in that certain Credit and Security Agreement dated January 23, 2002 ("Credit Agreement") by and between the Debtors and Wells Fargo from the proceeds received on account of the sale of the Purchased Assets. Notwithstanding anything to the contrary in this Order, Wells Fargo reserves all rights, including, without limitation, the right to seek any deficiency, as a result of disgorgement or otherwise, of the payment of the Obligations under the Credit Agreement from any other proceeds from the sale of the Purchased Assets or other property of the Debtors subject to the liens and security interests of Wells Fargo under the Credit Agreement. Notwithstanding any distribution of proceeds to Wells Fargo, nothing contained in this Order or payment of proceeds to Wells Fargo will alter the validity, extent, or priority of any liens and security interests of the creditors of the Debtors as they existed prior to the date of the entry of this Order.

7.      The Debtors shall deposit the actual amount owed up to a maximum of $800,000.00 ("Trust Fund Account") from the proceeds from sale of the Purchased Assets into a segregated interest-bearing account subject to any alleged trust fund claim of CSX Intermodal, Inc. The funds held in the Trust Fund Account shall continue to be subject to the rights, liens

and interests of other creditors in the Purchased Assets to the extent that the funds are determined
to be property of the Debtors and not trust fund property of CSX Intermodal, Inc.

        8.     To the extent that the Debtors do not have sufficient funds in their
operating account to pay all earned and unpaid wages, withholding taxes, vacation, and current
due employee related obligations through and including the date of closing on sale of the
Purchased Assets, then the Debtors shall be authorized to use up to $1,900,000.00 of the
proceeds from sale of the Purchased Assets, after payment of the Obligations to Wells Fargo
under paragraph 6 of this Order, to pay such claims.

        9.     To the extent that Purchased Assets subject to the liens and security
interests of the Bank of Gloucester, CIT, GECC, or GE Capital are excluded from the sale, the
purchase price of the Purchased Assets may be adjusted downward up to a maximum amount of
$1,600,000.00 on an aggregate basis, or such lesser amount reasonably related to the value of
any such assets excluded from the sale.

        10.    The payment of claims under paragraphs 6, 7 and 8 of this Order out of
proceeds from sale of certain of the Purchased Assets shall not prejudice the rights of the pre-
petition secured lenders for which First Union National Bank is agent (the "First Union Bank
Group") to argue that such claims also would be payable from other proceeds from sale of the
Purchased Assets and seek a reallocation of such proceeds applied under paragraphs 6, 7 and 8,
including the right to seek a replacement lien in accordance with existing orders entered in favor
of the First Union Bank Group or otherwise on such other proceeds from sale of the Purchased

Assets. Nothing contained in this Order will alter the priorities of the liens and security interests of the creditors of the Debtors as they existed prior to the date of the entry of this Order.

11.    All liens recorded against the Purchased Assets shall, upon Closing, be deemed released and discharged as against the Purchased Assets with all such liens and interests to attach to the proceeds of the sale pursuant Paragraph 4 above, and all parties and other entities, including filing agents and officers, title agents and companies, recorders of mortgages and deeds of trust, administrative agencies, governmental units and other state, federal and local officers are authorized and specifically directed to remove any recorded liens against the Purchased Assets from their records without the presentation of any affidavits, instruments, or returns otherwise required for recording, other than this Order.

12.    To the extent that General Electric Capital Corporation ("GECC") is determined to be an undersecured creditor with respect to the liens, claims, or encumbrances of GECC in the Purchased Assets or the proceeds from the sale of the Purchased Assets, GECC reserves all rights to seek to enforce any cross-collateralization provision of any loan or security agreement to which it and any of the Sellers are a party, subject to the liens of Wells Fargo granted in the Final DIP Order.

13.    Notwithstanding anything to the contrary in the Asset Purchase Agreement, to the extent that any equipment of Emerald Equipment Leasing, Inc. ("Emerald"), or any other lien or lessor creditor whose property is not being sold or transferred to Buyer, is located on property sold and assigned to the Buyer under the Asset Purchase Agreement, the Buyer shall cooperate in allowing Emerald or such other creditors to remove such property

during normal business hours as long as such removal will not unreasonably disrupt operations

of the Buyer. In addition, the Buyer shall cooperate in removing any such equipment from

Vessels in transit and store such equipment on leased premises at the final port of destination, to

the extent such final destination is a leased premises sold and assigned to the Buyer under the

Asset Purchase Agreement. Nothing contained in this Order shall prejudice any of Emerald's

rights to seek disgorgement of funds based on any of its claims, as well as to seek the creation of

a constructive trust in the proceeds from the sale of the Purchased Assets, nor the rights of the

Debtors or any other party to contest such constructive trust.

14.    Closing of the sale of the Purchased Assets shall occur as set forth in the

Asset Purchase Agreement approved by the Court herein. Debtors and Buyer may, by mutual

agreement, transfer title or possession of any asset at a time subsequent to closing of the sale.

All parties and other entities, including all filing agents and officers, administrative agencies,

governmental units and other state, federal and local officers shall effect all transfers of the

Purchased Assets without further order of the Court.

15.    Except as expressly provided in the Asset Purchase Agreement, Buyer has

not assumed or otherwise become obligated for any of the Debtors' liabilities. Consequently,

after closing of the sale to Buyer, all creditors of the Debtors, whether known or unknown, are

hereby enjoined from asserting or prosecuting any claim or cause of action against Buyer or the

Purchased Assets to recover on account of any liability owed by the Debtors.

9

16.    The Asset Purchase Agreement: (i) was proposed, negotiated, and entered into in good faith after arms-length bargaining of the parties; and (ii) provides the Debtors with the highest or otherwise best offer received for the Purchased Assets.

17.    The Buyer is a good faith purchaser entitled to the protections afforded a purchaser pursuant to 11 U.S.C. § 363(m).

18.    Pursuant to Section 1146(c) of the Bankruptcy Code, the making, delivery, filing or recording of any and all other instruments of conveyance or transfer of the Purchased Assets to evidence, effectuate or perfect the rights, transfers and interest contemplated by the Asset Purchase Agreement (the "Conveyances"), are exempt from and shall not be taxed under any federal, state or local law imposing a recording tax, stamp tax, transfer tax or similar tax (collectively, "Transfer Taxes"). Such instruments, orders and agreements transferring the Purchased Assets to Buyer shall contain the following endorsement:

> Because this [instrument] has been authorized pursuant to an order
> of the United States Bankruptcy Court for the District of Delaware,
> in contemplation of a plan of reorganization of the Grantor, it is
> exempt from transfer taxes, stamp taxes or similar taxes pursuant
> to 11 U.S.C. § 1146(c).

All filing and recording officers are hereby authorized and directed to accept for recording or filing, and to record or file immediately upon presentation thereof, the Conveyances, without the payment of any such Transfer Taxes and without the requirement or presentation of any affidavit or form with respect to any Transfer Tax regarding the Conveyances. All governmental authorities or taxing authorities shall be permanently enjoined from commencing or maintaining

the Purchased Assets to argue their rights to the proceeds of the sale and the manner in which the proceeds of the sale should be allocated.

23. Nothing in this Order shall be deemed to modify or impair any right or claim among the estates of the Debtors, including, but not limited to (a) any claims to the sale proceeds, and (b) any payment of the Obligations to Wells Fargo under the Credit Agreement.

24. This Court retains jurisdiction to:

(a) Interpret, implement and enforce the terms and provisions of this Order and the terms of the Asset Purchase Agreement, all amendments thereto and any waivers and consents thereunder and of each of the agreements executed in connection therewith;

(b) Compel delivery of the Purchased Assets to the Buyer;

(c) Resolve any disputes arising under or related to the sale of the Purchased Assets to the Buyer, subject to the provisions of the Asset Purchase Agreement;

(d) Protect Buyer, or any of the Purchased Assets, against any liens of any kind, including maritime liens, against the Purchased Assets after the transfer of the Purchased Assets to Buyer; and

(e) Adjudicate any issue that may arise by any person or entity asserting a claim or cause of action against Buyer arising from Debtors' use of the Purchased Assets prior to the Closing Date, which shall include, but shall not be limited to, successor claims.

25. This Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing.

Dated: Wilmington, Delaware
       April 26, 2002

_____

The Honorable Mary F. Walrath
United States Bankruptcy Judge

36895-001\DOCS DE:45595.5

 **Andrew Rooks**
05/13/2002 03:55 PM

To: lrobins@holtmarine.com
cc: Bill Streich/holtoversight@holtoversight
Subject: Re:

In addition, Global and Fast Lane are looking for similar letters. Please have Bill Streich send same to these guys.
Thanks.

Andy Rooks
904 855-1278 Phone
904 725-9875 Fax
lrobins@holtmarine.com

lrobins@holtmarine.com
05/13/02 02:13 PM

To: ARooks@SEASTARLINE.COM
cc: Bill Streich/holtoversight@holtoversight
Subject: Re:

Andy

On May 8,2002 we gave Illinois Auto to release chasses and gen set and to advise of
us of units that were released.

On May 10 they requested a hold harmless letter Navieras/NPR which a gave to
Bill Streich to handled.  As of this date Renee of Illinois Auto has not received the
letter.  Mr. Streich is not in his office but as soon as I locate him I will advise

Lorraine



SE50054

A-95



**Andrew Rooks**
05/13/2002 03:59 PM

To: lrobins@holtmarine.com
cc:
Subject: Re:

Lorraine,
Thanks for your help.

Andy Rooks
904 855-1278 Phone
904 725-9875 Fax
lrobins@holtmarine.com

lrobins@holtmarine.com
05/13/02 04:08 PM

To: ARooks@SEASTARLINE.COM
cc: Bill Streich/holtoversight@holtoversight
Subject: Re:

Andy

I have ask Bill Streich to send letter to both Fastlane and Global.  Will
let you know when they
go out

Lorraine



EXHIBIT
Robins-3
1/26/05

SE50055

A-96

Post Office Box #2550
Philadelphia, PA 19101-2550

FAX:  904-724-3007                              June 11, 2002

Mr. Phil Bates
SEA STAR
100 Bell Tel Way, Suite 300
Jacksonville, FL 32216

Dear Mr. Bates:

Please remit a check in accordance with the attached letter from MBC Leasing, Corp.

                              Regards,

                              GREENWICH TERMINALS LLC

                              Thomas J. Holt, Jr.

TJH,JR/MKC
Enclosure (2 pages)

Telephone 856-742-3000 · Telefax 856-742-3231

EXHIBIT "D"

A-97

 MBC LEASING CORP.

June 10, 2002

Mr. Thomas Holt, Sr., President
Emerald Equipment Leasing Company
101 S. King Street
Gloucester City, New Jersey 08030

Dear Tom:

Any money due from Sea Star for use of any of containers, gensets, and chassis previously leased by Emerald Equipment Leasing to NPR, Inc. and Holt Cargo Systems for a purpose other than completing shipments in progress on April 27 when Sea Star purchased certain assets of NPR and Holt Cargo should be paid directly to MBC Leasing. Any money due from Sea Star for use of any of the Emerald equipment to complete shipments in progress on April 27 should be paid in accordance with the memorandum that MBC understands exists between Sea Star and NPR, Holt Cargo, and possibly other affiliates to be allocated in accordance with the Bankruptcy Court's ruling on the allocation of the proceeds of sale to Sea Star.

Any money due from Sea Star for use of any of the 700 forty-foot dry van containers and the 283 forty-five-foot dry van containers MBC previously leased to NPR and Holt Cargo after May 15, 2002 for a purpose other than completing shipments in progress on April 27 should also be paid directly to MBC. Note that MBC believes it is entitled to money due from Sea Star for any use of the MBC equipment on or after April 27, 2002 through May 15, 2002 for a purpose other than completing shipments in progress on April 27. However, NPR and Holt Cargo may disagree because rejection of the MBC lease was effective May 15, 2002. Consequently, MBC is not insisting that money due from Sea Star for any use of the MBC equipment on or after April 27, 2002 through May 15, 2002 for a purpose other than completing shipments in progress on April 27 be paid to it at this time, but reserves all claims to that money.

Payments to MBC should be sent to me at 2 Hopkins Plaza, 5th Floor, Baltimore, Maryland 21201.

Sincerely,

Scott H. Kreeger
Treasurer & Assistant Secretary

SHK:sw
B1

Two Hopkins Plaza / P.O. Box 1451 / Baltimore, Maryland 21203 / (410) 237-5951

EXHIBIT