1

1       IN THE UNITED STATES DISTRICT COURT

2       FOR THE MIDDLE DISTRICT OF FLORIDA

3          JACKSONVILLE DIVISION

4        CASE NO. 3:04-CV-146-99HTS

5

6            - - -

7    SEA STAR LINE, LLC,                    :
     a limited liability company,           :
8     Plaintiff,                            :
          V.                                :
9    EMERALD EQUIPMENT LEASING, INC.,       :
     a corporation,                         :
10     Defendant.                           :

11

12

             - - -
13        December 8, 2004
             - - -
14
     Oral deposition of ARTHUR
15   B. DAVIS, held in the offices of Adelman
     Lavine Gold and Levin, Four Penn Center,
16   Philadelphia, Pennsylvania, 19103, commencing
     at 10:00 a.m., on the above date, before
17   Joseph Calavetta, a Federally-Approved
     Registered Professional Reporter and
18   Commissioner for the Commonwealth of
     Pennsylvania.
19
             - - -
20

21

22   ESQUIRE DEPOSITION SERVICES
     Fifteenth Floor
23   1880 John F. Kennedy Boulevard
     Philadelphia, Pennsylvania  19103
24   (215) 988-9191

        ESQUIRE DEPOSITION SERVICES

2

1                    - - -
         A P P E A R A N C E S :
2
           ARMSTRONG & MEJER, P.A.
3           BY:  TIMOTHY J. ARMSTRONG, ESQUIRE
           Suite 1111 Douglas Centre.
4           2600 Douglas Road
           Coral Gables, Florida  33134
5           305-444-3355
           Counsel for the Plaintiff
6

7           ADELMAN LAVINE GOLD AND LEVIN
           BY:  ALAN I. MOLDOFF, ESQUIRE
8           Four Penn Center, Suite 900
           Philadelphia, Pennsylvania  19103
9           215-568-7515
           Counsel for the Defendant
10

11           ALSO PRESENT:  JOHN EVANS AND
                       ANDY ROOKS
12

13                    - - -

14

15

16

17

18

19

20

21

22

23

24
           ESQUIRE DEPOSITION SERVICES

3

1                   I N D E X
                      - - -
2
          Testimony of:  Arthur B. Davis
3
              By Mr. Armstrong            7
4

5                      - - -
               E X H I B I T S
6                     - - -

7      EXHIBIT NO.   DESCRIPTION      PAGE MARKED

8      1    11-20-97 loan agreement        34

9      2    11-20-97 assignment            36

10     3    11-20-97 acknowledgement       38

11     4    4-26-02 document               40

12     5    order                          57

13     6    stipulation                    58

14     7    document                       59

15     8    document                       59

16     9    6-4 thru 6-02 e-mails          72

17     10   6-10-02 letter                 85

18     11   4-19-02 document               91

19     12   6-11-02 letter                 92

20     13   6-19-02 letter                 93

21     14   7-15-02 letter                 95

22     15   9-28-02 agreement              96

23     16   7-31-02 rental agreement       102

24     17   ind. contractor agreement      118

4

18   7-19-02 letter                    128

19   8-1-02 agreement          129

20   10-25-02 letter             131

21   11-13-02 letter             133

22   e-mail                            135

23   document                      136

24   3-27-03 letter              145

25   e-mails             148

26   document            153

27   8-27-03 letter              155

28   8-03 e-mails              156

29   4-24-03 telecopy          158

30   document            162

31   5-17-02 note              167

32   9-24-03 telefax           172

33   4-11-02 letter             224

34   e-mails             224

35   5-13-02 e-mails           227

36   6-7-02 e-mail              228

37   6-7-02 e-mail              229

38   memo             230

39   memo and list             231

40   7-12-02 memo             232

ESQUIRE DEPOSITION SERVICES

5

1

41   7-17-02 memo              233

2

42   7-18-02 letter            234

3

43   7-23-02 e-mail            234

4

44   8-9-02 e-mail             236

5

45   8-12-02 e-mail            237

6

46   10-4-02 e-mail            238

7

47   10-10-02 two e-mails      239

8

48   11-1-02 two e-mails       240

9

49   12-16-02 e-mail           241

10

50   document                  244

11

51   e-mail                    245

12

52   3-6-03 e-mail             249

13

53   3-19-03 e-mail            250

14

54   7-9-03 letter             250

15

55   document                  251

16

56   8-28-03 letter            252

17

57   11-26-03 e-mail           252

18

58   12-10-03 e-mail           253

19

59   1-14-04 handwritten document   254

20

60   2-19 & 21-04 two e-mails       255

21

61   e-mail                    256

22

62   5-11-04 handwritten document   256

23

63   8-11-04 e-mail            258

24

ESQUIRE DEPOSITION SERVICES

6

| | | | |
|---|---|---|---|
| 1 | 64 | 8-19-04 e-mail | 259 |
| 2 | 65 | 1-20-04 draft letter | 261 |

3                           - - -

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

ESQUIRE DEPOSITION SERVICES

7

1                    DEPOSITION SUPPORT INDEX

2

3

4        Direction To Witness Not To Answer
         Page  Line   Page  Line
5        None

6

7

8

9        Request For Production of Documents
         Page  Line   Page  Line
10       None

11

12

13       Stipulations
         Page  Line   Page  Line
14         5  2-9

15

16

17       Questions Marked
         Page  Line  Page  Line
18       None

19

20

21

22

23

24
                    ESQUIRE DEPOSITION SERVICES

8

1                   - - -

2                   (It is hereby

3          stipulated and agreed by and among

4          counsel that the sealing, filing

5          and certification are waived; and

6          that all objections, except as to

7          the form of the question, are

8          reserved to the time of trial.)

9                   - - -

10                  Arthur B. Davis, after

11         having first been duly sworn, was

12         examined and testified as follows:

13                  - - -

14             EXAMINATION

15                  - - -

16     BY MR. ARMSTRONG:

17         Q.    Please state your full

18     name.

19         A.    Arthur B. Davis.

20             MR. MOLDOFF:  Just

21         before you begin, so we are clear,

22         for the record, I confirm all

23         objections except as to the form

24         will be preserved until the time of

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                9

1    trial.

2        MR. ARMSTRONG:  That

3    is correct.  That is the rule.

4        MR. MOLDOFF:  That is

5    the standard rule.

6        Also I wanted to reflect we

7    are going to reserve the right for

8    the witness to read and sign.

9        MR. ARMSTRONG:  All

10    right.

11    BY MR. ARMSTRONG:

12        Q.    Mr. Davis, have you had

13    your deposition taken before?

14        A.    Yes, I have.

15        Q.    I am going to ask you some

16    questions.  If you don't understand any

17    of my questions ask me to repeat it, tell

18    me you didn't understand it, ask me to

19    repeat the question or rephrase the

20    question.

21        If at any time you want to

22    take a break, let us all know and we will

23    take a break.

24        You are here as

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis          10

1   representative of Emerald Equipment

2   Leasing, Incorporated pursuant to a

3   re-notice of taking deposition, are you

4   not?

5          A.    Yes.

6          Q.    What's your relationship

7   with Emerald Equipment Leasing,

8   Incorporated?

9          A.    At this time I am reviewing

10  the equipment that Emerald leased to Sea

11  Star Line and I am operating as basically

12  a consultant.

13         Q.    How long have you operated

14  as a consultant for Emerald Equipment

15  Leasing?

16         A.    Probably since around March

17  of 2001.

18         Q.    Have you ever been employed

19  by Emerald Equipment Leasing?

20         A.    No.

21         Q.    Have you ever been been an

22  officer of Emerald Equipment Leasing?

23         A.    Yes.

24         Q.    When were you an officer of

ESQUIRE DEPOSITION SERVICES

A-356

Arthur B. Davis                    11

1    Emerald Equipment Leasing?

2         A.    November of 1997 through

3    March of 2001.

4         Q.    What position did you

5    holed?

6         A.    I was president.

7         Q.    As president, what were

8    your duties and responsibilities?

9         A.    I oversaw the equipment.

10        Q.    What type of equipment?

11        A.    Chassis, containers,

12   generators.

13        Q.    This was Emerald equipment?

14        A.    That is correct.

15        Q.    What was the business of

16   Emerald?

17        A.    Emerald was a special

18   purpose entity that leased equipment to

19   NPR, Incorporated.

20        Q.    What is NPR, Incorporated?

21        A.    NPR, Incorporated was a

22   company that operated ships between the

23   United States and the Caribbean.

24        Q.    Did you have any

Arthur B. Davis                    12

1    relationship to NPR, Incorporated?

2          A.    I did.

3          Q.    What was your relationship?

4          A.    I was providing some

5    managerial services to NPR, Incorporated.

6          Q.    What type of managerial

7    services?

8          A.    I got involved with the

9    accounts payable system, purchasing,

10    insurance, accounts receivable.

11          Q.    Over what period of time,

12    did you provide those services?

13          A.    April of 2002 until April

14    26 of 2003.

15          Q.    2003 or 2002?

16          A.    2004.  I'm sorry.

17          Q.    What caused you to no

18    longer provide managerial services to

19    NPR, Incorporated?

20          A.    NPR, Incorporated was

21    bankrupt, Chapter 7 was filed so they

22    ceased to exist.

23          Q.    So when you ceased your

24    managerial services NPR, Incorporated

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                13

1    ceased to exist because it filed Chapter

2    7?

3        A.    That is correct.

4        Q.    All right.

5            MR. MOLDOFF:  For the

6    record, they filed Chapter 11, it

7    was later converted to a 7.

8            MR. ARMSTRONG:  They

9    filed a 7 in April of 2002.

10            MR. MOLDOFF:  It was

11    converted to a 7.

12            MR. ARMSTRONG:  Right.

13    BY MR. ARMSTRONG:

14        Q.    For how long prior to the

15    conversion to the Chapter 7, did you

16    provide managerial services to NPR,

17    Incorporated?

18        A.    From April of 1998 until

19    the Chapter 7 when they went out of

20    business.

21        Q.    Were you an officer of NPR,

22    Incorporated?

23        A.    No.

24        Q.    Were you a director of NPR,

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                    14

1    Incorporated?

2        A.    No.

3        Q.    Were you an employee of

4    NPR, Incorporated?

5        A.    No.

6        Q.    Were you paid by NPR,

7    Incorporated?

8        A.    No.

9        Q.    Who paid you for those

10    services?

11        A.    Holt Oversight & Logistical

12    & Technologies.

13        Q.    Were you involved in

14    providing managerial services with

15    respect to equipment used by NPR,

16    Incorporated?

17        A.    Yes.

18        Q.    What services did you

19    provide?

20        A.    I reviewed contracts for

21    various companies that they had leases

22    with, provided information on acquisition

23    of new equipment, the replacement of

24    equipment and that type of thing.

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                15

1          Q.     Did you review contracts

2     between NPR, Incorporated and Emerald

3     Equipment Leasing?

4          A.     Yes.

5          Q.     What was the purpose of

6     your review?

7          A.     The same as all of the

8     agreements.

9          Q.     What was the purpose with

10     respect to all of the agreements?

11          A.     To see what the contracts

12     and agreements were.

13          Q.     While you were providing

14     managerial services did NPR, Incorporated

15     inventory equipment on lease?

16          A.     They did.

17          Q.     Was that done on a regular

18     basis?

19          A.     Yes.

20          Q.     How often?

21          A.     I don't know.

22          Q.     Who was in responsible for

23     conducting such inventories?

24          A.     Inventories were maintained

ESQUIRE DEPOSITION SERVICES

A-361

Arthur B. Davis                16

1    by George Cervone.

2         Q.    Did you supervise George

3    Cervone?

4         A.    I worked with him.

5         Q.    Do you know whether NPR,

6    Incorporated prepared and maintained

7    lists of lost equipment?

8         A.    I am not sure at this time.

9         Q.    Have you ever seen any

10   inventories or lists of lost NPR,

11   Incorporated equipment?

12        A.    No, I don't believe so.

13        Q.    What did you do in working

14   with George Cervone?

15             MR. MOLDOFF:  Object

16             to the form of the question, too

17             overbroad.

18             You could answer.

19   A.    We reviewed what the equipment

20   needs of the company were as far as

21   quantities and types of equipment and

22   ages of equipment and we reviewed

23   proposals that I had received in regard

24   to new leases, requirements for new

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis          17

1    equipment.

2          Q.      And over what period of

3    time did you do that?

4          A.      Probably not long after I

5    started working in Edison in April of

6    1998 through maybe the middle of 2000.

7          Q.      Why did you stop in mid

8    2000?

9          A.      I am not sure of the exact

10   date, but at some point we had moved the

11   accounts payable from Arizona where it

12   was being handled back to Gloucester

13   City, New Jersey and at that point I

14   moved to Gloucester City and took over

15   the accounts payable department.

16             We had already recast the

17   leases with other parties, purchased new

18   equipment.  There was still involvement

19   between George and I, but not to the

20   extent that we had before.

21         Q.      When you refer to the

22   accounts payable department, are you

23   referring to the NPR, Incorporated

24   accounts payable department?

Arthur B. Davis                18

1     A.    Yes.

2         Q.    In connection with Emerald

3    Equipment Leasing, did you receive a

4    salary as president?

5         A.    No.

6         Q.    Were you paid for your

7    services to Emerald Equipment Leasing?

8         A.    No.

9         Q.    To whom did you report

10   while you were president of Emerald

11   Equipment Leasing?

12        A.    In what regard?

13        Q.    Was there one person to

14   whom you would report as president of

15   Emerald Equipment Leasing in regard to

16   your activities?

17             MR. MOLDOFF:  On

18        behalf of Emerald Equipment

19        Leasing?

20        A.    On behalf of Emerald

21   Equipment Leasing?

22        Q.    Yes.

23        A.    Tom Holt, Sr.

24        Q.    Who is Tom Holt, Sr?

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                19

1    Let me rephrase that.

2            What was Tom Holt, Sr.'s

3    position?

4        A.    In what?

5            MR. MOLDOFF:  Just

6        objection to the question being

7        overbroad.

8        Q.    In what capacity would you

9    report to Tom Holt, Sr?

10       A.    Well --

11           MR. MOLDOFF:  I

12       object.  There is no time frame,

13       maybe that will help.

14       A.    I am just confused about

15   your question.

16       Q.    As president of Emerald

17   Equipment Leasing, why would you report

18   to Tom Holt, Sr?

19       A.    Tom Holt, Sr was the owner

20   of NPR, Incorporated.

21       Q.    Was he also the owner of

22   Emerald Equipment Leasing?

23       A.    No.

24       Q.    Was Emerald Equipment

ESQUIRE DEPOSITION SERVICES

A-365

Arthur B. Davis                20

1    Leasing a subsidiary of NPR,

2    Incorporated?

3          A.    No.

4          Q.    Over what period of time

5    did you report to Tom Holt, Sr?

6          A.    I don't understand what you

7    are asking me.

8          Q.    From what time to what time

9    did you report to Tom Holt, Sr?

10          A.    In regard to what?

11          Q.    Did you begin reporting to

12    Tom Holt, Sr in 1998?

13          A.    In what context?

14          Q.    In any context?

15          A.    Well --

16              MR. MOLDOFF:  If you

17        know.

18          A.    I just don't understand the

19    area that we are talking about.

20          Q.    For what purposes would you

21    report to Tom Holt, Sr?

22              MR. MOLDOFF:  I object

23        to the question only to the extent

24        it assumes that he's reporting to

ESQUIRE DEPOSITION SERVICES

A-366

Arthur B. Davis                21

1      anybody.  I don't know whether you

2      were or you weren't, but there's an

3      assumption that you were reporting

4      to somebody.

5              So I think we first have to

6      lay a foundation as to whether or

7      not you were reporting to anybody.

8          Q.    Go ahead and answer the

9      question?

10         A.    I still don't understand

11     your question.  As what?

12         Q.    As anything?

13         A.    In what context?

14         Q.    Why would you report to Tom

15     Holt, Sr?

16         A.    In context of what, report?

17         Q.    In any context?

18         A.    To that I would have to say

19     I had employment that started at Holt in

20     1969, from that point I would have

21     reported to Tom Holt, Sr.

22         Q.    When you say you had

23     employment that started at Holt in 1969,

24     to what Holt are you referring?

ESQUIRE DEPOSITION SERVICES

A-367

Arthur B. Davis                22

1          A.     At that point I was

2     employed by Holt Cargo Systems,

3     Incorporated.

4          Q.     What is Holt Cargo Systems,

5     Incorporated?

6          A.     A corporation.

7          Q.     What is the business of

8     Holt Cargo Systems, Incorporated?

9          A.     Then or now?

10         Q.     Then?

11         A.     They were stevedores.

12         Q.     How long did Holt Cargo

13    Systems, Incorporated remain stevedores?

14         A.     Until the filing of Chapter

15    7.

16         Q.     Do you recall when that

17    was?

18         A.     April 26 of 2002.

19         Q.     You referred to Holt

20    Oversight, do you recall that?

21         A.     Yes.

22         Q.     What was the business of

23    Holt Oversight?

24         A.     Holt Oversight provided

ESQUIRE DEPOSITION SERVICES

A-368

Arthur B. Davis                23

1    managerial services, accounting services,

2    and computer services to various

3    companies.

4        Q.    Is Holtz oversight still in

5    business?

6        A.    Holt Oversight & Logistical

7    & Technologies is still in business.

8        Q.    Do you have any

9    relationship to Holt Oversight today?

10       A.    I am employed by Holt

11   Oversight & Logistical & Technologies,

12   Incorporated.

13       Q.    Are you an officer?

14       A.    No.

15       Q.    Are you a director?

16       A.    No.

17       Q.    Were you ever a director of

18   Emerald Equipment Leasing?

19       A.    No.

20       Q.    Does Emerald Equipment

21   Leasing have any business today?

22       A.    Emerald Equipment Leasing

23   today is under Chapter 7.

24       Q.    -- I'm sorry -- a Chapter

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                    24

1      11.

2              What is Emerald Equipment

3      Leasing's business under Chapter 11?

4              A.    Emerald Equipment Leasing

5      is in the business of leasing equipment.

6              Q.    To what entities does

7      Emerald lease equipment?

8              A.    None as of today.

9              Q.    When did Emerald stop

10     leasing equipment to anybody?

11             A.    As of November 30th of

12     2003.

13             Q.    What entities did Emerald

14     stop leasing equipment to as of November

15     30th of 2003?

16             A.    Sea Star Line.

17             Q.    Prior to November 30th of

18     2003 -- strike that.

19             Between April 1 of 2003 or

20     2002 rather and April 26 of 2002, to what

21     entities did Emerald lease equipment?

22             A.    NPR, Incorporated.

23             Q.    Did --

24             A.    -- And Holt Cargo Systems.

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                    25

1          Q.    Did Emerald lease equipment

2    to any entities other than NPR,

3    Incorporated and Holt Cargo Systems

4    during that period?

5          A.    No.

6          Q.    On April 26 of 2002, what

7    was your position with Emerald, if you

8    had any position?

9          A.    I'm sorry.  Which date?

10         Q.    April 26 of 2002?

11         A.    None.

12         Q.    All right.

13               Mr. Davis, on April 26 of

14   2002, did you have a position with NPR,

15   Incorporated?

16         A.    No.

17         Q.    Are you familiar with

18   Greenwich Terminals?

19         A.    Yes.

20         Q.    What is Greenwich

21   Terminals?

22         A.    Greenwich Terminals is a

23   stevedoring company.

24         Q.    Does Greenwich Terminals

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                    26

1     have any other business?

2          A.     I know that Greenwich

3     Terminals entered into an agreement to

4     rent facilities at Jacksonville, Florida.

5          Q.     When was that?

6          A.     The middle of July,

7     beginning of August of 2002.

8          Q.     Does Greenwich Terminals

9     still rent facilities at Jacksonville,

10    Florida?

11         A.     No, it does not.

12         Q.     When you used the term

13    stevedoring, what do you mean?

14         A.     Stevedores load and unload

15    ships, take cargo into or send cargo out

16    of the terminal, mount, dismount

17    containers, generators, they handle

18    handle cargo.

19         Q.     Are you including terminal

20    operations within your definition of

21    stevedore?

22         A.     Yes.

23         Q.     Does Greenwich Terminals

24    currently operate terminals?

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                    27

1        A.    They do.

2        Q.    Where does Greenwich

3    Terminals currently operate terminals?

4        A.    Philadelphia, Pennsylvania.

5        Q.    What is the name of that

6    terminal?

7        A.    Packer Avenue Marine

8    Terminal.

9        Q.    How long has Greenwich

10   Terminals operated the Packer Avenue

11   Marine Terminal?

12       A.    I think they started at the

13   end of April of 2002.

14       Q.    Do you know the

15   circumstances under which Greenwich

16   Terminals began operating Packer Avenue?

17       A.    I don't.

18       Q.    Was there ever any

19   relationship between Greenwich Terminals

20   and Emerald Equipment Leasing?

21       A.    Yes.

22       Q.    What was the relationship?

23       A.    Greenwich Terminals became

24   a contractor for Emerald Equipment

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis          28

1    Leasing in Jacksonville as well as

2    handling the equipment in Philadelphia.

3         Q.    When did Emerald Equipment

4    Leasing become a contractor for Emerald

5    in Jacksonville?

6         A.    I'm sorry.

7         Q.    When did Emerald become --

8    I'm sorry --

9              When did Greenwich

10   Terminals become a contractor for Emerald

11   in Jacksonville?

12             MR. MOLDOFF:

13             Objection to the question

14   only to the extent it's compound.

15             You should break it up

16   Jacksonville and then Philadelphia.

17             MR. ARMSTRONG:  I

18   haven't talked about Philadelphia

19   yet.

20             MR. MOLDOFF:  I

21   thought you asked about

22   Philadelphia and Jacksonville.

23             MR. ARMSTRONG:  No,

24   strictly Jacksonville.

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis          29

1          MR. MOLDOFF:  All

2     right.

3          THE WITNESS:  I

4     believe the middle of January --

5     I'm sorry - the middle of July of

6     2002.

7     MR. ARMSTRONG

8          Q.    Was there a written

9     agreement between Emerald Equipment

10    Leasing and Greenwich Terminals with

11    respect to the Jacksonville services?

12         A.    I don't know.

13         Q.    Do you recall ever seeing

14    one?

15         A.    No.

16         Q.    Have you ever seen a

17    written agreement between Greenwich

18    Terminals and anyone else with respect

19    to, or between Greenwich Terminals and

20    Emerald Equipment Leasing with respect to

21    the Packer Avenue services?

22         A.    No.

23         Q.    Are you familiar with MBC

24    Leasing, Incorporated?

Arthur B. Davis                    30

1       A.    I am.

2       Q.    How did you become aware of

3    MBC Leasing, Incorporated?

4       A.    I became aware that MBC

5    Leasing, Incorporated -- how did I become

6    aware of it?

7           I was advised that MBC

8    Leasing, Incorporated was going to

9    finance the chassis, containers and

10   generators for Emerald equipment.

11      Q.    When were you advised?

12      A.    November of 1997.

13      Q.    Who advised you?

14      A.    Bernard Gelman.

15      Q.    Who is Bernard Gelman?

16      A.    He was the CFO for Holt

17   Group, Incorporated.

18      Q.    Did you have any role in

19   negotiating contracts with MBC Leasing,

20   Incorporated?

21      A.    No.

22      Q.    Did you review contracts

23   between Emerald Equipment Leasing and MBC

24   Leasing, Incorporated?

ESQUIRE DEPOSITION SERVICES

A-376

Arthur B. Davis                    31

1          A.    I did.

2          Q.    What was the purpose of

3    your review as you understood it?

4          A.    I was reading the contracts

5    to know what was in the contract.

6          Q.    Why would you need to know

7    what was in the contract?

8          A.    As president of Emerald

9    Equipment Leasing I would have signed the

10   agreement.

11         Q.    Were you president of

12   Emerald Equipment Leasing in 1997?

13         A.    I was.

14         Q.    When did you become

15   president of Emerald Equipment Leasing?

16         A.    In 1997.

17         Q.    While you were president of

18   Emerald Equipment Leasing, did your

19   duties and responsibilities change at

20   all?

21         A.    Not really.

22         Q.    When you became president

23   of Emerald Equipment Leasing, did Emerald

24   Leasing have employees?

Arthur B. Davis                    32

1          A.    No.

2          Q.    While you were president of

3    Emerald Equipment Leasing, did Emerald

4    Leasing ever have employees?

5          A.    Not to my knowledge.

6          Q.    After you ended your tenure

7    as president of Emerald Equipment Leasing

8    and became an Emerald consultant, has

9    Emerald Equipment Leasing ever had any

10   employees?

11         A.    Not to my knowledge.

12         Q.    Who is responsible for

13   handling Emerald Equipment Leasing's

14   day-to-day operations?

15         A.    There are no operations

16   now.

17         Q.    Well, beginning -- while

18   you were president of Emerald Equipment

19   Leasing, who was responsible for handling

20   Emerald Equipment Leasing's day-to-day

21   operations?

22         A.    I just don't understand

23   what you're asking me.

24         Q.    Who maintained inventories

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                33

1   of Emerald equipment?

2        A.    Inventories were maintained

3   at NPR, Incorporated.

4        Q.    Was NPR, Incorporated

5   responsible for preparing and maintaining

6   the inventories?

7        A.    Yes.

8        Q.    Who did the billing for use

9   of Emerald equipment?

10        A.    I believe that was done at

11   NPR, Incorporated.

12        Q.    Did NPR, Incorporated bill

13   itself for using Emerald equipment?

14        A.    It was more an automatic

15   wire transfer of funds per the agreement.

16   It was a fixed amount.

17        Q.    Well, if the number of

18   pieces of equipment changed during any

19   period of time, did the amounts wired

20   change?

21        A.    I am not familiar that

22   there was, in fact a change in the number

23   of pieces.

24        Q.    Do you know whether there

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                    34

1    were any pieces lost by NPR,

2    Incorporated?

3         A.    I am sure that there were.

4         Q.    If pieces were lost, did

5    NPR, Incorporated continue to pay rent?

6         A.    If they didn't pay for the

7    equipment, yes.

8         Q.    Who would do the financial

9    calculations with respect to how much

10   NPR, Incorporated owed for lost

11   equipment?

12        A.    It was part of the

13   agreement.  There was a stipulated loss

14   value as part of the agreement.

15        Q.    Would NPR, Incorporated

16   determine what equipment was lost?

17        A.    That would be something

18   they would have to do, yes.

19        Q.    While NPR, Incorporated was

20   using the equipment, was any damaged, to

21   your knowledge?

22        A.    Yes.

23        Q.    Who was responsible for

24   calculating any amounts due for damaged

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                35

1    equipment?

2         A.    That would depend on if it

3    was going to be fixed or not.

4         Q.    Was that something that

5    NPR, Incorporated did?

6         A.    Certainly.

7         Q.    Did Emerald ever retain its

8    own surveyors to look at damaged

9    equipment?

10        A.    Not to my knowledge.

11        Q.    Let me show you a copy of a

12   document entitled Loan and Security

13   Agreement dated as of November 20th of

14   1997 which I will ask the court reporter

15   to mark as exhibit 1 for identification.

16              - - -

17              (Whereupon, Exhibit

18              Number 1 was marked for

19              identification.)

20              - - -

21        Q.    Do you recognize that

22   document?

23        A.    Yes.

24        Q.    Did you have any role in

ESQUIRE DEPOSITION SERVICES

A-381

Arthur B. Davis                    36

1    negotiating the loan and security

2    agreement?

3         A.    No.

4         Q.    When did you first see the

5    loan and security agreement?

6         A.    Probably not too long

7    before I signed it.

8         Q.    And did you sign the

9    original?

10         A.    I did.

11         Q.    Did anyone instruct you to

12    sign the original?

13         A.    I don't know what you are

14    asking.

15         Q.    Were you given instructions

16    to sign that document?

17         A.    Certainly.

18         Q.    Who instructed you to sign

19    that document?

20         A.    Bernard Gelman.

21         Q.    Mr. Gelman was CFO of what

22    entities?

23         A.    The Holt Group,

24    Incorporated.

Arthur B. Davis                    37

1          Q.    Is the Holt Group,

2     Incorporated a corporation to your

3     knowledge?

4          A.    I believe it was.

5          Q.    And do you know what the

6     business of the Holt Group, Incorporated

7     was?

8          A.    I am not sure.

9          Q.    Were you ever an employee

10    of the Holt Group, Incorporated?

11         A.    No.

12         Q.    Were you ever an officer of

13    the Holt Group, Incorporated?

14         A.    No.

15         Q.    Did you ever provide any

16    services for the Holt Group,

17    Incorporated?

18         A.    Probably.

19         Q.    Do you know what services

20    you provided for the Holt Group,

21    Incorporated?

22         A.    Not really.

23         Q.    Let me show you a copy of a

24    document entitled assignment of lease as

Arthur B. Davis            38

1    security and dated November 20th of 1997

2    which I will ask the court reporter to

3    mark as exhibit 2 for identification.

4                - - -

5                (Whereupon, Exhibit

6        Number 2 was marked for

7        identification.)

8                - - -

9    BY MR. ARMSTRONG:

10        Q.    Do you recognize that

11    document?

12        A.    Yes, I do.

13        Q.    Does your signature appear

14    on the last page?

15        A.    Yes, it does.

16        Q.    Were you instructed to sign

17    that document?

18        A.    Yes.

19        Q.    And who gave you those

20    instructions?

21        A.    Bernard Gellman.

22        Q.    Let me show you a copy of a

23    document entitled lessees notice consent

24    and acknowledgement dated November 20th

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                    39

1     of 1997 which I will ask the court

2     reporter to mark as exhibit 3 for

3     identification.

4                    - - -

5                    (Whereupon, Exhibit

6          Number 3 was marked for

7          identification.)

8                    - - -

9     BY MR. ARMSTRONG:

10         Q.     Do you recognize that

11    document?

12         A.     Yes, I do.

13         Q.     Does your signature appear

14    on the second page?

15         A.     It does.

16         Q.     Who instructed you to sign

17    that document?

18         A.     Bernard Gellman.

19         Q.     Who is Mark Goldman?

20         A.     He was a former employee at

21    Holt.

22         Q.     Which Holt?

23         A.     I don't know.

24         Q.     Do you know what his

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                40

1    position was?

2        A.    He was involved with the

3    warehouses.

4        Q.    Who is Ronald Katims?

5        A.    Ronald Katims was the

6    president of NPR, Incorporated.

7        Q.    Did Ron Katims have

8    anything to do with Emerald Equipment

9    Leasing?

10       A.    In what regard?  I will

11   answer it.  I don't know.

12       Q.    Who is Mario F. Escodero?

13       A.    Mario Escodero was

14   secretary at NPR, Incorporated.

15       Q.    Do you know what position

16   or what his duties were?

17       A.    He was an attorney.

18       Q.    Who is John A. Evans?

19       A.    He was secretary at Holt

20   Cargo Systems.

21       Q.    Do you know what his duties

22   were?

23       A.    No.

24       Q.    For what purpose did Holt

ESQUIRE DEPOSITION SERVICES

A-386

Arthur B. Davis        41

1    Cargo Systems lease equipment, if you

2    know?

3        A.    Let me back up for a moment

4    to Mr. Evans.  He was general counsel.

5    I'm sorry.

6        Q.    For what purpose did Holt

7    Cargo Systems, Incorporated lease

8    equipment if you know?

9        A.    I don't know.

10        Q.    Let me show you a document,

11    of a copy order, authorizing sale of the

12    NPR, Incorporated assets free and clear

13    of all liens claims and encumbrances

14    dated April 26 of 2002.

15        Do you recognize that

16    document which I will ask the court

17    reporter to mark as exhibit 4 for

18    identification?

19            - - -

20            (Whereupon, Exhibit

21        Number 4 was marked for

22        identification.)

23            - - -

24    BY MR. ARMSTRONG:

ESQUIRE DEPOSITION SERVICES

A-387

Arthur B. Davis                42

1          Q.    Have you seen this do

2      before?

3          A.    Yes.

4          Q.    Do you recall when you

5      first saw it?

6          A.    No.

7          Q.    Do you recall how long

8      after April 26 approximately had you

9      first saw the order?

10         A.    No.

11         Q.    Have you attend any of the

12     hearings in the Bankruptcy Court

13     pertaining to the sale of NPR,

14     Incorporated assets?

15         A.    No.

16         Q.    Have you ever read the

17     order?

18         A.    Yes.

19         Q.    Look at page 8, paragraph

20     13. Do you recall that provision?

21         A.    Yes.

22         Q.    Have you discussed that

23     provision with anyone other than your

24     attorney?

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                    43

1          A.     Yes.

2          Q.     With whom did you discuss

3     that provision?

4                 MR. MOLDOFF:  I object

5          to the question just to the extent

6          that it may call for trial

7          preparation or work product.

8                 I mean in what context are

9          you talking about?  Are you talking

10         about third parties?

11                At what point in time, in

12         preparation for this deposition,

13         litigation?

14                MR. ARMSTRONG:  I

15         think you are jumping the gun.  The

16         first question is with whom did you

17         discuss the provision?

18                THE WITNESS:  Tom

19         Holt, Sr.

20         Q.     When did you first have a

21    discussion with Tom Holt, Sr regarding

22    that provision?

23         A.     I couldn't say.  I don't

24    know.

ESQUIRE DEPOSITION SERVICES

A-389

Arthur B. Davis          44

1      Q.    Do you recall approximately

2  how long ago you first had a discussion

3  with Tom Holt, Sr regarding that

4  provision?

5      A.    Maybe this past summer

6          MR. MOLDOFF:  I renew

7      my objection.

8      Q.    Were you and Tom Holt, Sr

9  preparing to litigate against anyone in

10  regard to this provision?

11      A.    Well, the whole thing is in

12  litigation.

13      Q.    When did you decide that

14  you were going to litigate?

15      A.    I really don't recall the

16  date.

17      Q.    Prior to the filing of the

18  lawsuit, did you discuss this provision

19  with anyone?

20      A.    Possibly.

21      Q.    Do you recall?

22      A.    No.

23      Q.    Prior to the filing of the

24  lawsuit?

ESQUIRE DEPOSITION SERVICES

A-390

Arthur B. Davis          45

1          MR. MOLDOFF:  The

2     lawsuit you are talking about is

3     the lawsuit instituted in March of

4     2004 by Sea Star Line?

5     BY MR. ARMSTRONG:

6          Q.     Prior to March of 2004, do

7     you recall looking at paragraph 13 on

8     page 8 of the order?

9          A.     I am sure that I read the

10    order prior to March of 2004.

11         Q.     You don't recall how long

12    prior to March of 2004 you read the

13    order?

14         A.     That is correct.

15         Q.     And what was your purpose

16    in reading the order prior to March of

17    2004?

18         A.     Because this was an order

19    that was handed down by the Bankruptcy

20    Court.

21         Q.     When you read the order,

22    were you aware that Emerald Equipment

23    Leasing would be - Emerald equipment

24    would be stored on property and leased by

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                46

1     Sea Star Line as a result of the asset

2     sale?

3          A.     Yes.

4          Q.     When did you become aware

5     that equipment would be stored on Sea

6     Star Line property as a result of the

7     asset sale?

8          A.     Whenever it was that I read

9     this order.

10         Q.     Did you ever inventory

11    equipment stored on Sea Star Line

12    property as a result of the asset sale?

13             MR. MOLDOFF:  I just

14         object to the question, the form of

15         the question, to the extent that

16         I don't know whether whether you

17         mean Art Davis or anyone on behalf

18         of Emerald.

19             MR. ARMSTRONG:  I am

20         asking you.

21             THE WITNESS:  Would

22         you then repeat your question.

23             MR. ARMSTRONG:  Read

24         it back.

ESQUIRE DEPOSITION SERVICES

A-392

Arthur B. Davis                47

1                  - - -

2                  (Whereupon, the

3        pertinent portion of the record was

4        read.)

5                  - - -

6        A.    No.

7        Q.    Did you give anyone

8    instructions to inventory Emerald

9    equipment stored on Sea Star Line

10   property as a result of the asset sale?

11       A.    I don't think so.

12       Q.    Were you ever given

13   instructions to inventory equipment

14   stored on Sea Star Line property as a

15   result of the asset sale?

16       A.    No.

17       Q.    How did you expect to know

18   what equipment, what Emerald equipment

19   was stored ton Sea Star Line property as

20   a result of the asset sale?

21       A.    Quite frankly at the point

22   that I read this agreement it was a moot

23   point.

24       Q.    Why was that?

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                48

1          A.    Because there was an

2    agreement in place with Sea Star Line to

3    rent the equipment and Sea Star Line was

4    supposed to notify Emerald Equipment

5    Leasing as to what was there in the first

6    place.

7          Q.    When you are saying there

8    was an agreement in place with Sea Star

9    Line to rent the equipment, do you recall

10   when Sea Star Line and Emerald Equipment

11   Leasing entered into the agreement?

12         A.    May 1 of 2002.

13         Q.    And do you recall whether

14   the agreement applied to all NPR,

15   Incorporated equipment whether or not Sea

16   Star Line used it?

17         A.    It has nothing to do with

18   NPR, Incorporated, the equipment.

19         Q.    Do you recall whether it

20   applied to all equipment previously used

21   by NPR, Incorporated, whether or not Sea

22   Star Line used it?

23         A.    It applied to all equipment

24   that Sea Star Line would use.

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                    49

1      Q.    If Sea Star Line had

2    equipment that was stored on its property

3    pursuant to paragraph 13, how did you

4    expect to know what that equipment was?

5      A.    They had access to use all

6    of the equipment wherever it was and my

7    recollection is that there was a

8    requirement that Sea Star Line was going

9    to notify Emerald Equipment Leasing as to

10    what equipment was available.

11      Q.    As to what equipment was on

12    hired?

13      A.    When on hired certainly

14    because they were using it, as well as

15    what they physically had that was stored.

16      Q.    You were aware that there

17    was equipment that was stored on Sea Star

18    Line property that Sea Star was not

19    using, were you not?

20      A.    When?

21      Q.    After April 26 of 2002?

22      A.    At some point in time I

23    received information from Sea Star as to

24    what they said they were not going to be

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                50

1    using.

2        Q.    What steps did you take to

3    remove the equipment that was stored on

4    Sea Star Line's property from Sea Star

5    Line's location?

6        A.    At what point in time?

7        Q.    At any point in time?

8        A.    Well --

9        Q.    Beginning April 26 of 2002,

10   the date of the order which is identified

11   as exhibit 4?

12       A.    Well, equipment that was on

13   their premises that they were not --

14   allegedly not using, some was being sold

15   from the premises and other equipment was

16   taken off-site from the terminal.

17       Q.    What was your involvement

18   in selling equipment?

19       A.    I was selling equipment.

20       Q.    Were you working for any

21   particular entity in connection with the

22   sale of equipment?

23       A.    Sure.  I was an agent for

24   Greenwich Terminals.

Arthur B. Davis                    51

1     Q.    Do you know whether

2     Greenwich Terminals was working for any

3     particular entity in connection with

4     selling the equipment?

5          A.    Yes.

6          Q.    For what entity was

7     Greenwich Terminals working?

8          A.    MBC Leasing, Incorporated.

9          Q.    Do you know whether

10    Greenwich Terminals ever inventoried

11    equipment in storage on Sea Star Line

12    property?

13         A.    I know that I have.

14         Q.    When did you first

15    inventory equipment in storage on Sea

16    Star property?

17         A.    I don't know.

18         Q.    Do you recall whether it

19    was in 2002?

20         A.    Probably.

21         Q.    Do you recall where you

22    inventoried equipment on Sea Star

23    property during 2002?

24         A.    In the Sea Star terminal

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                52

1    itself, as well as what was referred to

2    as the showroom.

3        Q.    When you say the Sea Star

4    terminal, to what Sea Star terminal are

5    you referring?

6        A.    San Juan.

7        Q.    Do you recall when you

8    first went to San Juan to inventory

9    equipment, Emerald Equipment Leasing

10   equipment?

11       A.    No.

12       Q.    Did anyone go with you to

13   inventory equipment in San Juan?

14       A.    Not really.

15       Q.    How did you proceed to

16   proceed to inventory Emerald Equipment

17   Leasing equipment in the Sea Star Line in

18   San Juan?

19       A.    I would walk the terminal

20   and then write down unit numbers that I

21   saw.

22       Q.    Somewhere in your records

23   then you should have a handwritten list

24   of your first inventory of Emerald

ESQUIRE DEPOSITION SERVICES

A-398

Arthur B. Davis          53

1    equipment in San Juan?

2          A.    If I still have that, I

3    don't know if I have that.

4          Q.    After you wrote down the

5    information, what did you do with it?

6          A.    I would have faxed it back

7    to the office.

8          Q.    And was there a procedure

9    back at the office in dealing with your

10    faxed handwritten lists?

11          A.    I think the first time that

12    I actually started to do this was in

13    2003.

14          Q.    Prior to 2003, had any

15    Emerald representative inventoried

16    Emerald equipment at Sea Star Line

17    terminal in San Juan.

18              MR. MOLDOFF:  If you

19    know.  To your knowledge.

20          A.    I don't know.

21          Q.    Prior to 2003, had any

22    Greenwich Terminals representative

23    inventoried Emerald equipment in Sea Star

24    Line's terminal in San Juan?

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis          54

1           MR. MOLDOFF:  Again,

2      to your knowledge.

3           A.    I don't know.

4           Q.    Do you know whether there

5      was an inventory of Emerald equipment in

6      the terminal in San Juan by NPR,

7      Incorporated at any time on or before

8      April 26 of 2002?

9           A.    I don't know.

10          Q.    Have you ever inquired?

11          A.    I could only speculate and

12     I don't do that.

13          Q.    Have you ever asked anyone

14     for a NPR, Incorporated inventory of

15     Emerald equipment taken on or before

16     April 26th of 2002?

17          A.    Sure.

18          Q.    Whom did you ask?

19          A.    I would have asked George

20     Cervone.

21          Q.    Do you know, or do you

22     recall when you asked George Cervone?

23          A.    No.

24          Q.    Did George Cervone provide

ESQUIRE DEPOSITION SERVICES

A-400

Arthur B. Davis                55

1    you with an inventory or a copy of an

2    inventory?

3           A.     I am sure at some point he

4    did.

5           Q.     Did you review the

6    inventory?

7           A.     I am sure I did.

8           Q.     For what purpose did you

9    review the inventory?

10          A.     To see where equipment was

11   located.

12          Q.     Did you compare the

13   inventory with Emerald records as to

14   equipment on lease to NPR, Incorporated?

15          A.     No.

16          Q.     Have you ever compared NPR,

17   Incorporated inventories with Emerald

18   records as to equipment on lease to NPR,

19   Incorporated?

20          A.     No.

21          Q.     Did Emerald ever maintain

22   records as to equipment on lease to NPR,

23   Incorporated?

24          A.     As I said before that was

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                    56

1    done by NPR, Incorporated.

2        Q.    Did you ever ask Mr.

3    Cervone for any lists of lost Emerald

4    equipment on lease to NPR, Incorporated,

5    by lost I mean lost or missing?

6        A.    Not that I recall.

7        Q.    How could you determine

8    exactly what Emerald equipment was on

9    lease to NPR, Incorporated as of April 26

10   of 2002?

11       A.    It was all of the

12   equipment.

13       Q.    By all the of the

14   equipment, you are referring to equipment

15   whether it was actually in place or was

16   lost or missing?

17       A.    It was all of the equipment

18   that was in the schedules.

19       Q.    In what schedules?

20       A.    That were part of the

21   agreement.

22       Q.    What agreement?

23       A.    The agreement between

24   Emerald NPR, Incorporated and Holt Cargo

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                57

1    Systems.

2          Q.    Of that equipment, you have

3    no knowledge as to what pieces were

4    missing, is that correct?

5                MR. MOLDOFF:  If any.

6          I don't know we have established --

7          Object to the form of the question.

8                MR. ARMSTRONG:  Okay.

9          You may objection to the form.  Go

10         ahead and answer.

11         A.    Repeat the question.

12               MR. ARMSTRONG:  Go

13         ahead and repeat the question.

14               - - -

15               (Whereupon, the

16         pertinent portion of the record was

17         read.)

18               - - -

19         A.    Yes.

20         Q.    Have you ever attempted to

21    gain knowledge as to what pieces of

22    equipment, subject to an agreement

23    between Emerald and NPR, Incorporated or

24    an agreement between Emerald and Holt

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                58

1    Cargo Systems, were actually missing?

2        A.    No.

3        Q.    Order terminating the

4    automatic stay as to MBC Leasing,

5    Incorporated and certain assets of the

6    debtor which I will ask the court

7    reporter to mark this document as exhibit

8    5 for identification.

9              - - -

10             (Whereupon, exhibit

11       Number 5 was marked for

12       identification.)

13             - - -

14    BY MR. ARMSTRONG:

15       Q.    Do you recognize that

16    document?

17       A.    Yes.

18             - - -

19             (Whereupon, a short

20       recess was taken.)

21             - - -

22    BY MR. ARMSTRONG:

23       Q.    Let me show you a copy of a

24    document entitled stipulation between MBC

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                59

1    Leasing, Incorporated and debtors with

2    respect to adequate protection of

3    property which I will ask the court

4    reporter to mark as exhibit 6 for

5    identification.

6                - - -

7                (Whereupon, Exhibit

8        Number 6 was marked for

9        identification.)

10                - - -

11    BY MR. ARMSTRONG:

12        Q.    Do you recognize that

13    document?

14        A.    I don't really think I

15    remember the stipulation between MBC

16    Leasing, Incorporated and debtors.

17        Q.    Let me show you a copy of a

18    document entitled debtors - - MBC

19    Leasing, Incorporated responses,

20    objections and answers to MBC Leasing,

21    Incorporated Interrogatories which I will

22    ask the court reporter to mark as exhibit

23    7 for identification.

24                - - -

ESQUIRE DEPOSITION SERVICES

A-405

Arthur B. Davis                60

1          (Whereupon, Exhibit

2      Number 7 was marked for

3      identification.)

4              - - -

5      BY MR. ARMSTRONG:

6          Q.    Do you recognize that

7      document?

8          A.    I really don't remember the

9      debtor NPR, Incorporated's responses and

10     objections and --

11         Q.    Look at page 17, please do

12     you recognize the signature under NPR,

13     Incorporated?

14         A.    No.

15         Q.    Let me show you a copy of a

16     document entitled debtor, Holt Cargo

17     Systems, Incorporated responses to

18     objections and answers to MBC Leasing,

19     Incorporated Interrogatories which I will

20     ask the court reporter to mark as exhibit

21     8 for identification.

22              - - -

23          (Whereupon, Exhibit

24     Number 8 was marked for

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                61
1    identification.)

2                    - - -

3    BY MR. ARMSTRONG:

4        Q.    Do you recognize that

5    document?

6        A.    Not really.

7        Q.    Have you ever been told

8    that exhibit 7 and 8, NPR, Incorporated

9    and Holt cargo Answers to Interrogatories

10    exist?

11        A.    I don't know.

12        Q.    In exhibit 8, do you

13    recognize the signature under Holt Cargo

14    Systems, Incorporated?

15        A.    Not really.

16        Q.    Have you ever seen a

17    signature that appears like that?

18        A.    Yes.  Same signature as in

19    exhibit 7.

20        Q.    All right.

21            Mr. Davis, outside of

22    exhibit 7 and 8, have you ever seen a

23    signature that appears like that?

24        A.    Not that I could recall.

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                62

1      Q.      Have you ever heard the

2    name Scott Crieger?

3      A.      Yes.

4      Q.      How have you heard of the

5    name Scott Crieger?

6              MR. MOLDOFF:  If I

7      could go back for one second.  I am

8      not sure how Art answered the

9      question with respect to the

10     Interrogatories because I think

11     they were attached to the requests

12     for admission and Art, we may have

13     looked at that in connection with

14     with that, am I right?

15             THE WITNESS:  Right.

16             MR. MOLDOFF:  Other

17     than that I think your response

18     assumes other than maybe you have

19     just seen it.

20             THE WITNESS:  Um-hum.

21     Um-hum.

22             MR. MOLDOFF:  That's

23     why I wanted to make sure that the

24     record was clear about that.

Arthur B. Davis                63

1    BY MR. ARMSTRONG:

2          Q.    In what context have you

3    heard the name Scott Crieger?  How have

4    you?

5          A.    I have worked with Scott

6    Crieger.

7          Q.    How have you worked with

8    Scott Crieger?

9          A.    In regard to the Emerald

10   equipment.

11         Q.    What work have you done

12   with him in regard to the Emerald

13   equipment?

14         A.    Greenwich Terminals had an

15   arrangement with MBC Leasing,

16   Incorporated whereby they were an agent

17   for MBC Leasing, Incorporated to sell the

18   equipment, to sell Emerald's equipment.

19              They also were part of that

20   arrangement and they, through a separate

21   contractor, operated the terminal in

22   Jacksonville.

23         Q.    Who was that contractor?

24         A.    GTS.

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                64

1          Q.     Did MBC Leasing,

2     Incorporated compensate you, Arthur

3     Davis?

4          A.     No, they did not.

5          Q.     How were you compensated

6     for your services?

7          A.     I was paid by Holt

8     Oversight and Logistical Technologies.

9          Q.     Did you bill MBC Leasing,

10    Incorporated for your services?

11         A.     I did not.

12         Q.     Have you heard the name

13    Bill Hallam?

14         A.     Have I heard that name?

15         Q.     Yes.

16         A.     Yes.

17         Q.     In what context did you

18    heard that name?

19         A.     He's counsel for MBC

20    Leasing, Incorporated.

21         Q.     Have you had communications

22    with Mr. Hallam?

23         A.     I have.

24         Q.     What communications have

ESQUIRE DEPOSITION SERVICES

A-410

Arthur B. Davis                65

1    you had with Mr. Hallam?

2         A.    I have had communications

3    with him in regard to billing that we

4    received from Sea Star Line, invoices

5    that I provided to Sea Star Line,

6    information that I had asked Mr. Hallam

7    in regard to correspondence from Sea Star

8    Line.

9         Q.    When did you first

10   communicate with Mr. Hallam?

11        A.    I don't know.

12        Q.    Was it in 2002?

13        A.    I don't know.

14        Q.    Were any of your

15   communications with Mr. Hallam in

16   writing?

17        A.    I am not sure.

18        Q.    Did you send him any

19   e-mails?

20        A.    I may have.  I don't know.

21        Q.    And do you know where those

22   e-mails would be located if they exist?

23        A.    If they exist they would

24   have been provided to Sea Star.

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                66

1          Q.    Did you have a provision

2    for - a or a procedure for destroying

3    documents including e-mails after a

4    certain period of time?

5          A.    No.

6          Q.    Has Emerald had any such

7    procedure?

8                MR. MOLDOFF:  If you

9          know.

10         A.    Not to my knowledge.

11         Q.    Do you know whether Holtz

12   Oversight has had any such procedure?

13         A.    Not to my knowledge.

14         Q.    When you were e-mailing

15   people, what e-mail address would you

16   use?  Would it be an Emerald e-mail

17   address?

18         A.    Are you asking for my own

19   address?

20         Q.    Well, I am asking you -- it

21   is not a Sea Star Line address.  Would

22   you use a Holt Oversight address or an

23   Emerald Leasing address?  How would that

24   be handled?

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                67

1          A.     Are you asking me if it's

2     coming from me?

3          Q.     Yes.

4          A.     It would be a Holt

5     Oversight address.

6          Q.     And has it always been that

7     way?

8          A.     Yes.

9          Q.     Would you handle all of

10    your communications through the Holt

11    Oversight e-mail system?

12         A.     Yes, unless it was a

13    letter.

14         Q.     Did you send letters to Mr.

15    Hallam?

16         A.     I don't know.

17         Q.     Do you recall if you

18    received any letters from Mr. Hallam?

19         A.     Yes, I did.

20         Q.     Do you recall how many?

21         A.     No.

22         Q.     Do you recall the period of

23    time during which you received such

24    letters?

Arthur B. Davis                68

1      A.    No.

2          Q.    When you first went to work

3      for MBC Leasing, Incorporated through

4      Greenwich Terminals, of course, did you

5      have any discussions with anyone

6      concerning inventories of Emerald

7      equipment that had been used by NPR,

8      Incorporated?

9              MR. MOLDOFF:  I object

10             to the form, to the extent that

11             I am not sure that Mr. Davis

12             testified that he worked for MBC

13             Leasing, Incorporated through

14             Greenwich Terminals.

15                 I thought whatever you did

16             was through Holt Oversight.

17             MR. ARMSTRONG:  No.

18             It's through Greenwich Terminals;

19             is that correct?

20             THE WITNESS:  No.  I

21             am an employee of Holt Oversight.

22     BY MR. ARMSTRONG:

23         Q.    And did Holt Oversight have

24     a contract with MBC Leasing,

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                    69

1    Incorporated?

2        A.    No.

3        Q.    Greenwich Terminals had had

4    the contract with MBC Leasing,

5    Incorporated; is that correct?

6        A.    It did.

7        Q.    And you worked for MBC

8    Leasing, Incorporated through the

9    Greenwich Terminals contract, is that

10   correct?

11            MR. MOLDOFF:  If you

12       know.

13       A.    As an employee of Holt

14   Oversight I was an agent for Greenwich

15   Terminals.

16       Q.    And that was how you worked

17   for MBC Leasing, Incorporated; is that

18   correct?

19       A.    That's correct.

20       Q.    Getting back to my

21   question, when you began working for MBC

22   Leasing, Incorporated, was there any

23   discussion of inventories of equipment,

24   that is Emerald equipment used by NPR,

ESQUIRE DEPOSITION SERVICES

A-415

Arthur B. Davis                70

1    Incorporated?

2         A.    Not that I recall.

3         Q.    Did you ever tell anyone at

4    MBC Leasing, Incorporated that you didn't

5    know what Emerald equipment used by NPR,

6    Incorporated might have been missing on

7    or before April 26 of 2002?

8         A.    I don't believe so.

9         Q.    Did you ever tell Tom Holt,

10   Sr what Emerald equipment used by NPR,

11   Incorporated might have been missing on

12   or before April 26th of 2002?

13        A.    No.

14        Q.    Did he ever ask you whether

15   all of the Emerald equipment for which

16   NPR, Incorporated was paying was actually

17   in place on April 26th of 2002?

18        A.    No.  It is just not an

19   unusual situation that a leasing company

20   would have equipment with a lessee that

21   they may have misplaced, may have had

22   damaged, that they continued to pay for

23   the lease payment on the piece of

24   equipment and never report that it was

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                    71

1   lost, stolen, damaged or whatever.  It is

2   not an unusual thing.

3          Q.     Is that your understanding

4   of what NPR was doing?

5          A.     That is my understanding in

6   the industry.

7          Q.     Is that your understanding

8   of what NPR was doing?

9          A.     I don't know that NPR lost

10   any equipment.

11          Q.     Did you ever investigate

12   whether NPR, Incorporated lost any

13   equipment?

14          A.     I did not.

15          Q.     As president of Emerald you

16   were never asked to investigate whether

17   NPR lost any equipment?

18          A.     That is correct.

19          Q.     Now, did you ever

20   investigate after April 26th of 2002

21   whether NPR, Incorporated lost any

22   equipment?

23          A.     I did not.

24          Q.     What does the term POS mean

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                    72

1    if you know?

2         A.    Permanently out of service.

3         Q.    Have you seen that term in

4    connection with Emerald equipment on

5    lease to NPR?

6         A.    Yes.

7         Q.    What does that mean in the

8    industry?

9         A.    To me it would mean that a

10    piece of equipment, that that particular

11    piece of equipment might require more

12    money to repair to put it back into

13    proper working order than the company

14    would want to spend at that time.

15        Q.    Do you know whether NPR,

16    Incorporated paid rent for equipment that

17    was POS?

18        A.    They did.

19        Q.    Do you know what happened

20    to the Emerald equipment that was POS

21    after April 26th of 2002?

22        A.    I couldn't say on a general

23    basis.

24        Q.    Did you ever inventory

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                73

1     equipment that had been identified as POS

2     in the NPR documents?

3          A.     No.

4          Q.     I will show you a copy of a

5     document consisting of e-mails dated June

6     4th through June 7th of 2002, which I

7     will ask the court reporter to mark as

8     exhibit 9 for identification.

9                    - - -

10                  (Whereupon, Exhibit

11              Number 9 was marked for

12              identification.)

13                    - - -

14     BY MR. ARMSTRONG:

15          Q.     Have you ever seen those

16     e-mails before or any of them before?

17          A.     I don't think so.  I don't

18     remember seeing these e-mails.

19          Q.     Look at the e-mail from

20     Bill Hallam on the second page, do you

21     see that?

22          A.     I do.

23          Q.     It is to T. Holt, Jr at

24     holt marine dot com.  Do you know who T.

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                 74

1     Holt, Jr is?

2          A.    I do.

3          Q.    Who is that?

4          A.    Tom Holt, Jr.

5          Q.    What was Tom Holt, Jr's

6     connection with you with Emerald?

7          A.    I am not sure.

8          Q.    What is Holt Marine?

9          A.    That's his e-mail address.

10         Q.    Is that a company?

11         A.    Holt Marine at one time was

12    a company.

13         Q.    What was the business of

14    Holt Marine?

15         A.    Holt Marine Terminal,

16    Incorporated was a stevedoring company.

17         Q.    Where was Holt Marine

18    Terminal, Incorporated located?

19         A.    Gloucester City, New

20    Jersey.

21         Q.    Does Holt Marine terminal,

22    Incorporated still exist?

23         A.    Not to my knowledge.

24         Q.    There's a -- if you look in

Arthur B. Davis                    75

1      the middle of the page it says this rent

2      is in addition to such amounts as Sea

3      Star has agreed to pay NPR, Incorporated

4      and Holt Cargo Systems for the use of

5      equipment not purchased by Sea Star to

6      complete shipments in process as of three

7      o'clock a.m. on April 27th of 2002.  Do

8      you see that?

9           A.    Yes.

10          Q.    Have you ever heard had the

11     term shipments in process in connection

12     with the Emerald equipment?

13          A.    I have.

14          Q.    When did you first hear

15     that term?

16          A.    When I read some of the

17     court documents from federal court.

18          Q.    From the Bankruptcy Court?

19          A.    From the Bankruptcy Court.

20          Q.    And what was your

21     understanding then of shipments in

22     process?

23          A.    My understanding is that it

24     had to do with the equipment that was on

ESQUIRE DEPOSITION SERVICES