Arthur B. Davis                76

1    board the three vessels as of, I think it

2    was two o'clock or three o'clock in the

3    morning on April 27th.

4         Q.    And were you aware that

5    payments for shipments in process would

6    be made to NPR?

7         A.    I became aware of that.

8         Q.    When did you become aware

9    of that?

10        A.    I really don't know the

11   exact time.  Most recently during this

12   litigation.

13        Q.    Did you ever identify

14   equipment involved in shipments in

15   process?

16        A.    That was an impossible task

17   for me to do.

18        Q.    Why was that?

19        A.    Because although we asked

20   that Sea Star provide manifests many

21   times, they refused to do so.

22        Q.    Well, now, the equipment

23   that was on board the vessels as of three

24   o'clock a.m. on April 27th of 2002, was

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                77

1     listed in NPR, Incorporated manifests,

2     was it not?

3          A.     It was.

4          Q.     Did you ever review NPR's

5     manifests?

6          A.     I did not.

7          Q.     Did you ever ask NPR for

8     manifests?

9          A.     There was no NPR,

10     Incorporated.

11          Q.     NPR, Incorporated was

12     located in Gloucester City; is that

13     correct?

14          A.     No.

15          Q.     Where was NPR, Incorporated

16     located?

17          A.     Edison, New Jersey.

18          Q.     With respect to NPR,

19     Incorporated's records, where were those?

20          A.     They would have been with

21     the trustee.

22          Q.     And then are you saying

23     that at three o'clock a.m. on April 27th

24     of 2002 NPR, Incorporated's records

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                78

1    disappeared?

2        A.    No.

3        Q.    Did you ever ask the NPR,

4    Incorporated's trustee for the manifests

5    of these vessels as of three o'clock a.m.

6    on April 27th of 2002?

7        A.    I did not.  I continuously

8    asked Sea Star who had the manifests to

9    provide the manifests.

10       Q.    And have you ever heard

11   manifests from Sea Star?

12       A.    Never.

13       Q.    Sir, are you aware of

14   documents produced in this case?

15       A.    I am.

16       Q.    Have you reviewed those

17   documents?

18       A.    I have.

19       Q.    Did you review any of the

20   documents beginning with numbers SE 902

21   through SE 13,062?

22       A.    What is that designated?

23       Q.    Those are manifests from

24   4-27-2002 through 4-30-2004?

ESQUIRE DEPOSITION SERVICES

A-424

Arthur B. Davis                79

1          A.    I did look look at those

2     documents and they are in fact not

3     manifests.

4          Q.    What are they?

5          A.    They are loading reports

6     that were put together by Sea Star

7     employees allegedly from the original

8     documents.

9          Q.    When you say allegedly,

10     what do you mean?  Do you have any

11     question about what they are?

12          A.    Positively.  They are not

13     the original document.

14          Q.    Are you familiar with

15     preparation of manifests?

16          A.    Somewhat.

17          Q.    To what extent are you

18     somewhat familiar with the preparation of

19     manifests?

20          A.    I have my own understanding

21     as to how a manifest is prepared.

22          Q.    Have you ever prepared

23     manifests?

24          A.    I did not.

Arthur B. Davis                80

1          Q.     Have you ever had a job

2     where it was your duty to review

3     manifests?

4          A.     No.

5          Q.     Do you know whether there

6     are uniform methods of preparing

7     manifests?

8          A.     I would think that there

9     are because there are requirements that

10    manifests in this case be filed with

11    organizations such as U.S. Bureau of

12    Customs, U.S. Coast Guard both in the

13    United States, Department De Hacienda,

14    the Department of the Home or the House

15    of Customs in Puerto Rico and this is how

16    equipment or the contents is tracted as

17    to who shipped what and where, if duties

18    had to be paid, was it contraband and so

19    forth.

20          And it also allows that if

21    somebody -- said I got ten bales of

22    feathers in here and it turns out that it

23    is steel pipe.  Then they have -- they,

24    the government agency, has the ability to

Arthur B. Davis                81

1     go after the shipper and/or the receiver.

2          Q.     Did you ever go to any of

3     these agencies that you have mentioned

4     and asked to review the NPR, Incorporated

5     manifests for the voyages in process as

6     of three o'clock a.m. on April 27th of

7     2002?

8          A.     Not yet.

9          Q.     Do you plan to?

10         A.     We might.

11         Q.     When?

12         A.     I don't know that.

13         Q.     Did you make any effort to

14    determine what shipments were in process

15    as of April 27th of 2002 at three o'clock

16    a.m. other than to ask Sea Star for

17    manifests?

18         A.     I asked Sea Star for

19    manifests and I was told that the

20    manifests were at one point copied and

21    were available to be shipped.

22              They never shipped them,

23    they never provided them.

24         Q.     Were you also invited to

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                82

1    come to Jacksonville to review the

2    manifests?

3          A.    I was.

4          Q.    Did you go to Jacksonville

5    to review the manifests?

6          A.    I did not.

7          Q.    All right.

8          A.    I was told I would not be

9    able to capture any information in any

10   manner from the manifests.

11         Q.    Who told you that?

12         A.    I don't remember if it was

13   Phil Bates or Andy Rooks.

14         Q.    Do you know what was meant

15   by quote any information in any manner

16   unquote?

17         A.    Yes.  I was told I would

18   not be able to write it, I would not be

19   able to put it into a computer, I would

20   not be able to photocopy it.

21               I would be allowed to look

22   at the piece of paper period.  That I

23   could not leave with any type of

24   document.

ESQUIRE DEPOSITION SERVICES

A-428

Arthur B. Davis                83

1          Q.     When did you first begin

2    examining the documents that were

3    produced as manifests in this case?

4          A.     I don't understand your

5    question.

6          Q.     It is a very simple

7    question.

8                 When did you first begin to

9    examine the documents that were produced

10   as manifests in this case?

11         A.     Are you asking me the load

12   reports that were produced?

13         Q.     What do you mean when you

14   say load reports?

15         A.     That's not a manifest.  It

16   is whatever is entitled on the document

17   and whatever the document is entitled

18   that's what I mean.

19         Q.     So if the document is

20   entitled load report you are saying

21   that's not a manifest?

22         A.     It is in fact not a

23   manifest and even Sea Star said it is not

24   a manifest.

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                84

1          Q.     When did Sea Star say it is

2    not a manifest?

3          A.     In their e-mails.

4          Q.     Whose e-mails?

5          A.     Phil Bates.

6          Q.     Phil Bates told you that

7    the documents that you have been

8    reviewing are not manifests?

9          A.     No, he didn't tell me.  He

10   sent the e-mail to other people at Sea

11   Star.

12         Q.     Who were those other

13   people?

14         A.     I don't recall.

15         Q.     When did he send the

16   e-mail?

17         A.     After they finished the

18   input of all of the material from the

19   manifests, he commended his staff on

20   doing a good job of taking information

21   from the e-mails -- from the manifests.

22   I'm sorry.

23         Q.     And you are saying that

24   these documents that were produced are

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis          85

1    not the quote manifests unquote that Phil

2    Bates was referencing?

3         A.     They are not manifests

4    period.

5         Q.     And other than the fact

6    that you say they are entitled load

7    reports?

8         A.     They are not a manifest

9    period.  They are not a manifest.  No

10   other way to say that.

11        Q.     Well, yes, there is.  What

12   are the factors involved in preparing a

13   complete manifest in your view?

14        A.     The manifests will show the

15   vessel.  It is a specific form that the

16   government puts out.  And all of that

17   form has to be filled in showing every

18   piece of equipment that's loaded onto or

19   taken -- then taken from the vessel.

20        Q.     Taken from the vessel?

21        A.     When you have a discharge,

22   the stevedore, when they discharge a

23   ship, would have a copy of the manifest

24   to show what is supposed to come off that

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                86

1    report -- off that ship, I'm sorry, and

2    be able to compare what he discharged

3    back to the manifests, that's why the

4    manifest is so important.

5        Q.    The discharging stevedore

6    doesn't prepare a manifest, does he?

7        A.    He does not, but he uses

8    the manifests to confirm that he took

9    off.

10       Q.    Let me show you a copy of a

11   letter dated June 10 of 2002 which I will

12   ask the court reporter to mark as exhibit

13   10 for identification.

14           - - -

15           (Whereupon, Exhibit

16   Number 10 was marked for

17   identification.)

18           - - -

19   BY MR. ARMSTRONG:

20       Q.    Do you recognize that

21   document?

22       A.    Yes, I do.

23       Q.    When did Tom Holt, Sr

24   become president of Emerald Equipment

ESQUIRE DEPOSITION SERVICES

A-432

Arthur B. Davis                87

1    Leasing?

2        A.    I think March or April of

3    2001.

4        Q.    Is Tom Holt, Sr still

5    president of Emerald Equipment Leasing?

6        A.    Yes.

7        Q.    Did he succeed you as

8    president?

9        A.    Yes.

10        Q.    When did you become aware

11    that payments due for equipment not used

12    in shipments in process or not for a

13    purpose other than completing shipments

14    in process on April 27th, would be made

15    to MBC Leasing, Incorporated?

16        A.    I am not sure exactly.

17        Q.    Did you ever have any

18    discussions with Tom Holt, Sr regarding

19    the contents of this letter?

20        A.    No.

21        Q.    Did you ever have any

22    discussions with Tom Holt, Sr regarding

23    payments for shipments in progress to

24    NPR, Incorporated?

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                    88

1          A.    I don't understand that

2    question.

3          Q.    Did you and Tom Holt, Sr

4    ever discuss the fact that Sea Star

5    Line's payments for equipment used in

6    shipments in progress would be paid for

7    MBC Leasing, Incorporated or Holt Cargo

8    Systems?

9               MR. MOLDOFF:  You mean

10              in process.

11              MR. ARMSTRONG:  I used

12              the term process others use the

13              term progress.

14              MR. MOLDOFF:  And the

15              transcript I think when this was

16              all discussed at the hearing said

17              in transit.  I think we are all

18              talking about the same thing.

19              MR. ARMSTRONG:  That

20              is correct.

21              THE WITNESS:  I don't

22              recall any conversations.

23    BY MR. ARMSTRONG:

24          Q.    When did you first become

ESQUIRE DEPOSITION SERVICES

A-434

Arthur B. Davis                89

1    aware of the payments by Sea Star for

2    shipments in process or progress or

3    transit as of April 27th of 2002 would be

4    made to NPR, Incorporated?

5        A.    Probably when I met with

6    Andy Rooks last August of 2003 at

7    Jacksonville.

8        Q.    When you heard that, did

9    you go back and discuss it with Tom Holt,

10   Sr?

11       A.    No.

12       Q.    Did you discuss it with

13   anyone?

14       A.    I believe I had some

15   discussion with Scott Crieger in that

16   regard.

17       Q.    What did you say to Scott

18   Crieger?

19       A.    I asked him for his

20   understanding of what was happening

21   there.

22       Q.    What did he tell you?

23       A.    He had sent a letter or had

24   Bill Hallam send a letter, I am not

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis          90

1    exactly sure, but there was certainly a

2    question of what was involved there.

3              Andy Rooks had told me

4    prior to our meeting that there was an

5    agreement.  I had asked Andy for a copy

6    of the agreement.

7              He told me that Bob Leach

8    would have to get it for me.  Bob Leach

9    wasn't available when I was in

10   Jacksonville.

11             I asked again for copies of

12   what that agreement was supposed to be so

13   that the correct amounts could be applied

14   to the billing and I never did receive

15   any paperwork from this agreement at all.

16        Q.    Did you ever ask the NPR

17   bankruptcy lawyer for a copy of the

18   agreement?

19        A.    I did not.

20        Q.    Did you ever ask Emerald's

21   bankruptcy lawyer for a copy of the

22   agreement?

23        A.    At one point I probably

24   did.

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                    91

1          Q.    Do you recall?

2          A.    I think I did.

3          Q.    When did you first see a

4    copy of the agreement?

5          A.    It was certainly after the

6    August meeting with Sea Star.

7          Q.    Other than for shipments in

8    process, to what entity was Sea Star to

9    make payments for equipment, for Emerald

10   equipment after April 27th of 2002?

11         A.    They were paying the funds

12   to MBC Leasing, Incorporated.

13         Q.    How long was Sea Star to

14   pay the funds to MBC Leasing,

15   Incorporated?

16         A.    I don't understand your

17   question.

18         Q.    Why was Sea Star to pay the

19   funds to MBC Leasing, Incorporated rather

20   than Emerald?

21               MR. MOLDOFF:  If you

22         know.

23         Q.    If you know?

24         A.    My understanding is that

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                92

1    MBC Leasing, Incorporated held a lien,

2    they were the secured creditor on the

3    equipment, and my recollection is that

4    there was a lifting of the stay and that

5    MBC Leasing, Incorporated was allowed to

6    receive the money to reduce the amount of

7    the loan.

8        Q.    Let me show you a copy of a

9    document dated April 19th of 2002, which

10   I will ask the court reporter to mark as

11   exhibit 11 for identification.

12           - - -

13           (Whereupon, Exhibit

14       Number 11 was marked for

15       identification.)

16           - - -

17   BY MR. ARMSTRONG:

18       Q.    Have you ever seen that

19   document?

20       A.    Yes, I believe I have seen

21   this.

22       Q.    Do you recall when you

23   first saw it?

24       A.    As part of the production

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                93

1   of documents.

2          Q.    Did you discuss that

3   document with anyone?

4          A.    No.

5          Q.    Let me show you a copy of a

6   letter dated June 11 of 2002, together

7   with attachment which I will ask the

8   court reporter to mark as exhibit 12 for

9   identification.

10               - - -

11               (Whereupon, Exhibit

12         Number 12 was marked for

13         identification.)

14               - - -

15   BY MR. ARMSTRONG:

16         Q.    Have you seen that letter

17   before?

18         A.    Yes.

19         Q.    Do you recall when you

20   first saw it?

21         A.    As part of the production

22   of documents.

23         Q.    Do you recognize the

24   signature on the first page?

ESQUIRE DEPOSITION SERVICES

A-439

Arthur B. Davis                    94

1          A.    I am not sure.

2          Q.    Let me show you a copy of a

3    letter dated June 19 of 2002 which I will

4    ask the court reporter to mark as exhibit

5    13 for identification.

6                - - -

7                (Whereupon, Exhibit

8    Number 13 was marked for

9    identification.)

10               - - -

11   BY MR. ARMSTRONG:

12         Q.    Have you seen that letter

13   before?

14         A.    Yes, I have seen this

15   before.

16         Q.    When did you first see that

17   letter?

18         A.    I believe at the time of

19   the document production.

20         Q.    You had never seen it

21   before that time?

22         A.    I don't recall it.

23         Q.    You did not receive a copy

24   from Mr. Hallam?

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                95

1    A.    I don't recall receiving

2    seeing it before then.

3    Q.    Did you and Mr. Hallam have

4    any communications regarding the contents

5    of that letter or the subject matter of

6    that letter?

7              MR. MOLDOFF:  Take

8         your time because it is a long

9         letter.

10              THE WITNESS:  I am

11         going to read this.

12              - - -

13              (Whereupon, a short

14         recess was taken.)

15              - - -

16              MR. MOLDOFF:  If you

17         don't remember you could say you

18         don't remember.  It's maybe helpful

19         if counsel directed you to a

20         portion of that letter.

21              MR. ARMSTRONG:  No.

22         We will start --

23              MR. MOLDOFF:  -- all

24         right.

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                96

1           THE WITNESS:  No.

2           Q.    Did you have any

3    communications with Mr. Crieger

4    concerning any of the contents of that

5    letter?

6           A.    I said I recall -- I think

7    I remember talking with Scott Crieger

8    about money that was being paid to NPR,

9    Incorporated for what was on board the

10   vessels.

11          Q.    Let me show you a copy of a

12   letter dated July 15 of 2002 which I will

13   ask the court reporter to mark as exhibit

14   number 14 for identification.

15               - - -

16               (Whereupon, Exhibit

17   Number 14 was marked for

18   identification.)

19               - - -

20   BY MR. ARMSTRONG:

21          Q.    Do you recognize that

22   letter?

23          A.    Yes.

24          Q.    When did you first see that

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                97

1    letters?

2         A.    I don't recall.

3         Q.    Do you recall approximately

4    how long after at the time date of the

5    letter you first saw it?

6         A.    I do not.

7         Q.    Do you remember whether you

8    saw it prior to this lawsuit?

9         A.    I believe I have.

10         Q.    Did you ever any

11    discussions with Scott Crieger or Bill

12    Hallam regarding the contents of that

13    letter?

14         A.    I don't believe so.

15         Q.    Let me show you a copy a

16    document entitled indemnity agreement,

17    dated September 28 of 2002 which I will

18    ask the court reporter to mark as exhibit

19    15 for identification.

20              - - -

21              (Whereupon, Exhibit

22    Number 15 was marked for

23    identification.)

24              - - -

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                    98

1    BY MR. ARMSTRONG:

2          Q.    Have you seen that document

3    before?

4          A.    Yes.

5          Q.    When did you first see that

6    document?

7          A.    I am not sure.

8          Q.    Did you see it prior to the

9    filing of this lawsuit?

10         A.    Yes.

11         Q.    Did you and Scott Crieger

12    have any communications regarding the

13    indemnity agreement?

14         A.    Yes.

15         Q.    When did you first have

16    communications regarding the indemnity

17    agreement?

18         A.    I am not sure as to time.

19         Q.    How many communications do

20    you recall having with Scott Crieger

21    regarding the indemnity agreement?

22         A.    Not a few.

23         Q.    Did you contact Scott

24    Crieger regarding the indemnities

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                    99

1     agreement?

2          A.    I did.

3          Q.    And what was your purpose

4     in contacting him?

5          A.    I was advised by either

6     Phil Bates or Andy Rooks that an

7     indemnity agreement was in place and that

8     indemnified them Sea Star from having to

9     pay Emerald additional monies that we had

10    invoiced to them.  Invoices we provided

11    to them for equipment that we said they

12    used and billed out accordingly.

13         Q.    And do you recall whether

14    Mr. Bates or Mr. Rooks made these

15    statements during your meeting in

16    Jacksonville?

17         A.    I don't recall.

18         Q.    When you contacted Mr.

19    Crieger what did you say?

20         A.    I asked what the indemnity

21    agreement was about.

22         Q.    Did he give you a copy of

23    it?

24         A.    I believe either he sent it

ESQUIRE DEPOSITION SERVICES

A-445

Arthur B. Davis                    100

1        or Bill Hallam sent it.

2                Q.      What did he tell you the

3        indemnity agreement was about?

4                A.      It was about indemnifying

5        Sea Star from a third party claim - I'm

6        sorry - a third party claimant.

7                Q.      You reviewed the indemnity

8        agreement after you received it?

9                A.      I think I did, yes.

10               Q.      And you saw indemnity

11       agreement that the quote third party

12       claimant to which you referred would

13       include Emerald Equipment Leasing?

14                   MR. MOLDOFF:  I object

15               to the extent this document speaks

16               for itself, but he can answer as to

17               his understanding of the document.

18                   THE WITNESS:  I don't

19               know where that would be in this

20               document.

21               Q.      Do you recall the reference

22       to Emerald, NPR, Incorporated, Holt Cargo

23       or any party claiming under or through

24       them jointly and severally quote

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                101

1   competing claimants unquote?

2         A.    I could only say to the

3   extent, whatever it is that you just read

4   is here, that it is here.

5         Q.    Did you ask Scott Crieger

6   how the indemnity agreement might affect

7   any claim made by Emerald Equipment

8   Leasing?

9         A.    Certainly.

10        Q.    What did he tell you?

11        A.    That it was generally

12  nonsense.

13        Q.    What was generally

14  nonsense?

15        A.    That Sea Star Line would

16  say that monies that they have to pay for

17  equipment that they used would not be

18  discharged just because they decided they

19  weren't going to pay it.

20              If they used the equipment

21  they had to pay for the use of the

22  equipment, for the time that it was in

23  use.

24        Q.    And that's what Scott

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                    102

1      Crieger told you?

2            A.    That's what we discussed.

3            Q.    Did you have any other

4      communications with Scott Crieger

5      regarding the indemnity agreement?

6            A.    Yes.

7            Q.    What was the subject of

8      those communications?

9            A.    Well --

10           Q.    -- Or what was the subject?

11           A.    He told me he had

12     conversations with Phil Bates and that

13     Phil Bates agreed they had no standing to

14     not paying for the equipment that they

15     were using.

16           Q.    Do you recall when that

17     communication was?

18           A.    Not really.

19           Q.    Did you have any other

20     communications with Scott Crieger

21     regarding the indemnity agreement?

22           A.    No.

23           Q.    Did you have any

24     communications with Mr. Hallam regarding

ESQUIRE DEPOSITION SERVICES

A-448

Arthur B. Davis                103

1    the indemnity agreement?

2         A.    I don't recall.

3         Q.    Did you have any

4    communications with Tom Holt, Sr

5    regarding the indemnity agreement?

6         A.    Not that I recall.

7         Q.    Did you have any

8    communications with Tom Holt, Jr

9    regarding the indemnity agreement?

10        A.    I don't know.

11        Q.    I will show you a copy of a

12   document entitled equipment rental

13   agreement, dated as of July 31st of 2002,

14   which I will ask the court reporter to

15   mark as exhibit 16 for identification.

16             - - -

17             (Whereupon, Exhibit

18        Number 16 was marked for

19        identification.)

20             - - -

21   BY MR. ARMSTRONG:

22        Q.    Do you recognize that

23   document.

24        A.    Yes, I do recognize this

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                104

1    document.

2        Q.    Do you recognize the

3    signatures on, I believe it would be

4    page -- the last page of the document --

5    of the actual text of the contract?

6        A.    I believe I do.

7        Q.    Whose signatures do you

8    recognize?

9        A.    Philip Bates and Thomas J.

10   Holt.

11       Q.    Is that Thomas J. Holt, Sr?

12       A.    It would be, yes.

13       Q.    At the time was Thomas J.

14   Holt, Sr., President of Emerald Equipment

15   Leasing?

16       A.    Yes.

17       Q.    Prior to Mr. Holt signing

18   had the document, did you have any

19   discussions with him concerning its

20   contents?

21       A.    Yes.

22       Q.    And what were those

23   discussions?

24       A.    Basically went over the

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                    105

1      agreement.

2           Q.    So Mr. Holt read the

3      agreement before he signed it?

4           A.    I believe so.

5           Q.    Did you have any

6      communications with Scott Crieger

7      concerning this document?

8           A.    Yes.

9           Q.    What communications did you

10     have with Scott Crieger concerning the

11     equipment rental agreement?

12          A.    I provided the agreement.

13          Q.    After you provided the

14     agreement, did Scott Crieger ask you any

15     questions about it?

16          A.    I don't recall.

17          Q.    Did he give you any

18     instructions regarding the agreement?

19          A.    Only to the extent that he

20     didn't see a problem with it.

21          Q.    Do you recall anything

22     else?

23          A.    No.

24          Q.    Did you have any

ESQUIRE DEPOSITION SERVICES

A-451

Arthur B. Davis                106

1    communications with Mr. Hallam regarding

2    the equipment rental agreement?

3        A.    Yes.

4        Q.    What communications did you

5    have with him?

6        A.    This was an evolving

7    process, so whatever drafts came up,

8    copies were provided to Mr. Hallam.

9        Q.    Was Mr. Hallam telling you

10    what should be in the agreement?

11        A.    Yes, the same as yourself.

12        Q.    Did Mr. Hallam tell you

13    that signing the agreement would require

14    the authorization of MBC Leasing,

15    Incorporated?

16        A.    Yes.

17        Q.    Did you receive the

18    authorization of MBC Leasing,

19    Incorporated to sign the agreement?

20        A.    Yes.

21        Q.    Did you understand why the

22    authorization of MBC Leasing,

23    Incorporated was necessary to sign the

24    agreement?

ESQUIRE DEPOSITION SERVICES

A-452

Arthur B. Davis                107

1          A.    Yes.

2          Q.    What was your

3    understanding?

4          A.    MBC Leasing had a secured

5    lien on the equipment.

6          Q.    MBC Leasing, Incorporated

7    in actuality controlled the equipment, is

8    that correct?

9          A.    I don't understand the term

10   controlled.

11         Q.    You could not do anything

12   with respect to Emerald equipment without

13   MBC Leasing's permission, is that

14   correct?

15              MR. MOLDOFF:  If you

16         know.  To the extent it calls for a

17         legal conclusion I object.

18         A.    I don't know.

19         Q.    You are familiar with the

20   equipment rental agreement; is that

21   right?

22         A.    I am.

23         Q.    Paragraph 1, under

24   paragraph 1 effecting delivery would be

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis          108

1    by signed and dated equipment interchange

2    receipts; is that correct?

3        A.    That's correct.

4        Q.    What's an equipment

5    interchange receipt?

6        A.    It is a document that the

7    parties execute to show that a piece of

8    equipment was delivered or seized.

9        Q.    Is that sometimes

10   abbreviated as EIR?

11       A.    I have never heard that.

12       Q.    And, now, is there another

13   type of interchange receipt called a

14   trailer interchange receipt?

15       A.    Yes.

16       Q.    What is a trailer

17   interchange receipt?

18       A.    It would be the same

19   explanation.

20       Q.    Are equipment interchange

21   receipts and trailer interchange receipts

22   forms used to interchange equipment?

23       A.    Say that again please.

24       Q.    Are equipment interchange

ESQUIRE DEPOSITION SERVICES

A-454

Arthur B. Davis            109

1    receipts and trailer interchange receipt

2    forms used interchangeably in the

3    industry?

4         A.    I only know of the term

5    TIR.

6         Q.    What is a TIR?

7         A.    The trailer interchange --

8         Q.    -- Are equipment

9    interchange receipts and TIR forms used

10    interchangeably in the industry?

11         A.    As I just said I am

12    familiar with the term TIR.

13         Q.    So, you are not familiar

14    with the equipment interchange receipts?

15         A.    To the extent that they are

16    doing the same thing, then they are doing

17    the same thing.

18         Q.    Paragraph 10 a, states at

19    its sole expense lessee shall re-deliver

20    equipment to lessor at Philadelphia,

21    Pennsylvania, Sea Star Line Puerto Nuevo

22    San Juan, Greenwich Terminals, Port of

23    Jacksonville, Florida or any other

24    location as to which the parties agreed

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis          110

1     in writing.

2          Where was Greenwich

3     Terminals Philadelphia, Pennsylvania

4     located?

5          A.     3301 South Columbus

6     Boulevard, Philadelphia.

7          Q.     Is that the same as the

8     Packer Avenue terminal?

9          A.     It is.

10          Q.     Where was the Sea Star

11     terminal Puerto Nuevo, San Juan, Puerto

12     Rico location?

13          A.     At Puerto Nuevo, San Juan,

14     Puerto Rico.

15          Q.     That was the terminal that

16     Sea Star Line acquired from NPR,

17     Incorporated or from the Port Authority

18     through the NPR, Incorporated asset

19     purchase?

20          A.     I believe so.

21          Q.     Where was the Greenwich

22     Terminals Port of Jacksonville, Florida

23     located?

24          A.     At the Jacksonville port

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis          111

1     and that is the same facility that NPR

2     used to operate.

3          Q.     Was there a Greenwich

4     Terminal Port of Jacksonville, Florida on

5     April 27th of 2002?

6          A.     No.

7          Q.     When did the Greenwich

8     Terminals Port of Jacksonville, Florida,

9     actually open?

10          A.     I believe it actually

11     opened around the first of August of

12     2002.

13          Q.     Between April 27th of 2002

14     and approximately the 1st of August of

15     2002, where would Sea Star re-deliver

16     equipment in Jacksonville?

17          A.     I don't know that I could

18     answer that.

19          Q.     Did you ever make an

20     inquiry?

21          A.     Certainly.

22          Q.     From whom did you inquire

23     or to whom did you inquire?

24          A.     I am not sure who at Sea

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis          112

1    Star I spoke to about the equipment at

2    that time.

3          Q.    What did you learn as a

4    result of your inquiries?

5          A.    That equipment was being

6    put back into that yard.

7          Q.    What yard?

8          A.    The JAX yard.

9          Q.    Did the JAX yard have a

10   designation?

11         A.    I don't understand what you

12   mean by designation.

13         Q.    Was it the old NPR,

14   Incorporated terminal?

15         A.    That is correct.

16         Q.    Did you have people manning

17   the old NPR terminal between April 27th

18   of 2002 and August 1 of 2002?

19         A.    I don't believe so.

20         Q.    Why not?

21         A.    That wasn't being done.

22         Q.    How did you record what

23   equipment was being returned to the old

24   NPR terminal between April 27th and

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                113

1    August 1? Hold that thought.

2        A.    We didn't. We had relied

3    upon records that were inputted by Sea

4    Star for what was going out of the

5    terminal and what was coming into the

6    terminal.

7        Q.    Going out of what terminal?

8        A.    Either the JAX terminal,

9    that was the former NPR terminal or Sea

10    Star's terminal in JAX.

11        Q.    For what period of time did

12    you rely on those records?

13        A.    Sea Star employees were

14    using the Holt Logistic's computer system

15    as a tracting system for the equipment.

16        So for whatever that

17    specific period of time it was in use,

18    that would have certainly provided direct

19    information. And we also relied upon the

20    information from the Sea Star several

21    billing reports.

22        Q.    For what period of time did

23    Sea Star use the Holt's system, the

24    Holt's computer system?

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                 114

1            A.      I think it was

2     approximately three weeks.

3            Q.      Now, subparagraph b of

4     paragraph 10, says in part upon

5     re-deliver of particular equipment the

6     receiving terminal will execute an

7     equipment interchange receipt.  Do you

8     see that?

9            A.      I do.

10           Q.      In Philadelphia the

11    receiving terminal was Greenwich

12    Terminals; is that correct?

13           A.      Yes.

14           Q.      In JAX PORT after

15    approximately August 1st, the receiving

16    terminal was Greenwich Terminals; is that

17    correct?

18           A.      That's correct.

19           Q.      In San Juan the receiving

20    terminal was the Sea Star terminal; is

21    that correct?

22           A.      Yes.

23           Q.      Your understanding of the

24    language equipment interchange receipt in

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                    115

1    that subparagraph would be a TIR; is that

2    correct?

3        A.    Yes.

4        Q.    So when equipment was

5    re-delivered the terminal that took it in

6    would sign a TIR; is that right?

7        A.    It would.  The TIR would be

8    issued at the time that something was

9    happening with that specific piece of

10    equipment.

11        Q.    Would the TIR be issued at

12    the time that the equipment came through

13    the receiving terminal's gate?

14        A.    That's when it is supposed

15    to happen.  That is right.

16        Q.    And that would be in terms

17    of a piece of equipment coming into the

18    terminal, a gate-in procedure?

19        A.    Gate-in, yes.

20        Q.    And with respect to

21    equipment going out of the terminal, it

22    would be a gate-out procedure; is that

23    correct?

24        A.    That is correct.

ESQUIRE DEPOSITION SERVICES

A-461

Arthur B. Davis          116

1          MR. ARMSTRONG:  Do you

2     want a break for lunch?

3

4

5               - - -

6          ( Whereupon, a luncheon

7     recess wastaken.)

8               - - -

9

10

11     BY MR. ARMSTRONG:

12          Q.     Is gate-in abbreviated as

13     G.I.

14          A.     Yes.

15          Q.     Is gate-out abbreviated as

16     G.O.?

17          A.     I would take it for that,

18     yes.

19          Q.     In this equipment agreement

20     paragraph 15 a, states in part, this

21     agreement contains the entire agreement

22     between the parties and subject to the

23     provisions of section 1, may not be

24     amended altered or modified except by

ESQUIRE DEPOSITION SERVICES

A-462

Arthur B. Davis          117

1    writing signed by the party to be bound.

2        Do you see that?

3        A.    I see that.

4        Q.    Are you aware of any other

5    agreements between the parties, that is

6    Emerald Equipment Leasing and Sea Star

7    Line?

8        A.    Sure.

9        Q.    What other agreements

10   existed between Emerald Equipment Leasing

11   and Sea Star Line?

12       A.    This was the initial

13   agreement where Sea Star Line started to

14   lease equipment as of the May 1 of 2002.

15       Q.    Is that in writing?

16       A.    Yes.

17       Q.    Did this agreement

18   supersede that agreement?

19            MR. MOLDOFF:

20        Objection to the extent it seeks a

21        conclusion of law.

22       Q.    To the extent of your

23   knowledge?

24       A.    I would say it more

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis            118

1    formalized what the parties had already

2    been doing or tried to do, formalize what

3    the parties had already been doing for

4    like five months.

5         Q.    Are you aware of any other

6    agreements besides the two that you

7    described between Emerald Equipment and

8    Sea Star?

9         A.    Other than this written

10   agreement and the May agreement?

11        Q.    Right.

12        A.    Yes.

13        Q.    What other agreements

14   existed?

15        A.    There was an agreement with

16   Sea Star Line whereby I would sell

17   equipment if I had a ready buyer.

18             I would sell equipment at

19   various in lands port, I'm sorry, inland

20   depots or terminals so that they would

21   not have to return the equipment to the

22   three stated return ports.

23             And in turn Sea Star Line

24   had agreed that there part of the

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis          119

1    bargain, if you will, they would stop

2    off-hiring equipment in San Juan.

3         Q.    Was that agreement in

4    writing?

5         A.    It was not.

6         Q.    When do you think you

7    entered into that agreement?

8         A.    As I started to sell

9    equipment at the various inland depots.

10        Q.    And with whom do you think

11   you entered into that agreement?

12        A.    Phil Bates and Andy Rooks.

13        Q.    Are you aware any other

14   agreements between Emerald Equipment and

15   Sea Star?

16        A.    Not at this point, no.

17        Q.    Let me show a you a copy of

18   a document entitled independent

19   contractor agreement which I will ask the

20   court reporter to mark as exhibit 17 for

21   identification.

22             - - -

23             (Whereupon, Exhibit

24   Number 17 was marked for

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                    120

1      identification.)

2              - - -

3      MR. ARMSTRONG

4          Q.    Do you recognize that?

5      Before I ask you that, let me ask you

6      with respect to the equipment rental

7      agreement.

8              Are you aware of any

9      amendments to the equipment rental

10     agreement?

11         A.    I don't think so.

12         Q.    Are you aware of any

13     modifications to the equipment rental

14     agreement?

15         A.    No.

16             MR. MOLDOFF:  Other

17         than what he testified to, to the

18         extent they were modifications.

19             I object to the question to

20         the extent it may call for some

21         legal conclusion.

22         Q.    There were no modifications

23     to the equipment rental agreement as of

24     or after July 31st of 2002, is that

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis          121

1    correct?

2                   MR. MOLDOFF:  Same

3          objection, but you could answer.

4                   THE WITNESS:  Other

5          than the agreement that I had to

6          sell equipment with Sea Star.

7          Q.    Are you saying that that

8    was a modification of the equipment

9    rental agreement?

10                  MR. MOLDOFF:  Same

11         objection to the extent it calls

12         for a legal conclusion.

13         A.    Certainly.

14         Q.    That was not in writing; is

15   that correct?

16         A.    That is correct.

17         Q.    Are you aware of any

18   alterations of the equipment rental

19   agreement on or after July 31st of 2002?

20                  MR. MOLDOFF:

21            Objection to the question

22            just to the extent meaning of

23            alterations.

24         A.    I don't know what you mean

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                    122

1    by alterations.

2          Q.     The language in the

3    agreement states and I will repeat it

4    this agreement contains the entire

5    agreement between the parties and subject

6    to the provisions of section 1 may not be

7    amended, altered or modified except by a

8    writing signed by the party to be bound.

9               In the context of that

10   language, are you aware of any ways in

11   which the equipment rental agreement was

12   altered on or after July 31st of 2002?

13         A.     No.

14         Q.     Now, moving forward to the

15   independent contractor agreement which I

16   asked the court reporter to mark as

17   exhibit 17 for identification, do you

18   recognize that document?

19         A.     Yes, I have seen this.

20         Q.     When did you first see that

21   document?

22         A.     I am really not sure as to

23   the date.

24         Q.     Did you participate in

ESQUIRE DEPOSITION SERVICES

A-468

Arthur B. Davis                    123

1    negotiating the independent contractor

2    agreement?

3         A.    To some extent, yes.

4         Q.    What was your

5    participation?

6         A.    Talked about minimum

7    pricing on equipment and what we would be

8    able -- what would be able to be done on

9    behalf of MBC Leasing.

10        Q.    Look at the arrangement

11   page, section 21, notices to the

12   contractor?

13        A.    All right.

14        Q.    There's some handwriting

15   under Greenwich Terminals LLC. Can you

16   read that?

17        A.    Yes.

18        Q.    Is that Thomas J. Holt, Jr?

19        A.    It is.

20        Q.    President 3301 South

21   Columbus Boulevard Philadelphia,

22   Pennsylvania?

23        A.    Yes.

24        Q.    Do you recognize the

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                    124

1    handwriting?

2         A.    I do.

3         Q.    Whose handwriting is it?

4         A.    Tom Holt, Jr.

5         Q.    Was Tom Holt, Jr president

6    of Greenwich Terminals when this contract

7    was signed.

8              MR. MOLDOFF:  We will

9         object.

10        A.    I'm sorry.

11             MR. MOLDOFF:  I object

12        to that question.

13        Q.    All right.  You can go

14   ahead and answer.

15             MR. MOLDOFF:  I object

16        to the extent it's calls for

17        speculation.

18        A.    I don't know.

19        Q.    Look at exhibit D,

20   contractors representatives, do you know

21   who prepared that list?

22        A.    I believe it was MBC

23   Leasing.

24        Q.    Thomas Holt, Jr., Arthur

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis          125

1    Davis, Arthur Davis would be you; is that

2    correct?

3         A.    That's correct.

4         Q.    So you were a

5    representative of Greenwich Terminals

6    under this contract?

7         A.    That is right.

8         Q.    And the third name is

9    Martin McDonald, who is that?

10        A.    Martin McDonald was an

11   employee of NPR, Incorporated.

12        Q.    All right.

13             Was he an employee of NPR,

14   Incorporated on or about June 30th of

15   2002?

16        A.    No.

17        Q.    Do you know who his

18   employer was on or about June 30th of

19   2002?

20        A.    No.

21        Q.    Did he have any

22   relationship with Emerald on or about

23   June 30th of 2002?

24             MR. MOLDOFF:  If you

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis            126

1    know.

2        A.    Not that I am aware of.

3        Q.    When he was an employee of

4    NPR, Incorporated, what was Mr.

5    McDonald's position?

6        A.    I believe he was a vice

7    president.

8        Q.    Do you know what his duties

9    were as vice president?

10        A.    No.

11        Q.    Do you know what his

12    employment status was when NPR

13    terminated?

14        A.    I can't say for sure.

15        Q.    Do you know who was paying

16    Martin McDonald on June 30th of 2002?

17        A.    No.

18        Q.    Under this agreement, do

19    you know what Mr. McDonald's

20    responsibilities were on behalf of

21    Greenwich Terminals or as a Greenwich

22    Terminal representative?

23        A.    Yes.

24        Q.    What were his

Arthur B. Davis                127

1    responsibilities?

2         A.    He was to be involved with

3    the equipment specifically in Puerto

4    Rico.

5         Q.    Was there any reason why he

6    was to be involved with the equipment

7    specifically in Puerto Rico as you

8    indicated?

9         A.    That was what was assigned

10   to him.

11        Q.    And what was your

12   involvement as a Greenwich Terminals

13   representative?

14        A.    Generally all of the

15   equipment.

16        Q.    Did Mr. McDonald report to

17   you?

18        A.    Yes.

19        Q.    Did Mr. McDonald report to

20   you in writing?

21        A.    No.

22        Q.    Did he send you e-mails?

23        A.    No.

24        Q.    Was there any procedure for

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                128

1  reporting to you?

2      A.   We spoke on the phone.

3      Q.   How often did you speak on

4  the phone?

5      A.   On an as-needed basis.

6      Q.   Do you know where Mr.

7  McDonald is now, that is where he resides

8  now?

9      A.   I don't have an address for

10  him.

11      Q.   Do you know where he's

12  employed, if he is employed?

13      A.   I know he's employed, but I

14  am not sure where.

15      Q.   Is he employed in this

16  area?

17      A.   When you say this --

18      Q.   The Philadelphia area?

19      A.   No.

20      Q.   Where do you think he's

21  employed?

22      A.   North Jersey.

23      Q.   Let me show you a copy a

24  letter dated July 19 of 2002 which I ask

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis          129

1      the court reporter to mark as exhibit 18

2      for identification.

3                    - - -

4                    (Whereupon, Exhibit

5          Number 18 was marked for

6          identification.)

7                    - - -

8      BY MR. ARMSTRONG:

9          Q.    Have you ever seen that

10     letter before?

11         A.    Yes.

12         Q.    Do you recognize the

13     signature on that letter?

14         A.    Yes.

15         Q.    Whose signature is it?

16         A.    Scott had Crieger.

17         Q.    When did you first see that

18     letter?

19         A.    I am not sure.

20         Q.    Let me show you a copy of a

21     space allocation agreement dated August 1

22     of 2002, which I will ask the court

23     reporter to mark as exhibit 19 for

24     identification.

Arthur B. Davis          130

1              - - -

2                    (Whereupon, Exhibit

3         Number 19 was marked for

4         identification.)

5              - - -

6    BY MR. ARMSTRONG:

7         Q.    Do you recognize that

8    document?

9         A.    Yes, I have.

10        Q.    Did you participate in

11   negotiating the space allocation

12   agreement?

13        A.    No, I did not.

14        Q.    Who negotiated on behalf of

15   Greenwich Terminals?

16        A.    David Whene.

17        Q.    What was his position?

18        A.    I am not sure.

19        Q.    Did he work for Greenwich

20   Terminals?

21        A.    He did.

22        Q.    Does he still work for

23   Greenwich Terminals?

24        A.    Yes, he does.

ESQUIRE DEPOSITION SERVICES

A-476

Arthur B. Davis          131

1          Q.    Do you see the handwriting

2     on the first page as agents for MBC

3     Leasing, Incorporated.

4              Do you recognize that

5     handwriting?

6          A.    Yes.

7          Q.    Do you know who wrote that?

8          A.    Yes.

9          Q.    Who wrote that?

10         A.    I did.

11         Q.    The handwriting on the

12    second page, is that also yours?

13         A.    It is.

14         Q.    Whose initials are next to

15    the handwriting on the first page?

16         A.    Tom Holt, Jr.

17         Q.    Why did you write as agents

18    for MBC Leasing, Incorporated on the

19    first page?

20         A.    Because Greenwich Terminals

21    was.

22         Q.    And that was the only

23    capacity in which Greenwich Terminals was

24    entering into that agreement?

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis     132

1        MR. MOLDOFF:

2          Objection, calls for a

3     legal conclusion, legal conclusion,

4     also calls for speculation.

5      A.     You could repeat that

6   question?

7          - - -

8          (Whereupon, the

9     pertinent portion of the record was

10     read.)

11          - - -

12      A.     I believe so.

13      Q.     Do you know where page

14   three of the agreement is?

15      A.     No, I don't.

16      Q.     Let me show you a copy of a

17   letter dated October 25 of 2002 together

18   with attachments which I will ask the

19   court reporter to mark as exhibit 20 for

20   identification.

21          - - -

22          (Whereupon, Exhibit

23     Number 20 was marked for

24     identification.)

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis          133
1                    - - -

2       BY MR. ARMSTRONG:

3           Q.    Do you recognize that

4       letter?

5           A.    Yes.

6           Q.    In that letter your name

7       appears under Holt Oversight and Logistic

8       Technologies, Incorporated?

9           A.    Right.

10          Q.    What was your position with

11      Holt Oversight & Logistical &

12      Technologies at that time?

13          A.    It was the same as

14      previously described.

15          Q.    You were an employee?

16          A.    Yes.

17          Q.    And was Holt Oversight and

18      Logistics and Technologies, Incorporated

19      acting as part of the Greenwich contract

20      with MBC Leasing, Incorporated?

21          A.    Holt Oversight and

22      Logistics and Technologies,

23      Incorporated --

24              MR. MOLDOFF:  -- I

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                    134

1          object to the question.

2              Q.     Let me rephrase that.

3                  What was Holt Oversight and

4      Logistics and Technologies' role in

5      connection with the Greenwich Terminals,

6      MBC Leasing contract?

7                  MR. MOLDOFF:  If you

8          know.

9              A.     They were supplying me as

10     an agent.

11             Q.     Holt Oversight and

12     Logistics and Technologies, Incorporated

13     was paying you?

14             A.     Yes.

15             Q.     Let me show you a copy a

16     letter dated, telefax cover sheet dated

17     November 13 of 2002, which I will ask the

18     court reporter to mark as exhibit 21 for

19     identification.

20                 - - -

21                 (Whereupon, Exhibit

22         Number 21 was marked for

23         identification.)

24                 - - -

Arthur B. Davis                135

1    BY MR. ARMSTRONG:

2        Q.    Do you recognize that

3    document?

4        A.    Yes, I have seen this.

5        Q.    What action did you take to

6    comply with Scott Crieger's request?

7        A.    I spoke with the people at

8    Sea Star.

9        Q.    What did you say to them?

10       A.     I said to the people at Sea

11   Star that they needed to provide to me a

12   listing of any equipment that they

13   planned to purchase before they purchase

14   it, that they have to stop returning to

15   me as equipment that they are quotes

16   off-hiring, whether they off hired it, in

17   fact, or not, that they already purchased

18   and asked them what procedures they would

19   follow to insure that they would stop

20   doing that because they would return

21   their own equipment.

22       Q.    Who are the people at Sea

23   Star that you told?

24       A.     Andy Rooks, Phil Bates.

ESQUIRE DEPOSITION SERVICES

A-481

Arthur B. Davis                    136

1        Q.    Anyone else?

2        A.    Probably Arturo Rodriguez

3    in San Juan.

4        Q.    Anyone else?

5        A.    They come to mind.

6        Q.    Let me show you a copy of a

7    document that apparently is an e-mail

8    with a response which I ask the court

9    reporter to mark as exhibit 22 for

10   identification.

11            - - -

12            (Whereupon, Exhibit

13        Number 22 was marked for

14        identification.)

15            - - -

16   BY MR. ARMSTRONG:

17       Q.    Do you recognize that

18   document?

19       A.    Yes, I do.

20       Q.    Is the bottom a true and

21   correct copy of a e-mail that you sent?

22       A.    Yes.

23       Q.    And the top is Scott

24   Crieger's response to you?

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis          137

1      A.    It is.

2      Q.    Let me show you a copy of a

3   document which I will ask the court

4   reporter to mark as exhibit 23 for

5   identification.

6   BY MR. ARMSTRONG:

7      Q.    Do you recognize that

8   document?

9      A.    Yes.

10      Q.    Is that a true and correct

11   copy of a letter that you received or

12   e-mail that you received?

13      A.    This is an e-mail.

14      Q.    In your vocabulary it is

15   not a letter?

16      A.    Right.

17      Q.    Is it a true and correct

18   copy of an e-mail that you received?

19      A.    It appears to be so.

20      Q.    Are you familiar with the

21   showroom property at Puerto Nuevo?

22      A.    I am.

23      Q.    What is the showroom

24   property?

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                138

1       A.   It is a name that was given

2   as a designation to some ground that it

3   is immediately off the terminal.

4       Q.   Off what terminal?

5       A.   In Puerto Nuevo in San

6   Juan.

7       Q.   When you say -- you say

8   immediately off the terminal, to what

9   terminal are you referring?

10      A.   The terminal that was

11   operated by NPR, Incorporated that was

12   taken over by Sea Star.  The terminal is

13   separated from the quote showroom lot by

14   a roadway.

15      Q.   Are you familiar with the

16   name Sasi S-A-S-I, lot?

17      A.   No.

18      Q.   Have you ever heard that?

19      A.   No.

20      Q.   With respect to the

21   showroom lot, did MBC Leasing,

22   Incorporated or Emerald use that lot for

23   any period of time?

24      A.   It did.

Arthur B. Davis                139

1          Q.    When did the use begin?

2          A.    I am not positive.

3          Q.    Do you know whether it

4    began in 2002?

5          A.    It did.

6          Q.    Do you know whether if the

7    use continues today?

8          A.    It does not.

9          Q.    When did the use end?

10         A.    I am not sure.  I would

11   have to look it up.

12         Q.    Would it have been in 2003?

13         A.    I believe so.

14         Q.    During this use what was

15   done with the property, what was the

16   purpose of the use?

17         A.    There was a few containers

18   and a lot of chassis that were in the lot

19   and equipment was sold from that lot.

20         Q.    Sold by whom?

21         A.    Myself, Marty McDonald.

22         Q.    Where did you get the

23   containers and the chassis that were in

24   the showroom lot?

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis          140

1          A.     They were moved out of the

2    main terminal operated by Sea Star.

3          Q.     So they were moved out of

4    Sea Star Line's terminal into the

5    showroom lot?

6          A.     That is correct.

7          Q.     When they were moved out of

8    the Sea Star Line terminal, would that be

9    a gate-out of the Sea Star Line terminal?

10         A.     To my mind it would be.

11         Q.     Would there be a TIR

12   signed?

13         A.     There should have been.

14         Q.     When they were moved into

15   the showroom lot, would that have been a

16   gate-in?

17         A.     It could be considered

18   that.

19         Q.     Would a TIR have been

20   signed?

21         A.     No.

22         Q.     Why not?

23         A.     We operated it ourselves.

24         Q.     By ourselves whom do you

Arthur B. Davis                 141

1    mean?

2          A.    Greenwich.

3          Q.    So Greenwich produced no

4    TIRs with respect to equipment moved from

5    the Sea Star terminal to the showroom

6    lot; is that correct?

7          A.    Greenwich would not ever

8    have done that.  It wasn't their

9    terminal.  Sea Star moved the equipment

10    as gate-out from their terminal to the

11    showroom lot.

12          Q.    Whose terminal was the

13    showroom lot?

14               MR. MOLDOFF:

15          Objection to the question to the

16          extent it assumes that the lot is a

17          terminal.

18          Q.    The showroom lot was used

19    for storage of equipment, is that

20    correct?

21          A.    Yes.

22          Q.    And this was equipment that

23    previously had been stored in the Sea

24    Star terminal; is that correct?

Arthur B. Davis                 142

1          A.    It was in the Sea Star

2     terminal.

3          Q.    And Sea Star was concerned

4     about the overflow of equipment, Emerald

5     equipment in its terminal, was it not?

6          A.    I can't speak for Sea Star.

7          Q.    Did anyone ever tell you

8     that Sea Star Line was concerned about

9     the number of pieces of Emerald equipment

10    in the Sea Star terminal after April 27th

11    of 2002?

12         A.    Certainly.

13         Q.    And who told you that?

14         A.    I don't know.

15         Q.    Did Mr. Rooks tell you

16    that?

17         A.    I just said I don't know.

18         Q.    You don't recall anybody?

19         A.    I don't recall who told me.

20         Q.    And how many times were you

21    told that?

22         A.    What?

23         Q.    What Sea Star was concerned

24    about, the number of pieces of equipment

ESQUIRE DEPOSITION SERVICES

A-488

Arthur B. Davis                143

1    that were inside, that is Emerald's

2    equipment that were inside its terminal?

3        A.    Several times.

4        Q.    It was pretty much a

5    constant topic of conversation, wasn't

6    it?

7        A.    No.

8        Q.    Was it a monthly topic of

9    conversation?

10       A.    No.

11       Q.    Was it a quarterly topic of

12   conversation?

13       A.    I couldn't say.

14       Q.    And the cure for that was

15   supposed to be the rental of the showroom

16   property, wasn't it?

17           MR. MOLDOFF:  Object

18           to the form of the question.  You

19           can answer it.

20           THE WITNESS:  The cure

21           for what?  I don't understand the

22           question.

23       Q.    The cure for the over

24   crowding of Emerald equipment in the Sea

ESQUIRE DEPOSITION SERVICES

A-489

Arthur B. Davis                  144

1    Star terminal about which people whom you

2    don't know complained to you?

3              MR. MOLDOFF:  Same

4         objection.

5              THE WITNESS:  I don't

6         really understand what you are

7         saying when you say the cure.

8              There was equipment that

9         was in the Sea Star terminal that

10        was turned over to Emerald

11        Equipment and that equipment was

12        put into the showroom lot period.

13        Q.     Before the showroom lot was

14   acquired by Sea Star and MBC Leasing,

15   Incorporated, you were selling Emerald

16   equipment out of the Sea Star lot, had

17   you not?

18        A.     Yes.

19        Q.     For how long did you sell

20   Emerald equipment out of the Sea Star

21   terminal after April 27th of 2002?

22        A.     I have sold equipment

23   through about into November of 2004 I had

24   a sale.

ESQUIRE DEPOSITION SERVICES

A-490

Arthur B. Davis          145

1         Q.    So you are still selling

2    equipment that is stored in the Sea Star

3    terminal; is that correct?

4         A.    Not at this point.

5              MR. MOLDOFF:  You mean

6    2004 or 2003?

7         A.    I mean 2004.

8         Q.    He means 2004.

9              As of November of 2004, you

10   were still selling equipment that was

11   stored in the Sea Star terminal; is that

12   correct?

13        A.    I did have a sale for some

14   equipment that was owned by Emerald

15   Equipment Leasing and I am pretty sure it

16   was November of 2004.

17        Q.    And that equipment was

18   stored in the Sea Star terminal; is that

19   correct?

20        A.    I don't know what you mean

21   by stored.  It was physically there.

22        Q.    And did you consummate that

23   sale?

24        A.    That's what I said, I sold.

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis          146

1          Q.      Let me show you a copy of a

2    letter dated March 27 of 2003 which I ask

3    the court reporter to mark as exhibit 24

4    for identification.

5                      - - -

6                      (Whereupon, Exhibit

7          Number 24 was marked for

8          identification.)

9                      - - -

10    BY MR. ARMSTRONG:

11          Q.      Do you recognize that

12    document?

13          A.      Yes.

14          Q.      In part Scott Crieger

15    states arrangements are being made to

16    have all equipment either sold or removed

17    by the end of April.

18                  Do you see that?

19          A.      Yes.

20          Q.      Was all the equipment sold

21    by the end of April of 2003?

22          A.      I don't know.

23          Q.      So you don't know what

24    happened with the sale of the Emerald

ESQUIRE DEPOSITION SERVICES

A-492

Arthur B. Davis                147

1   equipment?

2        A.    I do.

3        Q.    Was there any equipment,

4   other than Emerald equipment, located at

5   the showroom property in March of 2003?

6        A.    Sure.

7        Q.    So you know that when he's

8   talking about arrangements are being made

9   to have all equipment sold, he is

10  referring to Emerald equipment; is that

11  correct?

12       A.    He would be referring to

13  Emerald equipment.

14       Q.    Was all of the equipment

15  sold before the end of April of 2003?

16       A.    It would depend on whether

17  or not I had access, if it was mine, if

18  it wasn't mine, if it was off-hired, not

19  off-hired.

20       Q.    You knew that all of the

21  equipment, the Emerald equipment was not

22  sold by the end of April of 2003; is that

23  correct?

24       A.    There was some Emerald

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                148

1    equipment that I just sold.

2        Q.    And was all of the Emerald

3    equipment removed from the showroom

4    property by the end of April of 2003?

5        A.    Probably not.

6        Q.    Why not?

7        A.    It might not have been

8    off-hired.  It may have just been put

9    there in May, it may have been put there

10   in October of 2004.

11       Q.    Are you saying that Emerald

12   equipment located in the showroom was on

13   hire?

14       A.    I apologize.  You are -- I

15   was thinking of an entirely different

16   area than the showroom.

17       Q.    What area were you thinking

18   about?

19       A.    I was thinking about inside

20   the terminal.

21       Q.    Inside what terminal?

22       A.    The Sea Star terminal in

23   San Juan.  So I apologize, but I will

24   have to ask you to re-ask the questions.

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis          149

1          Q.     And you were concerned that

2     some of the equipment inside the

3     terminal, referring to the Sea Star

4     terminal in San Juan, would be on-hire;

5     is that correct?

6          A.     That is correct as to the

7     showroom itself.  I know we got out of

8     there.

9          Q.     And you were concerned that

10     some of the equipment, the Emerald

11     equipment in the Sea Star terminal in San

12     Juan would be in storage; is that

13     correct?

14          A.     I don't know, but speaking

15     specifically to the showroom we did leave

16     the showroom property completely.

17          Q.     Let me me show you a series

18     of e-mails with attachments which I will

19     ask the court reporter to mark as exhibit

20     25 for identification.

21               - - -

22               (Whereupon, Exhibit

23          Number 25 was marked for

24          identification.)

ESQUIRE DEPOSITION SERVICES

A-495

Arthur B. Davis                150

1                  - - -

2    BY MR. ARMSTRONG:

3        Q.    Do you recognize these

4    documents?

5        A.    Yes.

6        Q.    Greenwich Terminals was an

7    agent for MBC Leasing, Incorporated; is

8    that correct?

9        A.    It was.

10       Q.    MBC Leasing, Incorporated

11   was compensating Greenwich Terminals; is

12   that correct?

13       A.    Yes.

14       Q.    Greenwich Terminals was

15   also an agent for Emerald, is that

16   correct?

17       A.    It was.

18       Q.    Was Emerald compensating

19   Greenwich Terminals?

20       A.    It was not.

21       Q.    As a matter of fact MBC

22   Leasing, Incorporated was paying all the

23   bills were they not?

24       A.    They were.

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis            151

1          Q.      Was there a contract

2    between Greenwich Terminals and Sea Star

3    Line?

4          A.      Not?

5          A.      Not to my knowledge.

6          Q.      What was your purpose in

7    presenting -- strike that.

8                  Who is Sheldon Granoff?

9          A.      Sheldon Granoff is a Holt

10   Oversight employee in the accounts

11   receivable department.

12         Q.      Does he or has he held a

13   position with Greenwich Terminals, to

14   your knowledge?

15         A.      Not to my knowledge.

16         Q.      Do you know who instructed

17   Mr. Granoff to communicate with Sea Star

18   regarding Greenwich Terminals bills?

19         A.      I did.

20         Q.      When did do you that?

21         A.      At various times.

22         Q.      And were these bills that

23   you had submitted to, or that Greenwich

24   Terminals had submitted to MBC Leasing,

ESQUIRE DEPOSITION SERVICES

A-497

Arthur B. Davis                 152

1    Incorporated?

2          A.    What bills?

3          Q.    The bills that you

4    instructed Mr. Granoff to communicate

5    with Sea Star about?

6          A.    No.  These were never

7    submitted to MBC Leasing, Incorporated.

8          Q.    Why not?

9          A.    Because it was a charge for

10   Sea Star.

11         Q.    Did Emerald Equipment

12   Leasing submit a charge to Sea Star for

13   Greenwich Terminals services?

14         A.    Could you repeat that?

15         Q.    Did Emerald submit a charge

16   to Sea Star for Greenwich Terminals

17   services?

18         A.    It did not.

19         Q.    You were asked to submit

20   any Greenwich Terminals charges through

21   Emerald Equipment Leasing; is that

22   correct?

23         A.    That's what Andy Rooks

24   wrote to Sheldon, that's correct.

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis          153

1          Q.      Emerald had the contractual

2     relationship with Sea Star Line; is that

3     correct?

4          A.      Emerald Equipment Leasing

5     had a contractual obligation or contract

6     with Sea Star Line and within that

7     agreement they acknowledged that

8     Greenwich Terminals was the receiving

9     terminal.

10              There were e-mails that

11     talk about the fact that they recognize

12     Greenwich Terminals.

13              And any place in the

14     industry if you go to Maher Terminal and

15     pick up a container or a chassis and you

16     incur expenses you are billed by the

17     terminal.  You are not billed by the

18     shipping line.  You are not billed by

19     anybody else.  You are billed by the

20     company that does the work.

21          Q.      What was your problem in

22     submitting the charges to Sea Star Line

23     through Emerald Equipment Leasing?

24          A.      Emerald Equipment Leasing

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis          154

1     didn't do the work.  Greenwich Terminals

2     did the work.  As it is stated here under

3     our agreement with Emerald Equipment

4     Leasing the return location for off-hires

5     was this terminal period.

6          It goes on to say it is

7     therefore, an Emerald transaction.  It is

8     not.  The return location was Greenwich.

9     Greenwich did the work and not Emerald.

10         Q.    Let me show you a copy of a

11    document which I ask the court reporter

12    to mark as exhibit 26 for identification.

13              - - -

14              (Whereupon, Exhibit

15         Number 26 was marked for

16         identification.)

17              - - -

18    MR. ARMSTRONG

19         Q.    Have you seen that document

20    before?

21         A.    I don't recall this.

22         Q.    Do you see the e-mail at

23    the top, the Dear Andy e-mail at the top

24    of the page?

ESQUIRE DEPOSITION SERVICES

A-500

Arthur B. Davis                 155

1       A.    Certainly.

2       Q.    There's a reference to our

3    principal, do you see that?

4       A.    Yes.

5       Q.    Do you know who our

6    principal was?

7       A.    It's plural with our

8    principals permission.  I am not sure who

9    Sheldon would have talked to.  And I am

10   also not sure what offset he was talking

11   about.

12      Q.    It says is unaccepted to --

13   unacceptable to our principal.  Do you

14   see that?

15      A.    To our principal.  Right.

16   Your company did this offset without our

17   principal's permission.

18      Q.    I am asking who the

19   principal is, if you know.

20          MR. MOLDOFF:  I am

21      objecting to the form of the

22      question to the extent that this

23      calls for speculation.

24          It is not an e-mail that

ESQUIRE DEPOSITION SERVICES

A-501

Arthur B. Davis                156

1     the witness testified - he never

2     seen before, he doesn't recall

3     actually seeing this, so I object.

4          THE WITNESS:  I think

5     I also said that I don't know who

6     he spoke with.

7          Q.     Let me show you a copy of a

8     letter dated August 27 of 2003 which I

9     ask the court reporter to mark as exhibit

10    27 for identification.

11             - - -

12             (Whereupon, Exhibit

13    Number 27 was marked for

14    identification.)

15             - - -

16    BY MR. ARMSTRONG:

17         Q.     Do you recognize in a

18    document?

19         A.     Yes, I do.

20         Q.     Is that a true and correct

21    copy of the letter that you received?

22         A.     Yes.

23         Q.     All right.

24         A.     I think so.

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis          157

1          Q.     Let me show you a copy of

2     some e-mails dated August 8 and August

3     11th of 2003 which I will ask the court

4     reporter to mark as exhibit 28 for

5     identification.

6                    - - -

7                    (Whereupon, Exhibit

8     Number 28 was marked for

9     identification.)

10                   - - -

11     BY MR. ARMSTRONG:

12          Q.     Do you recognize those

13     documents?

14          A.     I remember this.

15          Q.     The top of the second page

16     Scott Crieger states quote Art, after I

17     got over the shock of seven months of

18     your salary all at once unquote.  Do you

19     see that?

20          A.     I do.

21          Q.     You were submitting bills

22     for your salary to Mr. Crieger?

23          A.     I was.

24          Q.     And MBC Leasing was paying

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis          158

1    those bills?

2         A.    They were.

3         Q.    MBC Leasing was paying your

4    salary?

5         A.    They were paying it to

6    Greenwich Terminals.

7         Q.    Were they paying anyone

8    else's salary?

9         A.    They were paying for Marty

10   McDonald.

11        Q.    And you would submit

12   separate bills for Marty McDonald's

13   salary?

14        A.    That is correct.

15        Q.    Were they paying anyone

16   else's salary?

17        A.    Francisco Gonzalez.

18        Q.    Who is that?

19        A.    He's a gentleman in Puerto

20   Rico that was being used to help sell the

21   equipment.

22        Q.    And who was using him?

23        A.    We were.

24        Q.    By me are you --

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                     159

1        A.      Greenwich.

2        Q.      Was MBC Leasing,

3    Incorporated paying Tom Holt, Jr's

4    salary?

5        A.      No.

6        Q.      Let me show you a copy of a

7    letter or telefax, telecopy cover sheet

8    dated April 24th of 2003 which I will ask

9    the court reporter to mark as exhibit 29

10    for identification.

11              - - -

12              (Whereupon, Exhibit

13    Number 29 was marked for

14    identification.)

15              - - -

16    BY MR. ARMSTRONG:

17        Q.      Do you recognize that

18    document?

19        A.      Yes, I do.

20        Q.      The upper corner, left-hand

21    corner there is a note Tom, Sr for your

22    information, is that Arthur underneath?

23        A.      Yes.

24        Q.      Did you write that?

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis          160

1          A.    I did.

2          Q.    And why did you write it?

3          A.    So that Tom Holt, Sr had a

4     copy of this sheet.

5          Q.    There's a reference to

6     Tom's involvement.  Was that reference to

7     Tom Holt, Sr or to Tom Holt, Jr, if you

8     knot?

9          A.    Tom Holt, Jr.

10         Q.    Did you also send a copy of

11    this to Tom Holt, Jr?

12         A.    No, it went to Tom Holt, Jr

13    as well as myself.

14         Q.    There's a reference to

15    looks like Lorraine's.  Who is Lorraine?

16         A.    Lorraine Robbins.

17         Q.    By whom was she employed?

18         A.    I am not sure.

19         Q.    Did she work with you?

20         A.    Yes.  She worked with me on

21    this project.

22         Q.    In what capacity did she

23    work with you?

24         A.    To review the records and

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                161

1    do the billing.

2         Q.    Review what records?

3         A.    The self billing reports,

4    documents coming in regard to

5    inventories, sales and so forth.

6         Q.    Does she still work with

7    you?

8         A.    Yes, she does.  Sorry.

9         Q.    What are her duties at the

10   present time?

11        A.    Doing the same thing.

12        Q.    Where are you doing the

13   same thing?

14        A.    We are working presently in

15   Philadelphia.

16        Q.    What is is the address?

17        A.    7900 Old York Road, Elkins

18   Park, Pennsylvania.

19        Q.    And is that where the work

20   on this quote project unquote is

21   continuing?

22        A.    It is.

23        Q.    Is there any work being

24   done on this project in Gloucester City?

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis          162

1        A.    Not to my knowledge.

2        Q.    Where are the Emerald

3   records kept?

4        A.    Which records are you

5   talking about.

6        Q.    Are there different places

7   where different kinds of Emerald records

8   are kept?

9        A.    I think so.

10        Q.    Where are the Emerald

11   records related to this project kept?

12        A.    Elkins Park.

13        Q.    And are there other

14   locations where Emerald e-mail files are

15   are kept?

16        A.    Not to my knowledge.

17        Q.    Are there other locations

18   with Emerald contract files are kept?

19        A.    Not to my knowledge.

20            MR. MOLDOFF:  Are we

21        saying related to this project

22        or -- or no, or in general.

23            MR. ARMSTRONG:  In

24        general right now.

Arthur B. Davis            163

1    BY          MR. ARMSTRONG:

2         Q.    Let me show you a copy of a

3    document which I will ask the court

4    reporter to mark as exhibit 30 for

5    identification.

6              - - -

7              (Whereupon, Exhibit

8    Number 30 was marked for

9    identification.)

10             - - -

11   BY MR. ARMSTRONG:

12        Q.    Do you recognize that

13   document?

14        A.    Yes, I do remember this.

15        Q.    Is that a true and correct

16   copy of exchange of e-mails that you

17   remember?

18        A.    To the best of my

19   knowledge.

20        Q.    Did you have any further

21   communications with Scott Crieger

22   concerning the subject matter?

23        A.    Certainly.

24        Q.    After these e-mails?

ESQUIRE DEPOSITION SERVICES

A-509

Arthur B. Davis                164

1      A.    Certainly.

2      Q.    When did you next

3  communicate with Scott Crieger?

4      A.    I have no idea.

5      Q.    Do you recall what the

6  substance of the communication was?

7      A.    Certainly.

8      Q.    What was the substance of

9  the communication?

10     A.    That Sea Star was

11  continuing to not pay for equipment that

12  it was continuing to use.

13     Q.    And who said that?

14     A.    I did.

15     Q.    And what did Scott Crieger

16  say?

17     A.    He wanted to know if I had

18  any idea as to what the extent of that

19  could be.  And I said it could be

20  millions.

21     Q.    What was his response?

22     A.    Do whatever we felt should

23  be done.

24     Q.    Did you ever tell Scott

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                165

1    Crieger that you had no knowledge of the

2    equipment that was missing or POS and

3    leased to NPR, Incorporated as of April

4    26th of 2002?

5        A.    No.

6        Q.    Did you ever tell Scott

7    Crieger what the basis for your

8    conclusion that it could be millions was?

9        A.    Certainly.

10       Q.    And certainly what did you

11   tell him?

12       A.    I certainly said to him

13   that I had been reviewing as of this

14   particular point in time which was May of

15   2003 and we had a substantial number of

16   reports, self billing reports that came

17   from Sea Star and had sales data by unit

18   and TIRs for equipment that was being

19   returned by Sea Star and checking all of

20   this data and information from third

21   parties that the self billing reports

22   were wrong.

23       Q.    Number one, who was

24   checking all of this data?

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                166

1          A.      Lorraine was checking it

2    and I was checking it.

3          Q.      Was anybody else involved

4    in checking all of this data?

5          A.      Not really.

6          Q.      What information from third

7    parties were you receiving?

8          A.      I was getting information

9    from CSX Railroad.

10         Q.      In what form were you

11   getting information from CSX Railroad?

12         A.      Electronically.

13         Q.      Was this printed?

14         A.      It was not printed.

15         Q.      You did not print it?

16         A.      It was incorporated into

17   the daily move -- the move histories,

18   which was provided to Sea Star.

19         Q.      When you say daily move

20   histories, are you talking about

21   documents you and Lorraine prepared?

22         A.      No.  The daily move history

23   was compiled electronically, some

24   information was put in manually.  CSX

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                 167

1    computer talked with the Holt computer to

2    say what units moved on the rail line.

3    We looked at information that CSX -- that

4    Sea Star inputted into the system.

5         Q.    And over what period of

6    time did you collect the information from

7    CSX?

8         A.    It still goes on.

9         Q.    Do you have any of this

10   information in documentary form?

11        A.    Certainly.  All you have to

12   do is look at the move histories that

13   were already provided.

14        Q.    Sir, I am asking whether

15   you have any of the CSX information in

16   documentary form?  I'm sorry if I was

17   unclear.

18        A.    Then I don't understand the

19   question.

20        Q.    Do you have any of the

21   information provided by CSX in

22   documentary form?

23        A.    I still don't understand

24   what you mean because I would only reply

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis          168

1    to that, again, to look at the individual

2    move history.

3         Q.    And the move history is a

4    document that who prepared?

5         A.    It is prepared from the

6    computer system.

7         Q.    So it is a document that

8    someone in the Holt organization

9    prepares; is that correct?

10        A.    That is right.

11        Q.    Let me show you a copy of a

12   note dated May 17th of 2002, with

13   attachment, that I will ask the court

14   reporter to mark as exhibit 31 for

15   identification.

16            - - -

17            (Whereupon, Exhibit

18        Number 31 was marked for

19        identification.)

20            - - -

21   BY MR. ARMSTRONG:

22        Q.    Do you recognize those

23   documents?

24        A.    Yes, I do remember this.

ESQUIRE DEPOSITION SERVICES

A-514

Arthur B. Davis                169

1          Q.     Is that a true and correct

2    copy of a note that you sent to Andy?

3          A.     It looks like it.

4          Q.     Is the second page a true

5    and correct copy of the attachment?

6          A.     Probably.

7          Q.     Do you recognize the

8    handwriting on the second page?

9          A.     Yes.

10         Q.     Do you know what the

11   checkmarks mean?

12         A.     No.

13         Q.     Whose handwriting is that?

14         A.     Lorraine Robbins.

15         Q.     You are sending the note

16   May 17th of 2002; is that correct?

17         A.     That's correct.

18         Q.     How did you send that to

19   Mr. Rooks?

20         A.     I probably faxed it.

21         Q.     Now, can you read the dates

22   that are handwritten?

23         A.     Yes.

24         Q.     How many of those dates are

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                170

1    proper to April 26th of 2002?

2         A.    Ten.

3         Q.    You are complaining to Mr.

4    Rooks about a CSX document, is that

5    correct, indicating various moves?

6         A.    I am not complaining about

7    a document. I am saying I have attached

8    a copy of a notice from CSX Rail listing

9    charges that are being in invoiced to

10   Emerald Equipment Leasing for the

11   repositioning of equipment.

12             It is the position of CSX

13   to hold this equipment in the rail yard

14   until they collect the charges.

15             Lorraine was kind enough to

16   add the date of the freight move to the

17   schedule to aid you in checking the move

18   further within your system.

19             We appreciate if you would

20   contact me next week and advise of your

21   findings. I am not complaining about a

22   document.

23        Q.    You are complaining that

24   Mr. Rooks is not paying the charges

ESQUIRE DEPOSITION SERVICES

A-516

Arthur B. Davis                 171

1     listed on that document; is that correct?

2          A.     I am not complaining about

3     anything.

4                MR. MOLDOFF:  Object

5          to the form of the question.

6          Q.     Were you asking Mr. Rooks

7     to pay the charges listed on that

8     document?

9          A.     I am asking Mr. Rooks to

10    take a look at this document and to talk

11    with me about it and let him know that

12    CSX is holding the equipment in the yard

13    until they collect the charges.

14         Q.     Why would Mr. Rooks want to

15    look at that document?

16         A.     Because if unit number PRMU

17    650713 was sent into the yard, into the

18    CSX yard as a unit on a flat car and they

19    had assessed charges he should want to

20    know about it because that unit could

21    have been sent in by him, by Sea Star.

22    It may have a load in it.  It may be

23    empty, he may be using it, he would like

24    to know, I am sure that, the equipment,

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                172

1    in fact, was there.

2        Q.    Were you expecting Mr.

3    Rooks to pay the charges for

4    repositioning equipment prior to April

5    27th of 2002?

6        A.    No.

7        Q.    So you were just sending

8    this as a kindly gesture?

9        A.    Not a kindly gesture and

10   that's not polite quite frankly.

11           There are units that are on

12   here that show that the equipment moved

13   after the date that you specified.

14       Q.    Shipments in process; is

15   that correct?

16       A.    I don't know.

17       Q.    Did you ever make an

18   investigation?

19       A.    It wasn't up to me to have

20   to investigate.  They could have been

21   using it.  This is a reposition.

22           MR. MOLDOFF:  Okay.

23       Q.    And did you send Mr. Rooks

24   any other documents like this CSX

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                173

1    documents?

2         A.    I don't know.  I may have.

3         Q.    Now, did you download and

4    print this CSX document?

5         A.    No.

6         Q.    How did you get it?

7         A.    I probably received that as

8    a fax.

9         Q.    From whom?

10        A.    CSX rail.

11        Q.    Can you tell?

12        A.    I can't tell.

13        Q.    Let me show you a copy of a

14   telefax dated September 24th of 2003

15   together with attachment which I ask the

16   court reporter to mark as exhibit 32 for

17   identification.

18              - - -

19              (Whereupon, Exhibit

20         Number 32 was marked for

21         identification.)

22              - - -

23   BY MR. ARMSTRONG:

24        Q.    Do you recognize that

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                    174

1   document?

2          A.    I do remember seeing this.

3          Q.    Is that a true and correct

4   copy of a telefax that you received?

5          A.    Probably.

6          Q.    On September 24th of 2003,

7   you were still working for MBC Leasing,

8   Incorporated; is that correct?

9          A.    I was doing work for them,

10  yes.

11         Q.    He says quote just please

12  make sure you are not claiming payment

13  for units and time periods covered under

14  self billing reports from Sea Star

15  unquote.

16             Do you see that?

17         A.    Yes, I do.

18         Q.    How did you make sure that

19  you were not claiming payment for units

20  and time periods covered under

21  self-billing reports from Sea Star?

22         A.    As we talked about it

23  earlier this morning, not having received

24  copies of the manifests, we could not

ESQUIRE DEPOSITION SERVICES

A-520

Arthur B. Davis            175

1    know what units were on board the ships.

2            So is it possible that a

3    unit was billed, yes.  It is possible

4    that a unit was billed for which Sea Star

5    paid into NPR, Incorporated and if they

6    had the manifests as were promised then

7    we would be able to adjust the bill

8    accordingly.

9        Q.    Did you, after receiving

10   that telefax, contact Scott Crieger and

11   say I can't make sure?

12       A.    I am sure I did.

13       Q.    Do you recall specifically

14   telling him that?

15       A.    I think so.

16       Q.    When did you do that?

17       A.    Whenever -- in close

18   proximity to receipt.

19       Q.    Did you call him on the

20   phone?

21            MR. MOLDOFF:  Just to

22       clear up some confusion, I don't

23       think Art understood the question.

24            MR. ARMSTRONG:  I'm

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                176

1        sorry, counsel, you know, you could

2        objection as to form, but we are

3        not getting into argument at this

4        point.

5               MR. MOLDOFF:  You are

6        going to have an unclear

7        transcript.

8               MR. ARMSTRONG:  I

9        don't care.

10              If you want to clarify it

11       on cross-examination.

12              MR. MOLDOFF:  If that

13       is the way you want to conduct the

14       deposition.

15              MR. ARMSTRONG:  Fine.

16       BY MR. ARMSTRONG:

17       Q.     Let me show you a copy of a

18       document that's been identified as

19       plaintiffs exhibit 6 to the deposition of

20       Mr. Allen, John Allen.

21              Do you recognize that

22       document?

23       A.     Yes, I do.

24       Q.     Is that a correct copy of

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis          177

1     the telefax that you received?

2          A.     I believe so.

3          Q.     Does that represent the

4     agreement, that is the second page,

5     represent the agreement between Greenwich

6     Terminals and General Transportation

7     Services?

8          A.     Yes.

9          Q.     Let me show you a copy of a

10    document that's been identified as

11    plaintiffs exhibit 3 to the deposition of

12    John Allen.

13               Can you identify that?

14         A.     I don't recall this.

15         Q.     Do you know who prepared

16    that?

17         A.     Not offhand.

18         Q.     Does it look like something

19    that someone in your organization would

20    have prepared?

21         A.     No.

22         Q.     Let me show you a copy of a

23    document that's been identified as

24    Plaintiffs exhibit 5 to the deposition of

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis          178

1    John Allen.

2              Can you identify that?

3        A.    Yes.

4        Q.    Do you recall who prepared

5    the telefax?

6        A.    Yes.

7        Q.    Do you know who prepared

8    the list attached?

9        A.    No.

10       Q.    At the time you sent that

11   telefax, what was the procedure for

12   off-hiring equipment at JAX PORT, that is

13   Emerald equipment?

14       A.    From the time that John

15   Allen took over the terminal and a piece

16   of equipment arrived at the terminal he

17   would have prepared a TIR and listed the

18   piece of equipment, had the date of the

19   return and it would have been signed by

20   both a Sea Star representative and the

21   GTS representative.

22       Q.    When did John Allen take

23   over the terminal?

24       A.    I would have to check the

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                 179

1    exact date.

2         Q.    Was it on or about August 1

3    of 2002?

4         A.    It was in that area.

5         Q.    How many locations were

6    there for the terminal at Blunt Island,

7    do you know?

8         A.    I don't understand the

9    question.

10        Q.    You have heard of the Sand

11   Lot, haven't you?

12        A.    I have.

13        Q.    That was part of the

14   terminal, wasn't it?

15        A.    Yes, it is.

16        Q.    And that was used by Sea

17   Star and others to return equipment, was

18   it not?

19        A.    They may have put equipment

20   in there, I don't know.

21        Q.    MBC Leasing was paying for

22   that, weren't they?

23        A.    They were.

24        Q.    Did you have anybody at the

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis            180

1    Sand Lot to receive equipment?

2        A.    When?

3        Q.    Before August 1?

4        A.    No.

5        Q.    How would you record what

6    equipment was delivered to the Sand Lot

7    before August 1?

8        A.    We would have relied upon

9    Sea Star's documentation.

10       Q.    Do you know whether anyone

11   was at the Intermodal Lot to receive

12   Emerald equipment?

13       A.    As we discussed this

14   morning, until John Allen started in to

15   operate that terminal there was not an a

16   party there.

17       Q.    Would it be fair to say

18   then that with respect to equipment

19   re-delivered at JAX PORT, the only

20   records that you have prior to John

21   Allen's involvement are are those

22   provided by Sea Star?

23       A.    In regard to the JAX

24   terminal?

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                181

1     Q.     Yes, sir.

2     A.     I believe so.

3     Q.     Now, did you ever receive a

4     copy of the JAX-PORT inventory when it

5     shut down the old NPR terminal?

6     A.     No.

7     Q.     Did you ever ask for one?

8     A.     No.

9     Q.     I show you a copy of an

10    e-mail dated July 23rd of 2002 together

11    where attachments and a second e-mail

12    dated July 23rd of 2002 with attachments

13    that have been marked as plaintiffs

14    exhibit 8 and 4 to John Allen's

15    deposition.

16          Do you recognize that

17    document?

18    A.     Yes.  I think I remember

19    this.

20    Q.     Let me show you a copy of

21    an e-mail dated July 23rd of 2002 which

22    has been marked as Plaintiffs exhibit 9

23    to John Allen's deposition.

24          Do you recall receiving

ESQUIRE DEPOSITION SERVICES

A-527

Arthur B. Davis                182

1   that document?

2        A.    I think I remember this as

3   well.

4        Q.    Let me show you a copy of

5   an e-mail dated September 26th of 2002

6   which has been marked as Plaintiffs

7   exhibit 18 to Mr. Allen's deposition.

8            Do you recall sending that

9   e-mail?

10       A.    Yes.

11       Q.    Did you ever receive the

12  copies of the TIRs from Mr. Allen?

13       A.    Certainly.

14       Q.    Let me show you a copy of a

15  letter together with attachments that it

16  has been marked as plaintiffs exhibit 19

17  to Mr. Allen's deposition.

18           Do you recall receiving

19  those documents?

20       A.    Yes, I think I remember

21  this.

22       Q.    In regard to that, had you

23  been aware that the old NPR, Incorporated

24  terminal was not secured until August 31

Arthur B. Davis                183

1    of 2002?

2              MR. MOLDOFF:

3         Objection to the question.

4              THE WITNESS:  I really

5         don't recall when it was all closed

6         up.

7         Q.    After you received that,

8    did you take any action?

9         A.    I don't understand the

10   question.

11        Q.    Do you recall any

12   discussions with Mr. Allen regarding the

13   contents of that report?

14        A.    Yes.

15        Q.    What discussions do you

16   recall?

17        A.    I recall that we talked

18   about the fact that containers were down

19   stacked, put on the ground, there was a

20   buffer between the yard and the rest of

21   the terminal to insure that no one could

22   just come in and just drop equipment or

23   take out equipment.

24        Q.    Who down stacked the

ESQUIRE DEPOSITION SERVICES

A-529

Arthur B. Davis                184

1  containers?

2        A.    GTS did.

3        Q.    Do you recall anything else

4  about that report?

5        A.    Not offhand.

6              MR. ARMSTRONG:  Let's

7  break.

8                - - -

9              (Whereupon, a short

10  recess was taken.)

11               - - -

12             MR. ARMSTRONG:  All

13  right.

14             MR. MOLDOFF:  Back on

15  the record.

16        Mr. Davis would like to

17  clarify something that he said

18  regarding exhibit 32 and the

19  response to the questions in

20  connection with exhibit 32.

21             THE WITNESS:  I am not

22  sure exactly what I think I heard

23  in regard to this exhibit which

24  Scott Crieger said to me in the

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis          185

1      cover sheet just please make sure

2      you are not claiming payments for

3      units on time periods covered under

4      self-billing reports from Sea Star.

5              And I thought that your

6      question related to in-transit on

7      ships.  At least that's what I

8      think I heard.

9              And that's why I answered

10     if we had the manifests that we had

11     been asking for, that were never

12     received we could have adjusted

13     accordingly.

14             When we invoiced for units,

15     whether they were reported on the

16     self-billing report or not reported

17     on the self-billing reports, we

18     took into account just a lot of

19     information.

20             We took into account the

21     information provided by Sea Star on

22     its own self-billing report for

23     days paid.

24             We took into account TIRs

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis          186

1    which showed when the equipment was

2    On-hired or off-hired, sales

3    information, geographic locations

4    such as it was gate-out of

5    Philadelphia and ended up in

6    California and then ended up back

7    in San Juan where I sold it.

8         But no matter what, the

9    best of our knowledge, after

10   spending an immense amount of time

11   on our billings, we always gave

12   credit for the days paid and

13   pointed out in a lot of instances

14   that a credit was due on a piece of

15   equipment, was due to Sea Star

16   because it was overpaid.

17        I may have sold a piece of

18   equipment at a given point of time,

19   but it continued to appear after

20   the actual sale date and I hope

21   that clarifies for you.

22   BY MR. ARMSTRONG:

23        Q.    When you were referring to

24   manifests on the three vessels, you were

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis          187

1    referring to the NPR manifests, were you

2    not.

3          A.     That is correct.

4          Q.     And those are the manifests

5    that you never obtained from NPR; is that

6    correct?

7          A.     They weren't obtained from

8    anybody.

9          Q.     You didn't go down to

10   Gloucester City and say is there a copy

11   of the manifests for these vessels there?

12              MR. MOLDOFF:

13                Objection.  He testified

14           that he asked Sea Star for them and

15           he never received them from Sea

16           Star.

17   BY MR. ARMSTRONG:

18         Q.     You didn't ask anybody from

19   NPR?

20         A.     As far as I was concerned

21   there was nobody to ask.

22         Q.     Let me ask you about these

23   claim forms.  I have a few questions.

24              As I understand it you

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis          188

1   performed no inventories of Emerald

2   equipment before April 27th of 2002; is

3   that correct?

4        A.    That's correct.

5        Q.    What inventories of Emerald

6   equipment did you perform after April

7   27th of 2002?

8        A.    As stated this morning I

9   did take some inventory or inventories in

10  2003 when I was in Puerto Rico.

11       Q.    Did you take inventories at

12  any time at Packer Avenue?

13       A.    No.

14       Q.    Did you take any

15  inventories at JAX PORT?

16       A.    I personally did not.

17       Q.    Did anyone on your behalf?

18       A.    GTS did.

19       Q.    When did GTS inventory

20  Emerald equipment at JAX PORT?

21       A.    I would have to go back to

22  the documents where they showed what the

23  inventories were.

24       Q.    Did Mr. McDonald perform

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                 189

1      any inventories of Emerald equipment?

2             A.    I don't believe so.

3             Q.    Did you ask Inland Depots

4      for orders regarding Emerald equipment?

5             A.    I have asked some and Sea

6      Star provided many.

7             Q.    Sea Star provided Inland

8      Depot records as a matter of course?

9             A.    On occasion.

10            Q.    Did you investigate what

11     Emerald equipment was located in the

12     Dominican Republic as of April 27th of

13     2004?

14            A.    No, I did not.

15            Q.    Did you investigate whether

16     there were other locations where Emerald

17     equipment might be as of April 27th of

18     2004?

19            A.    No.

20            Q.    I am looking at a page and

21     this just happens to be one of 19

22     entitled schedule, 40 foot chassis 11 /

23     11 / 2003 ( amended 12 / 16 / 2003 ).

24            Am I correct in

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                190

1    understanding that this schedule

2    originally was prepared on November 11th

3    of 2003?

4         A.    May I?  Looking on how this

5    is laid out I don't believe this was

6    prepared by me.

7         Q.    Do you know who prepared

8    it?

9         A.    No.

10        Q.    Let me show you another

11   page.  For Emerald Equipment Leasing

12   invoice to Sea Star Line 11 / 11 / 2003

13   amended 8 / 23 / 2004, schedule 40 foot

14   chassis.

15            Do you recognize that page?

16        A.    This might be an early

17   billing, but it doesn't look like the

18   format that we were using.

19        Q.    This wasn't the format that

20   you were using in --

21        A.    -- it is possible, but

22   amended 8-23-2004.  No.

23        Q.    Do you recall having

24   columns, date on-hire?

ESQUIRE DEPOSITION SERVICES

A-536

Arthur B. Davis          191

1        A.    I recall having prefix

2   number - prefix number date on-hire, date

3   off-hire information that was Sea Star's

4   information that was Emerald's, how much

5   they paid, a spreadsheet that would show

6   a spread in there that would show the

7   actual days that were paid and under what

8   time period.  This looks like it is maybe

9   part of a schedule.

10       Q.    Let's look at document

11  E006622.  Is that the schedule?

12       A.    Yes.  This looks a lot more

13  like what we had produced which does not

14  look like what was previously shown to

15  me.

16       Q.    Let's look at that.

17  There's a column, first column is prefix.

18  What does that mean?

19       A.    Prefix of the number of the

20  unit itself.

21       Q.    Were there particular

22  prefixes relating to specific equipment?

23       A.    Yes.

24       Q.    How did you determine what

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                192

1    those prefixes were?

2        A.    That's something that was

3    done with the equipment.  The equipment

4    has those prefix numbers when we acquired

5    them.

6        Q.    When who acquired them?

7        A.    When Emerald acquired the

8    equipment in November of 1997.

9        Q.    From whom did Emerald

10    acquire the equipment?

11        A.    That was part of the NPR

12    transaction, the acquisition.

13        Q.    When you sold Emerald

14    equipment did you change the prefix

15    number?

16        A.    No.

17        Q.    Why not?

18        A.    Didn't find a need to.

19    NPR, Incorporated was out of business and

20    it was up to whoever the purchaser was to

21    put their own prefix on because their own

22    prefix would designate if they were going

23    to continue to use it -- in shipping

24    would designate their particular line.

Arthur B. Davis                  193

1          Q.     If the prefix was not

2    changed, how would you know that anyone

3    other than Emerald Equipment Leasing

4    owned the equipment if somebody bought it

5    for example,

6          A.     How would I know?  If I saw

7    it later you mean?

8          Q.     Yes.

9          A.     I would be able to look

10   into the database and see if I sold it.

11         Q.     How would a third party

12   know whether you had sold it or not?

13         A.     They would have to ask me.

14         Q.     So for every piece of

15   equipment with the PRRMC prefix, for

16   example, after April 27th of 2002,

17   someone would have to ask you to find out

18   whether or not it belonged to Emerald, is

19   that correct?

20         A.     Would you repeat that

21   please?

22                MR. ARMSTRONG:  Read

23         it back.

24         A.     That is correct.

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                  194

1          Q.      What about there's a column

2   number, was that an Emerald number?

3          A.      That was a specific number

4   applied to that one specific unit.

5          Q.      Another column is date

6   on-hire.  What's the meaning of that?

7          A.      That is the date on-hire

8   that Sea Star said they put the unit

9   on-hire.

10          Q.      Were you using Sea Star

11   documents to determine whether the unit

12   was on-hire?

13          A.      For the date -- for the Sea

14   Star date on-hire?

15          Q.      Yes.

16          A.      We used the Sea Star

17   documents.

18          Q.      Did you use any other

19   documents?

20          A.      Not for that.

21          Q.      The next column is date

22   off-hire.  What does that mean?

23          A.      The date that Sea Star said

24   they off-hired the unit.

ESQUIRE DEPOSITION SERVICES

A-540

Arthur B. Davis          195

1          Q.     How did you determine the

2    date off-hire for a particular piece of

3    equipment?

4          A.     Again we used Sea Star

5    information.

6          Q.     Did you use any other

7    information?

8          A.     Not for that.

9          Q.     You have per diem, what's

10   the meaning of that?

11         A.     The daily rental, the daily

12   charge that was to be paid for a piece of

13   equipment.

14         Q.     And what determination or

15   what documents did you use to determine

16   what the per diem was?

17         A.     The lease agreements.

18         Q.     Are you referring to the

19   equipment rental agreement?

20         A.     Yes.

21         Q.     There was no other

22   agreement, is that correct?

23              MR. MOLDOFF:

24              Objection to the question.

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis          196

1          THE WITNESS:  I know

2     of the May 1st agreement.

3          MR. MOLDOFF:  That's

4     been asked and answered.

5          THE WITNESS:  And the

6     4 / 29, as of 4 / 29 agreement.

7     Q.    The as of 4 / 29 agreement?

8     A.    Yes.

9     Q.    What is that?

10    A.    That was the other written

11    agreement.

12    Q.    Are you talking about the

13    equipment rental agreement dated as of

14    July 31st of 2002?

15    A.    Right effective 4 / 29.

16    Q.    And that is where I would

17    find the basis for the per diem

18    calculations?

19    A.    I believe so.

20    Q.    And there's a column actual

21    days paid.  Where did you get that

22    information?

23    A.    From the Sea Star

24    information.

Arthur B. Davis              197

1       Q.    All right.

2       A.    Their self-billing reports.

3       Q.    The next column is amount

4    paid.  Where did you get that

5    information?

6       A.    Sea Star billing reports.

7       Q.    The next column is actual

8    on-hire.  What does that mean?

9       A.    What we say the actual

10   on-hire was.

11      Q.    How did you determine what

12   the actual on-hire was for a particular

13   piece of equipment?

14      A.    We looked at the move

15   histories, we took into account

16   information supplied by Sea Star's

17   employees when they put information into

18   the Holt computer.  TIR information for

19   gate-out such as going out of

20   Philadelphia, gate-in information and so

21   on, railroad information.

22      Q.    You knew that Sea Star was

23   inventorying equipment at various

24   terminals including San Juan beginning

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis          198

1    late April of 2002; is that correct?

2         A.    They had equipment in San

3    Juan.

4         Q.    You knew that Sea Star was

5    inventorying equipment at various

6    terminals including that in San Juan

7    beginning in late April of 2002, is that

8    correct?

9              MR. MOLDOFF:  Object

10             to the form of the question.

11             THE WITNESS:  They had

12             equipment in San Juan, yes, they

13             did have equipment there.

14        Q.    Were they inventorying

15    equipment that was located there in the

16    Puerto Nuevo terminal in San Juan?

17             MR. MOLDOFF:  Was Sea

18             Star?

19        Q.    Wait a minute.

20             MR. MOLDOFF:  Hold

21             it.  I object.  I object.  You are

22             being argumentative and I object.

23        Q.    You know, do you not, that

24    as of April 27th of 2002 there was

ESQUIRE DEPOSITION SERVICES

A-544

Arthur B. Davis                199

1      Emerald equipment that had been on lease

2      to NPR, Incorporated located in the

3      terminal at Puerto Nuevo in San Juan; is

4      that correct?

5           A.    That is correct.

6           Q.    You know that one of the

7      things that Sea Star was doing was to

8      then inventory that equipment, is that

9      correct?

10                     MR. MOLDOFF:  Object

11               to the form of the question.  Do

12               you know?

13          A.    On April 27th.

14          Q.    On and after April 27th?

15          A.    I can't speak to on April

16     27th.

17          Q.    Can you speak to any date

18     after April 27th?

19          A.    Certainly.

20          Q.    What date can you first

21     speak to?

22          A.    The 22nd of June of 2002.

23          Q.    So as far as you know the

24     first time that Sea Star began to

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                200

1    inventory equipment was June 22nd of

2    2002?

3        A.    That is the first inventory

4    I received from them.

5        Q.    All right.

6            Mr. Davis, and do you know

7    how long it took to prepare that

8    inventory?

9        A.    I don't have any idea.

10        Q.    Did Mr. McDonald

11    participate in the inventory?

12        A.    No.

13        Q.    Was information as to the

14    location of Emerald equipment being

15    entered by Sea Star into the Holt

16    computer system?

17            MR. MOLDOFF:  At what

18        time?

19        Q.    At any time?

20        A.    Certainly.

21        Q.    So that information was

22    being entered into the computer system

23    beginning late April through at least a

24    three-week period; is that correct?

ESQUIRE DEPOSITION SERVICES