Arthur B. Davis                201

1          A.    I believe so.

2          Q.    And so you knew that Sea

3    Star was looking at locations of

4    particular equipment and putting the

5    information into the computer system; is

6    that right?

7          A.    No.

8          Q.    What did you think that Sea

9    Star was doing?

10         A.    I think that Sea Star was

11   providing tracking for gate-in and

12   gate-out information as it related to

13   specific pieces of equipment that they

14   were moving into and out of JAX and into

15   and out of Puerto Rico.

16         Q.    And was there information

17   being provided with respect to equipment

18   that did not move in that April, May or

19   time through June 22nd?

20         A.    As I said this was gate-in

21   and gate-out information that they were

22   putting into the computer system.

23         Q.    As far as gate-in

24   information is concerned, how did you

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis          202

1    determine what gate-in information

2    related to shipments in process?

3        A.    As I have said this morning

4    and this afternoon, the equipment that

5    was in transit on board the vessels could

6    not be tracked because we, in fact, never

7    received the manifests.

8        Q.    As far as gate-out

9    information is concerned, how did you

10   determine what equipment was involved in

11   shipments in prosess?

12       A.    I repeat the answer I just

13   gave you.

14       Q.    There's another column

15   actual off-hire.  What's the meaning of

16   that, sir?

17       A.    That's the date that we

18   believe the piece of equipment was, in

19   fact, off-hired.

20       Q.    And what is the basis of

21   your belief?

22       A.    It could be many things.

23   It could be a TIR that was signed.  It

24   could be a sale.  It could be the actual

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis        203

1    signed receipt of the piece of equipment.

2    It could have been on an inventory from

3    Sea Star and then sold.  There are many,

4    many different things that would go into

5    this.

6        Q.    And how would you determine

7    what the basis for your believe was, what

8    your belief was on the form that you

9    prepared?

10       A.    That's what I just said.

11       Q.    Is the basis of your belief

12   specified in the comments section?

13       A.    Yes.  We have provided

14   comments.

15       Q.    Is that the only basis for

16   your belief with respect to a particular

17   piece of equipment?

18       A.    We would have to go back to

19   each individual sheet we provided on this

20   piece of paper, general information as it

21   related to a specific unit.

22       Q.    All right.  But here I am

23   looking at PRMC120000.  It is not on your

24   page.  It is on the page that I am

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                204

1    looking at.

2           And this says the columns

3    date on-hire, date off-hire, quote not on

4    self-billing unquote.  What does that

5    mean?

6           A.     That means that it was not

7    found to be on the self-billing report.

8           Q.     This indicates under

9    comments -- well, it says actual on-hire

10    42902 actual off-hire 101702.

11           Those are determinations

12    that you and Lorraine Robbins made; is

13    that correct?

14           A.     That's correct.

15           Q.     Under comments with respect

16    to this piece of equipment it states

17    quote capital G.I. capital SJ 5 / 3 / 02,

18    capital RRTD capital JAX, capital TIR

19    looks like 6894910 / 17 / 02, capital AR

20    4 / 29 / 02 - 9 / 2502, capital PD zero,

21    owes 149 days unquote.  I correct that.

22    GISJ 5302 means gate-in San Juan on May 3

23    of 2002.

24           MR. MOLDOFF:  Wouldn't

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis          205

1   it be better if you showed him the

2   document.

3         MR. ARMSTRONG:  I

4   would be happy to.

5         MR. MOLDOFF:  Try to

6   answer the question.

7   BY MR. ARMSTRONG:

8         Q.     Does gate-in San Juan 5302

9   mean that it was gate-in to the Sea Star

10  terminal in San Juan on May 3 of 2002?

11        A.     What year are you talking

12  about?

13        Q.     I just gave you the year.

14        A.     Well, then we went through

15  a hole bunch of other things.

16        Q.     It is the first thing, sir.

17        A.     Okay, sir.

18        MR. MOLDOFF:  I will

19  make a copy if it makes it easier.

20        MR. ARMSTRONG:  No, it

21  is all right.

22        THE WITNESS:  All

23  right.  On the first unit under

24  comments we have GISJ 5302.  Does

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis            206

1     mean gate-in San Juan 5302?

2          Q.    That means that it was

3     coming into the Sea Star terminal on May

4     3 of 2002; is that correct?

5          A.    That's correct.

6          Q.    What's the next event that

7     you show?

8          A.    Returned to JAX with a TIR

9     on October 17 of 2002.

10          Q.    And that was a time when

11     Sea Star was moving Emerald equipment to

12     JAX?

13          A.    No.

14               MR. MOLDOFF:

15          Objection.

16          Q.    It wasn't?

17          A.    Emerald equipment was being

18     moved to JAX, to everywhere else from the

19     very beginning of when Sea Star started

20     to handle the customer base of NPR,

21     Incorporated.

22          Q.    All right.

23               You have a gate-in San

24     Juan?

ESQUIRE DEPOSITION SERVICES

A-552

Arthur B. Davis                    207

1          A.    That is correct.

2          Q.    May 3rd of 2002?

3          A.    Yes.

4          Q.    Your next event is return

5     to JAX; is that correct?

6          A.    That's correct.

7          Q.    You don't show a gate-out

8     San Juan, is that right?

9          A.    That is right.

10         Q.    So am I correct in

11    understanding that according to that

12    record that piece of equipment was

13    sitting in the terminal in San Juan from

14    May 3rd of 2002 through October 17 of

15    2002?

16              MR. MOLDOFF:  Object

17         to the form of the question.

18         A.    No.

19         Q.    And why am I incorrect?

20         A.    Because in October 17th

21    of --

22              First of all, I would need

23    to see the sheet to see if there were

24    other things on a particular piece of

Arthur B. Davis                208

1    paper.

2          Assuming for the moment

3    that there is not, this piece of

4    equipment was, in fact, returned to JAX.

5          Had we been provided with

6    the manifests and such that we asked for

7    we would be able to know the rest of the

8    information as to what happened with this

9    piece of equipment.

10          In the event that -- go

11    ahead.

12    Q.    Perhaps you did not

13    understand my question.

14    A.    I thought what you asked

15    was --

16    Q.    -- According to your

17    comments.

18          MR. MOLDOFF:  Let him

19    finish.

20    A.    Did this piece of

21    equipment sit in San Juan until the 17th

22    of October of 2002?

23    Q.    According to your comment

24    that's what the record shows, does it

Arthur B. Davis                209

1    not?

2        A.    It does not.

3        Q.    Where does the record show

4    that there was a gate-out San Juan

5    between May 3rd of 2002 and October 17th

6    of 2002?

7        A.    I will answer you again.

8    If we had been in receipt of all of the

9    documentation that we were supposed to

10   receive then we would not have so many

11   problems with this.

12           We could have sit down and

13   worked all of these things out.  We did

14   not receive it.  This container or

15   chassis didn't fly to JAX.  It was on a

16   ship.

17       Q.    Yes, sir.

18       A.    So it's could not have sat

19   in the terminal in San Juan until the

20   17th day of October.  It went out of San

21   Juan prior to the 17th day of October.

22       Q.    That's a good point.

23       A.    And, in fact, then was in

24   use with Sea Star.

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis          210

1        Q.      How was it in use by Sea

2   Star?

3        A.      How was it not in use by

4   Sea Star?  Sea Star didn't out of the

5   goodness of their heart decide to move a

6   piece of equipment from San Juan, a lone

7   chassis, back to JAX just to return it.

8   That didn't happen.

9            They used San Juan as a

10  dumping point for one ways wherever they

11  could.

12       Q.      Do you have any

13  documentation on that, sir?  Have you

14  produced all the documentation that you

15  have in that regard?

16       A.      I believe we have.

17           MR. MOLDOFF:  To make

18       the record clear, I think what Mr.

19       Davis said is Sea Star has not

20       produced the documents.  We

21       requested the manifests which would

22       have that information.

23           MR. ARMSTRONG:  I

24       won't bother to comment on that.

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                211

1    There were 13,000 pages of

2    documents, more or less, produced

3    with respect to equipment movements

4    on board.

5           THE WITNESS:  To

6    finish your line if I may and

7    pardon my interrupting.

8           MR. ARMSTRONG:  Yes.

9    There's not a question pending.

10           THE WITNESS:  I want

11    to finish this because let's finish

12    the rest of the line.

13           I have it as a TIR for unit

14    120000 coming into JAX on October

15    17th.

16           The rest of the information

17    came from Andy Rooks.  That's on

18    that line.  Or Andy Rooks said this

19    equipment was on-hire by Sea Star

20    Line 44902 through September 25th

21    of 2002, he paid zero and he owes

22    149 days.

23    BY MR. ARMSTRONG:

24           Q.    Where does Andy Rooks show

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis              212

1    that equipment was on-hire by Sea Star

2    Line?

3          A.    It was on a group of papers

4    that we returned as part of the

5    information that was provided to us and

6    it was one page out of 66 total pages of

7    information provided to us by Andy Rooks

8    when he started to review our invoices

9    and it was not on the self-billing

10   report.  That's what the capital AR

11   references --

12         Q.    -- Is that how you

13   determined that an unit is not on the

14   self-billing reports would be subject to

15   rent?

16         A.    These were his comments.

17   We used Sea Star information from their

18   own self-billing reports.

19              We used other information

20   such as TIRs, so Sea Star themselves

21   say -- Andy Rooks himself says I did not

22   have it on the self-billing reports.  I

23   owe you 149 days.  I returned it on the

24   September 25th, but guess what he didn't.

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis          213

1   He returned it on October 17th as

2   evidenced by a TIR issued in JAX number

3   68949.

4          Q.    In that line that you are

5   reading there, where does it say that

6   Andy Rooks says that the --

7          A.    -- That's AR.

8          Q.    That's not actual rent?

9          A.    Correct.  That's Andy

10  Rooks.

11         Q.    What's the meaning in your

12  forms of quote terminated and not

13  terminated unquote?

14         A.    Some of the equipment was

15  in fact off-hired.  Some of the equipment

16  was never off-hired.

17         Q.    Is there equipment that is

18  still on-hire?

19         A.    Not as far as I am

20  concerned.

21         Q.    Why not?

22         A.    Because the lease was

23  canceled.

24         Q.    These schedules were

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis          214

1    amended at various times, were they not?

2         A.    They were amended at

3    various times because we were reacting to

4    equipment that was being found as it was

5    being found.

6         Q.    All right.

7              Mr. Davis, and in your

8    document production you have produced

9    some amendments that were made during the

10   period, I believe May through August of

11   2004.

12             Do you recall that?

13        A.    Say that again.

14        Q.    You have produced some

15   amended schedules apparently dated

16   between May and August of 2004.  Do you

17   recall that?

18        A.    Sure.

19        Q.    Have you prepared any other

20   amendments after August of 2004?

21        A.    It is ongoing.

22        Q.    What is ongoing?

23        A.    Invoicing.

24        Q.    So your schedules are not

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis          215

1    the same today that they were in August

2    of 2004?

3         A.    We haven't really adjusted

4    too many.

5         Q.    Which ones have you

6    adjusted?

7         A.    We had adjusted, after we

8    received the documents under discovery,

9    we had adjusted for 16 days for a period

10   of May 16 through May 30th where the

11   original self-billing report that we

12   received and MBC Leasing received only

13   included certain payments,and

14   acknowledgement of certain units and not

15   all the units, but we were never in --

16   never did get the balance of the detail

17   of the self-billing reports.

18         So we went back to provide

19   the credit for the 16 days because they

20   paid for it, just wouldn't give us the

21   detail for it.

22         Q.    Did you do anything else

23   that you recall?

24         A.    I know that we have looked

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis          216

1    at some of the Sea Star TIRs that were

2    provided and some of those TIRs show

3    gate-out which is an earlier date than

4    what we had.

5         So we will be adjusting the

6    bills accordingly and if the TIRs shows

7    that it goes the other way and it wasn't

8    taken back out again then we can give

9    credit where it is due.

10        Q.    Did you find any

11   duplication of unit numbers in your

12   schedules?

13        A.    I am not sure I understand

14   your question.

15        Q.    Did you review the

16   schedules to determine whether there were

17   duplications with respect to the same

18   unit, that is you had listed the same

19   unit twice?

20        A.    There are many instances

21   where the unit is listed twice, but it is

22   also listed twice because you had more

23   than one thing that happened.

24            It could have come into

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis            217

1      Packer Avenue Marine Terminal and gone

2      back out.  Come back in or gone back out

3      again or vice versa and then ended up in

4      JAX.

5              But the report is repleat

6      with -- not on the self-billing report.

7              We show a gate-in to JAX

8      CSX Railroad from a third party and then

9      returned to JAX four months later with a

10     TIR not on the self-billing report, but

11     Andy says okay, I really think I owe you

12     June 25 to October 17th, I paid you zero

13     I owe you 114 days.  In that case it was

14     the same dates , but the bills -- they

15     speak for themselves and that kind of

16     thing is over and over and over again.

17         Q.    What do you mean when you

18     say over and over and over again?

19         A.    Where it is not on the

20     self-billing report, but it went out of

21     Packer Avenue Marine Terminal and was

22     returned someplace with a TIR or it was

23     sold in Puerto Rico.

24         Q.    In terms of saying it went

ESQUIRE DEPOSITION SERVICES

A-563

Arthur B. Davis          218

1    out of Packer Avenue Marine Terminal, am

2    I correct in understanding that you could

3    not or did not determine whether it went

4    out as a shipment in process in late July

5    or early may?

6        A.    If it did -- did you

7    determine?  I couldn't determine for the

8    same reasons I have said before.

9        Q.    All right.

10            Mr. Davis, on the DV

11    listings, have you amended those in the

12    last few months?

13        A.    I don't believe so.

14        Q.    How did you determine that

15    the units listed on these DV schedules

16    were units that were actually used by Sea

17    Star?

18        A.    You would have to go back

19    to each individual unit to see.

20        Q.    And did you go back to each

21    individual unit then to ascertain that

22    there was an equipment interchange

23    agreement showing delivery of that unit

24    to Sea Star?

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                219

1          A.        Sea Star had already been

2    using all of the equipment that they had

3    in-house on hand since the beginning of

4    May, so by the time wegot to this other

5    written agreement, which was to be

6    effective as of 4 / 29 five and a half

7    months had already passed.  It didn't

8    make any difference.  They had and used

9    what they had and what they used.

10          Q.        And how did you tell from

11    the DV schedule that equipment you have

12    listed was not being paid by NPR as of

13    April 26th of 2002, but was missing or

14    POS as of that date?

15          A.        Because there had to be

16    some basis upon which to start to bill it

17    in the first place.

18          Q.        That's fine.

19              Now, tell me what the basis

20    for starting to bill equipment listed on

21    the DV schedule was when you prepared

22    those schedule?

23          A.        It's those same basis as

24    the actual billing that we did.  We took

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis          220

1    the Sea Star self-billing reports.  We

2    took gate-in and gate-out information.

3    We took TIR data.  We took third party

4    information.

5         Q.    What third party

6    information did you get?

7         A.    From CSX, from CSX Rail,

8    from information provided at depots by

9    Sea Star Line, TIR gate-out, but it never

10   came back anywhere.  If it never came

11   back anywhere then the unit wasn't

12   returned.

13        Q.    Did you take third party

14   information from the Dominican Republic?

15        A.    I did not receive any third

16   party information from the Dominican

17   republic to the best of my knowledge.

18        Q.    Did you ask any third party

19   in the Dominican republic as to equipment

20   that they were holding?

21        A.    I was not aware of them

22   holding equipment.

23        Q.    You were not?

24        A.    No.

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                221

1      Q.    All right.

2           Mr. Davis, did you ask

3      anybody about equipment in the Dominican

4      Republic?

5      A.    If the equipment was, in

6      fact used by Sea Star it was Sea Star

7      Line's responsibility to return that

8      equipment no matter where it went.

9      Q.    Are you saying this

10     afternoon that you have never been aware

11     that third parties in the Dominican

12     Republic have held Emerald equipment that

13     was leased by NPR, Incorporated for the

14     reason that NPR, Incorporated and Emerald

15     didn't pay their bills?

16     A.    That Emerald didn't pay its

17     bills.  Emerald didn't have bills to pay.

18     Q.    That's probably the way it

19     was set up, but are you saying this

20     afternoon that you have never been aware

21     that parties in the Dominican Republic

22     have held Emerald equipment because of

23     NPR, Incorporated's failure to pay bills

24     such as bills for stevedoring or terminal

ESQUIRE DEPOSITION SERVICES

A-567

Arthur B. Davis                    222

1    operations?

2        A.    Teddy Hineson, I went to

3    the DV with Marty McDonald and met with

4    Teddy Hineson who said I think that I am

5    entitled to the NPR, Incorporated

6    equipment.

7            We said you are not

8    entitled to the NPR -- I mean Emerald

9    equipment because NPR, Incorporated did

10   not pay you and, in fact, much of that

11   equipment was, in fact recovered and paid

12   for and credit was given to Sea Star if

13   Sea Star had used it.

14       Q.    You knew that there were

15   other vendors unquote that were holding

16   Emerald equipment in the Dominican

17   Republic, did you not?

18       A.    That is the only one that

19   comes to mind.  When we did an invoice to

20   Sea Star, if Sea Star Line used the piece

21   of equipment and didn't return the piece

22   of equipment Sea Star had to pay for the

23   piece of equipment.

24       Q.    You invoiced Sea Star for

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis          223

1    Emerald equipment that you knew was in

2    the Dominican Republic and being held by

3    vendors on and after April 26th of 2002,

4    did you not?

5              MR. MOLDOFF:  Object

6         to the form of the question.

7         A.    No.

8         Q.    Let me show you a copy of a

9    letter dated --

10        A.    -- because if Sea Star had

11   the piece of equipment and they used the

12   piece of equipment then it was up to Sea

13   Star to do whatever it was going to do

14   with the piece of equipment.

15             The record reflects in

16   those beginning weeks that equipment came

17   from the Dominican Republic as well as to

18   the Dominican Republic.  Look at your own

19   load summaries.

20             Again you did not provide

21   manifests for the Samone J. or The

22   Trader.  You provide load summaries, not

23   the same, but your own load summaries

24   show hundreds and hundreds and hundreds

Arthur B. Davis                      224

1          of pieces of equipment going to and from

2          the Dominican Republic as well as to

3          other island.

4               Your own e-mails talk about

5          the fact that there will be an abrupt

6          stop to the movement of equipment in the

7          Dominican Republic.  We are going to

8          abruptly stop the service.

9               Did Sea Star do anything to

10         bring the equipment that was there that

11         they sent back to Puerto Rico?  I don't

12         know, but if they sent it there in August

13         and there was an abrupt stop in October

14         that's not me that has to pay for it.  It

15         is Sea Star that has to pay for it.

16              Q.     Please try to concentrate

17         on the period April 26th, 27th of 2002.

18              You knew, did you not, that

19         as of April 26th, 27th of 2002 vendors in

20         the Dominican Republic were holding

21         Emerald equipment because of NPR,

22         Incorporated's failure to pay their

23         bills?

24              A.     No.

ESQUIRE DEPOSITION SERVICES

A-570

Arthur B. Davis                225

1      Q.    No one told you that?

2      A.    That is right.

3      Q.    Okay.  Let me show you a

4    copy a letter dated April 11 of 2002, I

5    ask the court reporter to mark as exhibit

6    33 for identification.

7                  - - -

8                  (Whereupon, Exhibit

9         Number 33 was marked for

10            identification.)

11                 - - -

12    BY MR. ARMSTRONG:

13      Q.    Do you recognize that

14    letter?

15      A.    I only recognize it from

16    when I was providing documents on the

17    document production request.

18      Q.    Let me show you copies of

19    some e-mails that I will ask the court

20    reporter to mark as exhibit 34 for

21    identification.

22                 - - -

23                 (Whereupon, Exhibit

24         Number 34 was marked for

ESQUIRE DEPOSITION SERVICES

A-571

Arthur B. Davis                  226

1      identification.)

2              - - -

3      BY MR. ARMSTRONG:

4          Q.    Do you recognize those

5      documents?

6          A.    Yes, I do.

7          Q.    As of May 9th of 2002, were

8      you billing Sea Star Line for Emerald

9      Leasing equipment located at Illinois

10     Auto?

11             MR. MOLDOFF:  While

12         he's looking at that I am going to

13         get this copied.

14         A.    In regard to Illinois

15     Auto --

16             MR. MOLDOFF:  Wait.

17         Wait.  Wait until I come back.

18             - - -

19             (Whereupon, a short

20         recess was taken.)

21             - - -

22             THE WITNESS:  In

23         regard to Illinois Auto, I believe

24     we started to bill on the May 8th.

ESQUIRE DEPOSITION SERVICES

A-572

Arthur B. Davis            227

1        Q.        You knew that Illinois Auto

2    was holding equipment and refusing to

3    release it to Sea Star, did you not?

4                MR. MOLDOFF:  Object

5            to the form of the question.

6                THE WITNESS:  That's

7            not incorrect.

8    BY MR. ARMSTRONG:

9        Q.        When did you begin billing

10    for equipment held at Fast Lane?

11        A.        When it left Fast Lane.

12        Q.        When was that?

13        A.        Whenever it left.

14        Q.        Were you billing Sea Star

15    for equipment at Fast Lane on May 9 of

16    2002?

17        A.        I don't know.

18        Q.        When did you begin billing

19    Sea Star for equipment at Global

20    Intermodem?

21        A.        Whenever it was taken out.

22        Q.        Was that equipment taken

23    out before May 9th of 2002?

24        A.        I don't know.

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                228

1        Q.      Were you billing Sea Star

2    for equipment located at Empire Truck

3    Lines on May 9 of 2002?

4        A.      I don't know.

5        Q.      Let me show you a copy of

6    an e-mail dated May 13th of 2002 which I

7    will ask the court reporter -- I'm

8    sorry -- a series of e-mails dated May

9    13th of 2002 that I will ask the court

10   reporter to mark as exhibit 35 for

11   identification.

12                - - -

13               (Whereupon, Exhibit

14       Number 35 was marked for

15       identification.)

16                - - -

17   BY MR. ARMSTRONG:

18       Q.      Do you recognize those?

19       A.      Yes, I do.

20       Q.      Did you not know on May 13

21   of 2002 that Illinois Auto was still

22   refusing to release Emerald equipment?

23       A.      I did not.

24       Q.      Lorraine Robbins did not

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                    229

1       discuss that with you?

2               A.      I did not know.

3               Q.      What was Lorraine's Robbins

4       position with respect to the Emerald

5       Equipment Leasing, what were her duties?

6                       MR. MOLDOFF:  Asked

7               and answered.

8               A.      She was working with me to

9       review all of the data and we started to

10      create invoices accordingly.

11              Q.      Who is Jack Mohnacs

12      M-0-H-N-A-C-S?

13              A.      He was inhouse counsel.

14              Q.      Inhouse counsel for whom?

15              A.      One of the old companies.

16              Q.      Let me show you a copy of

17      an e-mail dated June 7th of 2002 that I

18      will ask the court reporter to mark as

19      exhibit 36 for identification.

20                      - - -

21                      (Whereupon, Exhibit

22              Number 36 was marked for

23              identification.)

24                      - - -

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                230

1    BY MR. ARMSTRONG:

2        Q.    Do you recognize that

3    document?

4        A.    Yes, I do.

5        Q.    Do you recall whether you

6    removed the equipment from the vessel?

7        A.    Yes, we did.

8        Q.    Let me show you a copy of

9    an e-mail dated June 7th of 2002 that I

10   will ask the court reporter to mark as

11   exhibit 37 for identification.

12               - - -

13               (Whereupon, Exhibit

14       Number 37 was marked for

15       identification.)

16               - - -

17   BY MR. ARMSTRONG:

18       Q.    Do you recognize that

19   document?

20       A.    Only from when it was

21   produced.

22       Q.    Let me show you a copy of a

23   memo together with attachments that I

24   will ask the court reporter to mark as

ESQUIRE DEPOSITION SERVICES

A-576

Arthur B. Davis                231

1    exhibit 38 for identification.

2                    - - -

3                    (Whereupon, Exhibit

4    Number 38 was marked for

5    identification.)

6                    - - -

7    BY MR. ARMSTRONG:

8        Q.    Do you recognize those

9    documents?

10       A.    Yes, I do.

11       Q.    Whose signature is on the

12   first page?

13       A.    Martin McDonald.

14       Q.    And what are the documents

15   comprising exhibit 38?

16       A.    Are you asking me to tell

17   you what --

18       Q.    -- To your knowledge what

19   are they?

20       A.    It is a listing of stacks

21   of chassis that Marty signed for on July

22   10th of 2002.

23       Q.    Did he discuss signing that

24   with you before he signed?

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                    232

1           A.    I would think he did.

2           Q.    Do you recall?

3           A.    I think so so.

4           Q.    Let me show did you a copy

5    of a memo together with an attached list

6    which I will ask the court reporter to

7    mark as exhibit 39 for identification.

8                      - - -

9                 (Whereupon, Exhibit

10          Number 39 was marked for

11          identification.)

12                     - - -

13   BY MR. ARMSTRONG:

14          Q.    Do you recognize those

15   documents?

16          A.    Yes.

17          Q.    Do you recognize the

18   signature on the first page?

19          A.    Yes.

20          Q.    Is that Martin McDonald?

21          A.    It is.

22          Q.    And what are these

23   documents?

24          A.    This is a list of 45 foot

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                233

1    containers that he signed for.

2        Q.    Let me show you a copy of a

3    memo together with attachment dated July

4    12 of 2002 which I will ask the court

5    reporter to mark as exhibit 40 for

6    identification.

7              - - -

8              (Whereupon, Exhibit

9        Number 40 was marked for

10        identification.)

11              - - -

12    BY MR. ARMSTRONG:

13        Q.    Do you recognize those

14    documents?

15        A.    Yes.

16        Q.    What are those documents?

17        A.    These are nine 45 foot

18    chassis that he signed for.

19        Q.    Those were in inventory?

20        A.    He signed for the receipt

21    of these nine pieces.

22        Q.    Did he investigate whether

23    the nine pieces were actually on the

24    premises before he signed for them?

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                234

1          A.    I would hope so.

2          Q.    Are those pieces that you

3     were going to move to showroom?

4          A.    I am not sure where these

5     would have gone.

6          Q.    Let me show you a copy of a

7     memo together with attachment dated July

8     17th of 2002 that I will ask the court

9     reporter to mark as exhibit 41 for

10      identification.

11                - - -

12                (Whereupon, Exhibit

13           Number 41 was marked for

14           identification.)

15                - - -

16     BY MR. ARMSTRONG:

17          Q.    Do you recognize those

18     documents?

19          A.    Not particularly.

20          Q.    Let's mow show you a copy

21     of a letter dated July 18 of 2002

22     together with attachments that I will ask

23     the court reporter to mark as exhibit 42

24     for identification.

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                    235

1                          - - -

2                          (Whereupon, Exhibit

3              Number 42 was marked for

4              identification.)

5                          - - -

6      BY MR. ARMSTRONG:

7              Q.     Do you recognize the letter

8      and the attachments?

9              A.     I think so.

10             Q.     Do you recall whether you

11     communicated with anyone at Sea Star Line

12     regarding the contents of the Hine

13     letters?

14             A.     I don't recall.

15             Q.     Let me show you a copy of

16     an e-mail together with attachments dated

17     July 23rd of 2002 which I will ask the

18     court reporter to mark as exhibit 43 for

19     identification.

20                         - - -

21                         (Whereupon, Exhibit

22             Number 43 was marked for

23             identification.)

24                         - - -

ESQUIRE DEPOSITION SERVICES

A-581

Arthur B. Davis                236

1    BY MR. ARMSTRONG:

2        Q.    Do do you recall receiving

3    that e-mail and the attachments?

4        A.    I think so.

5        Q.    And did you communicate

6    with anyone from Sea Star regarding that

7    e-mail?

8        A.    I believe I did.

9        Q.    With whom did you

10    communicate?

11        A.    Andy Rooks.

12        Q.    What was the substance of

13    your communication with Andy Rooks?

14        A.    I believe that it would

15    have -- we would have talked about what

16    equipment was -- what or when the

17    equipment would have gone into any of

18    these terminals, these inland -- what do

19    you call them?  Inland depots.

20        Q.    Were you billing Sea Star

21    for that equipment?

22        A.    I would have to go back to

23    each individual item in order to

24    determine that.

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                    237

1        Q.     Let me show you a copy of

2     an e-mail dated August 9th of 2002 --

3        A.     -- If I may, just to go

4     back into this for a second.  I notice

5     one of the terminals, inland depots

6     that's listed on her is Worthy Cartage in

7     Cincinnati which is a Sea Star Line

8     depot.

9        Q.     Let me show you a copy of

10    an e-mail dated August 9th of 2002 that I

11    will ask the court reporter to mark as

12    exhibit 44 for identification.

13                - - -

14                (Whereupon, Exhibit

15          Number 44 was marked for

16          identification.)

17                - - -

18    BY MR. ARMSTRONG:

19        Q.     Do you recall receiving

20    that e-mail?

21        A.     Yes, I do.

22        Q.     After your receipt did you

23    take any action?

24        A.     I did.

ESQUIRE DEPOSITION SERVICES

A-583

Arthur B. Davis          238

1      Q.    What action did you take?

2      A.    I called the gentleman to

3   find out if he had the equipment.

4      Q.    What did he say?

5      A.    No.

6      Q.    Were you billing Sea Star

7   for that equipment?

8      A.    I would have to find out by

9   going to each individual unit.

10      Q.    Let me show you a copy of

11   an e-mail dated August 12 of 2002 that I

12   will ask the court reporter to mark as

13   exhibit 45 for identification.

14            - - -

15            (Whereupon, Exhibit

16      Number 45 was marked for

17      identification.)

18            - - -

19   BY MR. ARMSTRONG:

20      Q.    Do you recall receiving

21   that e-mail?

22      A.    I remember this.

23      Q.    After receiving the e-mail

24   did you take any action?

ESQUIRE DEPOSITION SERVICES

A-584

Arthur B. Davis                239

1          A.    I did.

2          Q.    What action did you take?

3          A.    I was in contact with the

4    rail yard about the chassis.

5          Q.    Were you billing Sea Star

6    for that chassis?

7          A.    I would have to go back to

8    the billing.

9          Q.    Let me show you a copy of

10   an e-mail dated October 4 of 2002 that I

11   will ask the court reporter to mark as

12   exhibit 46 for identification.

13               - - -

14               (Whereupon, Exhibit

15         Number 46 was marked for

16         identification.)

17               - - -

18   BY MR. ARMSTRONG:

19         Q.    Do you recall receiving

20   that e-mail?

21         A.    I do.

22         Q.    After after you received

23   that e-mail what action did you take?

24         A.    I contacted Mr. Adams at

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis          240

1    Sarah Lee.

2         Q.    Were you billing Sea Star

3    for that unit or those units?

4         A.    I would have to go back to

5    the individual units to determine that.

6         Q.    Did you recover those

7    units?

8         A.    I would have to go back to

9    the individual units.

10         Q.    Let me show you a copy of

11    two e-mails dated October 10 of 2002

12    which I will ask the court reporter to

13    mark as exhibit 47 for identification.

14              - - -

15              (Whereupon, Exhibit

16         Number 47 was marked for

17         identification.)

18              - - -

19    BY MR. ARMSTRONG:

20         Q.    Do you recognize those

21    documents?

22         A.    I think so.

23         Q.    Were you aware that Global

24    in Memphis was holding equipment?

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                    241

1          A.     I don't recall at this

2     time.

3          Q.     After you received the

4     e-mail from Lisa Florence, do you recall

5     taking any action?

6          A.     I don't remember.

7          Q.     Were you billing Sea Star

8     for the equipment?

9          A.     I would have to go back to

10     each individual unit.

11          Q.     Let me show you a copy of

12     an e-mail or two e-mails dated November

13     1st of 2002 that I will ask the court

14     reporter to mark as exhibit 48 for

15     identification.

16               - - -

17               (Whereupon, Exhibit

18          Number 48 was marked for

19          identification.)

20               - - -

21     BY MR. ARMSTRONG:

22          Q.     Do you recognize that?  Do

23     you recall those e-mails?

24          A.     Yes, I do.

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis          242

1          Q.     Do you recall what the --

2    whether the problem was resolved?

3          A.     No, I don't.

4          Q.     Do you recall what action

5    you took?

6          A.     I don't.

7          Q.     Let me show you a copy of

8    an e-mail dated December 16 of 2002.  It

9    is together with other e-mails that I

10   will ask the court reporter to mark as

11   exhibit 49 for identification.

12                  - - -

13                  (Whereupon, Exhibit

14          Number 49 was marked for

15          identification.)

16                  - - -

17   BY MR. ARMSTRONG:

18          Q.     Do you recognize those

19   documents.

20          A.     Yes, I do.

21          Q.     All right.

22                  MR. MOLDOFF:  Off the

23          record.

24                  - - -

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                 243

1               (Whereupon, a

2        discussion was held off the

3        record.)

4                     - - -

5        BY MR. ARMSTRONG:

6               Q.     Do you recognize that

7        document exhibit 49?

8               A.     I do.

9               Q.     You say in part quote I

10       want to move some equipment back to JAX.

11       What's the cost to your pier in JAX?

12               Did you receive a cost from

13       Mr. Rooks?

14               A.     I don't remember if I

15       received it from Mr. Rooks or Mr. Bates.

16               Q.     Did you move the equipment

17       back to JAX?

18               A.     We did.

19               Q.     Where was the equipment

20       located before you moved it to JAX?

21               A.     In San Juan.

22               Q.     Where in San Juan?

23               A.     Inside the port -- inside

24       the terminal that Sea Star had.

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis          244

1      Q.      Did you charge Sea Star per

2      diem for that equipment through the time

3      that it arrived in JAX?

4      A.      I would have to look at

5      each individual piece of equipment.

6      Q.      You say quote can we leave

7      the chains on the stacked chassis and

8      return them to you in JAX unquote.  What

9      does that mean?

10      A.      I am not quite sure I see

11      where you are reading.

12      Evidently the chassis had

13      already been stacked and there were

14      chains on them and I asked if as opposed

15      to taking off the chains and putting

16      chains back on could we just leave the

17      chains that was already on on the

18      equipment until it was in JAX.

19      Q.      And what was the response?

20      A.      I don't remember.

21      Q.      Did you take chains off,

22      the chains off in JAX?

23      A.      I believe that the chains

24      were returned by Alex Garcia of the AGA

Arthur B. Davis            245

1    Group who was the one that actually moved

2    the chassis.

3         Q.    Moved the chassis from

4    where to where?

5         A.    From San Juan back to the

6    states.

7         Q.    Sea Star did not move the

8    chassis from San Juan back to the

9    continental United States?

10        A.    I believe they did, but I

11   believe the company that actually paid

12   for the freight, if my recollection is

13   correct, was AGA Group.

14        Q.    Let me show you a copy of a

15   handwritten document that I will ask the

16   court reporter to mark as exhibit 50 for

17   identification.

18             - - -

19             (Whereupon, Exhibit

20        Number 50 was marked for

21        identification.)

22             - - -

23   BY MR. ARMSTRONG:

24        Q.    Did you prepare that

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                     246

1    document?

2        A.    I did.

3        Q.    Did you send it to

4    Lorraine?

5        A.    I did.

6        Q.    What did you mean when you

7    said quote we both know he will love that

8    part unquote?

9        A.    What I meant very simply is

10   so many pieces of equipment were found to

11   be missing from the self-billing report

12   and at that point we had just been

13   putting bill after bill after bill in.

14       Q.    Let me show you a copy of

15   an e-mail or series of e-mails which I

16   will ask the court reporter to mark as

17   exhibit 51 for identification.

18             - - -

19             (Whereupon, Exhibit

20       Number 51 was marked for

21       identification.)

22             - - -

23   BY MR. ARMSTRONG:

24       Q.    Do you recognize those

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis              247

1    e-mails?

2        A.    Yes.

3        Q.    March 5th of 2003, second

4    paragraph you state quote on a separate

5    issue what are your thoughts in regard to

6    the chains and binders unquote.

7            Are those the same chains

8    that you were referencing in December of

9    2002?

10       A.    Are you talking about the

11   previous exhibit?

12       Q.    Yes, sir, but I believe

13   that it is December 16 of 2002, exhibit

14   49?

15       A.    No.

16       Q.    So these were more chains?

17       A.    That is right.

18       Q.    And did you reach a

19   settlement with respect to these chains

20   and binders?

21       A.    I don't believe so.

22       Q.    Have you ever paid for the

23   chains and binders?

24       A.    No.

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis          248

1       Q.     Has Emerald ever paid for

2    the chains and the binders?

3       A.     Not to my knowledge.

4       Q.     Why not?

5       A.     I don't believe we agree on

6    what was missing and what was provided in

7    the first place.

8       Q.     Where are the stacks to

9    which the chains and binders were affixed

10   now?

11      A.     They could be anywhere,

12   sold, could be any place.

13      Q.     Did you tell sell them with

14   the chains and the binders on them?

15      A.     No.

16      Q.     Did you take the chains and

17   binders off before you sold them?

18      A.     Certainly.

19      Q.     What did you do with the

20   chains and the binders after you took

21   them off?

22      A.     They were put into

23   containers.

24      Q.     And where are those

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                    249

1    containers?

2        A.    Probably sold.

3        Q.    You sold the containers,

4    but were the chains and the binders in

5    them?

6        A.    No.

7        Q.    What did you do with the

8    chains and the binders when you sold the

9    containers?

10       A.    The containers were sold

11   after the chains and the binders were

12   removed.

13       Q.    What did you do with the

14   chains and binders when you removed them

15   from the containers?

16       A.    Gave them to Sea Star.

17       Q.    You gave these chains and

18   binders back to Sea Star?

19       A.    That is right.

20       Q.    When did you do that?

21       A.    I am really not sure.

22       Q.    Do you have any receipts

23   for that?

24       A.    Yes.

ESQUIRE DEPOSITION SERVICES

A-595

Arthur B. Davis          250

1          Q.     Where are those receipts

2      located?

3          A.     Right at this second I

4      don't know.

5          Q.     Let me show you a copy of

6      an e-mail dated March 6th of 2003 that I

7      will ask the court reporter to mark as

8      exhibit 52 for identification.

9                    - - -

10                   (Whereupon, Exhibit

11             Number 52 was marked for

12             identification.)

13                   - - -

14     BY MR. ARMSTRONG:

15         Q.     Do you recognize that

16     document?

17         A.     Yes, I do.

18         Q.     Is that a true and correct

19     copy of an e-mail that you received?

20         A.     I think so.

21         Q.     Let me show you a copy of

22     an e-mail dated March 19 of 2003 that I

23     will ask the court reporter to mark as

24     exhibit 53 for identification.

ESQUIRE DEPOSITION SERVICES

A-596

Arthur B. Davis                251

1                        - - -

2                    (Whereupon, Exhibit

3           Number 53 was marked for

4           identification.)

5                        - - -

6      BY MR. ARMSTRONG:

7           Q.     Do you recognize that

8      document?

9           A.     I think I recognize this.

10          Q.     And toward the bottom of

11     the page there's a reference to

12     approximately 800 chains and binders.  Do

13     you see that?

14          A.     I do.

15          Q.     What happened to those?

16          A.     I couldn't say.  At this

17     time I don't know.

18          Q.     Let me show you a copy of a

19     letter dated July 9th of 2003 that I will

20     ask the court reporter to mark as exhibit

21     54 for identification.

22                       - - -

23                   (Whereupon, Exhibit

24          Number 54 was marked for

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                 252

1    identification.)

2                    - - -

3    BY MR. ARMSTRONG:

4        Q.    Do you recognize that

5    letter?

6        A.    Yes, I do.

7        Q.    Did you receive the

8    original of that letter?

9        A.    I think so.

10       Q.    Let me show you a copy of a

11   document which I will ask the court

12   reporter to mark as exhibit 55 for

13   identification.

14                   - - -

15               (Whereupon, Exhibit

16       Number 55 was marked for

17       identification.)

18                   - - -

19   BY MR. ARMSTRONG:

20       Q.    Do you recognize that

21   document?

22       A.    I think so.

23       Q.    Do you know who prepared

24   it?

ESQUIRE DEPOSITION SERVICES

A-598

Arthur B. Davis          253

1     A.     I believe this was prepared

2  by Lorraine and I.

3     Q.     Let me show you a copy of a

4  letter dated August 28 of 2003 which I

5  ask the court reporter to mark as exhibit

6  56 for identification.

7                    - - -

8              (Whereupon, Exhibit

9         Number 56 was marked for

10             identification.)

11                   - - -

12  BY MR. ARMSTRONG:

13     Q.     Do you recall receiving

14  that letter, sir?

15     A.     Yes, I remember receiving

16  this.

17     Q.     Let me show you a copy of

18  an e-mail dated November 26 of 2003 that

19  I will ask the court reporter to mark as

20  exhibit 57 for identification.

21                   - - -

22             (Whereupon, Exhibit

23         Number 57 was marked for

24             identification.)

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                254

1                  - - -

2      BY MR. ARMSTRONG:

3          Q.      Do you recall receiving

4      that e-mail?

5          A.      Yes, I do.

6          Q.      Do you know whether you

7      continued to charge rent for any of these

8      reefer containers or the chassis through

9      the date they were delivered to JAX?

10         A.      Again I would have to go

11     back to each individual unit.

12         Q.      Do you know where those

13     particular units were located?

14         A.      When?

15         Q.      The ones you wanted shipped

16     to JAX?

17         A.      They were inside the Sea

18     Star terminal in San Juan.

19         Q.      Let me show you a copy of

20     an e-mail dated December 10 of 2003 that

21     I will ask the court reporter to mark as

22     exhibit 58 for identification.

23                 - - -

24                 (Whereupon, Exhibit

ESQUIRE DEPOSITION SERVICES

A-600

Arthur B. Davis                    255

1        Number 58 was marked for

2        identification.)

3                - - -

4        BY MR. ARMSTRONG:

5            Q.    Do you recall that

6        document?

7            A.    I think so.

8            Q.    Is that draw and correct

9        copy of an e-mail that you sent?

10           A.    I believe so.

11           Q.    Were the chassis or reefers

12       and chassis carried by Sea Star from San

13       Juan for JAX?

14           A.    I believe so.

15           Q.    Let me show you a copy of a

16       handwritten document dated January 14 of

17       2004 that I will ask the court reporter

18       to mark as exhibit 59.

19               - - -

20               (Whereupon, Exhibit

21       Number 59 was marked for

22       identification.)

23               - - -

24       BY MR. ARMSTRONG:

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                256

1      Q.    Is that draw a true and

2    correct copy of a document that you

3    wrote?

4      A.    It is.

5      Q.    Let me show you a copy of

6    an e-mail dated -- two e-mails one dated

7    February 19 of 2004 the other February 21

8    of 2004 that I will ask the court

9    reporter to mark as exhibit 60 for

10    identification.

11        - - -

12       (Whereupon, Exhibit

13    Number 60 was marked for

14    identification.)

15        - - -

16    BY MR. ARMSTRONG:

17      Q.    Do you recall those

18    e-mails?

19      A.    I believe I remember this.

20      Q.    What action did you take

21    with respect to that equipment?

22      A.    I don't recall.

23      Q.    Let me show you a series of

24    e-mails which I will ask the court

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                    257

1    reporter to mark as exhibit 61 for

2    identification.

3                        - - -

4                        (Whereupon, Exhibit

5        Number 61 was marked for

6        identification.)

7                        - - -

8    BY MR. ARMSTRONG:

9        Q.    Do you recall those

10    e-mails?

11        A.    I do recall this.

12        Q.    All right.

13            What action did you take

14    with respect to that equipment?

15        A.    I believe this was brought

16    back into the JAX yard.

17        Q.    Let me show you a copy of a

18    handwritten document dated May 11th of

19    2004 and I will ask the court reporter to

20    mark as exhibit 63 for -- I'm sorry --

21    exhibit 62 for identification.

22                        - - -

23                        (Whereupon, Exhibit

24        Number 62 was marked for

ESQUIRE DEPOSITION SERVICES

A-603

Arthur B. Davis                    258

1     identification.)

2              - - -

3        Q.     Is that a true and correct

4     copy of a letter that you wrote?

5        A.     Yes.

6        Q.     And what was your purpose

7     in writing that letter?

8        A.     To make sure -- just what

9     it says that equipment should be released

10    if I did not send an e-mail or a fax.

11       Q.     Where was that equipment

12    located?

13       A.     It was located in Puerto

14    Rico report at the Sea Star Line

15    terminal.

16       Q.     Was this equipment in

17    storage at the Sea Star terminal?

18       A.     It may have been.

19       Q.     Who is Arturo?

20       A.     As far as I understand he's

21    the terminal manager.

22       Q.     Whose terminal manager?

23       A.     Sea Star Line.

24       Q.     Who is Manuel?

ESQUIRE DEPOSITION SERVICES

A-604

Arthur B. Davis          259

1       A.    Manuel Cabrarra from my

2   understanding he gets involved with the

3   equipment.

4       Q.    For whom did he work?

5       A.    Sea Star Line.

6       Q.    Am I correct that you were

7   instructing Sea Star Line employees not

8   to release any Emerald equipment from the

9   Sea Star terminal in May of 2004?

10      A.    That is correct.

11      Q.    Let me show you a copy of

12  an e-mail dated August 11th of 2004 that

13  I will ask the court reporter to mark as

14  exhibit 63 for identification.

15            - - -

16            (Whereupon, Exhibit

17        Number 63 was marked for

18        identification.)

19            - - -

20  BY MR. ARMSTRONG:

21      Q.    Do you recognize that

22  document?

23            - - -

24            (Whereupon, a short

ESQUIRE DEPOSITION SERVICES

A-605

Arthur B. Davis                260

1    recess was taken.)

2                    - - -

3        Q.    Let me show you a copy of

4    an e-mail dated August 11th of 2004 which

5    I had asked the court reporter to mark as

6    exhibit 63 for identification.

7            Did you write and send that

8    he e-mail?

9        A.    Yes.

10        Q.    Let me show you an e-mail

11    dated August 19 of 2004 which I will ask

12    the court reporter to mark as exhibit 64

13    for identification.

14                    - - -

15            (Whereupon, Exhibit

16        Number 64 was marked for

17        identification.)

18                    - - -

19    BY MR. ARMSTRONG:

20        Q.    Did you write and send that

21    e-mail?

22        A.    What?

23        Q.    Did you write and send that

24    e-mail?

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                    261

1        A.    I did.

2        Q.    In that e-mail you list

3    various units, do you not?

4        A.    Yes, I do.

5        Q.    Were those units on rent to

6    Sea Star?

7        A.    I would have to look at

8    each individual unit.

9        Q.    You don't know as of August

10    19th of 2004 whether those were on rent?

11        A.    If they were physically on

12    rent as of August 19th?

13        Q.    Right.

14        A.    No.  They would not have

15    been on rent.

16        Q.    Were they in storage at Sea

17    Star?

18        A.    They were physically there

19    at the terminal in San Juan.

20        Q.    Were you paying storage

21    charges for those units?

22        A.    I wasn't paying storage

23    charges.

24        Q.    Has Emerald ever paid

Arthur B. Davis                262

1    storage charges for units at Sea Star

2    Line's terminal in San Juan?

3        A.    Emerald itself, no.

4        Q.    Let me show you a copy of

5    an apparent draft letter dated January

6    20th of 2004 that I will ask the court

7    reporter to mark as exhibit 65 for

8    identification.

9                - - -

10               (Whereupon, Exhibit

11          Number 65 was marked for

12          identification.)

13               - - -

14    BY MR. ARMSTRONG:

15        Q.    Have you ever seen that

16    document before?

17        A.    I don't recall this and it

18    doesn't seem to necessarily make any

19    sense because it is talking about the

20    Bankruptcy Court Chapter 11 debtors and

21    Sea Star picking up assets and it's from

22    January of 2004.  I don't know.

23        Q.    It was produced by Emerald

24    Equipment Leasing, do you know where

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis               263

1    Emerald Equipment Leasing got it to

2    produce it?

3        A.    I don't know.  I don't

4    recall.  I don't know.

5        Q.    You have never seen it

6    before?

7        A.    I don't recall it.

8        Q.    All right.

9              Mr. Davis, have you ever

10   been convicted of a crime?

11       A.    No.

12       Q.    You have the right to read

13   and sign this deposition before it is

14   filed and I believe that your counsel has

15   already exercised that right on your

16   behalf so we don't have to go through the

17   rest of the options.

18            Thank you.

19            MR. MOLDOFF:  I have

20   no questions.

21            - - -

22            (Whereupon, the

23   deposition concluded at 5:50 p.m.)

24            - - -

ESQUIRE DEPOSITION SERVICES

264

1                    C E R T I F I C A T E

2            I hereby certify that the

3    witness was duly sworn by me and that the

4    deposition is a true record of the

5    testimony given by the witness;

6

7

8            _____

9            Joseph Calavetta, R.P.R.

10            12-15-04

11

12

13    (The foregoing certification of this

14    transcript does not apply to any

15    reproduction of the same by any means,

16    unless under the direct control and/or

17    supervision of the certifying shorthand

18    reporter.)

19

20

21

22

23

24

ESQUIRE DEPOSITION SERVICES

265

1               INSTRUCTIONS TO WITNESS

2          Please read your deposition over

3     carefully and make any necessary changes.

4     You should assign a reason in the

5     appropriate column on the errata sheet

6     for any change made.

7          After making any change which has

8     been noted on the following errata sheet,

9     along with the reason for any change,

10     sign your name to the errata sheet and

11     date it.

12          You are signing it subject to the

13     changes you have made on the errata

14     sheet, which will be attached to the

15     deposition.  You must sign in the space

16     provided.

17          Return the original errata sheet to

18     the deposing attorney within thirty (30)

19     days of receipt of the transcript by you.

20

21

22

23

24

ESQUIRE DEPOSITION SERVICES

A-611

266

1     ACKNOWLEDGMENT OF DEPONENT

2          I, _____, do hereby

3     certify that I have read the foregoing

4     pages, _____ and that the same is a

5     correct transcription of the answers

6     given by me to the questions therein

7     propounded, except for the corrections or

8     changes in form or substance, if any,

9     noted in the attached Errata Sheet.

10

11     _____

12     DATE

13

14     Subscribed and sworn to before me this

15     _____ day of _____,

16     200____.

17     My commision expires: _____

18

19     _____

20

21     Notary Public

22

23

24

ESQUIRE DEPOSITION SERVICES

A-612

267

1        - - - - - - - - -

2        E R R A T A

3        - - - - - - - - -

4    PAGE    LINE    CHANGE

5    ____    ____    _____

6    ____    ____    _____

7    ____    ____    _____

8    ____    ____    _____

9    ____    ____    _____

10   ____    ____    _____

11   ____    ____    _____

12   ____    ____    _____

13   ____    ____    _____

14   ____    ____    _____

15   ____    ____    _____

16   ____    ____    _____

17   ____    ____    _____

18   ____    ____    _____

19   ____    ____    _____

20   ____    ____    _____

21   ____    ____    _____

22   ____    ____    _____

23   ____    ____    _____

24   ____    ____    _____

ESQUIRE DEPOSITION SERVICES

268

1          LAWYER'S NOTES

2     PAGE  LINE

3     ____  ____  _____

4     ____  ____  _____

5     ____  ____  _____

6     ____  ____  _____

7     ____  ____  _____

8     ____  ____  _____

9     ____  ____  _____

10    ____  ____  _____

11    ____  ____  _____

12    ____  ____  _____

13    ____  ____  _____

14    ____  ____  _____

15    ____  ____  _____

16    ____  ____  _____

17    ____  ____  _____

18    ____  ____  _____

19    ____  ____  _____

20    ____  ____  _____

21    ____  ____  _____

22    ____  ____  _____

23    ____  ____  _____

24    ____  ____  _____

ESQUIRE DEPOSITION SERVICES

A-614