1

1    IN THE UNITED STATES DISTRICT COURT
     MIDDLE DISTRICT OF FLORIDA
2        JACKSONVILLE DIVISION

3

     SEA STAR LINE, LLC, a        : CIVIL ACTION
4    limited liability            :
     company,                     :
5      Plaintiff                  :
                                  :
6      vs.                        :
                      :
7    EMERALD EQUIPMENT  :
     LEASING, INC., a             :
8    corporation,                 : NO. 3:04:CV-
       Defendant                  : 146-99HTS
9

10         ------
           January 25, 2005
11         ------

12         Oral Deposition of THOMAS J.
     HOLT, SR., held in the law offices of
13   Adelman, Lavine, Gold & Levin, P.C.,
     Four Penn Center, Suite 800, 1600 JFK
14   Boulevard, Philadelphia, Pennsylvania
     19102, beginning at approximately
15   9:34 a.m., before Ann V. Kaufmann, a
     Registered Professional Reporter,
16   Certified Realtime Reporter, Approved
     Reporter of the U.S. District Court, and
17   a Notary Public of the Commonwealth of
     Pennsylvania.
18

19         ------

20

21

22   ESQUIRE DEPOSITION SERVICES
     1880 John F. Kennedy Boulevard
23   15th Floor
     Philadelphia, Pennsylvania  19103
24   (215) 988-9191

25         ESQUIRE DEPOSITION SERVICES

2

```
 1  APPEARANCES:

 2    ARMSTRONG & MEJER, P.C.
      TIMOTHY ARMSTRONG, ESQUIRE
 3    amesq@aol.com
      2600 Douglas Road, Suite 1111
 4    Coral Gables, FL  33134
      (305) 444-3355
 5    Counsel for Plaintiff

 6    ADELMAN, LAVINE, GOLD & LEVIN, P.C.
      ALAN I. MOLDOFF, ESQUIRE
 7    amoldoff@adelmanlaw.com
      Four Penn Center, Suite 900
 8    1600 JFK Boulevard
      Philadelphia, PA  19102
 9    (215) 568-7515
      Counsel for Defendant
10
    PRESENT:
11
      Andy Rooks
12     John Evans

13

14

15

16

17

18

19

20

21

22

23

24

25          ESQUIRE DEPOSITION SERVICES
```

3

1         EXAMINATION INDEX

2

   THOMAS J. HOLT, SR.

3

    BY MR. ARMSTRONG . . . . . 5

4

5

6         EXHIBIT INDEX

              MAR

7  Holt, Sr.

8

   1  Document          107

9

   2  E-mail dated August 29,   132

10     2003

11  3  Letter dated September 2,   132
      2003

12

   4  Fax cover sheet, letter   135

13     dated September 16, 2003
     copy of the Equipment

14     Rental Agreement

15  5  Letter dated October 31,   136
     2003

16

   6  Letter dated November 21,   137

17     2003

18

19

20

21

22

23

24

       ESQUIRE DEPOSITION SERVICES

4

1  DEPOSITION SUPPORT INDEX

2

3  DIRECTION TO WITNESS NOT TO

4      ANSWER

5      (NONE)

6

7  REQUEST FOR PRODUCTION OF

8    INFORMATION/DOCUMENTS

9      (NONE)

10

11    STIPULATIONS

12    Page 5    Line 1

13
      QUESTIONS MARKED
14
      (NONE)
15

16

17

18

19

20

21

22

23

24

25  ESQUIRE DEPOSITION SERVICES

5    Thomas J. Holt, Sr.

1        MR. ARMSTRONG:  Normal

2    procedure, objections as to form?

3        MR. MOLDOFF:  Yes.

4        ------

5        ....THOMAS J. HOLT, SR.,

6    10710 Ellicott Road, Philadelphia, PA

7    19154, having been duly sworn was

8    examined and testified as follows:

9        EXAMINATION

10    BY MR. ARMSTRONG:

11    Q.    Mr. Holt, I'm Tim

12    Armstrong.  I represent Sea Star Line in

13    the case involving Sea Star Line and

14    Emerald Equipment Leasing, Inc.

15        Please state your full

16    name.

17    A.    Thomas J. Holt, Sr.

18    Q.    Where do you reside?

19    A.    10710 Ellicott Road,

20    Philadelphia, Pennsylvania.

21    Q.    What is your business

22    address?

23    A.    Same.

24    Q.    By whom are you employed?

ESQUIRE DEPOSITION SERVICES

6    Thomas J. Holt, Sr.

1    A.   Self.

2    Q.   Are you involved in any

3  particular businesses?

4    A.   Involved in what fashion?

5  I'm an advisor, consultant.  Maybe you

6  can say it that way.  I consult to

7  people that seek advice.

8    Q.   How long have you been a

9  consultant?

10    A.   Probably about three years

11  since I got fired.

12    Q.   By whom were you fired?

13    A.   The trustee of my company.

14    Q.   What company was that?

15    A.   The Holt Group.

16    Q.   What is The Holt Group?

17    A.   What is The Holt Group?

18    Q.   Yes.

19    A.   It was a company that I had

20  that owned operating companies.

21    Q.   Does The Holt Group still

22  exist?

23    A.   No, sir.

24    Q.   What happened to it?

ESQUIRE DEPOSITION SERVICES

7     Thomas J. Holt, Sr.

1     A.   Liquidated by the trustee.

2     Q.   Has the liquidation been

3   complete?

4     A.   You'd have to ask them.  To

5   my knowledge, it has been.

6     Q.   Are you aware of any

7   discharge in bankruptcy or anything such

8   as that?

9     A.   I'm not a lawyer, so I

10  couldn't answer that.

11     Q.   You mentioned "operating

12  companies."  Was one of the operating

13  companies Holt Cargo Systems, Inc.?

14     A.   Yes, sir.

15     Q.   What was Holt Cargo

16  Systems, Inc.?

17     A.   It was a stevedoring

18  company in the port of Philadelphia.

19     Q.   Did Holt Cargo Systems,

20  Inc., have anything to do with

21  equipment?

22     A.   What kind of equipment?

23     Q.   Equipment used for carriage

24  of cargo.

8                    Thomas J. Holt, Sr.

1    A.  No.  It had equipment that

2   was used in the stevedoring business.

3    Q.  Did it have anything to do

4   with containers or gen-sets, trailers,

5   things of that nature?

6    A.  As an owner or lessee?

7    Q.  As anything.

8    A.  Holt Cargo Systems owned

9   some generators and containers, but only

10  in the course of their business, which

11  is providing stevedoring.

12   Q.  Did Holt Cargo Systems,

13  Inc., lease any trailers or containers?

14   A.  To them or from them?

15   Q.  From anyone.

16   A.  Not that I'm aware of.

17   Q.  What was your position with

18  Holt Group, Inc.?

19   A.  President.

20   Q.  Did you have an ownership

21  interest in Holt Group, Inc.?

22   A.  100%.

23   Q.  What was your position with

24  Holt Cargo Systems, Inc.?

ESQUIRE DEPOSITION SERVICES

9                          Thomas J. Holt, Sr.

1    A.   Owner, president.

2    Q.   Were you also fired as

3  president of Holt Cargo Systems, Inc.,

4  by the trustee?

5    A.   I don't recall the wording

6  of the letter, but I do believe it was

7  as Holt Group.

8    Q.   I was using your word

9  "fired."

10    A.   Yes, I was fired.

11    Q.   And when you refer to the

12  trustee, are you referring to a trustee

13  in a Chapter 7 bankruptcy case or

14  proceeding?

15    A.   In those days, it was

16  Chapter 11.

17    Q.   Who replaced you at Holt

18  Group, Inc.?

19    A.   I presume the trustee.

20    Q.   Who replaced you at Holt

21  Cargo Systems, Inc.?

22    A.   It was one in the same.  It

23  was either a subsidiary or affiliate.

24  Whatever the legal term was, I owned

ESQUIRE DEPOSITION SERVICES

A-623

10                          Thomas J. Holt, Sr.

1  both companies through The Holt Group.

2      Q.   Do you believe the trustee

3  replaced you?

4      A.   I think so.

5      Q.   Was Holt Hauling and

6  Warehousing System, Inc., one of those

7  companies?

8      A.   Yes, sir.

9      Q.   It was an operating company?

10     A.   No, sir.

11     Q.   What did Holt Hauling and

12  Warehousing Systems, Inc., do?

13     A.   It was a land holder.

14     Q.   What was your position with

15  that company?

16     A.   Owner and president.

17     Q.   Are you still owner and

18  president?

19     A.   No, sir.

20     Q.   When did you cease being

21  president?

22     A.   Again, I'm not a lawyer,

23  but I believe that was also liquidated

24  in the transactions of the trustee.

ESQUIRE DEPOSITION SERVICES

11                                    Thomas J. Holt, Sr.

1      Q.    That was at the same time?

2      A.    All the same time.

3      Q.    Are you familiar with SJIT?

4      A.    You mean -- SJIT?  This

5    was -- in what regard was SJIT?

6      Q.    Well, San Juan

7    International Terminal.

8      A.    I believe that was part of

9    The Holt Group, if I can remember that.

10      Q.    Did you have anything to do

11    with SJIT?

12      A.    If it was part of The Holt

13    Group, I owned it and was president.  I

14    believe I did.  We're going back now in

15    a very confusing time in my life.

16      Q.    I understand.

17      A.    But go ahead, keep going.

18      Q.    I don't want to confuse

19    you.

20      A.    You didn't confuse me.  The

21    time confused me, the events.

22      Q.    If I confuse you, let me

23    know.

24          How did they confuse you?

ESQUIRE DEPOSITION SERVICES

12                    Thomas J. Holt, Sr.

1     A.   I was never in a bankruptcy

2  before.

3     Q.   What was NPR Holding Corp.?

4     A.   That was part of The Holt

5  Group.

6     Q.   What did NPR Holding Corp.

7  do?

8     A.   That was the corporation

9  that owned Navieras, that would be it.

10  There were two or three companies known

11  as NPR.  But the records all show that,

12  so I don't want to surmise.

13     Q.   When you refer to Navieras,

14  are you referring to NPR, Inc.?

15     A.   I would have said yes to

16  that.

17     Q.   How about NPR Navieras

18  Receivables, Inc.?  Are you familiar

19  with that company?

20     A.   That's probably the one I

21  was referring to.  There were two or

22  three companies with similar names.

23     Q.   Were you president and

24  owner of all of those companies?

13                    Thomas J. Holt, Sr.

1    A.   Of what company?

2    Q.   NPR Holding Corp.

3    A.   No.

4    Q.   Who were the officers of

5  NPR Holding Corp.?

6    A.   In the time frame I'm

7  thinking of, it would have been my son

8  Thomas, Jr., would have been the

9  president.  He probably resigned at a

10  point in time to the trustee, but I'm

11  not familiar with that.

12    Q.   Were there any other

13  officers?

14    A.   I'd have to go find out and

15  look.  Remember, Holt Group owned those

16  companies.

17    Q.   Did you have any office or

18  position with NPR Holding Corp. that you

19  recall?

20    A.   I can't recall that.  The

21  records will show it.

22    Q.   Do you recall whether you

23  were a director of NPR Holding Corp.?

24    A.   Same answer.

ESQUIRE DEPOSITION SERVICES

14                                    Thomas J. Holt, Sr.

1    Q.   Do you recall whether you

2 were an officer of NPR, Inc.?

3    A.   Same answer.

4         MR. MOLDOFF:  Again, with

5 respect to this series of questions, I

6 know you are not limiting it to any

7 particular time period.  I assume you

8 mean at any time?

9         MR. ARMSTRONG:  Yes, sir.

10 BY MR. ARMSTRONG:

11    Q.   Do you recall whether you

12 were a director of NPR, Inc.?

13    A.   I would have to go back and

14 look at the records.

15    Q.   What is Greenwich

16 Terminals, if you know?

17    A.   Greenwich Terminals is a

18 stevedoring company in the port of

19 Philadelphia.

20    Q.   How long has Greenwich

21 Terminals existed?

22    A.   I don't know.  Could be

23 several years.

24    Q.   Have you ever had any

ESQUIRE DEPOSITION SERVICES

15                                    Thomas J. Holt, Sr.

1  position with Greenwich Terminals?

2      A.   No, sir.

3      Q.   Do you know who the

4  officers of Greenwich Terminals are?

5      A.   Officers I would tell you

6  are -- I can't tell you because I really

7  don't know.

8      Q.   Do you know who any of the

9  officers of Greenwich Terminals are?

10     A.   I would not know as

11  officers.  I do know that my son Thomas,

12  is involved in that company.  As to what

13  position he holds, I am not aware.

14     Q.   Do you know who owns the

15  company?

16     A.   I would, again, give you

17  the same answer.  You would have to go

18  ask them.  I'm not involved in that

19  company.

20     Q.   What is your position with

21  Emerald Equipment Leasing?

22     A.   At what period of time?

23     Q.   Well, today.

24     A.   Emerald is owned by me

ESQUIRE DEPOSITION SERVICES

A-629

16                          Thomas J. Holt, Sr.

1  today.

2      Q.    Are you an officer of

3  Emerald?

4      A.    I would be the president.

5      Q.    How long have you been

6  president?

7      A.    Approximately since the

8  summer of 2000.

9      Q.    How long have you owned

10  Emerald?

11     A.    Same time frame.

12     Q.    As president, what are your

13  duties and responsibilities with respect

14  to Emerald?

15     A.    Standard procedures of

16  trying to operate the company through a

17  liquidation of its equipment.  Emerald

18  is in bankruptcy.

19     Q.    Is it in Chapter 11?

20     A.    Yes, sir.

21     Q.    How long has Emerald been

22  in Chapter 11?

23     A.    Best guess?

24         MR. MOLDOFF:  If you know.

ESQUIRE DEPOSITION SERVICES

17                          Thomas J. Holt, Sr.

1        THE WITNESS: I don't know.

2   A couple years, two or three. The

3   documents would show that. I'm sure you

4   have them.

5   BY MR. ARMSTRONG:

6        Q.   What do you do in operating

7   the company today?

8        A.   I don't operate the

9   company. The company is closed down as

10  an operating company. What we're doing,

11  what I'm trying to do, is to locate the

12  equipment and liquidate it.

13       Q.   Is anyone working with you

14  in that regard?

15       A.   Yes.

16       Q.   Who is working with you?

17       A.   I had the assistance of a

18  fellow by the name of Art Davis and

19  Lorraine Robbins.

20       Q.   Does Art Davis have a

21  position with Emerald?

22       A.   No, sir.

23       Q.   Has Art Davis ever held a

24  position with Emerald?

ESQUIRE DEPOSITION SERVICES

A-631

18                    Thomas J. Holt, Sr.

1    A.   Years ago.

2    Q.   When you say "years ago,"

3  can you give me a time frame?

4        MR. MOLDOFF:  Again, if you

5  know.  Don't speculate.

6        THE WITNESS:  When Emerald

7  was formed, whenever that was.  I think

8  that was 1996 or '7, back in those days.

9  BY MR. ARMSTRONG:

10    Q.   How long did Art Davis,

11  Arthur Davis, remain president?

12    A.   I didn't say he was.  If I

13  did, he was president, just to clear up

14  your record.  I think if you go back, you

15  might see you jumped a question there.

16  It matters not.

17        He was the president from

18  when the company was formed.  I took it

19  over from he and its other investors I'm

20  going to tell you sometime in the summer

21  of 2000, to my best recollection.

22    Q.   Who were the other

23  investors?

24    A.   Several people that I had

ESQUIRE DEPOSITION SERVICES

19                              Thomas J. Holt, Sr.

1  working with me over the years as

2  qualified people in my business.  They

3  were -- individuals?  You want to know

4  names?

5          I could guess of a name

6  like Mark Goldman.  That's just off the

7  top of my head.  I don't remember who

8  they were.

9      Q.   How long has Art Davis

10  worked for you?

11     A.    Art Davis --

12         MR. MOLDOFF:  Object to the

13  form.

14         THE WITNESS:  In what

15  company?

16  BY MR. ARMSTRONG:

17     Q.    In any company in which you

18  have been involved.

19     A.    I have worked with Art off

20  and on for at least 30-plus years.

21     Q.    In any particular

22  companies?

23     A.    It would have been the

24  companies I owned.

ESQUIRE DEPOSITION SERVICES

20                              Thomas J. Holt, Sr.

1    Q.   Do you recall the names of

2  any of them?

3    A.   You named them.  There was

4  Holt Cargo Systems and eventually

5  then -- primarily, Holt Cargo Systems is

6  my best recollection.

7    Q.   What is Lorraine Robbins

8  doing in connection with Emerald?

9    A.   Well, she is assisting Art,

10  primarily, and I, in trying to get the

11  invoicing resolved between Emerald and

12  Sea Star and she is assisting in all the

13  paperwork that that demands.

14    Q.   How long has Lorraine

15  Robbins had anything to do with Emerald?

16    A.   That's a good question.  I

17  would probably tell you since about

18  sometime in '03 maybe is what I can

19  recollect.

20    Q.   Did you give her specific

21  instructions in regard to Emerald?

22    A.   Specific instructions in

23  regards to what?

24    Q.   In regard to the work that

ESQUIRE DEPOSITION SERVICES

21                    Thomas J. Holt, Sr.

1  she would do for Emerald or in

2  connection with Emerald beginning in

3  '03.

4      A.   I requested Lorraine to try

5  to resolve the differences between Sea

6  Star and Emerald and all the

7  documentation that that ensued.

8      Q.   How did you know Lorraine

9  Robbins?

10     A.   Oh, about 45 years ago she

11  came to work for me.

12     Q.   She has worked in your

13  companies?

14     A.   Yes, sir.

15     Q.   Has she ever been an

16  officer of any of your companies?

17     A.   She was an officer of my

18  company, Holt Cargo Systems.

19     Q.   Was she an officer of Holt

20  Group, Inc.?

21     A.   I don't recall.

22     Q.   Has she ever been a

23  director of any of the companies in

24  which you've been involved?

ESQUIRE DEPOSITION SERVICES

22                    Thomas J. Holt, Sr.

1    A.   Holt Cargo Systems.

2    Q.   Any others?

3    A.   She may have been with the

4    real estate holding company, Holt

5    Hauling & Warehousing, but I would have

6    to check those records.  This is all to

7    the best of my knowledge.  So if you

8    know something specifically, maybe I can

9    help you out.

10   Q.   You mentioned Mark

11   Goldman.  Who is he?

12   A.   He was a gentleman that

13   worked with me for a number of years and

14   left the company about eight years ago,

15   maybe ten.  Probably eight.  Closer to

16   eight than it would be to ten.

17   Q.   Left what company?

18   A.   Holt Cargo Systems.  I'm

19   trying remember in those days if I

20   operated under the name of Holt

21   Warehousing.  I might have operated a

22   company called Holt Warehousing, but he

23   was in the refrigerated warehouse side

24   of our company -- my company.

ESQUIRE DEPOSITION SERVICES

23                          Thomas J. Holt, Sr.

1    Q.   Did he have any involvement

2    with Emerald?

3    A.   He was long gone before

4    Emerald.  Maybe -- I don't remember.

5    Yeah, he might have.  I don't remember.

6    You are back in 1997 now, I guess, which

7    would be over just about eight years

8    ago.  He might have been.

9         Involved in Emerald as to

10   the extent of -- I would go back and

11   tell you he was involved with Emerald.

12   He was one of the stockholders, to my

13   knowledge, of Emerald when it was

14   formed.

15   Q.   Was Lorraine Robbins a

16   stockholder of Emerald?

17   A.   Not to my knowledge.

18   Q.   Was --

19   A.   She might have been, but

20   not to my knowledge.

21   Q.   Was Arthur Davis a

22   stockholder of Emerald?

23   A.   Yes.

24   Q.   Do you know what percentage

ESQUIRE DEPOSITION SERVICES

A-637

24                          Thomas J. Holt, Sr.

1  of stock Arthur Davis owned?

2      A.   Not off the top of my head.

3      Q.   Is Arthur Davis one of the

4  people that you bought out in 2000?

5      A.   He would have been, yes.

6      Q.   Do you know what percentage

7  of stock Mark Goldman owned?

8      A.   I would have to go pull

9  those files, if they're still around.  I

10  don't even know if they are still

11  around.  I would have to find them

12  somewhere.

13     Q.   Do you recall who the other

14  investors in Emerald were?

15     A.   One was John Whitely, and

16  I'm guessing to the rest of them.  I

17  won't do that.

18     Q.   What was John Whitely's

19  relationship to your companies?

20     A.   He was my CFO, I believe.

21  Yes, his duties as accountant would have

22  covered -- no, he was not my CFO.  He

23  would have been my accountant.

24     Q.   For any particular

ESQUIRE DEPOSITION SERVICES

25                    Thomas J. Holt, Sr.

1   companies?

2       A.   For Holt Cargo Systems.

3       Q.   Other than resolving or

4   attempting to resolve the Sea Star

5   accounts, does Emerald do any business

6   today?

7       A.   Only liquidation of

8   equipment.

9       Q.   When you say "liquidation,"

10  are you talking about selling equipment?

11      A.   Emerald's equipment,

12  period.

13      Q.   You are talking about

14  selling Emerald's equipment; correct?

15      A.   That's right.

16      Q.   Does Emerald lease Emerald

17  equipment to anyone today?

18      A.   Never did to anyone any

19  time.  Only Sea Star.

20      Q.   Did Emerald ever lease

21  equipment to NPR, Inc.?

22      A.   You are talking prior to

23  Sea Star?

24      Q.   Well, first of all, does

ESQUIRE DEPOSITION SERVICES

26                          Thomas J. Holt, Sr.

1   Emerald lease equipment to anyone today?

2       A.   No.

3       Q.   Prior to today, has Emerald

4   ever leased equipment to anyone?

5           MR. MOLDOFF:  At any time?

6           MR. ARMSTRONG:  At any time.

7           THE WITNESS:  Prior to today

8   and also prior to the failure of the

9   trustee to pay rent to Emerald, he was

10  the trustee of The Holt Group, the only

11  other company other than Sea Star that

12  Emerald leased equipment to was The Holt

13  Group -- correction -- to Navieras, NPR,

14  as you call them, who was a member of

15  The Holt Group.

16          There you go.  I got it

17  right now; right?

18  BY MR. ARMSTRONG:

19      Q.   Well, is there a difference

20  between Navieras, as you used the term,

21  and NPR?

22      A.   I look it as one in the

23  same.

24      Q.   So we are talking about the

            ESQUIRE DEPOSITION SERVICES

27                          Thomas J. Holt, Sr.

1    same company; correct?

2        A.   Same -- well, I can't tell

3    you you are talking about the same

4    company because the legalese of it, but

5    I can tell you, in my mind, one moment

6    you will hear people talk of Navieras

7    and another NPR.  I always treat it as

8    one.

9            Whether that's a legal

10   determination or not, I'm sorry.  But

11   that company leased from Emerald the

12   equipment it needed, NPR/Navieras, to

13   operate its business.

14       Q.   Now, when that company was

15   leasing equipment, did Emerald have

16   employees?  That is, when NPR was

17   leasing equipment from Emerald, did

18   Emerald have employees?

19       A.   I really couldn't tell

20   you.  I don't know.

21       Q.   When NPR was leasing

22   equipment from Emerald, did you have any

23   day-to-day involvement?

24       A.   Yes.

28                    Thomas J. Holt, Sr.

1    Q.   What was your involvement?

2    A.   When NPR was leasing the

3    equipment?

4    Q.   Yes, sir.

5    A.   My involvement was to make

6    sure that Emerald got paid.

7    Q.   Other than that, what was

8    your involvement?

9    A.   Not much of anything than

10   that agreement with NPR they were

11   responsible for all the Emerald

12   equipment.  So they operated it, they

13   repaired it, they did whatever they had

14   to do to that equipment.  Emerald did

15   not need people.

16   Q.   Did NPR do all of the

17   inventories of equipment?

18   A.   Yes.

19   Q.   Did NPR report to anyone at

20   Emerald concerning the status of

21   equipment?

22   A.   No.  When you say "status,"

23   you mean where it was?  What do you mean

24   when you say "status"?

29                    Thomas J. Holt, Sr.

1     Q.   Where it was?

2     A.   No, because it was the

3   responsibility of NPR, similar to the

4   Sea Star lease somewhat.

5     Q.   Did NPR report to Emerald

6   concerning the condition of the

7   equipment?

8     A.   No.

9     Q.   When you say that NPR's

10   responsibility was similar to the Sea

11   Star lease, what do you mean?

12     A.   Possession, movement of the

13   equipment, maintenance of the equipment,

14   responsibility for the equipment,

15   whether it be stolen, damaged,

16   whatever.  The documents speak for

17   themselves.

18     Q.   Whatever the written lease

19   or written agreement says is what --

20         MR. MOLDOFF:  Objection.

21     Q.   -- the responsibility was?

22   Is that what you mean when you say "the

23   documents speak for themselves"?

24         MR. MOLDOFF:  Objection to

ESQUIRE DEPOSITION SERVICES

30                    Thomas J. Holt, Sr.

1  the form.

2       THE WITNESS:  We had an

3  objection.

4       MR. MOLDOFF:  I object just

5  to the form of the question.

6       MR. ARMSTRONG:  He is

7  objecting to my form.

8       MR. MOLDOFF:  You can answer

9  the question if you understand what it

10  is that he is asking.

11       THE WITNESS:  Well, what I

12  understand is whatever the document

13  says, it says.

14  BY MR. ARMSTRONG:

15    Q.  Do you understand that the

16  document defines the responsibilities of

17  Emerald?

18       MR. MOLDOFF:  Well, object

19  to the form.  You haven't identified

20  what document we're talking about.

21  BY MR. ARMSTRONG:

22    Q.  What document are you

23  talking about?

24    A.  I'm talking about the

ESQUIRE DEPOSITION SERVICES

31                    Thomas J. Holt, Sr.

1    document that was put in place for the

2    possession of Sea Star to take over the

3    fleet of Emerald's equipment.

4        Q.   Are you talking about the

5    equipment rental agreement?

6        A.   I'm talking about the

7    equipment rental agreement.  You can

8    call it a rental agreement.  I would

9    call it a lease.

10        You talk about a series of

11    e-mails that were exchanged between

12    people.  Why don't you introduce the

13    documents and read them into the record,

14    and they are self-explanatory.

15        Q.   Other than the equipment

16    rental agreement and the series of

17    e-mails, are you aware of any other

18    documents that define Emerald's

19    responsibilities in connection with the

20    equipment?

21        MR. MOLDOFF:  Object to the

22    form of the question to the extent it

23    asks for a legal conclusion.

24        You can answer whatever you

ESQUIRE DEPOSITION SERVICES

32                         Thomas J. Holt, Sr.

1   understand.

2        THE WITNESS:  Well, I don't

3   understand when he says "Emerald's

4   responsibilities," because Emerald's

5   responsibilities are spelled out in

6   whatever the documents are.

7   BY MR. ARMSTRONG:

8        Q.   Are you aware of any

9   documents, besides those that you have

10  mentioned, the agreement and the series

11  of e-mails, that define Sea Star's

12  responsibilities with respect to the

13  Emerald equipment?

14       MR. MOLDOFF:  If you know.

15  Just answer to the best of your ability.

16       THE WITNESS:  I don't know.

17  Whatever is the total paper flow that

18  you have been reading is what it is.

19       I think somebody killed

20  about seven forests right now to crank

21  out all this paperwork.

22  BY MR. ARMSTRONG:

23       Q.   When you say "total paper

24  flow," you are covering a lot of

ESQUIRE DEPOSITION SERVICES

33                          Thomas J. Holt, Sr.

1  territory, a third of New Hampshire.

2      A.   True, true.

3      Q.   What was your understanding

4  of the arrangement between Emerald and

5  Sea Star with respect to Sea Star's use

6  of Emerald's equipment?

7      A.   My understanding is that

8  Sea Star needed the equipment to

9  complete the mission statement of the

10  acquisition of Navieras and that when

11  they got done with the equipment, they

12  would turn it back so we could sell it

13  and liquidate it.

14      Q.   Were you liquidating

15  equipment, or Emerald equipment, during

16  the time that Sea Star was using Emerald

17  equipment?

18      A.   Yes, sir.

19      Q.   Was Emerald doing that or

20  was someone else doing that?

21      A.   Well, we had several people

22  doing it.  There were agents out in the

23  highways and byways that when equipment

24  became available or it was not in the

ESQUIRE DEPOSITION SERVICES

A-647

34                    Thomas J. Holt, Sr.

1   use of Sea Star, that we would sell it.

2   Sea Star bought a lot of equipment,

3   also.

4       Q.    And how was MBC Leasing

5   involved in the Emerald equipment?

6       A.    They held the -- without

7   legalese, they held the financial

8   interests on the equipment.

9       Q.    How long had MBC Leasing

10  held the financial interest on the

11  Emerald equipment?

12      A.    A couple years.

13      Q.    Did there come a time when

14  MBC Leasing took control of the Emerald

15  equipment?

16          MR. MOLDOFF:  Object to the

17  form.

18          THE WITNESS:  I don't

19  understand what you mean by "control."

20  Did they physically take possession?

21  Not to my knowledge.  It was always in

22  the possession of Emerald, to my

23  knowledge.

24          Emerald assisted MBC in

ESQUIRE DEPOSITION SERVICES

A-648

35                          Thomas J. Holt, Sr.

1   trying to collect monies anywhere they

2   could, including from Sea Star,

3   attempting to properly invoice the

4   leasing of the equipment to Sea Star and

5   the liquidation of equipment that Sea

6   Star was not using so the money could

7   flow to MBC.

8   BY MR. ARMSTRONG:

9       Q.   Was MBC in charge?

10      A.   In charge of what?

11          MR. MOLDOFF:  Objection.

12  BY MR. ARMSTRONG:

13      Q.   Of the liquidation of the

14  equipment.

15      A.   Not to my knowledge.

16      Q.   Who was in charge?

17      A.   Emerald and indirectly MBC,

18  because they also would liquidate

19  equipment and send us notices so we

20  could take it off the inventory control.

21      Q.   How long have you known

22  Robert Magee?

23      A.   Bob?  I have known Bob

24  probably off and on for, guesstimate,

ESQUIRE DEPOSITION SERVICES

A-649

36                    Thomas J. Holt, Sr.

1  ten years.

2      Q.   How did you first come to

3  know Bob Magee?

4      A.   Through Tote, T-O-T-E.  I

5  would say he -- in his capacity there.

6  I assume it's Tote.  I don't know what

7  company he works for.

8          Probably in about '97 I got

9  to know Bob more directly through

10  meetings in Seattle, their home office,

11  prior their entrance into the Puerto

12  Rican service, Sea Star that is.

13     Q.   Did you or any of your

14  companies ever do business with Tote?

15     A.   Did we ever do business

16  with Tote?  As a stevedoring company,

17  no.

18     Q.   As anything.

19     A.   No, I can't remember that.

20         At any time?

21     Q.   At any time.

22         MR. MOLDOFF:  If you know.

23         THE WITNESS:  I don't know.

24  I'd have to -- maybe Bob can help you.

37                    Thomas J. Holt, Sr.

1   I don't recall doing anything with

2   them.  We might have gave them labor,

3   although I'm not sure, on ships.

4   BY MR. ARMSTRONG:

5       Q.   Have you or any of your

6   companies ever done business with any

7   company in which you knew Bob Magee was

8   involved?

9       A.   Sea Star.

10      Q.   What business have you done

11  with Sea Star?

12      A.   Leased them equipment.

13      Q.   Other than that, has there

14  been any business?

15      A.   Well, I can't specifically

16  tell you, but I seem to recall that we

17  assisted them when they were starting up

18  as Sea Star in the Puerto Rican

19  service.  I may be wrong.

20          But there's a recollection

21  that we might have assisted them somehow

22  in terminal services or berths for their

23  ships or something, but that you are

24  taking me way back.

ESQUIRE DEPOSITION SERVICES

38                          Thomas J. Holt, Sr.

1    Q.   Were you involved in the

2  NPR sale of certain assets to Sea Star?

3       MR. MOLDOFF:  Object to the

4  form.

5  BY MR. ARMSTRONG:

6    Q.   In the bankruptcy

7  proceeding.

8    A.   No.  In the bankruptcy

9  proceeding, that would have been the

10  trustee and maybe my son Tom.

11       I'm trying to go back to

12  your prior question and it seems to me

13  we assisted them with cranes in Puerto

14  Rico when they were starting up.

15       Since '97, I would normally

16  see Bob at least two or three times a

17  year when he comes back east.  His

18  family is back here.  He would stop in

19  and say hello.

20    Q.   Was this a business call or

21  a social call, to your understanding?

22    A.   It was always a business

23  call dealing more with what was going on

24  in the industry, who was building ships,

ESQUIRE DEPOSITION SERVICES

39                         Thomas J. Holt, Sr.

1    what trade routes were they looking at

2    versus Navieras joint ventures, if at

3    all possible, the determination of how

4    much is owed by Sea Star to Emerald, et

5    cetera.

6              There was never a question

7    about you owing us money.  That's a

8    foregone conclusion agreed to by your

9    people.  It's really a question of how

10   much.

11       Q.    When you say "you," you are

12   not talking about me, are you?

13       A.    Well, I don't know you,

14   Mr. Armstrong.  Are you of counsel of

15   Sea Star?  Do you work for them or do

16   you have your own firm?  I don't know.

17             I always presumed that you,

18   along with Mark and Bob, run Sea

19   Star/Tote/ Saltchuk.

20       Q.    Who is Mark?

21       A.    I don't know what he does

22   today.  The son-in-law of the owner of

23   Saltchuk.  Mark -- what's Mark's last

24   name?  Do you remember him?

ESQUIRE DEPOSITION SERVICES

A-653

40                          Thomas J. Holt, Sr.

1       MR. EVANS:  Talbot.

2       THE WITNESS:  Talbot.  Yes.

3   He is a very good friend of my son

4   Tom's.

5   BY MR. ARMSTRONG:

6       Q.   Have you communicated with

7   Mark Talbot in connection with Emerald

8   equipment?

9       A.   I personally have not.

10      Q.    You have communicated with

11  Bob Magee in connection with Emerald

12  equipment; correct?

13      A.   How much they owe us, yes.

14      Q.   Have you and Mr. Magee ever

15  been involved in settlement discussions?

16      A.   You could not call it

17  settlement discussions.  It was more of

18  a range.  Bob did not agree with the

19  range.  And, consequently, I said to

20  him, "Well, how are we going to resolve

21  this?"  We agreed it would have to go to

22  litigation.

23      Q.   When you say "range," what

24  do you mean?

ESQUIRE DEPOSITION SERVICES

41                              Thomas J. Holt, Sr.

1    A.   Well, he thought it was one

2  number and I thought it was another.

3    Q.   What number did he think it

4  was, to your recollection?

5      MR. MOLDOFF:  I object to

6  the questions about settlement to the

7  extent they are not relevant pursuant to

8  the Rules of Evidence.

9  BY MR. ARMSTRONG:

10   Q.   Go ahead and answer.

11   A.   He was less than $100,000.

12   Q.   And what figure was your

13  figure, if you recollect?

14   A.   It's what it has been

15  invoiced at, probably close to $5

16  million.  Whatever the numbers are, they

17  are.

18   Q.   Have you seen invoices for

19  $5 million?

20   A.   No.  I have seen invoices

21  that could total up to $5 million.

22   Q.   When did you last look at

23  Emerald invoices?

24   A.   Several months ago.

ESQUIRE DEPOSITION SERVICES

42                          Thomas J. Holt, Sr.

1   Q.   Do you know Brian Bogan?

2   A.   I might have met -- is he

3   their CFO?  What's Brian do with the

4   company?

5   Q.   He is with Saltchuk.

6   A.   He is with Saltchuk.

7        If he is their CFO, I might

8   have met him early on when I used to go

9   out there and pay a courtesy visit.

10  Q.   Did you have any

11  communications with him in connection

12  with Emerald equipment?

13  A.   I don't recall.

14  Q.   Do you know Mike Shea?

15  A.   The gentleman that was

16  running Sea Star in Puerto Rico, Mike

17  Shea?

18  Q.   Well, he was president of

19  Sea Star.

20  A.   Mike did a lot of things.

21  If it's the same guy we are talking

22  about, I know him.  I never had anything

23  to do with him with regards to Emerald.

24  Q.   Do you know Phil Bates?

ESQUIRE DEPOSITION SERVICES

43                    Thomas J. Holt, Sr.

1     A.    Probably to have met when I

2  was going through Puerto Rico.  Don't

3  really know him.

4     Q.    Do you recall whether you

5  had any communications with him in

6  regard to Emerald?

7     A.    I think there's some

8  e-mails back and forth, but that's long

9  done for me.

10    Q.    Do you recall

11 communications with any representatives

12 of Sea Star in connection with Emerald

13 equipment?

14    A.    There was -- back in the

15 taking over of the fleet by Sea Star,

16 there was some e-mails went back and

17 forth, some to my son.  I saw them then.

18        I'm trying to remember if

19 there was any directly from Shea.  I

20 don't think so.  And I don't think there

21 any directly from Bob Magee.  And I

22 don't think there was any from Brian --

23 did you say -- your CFO.

24    Q.    Brian Bogan.

ESQUIRE DEPOSITION SERVICES

A-657

44                     Thomas J. Holt, Sr.

1    A.    Bogan?  There might have

2  been.  There was a lot of paperwork

3  flying around in those days.  And as I

4  told you earlier, I was in the throes of

5  losing my company, so it was a very

6  confusing time for me.

7    Q.    Were you involved in the

8  negotiations for the Sea Star purchase

9  of certain assets from NPR?

10       MR. MOLDOFF:  Object.  I

11  think this was asked and answered.

12       THE WITNESS:  Third party,

13  because the trustee controlled that.

14  BY MR. ARMSTRONG:

15    Q.    Before the trustee took

16  over, did you have any involvement?

17    A.    Yes.  There was always

18  conversation with Sea Star prior to the

19  bankruptcy of Navieras or the filing of

20  it.  We were always trying to see if

21  there was a common ground to work

22  together.

23       They needed more space on

24  the marine terminal in Puerto Rico and

ESQUIRE DEPOSITION SERVICES

45                    Thomas J. Holt, Sr.

1   we were trying to see how we could come

2   together. We talked about buying out

3   certain stockholders back in the early

4   days. We talked about joint ventures.

5   We talked about cranes.

6        And, as I said, more lineal

7   footage for their ships to dock, what

8   would be the ability to use our space,

9   et cetera. There was always that kind

10  of cooperation going back and forth.

11     Q.   Were you conversing with

12  any particular people that you

13  understood represented Sea Star?

14       MR. MOLDOFF: Object to the

15  form.

16       THE WITNESS: As what?

17  BY MR. ARMSTRONG:

18     Q.   During that time.

19     A.   At that time? I was

20  involved in the conversations. My son

21  Tom would be, yes.

22     Q.   With whom were those

23  conversations occurring?

24     A.   I remember having several

ESQUIRE DEPOSITION SERVICES

Thomas J. Holt, Sr.

1  meetings with Mark Talbot, Bob Magee.

2  They would -- I don't know if they ever

3  had their local guy in.  Mike Shea, for

4  sure, was there.

5          Traditionally they would

6  take place in Puerto Rico and sometimes

7  in Seattle, sometimes in Philadelphia.

8  There was always a cooperative spirit

9  between the two companies prior to my

10  having to file bankruptcy.

11    Q.   Did there come a time -- or

12  there came a time when the bankruptcy

13  was filed --

14    A.   Yes.

15    Q.   -- and there was bidding

16  for assets of NPR, Inc.; correct?

17    A.   No.  When you use the word

18  "bidding," I don't know how you mean

19  it.

20          The time that I was

21  involved as the trustee in possession,

22  everything I was doing was trying to

23  better the strength of the company

24  financially and look for ways of

ESQUIRE DEPOSITION SERVICES

47                    Thomas J. Holt, Sr.

1  partners to have the company go on.

2        When you say "bidding," I

3  cannot tell you that I sat down with

4  anybody and said, "Do you want to buy

5  this company?"  It was always keep the

6  company alive as a partner, a joint

7  venture to bring financial strength.

8    Q.   When you are talking about

9  the trustee, are you referring to a

10  fellow named Thomas Hayes?

11    A.   He replaced me.

12    Q.   Hayes replaced you?

13    A.   Yes.  He went off and did

14  his own thing.

15    Q.   After Hayes replaced you in

16  your companies -- let me backtrack.

17        Is Hayes the one who wrote

18  you the letter?

19    A.   Of firing me?

20    Q.   Yes, sir.

21    A.   Yes, sir.

22    Q.   After Hayes replaced you,

23  did you have any involvement in the

24  negotiations for sale of NPR assets?

ESQUIRE DEPOSITION SERVICES

A-661

48                    Thomas J. Holt, Sr.

1    A.    No.  My son Tom might have,

2    but I didn't.

3          I don't want to mislead you

4    here.  I was the trustee-in-possession.

5    Then Hayes come in and he became the

6    trustee-in-possession, and under Chapter

7    11 proceedings he was doing everything

8    in his power to sell the company and the

9    assets or merge up with people; okay?

10         Then he fired me, because I

11   was still working for the company in his

12   tenure as the trustee.  Shortly after he

13   fired me, he elected to liquidate the

14   company, go to a 7.

15   Q.    Do you recall when he fired

16   you?

17   A.    It was March of '02.

18   Q.    Prior to the time that he

19   fired you, were you involved in efforts

20   to sell NPR assets?

21   A.    I was involved in assisting

22   him in people he was talking to, whoever

23   he was talking to, and it was very

24   peripherally.

49                    Thomas J. Holt, Sr.

1    He would come back and say

2  to my son or I, or both of us, "What do

3  you think this is worth?  How much is

4  that worth?  What should we do with this

5  ship?  Should we scrap it, repair it?"

6  It was all how do we bring this out of

7  Chapter 11.

8          And then it was sometime in

9  April of '02 that he elected to totally

10  liquidate it, so he went out and tried

11  to sell off the company as an operating

12  asset.

13    Q.   After he fired you, did you

14  have any involvement with NPR?

15    A.   I can tell you minimal, if

16  any.  I did not negotiate the sale of

17  NPR to Sea Star.  I did not negotiate

18  the leases on terminals or anything,

19  no.

20          I was sort of standing

21  around there trying to keep the door

22  open for the company to come out of 11.

23  I had no official position.

24    Q.   During your discussions

ESQUIRE DEPOSITION SERVICES

50    Thomas J. Holt, Sr.

1    with Bob Magee, have you and he

2    disagreed on anything in regard to the

3    Emerald equipment other than the range?

4    A.    A range of what was owed?

5    Q.    Well, you indicated that he

6    mentioned one figure and you mentioned

7    another.

8    A.    Well, was there any other

9    disagreements?  Not to my knowledge.

10    Q.    What is your understanding

11    of the basis for the disagreement?

12    A.    The amount of money.

13    Q.    Other than the amount of

14    money, do you disagree on or have you

15    discussed any disagreements on

16    interpretation of the equipment

17    agreement?

18    A.    I assume that's why we're

19    in litigation.

20    Q.    Did you and Mr. Magee

21    discuss any of that?

22    A.    No.  The agreement is the

23    agreement.  We never got into what does

24    Paragraph 3 mean, if there is a

ESQUIRE DEPOSITION SERVICES

51                    Thomas J. Holt, Sr.

1   Paragraph 3.

2         The agreement is the

3   agreement.  It really comes down to,

4   obviously, he believes that he doesn't

5   owe money and I believe he does.

6      Q.   Have you and he discussed

7   why he believes that he doesn't owe

8   money?

9      A.   No, we never got into that.

10     Q.   Have you and he discussed

11  why you believe that he owes a certain

12  amount of money or that Sea Star owes a

13  certain amount of money?

14     A.   Except for the underlying

15  documents of invoicing and the

16  methodology of invoicing, we never

17  really specifically talked anything but

18  what could be a settlement number.

19     Q.   Okay.

20     A.   And we were so far apart

21  that it was obvious that we needed an

22  impartial person to come up with the

23  amount.

24     Q.   To clear this up, is it

ESQUIRE DEPOSITION SERVICES

52                    Thomas J. Holt, Sr.

1  your understanding that all of your

2  communications with Bob Magee in regard

3  to Emerald Equipment were settlement

4  discussions?

5      A.   If you can call settlement

6  to please pay me, I will answer yes.

7          If you are saying that when

8  I say please pay me and he said we

9  disagree on the amount and then it comes

10  down to, well, who is going to

11  adjudicate what is the proper amount, I

12  think we talked peripherally about a

13  tremendous amount of equipment was

14  missing.  So if you don't have the

15  equipment, you pay for it.

16      Q.   When you say "equipment was

17  missing," did you have an inventory from

18  NPR showing what equipment was on-hire

19  to NPR as of the date --

20      A.   Yes.

21      Q.   -- of the asset purchase?

22      A.   Yes.

23      Q.   Did you have inventories

24  from NPR showing what equipment on-hire

ESQUIRE DEPOSITION SERVICES

53    Thomas J. Holt, Sr.

1    to NPR was missing as of that date?

2    A.  Yes.

3    Q.  Were those written

4    inventories?

5    A.  Yes.

6    Q.  Do you know when those

7    inventories were prepared?

8    A.  Daily.

9    Q.  Did anyone at Emerald

10   review those inventories?

11   A.  When NPR had the company?

12   Q.  Yes.

13   A.  No.

14   Q.  Was anyone at Emerald

15   responsible for reviewing those

16   inventories?

17   A.  No.  It was the

18   responsibility of NPR to return the

19   equipment when they were done with it.

20   Q.  Well, how did Emerald know

21   that the inventories were correct?

22   A.  They didn't.  They relied

23   on NPR's inventory.

24   Q.  Does Emerald have knowledge

ESQUIRE DEPOSITION SERVICES

A-667

54                    Thomas J. Holt, Sr.

1  today that the NPR inventories, as of

2  the time of the asset purchase, were

3  correct?

4      A.   We have no other reason to

5  assume otherwise.  But NPR was

6  responsible for the equipment under the

7  contract with Emerald and NPR.

8      Q.   All right.  Did you accept

9  those inventories as correct?

10     A.   That's correct.

11     Q.   And do you still accept

12  those inventories as correct?

13     A.   Well, as where they are, if

14  they are still in existence, yes.

15     Q.   Are you familiar with the

16  term "POS"?

17     A.   POS?

18     Q.   Yes.  Or "put out of

19  service, permanently out of service"?

20     A.   It could be a definition

21  used in the industry.

22     Q.   Are you familiar with that?

23     A.   I know of the term, yes.  I

24  never paid much attention to it, but

ESQUIRE DEPOSITION SERVICES

55                    Thomas J. Holt, Sr.

1  that's okay.

2     Q.    What is your understanding

3  of the meaning of that term?

4     A.    That if it's out of

5  service, it is awaiting to be repaired

6  to be put back into service.

7     Q.    Are you familiar with a

8  term "permanently out of service"?

9     A.    Same meaning, I'd imagine.

10     Q.    Do you recall whether any

11  Emerald equipment was permanently out of

12  service, according to NPR reports, as of

13  the time of the asset sale?

14     A.    Well, in an 11,000-piece

15  fleet, there is equipment that is

16  permanently out of service, a

17  percentage, or in the event of awaiting

18  repairs.

19         That didn't concern Emerald

20  because NPR was responsible for all that

21  equipment under the agreement between

22  NPR and Emerald.

23     Q.    Whether or not the

24  equipment was permanently out of

ESQUIRE DEPOSITION SERVICES

56                    Thomas J. Holt, Sr.

1   service, was NPR responsible for paying

2   per diem charges?

3       A.    They were responsible for

4   paying a sum of money each month for all

5   the equipment, because if it was

6   permanently out of service, it's because

7   it was done on their watch.

8           If it was out of service

9   for repairs, they are responsible, not

10  unlike your agreement that Sea Star has

11  with Emerald.  You break something in

12  half, you are going to fix it.

13      Q.    Would it be fair to say

14  that NPR was responsible to pay a

15  certain amount per month whether or not

16  the equipment had been lost?

17      A.    If they lost it, they are

18  responsible for it, and, yes, there was

19  a certain price per month.

20      Q.    And if it was lost, they'd

21  keep paying for it as part of that

22  price; correct?

23      A.    They would either keep

24  paying for it or they would pay for the

ESQUIRE DEPOSITION SERVICES

57                    Thomas J. Holt, Sr.

1  piece of equipment under the agreement

2  with NPR. That's standard procedure in

3  the industry.

4       Q.   Are you aware of any

5  prohibitions by Emerald against NPR

6  paying the value of lost equipment?

7       A.   You mean -- "prohibitions"

8  means what?

9           MR. MOLDOFF:  Object to the

10  form.

11          THE WITNESS:  The agreement

12  was the agreement.  Whatever it was, it

13  was.

14  BY MR. ARMSTRONG:

15      Q.   And if NPR paid the value

16  of the lost equipment, did that change

17  the amount of the monthly payment that

18  NPR would make?

19      A.   I don't know of any

20  agreement -- you got a real reach here.

21  Now you are going back several years.  I

22  don't know if the agreement was per day

23  per unit or replacement value if it was

24  lost or it was a flat sum of money over

ESQUIRE DEPOSITION SERVICES

A-671

58                    Thomas J. Holt, Sr.

1   a period of years while they had the

2   whole fleet in their possession and

3   responsible for the whole fleet.

4           MR. MOLDOFF:  Just as a

5   general instruction, I think

6   Mr. Armstrong would tell you the same

7   thing, you shouldn't speculate.  Or if

8   you are, say that you are.

9           THE WITNESS:  Then I don't

10  want to comment then.  I will just sit

11  here and look stupid.

12          MR. MOLDOFF:  You don't have

13  to do that.  You are not doing that.

14  BY MR. ARMSTRONG:

15      Q.   Do you know Bob Leetch?

16      A.   I know the name.  I'm

17  trying to recall how I know it.  Did he

18  work for me?

19      Q.   No.  He worked for Sea

20  Star.

21      A.   He worked for Sea Star?

22      Q.   He was Sea Star's CFO.

23      A.   You mean they had two CFOs,

24  Brian and Leetch?

ESQUIRE DEPOSITION SERVICES

59                          Thomas J. Holt, Sr.

1    Q.   Leetch was Sea Star's CFO.

2  Did you ever meet him?

3    A.   I know the name, I just

4  couldn't put it in what context.  An

5  awful lot of our people left and went

6  over to Sea Star, an awful lot of

7  Navieras people.

8    Q.   Did you ever have any

9  communications that you recall with Bob

10  Leetch?

11    A.   I probably did.

12    Q.   Do you recall what they

13  were?

14    A.   No.  Probably please pay,

15  something of that nature.  Might have

16  sent him e-mails, might have wrote him,

17  maybe he might have wrote me.  I don't

18  recall.

19    Q.   Do you recall whether you

20  had any communications with him in

21  connection with the asset sale, the NPR

22  asset sale?

23    A.   I would tell you that was

24  mostly Mr. Hayes and my son Tom.

ESQUIRE DEPOSITION SERVICES

60                    Thomas J. Holt, Sr.

1    Q.   When you say your son Tom,

2  we're referring to Tom, Jr.?

3    A.   Well, he is my son, Tom.

4  I'm senior, so he is junior, but that

5  don't mean necessarily that you read

6  that on correspondence, junior or

7  senior.

8    Q.   I understand.

9        You want to take a break?

10   A.   No, I'm just going to have

11  a little water.

12   Q.   Let me show you a copy of a

13  document that has been marked as

14  Exhibit 1 to the Emerald deposition.

15       Do you recall whether you

16  have seen that document before?

17   A.   This document was generated

18  when Emerald was formed and they did the

19  contract with MBC.  I had seen it.

20       MR. MOLDOFF:  This document

21  has certain markings on it and I don't

22  know whose markings they are.  I think

23  when you said you have seen this

24  document, you mean generically -- not

ESQUIRE DEPOSITION SERVICES

A-674

61                    Thomas J. Holt, Sr.

1   generically, but --

2        THE WITNESS:  Yes.

3        MR. MOLDOFF:  The document

4   is called a loan and security agreement.

5        THE WITNESS:  Have I ever

6   read it?  I don't know.

7        MR. MOLDOFF:  It may or may

8   not have had those markings on there.

9   Is that fair?

10       THE WITNESS:  I'm sure it

11   did back in those days.  This was -- it

12   is marked November '97.  This is the

13   financing agreement between Emerald and

14   MBC.

15   BY MR. ARMSTRONG:

16       Q.   Do you recall reading that?

17       A.   Not specifically line for

18   line, no; but I recall it.

19       Q.   What was your relationship

20   to Emerald in November 1997 when that

21   paper was signed?

22       A.   My relationship would have

23   been as the owner of Navieras.  And Mark

24   Goldman and Art Davis at some period of

ESQUIRE DEPOSITION SERVICES

62                        Thomas J. Holt, Sr.

1   time throughout their careers worked for

2   me, and I suggested that they would form

3   this company and take advantage of

4   whatever taxes and such that this

5   corporate form would do for them.  That

6   was my relationship.

7       Q.   Did Art Davis form Emerald?

8       A.   No.

9       Q.   Who formed Emerald?

10      A.   Emerald was formed at the

11   same time Navieras was formed.  So the

12   law firm would have been the guys that

13   formed the companies.

14           The time frame Emerald was

15   formed, I was the one that suggested

16   that it be formed for the leasing of the

17   Navieras equipment to Navieras.  There

18   was needed the ability to finance $35

19   million, so I suggested that we

20   establish this company owned by my key

21   employees over the years and they then

22   would lease the equipment back to

23   Navieras.

24      Q.   Am I correct in

ESQUIRE DEPOSITION SERVICES

63    Thomas J. Holt, Sr.

1  understanding that you suggested that

2  Art Davis, Mark Goldman, and perhaps

3  others, form Emerald to lease equipment

4  to Navieras or NPR?

5      A.   One in the same, in my

6  mind, yes.

7      Q.   In November 1997 was Art

8  Davis an owner of Emerald?

9      A.   When the company was

10  formed, yes.

11      Q.   Did he remain an owner of

12  Emerald through the buyout in 2000?

13      A.   Yes.

14      Q.   And in 2000 you bought Art

15  Davis and others out?

16      A.   And the other stockholders

17  out, yes.

18      Q.   Now, did you individually

19  buy them out or did you do it through a

20  corporation or corporations?

21      A.   However my attorney told me

22  to do it.  I think I did it as an

23  individual.  I can't recall.

24      Q.   Were they paid cash for

ESQUIRE DEPOSITION SERVICES

A-677

64                    Thomas J. Holt, Sr.

1  their interest in Emerald?

2      A.   No.  The cash to the value

3  of it?  No.  I took them out for a price

4  of a dollar.

5      Q.   Why would they agree to be

6  taken out for the price of a dollar?

7      A.   They didn't want to be

8  obligated to MBC anymore as Emerald.

9  They also did not want to continue.

10        They just -- at that time

11  they had advice that said that the

12  ownership of Emerald as an individual

13  did not give them what they were looking

14  for, which was depreciation.  So they

15  sought advice and the advice was sell

16  it, so I bought it back.

17     Q.   Did they receive anything

18  other than the dollar for Emerald?

19     A.   That's all I gave them.

20     Q.   Do you know whether anyone

21  else gave them anything?

22     A.   Who?

23     Q.   Gave Art Davis, Mark

24  Goldman and any other investors for

ESQUIRE DEPOSITION SERVICES

A-678

65                    Thomas J. Holt, Sr.

1  their interest --

2      A.   Who would the other people

3  be who would give it?

4      Q.   I have no idea.  I'm asking

5  you whether you know.

6          MR. MOLDOFF:  Object to the

7  form of the question.

8          THE WITNESS:  No, I don't

9  know of anyone.

10  BY MR. ARMSTRONG:

11     Q.   I show you a document

12  entitled "Assignment of Lease as

13  Security" which has been marked as

14  Exhibit 2 to the Emerald deposition.

15         Have you seen that document

16  before?

17     A.   Your question is, sir?

18     Q.   Have you ever seen that

19  before?

20     A.   Yes, I have.

21     Q.   It's your signature on the

22  last page?

23     A.   Yes, sir.

24     Q.   Was Holt Cargo Systems,

ESQUIRE DEPOSITION SERVICES

A-679

66                    Thomas J. Holt, Sr.

1    Inc., leasing equipment from anyone at

2    the time that you signed that?

3        A.   Not to my knowledge.

4        Q.   Do you know why Holt Cargo

5    Systems, Inc., signed that document?

6        A.   Because the bank wanted it.

7        Q.   Was Holt Cargo Systems,

8    Inc., leasing equipment from anyone at

9    that time?

10       A.   Not that I'm aware of.

11   They could have been, as I said,

12   peripherally in their stevedoring

13   business, but I'm not aware of that.

14       Q.   Let me show you a copy of a

15   document entitled "Order authorizing

16   sale of the NPR assets free and clear of

17   all liens, claims, and encumbrances,"

18   which has been marked as Exhibit 4 to

19   the Emerald deposition.

20           Have you seen that document

21   before?

22       A.   This is the bankruptcy?

23       Q.   Yes.

24       A.   I can't tell you that I saw

ESQUIRE DEPOSITION SERVICES

A-680

67                    Thomas J. Holt, Sr.

1  this particular document, but I read an

2  awful lot of documents.  Whatever this

3  document is, I can't relate to it

4  legally, but I assume this is where the

5  bank went in -- I'm not going to

6  assume.  It says what it says.

7      Q.   Have you seen it before?

8      A.   I'm sure I have.

9      Q.   Do you recall any

10  arrangement in connection with the asset

11  sale that Sea Star would store, keep

12  equipment in storage, on properties

13  acquired during that sale?

14         By "equipment" --

15      A.   For who?

16      Q.   -- I'm specifically -- for

17  Emerald.

18         MR. MOLDOFF:  Object to the

19  form.

20         THE WITNESS:  There was an

21  agreement -- and this is going back a

22  little bit for me -- that Sea Star was

23  storing equipment for Emerald, which

24  either the bank paid or Emerald paid.  I

ESQUIRE DEPOSITION SERVICES

A-681

68                    Thomas J. Holt, Sr.

1   don't recall how it worked.

2   BY MR. ARMSTRONG:

3       Q.   Do you recall how that

4   agreement came into being?

5           MR. MOLDOFF:  Object to the

6   form of the question.

7           THE WITNESS:  Not sitting

8   here today.

9           MR. MOLDOFF:  There's no --

10          THE WITNESS:  Go ahead.

11          MR. MOLDOFF:  There's really

12  no time frame right now.  At what point

13  in time are we talking about?

14          MR. ARMSTRONG:  Any time.

15  BY MR. ARMSTRONG:

16      Q.   Were you involved in

17  negotiating any agreement for storage of

18  Emerald equipment in terminal areas

19  acquired by Sea Star as part of the NPR

20  asset sale?

21      A.   No.

22          MR. MOLDOFF:  When he says

23  "you," he means you.

24          THE WITNESS:  Meaning me as

            ESQUIRE DEPOSITION SERVICES

69                    Thomas J. Holt, Sr.

1   the negotiator, no.  I was aware of it.

2   BY MR. ARMSTRONG:

3       Q.   As participating?

4       A.   I was aware of it.

5       Q.   How were you aware of it?

6       A.   I was told that's what was

7   going to happen between the bank and

8   also Emerald.

9       Q.   And who told you that?

10      A.   My recollection was Art

11  Davis.

12      Q.   Do you know what the

13  arrangements actually were for storage

14  of that equipment?

15      A.   I'm trying to recall if

16  Emerald or the bank was paying per

17  acre.  I think were paying by the acre.

18  I think that's what I approved.

19      Q.   When did you approve that?

20      A.   When it happened.

21      Q.   Do you recall when that

22  was?

23      A.   No.  As I told you, that

24  whole period was very confusing to me.

ESQUIRE DEPOSITION SERVICES

A-683

70                    Thomas J. Holt, Sr.

1  I was losing my main business, the sale-

2  off by Mr. Hayes of Navieras.

3          I would tell you it's right

4  in that time frame, probably the May,

5  June, July of '02. I'm guessing now.

6      Q.   During -- not any

7  particular month, but during that time

8  frame?

9      A.   To the best of my

10  recollection, yes; but you would know

11  better than me. The facts are the

12  facts.

13      Q.   Well, this Order is dated

14  April 26, 2002.

15      A.   Yes.

16      Q.   What arrangements did

17  Emerald make after that to pick up

18  equipment that was stored in Sea Star

19  terminal areas?

20          MR. MOLDOFF: Object to the

21  form of the question.

22  BY MR. ARMSTRONG:

23      Q.   To your knowledge.

24      A.   I don't know what you're

71                    Thomas J. Holt, Sr.

1  saying.  What arrangement?

2       It would have been

3  according to the agreement that was

4  worked out.

5     Q.   Did you ever see a written

6  agreement regarding picking up Emerald

7  equipment from Sea Star terminal areas?

8     A.   Only after the fact that

9  Sea Star took possession of the

10  equipment.

11     Q.   As of April 26, 2002, there

12  was also Emerald equipment in inland

13  depots; is that correct?

14     A.   Under load, yes.

15     Q.   Was there Emerald equipment

16  stored in inland depots that was not

17  under load?

18     A.   Probably waiting to be

19  loaded, yes.

20     Q.   What arrangements did

21  Emerald make to retrieve the Emerald

22  equipment that was not under load in

23  depots?

24       MR. MOLDOFF:  Object to the

ESQUIRE DEPOSITION SERVICES

72                    Thomas J. Holt, Sr.

1  form.

2          THE WITNESS:  Okay.

3          MR. MOLDOFF:  But you can

4  answer.

5          THE WITNESS:  In that time

6  frame, none, because it had been turned

7  over to Sea Star to operate the business

8  that they had purchased from Navieras.

9  We did not go after any equipment until

10  several months later.

11  BY MR. ARMSTRONG:

12    Q.   Was there a document that

13  turned equipment in inland depots over

14  to Sea Star?

15    A.   As far as I was concerned,

16  there was.

17    Q.   What was that document?

18    A.   It was an understanding

19  that was memorialized, I'm recalling, an

20  e-mail from Sea Star.  And then

21  subsequently it was turned into a formal

22  agreement.

23    Q.   Now, with respect to the

24  inland depot equipment, were there

ESQUIRE DEPOSITION SERVICES

A-686

73                    Thomas J. Holt, Sr.

1    documents signed showing what equipment

2    in each depot was turned over to Sea

3    Star?

4        A.   No, because Sea Star was

5    taking all of the equipment at that time

6    and they would return what they did

7    didn't need and what they didn't want.

8        Q.   Where did you hear that Sea

9    Star was taking all of the equipment at

10   that time?

11       A.   Where did I hear it?

12   Probably in the negotiations between Sea

13   Star and your people, and probably

14   either Art Davis or Tom or could have

15   been Bob Magee.  The objectivity was you

16   were continuing the business and you

17   needed the equipment.

18       Q.   Where did you get the

19   understanding that Sea Star was

20   continuing the NPR business?

21       MR. MOLDOFF:  Object to the

22   form of the question.

23   BY MR. ARMSTRONG:

24       Q.   Do you recall?

ESQUIRE DEPOSITION SERVICES

A-687

74                    Thomas J. Holt, Sr.

1    A.   Do I recall where I got

2    it?  I just told you it would have been

3    either from Hayes, who negotiated the

4    sale of the equipment, or it might have

5    been my son.  It was a shaking out

6    period for sure.  After several months,

7    you would determine what customers you

8    would want to keep or not keep.

9    Q.   Was that your understanding

10   of the terms of the asset purchase?

11   A.   I did not negotiate the

12   asset purchase.

13   Q.   Was that your understanding

14   of the terms?

15   A.   My understanding was they

16   were buying the business.

17   Q.   Did anyone ever tell you

18   that Sea Star was not buying the NPR

19   business?

20   A.   No.

21   Q.   Did you ever read the asset

22   purchase agreement?

23   A.   Now that's a reach.  I

24   don't recall.  I could have.  I don't

ESQUIRE DEPOSITION SERVICES

75                        Thomas J. Holt, Sr.

1   remember.  If you have it, show it to me

2   and we'll read it.

3       Q.   Let me show you a copy of a

4   memorandum dated April 19, 2002, that's

5   been marked as Exhibit 11 to the Emerald

6   deposition. Have you ever seen that

7   before?

8           MR. MOLDOFF:  Is the

9   question has he ever seen this before?

10          MR. ARMSTRONG:  It was have

11   you ever seen that before, not this.

12          THE WITNESS:  I have heard

13   of this document.  I have never seen it

14   before.

15   BY MR. ARMSTRONG:

16      Q.   Previously you referred to

17   a shakeout period, did you not, in

18   regard to the Sea Star acquisition?

19      A.   Yes.  I think I said

20   several months.

21      Q.   What did you mean by

22   "shakeout"?

23      A.   I believe I said that it

24   would take you several months to decide

ESQUIRE DEPOSITION SERVICES

76                    Thomas J. Holt, Sr.

1    what customers you wanted to keep or not

2    keep.

3        Q.    What did that have to do

4    with the equipment, the Emerald

5    equipment?

6        A.    How much equipment you

7    would have needed then to handle the

8    customers.

9        Q.    Did you have discussions

10   about that shakeout with anyone?

11       A.    I believe I did, but I

12   can't remember who it was right now.  I

13   never anticipated -- well, go ahead.

14   Next question.

15       Q.    What did you never

16   anticipate?

17       A.    That you would have had

18   this equipment forever.  It was always

19   that you would eventually buy what you

20   would have needed.

21       Q.    Were you anticipating that

22   Sea Star would buy all of the equipment?

23       A.    No, only what you would

24   have needed.

ESQUIRE DEPOSITION SERVICES

A-690

77                    Thomas J. Holt, Sr.

1    Q.   How did Emerald know what

2    equipment Sea Star was getting, that is,

3    Emerald equipment Sea Star was getting,

4    after April 26th?

5          MR. MOLDOFF:  Object to the

6    form.

7          THE WITNESS:  Equipment you

8    had in your possession was covered under

9    the Navieras/Emerald inventory.

10   BY MR. ARMSTRONG:

11   Q.   As far as you were

12   concerned, Sea Star was taking all of

13   the equipment covered under the Navieras

14   inventory?

15   A.   You were taking what the

16   Navieras inventory was to Emerald, which

17   was required to operate the NPR traded

18   book of business that was purchased from

19   Tom Hayes, always understanding that

20   sometime in the future the equipment

21   would be returned or purchased.

22   Q.   Was it your understanding

23   that Sea Star was taking all of the

24   equipment --

ESQUIRE DEPOSITION SERVICES

A-691

78                    Thomas J. Holt, Sr.

1    A.   Yes.

2    Q.   -- listed in the Navieras

3  inventory?

4    A.   That was my understanding,

5  yes, because we didn't know what Sea

6  Star needed in the way of equipment to

7  facilitate the purchase of Navieras.

8    Q.   Am I correct in

9  understanding that Emerald never audited

10  the Navieras inventories?

11       MR. MOLDOFF:  If you know.

12       THE WITNESS:  I would tell

13  you we never did.

14  BY MR. ARMSTRONG:

15    Q.   Is it your understanding

16  that Sea Star was taking POS equipment

17  identified in the Navieras inventory?

18    A.   To the extent that they

19  would use it, they would be then --

20  there was a mechanism as to how you

21  would be invoiced for the equipment

22  worked out between the various people.

23    Q.   Do you recall what that

24  mechanism was?

ESQUIRE DEPOSITION SERVICES

79                Thomas J. Holt, Sr.

1      A.    They attempted to use it on

2   the basis of when you return the

3   equipment, that TIR would be instituted.

4      Q.    Was there a mechanism that

5   a TIR be instituted when Sea Star took

6   possession of the equipment?

7      A.    It was impossible.  You

8   could not have initiated TIRs for when

9   you took possession at 3:00 a.m. on a

10  given day.  Nobody would sit down and

11  write several thousand TIRs.  That would

12  be presumptuous.

13     Q.    It is your understanding

14  that as of the closing of the NPR asset

15  sale, Sea Star took possession of all

16  equipment, all Emerald equipment, that

17  NPR had been leasing from Emerald;

18  correct?

19     A.    It was my understanding

20  that you took possession of all Emerald

21  equipment that NPR was leasing in the

22  operation of their business, and when

23  you got done with the equipment, you

24  would return it and a TIR would be

ESQUIRE DEPOSITION SERVICES

80                    Thomas J. Holt, Sr.

1    issued by Emerald or authorized or

2    acknowledged by Emerald, which would

3    then stop the leasing of the equipment.

4    And in fact that's what happened.

5        Q.    And am I correct in

6    understanding that your understanding of

7    this is based on the written agreement

8    and the e-mails exchanged?

9        A.    The agreement of what I

10   just said, yes.

11       Q.    Has anyone ever told you,

12   said to you, that your understanding in

13   that regard is incorrect?

14       A.    As to what I just said, no.

15       Q.    As of the closing of the

16   NPR asset sale, were you aware of any

17   equipment on lease to NPR that was being

18   held by third parties, such as vendors

19   or repair yards?

20       A.    There was equipment that

21   was held by vendors on monies that NPR

22   owed to them.  They were not aware that

23   it was not NPR's equipment; it was

24   Emerald's equipment.

ESQUIRE DEPOSITION SERVICES

A-694

81                    Thomas J. Holt, Sr.

1    Q.   Do you recall who those

2   vendors were?

3    A.   No.  There were more than

4   several, but I don't know who they were.

5    Q.   Did Emerald take steps to

6   identify the equipment that was being

7   held by these third parties?

8    A.   Can you repeat that,

9   please?

10    Q.   Did Emerald take steps to

11   identify the equipment that was being

12   held by third parties?

13    A.   Eventually.

14    Q.   What steps did Emerald

15   take?

16    A.   Well, as it sorted itself

17   out over a period of months, maybe

18   years, Emerald then proceeded to take

19   the equipment back.  In some cases, we

20   had to get the courts to do it.  But

21   specifically I can't sit here and tell

22   you who, where, and why and how much.

23    Q.   Well, did Emerald make --

24    A.   There is probably still

ESQUIRE DEPOSITION SERVICES

A-695

82                    Thomas J. Holt, Sr.

1   equipment out there that people are

2   holding.

3       Q.   Was that equipment that was

4   included in the NPR inventory?

5       A.   No, no.  You only paid for

6   what you got.  And the way we finally

7   determined what you had is when you

8   returned it.

9       Q.   Now, you are saying that

10   the equipment being held by third

11   parties was not included in the NPR

12   inventory that you received?

13      A.   You are being very

14   specific.  If you can name equipment

15   numbers, I can go back and research it

16   for you.  But there was equipment that

17   was being held by third parties that Sea

18   Star had to have equipment that was

19   required, like chassis to handle the

20   loads that were under load at the time.

21          There was -- I don't

22   know -- a couple thousand loads that

23   were moving then that people could have

24   held.  But whether there was equipment

83                    Thomas J. Holt, Sr.

1   that was being held by people that was

2   not turned over to Sea Star because of

3   it being held, the answer is yes.

4        Q.   And was that equipment that

5   was not turned over to Sea Star included

6   in the NPR inventories, its lists of

7   equipment?

8        A.   That would have been in the

9   NPR inventory because they had the

10   inventory for Emerald.  But if it wasn't

11   turned over to you then, you weren't

12   charged for it.

13           You were only charged for

14   what was physically in your possession

15   in the taking of the assets of Emerald

16   by you when you purchased Navieras, and

17   that's all based on your records and the

18   records that are supported by the

19   equipment being returned to the depots,

20   the records of equipment being sold,

21   because, obviously, there was equipment

22   that was not in your possession that was

23   sold by MBC.  You were never charged for

24   that stuff.

ESQUIRE DEPOSITION SERVICES

84                           Thomas J. Holt, Sr.

1    Q.   Did you use the NPR

2   inventories to determine what equipment

3   was in Sea Star's possession?

4    A.   Yes.  I would tell you that

5   Emerald did that.

6    Q.   Did Emerald ever make

7   specific lists of equipment that was

8   included or on those NPR inventories

9   that was not in Sea Star's possession?

10    A.   To the extent for the

11   invoicing to Sea Star, that's how the

12   list was generated.

13    Q.   How was the list generated?

14    A.   By your acknowledging you

15   had the equipment.

16    Q.   How did Emerald determine

17   what equipment was stored and what

18   equipment was being used by Sea Star?

19    A.   We were provided lists to

20   Emerald by the bank or directly to

21   Emerald.  You turned over inventories to

22   them, "you" being Sea Star.

23    Q.   And do you recall reviewing

24   any of those inventories?

ESQUIRE DEPOSITION SERVICES

85                    Thomas J. Holt, Sr.

1    A.   Not specifically, no.  I

2  left it in the hands of other people.

3    Q.   Did you have any day-to-

4  day, hands-on involvement --

5    A.   No.

6    Q.   -- in this?

7    Did you review what the

8  other people were doing?

9    A.   Yes.

10    Q.   And who were those other

11  people?

12    A.   Early on, it would have

13  been definitely Art, definitely

14  Lorraine, and they had a couple of other

15  people working with them.  They had

16  somebody by the name of -- I don't

17  remember his name -- down in

18  Jacksonville.  Frankie -- might have

19  been in Puerto Rico.

20    They had people working in

21  depots.  I remember Marty McDonald as a

22  consultant worked for them.  But I think

23  we're far off of what your question is,

24  please.

ESQUIRE DEPOSITION SERVICES

86                    Thomas J. Holt, Sr.

1     Q.    And what did you do to

2    review the work that they were doing?

3     A.    We spoke daily.  We

4    reviewed records, both in person and on

5    the phone, acknowledged how the

6    invoicing should go to Sea Star, under

7    what basis, location of equipment, when

8    equipment would be returned.

9          When equipment was

10   destroyed, we just said, sorry, we're

11   not taking this off of you.  I recall

12   some 20 or 30 pieces were destroyed by

13   Sea Star sitting in Puerto Rico.

14    Q.    You recall.  Did you ever

15   see that equipment?

16    A.    Only when I was down there

17   early on operating to get off the

18   terminal equipment, trying to set up how

19   to liquidate the equipment.  That was

20   early, early on.

21    Q.    When was early, early on?

22    A.    It was the summer of '02.

23    Q.    You were down in the Sea

24   Star terminal?

ESQUIRE DEPOSITION SERVICES

87                    Thomas J. Holt, Sr.

1    A.   No.  I would tell you that

2    then it was a question whether it was

3    CSX or Sea Star, because they made some

4    sort of agreement to share space.

5    Q.   Were you in the Sea Star

6    terminal in August or in the summer of

7    '02?

8    A.   I believe I was, yes.

9    Q.   Let me show you a copy of a

10   document that's been marked as Exhibit 7

11   to the Emerald deposition. Do you

12   recognize the signature on the last

13   page?

14   A.   What's the date of this

15   document?

16   Q.   I'm just asking whether you

17   recognize the signature.

18   A.   I'm sorry to say I don't.

19   Supposition, it could be Tom Hayes, but

20   I can't help you there.

21        Is there a significance to

22   the signature?

23        This is in, evidently, July

24   of '02, if I read this fax date right.

ESQUIRE DEPOSITION SERVICES

88                    Thomas J. Holt, Sr.

1    Q.   Let me show you a copy of a

2  document that's been marked as Exhibit 8

3  to the Emerald deposition. Do you

4  recognize the signature on that

5  document?

6    A.   Same answer.

7    Q.   Showing you a document

8  that's been marked as Exhibit 9 to the

9  Emerald deposition, copies of e-mails,

10  and specifically pages 2, 3, and 4 from

11  Bill Hallam to T. Holt, Jr.  Do you

12  recall seeing that e-mail before?

13    A.   No, I have not seen this

14  document.

15    Q.   Do you recall or have you

16  ever heard the term "shipments in

17  process"?

18    A.   Not particularly.  I would

19  know the term "shipment in transit," but

20  "process" if you want to say is

21  "transit," that's okay.

22    Q.   Have you ever heard the

23  term "shipment in transit" in connection

24  with NPR and Emerald?

ESQUIRE DEPOSITION SERVICES

A-702

89                    Thomas J. Holt, Sr.

1    A.    Not so much between NPR and

2    Emerald, but more between NPR/Sea Star

3    when they bought the company.

4    Q.    What was your understanding

5    of the term "shipments in transit" in

6    connection with NPR/Sea Star?

7    A.    That they were completing

8    the voyages of the loads and equipment

9    that were in the possession of

10   Navieras/NPR that was turned over to Sea

11   Star through the sale to Sea Star of

12   NPR.

13   Q.    What was your

14   understanding as to --

15   A.    Are we done with this?

16   Q.    What was your understanding

17   as to Emerald's right to bill for

18   equipment used in shipments in transit?

19   A.    The term "in transit," of

20   the period of time that was mentioned

21   with Sea Star/NPR, was a statement that

22   was handed out with the bankruptcy

23   judge.

24          I'm trying to recall, but

ESQUIRE DEPOSITION SERVICES

90                    Thomas J. Holt, Sr.

1   my mind seems to say that it was a

2   period of two weeks for product in

3   transit.

4       Q.   Did Emerald bill Sea Star

5   for equipment used in shipments in

6   transit?

7       A.   For that --

8          MR. MOLDOFF:  If you know.

9          THE WITNESS:  If I know, in

10  that two-week period, no.  If that's the

11  same thing that you are referring to as

12  "in transit" as covered by the judge.

13  BY MR. ARMSTRONG:

14      Q.   How did Emerald determine

15  what equipment, that is, what Emerald

16  equipment, was involved in shipments in

17  transit?

18      A.   They had the inventory from

19  NPR at that time.

20      Q.   Did the inventory from NPR

21  show what equipment was involved in

22  shipments in transit?

23      A.   I'm sure it did.

24      Q.   Do you recall reviewing

          ESQUIRE DEPOSITION SERVICES

Thomas J. Holt, Sr.

1  that inventory?

2    A.   No.

3    Q.   Let me show you a copy of a

4  document that's been marked as Exhibit 6

5  to the Emerald deposition. Have you ever

6  seen that before?

7    A.   Is this the one that

8  establishes in transit?

9    Q.   Pardon?

10    A.   Is this the document that

11  establishes the in transit by the judge?

12    Q.   I'm asking you whether you

13  have seen that document before.

14    A.   Well, I'll have to read it,

15  then.

16        I'm sure I have seen it.  I

17  don't specifically recall it, but I'm

18  sure I have seen it.

19    Q.   Let me show you a copy of a

20  document that's been marked as Exhibit 5

21  to the Emerald deposition.  Have you

22  seen that document before?

23    A.   Yes, I'm sure I have seen

24  it.

ESQUIRE DEPOSITION SERVICES

92                    Thomas J. Holt, Sr.

1    Q.   Let me show you a copy of a

2    letter dated April 11, 2002, that has

3    been marked as Exhibit 33 to the Emerald

4    deposition. Have you seen that letter

5    before?

6    A.   Yes.

7    Q.   Did you prepare that

8    letter?

9    A.   No.

10    Q.   Who prepared the letter?

11    A.   My secretary.

12    Q.   Did you dictate to your

13    secretary?

14    A.   I dictate to my secretary.

15    This particular letter was sent out

16    under my signature and I'm pretty sure I

17    sent it. It might have been sent by my

18    son Tom, but I'm pretty sure I sent it.

19    Q.   Do you recall dictating

20    that letter?

21    A.   Specifically this one? No.

22    Q.   Do you recall your

23    secretary preparing the letter?

24    A.   Yeah. Yes, not yeah.

Thomas J. Holt, Sr.

1    Q.   Do you recall signing the

2  original?

3    A.   Do you have the original?

4  I can look at my signature.

5    Q.   I'm asking you whether you

6  recall.

7    A.   You are going back to April

8  of '02.  I can't recall now.

9    Q.   Did you send the letter to

10  Robert Leetch?

11    A.   This letter went to

12  Mr. Leetch.  I'm trying to remember.

13  We're looking at April of '02.  This was

14  possibly -- the attached spreadsheet

15  reflects what we feel is the correct

16  reconciliation.

17       I either did this or

18  possibly my son Leo did.  Okay.

19    Q.   What was Leo's involvement

20  with Emerald?

21    A.   He was more than likely

22  assisting me for a smooth transition.

23    Q.   Did he have any involvement

24  with the NPR sale?

ESQUIRE DEPOSITION SERVICES

94                          Thomas J. Holt, Sr.

1    A.   No, I don't believe so.  He

2  might have been.  He might have been

3  trying to help Tom Hayes.

4    Q.   Did you have any face-to-

5  face meetings with Robert Leetch?

6    A.   I probably did.

7    Q.   Do you recall any?

8    A.   I don't recall any, but I

9  probably did.  There was a team of Sea

10  Star people running in and out of our

11  place for about two weeks.  I tried to

12  stay out of the way so I wouldn't hinder

13  them.

14    Q.   During this April time

15  frame?

16    A.   Sounds about right.

17    Q.   Do you recollect any

18  communications with Robert Leetch other

19  than this letter?

20    A.   Not that I'm aware of,

21  unless there is e-mails floating around.

22    Q.   The first part of Paragraph

23  2 refers to "issues raised by Phil Bates

24  with some of the equipment and the

ESQUIRE DEPOSITION SERVICES

95                    Thomas J. Holt, Sr.

1    current market."

2        Do you see that?

3    A.    Yes.

4    Q.    What were the issues raised

5    by Phil Bates with some of the

6    equipment?

7        MR. MOLDOFF:  Object to the

8    form.

9        THE WITNESS:  The letter

10    speaks for itself.  If you want

11    supposition, it was probably economic

12    market conditions.

13    BY MR. ARMSTRONG:

14    Q.    Well, you refer to some of

15    the equipment.  Do you recall what

16    issues he raised with respect to some of

17    the equipment?

18    A.    No.

19        MR. MOLDOFF:  Again,

20    objection to the form.

21    BY MR. ARMSTRONG:

22    Q.    Do you recall what issues

23    he raised with respect to the current

24    market?

ESQUIRE DEPOSITION SERVICES

96                    Thomas J. Holt, Sr.

1    A.   I presume he felt he was

2  overpaying for the equipment; I don't

3  know.

4    Q.   Was he buying the

5  equipment?

6    A.   He was talking about buying

7  equipment.  I always thought they were

8  going to buy all of it, but the letter

9  speaks for itself.

10    Q.   You say "We believe that

11  the active equipment" --

12    A.   Where are you now?

13    Q.   The next sentence.  "We

14  believe that the active equipment

15  population can be reconciled fairly

16  easily, and the attached spreadsheet

17  reflects what we feel is the correct

18  reconciliation."

19       Do you see that?

20    A.   Yeah.

21    Q.   Did you participate in

22  preparing the spreadsheet that's

23  attached?

24    A.   I don't think I did.

ESQUIRE DEPOSITION SERVICES

A-710

97                          Thomas J. Holt, Sr.

1     Q.    Do you know who prepared

2   it?

3     A.    Probably would have been

4   the computer section.

5     Q.    And who was in charge of

6   the computer section?

7     A.    In those days, it would

8   have been probably Shalom Cohen or John

9   Whitely.  You see, as I have been

10   telling you all along, what equipment

11   you got, you got.

12     Q.    Well, this spreadsheet

13   specifies "present Emerald equipment

14   fleet 4/12/02.  Number of units:

15   12,837."

16         Do you see that?

17     A.    Uh-huh, yes.

18     Q.    Was that the number of

19   units that you were proposing to

20   transfer to Sea Star?

21     A.    This, to me, says that,

22   yes.

23     Q.    How did you know that the

24   Emerald equipment fleet as of April 12,

ESQUIRE DEPOSITION SERVICES

98                    Thomas J. Holt, Sr.

1  2002, was 12,837 units?

2        MR. MOLDOFF:  If you know.

3        THE WITNESS:  It's what the

4  inventory said.

5  BY MR. ARMSTRONG:

6     Q.   When you say "inventory,"

7  are you referring to the NPR inventory?

8     A.   We have been talking about

9  that inventory now for the last hour or

10  two.

11    Q.   And you were proposing to

12  transfer 899 refrigerated containers to

13  Sea Star?

14    A.   We were proposing to

15  transfer all that equipment to Sea Star

16  and give them an option to buy it, on

17  the bottom line.

18    Q.   Did Sea Star accept that

19  proposal?

20    A.   I don't know.  Obviously,

21  in their opinion, they did not, because

22  we're here talking to you today.

23    Q.   Is it your position that

24  Emerald leased or rented to Sea Star 899

ESQUIRE DEPOSITION SERVICES

99                    Thomas J. Holt, Sr.

1  refrigerated containers as shown on that

2  spreadsheet?

3      A.   It is my position they

4  leased whatever they leased and that was

5  determined through a series of paperwork

6  flows coming from Sea Star to us and

7  from other entities.

8          What this document purports

9  to be is to sell them, after one year,

10  899 units.

11     Q.   Are those 899 units units

12  that you believe Sea Star leased or

13  rented from Emerald?

14         MR. MOLDOFF:  Asked and

15  answered.

16  BY MR. ARMSTRONG:

17     Q.   After the closing.

18         MR. MOLDOFF:  He just

19  answered the question.

20         THE WITNESS:  The documents

21  will speak for themselves.

22  BY MR. ARMSTRONG:

23     Q.   What documents, other than

24  the NPR inventory, would show the

ESQUIRE DEPOSITION SERVICES

100                    Thomas J. Holt, Sr.

1   refrigerated containers that Sea Star

2   leased or rented from Emerald?

3       A.   The amount of equipment

4   that you returned to us.  The amount of

5   equipment that you told us you had in

6   your inventory.  The amount of equipment

7   that you acknowledge you had possession

8   of over a period of some 28, 30 months.

9   We invoiced on your documents.

10      Q.   Did that include equipment

11  that Sea Star had possession of and was

12  storing?

13      A.   Only if it was in your

14  possession and you kept it in your

15  possession until you returned it to

16  Emerald under the documentation provided

17  for, which would be a TIR.

18          As to your question on

19  these 899 units, this is only a matrix

20  as to what the equipment breakdown was

21  in 12,837 units.  It broke it down to

22  refrigerated containers, dry containers,

23  generator sets, chassis.

24          Then it tried to help you

ESQUIRE DEPOSITION SERVICES

A-714