101                    Thomas J. Holt, Sr.

1  by saying if you wish to buy this after

2  one year, fine.

3        This doesn't mean you had

4  it in your possession all 899.  Your

5  documentation eventually showed us what

6  you had in your possession.

7     Q.   Did it show what was in

8  storage?

9     A.   That doesn't speak of

10  storage.

11     Q.   You referred to Sea Star's

12  documentation showing what equipment Sea

13  Star had in its possession; correct?

14        MR. MOLDOFF:  Asked and

15  answered.

16        THE WITNESS:  You certainly

17  showed us equipment that you, quote, had

18  in storage.  The only difference was

19  your people did not understand that it

20  was out somewhere under load at a

21  shipper's location or under load on a

22  ship.

23        So your documentation where

24  you thought something was in storage was

ESQUIRE DEPOSITION SERVICES

A-715

102                          Thomas J. Holt, Sr.

1   really very actively being used and had

2   not been returned to Emerald under a

3   TIR.

4          May I suggest a break at

5   this moment?

6          MR. ARMSTRONG:  Certainly.

7          (Recess.)

8   BY MR. ARMSTRONG:

9      Q.   Did Sea Star take the

10  equipment that was listed on the

11  spreadsheet, all of it?

12     A.   The one that we just looked

13  at?

14     Q.   Yes.

15     A.   That matrix?  No.

16     Q.   Do you know how much of

17  that equipment Sea Star took?

18     A.   Sitting here today, I

19  couldn't guess.

20     Q.   The last paragraph of the

21  first page says, "Emerald would propose

22  to provide the fleet adjustment on the

23  basis that the POS equipment that is in

24  San Juan or elsewhere can, at Emerald's

ESQUIRE DEPOSITION SERVICES

103                          Thomas J. Holt, Sr.

1   option, be relocated to a Sea Star port

2   facility, is relocated to Philadelphia

3   for disposition free of charge for

4   delivery or storage."  That's the first

5   sentence.

6        Do you see that?

7   A.   Yes.

8   Q.   What did you mean by that?

9   A.   We were attempting to sell

10  the equipment to Sea Star.  So this is

11  all hype.  It's all salesmanship.  How

12  can we entice you to buy something or

13  lease it for a long term?

14  Q.   Did that happen?

15  A.   Well, generically, as you

16  look at this statement, this did not

17  happen.  What did happen was Sea Star

18  leased equipment.

19  Q.   It says: "Additionally and

20  as if -- as and if container and gen-set

21  equipment is turned in pursuant to our

22  agreement, Emerald would want the

23  equipment repositioned pursuant to our

24  direction."

ESQUIRE DEPOSITION SERVICES

104                    Thomas J. Holt, Sr.

1      Did that did happen?

2      A.   You did return Emerald

3    equipment to our direction.  It's

4    covered under the agreement.

5      Q.   By "agreement," you are

6    referring to the written agreement;

7    correct?

8      A.   Yes.  The written agreement

9    reflected the verbal agreement, yes.  So

10   the document speaks for itself.

11     Q.   Is that your final

12   statement with respect to the document?

13     A.   Well, obviously we were

14   attempting to come to an orderly

15   liquidation of the Emerald agreement --

16   of the Emerald equipment, which was to

17   sell or lease to Sea Star.

18     Q.   Were you involved --

19     A.   I should add one thing

20   here, which my lawyer tells me never to

21   add.  We never offered in whole this

22   fleet to anybody else.  You were our

23   only buyer and/or also lessee.

24     Q.   After that April 11, 2002,

ESQUIRE DEPOSITION SERVICES

Thomas J. Holt, Sr.

1  letter were you involved in negotiations

2  with Sea Star for the Emerald equipment

3  agreement?

4      A.   Was I personally involved?

5      Q.   Yes, sir.

6      A.   Yes and no.  I was involved

7  from time to time in talking to people.

8  I don't remember who from your side.  I

9  was involved with working with my son --

10  and, obviously, you see Leo's name here,

11  so I should say sons -- and also Art

12  Davis.

13      Q.   When you say "my son," are

14  you referring to Tom, Jr.?

15      A.   Tom, sure.

16      Q.   And what was Tom, Jr.'s,

17  responsibility?

18      A.   His responsibility was not

19  to sell this equipment or lease it to

20  you.  He was assisting me in trying to

21  sell or lease it to you.

22      Q.   Did he report to you in

23  connection --

24      A.   He told me the deal that he

ESQUIRE DEPOSITION SERVICES

106                        Thomas J. Holt, Sr.

1   had worked out eventually, yes.

2       Q.   Do you recall when he told

3   you what the deal was?

4       A.   Sometime in the two weeks

5   that the equipment was in Sea Star's

6   possession, if I have the time frame

7   proper.

8           The whole theory was you

9   were going to take the entire fleet, but

10  it just wasn't going to be.  You didn't

11  need the entire fleet.

12      Q.   When you say "the whole

13  theory was," whose theory was that?

14      A.   Mine.  I wanted you to take

15  the entire fleet.

16      Q.   And that didn't happen?

17      A.   No, it didn't.

18      Q.   So what did Sea Star take?

19      A.   All the equipment that they

20  had in their possession and eventually

21  returned or purchased.

22      Q.   Was there any inventory,

23  other than the NPR inventory, done of

24  Emerald equipment in the time frame

107                    Thomas J. Holt, Sr.

1   April, early May 2002?

2      A.   Done by Emerald, no.

3      Q.   By anyone associated with

4   Emerald?

5      A.   No.  Probably done by Sea

6   Star, but not by Emerald.

7         MR. ARMSTRONG:  Let me show

8   you a copy of a document which I will

9   ask the court reporter to mark as

10   Exhibit 1 to this deposition.

11         (Above-described document

12   marked Holt, Sr., Exhibit 1.)

13         THE WITNESS:  Do we have a

14   question?

15   BY MR. ARMSTRONG:

16      Q.   Have you ever seen that

17   document before?

18      A.   Yes.

19      Q.   When did you first see it?

20      A.   Back when it was generated.

21      Q.   Did you have any

22   discussions with anyone concerning the

23   substance of that or the subject matter

24   of that document?

ESQUIRE DEPOSITION SERVICES

1    A.    No.

2    Q.    What did you do with it?

3    Did you do anything with it after you

4    saw it?

5    A.    No.

6    Q.    Did you make any comments

7    concerning this statement, quote, as

8    agreed today?

9    A.    Only to the point that it

10    was the best deal that could be gotten.

11    Q.    Did you accept that deal as

12    stated --

13    A.    Yes.

14    Q.    -- by Phil Bates?

15    A.    Well, accepted this deal,

16    and then, subsequently, a new formal

17    agreement was entered into.

18    Q.    You expected that there

19    would be a formal written agreement when

20    you saw this e-mail?

21    A.    This was not the deal I

22    wanted; okay?  But I also will tell you

23    that the only reason we entered into a

24    formal agreement with Sea Star was this

ESQUIRE DEPOSITION SERVICES

109                     Thomas J. Holt, Sr.

1  didn't cut the cake for them.

2          They needed a formal

3  agreement because they were using the

4  equipment far longer, evidently, than

5  they thought this document would

6  survive.

7      Q.   How did you know that?

8      A.   Because that's why we came

9  to a formal agreement.  It took two,

10  three months, maybe four months after

11  this for that agreement to be done.

12     Q.   Did anybody at Sea Star

13  tell you that this wouldn't cut the cake

14  for them?

15     A.   No, no.  Just the fact that

16  the new agreement came forward, which

17  was a semi-permanent type of agreement

18  versus a 30-day agreement.

19     Q.   Now, did the new agreement

20  require the approval of the Bankruptcy

21  Court?

22         MR. MOLDOFF:  Object to the

23  form.

24         If you know.

ESQUIRE DEPOSITION SERVICES

110                    Thomas J. Holt, Sr.

1  BY MR. ARMSTRONG:

2      Q.   If you know.

3      A.   I don't know.

4      Q.   Did the new equipment

5  require the approval of MBC Leasing, if

6  you know?

7      A.   I don't know.

8      Q.   Let me show you a copy of a

9  document that has been marked as

10  Exhibit 34 to the Emerald deposition.

11        Have you ever seen that

12  before?

13     A.   I have heard of this

14  document.  I have never seen it before.

15     Q.   How have you heard of that

16  document?

17     A.   I was told by Arthur that

18  we had to give authorization to the

19  depots to turn over Emerald equipment to

20  Sea Star.

21     Q.   You were aware that the

22  depots were holding Emerald equipment

23  after April 27, 2002?

24     A.   No.  I heard of some; but

ESQUIRE DEPOSITION SERVICES

A-724

111                    Thomas J. Holt, Sr.

1   this document doesn't say that.  This

2   document says they are not going to turn

3   the equipment over to a third party

4   without approval from Emerald.

5       Q.   Do you know what happened

6   to equipment that Emerald approved

7   turning over to Sea Star?

8       A.    Sea Star took possession of

9   it.

10      Q.   Do you know whether any

11  depots continued to hold equipment that

12  Emerald had approved turning over?

13      A.   Hold it for what reason?

14      Q.   For nonpayment by Sea

15  Star -- by NPR.

16      A.   No.  To my knowledge,

17  everybody was satisfied by Emerald.

18  There might be some isolated cases I'm

19  not aware of.  But all these depots had

20  equipment in storage under Emerald and

21  they were getting paid to hold them

22  there.

23      Q.   I show you a copy of a

24  letter dated June 11, 2002, which has

ESQUIRE DEPOSITION SERVICES

A-725

112                    Thomas J. Holt, Sr.

1   been marked as Exhibit 12 to the Emerald

2   deposition, and a letter dated June 10,

3   2002, which has been marked as

4   Exhibit 10 to the Emerald deposition.

5        Do you recognize those

6   documents?

7        A.   I have seen this before.

8        Q.   When you say "this," are

9   you referring to the Exhibit 10, the

10   June 10th letter addressed to you?

11       A.   Yes.

12       Q.   Do you recall when you

13   first saw that?

14       A.   When it probably came in.

15       Q.   Did you have any

16   discussions or other communications with

17   Scott Kreger concerning the contents of

18   that letter?

19       A.   I did.

20       Q.   When did you have such

21   communications?

22       A.   Probably within a

23   reasonable period of time after this

24   letter.

ESQUIRE DEPOSITION SERVICES

113                    Thomas J. Holt, Sr.

1    Q.   And what did you and he

2  discuss?

3    A.   We discussed what the facts

4  of the letter were.

5    Q.   Did you agree with the

6  contents of the letter?

7    A.   I don't have a problem with

8  it.

9    Q.   Did you tell him that?

10   A.   Yes.

11   Q.   What did he say to you?

12   A.   "Fine."  It's self-

13  explanatory.

14   Q.   At that time was MBC

15  running the show or in charge with

16  respect to Emerald equipment?

17      MR. MOLDOFF:  Object to the

18  form.

19      THE WITNESS:  MBC at that

20  time was attempting to reduce their debt

21  that Emerald owed them, so they got

22  leave from the Court, as you are aware

23  of, to sell off equipment.

24      Would they exercise

ESQUIRE DEPOSITION SERVICES

114                     Thomas J. Holt, Sr.

1    control?  Yeah, to the extent that they

2    were owed money.  But they worked very,

3    very closely with Emerald.

4            As you can see, this letter

5    deals with the question of Sea Star

6    buying 700 containers from MBC, amongst

7    other things, that had been leased to

8    NPR.

9    BY MR. ARMSTRONG:

10      Q.   Are you saying buying or

11   using 700 containers?

12      A.   Subsequently, they bought

13   the equipment; but here it says for the

14   use of them.

15      Q.   When did you gain the

16   understanding that Sea Star bought 700,

17   40-foot drive-end containers?

18      A.   I'm not saying it was 700.

19   This letter speaks of the use of 700.

20   MBC sold to Sea Star the -- I want to

21   use the right word so I don't confuse

22   you -- the high cube 40-footer

23   containers that was covered here.  So

24   the letter is self-explanatory.

ESQUIRE DEPOSITION SERVICES

115                    Thomas J. Holt, Sr.

1     Q.   As of June 10, 2002, how

2   much did Emerald owe to MBC?

3          MR. MOLDOFF:  Object to the

4   form.

5          Only if you know.

6          THE WITNESS:  Guesstimate,

7   about 10 million.

8   BY MR. ARMSTRONG:

9     Q.   As of June 10, 2002, did

10   all dispositions of Emerald equipment

11   require MBC's approval?

12    A.   As of June 10th?

13         MR. MOLDOFF:  Object to the

14   form.

15         THE WITNESS:  I don't know.

16   That's a legal question.

17   BY MR. ARMSTRONG:

18    Q.   At any time did sale of

19   Emerald equipment require MBC's

20   approval?

21    A.   No.

22    Q.   At any time did lease of

23   Emerald equipment require MBC's

24   approval?

ESQUIRE DEPOSITION SERVICES

116                      Thomas J. Holt, Sr.

1      MR. MOLDOFF:  Object to the

2   form.

3        THE WITNESS:  Only with

4   regards to Sea Star because we weren't

5   leasing to third parties.

6   BY MR. ARMSTRONG:

7      Q.   What persons were employed

8   by Emerald to sell Emerald equipment as

9   of June 10, 2002?

10      A.   They had -- Art went out

11   and got several agents, both in the

12   United States and Puerto Rico, as well

13   as the bank had to start to liquidate

14   this equipment in an orderly fashion,

15   all coordinated through Emerald.

16        The bank would not sell

17   unless Emerald was involved with it for

18   inventory control purposes, they relied

19   very heavily on Emerald.

20      Q.   What do you mean when you

21   say "inventory control purposes"?

22      A.   Emerald ran inventory

23   controls of this equipment.

24      Q.   What Emerald employees were

ESQUIRE DEPOSITION SERVICES

117                    Thomas J. Holt, Sr.

1   running the inventory controls?

2       A.   It would have been Lorraine

3   and it would have been Arthur.

4       Q.   Was Emerald paying

5   Lorraine?

6       A.   Was Emerald paying

7   Lorraine?  At what period of time?

8       Q.   When these inventory

9   controls were being run.

10      A.   Holt Logistics would have

11  been paying her.

12      Q.   What is Holt Logistics?

13      A.   That's the logistical arm

14  of a company that provides backroom

15  services.  They would have been paying

16  Lorraine.  She was an employee of

17  theirs.

18      Q.   Was Emerald paying Arthur

19  Davis when these inventory controls were

20  being run?

21      A.   No.  Same answer as

22  Lorraine.

23      Q.   What were the inventory

24  control procedures that were being run?

ESQUIRE DEPOSITION SERVICES

A-731

118                    Thomas J. Holt, Sr.

1    A.   As equipment was sold, they

2    would take it off the inventory.  Unless

3    equipment was discovered someplace that

4    was not physically in Sea Star's

5    possession, it was put back to the

6    status of where it was.

7         It always was on the

8    inventory that came out of NPR to

9    Emerald, so they just kept updating that

10   inventory control.

11   Q.   The basic inventory was the

12   NPR inventory?

13   A.   It started from that and

14   then evolved into something else over

15   several months or a couple years.

16   Q.   Have you ever seen the June

17   11, 2002, letter, the Exhibit 12 to the

18   Emerald deposition?

19   A.   No.

20   Q.   Let me show you a copy of a

21   document entitled "Equipment Rental

22   Agreement," which has been marked as

23   Exhibit 16 to the Emerald deposition.

24        Do you recognize that?

ESQUIRE DEPOSITION SERVICES

119                    Thomas J. Holt, Sr.

1     A.   Yes.

2     Q.   Did you sign the original

3   of that equipment rental agreement?

4     A.   I signed this agreement.

5   This is not the original, but I signed

6   the agreement.  I assume you have the

7   original.

8     Q.   I understand that.

9     A.   Yes, I did.

10     Q.   Did you sign the original

11   of that equipment rental agreement?

12     A.   This is my signature.

13     Q.   Did you read that equipment

14   rental agreement before you signed it?

15     A.   Yes.

16     Q.   Did you discuss the terms

17   of the equipment rental agreement with

18   anyone before you signed it?

19     A.   Yes.

20     Q.   Look at Paragraph 1 of that

21   agreement, please, sir.  How was

22   equipment to be transferred to Sea

23   Star --

24        MR. MOLDOFF:  Object to the

ESQUIRE DEPOSITION SERVICES

A-733

120                    Thomas J. Holt, Sr.

1   form of the question.

2   BY MR. ARMSTRONG:

3       Q.   -- under the agreement?

4           MR. MOLDOFF:  Object to the

5   form.

6           THE WITNESS:  Well, this

7   specific paragraph speaks of equipment

8   interchange receipts subject to the

9   terms and conditions of this agreement.

10  BY MR. ARMSTRONG:

11      Q.   What is an equipment

12  interchange receipt, if you know?

13      A.   It is a document

14  traditionally prepared by a marine

15  terminal for when a piece of equipment

16  goes in or out of that marine terminal.

17      Q.   Under that agreement, is

18  that your understanding of how Sea Star

19  was to acquire Emerald equipment?

20      A.   If they wanted a piece of

21  Emerald equipment that they did not have

22  in their possession as of the 31st of

23  July, they would go get that piece of

24  equipment and have a TIR issued, either

ESQUIRE DEPOSITION SERVICES

121                    Thomas J. Holt, Sr.

1   by Emerald or, in some cases, by the

2   third parties where Emerald equipment

3   was stored or from railroads or from

4   their own terminal.

5          As you see, the preamble of

6   the agreement speaks of equipment in use

7   at various times commencing April 29,

8   '02.

9          They had already had the

10   equipment.  This was just memorializing

11   the more formal conditions, redelivery

12   of equipment, maintenance, repairs, all

13   of the things that go into a lease

14   agreement, identification and expenses.

15   This is a written agreement; it speaks

16   for itself.

17      Q.   How did Emerald

18   differentiate between equipment in use

19   and in storage as of April 29, 2002?

20      A.   How did they

21   differentiate?  They did not.  This

22   speaks for equipment going out after

23   July 31, '02.

24          They did not differentiate

ESQUIRE DEPOSITION SERVICES

122                    Thomas J. Holt, Sr.

1   because we relied on the Sea Star

2   documents to tell us what you had in

3   possession in April, in May, in June of

4   '02, your self-billing reports to the

5   bank, which, subsequently, were purged

6   and in many instances found to be wrong;

7   your own inventory controls which you

8   provided us, which subsequently when

9   purged were found in some cases to be

10  wrong; and then the infamous TIRs, when

11  you effectively redelivered to Emerald;

12  and also other documents that we found

13  in the industry: railroad, trucking, et

14  cetera.

15      Q.   You refer to the "infamous

16  TIRs."  What did you mean by that?

17      A.   In what context did I say

18  that, sir?

19      MR. ARMSTRONG:  Would you

20  repeat or read back his answer for him.

21      (The court reporter read the

22  record as follows:

23      "ANSWER:  How did they

24  differentiate?  They did not.  This

ESQUIRE DEPOSITION SERVICES

A-736

123                         Thomas J. Holt, Sr.

1    speaks for equipment going out after

2    July 31, '02.

3           They did not

4    differentiate because we relied on the

5    Sea Star documents to tell us what you

6    had in possession in April, in May, in

7    June of '02, your self-billing reports

8    to the bank, which, subsequently, were

9    purged and in many instances found to be

10   wrong; your own inventory controls which

11   you provided us, which subsequently when

12   purged were found in some cases to be

13   wrong; and then the infamous TIRs, when

14   you effectively redelivered to Emerald;

15   and also other documents that we found

16   in the industry: railroad, trucking, et

17   cetera.")

18          THE WITNESS:  I meant when

19   it was convenient for Sea Star to decide

20   that they wanted to TIR out of their

21   control, the Emerald equipment, they

22   used their own TIRs, which, in some

23   cases, were never accepted by Emerald.

24          When you decided to move

ESQUIRE DEPOSITION SERVICES

124                     Thomas J. Holt, Sr.

1    something from one physical area over to

2    the showroom lot or the J lot, you used

3    your own self-generating TIRs.  That is

4    the reason I said "infamous."

5    BY MR. ARMSTRONG:

6         Q.    And you use the term

7    "purged."  What did you mean by that?

8         A.    We had to go check every

9    piece of equipment against the documents

10   that we garnered from various sources,

11   most of it from Sea Star, most of it in

12   your self-billing reports, your own

13   inventories, and then, subsequently,

14   finding out that they were still

15   actively going up and down the highways

16   and the high seas.

17          You have availability of all

18   this documentation to you.

19     Q.    With respect to this

20   agreement, is it your understanding that

21   Sea Star would sign the redelivery TIRs

22   in Puerto Nuevo, San Juan, Puerto Rico?

23     A.    Over to an Emerald

24   representative.

ESQUIRE DEPOSITION SERVICES

125                 Thomas J. Holt, Sr.

1    Q.   Is there any provision in

2   this agreement that you recall that

3   requires the signature of, quote, an

4   Emerald representative with respect to

5   equipment redelivered in San Juan?

6        MR. MOLDOFF:  Object to the

7   form of the question.

8        THE WITNESS:  The document

9   speaks for itself on the redelivery of

10  equipment.

11  BY MR. ARMSTRONG:

12   Q.   So if it's there, it's

13  there.  If it's not, then it's not part

14  of the agreement; correct?

15   A.   I didn't say that.

16  Whatever the agreement says, it speaks

17  for itself.

18   Q.   And whatever the agreement

19  says is what the agreement was; correct?

20       MR. MOLDOFF:  Object to the

21  form of the question.

22       THE WITNESS:  As far as

23  Emerald is concerned, yes.

24  BY MR. ARMSTRONG:

ESQUIRE DEPOSITION SERVICES

126                    Thomas J. Holt, Sr.

1    Q.   Now, with respect to this

2   agreement, is it your position that the

3   agreement applies only to equipment

4   delivered as of and after July 31, 2002?

5    A.   This agreement

6   formalizes --

7        MR. MOLDOFF:  Object to the

8   form of the question.

9        THE WITNESS:  Thank you.

10        This agreement formalizes a

11   previous agreement and it expounds upon

12   it, obviously, for many other issues.

13   BY MR. ARMSTRONG:

14    Q.   Does this agreement apply

15   to all equipment, all Emerald equipment

16   received by Sea Star?

17        MR. MOLDOFF:  Object to the

18   form of the question.

19        THE WITNESS:  This agreement

20   refers to all equipment that Sea Star

21   had of Emerald's.

22   BY MR. ARMSTRONG:

23    Q.   Does it apply to all

24   equipment that Sea Star had of

127                    Thomas J. Holt, Sr.

1  Emerald's?

2      A.   Yes.

3      Q.   Would it be fair to say

4  that this written agreement governs the

5  contractual relationship between Sea

6  Star and Emerald?

7      A.   Yes.

8          MR. MOLDOFF:  Object to the

9  form of the question.

10  BY MR. ARMSTRONG:

11      Q.   Let me show you a copy of a

12  document that's been marked as

13  Exhibit 56 to the Emerald deposition.

14          Have you ever seen that

15  letter dated August 28, 2003, before?

16      A.   I have seen this letter

17  before.

18      Q.   Do you recall when you

19  first saw it?

20      A.   Probably immediately after

21  it came in.

22      Q.   Did you discuss it with

23  anyone?

24      A.   I discussed it with Arthur

ESQUIRE DEPOSITION SERVICES

A-741

128                    Thomas J. Holt, Sr.

1    to go back and find out from the

2    bankruptcy records what they were

3    talking about, and that's when I first

4    learned that you had an in-transit

5    clause from the Court.

6        Q.   By "you," you are referring

7    to Sea Star?

8        A.   I always, when I'm speaking

9    to you, will refer to you as Sea Star,

10   unless you were the author of this

11   document, which it doesn't say you were.

12       Q.   When you learned that there

13   was an in-transit clause from the Court,

14   did you take any action with respect to

15   Emerald billings?

16       A.   I told our -- Lorraine and

17   Arthur to make sure you don't bill for

18   that period of time.

19       Q.   What did Arthur say?

20       A.   He agreed.

21       Q.   Did Lorraine say anything?

22       A.   No.  We followed the letter

23   of the judge.  Whatever the judge said,

24   that's what we followed.

ESQUIRE DEPOSITION SERVICES

A-742

129                    Thomas J. Holt, Sr.

1    Q.   Arthur confirmed that there

2   was an in-transit provision?

3    A.   He went back and found out

4   that there was a -- I believe there was

5   an agreement that you would lease the

6   equipment for a period of time

7   immediately after taking over the

8   company for some -- $50,000-some.  I

9   don't know who the heck got the money.

10  I don't know.  I would guess who you

11  paid.

12   Q.   When you say "taking over

13  the company" --

14   A.   You bought the assets of

15  the company.

16   Q.   And what company are you

17  referring to?

18   A.   Navieras.

19   Q.   NPR, Inc.?

20      You were aware that Sea

21  Star didn't purchase the stock of NPR,

22  Inc.; correct?

23   A.   To my knowledge, you only

24  bought the assets.

ESQUIRE DEPOSITION SERVICES

130                    Thomas J. Holt, Sr.

1    Q.   Did Emerald ever receive

2    permission from MBC Leasing to terminate

3    the equipment rental agreement?

4        MR. MOLDOFF:  I'm sorry.

5    Can you read back that question?

6        (The court reporter read the

7    record as follows:

8        "QUESTION:  Did Emerald ever

9    receive permission from MBC Leasing to

10   terminate the equipment rental

11   agreement?")

12       THE WITNESS:  I told Scott

13   Kreger we were terminating the

14   agreement, yes.

15   BY MR. ARMSTRONG:

16   Q.   When did you tell him that?

17   A.   When I did it.

18   Q.   When was that?

19   A.   It was either November --

20   in the fall of '03 or '04.  I can't

21   remember when.  Do you have the letter

22   around?

23   Q.   At that time did you have

24   any interest in the Emerald equipment?

ESQUIRE DEPOSITION SERVICES

131                    Thomas J. Holt, Sr.

1    A.   Yes.

2    Q.   What was your interest?

3    A.   To sell it, to liquidate

4   it, to collect the monies that Sea Star

5   owed Emerald, which they continued to

6   ignore.  So out of frustration, I

7   canceled the lease.

8    Q.   Let me show you a copy of

9   an e-mail -- well, you say out of

10   frustration, you canceled the lease.

11   Did you advise Scott Kreger that you

12   were doing that in writing?

13    A.   I don't think I did.  I

14   don't recall.  I might have sent him a

15   copy of the cancellation.

16    Q.   Let me show you a copy of

17   an e-mail dated August 29, 2003, which I

18   will ask the court reporter to mark as

19   Exhibit 2 to this deposition.

20        Do you recognize that?

21        (Above-described document

22   marked Holt, Sr. Exhibit 2.)

23        THE WITNESS:  What's your

24   question?

132                    Thomas J. Holt, Sr.

1  BY MR. ARMSTRONG:

2      Q.  Do you recognize that?

3      A.  I received it.

4      Q.  I show you a copy of a

5  letter dated September 2, 2003, which I

6  will ask the court reporter to mark as

7  Exhibit 3 to this deposition.

8          (Above-described document

9  marked Holt, Sr. Exhibit 3.)

10  BY MR. ARMSTRONG:

11     Q.  Have you ever seen that

12  letter before?

13     A.  Yes, I have seen it.

14     Q.  Do you recall when you

15  first saw it?

16     A.  Within the time frame of

17  when it was received.

18     Q.  Did you have any

19  discussions with anyone concerning its

20  contents?

21     A.  Only Arthur and Lorraine.

22     Q.  What did you say to Arthur?

23     A.  That we would protect our

24  interests to the best of our ability.

ESQUIRE DEPOSITION SERVICES

133                    Thomas J. Holt, Sr.

1    Q.   And what did you believe

2    were your interests at that time?

3    A.   That I had the authority to

4    sell the Emerald equipment and reduce

5    the debt at MBC.

6    Q.   Did you have any other

7    interest in your mind?

8    A.   In regards to what?

9    Q.   Did you believe that you

10   had any other interest at that time?

11   A.   What kind of interest?

12   Q.   In connection with the

13   Emerald equipment.

14   A.   I was the owner of it.

15   Q.   When you say "I," are you

16   referring to you?

17   A.   Me, Thomas J. Holt,

18   president and owner of Emerald.

19   Q.   Were you a stockholder?

20   A.   Of Emerald?

21   Q.   Yes.

22   A.   Absolutely.

23   Q.   Did you personally

24   guarantee the Emerald debt to MBC?

ESQUIRE DEPOSITION SERVICES

134                    Thomas J. Holt, Sr.

1    A.    I would have to go back and

2  look at the Emerald filings, the Emerald

3  loan documents.  I don't believe I did,

4  but that's -- they are what they are.  I

5  don't recall that I did.

6    Q.    Let me show you a copy of a

7  fax cover sheet, a letter dated

8  September 16, 2003, together with a copy

9  of the equipment rental agreement, which

10  I will ask the court reporter to mark as

11  Exhibit 4 to this deposition.

12        Have you ever seen that

13  before?

14        (Above-described document

15  marked Holt, Sr. Exhibit 4.)

16        THE WITNESS:  Yes, I have

17  seen this.

18  BY MR. ARMSTRONG:

19    Q.    Did you give anyone

20  instructions to send a copy of that

21  letter to Bob Magee?

22    A.    Did I tell them to send it

23  to Magee?  I probably did.

24    Q.    Do you recall why you told

ESQUIRE DEPOSITION SERVICES

135                    Thomas J. Holt, Sr.

1   them to send a copy to Magee?

2       A.   Because, to my knowledge,

3   he was the president and CEO of Sea

4   Star.

5       Q.   Is that the only reason?

6       A.   What other reason would you

7   send somebody a letter?  He was the one

8   involved in this.

9       Q.   What was his involvement?

10      A.   He kept talking to me about

11  settlement negotiations.

12      Q.   Was that his only

13  involvement, to your knowledge?

14      A.   No.  He might have been

15  involved early on in the negotiations to

16  buy Navieras off of Tom Hayes.  He might

17  have been involved with my son Thomas to

18  attempt to lease the equipment, the

19  Emerald equipment.

20           But you are inferring there

21  is an ulterior motive of sending this to

22  Mr. Magee, this letter from my lawyer?

23      Q.   Did you ever ask your son

24  whether Mr. Magee was involved in the

ESQUIRE DEPOSITION SERVICES

136                    Thomas J. Holt, Sr.

1  initial negotiations for Emerald

2  equipment?

3     A.   I don't recall.

4     Q.   I show you a copy of a

5  letter dated October 31, 2003.

6     A.   Bob is the president of Sea

7  Star, isn't he?

8        MR. ARMSTRONG:  Which I will

9  ask the court reporter to mark as

10  Exhibit 5 for identification.

11       (Above-described document

12  marked Holt, Sr. Exhibit 5.)

13       THE WITNESS:  Yes.

14  BY MR. ARMSTRONG:

15     Q.   Did you authorize the

16  sending of that letter?

17     A.   Yes.

18     Q.   Before the letter was sent,

19  did you send Mr. Kreger a copy?

20     A.   I don't know if I sent him

21  a copy or I told him I was going to do

22  it. In any event, we sent his lawyer a

23  copy.

24     Q.   Let me show you a copy of a

ESQUIRE DEPOSITION SERVICES

137                    Thomas J. Holt, Sr.

1  letter dated November 21, 2003, which I

2  will ask the court reporter to mark as

3  Exhibit 6 for identification.

4        (Above-described document

5  marked as Holt, Sr. Exhibit 6.)

6  BY MR. ARMSTRONG:

7     Q.   Have you seen that letter

8  before?

9     A.   Yes, I got a copy of this

10  letter.

11     Q.   Did you ever review the

12  invoices to which the letter referred?

13     A.   No.

14     Q.   Have you ever reviewed

15  invoices submitted by Emerald to Sea

16  Star?

17     A.   Yes.

18     Q.   What invoices have you

19  reviewed?

20     A.   Oh, I can't tell you

21  specifically the individual invoices.

22  Traditionally, at the end of each month,

23  I would take a look at what was sent out

24  in the way of a printout, a computer

ESQUIRE DEPOSITION SERVICES

138                          Thomas J. Holt, Sr.

1  printout.

2     Q.   Was it your understanding

3  that Emerald was sending computer

4  printout invoices to Sea Star each

5  month?

6     A.   Well, if computer printout

7  is identification of an invoice, I think

8  we're sending them out as they were

9  generating them.

10        I don't believe the per

11  month was an anniversary date. It was

12  more, to my knowledge, as to when they

13  were returning the equipment and we

14  acknowledged that we got the equipment

15  back.

16        The point I can read of

17  that letter was evidently for equipment

18  that was missing that you couldn't

19  produce.

20     Q.   What is Storage Transfer,

21  LLC?

22     A.   That's a corporation that

23  purchased from MBC the debt of Emerald.

24     Q.   When did Storage Transfer

ESQUIRE DEPOSITION SERVICES

139                    Thomas J. Holt, Sr.

1  purchase that debt?

2      A.   I don't remember the

3  dates.  It was in the fall of either '03

4  or '04.  It might have been '04.

5      Q.   Prior to the purchase, did

6  Storage Transfer have any interest in

7  Emerald?

8      A.   No, sir.

9      Q.   I show you a copy of an

10  Independent contractor agreement that

11  has been marked as Exhibit 17 to the

12  Emerald deposition.

13          Have you seen that document

14  before?

15      A.   I never seen this document,

16  but I knew it was in existence.

17      Q.   How did you know it was in

18  existence?

19      A.   My son told me about it and

20  I think Arthur told me about it, also.

21      Q.   Did you have any

22  discussions with Arthur concerning that

23  agreement?

24      A.   Only to the extent that

ESQUIRE DEPOSITION SERVICES

A-753

Thomas J. Holt, Sr.

1   Greenwich was attempting to liquidate

2   Emerald equipment on behalf of the bank,

3   and I'm all for anything that got the

4   bank's debt down.

5       Q.   By your son are you

6   referring to Tom, Jr.?

7       A.   Tom and his

8   representatives, whoever he designated

9   to start trying to help sell the

10  equipment.

11      Q.   Did Emerald have an

12  agreement such as that with Greenwich?

13      A.   Emerald had an agreement

14  with Greenwich only to the extent of

15  whatever services Greenwich performed

16  for Emerald.  What this document was, as

17  I recall, was to pay a commission to

18  Greenwich for equipment that they helped

19  sell of Emerald's for and on behalf of

20  MBC.

21      Q.   What services did Greenwich

22  provide for Emerald other than the sale

23  of Emerald equipment?

24      A.   It would have been the

ESQUIRE DEPOSITION SERVICES

141                     Thomas J. Holt, Sr.

1  standard services of equipment coming in

2  or out of the gate, the storage of

3  equipment, the mounting, demounting,

4  whatever Emerald's requirements were.

5      Q.   Did Greenwich have a

6  separate agreement with Emerald with

7  respect to such services?

8      A.   Separate in response to

9  what?

10     Q.   Did Emerald have a written

11 agreement with Emerald?

12     A.   No.

13     Q.   I'm sorry.

14     A.   No, I understood you.

15     Q.   I will start over.

16     A.   Please.

17     Q.   It gets bad.  Did Greenwich

18 have a written agreement with Emerald

19 for services?

20     A.   No.  They don't need a

21 written agreement as Greenwich.  They

22 have tariffs and they charge according

23 to their tariffs.

24         So you clearly understand,

ESQUIRE DEPOSITION SERVICES

142                           Thomas J. Holt, Sr.

1   this would be equipment that Sea Star

2   would return to Philadelphia to

3   terminate their agreement with Emerald.

4   Greenwich is a depot to receive that

5   equipment under the agreement that

6   Emerald had with Sea Star, known as the

7   Packer-Greenwich terminal, which is

8   operated by Greenwich.

9        This equipment would come

10  in, TIRs would be issued.  That would be

11  a charge.  Storage would be issued; that

12  would be a charge.  Mounting or

13  demounting chassis from containers would

14  be a charge.  Releasing the equipment to

15  people to purchase it would eventually

16  be a charge.  So that's the Greenwich

17  relationship with Emerald.

18    Q.   Let me show you a copy of a

19  letter dated July 19, 2002, which has

20  been marked as Exhibit 18 to the Emerald

21  deposition.

22       Have you ever seen that

23  before?

24    A.   No, but I had heard about

ESQUIRE DEPOSITION SERVICES

143                    Thomas J. Holt, Sr.

1  it. This memorializes the other

2  document that you showed me.

3     Q.   Was Emerald paying

4  Greenwich for any of the services listed

5  in that letter?

6     A.   No.  They would have been

7  invoiced to MBC by Greenwich.

8     Q.   Did you become involved in

9  the Sea Star purchase of Emerald

10  chassis?

11     A.   To the extent of value, if

12  we had them, I authorized them to be

13  released to them.  They probably bought

14  equipment they did not even have in

15  their possession that we had to release

16  to them.

17     Q.   Did you --

18     A.   I did not negotiate with

19  Sea Star.

20     Q.   Were you involved in

21  negotiations?

22     A.   No.  I never negotiated

23  with Sea Star the sale of equipment

24  directly.

ESQUIRE DEPOSITION SERVICES

144                          Thomas J. Holt, Sr.

1    Q.   Did you negotiate any

2    agreements with Sea Star after April 11,

3    2002?

4    A.   Only what came to me, then

5    I would pass it on to someone to

6    complete the deal, if it came up on my

7    radar screen.

8        If it went directly to one

9    of my representatives, they would bring

10   it to me and I would authorize it or not

11   authorize it.

12   Q.   Was there a particular

13   person to whom you would pass Sea Star

14   business?

15   A.   Yes.  It would have been

16   Arthur, Lorraine, or in the initial

17   early stages, my son Tom.

18   Q.   Other than those three?

19   A.   There might have been

20   somebody else, but I can't remember.

21   Maybe MBC.  If you know of anybody, let

22   me try and remember.

23   Q.   Were the three of them the

24   people who were primarily involved in

ESQUIRE DEPOSITION SERVICES

145                    Thomas J. Holt, Sr.

1  Emerald dealings?

2      A.   Only to the extent that Tom

3  was, early on, and then he got out of it

4  totally.  It was primarily Arthur and

5  Lorraine.

6      Q.   When did Tom get out of it?

7      A.   Oh, I would probably tell

8  you after the initial documentation was

9  done.

10     Q.   Was there any reason why he

11 got out of it that you recall?

12     A.   He is running his own

13 businesses.

14     Q.   Do you recall discussing

15 with anyone a requirement that MBC

16 Leasing approve the equipment rental

17 agreement before you signed it?

18     A.   The equipment rental

19 agreement between Sea Star and Emerald?

20     Q.   Correct.  Yes, sir.

21     A.   No, sir, I don't believe we

22 sought their approval.  I don't know

23 sitting here now, but I recall -- I

24 don't think we did.  If we did, fine;

ESQUIRE DEPOSITION SERVICES

146                    Thomas J. Holt, Sr.

1  but I don't think we did.

2         Total communication between

3  MBC and me, total.

4      Q.   Do you know whether Emerald

5  equipment is stored on Sea Star

6  facilities today?

7      A.   I wouldn't know.  Sea Star

8  was charged with the storage.  But

9  today?  If you have it, please return

10  it.  We requested that it be either

11  returned or paid for.

12      Q.   Do you recall when Emerald

13  equipment was last stored on Sea Star's

14  premises?

15      A.   Best guesstimate, sometime

16  in '03.

17      Q.   Do you know whether Sea

18  Star stored Emerald equipment in its San

19  Juan terminal in 2004?

20      A.   I don't know.  You would

21  have no reason to.

22         When did we terminate the

23  lease?  What was the date of the

24  termination of the lease?

ESQUIRE DEPOSITION SERVICES

147                    Thomas J. Holt, Sr.

1    Q.   Do you know whether Emerald

2  has been selling equipment out of Sea

3  Star's San Juan terminal in 2004?

4    A.   I don't know.  If you had

5  it there, we would sell it.

6    Q.   Have you ever discussed

7  that with Art Davis?

8    A.   I have not specifically in

9  '04.

10    Q.   Have you ever become aware

11  of any demands by Sea Star that Emerald

12  remove equipment from its facility in

13  San Juan?

14    A.   I do remember something and

15  I believe it was sometime in '03.

16    Q.   Did Emerald remove all of

17  the equipment after receiving that

18  demand?

19    A.   I don't know.  Art Davis

20  would know; I don't know.

21    Q.   Have you ever asked Art

22  Davis?

23    A.   Did we remove all the

24  equipment after your demand?  I recalled

ESQUIRE DEPOSITION SERVICES

148                    Thomas J. Holt, Sr.

1   that you wanted it out of there. I

2   don't know if it's in writing or not. I

3   never saw anything in writing.

4        And if you wanted it out of

5   there, there's no reason why we would

6   not move it out of there, unless, of

7   course, it was demolished by Sea Star or

8   your agents.

9        Q.   Have you ever made an

10  investigation?

11       A.   In regards to?

12       Q.   Whether it was demolished

13  by Sea Star or my agents.

14       A.   By Art Davis. I said, "Who

15  did that?"

16       And he said, "It was

17  covered under the control of Sea Star."

18  It's piled down under your terminal in

19  20 or 30 pieces. It looks like a scrap

20  yard, I'm told.

21       Q.   When did you ask Art Davis

22  about that?

23       A.   I recall it was sometime in

24  '03. I don't think it was '04. It

ESQUIRE DEPOSITION SERVICES

149                    Thomas J. Holt, Sr.

1    might have been.

2        Q.    Was that equipment shown on

3    the NPR 2002 or April 2002 inventory?

4        A.    It would have been, but

5    more so, it was covered under your

6    inventory to us.  This was after you had

7    possession of it.

8        Q.    Is it your position that

9    Sea Star is responsible for all

10   equipment that had been subject to the

11   agreement between Emerald and NPR?

12        MR. MOLDOFF:  It's been

13   asked and answered.  Object to the form.

14        THE WITNESS:  Do I answer

15   it?

16        MR. MOLDOFF:  You can answer

17   it.

18        THE WITNESS:  If it's in

19   your possession, it is your

20   responsibility.

21   BY MR. ARMSTRONG:

22        Q.    Is it your position that

23   any equipment in Sea Star's possession

24   after April 27, 2002, is Sea Star's

ESQUIRE DEPOSITION SERVICES

A-763

150    Thomas J. Holt, Sr.

1   responsibility, for purposes of paying

2   rent?

3        MR. MOLDOFF:  Object to the

4   form.

5        THE WITNESS:  If it's in

6   your possession and you did not off-hire

7   it, you owe rent on it.

8   BY MR. ARMSTRONG:

9        Q.   What do you mean when you

10  say "possession"?

11       A.   Well, is it on your ship?

12  Is it in a railroad yard in Chicago

13  under your bill of lading?  If you have

14  terminated it to three locations as

15  covered, it's not in your possession.

16  If you have not terminated it, it is in

17  your possession.

18       I've been asked and

19  answered this seven different ways.

20       Q.   Are you saying that

21  equipment that Sea Star terminated in

22  the Sea Star terminal in San Juan is not

23  in Sea Star's possession?

24       MR. MOLDOFF:  Object to the

ESQUIRE DEPOSITION SERVICES

A-764

151                    Thomas J. Holt, Sr.

1  form.

2        THE WITNESS:  If you have

3  properly terminated it in San Juan, as

4  per the agreement, then that's probably

5  why you were charging us storage.

6        But if you did not properly

7  terminate it and you had it there, it's

8  in your possession, it was not available

9  to us to sell, then it's in your

10  possession.

11       All this has been

12  documented, asked and answered, and it

13  continues to be the same answers.

14  BY MR. ARMSTRONG:

15     Q.   Is your position now that

16  Sea Star does not owe Emerald for

17  equipment involved in shipments in

18  transit?

19     A.   If it's in the covered

20  period given to Sea Star by Judge

21  Walrath, you do not owe for that

22  in-transit period and we did not invoice

23  for that in-transit period.

24     Q.   Is it your position that

        ESQUIRE DEPOSITION SERVICES

152                    Thomas J. Holt, Sr.

1   Sea Star owes for equipment held by

2   third parties such as depots for NPR

3   debts?

4        A.   If Sea Star placed the

5   equipment in those depots under the

6   lease agreement, it is Sea Star's

7   responsibility until you return the

8   equipment, for whatever reason the

9   equipment was being held for.  All I

10  know, Sea Star owed the depot money.  I

11  have no clue as to why the depot held

12  it.

13        If they said it was NPR,

14  they have no recourse to NPR because it

15  was liquidated under Chapter 7, and

16  everybody knows that it's under your

17  control through the lease agreement.

18        Emerald would not be

19  responsible for that action, except

20  Emerald would invoice you because it was

21  in your care, custody, and control under

22  the agreement.

23       Q.   If Sea Star did not place

24  the equipment in those depots, is it

153                    Thomas J. Holt, Sr.

1   your position that Sea Star would not

2   owe under the equipment rental

3   agreement?

4       A.   If Sea Star did not place

5   it there, then they did not have

6   authority to place it there, so,

7   therefore, you are not responsible.

8           But with Sea Star taking

9   possession of that equipment from those

10  depots, as the documentation you showed

11  me here, it was clearly straightened out

12  subsequently that the depots are given

13  authority to release the product to Sea

14  Star, "product" being chassis,

15  container, gen-set, or whatever you had

16  under load at the time.

17          As the documents show,

18  there were instances where you wanted to

19  pick up equipment and not because of

20  money owed, but because you were a

21  stranger to the depot, that we needed to

22  get an authorized representative to

23  release it to you, which at your request

24  we did at every turn.

ESQUIRE DEPOSITION SERVICES

A-767

154                    Thomas J. Holt, Sr.

1    Q.   You would not be taking the

2  position, would you, that Sea Star owes

3  with respect to equipment that depots

4  refused to release to Sea Star?

5    A.   When did Sea Star have

6  possession of the product?  If you put

7  it there, you are responsible.  If you

8  didn't put it there and somebody said

9  money is owed to it, it was either paid

10  by the bank or by Emerald or liquidated

11  out of the Chapter 7.  But if it's in

12  your possession, you owe.

13    Q.   If it was not liquidated by

14  Emerald or by the bank or in Chapter 7

15  and the depot refused to release the

16  equipment, you are not taking the

17  position, are you, that Sea Star owes

18  for that equipment?

19    A.   Who put it there?  Did Sea

20  Star put it there?

21    Q.   If Sea Star did not put it

22  into the depot.

23    A.   Then you would not be

24  responsible.

ESQUIRE DEPOSITION SERVICES

155                    Thomas J. Holt, Sr.

1    Q.   And the same would apply

2   with respect to a repair yard, would it

3   not?

4    A.   If it's not covered under

5   the lease to you, you would not be

6   responsible.  If you had possession and

7   it was covered under your lease and you

8   released it to a third party, such as a

9   trucker or a railroad, it is your

10  responsibility.

11         Just for one brief moment

12  here, there is money owed and these kind

13  of questions will probably be a matter

14  of a judge.  But there is money owed.

15  Why don't you just tell your client to

16  pay his bills?  This is really

17  insulting.

18    Q.   You would not be taking the

19  position, would you, that Sea Star owes

20  for equipment in storage under the

21  bankruptcy court's order?

22         MR. MOLDOFF:  Object to the

23  form of the question.

24         THE WITNESS:  Storage where?

ESQUIRE DEPOSITION SERVICES

156                    Thomas J. Holt, Sr.

1  BY MR. ARMSTRONG:

2      Q.   In any of its terminals in

3  accordance with Paragraph 13 of the

4  bankruptcy court's order.

5      A.   I'm taking the position

6  that I what?  Explain what you're

7  saying.

8           MR. ARMSTRONG:  Please hand

9  me the exhibits.

10  BY MR. ARMSTRONG:

11      Q.   Showing you Exhibit 4 to

12  the Emerald deposition, a copy of the

13  order authorizing sale of the NPR

14  assets, and referring you to Paragraph

15  13 on Page 8, are you taking the

16  position that Sea Star owes Emerald for

17  equipment in storage pursuant to that

18  paragraph of the Court's Order?

19           MR. MOLDOFF:  I object to

20  the question.  This order predates the

21  subsequent agreement between the parties

22  with respect to the leasing of the

23  equipment.  It is misleading.

24           If you can answer the

ESQUIRE DEPOSITION SERVICES

157                    Thomas J. Holt, Sr.

1  question, answer it.

2      THE WITNESS:  It's self-

3  explanatory.  I'm not going to go into a

4  legal document.  It says what it says.

5  BY MR. ARMSTRONG:

6      Q.   Are you taking the position

7  that Sea Star owes Emerald for equipment

8  in storage?

9      MR. MOLDOFF:  I object to

10  the question.

11      THE WITNESS:  It's been

12  asked and answered now nine times.

13      MR. MOLDOFF:  What's in

14  storage?

15      THE WITNESS:  If it's in

16  your possession and you have not

17  terminated the TIR properly, you pay for

18  it.

19      You can't run equipment in

20  and out of your yard any time it's

21  convenient, say, "oh, it's in storage,"

22  but when in fact it is going down the

23  road under a load or in fact you got it

24  at a depot or in fact you got it out on

ESQUIRE DEPOSITION SERVICES

158                    Thomas J. Holt, Sr.

1  a ship.  There is instances that's

2  legitimate on your part that you had

3  something in storage.  We paid rent for

4  that.

5          This document, Paragraph 13,

6  is self-explanatory.  I'm not going to

7  become a lawyer for you.

8  BY MR. ARMSTRONG:

9      Q.   With respect to equipment

10  that was legitimately in storage, are

11  you saying that Sea Star owes Emerald

12  rent?

13      A.   No.

14          MR. MOLDOFF:  I object to

15  the question.  What he has said -- when

16  you say the word "legitimately," he is

17  saying if it's properly off-hired.

18          THE WITNESS:  Properly

19  off-hired is what I was saying.

20  BY MR. ARMSTRONG:

21      Q.   Do you know whether there

22  was any equipment on or at the Sea Star

23  terminal in San Juan on April 27, 2002,

24  that belonged to Emerald?

ESQUIRE DEPOSITION SERVICES

159                    Thomas J. Holt, Sr.

1    A.    In April of 2002?

2    Q.    Yes.

3    A.    All the equipment belonged

4    to Emerald that Navieras had on the

5    terminal in that time frame.

6    Q.    Now, with respect to that

7    equipment, do you know whether any of it

8    remained in storage?

9    A.    I'd have to go back and

10   check the records.

11        MR. ARMSTRONG:  Give me two

12   minutes.

13        (Recess.)

14        MR. ARMSTRONG:  No further

15   questions.

16        I'm going to take these with

17   me because we will use -- I don't know

18   whether -- well, we will use some of

19   them over the next two days, so I don't

20   know whether you will be here.

21        MR. MOLDOFF:  I never did

22   speak to Marty McDonald.

23        (Discussion off the record.)

24        (Witness excused.)

ESQUIRE DEPOSITION SERVICES

160                    Thomas J. Holt, Sr.

1        (Whereupon the examination

2   adjourned at 12:48 p.m.)

3           ------

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

ESQUIRE DEPOSITION SERVICES

161                    Thomas J. Holt, Sr.

1        C E R T I F I C A T E

2

3            I hereby certify that the

4    witness was duly sworn by me and that

5    the deposition is a true record of the

6    testimony given by the witness

7            It was requested before

8    completion of the deposition that the

9    witness THOMAS J. HOLT, SR., have the

10    opportunity to read and sign the

11    deposition transcript.

12

13

14

15

16        --------------------------

17        Ann V. Kaufmann, RPR, CRR

18

19

20            (The foregoing certification

21    of this transcript does not apply to any

22    reproduction of the same by any means,

23    unless under the direct control and/or

24    supervision of the certifying reporter.)

            ESQUIRE DEPOSITION SERVICES

162                              Thomas J. Holt, Sr.

1    INSTRUCTION TO THE WITNESS

2         Please read your deposition

3    over carefully and make any necessary

4    corrections.  You should state the

5    reason in the appropriate space on the

6    errata sheets for any corrections that

7    are made.

8         After doing so, please sign

9    the errata sheet and date it.

10        You are signing same subject

11   to the changes you have noted on the

12   errata sheet, which will be attached to

13   your deposition.

14        It is imperative that you

15   return the original errata sheet to the

16   deposing attorney within thirty (30)

17   days of receipt of the deposition

18   transcript by you.  If you fail to do

19   so, the deposition transcript may be

20   deemed to be accurate and may be used in

21   court.

22

23

24

ESQUIRE DEPOSITION SERVICES

A-776

163                    Thomas J. Holt, Sr.

1          ------

2        E R R A T A

3          ------

4  PAGE   LINE    CHANGE

5  ____  ____  _____

6  ____  ____  _____

7  ____  ____  _____

8  ____  ____  _____

9  ____  ____  _____

10  ____  ____  _____

11  ____  ____  _____

12  ____  ____  _____

13  ____  ____  _____

14  ____  ____  _____

15  ____  ____  _____

16  ____  ____  _____

17  ____  ____  _____

18  ____  ____  _____

19  ____  ____  _____

20  ____  ____  _____

21  ____  ____  _____

22  ____  ____  _____

23  ____  ____  _____

24  ____  ____  _____

ESQUIRE DEPOSITION SERVICES

164                    Thomas J. Holt, Sr.

1    ACKNOWLEDGEMENT OF DEPONENT

2        I, _____, do

3    hereby certify that I have read the

4    foregoing pages, _____and that the

5    same is a correct transcription of the

6    answers given by me to the questions

7    therein propounded, except for the

8    corrections or changes in form or

9    substance, if any, noted in the attached

10    errata sheet.

11        _____

12        DATE

13

14    Subscribed and sworn to me this _____

15    day of _____, 2005.

16    My Commission expires:

17

18        _____

19

20    _____
        Notary Public

21

22

23

24

ESQUIRE DEPOSITION SERVICES