1

1   UNITED STATES DISTRICT COURT
    MIDDLE DISTRICT OF FLORIDA
2     JACKSONVILLE DIVISION
    CASE NO. 3:04-CV-146-99HTS
3         - - -
    SEA STAR LINE, LLC,              :
4   a limited liability
    company,                        :
5     Plaintiff,                    :
                                    :
6   vs.                             :
                                    :
7   EMERALD EQUIPMENT               :
      LEASING, INC., a              :
8   corporation                     :
    Defendant.                      :
9         - - -

10        January 26, 2005

11            - - -

12   Oral deposition of LORRAINE
     T. ROBINS, held in the offices of
13   Adelman, Lavine, Gold and Levin, Suite
     900, Four Penn Center, Philadelphia,
14   Pennsylvania 19103, commencing at 9:30
     a.m., on the above date, before Pamela J.
15   Gober Bracic, a Federally-Approved
     Registered Professional Reporter and
16   Commissioner for the Commonwealth of
     Pennsylvania.
17            - - -

18

19

20

21

22   ESQUIRE DEPOSITION SERVICES
     15th Floor
23   1880 John F. Kennedy Boulevard
     Philadelphia, Pennsylvania 19103
24   (215) 988-9191

ESQUIRE DEPOSITION SERVICES

2

1  A P P E A R A N C E S :

2

    ARMSTRONG & MEJER, P.A.
3      BY:  TIMOTHY J. ARMSTRONG, ESQUIRE
    Suite 1111, Douglas Center
4      2600 Douglas Road
    Coral Gables, Florida 33134
5      (305) 444-3355
    Counsel for the Plaintiff
6

7      ADELMAN, LAVINE, GOLD and LEVIN
    BY:  ALAN I. MOLDOFF, ESQUIRE
8      Suite 900
    Four Penn Center
9      Philadelphia, Pennsylvania  19103
    (215) 568-7515
10     Counsel for the Defendant

11

12     - - -

13

14

15

16

17

18

19

20

21

22

23

24

ESQUIRE DEPOSITION SERVICES

A-780

3

1              - - -

2          I N D E X

3  WITNESS              PAGE NO.

4  LORRAINE T. ROBINS

5     By Mr. Armstrong         6

6              - - -

7          E X H I B I T S

8  NO.     DESCRIPTION     PAGE NO.

9  1     Schedule DV 20      76

10  2     5/13/02 E-mail     96

11  3     5/13/02 E-mail     98

12  4     6/26/02 E-mail     102

13  5     7/12/02 E-mail     103

14  6     8/15/02 Letter     105

15  7     9/5/02  Fax        106

16  8     10/01/02 E-mail    107

17  9     10/01/02 E-mail    111

18  10    10/02/02 E-mail    112

19  11    11/08/02 E-mail    114

20  12    1/29/03 E-mails    116

21  13    3/03/03 Fax        119

22  14    3/05/03 E-mail     123

23  15    3/10/03 E-mail     128

24  16    3/25/03 E-mail     129
                (con't)
      ESQUIRE DEPOSITION SERVICES

A-781

4

1              - - -

2         E X H I B I T S

3  NO.      DESCRIPTION      PAGE NO.

4  17    3/27/03 E-mail    130

5  18    5/22/03 E-mail    132

6  19    9/15/03 E-mail    135

7  20    9/16/03 E-mail    138

8  21    9/16/03 E-mail    143

9  22    9/22/03 E-mail    144

10  23   12/16/03 E-mail    155

11              - - -

12

13

14

15

16

17

18

19

20

21

22

23

24

         ESQUIRE DEPOSITION SERVICES

5

1          DEPOSITION SUPPORT INDEX

2

Direction to Witness Not To Answer
3   Page  Line  Page  Line
    (None)
4

5

6

7

Request For Production of Documents
8   Page  Line  Page  Line
    (None)
9

10

11

Stipulations
12   Page  Line  Page  Line
     5    2-8
13

14

15

Questions Marked
16   Page  Line  Page  Line
    (None)
17

18

19

20

21

22

23

24

ESQUIRE DEPOSITION SERVICES

A-783

6

1            - - -

2            (It is hereby stipulated and

3      agreed by and between counsel that

4      the sealing, filing and

5      certification are waived; and that

6      all objections, except as to the

7      form of questions, be reserved

8      until the time of trial.)

9            - - -

10           LORRAINE T. ROBINS, after

11      having been duly sworn, was

12      examined and testified as follows:

13           - - -

14           EXAMINATION

15           - - -

16           MR. MOLDOFF:  We will

17      reserve the right to read and sign

18      the transcript.

19   BY MR. ARMSTRONG:

20      Q.   Please state your full name.

21      A.   Lorraine Robins.

22      Q.   What is your residence

23   address?

24      A.   7900 Old York Road,

        ESQUIRE DEPOSITION SERVICES

7                    LORRAINE T. ROBINS

1  apartment 812B, Elkins Park,

2  Pennsylvania.

3      Q.   Ms. Robins, have you ever

4  had your deposition taken before?

5      A.   Several, several years ago.

6      Q.   I'm going to ask you some

7  questions.  If you don't understand the

8  question, you can ask me to repeat it or

9  rephrase it.

10         If you want to take a break

11  during this deposition, all you have to

12  say is that you want to take a break and

13  we are under your control.  Other than

14  that, your counsel will probably

15  interpose objections from time to time as

16  to form.

17         If there's an objection as

18  to form, then you answer the question.

19  If counsel instructs you not to answer,

20  then of course you do not answer.

21      A.   I understand.

22      Q.   Do you recall the cases in

23  which you've had your deposition taken?

24      A.   No, I really don't.  It was,

ESQUIRE DEPOSITION SERVICES

8                    LORRAINE T. ROBINS

1   as I said, many, many years ago.

2       Q.   And what type of case?

3       A.   Maritime.

4       Q.   Personal injury?

5       A.   No.

6       Q.   Cargo?

7       A.   No, it wouldn't be cargo.

8       Q.   Do you recall what it was?

9       A.   It was about shipping,

10  that's all I remember.

11      Q.   What is your business

12  address?

13      A.   7900 Old York Road, Suite

14  116A.

15      Q.   Where?

16      A.   Elkins Park, Pennsylvania.

17      Q.   By whom are you employed?

18      A.   I'm not employed, I'm

19  retired at this time.

20      Q.   When were you last employed?

21      A.   June '02.

22      Q.   By whom were you last

23  employed?

24      A.   Gloucester Terminals, LLC or

ESQUIRE DEPOSITION SERVICES

9                    LORRAINE T. ROBINS

1   Inc.

2        Q.   Where is Gloucester

3   Terminals located?

4        A.   Gloucester City, New Jersey.

5        Q.   Is there a street address?

6        A.   King and Essex Streets.

7        Q.   Is that a Holt Company?

8        A.   No.

9             MR. MOLDOFF:  I object to

10            the question.  I don't know

11            whether you know what a Holt

12            Company is.

13   BY MR. ARMSTRONG:

14        Q.   Is that a company in which

15   any member of the Holt Company is

16   involved?

17        A.   Yes.

18        Q.   Who is involved in

19   Gloucester Terminals from the Holt

20   family?

21        A.   Leo Holt.

22        Q.   How long were you employed

23   by Gloucester Terminals?

24        A.   Approximately a year.  No,

          ESQUIRE DEPOSITION SERVICES

10                    LORRAINE T. ROBINS

1  no, wait a minute. I'm not sure. I

2  think it was a year.

3      Q.   What was your position?

4      A.   At that particular time I

5  didn't have a position. I mean, I wasn't

6  an officer.

7      Q.   What were your

8  responsibilities?

9      A.   My responsibilities, I was

10  involved in the operations and -- let me

11  think -- and general office.

12      Q.   What did you have to do with

13  operations?

14      A.   A lot of the customers, I

15  would deal with the customers, any

16  complaints or things that they had.

17      Q.   And what did you have to do

18  with the general office?

19      A.   With the general office,

20  there was -- sometimes I would help out

21  with the receivables. Various things.

22  Just general.

23      Q.   What is your employment

24  history prior to Gloucester Terminals?

ESQUIRE DEPOSITION SERVICES

11                    LORRAINE T. ROBINS

1      A.   I was executive

2   vice-president of the Holt Group, Inc.

3      Q.   When did you become

4   executive vice-president of the Holt

5   Group, Inc.?

6      A.   When the group was formed?

7      Q.   When was the group formed?

8      MR. MOLDOFF:  If you know.

9      THE WITNESS:  I don't know.

10   It was in the -- I don't know.  I

11   would have to look it up.

12   BY MR. ARMSTRONG:

13      Q.   Approximately how many years

14   ago was the Holt Group formed?

15      A.   The Holt Group was formed --

16   from today?

17      Q.   Yes.

18      A.   Five.

19      Q.   Five years ago?

20      A.   Mm-hum, yes.

21      Q.   And as executive

22   vice-president, what were your duties and

23   responsibilities?

24      A.   I was Tom Holt, Senior's

ESQUIRE DEPOSITION SERVICES

12                    LORRAINE T. ROBINS

1   assistant.

2       Q.   And what did you do as Tom

3   Holt, Senior's assistant?

4       A.   Different operations.  I did

5   finance, I did sales.

6       Q.   What did you do in

7   operations?

8       A.   A lot of coordination.

9       Q.   What type of coordination?

10      A.   Talking to the managers of

11  the piers, conveying any problems that

12  they would have directly to Tom, Senior,

13  and anything that they came to me with.

14      Q.   What did you do in finance?

15      A.   I set up a lot of payments

16  for various projects that we had.  Also

17  dealt, you know, with meetings with our

18  banks.

19      Q.   Anything else?

20      A.   No.

21      Q.   What did you do in sales?

22      A.   Sales, together with Tom, we

23  basically -- all of the container lines.

24  Originally we would do the contracts with

ESQUIRE DEPOSITION SERVICES

13                    LORRAINE T. ROBINS

1   the container lines and call on them,

2   which would be -- at that particular time

3   we had about six major lines.  And they

4   would deal strictly with Tom or myself.

5       Q.   What was the business of the

6   Holt Group, Inc.?

7       A.   I'm not exactly sure of the

8   structure of the company.  It was

9   formed --

10          MR. MOLDOFF:  I think he's

11       asking what did they do, what was

12       their business.

13          THE WITNESS:  They were like

14       a holding company, I believe.  I

15       don't know.

16   BY MR. ARMSTRONG:

17       Q.   How long did you remain

18   executive vice-president of the Holt

19   Group, Inc.?

20       A.   Until, I guess, June of '02,

21   June 30, 2002.

22       Q.   Why did you leave?

23       A.   That was after the company

24   went into Chapter 7.

ESQUIRE DEPOSITION SERVICES

14                              LORRAINE T. ROBINS

1      Q.   Did you also work for

2   Gloucester Terminals while you were

3   vice-president of the Holt Group, Inc.?

4      A.   No, I did not.

5      Q.   When did you start working

6   for Gloucester Terminals?

7      A.   In July of '02.

8      Q.   When did you stop working

9   for Gloucester Terminals?

10     A.   I must have had my dates

11  wrong, because I stopped working for them

12  before -- I said '02.  I think it was '03

13  that I stopped.  I had the wrong time

14  line.

15     Q.   What is your employment

16  history prior to becoming executive

17  vice-president of the Holt Group, Inc.?

18     A.   Executive vice-president for

19  Holt Cargo Systems, Inc.

20     Q.   What is or was Holt Cargo

21  Systems, Inc.?

22     A.   Holt Cargo Systems, Inc. was

23  a trucking company, a warehousing company

24  and a stevedoring company.

ESQUIRE DEPOSITION SERVICES

15                    LORRAINE T. ROBINS

1     Q.   When did you become

2   executive vice-president of Holt Cargo

3   Systems Inc.?

4     A.   When the company was formed.

5     Q.   When was the company formed?

6     A.   I would have to check that

7   date.

8     Q.   How long did you remain

9   executive vice-president?

10     A.   About 35 years.

11     Q.   Do you recall when you ended

12   your executive vice-presidency with Holt

13   Cargo Systems, Inc.?

14     A.   No, I do not.

15     Q.   As executive vice-president

16   of Holt Cargo Systems, Inc., what were

17   your duties and responsibilities?

18     A.   The same as I described

19   before.

20     Q.   Operations?

21     A.   Mm-hum.

22     Q.   What did you do in

23   operations?

24     A.   Coordinated with the pier

ESQUIRE DEPOSITION SERVICES

16                    LORRAINE T. ROBINS

1   and our customers.

2        Q.   What did you do in finance?

3        A.   Oversaw the payables.  We

4   had a department, but I set up payment

5   structures for certain accounts.

6        Q.   What did you do in sales?

7        A.   Same as I did before, dealt

8   with the container lines and the fruit,

9   break bulk customers.

10       Q.   Holt Cargo Systems, Inc. was

11  involved in trucking, was it not?

12       A.   Trucking.

13       Q.   And what else?

14       A.   Warehousing and stevedoring.

15       Q.   As executive vice-president,

16  to whom did you report?

17       A.   Thomas Holt, Senior.

18       Q.   Prior to becoming executive

19  vice-president of Holt Cargo Systems

20  Inc., what did you do, what was your

21  employment history?

22       A.   You take me back 40-some

23  years.  Aging me right before my eyes.

24       Q.   Look at me.

ESQUIRE DEPOSITION SERVICES

17          LORRAINE T. ROBINS

1     A.   Before that I worked for

2  Overland Motor Freight, from 1946 to

3  about 1961.  And 1961 I went to work for

4  Holt Motor Express  they were good times.

5     Q.   What did you do with Holt

6  Motor Express?

7     A.   Holt Motor Express, I did

8  the billing, I did the dispatching, I

9  coordinated with dispatching and I did

10  the bookkeeping.

11     Q.   What --

12     A.   And sales.

13     Q.   What position did you hold?

14     A.   We didn't have a position in

15  that company.

16     Q.   How long did you remain with

17  Holt Motor Express?

18     A.   From -- 1946 was the wrong

19  date, because I was with Overland first.

20     Q.   No, you said that --

21     A.   All right.

22     Q.   You were with Overland from

23  '46 to '61, I believe.

24     A.   No, no, no.  If I did I'm

ESQUIRE DEPOSITION SERVICES

18                    LORRAINE T. ROBINS

1    wrong.  Overland I was with from '46 to

2    '61.  Yeah, you are right.  That's right.

3    I'm confused.  I only had three jobs in

4    my life.

5        Q.    You joined Holt Motor

6    Express in 1961?

7        A.    1961, correct.

8        Q.    How long did you remain with

9    Holt Motor Express?

10       A.    Until the company -- I don't

11   know how the company structure went, but

12   at that time we ended up -- they ended up

13   incorporating the companies.  Before,

14   Holt Motor Express was a privately-owned

15   company by Leo Holt.  And when Mr. Holt

16   died, they formed a corporation.  And the

17   corporation was called Holt Cargo

18   Systems, Inc.

19            So that I've been with the

20   company 35 years, 40 years.  No, 35,

21   because the rest was Holt Group, Inc.

22       Q.    When Holt Cargo Systems,

23   Inc. was incorporated, did you join Holt

24   Cargo Systems, Inc.?

ESQUIRE DEPOSITION SERVICES

19                    LORRAINE T. ROBINS

1     A.   Mm-hum.

2     Q.   At that time did you become

3  executive vice-president?

4     A.   I don't remember.  I

5  think -- yes, yes.  I don't know whether

6  it was executive or just vice-president.

7     Q.   While you have been with any

8  of the Holt Companies, Holt Group, Holt

9  Cargo Systems, Inc., Gloucester

10  Terminals, that's what I am calling the

11  Holt Companies for purposes of this

12  question.

13     A.   Well, I don't --

14     Q.   Strike the question, I will

15  ask it a different way.

16     A.   Yes.

17     Q.   While you were with Overland

18  Motor Freight, did you have any

19  responsibilities with respect to

20  equipment?

21     A.   Equipment?

22     Q.   Yes.

23     A.   What do you mean by

24  equipment?

ESQUIRE DEPOSITION SERVICES

20                    LORRAINE T. ROBINS

1      Q.   Well, buying equipment for

2   the company, selling equipment for the

3   company?

4          MR. MOLDOFF:  Are you

5      talking about any equipment?

6          MR. ARMSTRONG:  Yes.

7          THE WITNESS:  No.  I was

8      general office manager.

9   BY MR. ARMSTRONG:

10     Q.   While you were with Holt

11  Motor Express, did you have any

12  responsibilities with respect to buying,

13  selling, leasing equipment?

14     A.   What kind of equipment are

15  you talking about?  That's awfully broad.

16     Q.   Trailers, containers,

17  gensets, cargo-moving equipment.

18     A.   No, I did not.

19     Q.   While you were with Holt

20  Cargo Systems, Inc., did you have any

21  responsibilities with respect to

22  cargo-moving equipment such as trailers,

23  containers, gensets, chassis?

24     A.   No.

ESQUIRE DEPOSITION SERVICES

21                    LORRAINE T. ROBINS

1     Q.   While you were with Holt

2  Group, Inc., did you have any

3  responsibilities with respect to

4  equipment such as trailers, containers,

5  gensets or chassis?

6     A.   No.

7     Q.   While you were with

8  Gloucester Terminals, Inc., did you have

9  any responsibilities with respect to such

10  equipment?

11     A.   No.

12     Q.   Have you ever had any

13  responsibilities with respect to

14  equipment such as containers, trailers,

15  gensets or chassis?

16     A.   Could you repeat that

17  question, please?

18          - - -

19          (Whereupon, the pertinent

20      portion of the record was read.)

21          - - -

22          THE WITNESS:  With

23      Gloucester Terminals?

24  BY MR. ARMSTRONG:

ESQUIRE DEPOSITION SERVICES

22          LORRAINE T. ROBINS

1    Q.  With anyone.

2    A.  With anyone?

3        MR. MOLDOFF:  Up to the

4    present.

5        THE WITNESS:  What do you

6    mean by responsibilities?

7  BY MR. ARMSTRONG:

8    Q.  Have you ever dealt with

9  buying, selling or leasing trailers,

10  containers, gensets or chassis?

11    A.  No.

12    Q.  What is your educational

13  background?

14    A.  I had two years of college

15  and -- or two years of business school

16  and one year of college.

17    Q.  Am I correct in

18  understanding that you retired from

19  Gloucester Terminals in June of 2003?

20    A.  Yes.

21    Q.  After June 23rd, have you

22  worked?

23    A.  Could you define work?  I

24  mean what do you mean work?

ESQUIRE DEPOSITION SERVICES

A-800

23                    LORRAINE T. ROBINS

1    Q.  Have you been involved in

2  any business activities?

3    A.  I have been assisting and

4  doing the -- I don't know how exactly to

5  explain this.  Let me think about this a

6  minute.  I have been working to

7  straighten out the billing for Emerald

8  Equipment  but this is basically

9  something that Tom Holt, Senior asked me

10  to help him out with.  It is a nonpaying

11  job.

12    Q.  When did you begin working

13  to straighten out the billing for Emerald

14  Equipment?

15    A.  I began working doing that,

16  I would say, late in '02.

17    Q.  Are you still working to

18  straighten out the billing for Emerald

19  Equipment?

20    A.  I could spend a lifetime

21  doing it.

22    Q.  Are you still doing it?

23    A.  Yes, I am.

24      MR. MOLDOFF:  Off the

ESQUIRE DEPOSITION SERVICES

24                    LORRAINE T. ROBINS

1    record.

2            - - -

3        (Whereupon, a discussion was

4    held off the record.)

5            - - -

6  BY MR. ARMSTRONG:

7        Q.    Did Tom Holt, Senior contact

8  you in connection with this project in

9  late '02?

10        A.    I don't know exactly how it

11  came about.  I think that -- I'm not sure

12  how it came about.

13        Q.    What --

14        A.    But I did it as a favor to

15  him.

16        Q.    Have you ever been paid in

17  connection with your work in regard to

18  straightening up the billing for Emerald

19  Equipment?

20        A.    No.

21        Q.    Have you ever received any

22  money from Holt Logistics?

23        A.    No.

24        Q.    Have you ever received any

ESQUIRE DEPOSITION SERVICES

25                    LORRAINE T. ROBINS

1  money from MBC Leasing in connection with

2  this project?

3      A.  No.

4      Q.  When you were approached,

5  were you given any instructions?

6      A.  No.

7      Q.  Have you ever been given any

8  instructions in regard to straightening

9  out the billing for Emerald Equipment?

10     A.  No.

11     Q.  Have you ever been involved

12  with NPR Holding Corp. in any capacity?

13     A.  When I was with Holt Group,

14  Inc., yes.  NPR, I don't know whether

15  it's all the same.  I don't know what

16  they were called.

17     Q.  When you say "they," what do

18  you mean?

19     A.  NPR I was involved with.

20     Q.  How were you involved with

21  NPR?

22     A.  I was involved with their

23  trucking -- I was involved with their

24  finance.  Their accounts payable system

ESQUIRE DEPOSITION SERVICES

26          LORRAINE T. ROBINS

1   was subcontracted out to a company in

2   Phoenix, Arizona.  And we started having

3   a lot of problems with nonpayment of

4   bills, so we brought -- NPR/Holt/Holt

5   Logistics to do their accounts payable,

6   and I dealt with the truckers trying to

7   get the truckers straightened out.  They

8   had bills -- I reconciled their accounts,

9   the truckers.  I dealt mainly with the

10   truckers.

11      Q.   Have you had any other

12   involvement with NPR?

13      A.   What do you mean by

14   involvement?

15      Q.   Have you done any work or

16   performed any business activities related

17   to NPR?

18      A.   Just what would be required

19   of me as the executive vice-president of

20   Holt holding companies, Holt Group, Inc.

21      Q.   And do you recall what was

22   required of you?

23      A.   No.  I was just very

24   involved in this situation with

ESQUIRE DEPOSITION SERVICES

27                    LORRAINE T. ROBINS

1  straightening out the truckers.

2       Q.   Have you ever performed any

3  work or been involved in business

4  activities related to Greenwich

5  Terminals?

6       A.   No.

7       Q.   Do you know what Greenwich

8  Terminals is?

9       A.   Greenwich Terminals, I

10  believe, is the operator of Packer Avenue

11  Marine Terminal.

12       Q.   Have you had any

13  communications with anyone from Greenwich

14  Terminals in connection with Emerald

15  Equipment?

16       A.   Yes, I have.  A couple times

17  I had to check some TIR information with

18  the clerks.  The clerks would be the ILA

19  clerks at the pier.

20       Q.   Why would you check TIR

21  information with a clerk at the pier?

22       A.   Because I would need a copy

23  or something like that.

24       Q.   Are the clerks at the pier

ESQUIRE DEPOSITION SERVICES

28                    LORRAINE T. ROBINS

1  the ones who keep the TIRs?

2       A.   Well, the TIRs, when they

3  come in, the trucker gets one, the

4  customer -- I think and the -- they

5  electronically do most of the work there.

6  Then they file.  They used to give them

7  copies, but now it's practically all

8  electronic.

9       Q.   Are you talking about

10 Greenwich being electronic?

11      A.   No.  I'm talking about --

12 Greenwich is electronic.  I'm talking

13 about your Maersk Lines, Blue Star Lines,

14 PAO.  These are steamship lines.  They

15 were all electronic.  And all the

16 information with the TIRs goes to them

17 automatically.  I think something like

18 every 15 minutes.

19      Q.   Do you know when this

20 started, this electronic transfer of

21 information?

22      MR. MOLDOFF:  Where are we

23      talking about?

24      MR. MOLDOFF:  At Greenwich.

ESQUIRE DEPOSITION SERVICES

29                    LORRAINE T. ROBINS

1       THE WITNESS:  From the time

2       they went in business.

3  BY MR. ARMSTRONG:

4       Q.    When did Greenwich go into

5  business?

6       A.    I don't know.

7       Q.    Do you know the approximate

8  date, the year?

9       A.    I don't want to venture a

10  guess.

11      Q.    While you were with Holt

12  Group, did you work with Arthur Davis?

13      A.    Yes, I did.

14      Q.    When did you begin working

15  with Arthur Davis?

16      A.    Arthur Davis worked for Holt

17  Logistics.  And I guess I started --

18  well, prior to that.  When he was with

19  Holt Logistics, he came in when the

20  treasurer for NPR -- when they moved the

21  accounts payable down to Holt Logistics,

22  the treasurer didn't come, and Arthur

23  took over his job.  He was dealing with

24  accounts payable.  So I dealt with him

ESQUIRE DEPOSITION SERVICES

30                    LORRAINE T. ROBINS

1  about the payment of the truckers.

2      Q.   Who was the NPR treasurer?

3      A.   Vince -- I don't think of

4  his last name.  I'm sorry, I forget his

5  last name.  I don't remember his last

6  name.

7      Q.   Had you worked with Arthur

8  Davis before that?

9      A.   Yes, I worked with him

10  before that.  He worked for the Holt

11  Companies for quite a number of years, so

12  we crossed paths all the time.

13      Q.   What positions did he hold

14  with the Holt Companies?

15      A.   He held maintenance,

16  construction positions.  Accounting he

17  did.  He originally started out doing

18  accounting.  Then he did construction,

19  maintenance, leasing.  When he went to

20  NPR, I know he was doing leasing.

21      Q.   When did he begin working

22  for NPR?

23      A.   Whenever Holt Logistics was

24  engaged by NPR to do their accounting or

ESQUIRE DEPOSITION SERVICES

31                    LORRAINE T. ROBINS

1  whatever.

2      Q.   Do you know how long he

3  remained with NPR?

4          MR. MOLDOFF:  Objection to

5      form.

6          THE WITNESS:  He didn't work

7      for NPR.

8  BY MR. ARMSTRONG:

9      Q.   He took over the NPR

10  treasurer's job?

11      A.   No, no, I did not say he

12  took over -- I said Holt Logistics put

13  him in there for the treasurer.  That's a

14  little bit different.

15      Q.   When Holt Logistics put him

16  in there for the treasurer --

17      A.   No, to do the treasurer's

18  job.

19      Q.   To do the treasurer's job?

20      A.   Right.

21      Q.   What was that job?

22      A.   What does a treasurer do?

23  He manages money, he sets up payment of

24  the bills and he did oversee the accounts

            ESQUIRE DEPOSITION SERVICES

1  payable department.

2      Q.   Did he oversee equipment

3  leasing by NPR?

4      A.   What he did is, he was

5  responsible for the payments to the

6  various leases that NPR had, such as with

7  Interpool and whatever other ones they

8  may have had, with Emerald.  That's where

9  he was familiar with the leasing.

10      Q.   Was he responsible for

11  inventories of equipment that NPR had?

12      A.   I would not know the answer

13  to that.

14      Q.   Do you know how long Arthur

15  Davis remained in the treasurer's job or

16  the NPR treasurer's job?

17        MR. MOLDOFF:  While he was

18      working --

19  BY MR. ARMSTRONG:

20      Q.   That he had taken over.

21      A.   He wasn't the treasurer.

22      Q.   I understand.

23      A.   All right.  But the way you

24  were putting the question to me sounds

        ESQUIRE DEPOSITION SERVICES

33                    LORRAINE T. ROBINS

1  like he had the treasurer's job.  He had

2  the treasure's duties, but he didn't have

3  his job.

4       Q.   Do you know how long Arthur

5  Davis had --

6       A.   I don't know when it began,

7  but I know that it was until the end --

8  until April 26th.  I don't know when it

9  started.

10      Q.   Of what year?

11      A.   '02.

12      Q.   Why did it end on April 26,

13  '02?

14      A.   The company was sold to Sea

15  Star Line.

16      Q.   What company?

17      A.   NPR.

18      Q.   Were you involved at all in

19  the sale of NPR assets to Sea Star Line?

20      A.   No.

21      Q.   Did you handle

22  communications on behalf of Tom Holt,

23  Senior, in connection with the sale of

24  NPR assets to Sea Star Line?

ESQUIRE DEPOSITION SERVICES

34                    LORRAINE T. ROBINS

1      A.   No.

2      Q.   Do you know Bob Magee?

3      A.   No.

4      Q.   Have you ever spoken with

5  Bob Magee?

6      A.   No.

7      Q.   Do you know Brian Bogen?

8      A.   No.

9      Q.   Do you recall speaking with

10  Brian Bogen?

11     A.   No.

12     Q.   Do you know Mike Shea?

13     A.   Yes.

14     Q.   How do you know Mike Shea?

15     A.   I knew Mike Shea from --

16  prior to his going with Sea Star Line,

17  from the industry.

18     Q.   In what connection did you

19  know Mike Shea from the industry?

20     A.   He worked for one of our

21  clients. I cannot recall who it was.

22  And that's how I knew him.

23     Q.   Did you have any

24  communications with Mike Shea while he

ESQUIRE DEPOSITION SERVICES

35                    LORRAINE T. ROBINS

1   was with Sea Star Line?

2       A.   Just hello and good-bye when

3   they were in Gloucester.

4       Q.   Do you know Phil Bates?

5       A.   Met him, also, once in

6   Gloucester.

7       Q.   Do you have any

8   communications with Phil Bates?

9       A.   No.

10      Q.   Do you know Bob Leach?

11      A.   Yes.  Again, they were all

12  in Gloucester during the week or so

13  before the sale was finalized.

14      Q.   When you say "they were

15  all," who do you mean?

16      A.   I meant Phil Bates, Mike

17  Shea, Bob Leach and some other people

18  that I didn't meet.

19      Q.   Do you know why they were in

20  Gloucester?

21      A.   Yes.  They were doing -- I

22  know they were in there because of the

23  sale.  I imagine they were doing a due

24  diligence.  I don't know.

        ESQUIRE DEPOSITION SERVICES

36                    LORRAINE T. ROBINS

1    Q.   Did you have any

2    responsibilities in connection with the

3    due diligence?

4    A.   No.

5    Q.   Did you communicate with Bob

6    Leach in connection with the due

7    diligence?

8    A.   No.

9    Q.   Do you recall communicating

10   with any representatives of Sea Star Line

11   in connection with the due diligence?

12   A.   No.

13   Q.   When you were asked to begin

14   working to straighten out the billing for

15   Emerald Equipment, was anyone else

16   involved in that project?

17   A.   Arthur Davis.

18   Q.   What was Arthur Davis'

19   involvement?

20   A.   Arthur Davis had noticed the

21   discrepancy in the bills.  I guess -- he

22   went to Tom Holt to point them out, and

23   that's when Tom asked me if I would get

24   involved and check it.

         ESQUIRE DEPOSITION SERVICES

LORRAINE T. ROBINS

1    Q.   Did he tell you what he

2  wanted you to do?

3    A.   No.

4    Q.   Do you have any specific

5  duties in connection with this project?

6    A.   Which project?

7    Q.   The straightening out of the

8  billing for the Emerald equipment.

9    A.   Yeah.  Yes, I do.

10    Q.   What specific duties do you

11  have in connection with straightening out

12  the billing for Emerald Equipment?

13    A.   Well, one, I do the billing.

14    Q.   Anything else?

15    A.   Well, I started out with

16  their self-billing reports.  And once I

17  took them and put them on a spreadsheet,

18  I started finding lots of errors.  And

19  from there I continued to bill.

20    Q.   How did you determine that

21  there were errors in the self-billing

22  reports?

23    A.   I would -- well, let me

24  explain to you how I did it and that will

ESQUIRE DEPOSITION SERVICES

38                    LORRAINE T. ROBINS

1    be much easier.

2        Q.   Yes, ma'am.

3        A.   I took the self-billing

4    reports and put them on a spreadsheet.

5    If I am correct, I believe that we got

6    three months, the first three months,

7    half of May and then May, June, July --

8    four months all in late

9    September/October.  I got them around

10   that time.  Arthur gave them to me about

11   that time, after Tom told me to look at

12   it.

13           I took the sheets, the

14   self-billing reports, and made a

15   spreadsheet on each category, which would

16   be 20-foot chassis, 40-foot chassis,

17   45-foot chassis; gensets; 20-foot dry

18   vans; 40-foot reefers; and 40-foot high

19   cubes and 45-foot high cubes, and divided

20   it across with -- on the self-billing

21   reports.  They had a date that they put

22   it on hire.

23           So I put the date on hire

24   and spread it across, by each month of

ESQUIRE DEPOSITION SERVICES

39                    LORRAINE T. ROBINS

1  the billing.  Then I started to check the

2  billings that were on the self-billing

3  report against our move histories and

4  other documents, which brought up

5  tremendous difference.

6         By this time it had to be

7  late in '02, at which time we did write

8  several, several e-mails and telephone

9  calls to Sea Star Line making them aware

10  of the discrepancies and asking them to

11  get it straightened out.

12     Q.   Did you do anything else?

13         MR. MOLDOFF:  Objection to

14     form.

15         THE WITNESS:  What do you

16     mean anything else?

17  BY MR. ARMSTRONG:

18     Q.   In connection with

19  straightening out the billing, this

20  project.

21     A.   I don't really understand

22  your question.  Anything else such as?

23     Q.   Did you take any action,

24  other than that that you described in

ESQUIRE DEPOSITION SERVICES

40                    LORRAINE T. ROBINS

1  your answer?

2      A.  We sent them e-mails, we

3  reconciled out bills, we sent out bills.

4      Q.  When did you last send out

5  bills to Sea Star Line?

6      A.  We sent out bills -- we sent

7  the bills to our attorney and I don't

8  know when he forwarded them, but we are

9  still in the process of amending bills.

10  Once we got the documents, we found

11  several more discrepancies and we are

12  amending the bills.  So it's an ongoing

13  process right now.

14      Q.  When did you last send the

15  bills to your attorney?

16          MR. MOLDOFF:  I object to

17      the question to the extent it

18      calls for work product.

19  BY MR. ARMSTRONG:

20      Q.  When did you last send the

21  bills to your attorney.

22      A.  I don't remember the time,

23  but I do believe that they were received

24  by Sea Star Line, because Andy Rooks or

ESQUIRE DEPOSITION SERVICES

41                    LORRAINE T. ROBINS

1    someone called and asked if we could

2    e-mail them down to him.

3        Q.   Are you talking about

4    documents that were produced in response

5    to requests for production in this

6    litigation?

7        A.   No.

8        Q.   When did you or Mr. Davis

9    last send bills to Sea Star Line?

10       A.   I believe August of -- I

11   think in August of '04.

12       Q.   You sent bills to Sea Star

13   Line in August of '04?

14       A.   I believe so.

15       Q.   Do you recall?

16       A.   I had taken the billing,

17   which we originally started billing

18   because of discrepancies in the

19   self-billing report.  Then we found

20   several other discrepancies.  We did have

21   a loading manifest from the MAYAGUEZ, so

22   we sent a bill out for that.

23           We were making them A, B, C,

24   D.  It ended up getting to be very

ESQUIRE DEPOSITION SERVICES

42                    LORRAINE T. ROBINS

1    confusing, so in August '03, when I got a

2    report from Mr. Rooks, I decided to

3    combine all the billing, and correct the

4    mistakes, and combined all the billing in

5    categories for each unit rather than as

6    we had been doing it in the past.

7              So we canceled out all those

8    invoices and did the individual invoices.

9    So it was sometime in the period from

10   August to September of '03 that the bills

11   were sent out to Sea Star Line.  I mean,

12   I would have to check the exact dates on

13   the bills.  I don't recall, but it was in

14   that period.  And those bills were for

15   each category of equipment.

16       Q.   You referred to quote,

17   unquote, our move histories.

18       A.   The ones we were working

19   with.

20       Q.   Who are "our?"

21       A.   When I say our move

22   histories, Arthur and I were both working

23   on them.

24       Q.   But were these move

ESQUIRE DEPOSITION SERVICES

43                    LORRAINE T. ROBINS

1    histories prepared by any particular

2    entity?

3         A.   Yes, yes.  These move

4    histories were originally prepared by

5    Holt Logistics on a program that they

6    wrote for Emerald Equipment.

7         Q.   When was this program

8    written for Emerald?

9         A.   I don't recall the date.

10        Q.   Was it written after April

11   2002?

12        A.   I don't know.

13        Q.   Did you use any other move

14   histories?

15        A.   What do you mean?

16        Q.   Other than the Holt

17   Logistics move histories.

18        A.   I use documentation.

19        Q.   You referred to quote,

20   unquote, other documents.  What were the

21   other documents?

22        A.   There was input into the

23   computer from -- for the first three

24   weeks or so.  Sea Star Line maintained

ESQUIRE DEPOSITION SERVICES

44                    LORRAINE T. ROBINS

1  the Holt Logistics system, and they were

2  entering various information into the

3  system.  So we used that.

4          CSX Rail electronically

5  gives Holt Logistics the movement on all

6  containers daily.  Some of the truckers

7  had called in, and we got information

8  from them.  It was various sources.  But

9  the hard documentation was the CSX Rail,

10  things like that.

11      Q.  Did you obtain any TIRs?

12      A.  Packer Avenue Marine

13  Terminal, they gave us -- that was also

14  in the system, we could get the TIR

15  numbers from Holt Logistics.  And when

16  GTS started On August 1st in

17  Jacksonville, we got TIRs on them on all

18  equipment that was returned to them by

19  Sea Star Line.  So they are the two

20  sources of TIRs that we got.

21      Q.  Did you get inventories from

22  GTS?

23      A.  I got some inventories from

24  GTS, I think.

ESQUIRE DEPOSITION SERVICES

A-822

45                    LORRAINE T. ROBINS

1    Q.   Did you review those

2  inventories?

3    A.   Absolutely.

4    Q.   Did you get inventories

5  taken by JAX Port?  Do you know what JAX

6  Port is?

7    A.   I know what JAX Port is.

8  The only inventory that I recall from JAX

9  Port was the sand lot, which they had an

10  inventory attached to the bill.  When I

11  say they, I mean Sea Star Line billed for

12  the sand lot.  And attached to that sand

13  lot bill was an inventory.

14    Q.   Who did Sea Star Line bill

15  for the sand lot?

16    A.   I guess they billed MBC or

17  Emerald Equipment, one or the other.

18    Q.   In regard to the Holt

19  Logistics system, are you familiar with

20  that system?

21    MR. MOLDOFF:  Objection to

22    form.  Are you talking about the

23    computer program?

24    THE WITNESS:  What do you

ESQUIRE DEPOSITION SERVICES

46                    LORRAINE T. ROBINS

1    mean, do I know about the system?

2    BY MR. ARMSTRONG:

3        Q.    Are you familiar with how

4    the system works?

5        A.    Depends on what -- there are

6    several different programs.  Depends on

7    what you are talking about.

8        Q.    What programs are you

9    familiar with in that system?

10       A.    I'm familiar with the

11   program that they wrote for NPR, I'm

12   familiar with the Holt Company programs

13   that are there.

14       Q.    Anything else?

15       A.    That's it.

16       Q.    Was the program written for

17   NPR, separately from the Holt Company

18   programs?

19       A.    Yes.

20       Q.    Do you know how it differed?

21       A.    I know that the program that

22   was written for NPR was designed by

23   Shalom Cohen.  And it was a very large

24   program, and they did all their billing

ESQUIRE DEPOSITION SERVICES

47                    LORRAINE T. ROBINS

1  on that.  He worked on that for about a

2  year, until it --

3      Q.   Do you know when he worked

4  on it?

5      A.   What do you mean when?

6  Well, the program was in effect when Sea

7  Star Line bought NPR.  And I would say it

8  had been in effect for about a year.  I'm

9  familiar with it because it made the

10  billing for the truckers much easier.

11     Q.   Is it your understanding

12  that Sea Star Line retained any program,

13  other than the NPR program, in the Holt

14  system, in the Holt Logistics system?

15     A.   To my knowledge, the other

16  program that they retained was the

17  logistics system that they set up for

18  NPR.

19     Q.   When you say "they," whom do

20  you mean?

21     A.   Holt Logistics set up for

22  NPR.

23     Q.   So Sea Star Line, to your

24  knowledge, was not involved in any other

ESQUIRE DEPOSITION SERVICES

1   programs related to the Holt Logistics

2   system?

3       A.   I did not think so.  I don't

4   know.

5       Q.   You referred to the loading

6   manifest from the MAYAGUEZ.  Do you

7   recall when that loading manifest was

8   dated?

9       A.   It was dated April 26th to

10  the 27th.

11      Q.   Of what year?

12      A.   2002.

13      Q.   How did you use the loading

14  manifest from the MAYAGUEZ?

15      A.   I took the loads that were

16  on it, and I billed for those.

17      Q.   Have you ever changed your

18  billing for those loads?

19      A.   Yes, I have.

20      Q.   When did you change your

21  billing?

22      A.   Recently, because I couldn't

23  get copies of the manifests.  I didn't

24  find out about the in-transit until

49                    LORRAINE T. ROBINS

1    January of this year.

2        Q.    This year being 2005?

3        A.    No, I'm sorry, 2004.  And I

4    didn't do anything on it, because I

5    didn't have the manifest, so I didn't

6    know what was in transit.

7            And recently in the

8    discovery we got a list that shows --

9    it's a Sea Star Line document that shows

10    what was in transit, where they took

11    credits against MBC Leasing, so I have

12    adjusted the billing from the containers

13    on that list for 14 days credit on each

14    unit.

15            And I would also like to

16    point out that there are a lot of

17    mistakes on that, too.

18        Q.    On what?

19        A.    On the document.

20        Q.    On what document?

21        A.    The in-transit settlement

22    with MBC on monies that were due Sea Star

23    Line for in-transit moves.  I don't have

24    the Bates number on it.

ESQUIRE DEPOSITION SERVICES

50                    LORRAINE T. ROBINS

1     Q.   What mistakes did you find?

2     A.   Taking credit for days that

3  weren't paid.

4     Q.   Anything else?

5     A.   That's big, pretty big.

6     Q.   What is the number?

7     A.   I don't have the number in

8  my head now.

9     Q.   Approximately, if it's that

10  big a number?

11     A.   I can't tell you. The

12  credit is thousands of dollars. But I

13  don't have it totaled.

14     Q.   Any other mistakes that you

15  found, that you can recall?

16     A.   No. The only mistakes that

17  I found that I was concerned with were

18  the monies. I have to take the listing

19  that they have as being correct, but the

20  credits are being issued, and that's part

21  of the amended bill that we are working

22  on.

23     Q.   What listing do you mean

24  when you say the listing that they have?

ESQUIRE DEPOSITION SERVICES

51                    LORRAINE T. ROBINS

1      A.   I'm talking about the

2   documents that were on the Bates report.

3   I don't know what the number is.  It had

4   containers that went out on the MAYAGUEZ,

5   the HUMACAO and the GUAYAMA.

6      Q.   Are you talking about NPR

7   documents?

8      A.   No; Sea Star documents.

9      Q.   Have you ever been informed

10  that the documents relating to or listing

11  containers that went out on those three

12  ships were prepared by NPR?

13     A.   What do you mean?  Were they

14  prepared by NPR?

15     Q.   Have you ever been informed

16  that the documents listing containers

17  that were on those three ships were

18  prepared by NPR?

19     A.   I've never been informed of

20  that.

21     Q.   Have you ever inquired as to

22  how those documents were prepared?

23     A.   Are you talking about the

24  ship manifests?

            ESQUIRE DEPOSITION SERVICES

52                    LORRAINE T. ROBINS

1    Q.   The documents listing the

2   containers on those three ships to which

3   you referred earlier.

4    A.   No.  Arthur originally

5   requested that we have manifests for

6   those vessels.  We never received the

7   manifests.  As a result, we could not --

8   we had to take whatever we had.  But when

9   Mr. Holt had a meeting with Mr. Magee in

10   December '03, he again asked Mr. Magee

11   for the manifests.  We never got the

12   manifests.

13    Q.   Are you talking about the

14   manifests for those three ships?

15    A.   Right.

16    Q.   How do you know that Mr.

17   Holt asked Mr. Magee for the manifests

18   for those three ships?

19    A.   No.  He asked them for

20   manifests period.

21    Q.   Not particularly for those

22   three ships?

23    A.   I don't know.

24    Q.   Do you know whether he asked

ESQUIRE DEPOSITION SERVICES

53                    LORRAINE T. ROBINS

1  for Sea Star Line manifests?

2      A.    Sea Star Line manifests.

3      Q.    Do you know whether the

4  manifests for those three ships were Sea

5  Star Line manifests?

6      A.    No, I do not.

7      Q.    Have you ever looked at

8  them?

9      A.    I have not.  I've never seen

10  them.

11     Q.    How did you determine what

12  equipment was on those three ships?

13     A.    The only ship that I could

14  determine was the MAYAGUEZ.

15        MR. MOLDOFF:  Objection to

16     form.  At what time are you

17     talking about?  Are you talking

18     about at any time?

19        THE WITNESS:  He said those

20     three ships.

21  BY MR. ARMSTRONG:

22     Q.    Go ahead and answer.

23        MR. MOLDOFF:  Am I right,

24     that you are talking about at any

        ESQUIRE DEPOSITION SERVICES

54                LORRAINE T. ROBINS

1    time up to the present?

2        MR. ARMSTRONG:  Yes.

3        THE WITNESS:  Now I am

4    completely confused.

5  BY MR. ARMSTRONG:

6        Q.   How did you determine what

7    equipment was on board those three ships?

8        A.   I determined that when I got

9    the documents in discovery, which I still

10   don't know if that is complete.  They

11   were Sea Star Line's documents, and

12   that's what I was using.

13       Q.   Did you look at the

14   documents?

15       A.   I absolutely looked at those

16   documents, yes.

17       Q.   And do you know who prepared

18   the documents?

19       A.   I do not know.  There's a

20   top line which gives you the name of the

21   ship, and it came out very dark, so I

22   don't know who prepared it.  But this was

23   given to us in discovery.

24       Q.   Do you know whether NPR

ESQUIRE DEPOSITION SERVICES

55                    LORRAINE T. ROBINS

1    prepared those documents?

2        A.   I would say no.

3        Q.   You do not know?

4            MR. MOLDOFF:  Wait a minute.

5        Off the record.

6                - - -

7            (Whereupon, a discussion was

8        held off the record.)

9                - - -

10            (Whereupon, the pertinent

11        portion of the record was read.)

12                - - -

13            THE WITNESS:  I do not know.

14   BY MR. ARMSTRONG:

15        Q.   Have you asked anyone

16   whether NPR prepared those documents?

17        A.   No.

18        Q.   From whom did you receive

19   the documents?

20        A.   I believe I received them in

21   the discovery -- the documents from Sea

22   Star Line.

23        Q.   Did any particular

24   individual give you those documents?

        ESQUIRE DEPOSITION SERVICES

LORRAINE T. ROBINS

1    A.    I don't recall how I got

2    them.  I just got them a few days ago.

3    Q.    A few days ago; less than

4    two weeks ago?

5    A.    Yes.

6    Q.    And who gave them to you?

7    A.    I don't recall whether it

8    was John Evans or whether it was Arthur

9    Davis.

10    Q.    Is John Evans involved in

11    this project of straightening out the

12    billing?

13    A.    John is involved in

14    basically helping us get the records

15    straightened out.

16    Q.    How long have you known John

17    Evans?

18    A.    Thirty-some years.

19    Q.    How do you know John Evans?

20    A.    John came to work for Holt

21    Cargo Systems, Inc. back in about 1970,

22    the early '70s.  Maybe it was late '68,

23    '69.

24    Q.    What was his position with

ESQUIRE DEPOSITION SERVICES

57                    LORRAINE T. ROBINS

1  Holt Cargo Systems, Inc.?

2      A.   Accounting.

3      Q.   Has he held other positions

4  with any of the Holt Companies?

5      A.   He has held other positions

6  and I don't know.  He was officer in some

7  positions, but I don't recall his

8  offices.

9      Q.   Do you know what his

10  responsibilities were?

11     A.   No.

12     Q.   Has he ever held legal

13  positions in any of the Holt Companies?

14     A.   Yes.

15     Q.   What positions have those

16  been?

17     A.   House counsel.

18     Q.   With what company or

19  companies?

20     A.   I don't know whether it was

21  Holt Cargo Systems or Holt Group, Inc., I

22  don't know.

23     Q.   Do you know how long he was

24  house counsel?

ESQUIRE DEPOSITION SERVICES

58                    LORRAINE T. ROBINS

1      A.   No, I don't.

2      Q.   Do you know when he was last

3   house counsel?

4      A.   No.

5      Q.   After you received these

6   documents regarding the three ships, did

7   you review them?

8      A.   Yes, I did.

9      Q.   And have you made any

10   changes in your claims after reviewing

11   these documents?

12      A.   Yes, I have.

13      Q.   What changes have you made?

14      A.   I gave credit for 14 days on

15   the vessels that we had billed -- I mean

16   on the containers that we had billed.

17      Q.   Did you make any other

18   changes?

19      A.   No.

20      Q.   And how did you determine

21   what the on-hire date was for equipment

22   on board these three vessels after you

23   gave the credit?

24      A.   Do you know, I gave the

                ESQUIRE DEPOSITION SERVICES

LORRAINE T. ROBINS        59

1    credit on April 29th, according to the

2    lease, but I really wanted to discuss it,

3    because I think it should have been to

4    the 27th, because they were already en

5    route.

6        Q.    That wasn't my question.

7    How did you determine what the on-hire

8    date for a particular piece of equipment

9    on board one of those vessels was, after

10   you gave that in-transit credit?

11       A.    I don't understand your

12   question. The billing that -- if I had

13   billing, I had already -- on the billings

14   that I had for Sea Star Line, say on a

15   40-foot container, I already had Sea Star

16   Line's date that they said they put it on

17   hire, or I had the actual date, if you

18   are familiar with the bills. And then I

19   comment as to how I came to that.

20           Now either -- that didn't

21   change. So that if it was an on-hire

22   date, in lots of instances I took Sea

23   Star Line's on-hire date, because I

24   didn't have any other information. If I

ESQUIRE DEPOSITION SERVICES

LORRAINE T. ROBINS      60

1  know the equipment was on the vessel, I

2  gave them 4/29.

3      Q.   You gave them --

4      A.   As an on-hire date, I gave

5  Sea Star Line 4/29 as an on-hire date.  I

6  had no other information.

7      Q.   If the equipment was on

8  board one of these three ships, you have

9  a 4/29 on-hire date?

10     A.   Yes.

11     Q.   Have you ever changed that?

12     A.   I gave credit.

13     Q.   What credit did you give?

14     A.   I gave them credit for two

15  weeks.

16     Q.   Now, did you then set the

17  on-hire date for the day after the

18  two-week credit period?

19     A.   What?  Pardon me?

20     Q.   Correct me if I'm wrong.

21  You say that you billed beginning

22  4/29/2002 for equipment listed on board

23  these three vessels.  You gave credit for

24  14 days.  Did you then set the on-hire

ESQUIRE DEPOSITION SERVICES

A-838

LORRAINE T. ROBINS      61

1  date as the day after the 14-day period

2  ended?

3      A.   I did if I had documentation

4  that called for it still being on hire.

5      Q.   What documentation was that?

6      A.   Could be a TIR, could be an

7  inventory.

8      Q.   Anything else?

9          MR. MOLDOFF:  Objection to

10         form.

11         THE WITNESS:  Any other

12         document that I would have at that

13         particular time.

14  BY MR. ARMSTRONG:

15      Q.   Was it your understanding

16  that any piece of equipment listed in an

17  inventory was on hire to Sea Star Line?

18      A.   No.

19      Q.   How did you determine what

20  equipment listed in inventories was on

21  hire to Sea Star Line?

22      A.   Well, I only -- the only

23  inventories that I recall I had -- two

24  inventories were San Juan.  One was dated

LORRAINE T. ROBINS    62

1  6/22 and one was dated 8/14. These were

2  not signed by any Emerald

3  representatives. And these were not

4  given to Emerald until sometime in 2003.

5  When I say June -- June 22nd and August

6  15th, that's '02, the year '02 on those.

7       I took the two inventories

8  and put them on an Excel sheet. And if,

9  in fact, the container -- and this was

10  only on containers -- if the container

11  was there for the 22nd of June and the

12  14th of June -- I mean the 15th of

13  August, I gave them credit to the 22nd of

14  June.

15       But in cases where it wasn't

16  on the June 22nd inventory, but it was on

17  the August 15th inventory, I gave them

18  credit for August 15th. Or in some

19  instances it was taken out again. And in

20  those instances it would be either a TIR

21  or some documentation, whichever it is.

22       But all of these things were

23  explained in the comments to our billing

24  of why we did it, how we did it, why we

ESQUIRE DEPOSITION SERVICES

LORRAINE T. ROBINS     63

1   started on a certain date.  And TIR

2   numbers were given on that comments

3   section, too.

4        Q.   Okay.

5        A.   The other inventory I had

6   was one from Marty McDonald, which he did

7   sign for, and that was for chassis and

8   gensets.  And I gave credit for that.

9        Q.   How did you give credit in

10   connection with the June 22nd inventory?

11        A.   I just billed it to June

12   22nd.

13        Q.   So if it was on the

14   inventory, you stopped your billing as of

15   June 22nd?

16        A.   That's correct.

17        Q.   Did you make any inquiry as

18   to whether any of the equipment of the

19   June 22nd inventory was in storage or had

20   been in storage prior to June 22nd?

21        A.   When I billed, I didn't bill

22   anything to Sea Star Line unless I had a

23   movement of some kind that they had

24   touched it.  If they had it, I billed it.

ESQUIRE DEPOSITION SERVICES

LORRAINE T. ROBINS      64

1  If it didn't have any connection to Sea

2  Star Line on it, I did not bill it.

3           I mean, there are quite a

4  few in that June 22nd inventory that I

5  didn't bill because I couldn't find any

6  connection to Sea Star Line. I didn't

7  take the whole inventory and just bill

8  it.

9      Q.   Are you familiar with the

10  NPR program?

11      A.   What NPR program?

12      Q.   The NPR program prepared by

13  Shalom Cohen.

14      A.   Vaguely.

15      Q.   Do you know how the NPR

16  program requires that you show taking

17  possession of a piece of equipment?

18      A.   No, I don't.

19      Q.   Do you know whether you have

20  to show an on hire to show that you have

21  possession of a piece of equipment under

22  that program?

23      A.   No, I don't have to.

24      Q.   Are you familiar with a

ESQUIRE DEPOSITION SERVICES

LORRAINE T. ROBINS      65

1  program called IQ -- you say you do not

2  have to?

3      A.   I don't think you have to.

4  I don't know.  I don't know the exact --

5  am I familiar with what?

6      Q.   Are you familiar with a

7  program called IQ Ship?

8      A.   I understand it's a program

9  that Sea Star Line uses.

10     Q.   Now, with respect to the

11  August 15th inventory, how did you give

12  your credits, what procedure did you use?

13     A.   If it appeared on the August

14  15th inventory and did not appear on the

15  June 22nd inventory, I used August 15th,

16  unless I had other information that the

17  container was still on hire.

18     Q.   What other information would

19  that be?

20     A.   Well, for one thing, a

21  container supposed to be in storage in

22  San Juan August 15th ends up with a TIR

23  coming back into Jacksonville.  I think

24  that's a pretty good example.

ESQUIRE DEPOSITION SERVICES

A-843

LORRAINE T. ROBINS

1    Q.   Coming into Jacksonville

2  after August 15th?

3    A.   Mm-hum.

4    Q.   Do you know whether Sea Star

5  Line moved empty equipment, that is,

6  Emerald equipment, from San Juan to

7  Jacksonville?

8    A.   I'm quite sure that -- I

9  don't know what they did.

10    Q.   Do you ever inquire?

11    A.   No.

12    Q.   Is that the procedure that

13  you followed with respect to the

14  McDonald-signed inventory?

15    A.   Yes.  But bear in mind, Mr.

16  Armstrong, these TIRs weren't seven days

17  later, they were months later.

18    Q.   What TIRs are you

19  referencing now?

20    A.   Where they were accepted

21  into Jacksonville by GTS, or that they

22  appeared on a rail car with CSX.

23    Q.   Let's talk about the

24  acceptance into Jacksonville by GTS.  Was

67                LORRAINE T. ROBINS

1    it your understanding that the agreement

2    between Sea Star Line and Emerald

3    required that a unit be accepted into

4    Jacksonville by GTS?

5        A.   Yes, it was.  After August

6    1st.

7        Q.   What about before August 1,

8    2002?

9            MR. MOLDOFF:  Objection to

10           form.

11           THE WITNESS:  Up until then

12           there was -- GTS went to work for

13           Greenwich sometime, end of July.

14           So prior to August 1st we took or

15           I took Sea Star Line's off-hire

16           dates and used them.  That is,

17           where they gave me a listing of

18           the equipment, specific numbers.

19   BY MR. ARMSTRONG:

20       Q.   After August 2004, have you

21   been amending your spreadsheets?

22       A.   Yes, I have.

23       Q.   Has the total claim

24   increased?

ESQUIRE DEPOSITION SERVICES

68                    LORRAINE T. ROBINS

1    A.   I think that it probably

2   will remain about the same, because when

3   we got certain documents, we found

4   several that we have not billed.  And

5   even giving the credits, just checking

6   one or two, it didn't make that much of a

7   difference.

8      Q.   How did you determine what

9   units were in Sea Star Line's possession

10   as of April 27, 2002?

11    A.   April 22nd?

12    Q.   April 27, 2002.

13    A.   I wasn't involved with it at

14   that time.

15    Q.   Did you make any effort to

16   determine what units were in Sea Star

17   Line's possession as of April 27, 2002?

18    A.   As I said, I was not

19   involved in it at that time.

20    Q.   Did you make any effort

21   determine what units were in inland

22   depots -- and I am speaking of Emerald

23   units -- as of April 27, 2002?

24    A.   I was not involved in that.

ESQUIRE DEPOSITION SERVICES

69                    LORRAINE T. ROBINS

1    Q.   I understand.  When you

2    became involved, did you make any effort

3    to determine what Emerald units had been

4    in Sea Star Line's possession as of April

5    27, 2002?

6    A.   The only thing that I

7    received was a list from Mr. Rooks dated

8    the 23rd or the 26th of July, which is a

9    list of containers or equipment that was

10   in various depots.

11   Q.   When did you receive the

12   list from Mr. Rooks?

13   A.   Maybe it was the end of

14   July, beginning of August '02.

15   Q.   When you say depots, are you

16   referring to inland depots?

17   A.   Basically they were trucking

18   companies.  I guess they were depots.

19   Q.   Other than that list, have

20   you made any effort, when you became

21   involved, to determine what Emerald units

22   were in Sea Star Line's possession as of

23   April 27, 2002?

24   A.   I, myself, was not, as I

ESQUIRE DEPOSITION SERVICES

70                    LORRAINE T. ROBINS

1   said, involved in that.  But I do know

2   the only way -- the only information we

3   had -- we couldn't get the manifest and

4   we just really didn't know what they had.

5   So I relied on their self-billing

6   reports.

7       Q.   Did you rely on any NPR

8   inventories?

9       A.   No.

10      Q.   When you became involved,

11  did you make an effort to determine what

12  Emerald equipment was held by third

13  parties as of April 27, 2002?

14      A.   What do you mean by third

15  parties?  Such as?

16      Q.   Stevedores, repair

17  facilities.

18      A.   Not that I know of.  There

19  shouldn't have been any, because the

20  companies were -- the company was in

21  bankruptcy.  And any of those claims

22  would have been settled in the bankruptcy

23  court.

24      Q.   Did you discuss with anyone

ESQUIRE DEPOSITION SERVICES

71                 LORRAINE T. ROBINS

1   whether any Emerald equipment had been

2   held by third parties as of April 27,

3   2002?

4        A.   It wasn't being held, but

5   there were several places where Sea Star

6   Line needed equipment that was at

7   various -- like Thermo King and various

8   places.  Could be depots.

9            Not being familiar with Sea

10   Star Line, they wouldn't take their

11   releases -- equipment had an NPR release.

12   Or we couldn't give them an NPR release,

13   because they were out of business.

14            But they would talk to me,

15   because I had done a lot of work with

16   these various truckers and depots, and

17   they knew me, and they wanted -- so I

18   would tell them, they can release it to

19   Sea Star Line or else write them, give

20   them written permission to release it.

21        Q.   Did you ever become aware

22   that depots were withholding equipment

23   because of debts that they claimed were

24   owed by NPR?

ESQUIRE DEPOSITION SERVICES

72                    LORRAINE T. ROBINS

1    A.   No, not to my knowledge.

2    Q.   Did you make an effort,

3  after you became involved, to determine

4  what equipment was being held in storage

5  at depots, speaking of Emerald equipment?

6    A.   I had no knowledge that

7  equipment was being held, other than the

8  one list that I received from Andy Rooks,

9  and I know that Sea Star Line had

10  equipment at various depots.

11    Q.   Did you make an effort to

12  determine, aside from your conversations

13  with Mr. Rooks, what equipment was in

14  storage at these depots, speaking of

15  Emerald equipment?

16    A.   I didn't know what was in

17  storage at those depots.  I didn't get

18  any information, and I wasn't under the

19  impression that they were storing

20  containers or chassis or gensets at

21  depots.

22    Q.   After you became involved,

23  did you make an effort to determine what

24  equipment, speaking of Emerald equipment,

ESQUIRE DEPOSITION SERVICES

73                    LORRAINE T. ROBINS

1  was being held in storage at Sea Star

2  facilities?

3      A.   The inventories that I had

4  were the only inventories -- the June

5  22nd, '02, August 15th, '02, July 10,

6  '02, Marty McDonald's and the sands lot.

7  I thought I had them all.

8      Q.   How did you determine what

9  equipment was in storage and what

10  equipment was in use by Sea Star Line?

11     A.   Again, I have to say, I

12  would go to my documents, to the move

13  histories, to my TIRs, and determine

14  whether it was in use or not.

15     Q.   Have you ever read the

16  equipment rental agreement between Sea

17  Star and Emerald?

18     A.   Just sections of it.

19     Q.   What sections do you recall

20  reading?

21     A.   The charges, the rates, per

22  diems, redelivery.

23        MR. ARMSTRONG:  Let's take a

24        break.

ESQUIRE DEPOSITION SERVICES

74                    LORRAINE T. ROBINS

1            - - -

2            (Whereupon, a recess was

3       taken.)

4            - - -

5   BY MR. ARMSTRONG:

6       Q.   Have you received copies of

7   TIRs after August 2004?

8       A.   August 2004?

9       Q.   Yes.

10      A.   Yes, I have.

11      Q.   And what have you done with

12  those TIRs?

13      A.   I'm spreadsheeting them.

14      Q.   Are you amending your

15  spreadsheets using those TIRs?

16      A.   Well, since I just finished

17  entering all the TIRs that I have,

18  because we didn't get those until January

19  8, '05, so I haven't made any amendments

20  to my billing.

21      Q.   Have you also prepared

22  depreciated value billings?

23      A.   I had prepared billing for

24  the -- not depreciated value, it's -- the

ESQUIRE DEPOSITION SERVICES

75        LORRAINE T. ROBINS

1  value is set forth in lease for each type

2  of equipment. I have prepared those.

3      Q.   And what was your procedure

4  in preparing those billings?

5      A.   Any equipment that wasn't

6  returned, that was on our self-billing

7  report after the 30th of November, I

8  considered lost. There had been

9  instances where it was delivered to us

10  later and I've adjusted it.

11      Q.   For purposes of preparing

12  the DV billings, you use self billings

13  reports?

14      A.   What do you mean DV?

15      Q.   I call it depreciated value.

16  You probably call it stipulated value.

17      A.   Yes, stipulated.

18      Q.   For purposes of preparing

19  those reports, you used the self-billing

20  reports to determine what equipment was

21  in Sea Star's possession?

22      A.   I used the schedules and the

23  invoices I sent to Sea Star Line.

24      Q.   How did you determine that

ESQUIRE DEPOSITION SERVICES

LORRAINE T. ROBINS

1    every piece of equipment on your

2    stipulated value billings had been in Sea

3    Star Line's possession?

4        A.   If it was on --

5        MR. MOLDOFF:  Objection to

6        form.

7        THE WITNESS:  If it was on

8        my billings, I had already

9        determined it had been in Sea Star

10       Line's possession.  Again, I show

11       in my comments on my bills how I

12       came to this conclusion.

13   BY MR. ARMSTRONG:

14       Q.   I'm going to show you a copy

15   of a Schedule DV 20-foot container

16   8/23/2004, amended.  I will ask the court

17   reporter to mark this as Exhibit-1 to

18   this deposition.  We will call it

19   Robins-1.

20           - - -

21       (Whereupon, Exhibit Robins-1

22       was marked for identification.)

23           - - -

24   BY MR. ARMSTRONG:

            ESQUIRE DEPOSITION SERVICES

77                           LORRAINE T. ROBINS

1    Q.   Can you identify this

2  document?

3    A.   This isn't my document.

4    Q.   Well, I will tell you that

5  that's a copy of the document, to my

6  knowledge, that we have, shall we say,

7  translated from hard copy to computer

8  disk, and that's a printout from the

9  disk.

10    A.   This is not my copy.  I

11  mean, one, my copy shows the actual days

12  that they paid.  It's all -- each month.

13        MR. MOLDOFF:  You are saying

14        this doesn't have the complete

15        information on it?

16        THE WITNESS:  Doesn't have

17        the complete information.

18  BY MR. ARMSTRONG:

19    Q.   Does it have the information

20  that is shown on there?

21        MR. MOLDOFF:  Objection to

22        form.  The document speaks for

23        itself.

24        THE WITNESS:  Yes.

ESQUIRE DEPOSITION SERVICES

78                    LORRAINE T. ROBINS

1          MR. MOLDOFF:  Is there a

2      question?

3  BY MR. ARMSTRONG:

4      Q.   The columns there, are those

5  columns that you utilized or did you

6  utilize different columns?

7      A.   Well --

8          MR. MOLDOFF:  If you know.

9          THE WITNESS:  Yes, I had

10     other columns in here.

11  BY MR. ARMSTRONG:

12     Q.   But the columns there that

13  are on that document --

14     A.   I would have to have the

15  other document to compare it.

16     Q.   Did you comment that certain

17  equipment was used as fence?

18     A.   Yes.

19     Q.   What do you mean by that?

20     A.   When Arthur Davis was down

21  in Puerto Rico, they had built, out of

22  the containers, a fence.  He called me

23  and gave me the numbers.  And I think we

24  also sent an e-mail immediately to Mr.

ESQUIRE DEPOSITION SERVICES

LORRAINE T. ROBINS

1  Rooks about the containers being used as

2  a fence.  In fact, I think a few days

3  later he went back and found another

4  fence.

5      Q.   Did you expect that the

6  Emerald equipment would be stored in the

7  middle of Sea Star's terminal?

8      A.   Yes, yes, I did.  There were

9  supposed to be certain places they were

10  going to store it, from what I understood

11  later, but I didn't expect them to use it

12  down at the end of the terminal and build

13  a fence between them and their ships.

14      Q.   Did you have a discussion

15  with anyone in Puerto Rico about that?

16      A.   I spoke with Mr. Davis when

17  he was down there.

18      Q.   Did you speak to anybody

19  else?

20      A.   No.

21      Q.   Now, when you are talking

22  about "fence" in your comments, are you

23  talking about units that are on the

24  perimeter of the terminal?

ESQUIRE DEPOSITION SERVICES

80                        LORRAINE T. ROBINS

1    A.   Yes.

2    Q.   And based --

3    A.   Or the sides.

4    Q.   And based on the fact that

5    the units were on the perimeter or the

6    sides of the terminal, you determined

7    that they were being used as a fence?

8    A.   No.  They were being used as

9    a fence.  You can tell a difference

10   between storage and a fence.

11   Q.   How can you tell the

12   difference between storage and a fence?

13   A.   Well, you would have to go

14   to the terminal and see.

15   Q.   What terminal?

16   A.   Go to the terminal in San

17   Juan or you could go -- how can I explain

18   it?

19   Q.   Would you have to go to the

20   terminal in San Juan to determine whether

21   these units were in storage or used as a

22   fence?

23   A.   Yes.

24   Q.   Did you go to the terminal

ESQUIRE DEPOSITION SERVICES

81                    LORRAINE T. ROBINS

1    in San Juan?

2        A.   No, I did not.

3        Q.   Have you ever visited the

4    terminal, the Sea Star terminal in San

5    Juan?

6        A.   No, I haven't.

7        Q.   Did you ever visit the

8    terminal in San Juan when it was an NPR

9    terminal?

10       A.   No, I haven't.

11       Q.   Your comment is based on

12   what Arthur Davis told you?

13       A.   That's correct.  He called

14   me from San Juan when he was on the pier

15   and gave me the numbers for several

16   pieces that were being used.

17       Q.   Do you recall when he did

18   that?

19       A.   Could have been January,

20   February '03.

21       Q.   I show you a copy of a

22   document entitled Order Authorizing Sale

23   of the NPR Assets Free and Clear of All

24   Liens, Claims and Encumbrances, which has

ESQUIRE DEPOSITION SERVICES

82                    LORRAINE T. ROBINS

1   been marked as Exhibit-4 to the Emerald

2   deposition.

3         Have you ever seen that

4   document before?

5         When I refer to the Emerald

6   deposition, I'm referring to the

7   deposition in which Arthur Davis appeared

8   as Emerald's designee.

9     A.   No, I haven't seen this.

10    Q.   Look at paragraph 13 on page

11  eight, please.

12    A.   (Witness complies.)

13    Q.   Has anyone ever advised you

14  of the storage requirement in the court's

15  order?

16        MR. MOLDOFF:  Objection to

17    form.

18        THE WITNESS:  No.

19  BY MR. ARMSTRONG:

20    Q.   Has anyone ever advised you

21  of the subject matter of paragraph 13 on

22  page eight?

23    A.   No.

24    Q.   I'm going to show you

        ESQUIRE DEPOSITION SERVICES

83                    LORRAINE T. ROBINS

1  Exhibit-8 to the Emerald deposition and

2  ask you whether you recognize the

3  signature on page 17.

4      A.   Nope.  No, I don't.

5      Q.   Let me show you Exhibit-7 to

6  the Emerald deposition and ask you

7  whether you recognize the signature.

8      A.   No, I don't.

9      Q.   That is on page 17?

10     A.   No.

11     Q.   Let me show you a copy of a

12  letter dated April 11, 2002, that has

13  been marked as Exhibit-33 to the Emerald

14  deposition.  Have you ever seen that

15  letter before?

16     A.   No.

17     Q.   Let me show I a copy of the

18  equipment rental agreement that has been

19  marked as Exhibit-16 to the Emerald

20  deposition.  Have you ever seen that

21  document before?

22     A.   Yes, I have.

23     Q.   When did you first see that

24  document?

ESQUIRE DEPOSITION SERVICES

84                    LORRAINE T. ROBINS

1    A.   I don't recall.

2    Q.   What provisions in that

3    document have you reviewed?

4    A.   I have reviewed the -- I

5    reviewed this, the Schedule A, which

6    gives you the lease rate, the stipulated

7    loss rate and the damage.  I reviewed

8    that.  And I reviewed the redelivery.

9    Q.   Did you ever look at

10   paragraph one?

11   A.   Yes, I've looked at that.

12   Q.   Did you discuss the contents

13   of paragraph one with anyone?

14   A.   This lease was signed in --

15   dated -- I don't know when it was signed,

16   because there is no date on the signature

17   page -- August '02.

18       The equipment that you are

19   talking about was already in evidence,

20   was already in use, so you couldn't get

21   interchanges on it.

22   Q.   How did you determine what

23   equipment was in use on April 29th, 2002,

24   that is, in use by Sea Star?

ESQUIRE DEPOSITION SERVICES

A-862

85                    LORRAINE T. ROBINS

1    A.   Well, this is something that

2   we looked at six months after it had

3   already been in use.  So by that time we

4   had the self-billing reports.  I would

5   say June, July, August, September, four

6   to five months, took the equipment that

7   was on the self-billing list and

8   considered that in use.

9    Q.   So every piece of equipment

10  on the self-billing list you considered

11  in use?

12   A.   Yes.

13   Q.   Did you consider any other

14  equipment in use?

15   A.   Well, later on, yes.  In

16  checking the self-billing reports where

17  they had a container in some instances,

18  especially if it came out of Packer

19  Avenue, we could go into the computer and

20  could tell whether it was with a chassis

21  or a container with a chassis or a

22  chassis with a container.

23        So then we would know it was

24  a double move.  So we would bill the

ESQUIRE DEPOSITION SERVICES

86                    LORRAINE T. ROBINS

1    container or the chassis, whichever

2    showed up with it, with a TIR going in or

3    out of the gate.

4        Q.   Did you look at anything

5    else?

6        A.   I looked at the vessel load

7    and discharge, on the computer, that was

8    inputted by the Sea Star personnel, and

9    if they -- they showed loads and who the

10   loads -- the customers on the loads.  I

11   billed those.  If I had TIRs from JAX

12   Port, I billed those.

13        Whatever information I got

14   from CSX Lines, which we received daily

15   from their electronic systems, if the

16   containers were moving on the rails, I

17   billed those.

18        Q.   You were aware, were you

19   not, that the terms and conditions of the

20   equipment rental agreement cover

21   equipment in use at various times,

22   commencing April 29th, 2002.  Correct?

23        MR. MOLDOFF:  Objection to

24        form.

ESQUIRE DEPOSITION SERVICES

87                    LORRAINE T. ROBINS

1          THE WITNESS:  I was more

2    aware of the May 1 agreement where

3    they -- I think Mr. Bates, Phil

4    Bates, sent -- it was a memorandum

5    of agreement that he sent to

6    Thomas Holt, Junior, for the use

7    of the equipment.

8          So I really didn't

9    consider -- I mean this

10    paragraph -- I was working with

11    the agreement that we had with Mr.

12    Bates or that Tom Holt, Junior,

13    had with Mr. Bates.

14  BY MR. ARMSTRONG:

15      Q.   When you say "this

16  paragraph" --

17      A.   I didn't say "this

18  paragraph."  I was working with the

19  agreement that was made by Mr. Bates with

20  Mr. Holt, Junior.  Tom Holt, Junior.

21      Q.   When you say "this

22  paragraph," are you talking about

23  paragraph number one?

24      A.   Yes, paragraph number one I

ESQUIRE DEPOSITION SERVICES

A-865

88                         LORRAINE T. ROBINS

1    didn't see until -- the first time I saw

2    it is when I got the billing structure.

3        Q.   And when was that?

4        A.   September or October of '02.

5        Q.   After September or October

6    of '02, were you aware of paragraph

7    number one?

8        A.   No, I wasn't aware of it.

9        Q.   When did you become aware of

10   paragraph number one?

11       A.   I just read it over.  I

12   didn't -- I really didn't -- I don't know

13   when I became aware of it, to tell you

14   the truth.  As I said, I remember just

15   checking on the rates and the redelivery.

16       Q.   Redelivery being paragraph

17   number ten in the equipment rental

18   agreement?

19       A.   Let me see.  Yes.

20       Q.   Would it be fair to say that

21   in preparing your billing, you did not

22   use paragraph number one of the equipment

23   rental agreement?

24       MR. MOLDOFF:  Objection to

ESQUIRE DEPOSITION SERVICES

A-866

89          LORRAINE T. ROBINS

1     form.

2         THE WITNESS:  In doing my

3     billing I used whatever

4     documentation I had to do the

5     billing.  If I had a TIR, I used

6     it.  If I had a load that was

7     discharged from a vessel and went

8     out the gate, I used that.  If it

9     was on CSX Rail, I used that.

10         I did not get any TIRs from

11     San Juan until discovery.  Well,

12     no, no, I'm sorry, that's wrong.

13     I got some in December.

14  BY MR. ARMSTRONG:

15     Q.   Did Emerald have

16  representatives in San Juan?

17     A.   Yes, they did.

18     Q.   Who were those

19  representatives?

20     A.   Marty McDonald and Frankie

21  Gonzalez.

22     Q.   Did you ever discuss TIRs

23  with Marty McDonald?

24     A.   No.

ESQUIRE DEPOSITION SERVICES

90                    LORRAINE T. ROBINS

1    Q.   Did you ever ask Marty

2  McDonald to get TIRs?

3    A.   Well, Marty McDonald would

4  know to get TIRs.  He was a steamship

5  man.

6    Q.   Did you ask him to get TIRs?

7    A.   No, I did not.

8    Q.   How long did Marty McDonald

9  remain an Emerald representative in San

10  Juan?

11    A.   I do not know the exact

12  date.

13    Q.   Did you ask Frankie Gonzalez

14  to get San Juan TIRs?

15    A.   I didn't, Arthur Davis did.

16    Q.   How do you know that Arthur

17  Davis did?

18    A.   Because he told me.

19    Q.   When did he tell you that?

20    A.   We started getting TIRs in

21  October of '03 and December of '03, and

22  Frankie was assigning them then.  But he

23  was signing out for equipment prior to

24  that.  That was part of his job.

ESQUIRE DEPOSITION SERVICES

91                    LORRAINE T. ROBINS

1    Q.   Did you ask him to get TIRs

2  that he had signed prior to that?

3    A.   I never had any dealings

4  whatsoever with Frankie.

5    Q.   Did you ask Arthur Davis to

6  ask Frankie to get TIRs that had been

7  signed prior to that?

8    A.   No.

9    Q.   Let me show you a copy of an

10  e-mail that's been marked as Exhibit-34

11  to the Emerald deposition.  Were you

12  involved in the Emerald billing project

13  in May 2002?

14    A.   No, I wasn't.

15    Q.   By whom were you employed in

16  May 2002?

17    A.   I was still employed by Holt

18  Group.

19    Q.   What were your

20  responsibilities in connection with the

21  Emerald equipment in May 2002?

22    A.   In May of 2002 I didn't have

23  any responsibilities towards it, towards

24  the Emerald equipment.

ESQUIRE DEPOSITION SERVICES

92                   LORRAINE T. ROBINS

1    Q.   What responsibilities did

2    you have with depots in May 2002?

3    A.   None, other than I had -- I

4    didn't have any contact -- well, I had

5    contact with them, because I answered

6    some of these things for Tom.  But it

7    wasn't in conjunction with Illinois

8    Auto --

9         These were all truckers and

10   people that had dealt with NPR.  So Tom

11   Holt had asked me to look into it for

12   him.  Tom Holt, Junior, that is.  He

13   passed it on to Arthur, and Arthur passed

14   it on to me, I believe.

15   Q.   Were you working for Arthur?

16   A.   No.

17   Q.   Why would Arthur pass it on

18   to you?

19   A.   Because Arthur knew that I

20   knew these people better than he did.

21   These are all -- as I told you before, I

22   was straightening out the billing and the

23   trucking companies for NPR.  Arthur was

24   working as treasurer -- was working,

ESQUIRE DEPOSITION SERVICES

93                    LORRAINE T. ROBINS

1  supervising the accounts payable.  And in

2  doing their statements and everything, I

3  got to know these people pretty well.

4  That's why I called.

5      Q.   Have you billed Sea Star for

6  Emerald equipment located at the depots

7  listed in that e-mail for the periods

8  prior to May 10, 2002?

9        MR. MOLDOFF:  If you know.

10       THE WITNESS:  Well, I know

11       that I have billed Illinois Auto

12       as of May 8th, because that's when

13       I wrote a letter telling them to

14       release it to Sea Star.

15  BY MR. ARMSTRONG:

16      Q.   When did you start billing

17  Fastlane?

18      A.   Fastlane I only would have

19  billed if a unit was put in there by Sea

20  Star after the 27th of June or taken out

21  of there -- I mean of April.  On Global,

22  I billed containers with them, because I

23  had information on their loads that they

24  were moving for Sea Star.

ESQUIRE DEPOSITION SERVICES

94                    LORRAINE T. ROBINS

1    Q.   When did you begin billing

2   Global?

3    A.   Various bills.  It depends

4   on whichever container I had information

5   on.

6    Q.   Did you bill Global prior to

7   or for the periods prior to May 10, 2002?

8        MR. MOLDOFF:  Objection to

9        form.

10       THE WITNESS:  I would have

11       to check his bills.

12       MR. MOLDOFF:  You said

13       billed Global.

14   BY MR. ARMSTRONG:

15   Q.   Did you bill for equipment

16   located at Empire for periods prior to

17   May 10, 2002?

18   A.   I believe so.  Prior to

19   when?

20   Q.   May 10, 2002.

21   A.   I would have to check my

22   records on that.

23   Q.   Do you recall?

24   A.   I don't recall.  You

ESQUIRE DEPOSITION SERVICES

95                    LORRAINE T. ROBINS

1   realize, there were a lot of containers

2   moving around.

3       Q.   Let me show you a copy of a

4   document that's been marked Exhibit-35 to

5   the Emerald deposition.  Do you recognize

6   that?

7       A.   I remember -- I don't

8   recognize it, but I remember that they

9   had to have -- they had some sort of a

10  legal question they wanted settled.

11      Q.   Did you bill for equipment,

12  Emerald equipment, located at Illinois

13  Auto prior to May 13, 2002?

14      A.   I billed for it from May

15  8th, the day that I released it.  I sent

16  a letter to Illinois Auto and a copy to

17  Sea Star, releasing the equipment.

18          And the other was a problem

19  that they had to give them some sort

20  of -- I don't know whether it was

21  insurance or what have you.  But I do

22  have a letter that I released it on May

23  8th.  So I billed from Illinois Auto on

24  May 8th.

ESQUIRE DEPOSITION SERVICES

96                    LORRAINE T. ROBINS

1    Q.  Let me show a copy of

2  e-mails which I will ask the court

3  reporter to mark as Exhibit-2 for

4  identification.

5              - - -

6      (Whereupon, Exhibit Robins-2

7      was marked for identification.)

8              - - -

9  BY MR. ARMSTRONG:

10    Q.  You were aware, as of May

11  13th, that Illinois Auto was refusing to

12  release equipment?

13    A.  Mm-hum, yes.

14    Q.  Did you change your billing

15  to Sea Star?

16      MR. MOLDOFF:  I object.

17      THE WITNESS:  I don't know.

18      I remember the first part.  I

19      would have to check it.

20  BY MR. ARMSTRONG:

21    Q.  You were aware, on May 13th,

22  that Global and Fastlane were still

23  refusing to release equipment?

24      MR. MOLDOFF:  Objection to

ESQUIRE DEPOSITION SERVICES

97                    LORRAINE T. ROBINS

1    form.

2  BY MR. ARMSTRONG:

3      Q.   Correct?

4      A.   No, that is not correct.

5      Q.   Did you ever become aware

6  that Global and Fastlane were refusing to

7  release equipment to Sea Star?

8      A.   I became aware that Global

9  was -- Sea Star was using Global Lines as

10  a carrier, and they were using our

11  equipment in early May.

12      Q.   How did you become aware of

13  that?

14      A.   In error, they sent me all

15  their invoices, to Sea Star.

16      Q.   What is Global Lines?

17      A.   Global Intermodal Service.

18      Q.   And those invoices pertain

19  to Emerald equipment?

20      A.   Yes.  And they showed

21  containers, they showed the loads.

22      Q.   I show you a copy of a

23  document which I have asked the court

24  reporter to mark as Exhibit-3 to this

ESQUIRE DEPOSITION SERVICES

98                    LORRAINE T. ROBINS

1   deposition.

2           - - -

3           (Whereupon, Exhibit Robins-3

4       was marked for identification.)

5           - - -

6   BY MR. ARMSTRONG:

7       Q.   Do you recognize that?

8       A.   Well, when I got the bills

9   from Global, and we called them to tell

10   them that they were wrong, that he had --

11   I think he billed them to NPR and he had

12   to bill them to Sea Star, and the same

13   thing with Fastlane's, then they wanted

14   us to send a letter that it was okay to

15   release to Sea Star Line.

16       Q.   Did you send that letter?

17       A.   I asked Bill Streich to send

18   that letter.

19       Q.   Who is Bill Streich?

20       A.   He was the -- I guess the

21   chief financial officer for the Holt

22   Group, Inc.  That was his title.

23       Q.   Did Bill Streich send that

24   letter?

ESQUIRE DEPOSITION SERVICES

A-876

99                    LORRAINE T. ROBINS

1          MR. MOLDOFF:  Objection to

2      form.

3          THE WITNESS:  As far as I

4      know, he did.

5   BY MR. ARMSTRONG:

6          Q.   Let me show you a copy of a

7   May 17, 2002 document that's been marked

8   as Exhibit-31 to the Emerald deposition.

9   Have you seen that document before?

10         A.   I don't recall having seen

11   this before.

12         Q.   Do you recognize the

13   handwriting on the second page?

14         A.   Yes, mine.

15         Q.   What was your purpose in

16   writing on the second page?

17         A.   I don't know.  I don't

18   remember.

19         Q.   Did you and Mr. Davis have

20   any communications regarding sending a

21   note to Sea Star, in connection with CSX?

22         MR. MOLDOFF:  Objection to

23      form.

24          THE WITNESS:  I'm looking at

ESQUIRE DEPOSITION SERVICES

100                LORRAINE T. ROBINS

1     a note to Mr. Rooks from Arthur

2     Davis. That's all I know about

3     it. I don't recall what my -- I

4     think these dates must be the

5     dates that they went in or out. I

6     don't know.

7  BY MR. ARMSTRONG:

8     Q.   Do you know why Mr. Davis

9  would send a note to Mr. Rooks with

10  respect to CSX transactions that occurred

11  prior to April 27, 2002?

12     A.   Well, I'm reading this and

13  it says --

14        MR. MOLDOFF: Don't

15     speculate.

16        THE WITNESS: I'm not. I

17     think the memo speaks for itself.

18  BY MR. ARMSTRONG:

19     Q.   Do you think Mr. Davis was

20  trying to bill Mr. Rooks for those CSX

21  moves?

22        MR. MOLDOFF: Objection to

23     form.

24        THE WITNESS: I do not think

ESQUIRE DEPOSITION SERVICES