101                LORRAINE T. ROBINS

1    so.

2    BY MR. ARMSTRONG:

3        Q.    If the memo speaks for

4    itself, what does it say to you?

5        A.    It says to me that those

6    containers were moving. It's a freight

7    bill for the freight. It came to Mr.

8    Davis. And he does say in there that I

9    put the dates that it moved or something.

10       Q.    It says, Lorraine was kind

11   enough to add the date of the freight

12   move to the schedule to aid you in

13   checking the move further within your

14   system?

15       A.    Mm-hum, yes.

16       Q.    Do you understand that this

17   document was a billing to Sea Star by Mr.

18   Davis?

19       A.    No, I don't.

20       Q.    Let me show you a copy of a

21   letter dated June 11, 2002, to which is

22   attached a letter dated June 10, 2002.

23   These are exhibits 12 and 10 to the

24   Emerald deposition. Do you recognize

ESQUIRE DEPOSITION SERVICES

102                    LORRAINE T. ROBINS

1   those?

2       A.   No, I do not.

3       Q.   I show you a copy of e-mails

4   dated June 25, 2002 and June 26, 2002,

5   that I will ask the court reporter to

6   mark as Exhibit-4 to this deposition.

7              - - -

8       (Whereupon, Exhibit Robins-4

9       was marked for identification.)

10              - - -

11  BY MR. ARMSTRONG:

12      Q.   Do you recognize those

13  e-mails?

14      A.   No.  I don't remember them.

15  But it's awfully hard.  If I could see

16  the attachments.  Do you have the

17  attachments?

18      Q.   To the e-mails?

19      A.   Yes.

20      Q.   They are not attached to

21  this e-mail.

22        Do you know what Mr. Davis

23  meant by saying, quote, is this a

24  surprise or what, unquote?

ESQUIRE DEPOSITION SERVICES

103                    LORRAINE T. ROBINS

1        MR. MOLDOFF:  Objection to

2    form.

3        THE WITNESS:  I don't know

4    what he meant.

5  BY MR. ARMSTRONG:

6    Q.   Do you recognize the

7  handwriting on that document?

8    A.   No, I don't.

9    Q.   Let me show you a copy of an

10  e-mail dated July 12, 2002 that I will

11  ask the court reporter to mark as

12  Exhibit-5 to this deposition.

13        - - -

14        (Whereupon, Exhibit Robins-5

15        was marked for identification.)

16        - - -

17  BY MR. ARMSTRONG:

18    Q.   This e-mail has some

19  underlinings on it that are not part of

20  the original.  Do you recognize this

21  e-mail?

22    A.   I don't recall.  I don't

23  really recall it.

24    Q.   Do you recall any

        ESQUIRE DEPOSITION SERVICES

104                    LORRAINE T. ROBINS

1  communications with anyone at Walt's

2  Drive Away regarding Emerald equipment?

3      A.   I don't recall.

4      Q.   Do you recall communications

5  with anyone at Pier West regarding

6  Emerald equipment?

7      A.   No.

8      Q.   What is Walt's Drive Away?

9      A.   It's a trucking company.

10      Q.   Is it a depot?

11      A.   I don't know if it's a

12  depot.

13      Q.   What is Pier West?

14      A.   Again, a trucking company.

15      Q.   Do you know whether it's a

16  depot?

17      A.   No, I don't.

18      Q.   Let me show you a copy of a

19  document, an e-mail together with

20  attachment that has been marked as

21  Exhibit-43 to the Emerald deposition.

22  Have you ever seen those documents

23  before?

24      A.   I've seen a document similar

ESQUIRE DEPOSITION SERVICES

105                    LORRAINE T. ROBINS

1  to this, but not this date.

2      Q.   What date is the document

3  that you've seen?

4      A.   Well, the document I saw was

5  July 23rd or 26th, '02.  So I don't know

6  if this is the same document that I saw.

7      Q.   I show you a copy of a

8  letter dated August 15th, 2002, together

9  with an attachment that I will ask the

10  court reporter to mark as Exhibit-6 to

11  this deposition.

12           - - -

13      (Whereupon, Exhibit Robins-6

14      was marked for identification.)

15           - - -

16  BY MR. ARMSTRONG:

17      Q.   Do you recognize those

18  documents?

19      A.   No, I don't.

20      Q.   In August 2002, were you

21  involved in the Emerald billing project?

22      A.   No.

23      Q.   Let me show you a copy of a

24  document which I will ask the court

ESQUIRE DEPOSITION SERVICES

106                    LORRAINE T. ROBINS

1  reporter to mark as Exhibit-7 for

2  identification.

3               - - -

4          (Whereupon, Exhibit Robins-7

5      was marked for identification.)

6               - - -

7  BY MR. ARMSTRONG:

8      Q.   Do you recognize that

9  document?

10     A.   No.

11     Q.   Do you recognize any of the

12  handwriting on that piece of paper?

13     A.   There seem to be several

14  different handwritings on here.  No.

15     Q.   Do you recognize any of it?

16     A.   I would be guessing.

17     Q.   Whose handwriting would you

18  be guessing it might be?

19     A.   This could be Arthur.

20     Q.   You were referring to the

21  handwriting at the bottom?

22     A.   No, no, the handwriting is

23  not his.  There is something different

24  about it.

        ESQUIRE DEPOSITION SERVICES

107                LORRAINE T. ROBINS

1    Q.   Let me show you a copy of an

2   e-mail dated October 1, 2002, which I

3   will ask the court reporter to mark as

4   Exhibit-8.

5              - - -

6        (Whereupon, Exhibit Robins-8

7        was marked for identification.)

8              - - -

9   BY MR. ARMSTRONG:

10   Q.   Do you recognize that

11   document?

12   A.   Yes, I remember seeing this.

13   Q.   Do you recall when you first

14   saw it?

15   A.   I first saw it -- no, I

16   don't recall when I first saw it.

17   Q.   Do you recall how it came to

18   you or how you saw it?

19   A.   It came to me through Arthur

20   Davis, to check it and bill it

21   accordingly.

22   Q.   Bill what?

23   A.   Well, what they were using.

24   Q.   How could you determine from

ESQUIRE DEPOSITION SERVICES

108                LORRAINE T. ROBINS

1  that e-mail what Sea Star was using?

2       A.   By checking the move

3  history.  This is not all Emerald's

4  equipment.  I don't think it's this one.

5  We got a similar document from Barbara

6  Davis.  I don't remember this one.  But

7  the format was the same.

8       Q.   When you say "checking the

9  move history," what move history would

10  you check?

11      A.   The inventory that I recall

12  getting from Barbara Davis showed in and

13  out.

14      Q.   Does the inventory in front

15  of you show in and out?

16      A.   No.  So this could not have

17  been the one that I saw.

18      Q.   To your knowledge, is there

19  a difference between a depot's inventory

20  and a depot's move history?

21      A.   I don't know.  I mean,

22  Global -- Global is also a trucker.  So I

23  don't know.  Well, this one went in here,

24  August 9, '02, so that definitely would

ESQUIRE DEPOSITION SERVICES

109                    LORRAINE T. ROBINS

1  be a Sea Star move.  This one went in

2  June 11, '02, so that again would be a

3  Sea Star move.  5/17/02, 5/29/02, 9/6/02.

4      Q.   How can you tell from that

5  document that it's a Sea Star move?

6      A.   Well, if it was an Emerald

7  container, it had to be a Sea Star move.

8      Q.   Do you know whether any of

9  that equipment had been in transit?

10     A.   I would have to check that.

11     Q.   How would you check that?

12     A.   From the in-transit list

13  that I had, that I just received.

14     Q.   What is the in-transit list

15  that you just received?

16     A.   On the MAYAGUEZ, the HUMACAO

17  and the GUAYAMA.

18     Q.   Does the in-transit list

19  that you received list equipment that was

20  in transit overland as of April 26th?

21     A.   On vessels only.

22     Q.   That's all it lists?

23     A.   That's all it's supposed to

24  list.

ESQUIRE DEPOSITION SERVICES

110                    LORRAINE T. ROBINS

1    Q.   Have you ever gotten a list

2  of equipment that was in transit overland

3  as of April 26, 2002?

4    A.   No.

5    Q.   Have you ever --

6    A.   Because that would have all

7  been on the ships by then.

8    Q.   Have you ever gotten a list

9  of equipment, loads that had been

10  discharged from NPR vessels and was en

11  route to customers, as of April 26, 2002?

12    A.   No.  The only information I

13  had on discharge is if it was input by

14  Sea Star for the three-week period, from

15  April 27th to whenever they stopped using

16  the systems, because they would put in

17  the name of the customer and the load.

18    Q.   And have you ever requested

19  information from Holt oversight as to

20  equipment loads discharged from NPR

21  vessels prior to April 26, 2002 and in

22  route to customers on April 26, 2002?

23    A.   Pardon me?

24         - - -

ESQUIRE DEPOSITION SERVICES

111                    LORRAINE T. ROBINS

1        (Whereupon, the pertinent

2        portion of the record was read.)

3            - - -

4        THE WITNESS:  No.

5    BY MR. ARMSTRONG:

6        Q.   Let me show you a copy of

7    e-mails dated October 1, 2002, which I

8    will ask the court reporter to mark as

9    Exhibit-9 to this deposition.

10           - - -

11       (Whereupon, Exhibit Robins-9

12       was marked for identification.)

13           - - -

14   BY MR. ARMSTRONG:

15       Q.   Do you recognize these

16   e-mails?

17       A.   Yes.

18       Q.   Whose handwriting is on

19   those e-mails?

20       A.   I don't know whose

21   handwriting that is.

22       Q.   Let me show you a copy of an

23   e-mail dated October 2, 2002, that I will

24   ask the court reporter to mark as

ESQUIRE DEPOSITION SERVICES

112                    LORRAINE T. ROBINS

1   Exhibit-10 for identification.

2            - - -

3        (Whereupon, Exhibit Robins-10

4        was marked for identification.)

5            - - -

6   BY MR. ARMSTRONG:

7        Q.   Do you recognize that

8   document?

9        A.   No, I don't recognize it.

10       Q.   Let me show you a copy of a

11  document that's been marked as Exhibit-48

12  to the Emerald deposition.  Do you

13  recognize that document?

14       A.   No, I don't.

15       Q.   Do you know why Emerald

16  would be billing Sea Star for a unit that

17  was gate out Packer on April 22, 2002?

18       MR. MOLDOFF:  Objection to

19       form.

20       THE WITNESS:  I would have

21       to check it, but the -- I would

22       have to check it to see what the

23       load was, because -- I can't tell

24       you from this.  I would have to

ESQUIRE DEPOSITION SERVICES

A-890

113               LORRAINE T. ROBINS

1    check it.

2    BY MR. ARMSTRONG:

3        Q.    As of April 22, 2002, any

4    load would have been an NPR load, would

5    it not?

6        A.    That's true, but they would

7    have gotten the -- the revenue would go

8    to Sea Star Line.

9        Q.    For this load?

10       A.    I don't know.  I have to

11   check it.  But all the revenue for the

12   last week went to Sea Star Line.

13       Q.    Who told you that?

14       A.    Bob Leach told me that.

15   Because I was having a problem, because

16   they -- the truckers had to be paid.  And

17   he guaranteed the payment of the truckers

18   for that week.

19       Q.    When you say that week --

20       A.    The week between whatever it

21   was and ending on April 26th.

22       Q.    When did you have this

23   conversation with Bob Leach?

24       A.    I don't know whether it was

ESQUIRE DEPOSITION SERVICES

114                   LORRAINE T. ROBINS

1   on the phone or when he was -- I believe

2   he was in our office.  Because I

3   couldn't, in good conscience, ask

4   truckers to haul freight and not get

5   paid.

6        Q.   Was this conversation before

7   the closing?

8        A.   Yes.

9        Q.   Do you recall any other

10  conversations with Bob Leach before the

11  closing?

12       A.   No, that was the only one.

13       Q.   Let me show you a copy of a

14  series of e-mails dated November 7th and

15  November 8, 2002, that I will ask the

16  court reporter to mark as Exhibit-11 to

17  this deposition.

18            - - -

19            (Whereupon, Exhibit Robins-11

20       was marked for identification.)

21            - - -

22  BY MR. ARMSTRONG:

23       Q.   Do you recognize those

24  documents?

ESQUIRE DEPOSITION SERVICES

115                    LORRAINE T. ROBINS

1    A.  No.

2    Q.  Do you recall Mr. Davis

3  telling CSX not to let Sea Star use

4  equipment?

5    A.  No, I do not.

6      MR. MOLDOFF:  Objection to

7    form.

8      THE WITNESS:  No, I do not.

9      MR. ARMSTRONG:  Let's break

10    for lunch.

11        - - -

12      (Whereupon, a recess was

13    taken.)

14        - - -

15  BY MR. ARMSTRONG:

16    Q.  Let me show you a copy of a

17  telefax and attached letter which has

18  been marked as Exhibit-21 to the Emerald

19  deposition.  Have you seen that before?

20    A.  No, I haven't.

21    Q.  Look at the last page.  Do

22  you recognize the handwriting on the last

23  page, other than the signature?

24    A.  Absolutely not.

        ESQUIRE DEPOSITION SERVICES

116              LORRAINE T. ROBINS

1    Q.  I show you a copy of e-mails

2  that I will ask the court reporter to

3  mark as Exhibit-12 to this deposition.

4          - - -

5      (Whereupon, Exhibit Robins-12

6      was marked for identification.)

7          - - -

8  BY MR. ARMSTRONG:

9    Q.  Do you recognize that

10  document?

11    A.  I probably saw this before,

12  yes.  Do you have a specific question?

13    Q.  Yes, look at PRMZ 004250.

14  It states in part, "This unit originally

15  went out of Packer Avenue terminal late

16  March '02 for the account of NPR."

17    A.  Right.

18    Q.  "On May 11, 2002, it

19  delivered a loaded container to Port

20  Elizabeth via your carrier North Star.

21  Based on this information this chassis

22  should have been put on lease from

23  4/27/02 until same is returned in

24  accordance with lease agreement."

ESQUIRE DEPOSITION SERVICES

A-894

117          LORRAINE T. ROBINS

1          Is that information that you

2    provided Port Elizabeth?

3          A.    Yes, I would have provided

4    that.

5          Q.    If the container, loaded

6    container, was delivered to Port

7    Elizabeth on May 11, 2002, what was the

8    basis for saying that this chassis should

9    have been put on lease from 4/27/02?

10          A.    Well, originally -- and I

11    had changed them all -- I was using the

12    wrong date.  It should be 4/29/02.  I

13    would have to check this and -- I know

14    it's been corrected to 4/29/02.  But the

15    other reasons, I would have to check it

16    and see what documentation I had.

17          But at that particular time

18    quite a few containers were delivered to

19    Newark or Port Elizabeth.  This is when Z

20    Star was using CSX Lines to take their

21    cargo up this way, down to Puerto Rico or

22    somewhere, I don't know where.

23          And again, I don't know what

24    kind of -- we had a Maersk gate log,

ESQUIRE DEPOSITION SERVICES

118                    LORRAINE T. ROBINS

1  probably, on this.  We didn't go into

2  that, though.

3      Q.   Can you tell from this

4  paragraph what information you had?

5      A.   No, I can't.  I know I had

6  Port Elizabeth, but I can't tell what

7  other information I had.  I had something

8  that had Sea Star touching the container

9  and using the container.  It was not

10  billed.

11      Q.   So if you found that Sea

12  Star touched the container --

13      A.   Used it, used it.

14      Q.   How did you determine

15  whether a container that Sea Star touched

16  was used by Sea Star?

17      A.   Well, look at the next one.

18      Q.   I'm asking you in general,

19  how did you make that determination?

20      A.   In general?

21      Q.   Yes.

22      A.   Again, with the

23  documentation that I had.

24      Q.   What documentation was that?

ESQUIRE DEPOSITION SERVICES

119                    LORRAINE T. ROBINS

1      A.   The move histories which --

2   the TIRs, the CSX and any other

3   documentation that I had.  I'd have to go

4   to each unit to see what documentation

5   was provided and the source of the

6   documentation.  I can't just tell from a

7   few lines like this.

8         But as I said before, we

9   gave as much information as we could in

10  our comments.

11     Q.   Let me show you a copy of a

12  handwritten document which I will ask the

13  court reporter to mark as Exhibit-13 for

14  identification.

15            - - -

16        (Whereupon, Exhibit Robins-13

17        was marked for identification.)

18            - - -

19  BY MR. ARMSTRONG:

20     Q.   Do you recognize that

21  document?

22     A.   Yes.

23     Q.   Is this from Arthur Davis to

24  you?

ESQUIRE DEPOSITION SERVICES

120                    LORRAINE T. ROBINS

1    A.  Yes, it is.

2    Q.   What did you understand that

3  he meant in saying, quote, to help your

4  blood flow, unquote?

5       MR. MOLDOFF:  Objection to

6    form.

7       THE WITNESS:  You would have

8    to ask Arthur Davis that.

9  BY MR. ARMSTRONG:

10    Q.   Did you have an

11  understanding of what that means?

12    A.   Well, it looked like I was

13  going to have to do a lot more work in

14  checking containers and seeing if they

15  were billable.  According to what he says

16  in his top part, in his comments, it

17  looks like they were containers in one

18  spot, and all of a sudden they showed up,

19  in quotes, our area.

20    Q.   What is quote, our area,

21  unquote?

22    A.   I don't know.

23    Q.   Did you ever ask him what,

24  quote, our area, unquote, is?

ESQUIRE DEPOSITION SERVICES

121                    LORRAINE T. ROBINS

1       MR. MOLDOFF:  Objection to

2    form.

3       THE WITNESS:  No, I did not.

4    I know that there was an area that

5    was supposed to be set aside for

6    our equipment.

7  BY MR. ARMSTRONG:

8       Q.   Was this an area in San

9  Juan?

10      A.   Yes, definitely San Juan.

11  This is definitely from San Juan.  March

12  '03.

13      Q.   Do you recall notifying Sea

14  Star that chassis had been located in its

15  care and custody?

16      A.   I don't understand what you

17  mean by that.  I have quite a few e-mails

18  going back and forth.

19      Q.   I will show you a copy of an

20  e-mail with that phrase in it.  I ask you

21  what you meant when you said care and

22  custody.

23      A.   I meant that they were using

24  it.  That's what I meant.

        ESQUIRE DEPOSITION SERVICES

122                    LORRAINE T. ROBINS

1    Q.   How did you determine that

2    units in Sea Star's care and custody were

3    in use by Sea Star?

4        A.   This would be information

5    that was given to me by Arthur Davis when

6    he was down there, and he gave me the

7    list of them.  They were being used on

8    the pier, and that was why I sent this

9    e-mail.

10           And I tried, as you can see,

11   I tried to give you as much information

12   on them as possible.

13       Q.   Am I correct in

14   understanding that if a unit was on the

15   perimeter of Sea Star's terminal, you

16   considered that unit as being in use by

17   Sea Star as a fence?

18   A.   No.

19       MR. MOLDOFF:  Objection to

20       form.

21       THE WITNESS:  No.

22   BY MR. ARMSTRONG:

23       Q.   How did you determine what

24   units were being used as a fence?

123                    LORRAINE T. ROBINS

1    A.  Mr. Davis took an inventory

2  of how the units were stacked around to

3  make the fence, at which time we did

4  inform Sea Star Line.  And I believe they

5  have since -- sometime in March or so,

6  broke down the fence.

7    Q.  March of what year?

8    A.  '03.

9    Q.  How did you learn that Sea

10  Star had broken down the fence in March

11  of '03?

12    A.  Mr. Davis was back in Puerto

13  Rico again.  I think that is the date.

14  I'm not positive, because he was there

15  again in July of '03.  It may have been

16  July of '03 rather than March.

17    Q.  Let me show you a copy of

18  e-mails that I will ask the court

19  reporter to mark as Exhibit-14 for

20  identification.

21         - - -

22      (Whereupon, Exhibit Robins-14

23      was marked for identification.)

24         - - -

ESQUIRE DEPOSITION SERVICES

A-901

124                    LORRAINE T. ROBINS

1  BY MR. ARMSTRONG:

2      Q.   Do you recall this e-mail?

3      A.   I don't recall the e-mail,

4  but I remember discussing it.

5      Q.   With whom did you discuss

6  it?

7      A.   With Arthur.

8      Q.   What discussion did you

9  have --

10     A.   About the container for the

11  AGA group.

12         The question?

13     Q.   Do you recall those e-mails?

14     A.   Not specifically, but I know

15  that I've read this e-mail before.

16     Q.   Look at the bottom of the

17  page, first reference is PRMC 170211.

18  Was that gate out Philadelphia?

19     A.   7/25.

20     Q.   4/25?

21     A.   4/25, yes.

22     Q.   That's 4/25/2002?

23     A.   Mm-hum.

24     Q.   To Roadway.  What is

ESQUIRE DEPOSITION SERVICES

A-902

125                    LORRAINE T. ROBINS

1  Roadway?

2      A.   Trucking company.

3      Q.   And then gate out, 5/7,

4  Elizabeth Roadway?

5      A.   Yes, it is gate out.

6      Q.   Then gate in, 7/26, Houston,

7  First Coast in your pool?

8      A.   Mm-hum.

9      Q.   Based on that information,

10  how would you determine that that chassis

11  should have been put on hire as of April

12  27, 2002?

13     A.   Based on the fact that -- I

14  would really -- I may have even more

15  information on it if I pulled up my

16  records, but based on the fact that

17  Roadway was a trucker that was used by

18  Sea Star, and Elizabeth was a port where

19  they had delivered quite a bit of cargo,

20  and Houston First Coast is definitely a

21  house carrier for them.

22     Q.   Are you saying that PRMC 170

23  211 was gate out Philadelphia on April

24  25, 2002, for Sea Star?

ESQUIRE DEPOSITION SERVICES

                            126            LORRAINE T. ROBINS

1    A.   I imagine so, yes.

2    Q.   That was before the closing,

3  was it not?

4    A.   Yes, it was.  But it could

5  have been an empty box.

6    Q.   Was Sea Star using Emerald

7  equipment before the closing?

8    A.   On this one, I have to see

9  what load was with it.

10   Q.   Well, look at PRMC 170318.

11  Gate out Philadelphia 4/16 to CSX

12  Railroad.  Correct?

13   A.   Well, this had to be CSX

14  Railroad Systems, because I would have --

15  if you look at this move history, which

16  we did provide for you, you will see all

17  the various moves it had during that

18  period of time, until it finally ended up

19  in First Coast.

20   Q.   Gate out Philadelphia, on

21  April 16th, was 11 days before the

22  closing, wasn't it?

23   A.   It was.

24   Q.   And that would have been a

            ESQUIRE DEPOSITION SERVICES

127                    LORRAINE T. ROBINS

1  gate out for NPR, would it not?

2      A.   Yes, it would.  But in June,

3  July and May, when it was riding the

4  rails, it wasn't for NPR.

5      Q.   How can I tell from this

6  that it was riding the rails in June,

7  July and May?

8      A.   Just not from this, but if I

9  had my work history I could give you all

10  the dates.

11         As I said before, CSX gave

12  us the advice daily on the movements of

13  the equipment marked PRMC, PRMZ, PRMU,

14  UFCC, TWXZ.

15      Q.   With respect to PRMZ 168726,

16  the e-mail shows gate out Jacksonville,

17  April 16, 2002, to CSX Railroad.

18  Correct?

19      A.   That's correct.

20      Q.   That would have been an NPR

21  move.  Correct?

22      A.   Same as the 170318.  The

23  information.  And sometimes I had two

24  pages of movement on the rails.

ESQUIRE DEPOSITION SERVICES

128                    LORRAINE T. ROBINS

1    Q.   That information is not

2    included in this e-mail, if it exists.

3    Correct?

4         MR. MOLDOFF:  Objection to

5         form.

6         THE WITNESS:  That is not

7         included in this e-mail, and it

8         does exist.

9    BY MR. ARMSTRONG:

10    Q.   Do you recall these three

11    units?

12    A.   Not specifically.

13    Q.   Let me show you a copy of an

14    e-mail dated March 19, 2003, that I will

15    ask the court reporter to mark as

16    Exhibit-15 to this deposition.

17              - - -

18         (Whereupon, Exhibit Robins-15

19         was marked for identification.)

20              - - -

21    BY MR. ARMSTRONG:

22    Q.   Have you seen that document

23    before?

24    A.   Yes, I have.

ESQUIRE DEPOSITION SERVICES

A-906

129                    LORRAINE T. ROBINS

1    Q.    Is that a true and correct

2    copy of an e-mail that you received?

3    A.    I imagine so.  I don't know

4    if it's a true and correct copy.

5    Q.    Let me show you a copy of an

6    e-mail together with attachment that is

7    dated March 25, 2003, and ask you whether

8    you recognize that document.  I will ask

9    the court reporter to mark it as

10   Exhibit-16.

11           - - -

12        (Whereupon, Exhibit Robins-16

13        was marked for identification.)

14           - - -

15        THE WITNESS:  Yes.

16   BY MR. ARMSTRONG:

17   Q.    Is that a true and correct

18   copy of an e-mail that you sent?

19   A.    Yes.

20   Q.    Do you recognize the prefix

21   EISU?

22   A.    No, I don't know who that

23   is.

24   Q.    That's not an Emerald box,

ESQUIRE DEPOSITION SERVICES

130                       LORRAINE T. ROBINS

1  is it?

2      A.   No, it is not.  The only

3  Emerald boxes were prefixed PRMU on the

4  boxes, all of them.

5      Q.   Let me show you a copy of a

6  series of e-mails that I will ask the

7  court reporter to mark as Exhibit-17 for

8  identification.

9          - - -

10         (Whereupon, Exhibit Robins-17

11         was marked for identification.)

12         - - -

13  BY MR. ARMSTRONG:

14     Q.   Do you recognize that

15  document?

16     A.   Did I get a copy of this?

17  Maybe I did.

18         MR. MOLDOFF:  Is the

19         question whether she ever

20         remembers seeing that?

21         THE WITNESS:  No, I don't

22         remember it.

23  BY MR. ARMSTRONG:

24     Q.   Going back to Exhibit-16 for

ESQUIRE DEPOSITION SERVICES

131                    LORRAINE T. ROBINS

1  the moment, the second page, the

2  attachment is a reference to EMR 011B.

3  Do you know what that is?

4      A.   That's just an Emerald

5  number. I don't know what that is

6  exactly. I think you will find out if

7  these have that.

8      Q.   Is that a document?

9      A.   No, it's not a document, I

10  don't think. I don't know exactly what

11  it means, but they all come up with that.

12  All the move histories.

13      Q.   There's also some

14  handwriting on it. Do you recognize the

15  handwriting?

16      A.   No.

17      Q.   Do you know what that means?

18      A.   Nope. It seems to me that

19  these are the TXXZ chassis, and there

20  were quite a few of them that Emerald had

21  on lease, but there was also a series

22  that -- I think it was Track Leasing had,

23  and a lot of these containers were

24  returned to -- these chassis were

ESQUIRE DEPOSITION SERVICES

132                    LORRAINE T. ROBINS

1    returned to Track Leasing and not

2    returned to NPR. So I don't know what

3    that means.

4        Q.   Returned by whom to Track

5    Leasing?

6        A.   Sea Star.

7        Q.   Well, Sea Star Line would

8    not be returning equipment to NPR, would

9    it?

10       A.   No, it would be returning it

11   to Emerald.

12       Q.   Let me show you a copy of a

13   series of e-mails which I will ask the

14   court reporter to mark as Exhibit-18 for

15   identification.

16            - - -

17            (Whereupon, Exhibit Robins-18

18        was marked for identification.)

19            - - -

20   BY MR. ARMSTRONG:

21       Q.   Do you recall receiving a

22   copy of the A. Davis e-mail dated May 22,

23   2003?

24       A.   Yes, I remember this.

             ESQUIRE DEPOSITION SERVICES

133                    LORRAINE T. ROBINS

1    Q.   Did you and Arthur Davis

2  have any discussions regarding his e-mail

3  to Andy Rooks?

4    A.   No.  The e-mail speaks for

5  itself.

6    Q.   It reefers to containers

7  that were used as a fence.  Do you know

8  where those were?

9    A.   San Juan.

10    Q.   Do you know where in San

11  Juan?

12    A.   I don't know the exact

13  location.  I'm not that familiar with the

14  pier.

15    Q.   Do you know what containers

16  were used for storage?

17    A.   I have a list of them.  I

18  don't have it with me now.

19    Q.   What happened to the list?

20    A.   Once I billed it and stated

21  what it was used for, I didn't keep the

22  list.  I transferred the data into the

23  invoice.

24    Q.   Did you then dispose of the

ESQUIRE DEPOSITION SERVICES

A-911

LORRAINE T. ROBINS

1  original list?

2      A.   The original list, yes.  I

3  don't have the original list, I don't

4  believe.

5      Q.   Do you know what was

6  stored --

7      A.   What was stored?  There's

8  no --

9      Q.   In these containers used for

10  storage.

11      A.   Yes, records and things.

12      Q.   Were those the NPR records?

13      A.   I believe there was some NPR

14  and some Sea Star records.

15      Q.   What is the basis for your

16  belief that there were Sea Star records

17  in those containers?

18      A.   I think there was a series

19  of e-mails that went back and forth on

20  that one.

21      Q.   Let me show you a copy of a

22  letter dated August 28, 2003, which has

23  been marked as Exhibit-56 to the Emerald

24  deposition.  Have you seen that letter

ESQUIRE DEPOSITION SERVICES

135                    LORRAINE T. ROBINS

1  before?

2      A.   No, I haven't.

3      Q.   Do you recall any

4  discussions with Tom Holt, Senior

5  regarding the equipment in transit?

6      A.   This was --

7        MR. MOLDOFF:  Objection to

8      form.

9        THE WITNESS:  No, I don't.

10      This was probably the first

11      time -- is this all in transit?  I

12      didn't even read the letter.

13        No, I didn't see this letter

14      and I didn't discuss it with Tom

15      Holt.

16  BY MR. ARMSTRONG:

17      Q.   Let me show you a copy of a

18  series of e-mails dated August and

19  September 2003 that I will ask the court

20  reporter to mark as Exhibit-19 to this

21  deposition.

22          - - -

23        (Whereupon, Exhibit Robins-19

24      was marked for identification.)

        ESQUIRE DEPOSITION SERVICES

136                    LORRAINE T. ROBINS

1              - - -

2    BY MR. ARMSTRONG:

3        Q.   Do you recognize those

4    e-mails?

5        A.   I don't remember the

6    instance so much but -- I don't remember

7    it.  Your question on this?

8        Q.   Do you recognize those

9    e-mails?

10       A.   I don't remember them.

11       Q.   Do you recognize the first

12   e-mail?

13       A.   As I said, I don't remember

14   them.  I did send it.  I don't remember

15   what it was about.

16       Q.   You don't remember why you

17   would have said, "Can't see any deal we

18   can make"?

19       A.   Art said that.  No, I don't

20   know why he said that.

21       Q.   Well, apparently you said

22   it, looking at the e-mail at the top.  Do

23   you see that?

24       A.   Oh, yes.

           ESQUIRE DEPOSITION SERVICES

137                    LORRAINE T. ROBINS

1    Q.   Are you not addressing Art?

2    A.   I don't know what they were

3    asking. I will have to read the whole

4    e-mail.

5    Q.   You were going to say

6    something?

7    A.   I don't recall -- there must

8    have been conversations going back and

9    forth between Andy Rooks, Arthur Davis

10    and he must have told me about it, and I

11    don't know what deal I'm talking about.

12    Because from reading this, the returns

13    were the returns.

14        The only thing -- there was

15    a problem with the containers that had

16    crushed cars in them. And I think that

17    was the -- I think that's what was

18    prompted us to say that. I don't know

19    what they were. I don't remember.

20    Q.   On the bottom, do you see

21    the lettering H.O.L.T.? Is that a

22    company?

23    A.   Yes, that's the abbreviation

24    for Holt Oversight Logistics Technology.

ESQUIRE DEPOSITION SERVICES

138                    LORRAINE T. ROBINS

1        Q.   Let me show you a copy of an

2   e-mail dated September 16, 2003, that I

3   will ask the court reporter to mark as

4   Exhibit-20 for identification.

5              - - -

6        (Whereupon, Exhibit Robins-20

7        was marked for identification.)

8              - - -

9   BY MR. ARMSTRONG:

10       Q.   Do you recognize that

11  document?

12       A.   I don't recall the document,

13  but I recall conversations with Arthur

14  discussing -- Arthur was trying to assist

15  Sea Star by selling some of the equipment

16  from their depots that they used.

17       Q.   Those were depots were

18  Arthur Davis had customers for the

19  equipment?

20       A.   If he had a customer.

21       Q.   He would sell, at the

22  depots, if he had a customer in the area.

23  Is that correct?

24       A.   No.  As it says here, he was

                ESQUIRE DEPOSITION SERVICES

139                    LORRAINE T. ROBINS

1  advised that he had -- that they had

2  equipment -- that Sea Star had equipment

3  at Shaw, and he's saying that he will do

4  what he can to sell the equipment to that

5  place to save them the expense of

6  bringing it back to port.

7      Q.    With respect to equipment

8  that he was selling, when did the

9  off-hire end or on-hire end?

10     A.    In this case it would be

11 when he sold it.

12     Q.    Was that true in every case?

13     A.    As long as it was Sea Star

14 equipment that was placed in depots by

15 Sea Star, it was true.

16     Q.    Would you take equipment off

17 hire if Arthur Davis asked Sea Star to

18 reserve the equipment for sale?

19     A.    No.

20         MR. MOLDOFF:  Objection to

21     form.

22 BY MR. ARMSTRONG:

23     Q.    You would not take it off

24 hire unless it was actually sold?

ESQUIRE DEPOSITION SERVICES

LORRAINE T. ROBINS

1    A.   Arthur never reserved for

2    sale.  He either sold it or he didn't

3    sell it.

4    Q.   Look at PRMZ 084059.  Gate

5    out JAX, 4/26/02.  That was before the

6    closing.  Correct?

7    A.   That was the day of the

8    closing.

9    Q.   The closing was on April 27,

10   2002 at three o'clock a.m., was it not?

11   A.   I don't think so.  I think

12   the funds changed hands on the 26th.

13   Q.   Where did you get that

14   information?

15   A.   I don't know.

16   Q.   Assume that 4/26/02 was the

17   day before the closing --

18   A.   It could have been an

19   in-transit load.  Because the last

20   vessel, the MAYAGUEZ, discharged on the

21   26th.  In all probability it was gate

22   out -- I would have to look at the report

23   on that.

24   Q.   It was gate in Shaw,

ESQUIRE DEPOSITION SERVICES

141                    LORRAINE T. ROBINS

1  7/26/02, per Andy Rooks?

2      A.   That was the inventory from

3  Andy Rooks that I spoke to you about, and

4  Shaw is a trucker that NPR never used.  I

5  believe he is a house carrier for Sea

6  Star Line.

7      Q.   And now, why would you

8  charge per diem for the period between

9  April 26, 2002 and July 26, 2002?

10      A.   Well, as I said to you

11  before, Mr. Armstrong, I wasn't aware of

12  the voyaging transit moves, so on this

13  particular one I would have gone back and

14  given them a credit for the 14th days

15  that -- if it was in transit, if it was a

16  load, I would have given them credit for

17  14 days when it was in transit.

18      Q.   And you would have assumed

19  that that piece of equipment was in Sea

20  Star's possession at the end of the 14th

21  days?

22      A.   Absolutely.

23      Q.   And that was the assumption

24  on which you based your revised billing?

ESQUIRE DEPOSITION SERVICES

142                    LORRAINE T. ROBINS

1    A.   If, in fact, I checked this

2    and it was a load discharged from the

3    MAYAGUEZ, who -- and it went out of the

4    terminal, which I should have more

5    information on, because most of my notes

6    were written right on the sheet, I would

7    have, yes.

8    Q.   On what sheet?

9    A.   The move history sheets.

10   Copies of those were given to you.

11   Q.   You show PRMC 151000 in Mr.

12   Davis' e-mail, gate in JAX, 4/26/02.  Is

13   that correct?

14   A.   Correct.

15   Q.   Gate in JAX would have been

16   gate into the NPR terminal.  Correct?

17   A.   That's correct.

18   Q.   Why would something that was

19   gate in JAX 4/26/02 be on Sea Star's

20   self-billing report?

21   A.   Well, it could have been a

22   load that went on this ship, because on

23   the 26th the ship was loading down there,

24   also.  Or the 27th.  I would have to

ESQUIRE DEPOSITION SERVICES

143                    LORRAINE T. ROBINS

1  check the records to see what else I had

2  -- what other documentation I had on this

3  chassis.

4      Q.   There is no other

5  information provided in this September

6  16, 2003 e-mail.  Is that correct?

7      A.   That's correct.  That

8  information would have been provided on

9  the billing.

10     Q.   I show you a copy of an

11  e-mail dated September 16, 2003.  I will

12  ask the court reporter to mark it as

13  Exhibit-21 for identification.

14             - - -

15     (Whereupon, Exhibit Robins-21

16     was marked for identification.)

17             - - -

18  BY MR. ARMSTRONG:

19     Q.   Do you recall receiving a

20  copy of that e-mail?

21     A.   I don't remember it

22  specifically, but I'm sure that I did.

23     Q.   Let me show you a copy of

24  some e-mails dated September 4, 9th and

ESQUIRE DEPOSITION SERVICES

144                    LORRAINE T. ROBINS

1  22, 2003, which I will ask the court

2  reporter to mark as Exhibit-22 for

3  identification.

4              - - -

5          (Whereupon, Exhibit Robins-22

6      was marked for identification.)

7              - - -

8  BY MR. ARMSTRONG:

9      Q.   Do you recall seeing those

10  e-mails?

11      A.   No.

12      Q.   Do you recall any

13  discussions with Arthur Davis regarding

14  per diem charges for the unit specified

15  in the e-mails?

16      A.   No.  This looks like -- it

17  was in Miami and they are asking Arthur

18  if he could -- what he can do to help

19  them so he doesn't have to reposition it.

20      Q.   What does Arthur say?

21      A.   Let me know when the chassis

22  is at your terminal and I will arrange to

23  have it picked up.  I don't know what

24  they are talking about.

          ESQUIRE DEPOSITION SERVICES

145                 LORRAINE T. ROBINS

1        MR. MOLDOFF:  There is no

2     question pending.

3  BY MR. ARMSTRONG:

4     Q.   Let me show you a copy of an

5  e-mail that has been identified as

6  Exhibit-57 to the Emerald deposition.

7  Have you seen that before?

8     A.   No, I haven't.

9     Q.   Do you know whether you

10  charged per diem for Emerald equipment

11  moved by Sea Star from San Juan to

12  Jacksonville at Arthur Davis' request?

13     A.   That bill has not been paid

14  by Emerald as of yet.

15     Q.   Do you know whether Emerald

16  charged per diem for that?

17     A.   Oh, per diem?  No,

18  absolutely did not.  Not for the move.

19  We may have charged per diem for the

20  equipment if it was on hire prior to the

21  shipping.

22     Q.   When did you take it off

23  hire?

24     A.   When it was returned to

       ESQUIRE DEPOSITION SERVICES

146                    LORRAINE T. ROBINS

1   Arthur Davis in San Juan.

2       Q.   You didn't take it off hire

3   when it entered the Sea Star terminal and

4   a TIR was signed?

5       A.   It was taken off hire when

6   it was given to Arthur with a TIR and he

7   signed it.

8       Q.   Who instructed you to do it

9   that way?

10      A.   Who instructed me?  Arthur

11  did.

12      Q.   Is that what Arthur did?

13      A.   Absolutely.

14      Q.   And that's what Arthur told

15  you to do?

16      A.   No.  You are mixing up what

17  I said.  What I said is the equipment was

18  taken off hire when Arthur signed the

19  TIRs.  Arthur gave me the copies of the

20  TIRs, which I attached to the -- when he

21  came back from Puerto Rico, which I

22  attached to the self-billing reports, and

23  that's when they went off hire.

24      Q.   Now, who told you to keep

            ESQUIRE DEPOSITION SERVICES

147                    LORRAINE T. ROBINS

1    the equipment on hire until Arthur Davis

2    signed those TIRs?

3        A.    No one told me that.

4        Q.    You made that decision on

5    your own?

6        A.    No.  I made that decision

7    based upon the documentation I had for

8    each unit.  I did not say -- I may not

9    have billed all of them.  I can't tell

10   you.  I have to check the whole list.

11       Q.    You had read the redelivery

12   section of the equipment rental

13   agreement, had you not?

14       A.    Mm-hum, yes.

15       Q.    You were aware that Sea

16   Star's terminal in San Juan was a

17   designated terminal for redelivery?

18       A.    That's correct.

19       Q.    And you were aware that a

20   TIR signed by Sea Star in San Juan was a

21   redelivery document.  Correct?

22       MR. MOLDOFF:  Objection to

23   form.

24       THE WITNESS:  No, it was

ESQUIRE DEPOSITION SERVICES

148                    LORRAINE T. ROBINS

1    not, because it wasn't a

2    redelivery document unless a

3    representative from Emerald signed

4    it.  There was no notification

5    whatsoever on it.

6  BY MR. ARMSTRONG:

7      Q.  Now, show me in paragraph

8  ten the provision relating to the

9  requirement that a representative of

10  Emerald sign.

11     A.  Paragraph A.  From Puerto

12  Rico and -- I very rarely -- we didn't

13  get redelivery notices.

14        MR. MOLDOFF:  Objection to

15     form.

16  BY MR. ARMSTRONG:

17     Q.  It's a very simple question.

18  Show me the language in paragraph ten,

19  please.

20        MR. MOLDOFF:  You can tell

21     him whatever your understanding

22     is.

23        THE WITNESS:  It's my

24     understanding.

        ESQUIRE DEPOSITION SERVICES

149                    LORRAINE T. ROBINS

1  BY MR. ARMSTRONG:

2      Q.   Do you see any language

3  relating to your understanding in

4  paragraph ten?

5      MR. MOLDOFF:  A contract has

6      been construed by the --

7      THE WITNESS:  A TIR alone,

8      regardless of what this says, my

9      understanding is that it has to be

10     a representative.  I believe you

11     will find it is practiced

12     throughout the port, that if you

13     have a TIR, a representative or an

14     agent co-signs it.  You will not

15     find a TIR that has a one-way

16     signature.

17  BY MR. ARMSTRONG:

18     Q.   To what port are you

19  referring?

20     A.   Port?  All ports.

21     Q.   All ports in the world?

22     A.   No, all ports in the United

23  States.  All container ports in the

24  United States.

ESQUIRE DEPOSITION SERVICES

150                     LORRAINE T. ROBINS

1    Q.   Now, did you and Mr. Davis

2  ever discuss your understanding?

3    A.   I believe -- I not only

4  discussed it with him, but I believe I

5  also e-mailed Mr. Rooks my understanding

6  that it had to be signed by a

7  representative of Emerald.

8    Q.   Did you and Mr. Davis ever

9  discuss why he was asked to sign TIRs in

10  December 2003?

11    A.   Yes, because they were

12  delivering the cargo to him.  This was

13  December 2nd and 3rd, and on the

14  second -- he came back on the 3rd, 4th

15  and they were gone.

16    Q.   They were already in the

17  terminal when he signed the TIRs, were

18  they not?

19      MR. MOLDOFF:  Objection to

20    form.

21      THE WITNESS:  I don't know

22    where they were.

23  BY MR. ARMSTRONG:

24    Q.   And those were pieces of

ESQUIRE DEPOSITION SERVICES

151                LORRAINE T. ROBINS

1  equipment that Mr. Davis wanted shipped

2  to Jacksonville. Is that correct?

3      A.  That is correct.

4      Q.  And Mr. Davis signed TIRs to

5  attest to the condition of that equipment

6  prior to shipment, did he not?

7          MR. MOLDOFF: Objection to

8      form.

9          THE WITNESS: No, that's not

10     true. He signed as for receipt --

11     not the condition, the receipt.

12  BY MR. ARMSTRONG:

13     Q.  That's what he told you?

14     A.  That's what he did.

15     Q.  Did he tell you that?

16     A.  When you sign a TIR, you

17  sign for the condition and receipt that

18  acknowledges that you have the piece of

19  equipment.

20          If you are familiar with a

21  TIR form, you will see the terms and

22  conditions are clearly spelled out on the

23  form.

24     Q.  Perhaps now you will answer

          ESQUIRE DEPOSITION SERVICES

152                    LORRAINE T. ROBINS

1   my question.

2        MR. MOLDOFF:  Wait a minute.

3        That's argumentative and improper.

4        If you want to ask the question

5        properly, please do.

6   BY MR. ARMSTRONG:

7        Q.   Did he tell you that?

8        A.   Tell me what?

9        Q.   That he signed the TIR to

10  acknowledge receipt of the equipment?

11       MR. MOLDOFF:  If you

12       remember.

13       THE WITNESS:  No, I don't

14       remember him saying anything.  I

15       got the TIRs, I saw he signed

16       them.

17  BY MR. ARMSTRONG:

18       Q.   And you assumed --

19       A.   I didn't assume.  As I told

20  you, where he signed it were the terms

21  and conditions.  And where he had certain

22  things, he made notations the TIRs.

23  These TIRs I have copies of.

24       Q.   And your requirement that an

ESQUIRE DEPOSITION SERVICES

153                    LORRAINE T. ROBINS

1    Emerald representative sign the TIR is

2    regardless of the language in paragraph

3    ten?

4         MR. MOLDOFF:  Objection to

5         form.

6         THE WITNESS:  I'm telling

7         you what my understanding is.  My

8         understanding in the industry is,

9         a TIR is signed by the terminal

10        and an agent for the line or the

11        owner of the equipment.  It is not

12        a one-way receipt.

13            And the reason that Arthur

14        was shipping them to Jacksonville

15        was because we were trying to

16        clear out all the equipment from

17        the terminal there.

18   BY MR. ARMSTRONG:

19        Q.   So you had been asked to

20   clear the equipment out by Sea Star.  Is

21   that correct?

22        A.   That's correct.

23        Q.   Did you, in fact, clear all

24   of the equipment out of the Sea Star

               ESQUIRE DEPOSITION SERVICES

154                    LORRAINE T. ROBINS

1   terminal in San Juan?

2          MR. MOLDOFF:  If you know.

3          THE WITNESS:  I don't know.

4      I know that -- what I did know is

5      that very recently a bill was sent

6      with a -- we finally got a list of

7      the equipment.  I have to check to

8      see how that correlates with

9      everything.

10  BY MR. ARMSTRONG:

11      Q.   How what correlates?

12      A.   The list that I got last

13  week or the week before last.

14          THE WITNESS:  I think it

15      came through you, Alan, did it

16      not?  And the one that I had on

17      the 30th.  Their last list.

18  BY MR. ARMSTRONG:

19      Q.   Let me show you a copy of

20  Exhibit-58 to the Emerald deposition.

21  Have you seen that before?

22      A.   No.

23      Q.   Were you aware of the move?

24      A.   I was aware of the move.

           ESQUIRE DEPOSITION SERVICES

155                LORRAINE T. ROBINS

1    Q.   Do you know when you stopped

2  billing per diem for that equipment?

3    A.   I would have to find out

4  what the equipment was.

5    Q.   Let me show you a copy of a

6  document that I will ask the court

7  reporter to mark as Exhibit-23 for

8  identification.

9           - - -

10      (Whereupon, Exhibit Robins-23

11      was marked for identification.)

12           - - -

13  BY MR. ARMSTRONG:

14    Q.   Do you recognize that

15  document?

16    A.   No, I don't.

17    Q.   Do you recognize any of the

18  handwriting on the document?

19    A.   No.

20    Q.   Let me show you a copy of a

21  note dated January 14, 2004.  It has been

22  marked as Exhibit-59 to the Emerald

23  deposition.  Have you seen that before?

24    A.   No, I never saw this before.

         ESQUIRE DEPOSITION SERVICES

156                    LORRAINE T. ROBINS

1     Q.   Do you know whether Emerald

2   was billing Sea Star for the equipment

3   that is listed in that memo or note?

4     A.   I would have to go back and

5   check each one.  I can't tell you by just

6   looking at it.

7     Q.   Let me show you a copy of a

8   document dated May 11, 2004, that's been

9   marked as Exhibit-62 to the Emerald

10  deposition.  Have you ever seen that

11  before?

12    A.   No, I have not.

13    Q.   In your billings, did you

14  bill Sea Star for cost of any equipment

15  that Sea Star had returned?

16    A.   I don't understand your

17  question.

18    Q.   Did you bill Sea Star for

19  any amount in excess of per diem billings

20  for any of the equipment that Sea Star

21  returned?

22    A.   In excess -- no, I didn't,

23  if they returned it.

24    Q.   If Sea Star returned the

ESQUIRE DEPOSITION SERVICES

157          LORRAINE T. ROBINS

1  equipment, would there be any billings

2  for stipulated value?

3      A.   Not if they returned the

4  equipment.

5      Q.   Would there be any billings

6  for anything other than per diem on

7  equipment that Sea Star returned?

8      A.   That Sea Star returned?

9      Q.   Yes.

10      A.   No, there would not be.

11      Q.   In your calculation of the

12  Emerald equipment leasing invoice to Sea

13  Star, dated August 2003, 2004, you billed

14  for, in part, by category, for 40-foot

15  chassis not terminated as per lease

16  equipment and additional rent.  Do you

17  recall that?

18      A.   Yes, I do.

19      Q.   Does that reflect any

20  chassis that Sea Star returned to

21  Emerald?

22      A.   No, it does not.  If there

23  were returns later than that bill, they

24  were adjusted.

ESQUIRE DEPOSITION SERVICES

158                    LORRAINE T. ROBINS

1    Q.   And how were they adjusted?

2    A.   I would have to check it.

3    Q.   Was there any formula that

4  you used for calculating the adjustment?

5    A.   If, in fact, it was a Sea

6  Star return -- I have to see the bill.

7    Q.   I'm just asking whether

8  there was a formula that you used in

9  calculating adjustments.

10    A.   It depends on when it was

11  returned.

12    Q.   Would it be fair to say that

13  any unit that is shown as adjusted was a

14  unit that was returned?

15    A.   I think I gave the reason at

16  the bottom of the last page of that bill

17  that you are looking at, why it was

18  adjusted.  I haven't seen that -- did I

19  not?

20    Q.   When you say that chassis

21  were recovered by an outside agency --

22     MR. MOLDOFF:  When she says

23     "where," what were you referring

24     to?

ESQUIRE DEPOSITION SERVICES

A-936

159               LORRAINE T. ROBINS

1          MR. ARMSTRONG:  Would you

2     let me finish the question?

3          MR. MOLDOFF:  No.  I think

4     you should show her the document.

5  BY MR. ARMSTRONG:

6     Q.    Had Emerald appointed any

7  outside agency to recover chassis in San

8  Juan?

9     A.    There was an agent that was

10  working, recovering chassis in San Juan.

11     Q.    Who was that agent?

12     A.    Ariel -- I have to get his

13  name.

14     Q.    Is that his first name?

15     A.    That was his first name.

16  And he recovered quite a bit.  So on

17  those, what we would do is, we would

18  adjust the stipulated value and subtract

19  from that -- if we got, say, $1,000 for

20  the chassis when we sold it, after we got

21  it back, I would take that thousand

22  dollars off.  I would adjust it by that.

23          As far as the per diem

24  charges go, we are still waiting for an

ESQUIRE DEPOSITION SERVICES

160                    LORRAINE T. ROBINS

1   opinion as to whether it should be the

2   per diem charge or the interest charge

3   for nonpayment of bills at 18 percent.

4       Q.   Where did you get the 18

5   percent?

6       A.   It's in the contract.  The

7   lease agreement.

8       Q.   And you are awaiting an

9   opinion from whom?

10      A.   Counsel.

11      Q.   Mr. Moldoff?

12      A.   Do you know what I'm talking

13  about?  Off the record.

14      Q.   I'm just asking you whether

15  counsel is Mr. Moldoff.

16      A.   Mr. Moldoff, yes.

17      Q.   So your adjustment was equal

18  to the difference between the stipulated

19  value of a piece of equipment and the

20  selling price for that piece of

21  equipment?

22      A.   That's correct.

23      Q.   Were there any other factors

24  included in that?

ESQUIRE DEPOSITION SERVICES

161                    LORRAINE T. ROBINS

1    A.   No.

2    Q.   Is that true for all

3  categories of equipment?

4    A.   Well, what do you mean by

5  all categories?  All adjustments?

6    Q.   Were there adjustments in

7  other categories, other than the chassis?

8    A.   Every category.

9    Q.   And was the formula the same

10  for every category?

11    A.   Yes, it was.

12    Q.   Did you recover equipment in

13  other categories?

14    A.   We recovered reefers, we

15  recovered containers and chassis.  A lot

16  of this equipment was recovered at

17  Tropical, and it was recovered inner-

18  ship.  It was recovered all over the

19  island.

20    Q.   If the equipment had been

21  included in one of the inventories in San

22  Juan, it should not have been billed as

23  not terminated as per lease agreement.

24  Correct?

ESQUIRE DEPOSITION SERVICES

A-939

162                    LORRAINE T. ROBINS

1     MR. MOLDOFF:  Objection to

2   form.

3       THE WITNESS:  Not

4   necessarily.  It depends on

5   whether it was terminated and

6   taken out again.  I can't give

7   that as a blanket answer.  If you

8   have a specific unit, I would have

9   to check it.

10  BY MR. ARMSTRONG:

11      Q.   You would have to go back to

12  your own records to check that?

13      A.   That's right.  Bear in mind,

14  you are talking about thousands of pieces

15  of equipment.  It's awfully hard to

16  remember all of them.

17      Q.   If the equipment was in the

18  showroom, that equipment was in Emerald's

19  possession.  Correct?

20      A.   That's correct.

21      Q.   None of that equipment

22  should have been billed for a stipulated

23  value.  Correct?

24      A.   Again, I don't know unless I

ESQUIRE DEPOSITION SERVICES

A-940

163                    LORRAINE T. ROBINS

1   check the equipment, because there are

2   pieces of equipment that came out of the

3   showroom once the stacks were broken down

4   that were taken by NPR.  So -- sorry, I

5   mean Sea Star Line.  So I will have to,

6   again, check each piece of equipment.

7       Q.   Once the stacks were broken

8   down where?

9       A.   In the showroom.  I think

10  they bundled some and sent it there.

11      Q.   Who bundled some?

12      A.   Sea Star Line.

13      Q.   Well, equipment taken out of

14  the showroom would have been sold or

15  shipped back to Jacksonville.  Is that

16  correct?

17      A.   I do not know.

18          MR. MOLDOFF:  Let me take a

19      short break.

20              - - -

21          (Whereupon, a recess was

22      taken.)

23              - - -

24  BY MR. ARMSTRONG:

            ESQUIRE DEPOSITION SERVICES

164                LORRAINE T. ROBINS

1    Q.   When did you hire Ariel, or

2  who hired Ariel would be the more proper

3  question?

4    A.   I believe they called us.

5    Q.   Who called you?

6    A.   They didn't call me, they

7  called Arthur Davis.

8    Q.   Who called Arthur Davis?

9    A.   Joe McCatum.

10    Q.   Who is Joe McCatum?

11    A.   He works for that company.

12    Q.   For Aerial's company?

13    A.   What's his name is, yes.  I

14  can get you the name.

15    Q.   When did Joe McCatum call

16  Arthur Davis?

17    A.   I don't know exactly.  I

18  would know better if I had my records

19  here.  It was sometime in '04, when he

20  located a large quantity of containers

21  and chassis.  I'm sure it was in

22  Tropical's yard.  Which he give us a list

23  of and we checked.

24    Q.   Tropical who's yard?

ESQUIRE DEPOSITION SERVICES

A-942

165                LORRAINE T. ROBINS

1    A.   It was a railroad, container

2    line, going back and forth from San Juan

3    to the Dominican Republic.

4    Q.   And how did you determine

5    that those containers and chassis were

6    under the contract with Sea Star?

7    A.   Again, from my records.

8    Q.   So am I correct in

9    understanding that to bill for a

10   stipulated value or any part of a

11   stipulated value, you had to have a

12   record showing that Sea Star actually had

13   possession of that equipment?

14   A.   That is correct.

15   Q.   What records did you review

16   in connection with the stipulated value

17   billings?

18        MR. MOLDOFF:  Objection to

19        form.

20        THE WITNESS:  The same

21        records that I reviewed to see if

22        Sea Star was using the equipment,

23        self-billing reports and all other

24        documents concerning the container

ESQUIRE DEPOSITION SERVICES

166                    LORRAINE T. ROBINS

1   or chassis

2   BY MR. ARMSTRONG:

3       Q.   And what other "all other"

4   documents concerning the container or

5   chassis?

6           MR. MOLDOFF:  Objection to

7       form; asked and answered.

8           THE WITNESS:  Move

9       histories, the billing reports,

10      inventories, which were all -- all

11      this was -- the inventories and

12      various other information was

13      handwritten on the move histories.

14      So in most cases I could just go

15      to the move history.

16  BY MR. ARMSTRONG:

17      Q.   Who handwrote the

18  information on the move history?

19      A.   I did.

20      Q.   Was your primary source the

21  move history?

22      A.   No.  The move history gave

23  me a history of what had happened to the

24  piece of equipment until about -- well, I

        ESQUIRE DEPOSITION SERVICES

A-944

167                    LORRAINE T. ROBINS

1  had the starting date, whichever --

2  whatever date it was, I don't know.

3        Then we had the information

4  that was coming in from Packer Avenue,

5  because that was automatically

6  transmitted electronically.  We had the

7  information coming in from CSX, which was

8  transmitted electronically to the move

9  histories, and then if, in fact, we sold

10  it, I would input that information so

11  that we knew it was sold.

12     Q.  Do you recall using any

13  documents, other than those that you've

14  described during this deposition, to

15  prepare your stipulated value invoices?

16     A.  I think that I covered them

17  all.

18     Q.  Do you know whether there's

19  a requirement that Sea Star sign TIRs for

20  equipment redelivered to Packer Avenue?

21     A.  Their trucker signs them,

22  yes.  The trucker must sign a TIR, a copy

23  of which goes to the trucker.  The

24  information on the TIR is transmitted to

ESQUIRE DEPOSITION SERVICES

168

1  the shipping line or the owner of the

2  equipment.  This is done by an ILA clerk.

3          MR. ARMSTRONG:  I have

4    nothing further.  Thank you.

5          MR. MOLDOFF:  I have

6    nothing.

7            - - -

8        (Whereupon, the deposition

9    concluded at 3:00 p.m.)

10            - - -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

          ESQUIRE DEPOSITION SERVICES

169

1        C E R T I F I C A T E

2             I hereby certify that the

3    witness was duly sworn by me and that the

4    deposition is a true record of the

5    testimony given by the witness.  At the

6    time of the deposition, the witness

7    requested to read and sign the

8    transcript.

9

10

11

12        _ _ _ _ _ _ _ _ _ _ _

13             Pamela J. Gober Bracic,

14             RPR

15             Dated: February 2, 2005

16

17

18             (The foregoing certification

19    of this transcript does not apply to any

20    reproduction of the same by any means,

21    unless under the direct control and/or

22    supervision of the certifying reporter.)

23

24

ESQUIRE DEPOSITION SERVICES

170

1      INSTRUCTIONS TO WITNESS

2          Please read your deposition

3   over carefully and make any necessary

4   changes.  You should assign a reason in

5   the appropriate column on the errata

6   sheet for any change made.

7          After making any change

8   which has been noted on the following

9   errata sheet, along with the reason for

10  any change, sign your name to the errata

11  sheet and date it.

12         You are signing it subject

13  to the changes you have made in the

14  errata sheet, which will be attached to

15  the deposition.  You must sign in the

16  space provided.

17         Return the original errata

18  sheet to the deposing attorney within

19  thirty (30) days of receipt of the

20  transcript by you.

21

22

23      _____

24

ESQUIRE DEPOSITION SERVICES

A-948

171

```
1          --------

2        E R R A T A

3          --------

4   PAGE   LINE   CHANGE

5   ___   ____   _____

6   ___   ____   _____

7   ___   ____   _____

8   ___   ____   _____

9   ___   ____   _____

10  ___   ____   _____

11  ___   ____   _____

12  ___   ____   _____

13  ___   ____   _____

14  ___   ____   _____

15  ___   ____   _____

16  ___   ____   _____

17  ___   ____   _____

18  ___   ____   _____

19  ___   ____   _____

20  ___   ____   _____

21  ___   ____   _____

22  ___   ____   _____

23  ___   ____   _____

24  ___   ____   _____
```

ESQUIRE DEPOSITION SERVICES

172

1    ACKNOWLEDGMENT OF DEPONENT

2    I, _ _ _ _ _ _ _ _ _ _ _ _, do

3    hereby certify that I have read the

4    transcript in the matter of _ _ _ _ _ _ _

5    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

6    and that the same is a correct

7    transcription of the answers given by me

8    to the questions therein propounded,

9    except for the corrections or changes in

10   form or substance, if any, noted in the

11   attached Errata Sheet.

12   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

13   DATE            SIGNATURE

14

15   Subscribed and sworn to before me this

16   _ _ _ _ day of _ _ _ _ _ _ _ _ _,

17   200 _ _.

18   My commission expires:  _ _ _ _ _ _ _ _

19                  Notary Public

20

21

22

23

24

ESQUIRE DEPOSITION SERVICES

A-950

173

1               LAWYER'S NOTES

2  PAGE  LINE

3  ____  ____  _____

4  ____  ____  _____

5  ____  ____  _____

6  ____  ____  _____

7  ____  ____  _____

8  ____  ____  _____

9  ____  ____  _____

10  ____  ____  _____

11  ____  ____  _____

12  ____  ____  _____

13  ____  ____  _____

14  ____  ____  _____

15  ____  ____  _____

16  ____  ____  _____

17  ____  ____  _____

18  ____  ____  _____

19  ____  ____  _____

20  ____  ____  _____

21  ____  ____  _____

22  ____  ____  _____

23  ____  ____  _____

24  ____  ____  _____

ESQUIRE DEPOSITION SERVICES