UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| EMERALD EQUIPMENT LEASING, INC. | ) | Case No. 01-934 (MFW) |
| | ) | |
| Debtor. | ) | Re: Docket Numbers: 144, 154 |

## ORDER APPROVING THE STIPULATION BETWEEN SEA STAR LINE, LLC AND THE DEBTOR REGARDING DISPOSITION OF CERTAIN EQUIPMENT

Upon consideration of the Stipulation Regarding Disposition of Certain Equipment by and Between debtor-in-possession Emerald Equipment Leasing, Inc. and Sea Star Line, LLC (the "Stipulation") (attached hereto as Exhibit A), to resolve the Motion of Sea Star Line LLC for relief from the automatic stay (the "Motion") and it appearing that due and proper notice of the Motion and Stipulation has been given; and after due deliberation, and sufficient cause appearing therefor; it is hereby

ORDERED that the Stipulation is APPROVED; and it is further

ORDERED that the parties are authorized to take any actions necessary to effectuate the terms of the Stipulation and/or this Order; and it is further

ORDERED that this Court shall retain jurisdiction to determine any dispute arising from or related to the Stipulation and this Order

SO ORDERED this 2̲5̲ day of ̲S̲e̲p̲t̲, 2005.

The Honorable Mary F. Walrath
United States Bankruptcy Judge

{10006825.DOC}



EXHIBIT 94
EEL - 8
3-12-08
www.DeposDE.com

EXHIBIT A

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| EMERALD EQUIPMENT LEASING, INC. | ) | Case No. 01-934 (MFW) |
| | ) | |
| Debtor. | ) | |

## STIPULATION REGARDING DISPOSITION OF CERTAIN EQUIPMENT

This Stipulation (the "Stipulation"), which is subject to approval by the Bankruptcy Court, is entered into by and between debtor-in-possession Emerald Equipment Leasing, Inc. ("EEL") and Sea Star Line L.L.C. ("Sea Star").

### RECITALS

WHEREAS, on March 21, 2001, EEL filed a petition for relief under Chapter 11, Title 11, of the United States Code (the "Bankruptcy Code"), together with various affiliated entities (the "Affiliated Entities"), which case was initially jointly administered pursuant to an Order of the Court consolidating the cases for joint administration; and,

WHEREAS, the bankruptcy cases of the Affiliated Entities, but not that of EEL, were subsequently converted to cases under Chapter 7 of the Bankruptcy Code, and a trustee appointed, by Order of the court dated July 25, 2002; and,

WHEREAS, by Order of the Court of May 23, 2003, the joint administration of EEL's Chapter 11 case with the Chapter 11 cases of the other Affiliated Entities was terminated; and,

WHEREAS, EEL was previously in the business of leasing cargo handling equipment, including cargo containers, chassis to transport the cargo containers and gensets, to its principal customers, the Affiliated Entities; and,

WHEREAS, in 1997, EEL obtained a term loan from MBC in the approximate amount of $35,000,000 to enable EEL to purchase equipment from the Affiliated Entities

{1000682310C}

(the "Financing Agreement"), NPR, Inc. and Holt Cargo Systems, Inc., which equipment EEL in turn leased to NPR, Inc.; and,

WHEREAS, to secure its repayment obligations to MBC, EEL granted MBC a security interest in all of the purchased equipment, together with accounts, contract rights and other general intangibles arising from the use or sale of the equipment; and,

WHEREAS, EEL assigned its lease with NPR to MBC as additional security for its obligation to repay MBC; and,

WHEREAS, by Order dated July 22, 2002, the court granted MBC relief from the automatic stay, effective as of April 29, 2002, (the "MBC Relief From Stay Order") to exercise and enforce all of its rights and remedies against EEL's equipment which served as collateral to the Financing Agreement, and further ordered MBC to "deposit any proceeds of sale of the equipment in excess of the amount necessary to satisfy the outstanding balance due under the loan documents, if any, to [EEL] to be held pending further order of this Court"; and,

WHEREAS, on or about November 1, 2003, MBC assigned its secured position arising from the Financing Agreement to Storage Transfer, LLC ("Storage Transfer"); and,

WHEREAS, post-petition EEL and Sea Star, with MBC's authorization, entered into an Equipment Rental Agreement, dated as of July 31, 2002 (the "Equipment Rental Agreement"); and,

WHEREAS, a dispute arose between Sea Star and EEL regarding alleged breach of the Equipment Rental Agreement, such dispute, inter alia, being the subject of litigation in the United States District Court for the District of Delaware, *Sea Star Line LLC v. Emerald Equipment Leasing, Inc.*, No. 05-245-JJF (the "Litigation"); and,

WHEREAS, EEL asserts that Storage Transfer, by the Assignment from MBC, holds a fully perfected lien in all proceeds recovered by EEL in the Litigation; and,

{10006823.DOC}

WHEREAS, EEL asserts that by Agreement dated February 25, 2004, between Storage Transfer and EEL, Storage Transfer has agreed to a "carve out" to the EEL bankruptcy estate of fifteen percent (15%) of any proceeds, net of expenses or other amounts disbursed to third parties, it would otherwise receive on account of its secured claim as a result of any settlement of the Litigation or the collection of any judgment obtained upon prosecution of the claims against Sea Star; and,

WHEREAS, Sea Star asserts that certain equipment has been left on its premises at the San Juan Terminal, including 49 chassis and 17 cargo containers (the "Holdover Equipment"), without payment of storage fees, after Sea Star's demand by letter of October 17, 2003, that MBC and EEL remove EEL equipment from the San Juan Terminal; and,

WHEREAS, on August 29, 2005, Sea Star brought a motion for relief from the automatic stay (the "Motion") requesting that the Court enter an order, in the alternative:

(a)    that the automatic stay does not apply to the Holdover Equipment since it is not owned by debtor EEL; or

(b)    that the stay be lifted to allow Sea Star to dispose of the Holdover Equipment in a manner permitted by Puerto Rico law.

WHEREAS, EEL responded to the Motion disputing many of the assertions made by Sea Star in the Motion and advising, inter alia, that: (a) certain of the Holdover Equipment is not owned by EEL; and, (b) other of the Holdover Equipment owned by EEL will be voluntarily removed by EEL.

WHEREAS, EEL and Sea Star wish to resolve the issues raised by the Motion in a timely and cost-effective manner and EEL believes the Stipulation to be in the best interests of the estate;

## STIPULATED ORDER

ACCORDINGLY, EEL and Sea Star hereby STIPULATE AND AGREE and move the Court to enter an order as follows:

{10006823.DOC}

-3-

1.     The equipment listed in Exhibit "A", Part (a) is owned by EEL and shall be made available for pick up by Sea Star and be retrieved by EEL at its own expense, within thirty (30) days of the date of this Order.  As to any equipment listed in Part (a) that is not removed from the San Juan Terminal premises by this date, the automatic stay of Bankruptcy Code § 362(a) is terminated, without further Order of the Court, and Sea Star shall be entitled to dispose of such equipment in such manner as permitted by applicable law.

2.     The equipment listed in Exhibit "A", Part (b) is owned by EEL, but EEL abandons all interest in the equipment , pursuant to Bankruptcy Code § 554(a).  Sea Star shall be entitled to dispose of such equipment in such manner as permitted by applicable law.  The abandonment of the Part (b) equipment shall be without prejudice to any argument by Sea Star or EEL regarding, inter alia, costs or fees relating to use or storage of the equipment, and all such disputes shall be preserved and resolved in the Litigation.

3.     The equipment listed in Exhibit "A", Part (c), was formerly owned by EEL but the bankruptcy estate no longer claims an interest in this Part (c) equipment.  As the equipment is not property of the estate, the automatic stay of Bankruptcy Code § 362(a) is not applicable to the Part (c) equipment.  Within ten (10) days of the date of this Order, EEL shall provide Sea Star with copies of the Bills of Sale for all the Part (c) equipment, together with the names and addresses of the buyers and the dates of sale.

4.     The equipment listed in Exhibit "A", Part (d), is owned by EEL and shall be made available for pick up by Sea Star and shall be retrieved by EEL at its own expense, within thirty (30) days of the date of this Order.  As to any equipment listed in Part (d) that is not removed from the San Juan Terminal premises by this date, the automatic stay of Bankruptcy Code § 362(a) is terminated, without further Order of the Court and Sea Star shall be entitled to dispose of such equipment in such manner as permitted by applicable law.

{10006823.DOC}

- 4 -

5.    The equipment listed in Exhibit "A", Part (e) is owned by EEL. EEL abandons all interest in the equipment, pursuant to Bankruptcy Code § 554(a). Sea Star shall be entitled to dispose of such equipment in such manner as permitted by applicable law. The abandonment of the Part (e) equipment shall be without prejudice to any argument by Sea Star or EEL regarding, inter alia, costs or fees relating to use or storage of the equipment, and all such disputes shall be preserved and resolved in the Litigation.

6.    The equipment listed in Exhibit "A", Part (f), is not owned by EEL and no party known to EEL claims an interest in the equipment. Therefore the automatic stay of Bankruptcy Code § 362 is inapplicable, and Sea Star shall be entitled to dispose of such equipment in such manner as permitted by applicable law.

7.    Except as specified above, nothing contained in this Stipulation or the Court's Order shall prejudice or modify the rights of Sea Star or EEL, or limit any claim or argument to challenge and/or dispute any of the parties' alleged rights or obligations under the Equipment Rental Agreement, or otherwise, including but not limited to costs or charges which may be asserted by one against the other, or in any way limit the parties' ability to assert claims in the Litigation related to the equipment listed in Exhibit "A".

8.    This Stipulation is valid and effective when approved by the Court.

9.    This Stipulation, when approved by the Court, resolves the Motion in its entirety.

10.    This Stipulation may be executed in one or more counterparts, including facsimile transmittals, each of which shall be deemed an original and all of which, when taken together, shall constitute one in the same document.

SEA STAR LINE, LLC

SMITH KATZENSTEIN & FURLOW

(160632.DOC)

EMERALD EQUIPMENT LEASING, INC.

ADELMAN LAVINE GOLD & LEVIN

- 5 -

Kathleen M. Miller
800 Delaware Avenue, 7th Floor
P.O. Box 410
Wilmington, DE 19899
Phone: (302) 652-8400
Fax: (302) 652-8405

Charles C. Robinson
GARVEY SCHUBERT BARER
1191 Second Avenue, 1800
Seattle, WA 98101-2939

Timothy J. Armstrong
ARMSTRONG & MEJER, P.A.
Suite 1111, Douglas Centre
2600 Douglas Road
Coral Gables, FL 33134

Raymond A.H. Lemisch
919 North Market Street, Suite 710
Wilmington, DE 19801
(302) 654-8200

Gary M. Schildhorn
Alan L. Moldoff

Suite 900, Four Penn Center Plaza
Philadelphia, PA 19103-2808

{10006823.JXOC}

- 6 -

ExHiBiT A

| 8/8/05 | | | | | | | | |
|--------|--|--|--|--|--|--|--|--|
| **Part (a)** | | | | | | | | |
| PRMC | 120414 | | | | | | | |
| PRMC | 150164 | | | | | | | |
| PRMC | 150258 | | | | | | | |
| PRMC | 160878 | | | | | | | |
| PRMZ | 167984 | | | | | | | |
| PRMC | 170308 | | | | | | | |
| UFCC | 077707 | | | | | | | |
| PRMU | 800119 | | | | | | | |
| | | | | | | | | |
| **Part (b)** | | | | | | | | |
| PRMC | 120021 | | | | | | | |
| PRMC | 120028 | | | | | | | |
| PRMC | 120089 | | | | | | | |
| PRMC | 120160 | | | | | | | |
| PRMC | 120211 | | | | | | | |
| PRMC | 120282 | | | | | | | |
| PRMC | 120283 | | | | | | | |
| PRMC | 120334 | | | | | | | |
| PRMC | 120352 | | | | | | | |
| PRMC | 120362 | | | | | | | |
| PRMC | 120419 | | | | | | | |
| PRMC | 120431 | | | | | | | |
| | | | | | | | | |
| **Part (c)** | | | | | | | | |
| PRMC | 120105 | | | | | | | |
| PRMC | 120451 | | | | | | | |
| PRMC | 120492 | | | | | | | |
| PRMC | 120639 | | | | | | | |
| PRMC | 120772 | | | | | | | |
| PRMC | 150079 | | | | | | | |
| PRMC | 150744 | | | | | | | |
| PRMZ | 165771 | | | | | | | |
| PRMZ | 177505 | | | | | | | |
| **Part (d)** | | 1st Inv | | | | | | |
| PRMC | 120176 | 10/19/04 | | | | | | |
| PRMC | 120470 | 8/18/05 | | | | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| PRMC | 120487 | 8/18/05 | | | | | |
| PRMC | 120488 | 8/18/05 | | | | | |
| PRMC | 120687 | 2/23/04 | | | | | |
| PRMC | 120734 | 8/18/05 | | | | | |
| PRMC | 150351 | 8/18/05 | | | | | |
| PRMC | 150551 | 8/18/05 | | | | | |
| PRMC | 151111 | 8/18/05 | | | | | |
| TXXZ | 167665 | 10/19/04 | | | | | |
| PRMC | 170344 | 8/18/05 | | | | | |
| PRMC | 170601 | 8/18/05 | | | | | |
| PRMZ | 170786 | On SJ Pier 12/2/03 Not on Pier 12/03/03 | | | | | |
| | | on 2/23/04 and further inventories | | | | Not on 9/30/03 | |
| PRMC | 170913 | 8/18/05 | | | | | |
| PRMC | 171056 | 8/18/05 | | | | | |
| TXXZ | 174539 | 10/19/04 | | | | | |
| TXXZ | 178625 | On SJ Pier 12/2/03 Not on Pier 12/03/03 | | | | | |
| | | on 2/23/04 and further inventories | | | | Not on 9/30/03 | |
| PRMZ | 182116 | 5/15/04 | | | | | |
| PRMZ | 079473 | On SJ Pier 12/2/03 Not on Pier 12/03/03 | | | | | |
| | | on 2/23/04 and further inventories | | | | | |
| UFCG | 081592 | 5/15/04 | | | | | |
| PRMZ | 085316 | 5/15/04 | | | | | |
| PRMU | 600354 | 2/23/04 | | | | | |
| PRMU | 600479 | On 9/30/03 not available 12/2/03 | | | | | |
| | | on 2/23/04 and further inventories | | | | | |
| PRMU | 673548 | On 9/30/03 not available 12/2/03 | | | | | |
| | | on 2/23/04 and further inventories | | | | | |
| PRMU | 674356 | 8/18/05 | | | | | |
| PRMU | 850888 | On 9/30/03 not available 12/2/03 | | | | | |
| | | on 2/23/04 and further inventories | | | | | |
| | | | | | | | |
| t Part (e) | | | | | | | |
| PRMU | 609716 | | | | | | |
| PRMU | 670416 | | | | | | |
| PRMU | 670463 | | | | | | |
| PRMU | 670495 | | | | | | |
| PRMU | 674657 | | | | | | |
| | | | | | | | |
| t Part (f) | | | | | | | |
| PRMU | 609525 | | | | | | |
| PRMU | 670060 | | | | | | |
| PRMU | 670374 | | | | | | |

A-961

| PRMU | 671223 | | | | | | |
|---|---|---|---|---|---|---|---|
| PRMU | 983894 | | | | | | |
| PRMU | 650503 | | | | | | |

# ECKERT SEAMANS

Eckert Seamans Cherin & Mellott, LLC
Two Liberty Place
50 South 16th Street
22nd Floor
Philadelphia, PA 19102

TEL 215 851 8400
FAX 215 851 8383
www.eckertseamans.com

Gary M. Schildhorn
Direct Dial: 215-851-8465
E-Mail: gschild@adelmanlaw.com

August 15, 2007

**BY FIRST-CLASS MAIL AND E-MAIL**

Lorraine Robins
2700 Atlantic Avenue
Longport, NJ  08403

Re:    **Carveout in Emerald Bankruptcy Case Docket No. 01-00934 (BLS)**

Dear Ms. Robins:

As you know, the attorneys at Adelman Lavine Gold Schildhorn and Kleban ("Adelman") who had been employed as counsel for Emerald Equipment Leasing, Inc. ("Emerald") in the Emerald bankruptcy proceedings have left the Adelman law firm as of March 31, 2007 and are now employed by Eckert Seamans Cherin & Mellott, LLC ("Eckert Seamans"). In that regard, Eckert Seamans has filed an Application to be employed as counsel for Emerald in place of the Adelman law firm, as of April 1, 2007. The services Eckert Seamans is providing are the same that Adelman was providing, and include but are not limited to the prosecution of Emerald's claim against Sea Star Lines, L.L.C. and (based upon the results of that litigation) the preparation and filing of a liquidating plan of reorganization for Emerald.

You had previously executed a Carveout Agreement dated February 25, 2004 (see attached) wherey Storage Transfer L.L.C. ("Storage") had agreed to a carveout from the proceeds of its collateral in an amount sufficient to pay fees earned and costs incurred by the Adelman law firm in the Emerald Chapter 11 proceeding. Pursuant to our discussions, Storage has agreed to allow a similar carveout from the proceeds of its collateral in an amount sufficient to pay fees earned and costs incurred by Eckert Seamans in the Emerald Chapter 11 proceeding (including prosecution of Emerald's claim against Sea Star Lines, LLC. This agreement, like the agreement with the Adelman law firm is without prejudice to Storage's right to object to any fee application as may be submitted by Eckert Seamans in the Emerald Chapter 11 proceedings. Eckert Seamans will be able to seek reimbursement from the carevout upon the filing of certificates of no objection to any monthly fee requests and the entry of an Order approving any quarterly fee application, if at such time the Emerald estate does not have the funds to pay amounts owed to Eckert Seamans.



EXHIBIT S.T-12
ROBINS – 1/2/08 -rgli

www.DeposDE.com

PHILADELPHIA, PA    PITTSBURGH, PA    HARRISBURG, PA    BOSTON, MA    WASHINGTON, DC    WILMINGTON, DE
MORGANTOWN, WV    SOUTHPOINTE, PA    WHITE PLAINS, NY

A-963

**ECKERT SEAMANS**

Eckert Seamans Cherin & Mellott, LLC
Two Liberty Place
50 South 16th Street
22nd Floor
Philadelphia, PA 19102

TEL 215 851 8400
FAX 215 851 8383
www.eckertseamans.com

Lorraine Robins
August 15, 2007
Page #

Please execute this letter on the space provided and return a copy to me in the enclosed envelope evidencing Storage's agreement to the carveout.

Very truly yours,

GARY M. SCHILDHORN

GMS/md

cc:     Thomas Holt, Sr.

AGREED TO AND ACCEPTED BY:
STORAGE TRANSFER L.L.C.

BY: _Lorraine Robins_

Lorraine Robins,
Its Sole Member

PHILADELPHIA, PA    PITTSBURGH, PA    HARRISBURG, PA    BOSTON, MA    WASHINGTON, DC    WILMINGTON, DE
MORGANTOWN, WV    SOUTHPOINTE, PA    WHITE PLAINS, NY

A-964

Lorraine Robins

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

—   —   —

SEA STAR LINE, LLC, A LIMITED :
LIABILITY COMPANY,            :
                             : Civil Action No.
        Plaintiff/          :
Counterclaim Defendant,      : 05-CV-245-JJF (LPS)
                             :
        vs.                  :
                             :
EMERALD EQUIPMENT LEASING,   :
INC., a corporation,         :
                             :
        Defendant/           :
Counterclaim Plaintiff.      :

Deposition of Lorraine Robins
taken at Eckert Seamans Cherin & Mellott, LLC
Two Liberty Place, 50 South 16th Street, 22nd Floor
Philadelphia, Pennsylvania
Friday, January 25,  2008
9:05 a.m.

Gail L. Inghram Verbano, CSR, RMR, CLR
302.449.0529

Lorraine Robins

Page 2

APPEARANCES

On behalf of Sea Star Line:

KATHLEEN M. MILLER, ESQUIRE
Kmiller@skfdelaware.com
SMITH, KATZENSTEIN & FURLOW, LLP
800 Delaware Avenue, 7th Floor
Wilmington, Delaware 19899
302.652.8400

and

TIMOTHY J. ARMSTRONG, ESQUIRE
amesq@aol.com
ARMSTRONG & MEJER, P.A.
2222 Ponce de Leon Boulevard
Penthouse Suite
Miami, Florida 33134
305.444.3355

On behalf of Emerald Equipment Leasing, Inc. :

ALAN I. MOLDOFF, ESQUIRE
amoldoff@eckertseamans.com
ECKERT SEAMANS CHERIN & MELLOTT, LLC
Two Liberty Place
50 South 16th Street, 22nd Floor
Philadelphia, Pennsylvania 19102
215.851.8450

ALSO PRESENT:

Tom Holt

Page 3

CONTENTS

| WITNESS: | PAGE |
|---|---|
| LORRAINE ROBINS | |
| Mr. Armstrong | 6 |
| Mr. Moldoff | 79 |

EXHIBITS

| S.T. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Promissory Note dated 11-1-03 | 9 |
| 2 | Loan Sale and Assignment Agreement dated 11-1-03 | 11 |
| 3 | Security Agreement between Storage Transfer and MBC Leasing Corp. dated 11-26-03 | 12 |
| 4 | Guaranty Agreement dated 11-1-03 | 12 |
| 5 | Acknowledgement of Receipt of Original Loan Documents dated 11-1-03 | 12 |
| 6 | Large packet of Bills of Sale | 13 |
| 7 | Bill from Gebhardt & Smith dated 12-17-03 | 13 |
| 8 | US-DOJ Quarterly Fees Statement dated Q1 2006 | 13 |
| 9 | Group of Documents, Later Amended with Bills of Sale | 13 |
| 10 | Letter from Gary Schildhorn, Adelman Lavine Gold & Levin, to Ms. Robins dated 2-25-04 | 14 |

Page 4

EXHIBITS

| S.T. | DESCRIPTION | PAGE |
|---|---|---|
| 11 | Letter from Mr. Schildhorn dated 2-25-04 | 14 |
| 12 | Letter from Mr. Schildhorn dated 8-15-07 | 14 |
| 13 | Indemnity Agreement dated 9-28-02 | 27 |
| 14 | Motion of MBC Leasing Corp. for Allowance and Payment of Administrative Priority Claims | 49 |
| 15 | Bill of Sale dated 11-2003 | 50 |
| 16 | Handwritten note of Arthur Davis dated 5-11-04 | 52 |
| 17 | Email from Mr. Davis to Andrew Rooks dated 8-11-04 | 53 |
| 18 | Telecopier cover sheet from Scott Krieger to Mr. Davis dated 9-24-03 | 53 |
| 19 | Letter from Mr. Krieger to Tom Holt dated 10-30-03 | 53 |
| 20 | Email from Mr. Davis to Mr. Krieger dated 9-25-03, with attachment | 54 |
| 21 | Document entitled "Inventory located in Vega Alta" dated 12-4-04 | 55 |

Page 5

EXHIBITS

| S.T. | DESCRIPTION | PAGE |
|---|---|---|
| 22 | Packet of spreadsheets entitled "Emerald Equipment Leasing Invoice to Sea Star Line, Inc, Schedule 40 CH, Units on Self-Billing Report and Units Not On Self-Billing Report Both Terminated and Still On Hire" amended 8-28-07 | 68 |
| 23 | Document entitled "Emerald Equipment Leasing Invoice to Sea Star Lines, 40-foot Chassis, Not Terminated As Per Lease Agreement and Additional Rent" | 70 |
| 24 | Packet of spreadsheets entitled "Emerald Equipment Leasing Invoice to Sea Star Line, Inc, Schedule 40 CH, Units on Self-Billing Report and Units Not On Self-Billing Report Both Terminated and Still On Hire" amended 5-1-06 | 72 |
| 25 | Invoice from The Corona Group dated 8-16-06 | 75 |

(The original exhibits were returned to Ms. Miller;
digital copies were provided to all counsel.)

Lorraine Robins

3 (Pages 6 to 9)

Page 6

1      Lorraine Robins, having first been duly
2  sworn according to law, was examined and testified as
3  follows:
4              - - - -
5              EXAMINATION
6  BY MR. ARMSTRONG:
7      Q  Please state your full name.
8      A  Lorraine Robins.
9      Q  Ms. Robins, do you want me to talk to you
10  about depositions again, or do you remember what we
11  said the last time?  I'm going to ask you some
12  questions --
13      A  That's fine.
14      Q  Okay.  What's your residence address?
15      A  19189 Sable Lake Drive, Boca Raton,
16  Florida.
17      Q  What is your business address?
18      A  7900 Old York Road, Elkins Park,
19  Pennsylvania, 19027.
20      MR. MOLDOFF:  Why don't you just -- tell
21  him the business that you're talking about.
22  BY MR. ARMSTRONG:
23      Q  What is your business?
24      A  Storage Transfer, LLC.

Page 7

1      Q  And how long have you been with Storage
2  Transfer, LLC?
3      A  Since November '03.
4      Q  And what is your position with Storage
5  Transfer?
6      A  Owner.
7      Q  How long have you been owner?
8      A  Since November 2003.
9      Q  Are there any other owners?
10      A  No.
11      Q  Are there managers or managing directors?
12      A  No.
13      Q  Are there -- well, what is the business
14  of Storage Transfer, LLC?
15      A  It's selling and leasing equipment,
16  chassis, containers and gen-sets.
17      Q  How long has Storage Transfer been in
18  that business?
19      A  Since end of October 2003.
20      Q  Are there any employees?
21      A  At this particular time, no.
22      Q  Have there ever been employees of Storage
23  Transfer?
24      A  We had contractors, but not --

Page 8

1      Q  And who were the contractors?
2      A  I had Jack Evans, John Evans; and Susan
3  Evans doing office, clerical work.
4      Q  Anyone else?
5      A  Arthur Davis.
6      Q  And what did Arthur Davis do?
7      A  He basically sold equipment.
8      Q  Was he an employee of Storage Transfer?
9      A  No, not until recently.
10      Q  Is he an employee of Storage Transfer
11  now?
12      A  He has been working for Storage Transfer
13  this past year.
14      Q  Has he been working regularly during the
15  past year?  Or periodically?
16      A  Not regularly:  Periodically.
17      Q  And on what basis?  Is it salary?
18  Commission?
19      A  It's contract.
20      Q  And he has been working to sell
21  equipment?
22      A  That's correct.
23      Q  Does he still work to sell equipment for
24  Storage Transfer?

Page 9

1      A  Yes.
2      Q  Has Mark McDonald ever had a relationship
3  with Storage Transfer?
4      A  No.
5      Q  Has Thomas Holt, Sr., ever had a
6  relationship with Storage Transfer?
7      A  Thomas Holt, Sr., only guaranteed a loan
8  for Storage Transfer.  That's the only relationship
9  he had.
10      Q  Does he still guarantee a loan for
11  Storage Transfer?
12      A  No; it's been canceled.
13      Q  When did he guarantee that loan?
14      A  November 2003, I believe.
15      Q  When was the loan canceled?
16      A  I would have to check that.  Well, it's
17  canceled but it doesn't have a date on it.
18      MR. ARMSTRONG:  Let me show you a
19  document which I'll ask the court reporter to mark as
20  Exhibit 1 for identification.
21      (S.T. Exhibit 1 was marked for
22      identification.)
23  BY MR. ARMSTRONG:
24      Q  Is this the document to which you were

Lorraine Robins

4 (Pages 10 to 13)

Page 10

1 referring?
2    A  The cancelation, yes.
3    Q  Are you here as a representative of
4 Storage Transfer?
5    A  That's correct.
6    Q  And that's the only capacity in which
7 you're here; is that correct?
8    A  That's correct.
9    Q  Are you represented by counsel?
10    A  No.
11    MR. MOLDOFF:  Could I just -- in order --
12 I see we have it marked as Robins Exhibit 1.  Would
13 it make it easier for reference to make it Storage
14 Transfer?
15    MR. ARMSTRONG:  Why don't we make it ST.
16    MR. MOLDOFF:  Something like that, so we
17 don't get confused.  Is ST acceptable?
18    MR. ARMSTRONG:  ST is fine.
19    MR. MOLDOFF:  ST being for Storage
20 Transfer.
21    MR. ARMSTRONG:  That's correct.
22 BY MR. ARMSTRONG:
23    Q  Does Storage Transfer maintain any places
24 of business, other than the one that you identified

Page 11

1 before?
2    A  No.
3    Q  There are no Storage Transfer places of
4 business in Florida?
5    A  No.
6    Q  Do you do work for Storage Transfer when
7 you're in Florida?
8    A  No.
9    Q  Have you brought documents with you?
10    A  Yes.
11    Q  May I see them?
12    A  I have this one, if you want this.
13    Q  Yes.
14    A  I have the loan agreement.
15    MR. ARMSTRONG:  You have handed me a Loan
16 Sale and Assignment Agreement.  Let me ask that the
17 court reporter mark this as Exhibit 2 for
18 identification.
19    (S.T. Exhibit 2 was marked for
20    identification.)
21    MR. ARMSTRONG:  You have handed me a copy
22 of a Security Agreement between Storage Transfer and
23 MBC Leasing Corp.  Let me ask that the court reporter
24 mark this as Exhibit 3 for identification.

Page 12

1    (S.T. Exhibit 3 was marked for
2    identification.)
3    MR. ARMSTRONG:  You have handand me a
4 copy of a Guaranty Agreement.  Let me ask that the
5 court reporter mark this as Exhibit 4 for
6 identification.
7    (S.T. Exhibit 4 was marked for
8    identification.)
9    MR. ARMSTRONG:  You have handed me a
10 document entitled Acknowledgment of Receipt of
11 Original Loan Documents.  Let me ask that the court
12 reporter mark this as Exhibit 5 for identification.
13    (S.T. Exhibit 5 was marked for
14    identification.)
15    THE WITNESS:  You want the rest?
16    MR. ARMSTRONG:  Yeah.
17    THE WITNESS:  Okay.  The bills of sale.
18 There's a lot of them.
19    MR. ARMSTRONG:  You have handed me a
20 package of bills of sale.  Let me ask that the court
21 reporter mark these as composite Exhibit 6 for
22 identification.
23    Counsel, to keep these straight, is it
24 enough to make it a Composite 6, or do you want to go

Page 13

1 A, B, C, D, E?
2    MR. MOLDOFF:  Composite 6 is fine.
3    (S.T. Exhibit 6 was marked for
4    identification.)
5    MR. ARMSTRONG:  You have handed me a bill
6 from the Law Offices of Gebhardt & Smith dated
7 December 17th, 2003.  Let me ask the court reporter
8 to mark this as Exhibit 7 for identification.
9    (S.T. Exhibit 7 was marked for
10    identification.)
11    MR. ARMSTRONG:  You have handed me a
12 United States Department of Justice Quarterly Fees
13 Statement for Chapter 11, Emerald Equipment Leasing,
14 Inc.  Let me ask that the court reporter mark this as
15 Exhibit 8 for identification.
16    (S.T. Exhibit 8 was marked for
17    identification.)
18    MR. ARMSTRONG:  You have handed me a copy
19 of an invoice dated May 17th, 2004, from Ariel
20 Valantin to Storage Transfer, LLC.  Let me ask that
21 the court reporter mark this as Exhibit 9 for
22 identification.
23    (S.T. Exhibit 9 was marked for
24    identification.)

Lorraine Robins

Page 14

1    MR. ARMSTRONG: You have handed me a copy
2 of a letter dated February 25th, 2004, addressed to
3 Storage Transfer, LLC, care of Lorraine Robins,
4 signed by Gary M. Schildhorn. Let me ask that the
5 court reporter mark this as Exhibit 10 for
6 identification.
7        (S.T. Exhibit 10 was marked for
8        identification.)
9    MR. ARMSTRONG: You have handed me a copy
10 of a letter dated February 25th, 2004, Re:
11 Carve-out, addressed to Storage Transfer, LLC, care
12 of Lorraine Robins, signed by Gary M. Schildhorn.
13 Let me ask that the court reporter mark this as
14 Exhibit 11 for identification.
15        (S.T. Exhibit 11 was marked for
16        identification.)
17    MR. ARMSTRONG: You have handed me a copy
18 of a letter dated August 15th, 2007, addressed to
19 Lorraine Robins, signed by Gary M. Schildhorn. Let
20 me ask that the court reporter mark this as
21 Exhibit 12 for identification.
22        (S.T. Exhibit 12 was marked for
23        identification.)
24 BY MR. ARMSTRONG:

Page 15

1    Q  When you say that Emerald -- I'm sorry --
2 Storage Transfer is in the business of selling
3 equipment --
4    A  Well, leasing equipment and selling
5 equipment.
6    Q  Does Storage Transfer lease and sell its
7 own equipment?
8    A  No.
9    Q  What equipment does Storage Transfer
10 lease and sell?
11    A  Well, it doesn't lease; it sells Emerald
12 equipment.
13    Q  Then is there any lease business in which
14 Storage Transfer is involved?
15    A  Not at this particular time.
16    Q  Has there ever been any lease business in
17 which Storage Transfer has been involved?
18    A  That Storage Transfer has been the lessee
19 or the lessor?
20    Q  Well, let's say in which Storage Transfer
21 has been the lessee.
22    A  Lessee, no.
23    Q  In which Storage Transfer has been the
24 lessor?

Page 16

1    A  Not at this particular time, no.
2    Q  Has there ever been any lease transaction
3 for equipment in which Storage Transfer has been the
4 lessor?
5    A  No.
6    Q  Does Storage Transfer have any
7 relationship with MBC Leasing Corp. at this time?
8    A  We had an agreement with MBC.
9    Q  Is that agreement still in effect?
10    A  The agreement was for the purchase of the
11 loan. And since it has been paid off in full, the
12 agreement is -- I don't want to say that the
13 agreement is no longer in effect. We had purchased
14 the position of MBC.
15    Q  When you indicate that the agreement was
16 for the purchase of the MBC loan --
17    A  That's correct.
18    Q  -- are you referring to the Loan Sale and
19 Assignment Agreement that has been marked as
20 Exhibit 2?
21    A  Yes.
22    Q  Who negotiated that agreement on behalf
23 of Storage Transfer?
24    A  I did.

Page 17

1    Q  When did you begin negotiating that
2 agreement?
3    A  In October of '03.
4    Q  With whom did you negotiate?
5    A  Scott Krieger of MBC.
6    Q  Do you know what Mr. Krieger's position
7 was with MBC at that time?
8    A  I don't know what his title was exactly.
9 I don't remember. I mean, I did at that time, but I
10 think it should be here in the documents.
11        Treasurer and assistant treasurer --
12 secretary and assistant treasurer -- no, it's
13 treasurer and assistant secretary. Sorry about that.
14    Q  Are you referring to the signature line?
15    A  On Page 12.
16    Q  On Page 12.
17        On Page 13, do you recognize the
18 signature on behalf of Storage Transfer?
19    A  That's correct.
20    Q  Is that your signature?
21    A  That is my signature.
22    Q  Is Exhibit 2 a true and correct copy of
23 the Loan Sale and Assignment Agreement?
24    A  Best of my knowledge, it is.

Lorraine Robins

Page 18

1  Q  Was the Guaranty Agreement part of that
2  transaction?
3  A  Yes, it was.
4  Q  Was the Security Agreement part of that
5  transaction?
6  A  Yes, it was.
7  Q  Was the promissory note part of that
8  transaction?
9  A  Yes.
10  Q  Is Exhibit 1 a true and correct copy of
11  the promissory note?
12  A  This is a correct copy -- Exhibit 1 is
13  the cancelation of the promissory note.
14  Q  I understand.  Is it a true and correct
15  copy of the promissory note that was canceled?
16  A  Yes.
17  Q  Is Exhibit 3 a true and correct copy of
18  the Security Agreement?
19  A  Yes, it is.
20  Q  Is Exhibit 4 a true and correct copy of
21  the Guaranty Agreement?
22  A  Yes, it is, according to my records.
23  Q  Is Exhibit 5 a true and correct copy of
24  the Acknowledgment of Receipt of Original Loan

Page 19

1  Documents?
2  A  Yes, it is.
3  Q  In connection with the Loan Sale and
4  Assignment Agreement, why did you want to purchase
5  the loan from MBC?
6  A  Well --
7  MR. MOLDOFF:  Object to the form.  When
8  you use the word "you," you're again referring to
9  Storage Transfer; correct?
10  MR. ARMSTRONG:  Yes.  I think -- as I
11  understand it --
12  BY MR. ARMSTRONG:
13  Q  And Let's be clear on the record.  You are
14  here solely as a representative of Storage Transfer;
15  is that correct?
16  A  That's correct.
17  Q  All right.  So when I use the royal
18  "you," I am referring to the representative of
19  Storage Transfer.
20  MR. MOLDOFF:  That's fine.
21  BY MR. ARMSTRONG:
22  Q  Okay.  You are not testifying as an
23  individual?
24  A  That's correct.

Page 20

1  I had been working together with MBC on
2  the sale of their equipment and the bringing down of
3  their loan and they were starting -- one of their
4  staff had left.  They were understaffed, and they
5  were really getting a little bit tired of the loan
6  itself.  It was a lot more work than they were
7  getting the funds for.
8  I was winding down as executive vice
9  president of Holt Cargo -- of Holt Group, Inc., and I
10  thought that this would be something that I could get
11  interested in, some work that I could do.
12  So that's why I made the arrangements
13  with Scott.  I approached him, and he was more than
14  willing to sell the loan.
15  Q  When did you end your position as
16  executive vice president of Holt Group, Inc.?
17  A  I think it was in June of '03.  I'd have
18  to check.  It was around that time.
19  Q  Did you do any work after you ended your
20  position as executive vice president?
21  A  For whom?
22  Q  For anyone.  Did you have a job after
23  that?
24  A  No.

Page 21

1  Q  When you started Storage Transfer, what
2  type of work were you doing?
3  A  Basically, I was selling the equipment.
4  We were selling equipment.
5  Q  When you say "we," who do you mean?
6  A  I mean Mr. Davis, at that particular
7  time, was working for -- I believe it was Greenwich
8  Terminals, I'm not sure -- and he had been selling
9  the equipment.
10  Q  After you formed -- I'm sorry.
11  Who formed Storage Transfer?
12  A  Who formed it?  I formed it.  A lawyer
13  formed it.
14  Q  And who was lawyer?
15  A  I believe it was Harold Solomon.  I have
16  to check my records on that.
17  Q  Did Harold Solomon represent you in the
18  transaction involving the Loan Sale and Assignment
19  Agreement?
20  A  No.
21  Q  Did any lawyer represent you?
22  A  No.
23  Q  Did any lawyer review the documents?
24  A  No.

Lorraine Robins

Page 22

1    Q  In terms of the documents, did you
2  communicate with anyone at MBC in regard to
3  preparation?
4    A  With Mr. Krieger, Scott Krieger.
5    Q  Did you communicate with any MBC
6  attorneys?
7    A  I don't recall whether I spoke to Bill
8  Hallam or not.
9    Q  Do you know Bill Hallam?
10    A  I think I may have spoke to him once or
11  twice.  I'm not sure.
12    Q  Prior to signing the Loan Sale and
13  Assignment Agreement, did you make any investigation
14  as to what the status of the loan was?
15    A  Yes.
16    Q  And how did you do that?
17    A  Got the information from Mr. Krieger.
18    Q  Did you make any independent
19  investigation?  That is, independent of Mr. Krieger.
20    A  No.
21    Q  Did you make any investigation as to what
22  equipment was covered?
23    A  Well, I knew what equipment was covered.
24  It was -- because I had the -- I had a list of all

Page 23

1  the equipment.
2    Q  Where did you get the list?
3    A  I had a list from Mr. Krieger; and I have
4  another list of all the equipment.  I don't know
5  where that came from.
6    Q  Do you know when Mr. Krieger's letter was
7  prepared -- that is, the list he gave you?
8    A  Well, I know there was a list that was
9  attached to this.
10    Q  Do you know when that was prepared?
11    A  No, I do not.
12    Q  Did you ask?
13    A  No.  You have to understand, I had a very
14  good relationship with MBC Bank, and I had explicit
15  trust in what they gave me.
16    Q  Did you make any independent inquiry or
17  investigation as to whether all of that equipment was
18  in existence?
19    A  No.
20    Q  Have you ever investigated whether all of
21  that equipment is in existence?
22    A  Well, all that equipment was in
23  existence, because we had a computer printout from
24  the very beginning of the equipment from Naverios.

Page 24

1    Q  When you say "from the very beginning,"
2  when was the beginning?
3    A  I have to check the list of equipment.  I
4  don't have it with me.  May have dated it.
5    Q  Are you referring to an equipment list
6  that was printed out April 29th --
7    A  No, I'm not referring to that.
8    Q  -- 2002?
9    A  No.  I'm referring to an equipment list
10  that was printed out that gave the numbers of the
11  container numbers, the equipment numbers, the VIN
12  numbers and license plate numbers.
13    Q  When did you first see that list?
14    A  I can't recall that.
15    Q  When was the list put together?
16    A  I don't know that.  I don't have the list
17  here.  But I believe that list was given -- was a
18  part of the original documents that were given in
19  discovery.
20    Q  Part of the --
21    A  Documents that were sent in discovery.
22    Q  Did you enter into any other assignment
23  agreements with MBC?
24    A  No.

Page 25

1    Q  Were there any assignments, other than
2  those stated in that agreement -- that is, the Loan
3  Sale and Assignment Agreement, Exhibit 2 --
4    A  No.
5    Q  -- that Storage received from MBC?
6    A  No.  These are all the documents I
7  received from MBC.
8    Q  Did you investigate whether MBC had any
9  other claims against anyone in connection with
10  Emerald Equipment?
11    A  I don't understand your question.
12    MR. MOLDOFF:  Anyone other than Sea Star?
13  BY MR. ARMSTRONG:
14    Q  Against anyone other than claims -- let
15  me rephrase that.
16    Did you investigate whether MBC had
17  claims against anyone other than those claims that
18  are specified in this agreement?
19    A  No.  MBC gave me -- or signed over all
20  the titles of equipment to me and gave me all the
21  titles.
22    Q  Is that a separate document?
23    A  Well, that's -- how many pieces of
24  equipment?  Every piece of equipment had a title.

Lorraine Robins

Page 26

1      Q  So you received the titles with an MBC
2  assignment on the --
3      A  Right.
4      Q  -- front or the back, wherever the space
5  was?
6      A  That's correct.
7      Q  And was the assignment then to Storage
8  Transfer, LLC?
9      A  They signed -- yes, uh-huh.
10         See, they had a lien against it; and they
11  signed off the lien and turned the titles over to
12  Storage Transfer.
13     Q  All right.  Did you have any
14  communications with Mr. Krieger about any particular
15  provisions of this Loan Sale and Assignment
16  Agreement?
17     A  Such as what?  I don't understand your
18  question.
19     Q  Well, when the Loan Sale and Assignment
20  Agreement was drafted, did you review the draft?
21     A  Yes, I did.
22     Q  Is that the same draft that you reviewed?
23     A  Well, we may have made corrections to it.
24  I don't know.  This is the final draft.  This

Page 27

1  isn't -- may not have been the same draft that I --
2  that I --
3      Q  Do you recall whether you made any
4  corrections to the draft?
5      A  That was four years ago.  Okay?
6         MR. ARMSTRONG:  Let me show you a copy of
7  a document that I'll ask the court reporter to mark
8  as Exhibit 13.
9         (S.T. Exhibit 13 was marked for
10              identification.)
11  BY MR. ARMSTRONG:
12     Q  Do you recognize that document?  It's the
13  indemnity.
14     A  No, I don't really recognize it, huh-uh.
15  No, I don't recognize this.
16     Q  Do you recall ever seeing an Indemnity
17  Agreement before --
18     A  I remember --
19     Q  -- such as that?
20     A  No.  I remember some talk about this
21  Indemnity Agreement.  And I believe that -- I believe
22  that Mr. Hallam sent a letter giving an explanation
23  of what this really meant.
24     Q  Sent a letter to whom?

Page 28

1      A  Sea Star Line -- or maybe to you, Tim.
2      Q  Did he send a letter to you?
3      A  No.  I remember seeing it somewhere in
4  the documents.
5      Q  Do you recall when he sent that letter?
6      A  No.
7      Q  Now, there's -- Exhibit 7 is a statement
8  from Gebhardt & Smith.
9      A  Uh-huh.
10     Q  What is that reference?
11     A  That was Bill Hallam's invoice for
12  setting up the loan agreement, which I agreed to pay.
13     Q  And did you pay that invoice?
14     A  I did.  I think there's a check attached
15  to it.  If there isn't, there should have been.
16         I did pay.  It has been paid by Storage
17  Transfer.
18     Q  Exhibit 10 is a copy of a letter dated
19  February 25th, 2004, Re:  Contribution to the
20  Emerald Estate.
21     A  Uh-huh.
22     Q  Do you recall that letter?
23     A  Yes, I do.
24     Q  Is that a true and correct copy of the

Page 29

1  letter that you received?
2      A  Yes, it is.
3      Q  Did you sign that letter on the second
4  page?
5      A  Yes, I did.
6      Q  And do you recognize your signature?
7      A  I do.
8      Q  What were the circumstances under which
9  you received that letter?
10     A  Well, I think the letter is
11  self-explanatory communications.
12     Q  When did the communications regarding
13  contribution to the Emerald estate first arise?
14     A  I guess it was in February sometime.  I
15  think it was prior to that.  I don't recall.  I see
16  this is dated February, but I don't recall.
17     Q  And why were you discussing -- that is,
18  Storage Transfer discussing -- a contribution to the
19  Emerald estate?
20     A  We agreed to do it.
21     Q  And why did you agree to do it?
22     A  Because evidently, at that particular
23  time, if my conversations with Gary Schildhorn were
24  correct, I felt it was the proper thing to do.

Lorraine Robins

Page 30

1      Q   What was Storage Transfer to receive in
2  return for its contribution to the Emerald estate?
3      A   The 15 percent for the Emerald estate
4  would be paid to the Emerald estate after all
5  expenses.  What was then left after that would go to
6  the secured creditor.  And if anyone was left after
7  the secured creditor received payment, then it would
8  go back to the estate.
9          Storage Transfer was the secured
10  creditor, because it had assumed MBC's secured
11  position.
12      Q   Storage Transfer assumed MBC's position,
13  you understood, under the Loan Sale and Assignment
14  Agreement; is that correct?
15      A   That's correct.  That's correct.
16      Q   Under that Loan Sale and Assignment
17  Agreement, was Storage Transfer obligated to collect
18  moneys from third parties, such as Sea Star, that
19  might have owed money to MBC or to Emerald?
20      A   That's correct, and paid down the loan
21  accordingly.  Whatever Storage Transfer received
22  during that period of time was applied against the
23  loan balance.
24      Q   Against what loan balance?

Page 31

1      A   The MBC loan balance which Storage
2  Transfer now was a holder of.
3      Q   Under the Loan Sale and Assignment
4  Agreement, Storage Transfer would collect money and
5  give part and it to MBC; correct?
6      A   Yes.  They gave 400,000.  That is what
7  the promissory note was about.
8      Q   Storage Transfer also agreed to give MBC
9  20 percent of whatever Storage Transfer collected
10  from Sea Star; correct?
11      A   On -- on the rental equipment after
12  expenses.
13      Q   And what were the expenses involved in
14  this collection?
15      A   Well, expenses were any expenses that
16  Storage Transfer had for office, for salaries, for
17  recovery of equipment.  Any expenses they had for
18  doing business.
19      Q   Did Storage Transfer hire attorneys to
20  collect the money?
21      A   No.
22      Q   How was Storage Transfer to collect the
23  money without attorneys?
24      A   They issued a bill of sale, and they

Page 32

1  had -- when they sold equipment.  Once the
2  equipment -- they received the money, then they would
3  release the titles.  They would not release titles
4  unless they received cash.
5      Q   Did Storage Transfer hire attorneys to
6  deal with Sea Star in regard to collections?
7      A   No.
8      Q   Has Storage Transfer ever hired
9  attorneys?
10      A   I don't think so, other than for
11  incorporation.
12          Well, I may have hired an attorney for --
13  to have my deposition postponed.
14      Q   Other than that, Storage Transfer has
15  never hired attorneys?
16      A   No.
17      Q   So at this point, Storage Transfer has
18  incurred no attorneys' fees in connection with any
19  collections from Sea Star?
20      A   No, we have incurred attorneys' fees,
21  because we have the fees for -- I think for -- well,
22  it was Adelman Lavine.  We were paying those.
23      Q   Did Storage Transfer hire Adelman Lavine
24  to --

Page 33

1      A   No.
2      Q   -- pursue this collection?
3      A   No, not for collection.
4          MR. MOLDOFF:  I believe there were
5  documents relating to the carve-out that goes to
6  that.
7  BY MR. ARMSTRONG:
8      Q   Well, in connection with the collection,
9  how was Storage Transfer to -- or how did Storage
10  Transfer plan to deal with Sea Star?
11      A   What do you mean, how did we plan to deal
12  with Sea Star?
13      Q   Storage Transfer wanted to collect money
14  from Sea Star; correct?
15      A   Yes.  But Emerald is -- Emerald is the
16  one that's dealing with Sea Star, not Storage
17  Transfer.
18      Q   Is Emerald dealing with Sea Star on
19  behalf of Storage Transfer?
20      A   No.  It's -- it's on behalf of the
21  creditors.
22      Q   On behalf of what creditors?
23      A   Whatever creditors Emerald has.
24      Q   And do you know what creditors Emerald

Lorraine Robins

Page 34

1    has?
2        A  No, I don't.
3        Q  Are there any secured creditors other
4    than Storage Transfer of Emerald?
5        A  I don't know.  But I know Storage
6    Transfer is a secured creditor.
7        Q  Has Storage Transfer paid any of
8    Emerald's attorneys' fees?
9        A  They have.
10       Q  Over what period of time has Storage
11   Transfer paid Emerald attorneys' fees?
12       A  I would have to check on that.
13       Q  And does Storage Transfer pay Emerald's
14   attorneys' fees on a regular basis?
15       A  No.
16       Q  Is there a periodic basis during which --
17       A  I haven't paid them for quite a while, so
18   I'm going to say it's periodic.
19       Q  Has Storage Transfer paid Emerald
20   attorneys' fees?
21       A  Yes.
22       Q  And is there a Storage Transfer check
23   showing payment?
24       A  Yes.

Page 35

1        Q  Are there invoices supporting that
2    payment?
3        A  No; the invoices are to Emerald.  Storage
4    Transfer just sent a check on account.
5        Q  And what is the amount of attorneys' fees
6    that Storage Transfer has paid -- that is, Emerald
7    attorneys' fees?
8        A  I would have to check that.  I don't know
9    offhand.  It wasn't too much, I don't think.
10       Q  You don't recall when the payment was
11   made?
12       A  It was probably made in '03 and a little
13   bit in '04.  And it wasn't constant.  It wasn't a
14   monthly thing or anything else like that.  It was
15   give as you could.
16       Q  Have you been receiving bills -- that is,
17   has Storage Transfer been receiving bills from
18   Emerald's attorneys?
19       A  No.
20       Q  Has Lorraine Robins individually been
21   receiving bills from Emerald's attorneys?
22       A  No.
23       Q  Other than attorneys' fees, what
24   collection expenses has Storage Transfer incurred?

Page 36

1        A  Well, I think you have an exhibit there
2    from Ariel.
3        Q  You're referring to Exhibit 9 for
4    identification?
5        A  Yes.
6        Q  What does that exhibit cover?
7        A  That exhibit covers equipment that was
8    located -- Emerald equipment that was located in --
9    by Ariel Valentin in Priority Ro/Ro, Pier 15,
10   San Juan.
11       Q  When was that equipment located at
12   Priority Ro/Ro?
13       A  Let me see -- this bill of sale is dated
14   May 17th, 2004.
15       Q  And did Storage Transfer pay that bill?
16       A  Yes, they did.
17       Q  Has Storage Transfer received any other
18   bills?
19       A  No.
20       Q  Storage Transfer has been selling
21   equipment, has it not?
22       A  Yes, it has.
23       Q  Did Storage Transfer sell the equipment
24   covered by this bill -- that is, Exhibit 9?

Page 37

1        A  I think they sold most of that equipment.
2    There's an invoice in there for it.
3        Q  Do you know when Storage Transfer sold
4    the equipment?
5        A  If you'll give me the bills, I'll let you
6    know.
7        Q  These are the rest.
8        A  No, that's not the bills; these are the
9    bills (indicating).
10       Q  You've given me a copy of a Storage
11   Transfer document entitled "Bill of Sale" dated
12   April 16th, 2004, reflecting a transfer to Priority
13   Ro/Ro, LLC, care of E. T. Heinsen.
14           Is that the equipment that's covered by
15   the Ariel Valentin invoice?
16       A  Well, I have to cross-check it with that.
17   I'm sure it is, and there's another one.
18       Q  There's a list of equipment attached to
19   the bill of sale; is that correct?
20       A  That is correct.
21       Q  And who prepared that list?
22       A  I did.  I did.
23       Q  Do you recognize the signatures on the
24   bill of sale?

Lorraine Robins

Page 38

1      A   Priority Ro/Ro and Arthur Davis.
2         MR. ARMSTRONG:  This bill of sale is part
3  of Exhibit 9.  For clarity, I'm going to mark it as
4  9A.
5         THE WITNESS:  And B.
6         MR. ARMSTRONG:  Is that agreeable,
7  Counsel?
8         MR. MOLDOFF:  Yes.
9  BY MR. ARMSTRONG:
10     Q   All right.  You've given me another bill
11 of sale in the amount of $73,750 that I'll mark as
12 9B.  This indicates transfer to Priority Ro/Ro LLC,
13 care of E. T. Heinsen.  There's also an equipment
14 list attached to that.
15         Is that a true and correct copy of the
16 Storage Transfer bill of sale?
17     A   Yes, it is.
18     Q   Do you recognize the signatures on 9A and
19 9B?
20     A   I recognize Arthur Davis' signature.  I
21 don't recognize whoever signed for Heinsen.
22     Q   When that equipment was sold, what was
23 Arthur Davis' position with Storage Transfer?
24     A   He was working as a contractor.

Page 39

1      Q   So did he have authority to sign
2  documents on behalf of Storage Transfer?
3      A   Yes, he did.
4      Q   What negotiations were there with
5  Priority Ro/Ro in regard to sale of the equipment?
6      A   They were made by Mr. Davis.
7      Q   Were you involved?
8      A   No.
9      Q   Did he report to you regarding the
10 negotiations?
11     A   Yes, he did.
12     Q   And what did he tell you?
13     A   Gave me the list of the equipment that
14 the man was buying and the prices he got.
15     Q   When you say "the man," do you know who
16 the --
17     A   Well, I don't know who he was dealing
18 with, whether he was dealing with Priority or dealing
19 with Heinsen, because, see, both names are on the
20 invoice.
21         And I think one was signed by Heinsen.  I
22 don't know who the other one was signed by.  One was
23 signed by Heinsen; one was signed by Priority Ro/Ro.
24 Do you want to see them again?

Page 40

1      Q   Yes.
2         There are check marks on the equipment
3  list.  Do you know what those check marks reference?
4      A   May I see?
5      Q   Yes.
6      A   I guess this is where I -- I don't know.
7  I don't know what they reference.  Huh-uh, I don't
8  know.
9      Q   The list is a document that you've
10 prepared; correct?
11     A   Yes.
12     Q   Where did you get the information
13 necessary to prepare that list?
14     A   From here.
15     Q   From the Ariel invoice?
16     A   That is correct.
17     Q   Let me see the first page of those bills
18 of sale, please.
19     A   You got the one there.  Here's the other
20 one.
21     Q   No -- never mind.
22         On Exhibit 9B, did you prepare the list
23 attached?
24     A   Yes.

Page 41

1      Q   Do you know why the check marks are on
2  that list?
3      A   No.
4      Q   Do you recall how long before the actual
5  sale the negotiations began?
6      A   How long before the sale?
7      Q   Before the actual bill of sale was
8  signed.
9         MR. MOLDOFF:  Object to form.
10        THE WITNESS:  I don't know.
11        It says here it was signed on 4/30/04 on
12 this one.
13 BY MR. ARMSTRONG:
14     Q   Yes.  My question was, do you know how
15 long before the document was signed the negotiations
16 actually started?
17     A   Started on April 7th.
18     Q   Why do you say April 7th?
19     A   Because of the date that we have here on
20 the bill of sale.
21     Q   Are you saying that negotiations --
22     A   Well, this one is the 16th of April,
23 and this one is the 7th of April.
24     Q   All right.  You're saying that 9B is the

Lorraine Robins

Page 42

1  7th of April; 9A is the 16th of April.
2      Were all of the negotiations in regard to
3  9B on the same day that the bill of sale is dated?
4      MR. MOLDOFF: Object to form.
5      THE WITNESS: I don't know.
6  BY MR. ARMSTRONG:
7      Q  I'm just asking whether you know how long
8  before these were actually done.
9      A  No, I don't.
10     Q  May I see the other bills of sale,
11 please.
12     A  What other bills?  Oh, all of them?
13     Q  All right.  Referring back to this
14 February 25th letter regarding contribution to the
15 Emerald estate, the second sentence states, "Emerald
16 currently intends to prosecute certain substantial
17 claims against Sea Star Lines, LLC."
18     Do you recall that?
19     A  Yes, I guess.
20     Q  When did discussions regarding
21 prosecution of claims against Sea Star start?
22     A  They started January or February -- I
23 think it was that year.
24     Q  And what was your involvement in those

Page 43

1  discussions?
2      MR. MOLDOFF:  Object to the form.  When
3  you say "you" now, Storage Transfer?
4      MR. ARMSTRONG:  Storage Transfer.
5      MR. MOLDOFF:  He means Storage Transfer.
6      THE WITNESS:  I know he means Storage
7  Transfer.  But I don't -- I don't -- my involvement?
8  I guess they came -- we discussed the bills, the
9  self-billing reports, the lack of payment, the
10 equipment that was missing, the response we were
11 getting.
12 BY MR. ARMSTRONG:
13     Q  Over what period of time were there
14 self-billing reports?
15     A  The self-billing reports started
16 August 29th, '02, through, I believe,
17 November 30th, '03.
18     Q  When you refer to "self-billing reports,"
19 what do you mean?
20     A  I mean the invoices that Sea Star Line
21 prepared designating the equipment that they were
22 supposed to be using, and the lease payments due on
23 those -- that equipment.
24     MR. MOLDOFF:  Just as a clarification, I

Page 44

1  believe you said August of '02.
2      THE WITNESS:  Oh, I mean, April.  April
3  '02 -- April 29th, '02.
4  BY MR. ARMSTRONG:
5      Q  Well, was the first self-billing report
6  on April 29th '02?
7      A  Yes, it was.
8      Q  When you say "we," in terms of your
9  discussions, who are "we"?
10     A  I mean myself.  Me.  My discussions.
11     It became apparent that Sea Star Line was
12 not paying for all the equipment they were using.
13     Q  As of February 25th, 2004, had Storage
14 Transfer decided to file suit against Sea Star Line?
15     A  No.
16     Q  What were Storage Transfer's plans as of
17 February 25th, 2004?
18     A  Emerald was going to file suit.
19     Q  Did Storage Transfer plan that Emerald
20 would file suit against Sea Star Line?
21     A  No.  Emerald planned that they were going
22 to file suit against Sea Star Line.
23     Q  And who, on behalf of Emerald,
24 communicated with you concerning Emerald's plan?

Page 45

1      A  Could have been Adelman Lavine.  I don't
2  know.  I don't recall that now.  But I know suit was
3  being filed.
4      Q  Did you have any communications regarding
5  filing the suit with Tom Holt, Sr.?
6      A  I probably discussed the lack of payment
7  with him.
8      Q  Do you recall whether you had any such
9  discussion before February 25th?
10     A  I really can't say what time frame it was
11 in.
12     Q  As of February 25th, Storage Transfer
13 understood that Emerald planned to file suit against
14 star?
15     A  That's correct.
16     Q  Did Emerald tell you, or anyone else at
17 Storage Transfer, that to file suit against Sea Star,
18 Emerald would need your permission?
19     A  No.
20     Q  Have there been any amounts disbursed to
21 third parties other than those we've discussed, that
22 you recall?
23     A  No -- well, disbursed money to my staff
24 when I was -- my contractors.  That's all.

Lorraine Robins

Page 46

1      Q  This refers to 15 percent of any
2  proceeds, net of expenses or other amounts disbursed
3  to third parties.
4      A  Uh-huh.
5      Q  What were the expenses?
6      A  Telephone, office equipment, office rent,
7  contract employees, my salary.
8      Q  Were you receiving a salary?
9      A  Not yet.
10      Q  Have you ever received a salary?
11      A  No.
12      Q  Is there any writing -- that is, any
13  document -- regarding your salary?
14      A  I have to write myself a letter.
15      Q  What are the other amounts disbursed to
16  third parties, to you knowledge, stated in that
17  letter?
18      A  I would have to look at my books to find
19  that out.
20      Q  Before you signed this letter, did you
21  discuss the contents with an attorney?
22      A  No.
23      (Brief recess.)
24  BY MR. ARMSTRONG:

Page 47

1      Q  You received another letter dated
2  February 25th, 2004, that has been marked as
3  Exhibit 11.
4      A  Yeah, uh-huh.
5      Q  Do you know what the purpose of that
6  letter was?
7      A  It was my agreement to -- I'm not reading
8  it, skimming over it.  Looks like it's my agreement
9  to do the carve-out.
10      Q  Is that carve-out in addition to the
11  contribution to the Emerald estate?
12      A  It's the same thing.  There's only one
13  carve-out.
14      Q  I think you better look at the carve-out
15  letter.  Why don't you read it.
16      A  I was trying to rush.
17      Q  I know.
18      A  Yeah, this is Storage's guarantee of
19  paying the legal fees for Adelman & Lavine.
20      Q  It's entitled "carve-out."
21      A  I didn't write the letter.  I don't know
22  why it's entitled "carve-out."  But it basically
23  refers to the legal fees.
24      Q  Is that a carve-out for a legal fees?

Page 48

1      A  I got to read the next part.
2      Yeah, it's a carve-out for legal fees.
3      Q  Is that in addition to the 15 percent
4  carve-out?
5      A  Yes, it is.
6      Q  So am I correct in understanding that
7  Storage has two carve-outs:  One --
8      A  For legal fees.
9      Q  -- carve-out to Emerald, and the other
10  for legal fees?
11      A  Yes.  One is for the estate, and one is
12  for legal fees.
13      Q  And Exhibit 12 is a copy of a letter
14  dated August 15th, 2007, that you received;
15  correct?
16      A  Uh-huh.
17      Q  Is that a third cash-out?
18      A  No, it is not.  It's Adelman Lavine had
19  merged their firm with Eckert Seamans; and it just is
20  reverting to -- the carve-out of the legal fees is
21  now reverting to Eckert Seamans instead of Adelman
22  Lavine.
23      Q  For the Eckert Seamans bills?
24      A  Yeah.

Page 49

1      Q  You've also given me a Chapter 11
2  quarterly fee statement, Emerald Equipment Leasing,
3  Inc.  That is Exhibit 8.
4      Do you know what that document is?
5      A  Well, this was a document for the
6  trustee.  And they were around -- balances for the
7  trustee -- the trustee for a period of time.  They
8  hadn't been paid by Emerald, because Emerald didn't
9  have any money.  I paid it for them.
10      Q  Do you have any other quarterly fee
11  statements?
12      A  Yeah, I do.  I have another additional
13  $3,000 worth that I haven't paid yet.
14      MR. ARMSTRONG:  Let me show you a copy of
15  a document entitled Motion of MBC Leasing Corp. for
16  Allowance and Payment of Administrative Priority
17  Claims that I'll ask the court reporter to mark as
18  Exhibit 14 for identification.
19      (S.T. Exhibit 14 was marked for
20      identification.)
21  BY MR. ARMSTRONG:
22      Q  Have you ever seen this document before?
23      A  No, I have not.
24      Q  Did you and Mr. Krieger, or anyone else

Lorraine Robins

14 (Pages 50 to 53)

Page 50

1  from MBC, discuss claims that MBC had against NPR, or
2  the estate of NPR, Inc.?
3        A  No. I don't know whether that's -- it's
4  been so long since I read the agreement, I don't know
5  whether it's covered in the agreement.
6        Q  The agreement --
7        A  But I never saw this document before.
8        Q  The agreement deals with Emerald
9  Equipment Leasing, Inc.; correct?
10       A  Uh-huh.
11            MR. ARMSTRONG:  Let me show you a copy of
12  a document that's previously been marked as Exhibit 3
13  to Mr. McAda's deposition. I'll mark this as
14  Exhibit 15 for purposes of this deposition.
15            (S.T. Exhibit 15 was marked for
16            identification.)
17  BY MR. ARMSTRONG:
18       Q  Have you ever seen that document before?
19       A  Well, I don't recall, but it looks like a
20  bill of sale.
21       Q  Do you know who prepared the attachment?
22       A  No, I don't.
23       Q  Do you recognize the signature on the
24  bill of sale itself?

Page 51

1        A  It says Arthur Davis.
2        Q  And the bill of sale is dated
3  November 2003; correct?
4        A  Right.
5        Q  In November 2003, do you know why
6  Mr. Davis was signing on behalf of Greenwich
7  Terminals?
8        A  Well, I told you before, prior to that he
9  was -- he was doing it for -- he was working on
10  selling the equipment, and he was working for
11  Greenwich Terminals at that particular time. I
12  believe Greenwich Terminals had some sort of
13  agreement with MBC; and I'm not familiar with it,
14  though.
15       Q  When did Storage Transfer actually begin
16  selling equipment in the name of Storage Transfer?
17       A  Once it paid off its loan to MBC, these
18  funds would have gone to MBC.
19       Q  Do you recall when the actual payment was
20  made?
21       A  I wouldn't know that. Payment would have
22  gone directly to MBC.
23            MR. ARMSTRONG:  Let me show you a copy of
24  a handwritten document that I'll ask the court

Page 52

1  reporter to mark as Exhibit 16.
2            (S.T. Exhibit 16 was marked for
3            identification.)
4  BY MR. ARMSTRONG:
5        Q  Do you recognize the signature?
6        A  It's Arthur Davis.
7        Q  May 11th, 2004, was Arthur Davis acting
8  on behalf of Storage Transfer?
9        A  I don't know. It doesn't say who he's
10  acting for on here.
11       Q  Was he a contractor for Storage Transfer
12  at that time?
13       A  '04, he may have been, yes. He may have
14  been. Yes, I would see he was then.
15       Q  Was he writing that memo on behalf of
16  Storage Transfer?
17       A  I don't know. I don't know who he wrote
18  it on.
19       Q  Well, did he have authority to give
20  instructions on behalf of Storage Transfer at that
21  time?
22       A  At that time, he did.
23            MR. ARMSTRONG:  Let me show you a copy of
24  a document that I'll ask the court reporter to mark

Page 53

1  as Exhibit 17 for identification.
2            (S.T. Exhibit f17 was marked for
3            identification.)
4  BY MR. ARMSTRONG:
5        Q  At that time, was Mr. Davis acting on
6  behalf of Storage Transfer in regard to equipment
7  sales?
8        A  I would say so.
9            MR. ARMSTRONG:  Let me show you a copy of
10  a document that I'll ask the court reporter to mark
11  as Exhibit 18 for identification. It's a telecopy
12  cover sheet dated 9/24/03.
13            (S.T. Exhibit 18 was marked for
14            identification.)
15  BY MR. ARMSTRONG:
16       Q  Have you ever seen that document before?
17       A  No.
18            MR. ARMSTRONG:  Let me show you a copy of
19  a letter dated October 30th, 2003, that I'll ask
20  the court reporter to mark as Exhibit 19 for
21  identification.
22            (S.T. Exhibit 19 was marked for
23            identification.)
24  BY MR. ARMSTRONG:

Lorraine Robins

15 (Pages 54 to 57)

Page 54

1    **Q   Have you ever seen that document before?**
2    A  No.
3        MR. ARMSTRONG:  Let me show you a copy
4    of -- apparently is an email dated September 25th,
5    2003, together with an attachment that I'll ask the
6    court reporter to mark as Exhibit 20 for
7    identification.
8        (S.T. Exhibit 20 was marked for
9        identification.)
10   BY MR. ARMSTRONG:
11      **Q   Have you seen that email and attachment**
12   **before?**
13      **Oops, I marked the wrong piece of paper.**
14      A  No, I don't remember seeing it.
15      MR. ARMSTRONG:  Mark "20" on that at the
16   bottom.
17      MR. MOLDOFF:  Let me just take a look at
18   this before we go on.
19      THE WITNESS:  This was during the period
20   of time that he was working for --
21      MR. MOLDOFF:  Shhh.
22   BY MR. ARMSTRONG:
23      **Q   Do you know who prepared the document**
24   **entitled "Emerald Equipment Leasing Inventory,**

Page 55

1    **September 24th, 2003"?**
2    A  That -- what one?  The attachment?
3    **Q   Yes.**
4    A  No, I don't.
5    **Q   That is not something that you prepared?**
6    A  No, definitely not.
7        MR. ARMSTRONG:  Show you a copy of a
8    document entitled "Inventory Located in Vega Alta,
9    December 4th, 2004," that I'll ask the court
10   reporter to mark as Exhibit 21 for identification.
11      (S.T. Exhibit 21 was marked for
12      identification.)
13   BY MR. ARMSTRONG:
14      **Q   Do you recognize that document?**
15      A  I've seen this document before.  I don't
16   remember when, though.
17      **Q   Do you know who prepared it?**
18      A  No, I don't.
19      **Q   Was it prepared on behalf of Storage**
20   **Transfer?**
21      MR. MOLDOFF:  Object to the form.
22      THE WITNESS:  I don't know who prepared
23   it, so I don't know.
24   BY MR. ARMSTRONG:

Page 56

1    **Q   Did you prepare any inventories?**
2    A  Uh-huh.
3        MR. MOLDOFF:  Object to the form.
4        THE WITNESS:  Yes, I did.
5    BY MR. ARMSTRONG:
6        **Q   What inventories did you prepare?**
7        A  Well, I didn't prepare inventories
8    per se.  I took Sea Star's inventories, and I had put
9    them in some semblance of order.  Other than that --
10   but I didn't prepare inventories themselves.
11      **Q   What do you mean when you say you put**
12   **them in some semblance of order?**
13      A  Well, I had gotten an inventory for
14   June 22, '02, and August 15th, '02.  And they
15   weren't in numerical order or any kind of order, so I
16   put them on a spreadsheet, got them into numerical
17   order.
18      **Q   Have you prepared any inventories on**
19   **behalf of Storage Transfer?**
20      A  No.
21      **Q   Has Storage Transfer instructed anyone to**
22   **prepare inventories of Emerald Equipment?**
23      A  Not to my knowledge.
24      **Q   Do you know what Vega Alta is?**

Page 57

1    A  Vega Alta was a piece of ground where the
2    equipment that was originally in the sand lot -- or
3    in the -- I mean the showroom was moved to.
4        **Q   What is "the showroom"?**
5        A  San Juan.
6        **Q   Is that part of the port facility in**
7    **San Juan?**
8        A  I don't know whether -- I think it's part
9    of the port facility.
10      **Q   When was the equipment moved to Vega**
11   **Alta?**
12      A  Probably in December '04.  That's what
13   this inventory says.
14      **Q   Do you know why the equipment was moved**
15   **to Vega Alta?**
16      A  Yes; it was too expensive to keep it in
17   the showroom.
18      **Q   Too expensive for whom?**
19      A  For, I guess at that particular time, Sea
20   Star Line -- I mean, Storage Transfer was paying for
21   the storage.
22      **Q   Did Storage Transfer pay for storage at**
23   **the showroom?**
24      A  I would have to check on that.

Lorraine Robins

16 (Pages 58 to 61)

Page 58

1    Q   Did Storage Transfer pay for storage at
2  Vega Alta?
3    A   Yes, they did.
4    Q   Does Storage Transfer have records of the
5  payments?
6    A   Yes, they do.
7    Q   Have you ever seen that document entitled
8  "Inventory Located in Vega Alta, December 4th,
9  2004"?
10    A   No. I think I saw that in -- I think
11  that the first time I saw that was in Mr. McAda's
12  deposition, when we got copies of that.
13    Q   Have you ever compared that inventory
14  with the Emerald claims?
15    A   How do you mean that?
16    Q   Have you ever compared the numbers -- the
17  equipment identification numbers in that inventory
18  with equipment numbers in Emerald's claims?
19    A   They should -- you mean Emerald claims to
20  where?
21    Q   Emerald claims against Sea Star.
22    A   No, I'm quite sure that I compared them
23  to that. They wouldn't be on the -- if they were in
24  Vega Alta, they wouldn't be on Sea Star's invoice.

Page 59

1    Q   So if they were on Sea Star's invoice, it
2  would be incorrect?
3    A   That would be incorrect.
4    Q   And when you say "invoice," to what are
5  you referring?
6    A   The fees that we sent you are invoices.
7  We may call them schedules, but they're invoices.
8    Q   Now, do you make changes in those
9  schedules?
10    A   I have made changes, yes.
11    Q   Over what period of time have you made
12  changes?
13    A   Well, I started making changes --
14    MR. MOLDOFF:   Well, I object to form.
15  Again, we have to keep in mind, when you say "you," I
16  don't know who "you" are.
17    THE WITNESS:   Well, I thought that he
18  said in the very beginning "you" is always referring
19  to Storage Transfer. Is that correct?
20    MR. ARMSTRONG:   Yes.
21    THE WITNESS:   So I'm answering as Storage
22  Transfer.
23    MR. MOLDOFF:   Right. Is Storage doing to
24  the invoice --

Page 60

1    MR. ARMSTRONG:   Counselor --
2    MR. MOLDOFF:   I'm just --
3    MR. MOLDOFF:   Are you the attorney?
4    MR. MOLDOFF:   I'm an attorney, yes.
5    MR. ARMSTRONG:   Are you Storage
6  Transfer's attorney?
7    MR. MOLDOFF:   No, I'm not.
8    MR. ARMSTRONG:   Would you let the witness
9  respond --
10    MR. MOLDOFF:   I'm Emerald's attorney, and
11  I'm just trying to make the record appear clear.
12    MR. ARMSTRONG:   Would you let the witness
13  respond.
14    THE WITNESS:   What's the question now?
15  BY MR. ARMSTRONG:
16    Q   Have you made changes in the invoices?
17    A   Yes, I did.
18    Q   And over what period of time have you
19  made changes in the invoices?
20    A   Over the past couple of years, because I
21  started making changes when we started receiving
22  documents in discovery, where I found many, many
23  pieces of equipment that weren't on the self-billing
24  report that had been used by Sea Star Lines.

Page 61

1    Q   You knew before you started receiving
2  documents in discovery that there were pieces of
3  equipment not on self-billing reports; correct?
4    A   That is correct.
5    Q   And you knew that when you were wearing
6  your, let us say, Emerald hat before Storage Transfer
7  came into --
8    A   I wasn't wearing an Emerald hat.
9    Q   Well, wearing your help-straighten-out-
10  the-books hat before Storage Transfer came into
11  existence; correct?
12    A   That's correct.
13    Q   Mr. Davis had complained about that
14  beginning in May 2002; correct?
15    A   May 2002? I don't know.
16    Q   And you pointed out problems September
17  and later in 2002; correct?
18    A   Oh, I put a pointed out problems all
19  along, yes.
20    Q   Every time you received a self-billing
21  report, you reviewed it; correct?
22    A   When I first received self-billing
23  reports -- the first self-billing report I received
24  was sometime in, I believe, September or October '02.

Lorraine Robins

Page 62

1    At that time, I received April 29th to May 15th;
2    May 15th to May 30th; June and July -- I believe
3    those -- three months.
4            At that particular time, the only thing I
5    did with those was put them on a spreadsheet,
6    reporting the equipment that they showed on there,
7    the amount that was paid.
8            That's the only thing I did. I wasn't
9    checking them against anything; I was just putting
10   them in some semblance of order.
11       Q   When did you begin checking them?
12       A   I began checking them -- I guess it was
13   much, much later, several months later.
14           This transpired when Mr. Davis went down
15   to San Juan several times and found equipment unused
16   on the pier; and he would send a fax or call me up on
17   the telephone and give me a list of equipment that he
18   saw moving with Sea Star tractors on the pier,
19   checking to see if they were on the self-billing
20   reports.
21           He saw a group of our -- of containers
22   that were being used for a shop and offices, fence
23   line and things like that. So that's when I started
24   checking to see if they were on the self-billing

Page 63

1    report.
2        Q   And you were aware that Mr. Davis had
3    complained, in 2002, about alleged discrepancies in
4    the self-billing reports?
5        A   Could have been at that particular time,
6    towards the end of 2002, yes.
7        Q   You never saw any of Mr. Davis'
8    communications to Sea Star regarding self-billing
9    reports?
10       A   No, I don't recall any.
11       Q   As Storage Transfer, have you continued
12   to review self-billing reports?
13       A   I have.
14       Q   Have you made changes in your invoices?
15       A   I have.
16       Q   How do you notify Sea Star when you're
17   making a change in your invoices?
18       A   Well, originally I started sending out
19   invoices in an A, B, C -- an A invoice, B, C, that
20   kind, and it was a mixed-up invoice.
21           Then in August of '03 -- August 21st of
22   '03, I received a 66-page statement from Andy Rooks
23   of Sea Star Line. And when I started checking this
24   against what he said he had for equipment and what I

Page 64

1    said, I found that there were lots and lots of
2    discrepancies.
3            At that particular time, I decided it
4    would be much simpler to take each category, such as
5    20-foot chassis, 40-foot chassis, 45-foot chassis,
6    gen-sets and each type of container and make a
7    separate invoice for each one. So I changed billing
8    systems entirely and set them up that way.
9        Q   When you set them up that way, did you
10   send the invoices to Sea Star on a monthly basis?
11       A   Sent them on a monthly basis. By then it
12   was -- I sent them at the end of the -- let's see.
13   It's -- by the time I got them done, it was probably
14   at the end of that period of time when the lease
15   expired.
16           So I didn't -- so I sent them all out at
17   one time. But I did send them the invoices.
18       Q   Do you recall when you sent them out?
19       A   Not really. They must have dates on them
20   somewhere. Copies were received by Sea Star Line.
21       Q   And how do you know that?
22       A   Well, they didn't come back to me.
23       Q   Did you send them to any particular
24   person at Sea Star Line?

Page 65

1        A   Well, sometimes I sent them
2    electronically to Andy Rooks.
3        Q   When did you begin doing that?
4        A   I don't recall.
5        Q   Your invoices -- well, became Storage
6    Transfer invoices after the change?
7        A   No; they became Emerald invoices over
8    time.
9        Q   Is Emerald acting on behalf of Storage
10   Transfer in regard to these invoices?
11           MR. MOLDOFF: Object to form.
12           THE WITNESS: I don't know what you mean
13   by that.
14   BY MR. ARMSTRONG:
15       Q   Well, am I correct in understanding that
16   Storage Transfer expected to collect the money;
17   correct?
18       A   That's correct.
19       Q   So any invoices that are prepared now
20   would be for Storage Transfer; correct?
21       A   No, they're for Emerald's equipment.
22           Emerald Equipment, when they receive
23   payment for these invoices, at 15 percent carve-out,
24   would go to the estate; the legal fees will be paid;

Lorraine Robins

18 (Pages 66 to 69)

Page 66

1  the balance will go to the secured creditors; and
2  anything over the secured creditors will revert to
3  the estate.
4      Q  Well, am I correct in understanding that
5  you can't determine what the 15 percent carve-out to
6  Emerald would be until all of this is completed?
7      A  That's correct.
8      Q  So when the money is received in payment
9  of an invoice, that would go to Storage Transfer;
10  correct?
11      A  No; it would go to Emerald.
12      Q  Storage Transfer has to pay MBC; correct?
13      A  No; MBC has been paid. Storage Transfer
14  has taken MBC's position. MBC has to receive
15  20 percent of the rental after expenses.
16      Q  So Storage Transfer would have to pay MBC
17  20 percent of any payment received after Storage
18  Transfer's expenses; correct?
19      A  After Storage Transfer's expenses, after
20  the 15 percent carve-out for the estate, and after
21  the legal fees. Then that money goes to Storage
22  Transfer, who has taken MBC's position.
23          With that money, it will be 20 percent of
24  the revenue for rental of equipment, less Emerald's

Page 67

1  expenses.
2      Q  Does the Loan Sale and Assignment
3  Agreement provide for a carve-out to Emerald?
4      A  What do you mean, a carve-out to Emerald?
5      Q  The Loan Sale and Assignment Agreement
6  between --
7      A  Of the loan? No, that only comes to --
8      Q  It doesn't say anything about a carve-out
9  to Emerald, does it?
10      A  No. No, it doesn't.
11      Q  It provides for a 20 percent payment to
12  MBC, as designed in the agreement?
13      A  That's correct.
14      Q  And am I correct in understanding that
15  MBC is not a party to any carve-out agreement between
16  Storage Transfer and Emerald?
17      A  That's correct.
18      Q  Now, have you been adding equipment to
19  these invoices?
20      A  I have.
21      Q  And how have you done that? What are the
22  circumstances under which you've done that?
23      A  I don't know which invoices you're
24  looking at there. You say "these invoices."

Page 68

1      MR. ARMSTRONG: Well, let me say -- let
2  me ask you whether you recognize these documents that
3  I'll ask the court reporter to mark as Exhibit 22.
4      (S.T. Exhibit 22 was marked for
5  identification.)
6  BY MR. ARMSTRONG:
7      Q  I'm going to show you a copy of Emerald
8  Equipment lease invoice to Sea Star Line, Inc.,
9  schedule -- it looks like 40-foot chassis.
10      A  Okay.
11      Q  My old eyes have problems with this. It
12  starts with document Page No. E06881A?
13      A  Yeah; this is the latest bill.
14          I thought we got this blown up for you.
15  Wasn't this blown up for you?
16      Q  Pardon?
17      A  Wasn't this blown up when you got it?
18      Q  Not for me. I don't know whether it was
19  blown up --
20      A  If you'll see, there's a little column
21  alongside of each -- right here -- see this little
22  column here?
23      Q  Uh-huh.
24      A  It's marked "AG." That means it was

Page 69

1  adjusted.
2      Q  That was adjusted from previous invoices;
3  is that correct?
4      A  That's correct.
5      Q  Previous invoices from the beginning? Or
6  from the first person on?
7      A  Yes. So this is the most current
8  invoice, I believe.
9      Q  Can you tell from this document when you
10  prepared -- I should say when Storage prepared this
11  invoice?
12      A  It says "amended 8/28/07" -- my copy that
13  I'm looking at.
14      Q  So am I correct in understanding that
15  this document was amended after the amended
16  counterclaim was filed?
17      A  What amended counterclaim?
18      Q  The Emerald Equipment Leasing amended
19  counterclaim against Sea Star.
20      A  Yes, it was amended.
21      Q  Was it amended to include equipment that
22  was not on invoices submitted to Sea Star prior to
23  filing the amended counterclaim?
24      A  It was amended to equipment that was not

Lorraine Robins

Page 70

1  on Sea Star's prior invoices; and it was also
2  adjusted, in some cases, down.
3       I mean, if -- we gave them credit for
4  something if we had missed it.  It was amended both
5  ways, up and down.
6       **Q  Have you continued to amend invoices**
7  **after Exhibit 22?**
8       A  I think I've stopped now.
9       MR. ARMSTRONG:  Let me show you a
10 document that I'll ask the court reporter to mark as
11 Exhibit 23.  It's Emerald Equipment Leasing Invoice
12 to Sea Star Lines 40-Foot Chassis, Not Terminated As
13 Per Lease Agreement and Additional Rent.
14      (S.T. Exhibit 23 was marked for
15      identification.)
16 BY MR. ARMSTRONG:
17      **Q  Is that a document that you prepared?**
18      A  Yes, it is.
19      **Q  And in regard to Exhibit 22, was**
20 **Exhibit 23 prepared before Exhibit 22?**
21      A  Yes.  According to this, it was
22 October 21st, '06.
23      **Q  No, that document has, in the far**
24 **right-hand column, the word "adjusted."**

Page 71

1       A  That's correct.
2       **Q  -- by several.  What does that mean?**
3       A  That means that we later -- we later
4  recouped the equipment and sold it.and when we did,
5  we gave a credit for the stipulated value and made it
6  what we received less the stipulated value.
7       Look at the first one.  It says $900.  So
8  that means that we got $1,300 payment for that
9  chassis.
10      **Q  After you recouped the equipment, did you**
11 **give Sea Star any notice of sale prior to the time**
12 **that you sold it?**
13      A  No; the lease was canceled at this
14 particular time.
15      **Q  At what particular time?**
16      A  When we sold it.
17      **Q  Are you saying that the lease didn't**
18 **apply to the sale?**
19      MR. MOLDOFF:  Object to form.
20      THE WITNESS:  I'm saying that we didn't
21 give them notice.
22 BY MR. ARMSTRONG:
23      **Q  On any of the adjusted sales, do you**
24 **recall giving Sea Star notice prior to the sale?**

Page 72

1       A  No.
2       **Q  That document, Exhibit 23, does not have**
3  **what we call a Bates number, the E followed by the**
4  **numbers.**
5       A  Well, then you should have one with the
6  Bates numbers.  I don't know where you got these if
7  they don't have a Bates number.
8       **Q  Do you know when that document was**
9  **furnished to Sea Star?**
10      A  No, I don't, because all these invoices
11 should have gone out together, because -- it should
12 have a Bates number on it.
13      MR. ARMSTRONG:  All right.  I'm going to
14 show you another series of documents -- Emerald
15 Equipment Leasing, Inc.; Schedule 40-Foot Chassis --
16 that I'll ask the court reporter to mark as
17 Exhibit 24 for identification.
18      (S.T. Exhibit 24 was marked for
19      identification.)
20 BY MR. ARMSTRONG:
21      **Q  Do you recognize that?**
22      A  This looks like a prior bill.  What was
23 this one?  This is an earlier invoice, I believe.
24      **Q  In October 2007, do you recall sending**

Page 73

1  **Andy Rooks an electronic version of the invoice?**
2       A  No, I don't recall.  I know I sent them
3  all electronic versions sometime, but I don't know
4  when it was.  Is that what this is?
5       **Q  I think that's what it is.**
6       A  Okay.
7       **Q  Is it your understanding that that**
8  **version is an earlier version of Exhibit 22?**
9       A  Yes, it is.
10      This is dated -- amended August 28th,
11 '07; and this is amended May 1st, '06.
12      **Q  Have you prepared any invoices after**
13 **August 2007 or revised any invoices after**
14 **August 2007?**
15      A  Well, I don't know.  I'd have to look at
16 all the invoices.  They should have been all around
17 the same time, but I'm not sure.  What do they say
18 here?
19      **Q  I'm not going to show you any more.  I'm**
20 **out of invoices.**
21      A  Oh, you're out of invoices.
22      Well, it was during this period of time
23 that I was sending them so -- they all fell around
24 that date.

Lorraine Robins

Page 74

1    Q  And did you add equipment to this
2  invoice, Exhibit 22, that had not been on prior
3  invoices?
4    A  I would say so.  I'd have to check it
5  against each invoice.
6      I'd said yes, because the total on this
7  invoice is 889,000 and change.
8    Q  Wait.  You're referring to Exhibit 24?
9    A  Yeah.  And on this one it's 904,000 and
10  change.
11    Q  Did you take equipment off invoices?
12    A  In some cases.
13    Q  What cases would you take equipment off
14  invoices?
15    A  If a document showed me that you had
16  returned it or that it was signed for by a
17  representative of Emerald, I adjusted the bill
18  accordingly.  I wouldn't --
19    Q  Was it your understanding that a
20  representative of Emerald had to sign for equipment
21  that was returned?
22    A  Yes.
23    Q  Where did you gain that understanding?
24    A  I gained that, I think, from the lease

Page 75

1  agreement with Emerald.
2    Q  Have you read the complete lease
3  agreement since we were last together?
4    A  Not really.  Not really.
5      I also thought I received -- somewhere I
6  read a document from Andy Rooks where he spelled out
7  the fact that the lease agreement has to be -- the
8  Emerald agent had to sign off with -- I have that
9  document somewhere.
10    Q  Okay.  Am I correct in understanding that
11  as of today, you have not read the complete equipment
12  rental agreement?
13    A  Oh, I have read it.  I just don't
14  remember it right now.
15      MR. ARMSTRONG:  Let me show you a copy of
16  a letter dated August 16th, 2006, that I'll ask the
17  court reporter to mark as Exhibit 25 for
18  identification.
19      (S.T. Exhibit 25 was marked for
20      identification.)
21  BY MR. ARMSTRONG:
22    Q  Do you recognize that letter?
23    A  No, I don't.
24    Q  Do you know what The Corona Group is?

Page 76

1    A  No, I do not.
2    Q  Have you ever heard of it?
3    A  No, I have not.
4    Q  August 16th, 2006, was Mr. Davis a
5  contract representative or employee for Storage
6  Transfer?
7    A  He worked off and on during that year.
8    Q  Have you ever spoken with E. T. Heinsen?
9    A  Spoken with him?  Yes, I spoke to E. T.
10  Heinsen, to Teddy Heinsen.
11    Q  When did you last speak with him?
12    A  I spoke with him in -- about a year ago.
13    Q  What was the subject of your
14  conversation?
15    A  The subject of my conversation was, one,
16  I was -- I wanted to get his -- copies of his
17  electronic data that he -- I wanted to confirm his --
18  rather, how he transmitted his data from his facility
19  to Navieros in Edison.and he told me that this was
20  transmitted daily from him to Edison for all the
21  loading and unloading of ships and movements of cargo
22  directly into their computer.
23    Q  Over what period of time did he tell you
24  that occurred?

Page 77

1    A  When he was an agent.
2    Q  And he had been an agent for NPR
3  beginning in 2000?
4    A  I have no idea how long he was an agent.
5    Q  Did he tell you anything else?
6    A  No.
7    Q  What did you say to him?
8    A  I asked him how he did it.  And he
9  explained it to me, and I said, Thank you.
10    Q  Have you spoken or communicated with any
11  other representatives of E. T. Heinsen C. Por A., the
12  company?
13    A  No.
14    Q  Are there any representatives of Emerald,
15  other than Arthur Davis, to your knowledge?
16    A  I don't know whether Arthur represents
17  Emerald or not.
18    Q  If you had to communicate with Emerald,
19  with whom would you communicate?  Anyone from
20  Emerald.
21    A  I would communicate with Mr. Holt.
22    Q  Have you had any communications with
23  representatives of the NPR bankruptcy trustee?
24    A  No.

Lorraine Robins

Page 78

1      Q   Have you had any communications with
2  anybody holding Emerald Equipment?
3      A   Such as?
4      Q   Any depots, terminals.
5      A   During what period of time?
6      Q   During -- while you're at Storage
7  Transfer.
8      A   No.
9      Q   Do you communicate with respect to
10  purchasers of Emerald Equipment?
11     A   No.
12     Q   Who does, on behalf of Storage?
13     A   Mostly Arthur Davis.
14     Q   Are you involved in recoveries of Emerald
15  Equipment on behalf of Storage?
16     A   In some respects.
17     Q   What involvement?
18     A   Well, such as I had to approve Ariel
19  Valentin's getting involved in locating our equipment
20  and paying his bills.
21     Q   Does Storage use particular facilities to
22  store Emerald Equipment?
23     A   No.  The only -- only storage that we did
24  have was when -- oh, storage, you're saying now?

Page 79

1      Q   Yes.
2      A   I don't think so.
3      Q   Where is Emerald Equipment stored now?
4      A   To the best of my knowledge, we cannot
5  locate any further equipment.
6      Q   Has all of the equipment that you located
7  been sold?
8      A   All the equipment that we've located has
9  been sold.
10         MR. ARMSTRONG:  I have nothing further.
11  Thank you.
12         THE WITNESS:  Thank you.
13         MR. MOLDOFF:  I just have one quick
14  follow-up.
15            EXAMINATION
16  BY MR. MOLDOFF:
17     Q   You indicated that on the -- I think it
18  was the bill of sale to McAda that there was a list
19  of equipment -- I'm sorry.  Strike that.
20     I believe it would be the Alta Vega list
21  of equipment?
22     A   Oh, yeah.  That is equipment that was
23  moved from the showroom to Alta Vega.
24     Q   If there was any equipment on here for

Page 80

1  which Emerald believes Sea Star owes rent, would any
2  of those equipment pieces appear on the Emerald
3  invoices?
4      A   No, no, no.  They wouldn't -- I don't
5  think so.  I mean, what are you saying?
6      Q   I'm asking you that, if any of this
7  equipment --
8      A   No.  They were in --
9      Q   -- might have been returned, but there
10  was rent owed, would that possibly appear on the
11  Emerald invoice?
12     A   Oh.
13         MR. ARMSTRONG:  Object to form.
14         THE WITNESS:  I don't know if there was
15  rent owed.  It could have been returned equipment.
16     In other words, it could have been
17  returned to us, and it could be on there for rent.
18  It wouldn't be on there for stipulated value, if
19  that's -- that's what I meant.
20  BY MR. MOLDOFF:
21     Q   Okay.  Because you had indicated that you
22  had not really checked that against the invoices.
23  But you also indicated, in a prior question and
24  answer, that there should not appear any of that

Page 81

1  equipment on the invoices.
2      A   That's right.
3         MR. ARMSTRONG:  Object to form.
4  BY MR. MOLDOFF:
5      Q   Are you now correcting that response?
6         MR. ARMSTRONG:  Object to form.
7         THE WITNESS:  What I'm saying is, if it
8  was rent owed and it was returned, it could be on
9  that list.  But it wouldn't be on the
10  stipulated-value invoice.
11         MR. MOLDOFF:  Okay.  I have nothing
12  further.
13         MR. ARMSTRONG:  You have the right to
14  read and sign this deposition prior to the time that
15  it's filed.
16         THE WITNESS:  Okay.
17         MR. ARMSTRONG:  If you choose to exercise
18  that right, you will make arrangements with the court
19  reporter in regard to reading and signing.
20     Alternatively, you can waive the right,
21  trusting to the accuracy of the court reporter.
22  However, you must state on the record whether you
23  want to read or waive.
24         THE WITNESS:  How would I get the record?

Lorraine Robins

22 (Pages 82 to 83)

Page 82

1    MR. MOLDOFF: The court reporter would
2 send it to you, and then you have the right to read.
3 And if there's any corrections, you can tell us what
4 the corrections are.
5    THE WITNESS: I think I would like to do
6 that.
7    MR. ARMSTRONG: Thank you.
8    (Deposition concluded at 11:15 a.m.)
9    C E R T I F I C A T I O N
10
11
12    I hereby certify that I have read the
13 foregoing transcript of my deposition testimony, and
14 that my answers to the questions propounded, with the
15 attached corrections or changes, if any, are true and
16 correct.
17
       ----------------------------------
18    LORRAINE ROBINS
19
20
21
22
23
24

Page 83

1    CERTIFICATE OF SHORTHAND REPORTER
2
3    I, Gail Inghram Verbano, CSR, RMR, CLR,
4 the officer before whom the foregoing proceedings
5 were taken, do hereby certify that the foregoing
6 transcript is a true and correct record of the
7 proceedings; that said proceedings were taken by me
8 stenographically and thereafter reduced to
9 typewriting under my supervision; and that I am
10 neither counsel for, related to, nor employed by any
11 of the parties to this case and have no interest,
12 financial or otherwise, in its outcome.
13
14
15
16 *Gail Inghram Verbano*
    Gail Inghram Verbano, CSR, RMR, CLR
17  CA-CSR No. 8635
    Certification No.: 220
18  (Expires 1-31-2011)
19
20
21
22
23
24