Thomas Holt

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

—   —   —

SEA STAR LINE, LLC, A LIMITED :
LIABILITY COMPANY,            :
                             : Civil Action No.
        Plaintiff/           :
        Counterclaim Defendant, : 05-CV-245-JJF (LPS)
                             :
            vs.              :
                             :
EMERALD EQUIPMENT LEASING,    :
INC., a corporation,         :
                             :
        Defendant/           :
        Counterclaim Plaintiff. :

Deposition of THOMAS HOLT, SR.
taken at Eckert Seamans Cherin & Mellott, LLC
Two Liberty Place, 50 South 16th Street, 22nd Floor
Philadelphia, Pennsylvania 19102
Tuesday, February 12 2008
9:45 a.m.

Gail L. Inghram Verbano, CSR, RMR, CLR
302.449.0529

Thomas Holt

2 (Pages 2 to 5)

Page 2

A P P E A R A N C E S

On behalf of Sea Star Line:

    TIMOTHY J. ARMSTRONG, ESQUIRE
    amesq@aol.com
    ARMSTRONG & MEJER, P.A.
    2222 Ponce de Leon Boulevard
    Penthouse Suite
    Miami, Florida 33134
    305.444.3355

On behalf of Emerald Equipment Leasing, Inc.:

    ALAN I. MOLDOFF, ESQUIRE
    amoldoff@eckertseamans.com
    ECKERT SEAMANS CHERIN & MELLOTT, LLC
    Two Liberty Place
    50 South 16th Street, 22nd Floor
    Philadelphia, Pennsylvania 19102
    215.851.8450

ALSO PRESENT:

    Andrew Rooks

Page 3

CONTENTS

WITNESS:                          PAGE
THOMAS HOLT, SR.
  Mr. Armstrong          5

EXHIBITS
E.E.L.   DESCRIPTION                    PAGE

| 1 | Renotice of deposition | 16 |
| 2 | Fax from Andy Rooks to Art Davis dated 6-4-02 | 67 |
| 3 | Email from Ms. Robins to Mr. Rooks dated 6-26-02 | 69 |
| 4 | Greenwich Terminals invoice dated 3-6-03 | 71 |
| 5 | Photocopies of two checks from Greenwich Terminals to Martin McDonald | 72 |
| 6 | Letter from Mr. Moldoff to Mr. Armstrong dated 6-29-04 | 91 |
| 7 | Email from Mr. Davis to Mr. Rooks dated 8-19-04 | 93 |
| 8 | Order approving the stipulation between Sea Star Line and the debtor regarding disposition of certain equipment | 98 |
| 9 | Maritime liens asserted by E. T. Heinsen C Por A and Naves Y Terminales, S.A. | 106 |

Page 4

| 10 | Spreadsheets of invoices | 112 |
| 11 | Spreadsheets of invoices with attached email from setox@aol to Mr. Rooks dated 10-26-07 | 113 |

(The original exhibits were returned to Ms. Kathleen Miller; digital copies were provided to all counsel.)

Page 5

1    THOMAS HOLT, SR., having first been duly
2 sworn according to law, was examined and testified as
3 follows:
4                     - - -
5            EXAMINATION
6 BY MR. ARMSTRONG:
7    Q  Please state your full name.
8    A  Thomas J. Holt, Sr.
9    Q  Mr. Holt, what is your business address?
10    A  My business address? Well, I guess for
11 the want of a better one, we'll use my home address.
12    Q  And your home address is the same as it
13 was when you were deposed before?
14    A  Yes, sir.
15    Q  Are you employed?
16    A  No, sir.
17    Q  Do you hold positions with any companies?
18    A  Emerald Leasing.
19    Q  What is your position with Emerald
20 Leasing?
21    A  President.
22    Q  Have you remained president since you
23 bought out the other people in 2000 or so?
24    A  Yes, sir.

Thomas Holt

Page 6

1    Q   Are there any employees of Emerald
2  Equipment Leasing?
3        A  No, sir.
4    Q   Have there been any employees of Emerald
5  Equipment Leasing during the past three years?
6        A  Using the term "employees," I have no
7  employees.  I do hire people from time to time to do
8  work for me.
9    Q   Those -- would you call those people
10  independent contractors?
11        A  For want of a better word, yes.
12    Q   Or contractors?
13        A  Yes.
14    Q   All right.  Whom have you hired in the
15  past three years to do work for Emerald Equipment
16  Leasing?
17        A  Immediately, Lorraine Robins comes to
18  mind.  Art Davis; John Evans; his wife, Mrs. Evans.
19  I can't remember the name of the gentleman down in
20  Puerto Rico, but that was three years ago, I guess --
21  two to three years ago.  And from time to time
22  various people do help me.
23    Q   When did you hire Lorraine Robins?
24        A  When did I hire her?

Page 7

1    Q   To do work for Emerald Equipment Leasing
2  or retain her to do work for Emerald Equipment
3  Leasing.
4        MR. MOLDOFF:  Object to the form of the
5  question.
6        THE WITNESS:  Lorraine, in her career,
7  has worked for me for several years, 45 or more.  The
8  immediate period of the time frame would be about '02
9  to maybe through to '03, '4; and that's when Emerald
10  had her working for them.
11  BY MR. ARMSTRONG:
12    Q   Does Lorraine Robins still do work for
13  Emerald Equipment Leasing?
14        A  She does for her company, Storage
15  Transfer.
16    Q   While she was doing work for Emerald
17  Equipment Leasing, was she paid?
18        A  No.
19    Q   Was there an agreement as to payment made
20  with her?
21        A  There is an agreement to pay her and
22  other people at the hopefully successful conclusion
23  of this litigation.
24    Q   Is that agreement in writing?

Page 8

1        A  No, sir.
2    Q   What work did Ms. Robins do with Emerald
3  Equipment Leasing or for Emerald Equipment Leasing?
4        A  Well, the same as the other people:  They
5  attempted to find out where all the equipment was,
6  attempted to offer for sale to the marketplace;
7  continued to put together the correlation of
8  information that we were receiving from Sea Star,
9  MBC Bank and other entities to determine the proper
10  value of equipment to be sold; the proper value of
11  the rents that Sea Star was reporting under their
12  self-billing report.
13    Q   During what period of time was Arthur
14  Davis a contractor for Emerald Equipment Leasing?
15        A  The same as Lorraine.
16    Q   Does he still do work for Emerald?
17        A  Indirectly, yes.
18    Q   When you say "indirectly," what work does
19  he do?
20        A  Well, when he's available, he attempts to
21  find out if there's any equipment that has not been
22  turned back; if possible, to sell equipment that was
23  never turned back if it's found on the world market.
24  He talks to me about various other entities that he

Page 9

1  may think there's opportunities of employment for.
2    Q   You mentioned that Ms. Robins and
3  Mr. Davis gathered information from Sea Star,
4  MBC Bank and other entities.
5        Do you know what those other entities are
6  or were?
7        A  Trucking companies, railroad entities
8  that would have possession of the equipment that Sea
9  Star abandoned throughout the trade lanes in the
10  United States.
11    Q   That Sea Star abandoned?
12        A  Yes, sir.
13    Q   When did you learn that Sea Star had
14  abandoned equipment?
15        A  When they never returned the equipment
16  that was under lease to them.
17    Q   When did you learn that?
18        A  When did I learn that?
19    Q   Yes.
20        A  Time frame?
21    Q   Yes, sir.
22        A  Let's see.  This is '08.  I would tell
23  you right up until today.  Predominantly in '03 and
24  '04, but certainly up to today.  As you're aware,

Thomas Holt

Page 10

1   there's several hundred pieces of equipment missing
2   that you never returned.
3       Q   I take it that you're using the royal
4   "you"?
5       A   As always, I look at counsel as Sea Star.
6       Q   Thank you.
7           What arrangement was there or is there to
8   compensate Arthur Davis?
9       A   The same answer as Lorraine.
10      Q   What work has John Evans done as a
11  contractor?
12      A   He, as an attorney, assisted Lorraine and
13  Arthur in the correlation and discovery of documents
14  from Sea Star and other entities and advice to me.
15      Q   During what period of time was John Evans
16  a contractor for Emerald Equipment?
17      A   For Emerald Equipment?  Probably sometime
18  in '06 that ended.
19      Q   Do you recall when it started?
20      A   It would have started probably about '02,
21  '03, best guesstimate.
22      Q   What agreement for compensation does
23  Emerald or has Emerald had with John Evans?
24      A   Emerald was paying Mr. Evans; and it got

Page 11

1   to a point in time where it couldn't pay him anymore
2   so we parted company.  Ran out of money.
3       Q   How was Mr. Evans being paid?  Was it by
4   the hour or a salary?
5       A   I think it was more weekly, if I
6   remember.
7       Q   Was it a salary arrangement or an hourly
8   arrangement?
9       A   No, I believe it was more weekly, not
10  hourly.  Might have been per diem.
11      Q   Was there a written contract?
12      A   No, sir.
13      Q   And what work did Mrs. Evans do for
14  Emerald?
15      A   Assisted in the correlation of all the
16  documents.
17      Q   Over what period of time did she do that
18  work?
19      A   Best guess for Emerald would have been
20  probably '05.
21      Q   During the year '05?  No work prior, no
22  work afterwards?
23      A   I don't think so.
24      Q   Was there an arrangement --

Page 12

1       A   I'm sorry.
2       Q   No, I'm sorry.  I cut you off.
3       A   Go ahead.
4       Q   Was there an arrangement to compensate
5   her?
6       A   Yes, sir.
7       Q   And what was that arrangement?
8       A   Again, it was paid on a weekly basis, and
9   I feel it was -- the rate was per diem.  It might
10  have been by the hour, but -- it was what it was.
11      Q   Was Emerald Equipment Leasing making the
12  payments to Mr. Evans and Mrs. Evans?
13      A   Was Emerald Equipment Leasing making
14  payments to them?
15      Q   Making the payments.
16      A   Are you talking about payroll?  What kind
17  of --
18      Q   Talking about writing checks, that sort
19  of thing.
20      A   Payments for services they rendered?
21      Q   Yes.
22      A   Emerald was paying them, yes.
23      Q   Do you recall the names of the other
24  people?

Page 13

1       A   No, not off the top of my head.
2       Q   You recall Marty McDonald?
3       A   Okay.  Thank you for reminding me.  But
4   Marty was more in '03 and '04, I think.  But thank
5   you for reminding me.
6       Q   You're welcome.
7           Was he working for Emerald at that time?
8       A   Yes.
9       Q   Was he being paid by Emerald?
10      A   Yes, sir.
11      Q   What were his responsibilities?
12      A   His responsibilities was to assist Arthur
13  and Lorraine in trying to find Emerald's equipment,
14  more towards Jacksonville and Puerto Rico; and trying
15  to recover the equipment; and also to assist in
16  whatever paperwork was required.
17      Q   Does Marty McDonald still do any work for
18  Emerald?
19      A   No, sir.
20      Q   Do you recall a Francisco or Frankie
21  Gonzalez?
22      A   I remember the name Frankie.  He was in
23  Puerto Rico -- or was he in Jacksonville?
24      Q   He was in Puerto Rico.

Thomas Holt

Page 14

1    A    Okay.
2    Q    Was he working for Emerald?
3    A    He was working for Emerald.
4    Q    Over what period of time?
5    A    Probably the same time frame.  From -- I
6    want to say '02, but I think it was probably later
7    part of that, maybe '03 and '04.  Maybe '03, because
8    Storage Transfer came into existence back in those
9    days.
10    Q    What were his responsibilities?
11    A    To find the equipment that was scattered
12    all over.
13    Q    How was he paid?
14    A    He was paid by Emerald.
15    Q    By check?
16    A    Jeez.  I don't know if it was check,
17    cash, wire transfer.  You're going to '03? '02? Six
18    years ago.  He was paid.  He wasn't doing it for
19    free.
20    Q    Do you recall the name Joe Maqueda?
21    A    I recall the name.  My mind says he was
22    some sort of salesperson or in the leasing business.
23    Q    Was he working for Emerald?
24    A    He would probably have been working

Page 15

1    through Art Davis or Lorraine for Emerald selling
2    equipment.  That's how I would seem to remember.  I
3    don't know if he was an actual employee.
4    Q    Do you know whether he was paid by
5    Emerald?
6    A    Yes; if he worked for Emerald, he
7    certainly would have been paid.  If he was a
8    salesperson for Emerald, he would have been paid a
9    commission, I would assume.  Or if he just bought
10    equipment from Emerald, that was that story.
11    Q    Who was responsible for actually making
12    the payments to these contractors on behalf of
13    Emerald?
14    A    Myself in a great degree, and Lorraine or
15    Art.
16    Q    Did you actually write Emerald checks?
17    A    I don't think I ever wrote a check in my
18    life.  I always had my people write them.
19    Q    Well, who was or were the Emerald people
20    that wrote the checks to these contractors, if there
21    were checks?
22    A    That time frame?
23    Q    Yes, sir.
24    A    If it was checks, it would have been

Page 16

1    Lorraine; and it could have been wire transfers, as I
2    said earlier.
3    Q    Would Lorraine have been responsible for
4    arranging the wire transfers?
5    A    Yes.
6        MR. ARMSTRONG:  Let me show you a copy of
7    a renotice of taking deposition that I'll ask the
8    court reporter to mark as Exhibit 1 for
9    identification.
10        Counsel, before we start, do you want to
11    mark this as Emerald Exhibit 1 or -- do you have any
12    preference?
13        MR. MOLDOFF:  That's fine.  I'm sure we
14    probably used that designation before.
15        (Discussion off the record.)
16        (E.E.L. Exhibit 1 was marked for
17        identification.)
18    BY MR. ARMSTRONG:
19    Q    Have you seen that document before?
20    A    This document I saw today.  I had the
21    other document that you were going to do back in
22    January.  I would think they're one and the same.  I
23    don't know.  You would know.
24    Q    I will say to you that Exhibit A should

Page 17

1    be the same on both.  The original in January was a
2    notice; this is a renotice.  But the Exhibit A's
3    attached should be the same.
4        So look at Exhibit A.  Have you seen that
5    before?
6    A    This document here that says "Exhibit A"?
7    Q    Yes.
8    A    Yes.  I seen it from your prior
9    deposition notice.
10    Q    And have you reviewed it?
11    A    I read it.
12    Q    Are you here to testify as the corporate
13    representative of Emerald Equipment Leasing, Inc., as
14    to all items in Exhibit A?
15    A    To the best of my ability.
16    Q    Are there any other individuals who will
17    testify as corporate representatives of Emerald as to
18    any of the items specified on Exhibit A?
19    A    I am the only corporate representative of
20    Emerald.
21        MR. MOLDOFF:  Well, that's actually --
22    you mean that's actually the official --
23        THE WITNESS:  President.
24        MR. MOLDOFF:  -- officer?

Thomas Holt

Page 18

1    THE WITNESS: Yes.
2    MR. MOLDOFF: Of the company.
3    THE WITNESS: That's how I took his
4  question.
5    MR. MOLDOFF: He's here to answer the
6  questions -- I believe that he can testify to these
7  various areas. And as he said, he'll do the best he
8  can.
9  BY MR. ARMSTRONG:
10    **Q   Did you bring any documents with you?**
11    A  Documents of -- like this?
12    **Q   Any papers. The renotice states, "The**
13  **said deponent is to bring the following:  All**
14  **documents responsive to Sea Star Line, LLC's Request**
15  **for Production of Documents dated December 19th,**
16  **2006."**
17    MR. MOLDOFF: I could just -- I discussed
18  that with Mr. Holt briefly today.
19    The prior notice that we had did not have
20  that same designation. I just noticed it myself just
21  recently and just mentioned it to Mr. Holt.
22    Obviously, I think as you know,
23  Mr. Armstrong, all of those documents, which are
24  quite voluminous, we have supplied and Sea Star has.

Page 19

1  So we could not possibly produce, and I don't think
2  there was any requirement for us to re-produce, all
3  the documents that we've already produced. So we
4  don't have any documents here.
5    MR. ARMSTRONG: So that we're clear, your
6  position is that you have produced all of the
7  documents and that there will be no additional
8  documents produced today?
9    MR. MOLDOFF: I produced all the
10  documents. Without further review, do I know that
11  there are no possible other documents? I can't say
12  that specifically. If there are, we will produce
13  them.
14    But the best of our knowledge right now,
15  we believe that we have produced whatever we had that
16  was responsive to the Request for Production of
17  Documents. Also, given our objections and other
18  responses that we've filed in connection with the
19  request.
20  BY MR. ARMSTRONG:
21    **Q   Mr. Holt, how did Emerald determine the**
22  **specific locations of the Emerald equipment involved**
23  **in Emerald's claims at the inception of the lease**
24  **between Emerald and Sea Star, as alleged in**

Page 20

1  **Paragraph 12 of the Amended Counterclaim?**
2    MR. MOLDOFF: Object to the form of the
3  question.
4    THE WITNESS: Paragraph 1?
5  BY MR. ARMSTRONG:
6    **Q   No.  Look at Paragraph -- look at**
7  **Paragraph 2 of the Exhibit A.**
8    A  Didn't you say Paragraph 12?
9    **Q   I said Paragraph 12 of the Amended**
10  **Counterclaim.**
11    A  What would you like me to look at,
12  Paragraph 2 of this document, Exhibit A?
13    **Q   Yes.**
14    A  Thank you.
15    **Q   In Paragraph 12 of the Amended**
16  **Counterclaim, it is stated, "At the inception of the**
17  **lease between Emerald and Sea Star, the Emerald**
18  **equipment was not in Emerald's possession.  Instead,**
19  **all of the equipment was, inter alia, in terminals in**
20  **the possession of shippers at inland depots or on**
21  **board NPR vessels purchased by Sea Star."**
22    **How did Emerald determine the specific**
23  **locations of this equipment at the inception of the**
24  **lease between Emerald and Sea Star?**

Page 21

1    MR. MOLDOFF: Object to the form of the
2  question.
3    THE WITNESS: Emerald determined it
4  through the inventory controls of NPR, who had leased
5  all of Emerald's equipment for years; and the
6  continual inventory control systems that were coming
7  from NPR, Inc., in conjunction with Sea Star.
8    Sea Star took over the inventory controls
9  of NPR under NPR's 3900 computer, and they maintained
10  that inventory for a period of time.
11  BY MR. ARMSTRONG:
12    **Q   For what period of time did Sea Star**
13  **maintain that inventory?**
14    A  Well, this document was in Madison,
15  New Jersey. And I want to tell you it was, to my
16  best guesstimate -- because I wasn't involved, in
17  fact, at that point in time, as you know -- it could
18  have been for a period of three months. Certainly
19  not less than one month. Somewhere in that time
20  frame.
21    **Q   Were you ever involved in the inventory**
22  **controls of NPR?**
23    A  Yes.
24    **Q   And over what period of time were you**

Thomas Holt

Page 22

1  involved in the inventory controls of NPR?
2      A  Well, as its chief executive officer and
3  owner of the company, the period of time that I owned
4  it.
5      Q  What period of time was that?
6      A  I bought the company in '07; and it was
7  liquidated -- at least I was let out in '02.
8      Q  Did you buy the company in '97?
9      A  Yes, sir.
10     Q  And you owned the company until the
11  company -- that is, NPR -- was liquidated in 2002?
12     A  I owned the company until a trustee
13  replaced me in '02, March of '02.  The company was in
14  bankruptcy.
15         You will find voluminous testimony on
16  this that I gave you two years ago.
17     Q  So I'm moving on.
18         But my question in regard to the
19  inventory controls, what was your specific
20  involvement during that period of time?
21     A  Did I run the computer?  No.  Did I know
22  that the inventories were taken on a daily basis?
23  Yes.  Submitted daily to all terminals of NPR,
24  including the home office, where I was.

Page 23

1      Q  And did you ever review those
2  inventories?
3      A  Yes.
4      Q  Who, on behalf of Emerald, reviewed the
5  inventories?
6         MR. MOLDOFF:  Object to the form of the
7  question.
8         THE WITNESS:  Well, on behalf of
9  Emerald -- wearing the same hat as the owner of
10  Emerald in those days -- I was not as interested in
11  the daily inventories of Emerald because Emerald did
12  not truly have one.  It was NPR's inventory for
13  Emerald, because it was under a total lease.  It was
14  not what you would call a specific unit per-diem
15  lease that was entered into with Sea Star and
16  Emerald.
17         If that can help you, fine.  That's the
18  way I saw it.
19  BY MR. ARMSTRONG:
20     Q  In April 2002, there were NPR inventories
21  continuing; correct?
22     A  That's right, on behalf of Emerald.
23     Q  And before the Court authorized the asset
24  purchase by Sea Star from NPR, did Emerald make any

Page 24

1  determination that the inventories of NPR -- that is,
2  the equipment inventories -- were correct?
3      A  That day?  No.  Did we know them to be
4  correct?  As best as NPR's ability and Emerald's, to
5  know where the equipment was, the condition of the
6  equipment and who was using it.
7         The asset sale of NPR did not include
8  Emerald equipment.
9      Q  Would it be fair to say that insofar as
10  Emerald was concerned, the NPR inventories as to
11  types and locations of equipment were correct in --
12  say as of April 25th, 2002?
13     A  We knew them to be correct, because they
14  were doing, prior to April 25th -- or when was the
15  sale?  April 26th?
16     Q  The order was entered April 26th; the
17  sale closed on April 27th.
18     A  Well, what I'm trying to tell you is that
19  we knew them to be correct, because it was doing the
20  mission statement of NPR and handling all the cargo
21  requirements of NPR, and we had reports from all the
22  terminals on what equipment was available and not
23  available, as NPR.
24         So Emerald relied upon that, because it

Page 25

1  was a gross lease, not a per-diem lease, as we
2  talked.
3      Q  All right.  Now, when you say "all the
4  terminals," were there terminals other than NPR
5  terminals involved in that inventory?
6      A  Well, we had equipment that you took
7  possession of in railroad yards, intermodal yards and
8  trucking company yards.  We had equipment under load.
9  We had equipment waiting to be loaded throughout the
10  country.  We maintained depots in all those places.
11  That was all there, covered under the NPR inventory
12  controls.
13     Q  The inventory controls covered equipment
14  terminals, inland depots, yards in the continental
15  United States?
16     A  To be very specific what terminals, I
17  couldn't tell you.  Did it show where the equipment
18  was?  Yes.
19     Q  It showed equipment in Puerto Rico;
20  correct?
21     A  Yes.
22     Q  Showed equipment in the Dominican
23  Republic?
24     A  Yes.

Thomas Holt

Page 26

1    Q   Was the terminal in Puerto Rico reporting
2  as to locations of equipment to NPR or to someone
3  else on behalf of NPR?
4         MR. MOLDOFF:  Object to the form of the
5  question.
6         THE WITNESS:  The inventory controls
7  would have had to come, plus or minus, every day from
8  the various terminals back to the mainframe computer
9  in Madison so that the marketing department would
10  know what equipment was where, for the availability
11  for -- first, to deliver cargo to the consignees; and
12  second, to have equipment available for shippers
13  throughout the territory you speak of.
14  BY MR. ARMSTRONG:
15    Q   What was the procedure in the Dominican
16  Republic?
17         MR. MOLDOFF:  Object to the form of the
18  question.
19  BY MR. ARMSTRONG:
20    Q   With respect to reporting.
21    A   The best I could tell you is that, if I
22  can recall in those days, the Dominican Republic was
23  reporting directly to the mainframe in Madison.
24         Now, did it go through Puerto Rico to get

Page 27

1  there?  It could have.  But certainly they knew what
2  equipment was where.
3    Q   Did Emerald ever audit the equipment
4  inventories reported by NPR?
5    A   Well, it was -- in the possession of NPR?
6    Q   Yes, sir.
7    A   No.  As I told you, it was a grossed-up
8  lease.
9    Q   What is a grossed-up lease?
10    A   It's a lease that NPR and Emerald entered
11  into where the total fleet of Emerald would be leased
12  by NPR for a period of time.
13    Q   Did you have any communications with Sea
14  Star representatives concerning self-billing reports?
15    A   No.  We talked in generalities to that.
16  That was concluded between parties other than I.
17    Q   And who were those parties?
18    A   Well, my best guess right now -- and I
19  can't tell you definitely -- was the Sea Star people,
20  hopefully, because they prepared them:  Art Davis,
21  Lorraine, MBC Bank.
22    Q   Did you ever become aware that
23  self-billing reports by Sea Star were inaccurate?
24    A   To answer that question, I should tell

Page 28

1  you that I was the person authorizing Emerald to
2  enter into these self-billing reports between MBC,
3  Sea Star and Emerald.
4         Now, to answer your question:  Yes.
5    Q   When did you become aware that Sea Star
6  self-billing reports were inaccurate?
7    A   Oh, it had to be the latter part of '02.
8    Q   How did you personally learn that Sea Star's
9  billing reports were inaccurate?
10    A   It was an accumulation of information
11  that came into Emerald's office from your
12  self-billing reports and from other marine terminals,
13  truckers, railroad yards, et cetera.  And primarily
14  from your own documents, as we started to see a
15  pattern of equipment not being accounted for.
16    Q   When did Emerald start to see the pattern
17  of equipment not being accounted for?
18    A   I would tell you that once we started
19  receiving your documents -- and I'm going to put a
20  time frame on it -- could be wrong -- sometime in the
21  fall of '02, maybe September/October.
22    Q   How did you personally learn that the Sea
23  Star self-billing reports were inaccurate?
24    A   I reviewed them after they were corrected

Page 29

1  by Lorraine and Arthur.
2         It was nothing that comes as any surprise
3  to the Sea Star people.  We were complaining bitterly
4  about it.
5    Q   And when did Emerald start complaining
6  bitterly about the self-billing reports?
7    A   Once we started to see how you were
8  underpaying.
9    Q   When was that?  Was that in --
10    A   That was -- it could have been --
11    Q   Summer?  fall?
12    A   It could have -- well, I'm telling you
13  when I got involved.
14    Q   Okay.
15    A   It could have been sometime in August,
16  July, June of '02, right from the get-go.
17    Q   Did you retain Lorraine Robins as a
18  contractor before you determined that the -- or
19  learned that the Sea Star self-billing reports were
20  inaccurate?
21    A   Before or after?  I retained her from
22  when Emerald needed someone to cover their office
23  activities.  I retained her and Arthur.  And it would
24  have been probably immediately -- I don't know -- in

Thomas Holt

Page 30

1  July or August of that year.
2      Q  July or August of 2002?
3      A  '02. '02, yeah.
4      Now, that's six years ago, so -- five and
5  a half years ago, so I believe that's the time frame.
6      Q  When you learned that the Sea Star
7  self-billing reports were inaccurate, what action did
8  you take?
9      A  Well, I instructed them to communicate,
10 in every instance, back to the Sea Star people.  To
11 correct the invoices, send them back to the Sea Star
12 people.  I started talking to people at Sea Star --
13 specifically, Bob McGee.
14     Q  Do you know whether Mr. Davis and
15 Ms. Robins followed your instructions?
16     A  Only the facts that bring us here today,
17 yes.  Yes, they did follow them.
18     Q  When did you talk to Bob McGee about the
19 self-billing reports?
20     A  You mean the understating of them?
21     Q  Yes.
22     MR. MOLDOFF:  If you recall.  Again,
23 don't speculate.
24     THE WITNESS:  I don't have ability to

Page 31

1  tell you what day I called him on the phone.  But it
2  probably was to closer to September/October.
3  BY MR. ARMSTRONG:
4      Q  2002?
5      A  Yes.  Had meetings with the man in
6  that -- towards the end of the year.
7      Q  Was the problem ever resolved?
8      A  No, sir.
9      Q  Did you have any communications with
10 anyone from MBC Bank regarding the self-billing
11 reports or MBC leasing?
12     A  Well, back in those days, my contact with
13 the bank was Scott Krieger.  And I just said to him,
14 As far as I'm concerned, you weren't paying the right
15 rates -- not the rates, the right per diems.  The
16 rates were always proper under the schedule of rates
17 in the Sea Star/Emerald lease, but it was the amount
18 of per diems.
19     In many cases, it was a mistake by your
20 billing people.  Many cases you could see there was a
21 pattern over the time frame of several months that
22 equipment was not being reported.
23     Q  In what types of cases, if you can say,
24 was the pattern evident?

Page 32

1      A  In the instance of equipment under load
2  somewhere and not shown on the self-billing report.
3  That really became very evident in '03.
4      The instance of equipment being reported,
5  but underreported, started, as I said to you, to show
6  up, in our minds, through the end of '02.
7      And finally, to finish your -- you go
8  next.  I'll wait for you.
9      Q  No, go ahead.
10     A  No.
11     Q  Go with the "finally."
12     A  No, please, you first.
13     MR. MOLDOFF:  Ask another question,
14 please.
15     THE WITNESS:  You invited me.  I'll wait
16 for you.
17 BY MR. ARMSTRONG:
18     Q  Well, thank you.
19     As you were saying, "and finally."
20     A  That would not be an answer to a question
21 that you might give me.  Please give me a question,
22 and I'll answer it.
23     Q  Yes, sir.  I'll be happy to.
24     When you say you weren't paying the per

Page 33

1  diem, you were referring to Sea Star not paying the
2  per diem; correct?  Not MBC?
3      A  MBC was the people that had the loan on
4  the equipment.  It was the documents that Sea Star
5  was providing Emerald and MBC, known as your
6  self-billing reports.
7      Q  And those self-billing reports dealt with
8  per-diem payments; correct?
9      A  They dealt with two things:  They dealt
10 with per-diem payments, the rate; and they dealt with
11 the amount of days; and a third thing would have been
12 possession.  That would have shown possession.
13     Q  You were aware, were you not, that Sea
14 Star was storing equipment?
15     A  For whose benefit?  Sea Star's or
16 somebody else's?
17     Q  For MBC.
18     A  That they were physically storing
19 equipment for MBC?
20     Q  Yes.
21     A  Under the Emerald lease?
22     Q  Under the --
23     A  Or is that a separate transaction between
24 Sea Star and MBC?

Thomas Holt

Page 34

1    Q  Well, under the Court's order on the
2  asset sale for --
3    A  No, I'm sorry.  The -- the negotiation
4  between MBC and Sea Star I was not privy to.
5    MR. MOLDOFF:  I -- just object to the
6  question.  I'm not sure under what area of testimony
7  that you have on Exhibit A.  Are we -- are you
8  referring to -- when you're talking about storage, I
9  don't see that as any of the particular areas that
10  you designated.
11    MR. ARMSTRONG:  Well, I'm referring to
12  this.
13  BY MR. ARMSTRONG:
14    Q  What do you mean when you say
15  "possession"?
16    A  Possession of what?  Equipment?
17    Q  Equipment; yes, sir.
18    A  In whose possession?
19    Q  In Sea Star's possession.
20    A  Means you had Emerald's equipment under
21  lease between Sea Star and Emerald.  I never knew
22  your agreement with MBC.  I wasn't privy to it.
23    Q  So --
24    A  I only know, by third party, that you

Page 35

1  bought some equipment from MBC; and my loan was
2  credited with that amount of money.
3    Q  In your analysis of the self-billing
4  reports --
5    A  Yes, sir.
6    Q  -- did you differentiate between Sea
7  Star's possession of the equipment for use and Sea
8  Star's possession of the equipment for storage?
9    A  We differentiated -- if that is the right
10  word, we -- better to say you were invoiced where
11  your invoices were corrected for only the equipment
12  that was in your possession.
13    Now, if you wanted to store it -- like
14  many times in the invoices you would leave equipment
15  at a depot in Seattle, Washington, or Cincinnati or
16  Timbuktu.  That would be up to you.  We were not in
17  the storage business; we were in the selling of
18  equipment.
19    Your possession was the only thing we
20  were interested in, and we got that information from
21  your self-billing reports.
22    Q  Did you ever become aware that equipment
23  in Sea Star's possession was in storage for sale by
24  MBC and Emerald?

Page 36

1    A  I was never aware that you were an agent
2  for MBC to sell my equipment.
3    Q  Did you ever become aware that equipment
4  in the possession of Sea Star was in storage for sale
5  by MBC or Emerald, not by Sea Star?
6    A  I answered that question.  Your dealings
7  with MBC were directly between the two of you.  We
8  never authorized MBC to place our equipment in
9  storage anywhere.  We didn't have to.  Our equipment
10  was actively in your possession or in our possession
11  being sold.
12    Q  When it was in your possession, was it
13  ever located at a Sea Star terminal?
14    A  It was equipment that Emerald had in a
15  facility -- which was your marine terminal in
16  Puerto Rico -- totally isolated, totally there to be
17  sold for Emerald.
18    Q  Did Emerald ever bill Sea Star for any of
19  that equipment?
20    A  Yes, sir.
21    Q  And what was the reason Emerald billed
22  Sea Star for that equipment?
23    A  Because you took possession of it and
24  moved cargo on it.

Page 37

1    Q  If it was in a Sea Star terminal in
2  Emerald's possession for sale --
3    A  A storage lot.
4    Q  -- did Emerald bill Sea Star for any of
5  that equipment?
6    MR. MOLDOFF:  Object to the form of the
7  question.
8    THE WITNESS:  When you took possession of
9  it and used it for Sea Star's cargo.
10  BY MR. ARMSTRONG:
11    Q  Did Emerald ever bill Sea Star for
12  equipment while it was in Emerald's possession?
13    A  Would you say that slow.
14    Q  I thought I spoke slowly.
15    A  No, because --
16    Q  Did Emerald ever bill Sea Star for
17  equipment while it was in Emerald's possession?
18    A  Not to my knowledge.
19    MR. MOLDOFF:  Object to the form of the
20  question, but you can answer.
21    THE WITNESS:  Thank you.
22  BY MR. ARMSTRONG:
23    Q  Did Emerald have possession of any
24  equipment in inland depots that Sea Star used?

Thomas Holt

Page 38

1    A  No, sir.
2    Q  Did Emerald retrieve equipment that was
3  located in Emerald -- I'm sorry -- in Emerald depots
4  that became Sea Star depots after the asset purchase?
5    A  I will tell you --
6        MR. MOLDOFF:  Object to the form of the
7  question.
8        THE WITNESS:  Okay.  I guess that's
9  somewhere in here.
10       I would tell you that Emerald retrieved
11 equipment in depots that Sea Star utilized for the
12 delivery of their cargoes and never returned to
13 Emerald.  And Emerald subsequently was notified by
14 truckers, railroads, "Come and get your equipment; it
15 was abandoned by Sea Star."
16 BY MR. ARMSTRONG:
17   Q  Do you recall the names of any truckers
18 that said, "Come and get your equipment; it was
19 abandoned by Sea Star"?
20   A  There's one in New York.  I don't have
21 the name on the top of my head.
22       And there was two places in railroad
23 yards.  One in Chicago -- and this is multiple times.
24 One in Chicago and one in -- I want to say Ohio, but

Page 39

1  I'm sorry, I don't have that at my fingertips.  It is
2  all covered under the invoices that we sent you.
3    Q  Do you recall the name of the railroads?
4  Or names of the railroads?
5    A  CSX jumps to mind.  I don't think there
6  was any Norfolk Southern.  But I do think it was CSX.
7    Q  Did you have any communications with Sea
8  Star representatives regarding the undertaking of the
9  obligation to report to Emerald its usage of the
10 Emerald equipment?
11   A  I personally?
12   Q  Yes, sir.
13   A  I hate to ask you:  Would you repeat that
14 back, please.
15       Or you repeat it, because I'm confused
16 with that question.
17       (Record read.)
18       THE WITNESS:  I would tell you early on I
19 did.  Who I said it to, I don't remember.  I probably
20 even wrote letters, but I don't remember.  But -- the
21 answer is what I just said.
22 BY MR. ARMSTRONG:
23   Q  Is the early-on time frame, the June,
24 July --

Page 40

1    A  August.
2    Q  -- August 2002?
3    A  You might as well say all of '02, to the
4  best of my recollection.
5    Q  All right.  Do you have any knowledge
6  that Sea Star intended to defraud Emerald in
7  connection with the self-billing reports?
8    A  Personal knowledge would go this way:
9  The self-billing reports are self-explanatory.  But
10 as I started to see that the underreporting
11 continued, I just felt that there was a pattern here.
12       You have to go back a little bit, if I
13 may, I guess.
14       The whole position of entering into an
15 agreement with Sea Star and Emerald was one based on
16 a relationship that was a couple years old of the
17 personalities and your owners of Sea Star/Saltchuk.
18       There was, built over that time frame, a
19 trust.  I mean, no sane person would turn over
20 millions of dollars to somebody without certainly
21 having several millions of dollars of letters of
22 credit posted.  We just took it on trust that this
23 agreement that was entered into would be for the best
24 of both parties, Sea Star and Emerald.  And it's

Page 41

1  self-explanatory throughout the term and how it came
2  about.
3        The intent was, eventually you would buy
4  equipment; and what you wouldn't buy, you would turn
5  back.  Not everybody is perfect in covering the dots
6  and crossing the Ts, but it was built on trust.
7        And when I started to see the problems, I
8  talked to Bob McGee about it.  I assumed he talked to
9  his people.  But eventually it got so bad that I
10 finally said, "Enough is enough.  Give me back all my
11 equipment."  The point being that I felt that my
12 trust was placed in the wrong place.
13       And soon after, the telephone
14 conversations between Tom and Bob stopped.  He just
15 would not answer.  Even today, I don't even know if
16 the poor guy is still alive, because I left several
17 voice messages for him throughout August and
18 September.  I heard third-handedly that he was very
19 ill.
20       But the fact of the matter is the owner
21 of Emerald -- I, Tom Holt -- turned over all this
22 equipment to them to use for periods of months,
23 months, years, and never ever did I ask for letters
24 of credit, moneys being deposited, et cetera.  I was

Thomas Holt

Page 42

1  quite content that your self-billing reports would
2  pay down my loan at MBC.
3        Now, I don't know if that helps you or
4  don't help you. But that's how the foundation was
5  going forward, into that agreement.
6        Q  Payments under the -- under the
7  self-billing reports went to MBC?
8        A  That's correct.
9        Q  Did they ever go to Emerald?
10       A  No, sir.
11       Q  Over what period of time did Emerald
12  receive self-billing reports from Sea Star?
13       A  It went through '03. I think it stopped
14  sometime in August/September of '03. That's a
15  guesstimate.
16       Q  All of the payments under those reports
17  went to MBC during that period of time?
18       A  That was the agreement, that the moneys
19  would be paid to them for Sea Star utilizing Emerald
20  equipment to pay down Emerald's loan with MBC.
21       Q  When you spoke with Scott Krieger about
22  problems with the self-billing reports, what did he
23  say to you?
24       A  It's not his problem.

Page 43

1        Q  Did he say why? Is that all he said?
2        A  He asked me why. And I said, Bob, as far
3  as I know, they probably don't have the right idea on
4  how the clerk makes up the self-billing reports. I
5  don't know why.
6        But the position is, Hey, Tom, I'm a
7  banker; I'm getting my loan reduced. Thank you very
8  much. I'm not involved in your agreement between
9  Emerald and Sea Star.
10       Q  When did you speak with Krieger about
11  that?
12       A  The fall of '02 and then into '03. Then
13  when I tried to find him later on, he had been
14  replaced. He left the bank.
15       Q  And do you recall approximately how many
16  discussions you had with him about the self-billing
17  reports?
18       A  Once he told me it wasn't his problem, I
19  stopped calling him on that issue.
20       Q  On what issues did you call him?
21       A  Then we had other business dealings, the
22  family did, with Mr. Krieger, that --
23       Q  I should say, what other Sea Star issues?
24       A  Well -- Sea Star. Sea Star issues with

Page 44

1  MBC and Emerald?
2        There was a question being raised -- and
3  I don't know what period of time -- about an
4  indemnification meant (sic) that was in an agreement
5  between yourselves, Sea Star, and MBC. I was made
6  aware of it. I got copies of the documentation that
7  flew around.
8        I don't know if that was in '05, '06.
9  Might have been '03. I just didn't -- somebody was
10  misinterpreting the document, and it wasn't my -- my
11  document. It was between MBC and Sea Star.
12       Q  Did you discuss with anyone regarding a
13  claim that information contained in the self-billing
14  reports was false and misleading?
15       A  Did I discuss with anyone?
16       Q  Yes.
17       A  I discussed it with Bob McGee. I
18  discussed it with, as I told you, Scott Krieger.
19       Now, anyone after that? Obviously
20  counsel. Obviously, Lorraine and Arthur, Jack Evans.
21  I certainly did not put it in the Journal of
22  Commerce, if that's your question.
23       Q  When did you have discussions with
24  Lorraine Robins and Arthur Davis concerning the claim

Page 45

1  that information contained in the self-billing
2  reports was false and misleading?
3        A  Literally, every time a self-billing
4  report showed up.
5        And there came a time when I talked to
6  Krieger about the position that Sea Star was taking,
7  that they did not like the idea that their
8  self-billing reports were being ripped apart by
9  Lorraine. And this person complained bitterly to MBC
10  and took the position they weren't going to send any
11  more self-billing reports.
12       Somewhere there's a couple of emails,
13  letters flying around that document that person's
14  position. I think it was somebody in Puerto Rico.
15       Q  How were the self-billing reports false?
16  In other words, what information contained in the
17  self-billing reports was false?
18       A  I thought we covered this about
19  45 minutes ago. But again, I'll tell you.
20       When the self-billing reports would be
21  presented, we would -- "we" being Lorraine and Arthur
22  and the office -- would gather all the information on
23  that, gather the information from where they could
24  find it -- i.e., railroads, truckers, Sea Star,

Thomas Holt

Page 46

1   stevedores, anywhere they could find where that piece
2   of equipment was. And in some instances, we would
3   find it where you paid 14 days; you truly should have
4   paid 30 because the agreement was for a 30-day
5   minimum. In some instances, where you paid for 79
6   days but the equipment wasn't returned for 159 days.
7   And all backed up by documentation.
8          And each one of those was corrected and
9   sent back to Sea Star.
10         And that's why the person on the other
11  side of the table at Sea Star says, I'm done playing
12  around with this. I'm spending too much time trying
13  to find out what's right and what's wrong. And
14  that's the letters I'm talking about that went off to
15  MBC.
16         Again, MBC's position is, We're not
17  involved in this.
18      Q  How did the information contained in the
19  self-billing reports mislead Emerald?
20      A  Misled us to the extent of the amount of
21  dollars that the loan was not reduced.
22         And to be fair, there were some that we
23  agreed with you that we then went and issued credits,
24  where we were wrong.

Page 47

1      Q  What knowledge does Emerald have as to
2   Sea Star's, quote, reckless difference as to the
3   veracity of the information contained in the
4   self-billing reports during preparation of the
5   reports?
6      A  The attitude shown in the self-billing
7   reports and the preparation of them showed a careless
8   indifference, absolutely proving to me that I placed
9   my trust in the wrong people; and that's why I
10  demanded the equipment back.
11         I mean, you consider for a moment the
12  equipment is leased out; we're getting paid rent,
13  surely not the right amount. But so what? I didn't
14  have to worry about getting that loan reduced at the
15  bank.
16         But what did I do after I seen this --
17  what I would call an arrogance on the part of the
18  corporation for allowing this to continue, after time
19  and again, I said, This is happening, straighten it
20  out?
21         That I considered it, in my opinion, my
22  trust literally was totally misplaced; and No. 2, I
23  considered it fraud.
24         You well know you were using my equipment

Page 48

1   and never paying for it, by leasing it to third
2   parties. We never found that out until we got into
3   discovery. And we don't even know if that's the only
4   instance.
5          As far as I'm concerned, the whole thing
6   showed a pattern that somebody deliberately was
7   taking advantage of my trust in Sea Star's people and
8   using it to their advantage.
9          I don't understand why. It was only
10  money that -- Lord knows, you got a balance sheet
11  that don't have to worry about a couple million
12  dollars. Why you would expose yourself like this, I
13  have no idea.
14      Q  When did you first become aware of this
15  reckless indifference?
16      A  I started to see it in the attitude --
17         MR. MOLDOFF: Object to the form of the
18  question, but --
19         THE WITNESS: I'm sorry.
20         MR. MOLDOFF: Go ahead.
21         THE WITNESS: I got to slow down.
22         MR. MOLDOFF: No, you can answer. But
23  don't speculate.
24         THE WITNESS: If I'm speculating, tell

Page 49

1   me, and I'll try to straighten it out for you.
2          I started to become aware of it with the
3   self-billing reports and the amount of corrections
4   that were on them. I mean, we're not talking one or
5   two corrections. It's voluminous.
6          Then the arrogance of the Sea Star
7   people: We're not going to do this. We're not going
8   to report this anymore. We're not going to change
9   this.
10         And they weren't complaining to us --
11  "us," being Emerald. They were complaining to MBC.
12  And MBC then said, Hey, we're not involved in this.
13         MR. MOLDOFF: Would you like to take a
14  break?
15         THE WITNESS: No, I'm fine.
16  BY MR. ARMSTRONG:
17      Q  Did you first become aware of this in
18  2002?
19         MR. MOLDOFF: Objection to the form of
20  the question.
21         THE WITNESS: I've answered that question
22  nine ways.
23         MR. MOLDOFF: Object to the form of the
24  question.

Thomas Holt

Page 50

BY MR. ARMSTRONG:
1     **Q  I asked when did you first become aware?**
3 **First.**
4     A  Best of my knowledge, the pattern started
5 showing up in the late third/early fourth quarter of
6 '02.
7        Now, that's to my best recollection.  It
8 certainly manifested itself when you got into '03.
9 And absolutely when we got into some discovery, which
10 shows where it was done.  I mean, we saw in discovery
11 documents between your people -- you must be aware of
12 this, Counsel -- that they were saying, We can't do
13 this anymore, we got to report this equipment.
14        You read those documents between your
15 people.  I have, in discovery.
16     **Q  Do you recall the documents you're**
17 **talking about?**
18     A  Yeah.  It was a document that went
19 from -- I don't remember the guy's name right now.
20 But he sent it to the operating people in
21 Puerto Rico:  "We're being charged for this.  Get rid
22 of this equipment."
23        And that's when they started backdating
24 documents.

Page 51

1        Look, you know this better than me.  You
2 obviously -- in what documents you to sent to Emerald
3 under discovery.  Our whole claim is based on your
4 documents and whatever documents we could find from
5 the people we talked about.
6        But the whole thing is your own
7 documents.
8     **Q  Do you recall what documents were being**
9 **backdated?**
10     A  The documents that all of a sudden, after
11 several months, when somebody woke up and said, Gee,
12 we better put this in the storage lot; and then,
13 voilà, it showed up in the storage lot.  But the
14 documents were backdated several months:  Your
15 documents.
16        Many instances, equipment that we had for
17 sale, we had buyers that come into our area to
18 inspect the equipment.  I mean, we look at it on
19 Tuesday; Wednesday it was gone.  Where did it go?
20 Well, it's on loan going up to Minneapolis.
21        You know, I better just slow down a
22 minute because, quite frankly, this demonstrates time
23 and again the mistrust that I put in this company.
24 And, boy, the issue today and all of the shenanigans

Page 52

1 that are going on to get this resolved, it certainly
2 shows that this company is not of the -- what's the
3 word I want to use?  -- of the ethics that I thought
4 they had.
5        So now you understand my feelings.
6     **Q  What knowledge does Emerald have that Sea**
7 **Star's preparation of the, quote, inaccurate**
8 **self-billing reports, unquote, were with the**
9 **intention of defrauding Emerald?**
10     A  The preponderance of continuing the
11 inaccurate, deliberate reporting of the self-billing
12 reports.  I'll give you one example.
13     **Q  Okay.**
14     A  You took our equipment and subleased it,
15 never paid us for it.  You subleased 75 pieces of
16 equipment.
17        When you look at the discovery that we
18 were able to -- and that's only one piece that you
19 let us have -- it violated our agreement.  You were
20 never allowed to take our equipment and give it to a
21 third party; and you collected money.  And not pay
22 under the self-billing reports?
23     **Q  Do you recall --**
24     A  Forget whether you didn't pay it or you

Page 53

1 did pay it:  You were not allowed to do it.
2     **Q  Do you recall the name of the sublessee?**
3     A  CSX Railroad.
4     **Q  Do you recall when that sublease**
5 **occurred?**
6     A  The document will speak for itself.
7     MR. MOLDOFF:  If you recall.
8     THE WITNESS:  I don't recall the date.  I
9 don't recall what year.
10 BY MR. ARMSTRONG:
11     **Q  Okay.**
12     A  I saw it.  I was so infuriated -- I mean,
13 how do you have a business relationship --
14     MR. MOLDOFF:  There's no question
15 pending.
16     THE WITNESS:  Thank you.
17     MR. MOLDOFF:  I know you want to vent,
18 but this is not necessarily the place to vent.
19 BY MR. ARMSTRONG:
20     **Q  Did Emerald ever rely on Sea Star's**
21 **self-billing reports?**
22     A  Constantly.
23     **Q  When did Emerald stop relying on the**
24 **self-billing reports?**

Thomas Holt

15 (Pages 54 to 57)

Page 54

1    A  I don't think we ever stopped.  What we
2  were doing was taking the self-billing reports and
3  the various information we had at our disposal and
4  correcting them.
5    Q  So am I correct in understanding that you
6  weren't taking the self-billing reports as gospel?
7    A  Not when we seen how many mistakes were
8  in them.
9    Remember one thing:  This is -- Emerald
10  is a company that did not have 93 people in the back
11  room running numerous computers.  We relied on the
12  trustworthiness of Sea Star.
13    The agreement was, you pay the money to
14  MBC; the self-billing reports would come in; and we
15  accepted them until we started seeing, month after
16  month, mistakes.
17    Now, when it became very obvious, that's
18  when I said, I can't trust them anymore.  I canceled
19  your lease.
20    What right person, in their right mind
21  frame, would cancel a lease when they were collecting
22  money -- sure, not the right amount.  But as far as I
23  was concerned, you were probably going to destroy
24  another 2,000 pieces of equipment and I'd never see

Page 55

1  it.
2    At the moment in time, there were still
3  about 900 pieces that were unaccounted for by you
4  that we couldn't find on your self-billing reports.
5  Now --
6    MR. MOLDOFF:  There's no question
7  pending.
8    THE WITNESS:  Enough.  Enough already.
9  BY MR. ARMSTRONG:
10    Q  When you're talking about canceling the
11  lease, are you referring to Alan Moldoff's letter in
12  October 2003?
13    A  If that's when it was, I asked my
14  attorney to cancel the lease.
15    Q  So that's when you decided to cancel the
16  lease?
17    A  Might have been a couple days before
18  that.  I don't know.
19    Q  Well, in that time frame; is that
20  correct?
21    A  Yes, sir.
22    Q  Emerald started correcting the Sea Star
23  self-billing reports in May and June 2002; correct?
24    A  I don't know.  I could tell you it was in

Page 56

1  a time frame of that '02.  It was probably sometime
2  in -- whenever you started getting your self-billing
3  reports out.
4    Q  Do you recall any self-billing report
5  that Emerald did not correct?
6    MR. MOLDOFF:  If you know.
7  BY MR. ARMSTRONG:
8    Q  If you know.
9    A  I don't know that question.
10    Q  Do you recall whether Emerald ever relied
11  on a report as being accurate after June 2002?
12    A  I don't know if you --
13    MR. MOLDOFF:  Object to the form of the
14  question.
15    THE WITNESS:  To me that question has
16  been answered several times.
17    But clearly understand, the goal of
18  Emerald was to audit the self-billing reports of Sea
19  Star; and in that auditing is how we started to see
20  the pattern.
21  BY MR. ARMSTRONG:
22    Q  When you say "audit," what do you mean?
23    A  I mean how much money was paid to the
24  bank.  And let's not misunderstand what this

Page 57

1  self-billing report is, because it was a self-serving
2  document, by Sea Star to Emerald, who trusted
3  implicitly the Sea Star people.  Now, here we go:
4  All of a sudden we start to see all these mistakes.
5    Please, what's your next question?
6    Q  Did the audit include investigation as to
7  whether there were mistakes in the self-billing
8  reports?
9    A  That's how they came about, yeah.
10    Q  Would it be fair to say then that as far
11  as you were concerned, the self-billing report was
12  not accurate until Emerald had audited it?
13    MR. MOLDOFF:  Object to the form of the
14  question.
15    THE WITNESS:  I don't understand that
16  question.  I could answer it this way:  As far as
17  Emerald was concerned, they were relying on the
18  accuracy of your self-billing report.
19    When it became obvious that there were
20  numerous mistakes in it, and when we complained to
21  your people about these mistakes, it then became very
22  obvious, the arrogance and the cavalier way that Sea
23  Star was treating Emerald.
24    Hell, you came up with two self-billing

Thomas Holt

Page 58

1  reports in one month. We didn't know which one was
2  right. But please, ask your questions.
3  BY MR. ARMSTRONG:
4      Q  Are you referring to the self-billing
5  reports in September 2002?
6      A  Yes.
7      Q  And when you found out that there were
8  two self-billing reports in September 2002, what
9  action did you take?
10     A  Whatever action the office did, they did.
11         MR. MOLDOFF: I object to the form of the
12  question.
13  BY MR. ARMSTRONG:
14     Q  And who was responsible for taking that
15  action?
16     A  The office, Lorraine or Arthur. Assuming
17  it was in -- yeah, Lorraine or Arthur.
18     Q  Would it be fair to say that after you
19  began -- that is, after Emerald began discovering
20  mistakes -- Emerald didn't rely on the accuracy of
21  Sea Star's self-billing reports?
22         MR. MOLDOFF: Object to the form of the
23  question.
24         THE WITNESS: We certainly did not rely

Page 59

1  on the accuracy. We had to then research how Sea
2  Star put together the self-billing report on
3  individual pieces of equipment; and then we had to
4  get as much information as we could on that
5  individual transaction.
6          When that was correlated and the
7  corrections made, they were immediately sent back to
8  the Sea Star people.
9  BY MR. ARMSTRONG:
10     Q  Did Emerald audit every self-billing
11  report --
12     A  Yes.
13     Q  -- submitted by Sea Star?
14         MR. MOLDOFF: If you know. And object to
15  the form of the question.
16         THE WITNESS: Emerald took every
17  self-billing report and corrected it; and as I told
18  you earlier, in some instances, it was to the favor
19  of Sea Star.
20  BY MR. ARMSTRONG:
21     Q  Did that auditing begin in May or
22  June 2002?
23         MR. MOLDOFF: Object to the form of the
24  question.

Page 60

1          THE WITNESS: I don't know. I don't
2  know -- asked and answered 19 times: It could have
3  been August; it could have been June.
4          MR. MOLDOFF: Don't speculate. If you
5  don't know, you don't know.
6          THE WITNESS: No, I'm trying to help him
7  out.
8          MR. MOLDOFF: So you don't know.
9  BY MR. ARMSTRONG:
10     Q  Would Arthur Davis have more knowledge in
11  regard to that?
12     A  Arthur and Lorraine.
13     Q  Did you speak with anyone at Sea Star
14  regarding Emerald's reliance on the self-billing
15  reports to determine the rental fees for the Emerald
16  equipment?
17     A  I personally talked to McGee in regards
18  to the fact that the self-billing reports were not
19  accurately showing the amount of moneys owed. That
20  was I, personally.
21          My other people were contacted virtually
22  on a daily basis between Emerald's office and your
23  offices -- various offices.
24     Q  Do you know the names of any Sea Star

Page 61

1  people?
2      A  Sitting here today, I cannot tell you
3  specifically their names.
4      Q  And would it be Arthur Davis and Lorraine
5  Robins who would have been contacting these Sea Star
6  people?
7      A  Yes. And -- and to that extent, it's
8  also in your documents. You know who the people are.
9  You've read the names. You've read the various
10  correspondence going back and forth.
11         Could I personally today sit here and
12  tell you that Mr. Bates did this or Mr. McGee did
13  that or Henry Aldridge did something else? No. The
14  fact of the matter is, it's in the documents -- your
15  documents, not my documents.
16     Q  Was Emerald ever involved in collecting
17  rents based on Sea Star's usage of Emerald equipment?
18         MR. MOLDOFF: Object to the form of the
19  question.
20         THE WITNESS: I don't understand the
21  question.
22  BY MR. ARMSTRONG:
23     Q  Did collections go through Emerald rather
24  than MBC with respect to usage of Emerald equipment?

Thomas Holt

Page 62

1     MR. MOLDOFF: Objection to the form of
2   the question. If you understand it, you can answer.
3     THE WITNESS: Well, if he's asking me did
4   Emerald collect any money directly from Sea Star, I
5   don't remember it; because the agreement was it was
6   to go to MBC to reduce Emerald's debt.
7     (Brief recess.)
8     MR. MOLDOFF: If we're going back on the
9   record, Mr. Holt wants to just clarify or clear up
10  some earlier testimony.
11    So, Mr. Holt, do you want to do that?
12    THE WITNESS: Well, I'll try to clarify
13  it to the best of my ability.
14    There was a question about who paid Jack
15  Evans and Mrs. Evans and Arthur Davis and Lorraine.
16  I had to refresh my memory and I had to go back and
17  look at it.
18    Jack Evans and Mrs. Evans were paid by
19  secured creditors and also Storage Transfer, who
20  subsequently bought the loan from MBC. Lorraine and
21  Arthur was never paid by Emerald. Emerald had no
22  money. And/or I believe Greenwich in, Greenwich --
23  well --
24    MR. MOLDOFF: Which was?

Page 63

1     THE WITNESS: They were working as agents
2   for Greenwich, yes.
3     MR. MOLDOFF: For MBC.
4     THE WITNESS: For MBC.
5   BY MR. ARMSTRONG:
6     Q  Excuse me. Were working as agents for
7   MBC?
8     A  MBC.
9     MR. MOLDOFF: If you know.
10    THE WITNESS: If I know. I know that
11  Greenwich was selling equipment. Emerald was selling
12  equipment. But the fact of the matter is, actual
13  payroll never came out of Emerald. Emerald did not
14  have any money.
15  BY MR. ARMSTRONG:
16    Q  Did Greenwich pay Art Davis?
17    A  To my knowledge --
18    Q  If you know.
19    A  To my knowledge, they did; and also
20  Lorraine.
21    Q  Lorraine Robins?
22    A  Yes.
23    Q  And who were the secured creditors that
24  paid John Evans and his wife?

Page 64

1     MR. MOLDOFF: If you know.
2     THE WITNESS: I want to tell you MBC, but
3   I'm not definitely sure about that. And at that
4   point in time, it was probably Storage Transfer.
5   BY MR. ARMSTRONG:
6     Q  The Counterclaim -- or the Amended
7   Counterclaim refers to Emerald's ongoing work on
8   detailed invoices to Sea Star, setting forth the
9   amounts owed to Emerald under the equipment rental
10  agreement.
11    A  You're reading from where, sir?
12    Q  I'm looking at Paragraph 11 of Exhibit A;
13  and that refers to Paragraph 21 of the Amended
14  Counterclaim. This -- I'll be happy to show you.
15    A  21. Okay.
16    Yes, sir.
17    Q  Is Emerald's work still ongoing?
18    MR. MOLDOFF: If you know.
19    THE WITNESS: It's not as active as it
20  used to be. But if we do find a piece of equipment
21  that comes out of the blue, we adjust invoices
22  accordingly. But virtually, we're shut down. It's
23  only when something comes into our lap voluntarily
24  rather than us going out and look for it.

Page 65

1   BY MR. ARMSTRONG:
2     Q  Well, who is responsible at Emerald, or
3   for Emerald, to adjust invoices?
4     A  That would be myself, Lorraine or Arthur.
5     Q  You referred to corrected invoices.
6   Would adjusted invoices be corrections of Emerald
7   invoices?
8     A  Corrected or adjusted is one and the
9   same.
10    MR. MOLDOFF: Objection to the form of
11  the question. But --
12  BY MR. ARMSTRONG:
13    Q  When Emerald submitted corrected
14  self-billing reports, so to speak, to Sea Star, do
15  you know whether Sea Star responded to Emerald's
16  corrections?
17    A  Yes.
18    Q  Do you know whether Sea Star agreed with
19  Emerald's corrections?
20    A  To my knowledge, they agreed; and to my
21  knowledge, they disagreed. And very, very definitely
22  took the position that they weren't going to be
23  changing any more self-billing reports.
24    Q  When Sea Star agreed with Emerald

Thomas Holt

Page 66

1  corrections, do you know whether Sea Star changed its
2  self-billing reports to reflect that agreement?
3      A  I would tell you no, because the moneys
4  were never paid.
5      Q  The moneys were never paid to MBC?
6      A  Never paid to anybody, MBC or Emerald.
7      Q  Was there a period of time --
8      A  Or Storage Transfer.
9      Q  Was there a period of time when Emerald
10  was to receive direct payment of the per-diem rental
11  charges?
12      A  Only after the MBC loan was to be paid
13  off.
14      Q  Was the MBC loan ever paid off?
15      A  Not by Emerald.
16      Q  Was it paid off by anybody?
17      A  I have no knowledge of that.
18      Q  Do you have knowledge that the MBC loan
19  was ever paid off?
20      A  I have knowledge that MBC sold the loan.
21      Q  Well, do you have knowledge that Emerald
22  has ever been entitled to direct payments of any
23  per-diem rentals while the equipment rental agreement
24  was in effect?

Page 67

1      MR. MOLDOFF: Objection to the form of
2  the question.
3      THE WITNESS: I don't have knowledge.
4  But the fact is, that was not the intent of the
5  agreement with MBC at Sea Star.
6  BY MR. ARMSTRONG:
7      Q  Was the intent of the agreement what you
8  said before in regard to paying down the loan?
9      A  That's correct.
10      MR. ARMSTRONG: Let me show you a copy of
11  a fax dated June 4th, 2002, that I'll ask the court
12  reporter to mark as Exhibit 2 for identification.
13      (E.E.L. Exhibit 2 was marked for
14      identification.)
15  BY MR. ARMSTRONG:
16      Q  Have you ever seen that document before?
17      A  This is probably one of the many
18  documents I talked about earlier.  There was
19  communication went back and forth between Emerald and
20  Sea Star.
21      Q  At this time, Art Davis was auditing the
22  self-billing report?
23      A  I guess so.
24      MR. MOLDOFF: If you know.

Page 68

1      THE WITNESS: I don't know.
2  BY MR. ARMSTRONG:
3      Q  Have you seen that document before?
4      A  I probably did.  I can't recall it
5  specifically.
6      Q  Was Art Davis responsible for locating
7  discrepancies on Sea Star's self-billing report?
8      A  He would be responsible to look at the
9  self-billing reports and audit them, yes.
10      Q  And do you know whether the self-billing
11  report was corrected by Sea Star?
12      A  I have no idea.
13      Q  In June 2002, was Emerald relying on the
14  accuracy of Sea Star's self-billing report?
15      MR. MOLDOFF: Object to the form of the
16  question.
17      THE WITNESS: Emerald always relied on
18  the accuracy of Sea Star's self-billing report.  I
19  don't know if there was one in June.  I can't speak
20  specifically to a self-billing report in June.
21  BY MR. ARMSTRONG:
22      Q  If Emerald was relying on the accuracy of
23  Sea Star's self-billing report in May or June 2002,
24  what was the reason for auditing and looking for

Page 69

1  discrepancies?
2      A  The reason for looking for discrepancies
3  would be to see if there were any, based on
4  information that Emerald had.
5      Q  Was that a normal procedure, from the
6  beginning of the self-billing reports?
7      A  Only to look at the accuracy of the
8  report.
9      Q  And to point out any discrepancies;
10  correct?
11      A  Did it many times.
12      MR. MOLDOFF: Objection to the form of
13  the question.
14  BY MR. ARMSTRONG:
15      Q  Do you recall pointing out or Emerald
16  pointing out any discrepancies before June 2002?
17      MR. MOLDOFF: If you know.
18      THE WITNESS: No.
19      MR. ARMSTRONG: Okay.  Let me show you a
20  copy of an email from Lorraine Robins dated
21  June 26th, 2002.  Have you ever seen that document?
22      I'll ask that the court reporter mark it
23  as Exhibit 3 for identification.
24      (E.E.L. Exhibit 3 was marked for

Thomas Holt

Page 70

1    identification.)
2        THE WITNESS:  This document I have not
3    seen.
4    BY MR. ARMSTRONG:
5        Q  Were you aware that Lorraine Robins was
6    monitoring Sea Star in June 2002?
7        A  Was I aware that she was doing it --
8        Q  Yes.
9        A  -- in '02?  In June of '02.
10        MR. MOLDOFF:  If you know.
11        THE WITNESS:  I don't know.
12    BY MR. ARMSTRONG:
13        Q  Had you given Lorraine Robins any
14    instructions or made any requests that she monitor
15    Sea Star's activities in June 2002?
16        A  I can't speak of June.  But I can tell
17    you, I gave her instructions to start monitoring, as
18    you call it -- or checking the correctness of their
19    bills as these mistakes kept popping up.
20        Q  Do you know whether you gave her
21    instructions before the date of this email?
22        A  I can't tell you when it was.
23        MR. ARMSTRONG:  Let me show you a copy of
24    a Greenwich Terminals invoice dated March 6th,

Page 71

1    2003, that I'll ask the court reporter to mark as
2    Exhibit 4 for identification.
3        (E.E.L. Exhibit 4 was marked for
4        identification.)
5    BY MR. ARMSTRONG:
6        Q  Do you recognize that document?
7        A  I've never seen this document.
8        Q  Okay.  Let me show you a copy of
9    Exhibit 14 to the Storage Transfer deposition that I
10    ask the court reporter -- strike that.
11        Exhibit 14 to the Storage Transfer
12    deposition:  Have you ever seen that document before?
13        A  No, I never saw it.
14        Q  Do you recall having any communications
15    with Scott Krieger or anyone else at MBC regarding
16    MBC claims for use of Emerald equipment after
17    April 29th, 2002, outside the equipment rental
18    agreement?
19        Let me rephrase it.
20        A  Please.
21        Q  Do you recall having discussions or
22    communicating with anyone at MBC regarding MBC claims
23    against NPR for use of Emerald equipment after
24    April 29th, 2002?

Page 72

1        A  So you're talking after April 29th,
2    '02?
3        Q  Yes.
4        A  And the question is MBC --
5        Q  Making claims against the NPR bankruptcy
6    estate at that time for usage of Emerald equipment
7    after April 29th, 2002.
8        MR. MOLDOFF:  If you know.
9        THE WITNESS:  I don't know.
10    BY MR. ARMSTRONG:
11        Q  You don't recall?
12        A  Alls I recall was that MBC went into the
13    court and said, "I want to sell this equipment; I
14    have a loan against it."
15        And the Court allowed them to.  And then
16    Emerald entered into the agreement to do the deal
17    with Sea Star and MBC, and that's why we're here
18    today on the self-billing reports.  Best of my
19    knowledge.
20        MR. ARMSTRONG:  All right.  Let me show
21    you two checks payable to Martin McDonald that I'll
22    ask the court reporter to mark as composite Exhibit 5
23    for identification.
24        (E.E.L. Exhibit 5 was marked for

Page 73

1        identification.)
2    BY MR. ARMSTRONG:
3        Q  Have you ever seen copies of those checks
4    payable to McDonald?
5        A  First time I saw this was in the
6    documents you handed me a minute ago.  These checks
7    I've never seen before.
8        Q  Okay.  Did you have any communications
9    with anyone at MBC concerning MBC's payments of
10    McDonald?
11        A  The only thing that I was involved in in
12    those days was for McDonald to find as much of the
13    equipment as he could of Emerald's on behalf of MBC.
14    So evidently -- I'm not speculating, but I guess he
15    was working for MBC there.
16        Q  After April 29th, 2002, was there a
17    procedure at Emerald in regard to taking inventories
18    of Emerald equipment?
19        A  We relied on the inventories that came
20    from NPR and then over to Sea Star.
21        Q  Did Emerald make its own inventories?
22        A  After the bankruptcy?
23        Q  Yes, sir.
24        A  I don't think we did.  I'm not sure.

Page 74

1      Q  Let me show you a copy of Exhibit 20 to
2  the Storage Transfer deposition.
3          Have you ever seen those documents
4  before?
5      A  I never seen this document before.
6      Q  Well, I've given you two pieces of paper.
7  The first is an email, and the second is an
8  attachment to that email. The email states, in the
9  first sentence, "I've attached what I believe is the
10  current inventory of the Emerald equipment."
11          Do you know when that inventory was
12  prepared?
13          MR. MOLDOFF:  If you know.
14          THE WITNESS:  I don't know when it was
15  prepared, but I know the methodology.
16  BY MR. ARMSTRONG:
17      Q  All right.  Can you tell me the
18  methodology for preparation.
19      A  They had an inventory that they knew was
20  Emerald equipment.  And every time they sold it a
21  piece, or it was obviously in possession of Sea Star,
22  they just accounted for it on their internal
23  inventory that they maintained as Emerald.
24      Q  All right.  What was that inventory that

Page 75

1  they knew was Emerald equipment?
2      A  What was it?
3      Q  Yes, sir.
4      A  It was a list of all the equipment of
5  Emerald's; and they added and subtracted as the days,
6  weeks and months went on.
7      Q  Are you talking about the NPR inventory?
8      A  No, NPR was gone.  You're talking in
9  September of '03?
10      Q  Yes, sir.
11      A  They had the Emerald inventory that they
12  got from NPR that was maintained by Sea Star for a
13  period of time -- two months, three months, I don't
14  know.  They probably even got inventories of Emerald
15  equipment that Sea Star had in their possession.
16          So from the total inventory of Emerald
17  equipment that Sea Star did not have or was just
18  laying around the world in other people's
19  possessions, they kept a record.
20          And this inventory is self-explanatory.
21  It tells the bank where equipment was at that moment
22  in time and how they were selling against it.  The
23  letter is self-explanatory.  But I never saw the
24  letter.

Page 76

1      Q  Was --
2      A  They had knowledge of inventory.
3      Q  Was -- you referred to inventory that was
4  maintained by Sea Star --
5      A  Yes.
6      Q  -- for some period of time.
7      A  Yes.
8      Q  There was also an inventory maintained by
9  one of the Holt companies after April 27th, 2002,
10  wasn't there?
11      A  Okay.
12          MR. MOLDOFF:  Object to the form.
13  BY MR. ARMSTRONG:
14      Q  Was there?
15      A  Probably was.  You're talking about Holt
16  Logistics.
17      Q  And how did that inventory differ from
18  the Sea Star inventory?
19      A  Well, would be the equipment that Sea
20  Star did not take.
21      Q  Well, would it have been the total
22  equipment?
23      A  What --
24          MR. MOLDOFF: Object to form.

Page 77

1          THE WITNESS:  What company?
2  BY MR. ARMSTRONG:
3      Q  Of Emerald.
4      A  Sea Star did not take the total equipment
5  of Emerald.
6      Q  I'm saying would the Holt Logistics
7  inventory have covered all of the Emerald equipment?
8      A  Yes, sir.
9      Q  Could this have been based on the Holt
10  Logistics inventory -- that is, the inventory that is
11  attached to the Davis September 25th email?
12      A  I have no idea.
13          MR. MOLDOFF:  If you know.
14  BY MR. ARMSTRONG:
15      Q  Would it be fair to say then that you
16  don't know how this inventory attached to the
17  September 25th email was put together?
18      A  I said that.  I told you that I only know
19  their methodology.  I don't know how he came to that
20  one.  He probably did it by adding and subtracting
21  what the inventories were that he had in his control.
22  He had inventories, start and stop inventories.
23      Q  He had Holt Logistics inventories in his
24  control, didn't he?

Thomas Holt

Page 78

1      A  I don't know.  Do you know?  I don't
2   know.  If he did, he did.
3      Q  Didn't Arthur Davis work for Holt
4   Logistics?
5      A  I don't know if he worked for them in
6   September of '03.
7      Q  Did he have an email address at Holt
8   Logistics any time after April 29, 2002?
9      MR. MOLDOFF:  If you know.
10      THE WITNESS:  You would have to ask him.
11  BY MR. ARMSTRONG:
12      Q  What is Holt Oversight?
13      A  It's Holt Logistics.
14      Q  Do you recognize the adavis@holtoversight
15  email address?
16      A  That's an email address, yes.  Do I
17  recognize it?  I assume it is his.
18      You're asking me things that I'm not
19  privy to.  You have to ask him.  I wasn't there in
20  April of '03, at Holt Logistics.
21      Q  The first sentence of the second
22  paragraph states, "Lorraine and I believe the
23  invoices to Sea Star Line will total approximately
24  1 mil."

Page 79

1      Did you have any discussions with
2   Lorraine Robins and Arthur Davis concerning the total
3   invoices to Sea Star Line?
4      A  No.
5      Q  Do you know how Arthur Davis developed
6   the belief that the invoices to Sea Star Line will
7   total approximately 1 mil, as stated in the
8   September 25th, 2003, email?
9      A  I don't know that -- how Mr. Evans'
10  mind -- Mr. Davis' mind works with regards to his
11  estimations.
12      I can probably tell you that the ongoing
13  self-billing report is the document that he was
14  working from.
15      I have no idea how much was billed to Sea
16  Star and paid to the bank.
17      Q  Do you know how the 1 mil total became,
18  quote, damages in excess of $4 million, as alleged in
19  the Amended Counterclaim?
20      A  I think you're confusing one number with
21  another.  You're taking the supposition of Mr. Davis
22  for rentals of a million dollars he thought would
23  happen versus the excess of $4 million, which
24  consists of actual unpaid rent owed by Sea Star and

Page 80

1   actual missing equipment that Sea Star owes for.
2      So you're confusing two documents there.
3   On one you're taking what he thinks is going to
4   happen, which has got nothing to do with the
5   $4 million.
6      Q  Well, how much of the $4 million is
7   rental?
8      MR. MOLDOFF:  If you know.
9      THE WITNESS:  At what point in time?
10  BY MR. ARMSTRONG:
11      Q  As of the date the Amended Counterclaim
12  was filed.  That Amended Counterclaim asked for
13  damages in excess of $4 million.
14      A  Somewhere you'll find your self-billing
15  reports that were corrected probably equal -- and
16  this is off the top of my head; I haven't added it
17  up -- about 2,2-, 2,3- of unpaid rent; and then the
18  balance would be missing equipment that you never
19  returned.
20      That's got nothing to do with what is the
21  supposition of Mr. Davis in that -- did you say
22  that's an email?  In that document, whatever it is.
23  BY MR. ARMSTRONG:
24      Q  Did you and Mr. Davis ever discuss his

Page 81

1   supposition as to what the invoices to Sea Star would
2   total any time in September or October 2003?
3      MR. MOLDOFF:  If you recall.
4      THE WITNESS:  Not to my recollection.  We
5   always talked about numbers -- how much the fleet
6   would sell for, how much he could get for a 40-foot
7   chassis versus a 20; how much would the income be
8   that we could anticipate from Sea Star.
9      We always felt that there would be far
10  significant moneys to pay off in the time frame that
11  Emerald was operating on.
12  BY MR. ARMSTRONG:
13      Q  To pay off what?
14      A  To pay off the debt to MBC and give a
15  return to Emerald.
16      Q  Do you recall what the debt to MBC was in
17  September of 2003?  That is, the Emerald debt.
18      A  Not exactly.  I'm guesstimating it was
19  several millions of dollars.  Some reason my mind
20  says 6, but I think it was a little less than that.
21      I mean, the methodology -- if we were
22  paid, as we're entitled to, it probably comes close
23  to 6 million.
24      Q  Show you a copy of a letter dated

Thomas Holt

Page 82

1  October 30th, 2003, that is Exhibit 19 to the
2  Storage Transfer deposition.
3          Have you ever seen that letter before?
4      A  This is a letter from MBC addressed to
5  Thomas Holt, Jr., who happens to be my son, at
6  October 30th, '03. What's it say?
7          I've never seen this letter.
8          MR. MOLDOFF: I would also, for the
9  record, note that I'm not sure where or how that
10 relates to any of the -- the Amended Counterclaim or
11 any of the areas of listed testimony on the Notice of
12 Deposition, unless Counsel can direct me to how it
13 relates to any of the areas listed.
14 BY MR. ARMSTRONG:
15     Q  Were you going to buy the debt from MBC?
16     A  No, sir.
17     Q  Do you know what the basis of the
18 statement, "As you're probably aware, we have
19 negotiated a deal in principle to sell MBC Leasing's
20 Emerald loan documents to your father effective
21 11/1/03"?
22     A  No, sir.
23     Q  Did you have any discussions with
24 Lorraine Robins regarding establishing Storage

Page 83

1  Transfer?
2      A  No, sir.
3      Q  Were you aware of the Loan Sale and
4  Assignment Agreement signed by Storage Transfer on
5  November 1st, 2003?
6          MR. MOLDOFF: Counsel, could you please
7  tell me, before I let him respond to that question,
8  which area of testimony that you have appended to
9  your Notice of Deposition that relates to the
10 question you just asked.
11         MR. ARMSTRONG: It relates to the
12 damages.
13         MR. MOLDOFF: How does it relate to the
14 damages? The damages arise out of the invoices that
15 have been submitted --
16         MR. ARMSTRONG: Well, as you know,
17 Counsel, there's a question --
18         THE WITNESS: Excuse me, I'll interrupt.
19 While you guys are duking it out, I'll go to the
20 boys' room.
21         MR. ARMSTRONG: Okay.
22         (Brief recess.)
23         (Record read.)
24 BY MR. ARMSTRONG:

Page 84

1      Q  Did anyone ever ask Emerald to join into
2  the Loan Sale and Assignment Agreement, which has
3  been marked as Exhibit 2 to the Storage Transfer
4  deposition?
5          MR. MOLDOFF: Could we just finish our
6  colloquy before the witness left? You were
7  explaining why you think this inquiry --
8          MR. ARMSTRONG: There are questions as to
9  damage. There are questions as --
10         MR. MOLDOFF: Could you just let me
11 finish.
12         MR. ARMSTRONG: Well, you're asking me to
13 explain.
14         MR. MOLDOFF: Well, let me finish asking
15 it.
16         MR. ARMSTRONG: All right.
17         MR. MOLDOFF: -- how it relates to any of
18 the areas listed in the deposition notice.
19         MR. ARMSTRONG: And I've told you: It
20 relates to the damages claimed by Emerald, not only
21 as to amount but also as to right.
22         MR. MOLDOFF: Well, that's a defense.
23 This question is just about the damages. That's your
24 defense.

Page 85

1          MR. ARMSTRONG: So what?
2          MR. MOLDOFF: So the area of testimony
3  relates to the damage that we claim --
4          MR. ARMSTRONG: Are you instructing the
5  witness not to answer?
6          MR. MOLDOFF: Let me hear the question,
7  and we'll take it from there. But I'm going to limit
8  it, because that's not what the area of testimony --
9          MR. ARMSTRONG: Well, you decide to do
10 what you're going to do, and then we'll deal with it.
11         MR. MOLDOFF: Fine.
12 BY MR. ARMSTRONG:
13     Q  Did anyone ever ask Emerald Equipment to
14 join in the Loan Sale and Assignment Agreement that
15 is Exhibit 2 to the Storage Transfer deposition?
16         MR. MOLDOFF: If you understand the
17 question. I object to the form.
18         THE WITNESS: I don't understand the
19 question.
20 BY MR. ARMSTRONG:
21     Q  Did anyone --
22     A  Emerald is not party to that agreement.
23     Q  And did anyone ever ask Emerald to become
24 a party to the agreement?

Thomas Holt

Page 86

1    A  To that agreement, no. To Emerald's
2  position with regards to a carve-out to protect its
3  creditors. I don't know if it's part of or not part
4  of that document you just showed me.
5    Q  Let me show you a letter dated
6  February 25th, 2004, that is Exhibit 10 to the
7  Storage Transfer deposition; and a letter dated
8  February 25th, 2004, that is Exhibit 11 to the
9  Storage Transfer deposition.
10    Do you recognize those documents?
11    A  Yes, sir.
12    Q  What are those documents?
13    A  They're self-explanatory. I'm not a
14  lawyer. I told you that several times.
15    But the one, Exhibit 10, says,
16  "contribution to the Emerald estate"; and 11 says
17  "carve-out."
18    Q  When was the first discussion about a
19  contribution to the Emerald estate by Storage
20  Transfer?
21    A  When did I want a contribution to Emerald
22  with regards to --
23    Q  I'm asking when the first discussion was.
24    A  I couldn't tell you that. I don't really

Page 87

1  know. It was sometime involved in whenever the
2  transaction was taking place.
3    Q  What transaction are you referring to?
4    A  The purchase of the loan by Storage
5  Transfer. It was my loan. I was the one that owed
6  the money to Emerald.
7    Q  Okay. Storage Transfer was purchasing --
8    A  The loan.
9    Q  -- the Emerald loan from MBC.
10    A  Yes.
11    Q  Was part of that purchase to involve a
12  carve-out to the Emerald estate?
13    MR. MOLDOFF: Object to the form of the
14  question. If you know.
15    THE WITNESS: I'm confused with the
16  question, because we have these two documents here,
17  and they're self-explanatory. But I don't understand
18  the question.
19  BY MR. ARMSTRONG:
20    Q  Well, when did the question regarding a
21  carve-out to the Emerald estate come up?
22    MR. MOLDOFF: If you know.
23    THE WITNESS: I don't know.
24  BY MR. ARMSTRONG:

Page 88

1    Q  Was it --
2    A  The time frame? I don't know.
3    Q  Was there a discussion regarding a
4  carve-out to the Emerald estate before the loan
5  transfer -- Loan Sale and Assignment Agreement was
6  signed?
7    MR. MOLDOFF: Asked and answered.
8    THE WITNESS: I don't know. I -- I'm
9  sorry. I don't remember the dates.
10  BY MR. ARMSTRONG:
11    Q  When did you first see the two letters
12  dated February 25th, 2004?
13    MR. MOLDOFF: If you know.
14    THE WITNESS: These letters here were
15  copied to me in February '04.
16  BY MR. ARMSTRONG:
17    Q  Were they --
18    A  When I had seen them, I don't remember.
19    Q  Okay. Were they written at your
20  direction?
21    MR. MOLDOFF: If you know.
22    THE WITNESS: At my direction, per se? I
23  would have to tell you I was protected in the Emerald
24  estate, because the bottom line is, they didn't have

Page 89

1  to do a carve-out. Just like MBC did not have to
2  give me time to pay off their loan.
3    If they called the loan, Emerald is gone.
4  Emerald is in bankruptcy when this was going on. We
5  were trying to protect the creditors.
6  BY MR. ARMSTRONG:
7    Q  Did Emerald pay any money in exchange for
8  this carve-out?
9    A  Why would Emerald pay any money? They
10  were the debtor.
11    Q  What was the -- what was the
12  consideration for the carve-out?
13    A  That Emerald would survive. That their
14  creditors would hopefully get some money.
15    MR. MOLDOFF: Object to the form of the
16  question; calls for a legal conclusion.
17    THE WITNESS: I don't know how that
18  question even gets involved with this. I had nothing
19  to do with Storage.
20  BY MR. ARMSTRONG:
21    Q  You referred to Sea Star's possession of
22  Emerald's equipment.
23    A  Please don't tell me you didn't have it.
24  Is that where you're going?

Thomas Holt

Page 90

1    **Q   Let me show you a copy of a note dated**
2    **May 11th, 2004, that's Exhibit 16 to the Storage**
3    **Transfer deposition.**
4        **Have you ever seen that document before?**
5        A   No, sir.
6        **Q   Were you aware that -- did you ever**
7    **become aware that Arthur Davis was instructing Sea**
8    **Star not to release Emerald equipment?**
9        A   I'm not aware of this document.  Does
10   Arturo work for Sea Star?
11       I don't know who this was sent to.  I
12   don't know the person and I don't know --
13       MR. MOLDOFF:  If you don't know, just say
14   you don't know.
15       THE WITNESS:  I don't know.
16   BY MR. ARMSTRONG:
17       **Q   Did you ever become aware that Arthur**
18   **Davis instructed Sea Star not to release Emerald**
19   **equipment?**
20       A   At what time frame?
21       **Q   Let's start with any time frame.**
22       A   Well, certainly in the instance of when
23   Emerald had the lease, we would not ask Sea Star to
24   release equipment to a third party without giving you

Page 91

1    specific authority.
2        As to what Storage Transfer and Emerald
3    were doing here, I don't know.  I never saw this.
4        **Q   Was Arthur Davis representing Emerald in**
5    **May 2004?**
6        MR. MOLDOFF:  If you know.
7        THE WITNESS:  I can't tell you if I know
8    or don't know.
9        In May of '04, Storage Transfer owned the
10   loan and Emerald had the lease.  Emerald did not tell
11   Arthur to write that email.
12   BY MR. ARMSTRONG:
13       **Q   Did you ever become aware that equipment**
14   **was being stored at Sea Star's terminal in San Juan**
15   **during 2004?**
16       A   I don't know.  This is a period after the
17   time that you were to have returned all of Emerald's
18   equipment.  So I don't know anything about these
19   documents -- or that document.  If you're reading
20   something else, let me see it.
21       MR. ARMSTRONG:  I'll show you a copy of a
22   letter dated June 29th, 2004, that I'll ask the court
23   reporter to mark as Exhibit 6 for identification.
24       (E.E.L. Exhibit 6 was marked for

Page 92

1        identification.)
2    BY MR. ARMSTRONG:
3        **Q   Have you ever seen that letter before?**
4        A   Yes, I saw it.
5        **Q   Do you recall when you first saw it?**
6        A   When it was brought up to me.
7        **Q   Was it your understanding that Sea Star**
8    **was not storing any Emerald equipment at the time**
9    **that letter was sent?**
10       MR. MOLDOFF:  Object to the form of the
11   question.
12       THE WITNESS:  I don't know.  They should
13   not have been.
14       This looks like a piece of equipment they
15   had in their possession if it's under the lease
16   agreement between Sea Star and Emerald.  Evidently
17   you found some equipment you wanted to return several
18   months later, of the termination.
19   BY MR. ARMSTRONG:
20       **Q   Let me show you a copy of Exhibit 17 to**
21   **the Storage Transfer deposition.**
22       **Have you ever seen that document before?**
23       A   No, I have never seen it.
24       MR. ARMSTRONG:  Let me show you a copy of

Page 93

1    a document that I'll ask the court reporter to mark
2    as Exhibit 7 to this deposition.
3        (E.E.L. Exhibit 7 was marked for
4        identification.)
5    BY MR. ARMSTRONG:
6        **Q   Have you ever seen that document before?**
7        A   No, sir, I never saw it.
8        **Q   Let me show you a copy of Exhibit 21 to**
9    **the Storage Transfer deposition.  Have you seen that**
10   **document before?**
11       A   It's a lot of equipment.  No, I never saw
12   it before.
13       **Q   Did you ever become aware of an inventory**
14   **of equipment at Vega Alta in December 2004?**
15       A   I'm not specifically aware of that.  I
16   know that people were down there on behalf of Emerald
17   trying to find their equipment.  If that was an
18   inventory taken, I'll accept you saying it.
19       We had people all over the place trying
20   to --
21       **Q   Do you know what Vega Alta is?**
22       A   It's a town somewhere in Puerto Rico, to
23   my knowledge.
24       **Q   Do you know whether Emerald had a storage**

Thomas Holt

25 (Pages 94 to 97)

Page 94

1 facility at Vega Alta?
2     A  I have no clue.  You'd have to ask Art
3 Davis.
4     Q  Art Davis would not have asked you before
5 entering into agreement for a storage facility at
6 Vega Alta?
7     MR. MOLDOFF:  Object to the form of the
8 question.
9     THE WITNESS:  I don't know if he would
10 have asked me.  If he had said, Gee, I need a storage
11 yard, I would have said yes.
12     I don't even know where that place is.
13 Is it on the island?
14 BY MR. ARMSTRONG:
15     Q  It's in Puerto Rico.
16     A  Good.  I just learned something.
17     Q  You never became aware of any storage
18 yard for Emerald equipment at Vega Alta?
19     A  I knew there were storage yards.  Where?
20 I don't know.  How many?  I would tell you no more
21 than two, because I probably would not have wanted to
22 go for the expense.
23     Q  Do you know whether Emerald has made
24 claims against Sea Star for stipulated loss values of

Page 95

1 equipment that was in the Vega Alta storage yard?
2     A  I do not know that.
3     MR. MOLDOFF:  If you know.
4     THE WITNESS:  If it was under lease to
5 you, a claim would have been made wherever it was.
6 BY MR. ARMSTRONG:
7     Q  Even if it was in an Emerald storage
8 yard?
9     A  Even if it was under my Christmas tree,
10 if it was in your possession, we still would have
11 invoiced you.
12     Q  And would you have invoiced for a
13 stipulated loss value if it was under your Christmas
14 tree?
15     A  If it was in your possession and never
16 returned to us, you would be invoiced.
17     Q  If it was in your storage yard, would it
18 have been returned to you?
19     A  I don't know how it got to that storage
20 yard.  I would have to document it.  And this is what
21 you and I are talking about:  We would have to follow
22 the flow of the documentation.
23     If you did not have it terminated under
24 your agreement with Emerald, we would invoice you.

Page 96

1     Q  You would invoice for equipment that was
2 in your storage yard and claim a stipulated loss
3 value; is that correct?
4     MR. MOLDOFF:  Object to the form of the
5 question.  Answer if you know.
6     THE WITNESS:  Yeah, I answered it.
7     MR. MOLDOFF:  Asked and answered.
8     THE WITNESS:  Asked and answered.
9     If you had not terminated the agreement
10 the way it was supposed to be, we have no clue what
11 equipment is anywhere in your possession.  For all we
12 know, you might have entered the terminal one night
13 and threw it out in the street.
14     MR. MOLDOFF:  And as Mr. Armstrong knows,
15 in areas where -- or instances where equipment was
16 later located, it was not returned by Sea Star,
17 stipulated loss values were charged but they were
18 adjusted.
19     MR. ARMSTRONG:  Are you making an
20 argument at this point, Counsel?  Or are you
21 answering a question?
22     MR. MOLDOFF:  It's a statement, and
23 you're well aware of it.
24     THE WITNESS:  That's a statement of fact.

Page 97

1 BY MR. ARMSTRONG:
2     Q  Let me show you a copy of a document
3 entitled Order Approving the Stipulation Between Sea
4 Star Line and the Debtor Regarding Disposition of
5 Certain Equipment.
6     Are you aware of that order?
7     A  I don't understand what this says.  Who
8 entered into this?  MBC and Sea Star?
9     Q  It looks like Emerald and Sea Star, sir.
10     A  Hold on.  I'll refer to my counsel,
11 because I don't understand it.
12     Q  All I'm asking you is, are you aware of
13 that order?
14     MR. MOLDOFF:  If you recall.
15     THE WITNESS:  I don't know what it is.
16 Is it a sale of Emerald's equipment to Sea Star?  If
17 that's what it is, I was aware that you bought
18 equipment.  But what's this mean?  I don't understand
19 it.
20 BY MR. ARMSTRONG:
21     Q  I'm showing you a document.
22     A  I never saw it before.
23     Q  Are you aware of that document?
24     A  I never saw it before.  I don't know what

Thomas Holt

Page 98

1  it is. You'll have to tell me what it means. Then
2  it could refresh my memory.
3      Q  You've never seen it before?
4      A  To my knowledge, I have not.
5          MR. ARMSTRONG:  All right. Can I ask
6  that this be marked as 8.
7          (E.E.L. Exhibit 8 was marked for
8          identification.)
9  BY MR. ARMSTRONG:
10     Q  As part of your damage claim --
11     A  I'm not done reading it, so give me a
12 minute here.
13         MR. MOLDOFF:  For the record, it was a
14 settlement of an issue that arose regarding equipment
15 that was remaining in court or going -- there was a
16 continuing dispute. But it was a settlement that was
17 approved by the bankruptcy court with respect to the
18 disposition of that equipment pursuant to the
19 stipulation.
20         THE WITNESS:  Then it is what it is.
21         MR. MOLDOFF:  And the document speaks for
22 itself.
23 BY MR. ARMSTRONG:
24     Q  Does part of your damage claim relate to

Page 99

1  equipment that was located in the Dominican Republic
2  on April 27th, 2002?
3      A  Sitting here, I can't tell you without
4  going into all the documents.
5          We -- you're now talking about equipment
6  you never returned? Is that what you're suggesting?
7      Q  I'm not suggesting anything. I'm --
8      A  What's your question then?
9      Q  I'm asking you a question.
10         Does part of your damage claim --
11     A  Right.
12     Q  -- that is, Emerald's damage claim --
13     A  Right.
14     Q  -- relate to equipment that was in the
15 Dominican Republic on April 27th?
16         MR. MOLDOFF:  In other words, the
17 question relates to either rental payments and/or --
18         THE WITNESS:  Prior to April --
19         MR. MOLDOFF:  -- stipulated loss value.
20         I object to the question.
21 BY MR. ARMSTRONG:
22     Q  On or before April 27th, 2002.
23     A  We would not invoice you on or before
24 April 27th, '02.

Page 100

1          MR. MOLDOFF:  Are you saying --
2  BY MR. ARMSTRONG:
3      Q  Does part of your claim relating to
4  Emerald equipment cover equipment that was located in
5  the Dominican Republic on or before April 27th,
6  2002?
7          MR. MOLDOFF:  Do you mean if it was
8  thereafter used by Sea Star? I object to the form of
9  the question.
10         THE WITNESS:  Well, let's first
11 establish, when did you buy the company?
12 BY MR. ARMSTRONG:
13     Q  I think we went through that a couple of
14 hours ago.
15     A  We went through a lot.
16     Q  The document -- the order was entered on
17 April 27th -- I'm sorry -- April 26th, and the
18 closing occurred by the transfer of funds on
19 April 27th.
20     A  So April 29th, you had possession of
21 the Emerald equipment.
22     Q  That's a comment by you.
23     A  Yes.
24     Q  Now, I'm asking you --

Page 101

1      A  It's a fact.
2      Q  -- a question.
3      A  You took over Emerald's equipment as of
4  the closing. You either would return it within two
5  weeks after the closing or you were using it. If you
6  returned it, you would not be charged.
7      Q  Does part of Emerald's claim relate to
8  equipment that was located in the Dominican Republic
9  on or before April 27th, 2002?
10         MR. MOLDOFF:  Object to the form of the
11 question.
12         THE WITNESS:  April 29th or 27th?
13 BY MR. ARMSTRONG:
14     Q  April 27th.
15     A  And that's prior to you buying the
16 company.
17     Q  April 27th, 2002.
18         MR. MOLDOFF:  Object to the form of the
19 question.
20         THE WITNESS:  It is, so -- I don't
21 understand the question. I leave it at that.
22 BY MR. ARMSTRONG:
23     Q  You don't understand what Emerald's claim
24 is with respect to equipment located in the Dominican

Thomas Holt

Page 102

```
1   Republic?
2         MR. MOLDOFF: Mr. Armstrong, as you are
3   well aware, if Sea Star used the equipment, it is
4   listed on the invoices.
5         MR. ARMSTRONG: Counselor, you're abusing
6   your privilege in this deposition --
7         MR. MOLDOFF: I'm not abusing my
8   privilege.
9         MR. ARMSTRONG: -- and I shall take --
10        MR. MOLDOFF: That's fine.
11        MR. ARMSTRONG: -- measures under the
12  rules.
13        MR. MOLDOFF: That's fine.
14        MR. ARMSTRONG: You are not entitled to
15  sit there and argue --
16        MR. MOLDOFF: The witness does not
17  understand the question. I'm trying to make it
18  understandable for him.
19        MR. ARMSTRONG: Well, then I'll try to
20  make it understandable.
21        MR. MOLDOFF: Okay. Well, give it
22  another shot.
23  BY MR. ARMSTRONG:
24     Q   Do you know what your claim is -- that
```

Page 103

```
1   is, what Emerald's claim is -- with respect to
2   equipment in the Dominican Republic?
3       A   I know my claim. Whether it's in the
4   Dominican Republic or wherever else the equipment was
5   used by Sea Star is my claim. And the records speak
6   for themselves.
7       Q   What do you know about your claim with
8   respect to equipment in the Dominican Republic?
9         MR. MOLDOFF: Object to the form of the
10  question.
11        THE WITNESS: I don't even know if there
12  was equipment then on the 27th of April. I'm just
13  trying to tell you that, if there was and if it was
14  in your possession, you would have been invoiced for
15  it.
16        Now, can you tell me if you had equipment
17  then?
18  BY MR. ARMSTRONG:
19     Q   Do you know Teddy Heinsen?
20      A   Then you know as much as I do about this
21  question you're asking.
22        I know Teddy Heinsen.
23     Q   Did you have any communications with
24  Teddy Heinsen regarding equipment in the Dominican
```

Page 104

```
1   Republic after April 27th, 2002?
2       A   After; not before.
3       Q   Did you communicate, after April 27th,
4   2002, with Teddy Heinsen regarding equipment in the
5   Dominican Republic?
6       A   I did not personally. Arthur and
7   Lorraine had extensive conversation with Teddy after
8   the sale of NPR to Sea Star and the possession taken
9   of Sea Star of Emerald's equipment.
10      Q   And did Lorraine and Arthur report to you
11  regarding their extensive conversations with Teddy
12  Heinsen?
13      A   They kept me advised.
14      Q   And what did Lorraine and Arthur tell
15  you?
16      A   They told me that there was a lot of
17  equipment down there; that Teddy felt he should have
18  been paid by NPR, who was liquidated; that he should
19  have been paid by Emerald, who was liquidated; but
20  who Sea Star was taking possession of the equipment
21  to use for their benefit.
22        And our position was, take that up with
23  Sea Star.
24      Q   And did Teddy Heinsen tell you that he
```

Page 105

```
1   was -- or tell Lorraine and Arthur that he had a lien
2   on the Emerald equipment?
3       A   Teddy Heinsen never talked to me. He
4   talked to Lorraine and Arthur. And there were
5   several other people involved in it, including some
6   Sea Star people.
7         It was all resolved, to my knowledge.
8   That's about the best I can help you with regards to
9   Teddy Heinsen.
10      Q   Were you aware of any meetings involving
11  Arthur Davis and Martin McDonald in the Dominican
12  Republic with Teddy Heinsen?
13      A   Marty McDonald could have been there. I
14  don't think Arthur ever went there, to my knowledge.
15  He might have.
16        No, I'm not aware of any. But it could
17  have happened in the normal course of business.
18      Q   Do you know whether Arthur Davis and
19  Marty McDonald went to the Dominican Republic in an
20  attempt to retrieve equipment from Teddy Heinsen --
21  that is, Emerald equipment?
22      A   I do believe I just answered that
23  question: I'm not aware of them going there.
24        Would they have gone there? The normal
```

Thomas Holt

Page 106

1  course of business to retrieve equipment that was in
2  the possession of Sea Star, they would have went
3  there. If it was in the possession of Teddy Heinsen
4  on behalf of Emerald, they would have went there.
5      I do know that Mr. Heinsen purchased a
6  lot of equipment from Emerald.
7      **Q Do you know when Mr. Heinsen purchased**
8  **that equipment from Emerald?**
9      A Throughout the course of a couple of
10 years.
11     MR. ARMSTRONG: Let me show you a copy of
12 a document entitled Notice of Maritime Liens Asserted
13 by E. T. Heinsen C Por A and Naves Y Terminales, S.A.
14 and I'll ask the court reporter to mark as Exhibit 9
15 for identification.
16     (E.E.L. Exhibit 9 was marked for
17     identification.)
18     THE WITNESS: Counsel, what's this have
19 to do with why I'm here today?
20 BY MR. ARMSTRONG:
21     **Q Have you ever seen that document before?**
22     MR. MOLDOFF: You can answer the question
23 if you can.
24     THE WITNESS: I've never seen this

Page 107

1  document. I don't even know what it is. Is it a
2  claim for stevedoring? A claim for
3  stevedoring-related services.
4      MR. MOLDOFF: Just answer the question.
5      THE WITNESS: I never saw the document.
6  BY MR. ARMSTRONG:
7      **Q Did you ever become aware that Heinsen**
8  **was claiming maritime liens on Emerald equipment as**
9  **of April 25th, 2002?**
10     A I answered that before: Yes, I knew that
11 he was attempting to hold Emerald equipment under a
12 lien. What equipment, I don't know what it was, but
13 it had been resolved.
14     **Q Do you know when it was resolved?**
15     A I would think within weeks of when they
16 claimed it.
17     **Q Do you know how it was resolved?**
18     A The attorneys resolved it. I don't know,
19 here sitting today. We'd have to go get the record.
20 Whatever it is, it is.
21     Are you suggesting that Emerald had
22 equipment in Santo Domingo, and then turned around
23 and invoiced you for lost equipment? Are you going
24 to say that? Is that what you're saying?

Page 108

1      **Q Did you participate in any resolution of**
2  **a Heinsen maritime lien claim?**
3      A I didn't get an answer to my question.
4  We're talking here about equipment that you're making
5  an allegation to. I want to know if you know that as
6  fact.
7      **Q Did you participate —**
8      MR. MOLDOFF: He doesn't have to answer
9  your question.
10 BY MR. ARMSTRONG:
11     **Q — in any resolution of the Heinsen**
12 **maritime lien claim?**
13     A I participated between Lorraine and
14 Arthur Davis. I did not get involved with the
15 lawyers. I did not get involved with Teddy Heinsen.
16     **Q Did Arthur Davis report to you that the**
17 **maritime lien claim asserted by E. T. Heinsen had**
18 **been resolved?**
19     A What I can remember, the issue between
20 Heinsen and this document was resolved. How, I don't
21 know.
22     **Q Do you know when it was resolved?**
23     A I thought within a matter of weeks of it.
24     **Q How did you gain that information?**

Page 109

1      A My recollection is I was told that by
2  Arthur or Lorraine. Whether it was or wasn't, I
3  don't know. The record will speak for itself.
4      MR. MOLDOFF: Let's take a break,
5  two-minute break.
6      MR. ARMSTRONG: That's fine, because I'm
7  almost finished.
8      MR. MOLDOFF: Okay.
9      (Brief recess.)
10 BY MR. ARMSTRONG:
11     **Q Mr. Holt, have you ever participated in**
12 **the preparation of the spreadsheet invoices sent to**
13 **Sea Star?**
14     A Physically participate, no.
15     **Q Have you participated in any way?**
16     A The overview and review.
17     **Q Did you review those invoices?**
18     A I did.
19     **Q If Sea Star responded, did you review**
20 **responses?**
21     A I probably did.
22     MR. MOLDOFF: Objection to the form of
23 the question.
24 BY MR. ARMSTRONG:

Thomas Holt

29 (Pages 110 to 113)

Page 110

1    Q  Have you reviewed the backup documents
2  for the spreadsheet invoices?
3    A  Physically, no.  No.  I just took the
4  position of Arthur and Lorraine that, after review of
5  all this, it shows that Sea Star used the equipment
6  more than what they were paying for.
7    Q  Have you reviewed any of the backup
8  documents submitted with any Sea Star responses?
9    MR. MOLDOFF:  Object to form.  What
10  responses are you referring to?
11    MR. ARMSTRONG:  Responses to the
12  spreadsheet invoices.
13    THE WITNESS:  I have reviewed some of
14  their answers, yes.
15    MR. MOLDOFF:  During the -- are you
16  referring to the response -- just so that we're
17  clear, are you referring to the responses to the
18  arbitration that you said would not be admissible in
19  evidence?
20    MR. ARMSTRONG:  No.
21    MR. MOLDOFF:  What responses are you
22  referring to?
23    MR. ARMSTRONG:  I'm referring to
24  responses outside of that, which, as you know, have

Page 111

1  gone on for several years.
2    MR. MOLDOFF:  Well, I don't know that.
3  But --
4  BY MR. ARMSTRONG:
5    Q  Let me show you -- let's see -- copies of
6  spreadsheet invoices for 20-foot chassis and 40-foot
7  chassis.  And I'll tell you that I'm just showing you
8  the first and last page of each of these invoices.
9  They show as having been amended in August 2007.
10    Have you seen those documents before?
11    A  No, I haven't seen this document.
12    Was the amendment a plus or minus for Sea
13  Star?
14    Q  Usually the amendments are minuses for
15  Sea Star.
16    A  You're saying in '07 --
17    Q  I'm just asking, have you seen those
18  documents?
19    A  Not these documents specifically.
20    MR. MOLDOFF:  If you recall.
21    THE WITNESS:  I don't recall.  But the
22  reason you said '07 is -- I don't believe I saw them.
23  BY MR. ARMSTRONG:
24    Q  Okay.

Page 112

1    A  Okay?
2    Q  When do you last recollect seeing Emerald
3  spreadsheet invoices?
4    A  Probably an ongoing time frame up through
5  '06.  Maybe a little bit in '07.  But that doesn't
6  mean I didn't see them, but I don't remember them.
7  That's the best way to say it to you.
8    Q  Do you know whether those spreadsheet
9  invoices are part of Emerald's Amended Counterclaim?
10    MR. MOLDOFF:  If you know.
11    THE WITNESS:  I don't know.  They should
12  be, but I don't know.  If they were amended, they
13  should be part of the amendments, because we gave
14  adjustments numerous, numerous times.
15  BY MR. ARMSTRONG:
16    Q  And do you know when the Amended
17  Counterclaim was filed?
18    A  No.
19    MR. ARMSTRONG:  Let me ask the court
20  reporter to mark these invoices as composite
21  Exhibit 10 for identification.
22    (E.E.L. Exhibit 10 was marked for
23    identification.)
24  BY MR. ARMSTRONG:

Page 113

1    Q  Let me show you two other spreadsheet
2  invoices amended 5/1/06, together with an email from
3  Lorraine Robins dated October 26, 2007.
4    Have you seen any of those documents?
5  I'll ask the court reporter to mark them as
6  Exhibit 11 for identification.
7    (E.E.L. Exhibit 11 was marked for
8    identification.)
9    THE WITNESS:  I did not see this
10  document.  And what month is this for?
11  BY MR. ARMSTRONG:
12    Q  At the top, the indication is that --
13    A  Is this a correction?  Okay.
14    No, I have not seen this document.  When
15  was it forwarded?  '07?  Yeah, '07.
16    Q  In October 2007, was Lorraine Robins
17  working for Emerald?
18    A  She was working for her company, but on
19  behalf also of Emerald, the lessor of the equipment
20  to Sea Star.
21    You got a lot of corrections there.
22    Q  Now, you see that email, October 26th,
23  2007.  You see the invoice, spreadsheets attached to
24  that email amended May 1st, 2006, according to the

Thomas Holt

Page 114

1  invoices.
2      A  I didn't read each line, but okay.
3      Q  Well, you look at the top line --
4      A  Top line of the amended invoice?
5      Q  Right.
6      A  Amended 5/1/06.  Okay.
7      Q  And look at the other amended invoice.
8      A  Same thing.
9      Q  Amended 5/1/06.
10     A  And then there's one here amended
11  12/1/05.
12     Q  Now, which set of invoices -- those that
13  I've shown you that are Exhibit 10 or those that you
14  have in your hand that are Exhibit 11 -- applies to
15  the Amended Counterclaim?
16     A  My presumption is they all do.  These
17  amendments, as dated, are solely based on facts that
18  were garnished through discovery from you or other
19  information that come in for them.
20         We have stuff that goes -- here's one for
21  March 14th, '03.  Here's one for October '02.  This
22  is the information we're getting from your records.
23     Q  Sir, Ms. Robins sends an email
24  October 26th, 2007.

Page 115

1      A  Right.
2      Q  She attaches invoices; and I'm showing
3  you two of the categories, first and last page, as I
4  told you.
5      A  Yes, sir.
6      Q  We see that those invoices indicate, at
7  the top, that they were amended May 1st, 2006;
8  correct?
9         MR. MOLDOFF:  I object to the form of the
10  question.  That's what the document says.  It doesn't
11  say that that's when the amendments were actually
12  made.
13  BY MR. ARMSTRONG:
14     Q  Well, Counsel has raised a good point.
15         Can you tell when the amendments were
16  actually made?
17     A  No.
18         MR. MOLDOFF:  If you know.
19  BY MR. ARMSTRONG:
20     Q  Do you know whether there are amendments
21  on those invoices that were made after May 1st,
22  2006?
23     A  I can't tell you that.  The document
24  speaks for itself.  I'm looking at it here -- I'm

Page 116

1  looking at it here and saying, Why was it amended?
2         And then I look at the explanation:  "Not
3  on self-billing report," is the predominant reason
4  why they were amended.  For all I know she never got
5  around to doing a stack of self-billing reports.
6      Q  All right, sir.
7      A  I have no clue.  But the fact is that it
8  shows that you owed money.
9      Q  Showing you Exhibit 10, which says,
10  amended 8/28/07, on both sets --
11     A  Okay.
12     Q  -- and Exhibit 11 --
13     A  Okay.
14     Q  -- which are the more current amended
15  invoices?
16         MR. MOLDOFF:  If you know.
17         THE WITNESS:  Well, I don't know.  But
18  you can read them and figure out which they are.
19         They're separate.  They're not one and
20  the same, if that's your question.  There's separate
21  numbers, separate equipment numbers, separate dates.
22  They're separate.
23         This is not -- are you saying this is a
24  duplication?  I don't think so, sir.

Page 117

1  BY MR. ARMSTRONG:
2      Q  Is your answer that you don't know which
3  of these is the current invoice for the 20-foot
4  chassis and the 40-foot chassis?
5      A  My answer is, that is purported to be an
6  amended invoice, pure, plain and simple, for whatever
7  it may be -- both of them.
8         MR. MOLDOFF:  And Counsel, if there are
9  any questions regarding what the invoice is, which
10  you should be responding to in discovery, all you
11  have to do is pick up the phone and ask me, if
12  there's any question about that.
13         MR. ARMSTRONG:  Yes, Counsel; I certainly
14  shall do that.
15  BY MR. ARMSTRONG:
16     Q  Do you know whether this 8/28/07 invoice
17  has been amended after 8/28/07?
18     A  I don't know.
19         You asked me is it part of the
20  Counterclaim.  I don't know.  I assume it is.  You
21  would know better than me.
22         I sure hope it's part of our claim.  I
23  wouldn't want to leave several hundred thousand
24  dollars on the table.

Thomas Holt

31  (Pages 118 to 119)

Page 118

1    MR. ARMSTRONG:  I have nothing further.
2  Thank you.
3         (Deposition concluded 1:00 p.m.)
4         C E R T I F I C A T I O N
5
6
7         I hereby certify that I have read the
8  foregoing transcript of my deposition testimony, and
9  that my answers to the questions propounded, with the
10  attached corrections or changes, if any, are true and
11  correct.
12
13  ----------------------------------
    THOMAS HOLT, SR.
14
15
16
17
18
19
20
21
22
23
24

Page 119

1    CERTIFICATE OF SHORTHAND REPORTER
2
3         I, Gail Inghram Verbano, CSR, RMR, CLR,
4  the officer before whom the foregoing proceedings
5  were taken, do hereby certify that the foregoing
6  transcript is a true and correct record of the
7  proceedings; that said proceedings were taken by me
8  stenographically and thereafter reduced to
9  typewriting under my supervision; and that I am
10  neither counsel for, related to, nor employed by any
11  of the parties to this case and have no interest,
12  financial or otherwise, in its outcome.
13
14
15
16  _Gail Inghram Verbano_ _____
    Gail Inghram Verbano, CSR, RMR, CLR
17  CSR No. 8635
    Certification No.: 220
18  (Expires 1-31-2011)
19
20
21
22
23
24