# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

SEA STAR LINE, LLC,                          )
a limited liability company,                 )          Civil Action No. 05-CV-245-JJF
                                             )
      Plaintiff,                         )
                                             )
-vs-                                         )
                                             )
EMERALD EQUIPMENT LEASING, INC.,             )
a corporation,                               )
                                             )
      Defendant,                         )
                                             )
-vs-                                         )
                                             )
SEA STAR LINE, LLC,                          )
                                             )
      Counter-Defendant.                 )

## SEA STAR LINE, LLC'S POST TRIAL OPENING BRIEF

SMITH, KATZENSTEIN & FURLOW LLP
Kathleen M. Miller (I.D. No. 2898)
800 Delaware Avenue, 10th Floor
P.O. Box 410
Wilmington, DE 19899
Telephone:  302-652-8400
Facsimile: 302-652-8405
E-mail: Kmiller@skfdelaware.com

*Attorneys for Sea Star Line, LLC*

OF COUNSEL:
Timothy J. Armstrong
ARMSTRONG & MEJER, P.A.
2222 Ponce de Leon Boulevard
Penthouse Suite
Miami, FL 33134
Telephone: 305-444-3355

August 7, 2008

05130|BRF|10049978.WPD

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

STATEMENT OF CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.    Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    B.    Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

          1.    Sea Star-NPR Asset Purchase . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

          2.    Post-Closing Transactions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

          3.    MBC-Sea Star Indemnity Agreement . . . . . . . . . . . . . . . . . . . . . . 9

          4.    Emerald-Sea Star Rental Agreement . . . . . . . . . . . . . . . . . . . . . . 12

          5.    MBC-Storage Loan Sale & Assignment Agreement . . . . . . . . . . . . . . . 13

          6.    "Carveouts" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

SUMMARY OF ARGUMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    I.    Sea Star Is Entitled to Declarations of Legal Rights and Obligations under the Rental Agreement and the Sale Order. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

          1.    Sea Star has no responsibility or liability for Emerald equipment subject to previous agreements between Emerald and NPR that Sea Star did not use pursuant to the Rental Agreement after closing of the asset purchase. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

          2.    Emerald's delivery of each piece of Emerald equipment subject to the Rental Agreement must have been effected and evidenced by an equipment interchange receipt – a TIR – signed and dated on or after April 29, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . 22

3.    Redelivery of equipment subject to the Rental Agreement may
      have been at Greenwich terminal, Philadelphia, Pennsylvania;
      Sea Star terminal, Puerto Nuevo, San Juan, Puerto Rico; Greenwich
      terminal, Port of Jacksonville, Florida; or any other location as to
      which the parties have agreed in writing. . . . . . . . . . . . . . . . . . . . . . . . . . 23

4.    Redelivery of Emerald equipment subject to the Rental Agreement
      may have been effected and evidenced by a TIR signed by the
      Sea Star terminal, Puerto Nuevo, San Juan, Puerto Rico, a
      designated receiving terminal, at which time Emerald was required
      to off-hire the equipment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

5.    Sea Star has no responsibility or liability to compensate for use
      of Emerald equipment prior to or during Shipments in Transit. . . . . . . 25

6.    The Sale Order imposes no obligation with respect to any lessor's
      equipment that on April 27, 2002, was not located on leased property
      acquired under the Asset Purchase Agreement; that was not
      involved in shipment to a "final port of destination" where Sea Star
      leased premises acquired under the Asset Purchase Agreement and Sale
      Order; that was returned to port or inland facilities by third parties,
      such as consignees, which had received shipments at final destinations
      outside ports. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

7.    Sea Star has had no duty to "redeliver" or pay compensation
      for Emerald equipment that Sea Star "touched" but did not use,
      including but not limited to Emerald equipment which was
      involved in Shipments in Transit or held by third parties, such as
      E.T. Heinsen and inland depots, and was returned to port terminals
      or inland depots where Sea Star leased premises; Emerald
      equipment which entered NPR terminals prior to closing of the asset
      purchase; and Emerald equipment for which delivery under
      the Rental Agreement is not evidenced by a TIR, signed and dated by
      Sea Star for use on or after April 29, 2002. . . . . . . . . . . . . . . . . . . . . . 27

8.    Sea Star has had no duty to "redeliver" or pay for Emerald
      equipment involved in Shipments in Transit that third parties,
      such as consignees, did not return to port terminals or inland depots
      where Sea Star leased premises. Any Emerald recourse would be to
      the NPR bankruptcy estate. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

9.     For Emerald equipment involved in Shipments in Transit, any Sea Star on-hire obligation would begin when Sea Star signed a TIR for its use after completion of a Shipment in Transit. . . . . . . . . . . 27

10.    Any Sea Star on-hire obligation for Emerald equipment in the possession of third parties, such as depots, shipper pools, shipper warehouses, or former NPR agents or stevedores, as of and after closing would begin when Sea Star signed a TIR removing such Emerald equipment from a depot or shipper pool or acknowledging receipt from a customer or delivering carrier for Sea Star's use. Otherwise, Sea Star would have no responsibility for such equipment . . . . . . . . . . . . . . . . . . . . . . 28

11.    Sea Star has no obligation to Emerald for *per diem* rent. . . . . . . . . . . . 29

12.    Sea Star has no obligation for Emerald Stipulated Loss Value claims unless a signed TIR discloses Sea Star's on-hire of such Emerald equipment under the Rental Agreement on or after April 29, 2002; and there is no evidence of redelivery under the Rental Agreement. . . . . 31

13.    Sea Star has no obligation for Emerald's adjusted Stipulated Loss Value claims pertaining to Emerald equipment recovered and sold. Emerald admittedly did not give Sea Star notice required by paragraph 13(b)(iii) of the Rental Agreement prior to sales of Emerald equipment for which Emerald alleges Sea Star is responsible. . . . . . . . 31

II.    Emerald Is Not a Real Party in Interest and Lacks Standing to Prosecute Claims Against Sea Star. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

    A.    Equipment Rental Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

    B.    Loan Sale & Assignment Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . 34

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

## TABLE OF AUTHORITIES

**Cases**                                                                                      **Page(s)**

*Akparewa v. Amoco Oil Co.*,
    771 A.2d 508 (Md. Ct. Spec. App. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Anderson Adventures, LLC v. Sam & Murphy,* Inc.,
    932 A.2d 1186 (Md. Ct. Spec. App. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Bakery & Confectionary Union & Indus. Int'l Pension Fund v. Ralph's Grocery  Co.*,
    118 F.3d 1018 (4th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Boyd v. Hickman*,
    689 A.2d 106 (Md. App. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Caplin v. Marine Midland Grace Trust Co.*,
    406 U.S. 416 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Cochran v. Norkunas*,
    919 A.2d 700 (Md. App. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*CTI-Container Leasing Corp. v. Oceanic Ops. Corp.*,
    682 F.2d 377 (2nd Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Discover Bank v. Vaden*,
    489 F.3d 594 (4th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*First Nat'l Bank of Md. v. DiDomenico*,
    487 A.2d 646 (Md.  App. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Gambo v. Bank of Md.*,
    648 A.2d 1105 (Md. Ct. Spec. App. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*General Motors Acceptance Corp. v. Dykes (In re Dykes)*,
    10 F.3d 184 (3d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Gill v. Computer Equip. Co.*,
    292 A.2d 54 (Md. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*In re LTV Steel Co.*,
    299 B.R. 863 (N.D. Oh. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Interpool Ltd. v. Char Yigh Marine (Panama) S.A.*,
    890 F.2d 1453 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Interpool, Ltd. v. Bernuth Agencies, Inc.*,
    959 F. Supp. 644 (S.D.N.Y. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Lake Carriers' Ass'n v. MacMullan*,
    406 U.S. 498 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*LaSalle Bank N.A. v. Lehman Bros. Holdings, Inc.*,
    237 F. Supp.2d 618 (D. Md. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*LaSalle Bank, N.A. v. Lehman Bros. Holdings, Inc.*,
    237 F. Supp.2d 618 (D. Md. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Lauritzen v. Larsen*,
    345 U.S. 571 (1953) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Maryland Cas. Co. v. Pacific Coal & Oil Co.*,
    312 U.S. 270 (1941) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Maryland Nat'l Bank v. Wathen*,
    414 A.2d 1261 (Md. App. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Maslow v. Vanguri*,
    896 A.2d 408 (Md. Ct. Spec. App. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Norfolk Southern Ry. v. James N. Kirby, Pty. Ltd.*,
    543 U.S. 14 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Perpetual Financial Cor. v. United States*,
    61 Fed. Cl. 126 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 35

*Shearson Lehman Hutton, Inc. v. Wagoner*,
    944 F.2d 114 (2d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 35

*Steel Co. v. Citizens for a Better Environment*,
    523 U.S. 83 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Surrick v. Killion*,
    449 F.3d 520 (3d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Township of Piscataway v. Duke Energy,*
    488 F.3d 203 (3d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 35

*United States v. Gov't of Virgin Is.,*
    363 F.3d 276 (3d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Warth v. Seldin,*
    422 U.S. 490 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 35

## **Statutes and Other Authorities**

28 U.S.C. § 1333 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

28 U.S.C. § 2201 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

28 U.S.C. §1404(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Fed. R. Civ. P. 9(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

## STATEMENT OF CASE

### A.    Proceedings

Sea Star[1] filed a Complaint against Emerald in the United States District Court for the Middle District of Florida on March 1, 2004. D.I. 1.[2] In Count I, Sea Star seeks declaratory judgment as to rights and liabilities under an Equipment Rental Agreement, dated as of July 31, 2002 ("Rental Agreement") [Tr.Ex. 17], and an Order Authorizing Sale of the NPR Assets Free and Clear of All Liens, Claims and Encumbrances, dated April 26, 2002 ("Sale Order") [Tr.Ex. 6], and other relief. D.I. 1 at 10-13. Counts II, III, and IV claim damages based on breaches of maritime contracts, open account, and goods and services provided. D.I. 1 at 13-15.

After service of Sea Star's Complaint, Emerald moved to dismiss, transfer, or abstain. D.I. 9. Emerald also initiated an adversary proceeding in the United States Bankruptcy Court for the District of Delaware. Applying the "first filed" rule, the bankruptcy judge dismissed Emerald's action. D.I. 11. The Florida district court set trial on a calendar commencing February 22, 2005. D.I. 13. Several days before the pretrial conference, the court invoked 28 U.S.C. §1404(a) to grant

---

[1]References to parties are: Sea Star Line, LLC is identified as "Sea Star"; Emerald Equipment Leasing, Inc. is identified as "Emerald." References to non-parties are: E.T. Heinsen, C. por A., is identified as "Heinsen"; Greenwich Terminals, LLC is identified as "Greenwich"; Holt Cargo Systems, Inc. is identified as "Holt Cargo"; MBC Leasing Corp is identified as "MBC"; NPR, Inc. is identified as "NPR"; and, Storage Transfer, LLC is identified as "Storage."

[2]References to the Docket are abbreviated as "D.I.", followed by index number and page number. References to the trial transcript are abbreviated as "Tr.", followed by volume and page number(s). References to trial exhibits are abbreviated as "Tr.Ex." References to deposition transcripts are: Emerald Equipment Leasing, Inc. deposition dated December 8, 2004 is abbreviated as "EM.I"; Emerald Equipment Leasing, Inc. deposition dated February 12, 2008 is abbreviated as "EM.II"; Storage Transfer, LLC deposition dated January 25, 2008 is abbreviated as "ST"; Thomas Holt, Sr. deposition dated January 25, 2005 is abbreviated as "HSR"; Lorraine Robins deposition dated January 26, 2005 is abbreviated as "ROB." Relevant pages of deposition transcripts will be attached to Sea Star's Reply Brief.

Emerald's motion "in part" and transferred the case to this Court. D.I. 45. Its Order recounted:

> According to Emerald, it has a four million dollar claim against Sea Star for unpaid rental charges and its claim against Sea Star is the sole asset of the bankruptcy estate that offers a distribution to creditors in its pending bankruptcy.

D.I. 45 at 1.

Emerald then filed an Answer, Affirmative Defenses, and Counterclaim. D.I. 46. On January 26, 2006, this Court dismissed that portion of Count I of the Counterclaim which alleged breach of an e-mail agreement; Count II for *quantum meruit*; Count III to the extent rent was sought; and Counts V, VI, VII, and VIII for failure to plead in accordance with Fed. R. Civ. P. 9(b). D.I. 75, 76. The Court granted Emerald leave to amend its counterclaim. In its Amended Counterclaim, Emerald re-asserted all counts in the original Counterclaim, except post-petition *quantum meruit*. D.I. 79. After the Court denied Sea Star's motion to dismiss the Amended Counterclaim, [D.I. 80, 81, 86, 87], Sea Star filed an Answer and Affirmative Defenses. D.I. 90.

During a pre-trial conference on November 1, 2007, the Court bifurcated trial on the Complaint and the Amended Counterclaim, referring all pre-trial matters relating to the Amended Counterclaim to Magistrate Judge Stark. D.I. 142. Subsequently, Sea Star filed a Motion for Partial Summary Judgement, together with an Opening Brief and an Appendix; the parties submitted a Pre-Trial Order; and the Court held a pre-trial conference on the claims asserted in the Complaint and to be tried in the first trial. D.I. 192, 193, 197. On July 7, 8, and 22, 2008, the Court held a bench trial on the Complaint.[3]

---

[3]The Court has set trial on Emerald's Amended Counterclaim on September 15, 2008; the Magistrate Judge has scheduled a pre-trial conference on August 29, 2008. D.I. 182, 188.

At the conclusion of the testimony, the Court directed that the parties file post-trial briefs, addressing the issues raised in paragraphs 1 (a) through (c) of the Pre-Trial Order for the July 7, 2008 trial. <u>D.I.</u> 203. The Court further directed that the claims raised in paragraphs 1 (d) and (e) of the Pretrial Order should not be briefed at this time.

**B.    <u>Factual Background</u>**

Organized as a Delaware limited liability company, Sea Star is headquartered in Jacksonville, Florida. <u>Tr.</u> 3:3-4. Sea Star engages in ocean transportation of cargo, primarily between the United States mainland and Puerto Rico. <u>Tr.</u> 1:5, 3:4; <u>D.I.</u> 137 ¶ 3(a). To move cargo, Sea Star utilizes several types and sizes of containers and chassis, as well as gen sets. <u>Tr.</u> 1:6-7. In April 2002 Sea Star owned or leased approximately 6500 piece of cargo equipment. <u>Tr.</u> 1:7.

Emerald is a Chapter 11 Debtor under the United States Bankruptcy Code, having filed a voluntary petition for relief in the United States Bankruptcy Court for the District of Delaware in 2001 (initially, Jointly Administered under Case No. 01-926) (the "Bankruptcy Action"). <u>D.I.</u> 137 ¶ 3(b).[4] In 1997 Emerald had obtained a $35 million loan from MBC to purchase equipment from NPR and Holt Cargo. <u>Tr.</u> 2:6; <u>Tr.Exs.</u> 3 (at 1-2 ¶ 4), 58. Emerald granted MBC a security interest in all the purchased equipment, together with accounts, contract rights, and other general intangibles arising from the equipment, and assigned to MBC the Emerald Equipment Lease Agreements with NPR and Holt Cargo, dated November 18, 1997. <u>Tr.</u> 2:6-7; <u>Tr.Exs.</u> 3 (at 2-4 ¶¶ 6, 10-11), 58, 59,

---

[4]On July 25, 2002, the bankruptcy court granted the Motion of the United States Trustee to Convert the Cases of the Jointly Administered Debtors under Chapter 11 to Cases under Chapter 7 of the Bankruptcy Code. <u>Tr.Ex.</u> 16. The Order excepted only Emerald and Dockside Refrigerated Warehouse, Inc., which remained Chapter 11 debtors. On May 23, 2003, the court severed the Emerald case from the joint administration of the converted Chapter 7 proceedings. <u>Tr.Ex.</u> 35. The Emerald proceeding became Case No. 01-934.

60, Emerald's sole function had been to serve as lessor of cargo transportation equipment –
containers, chassis, and gen sets – for its affiliates and co-debtors, NPR, an ocean carrier, and Holt
Cargo, as lessees. D.I. 137 ¶¶ 3(c), (d), (e). NPR's monthly payments to Emerald and Emerald's
monthly payments to MBC were set amounts. Tr. 1:218.

### 1.  Sea Star-NPR Asset Purchase

In April 2002, Sea Star entered into an Asset Purchase Agreement, as amended, with
NPR and other Emerald affiliates in the Bankruptcy Action. D.I. 137 ¶ 3(f). While Sea Star was
engaged in a due-diligence investigation, Thomas Holt, Sr. sent Robert Leetch, Sea Star's chief
financial officer, a proposal for lease-purchase of the "currently leased" Emerald equipment fleet,
which allegedly consisted of at least 12,000 units. Tr. 1:190, 3:5; Tr.Ex. 1. Mr. Holt was, and
remains, Emerald's sole stockholder and president; he also had been owner and president of NPR.
Tr. 1:181-82, 184, 218; HSR at 15-16; EM.I at 19, 86-87. A few days after receiving the letter, Mr.
Leetch rejected the proposal. Tr. 1:192, 3:5-6, 24. Sea Star personnel were not satisfied with the
accuracy of NPR record-keeping, particularly as to existence and service condition of the equipment;
they also found the equipment old and in poor repair. Tr. 3:5, 1:12. According to Mr. Holt, the
average age of the equipment approximated 12 years. Tr. 1:187.

Because NPR intended to cease operations after the asset purchase, Sea Star became
concerned that cargo would be stranded in various stages of transit between points of origin and
destination. Tr. 3:6-7. At the time of and after closing, cargo booked by NPR would be at shippers'
locations in process of loading or loaded in containers dispatched by NPR; onboard NPR vessels;
in terminals or depots; and in possession of truckers' or railroads for inland transport to consignees
("Shipments in Transit"). Tr. 3:8-9, 15-20, 1:152. Particular Shipments in Transit would involve

not only containers but also chassis and gen sets. Tr. 3:9-10, 1:153.

Sea Star wanted to ensure that NPR customers were served and that Shipments in Transit were safe, secure, and delivered to their destinations. Tr. 3:39-40. After several meetings, Sea Star and NPR representatives agreed to a memorandum which delineated payment and claim procedures for cargo Shipments in Transit, whether the equipment be on ships or at some other point in the transit process at the time of the closing. Tr. 3:6-8, 10-14, 52-53; Tr.Ex. 2. Since they could not ascertain actual costs and cargo volumes before the fact, NPR personnel developed volume and rate estimates for Mr. Leetch's review. Tr. 3:13-14, 25-26, 29-32.

To estimate equipment costs for cargo onboard the ships at closing, NPR utilized a blended rate for containers and chassis and a fourteen-day average turnaround time for equipment in Puerto Rico. Tr. 3:30-31; Tr.Ex. 2 at 3. NPR furnished no other rate scenarios and no average turnaround times for equipment on the mainland. Tr. 3:32. In its projections, NPR did not identify owners or lessors of cargo equipment that might be involved in Shipments in Transit. Tr. 3:30. NPR and Sea Star established reimbursement procedures, if a party invoiced and substantiated actual costs exceeding estimated expenses to complete Shipments in Transit. Tr. 3:14-15.

When NPR sought the bankruptcy court's approval of the proposed asset sale, MBC's and Emerald's attorneys objected. Tr.Ex. 5; D.I. 137 ¶ 3(g). Among concerns they expressed were payment obligations for equipment leased by NPR that would be involved in Shipments in Transit and for storage charges that Sea Star would impose on Emerald and MBC equipment. Tr.Ex. 5 at 28-41.[5] The court overruled "the Emerald entities" objections and held that any arguable rights of

---

[5]MBC's attorney also advised the bankruptcy court that "even if the 30-day mark that Sea Star's talking about,...my understanding in the turnover in the industry is there will be equipment that's not back by then. And certainly at some point we're going to face storage charges by Sea Star,

equipment lessors would be preserved against the sale proceeds. Tr.Ex. 5 at 41.

During the hearing, NPR's counsel presented the plan for Shipments in Transit to the bankruptcy court. Tr. 3:39; Tr.Ex. 5 at 56-58. He confirmed that components of Sea Star payments included NPR's projected equipment leasing and financing costs, labor, materials, and other factors involved in transporting Shipments in Transit from origin to destination points. Also, he acknowledged that NPR might be subject to administrative claims, until equipment utilized for Shipments in Transit was out of service. Tr.Ex. 5 at 56-58.

On April 26, 2002, the bankruptcy court entered the Sale Order. Tr.Ex. 6. The court found and determined:

> The sale of assets does not amount to a consolidation, merger, *de facto* merger or similar restructuring of either or both of the Buyer and the Debtors.
>
> Buyer is only buying the Purchased Assets and is not a successor in interest to Debtors, nor does Buyer's acquisition of the Purchased Assets reflect a substantial continuation of the operations of the Debtors' business.

Tr.Ex. 6 at 3-4, ¶¶ 15, 16. Overruling all objections that had not been withdrawn, the bankruptcy court authorized Sea Star's acquisition of the specified NPR assets. Tr.Ex. 6 at 5 ¶¶ 2, 3.

Sea Star refused to acquire, assume, or accept assignment of any equipment agreements between Emerald and NPR or Holt Cargo. D.I. 137 ¶ 3(h). As to equipment not purchased or leased by Sea Star, the court ordered:

> [T]o the extent that any equipment of Emerald Equipment Leasing, Inc. ("Emerald"), or any other lien or lessor creditor whose property is not being sold or transferred to Buyer, is located on property sold or assigned to Buyer under the Asset Purchase

and we're not in a position to...stop those by going and taking our collateral." Tr.Ex. 5 at 60.

Agreement, the Buyer shall cooperate in allowing Emerald...to remove such property during normal business hours as long as such removal will not unreasonably disrupt operations of the Buyer. In addition, the Buyer shall cooperate in removing any such equipment from Vessels in transit and store such equipment on leased premises at the final port of destination, to the extent such final destination is a leased premises sold and assigned to the Buyer under the Asset Purchase Agreement....

...

Except as expressly provided in the Asset Purchase Agreement, Buyer has not assumed or otherwise become obligated for any of the Debtors' liabilities. Consequently, after closing of the sale to Buyer, all creditors of the Debtors, whether known or unknown, are hereby enjoined from asserting or prosecuting any claim or cause of action against Buyer or the Purchased Assets to recover on account of any liability owed by the Debtors.

Tr.Ex. 6 at 8-9 ¶¶ 13, 15.  The court retained jurisdiction to "[i]nterpret, implement and enforce the terms and provisions of this [Sale] Order and the terms of the Asset Purchase Agreement, all amendments thereto and any waivers and consents thereunder and of each of the agreements executed in connection therewith" and to adjudicate certain other issues, including but not limited to "successor claims." Tr.Ex. 6 at 12 ¶¶ 24(a),(e).

### 2.    Post-Closing Transactions

The asset purchase closed at 3 a.m. on April 27, 2002. Tr. 3:11; D.I. 137 ¶ 3(j).  In compliance with the Sale Order, Sea Star stored equipment of Emerald and other NPR lien or lessor creditors that was located on or returned to property Sea Star had acquired under the Asset Purchase Agreement. Tr. 1:13.  MBC and Emerald representatives knew Emerald equipment that had been leased to NPR remained in the San Juan terminal and would be stored on Sea Star's premises after the closing. Tr.Ex. 5 at 30-31, 60; EM.I 45-46, 198-99.  According to Mr. Holt, "[a]ll the equipment belonged to Emerald that Navieras [NPR] had on the terminal in that [April 2002] time frame."

HSR at 159.

       Following procedures approved by the bankruptcy court, Sea Star paid NPR for the

Shipments in Transit, including equipment expenses. EM.I at 76; Tr. 1:71. Neither Sea Star nor

NPR submitted additional requests for reimbursement. Tr. 3:15, 17, 18, 34. Later NPR confirmed:

"No amount is due to NPR from Sea Star for use of Emerald Equipment being used at the time of

Closing" or "for the use of Emerald Equipment located on a vessel purchased by Sea Star at the time

of Closing." Tr.Ex. 10 at 10, nos. 11, 12. Thus, Sea Star has owed no rent for Emerald equipment

involved in Shipments in Transit. Tr. 1:53, 204; D.I. 137 ¶ 3(s); EM.I at 89, 175.

       In a June 11, 2002 letter, Thomas Holt, Jr., on behalf of Emerald, requested that Sea

Star "remit a check in accordance with the attached letter from MBC Leasing, Corp." for equipment

used by Sea Star. Tr. 1:17-18; Tr.Ex. 8. The attached letter, dated June 10, 2002, from Scott Krieger

of MBC instructed Mr. Holt, Sr.:

> Any money due from Sea Star for use of any of containers, gensets,
> and chassis previously leased by Emerald Equipment Leasing to NPR,
> Inc. and Holt Cargo Systems for a purpose other than completing
> shipments in progress on April 27 when Sea Star purchased certain
> assets of NPR and Holt Cargo should be paid directly to MBC
> Leasing. Any money due from Sea Star for use of any of the Emerald
> equipment to complete shipments in progress on April 27 should be
> paid in accordance with the memorandum that MBC understands
> exists between Sea Star and NPR, Holt Cargo, and possibly other
> affiliates to be allocated in accordance with the Bankruptcy Court's
> ruling on the allocation of proceeds of sale to Sea Star.

Tr.Ex. 8 at 2. Mr. Holt, Sr. probably asked his son to send the June 11 letter to Sea Star and has

confirmed that MBC "held the financial interests on the equipment" titled in the name of Emerald.

Tr. 1:197-98; HSR at 34.

       As of June 30, 2002, MBC entered into an Independent Contractor Agreement with

Greenwich, a company headed by Mr. Holt, Jr. <u>Tr.Ex.</u> 9; <u>Tr.</u> 1:125, 159-60. Mr. Krieger of MBC

informed Sea Star in a July 19 letter:

> Please be advised that Greenwich Terminals, LLC is authorized as
> MBC Leasing Corp.'s agent for the following purposes:
>
>> 1.    Assembling and storing Emerald Leasing's
>> equipment.
>>
>> 2.    Soliciting purchasers and selling the Emerald
>> Leasing equipment.
>
> The authorized representatives of Greenwich Terminals, LLC are:
>
>> Thomas Holt, Jr.
>> Arthur Davis
>> Martin McDonald

<u>Tr.</u> 1:16-17, 164-65; <u>Tr.Ex.</u> 13; *see* <u>EM.I</u> at 123-25. Francisco Gonzalez also represented MBC and

Emerald in San Juan, Puerto Rico. <u>Tr.</u> 1:17; <u>EM.I</u> at 158-59; <u>ROB</u> at 90; <u>EM.II</u> at 13-14. In the Port

of Jacksonville, Florida, General Transportation Services, Inc. represented MBC and Emerald. <u>Tr.</u>

1:160-61; <u>Tr.Ex.</u> 11. MBC paid all bills, including Greenwich invoices for agency and individuals'

services and expenses. <u>Tr.</u> 1:162-64; <u>Tr.Exs.</u> 13, 28, 33, 37; <u>EM.I</u> at 157-58; <u>HSR</u> at 142-43.

On July 22, 2002, the bankruptcy court entered an Order Terminating the Automatic

Stay as to MBC, effective April 29, 2002. <u>Tr.Ex.</u> 14. The Order authorized MBC to foreclose its

security interest and to remove from Emerald's possession and sell Emerald equipment. <u>Tr.Ex.</u> 14;

<u>D.I.</u> 137 ¶ 3(o). Sale proceeds would be applied to Emerald's indebtedness to MBC. <u>Tr.Ex.</u> 14.

### 3.    <u>MBC-Sea Star Indemnity Agreement</u>

To induce Sea Star's direct payment for use of "EMERALD EQUIPMENT" — *i.e.,*

equipment leased by Emerald to NPR and Holt Cargo pursuant to the November 18, 1997 Equipment

Lease Agreements, MBC executed an Indemnity Agreement, dated September 28, 2002. Tr. 1:24; Tr.Ex. 19; D.I. 137 ¶ 3(p). MBC agreed to indemnify and defend Sea Star "against claims of COMPETING CLAIMANTS [specifically including Emerald] on the terms and conditions set forth" in the Indemnity Agreement. Tr.Ex. 19 at 1-2. The Agreement further states:

> 1. Agreement to Pay for Use of Equipment. ...SEA STAR will remit to MBC...(a) for each item of the EMERALD EQUIPMENT used during the period of April 27, 2002 through and including July 31, 2002, the amount determined by multiplying the applicable daily rate specified on "Equipment Schedule A"...by the number of days during that period in which such item of EMERALD EQUIPMENT was used...after deduction of such reasonable charges as are due to SEA STAR for storage and handling of EMERALD EQUIPMENT.... Beginning on August 31, 2002 and continuing on the last day of each month thereafter, SEA STAR shall remit to MBC for each item of EMERALD EQUIPMENT in SEA STAR'S possession during that month or portion thereof compensation of the daily rates specified on the EMERALD SCHEDULE from the first day of the month through and including the earliest of: (a) the day on which SEA STAR purchases such item and pays the purchase price therefor; (b) the day on which SEA STAR makes such item available for removal from SEA STAR'S possession by MBC; or (c) the last day of the month after deduction of such reasonable charges as are due to SEA STAR for storage and handling of EMERALD EQUIPMENT....

> 2. Waiver of Further Claims by MBC for Use of Equipment. MBC acknowledges and agrees that the compensation rates set forth in "Equipment Schedule A"...represent fair and reasonable compensation for the use of the EMERALD EQUIPMENT...by SEA STAR and that provided SEA STAR pays the amounts specified in Section 1 of this AGREEMENT for each item of EMERALD EQUIPMENT...that it has used during the applicable period when and as due, subject to deductions specified in Section 1, MBC will assert no further claims against SEA STAR for compensation for the use of the EMERALD EQUIPMENT...by SEA STAR.

> ...

> 4.     Agreement to Indemnify and Defend. Provided that SEA STAR provides MBC with prompt written notice of any claims, causes of action, liabilities, or damages asserted against SEA STAR by any COMPETING CLAIMANT relating to any COMPETING

CLAIMANT'S alleged entitlement to compensation for use of EMERALD EQUIPMENT or MBC EQUIPMENT during any period for which SEA STAR has paid MBC pursuant to this AGREEMENT (a "PROCEEDING"), MBC will defend the PROCEEDING at its expense. MBC acknowledges and agrees that if the BANKRUPTCY COURT or any other court of competent jurisdiction (a "COURT") determines in a PROCEEDING that a COMPETING CLAIMANT is entitled to be compensated for use of any EMERALD EQUIPMENT... for any period for which SEA STAR has paid MBC pursuant to this AGREEMENT, within five (5) business days after receipt by MBC of written demand by SEA STAR, MBC will remit to SEA STAR by certified check, cashier's check, or wire transfer the lesser of: (a) the amount to which the COURT determined the COMPETING CLAIMANT is entitled for that period; or (b) the amount, net of deductions specified in Section 1, paid by SEA STAR to MBC pursuant to this AGREEMENT for use of the pertinent item or items of EMERALD EQUIPMENT...during that period...[and] interest ....

...

6. <u>Amendment</u>. This AGREEMENT shall not be amended, changed or modified, except by an agreement in writing, signed by the party against whom enforcement of the change is sought.

<u>Tr.Ex.</u> 19 ¶¶ 1, 2, 4, 6. No amendment, change, modification, or assignment occurred.

On October 4, 2002, Sea Star sent MBC a check for *per diem* use of Emerald equipment from April 27 through July 31, 2002, less storage and handling. <u>Tr.</u> 1:20, 27-28, 87; <u>Tr.Ex.</u> 23. With its letter, Sea Star enclosed self-billing report summaries, corresponding to detailed self-billing reports previously submitted, and detailed storage and handling invoices. <u>Tr.Ex.</u> 23. One purpose of the self-billing reports was to recapitulate the mutual accounts between Sea Star and MBC. <u>Tr.</u> 1:115. Generated out of Sea Star's computer system, the monthly reports sent to MBC and Emerald reflected equipment purchases and use, as well as storage and handling charges. Each report referenced individual unit type and number, on-hire date, location, number of days in billing month, and rate. <u>Tr.</u> 1:19. Attached was documentation regarding handling and storage of Emerald equipment. <u>Tr.</u> 1:18-19; <u>Tr.Ex.</u> 61. Sea Star's practice of sending self-billing reports to MBC and

Emerald continued through 2003. <u>Tr.</u> 1:20; <u>Tr.Exs.</u> 61, 65-D; <u>D.I.</u> 149 at 5.

    **4.**    **Emerald-Sea Star Rental Agreement**

    After MBC gave requisite approval to the contract form and substance, Sea Star and

Emerald signed the Rental Agreement, dated as of July 31, 2002. <u>Tr.</u> 1:25, 194; <u>Tr.Ex.</u> 17; <u>D.I.</u> 137

¶ 3(q); <u>EM.I</u> at 104-07. The short-term Rental Agreement pertains to individual pieces of equipment,

not a fleet. <u>Tr.</u> 1:113. Contractual terms and conditions "cover equipment in use at various times

commencing April 29, 2002." <u>Tr.Ex.</u> 17 at 1.

    Expressly "subject and subordinate to any lease or security interest in favor of a third-

party lessor or lender to Lessor" [<u>Tr.Ex.</u> 17 ¶ 4(b)], the Rental Agreement further states:

> 14. <u>Applicable Law</u>. This Agreement shall be interpreted and
> the rights, liabilities and duties of the parties determined in accordance
> with the laws of the State of Maryland.
>
> 15. <u>Miscellaneous</u>. (a)...This Agreement contains the entire
> agreement between the parties and, subject to the provisions of section
> 1, may not be amended, altered or modified, except by a writing signed
> by the party to be bound.

<u>Tr.Ex.</u> 17 ¶¶ 14, 15(a); <u>Tr.</u> 1:195. No amendments, alterations, or modifications occurred. <u>Tr.</u> 1:26,

194; <u>EM.I</u> at 122.

    MBC, not Emerald, was entitled to receive — and did receive — the monetary

payments and other compensation for use of Emerald equipment during the period covered by the

Rental Agreement and Sea Star self-billing reports. <u>Tr.Exs.</u> 8, 17; <u>EM.I</u> at 91-92; <u>EM.II</u> at 42; <u>D.I.</u>

158 at 15.[6] Likewise, MBC received the sale proceeds. <u>Tr.</u> 1:209-10. "Emerald never got a dime."

---

    [6]Emerald's attorney has stated:

> Sea Star prepared these self-billing reports. They sent them to MPC
> (*sic*) because they had an assignment of lease. They had relief from

Tr. 1:198.  In January 2003, MBC filed a Motion for Allowance and Payment of Administrative

Priority Claims in the NPR Bankruptcy Action.  Tr.Ex. 27.  MBC's motion covers "continued use of

the Sea Star Emerald Equipment" through June 11, 2002.  Tr.Ex. 27 at 14-16.

### 5.     MBC-Storage Loan Sale & Assignment Agreement

Effective November 1, 2003, MBC, as assignor, and Storage, as assignee, executed

a Loan Sale and Assignment Agreement ("Assignment Agreement").  Tr.Ex. 42; ST at 11, 17.  The

outstanding balance of MBC's loan to Emerald consisted of $2,892,662.16 principal; $821,969.73

late charges; and $915,532.61 interest.  Tr.Ex. 42 ¶ 7a.  Storage agreed to purchase the MBC loan for

$650,000.00, plus 20% "of the net amount, after deduction of reasonable attorneys' fees and other

reasonable collection expenses" of any amount Storage received from Sea Star.  Tr.Ex. 42 ¶¶ 2, 3.[7]

Entitled "No Competing Claim Against Sea Star", paragraph 6.3 of the Assignment

Agreement states:

> ASSIGNEE [Storage] agrees not to assert any entitlement to
> compensation from Sea Star for use of EMERALD EQUIPMENT
> during any period for which Sea Star has paid ASSIGNOR [MBC]
> pursuant to the Sea Star INDEMNITY [the MBC-Sea Star Indemnity
> Agreement].

Tr.Ex. 42 ¶ 6.3.  The Assignment Agreement defines "EMERALD EQUIPMENT" as "certain

---

> stay.
>      They [MBC] were entitled to the proceeds....

D.I. 158 at 15.

[7]On October 30, 2003, MBC had informed Thomas Holt, Jr. of its "deal in principle" to sell
the Emerald loan documents to his father.  Tr.Ex. 40.  He thought Mr. Holt, Sr. had purchased the
documents.  Tr. 1:174-75.  However, Lorraine Robins, a former assistant to Mr. Holt, Sr. and officer
of Holt Cargo Systems, who had been an employee of various Holt companies for 45 years, formed
Storage and signed the Assignment Agreement.  ST at 17; ROB at 11-12, 15; HSR at 21.

equipment securing payment of the LOAN" from MBC to Emerald, evidenced by defined "ASSIGNED DOCUMENTS", Tr.Ex. 42 ¶ 3. Storage received no other assignments from MBC. ST at 24-25.

### 6.     "Carveouts"

In a letter dated February 25, 2004, Gary M. Schildhorn, an Emerald attorney, wrote Ms. Robins:

> I am advised that Storage Transfer, L.L.C. ("Storage") has acquired the secured position of MBC Leasing Company in the Estate of Emerald Equipment Leasing, Inc. ("Emerald"). Emerald currently intends to prosecute certain substantial claims against Sea Star Lines LLC. Storage has agreed to contribute to the Emerald estate 15% of any proceeds, net of expenses or other amounts disbursed to third parties, it would otherwise receive on account of its secured claim as a result of any settlement of the Sea Star claim or the collection of any judgment obtained upon prosecution of this claim....

Tr.Ex. 49. As Storage's "Sole Member," Ms. Robins "AGREED TO AND ACCEPTED" this "carveout" by signing the letter. Tr.Ex. 49 at 2; ST at 28-29.

Emerald's dealings with Sea Star has been "on behalf of the creditors;" Storage, its secured creditor, expects to collect the money. ST at 30, 33-34, 65. According to Ms. Robins, Storage expenses will include not only amounts paid to third parties but also telephone, office equipment and rent, and contract employees, as well as her unspecified salary. ST at 31, 46. Any carveout in favor of Emerald is subject to another carveout for Emerald legal fees, which Storage began paying after execution of the Assignment Agreement. Tr.Exs. 50, 57; ST at 33-34, 46-48. Until collections are complete, all legal fees and expenses are paid, and MBC receives its 20 percent share, Storage cannot calculate whether Emerald would receive any carveout. ST at 65-66. Moreover, Ms. Robins must "write myself a letter" to determine her salary. ST at 46. Unlike

Storage, MBC is not a party to any "carveout agreement" with Emerald or its attorneys.  <u>ST</u> at 67.

## SUMMARY OF ARGUMENTS

1.     Express written provisions of the Rental Agreement and the Sale Order delineate and define the parties' rights and obligations. The Rental Agreement, which is the formal documented contractual arrangement between the parties, constitutes their "entire agreement." Emerald nonetheless has ignored the Rental Agreement's and the Sale Order's explicit requirements and limitations and has asserted claims which contravene their terms.  Sea Star is entitled to the declarations of the parties' rights and obligations under the Rental Agreement and the Sale Order, discussed in detail below.

2.     Emerald is not a real party in interest and lacks the requisite "personal stake in the outcome" of any controversy to sue Sea Star.  Serving as a stalking horse, Emerald actually is attempting to assert alleged legal rights and interests of third parties, namely MBC and Storage, against Sea Star.  Emerald's role has been to assist MBC and Storage in collections and liquidation of equipment.  Its dealings with Sea Star has been "on behalf of the creditors."  Storage, its secured creditor, expects to collect any funds, which MBC anticipates sharing.  After payment of expenses, Emerald's undefined, indeterminate "carveout," derived from Storage's claim, appears chimerical.

3.     The Assignment Agreement withholds assignment to Storage of any entitlement to compensation from Sea Star for use of Emerald equipment during any period in which Sea Star paid MBC.  Moreover, paragraph 6.3 clearly and unambiguously proscribes assertion by Storage of any such entitlement.  Since Emerald's undefined, indeterminate derivative "carveout" rights can be no greater than Storage's rights, it is prohibited from asserting any claim for *per diem* rental of Emerald equipment.

## ARGUMENT

I.    **Sea Star Is Entitled to Declarations of Legal Rights and Obligations under the Rental Agreement and the Sale Order.**

Because the Rental Agreement is a maritime contract, this Court has jurisdiction pursuant to 28 U.S.C. § 1333. *See Interpool Ltd. v. Char Yigh Marine (Panama) S.A.*, 890 F.2d 1453, 1457 (9th Cir. 1989); *CTI-Container Leasing Corp. v. Oceanic Ops. Corp.*, 682 F.2d 377, 379-80 (2nd Cir. 1982); *Interpool, Ltd. v. Bernuth Agencies, Inc.*, 959 F. Supp. 644, 650 (S.D.N.Y. 1997). Sea Star and Emerald have specified that Maryland law shall govern interpretation of the Rental Agreement and determination of the parties' rights, duties, and liabilities. Tr.Ex. 17 ¶ 14. With respect to the issues *sub judice*, the choice-of-law provision does not impinge on maritime law. *See Lauritzen v. Larsen*, 345 U.S. 571, 588-89 (1953); *LaSalle Bank N.A. v. Lehman Bros. Holdings, Inc.*, 237 F. Supp.2d 618, 626 (D. Md. 2002).

In regard to declaratory relief, the Supreme Court has explained: "Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment...." *Maryland Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941)(citations omitted). *Accord, Lake Carriers' Ass'n v. MacMullan*, 406 U.S. 498, 506 (1972). Within the ambit of 28 U.S.C. § 2201, Count I of Sea Star's Complaint is ripe for a declaratory decision. Given the substantial sums in dispute and the parties' contradictory contractual interpretations, the controversy is indeed "live." *See, e.g., Surrick v. Killion,* 449 F.3d 520, 527-29 (3d Cir. 2006); *United States v. Gov't of Virgin Is.,* 363 F.3d 276, 285-86 (3d Cir. 2004).

When Sea Star moved to dismiss Emerald's original Counterclaim, this Court adhered

to the "objective interpretation of contracts" under Maryland law to examine the Rental Agreement.

<u>D.I.</u> 75 at 10 (citation omitted). The Court held:

> The Equipment Rental Agreement 'cover[s] equipment in use at various times commencing April 29, 2002.'... It also contains an Integration Clause which states that '[t]his Agreement contains the entire agreement between the parties and subject to the provisions of section 1, may not be amended, altered, or modified, except by a writing signed by the party to be bound.'... Based on this language, the Court concludes that a reasonable person reading the Equipment Rental Agreement would not find any ambiguity in its terms....
>
> ...
>
> [E]xtrinsic evidence is not required to illuminate the meaning of the Equipment Rental Agreement because it is not ambiguous when viewed from the standpoint of a reasonable person.... As Emerald acknowledges in its Counterclaim, the Equipment Rental Agreement was the parties' formal documentation of the leasing arrangement that had existed previously.... Further, the Equipment Rental Agreement has an Integration Clause expressing the parties' intent that the Equipment Rental Agreement be "the entire agreement between the parties."

<u>D.I.</u> 75 at 11-13 (references & citations omitted).

Ostensibly, Emerald's owner and president, Mr. Holt, has conceded that the Rental Agreement "refers to all equipment that Sea Star had of Emerald's" and governs the contractual relationship between Sea Star and Emerald. <u>HSR</u> at 126-27. Confirming that he understands the Rental Agreement, he testified:

> The documents speak for themselves.
>
> ...
>
> [W]hat I understand is whatever the document says, it says.
>
> ...
>
> I'm talking about the equipment rental agreement.
>
> ...
>
> The agreement was the agreement. Whatever it was, it was.

<u>HSR</u> at 29-31, 57.

From Mr. Holt's perspective, the Emerald-NPR lease and the Emerald-Sea Star Rental Agreement were fundamentally different: The Emerald-NPR lease was not "a specific unit per-diem lease that was entered into with Sea Star and Emerald." EM.II at 23. The Emerald-NPR lease "was a grossed-up lease..., where the total fleet of Emerald would be leased by NPR for a period of time." EM.II at 27. In April 2002, Sea Star rejected Mr. Holt's total-fleet proposal before closing on the asset purchase. Tr. 1:190, 192, 3:5-6, 24; Tr.Ex. 1; HSR at 96-98. His "whole theory was you were going to take the entire fleet, but it just wasn't going to be. [Sea Star] didn't need the entire fleet." HSR at 106.

Contradicting his earlier admissions, however, Mr. Holt now contends:

> You took over Emerald's equipment as of the closing. You either would return it within two weeks after the closing or you were using it. If you returned it, you would not be charged.

EM.II at 101. These subjective assumptions and beliefs are not only unfounded but also immaterial. *E.g., Maslow v. Vanguri,* 896 A.2d 408, 420 (Md. Ct. Spec. App. 2006). Because the words of the Rental Agreement "have a plain and obvious meaning, all construction, in hostility with such meaning is excluded." *Norfolk Southern Ry. v. James N. Kirby, Pty. Ltd.,* 543 U.S. 14, 32 (2004). The Court's province is not to rewrite the Rental Agreement because Emerald has become dissatisfied with its terms. *Maslow v. Vanguri, supra* at 420. Emerald is "bound by the contract itself, construed by the same rules of law which govern all other contracts." *Gill v. Computer Equip. Co.,* 292 A.2d 54, 58 (Md. 1972).

The work of Lorraine Robins complicates and compounds the controversy. To assist in collections for MBC, Mr. Holt enlisted Ms. Robins, his longtime assistant, and Mr. Davis, a former Emerald stockholder and president. HSR at 18, 23; EM.II at 29-30. Ms. Robins was not

involved in any effort to identify units in Sea Star's facilities, in third-parties' inland depots, or elsewhere as of April 27, 2002. ROB at 68-69. When Ms. Robins testified in January 2005, she admittedly had read "just sections" of the Rental Agreement — "[t]he charges, the rates, per diems, redelivery," and "the Schedule A, which gives you the lease rate, the stipulated loss rate and the damage." ROB at 73, 84. She had not even seen the Sale Order, and no one had advised her of its storage provisions. *Id.* at 82. When Ms. Robins testified in January 2008, she still had "[n]ot really" read the complete Rental Agreement. ST at 75.

To decide whether Sea Star had on-hired Emerald equipment under the Rental Agreement, Ms. Robins devised a "touch" theory. For instance, Emerald "did not" differentiate between Emerald equipment in use and in storage as of April 29, 2002, particularly in San Juan, in billing Sea Star. HSR at 121. Regarding spreadsheet "invoices" that she prepared, Ms. Robins explained:

> When I billed, I didn't bill anything to Sea Star unless I had a movement of some kind that they had touched it. If they had it, I billed it.

ROB at 63. Any alleged nexus between Ms. Robins' "touch" theory of contract creation and enforcement and the Rental Agreement's terms, including the explicit on-hire and off-hire provisions, is non-existent. One consequence of Ms. Robins' self-made criteria of contract construction and billing is that Sea Star has been required to review Emerald claims concerning thousands of pieces of equipment that never were subject to the Rental Agreement.

Sea Star seeks the following declarations of legal rights and obligations under the Rental Agreement and the Sale Order:

> **1.    Sea Star has no responsibility or liability for Emerald equipment subject to previous agreements between Emerald and NPR that Sea Star did not use pursuant to the Rental Agreement after closing of the asset purchase.**

Undermining the Holts' aspersions, the Sale Order prohibits claims predicated on allegations that Sea Star is NPR's successor in interest or that acquisition of the Purchased Assets reflects substantial continuation of the Debtors' business operations. Tr.Ex. 6 at 4 ¶ 16. Sea Star certainly was concerned with effecting a smooth transition of service between the continental United States and Puerto Rico. However, the Holts are well aware that Sea Star was not purchasing NPR or continuing NPR's bankrupt business operations.

As to equipment not purchased or leased by Sea Star, the bankruptcy court ordered:

> [T]o the extent that any equipment of Emerald...is located on property sold or assigned to Buyer under the Asset Purchase Agreement, the Buyer shall cooperate in allowing Emerald...to remove such property during normal business hours as long as such removal will not unreasonably disrupt operations of the Buyer. In addition, the Buyer shall cooperate in removing any such equipment from Vessels in transit and store such equipment on leased premises at the final port of destination, to the extent such final destination is a leased premises sold and assigned to the Buyer under the Asset Purchase Agreement....

Tr.Ex. 6 at 8-9 ¶¶ 13. Moreover, Sea Star refused to acquire, assume, or accept assignment of any equipment agreements between Emerald and NPR or Holt Cargo. D.I. 137 ¶ 3(h). The Sale Order enjoins Emerald from asserting or prosecuting any claim or cause of action against Sea Star "to recover on account of any liability owed by [NPR]." Tr.Ex. 6 at 9 ¶ 15.

While Mr. Holt deemed paragraph 13 of the Sale Order "self-explanatory," Ms.

Robins had not seen the document. HSR at 57; ROB at 82. As stated above, Ms. Robins "did not" differentiate between Emerald equipment in use and in storage as of April 29, 2002, in preparing Emerald's spreadsheet "invoices" to Sea Star. She deemed every piece of equipment included in the self-billing reports to be in use. ROB at 85. For example, Sea Star periodically provided inventories and other documentation identifying Emerald equipment located in its San Juan terminal and third-party depots, many of which were attachments to its self-billing reports. Tr. 1:33-34, 36-37; Tr.Exs. 15, 20, 22, 25. Sea Star later learned that Ms. Robins has charged *per diem* rent, and in some cases, stipulated loss values, for equipment inventoried and stored in terminals or depots but never used by Sea Star. Tr. 1:32-33.

> **2.    Emerald's delivery of each piece of Emerald equipment subject to the Rental Agreement must have been effected and evidenced by an equipment interchange receipt – a TIR – signed and dated on or after April 29, 2002.[8]**

With respect to delivery and on-hire, the Rental Agreement requires:

> 1.    Equipment. ...Delivery of all equipment to Lessee [Sea Star] or its agents by Lessor [Emerald] shall be effected and evidenced by signed and dated equipment interchange receipts and shall be subject to the terms and conditions of this Agreement.

> 2.    Term. The lease term for each item of Equipment shall begin on the date when such Equipment is delivered to Lessee or its agent and shall end on the date when such Equipment is taken off hire pursuant to section 10 below....

---

[8]An equipment interchange receipt "is a document that the parties execute to show that a piece of equipment was delivered or seized." EM.I at 108. It is "traditionally prepared by a marine terminal for when a piece of equipment goes in or out of that marine terminal." HSR at 120. In the Rental Agreement, an "equipment interchange receipt" would be a "TIR." EM.I at 114-15. A TIR would be issued at the time equipment entered ("gate in") or exited ("gate out") a terminal or depot. EM.I at 115-16. TIRs have been Sea Star's primary source documents to track equipment moves. Tr. 1:65, 114. In some cases, Sea Star utilized activity reports, such as gate logs summarizing gate moves, received from third-party depots. Tr. 1:67, 71, 75.

Tr.Ex. 17 ¶¶ 1, 2. Sea Star on-hired specific Emerald equipment that was not involved in Shipments in Transit on the date Sea Star's use began and on-hired specific Emerald equipment that had been involved in Shipments in Transit on the date Sea Star's use for a new cargo movement began. Tr. 1:63, 114; D.I. 137 ¶¶ 3(k), (l).

Emerald can make no pretense of compliance with the Rental Agreement's on-hire provision. EM.I at 219; HSR at 77, 79-80, 121. Ms. Robins "used whatever documentation I had to do the billing." ROB at 89. She never asked the Emerald representatives in Sea Star's San Juan terminal to obtain TIRs. ROB at 90. Francisco Gonzalez, an MBC and Emerald agent, was in the San Juan terminal daily, inspecting, selling, and delivering Emerald equipment. Tr. 2:27, 30, 31. In addition, Martin McDonald was "there a lot in the beginning" and signed inventories on behalf on MBC and Emerald. Tr. 2:31, 34. Ms. Robins' "touch" test for determining whether and when Sea Star on-hired Emerald equipment contravenes the Rental Agreement's explicit on-hire requirements.

> **3.    Redelivery of equipment subject to the Rental Agreement may have been at Greenwich terminal, Philadelphia, Pennsylvania; Sea Star terminal, Puerto Nuevo, San Juan, Puerto Rico; Greenwich terminal, Port of Jacksonville, Florida; or any other location as to which the parties have agreed in writing.**
>
> *See* discussion in paragraph 4 below.

**4.      Redelivery of Emerald equipment subject to the Rental Agreement may have been effected and evidenced by a TIR signed by the Sea Star terminal, Puerto Nuevo, San Juan, Puerto Rico, a designated receiving terminal, at which time Emerald was required to off-hire the equipment.**

Regarding redelivery and off-hire, the Rental Agreement provides, in pertinent part:

10. Redelivery of Equipment.

(a) At its sole expense, Lessee shall redeliver Equipment to Lessor at Greenwich terminal, Philadelphia, Pennsylvania; Sea Star terminal, Puerto Nuevo, San Juan, Puerto Rico; Greenwich terminal, Port of Jacksonville, Florida; or any other location as to which the parties have agreed in writing....

(b)      Upon redelivery of particular Equipment, the receiving terminal will execute an equipment interchange receipt....
...
(e)      At the time of return, Equipment will be taken off hire; and rental charges will cease....

Tr.Ex. 17 ¶¶ 10(a), (b), (e); Tr. 1:114.  Again, Mr. Holt has testified:  "The document speaks for itself on the redelivery of equipment."  Whatever the Rental Agreement says is what the agreement was, "[a]s far as Emerald is concerned, yes."  HSR at 125.  Emerald has acknowledged that Sea Star returns of equipment — *i.e.,* off-hire of individual units "effected and evidenced" by equipment interchange receipts signed and dated by the receiving terminal — occurred when equipment comes through the terminal gate and that the Sea Star terminal in San Juan was a designated receiving terminal, where TIRs signed by Sea Star effected return of Emerald equipment.  EM.I at 114-15; Tr. 1:90.

Though Ms. Robins knew the Rental Agreement designated Sea Star's San Juan terminal as a redelivery location, she decided that a TIR signed by Sea Star when Emerald equipment entered the terminal "wasn't a redelivery document unless a representative from Emerald signed it"

[ROB at 147-48], despite the fact that no such requirement exists in the Rental Agreement. Thus, Emerald's claims against Sea Star include billings for Emerald equipment in storage. For instance, after Sea Star agreed to reposition equipment stored by Emerald in its San Juan terminal to Emerald's Jaxport terminal [Tr.Ex. 45], Mr. Davis signed a TIR to confirm condition before loading onboard Sea Star's vessel. Ms. Robins was aware that Sea Star had asked Emerald to clear its equipment out of the San Juan terminal, yet she billed Sea Star *per diem* rental for the equipment which Emerald had stored and was removing. Inexplicably, she rationalized: "We may have charged per diem for the equipment if it was on hire prior to the shipping.... It was taken off hire when it was given to Arthur [Davis] with a TIR and he signed it." ROB at 145-46.

> **5.    Sea Star has no responsibility or liability to compensate for use of Emerald equipment prior to or during Shipments in Transit.**

Emerald now is "vigorously agreeing that if there was an in-transit shipment at the time of the closing of Sea Star's acquisition of NPR and Sea Star paid NPR for the use of the equipment in-transit, they don't owe Emerald any money." Tr. 1:53. Sea Star does "not owe us for shipments in transit." Tr. 1:204. Mr. Holt "always knew that shipments would be in-transit." Tr. 1:205. After learning that Sea Star "had an in-transit clause from the Court," he told Ms. Robins and Mr. Davis "to make sure you don't bill for that period of time." HSR at 128. Emerald allegedly "did not invoice for that in-transit period." HSR at 151. Emerald's actions belie its protestations.

When Ms. Robins found out about "the in-transit" provision in January 2004, however, she merely "adjusted the billing from the containers on that list for 14 days credit on each unit;" her "list" was limited to certain loaded containers onboard ex-NPR vessels on April 27, 2002. ROB at 48-49, 58. If she knew "the equipment was on the vessel,...I gave Sea Star Line 4/29 as an

on-hire date...[and] gave them credit for two weeks." <u>ROB</u> at 59-60.  Ms. Robins also billed Sea

Star for equipment involved in Shipments in Transit or en route overland to NPR customers, before

and after the closing.    <u>ROB</u> at 110, 112-13, 116-17, 123-26, 140-43; <u>Tr.Exs.</u> 25, 29, 30.

Furthermore, even when she has been confronted with the evidence, Ms. Robins has refused to

recognize that Shipments in Transit necessarily involved utilization of chassis and gen sets, together

with containers.  <u>Tr.</u> 1:153, 3:9-10; <u>Tr.Ex.</u> 2.   Although Mr. Davis testified he would have to

examine the documents for individual units involved in Shipments in Transit to determine billing

and crediting procedures, he admittedly has no reason to disagree with Ms. Robins as to her billing

procedures; they "basically worked together." <u>Tr.</u> 2:10-11.

> **6.     The Sale Order imposes no obligation with respect to any
> lessor's equipment that on April 27, 2002, was not located on
> leased property acquired under the Asset Purchase Agreement;
> that was not involved in shipment to a "final port of destination"
> where Sea Star leased premises acquired under the Asset
> Purchase Agreement and Sale Order; that was returned to port
> or inland facilities by third parties, such as consignees, which had
> received shipments at final destinations outside ports.**

> <u>Tr.Ex.</u>6 at 8-9, ¶ 13 (Sale Order).  *See* pp. 5-8, 13, 21-22  *supra*.

7.      Sea Star has had no duty to "redeliver" or pay compensation for Emerald equipment that Sea Star "touched" but did not use, including but not limited to Emerald equipment which was involved in Shipments in Transit or held by third parties, such as E.T. Heinsen and inland depots, and was returned to port terminals or inland depots where Sea Star leased premises; Emerald equipment which entered NPR terminals prior to closing of the asset purchase; and Emerald equipment for which delivery under the Rental Agreement is not evidenced by a TIR, signed and dated by Sea Star for use on or after April 29, 2002.

Regarding the spreadsheet "invoices" that she has prepared, Ms. Robins stated:

When I billed, I didn't bill anything to Sea Star unless I had a movement of some kind that they had touched it.  If they had it, I billed it.

ROB at 63.  Ms. Robins' "touch" test contravenes explicit on-hire and off-hire provisions in the

Rental Agreement.  *See also* pp. 22-25 *supra*.

8.      Sea Star has had no duty to "redeliver" or pay for Emerald equipment involved in Shipments in Transit that third parties, such as consignees, did not return to port terminals or inland depots where Sea Star leased premises.  Any Emerald recourse would be to the NPR bankruptcy estate.

Tr.Ex.6 at 9, ¶ 15 (Sale Order).  *See also* pp. 5-8, 13, 23-25 *supra*.

9.      For Emerald equipment involved in Shipments in Transit, any Sea Star on-hire obligation would begin when Sea Star signed a TIR for its use after completion of a Shipment in Transit.

Tr.Ex. 17 ¶ 1 (Rental Agreement). *See also* pp. 21-23 *supra*.

**10.    Any Sea Star on-hire obligation for Emerald equipment in the possession of third parties, such as depots, shipper pools, shipper warehouses, or former NPR agents or stevedores, as of and after closing would begin when Sea Star signed a TIR removing such Emerald equipment from a depot or shipper pool or acknowledging receipt from a customer or delivering carrier for Sea Star's use.    Otherwise, Sea Star would have no responsibility for such equipment.**

As stated above, Sea Star refused to acquire, assume, or accept assignment of any equipment agreements between Emerald and NPR. D.I. 137 ¶ 3(h). The Sale Order enjoins Emerald from asserting or prosecuting any claim or cause of action against Sea Star "to recover on account of any liability owed by the Debtors", including NPR. Tr.Ex. 6 at 9 ¶ 15. Mr. Holt has admitted that Emerald equipment located in depots, repair yards, and other inland facilities would not be Sea Star's responsibility "[i]f it's not covered" under the Rental Agreement. HSR at 155.

To Mr. Holt's knowledge "[t]here was equipment that was held by vendors on monies that NPR owed to them. They were not aware that it was not NPR's equipment; it was Emerald's equipment.... There were more than several ...." HSR at 80-81; Tr. 1:204. "[W]hether there was equipment that was being held by people that was not turned over to Sea Star because of it being held, the answer is yes." HSR at 82-83. Mr. Holt does not believe Emerald ever collected equipment in inland depots. Tr. 1:199.

Furthermore, Mr. Holt has been aware that Mr. Rooks and other Sea Star representatives e-mailed Mr. Davis and Ms. Robins, reporting third parties' refusals to release Emerald equipment. Tr. 1:28-32, 60, 203; Tr.Exs. 7, 12, 24, 25. Paradoxically, Ms. Robins professed ignorance that third parties held any Emerald equipment as of April 27, 2002, although she knew inland depots would not allow Sea Star to take possession of Emerald equipment. ROB

at 71. Ms. Robins billed Sea Star for Emerald equipment that depots and truckers having claims against NPR retained and refused to release but that she had "released." Tr.Exs. 7, 12, 24; ROB at 93-95, 103-04. Moreover, she billed Sea Star for Emerald equipment that Mr. Davis instructed depots not to release to Sea Star or directed Sea Star to reserve for his prospective sales. Tr.Ex. 25; ROB at 139.

      At the time of the Sale Order, Emerald and its attorneys also were cognizant that E.T. Heinsen, a former NPR agent in the Dominican Republic, was holding Emerald equipment and had filed a maritime lien claim in the Bankruptcy Action. Tr. 1:207-08; Tr.Ex. 4; EM.II at 107. When Arthur Davis and Martin McDonald met with Heinsen, he refused to release the Emerald equipment. Tr. 1:208; EM.I at 222. Subsequently, Storage recovered and sold Emerald equipment to E.T. Heinsen. Tr. 2:8; Tr.Ex. 51; ST at 37-39. EM.II at 106. Emerald then billed Sea Star for rent and "adjusted" Stipulated Loss Values. EM.I at 222. None of these billings comports with the requirements of the Rental Agreement and Sale Order. Tr.Exs. 17 ¶ 1, 6 at 9 ¶ 15. *See also* pp. 6-7, 11-13, 21-23, 25-26 *supra*.

### 11.    Sea Star has no obligation to Emerald for *per diem* rent.

      Emerald's execution of the Rental Agreement required authorization by MBC, Emerald's secured lender. EM.I at 106; HSR at 115-16. Paragraph 4(b) provides that the Rental Agreement is "subject and subordinate to any lease or security interest in favor of a third-party lessor or lender to Lessor." Tr.Ex. 17 ¶ 4(b). Thus, two other MBC contracts become pertinent. *See Anderson Adventures, LLC v. Sam & Murphy,* Inc., 932 A.2d 1186, 1195 (Md. Ct. Spec. App. 2007).

      First, as a condition precedent to authorization of the Rental Agreement, MBC required the Indemnity Agreement. To induce Sea Star's direct payment for use of Emerald

equipment covered by the Rental Agreement, MBC contracted to indemnify and defend Sea Star "against claims by COMPETING CLAIMANTS [specifically including Emerald] on the terms and conditions set forth" in the Indemnity Agreement. Tr.Ex. 19 at 1-2; D.I. 137 ¶ 3(p). Second, as a condition to Storage's purchase of the Emerald loan documents, MBC required inclusion of paragraph 6.3 in the Assignment Agreement. Entitled "No Competing Claim Against Sea Star," paragraph 6.3 states:

> ASSIGNEE [Storage] agrees not to assert any entitlement to compensation from Sea Star for use of EMERALD EQUIPMENT during any period for which Sea Star has paid ASSIGNOR [MBC] pursuant to the Sea Star INDEMNITY [MBC-Sea Star Indemnity Agreement].

Tr.Ex. 42 ¶ 6.3.[9]   Storage received no other assignments from MBC.

Indisputably, Sea Star paid MBC for use of Emerald equipment during the April 2002-December 2003 period pursuant to the Indemnity Agreement. Tr.Exs. 19, 61, 65-D. See also p. 12 supra. Self-billing reports recounting the mutual dealings between Sea Star and MBC continued after termination of the Rental Agreement. In the Assignment Agreement, MBC did not merely omit an assignment to Storage; paragraph 6.3 expressly prohibits assertion of any entitlement to compensation for use of Emerald equipment during the entire April 2002-December 2003 period. Ms. Robins signature conclusively evidences Storage's stated agreement to the proscription, ST at 17.

The undefined, indeterminate "carveout" granted Emerald by Storage cannot encompass a greater claim – or interest – than that specifically assigned to Storage by MBC. See,

---

[9]Paragraph 6.3 is consistent with a September 24, 2003 telefax from Scott Krieger of MBC, instructing Mr. Davis: "Just please make sure you are not claiming payments for units and time periods covered under self billing reports from Sea Star." Tr.Ex. 39.

*e.g., Perpetual Financial Cor. v. United States,* 61 Fed. Cl. 126, 143 (2004) (incidental, contingent, remote interest). As the third-party beneficiary named in paragraph 6.3, Sea Star has the right to enforce the proscription, which inures to its benefit. *E.g., Bakery & Confectionary Union & Indus. Int'l Pension Fund v. Ralph's Grocery Co.,* 118 F.3d 1018, 1021 (4th Cir. 1997).[10]

> **12.    Sea Star has no obligation for Emerald Stipulated Loss Value claims unless a signed TIR discloses Sea Star's on-hire of such Emerald equipment under the Rental Agreement on or after April 29, 2002; and there is no evidence of redelivery under the Rental Agreement.**

Tr.Ex. 17 ¶¶ 1, 10 (Rental Agreement); Tr.Ex. 6 at 8-9, ¶¶ 13, 15 (Sale Order). *See also* pp. 6-7, 11-13, 21-29 *supra.*

> **13.    Sea Star has no obligation for Emerald's adjusted Stipulated Loss Value claims pertaining to Emerald equipment recovered and sold. Emerald admittedly did not give Sea Star notice required by paragraph 13(b)(iii) of the Rental Agreement prior to sales of Emerald equipment for which Emerald alleges Sea Star is responsible.**

Pertinent to equipment for which Emerald billed an "adjusted" Stipulated Loss Value after recovery and sale, paragraph 13(b)(iii) of the Rental Agreement states:

> 13.    Events of Default.
>
> ...
>
> (b) Upon the occurrence of any default by Lessee under this Agreement, Lessor shall (except to the extent otherwise required by law) be entitled to:
>
> ...
>
> (iii) Elect to sell any or all Equipment after giving thirty (30)

---

[10]Even assuming *arguendo* that paragraph 6.3 of the Assignment Agreement would not preclude all *per diem* rent claims, MBC's Motion for Allowance and Payment of Administrative Priority Claims prevents any claim concerning "continued use of the Sea Star Emerald Equipment" through June 11, 2002. Tr.Ex. 27 at 14-16. Emerald's April 29, 2002 on-hire date becomes immaterial.

days notice to Lessee at one or more public or private sales ....

Tr.Ex. 17 ¶ 13(b)(iii).   Governing Maryland law, as well as the Rental Agreement, proscribes Emerald's adjusted Stipulated Loss Value claims relating to Emerald equipment on-hired by Sea Star that Storage and Emerald recovered and sold without the prior notice mandated by paragraph 13(b)(iii). *Maryland Nat'l Bank v. Wathen,* 414 A.2d 1261, 1263-65 (Md. App. 1980). *Accord, First Nat'l Bank of Md. v. DiDomenico*, 487 A.2d 646, 649-50 (Md. App. 1985); *see Gambo v. Bank of Md.*, 648 A.2d 1105, 1113 (Md. Ct. Spec. App. 1994).

Before sales of equipment that Emerald or Storage recovered and sold, Emerald admittedly never delivered to Sea Star the notices required by paragraph 13(b)(iii) of the Rental Agreement.   Tr. 2:7-8.   Emerald nonetheless has asserted claims against Sea Star for rent and "adjusted" Stipulated Loss Values of such equipment  ROB at 75-76, 157-59; ST at 70-72.   An example is the E.T. Heinsen billing. *See* p. 29 *supra.*  Assuming *arguendo* Emerald could prove Sea Star on-hired and did not off-hire particular equipment, the Rental Agreement and governing Maryland law proscribe its adjusted Stipulated Loss Value claims relating to Emerald equipment that Storage and Emerald recovered and sold without the mandated prior notice mandated by paragraph 13(b)(iii).

## II.     Emerald Is Not a Real Party in Interest and Lacks Standing to Prosecute Claims Against Sea Star.

### A.     Equipment Rental Agreement

The threshold issue in regard to claims under the Rental Agreement is whether Emerald is a real party in interest. *See Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 111 (1998). As explained by the Third Circuit, the related doctrine of standing encompasses constitutional requirements and prudential considerations. *Township of Piscataway v. Duke Energy*, 488 F.3d 203,

208-09 (3d Cir. 2007). Generally, a party must assert its own legal rights and interests, not third parties' legal rights and interests. *Warth v. Seldin,* 422 U.S. 490, 499 (1975); *Discover Bank v. Vaden,* 489 F.3d 594, 601-02 (4th Cir. 2007); *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 117-18 (2d Cir. 1991).

   Under Maryland law, which governs the Rental Agreement and the Assignment Agreement, a "'real party in interest' must have 'an actual, real and justiciable interest susceptible of protection through litigation.'" *Akparewa v. Amoco Oil Co.*, 771 A.2d 508, 519 (Md. Ct. Spec. App. 2001), *quoting Boyd v. Hickman*, 689 A.2d 106, 116 (Md. App. 1997); *see Discover Bank v. Vaden, supra,* 489 F.3d at 601-03; *LaSalle Bank, N.A. v. Lehman Bros. Holdings, Inc.*, 237 F. Supp.2d 618, 626, 632 (D. Md. 2002). *See also* Tr.Exs. 17 ¶ 14, 42 ¶ 18. As Mr. Holt has testified, however, Emerald has "assisted MBC in trying to collect monies anywhere they could, including from Sea Star, attempting to properly invoice the leasing of the equipment to Sea Star and the liquidation of equipment that Sea Star was not using so the money could flow to MBC." HSR at 34-35. According to Ms. Robins, Emerald's dealings with Sea Star has been "on behalf of the creditors." Storage, its secured creditor, expects to collect the money, which MBC anticipates sharing. ST at 30, 33-34, 65; Tr.Ex. 42 ¶¶ 2, 3.

   To function as the real party in interest for purposes of Fed. R. Civ. P. 17(a), Emerald must hold the substantive legal rights sought to be enforced. Manifestly, Emerald does not have the requisite actual, real and justiciable interest susceptible of protection through litigation. Instead, Emerald serves as a stalking horse, attempting to assert alleged legal rights and interests of third parties — *e.g.,*, MBC and Storage Its undefined, indeterminate "carveout", granted by Storage for purposes of initiating this litigation, appears illusory. Tr.Ex. 49. *See also* p. 14. Therefore, Emerald is not a

real party in interest.

### B.    Loan Sale & Assignment Agreement

Even assuming that Emerald could demonstrate a legal right to maintain any claims in the Amended Counterclaim, Emerald cannot be a real party in interest in connection with *per diem* rental claims against Sea Star. Because the Rental Agreement is expressly "subject and subordinate to any lease or security interest in favor of a third-party lessor or lender to Lessor" [Tr.Ex. 17 ¶ 4(b)], any interest of Emerald always remained subordinate to that of MBC, its secured lender. In the Assignment Agreement, MBC clearly and unambiguously has proscribed assertion by Storage of "any entitlement to compensation from Sea Star for use of EMERALD EQUIPMENT during any period for which Sea Star has paid ASSIGNOR pursuant to the Sea Star INDEMNITY." Tr.Ex. 42 ¶ 6.3. Adhering to the principle of objective contractual interpretation, the provision is unambiguous; the Court gives effect to its plain meaning and does not contemplate any alleged subjective intent at the time of formation. *Cochran v. Norkunas,* 919 A.2d 700, 709-10 (Md. App. 2007).

Under the Indemnity Agreement, MBC, not Emerald, was entitled to receive — and did receive — the compensation for use of Emerald equipment during the period covered by the Rental Agreement and Sea Star self-billing reports. Tr.Exs. 8, 17; EM.I at 91-92; EM.II at 42; D.I. 158 at 15. Sea Star and MBC exchanged payments and credits throughout the term of the Rental Agreement. Self-billing reports reflecting their mutual dealings continued through December 2003. Emerald was not entitled to compensation from Sea Star for use of the Emerald equipment pursuant to the Rental Agreement and "never got a dime." Tr. 1:198. *See also* pp. 11-12 *supra.*

The Assignment Agreement *sub judice* prohibits assertion of a compensation claim for use of Emerald equipment during any period in which Sea Star has paid MBC. No undefined,

indeterminate "carveout" granted Emerald by Storage can encompass a greater claim – or interest – than that specifically assigned to Storage by MBC. *See, e.g., Perpetual Financial Cor.,* 61 Fed. Cl. at 143 (incidental, contingent, remote interest).   Emerald, like Storage, is bound by the Assignment Agreement and may not disregard the explicit contractual limitations and prohibitions. Thus, contractually and legally, Emerald lacks the requisite "personal stake in the outcome" of any controversy to sue Sea Star with respect to any matter covered by paragraph 6.3, including a claim for *per diem* rent. *Warth v. Seldin, supra,* 422 U.S. at 498-99; *Accord, Shearson Lehman Hutton, Inc. v. Wagoner, supra,* 944 F.2d at 117-18; *see Caplin v. Marine Midland Grace Trust Co.,* 406 U.S. 416, 428-33 (1972); *Town of Piscataway v. Duke Energy, supra,* 488 F.3d at 208-09; *General Motors Acceptance Corp. v. Dykes (In re Dykes)*, 10 F.3d 184, 187-88 (3d Cir. 1993).

## CONCLUSION

Clear and specific written terms express and define the spirit of the Rental Agreement and the Sale Order. "Without such boundaries, the rule of law becomes as mad as a hatter." *In re LTV Steel Co.,* 299 B.R. 863 (N.D. Oh. 2003). Sea Star requests that the Court declare the parties' rights and obligations in accordance with the Rental Agreement and the Sale Order, as outlined in paragraphs 1 through 13 above. Further, because Emerald lacks standing and is not a real party in interest, Sea Star requests that the Court declare that Emerald has no right to pursue the Amended Counterclaim. Assuming *arguendo* that Emerald has a legal right to maintain any claims, the absolute proscription in the Assignment Agreement binds Emerald and precludes assertion that Emerald is a legitimate real party in interest with respect to *per diem* rental claims against Sea Star.

Dated: August 7, 2008

SMITH, KATZENSTEIN & FURLOW LLP

/s/ Kathleen M. Miller
Kathleen M. Miller (I.D. No. 2898)
800 Delaware Avenue, 7th Floor
P.O. Box 410
Wilmington, DE 19899
Telephone: 302-652-8400
Telecopy: 302-652-8405
E-mail: Kmiller@skfdelaware.com

OF COUNSEL:
Timothy J. Armstrong
ARMSTRONG & MEJER, P.A.
2222 Ponce de Leon Boulevard
Penthouse Suite
Miami, FL 33134
Telephone: 305-444-3355

*Attorneys for Sea Star Lines, LLC*