# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| **SEA STAR LINE, LLC,**<br>**a limited liability company,** | ) <br> ) **Civil Action No. 05-CV-245-JJF (LPS)** |
| **Plaintiff,** | )<br>) |
| -vs- | )<br>) |
| **EMERALD EQUIPMENT LEASING, INC.,**<br>**a corporation,** | )<br>) |
| **Defendant,** | )<br>) |
| -vs- | )<br>) |
| **SEA STAR LINE, LLC,** | )<br>) |
| **Counter-Defendant.** | ) |

## SEA STAR LINE, LLC'S OPENING BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE AMENDED COUNTERCLAIM

Smith, Katzenstein & Furlow LLP
Kathleen M. Miller (I.D. No. 2898)
800 Delaware Avenue
P.O. Box 410
Wilmington, DE 19899
Telephone: 302-652-8400
Facsimile: 302-652-8405
E-mail: Kmiller@skfdelaware.com

*Attorneys for Sea Star Line LLC*

OF COUNSEL:
Timothy J. Armstrong
Armstrong & Mejer, P.A.
2222 Ponce de Leon Boulevard
Penthouse Suite
Miami, FL 33134
Telephone: 305-444-3355

August 14, 2008

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

STATEMENT OF CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.    Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    B.    Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        1.    Sea Star-NPR Asset Purchase . . . . . . . . . . . . . . . . . . . . . . . . 3

        2.    Post-Closing Transactions . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        3.    MBC-Sea Star Indemnity Agreement . . . . . . . . . . . . . . . . . . . 9

        4.    Emerald-Sea Star Rental Agreement . . . . . . . . . . . . . . . . . . . 11

        5.    MBC-Storage Loan Sale & Assignment Agreement . . . . . . . . . . . . . . . 13

        6.    "Carveouts" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        7.    Self-Billing Reports . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

SUMMARY OF ARGUMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    I.    Emerald Is Not a Real Party in Interest and Lacks Standing to
        Prosecute Claims Against Sea Star. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

    II.    As a Matter of Law, Emerald Has Not Asserted and Cannot Prove
        Tort Claims against Sea Star. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

        A.    Independent Legal Duty/Economic Loss Doctrine . . . . . . . . . . . . . . . 23

        B.    Elements of Fraud . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

    III.    The Rental Agreement and Maryland Law Bar Emerald's "Adjusted
        Stipulated Loss Value" and Punitive Damage Claims. . . . . . . . . . . . . . . . . . 28

      A.     "Adjusted" Stipulated Loss Values . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

      B.     Punitive Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

IV.   The Maryland Statute of Limitations Bars Claims Asserted
      in the Amended Counterclaim. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

## **TABLE OF AUTHORITIES**

**Cases**                                                                  **Page(s)**

*Akparewa v. Amoco Oil Co.,*
    771 A.2d 508 (Md. Ct. Spec. App. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

*Biktasheva v. Red Square Sports, Inc.,*
    366 F. Supp.2d 289 (D. Md. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29

*Caplin v. Marine Midland Grace Trust Co. of New York,*
    406 U.S. 416 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

*Cochran v. Norkunas,*
    919 A.2d 700 (Md. App. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Colao v. County Council of Prince George's County,*
    697 A.2d 96 (Md. App. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*CTI-Container Leasing Corp. v. Oceanic Operations Corp.,*
    682 F.2d 377 (2d Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Dici v. Commonwealth of Pa.,*
    91 F.3d 542 (3d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Discover Bank v. Vaden,*
    489 F.3d 594 (4th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Duquesne Light Co. v. Westinghouse Elec. Corp.,*
    66 F.3d 604 (3d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*East River S.S. Corp. v. Transamerica Delaval, Inc.,*
    476 U.S. 858 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*First Nat'l Bank of Md. v. DiDomenico,*
    487 A.2d 646 (Md.  App. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*First Union Nat'l Bank v. Steele Software Sys. Corp.,*
    838 A.2d 404 (Md. Ct. Spec. App. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 27

*G.M. Pusey & Assoc., Inc. v. Britt/Paulk Ins. Agency, Inc.,*
    2008 WL 2003747 (D. Md.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Gambo v. Bank of Md.,*
    648 A.2d 1105 (Md. Ct. Spec. App. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Gill v. Computer Equip. Co.,*
    292 A.2d 54 (Md. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Heckrotte v. Riddle,*
    168 A.2d 879 (Md. 1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Howard Oaks, Inc. v. Maryland Nat'l Bank,*
    810 F. Supp. 674 (D. Md. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Huron Tool & Eng'g Co. v. Precision Consulting Servs., Inc.,*
    532 N.W. 2d 541 (Mich. Ct. App. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*In re Dykes,*
    10 F.3d 184 (3d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*In re Global Link Telecom Corp.,*
    327 B.R. 711 (Bankr. D. Del. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Interpool Ltd. v. Char Yigh Marine (Panama) S.A.,*
    890 F.2d 1453 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Interpool, Ltd. v. Bernuth Agencies, Inc.,*
    959 F. Supp. 644 (S.D.N.Y. 1997),
    *aff'd* 129 F.3d 113 (2nd Cir. 1997) (Table) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Johnson v. Federal Kemper Insurance Co.,*
    536 A.2d 1211 (Md. Ct. Spec. App. 1988),
    *cert. denied,* 542 A.2d 844 (Md. 1988) (Table) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*LaSalle Bank Nat'l Ass'n v. Lehman Bros. Holdings, Inc.,*
    237 F. Supp.2d 618 (D. Md. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 21

*Lauritzen v. Larsen,*
    345 U.S. 571 (1953) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Maryland Nat'l Bank v Traenkle,*
    933 F. Supp. 1280, 1289 (D. Md. 1996),
    *aff'd* 10 Fed. Appx. 194 (4th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Maryland Nat'l Bank v. Wathen,*
    414 A.2d 1261 (Md. App. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Midland Red Oak Realty, Inc. v. Friedman, Billings & Ramsey & Co., Inc.,*
    2005 WL 445710 (Del. Super. Ct.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Norfolk Southern Ry. v. James N. Kirby, Pty. Ltd.,*
    543 U.S. 14 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Odyssey Travel Center, Inc. v. RO Cruises, Inc.,*
    262 F. Supp.2d 618 (D. Md. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 29

*Perpetual Fin. Corp. v. United States,*
    61 Fed. Cl. 126 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Pinkert v. Oliveri, P.A.,*
    2001 WL 641737 (D. Del.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Public Service Enterprise Group, Inc. v. Philadelphia Elec. Co.,*
    722 F. Supp. 184 (D.N.J. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

*Shearson Lehman Hutton, Inc. v. Wagoner,*
    944 F.2d 114 (2d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 23

*Steel Co. v. Citizens for a Better Env't,*
    523 U.S. 83 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Sterling v. Beneficial Nat'l Bank, N.A.,*
    1994 WL 315365 (Del. Super. Ct.),
    *aff'd,* 650 A.2d 1307 (Del. 1994)(Table) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Township of Piscataway v. Duke Energy,*
    488 F.3d 203 (3d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 23

*Tse v. Ventana Med. Sys., Inc.,*
    297 F.3d 210 (3d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Warth v. Seldin,*
    422 U.S. 490 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 23

*Werwinski v. Ford Motor Co.,*
    286 F.3d 661 (3rd Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24-26

*Wilmington Trust Co. v. Clark,*
    424 A.2d 744 (Md. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## Statutes and Other Authorites

28 U.S.C.A. § 1333 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Fed. R. Civ. P. 9(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Fed. R. Civ. P. 10(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Fed. R. Civ. P. 17(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Fed R. Civ. P. 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Md. Cts. & Jud. Proc. Code Ann. § 5-101 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

## STATEMENT OF CASE

A.    **Proceedings**

On March 1, 2004, Sea Star[1] filed a Complaint in the United States District Court for the Middle District of Florida.  D.I. 1.[2]  Sea Star seeks declaratory judgment as to rights and liabilities under an Equipment Rental Agreement, dated as of July 31, 2002 ("Rental Agreement") [Tr.Ex. 17], and an Order Authorizing Sale of the NPR Assets Free and Clear of All Liens, Claims and Encumbrances, dated April 26, 2002 ("Sale Order") [Tr.Ex. 6], and other relief and damages.  D.I. 1 at 10-15.  After service of Sea Star's Complaint, Emerald moved to dismiss, transfer, or abstain.  D.I. 9.  Emerald also initiated an adversary proceeding in the United States Bankruptcy Court for the District of Delaware.  Applying the "first filed" rule, the bankruptcy judge dismissed Emerald's action.  D.I. 11.  The Florida district court set trial on a calendar commencing February 22, 2005.  D.I. 13.  Several days before the pretrial conference, the court invoked 28 U.S.C. §1404(a) to transfer the case to this Court."  D.I. 45.  Its Order recounted:

According to Emerald, it has a four million dollar claim against Sea

---

[1]References to parties are: Sea Star Line, LLC is identified as "Sea Star"; Emerald Equipment Leasing, Inc. is identified as "Emerald."  References to non-parties are: E.T. Heinsen, C. por A., is identified as "Heinsen";  Greenwich Terminals, LLC is identified as "Greenwich"; Holt Cargo Systems, Inc. is identified as "Holt Cargo"; MBC Leasing Corp is identified as "MBC"; NPR, Inc. is identified as "NPR"; and, Storage Transfer, LLC is identified as "Storage."

[2]References to the Docket are abbreviated as "D.I.", followed by index number and page number.  References to the July 2008 trial transcript are abbreviated as "Tr.", followed by volume and page number(s).  References to July 2008 trial exhibits are abbreviated as "Tr.Ex."  References to deposition transcripts are: Emerald Equipment Leasing, Inc. deposition dated December 8, 2004 is abbreviated as "EM.I"; Emerald Equipment Leasing, Inc. deposition dated February 12, 2008 is abbreviated as "EM.II"; Storage Transfer, LLC deposition dated January 25, 2008 is abbreviated as "ST"; Thomas Holt, Sr. deposition dated January 25, 2005 is abbreviated as "HSR"; Lorraine Robins deposition dated January 26, 2005 is abbreviated as "ROB."  The exhibits and relevant transcript pages will be submitted with Sea Star's reply brief.

> Star for unpaid rental charges and its claim against Sea Star is the sole
> asset of the bankruptcy estate that offers a distribution to creditors in
> its pending bankruptcy.

D.I. 45 at 1.

Emerald then filed an Answer, Affirmative Defenses, and Counterclaim. D.I. 46. On

January 26, 2006, this Court dismissed the Count I claim for breach of an e-mail agreement; Count

II for *quantum meruit*; Count III to the extent rent was sought; and Counts V, VI, VII, and VIII for

failure to plead in accordance with Fed. R. Civ. P. 9(b). D.I. 75, 76. The Court granted Emerald

leave to file an amended counterclaim. Emerald's Amended Counterclaim re-asserted all counts in

the original Counterclaim, except post-petition *quantum meruit*. D.I. 79. When the Court denied

Sea Star's motion to dismiss the Amended Counterclaim [D.I. 80, 81, 86, 87], Sea Star filed an

Answer and Affirmative Defenses. D.I. 90.

During a pre-trial conference on November 1, 2007, the Court bifurcated trial on the

Complaint and the Amended Counterclaim, referring all pre-trial matters relating to the Amended

Counterclaim to Magistrate Judge Stark. D.I. 142. Subsequently, Sea Star filed a Motion for Partial

Summary Judgement, together with an Opening Brief and an Appendix; the parties submitted a Pre-

Trial Order. After a pre-trial conference concerning claims in the Complaint, the Court held a bench

trial on the Complaint in July 2008. D.I. 192, 193, 197. The Court directed the parties to file Post-

Trial Briefs as to issues in paragraphs 1(a) through (c) of the Pre-Trial Order for the July 7, 2008 trial

[D.I. 203]. Tr. 2:56-58. Trial on the Amended Counterclaim is scheduled to begin on September

15, 2008. D.I. 182. A pre-trial conference is set for August 29, 2008.

**B.**   **Factual Background**

Organized as a Delaware limited liability company, Sea Star is headquartered in

Jacksonville, Florida. Tr. 3:3-4. Sea Star engages in ocean transportation of cargo, primarily

between the United States mainland and Puerto Rico. Tr. 1:5, 3:4; D.I. 137 ¶ 3(a). To move cargo,

Sea Star utilizes several types and sizes of containers and chassis, as well as gen sets. Tr. 1:6-7. In

April 2002 Sea Star owned or leased approximately 6500 piece of cargo equipment. Tr. 1:7.

Emerald is a Chapter 11 Debtor under the United States Bankruptcy Code, having

filed a voluntary petition for relief in the United States Bankruptcy Court for the District of Delaware

in 2001 (initially, Jointly Administered under Case No. 01-926) (the "Bankruptcy Action"). D.I. 137

¶ 3(b).[3] In 1997 Emerald had obtained a $35 million loan from MBC to purchase equipment from

NPR and Holt Cargo. Tr. 2:6, 1:218; Tr.Exs. 3 (at 1-2 ¶ 4), 58. Emerald granted MBC a security

interest in all the purchased equipment, together with accounts, contract rights, and other general

intangibles arising from the equipment, and assigned to MBC the Emerald Equipment Lease

Agreements with NPR and Holt Cargo, dated November 18, 1997. Tr. 2:6-7; Tr.Exs. 3 (at 2-4 ¶¶

6, 10-11), 58, 59, 60, Emerald's sole function had been to serve as lessor of cargo transportation

equipment – containers, chassis, and gen sets – for its affiliates and co-debtors, NPR, an ocean

carrier, and Holt Cargo, as lessees. D.I. 137 ¶¶ 3(c), (d), (e). NPR's monthly payments to Emerald

and Emerald's monthly payments to MBC were set amounts. Tr. 1:218.

## 1.     Sea Star-NPR Asset Purchase

In April 2002 Sea Star entered into an Asset Purchase Agreement, as amended, with

---

[3]On July 25, 2002, the bankruptcy court granted the Motion of the United States Trustee to Convert the Cases of the Jointly Administered Debtors under Chapter 11 to Cases under Chapter 7 of the Bankruptcy Code. Tr.Ex. 16. The Order excepted only Emerald and Dockside Refrigerated Warehouse, Inc., which remained Chapter 11 debtors. On May 23, 2003, the court severed the Emerald case from the joint administration of the converted Chapter 7 proceedings. Tr.Ex. 35. The Emerald proceeding became Case No. 01-934.

NPR and other Emerald affiliates in the Bankruptcy Action. D.I. 137 ¶ 3(f). Because NPR intended

to cease operations after the asset purchase, Sea Star became concerned that cargo would be stranded

in various stages of transit between points of origin and destination. Tr. 3:6-7. At the time of and

after closing, cargo booked by NPR would be at shippers' locations in process of loading or loaded

in containers dispatched by NPR; onboard NPR vessels; in terminals or depots; and in possession

of truckers' or railroads for inland transport to consignees ("Shipments in Transit"). Tr. 3:8-9, 15-

20, 1:152. Particular Shipments in Transit would involve not only containers but also chassis and

gen sets. Tr. 3:9-10, 1:153.

Sea Star wanted to ensure that NPR customers were served and that Shipments in

Transit were safe, secure, and delivered to their destinations. Tr. 3:39-40. After several meetings,

Sea Star and NPR representatives agreed to a memorandum which delineated payment and claim

procedures for cargo Shipments in Transit, whether the equipment was on ships or at some other

point in the transit process at the time of the closing. Tr. 3:6-8, 10-14, 52-53; Tr.Ex. 2. Since they

could not ascertain actual costs and cargo volumes before the fact, NPR personnel developed volume

and rate estimates for Mr. Leetch's review. Tr. 3:13-14, 25-26, 29-32.

To estimate equipment costs for cargo onboard the ships at closing, NPR utilized a

blended rate for containers and chassis and a fourteen-day average turnaround time for equipment

in Puerto Rico. Tr. 3:30-31; Tr.Ex. 2 at 3. NPR furnished no other rate scenarios and no average

turnaround times for equipment on the mainland. Tr. 3:32. In its projections, NPR did not identify

owners or lessors of cargo equipment that might be involved in Shipments in Transit. Tr. 3:30. NPR

and Sea Star established reimbursement procedures, if a party invoiced and substantiated actual costs

exceeding estimated expenses to complete Shipments in Transit. Tr. 3:14-15.

When NPR sought the bankruptcy court's approval of the proposed asset sale, MBC's and Emerald's attorneys objected. Tr.Ex. 5; D.I. 137 ¶ 3(g). Among concerns they expressed were payment obligations for equipment leased by NPR that would be involved in Shipments in Transit and for storage charges that Sea Star would impose on Emerald and MBC equipment. Tr.Ex. 5 at 28-41.[4] The court overruled "the Emerald entities" objections and held that any arguable rights of equipment lessors and lienors would be preserved against the sale proceeds. Tr.Ex. 5 at 41.

During the hearing, NPR's counsel presented the plan for Shipments in Transit to the bankruptcy court. Tr. 3:39; Tr.Ex. 5 at 56-58. He confirmed that components of Sea Star payments included NPR's projected equipment leasing and financing costs, labor, materials, and other factors involved in transporting Shipments in Transit from origin to destination points. Also, he acknowledged that NPR might be subject to administrative claims, until equipment utilized for Shipments in Transit was out of service. Tr.Ex. 5 at 56-58.

On April 26, 2002, the bankruptcy court issued the Sale Order. Tr.Ex. 6. The court found and determined:

> The sale of assets does not amount to a consolidation, merger, *de facto* merger or similar restructuring of either or both of the Buyer and the Debtors.
>
> Buyer is only buying the Purchased Assets and is not a successor in interest to Debtors, nor does Buyer's acquisition of the Purchased Assets reflect a substantial continuation of the operations of the Debtors' business.

Tr.Ex. 6 at 3-4, ¶¶ 15, 16. Overruling all objections that had not been withdrawn, the bankruptcy

---

[4]MBC's attorney also advised the bankruptcy court that "even if the 30-day mark that Sea Star's talking about,...my understanding in the turnover in the industry is there will be equipment that's not back by then. And certainly at some point we're going to face storage charges by Sea Star, and we're not in a position to...stop those by going and taking our collateral." Tr.Ex. 5 at 60.

court authorized Sea Star's acquisition of the specified NPR assets. Tr.Ex. 6 at 5 ¶¶ 2, 3.

Sea Star refused to acquire, assume, or accept assignment of any equipment agreements between Emerald and NPR or Holt Cargo. D.I. 137 ¶ 3(h). While Sea Star was engaged in a due-diligence investigation, Thomas Holt, Sr. had sent Robert Leetch, Sea Star's chief financial officer, a proposal to lease-purchase the "currently leased" Emerald equipment fleet, which was alleged to have been at least 12,000 pieces. Tr. 1:190, 3:5; Tr.Ex. 1. Mr. Holt was, and remains, Emerald's sole stockholder and president; he also had been owner and president of NPR. Tr. 1:181-82, 184, 218; HSR at 15-16; EM.I at 19, 86-87.

A few days after receiving the letter, Mr. Leetch rejected the proposal. Tr. 1:190, 3:5-6, 24; HSR at 96-98.[5] Sea Star personnel were not satisfied with the accuracy of NPR record-keeping, particularly as to existence and service condition of the equipment. They also found the equipment old and in poor repair. Tr. 3:5, 1:12. According to Mr. Holt, the average age of the equipment approximated 12 years. Tr. 1:187.

As to equipment not purchased or leased by Sea Star, the court ordered:

> [T]o the extent that any equipment of Emerald Equipment Leasing, Inc. ("Emerald"), or any other lien or lessor creditor whose property is not being sold or transferred to Buyer, is located on property sold or assigned to Buyer under the Asset Purchase Agreement, the Buyer shall cooperate in allowing Emerald...to remove such property during normal business hours as long as such removal will not unreasonably disrupt operations of the Buyer. In addition, the Buyer shall cooperate in removing any such equipment from Vessels in transit and store such equipment on leased premises

---

[5]From Mr. Holt's perspective, the Emerald-NPR lease was not "a specific unit per-diem lease that was entered into with Sea Star and Emerald." EM.II at 23. The Emerald-NPR lease "was a grossed-up lease..., where the total fleet of Emerald would be leased by NPR for a period of time." EM.II at 27. His "whole theory was you were going to take the entire fleet, but it just wasn't going to be. [Sea Star] didn't need the entire fleet." HSR at 106.

at the final port of destination, to the extent such final destination is a leased premises sold and assigned to the Buyer under the Asset Purchase Agreement....

...

Except as expressly provided in the Asset Purchase Agreement, Buyer has not assumed or otherwise become obligated for any of the Debtors' liabilities. Consequently, after closing of the sale to Buyer, all creditors of the Debtors, whether known or unknown, are hereby enjoined from asserting or prosecuting any claim or cause of action against Buyer or the Purchased Assets to recover on account of any liability owed by the Debtors.

Tr.Ex. 6 at 8-9 ¶¶ 13, 15. The court retained jurisdiction to "[i]nterpret, implement and enforce the terms and provisions of this [Sale] Order and the terms of the Asset Purchase Agreement, all amendments thereto and any waivers and consents thereunder and of each of the agreements executed in connection therewith" and to adjudicate certain other issues, including but not limited to "successor claims." Tr.Ex. 6 at 12 ¶¶ 24(a),(e).

### 2. Post-Closing Transactions

The asset purchase closed at 3 a.m. on April 27, 2002. Tr. 3:11; D.I. 137 ¶ 3(j). In compliance with the Sale Order, Sea Star stored equipment of Emerald and other NPR lien or lessor creditors that was located on or returned to property Sea Star had acquired under the Asset Purchase Agreement. Tr. 1:13. MBC and Emerald representatives knew Emerald equipment that had been leased to NPR remained in the San Juan terminal and would be stored on Sea Star's premises after the closing. Tr.Ex. 5 at 30-31, 60; EM.I 45-46, 198-99. According to Mr. Holt, "[a]ll the equipment belonged to Emerald that Navieras [NPR] had on the terminal in that [April 2002] time frame." HSR at 159.

Following procedures approved by the bankruptcy court, Sea Star paid NPR for the Shipments in Transit, including equipment expenses. EM.I at 76; Tr. 1:71. Neither Sea Star nor

NPR submitted additional requests for reimbursement. Tr. 3:15, 17, 18, 34. Later NPR confirmed: "No amount is due to NPR from Sea Star for use of Emerald Equipment being used at the time of Closing" or "for the use of Emerald Equipment located on a vessel purchased by Sea Star at the time of Closing." Tr.Ex. 10 at 10, nos. 11, 12. Thus, Sea Star has owed no rent for Emerald equipment involved in Shipments in Transit. Tr. 1:53, 204; D.I. 137 ¶ 3(s); EM.I at 89, 175.

In a June 11, 2002 letter, Thomas Holt, Jr., on behalf of Emerald, requested that Sea Star "remit a check in accordance with the attached letter from MBC Leasing, Corp." for equipment used by Sea Star. Tr. 1:17-18; Tr.Ex. 8. The attached letter, dated June 10, 2002, from Scott Krieger of MBC instructed Mr. Holt, Sr.:

> Any money due from Sea Star for use of any of containers, gensets, and chassis previously leased by Emerald Equipment Leasing to NPR, Inc. and Holt Cargo Systems for a purpose other than completing shipments in progress on April 27 when Sea Star purchased certain assets of NPR and Holt Cargo should be paid directly to MBC Leasing. Any money due from Sea Star for use of any of the Emerald equipment to complete shipments in progress on April 27 should be paid in accordance with the memorandum that MBC understands exists between Sea Star and NPR, Holt Cargo, and possibly other affiliates to be allocated in accordance with the Bankruptcy Court's ruling on the allocation of proceeds of sale to Sea Star.

Tr.Ex. 8 at 2. Mr. Holt, Sr. has confirmed that MBC "held the financial interests on the equipment" titled in the name of Emerald. Tr. 1:197-98; HSR at 34.

As of June 30, 2002, MBC entered into an Independent Contractor Agreement with Greenwich, a company headed by Mr. Holt, Jr. Tr.Ex. 9; Tr. 1:125, 159-60. Mr. Krieger of MBC

informed Sea Star in a July 19 letter:

> Please be advised that Greenwich Terminals, LLC is authorized as MBC Leasing Corp.'s agent for the following purposes:
>
>> 1.    Assembling and storing Emerald Leasing's equipment.
>>
>> 2.    Soliciting purchasers and selling the Emerald Leasing equipment.
>
> The authorized representatives of Greenwich Terminals, LLC are:
>
>> Thomas Holt, Jr.
>> Arthur Davis
>> Martin McDonald

Tr. 1:16-17, 164-65; Tr.Ex. 13; *see* EM.I at 123-25.  Francisco Gonzalez also represented MBC and Emerald in San Juan, Puerto Rico.  Tr. 1:17;  EM.I at 158-59; ROB at 90; EM.II at 13-14.  In the Port of Jacksonville, Florida, General Transportation Services, Inc. represented MBC and Emerald.  Tr. 1:160-61; Tr.Ex. 11.  MBC paid all bills, including Greenwich invoices for agency and individuals' services and expenses.  Tr. 1:162-64; Tr.Exs. 13, 28, 33, 37; EM.I at 157-58; HSR at 142-43.

On July 22, 2002, the bankruptcy court issued an Order Terminating the Automatic Stay as to MBC, effective April 29, 2002.  Tr.Ex. 14.  The Order authorized MBC to foreclose its security interest and to remove from Emerald's possession and sell Emerald equipment.  Tr.Ex. 14; D.I. 137 ¶ 3(o).  Sale proceeds would be applied to Emerald's indebtedness to MBC.  Tr.Ex. 14.

### 3.    MBC-Sea Star Indemnity Agreement

To induce Sea Star's direct payment for use of "EMERALD EQUIPMENT" — *i.e.,* equipment previously leased by Emerald to NPR and Holt Cargo pursuant to the November 18, 1997 Equipment Lease Agreements, MBC executed an Indemnity Agreement, dated September 28, 2002.

Tr. 1:24; Tr.Ex. 19; D.I. 137 ¶ 3(p). MBC agreed to indemnify and defend Sea Star "against claims of COMPETING CLAIMANTS [specifically including Emerald] on the terms and conditions set forth" in the Indemnity Agreement. Tr.Ex. 19 at 1-2. The Agreement further states:

1. Agreement to Pay for Use of Equipment. ...SEA STAR will remit to MBC...(a) for each item of the EMERALD EQUIPMENT used during the period of April 27, 2002 through and including July 31, 2002, the amount determined by multiplying the applicable daily rate specified on "Equipment Schedule A"...by the number of days during that period in which such item of EMERALD EQUIPMENT was used...after deduction of such reasonable charges as are due to SEA STAR for storage and handling of EMERALD EQUIPMENT.... Beginning on August 31, 2002 and continuing on the last day of each month thereafter, SEA STAR shall remit to MBC for each item of EMERALD EQUIPMENT in SEA STAR'S possession during that month or portion thereof compensation of the daily rates specified on the EMERALD SCHEDULE from the first day of the month through and including the earliest of: (a) the day on which SEA STAR purchases such item and pays the purchase price therefor; (b) the day on which SEA STAR makes such item available for removal from SEA STAR'S possession by MBC; or (c) the last day of the month after deduction of such reasonable charges as are due to SEA STAR for storage and handling of EMERALD EQUIPMENT....

2. Waiver of Further Claims by MBC for Use of Equipment. MBC acknowledges and agrees that the compensation rates set forth in "Equipment Schedule A"...represent fair and reasonable compensation for the use of the EMERALD EQUIPMENT...by SEA STAR and that provided SEA STAR pays the amounts specified in Section 1 of this AGREEMENT for each item of EMERALD EQUIPMENT...that it has used during the applicable period when and as due, subject to deductions specified in Section 1, MBC will assert no further claims against SEA STAR for compensation for the use of the EMERALD EQUIPMENT...by SEA STAR.

...

4. Agreement to Indemnify and Defend. Provided that SEA STAR provides MBC with prompt written notice of any claims, causes of action, liabilities, or damages asserted against SEA STAR by any COMPETING CLAIMANT relating to any COMPETING CLAIMANT'S alleged entitlement to compensation for use of EMERALD EQUIPMENT or MBC EQUIPMENT during any period

for which SEA STAR has paid MBC pursuant to this AGREEMENT (a "PROCEEDING"), MBC will defend the PROCEEDING at its expense. MBC acknowledges and agrees that if the BANKRUPTCY COURT or any other court of competent jurisdiction (a "COURT") determines in a PROCEEDING that a COMPETING CLAIMANT is entitled to be compensated for use of any EMERALD EQUIPMENT... for any period for which SEA STAR has paid MBC pursuant to this AGREEMENT, within five (5) business days after receipt by MBC of written demand by SEA STAR, MBC will remit to SEA STAR by certified check, cashier's check, or wire transfer the lesser of: (a) the amount to which the COURT determined the COMPETING CLAIMANT is entitled for that period; or (b) the amount, net of deductions specified in Section 1, paid by SEA STAR to MBC pursuant to this AGREEMENT for use of the pertinent item or items of EMERALD EQUIPMENT...during that period...[and] interest ....

...

6. <u>Amendment</u>. This AGREEMENT shall not be amended, changed or modified, except by an agreement in writing, signed by the party against whom enforcement of the change is sought.

<u>Tr.Ex.</u> 19 ¶¶ 1, 2, 4, 6. No amendment, change, modification, or assignment occurred. On October 4, 2002, Sea Star sent MBC a check for *per diem* use of Emerald equipment from April 27 through July 31, 2002, less storage and handling. <u>Tr.</u> 1:20, 27-28, 87; <u>Tr.Ex.</u> 23. With its letter, Sea Star enclosed self-billing report summaries, corresponding to detailed self-billing reports previously submitted, and detailed storage and handling invoices. <u>Tr.Ex.</u> 23.

### 4.    **Emerald-Sea Star Rental Agreement**

After MBC gave requisite approval to the contract form and substance, Sea Star and Emerald signed the Rental Agreement, dated as of July 31, 2002. <u>Tr.</u> 1:25, 194; <u>Tr.Ex.</u> 17; <u>D.I.</u> 137 ¶ 3(q); <u>EM.I</u> at 104-07. The short-term Rental Agreement pertains to individual pieces of equipment, not a fleet. <u>Tr.</u> 1:113; <u>EM.II</u> 23, 27. Contractual terms and conditions "cover equipment in use at various times commencing April 29, 2002." <u>Tr.Ex.</u> 17 at 1.

With respect to delivery and on-hire, the Rental Agreement requires:

    1.    <u>Equipment</u>. ...Delivery of all equipment to Lessee [Sea Star] or its agents by Lessor [Emerald] shall be effected and evidenced by signed and dated equipment interchange receipts and shall be subject to the terms and conditions of this Agreement.

    2.    <u>Term</u>. The lease term for each item of Equipment shall begin on the date when such Equipment is delivered to Lessee or its agent and shall end on the date when such Equipment is taken off hire pursuant to section 10 below....

<u>Tr.Ex.</u> 17 ¶¶ 1, 2.

Regarding redelivery and off-hire, the Rental Agreement provides in pertinent part:

    10.  <u>Redelivery of Equipment</u>.

    (a) At its sole expense, Lessee shall redeliver Equipment to Lessor at Greenwich terminal, Philadelphia, Pennsylvania; Sea Star terminal, Puerto Nuevo, San Juan, Puerto Rico; Greenwich terminal, Port of Jacksonville, Florida; or any other location as to which the parties have agreed in writing....

    (b)    Upon redelivery of particular Equipment, the receiving terminal will execute an equipment interchange receipt....

    ...

    (e)    At the time of return, Equipment will be taken off hire; and rental charges will cease....

<u>Tr.Ex.</u> 17 ¶¶ 10(a), (b), (e); <u>Tr.</u> 1:114.

Expressly "subject and subordinate to any lease or security interest in favor of a third-party lessor or lender to Lessor" [<u>Tr.Ex.</u> 17 ¶ 4(b)], the Rental Agreement further states:

    14.  <u>Applicable Law</u>. This Agreement shall be interpreted and the rights, liabilities and duties of the parties determined in accordance with the laws of the State of Maryland.

    15.  <u>Miscellaneous</u>. (a)...This Agreement contains the entire agreement between the parties and, subject to the provisions of section 1, may not be amended, altered or modified, except by a writing signed by the party to be bound.

Tr.Ex. 17 ¶¶ 14, 15(a); Tr. 1:195.  No amendments, alterations, or modifications occurred.  Tr. 1:26,

194; EM.I at 122.

MBC, not Emerald, was entitled to receive — and did receive — the monetary

payments and other compensation for use of Emerald equipment during the period covered by the

Rental Agreement and Sea Star self-billing reports.  Tr.Exs. 8, 17; EM.I at 91-92; EM.II at 42; D.I.

158 at 15.[6]  Likewise, MBC received the sale proceeds.  Tr. 1:209-10.  "Emerald never got a dime."

Tr. 1:198.  In January 2003, MBC filed a Motion for Allowance and Payment of Administrative

Priority Claims in the NPR Bankruptcy Action.  Tr.Ex. 27.  MBC's motion covers "continued use of

the Sea Star Emerald Equipment" through June 11, 2002.  Tr.Ex. 27 at 14-16.

### 5.    MBC-Storage Loan Sale & Assignment Agreement

Effective November 1, 2003, MBC, as assignor, and Storage, as assignee, executed

a Loan Sale and Assignment Agreement ("Assignment Agreement").  Tr.Ex. 42; ST at 11, 17.  The

outstanding balance of MBC's loan to Emerald consisted of $2,892,662.16 principal; $821,969.73

late charges; and $915,532.61 interest.  Tr.Ex. 42 ¶ 7a.  Storage agreed to purchase the MBC loan for

$650,000.00, plus 20% "of the net amount, after deduction of reasonable attorneys' fees and other

reasonable collection expenses" of any amount Storage received from Sea Star.  Tr.Ex. 42 ¶¶ 2, 3.[7]

---

[6]Emerald's attorney has acknowledged:

> Sea Star prepared these self-billing reports.  They sent them to MPC
> (*sic*) because they had an assignment of lease.  They had relief from
> stay.
> They [MBC] were entitled to the proceeds....

D.I. 158 at 15.

[7]On October 30, 2003, MBC had informed Thomas Holt, Jr. of its "deal in principle" to sell
the Emerald loan documents to his father.  Tr.Ex. 40.  He thought Mr. Holt, Sr. had purchased the

Entitled "<u>No Competing Claim Against Sea Star</u>", paragraph 6.3 of the Assignment

Agreement states:

> ASSIGNEE [Storage] agrees not to assert any entitlement to
> compensation from Sea Star for use of EMERALD EQUIPMENT
> during any period for which Sea Star has paid ASSIGNOR [MBC]
> pursuant to the Sea Star INDEMNITY [the MBC-Sea Star Indemnity
> Agreement].

<u>Tr.Ex.</u> 42 ¶ 6.3. As defined in the Assignment Agreement, "EMERALD EQUIPMENT" is "certain

equipment securing payment of the LOAN" from MBC to Emerald, evidenced by defined

"ASSIGNED DOCUMENTS". <u>Tr.Ex.</u> 42 ¶ 3. MBC gave Storage no other assignments. <u>ST</u> at 24-25.

### 6.    "<u>Carveouts</u>"

In a letter dated February 25, 2004, Gary M. Schildhorn, an Emerald attorney, wrote

Ms. Robins:

> I am advised that Storage Transfer, L.L.C. ("Storage") has acquired
> the secured position of MBC Leasing Company in the Estate of
> Emerald Equipment Leasing, Inc. ("Emerald"). Emerald currently
> intends to prosecute certain substantial claims against Sea Star Lines
> LLC. Storage has agreed to contribute to the Emerald estate 15% of
> any proceeds, net of expenses or other amounts disbursed to third
> parties, it would otherwise receive on account of its secured claim as
> a result of any settlement of the Sea Star claim or the collection of any
> judgment obtained upon prosecution of this claim....

<u>Tr.Ex.</u> 49. As Storage's "Sole Member," Ms. Robins "AGREED TO AND ACCEPTED" this

"carveout" by signing the letter. <u>Tr.Ex.</u> 49 at 2; <u>ST</u> at 28-29.

Emerald's dealings with Sea Star has been "on behalf of the creditors"; Storage, its

---

documents. <u>Tr.</u> 1:174-75. However, Lorraine Robins, a former assistant to Mr. Holt, Sr. and officer
of Holt Cargo Systems, who had been an employee of various Holt companies for 45 years, formed
Storage and signed the Assignment Agreement. <u>ST</u> at 17; <u>ROB</u> at 11-12, 15; <u>HSR</u> at 21.

secured creditor, expects to collect the money. <u>ST</u> at 30, 33-34, 65.  According to Ms. Robins, Storage expenses will include not only amounts paid to third parties but also telephone, office equipment and rent, and contract employees, as well as her unspecified salary. <u>ST</u> at 31, 46.  Any carveout in favor of Emerald is subject to carveouts for Emerald legal fees, which Storage began paying after execution of the Assignment Agreement. <u>Tr.Exs.</u> 50, 57; <u>ST</u> at 33-34, 46-48.  Until collections are complete, all legal fees and expenses are paid, and MBC receives its 20 percent share, Storage cannot calculate whether Emerald would receive any carveout. <u>ST</u> at 65-66.  Moreover, Ms. Robins must "write myself a letter" to determine her salary. <u>ST</u> at 46.  Unlike Storage, MBC is not a party to any "carveout agreement" with Emerald or its attorneys. <u>ST</u> at 67.

### 7.  <u>Self-Billing Reports</u>

Generated out of Sea Star's computer system, the monthly reports sent to MBC and Emerald reflected equipment purchases and use, as well as storage and handling charges.  One purpose of the self-billing reports was to recapitulate the mutual accounts between Sea Star and MBC. <u>Tr.</u> 1:115.  Each report referenced individual unit type and number, on-hire date, location, number of days in billing month, and rate. <u>Tr.</u> 1:19.  Attached was documentation regarding handling and storage of Emerald equipment. <u>Tr.</u> 1:18-19; <u>Tr.Ex.</u> 61.  Sea Star's practice of sending self-billing reports to MBC and Emerald continued through 2003, after Emerald terminated the Rental Agreement. <u>Tr.</u> 1:20; <u>Tr.Exs.</u> 61, 65-D; <u>D.I.</u> 149 at 5.

Emerald's goal was to audit Sea Star's self-billing reports, but payments under the self-billing reports were to MBC. <u>EM.II</u> at 42, 56, 68-69; <u>EM.I</u> at 91-92; <u>D.I.</u> 158 at 15; <u>Tr.</u> 1:198.  When Mr. Davis received self-billing reports in July 2002, he Mr. Davis became aware of discrepancies. <u>Tr.</u> 2:212-13.  Emerald's sole owner, president, and corporate designee, Mr. Holt, Sr. has testified:

"As soon as they got the first one and then compared it to the second one, it was brought to my attention." <u>Tr.</u> 1:214.  After Emerald began discovering mistakes in Sea Star self-billing reports, Emerald "certainly did not rely on the accuracy" and "were complaining bitterly" about the self-billing reports, "right from the get-go" in June, July, or August 2002. <u>EM.II</u> at 29, 58-59, 69; <u>ST</u> 63. Emerald corrected every self-billing report and pointed out discrepancies "many times". <u>EM.II</u> at 59, 69.  Sea Star "agreed" and "disagreed" with Emerald corrections. <u>EM.II</u> at 65.

## SUMMARY OF ARGUMENTS

Express written provisions of the Rental Agreement and the Sale Order delineate and define the parties' rights and obligations. The Rental Agreement, which is the formal documented contractual arrangement between the parties, constitutes their "entire agreement." Emerald nonetheless has ignored the Rental Agreement's and the Sale Order's explicit requirements and limitations and has asserted claims which contravene their terms.

1.     Emerald is not a real party in interest and lacks the requisite "personal stake in the outcome" of any controversy to sue Sea Star. Serving as a stalking horse, Emerald actually is attempting to assert alleged legal rights and interests of third parties, namely MBC and Storage, against Sea Star. Emerald's role has been to assist MBC and Storage in collections and liquidation of equipment; its dealings with Sea Star has been "on behalf of the creditors." Storage, its secured creditor, expects to collect any funds, which MBC anticipates sharing.

Even if Emerald could function as a real party in interest as to certain claims under the Rental Agreement, paragraph 6.3 of the Assignment Agreement withholds assignment to — and proscribes assertion by — Storage of any entitlement to compensation from Sea Star for use of Emerald equipment during any period in which Sea Star paid MBC. Emerald's undefined, indeterminate derivative "carveout" rights can be no greater than Storage's rights under the Assignment Agreement. Consequently Emerald is prohibited from asserting any claim for *per diem* rental of Emerald equipment.

2.     As a matter of law, the economic-loss rule precludes Emerald's tort claims, which are interwoven with its breach-of-contract claim. None of the alleged torts is separate from and independent of the alleged breach of contract. Even if Emerald could assert tort claims, the

undisputed material facts confirm that Emerald began to contest Sea Star self-billing reports during summer 2002 and cannot prove reliance.

        3.     Since Emerald admittedly sold recovered equipment without prior notice to Sea Star, the Rental Agreement and Maryland law bar Emerald's claims for "Adjusted Stipulated Loss Value" against Sea Star. Furthermore, the Rental Agreement and Maryland law bar Emerald's claims for punitive damages.

        4.     The Maryland statute of limitations bars claims initially asserted by Emerald in the Amended Counterclaim and in Emerald spreadsheet "invoices" more than three years after accrual. With respect to such claims, the relation-back doctrine is inapposite.

## ARGUMENT

Because the Rental Agreement is a maritime contract, this Court has jurisdiction

pursuant to 28 U.S.C.A. § 1333. *See Interpool Ltd. v. Char Yigh Marine (Panama) S.A.*, 890 F.2d

1453, 1457 (9th Cir. 1989); *CTI-Container Leasing Corp. v. Oceanic Operations Corp.*, 682 F.2d

377, 379-80 (2d Cir. 1982); *Interpool, Ltd. v. Bernuth Agencies, Inc.*, 959 F. Supp. 644, 650

(S.D.N.Y. 1997), *aff'd* 129 F.3d 113 (2nd Cir. 1997) (Table). Sea Star and Emerald have specified

that Maryland law shall govern interpretation of the Rental Agreement and determination of the

parties' rights, duties, and liabilities. Tr.Ex. 17 ¶ 14. With respect to the issues *sub judice*, the

choice-of-law provision does not impinge on maritime law. *See Lauritzen v. Larsen*, 345 U.S. 571,

588-89 (1953); *LaSalle Bank Nat'l Ass'n v. Lehman Bros. Holdings, Inc.*, 237 F. Supp.2d 618, 626

(D. Md. 2002).

> As to summary judgment, Fed R. Civ. P. 56(c) provides in pertinent part:
> The judgment sought shall be rendered forthwith if the pleadings,
> depositions, answers to interrogatories, and admissions on file,
> together with the affidavits, if any, show that there is no genuine issue
> as to any material fact and that the moving party is entitled to a
> judgment as a matter of law.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Applicable substantive law determines

what facts are material. *Id.* at 248.

Once Sea Star has satisfied its initial burden under Rule 56(c), Emerald must submit

evidence showing specific facts as to which genuine issues remain for trial. *Celotex Corp. v. Catrett*,

477 U.S. 317, 323 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587

(1986). The focus is on "whether the evidence presents a sufficient disagreement to require

submission to a [fact finder] or whether it is so one-sided that one party must prevail as a matter of

law." *Anderson*, 477 U.S. at 243. *Accord, Dici v. Commonwealth of Pa.*, 91 F.3d 542, 547 (3d Cir. 1996). If Emerald fails to make a sufficient showing on an essential element of its burden of proof, Sea Star is entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 322-23; *Tse v. Ventana Med. Sys., Inc.*, 297 F.3d 210, 218 (3d Cir. 2002).

Examining the Rental Agreement, this Court has adhered to the "objective interpretation of contracts" under Maryland law. D.I. 75 at 10 (citation omitted). The Court has held:

> The Equipment Rental Agreement 'cover[s] equipment in use at various times commencing April 29, 2002.'... It also contains an Integration Clause which states that '[t]his Agreement contains the entire agreement between the parties and subject to the provisions of section 1, may not be amended, altered, or modified, except by a writing signed by the party to be bound.'... Based on this language, the Court concludes that a reasonable person reading the Equipment Rental Agreement would not find any ambiguity in its terms....
>
> ...
>
> [E]xtrinsic evidence is not required to illuminate the meaning of the Equipment Rental Agreement because it is not ambiguous when viewed from the standpoint of a reasonable person.... As Emerald acknowledges in its Counterclaim, the Equipment Rental Agreement was the parties' formal documentation of the leasing arrangement that had existed previously.... Further, the Equipment Rental Agreement has an Integration Clause expressing the parties' intent that the Equipment Rental Agreement be "the entire agreement between the parties."

D.I. 75 at 11-13 (references & citations omitted).

Because the words of the Rental Agreement "have a plain and obvious meaning, all construction, in hostility with such meaning is excluded." *Norfolk Southern Ry. v. James N. Kirby, Pty. Ltd.*, 543 U.S. 14, 32 (2004). Emerald's owner and president, Mr. Holt, has conceded that the Rental Agreement "refers to all equipment that Sea Star had of Emerald's" and governs the

contractual relationship between Sea Star and Emerald. HSR at 126-27.[8]  Emerald is "bound by the

[Rental Agreement] itself, construed by the same rules of law which govern all other contracts." *Gill*

*v. Computer Equip. Co.,* 292 A.2d 54, 58 (Md. 1972).

### I.    Emerald Is Not a Real Party in Interest and Lacks Standing to Prosecute Claims Against Sea Star.

The threshold issue is whether Emerald is a real party in interest. *See Steel Co. v.*

*Citizens for a Better Env't,* 523 U.S. 83, 111 (1998).  To function as the real party in interest for

purposes of Fed. R. Civ. P. 17(a), Emerald must hold the substantive legal rights sought to be

enforced.  As explained by the Third Circuit, the related doctrine of standing encompasses both

constitutional requirements and prudential considerations. *Township of Piscataway v. Duke Energy,*

488 F.3d 203, 208-09 (3d Cir. 2007). Generally a party must assert its own legal rights and interests,

not third parties' legal rights and interests. *Warth v. Seldin,* 422 U.S. 490, 499 (1975); *Discover Bank*

*v. Vaden,* 489 F.3d 594, 601-02 (4th Cir. 2007); *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d

114, 117-18 (2d Cir. 1991).

Under governing Maryland law, a "'real party in interest' must have 'an actual, real

and justiciable interest susceptible of protection through litigation.'" *Akparewa v. Amoco Oil Co.*,

771 A.2d 508, 519 (Md. Ct. Spec. App. 2001), *quoting Boyd v. Hickman*, 689 A.2d 106, 116 (Md.

App. 1997); *see Discover Bank,* 489 F.3d at 601-03; *LaSalle Bank*, 237 F. Supp.2d at 626, 632.  *See*

*also* Tr.Exs. 17 ¶ 14, 42 ¶ 18.  As Mr. Holt has testified, however, Emerald's role merely has been

to "assist[] MBC in trying to collect monies anywhere they could, including from Sea Star, attempting

---

[8]From his perspective, the Emerald-NPR Equipment Lease and the Emerald-Sea Star Rental Agreement were fundamentally different: The Emerald-NPR lease was a "grossed up lease" of the "total fleet of Emerald...for a period of time," not "a specific unit per-diem lease that was entered into with Sea Star and Emerald." EM.II at 23, 27.

to properly invoice the leasing of the equipment to Sea Star and the liquidation of equipment that Sea Star was not using so the money could flow to MBC." <u>HSR</u> at 34-35. According to Ms. Robins, Emerald's dealings with Sea Star has been "on behalf of the creditors." Storage, its secured creditor, expects to collect the money, which MBC anticipates sharing. <u>ST</u> at 30, 33-34, 65; <u>Tr.Ex.</u> 42 ¶¶ 2, 3.

Manifestly, Emerald does not have the requisite actual, real and justiciable interest susceptible of protection through litigation. Instead, Emerald serves as a stalking horse, attempting to assert alleged legal rights and interests of third parties — *e.g.,* MBC and Storage. Its undefined, indeterminate "carveout" from Storage several months after the Assignment Agreement is illusory. <u>Tr.Ex.</u> 49. Therefore, Emerald is not a real party in interest.

Even assuming that Emerald could demonstrate a legal right to maintain any claims asserted in the Amended Counterclaim, Emerald cannot be a real party in interest regarding *per diem* rental claims against Sea Star. Because the Rental Agreement is expressly "subject and subordinate to any lease or security interest in favor of a third-party lessor or lender to Lessor" [<u>Tr.Ex.</u> 17 ¶ 4(b)], any arguable interest of Emerald always has remained subordinate to that of MBC, its secured lender. Under the Indemnity Agreement, MBC, not Emerald, was entitled to receive — and did receive — the compensation for use of Emerald equipment during the period covered by the Rental Agreement and Sea Star self-billing reports, which reflected Sea Star and MBC exchanges of payments and credits through December 2003. <u>Tr.Exs.</u> 8, 17; <u>EM.I</u> at 91-92; <u>EM.II</u> at 42; <u>D.I.</u> 158 at 15. Emerald was not entitled to compensation from Sea Star for use of the Emerald equipment pursuant to the Rental Agreement and "never got a dime." <u>Tr.</u> 1:198.

In the Assignment Agreement, MBC clearly and unambiguously has prohibited

Storage's assertion of "any entitlement to compensation from Sea Star for use of EMERALD EQUIPMENT during any period for which Sea Star has paid ASSIGNOR pursuant to the Sea Star INDEMNITY." Tr.Ex. 42 ¶ 6.3. Adhering to the principle of objective contractual interpretation, the provision is unambiguous: the Court gives effect to its plain meaning and does not contemplate any alleged subjective intent at the time of formation. *Cochran v. Norkunas,* 919 A.2d 700, 709-10 (Md. App. 2007); *First Union Nat'l Bank v. Steele Software Sys. Corp.,* 838 A.2d 404, 447-48 (Md. Ct. Spec. App. 2003). Emerald, like Storage, is bound by the Assignment Agreement and may not disregard the explicit contractual limitations and prohibitions. No undefined, indeterminate "carveout", granted by Storage to Emerald for purposes of initiating litigation, can encompass a broader claim – or interest – than that specifically assigned by MBC to Storage. *See, e.g., Perpetual Fin. Corp. v. United States,* 61 Fed. Cl. 126, 143 (2004) (incidental, contingent, remote interest). Contractually and legally, Emerald lacks the requisite "personal stake in the outcome" to sue Sea Star with respect to any matter covered by paragraph 6.3, including claims for *per diem* rent. *Warth,* 422 U.S. at 498-99; *Accord, Shearson Lehman Hutton, Inc.,* 944 F.2d at 117-18; *see Caplin v. Marine Midland Grace Trust Co. of New York,* 406 U.S. 416, 428-33 (1972); *Township of Piscataway,* 488 F.3d at 208-09; *In re Dykes,* 10 F.3d 184, 187-88 (3d Cir. 1993).

> **II.    As a Matter of Law, Emerald Has Not Asserted and Cannot Prove Tort Claims against Sea Star.**

> **A.    Independent Legal Duty/Economic Loss Doctrine**

The seminal decision articulating the economic loss doctrine is maritime, *East River S.S. Corp. v. Transamerica Delaval, Inc.,* 476 U.S. 858 (1986), under which, Emerald's tort claims fail. Moreover, under any state's law the Court might find controlling [D.I. 75 at 23-24 n.5],

Emerald's tort claims cannot survive. Counts IV through VII[9] are expressly "undergirded by factual

allegations identical to those supporting [EMERALD's] breach of contract counts." *Werwinski v.*

*Ford Motor Co.*, 286 F.3d 661, 678 (3rd Cir. 2002), *quoting Public Service Enterprise Group, Inc.*

*v. Philadelphia Elec. Co.*, 722 F. Supp. 184, 201 (D.N.J. 1989); *see* Fed. R. Civ. P. 10(b). Indeed,

the Amended Counterclaim "incorporates" the breach-of-contract paragraphs into each tort count,

highlighting their interdependence. D.I. 79, ¶¶ 29, 41, 45, 51.

In the Amended Counterclaim, Sea Star "self billing reports" comprise the predicates,

not only for Emerald's fraud and negligence claims but also for its breach-of contract claims.

Initially, Emerald alleges with respect to the breach of contract claim:

> Under these circumstances, in order to ascertain rental payments due for the Emerald Equipment, Sea Star provided Emerald with monthly "self-billing reports", whereby Sea STAR undertook the obligation to report to Emerald its "usage" of the Emerald Equipment.

> Upon later investigation, Emerald discovered that the "self-billing reports" prepared by Sea Star were grossly understated, failing, <u>inter alia</u>, to account for numerous pieces of Emerald Equipment which Sea Star had been using without paying rental charges to Emerald and failing to pay the appropriate amounts for usage of equipment contained in the "self-billing reports".

D.I. 79 ¶¶ 14, 15. Emerald then expressly incorporates these allegations into all seven counts of the

Amended Counterclaim. D.I. 79 ¶¶ 17, 22, 25, 29, 41, 45, 51.

Sea Star's alleged tort duties pertain to "rental payments" specified in the Equipment

Rental Agreement for "use" or "usage of Emerald Equipment" covered by the Rental Agreement.

*E.g.*, D.I. 79 ¶¶ 31, 32, 33, 34, 42, 43, 46, 47, 52, 55, 57. Clearly, Emerald's tort claims are

---

[9]Count IV is a claim for fraud; Count V is a claim for constructive fraud; Count VI is a claim for fraudulent concealment; and Count VII is a claim for negligent misrepresentation/breach of fiduciary duty.

"interwoven with" and "but another thread in the fabric of [its] contract claim." *Huron Tool &*

*Eng'g Co. v. Precision Consulting Servs., Inc.*, 532 N.W. 2d 541, 545 (Mich. Ct. App. 1995),

*quoting Public Serv. Enter. Group, Inc.*, 722 F. Supp. at 201. *Accord, Werwinski*, 286 F.3d at 676

(*Huron* leading case recognizing limited fraud-in-inducement exception, only if fraud "'extraneous

to the contract,'" not "'interwoven with the breach of contract'"). Counts IV through VII depend

solely on Sea Star's alleged performance or non-performance of contractual duties and are therefore

insufficient.

Furthermore, discovery discloses that any obligation to submit self-billing reports

would have existed solely by reason of and in relation to the Rental Agreement and the Indemnity

Agreement. *See Pinkert v. Oliveri, P.A.*, 2001 WL 641737, at *5 (D. Del.) (attached as Ex. A) (no

violation of common law duty independent of construction contract). *Pinkert* pointed out:

> [W]here an action is based entirely on a breach of the terms of a
> contract between the parties, and not on a violation of an independent
> duty imposed by law, a plaintiff must sue in contract and not in tort.
> [Citation omitted].    '[A breach of contract claim] cannot be
> 'bootstrapped' into a fraud claim merely by adding the words
> 'fraudulently induced' or alleging that the contracting parties never
> intended to perform.'

*Id., quoting Iotex Commc'ns, Inc. v. Defries*, 1998 WL 914265, at *5 (Del. Ch.). *Accord, Midland*

*Red Oak Realty, Inc. v. Friedman, Billings & Ramsey & Co., Inc.*, 2005 WL 445710, *3 (Del. Super.

Ct.) (attached as Ex. B) (dismissing fraud and negligence claims based on contractual obligations,

not "any common law duty independent of the contract terms"); *see Werwinski,* 286 F.3d at 680 &

n.8 ("gist of the action" doctrine barring replication of claim for breach of underlying contract);

*Odyssey Travel Center, Inc. v. RO Cruises, Inc.*, 262 F. Supp.2d 618, 627 (D. Md. 2003); *Public*

*Serv. Enter. Group, Inc.*, 722 F. Supp. at 200-01; *Wilmington Trust Co. v. Clark,* 424 A.2d 744, 754

(Md. 1981); *Heckrotte v. Riddle*, 168 A.2d 879, 881-82 (Md. 1961).

The economic loss doctrine "prohibits [Emerald] from recovering in tort economic losses to which [its] entitlement flows only from a contract." *Werwinski,* 286 F.3d at 671, *quoting Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 618 (3d Cir. 1995). *Accord, Sterling v. Beneficial Nat'l Bank, N.A.*, 1994 WL 315365, at *3 (Del. Super. Ct.), *aff'd*, 650 A.2d 1307 (Del. 1994)(Table) (attached as Ex. C). In *Werwinski* the Third Circuit explained:

> [T]he need to provide a plaintiff additional tort remedies is diminished greatly when (1) the plaintiff can be made whole under contract law, and (2) allowing additional tort remedies will impose additional costs on society. As we have said previously, 'when loss of the benefit of a bargain is the plaintiff's sole loss,...the undesirable consequences of affording a tort remedy in addition to a contract-based recovery [are] sufficient to outweigh the limited interest of the plaintiff in having relief beyond that provided by warranty claims.'

*Werwinski*, 286 F.3d at 680, *quoting Duquesne Light Co.,* 66 F.3d at 618-19.  Exemplified by *Werwinski*, controlling Third Circuit precedent mandates imposition of the economic loss doctrine.

## B.    Elements of Fraud

Even if the Amended Complaint could state tort claims separate from and independent of the Rental Agreement, Emerald cannot prove fraud.  To prevail on an intentional misrepresentation claim under Maryland common law, Emerald must establish the following facts by clear and convincing evidence:

1.    Sea Star made a false representation to Emerald;

2.    Falsity of the statement was either known to the Sea Star or the representation was made with reckless indifference as to its truth;

3.    The misrepresentation was made for the purpose of defrauding Emerald;

4.      Emerald had the right to rely and did rely on the misrepresentation in the full

belief of its truth and would not have taken action from which the injury

resulted if the misrepresentation had not been made; and

5.      Emerald suffered compensable damage directly resulting from the

misrepresentation.

*First Union Nat'l Bank,* 838 A.2d at 425-26.  In Maryland a fraud cause of action has a strict *scienter*

requirement, necessitating proof by clear and convincing evidence of a deliberate attempt to deceive.

*Id.* at 433.

Contradicting the testimony of Emerald's own witnesses, the Amended Counterclaim

falsely asserts that "Emerald had a right to rely and did in fact rely on the misrepresentations made

by Sea Star in the 'self billing reports'"; that "Emerald justifiably relied upon the fraudulently

prepared 'self billing reports'"; that "Sea Star knew that Emerald relied upon Sea Star to accurately

report the usage of the Emerald Equipment and the costs incurred"; that "Emerald's reliance upon

Sea Star's 'self billing reports' was not only justified, it was necessary to maintain the relationship

between the parties..."; and that Emerald having relied upon the 'self billing reports' provided by Sea

Star was damaged in that it was unable to collect the actual rents earned based on Sea Star's usage

of the Emerald Equipment."  D.I. 79 ¶¶ 39, 49, 54, 56, 57.[10]  To the contrary, Emerald's goal was

to audit Sea Star's self-billing reports. EM.II at 42, 56, 68-69; EM.I at 91-92; D.I. 158 at 15.  When

he received self-billing reports in July 2002, Mr. Davis became aware of discrepancies. Tr. 2:12-13.

---

[10]The documents and testimony have established that MBC, not Emerald, was entitled to
receive — and did receive — the compensation for use of Emerald equipment during the period
covered by the Rental Agreement and Sea Star self-billing reports, which reflected Sea Star and
MBC exchanges of payments and credits through December 2003.  Tr.Exs. 8, 17; EM.I at 91-92;
EM.II at 42; D.I. 158 at 15.  Emerald "never got a dime". Tr. 1:198.

Emerald "certainly did not rely on the accuracy" and complained "bitterly" about the self-billing reports, "right from the get-go" in June, July, or August 2002. EM.II at 29, 58-59; ST at 63. During trial on July 7, 2008, Mr. Holt, Sr., Emerald's sole owner, president, and corporate designee, testified: "As soon as they got the first one and then compared it to the second one, it was brought to my attention." Tr. 1:214. He told the Court: "It took about two months for it to go south." Tr. 1:220. Emerald corrected every self-billing report and pointed out discrepancies "many times". EM.II at 59, 69. Assuming Emerald somehow could refute the indisputable material facts and prove all other fraud elements, Emerald cannot demonstrate reliance. *See, e.g., Howard Oaks, Inc. v. Maryland Nat'l Bank,* 810 F. Supp. 674, 677-78 (D. Md. 1993).[11]

### III. The Rental Agreement and Maryland Law Bar Emerald's "Adjusted Stipulated Loss Value" and Punitive Damage Claims.

#### A. "Adjusted" Stipulated Loss Values

Pertinent to equipment for which Emerald billed an "adjusted" Stipulated Loss Value after recovery and sale, paragraph 13(b)(iii) of the Rental Agreement states:

> 13. Events of Default.
> ...
> (b) Upon the occurrence of any default by Lessee under this Agreement, Lessor shall (except to the extent otherwise required by law) be entitled to:
> ...
> (iii) Elect to sell any or all Equipment after giving thirty (30) days notice to Lessee at one or more public or private sales
> ....

---

[11]As described by Mr. Holt, Mr. Davis', Ms. Robins', and others' duties and conduct on behalf of Emerald and MBC also negate the notion of a "fiduciary" relationship between Sea Star and Emerald. *E.g., G.M. Pusey & Assoc., Inc. v. Britt/Paulk Ins. Agency, Inc.,* 2008 WL 2003747, at *6-*7 (D. Md.) (attached as Ex. D); *Biktasheva v. Red Square Sports, Inc.,* 366 F. Supp.2d 289, 295-97 (D. Md. 2005).

Tr.Ex. 17 ¶ 13(b)(iii).

Before sales of equipment that Emerald or Storage recovered and sold, Emerald admittedly never delivered to Sea Star the notices required by paragraph 13(b)(iii). Tr. 2:7-8. Emerald nonetheless has asserted claims against Sea Star for rent and "adjusted" Stipulated Loss Values of such equipment. ROB at 75-76, 157-59; ST at 70-72. Assuming *arguendo* Emerald could prove Sea Star on-hired and did not off-hire particular equipment, the Rental Agreement and governing Maryland law proscribe its adjusted Stipulated Loss Value claims relating to Emerald equipment that Storage and Emerald recovered and sold without the prior notice mandated by paragraph 13(b)(iii). *Maryland Nat'l Bank v. Wathen,* 414 A.2d 1261, 1263-65 (Md. App. 1980). *Accord, First Nat'l Bank of Md. v. DiDomenico,* 487 A.2d 646, 649-50 (Md. App. 1985); *see Gambo v. Bank of Md.,* 648 A.2d 1105, 1113 (Md. Ct. Spec. App. 1994).

**B.**   **Punitive Damages**

The Rental Agreement provides: "Under no circumstances shall either party be liable to the other party for exemplary damages." Tr.Ex. 17 ¶ 11(b). "In an action for breach of contract alone, such as this one, punitive damages are not available even if the [complainant] can show actual malice." *Johnson v. Federal Kemper Insurance Co.,* 536 A.2d 1211, 1214 (Md. Ct. Spec. App. 1988), *cert. denied,* 542 A.2d 844 (Md. 1988) (Table). *Accord, Maryland Nat'l Bank v Traenkle,* 933 F. Supp. 1280, 1289 (D. Md. 1996), *aff'd* 10 Fed. Appx. 194 (4th Cir. 2001); *see Biktasheva v. Red Square Sports, Inc.,* 366 F. Supp.2d 289, 296 (D. Md. 2005); *Odyssey Travel Center,* 262 F. Supp.2d at 630.

**IV.**   **The Maryland Statute of Limitations Bars Claims Asserted in the Amended Counterclaim.**

In Maryland, the general rule in contract cases is that the cause of action accrues on the date of the alleged breach. *In re The Maxima Corp.*, 277 B.R. 244, 248 (D. Md. 2002). The Rental Agreement pertains to individual pieces of equipment, not a fleet. Tr. 1:113; EM.II at 23, 27. From Mr. Holt's perspective, the Rental Agreement was "a specific unit per-diem lease that was entered into with Sea Star and Emerald." EM.II at 23. The Rental Agreement required that on-hire "[d]elivery of all equipment to [Sea Star] or its agents by [Emerald] shall be effected and evidenced by signed and dated equipment interchange receipts and shall be subject to the terms and conditions of this Agreement." Tr.Ex. 17 ¶ 1. Delivery of "each item of equipment" to Sea Star constituted a particular transaction and initiated a separate "lease term". Tr.Ex. 17 ¶ 2. On October 31, 2003, Emerald's attorney notified Sea Star of the termination of the Rental Agreement.

Emerald can allege no breach of the Rental Agreement later than the deadline for return of equipment after demand. Nonetheless, Emerald has continued to create and revise "invoices", adding new claims and equipment, long after filing and without seeking to amend the Amended Counterclaim. *E.g.*, ST at 63. Presently Emerald is still creating new claims and adding equipment.

In paragraph 36(b) of the Amended Counterclaim, Emerald refers to a "Sea Star invoice to CSX Line" relating to transactions "from May 15, 2002 to July 17, 2002". D.I. 79, ¶ 36(b), Ex. "E"; EM.II at 52-53. In paragraph 36(c) Emerald alleges "certain documentation indicates that duplicate 'self-billing reports' were prepared by Sea Star for the month of September, 2002 indicating different amounts for the same month." D.I. 79, ¶ 36(c), Ex. "F". Emerald's initial allegations as to the particular "fraudulent and/or misleading information supplied by Sea Star" in 2002 are in the Amended Counterclaim.

When the Amended Complaint "does not rely upon the facts and transactions originally pled or plead them more specifically,  but rather is based on new facts and different transactions," the amended pleading "will not relate back to the original pleading." *In re Global Link Telecom Corp.,* 327 B.R. 711, 716 (Bankr. D. Del. 2005). "[T]o use the relation-back doctrine to bootstrap new transactions onto viable actions is an abuse of due process ...." *Id.* (citation omitted). In Maryland, an amendment to a pleading to state a new cause of action, filed after expiration of the pertinent statute of limitations, would be barred. *Colao v. County Council of Prince George's County.*, 697 A.2d 96, 106 (Md. App. 1997).

As a matter of law, Emerald's efforts to bootstrap new equipment transactions and claims into trial on its Amended Counterclaim more than three years after the alleged causes of action accrued are barred by the Maryland statute of limitations. Md. Cts. & Jud. Proc. Code Ann. § 5-101.  Likewise, Emerald's claims outlined in paragraphs 36(b) and 36(c) of the Amended Counterclaim  are barred by section 5-101.  The Amended Counterclaim was filed on February 15, 2006, more than three years after the alleged causes of action accrued.

## CONCLUSION

Clear and specific written terms of the Sale Order, Rental Agreement, Indemnity Agreement, and Assignment Agreement define the dispute between Sea Star and Emerald. As a matter of contract and law, Emerald is not a real party in interest and has no right to pursue the Amended Counterclaim. Assuming *arguendo* that Emerald has a legal right to maintain any claims, the agreed, absolute proscription in the Assignment Agreement binds Emerald and precludes assertion that Emerald is a legitimate real party in interest with respect to *per diem* rental claims against Sea Star. Furthermore, Emerald's tort claims are fatally flawed in light of the Rental Agreement and applicable law. Sea Star is entitled to summary judgment, dismissing all non-contract claims in the Amended Counterclaim.

Dated: August 14, 2008

SMITH, KATZENSTEIN & FURLOW LLP

/s/ Kathleen M. Miller
Kathleen M. Miller (I.D. No. 2898)
800 Delaware Avenue, 7th Floor
P.O. Box 410
Wilmington, DE 19899
Telephone: 302-652-8400
Telecopy: 302-652-8405
E-mail: Kmiller@skfdelaware.com

OF COUNSEL:
Timothy J. Armstrong
ARMSTRONG & MEJER, P.A.
2222 Ponce de Leon Boulevard
Penthouse Suite
Miami, FL 33134
Telephone: 305-444-3355

*Attorneys for Sea Star Lines, LLC*