# Exhibit A

Westlaw.

Not Reported in F.Supp.2d                                   Page 1
Not Reported in F.Supp.2d, 2001 WL 641737 (D.Del.)

CPinkert v. John J. Olivieri, P.A.
D.Del.,2001.
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
Michael S. PINKERT and Eleanor A. Pinkert, Plaintiffs,
v.
John J. OLIVIERI, P.A., Brosnahan Builders, Inc.,
Kevin Brosnahan and Linda Brosnahan, Defendants and
Third-Party Plaintiffs,
v.
REEF INDUSTRIES, INC., Facilities Restoration
Supply, Inc. and Preservation & Protection Systems,
Inc., Third-Party Defendants,
v.
Ocean DESIGNS, Ocean Designs LLC and Paul
Rouchard D/B/A Ocean Designs, Inc.; C. Joseph
Couchman Tile Inc.; Doug Griffith Drywall; W.M.
Plumbing & Heating, Inc. A/K/A and/or D/B/A Wm
Plumbing & Heating, Inc.; and Advance Fiberglass
Technologies, LLC., Additional Third-Party
Defendants.
No. CIV. A. 99-380-SLR.

May 24, 2001.

Daniel B. Rath, Esquire of Klett, Rooney, Lieber &
Schorling, P.C. , Wilmington, Delaware. Counsel for
Plaintiffs. Of Counsel: Michael A. Gatje, Esquire of
Wickwire Gavin, P.C., Vienna, Virginia.
Adam Balick, Esquire of Balick & Balick, Wilmington,
Delaware. Counsel for Defendant and Third-Party Plaintiff
John J. Olivieri, P.A.
Neal C. Belgam, Esquire of Blank, Rome, Comisky &
McCauley, Wilmington, Delaware. Benjamin C. Wetzel,
III, Esquire and Natalie M. Ippolito, Esquire of Bailey &
Wetzel, P.A., Wilmington, Delaware. Counsel for
Defendants and Third-Party Plaintiffs Brosnahan Builders,
Inc., Kevin Brosnahan and Linda Brosnahan.
Loreto P. Rufo, Esquire of The Bayard Firm, Wilmington,
Delaware. Counsel for Third-Party Defendants Reef
Industries, Inc., Facilities Restoration Supply, Inc. and
Preservation & Protection Systems, Inc.
Richard W. Pell, Esquire and Jennifer L. Gioia, Esquire of
Tybout, Redfearn & Pell, Wilmington, Delaware. Counsel
for Additional Third-Party Defendants Ocean Designs LLC and Paul Rouchard D/B/A Ocean
Designs, Inc.

MEMORANDUM OPINION

ROBINSON, Chief J.

I. INTRODUCTION

*1 Plaintiffs Michael and Eleanor Pinkert filed this action
on June 16, 1999 claiming damages arising out of the
construction of their home in Bethany Beach, Delaware.
Plaintiffs' complaint alleges breach of contract and various
counts of fraud against defendants Brosnahan Builders,
Inc., Kevin Brosnahan and Linda Brosnahan ("the
Brosnahan defendants"), as well as breach of contract,
professional negligence and negligent misrepresentation
against defendant John J. Olivieri, P.A. ("Olivieri").
(D.I.1) On July 23, 1999, Olivieri filed a third-party
complaint for indemnification and contribution against
Reef Industries, Inc. ("Reef Industries") and Facilities
Restoration Supply, Inc. ("Facilities Restoration"), which
the court dismissed on September 29, 2000. (D.I.115) On
August 21, 2000, the court granted the Brosnahan
defendants leave to file a third-party complaint against
Ocean Designs, Ocean Designs LLC and Paul Rouchard
("Ocean Designs"), W.M. Plumbing & Heating, Inc., and
Advance Fiberglass Technologies, LLC, alleging breach
of contract and negligence, and seeking indemnity and
contribution. (D.I.101) On October 10, 2000, Ocean
Designs filed a third-party complaint against Taco Metal,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 641737 (D.Del.)

Inc. ("Taco Metal") for indemnification and contribution. (D.I.123) On November 20, 2000, the Brosnahan defendants filed a third-party complaint against Reef Industries, Facilities Restoration, and Preservation & Protection Systems, Inc. ("Preservation Systems"), alleging claims of negligence, breach of the implied warranty of fitness, and indemnification and contribution. (D.I.157) The court has jurisdiction pursuant to 28 U.S.C. § 1332.

Currently before the court are the Brosnahan defendants' motion for summary judgment on all claims against them (D.I.124), the Brosnahan defendants' motion for partial summary judgment that plaintiffs are not entitled to recover attorney's fees (D.I.221), the Brosnahan defendants' motion for protective order respecting pre-judgment discovery in aid of execution (D.I.218), Reef Industries' motion for summary judgment on all claims against it (D.I.225), Preservation Systems' motion for summary judgment on all claims against it (D.I.228), Facilities Restoration's motion for summary judgment on all claims against it (D.I.230), and Ocean Designs' motion for summary judgment on all claims against it. (D.I.233) For the following reasons, the court shall grant in part and deny in part the Brosnahan defendants' motion for summary judgment on claims against them; grant the Brosnahan defendants' motions for summary judgment that plaintiffs are not entitled to attorney's fees under paragraph 16(b) of the Construction Contract and for a protective order limiting discovery; grant in part and deny in part Reef Industries' motion for summary judgment on claims against it; grant Facilities Restoration's and Preservation Systems' motions for summary judgment on claims against them; and deny Ocean Designs' motion for summary judgment on claims against it.

II. BACKGROUND

A. Relevant Parties

*2 Plaintiffs are husband and wife who reside in McLean, Virginia. Defendant Brosnahan Builders, Inc. ("Brosnahan Builders") is a corporation organized under the laws of Delaware, with its principal place of business in Frankford, Delaware. Brosnahan Builders is primarily engaged in the business of constructing single family homes. Defendant Kevin Brosnahan is the president of Brosnahan Builders, and his wife, defendant Linda Brosnahan, is an employee of Brosnahan Builders. Kevin and Linda Brosnahan are Delaware residents and are sued in their individual capacities. Olivieri is a professional association organized under the laws of New Jersey, with its principal place of business in New Jersey. Olivieri is primarily engaged in the business of providing architectural services. (D.I.1) Reef Industries is a Texas corporation that manufactures vapor barriers used as siding in buildings. Facilities Restoration and Preservation Systems, Pennsylvania corporations, are distributors of Reef Industries' products. (D.I.157) Ocean Designs, a Maryland limited liability company, is a supplier and installer of aluminum railings. (D.I.240, Ex. A) Taco Metal is a Florida corporation that manufactures aluminum used in railings. (D.I.123)

B. Facts

In 1995, plaintiffs purchased a beachfront property (the "Property") in Bethany Beach, Delaware to construct a three-story home (the "Residence"). On October 30, 1995, plaintiffs entered into an "Architecture Contract" with Olivieri that required Olivieri to create designs and plans, review shop drawings, provide specifications to the contractor and subcontractors, and meet with contractors on-site. (D.I.126, Ex. A)

On September 30, 1997, plaintiffs and Brosnahan Builders entered into a "Construction Contract" for the construction

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 641737 (D.Del.)

Page 3

of the Residence for a price of approximately $1.5 million. (D.I.126, Ex. B) The Construction Contract provides, in pertinent part:

3. *Plans and Specifications.* (a) The Home shall be constructed and completed substantially in accordance with those certain plans and specifications more particularly identified by Exhibit "A" attached hereto and incorporated herein by reference ...[FN1]

> [FN1.] The parties have not submitted "Exhibit 'A' " to the court, but the Brosnahan defendants allege that Olivieri's "Project Manual" is incorporated into the referenced "Plans and Specifications." (D.I.154, Ex. 2) The Project Manual in turn incorporates the "General Conditions of the Contract for Construction" published by the American Institute of Architects ("AIA"), which describes the AIA standard forms for progress payments (the G703 Continuation Sheet and G702 Application for Certification and Payment). (D.I.154, Ex. 3)

10. Changes in Plans and Specifications....

(b) Owner may, at any time and from time to time prior to the Completion Date without invalidating this Agreement, require changes to the Work. Such changes may consist of additions, deletions, or modifications to the Plans and Specifications, with the Contract Sum and completion Date being adjusted accordingly. Such changes in the Work shall be authorized by written Change Order signed by Owner, Contractor and Architect, or by written Construction Change Directive signed by Owner and Architect. The Contract Sum and the Completion Date shall be changed only by Change Order....

(c) Contractor shall be under no obligation to implement any change nor shall Owner [be] under any obligation to pay for the same unless and until the same is documented by such a change order. Likewise, no change in the Work shall be authorized absent a change order for same signed by Owner and no change order shall be [in] effect unless the same is signed by Owner.

*3 ...

12. *Payment.* (a)(i) Payments to the Contractor shall be paid in accordance with Exhibit B.[FN2]

> [FN2.] "Exhibit B" is the AIA standard G703 Continuation Sheet ("Continuation Sheet"), a list of the work that Brosnahan Builders was contracted to perform with a scheduled price for each item. Each Continuation Sheet references the AIA standard G702 Application and Certification for Payment ("Application and Certification for Payment"). (D.I.154, Ex. 4)

(ii) Progress invoices shall be accompanied by such documentation as Owner and/or Architect may reasonably require to verify the propriety of such request for payment. Following review of each such invoice (and its supporting documentation) by Owner, Architect and Owner's lender, and acceptance of the same, Owner shall, in exchange for appropriate mechanics' lien releases, satisfy such invoice.

...

16. *Indemnification.* (a) Owner agrees to defend, indemnify and hold Contractor harmless from and against any and all loss, cost, expense, liability, actions, and claims for injury suffered by Owner or others, including reasonable

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 641737 (D.Del.)

attorneys fees, or for harm caused to the Lot or the Home, due solely to inspections of the Home by Owner or Owner's invitees prior to Settlement.

(b) Contractor agrees to defend, indemnify and hold Owner harmless from and against any and all loss, cost, expense, liability, actions, and claims whatsoever (including, without limitation, reasonable attorneys fees and court costs) incurred by Owner incident to any malfeasance or nonfeasance by Contractor with respect to Contractor's responsibilities under the terms of this Agreement.

...

19. *Governing Law.* This Agreement shall be governed, construed and enforced in accordance with Delaware law.

(D.I.126, Ex. B)

Brosnahan Builders began construction of the Residence in September 1997 and completed the project in April 1999. (D.I.1) Brosnahan Builders subcontracted with Ocean Designs to deliver and install the exterior aluminum railings on the Residence, and with Reef Industries to deliver the vapor barrier used in the exterior siding.[FN3] On fifteen occasions during construction, Brosnahan Builders submitted to Olivieri an AIA standard Application and Certification for Payment.[FN4] Each was signed by Linda Brosnahan and provided:

FN3. Olivieri's Plans and Specifications required the "VAPORguard wrap," which Brosnahan Builders ordered from Reef Industries. Reef Industries instead delivered the "T-65G wrap," which Brosnahan Builders installed onto the

Residence. Reef Industries fully admits the delivery error, but claims that because of their similarity, there was no damage caused to the Residence by the T-65G wrap that would not have been caused by the VAPORguard wrap. (D.I.226)

FN4. A Continuation Sheet with a list of services performed was appended to each Application and Certification for Payment. (D.I.144, Ex. 4)

The undersigned Contractor certifies that to the best of the Contractor's knowledge, information and belief the Work covered by this Application for Payment has been completed in accordance with the Contract Documents, that all amounts have been paid by the Contractor for Work for which previous Certificates for Payment were issued and payments received from the Owner, and that current payment shown herein is now due.
(D.I.144, Ex. 4) Olivieri made several visits to the construction site and approved each Application and Certification for Payment, which also provided:

In accordance with the Contract Documents, based on on-site observations and the data comprising the application, the Architect certifies to the Owner that to the best of the Architect's knowledge, information and belief the Work has progressed as indicated, the quality of the Work is in accordance with the Contract Documents, and the Contractor is entitled to payment of the AMOUNT CERTIFIED.

(D.I.144, Ex. 4) (emphasis in original)

*4 In November 1998, with construction substantially completed, plaintiffs and their family moved into the Residence. After a rainstorm in January, plaintiffs noticed

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 641737 (D.Del.)

Page 5

water leaks around windows, doors and ceiling fixtures. Plaintiffs retained an independent moisture consultant, who concluded that the wrong building wrap had been installed, there was no aluminum flashing around doors and windows, and there were no roof vents as provided by the Plans and Specifications. (D.I.1) Plaintiffs have since discovered other deficiencies, including corrosion of exterior railings, cracks in the marble tile floor, flaws in the drywall installation and finishing, leaking showers, defectively installed shower panes, and improperly installed fiberglass roofing. (D.I. 126, Ex. 1; D.I. 240, Ex. A) As of October 2000, plaintiffs have spent over $650,000 in remedial architectural and construction costs. (D.I.144, Ex. 3) Plaintiffs allege that when they confronted Kevin Brosnahan with the construction defects, he responded by asserting that he did not have the "manpower" or the "money" to remedy the problems, and that if pursued, he would "go bankrupt." (D.I.1)

C. Plaintiffs' Complaint

Count I of plaintiffs' complaint alleges breach of contract by Brosnahan Builders for failing to perform work in accordance with general industry standards and the Plans and Specifications provided by Olivieri. Count V alleges that Brosnahan Builders committed fraud by requesting payment for work that plaintiffs claim was not properly performed.

Count VI asserts that Kevin Brosnahan committed fraud in his individual capacity by requesting payments on behalf of Brosnahan Builders for work that plaintiffs claim was not performed in accordance with the Plans and Specifications and general industry standards. Counts VII and VIII allege that Linda Brosnahan committed fraud and equitable fraud in her individual capacity by signing payment requests on behalf of Brosnahan Builders for the work performed.

Counts IX, X, and XI assert that the Brosnahan defendants violated Delaware's Consumer Fraud Act, 6 Del. C. § 2513, by submitting payment requests on behalf of the Brosnahan Builders for work plaintiffs claim was not performed in accordance with the Plans and Specifications and general industry standards.[FN5]

> FN5. The Consumer Fraud Act provides, in pertinent part:
>
> The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale, lease or advertisement of any merchandise, whether or not any person has in fact been misled, deceived or damaged thereby, is an unlawful practice.
>
> 6 Del. C. § 2513(a).

Counts II, III and IV allege breach of contract, professional negligence and negligent misrepresentation by Olivieri for failure to adequately inspect and monitor the construction work, and for approving payment requests by the Brosnahan defendants for defective work.

III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 641737 (D.Del.)

and that the moving party is entitled to judgment as a matter of law."Fed.R.Civ.P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n. 10 (1986)."Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."Horowitz v. Fed. Kemper Life Assurance Co., 57 F.3d 300, 302 n. 1 (3d Cir.1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.' " Matsushita, 475 U.S. at 587 (quoting Fed.R.Civ.P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir.1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

## IV. DISCUSSION

A. Plaintiffs' Fraud Claims Against the Brosnahan Defendants

*5 As a general rule under Delaware law, where an action is based entirely on a breach of the terms of a contract between the parties, and not on a violation of an independent duty imposed by law, a plaintiff must sue in contract and not in tort. See Garber v. Whittaker, 174 A. 34, 36 (Del.Super.1934)."[A breach of contract claim] cannot be 'bootstrapped' into a fraud claim merely by adding the words 'fraudulently induced' or alleging that the contracting parties never intended to perform."Iotex Communications, Inc. v. Defries, 1998 WL 914265, at *5 (Del. Ch. Dec. 21, 1998).See also Dann v. Chrysler Corp., 174 A.2d 696, 700 (Del. Ch.1961) ("Using the word 'fraud' or its equivalent in any form is just not a substitute for the statement of sufficient facts to make the basis of the charge reasonably apparent.").

Plaintiffs allege that the Brosnahan defendants: (1) contracted to perform construction services; (2) failed to perform the services in the manner called for by the Construction Contract; and (3) submitted payment applications indicating the services had been performed according to the Construction Contract. The gravamen of plaintiffs' common law fraud, equitable fraud, and Consumer Fraud Act claims is that the Brosnahan defendants knowingly misrepresented the nature of their work each time they submitted an Application and Certification for Payment. These alleged misrepresentations were not collateral to the Construction Contract, but rather memorialized as some of the Brosnahan defendants' principal obligations under their agreement with plaintiffs. The duty to submit periodic payment applications existed solely by reason of the Construction Contract. Neither Brosnahan Builders, Kevin Brosnahan nor Linda Brosnahan violated any common law duty independent of the Construction Contract between Brosnahan Builders and plaintiffs. See, e.g., Feinberg v. Saunders Karp & Megrue, L.P., No. 97-297-SLR, 1998 WL 863284, at *17 (D.Del. Nov. 13, 1998) (dismissing fraud action under New York law where breached promise was incorporated into written agreement); Richmond Metro. Auth. v. McDevitt St. Bovis, Inc., 507 S.E.2d 344, 348 (Va.1998) (dismissing fraud claims based on contractor's alleged misrepresentations in submissions of applications for payment because no independent duty

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                           Page 7
Not Reported in F.Supp.2d, 2001 WL 641737 (D.Del.)

existed apart from construction contract).

Plaintiffs have also failed to present evidence that they were fraudulently induced into the Construction Contract. Such evidence may, in certain cases, give rise to an action in fraud. *See, e.g., Tam v. Spitzer,* No. 12538, 1995 WL 510043, at *6 (Del. Ch. Aug. 17, 1995). Here, plaintiffs' allegations arise solely from the Brosnahan defendants' performance of their contractual duties and are, therefore, insufficient to support a fraud claim. Thus, the court dismisses all of the fraud claims against the Brosnahan defendants (Counts V through XI) in plaintiffs' complaint.[FN6]

> FN6. The Brosnahan defendants also argue that plaintiffs' fraud claims are barred by the economic loss doctrine. *See Danforth v. Acorn Structures, Inc.,* 608 A.2d 1194, 1195 (Del.1992) ("The economic loss doctrine is a judicially created doctrine that prohibits recovery in tort where a product has damaged only itself (i.e., has not caused personal injury or damage to other property) and, the only losses suffered are economic in nature.") (emphasis in original). The 1996 Delaware Home Owner's Protection Act, however, has banned the application of the economic loss doctrine to certain residential construction cases:
>
> > No action based in tort to recover damages resulting from negligence in the construction or manner of construction of an improvement to residential real property and/or in the designing, planning, supervision and/or observation of any such construction or manner of construction shall be barred solely on the ground that the only losses suffered are economic in nature.

> 6 Del. C. § 3652. Based on the record presented, the court finds that if plaintiffs had alleged fraud claims based on duties apart from the Construction Contract, those claims would not be barred by the economic loss doctrine.

**B. Plaintiffs' Breach of Contract Claim Against the Brosnahan Defendants**

*6 The Brosnahan defendants also argue that they are not liable for breach of the Construction Contract because they were acting under the direction of Olivieri. *See Ridley Inv. Co. v. Croll,* 192 A.2d 925, 927 (Del.1963) ("[A] contractor is not liable for any damage occasioned by a defect in plans and specifications furnished by the owner if he performs his work without neglect and in a workmanlike manner."). The Brosnahan defendants claim that any deviations from the Plans and Specifications were approved by Olivieri and, therefore, they are not liable for damage that resulted from those changes.

Based on the record presented, the court finds genuine issues of material fact as to whether the deviations from the Plans and Specifications that resulted in damage to plaintiffs' Residence were approved by Olivieri, as well as whether the Brosnahan defendants' work was performed "without neglect and in a workmanlike manner." Thus, summary judgment that the Brosnahan defendants are not liable to plaintiffs because they were acting as agents of Olivieri is denied.

**C. Attorney's Fees Pursuant to Paragraph 16(b) of the Construction Contract**

Plaintiffs allege that they are entitled to recover their attorney's fees from the Brosnahan defendants pursuant to

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 641737 (D.Del.)

paragraph 16(b) of the Construction Contract. The Construction Contract is governed by Delaware law, which states that "apart from statute or contract a litigant must pay his [own] counsel fees."*Maurer v. Int'l Re-Insurance Corp.,* 95 A.2d 827, 830 (Del.1953). The Delaware Code, which allows recovery of attorney's fees when a lawsuit is based on a written instrument, states that "counsel fees shall not be entered as part of such judgment unless the note, bond, mortgage, invoice or other instrument of writing sued upon, by the terms thereof, expressly provides for the payment and allowance thereof ..."10 Del. C. § 3912.

The court must determine, therefore, whether paragraph 16(b) of the Construction Contract expressly provides for the recovery of plaintiffs' attorney's fees. Paragraph 16(b) provides:

Contractor agrees to defend, indemnify and hold Owner harmless from and against any and all loss, cost, expense, liability, actions, and claims whatsoever (including, without limitation, reasonable attorneys fees and court costs) incurred by Owner incident to any malfeasance or nonfeasance by Contractor with respect to Contractor's responsibilities under the terms of this Agreement.

(Emphasis added) The language "defend, indemnify and hold Owner harmless" clearly renders Paragraph 16(b) an indemnification provision which acts to protect plaintiffs from liability if they are sued by a third party for damage caused by "malfeasance or nonfeasance" by the Brosnahan defendants. Plaintiffs' belief that they are entitled to attorney's fees based on this indemnification provision is irreconcilable with the terms of the provision. The Brosnahan defendants cannot agree to "defend, indemnify and hold [plaintiffs] harmless" from a lawsuit filed against the Brosnahan defendants by plaintiffs themselves. Other Delaware courts have held that similar indemnification provisions are not applicable to claims between

contracting parties; they are intended to protect one contracting party against liability from third party claims when the other contracting party is at fault. *See, e.g., DRR, L.L.C. v. Sears, Roebuck and Co.,* 949 F.Supp. 1132, 1142 (D.Del.1996); *Cannon and Son v. Dorr-Oliver,* 394 A.2d 1160, 1165 (Del.1978). Therefore, the Brosnahan defendants' motion that plaintiffs are not entitled to attorney's fees pursuant to Paragraph 16(b) of the Construction Contract is granted.

D. Pre-Judgment Discovery of the Brosnahan Defendants' Assets

*7 The Brosnahan defendants have requested a protective order preventing pre-judgment discovery of their assets. The Federal Rules of Civil Procedure do not permit pre-trial discovery of a defendant's finances. *See Gangemi v. Moor,* 268 F.Supp. 19, 21-22 (D.Del.1967); *McCurdy v. Wedgewood Capital Mgmt. Co.,* No. 97-4304, 1998 WL 964185, at *10 (E.D.Pa. Nov. 16, 1998) ("Rule 26 will not permit the discovery of facts concerning a defendant's financial status, or ability to satisfy a judgment, since such matters are not relevant, and cannot lead to the discovery of admissible evidence."). Two exceptions to this general rule have been recognized by Delaware courts, namely, if there is a "factual basis rising to the level of a triable issue for punitive damages," or if a plaintiff "can prove by a preponderance of the evidence that a defendant made a negligent misrepresentation of a material fact with the intent that a consumer rely upon it" under the Delaware Consumer Fraud Act. *State ex rel. Brady, State of Delaware v. Wellington Homes,* No. 99C-09-168-JTV, 2001 WL 238125, at *1 (Del.Super.Jan. 23, 2001).

The court is dismissing plaintiffs' fraud claims against the Brosnahan defendants, thereby rendering punitive damages unrecoverable from them. *See E.I. DuPont de Nemours and Co. v. Pressman,* 679 A.2d 436, 445 (Del.1996) ( "[P]unitive damages are not recoverable for

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 641737 (D.Del.)

breach of contract unless the conduct also amounts independently to a tort."). Thus, the court finds no basis to deviate from the general rule prohibiting pre-trial discovery of the Brosnahan defendants' assets. The Brosnahan defendants' request for a protective order is granted.

E. The Brosnahan Defendants' Claims Against Reef Industries

The Brosnahan defendants filed a third-party complaint against Reef Industries, alleging negligence, breach of the implied warranty of fitness for a particular purpose, and indemnification and contribution. The Brosnahan defendants do not oppose Reef Industries' motion for summary judgment as to the implied warranty claim, which is therefore dismissed.

Regarding the remaining negligence claim and indemnification and contribution claim, the court concludes that there exist genuine issues of material fact as to Reef Industries' liability. Reef Industries admits that it delivered the T-65G wrap instead of the VAPORguard wrap requested by Brosnahan Builders, and the parties appear to agree that all cited experts acknowledge that either wrap would have caused damage to the Residence. However, the record is unclear as to the difference in extent of damage caused by one type over the other type. Therefore, the court finds there are triable issues of fact on this issue, and declines to grant summary judgment on the remaining claims against Reef Industries.

F. The Brosnahan Defendants' Claims Against Facilities Restoration and Preservation Systems

The Brosnahan defendants do not oppose motions for summary judgment by Facilities Restoration and

Preservation Systems on all claims against them. Therefore, the court grants their motions for summary judgment and dismisses them from the case.

G. The Brosnahan Defendants' Claims Against Ocean Designs

*8 Ocean Designs argues for summary judgment that it is not liable for the corrosion of plaintiffs' aluminum railings because if the corrosion was in fact due to a defect in the railings and not poor maintenance by plaintiffs, that defect was caused by Taco Metal, Ocean Designs' aluminum supplier. The court finds that there exists a genuine issue of material fact as to whether Ocean Designs is responsible for the defective aluminum railings. Although Ocean Designs may ultimately be found not to be at fault, Ocean Designs contracted with Brosnahan Builders to supply and install quality aluminum railings. To the extent that Taco Metal is responsible for the corroded aluminum, Ocean Designs is seeking indemnification and contribution from it. Based on the record presented, therefore, Ocean Designs' motion for summary judgment is denied.

V. CONCLUSION

For the reasons stated, the court shall grant in part and deny in part the Brosnahan defendants' motion for summary judgment on claims against them; grant the Brosnahan defendants' motions for summary judgment that plaintiffs are not entitled to attorney's fees under paragraph 16(b) of the Construction Contract and for a protective order limiting discovery; grant in part and deny in part Reef Industries' motion for summary judgment on claims against it; grant Facilities Restoration's and Preservation Systems' motions for summary judgment on claims against them; and deny Ocean Designs' motion for summary judgment on claims against it. An appropriate

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                    Page 10
Not Reported in F.Supp.2d, 2001 WL 641737 (D.Del.)

order shall issue.                                                    Pinkert v. John J. Olivieri, P.A.
                                                                     Not Reported in F.Supp.2d, 2001 WL 641737 (D.Del.)

                           ORDER
                                                                     END OF DOCUMENT

At Wilmington, this 24th day of May, 2001;

IT IS ORDERED that:

1. The Brosnahan defendants' motion for summary
judgment on the claims (D.I.124) is granted in part and
denied in part.

2. The Brosnahan defendants' motion for partial summary
judgment that plaintiffs are not entitled to attorney's fees
pursuant to paragraph 16(b) of the Construction Contract
(D.I.221) is granted.

3. The Brosnahan defendants' motion for a protective
order respecting pre-judgment discovery in aid of
execution (D.I.218) is granted.

4. Reef Industries' motion for summary judgment
(D.I.225) is granted in part and denied in part.

5. Preservation Systems's motion for summary judgment
(D.I.228) and Facilities Restoration's motion for summary
judgment (D.I.230) are granted.

6. Ocean Designs' motion for summary judgment
(D.I.233) is denied.

D.Del.,2001.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# Exhibit B

Westlaw.

Not Reported in A.2d                                                                      Page 1
Not Reported in A.2d, 2005 WL 445710 (Del.Super.)

**C**Midland Red Oak Realty, Inc. v. Friedman, Billings & Ramsey, Inc.
Del.Super.,2005.
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES
BEFORE CITING.

Superior Court of Delaware.
MIDLAND RED OAK REALTY, INC. and Mro
Southwest, Inc. Plaintiffs,
v.
FRIEDMAN, BILLINGS & RAMSEY & CO., INC.
and Velasco Group, L.L.C. Defendants.
**No. Civ.A.04C05091CLS.**

Submitted Nov. 15, 2004.
Decided Feb. 23, 2005.

Upon Consideration of Defendants' Motion To Dismiss.
Denied in Part. Granted in Part.

Jonathan L. Parshall, Murphy Spadaro & Landon,
Wilmington, Delaware, Shawn L. Raymond, J. Hoke
Peacock III, Susman Godfrey LLP, Houston, Texas, for
Plaintiffs Midland Red Oak Realty, Inc. and MRO
Southwest, Inc.
Arthur G. Connolly, III, Connolly Bove Lodge & Hutz,
LLP, Wilmington, Delaware, Howard W. Gutman,
William B. Pittard, IV, Williams & Connolly LLP,
Washington, D.C., for Defendant Friedman, Billings &
Ramsey, Co., Inc.
Judith M. Kinney, Reed Smith, Wilmington, Delaware,
Richard C. Sullivan, Jr., Anne M. Devens, Falls Church,
Virginia, for Defendant Velasco Group, L.L.C.

*ORDER*

SCOTT, J.

I. Facts

**\*1** In this action, Plaintiffs Midland Oak Realty, Inc. and
MRO Southwest, Inc. ("MRO") are suing Defendants
Friedman, Billings, Ramsey & Co., Inc. ("FBR") and
Velasco Group, L.L.C. ("Velasco") over a real-estate
financing contract. MRO is a Delaware corporation with
its principal office in Midland, Texas. FBR is a Delaware
corporation with its principal office in Arlington, Virginia.
Velasco is a limited liability Virginia corporation.

MRO is a real-estate investment firm engaged in buying,
developing, and managing undervalued commercial
properties in Texas, Oklahoma, and Arizona. In June
1999, MRO entered into a three-year financing contract
with Lehman Brothers. The financing was to cover fifteen
properties. MRO was required to pay the principal balance
and a $5.275 million exit fee when the credit facility
expired on July 1, 2002.

During the summer of 2001, MRO began to search for
financing to replace the Lehman contract. MRO was put
in touch with FBR to discuss possible financing options.
In the beginning of 2002, MRO also interviewed other
financing consultants. Ultimately, MRO chose FBR and
Holliday Fenoglio Fowler ("Holliday") to discuss
financing options. MRO informed each of the firms that it
needed to re-finance before the Lehman contract expired.
FBR and Holliday suggested that the financing be split
into an "A" piece and a "B" piece in order to optimize
financing.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                                                    Page 2
Not Reported in A.2d, 2005 WL 445710 (Del.Super.)

FBR made its pitch to MRO on January 28, 2002. Jeff McClure, then vice-president of FBR, made several representations to MRO. He first stated that FBR had expertise in real estate financing, specifically, it was their specialty and they knew the market "better than anyone." McClure also represented to MRO that $24 million was a reasonable amount for financing of the "B" piece. McClure was confident in "B" piece financing. He suggested that MRO find the cheapest price for the "A" piece.

In February, 2002, MRO assigned the "B" piece to FBR and the "A" piece to Holliday. MRO told Lehman about the re-financing effort. Lehman agreed in front of a Velasco representative to waive the $5.275 million fee if MRO re-financed the "A" and "B" pieces before the Lehman contract expired. While FBR had already begun work on financing, its contract with MRO had not been signed. The contract was not signed until May 6, 2002. The terms of engagement specified that FBR would find financing on "a best efforts basis."

Holliday secured financing for the "A" piece with Greenwich Corporate Products. FBR, however, had not found financing as of April, 2002. In mid-April, McClure left FBR to start his own consulting group, Velasco. FBR assured MRO that McClure departure would not affect the "B" piece financing.

At a May 1, 2002 status conference between MRO, FBR and Holliday, FBR notified the parties that it had enlisted the help of Velasco to obtain financing. MRO was not a party to this contract. McClure attended the meeting on behalf of Velasco and stated that "I have the deal done" in regard to the "B" piece. MRO informed Velasco that a Texas financier, Smith Brownlie, wanted to underwrite the transaction, but would need at least sixty days. McClure responded that the "B" piece was done, and did not need Brownlie's money.

*2 On June 4, 2002, Holliday, Velasco, FBR, and MRO met in Texas. Brownlie was also present. Brownlie asked McClure about the status of the "B" piece. McClure responded that he had not finalized any financing. In addition, he stated that MRO's "B" piece financing was "in good shape." Brownlie became agitated because he had wished to finance the project but was told that the financing was already completed. Velasco and FBR indicated to MRO after the meeting that they had sent several proposals to different sources.

When asked to provide evidence of potential financers, Velasco provided MRO and Holliday with a list of people not regularly in the real estate finance market. This caused MRO and Holliday to be alarmed. A lack of pitch book for the real estate financing also alarmed MRO. When Velasco finally did produce offers they had received for the "B" piece, MRO realized that they were well below the price needed to replace the Lehman contract. FBR assured MRO that "the deal would get done" and "not to worry."

Ultimately, the Lehman contract expired without financing for the "B" piece. Holliday had tried at the last minute to obtain financing, but was unsuccessful. As a result of not obtaining re-financing, MRO became in default to Lehman. Subsequently, MRO and Lehman entered into a forbearance agreement. MRO has liquidated the vast majority of its portfolio holdings.

II. Standard of Review

Delaware has clear standards for granting a Rule 12(b)(6) Motion to Dismiss. The Court must accept all well-pled allegations as true.[FN1] The Court must then apply a broad sufficiency test: "whether a plaintiff may recover under any reasonable conceivable set of circumstances

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                                              Page 3
Not Reported in A.2d, 2005 WL 445710 (Del.Super.)

susceptible of proof under the complaint."[FN2] Dismissal will not be granted if the complaint "gives general notice as to the nature of the claim asserted against the defendant."[FN3] Further, a complaint "will not be dismissed unless it is clearly without merit, which may be either a matter of law or of fact."[FN4] "Vagueness or lack of detail," standing alone, is insufficient to dismiss a claim.[FN5]

> FN1. *Spence v. Funk,* 396 A.2d 967, 968 (Del.Supr.1978).

> FN2. *Id.* (Internal citation omitted).

> FN3. *Diamond State Tel. Co. v. Univ. of Delaware,* 269 A.2d 52, 58 (Del.Supr.1970).

> FN4. *Id.*

> FN5. *Id.*

III. Discussion

In determining how to rule on the Motion, this Court must look to the contract between FBR and MRO. FBR contends that the contract language permits recovery only for "willful misconduct or gross negligence." It is their position that the Motion to Dismiss should be granted because MRO has failed to plead either willful misconduct or gross negligence in their First Amended Complaint. MRO counters that the Motion should not be dismissed because the indemnity provision does not apply until this Court issues a final ruling on the merits.

The Indemnity Provision of the FBR/MRO contract states

in pertinent part:

The Company agrees to indemnify and hold harmless FBR and its affiliates ... and their respective directors, officers, employees, agents and controlling persons ... The Company will not be liable to any Indemnified Party under the foregoing indemnification and reimbursement provisions ... to the extent that any loss, claim, damage or liability is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted primarily from FBR's *willful misconduct or gross negligence.* (emphasis added) ...

**\*3** The Company also agrees that no Indemnified Party shall have any liability (whether direct or indirect, in contract or tort or otherwise) to the Company or its security holders or creditors related to or arising out of this engagement of FBR pursuant to, or the performance by FBR of the services contemplated by, this Agreement except to the extent that any loss, claim, damage or liability is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted primarily from FBR's *willful misconduct or gross negligence.* (emphasis added).

A. *Plain Meaning Rule*

In Delaware, the principles governing contract interpretation are well settled.[FN6] "Where the contract language is clear and unambiguous, the parties' intent is ascertained by giving the language its ordinary and usual meaning."[FN7] If the parties disagree as to the proper interpretation of the contract, the disagreement does not automatically create an ambiguity.[FN8] Instead, "a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings."[FN9]

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                    Page 4
Not Reported in A.2d, 2005 WL 445710 (Del.Super.)

FN6.*Northwestern Nat'l Ins. Co., v. Esmark, Inc.*, 672 A.2d 41, 43 (Del.Supr.1995).

FN7.*Id.* (Internal citation omitted).

FN8.*Id.*

FN9.*Id.* (citing *Rhone-Poulenc Basic Chemicals Co., Inc. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del.Supr.1992)).

In the case *sub judice*, the express language of the FBR/MRO agreement reserves Plaintiff's right to deny indemnification to Defendant if a court has rendered a final judgment holding that FBR acted with willful misconduct or gross negligence. By employing the Plain Meaning Rule, this Court agrees with MRO that a determination of indemnification cannot be made with respect to the parties, on at least a few of the claims, until after this case has gone to trial and been decided.

*B. Recovery of Breach of Contract in Tort Law*

FBR asserts that Counts III and IV must be dismissed against them because a plaintiff may not recover in tort for breaches of contract agreements. This Court agrees.

"As a general rule under Delaware law, where an action is based entirely on a breach of the terms of a contract between the parties, and not on a violation of an independent duty imposed by law, a plaintiff must sue in contract and not in tort."[FN10] In both *Pinkert v. Olivieri* and *Tristate Courier and Carriage, Inc. v. Berryman*,[FN11] the Delaware courts held that a breach of contract claim could not be "bootstrapped into a fraud claim merely by adding

the words 'fraudulently induced' or alleging that the contracting parties never intended to perform."[FN12]

FN10.*Pinkert v. Olivieri*, 2001 WL 641737 *5 (D.Del.2001).

FN11.2004 WL 835886 *11 (Del.Ch.2004). (Internal citation omitted).

FN12.*Pinkert*, 2001 WL 641737 at *5; *Tristate Courier and Carriage, Inc.*, 2004 WL 835886 at *11.

MRO's claims of Fraud and Negligence are based entirely on obligations owed by FBR under the contractual agreement. The alleged material misrepresentations made by FBR are not collateral issues in this case. FBR has not violated any common law duty independent of the financing contract terms. In addition, MRO has not pointed to a representation or obligation other than the existence of the financing agreement upon which it can base a fraud or negligence claim. FBR's Motion to Dismiss is Granted as to Counts III and IV.

*C. Willful Conduct and Gross Negligence May be Averred Generally*

**\*4** Moreover, FBR argues that MRO has failed to sufficiently plead a cause of action because MRO's First Amended Complaint does not use the word "willful." This Court disagrees.

Delaware Superior Court Rule 9(b) describes the causes of actions that are to be pled with particularity. It reads:

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                                         Page 5
Not Reported in A.2d, 2005 WL 445710 (Del.Super.)

*(b) Fraud, negligence, mistake, condition of mind.*In all averments of fraud, negligence or mistake, the circumstances constituting fraud, negligence or mistake should be stated with particularity. Malice, intent, knowledge and other condition of mind of a person may be averred generally.

Willful and wanton each refer to a "distinct state of mind." [FN13]Accordingly, willful and wanton need only be averred generally as required in Rule 9(b).

> FN13.*Johnson v. Pritchett,* 2001 WL 1222100 *3 (Del.Super.)* (citing *Jardel Co., Inc. v. Hughes,* 523 A.2d 528, 529-30 (Del.Supr.1987)).

In *Hedrick v. Webb,*[FN14] the Court held that "the term aver [ ] implies that there must be at least a positive assertion of the state of mind."[FN15]There, the plaintiffs failure to mention wanton negligence or willful intent in their Complaint was fatal.[FN16]The Court held that the plaintiffs had no cause of action under the Tort Claims Act because they failed to mention the state of mind.[FN17]

> FN14.2004 WL 2735517 (Del.Super.).

> FN15.*Id.* at *7.

> FN16.*Id.*

> FN17.*Id.*

While Plaintiffs do not use the word "willful" in their Complaint, this Court does not find the omission to be fatal. As discussed below, Plaintiffs have alleged sufficient facts to withstand a Motion to Dismiss.

*D. Wanton Conduct is a Question for the Jury*

Generally, the issue of whether facts and circumstances amount to willful conduct or gross negligence is a fact question for the jury.[FN18]It is a matter of law when the "conduct in question falls short of gross negligence, the case is entirely free from doubt, and no reasonable jury could find gross negligence."[FN19]

> FN18.*Eustice v. Rupert,* 460 A.2d 507, 509 (Del.Supr.1983); *Nicholson v. Mount Airy Lodge, Inc.,* 1997 WL 805185 *4 (E.D.Pa.).* (Internal citations omitted).

> FN19.*Id.* (citing *Albright v. Abington Mem'l Hosp.,* 548 Pa. 268, 696 A.2d 1159, 1165 (Pa.1997)).

Willful conduct has been defined as a "conscious indifference" or "I don't care attitude which is the prerequisite of wanton behavior."[FN20]Wanton conduct is a "conscious indifference to consequences in circumstances where [the] probability of harm to another within the circumference of the conduct is reasonably apparent, although harm to such others in not intended."[FN21]

> FN20.*Eustice,* 460 A.2d 509. (Internal citations omitted).

> FN21.*Id.* (citing *Law v. Gallegher,* 197 A. 479, 482 (Del.Supr.1938)).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                                                                    Page 6
Not Reported in A.2d, 2005 WL 445710 (Del.Super.)

*1. Breach of Contract*

This Court finds that there is evidence from which a
reasonable jury could find that FBR was grossly negligent
or engaged in willful conduct in breaching the financing
contract with MRO. First, the contract language stated that
FBR conduct the Offering on a "best efforts basis only
after execution of an underwriting agreement." As of May
1, 2002, FBR contended that the "deal was done." The
deal, however, was not done and these representations
were made merely three months before the expiration of
the Lehman credit facility. In addition, the statements that
led MRO to believe that the B piece was proceeding to the
underwriting stage may not have been boasting. Finally,
the issue of whether FBR was grossly negligent when they
told Brownlie, who wanted to secure financing for the
Lehman project, that he need not finance the project
because it was done is best suited for a determination by
the fact-finder.

*2. Breach of Covenant of Good Faith and Fair Dealing*

**\*5** The concept that a covenant of good faith and fair
dealing is implied in a contractual relationship is well
accepted in Delaware.[FN22] Good faith has been defined as
"faithfulness to an agreed common purpose and
consistency with the justified expectations of the other
party."[FN23] Although MRO's allegations of the breach of
covenant of good faith are vague at best, this Court does
not believe that the count is so clearly without merit that
it be dismissed. Accepting all well-pled allegations as true,
FBR may have acted in disregard to MRO's expectations
that financing be obtained when it told a possible financier
that the "deal was done," when in fact, it was not.

FN22.*Merrill v. Crothall-American, Inc.,* 606
A.2d 96, 101 (Del.Supr.1992). At common law,
fair dealing and good faith was impliedly a part

of every kind of contract. *See* Restatement
(Second) of Contracts § 204 (1979).

FN23. Restatement (Second) of Contracts § 205,
cmt. a. (1979).

This Court DENIES FBR's Motion to Dismiss Counts I
and II because it cannot be concluded as a matter of law
that FBR's conduct was not willful or grossly negligent.

*E. Velasco's Relationship with FBR*

FBR and Velasco both asserted at the Motion that Velasco
was in fact FBR's agent under the FBR/MRO contract. It
is FBR's position that MRO must concede that Velasco is
an agent of FBR because some of the causes of action
against FBR stem from Velasco's actions. In contrast,
MRO contends that previous to the hearing, FBR would
not admit that Velasco was its agent. This Court believes
that at this stage in the proceedings, there is a basis upon
which the Plaintiffs may recover against Velasco.
Velasco's Motion to Dismiss Counts III, IV, and V of the
First Amended Complaint is DENIED.

"Agency is the relationship which results from the
manifestation of consent by one person to another that the
other shall act on his behalf and subject to his control, and
consent by the other so to act."[FN24] On the other hand, if the
agent is an independent contractor, and the employer does
not retain control over him, the employer is not liable for
the independent contractor's negligent actions.[FN25]

FN24. Restatement (First) of Agency § 1(1)
(1933).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                                    Page 7
Not Reported in A.2d, 2005 WL 445710 (Del.Super.)


      FN25.Restatement (Second) of Torts § 414
(1977).


In the pleadings before the Court, there is insufficient
evidence to determine if Velasco was an agent or an
independent contractor for purposes of this Motion. This
Court is cognizant that FBR enlisted the help of Velasco,
however, the status of their relationship remains an issue
to be determined. This Court, with so little information,
cannot conclude as a matter of law what Velasco's status
was in the contract. The Motion, therefore, will not be
dismissed with regard to the claims against Velasco.


IV. Conclusion


Based on the foregoing reasons, Counts III and IV are
DISMISSED against FBR. Counts I and II remain against
FBR. Counts III, IV, and V remain against Velasco.


IT IS SO ORDERED.


Del.Super.,2005.
Midland Red Oak Realty, Inc. v. Friedman, Billings &
Ramsey & Co., Inc.
Not Reported in A.2d, 2005 WL 445710 (Del.Super.)


END OF DOCUMENT


© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# Exhibit C

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 1994 WL 315365 (Del.Super.)

**H**Sterling v. Beneficial Nat. Bank, N.A.
Del.Super.,1994.
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES
BEFORE CITING.

Superior Court of Delaware.
Eugene N. STERLING, Annabel W. Sterling, Bryan K.
Sterling and C. Keith Sterling, Plaintiffs,
v.
BENEFICIAL NATIONAL BANK, N.A., a National
Banking Association, Defendant.
**No. 91C-12-005.**

Submitted Dec. 3, 1993.
Decided April 13, 1994.

Thomas C. Jackson, Dover, for plaintiffs Eugene N. Sterling, Annabel W. Sterling, Bryan K. Sterling, and C. Keith Sterling.
Melvyn I. Monzack and Joseph J. Bodnar, of Walsh and Monzack, P.A., Wilmington, for defendant Beneficial Nat. Bank.

MEMORANDUM OPINION

RIDGELY, President Judge.
**\*1** On December 4, 1991, Plaintiffs Eugene N. Sterling, Annabel W. Sterling, Bryan K. Sterling, and C. Keith Sterling (collectively, "Sterlings") filed this action against Defendant Beneficial National Bank ("Beneficial") alleging fraud, misrepresentation, breach of contract, negligence and breach of fiduciary relationship, in connection with a Loan and Subordination Agreement entered into among the parties. The Sterlings allege that in connection with this transaction, they

invested Thirty Thousand Dollars ($30,000.00) and suffered loss caused by Beneficial. They now seek compensatory and punitive damages in this Court.

On September 18, 1992, Beneficial moved for summary judgment on the ground that the Sterlings had allegedly failed to respond in a timely fashion to Beneficial's Request for Admissions. After further discovery, Beneficial has renewed its motion for summary judgment. This is the Court's ruling on the motion.

I. FACTS

The Sterlings are four Delaware residents who lent $30,000 to Madison & Co. of New York, Inc. ("Madison") via promissory notes in May 1991.[FN1] The promissory notes were issued in two increments of $10,000 and two increments of $5,000. Each was a 90-day note, bearing 20% interest (80% annualized return). Madison had been experiencing a capital shortage and was in need of a loan. In order to facilitate the loan, Beneficial, one of Madison's regular secured creditors, agreed to subordinate its security interest in certain inventory and accounts receivable of Madison's to that of the new lenders, the Sterlings. The accounts receivable were those of one of Madison's steady customers, A.R.A. Services ("A.R.A.").

FN1. The Sterlings contend the loan was in the amount of $30,000, while Beneficial states at one point the loan was for $25,000. On a motion for summary judgment, the facts must be viewed in the light most favorable to the nonmoving party. *Hammond v. Colt. Ind. Operating Corp.*, Del.Super., 565 A.2d 558, 560 (1989). Because of this, the Court will use $30,000 as the proper figure for purposes of this motion.

Paragraph 5 of the Loan and Subordination Agreement (the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                                                          Page 2
Not Reported in A.2d, 1994 WL 315365 (Del.Super.)

"Agreement") between Madison, Beneficial, and the Sterlings
is the focal point of this suit. This paragraph delineates the
terms under which the loan is to be repaid. Because the alleged
obligations flowing from the paragraph are in dispute, the
entire paragraph is reprinted here:

*Payment Procedures*

Madison covenants and agrees with Beneficial and the Lender
[the Sterlings] that the invoices and statements rendered by
Madison relating to the Accounts Receivable shall direct
payment to a lock box in the name of Madison but under the
sole supervision and control, subject to the terms of this
Agreement, of Beneficial. Beneficial covenants and agrees with
the Lender and Madison that collections which constitute
Subordinated Collateral hereunder ("Collections") received by
Beneficial under the foregoing system shall be segregated for
accounting purposes (while retaining their character as
Collections, nevertheless) as follows: Lender shall receive
funds sufficient to repay the loan in full with the applicable
interest thereon; of the balance, 45% shall be for the benefit of
Beneficial, and 55% for the benefit of and use by Madison.
From the accounts so established and maintained, Beneficial
shall make remittances at intervals to be determined by
agreement of the parties hereto or, in the absence of such
agreement, at weekly intervals. Amounts remitted to Beneficial
for its benefit shall be applied by Beneficial to reduce
obligations of Madison to Beneficial under existing loans.
Amounts remitted to the Lender shall be applied by the Lender
to satisfy principal and interest obligations of Madison to the
Lender under the Loan.

*2 The loan, Agreement, and payment arrangement can be
illustrated by the following diagram:

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 1994 WL 315365 (Del.Super.)

    $30k

    pr/note          invoices         payments

Sterlings  ----->    Madison  ------->  A.R.A.   --------->           Lock Box

  :              :                               (controlled by

  :              :                               Beneficial)

  :              *:Second Payment Obligation*            :       :

  :       _____                                :

  :      After pr/note is repaid, 55% of proceeds          :

  :      are then paid to Madison, 45% to be          :

  :      retained by Beneficial as payment          :

  :      for existing loans                 :

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                                                          Page 4
Not Reported in A.2d, 1994 WL 315365 (Del.Super.)

:                                                                                    :

:        *First*                                                                     :
        *Payment*
        *Obligatio*
        *n*

Repayme
nt of
pr/note
and
interest
until paid
in full

The current dispute arose when the Sterlings failed to receive all the payments due under the contract. The Sterlings allege certain payments were never sent to the lock box, but rather, were diverted directly to Madison and have since been used by Madison improperly. Beneficial disputes that any payments went directly to Madison. But this dispute is irrelevant for the purposes of this motion. What is relevant and undisputed is that not all required payments were made by A.R.A. directly to the lock box. This is the subject of the current lawsuit.

## II. CONTENTIONS OF THE PARTIES

The Sterlings contend Beneficial owed a duty to the Sterlings to ensure that all payments were made by A.R.A. to the lock box for subsequent distribution by Beneficial. Beneficial contends it owed no such duty to the Sterlings, and that its only obligations were to maintain control and supervision of the lock box and to distribute payments received there in accordance with the formula mandated by Paragraph 5 above. Although a vague allegation is made in the Complaint, the Sterlings have not put forth any evidence to substantiate the contention that any payments which were deposited into the lock box were misappropriated or mishandled by Beneficial.

Thus, there is no genuine issue of material fact that Beneficial did not breach its duty to properly distribute the payments which were received at the lock box. The focal point of this suit is Sterlings' claim that Beneficial is liable for *A.R.A.'s failure to make all required payments to the lock box.*

## III. THE LEGAL STANDARD FOR SUMMARY JUDGMENT

A motion for summary judgment requires the Court to examine the record to determine whether there are any genuine issues of material fact or whether the evidence is so one-sided that one party should prevail as a matter of law. *Burkhart v. Davies,* Del.Supr., 602 A.2d 56, 59 (1991), *cert. denied,* 112 S.Ct. 1946 (1992). The court will consider the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits in making its determination. Super.Ct.Civ.R. 56(c). If, after viewing the record in the light most favorable to the nonmoving party, the Court finds no genuine issue of material fact, summary judgment is appropriate. *Hammond v. Colt Ind. Operating Corp.,* Del.Supr., 565 A.2d 558, 560 (1989). However, summary judgment may not be granted when the record indicates a material fact is in dispute or if it seems desirable to inquire more thoroughly into the facts in order to clarify the application of law to the circumstances. *Wilson v.*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 1994 WL 315365 (Del.Super.)

Page 5

_Triangle Oil Co.,_ Del.Super., 566 A.2d 1016, 1018 (1989).

**\*3** The moving party initially bears the burden of showing a genuine issue of material fact does not exist. _Moore v. Sizemore,_ Del.Supr., 405 A.2d 679, 680 (1979) ("_Moore_"). If a properly supported motion for summary judgment shows no genuine issue of material fact, the burden shifts to the nonmoving party to prove material issues of fact exist. _Id._ at 681. To carry its burden, the nonmovant must produce specific facts which would sustain a verdict in its favor. _Anderson v. Liberty Lobby, Inc.,_ 477 U.S. 242, 248-49 (1986).[FN2] The nonmovant cannot create a genuine issue for trial through bare assertions or conclusory allegations. _Celotex Corp. v. Catrett,_ 477 U.S. 317, 324 (1986); _Martin v. Nealis Motors,_ Del.Supr., 247 A.2d 831, 833 (1968).

> FN2. Because the Federal Rules of Civil Procedure and the Delaware Superior Court Civil Rules are similar, construction of the Federal Rules is persuasive concerning the construction of Superior Court Rules. _Hoffman v. Cohen,_ Del.Supr., 538 A.2d 1096, 1097-98 (1988).

### IV. ANALYSIS

The Sterlings have pled the following causes of action against Beneficial: fraud, misrepresentation, negligence, breach of fiduciary relationship, and breach of contract. In its renewed motion for summary judgment, Beneficial contends there are insufficient facts to support a claim under any of these theories. Each theory, along with its relevant facts, is analyzed below:

### A. Fraud/Misrepresentation

Beneficial contends the Sterlings have not established a prima facie case for fraud or misrepresentation. The elements required for a claim of fraud are: (1) a false representation, usually of fact, (2) made either with knowledge or belief, or with reckless indifference to its falsity, (3) with an intent to induce the plaintiff to act or refrain from acting, (4) plaintiff's action or inaction in reasonable reliance thereof, and (5) damages caused by such reliance. _Browne v. Robb,_ Del.Supr., 583 A.2d 949, 955 (1990), _cert. denied,_ 111 S.Ct. 1425 (1991) ("_Browne_").

Actionable misrepresentation is closely related to a claim for fraud. An action may arise for misrepresentation with only a false impression as to the true state of affairs, with the actor failing to provide qualifying information to cure the mistaken belief. _Norton v. Poplos,_ Del.Supr., 443 A.2d 1, 5 (1982). Thus, it can be characterized as fraud without the element of deception.

Plaintiff must allege with particularity "the time, place and contents of the false representations ..."_Browne,_ 583 A.2d at 955. The complaint in this case makes the general allegation that Beneficial assured the Sterlings "that repayment was assured due the Defendant Beneficial's control, supervision and monitoring of payment by customer and repayment to [the Sterlings]." Complaint at 2. However, no date or time is ascribed to these broad representations, nor do the Sterlings raise the necessary facts in their response to the motion for summary judgment. For these reasons, the necessary elements for claims of fraud and misrepresentation simply have not been shown. Therefore, the claims fail.

### B. Negligence

Under Delaware tort law, purely economic losses are unrecoverable, notwithstanding the existence of privity of contract. _Danforth v. Acorn Structures, Inc.,_ Del.Supr., No. 479, 1991, (June 18, 1992) at 17. Because no personal injury or property damage has been alleged here, the Sterlings' cause of action for negligence rests entirely upon an economic loss

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                    Page 6
Not Reported in A.2d, 1994 WL 315365 (Del.Super.)

theory, and thus, fails as a matter of law. *Id.*

### C. Breach of Fiduciary Relationship

**\*4** In its renewed motion for summary judgment, Beneficial contends the Sterlings have not amply supported their claim for breach of fiduciary relationship. The Sterlings do not address this issue in their answering brief. Additionally, there is a jurisdiction question which must be addressed first and which neither party has discussed in any pleading or motion.

Delaware maintains separate courts for law and equity, with the Superior Court having general jurisdiction over the former, and the Court of Chancery the latter. Del. Const. art. IV, §§ 7, 10; 10 *Del.C.* §§ 341, 542. Although, as a general rule, "Chancery takes jurisdiction over 'fiduciary' relationships because equity, not law, is the source of the right asserted,"*McMahon v. New Castle Associates,* Del.Ch., 532 A.2d 601, 604 (1987) ( "*McMahon* "), its exclusive jurisdiction is not determined by the labels the parties apply. *McMahon* involved a dispute between a tenant and his landlord. In the context of that case Chancellor Allen stated:

Here the relationships is not "fiduciary" in the traditional sense; it is wholly commercial and recourse for violation of the duties assumed by the parties is, in my opinion, in the law court, not in Chancery.

*Id.* at 605.

Here, the relationships were commercial and the remedy sought by the Sterlings-compensatory and punitive damages-is legal in nature. Reduced to its essence, the Sterlings' claim is one for breach of a commercial contract and it will be addressed as such, *infra.*

### D. Breach of Contract

The crux of this claim is the Sterlings' contention that Paragraph 5 of the Agreement, *see, supra,* at 3-4, combined with the lay person's general "common knowledge" and "common sense" about banking practices, created a duty on the part of Beneficial to ensure that all payments were made by A.R.A. to the lock box. To quote from the Sterlings' brief:

As between Madison and Beneficial, Plaintiffs [the Sterlings] expected Defendant Beneficial to have the greater incentive and responsibility because they stood to get a fair amount of money out of this payment, and it's common knowledge that Banks in general are always very attentive to the details and documents that secure and protect their interests. This belief and expectation on Plaintiffs' part was entirely reasonable.... Common sense also supports Plaintiffs' belief in this regard also; after all, with that much at stake for the Defendant Bank, why would they not take all reasonable action to protect their interest, and thus protect Plaintiffs in the process?

Plaintiffs' Answering Brief to Defendant's [Renewed] Motion for Summary Judgment at 3 ("Answer Brief").

Additionally, the Sterlings argue Beneficial's duty under Paragraph 5 to be ambiguous (subject to two or more reasonable interpretations) as a matter of law, thereby requiring extrinsic evidence to be introduced and a factual determination to be made as to the true scope of Beneficial's duty. In support of this theory, the Sterlings introduce three pieces of evidence: (1) A July 10, 1991 letter from Beneficial's attorney to Madison's attorney, discussing the Agreement (the "Letter"), (2) the minutes of Beneficial's Loan Committee meeting, at which the Agreement was discussed and approved (the "Meeting Minutes"), and (3) the deposition testimony of Beneficial's attorney, Melvyn Monzack ("Monzack") (of Walsh and Monzack, P.A.).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                                    Page 7
Not Reported in A.2d, 1994 WL 315365 (Del.Super.)

**\*5** The Sterlings contend certain language in the Letter and Meeting Minutes which states that Monzack would "remain actively involved in the structuring and monitoring of the proposed arrangement" indicates that Monzack's (and thus, Beneficial's) duty under the Agreement was to ensure that A.R.A. made all necessary payments to the lock box. Monzack stated in his deposition that he never understood his role to include such a duty. Thus, the Sterlings argue this uncertainty about the extent of Monzack's (and by extension, Beneficial's) duty is proof positive that the language of Paragraph 5 is ambiguous.

The Sterlings believe the key question to ask in this claim is "What did the parties *intend* Paragraph 5 to mean?" *See* Answer Brief at 5. Thus, because summary judgment is "inappropriate" where the ultimate fact is one of "intention," *Murphy v. Godwin,* Del.Super., 303 A.2d 668, 672 (1973), the Sterlings believe summary judgment should be denied here.

While it is true that summary judgment is improper where the ultimate question is one of subjective intent, the Sterlings rely only upon extrinsic evidence in support of their argument. However, the agreement must *first* be shown to be ambiguous before extrinsic evidence may be introduced for the purposes of shedding light upon the meaning of an agreement. *Citadel Holding Corp. v. Roven,* Del.Super., 603 A.2d 818, 822 (1992) (holding that if a writing is plain and clear on its face, the writing itself is the sole source for gaining an understanding of intent). Instead, the Sterlings have attempted to "bootstrap" their argument by: (1) using extrinsic evidence to create the ambiguity, and (2) then avoiding summary judgment by arguing the ambiguity goes to the issue of intent. This is impermissible. If the agreement is clear on its face, no extrinsic evidence may be considered. *Id.*

Moreover, even if the Letter and Meeting Minutes are considered, they do not support the Sterlings' contention that Beneficial assumed a broad duty of ensuring A.R.A.'s payment. All they indicate is that Monzack (Beneficial's attorney) will

"remain actively involved in the structuring and monitoring of the agreement." At most, assuming a valid agency relationship between Beneficial and Monzack, this statement is merely a reaffirmation of Beneficial's duty announced in Paragraph 5 of the Agreement-to continually receive payments at the lock box and distribute the funds according to the schedule provided in the Agreement. The language of the Letter and Meeting Minutes hint at nothing about Monzack (Beneficial) having a duty to ensure A.R.A. makes its payments on time.

The language on the face of the Agreement [FN3] is clear-Beneficial has a duty to disburse monies received at the lock box, according to the formula prescribed in the Agreement. Contrary to the Sterlings' contentions, nothing in the Agreement imposes upon Beneficial a duty to *insure payment by A.R.A. to the lock box.* Any subjective beliefs or expectations the Sterlings may have harbored regarding Beneficial's duty goes only to the issue of unilateral mistake, which is a legal theory applicable in only very limited circumstances. *See Matter of Enstar Corp.,* Del.Supr., 604 A.2d 404, 411 (1990) (delineating the following requirements for recision of a contract on the ground of unilateral mistake: (1) an unconscionable agreement, (2) a mistake relating to the substance of consideration, (3) occurrence of the mistake regardless of the exercise of ordinary care, and (4) the possibility of restoring the aggrieved party to the status quo). However, unilateral mistake is not alleged here.

> FN3. The Agreement contains an integration clause at Paragraph 15, which states that the "Agreement contains the entire understanding of the parties hereto with respect to the subject matter of the Agreement ... and can be amended, modified or canceled only by a written instrument executed by all parties hereto." This further supports a refusal to consider extrinsic evidence for the purpose of determining the parties' obligations.

**\*6** Therefore, because the Agreement is not ambiguous on its

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                          Page 8
Not Reported in A.2d, 1994 WL 315365 (Del.Super.)

face, no extrinsic evidence may be considered. And, because
no evidence indicates Beneficial improperly handled whatever
monies which were in fact deposited in the lock box, there is          END OF DOCUMENT
no material issue of fact concerning whether Beneficial
breached its only duty under terms of the Agreement. Thus, the
cause of action for breach of contract fails.

## V. CONCLUSION

Based upon the evidence submitted, the Court finds no genuine
issue of material fact regarding any of the causes of action
alleged by the Sterlings against Beneficial. There have been no
particularized facts shown which would indicate a *prima facie*
case for the claims of fraud or misrepresentation. The claim for
negligence is legally insufficient because only economic
damages are claimed.

The final claim-breach of contract-depends entirely upon a
finding by the Court that Beneficial's duty owed to the
Sterlings included a duty of insuring payment by A.R.A. to the
lock box-a finding which the Court cannot reasonably make.
The only duty specified in the Agreement is that of Beneficial's
proper handling and disbursing of funds which were deposited
in the lock box. The Sterlings have not put forth facts which
could reasonably substantiate a breach of the duty specified.

For the foregoing reasons, the Court finds the existence of no
genuine issues of material fact with respect to any of the claims
presented in this action. Consequently, Beneficial's Renewed
Motion for Summary Judgment is GRANTED.

IT IS SO ORDERED.

Del.Super.,1994.
Sterling v. Beneficial Nat. Bank, N.A.
Not Reported in A.2d, 1994 WL 315365 (Del.Super.)

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# Exhibit D

Westlaw.

Slip Copy                                                                                    Page 1
Slip Copy, 2008 WL 2003747 (D.Md.)

**C**G.M. Pusey and Associates, Inc. v. Britt/Paulk Ins.
Agency, Inc.
D.Md.,2008.
Only the Westlaw citation is currently available.
United States District Court,D. Maryland.
G.M. PUSEY AND ASSOCIATES, INC., et al.,
Plaintiffs,
v.
BRITT/PAULK INSURANCE AGENCY, INC.,
Defendant.
**Civil Action No. RDB-07-3229.**

May 6, 2008.

Bruce Frederick Bright, Ayres Jenkins Gordy and Almand
PA, Ocean City, MD, for Plaintiff.
John Alden Carpenter, Jr., Washington, DC, J. David
Hopkins, Meghan D. Marino Locke Lord Bissell and
Liddell LLP, Atlanta, GA, for Defendant.

### *MEMORANDUM OPINION*

RICHARD D. BENNETT, District Judge.
**\*1** This case arises from alleged breaches of a
Confidentiality Agreement and an Employment
Agreement. George M. Pusey, individually and as an
authorized officer of G.M. Pusey and Associates, Inc.
("GMP"), executed these agreements with the Defendant
corporation, Britt/Paulk Insurance Agency, Inc.
("Britt/Paulk" or "Defendant"). GMP and Mary Anne
Pusey, both individually and as Personal Representative of
her deceased husband's estate, (collectively, "Plaintiffs")
have brought this action against Britt/Paulk. Currently
pending before this Court is a Motion to Dismiss or, in the
Alternative, Motion for a More Definite Statement. (Paper
No. 13.) This Court has diversity jurisdiction over this
matter pursuant to 28 U.S.C. § 1332.[FN1]The parties'

submissions have been reviewed and no hearing is
necessary. *See* Local Rule 105.6 (D.Md.2008). For the
reasons that follow, the Motion to Dismiss is GRANTED
in part and DENIED in part. Specifically, the Motion to
Dismiss is GRANTED as to Counts II and III as well as to
Plaintiff Mary Anne Pusey in her individual capacity,
although she will remain a Plaintiff in her capacity as
Personal Representative of the Estate of George M. Pusey.
The Motion to Dismiss is DENIED as to Counts I, IV, V,
and VI. The alternative Motion for a More Definite
Statement is DENIED.

FN1. Plaintiff Mary Anne Pusey is an individual
citizen of the State of Maryland. Since she is also
bringing suit as the Personal Representative of
the Estate of George M. Pusey, Ms. Pusey, in her
representative capacity, is "deemed to be a
citizen only of the same State as the
decedent."28 U.S.C. § 1332(c)(2). There is
currently no information in the pleadings before
this Court to establish the citizenship of the
decedent, George M. Pusey. Since Mary Anne
Pusey and George M. Pusey were married at the
time of Mr. Pusey's death, it appears from the
parties' submissions that Mr. Pusey was also a
citizen of the State of Maryland. The Defendant,
Britt/Paulk Insurance Agency, Inc., is a
corporation organized under the laws of the State
of Georgia and has its principal place of business
in the State of Georgia with a branch office in the
State of Delaware.

### *BACKGROUND*

The alleged facts are viewed in a light most favorable to
the Plaintiffs.*Venkatraman v. REI Sys., Inc.,* 417 F.3d 418,
420 (4th Cir.2005). George M. Pusey, for thirty years
prior to his death, worked in the insurance
industry-initially as a claims adjuster, then as a

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                          Page 2
Slip Copy, 2008 WL 2003747 (D.Md.)

salesperson, producer, and independent agent. (Compl.¶ 5.) During this time, Mr. Pusey developed and maintained relationships with people and companies within the business community, including but not limited to policyholders, customers, clients, joint ventures, distributors, associations, insurance companies, insurance agencies, and underwriters. (*Id.*) In addition, Mr. Pusey developed and maintained special skills, abilities, knowledge, and information in the insurance field specifically tailored to the commercial forestry/timber harvesting (*i.e.,* logging) industry. (*Id.*)

Over the years, Mr. Pusey began to write insurance policies within the logging industry for several different insurance companies, such as Reliance Insurance Company, The Hartford Insurance Company, Royal Insurance, and Empire Insurance Company. (*Id.* ¶ 6.) Mr. Pusey operated as a "managing general agent" with a group of independent agencies and producers operating for him throughout the country. (*Id.*) Providing insurance policies for this network became a highly profitable business for Mr. Pusey, generating approximately $6 million in insurance premiums annually (hereinafter this will be referred to as the "logging insurance program").(*Id.*)

In or about 1994, Mr. Pusey decided to become an independent agent for O'Donovan and Associates ("O'Donovan"), an independent insurance agency.(*Id.* ¶ 7.) However, Mr. Pusey continued to maintain and develop his logging insurance program. (*Id.*) Mr. Pusey was an agent of O'Donovan until approximately 2001. (*Id.* ¶ 8.)

*2 In or about 1999, Mr. Pusey organized G.M. Pusey and Associates, Inc. ("GMP") under the laws of the State of Maryland. (*Id.* ¶ 9.) This corporation lay dormant until approximately 2001 when Mr. Pusey began to operate GMP as an independent insurance agency. (*Id.*) Mr. Pusey

continued to focus his business on the logging industry, utilizing his network of independent agencies, producers, and policyholders throughout the country. (*Id.*) During this time, GMP continued to issue policies through O'Donovan with the understanding that O'Donovan would receive a portion of the commissions earned by GMP. (*Id.* ¶ 10.)

In late 2005 or early 2006, Mr. Pusey decided to market himself and GMP to other insurance companies as a specialist in insurance related to the logging industry. (*Id.* ¶ 13.)During this effort, Mr. Pusey contacted Munich Re Group ("Munich") to discuss the possibility of Munich becoming the issuing company for the logging industry insurance policies that Mr. Pusey and GMP would write in the future. (*Id.*) Munich had been issuing policies through Britt/Paulk Insurance Agency, Inc. ("Britt/Paulk") for quite some time. (*Id.* ¶ 14.)Munich arranged a meeting between Mr. Pusey and representatives of Britt/Paulk to discuss the possibility of Britt/Paulk becoming the sponsoring agency for Mr. Pusey and GMP through which they would manage and conduct the logging insurance program. (*Id.*)

In an effort to continue the discussions, Britt/Paulk entered into a "Confidentiality Agreement" with Mr. Pusey and GMP. (*See id.* at Ex. B.) This agreement stated in pertinent part: "Britt Paulk has expressed its interest in entering into a business arrangement or transaction ... with [GMP and Mr. Pusey]; and ... in connection therewith it may be desirable for the Parties to consult and for [GMP] and/or [Mr. Pusey] to disclose to Britt Paulk certain proprietary and confidential information relating to [GMP] and [Mr. Pusey]."(*Id.* at Ex. B.) Under the agreement, Britt/Paulk agreed not to "disclose, disseminate, or publish" the confidential information or use it "for any purpose other than in connection with its own internal discussion, negotiation, evaluation, or execution of the Transaction."(*Id.*) The scope of the "confidential information" was broad, including "information relating to [GMP's] and/or [Mr. Pusey's] prospects and

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                                Page 3
Slip Copy, 2008 WL 2003747 (D.Md.)

clients,'"'"information, documents and files that [GMP] and/or [Mr. Pusey] has already provided to Britt Paulk," and all information generated by or for Britt Paulk ... that in whole or in part include, reflect or are based on Confidential Information obtained from [GMP] and/or [Mr. Pusey]." (*Id.*)This Confidentiality Agreement has a three-year term, which commenced on February 22, 2006. (*Id.*)

After extensive negotiation, GMP and Mr. Pusey agreed that Britt/Paulk would become the sponsoring agency through which GMP and Mr. Pusey would continue to manage the logging insurance program and Munich would serve as the issuing insurance carrier. (*Id.* ¶ 19.)Mr. Pusey agreed to become an employee of Britt/Paulk pursuant to an Employment Agreement dated September 1, 2006.(*Id.* at Ex. C.)

*3 Since Mr. Pusey's death in March of 2007, Britt/Paulk has allegedly continued to maintain and profit from the logging insurance program and the alleged confidential information related to that program. (Compl.¶ 24.) At no time did GMP or Mr. Pusey's estate transfer, assign, or waive its rights to the confidential information or the logging insurance program. (*Id.* ¶ 21.)Thus, Britt/Paulk has allegedly failed to pay GMP, the Estate of George Pusey, or Mary Anne Pusey (as widow and Personal Representative of his Estate) any kind of compensation for use of the information. (*Id.*)

On October 22, 2007, Mary Anne Pusey, both individually and in her capacity as Personal Representative of the Estate of George M. Pusey, and GMP originally filed a Complaint against Britt/Paulk in the Circuit Court for Worcester County, Maryland. On November 30, 2007, Britt/Paulk filed a Notice of Removal to this Court on the basis of diversity jurisdiction, pursuant to 28 U.S.C. §§ 1332 and 1441.

The Complaint contains a total of six counts. (Paper No. 2.) Count I alleges that Britt/Paulk breached the Confidentiality and Employment Agreements by failing to compensate GMP and Mr. Pusey's estate for its continued use of the confidential information. (*Id* . ¶¶ 25-27.)Count II is worded identically but purports to state a claim for breach of the fiduciary duties that were allegedly owed to the Plaintiffs by Britt/Paulk. (*Id.* ¶¶ 28-30.)In Count III, Plaintiffs allege that Britt/Paulk breached the duty of good faith and fair dealing during negotiations and after Mr. Pusey's death by continuing to use his insurance logging program for profit without providing compensation.(*Id.* ¶¶ 31-33.)Count IV alleges that Britt/Paulk made false representations of material facts to Mr. Pusey and GMP when it promised to compensate them for use of the confidential information and logging insurance program, because GMP and Mr. Pusey reasonably and justifiably relied on those misrepresentations.(*Id.* ¶¶ 35-37.)Count V alleges that Britt/Paulk has been unjustly enriched. (*Id.* ¶¶ 38-41.)Finally, Count VI alleges that Britt/Paulk "has engaged and is continuing to engage in conduct constituting willful and malicious misappropriation of trade secrets within the meaning of the Maryland Uniform Trade Secrets Act,"Md.Code Ann., Com. Law §§ 11-201, *et seq. (Id.* ¶¶ 42-44.)

On December 21, 2007, Defendant, Britt/Paulk, filed a Motion to Dismiss, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, or in the alternative, a Motion for a More Definite Statement pursuant to Rule 12(e) of the Federal Rules of Civil Procedure. (Paper No. 13.)

*STANDARD OF REVIEW*

Defendant has moved for dismissal pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Under Rule 12(b)(6), a complaint may be dismissed for failure to state a claim upon which relief can be granted.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                          Page 4
Slip Copy, 2008 WL 2003747 (D.Md.)

Fed.R.Civ.P. 12(b)(6). A Rule 12(b)(6) motion tests the legal sufficiency of a complaint. _Edwards v. City of Goldsboro,_ 178 F.3d 231, 243 (4th Cir.1999). Therefore, the court must accept all well-pleaded allegations as true and construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff. _Ibarra v. United States,_ 120 F.3d 472, 473 (4th Cir.1997). A complaint must meet the "simplified pleading standard" of Rule 8(a)(2), _Swierkiewicz v. Sorema N.A.,_ 534 U.S. 506, 513, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002), which requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)).

**\*4** Although Rule 8(a)(2) requires only a "short and plain statement," the Supreme Court of the United States recently explained that a complaint must contain "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action." _Bell Atl. Corp. v. Twombly,_ ---U.S. ----, ---- - ----, 127 S.Ct. 1955, 1964-65, 167 L.Ed.2d 929 (2007). The factual allegations contained in a complaint "must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." _Id._ at 1965.Thus, a complaint must allege "enough facts to state a claim to relief that is plausible on its face." _Id._ at 1974.

While "notice pleading requires generosity in interpreting a plaintiff's complaint[,] ... generosity is not fantasy." _Bender v. Suburban Hosp., Inc.,_ 159 F.3d 186, 191 (4th Cir.1998). In considering a motion to dismiss, the court "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments" nor "the legal conclusions drawn from the facts." _Eastern Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship,_ 213 F.3d 175, 180 (4th Cir.2000) (citations omitted).

_DISCUSSION_

Britt/Paulk Insurance Agency, Inc. has moved to dismiss all counts of the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. As a general matter, Britt/Paulk contends in its Motion to Dismiss that Mary Anne Pusey, in her individual capacity, should be dismissed from this case for lack of standing [FN2] on the grounds that she was not a party to any of the contracts or an owner of any of the confidential information at issue. To meet the standing requirement, "[a] plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." _Allen v. Wright,_ 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984); _see also Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.,_ 204 F.3d 149, 154 (4th Cir.2000). It is well established that a plaintiff must prove three elements: "(1) injury in fact; (2) traceability; and (3) redressability." _Friends of the Earth,_ 204 F.3d at 154;_Lujan v. Defenders of Wildlife,_ 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Plaintiffs argue that Ms. Pusey has standing in her individual capacity because of the clause found in the Confidentiality Agreement which states in part that the contract "shall be binding upon, and shall inure to the benefit of, the Parties and their respective, [sic] parent, subsidiary and other affiliated and related firms, and their successors, assigns, executors, administrators and personal representatives." (Compl.Ex.B.) However, the clause specifically leaves out heirs, thus, Ms. Pusey cannot claim to have suffered any injury in fact in her individual capacity. Rather, this clause makes the appropriate party of interest the Estate of George M. Pusey and not Ms. Pusey. Therefore, while Ms. Pusey may properly sue as the personal representative of the Estate of George M. Pusey, she will be dismissed for lack of standing in her _individual_ capacity.

FN2. The Defendant states that Ms. Pusey should be dismissed under Rule 12(b)(6) of the Federal Rules of Procedure, but this dismissal should be

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

decided under Rule 12(b)(1). Since subject matter jurisdiction can be raised at any time by the court *sua sponte,* this Court can properly decide at this time whether Ms. Pusey lacks standing and should be dismissed under Rule 12(b)(1).

**\*5** As this Court's jurisdiction is based on diversity of citizenship, this Court will apply Maryland law with respect to the Defendant's Motion to Dismiss. *See Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) ("Except in matters governed by the Federal Constitution or by Acts of Congress, the law to be applied in any case is the law of the State."); *Limbach Co., LLC v. Zurich Am. Ins. Co.,* 396 F.3d 358, 361 (4th Cir.2005) ("The district court must apply the law of the forum state, including its choice of law rules.").

**I. Count I: Breach of Contract**

As to Count I, Britt/Paulk argues that the Plaintiffs failed to state a claim for breach of contract because the merger and integration clauses contained in the subsequent Employment Agreement extinguished the initial Confidentiality Agreement.[FN2]Specifically, the Employment Agreement provides "[t]his instrument contains the entire and only agreement between the parties respecting its subject matter and supercedes all preexisting agreements between the[m], oral or written, regarding that subject matter."(Compl.Ex.B.) However, Maryland has long recognized that this theory can only be applied to an agreement that is executed by the *same parties* and relates to the *same subject matter. See Hercules Powder Co. v. Harry T. Campbell Sons Co.* 156 Md. 346, 144 A. 510, 516 (Md.1929) (citation omitted) ("[A] subsequent contract completely covering the same subject matter, and made by the same parties, as an earlier agreement, but containing terms inconsistent with the former contract, so that the two cannot stand together, rescinds, substitutes,

and is substituted for the earlier contract and becomes the only agreement of the parties on the subject.").

FN3. Britt/Paulk raises the same argument with respect to an integration clause in a Broker Agreement between itself and GMP. (Def.'s Mem. Supp. Mot. Dismiss Ex. A.) Ordinarily, when the parties attach extrinsic documents, such as the Broker Agreement in this case, to a motion to dismiss for failure to state a claim, the motion must be converted to one for summary judgment assuming the parties have had reasonable time to conduct discovery. *See*Fed.R.Civ.P. 12(b). The Fourth Circuit has created an exception such that "when a defendant attaches a document to its motion to dismiss, 'a court may consider it in determining whether to dismiss the complaint [if] it was integral to and explicitly relied on in the complaint and [if] the plaintiffs do not challenge its authenticity.'" *Am. Chiropractic v. Trigon Healthcare,* 367 F.3d 212, 234 (4th Cir.2004) (citations omitted); *see also Blankenship v. Manchin,* 471 F.3d 523, 526 n. 1 (4th Cir.2006). Here, Plaintiffs argue that the Broker Agreement "is not executed by [Britt/Paulk]," that Defendant has not attached the appropriate affidavit to support a Rule 56 motion, and that it has not had an opportunity to conduct discovery to oppose a motion for summary judgment. (Pls.' Mem. Opp'n Mot. Dismiss 2, 4.) Accordingly, this Court will not rely on the Broker Agreement at this time and, therefore, need not convert the motion to dismiss to one for summary judgment.

As this Court has previously noted,

"[a]n integrated agreement is a writing or writings constituting a final expression of one or more terms of an agreement.""Where the parties reduce an agreement

Slip Copy                                                                                                  Page 6
Slip Copy, 2008 WL 2003747 (D.Md.)

to a writing which in view of its completeness and
specificity reasonably appears to be a complete
agreement, it is taken to be an integrated agreement
unless it is established by other evidence that the writing
did not constitute a final expression."An integrated
agreement is "completely integrated" if it is adopted as
the "complete and exclusive statement of the terms of
the agreement"; otherwise it is "partially integrated."
Whether an agreement [sic] integrated, and whether it is
completely or partially integrated, are preliminary
questions determined by the court.

Reutemann v. Lewis Aquatech, Inc., 2005 U.S. Dist.
LEXIS 13272, *7-8, 2005 WL 1593473 (D.Md. July 5,
2005) (quoting Restatement (Second) of Contracts §§
209-210 (1981)) (internal citations omitted).

Here, the Confidentiality Agreement was made between
Mr. Pusey, individually, and GMP and Britt/Paulk. (See
Compl. Ex. B.) The Employment Agreement, in contrast,
was only between Mr. Pusey and Britt/Paulk; GMP was
not a party to that contract. (See Compl. Ex. C.) The
subject matter of the contracts was also different. The
Confidentiality Agreement dealt with the protection of
confidential information that Mr. Pusey and GMP
provided to Britt/Paulk during negotiations to form a
business relationships. (Id. at Ex. B.) In contrast, the
Employment Agreement addressed confidential
information that Britt/Paulk provided to Mr. Pusey and
precluded Mr. Pusey from revealing that information.(Id.
at Ex. C.) The Employment Agreement specifically
excluded any information that Mr. Pusey or GMP may
have given to Britt/Paulk in the course of their
negotiations and ongoing business relationship. (Id.
("[A]ny information relating to pre-existing customer
relationships, and any other information, skills and
knowledge in [Mr.] Pusey's possession prior to his
[Britt/Paulk] employment, shall not be considered
Confidential Information for the purposes of this
Agreement....").)

*6 In D & G Flooring, LLC v. Home Depot U.S.A., Inc.,
Civil Case No. JFM-04-2954, 2005 U.S. Dist. LEXIS
3992 (D.Md. Mar.15, 2005), a case cited by Britt/Paulk,
this Court held that the plaintiff flooring company could
not reasonably believe that it was the exclusive flooring
installer for Home Depot because the parties' 1997
contract expressly provided that there was no exclusivity
and the parties' 2002 contract, which fully integrated the
1997 contract, likewise made no mention of exclusivity. D
& G Flooring, LLC is distinguishable from this case,
however, because only D & G Flooring, LLC and Home
Depot were parties to both the 1997 and 2002 contracts
and because the subject matter was the same in both-the
terms by which D & G Flooring rendered flooring
installation services for Home Depot. In contrast, in this
case, all of the parties to the Confidentiality Agreement
are not included in the Employment Agreement and the
subject matter of the two contracts-the protection of
confidential information shared during negotiations and an
individual's terms of employment, respectively-are not the
same.

At this stage in the proceedings, this Court finds that the
integration clause in the Employment Agreement does not
extinguish the Confidentiality Agreement. Accordingly,
the Defendant's Motion to Dismiss pursuant to Rule
12(b)(6) is DENIED as to Count I.

**II. Count II: Breach of Fiduciary Duty**

As to Count II, Britt/Paulk notes that Maryland does not
recognize an independent cause of action for breach of
fiduciary duty. Int'l Brotherhood of Teamsters v. Willis
Corroon Corp., 369 Md. 724, 802 A.2d 1050, 1052 n. 1
(Md.2002); Vinogradova v. Suntrust Bank, Inc., 162
Md.App. 495, 875 A.2d 222, 231 (Md.Ct.Spec.App.2005)
(quoting Int'l Brotherhood of Teamsters, 802 A.2d at 1052

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                    Page 7
Slip Copy, 2008 WL 2003747 (D.Md.)

n. 1). This Court has also recognized this principle of Maryland law. *See* *Swedish Civil Aviation Admin. v. Project Management Enterprises, Inc.,* 190 F.Supp.2d 785, 801 (D.Md.2002) ("[T]here is no independent tort for breach of fiduciary duty in Maryland, especially in light of the multiple alternative remedies involving the alleged breach available ."); *Kerby v. Mortgage Funding Corp.,* 992 F.Supp. 787, 803 (D.Md.1998) ("Maryland recognizes no universal or omnibus tort for the redress of breach of fiduciary duty, at least in a situation where other remedies exist ....") (internal quotations omitted); *McGovern v. Deutsche Post Global Mail, Ltd.,* 2004 WL 1764088, 11-12 (D.Md.2004) ("[A] breach of fiduciary duty can give rise to a cause of action-that is, it can be a component of a cause of action-but it cannot be a cause of action standing alone.").

The Plaintiffs argue that the Maryland Court of Appeals in *Kann v. Kann,* 344 Md. 689, 690 A.2d 509 (Md.1997), left the door open for an independent cause of action for breach of fiduciary duty. In *Kann,* the court held that "this does not mean that there is no claim or cause of action for breach of fiduciary duty." *Id.* at 521. However, "a careful reading of [*Kann* ] merely leads to the conclusion that a breach of fiduciary duty would continue to be part of other causes of action." *Swedish Civil Aviation,* 190 F.Supp.2d at 801. Since the Plaintiffs have a variety of alternative remedies, including the breach of contract claim, in which a breach of fiduciary duty may be a part, Defendant's Motion to Dismiss is GRANTED as to Count II.

### III. Count III: Breach of Duty of Good Faith and Fair Dealing

*7 Britt/Paulk also argues that Maryland does not recognize an independent cause of action for breach of the duty of good faith and fair dealing. Specifically, in *Mount Vernon Props., LLC v. Branch Banking & Trust Co.,* 170 Md.App. 457, 907 A.2d 373, 382 (Md.Ct.Spec.App.2006), the Court of Special Appeals of Maryland held that "there is no independent cause of action at law in Maryland for breach of the implied covenant of good faith and fair dealing." This Court has similarly recognized this principle of Maryland law. *Abt Assocs., Inc. v. JHPIEGO Corp.,* 104 F.Supp.2d 523 (D.Md.2000) (quoting *Parker v. Columbia Bank,* 91 Md.App. 346, 366, 604 A.2d 521 (1992) ("[T]he Court of Special Appeals stated that the implied duty of good faith 'simply prohibits one party to a contract from acting in such a manner as to prevent the other party from performing his obligations under the contract.'"); *Baker v. Sun Co., Inc.,* 985 F.Supp. 609, 610 (D.Md.1997).

However, Maryland has recognized an imposition of the duty of good faith and fair dealing in the *performance of a contract. See* *Food Fair Stores, Inc. v. Blumberg,* 234 Md. 521, 200 A.2d 166 (Md.1964) ("[I]n every contract there exists an implied covenant that each of the parties thereto will act in good faith and deal fairly with the others."). Therefore, Plaintiffs' claim for breach of duty of good faith and fair dealing is merely a part of the breach of contract claim, and this Court has already held that Count I states a claim for breach of contract. Accordingly, Defendant's Motion to Dismiss Count III is GRANTED.

### IV. Count IV: Misrepresentation

Count IV of the Complaint alleges misrepresentation on the part of Britt/Paulk regarding the negotiations and ongoing business dealings between the parties.[FN4] Britt/Paulk argues that this count is in all practicality an "artfully plead claim for fraud" (Def's Mot. to Dismiss 11 (internal quotation omitted)) and that, therefore, it fails to comply with the particularity requirements of Rule 9(b) of the Federal Rules of Civil Procedure. Rule 9(b) states in pertinent part: "In all averments of fraud ..., the circumstances constituting fraud ... shall be stated with particularity." Fed. R. Civ. P 9(b). This rule essentially

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                    Page 8
Slip Copy, 2008 WL 2003747 (D.Md.)

requires plaintiffs to plead specific allegations with regard to "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Harrison v. Westinghouse Savannah River Co.,* 176 F.3d 776, 784 (4th Cir.1999). A failure to comply with this rule is treated as a failure to state a claim under Rule 12(b)(6). *See Harrison,* 176 F.3d at 783 n. 5. Before the motion to dismiss will be granted, "[a] court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." *Id.* at 784.

> FN4. This Court notes that this action was originally brought in the Circuit Court for Worcester County, Maryland. Under the Maryland Rules, there is no corollary to Rule 9(b) in the Federal Rules of Civil Procedure.

**\*8** In this case, Plaintiffs allege in Count IV that Britt/Paulk, "through its agents and representatives," made false misrepresentations of material fact (Compl.¶ 35), although the Complaint does not specify which agents made the statements. The Complaint also articulates the contents of these misrepresentations, including that Britt/Paulk would only use the confidential information as specified in the Confidentiality Agreement, and that it would not disclose the confidential information without compensating Mr. Pusey and GMP as contemplated by the Employment Agreement. (*Id.*) In addition, the Complaint alleges that these representations were made during the negotiations between Britt/Paulk and Mr. Pusey and GMP. (*Id.*)This Court finds that Count IV of the Plaintiffs' Complaint sufficiently puts the Defendant on notice of the specific circumstances giving rise to its claim for misrepresentation and, therefore, satisfies the particularity requirement for a fraud claim set forth in Rule 9(b) of the Federal Rules of Civil Procedure. Therefore, the Defendant's Motion to Dismiss is DENIED as to Count IV.

**V. Count V: Unjust Enrichment**

Count V of the Complaint alleged unjust enrichment on the part of Britt/Paulk. Britt/Paulk argues that this claim must fail as a matter of law, because it is a quasi-contract remedy and because there is already an express agreement that controls between the parties. The equitable remedy for unjust enrichment permits recovery "where, in fact, there is no contract, but where circumstances are such that justice warrants a recovery as though there had been a promise." *County Comm'rs of Caroline County v. J. Roland Dashiell & Sons, Inc.,* 358 Md. 83, 747 A.2d 600, 606 (Md.2000) (citation omitted). Britt/Paulk is correct that a plaintiff cannot recover under a quasi-contract claim "when a contract exists between the parties concerning the same subject matter on which the quasi-contractual claim rests...." *Id.* at 607.However, although the Plaintiffs "may not recover under both contract and quasi-contract theories, [they are] not barred from pleading these theories in the alternative where the existence of a contract concerning the subject matter is in dispute." *Swedish Civil Aviation Admin. v. Project Management Enterprises, Inc.,* 190 F.Supp.2d 785, 792 (D.Md.2002). Therefore, since there is a dispute regarding the validity of the Confidentiality Agreement, Plaintiffs may plead their claim for unjust enrichment.

Additionally, the Federal Rules of Civil Procedure allow parties to plead claims in the alternative. Rule 8(e)(2) states in part, "[a] party may also state as many separate claims or defenses as the party has regardless of consistency and whether based on legal [or] equitable ... grounds."Fed. R. Civ. P 8(e)(2). Accordingly, Plaintiffs may plead claims both in contract and quasi-contract. Therefore, Defendant's Motion to Dismiss Count V is

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                          Page 9
Slip Copy, 2008 WL 2003747 (D.Md.)

DENIED.

**VI. Count VI: Violation of the Maryland Uniform Trade Secrets Act**

*9 In Count VI of the Complaint, the Plaintiffs allege that Britt/Paulk violated the Maryland Uniform Trade Secrets Act ("MUTSA"), Md.Code Ann., Com. Law §§ 11-1201, *et seq.*, by continually using the confidential information that Mr. Pusey and GMP disclosed to Britt/Paulk.

MUTSA defines a "trade secret" as

> information, including a formula, pattern, compilation, program, device, method, technique, or process, that: (1) Derives independent economic value ... from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

*Id.*§ 11-1201(e). Since the record does not include detailed information about what was contained within the alleged confidential information, this Court cannot make a determination at this stage whether the information either derived independent economic value or was subject to reasonable efforts to maintain its secrecy. Therefore, at this stage of the proceedings, this Court must assume that the allegation in the Complaint that the confidential information constituted a "trade secret" under MUTSA.

Defendant primarily argues that Plaintiffs failed to state a claim for relief under MUTSA, because they did not allege that Britt/Paulk used improper means to acquire the information or disclose any trade secrets. (Def.'s Mem.

Supp. Summ. J. 15.) In support, Defendant relies on *LeJeune v. Coin Acceptors, Inc.*, 381 Md. 288, 849 A.2d 451, 465 (Md.2004), in which the Maryland Court of Appeals noted that section 11-1201(c)"describes two general types of misappropriation: (1) acquisition of a trade secret by improper means or (2) disclosure of a trade secret." As to the first kind of misappropriation, the statute clearly states that "improper means" can come in several forms including: "theft, bribery, *misrepresentation*, breach or inducement of a *breach of a duty to maintain secrecy,* or espionage...."Md.Code Ann., Com. Law § 11-1201(b) (emphasis added). In Count IV of the Complaint, which this Court has already held survives the Motion to Dismiss, Plaintiffs properly allege that Britt/Paulk improperly acquired and used the confidential information through misrepresentation. (*See* Compl. ¶¶ 34-37.) Additionally, in Count I, which this Court has also held survives the Motion to Dismiss, Plaintiffs claim that the Confidentiality Agreement established a duty of secrecy pertaining to the confidential information. (*See id.* ¶¶ 25-27.)Thus, the Complaint sufficiently alleges facts that, if proven, would support a finding that Britt/Paulk obtained the confidential information by improper means.

As to the second kind of misappropriation, despite the phrasing used in *LeJeune,* MUTSA clearly states that "disclosure or *use* of a trade secret" satisfies the definition of "misappropriation." Md.Code Ann., Com. Law § 11-1201(c)(2) (emphasis added). The Plaintiffs allege numerous times throughout their Complaint that Britt/Paulk has and is continuing to use the confidential information that is covered by the Confidentiality Agreement. Accordingly, Defendant's Motion to Dismiss Count VI is DENIED.

*10 As a final matter, Defendant has alternatively moved for a more definite statement. Pursuant to Rule 12(e) of the Federal Rules of Civil Procedure, "[a] party may move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                                   Page 10
Slip Copy, 2008 WL 2003747 (D.Md.)

ambiguous that the party cannot reasonably prepare a response."However, as this Court has held that Counts I, IV, V, and VI have stated a claim upon which relief can be granted, Defendant's Motion for a More Definite Statement is DENIED.

### CONCLUSION

For the forgoing reasons, the Defendant's Motion to Dismiss with respect to Counts II and III is GRANTED. The Defendant's Motion to Dismiss with respect to Counts I, IV, V, and VI is DENIED. The Defendant's Motion in the alternative for a More Definite Statement is DENIED. The Defendant's Motion to Dismiss Ms. Pusey in her individual capacity will be GRANTED. A separate Order follows.

### ORDER

Based on the reasons stated in the foregoing Memorandum Opinion, IT IS this 6th day of May, 2008, HEREBY ORDERED that

a. Defendant Britt/Paulk Insurance Agency, Inc.'s Motion to Dismiss or, in the Alternative, Motion for a More Definite Statement (Paper No. 13) is GRANTED in part and DENIED in part;

   i. The Motion to Dismiss is GRANTED as to Counts II and III, which are dismissed with prejudice, as well as to Plaintiff Mary Anne Pusey in her individual capacity;

   ii. The Motion to Dismiss is DENIED as to Counts I, IV, V, and VI;

   iii. The Motion for a More Definite Statement is DENIED;

b. Defendant Britt/Paulk Insurance Agency, Inc. shall file an Answer to the Complaint within twenty (20) days; and

c. The Clerk of the Court transmit copies of this Order and the accompanying. Memorandum Opinion to counsel of record.

D.Md.,2008.
G.M. Pusey and Associates, Inc. v. Britt/Paulk Ins. Agency, Inc.
Slip Copy, 2008 WL 2003747 (D.Md.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.