## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SEA STAR LINE, LLC,<br>a limited liability company, | : | Civil Action No. 05-CV-245-JJF |
| | : | |
| Plaintiff, | : | |
| | : | |
| -vs- | : | |
| | : | |
| EMERALD EQUIPMENT LEASING, INC.,<br>a corporation, | : | |
| | : | |
| Defendant, | : | |
| | : | |
| -vs- | : | |
| | : | |
| SEA STAR LINE, LLC, | : | |
| | : | |
| Counter-Defendant. | : | |

### EMERALD EQUIPMENT LEASING, INC.'S POST TRIAL ANSWERING BRIEF

ECKERT SEAMANS CHERIN & MELLOTT, LLC
Ronald S. Gellert, Esquire (No. 4259)
Tara L. Lattomus, Esquire (No. 3515)
Margaret F. England (No. 4248)
300 Delaware Avenue, Suite 1210
Wilmington, De 19801
Phone: 302-425-0430
Fax:    302-425-0432

Gary M. Schildhorn, Esquire
Alan I. Moldoff, Esquire
Two Liberty Place
50 South 16th Street, 22nd Floor
Philadelphia, PA 19102
Phone: 215-851-8400
Fax:    215-851-8383

Attorneys for Emerald Equipment Leasing, Inc.

## INTRODUCTION

The issues in this case are not complicated.  The facts are, for the most part, not disputed.

A lease, the Rental Agreement,[1] was entered into between Emerald and Sea Star by which Sea

Star agreed to pay per diem rental charges for its use of the equipment owned by Emerald, i.e.,

the Emerald Equipment.  Sea Star agreed to account for its usage by preparing monthly "self-

billing reports."  Sea Star prepared the self-billing reports which it sent to Emerald and to

Emerald's lender, MBC.  The self-billing reports substantially underreported Sea Star's usage of

the Emerald Equipment.  None of these facts are questioned.  The primary issues that remain are

the amount by which the self-billing reports underreported Sea Star's usage of the Emerald

Equipment and what equipment used by Sea Star was not returned to Emerald.  Essentially, then,

this is an "accounting" case.

Despite this, Sea Star has and continues to raise a myriad of mostly irrelevant,

impertinent, or specious issues and arguments, both factually and legally, wholly lacking in any

significance or merit.  During the course of this tortuous litigation (which Sea Star initiated as a

declaratory judgment action in Florida in a "race to the courthouse"), Sea Star has filed two (2)

motions to dismiss and two (2) summary judgment motions.  Its refusal to provide various

requested discovery has resulted in time consuming and expensive discovery motions.  Due to

the wholly inaccurate and substantially underreported usage of the Emerald Equipment set forth

in the self-billing reports, Emerald has been forced to spend countless hours and considerable

expense to extract the pertinent information from Sea Star through discovery in order to prepare

its own accounting of Sea Star's use of the Emerald Equipment.  Too much ink has been wasted

---

[1] For purposes of uniformity, Emerald will utilize the same designations used by Sea Star in its Opening Brief, including references to the record.  The only additional references utilized by Emerald which were not used by Sea Star are references to the deposition of Philip Bates dated January 10, 2005 which shall be designated as "Bates" and the Rule 30(b)(6) deposition of Sea Star dated March 18, 2008 which shall be designated as "Sea Star 30(b)(6)."  Copies of the referenced transcript pages are attached as Exhibit 1 to this brief.

on issues repeatedly raised by Sea Star which are either issues which Emerald does not dispute (and never has disputed), or issues which are entirely without merit.  In short, Sea Star has successfully delayed for five years a proper accounting of its usage of the Emerald Equipment, an accounting which Sea Star was obligated to accurately perform in the first place.

## STATEMENT OF CASE

### A.    Proceedings

Emerald will not belabor the record with its own recitation of the Proceedings. Rather, Emerald will only supplement what Sea Star has already stated to add some context to this case.

The Complaint filed by Sea Star was filed within days after Emerald invited Sea Star to sit down to review its records and the Sea Star self-billing reports in an effort to amicably resolve this dispute.  D.I. 9.  It was only after Emerald received no response from Sea Star, and before Emerald knew Sea Star had already filed the declaratory judgment action which began this litigation, that Emerald filed its own Complaint in the Bankruptcy Court.  Although the Bankruptcy Court thereafter dismissed the Emerald Complaint due to the First Filed Rule, it dismissed the Complaint, without prejudice, to await the outcome of Emerald's Motion to Dismiss or Transfer Venue of the Sea Star Complaint filed in Florida.  D.I. 11.  The Emerald Motion to Dismiss or Transfer Venue was based primarily on Emerald's argument that the Sea Star Complaint was filed in a "race to the courthouse" as a litigation tactic.  D.I. 9.  The Florida District Court eventually granted Emerald's Motion transferring the Sea Star Complaint to this Court.  D.I. 45.

With respect to the successive Sea Star Motions to Dismiss the Emerald Counterclaim, D.I. 56, 57, 58 and 59 and D.I. 80 and 81, it is relevant to these proceedings that

this Court rejected certain arguments made in Sea Star's Second Motion to Dismiss.  D.I. 81 and

83.  Significantly, while this Court granted Sea Star's First Motion to Dismiss that portion of

Count I of the Emerald Counterclaim which alleged a breach of an "e-mail agreement" based on

the integration clause in the Rental Agreement, it rejected Sea Star's argument in the Second

Motion to Dismiss that due to the integration clause in the Rental Agreement, no reference to the

prior e-mail agreement could be made in the Complaint.  Specifically, this Court ruled that:

> The factual recitation of the Amended Counterclaim is simply that,
> the factual predicate for the parties' dispute, and in this case, the
> factual predicate included the fact that the parties had entered into
> the E-mail Agreement, even though that agreement cannot stand on
> its own for purposes of a breach of contract claim.

D.I. 86 at pages 2-3.[2]

Finally, it should be noted that these proceedings have been fraught with

substantial discovery disputes.  Emerald's Counterclaim, to a large extent, involves the pursuit of

an accurate accounting of Sea Star's use of its equipment for which Sea Star is obligated to pay

per diem rental charges.  Despite this, Sea Star had to be compelled by Court Order to produce

ship manifests which would evidence Sea Star's use of Emerald Equipment.  D.I. 149, 151, 160.[3]

Sea Star similarly fought unsuccessfully against production of other source documents to show

Sea Star's use of the Emerald Equipment such as trucker invoices.  D.I. 149, 151, 160.  Sea Star

also fought any effort by Emerald to compel Sea Star to simply disclose what its position was

---

[2] Emerald asserts that the Court did not find the entire Rental Agreement unambiguous, even though the quoted words from the Court's ruling in Sea Star's Opening Brief (at page 18 of the Opening Brief) can be interpreted in that manner.  The issue in the Sea Star first Motion to Dismiss upon which the Court ruled related only to the merger clause.  No other terms of the Rental Agreement were at issue – thus the Court could not have meant based only on the pleadings, that all of the terms of the Rental Agreement were unambiguous and that no parole evidence could ever be used to determine the intent of the parties in construing those other terms.  Sea Star's use of words – such as the words it quotes from this Court's prior ruling, wholly taken out of context, and not understood in the circumstances in which they were used – is emblematic of Sea Star's use of words, giving "literal," but wholly unreasonable meaning to those words.

[3] Of particular note, is the fact that these "manifests" which Sea Star tried to obstruct Emerald from obtaining during this litigation were recognized by Sea Star, in an internal e-mail before this litigation was instituted, as documents which Emerald should have a right to review.  Tr.Ex. 99.

with respect to its use of the equipment in question; i.e., for Sea Star to provide a clear response to Emerald's claims with respect to each piece of equipment at issue.  D.I. 149, 151, 160.  After the Magistrate assigned to certain pre-trial issues in this case ruled in Emerald's favor on these discovery issues, Sea Star then unsuccessfully sought relief from this Court to set aside the Magistrate's decisions.  D.I. 164, 165, 170, 173, 176.  After all of that, further intervention from the Magistrate was required to compel Sea Star to make full disclosure of the requested documents.  D.I. 183, 184, 185, 186, 187, 188.  A Motion for Sanctions regarding Sea Star's conduct in conjunction with these discovery disputes is presently pending.  D.I. 189, 190.

### B.    Factual Background

Similar to its treatment of a recitation of the Proceedings, Emerald will not belabor the record with its own complete recitation of a Factual Background.  Rather, Emerald will highlight what it believes to be the pertinent facts drawn from the testimony at the hearing or other parts of the record.  Initially, however, Emerald will also note the myriad of Sea Star factual contentions set forth in its statement of the Factual Background which, even if true, are wholly irrelevant, impertinent or without any significance to the "real" issues in this case.

The Sea Star recitation of facts (pages 2-15 of the Sea Star Opening Brief) focuses on several entirely non-germane areas which are nothing more than "red herrings" in this case.  First, Sea Star places emphasis on Tom Holt, Sr.'s April 11, 2002 letter to Robert Leetch for the lease/sale to Sea Star of the entire fleet of equipment which Emerald had previously leased to NPR.  Tr.Ex. 1.  Emerald has never contended and does not contend Sea Star purchased or leased its entire fleet of equipment.  No matter how many times Sea Star raises this bogus issue, the result is still the same.  Emerald's claims against Sea Star are based on use of equipment, i.e., if

5

Sea Star used the Emerald Equipment in the course of its business, Sea Star must pay rental charges for such use.

Similarly, Sea Star repeatedly refers to portions of the Sale Order which confirms that the sale of the NPR assets to Sea Star does not amount to a "consolidation, merger, defacto merger, or similar restructuring" of Sea Star and NPR and states that Sea Star "refused to acquire, assume, or accept assignment of any equipment agreement between Emerald and NPR." Emerald has never made any allegations otherwise in this litigation. Again, it is only Sea Star's use of the Emerald Equipment which is at issue.

Finally, Sea Star continues to burden the record with its contentions regarding the "in-transit" issue. No matter how many times Emerald tells Sea Star it agrees that Sea Star is not obligated to Emerald for equipment used in-transit for which Sea Star paid NPR, Sea Star continues to raise this issue. While the identification of which particular pieces of equipment were used by Sea Star for "shipments in transit" for which it paid NPR, is in dispute – that issue goes to a fact finder's determination based on an evidentiary hearing still to be held.

Emerald submits the salient facts are as follows. In April, 2002, Sea Star entered into an Asset Purchase Agreement, as amended, with NPR and other related entities. D.I. 137, ¶3(f). On April 26, 2002, the Bankruptcy Court entered an Order authorizing the sale of the NPR assets free and clear of liens, claims and encumbrances to Sea Star (the "Sale Order"). D.I. 137, ¶3(h); Tr.Ex. 6. It was important for Sea Star to have a smooth transition after its acquisition of the NPR assets so as to not disrupt service for the customers. Tr1:73, Tr1:122. To accomplish this smooth transition, Sea Star required the use of some of the NPR fleet of equipment which had previously been leased by NPR from Emerald. Tr1:73-75, Tr1:108-109, Trl:122-123. Accordingly, Sea Star agreed to lease equipment from Emerald on a per diem basis, which

agreement was confirmed in an e-mail dated May 2, 2002.  Tr.Ex. 70, Tr1:85, Tr1:125.  The

agreement set forth in the May 2, 2002 e-mail was essentially a usage agreement, whereby Sea

Star agreed to pay per diem rental for its usage of the Emerald Equipment.  Tr.Ex. 70, Tr1:126-

126, Bates: 48-56.

Sea Star began using the Emerald Equipment immediately after its purchase of the

NPR assets.  Tr1:74-75; Tr2:11.  The agreement set forth in the May 2, 2002 e-mail was the

guideline by which Sea Star's Director of Fleet Management, Andrew Rooks, instructed the

personnel in his department in connection with Sea Star's usage of the Emerald Equipment.

Tr1:86-87.  At the beginning, there was much confusion and little information was given to

Emerald about which pieces of equipment Sea Star was using.  Tr1:131-132, Tr.Ex. 71, Tr.Ex.

72.

Subsequently, a Rental Agreement was executed by Sea Star and Emerald dated

as of July 31, 2002 and which, by its terms, covered equipment in use as of April 29, 2002.  The

e-mail agreement controlled Sea Star's usage of the Emerald Equipment until the Rental

Agreement was executed.  Tr1:86-87, Tr1:129.  The Rental Agreement was executed some time

after September 10, 2002.  Tr1:137, Bates: 79.  The Rental Agreement formalized the leasing

arrangement between Sea Star and Emerald and was not meant to change the basic material

terms of that arrangement.  Tr1:130.

At the time Sea Star acquired NPR's assets and began using Emerald's

Equipment, the Emerald Equipment was scattered all over the United States and the Caribbean,

in terminals, port facilities, on ships, in depots, in trucks, inland depots, at customers and trains.

Tr1:74-75, Tr2:11, Bates: 61-62.  Since the e-mail agreement allowed Sea Star to use the

Emerald Equipment wherever that equipment may be located, Sea Star had access and the ability

7

to control such equipment.  Tr1:126.  No advance notice to Emerald was required or provided

before Sea Star could use the Emerald Equipment.  Tr1:76, Tr1:127, Tr2:11.  No document or

receipt was needed from Emerald before Sea Star could commence use of the Emerald

Equipment.  Bates: 100.

   Various source documents would evidence Sea Star's use of the Emerald

Equipment which would include not only TIRs, but other documents, such as gate logs and

inventories.  Tr1:75-76, Tr1:65-70, Tr1:75-76, Tr1:117-118.  These source documents were

either created by Sea Star or provided to Sea Star.  Tr1:76.  The source documents were not

provided to Emerald.  Tr1:76-77.

   Other than to complete an "in-transit" use of equipment, Mr. Rooks stated it was

his understanding that Sea Star was required to pay Emerald if it used Emerald's equipment for

the operation of Sea Star's business, stating "yes, if we used – absolutely.  If we used any

equipment, we would be responsible for the payment of that equipment."  Tr1:75.  Philip Bates,

the Senior Vice President of Operations of Sea Star (and the person who signed the Rental

Agreement on behalf of Sea Star) testified at his deposition similarly stating specifically "that

even though we had not assumed the NPR Lease for Emerald Equipment that we would pay for

equipment we've used."  Bates: 48-49, Bates: 56, Bates: 69-70, Bates: 76-79.  Mr. Bates further

confirmed that, although he did not think there could be equipment used without a TIR, if Sea

Star used certain equipment for which a TIR was not prepared, Sea Star would be obligated to

pay for that equipment.  Bates: 92.  Similarly, Mr. Rooks agreed that, notwithstanding whatever

the provisions of the Rental Agreement said, if Sea Star used the Emerald Equipment, "in the

spirit of the agreement" Sea Star would be obligated to pay for that equipment.  Tr2:54.  As the

designated Rule 30(b)(6) representative of Sea Star, Mr. Rooks stated: "If during our audits and

8

our review of Emerald's claim we determined that we, indeed, utilized that equipment, then we would categorize that as usage in the spirit of the Rental Agreement." Sea Star 30(b)(6) 157-159.

In order to terminate equipment for off-hire in San Juan Puerto Rico, Sea Star created an area in its terminal called the J-Lot which was used to store and redeliver Emerald Equipment. Tr1:90-91. In an e-mail dated August 6, 2003, Mr. Rooks instructed his staff that the Rental Agreement required off-hire TIRs and inspection reports were to be provided when a unit was terminated at the designated depot which in the terminal in San Juan meant the J-Lot. Tr1:89-92, Tr.Ex. 93. In the August 6, 2003 e-mail, Mr. Rooks states:

Arturo/Manuel/Ricardo:

> Our rental agreement with Emerald states that an off hire TIR and inspection report be provided when a unit is terminated at the designated depot. In San Juan, as you know, we are the designed depot. (J14/15). It is imperative that we start providing a TIR for each unit when it is "terminated" to the J area. I am required to notify Art Davis in advance, but we are also required (as the designated depot), to provide an off hire TIR at time of termination. Any questions?

Mr. Rooks also instructed his staff that advance notice of terminations of equipment had to be provided to Emerald pursuant to the Rental Agreement. Tr1: 91-92, Tr.Ex. 91 and 92. In order for Emerald to remove the equipment from the J-Lot, gate receipts were required to be signed by an Emerald representative which were the documents that Sea Star utilized to show that Emerald actually got back the equipment. Tr1:95, Tr.Ex. 83.

In order to account for Sea Star's usage of the Emerald Equipment, Sea Star offered to provide monthly "self-billing reports." Tr1:18-20, Tr1:127-128. Sea Star admits it undertook a duty to provide self-billing reports. Tr.Ex. 68 at Request for Admission No. 8, Tr1:78-79. Sea Star further admits it had a duty to accurately account for the use of the Emerald

9

Equipment in the self-billing reports.  Tr.Ex. 68 at Request for Admission No. 9; Tr1:79-80.  It was Rooks' department's responsibility to provide the self-billing reports.  Tr1:80.  The self-billing reports were not accurate.  Tr.Ex. 67 at Request for Admission No. 33; Tr1:81, Tr2:42.  Sea Star knew these self-billing reports were inaccurate as early as 2002.  Tr2:43.  Despite this, Sea Star has never reissued its self-billing reports.  Tr2:44-45.

       Mr. Rooks says Sea Star does not know the extent of the inaccuracy of the self-billing reports.  Tr1:81.  At the hearing, Mr. Rooks stated there is "still an ongoing audit that we are performing."  Tr1:81.  Sea Star has provided Exhibit "A" to Supplemental Interrogatories which is a schedule of equipment which Sea Star now agrees it used.  Tr.Ex. 69.  Mr. Rooks stated at the hearing that Sea Star has not calculated what it owes for its admitted use of the Emerald Equipment based on its Exhibit "A" to Supplemental Interrogatories (Tr.Ex. 69), Tr2:45-38.  However, at the Rule 30(b)(6) deposition, Mr. Rooks said Sea Star had done such an analysis and had come to a total, but stated he did not have that information "here."  Sea Star 30(b)(6): 154-156.  At that time, Mr. Rooks also stated that, as part of its review, Sea Star did compare its Exhibit "A" to Supplemental Interrogatories (Tr.Ex. 69) with the self-billing reports but could not, in any way quantify the results of that review.  Sea Star 30(b)(6): 156-157.  Emerald has calculated that out of the 2,885 equipment pieces contained on Exhibit "A" to Supplemental Interrogatories (Tr.Ex.69), 1,072 equipment pieces were not on the Sea Star self-billing reports.[4]

---

[4] This exhibit has been updated by Sea Star, which as of August 5, 2008, now shows 3,162 equipment pieces Sea Star now admits using.  Emerald has not yet calculated how many of these additional pieces were never scheduled on the self-billing reports.

## APPLICABLE LAW

### A.     Contract Interpretation Under Maryland Law

The Rental Agreement provides that the rights liabilities and duties of the parties shall be determined in accordance with the laws of the State of Maryland.  Maryland law adheres to an objective interpretation of contracts.  State v. Attman/Glazer, 594 A.2d 138, 144 (Md. 1991); Cloverland, Inc. v. Fry,  587 A.2d 527, 530 (Md. 1991); Feick v. Thrutchley, 586 A.2d 3, 4 (Md. 1991); General Motors Acceptance v. Daniels, 492 A.2d 1306, 1310 (Md. 1985); Orkin v. Jacobson, 332 A.2d 901, 903 (Md. 1975); Kasten Constr. v. Rod Enterprises, 301 A.2d 12, 17-18 (Md. 1973). Under the objective view, a written contract is ambiguous if, when read by a reasonably prudent person, it is susceptible of more than one meaning.  Heat & Power Corp. v. Air Prods. & Chem., Inc., 578 A.2d 1202, 1208 (Md. 1989); Truck Ins. Exch. v. Marks Rentals, 418 A.2d 1187, 1190 (Md. 1980). The determination of whether language is susceptible of more than one meaning includes a consideration of "the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution," Pacific Indem. v. Interstate Fire & Cas., 488 A.2d 486, 488 (Md. 1985).  In construing contractual language, including for the purpose of determining whether ambiguity exists, "effect must be given to each clause so that a court will not find an interpretation which casts out or disregards a meaningful part of the language of the writing unless no other course can be sensibly and reasonably followed." Cochran v. Norkunas, 919 A.2d 700, 710 (Md. 2007) (quoting Sagner v. Glenangus Farms, 198 A.2d 277, 283 (Md. 1964)).  Under Maryland law, to ascertain its true meaning, a contract must be construed in its entirety and, if reasonably possible, effect must be given to each clause.  Sagner v. Glenangus Farms, Inc., 198 A.2d 277, 283 (Md. 1964); see also Bausch &

11

Lomb, Inc. v. Utica Mut. Ins. Co., 625 A.2d 1021, 1033 (Md. 1993); Dahl v. Brunswick Corp., 356 A.2d 221, 226 (Md. 1976).

### B.     Agreements May be Modified by Subsequent Course of Dealing

Under Maryland law, parties may amend their written agreements by a subsequent course of dealing.  Questar Homes of Avalon, LLC v. Pillar Construction, Inc., 882 A.2d 288, 294-95 (Md. 2005) (citing Univ. Nat'l Bank v. Wolfe, 369 A.2d 570, 576 (Md. 1977)).  Further, the parties by their conduct may waive the requirements of a written contract.  Taylor v. University Nat'l Bank, 282 A.2d 91 (1971) (citing Pumphrey v. Pelton, 245 A.2d 301 (1968) (holding that "the conduct of the parties to a contract may be evidence of a subsequent modification of their contract")).  This is so notwithstanding a written agreement that any change to a contract must be in writing.  Taylor v. University Nat'l Bank, 282 A.2d at 91; Chas. Burton Bldrs. v. L & S Constr., 271 A.2d 534 (Md. 1970); Freeman v. Stanbern Const. Co., 106 A.2d 50 (Md. 1954) (holding that a subsequent modification of a written contract may be established by a preponderance of the evidence); Hoffman v. Glock, 315 A.2d 551 (Md. App. 1974).  Whether there has been a waiver of a contractual right involves a matter of intent that ordinarily turns on the factual circumstances of each case.  Gold Coast Mall, Inc. v. Lamar Corp., 468 A.2d 91, 98 (Md. 1983); Bargale Indus., Inc. v. Robert Realty Co., Inc., 343 A.2d 529, 533 (Md. 1974); Canaras v. Lift Truck Servs., Inc., 322 A.2d 866, 878-79 (Md. 1974).

## ARGUMENT

A.    **Sea Star Has Not Carried Its Burden of Proof in Connection With Its Requested Declarations**

1.    **Sea Star Requested Declaration:  Sea Star has no responsibility or liability for Emerald Equipment subject to previous agreements between Emerald and NPR that Sea Star did not use pursuant to the Rental Agreement after closing of the asset purchase**

The requested Sea Star declaration should be denied, as stated, because it is overbroad.  While Sea Star has no obligation for Emerald Equipment it did not use under the Rental Agreement, Sea Star still has obligations under the Sale Order and/or common law.  To the extent the requested declaration states otherwise, it should be denied.

This requested declaration is a prime example of one of Sea Star's "red herrings." Sea Star's support for this requested declaration (see pps. 21-22 of the Opening Brief) are filled with non-issues that Sea Star insists upon making issues.  Emerald has never taken a position that Sea Star leased Emerald's entire fleet of equipment which had previously been leased to NPR. This entire litigation, at least from Emerald's perspective, is to compel Sea Star to account for and pay all rental charges or other charges due and owing under the Rental Agreement for equipment which Sea Star used.  It has nothing to do with whatever Sea Star "touched," "stored" or "inventoried", unless such "touch," "storage" or "inventory" was in connection with Sea Star's use of said equipment in the course of its business.  That is what this case is about, no matter how hard Sea Star tries to make it about something else.

As such, Tom Holt's April 11, 2002 letter (Tr.Ex. 1) seeking to lease/sell the entire Emerald fleet to Sea Star, which Sea Star rejected, is totally irrelevant.  The Sale Order provisions which find that Sea Star's purchase of NPR's assets does not constitute a substantial continuation of NPR's business operations or make Sea Star a successor-in-interest to NPR was

{M0674740.1}

never disputed by Emerald.  It is, and always has been, a non-issue.  Sea Star's refusal to acquire, assume or accept assignment of any equipment agreements between Emerald and NPR or Holt Cargo, is not, and has never been, an issue in this case.  The Sale Order provisions which do not allow Emerald to assert or prosecute any claim or cause of action against Sea Star to recover on account of any liability owed by NPR is not, and has never been, an issue in this case.

The selected excerpts Sea Star has pulled from Lorraine Robins' deposition relating to the preparation of Emerald's spreadsheet "invoices" are nothing but Sea Star's self-serving mischaracterizations of her testimony and the import of the Emerald invoices which support Emerald's claims of rent and other charges for Sea Star's use of the Emerald Equipment. See, e.g., ROB:118, where Ms. Robins made clear that when she used the term "touched," she meant "used."  The Emerald claims relate to Sea Star's use of the Emerald Equipment.  Either Sea Star was using the equipment in the course of its business or they were not.  Such findings are still to be made. Sea Star will have an opportunity to show this Court or a special master to be appointed that it did not use the equipment which Emerald contends was used by Sea Star in the course of its business.

    **2.**    **Sea Star's Requested Declaration:  Emerald's delivery of each piece of Emerald equipment subject to the Rental Agreement must have been effected and evidenced by an equipment interchange receipt – a TIR – signed and dated on or after April 29, 2002.**

Sea Star is not entitled to Requested Declaration No. 2.  Requested Declaration No. 2 ignores the plain language of the Rental Agreement at paragraph 5 which provides:

> Equipment Delivery and Interchange.  Lessor shall make the Equipment available for delivery to Lessee at the locations agreed by the parties.  The signature of Lessee's representatives on an equipment interchange receipt shall constitute conclusive evidence that the Equipment to which the receipt relates has been delivered to Lessee.

This provision provides that a TIR is merely *conclusive* evidence of delivery of the Emerald Equipment, not *exclusive* evidence of such delivery.  Indeed, the record is clear that various documents and other evidence show a "movement" of equipment – not just TIRs.

          Here, it is clear both from the language of the Rental Agreement and from the facts and circumstances of the parties at the time of execution of the Rental Agreement that providing a signed equipment interchange receipt to evidence "delivery" of Emerald's equipment was the contractual responsibility of Sea Star.  At the time the parties entered into the Rental Agreement, the Emerald Equipment was already in place at various locations in the United States, Puerto Rico and the Dominican Republic.  In addition, Sea Star had Emerald equipment already in its possession or control upon Sea Star's acquisition of NPR's assets.  Considering "the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution," this was a per diem rental agreement for certain equipment, specifically, shipping containers and carriages, which was already conveniently located in various ports and transportation centers and which was ready and available for use by Sea Star.  Under the facts and circumstances at the time the Rental Agreement was entered into, Emerald was meeting its contractual responsibility to make the equipment "available for delivery" to Sea Star, but Sea Star had a contractual duty to provide a signed TIR to Emerald when it commenced its use of Emerald's equipment to conclusively document the start of the rental period.  However, Sea Star failed to do this on a consistent basis, even though, under the facts and circumstances at the time of execution of the Rental Agreement, the documentation of such equipment usage was, for the most part, under the particular control of Sea Star.   Considering the character of the contract between the parties, its purpose is crystal clear —it was a rental agreement— making Sea Star obligated to pay rent for the Emerald Equipment it used.  It is absurd to the point of being

15

disingenuous for Sea Star to claim that its own failure to document equipment usage alleviates its duty to pay rent.  To the extent Sea Star failed to prepare and provide to Emerald a signed equipment interchange receipt – a TIR – for each piece of Emerald Equipment it took delivery of and used in the course of business, Sea Star breached paragraph 1 of the Rental Agreement.  Sea Star cannot be allowed to use its breach of the Rental Agreement as an excuse not to pay rental charges for its use of the Emerald Equipment.

Notably,  requested declaration No. 2 contradicts Sea Star's originally requested declaration as stated in its Complaint D.I. 1, 50; Tr.Ex. 66; the Rental Agreement (Tr.Ex. 17); Exhibit "A" to the Sea Star Supplemental Answer to Interrogatory No. 1 (Tr.Ex. 69) and the trial testimony with respect to the various documentation which evidences a "use" of equipment commencing Sea Star's obligation to pay per diem rental until redelivered to Emerald.  Sea Star's requested declaration in its Complaint at paragraph 21(b), (c) and (e) recognized that not just a "TIR" would evidence on hire and rental obligations of the Emerald Equipment to Sea Star, but that "any Sea Star 'on-hire' and rental obligation began when Sea Star signed an equipment interchange receipt or TIR for use – <u>or other written evidence discloses Sea Star's use at a particular time</u>." [Emphasis added].  Clearly, other evidence, not only TIRs, may show Sea Star's use of Emerald Equipment for which it is obligated to pay rent.  Similarly, Exhibit "A" to Sea Star's Supplemental Answer to Interrogatory No. 1 (Tr.Ex. 69), underscores Sea Star's recognition that the start date for a rental obligation can be derived, and in many cases, must be derived from source documents other than TIRs.

By reason of the foregoing, Sea Star is not entitled to its requested declaration. Any competent evidence of Sea Star's use of the Emerald Equipment commences Sea Star's on-

hire of such equipment and its obligation to pay per diem rental charges under the Rental Agreement.

> 3.     **Sea Star's Requested Declaration No. 3:  Redelivery of equipment subject to the Rental Agreement may have been at Greenwich terminal, Philadelphia, Pennsylvania; Sea Star terminal, Puerto Nuevo, San Juan, Puerto Rico; Greenwich terminal, Port of Jacksonville, Florida; or any other location as to which the parties have agreed in writing.**

> 4.     **Sea Star's Requested Declaration No. 4:  Redelivery of equipment subject to the Rental Agreement may have been effected and evidenced by a TIR signed by Sea Star terminal, Puerto Nuevo, San Juan, Puerto Rico; a designated receiving terminal, at which time Emerald was required to off-hire the equipment.**

Sea Star is not entitled to requested declarations No. 3 and No. 4.  The Rental Agreement provides at paragraph 10(a) that redelivery of equipment, used by Sea Star, had to be made "to Lessor" (Emerald) at Greenwich Terminal, Philadelphia, Pennsylvania; Sea Star Terminal, Puerto Nuevo, San Juan, Puerto Rico; Greenwich Terminal, Port of Jacksonville, Florida; or any other location as to which the parties have agreed, in writing.  It is those two words – "to Lessor", i.e., Emerald – which Sea Star ignores.  The Greenwich Terminal in Philadelphia and the Greenwich Terminal in Jacksonville were controlled by Emerald or its agents.  Tr1:90.  The Sea Star Terminal in San Juan, Puerto Rico, was, however, controlled by Sea Star.  Tr1:90.  Since the parties recognized that Sea Star could not return the Emerald Equipment to itself in the Sea Star San Juan Terminal (which it controlled), designated areas were set up in the San Juan Terminal known as the J-Lot for the return of Emerald Equipment.  In addition, redelivery under paragraph 10(a) of the Rental Agreement provided that the Lessor (Emerald) was to be given 72 hours prior notice in writing of types and quantities of equipment which Sea Star intended to redeliver at particular ports.  In San Juan, then, the equipment to be "off-hired" had to be moved to a designated area in the San Juan Terminal (the J-Lot) and not

17

subsequently re-used or lost by Sea Star. Also, Sea Star was required to provide Emerald with 72 hours prior written notice of such redelivery. A TIR signed by Sea Star at the San Juan Terminal merely reflecting equipment coming into that terminal without "redelivery" to Emerald as set forth above does not constitute "off-hire" of the equipment under the Rental Agreement.

Indeed, the foregoing "off-hire" requirements were well known to Sea Star as reflected by the internal e-mail from Mr. Rooks to his subordinates which states:

Arturo/Manuel/Ricardo:

> Our rental agreement with Emerald states that an off hire TIR and inspection report be provided when a unit is terminated at the designated depot. In San Juan, as you know, we are the designed depot. (J14/15). It is imperative that we start providing a TIR for each unit when it is "terminated" to the J area. I am required to notify Art Davis in advance, but we are also required (as the designated depot), to provide an off hire TIR at time of termination. Any questions?

Such a reading of the Rental Agreement, as understood by Mr. Rooks, is certainly consistent with both the facts and circumstances of the parties at the time the Rental Agreement was entered and the plain language of its terms. The equipment had to be redelivered "to Emerald" in order to be off-hired. In San Juan, since Sea Star controlled the Sea Star Terminal, redelivery of the equipment to Emerald could only be done by designating an area of the terminal (the J-Lot) for the segregation of the Emerald Equipment and for no further use of that equipment. The course of conduct of the parties in this case confirms this reasonable construction of the Rental Agreement, and to the extent, if any, inconsistent, modified the Rental Agreement.

Accordingly, Sea Star is not entitled to its requested declaration which ignores the language of the Rental Agreement, as well as the parties' understanding of the Rental Agreement and their subsequent course of conduct in implementing the Rental Agreement.

{M0674740.1}

5.      **Sea Star's Requested Declaration:  Sea Star has no responsibility or liability to compensate for use of Emerald Equipment prior to or during Shipments In-Transit**

Emerald does not and has not disputed that Sea Star does not have an obligation to pay rental charges to Emerald for equipment which Sea Star <u>solely</u> used for shipments in transit and for which it paid NPR.  The issue, of course, is an accurate identification of such equipment.

In its Opening Brief, Sea Star raises issues with respect to how the Emerald invoices, which set forth Emerald's claim for rental and stipulated loss values owed under the Rental Agreement, were prepared.  If Sea Star is convinced that the Emerald invoices do not appropriately account for equipment used for shipments in transit, based on the relevant documentation, then it will have an opportunity to present such evidence at a hearing on Emerald's Counterclaim.[5]

---

[5] Interestingly, Sea Star, for the first time on July 3, 2008, several days before the hearing in this matter, tendered an exhibit which it says reflects the Sea Star equipment used for shipments in transit.  Tr.Exs. 65A and 65B.  No previous identification of such equipment has been made (other than for equipment on ships) in the five years during which this matter has been litigated.

{M0674740.1}

6. **Sea Star's Requested Declaration: The Sale Order imposes no obligation with respect to any lessor's equipment that on April 27, 2002, was not located on leased property acquired under the Asset Purchase Agreement; that was not involved in shipment to a "final port of destination" where Sea Star leased premises acquired under the Asset Purchase Agreement and Sale Order; that was returned to port or inland facilities by third parties, such as consignees, which had received shipments at final destinations outside ports.**

Sea Star is not entitled to this requested declaration because it is ambiguous (filled with double negatives and compound) and should be rejected for the reason that it simply is not understandable.

Furthermore, the requested declaration appears to relate to parties other than Emerald (i.e., "any Lessor's equipment"), which are not before this Court. For this additional reason, the requested declaration should be denied. A.S. Abell Co. v. Chell, 412 F.2d 712 (4th Cir. 1969) (declaratory relief may properly be withheld for non-joinder of interested parties).

Finally, to the extent the Court does consider this requested declaration, it should be denied as contrary to plain language of the Sale Order. Paragraph 13 of the Sale Order explicitly sets forth the obligations of Sea Star which are clear and to Emerald's knowledge, there is no dispute between the parties as to its terms. The Sale Order expressly provides that to the extent any Emerald Equipment is located on property sold or assigned to Sea Star under the Asset Purchase Agreement, Sea Star is obligated to cooperate in allowing Emerald to remove such property during normal business hours, as long as such removal will not unreasonably disrupt operations of Sea Star. Additionally, paragraph 13 of the Sale Order obligated Sea Star to cooperate in removing any such equipment used for shipments in transit and to store such equipment on leased premises at the final port of destination, to the extent such final port of destination is a leased premise sold and assigned to Sea Star under the Asset Purchase Agreement.

20

In this case, just after closing on the NPR Asset Purchase Agreement, Sea Star agreed to lease Emerald Equipment on a per diem basis. Emerald's claims involve Emerald Equipment which Emerald contends were not being stored by Sea Star for Emerald, but rather was being used by Sea Star for its own use. The requested declaration, to the extent it can be understood, has no application to Emerald's Counterclaim and should be denied.

> **7.     Sea Star's Requested Declaration:  Sea Star has had no duty to "redeliver" or pay compensation for Emerald equipment that Sea Star "touched" but did not use, including but not limited to Emerald equipment which was involved in Shipments in Transit or held by third parties, such as E.T. Heinsen and inland depots, and was returned to port terminals or inland depots where Sea Star leased premises; Emerald equipment which entered NPR terminals prior to closing of the asset purchase; and Emerald equipment for which delivery under the Rental Agreement is not evidenced by a TIR, signed and dated by Sea Star for use on or after April 29, 2002.**

Sea Star is not entitled to this requested declaration. It also, like Sea Star's requested declaration No. 6 is convoluted and unclear and should be denied.

Emerald's claim is based on Sea Star's use of the Emerald Equipment (other than solely for in-transit use); not equipment it merely "touched." Despite Sea Star's use of the appellation of Ms. Robins "touch test," Sea Star knows this is a wholly unfair characterization. That is not what this case is about. The Emerald invoices, backed up by the voluminous documentation gathered in this case, will speak for themselves. The very sentence in which Ms. Robins used the word "touch," she also spoke about "movement" of the equipment. The Emerald invoices in dispute relate to Sea Star's "movement" of the Emerald Equipment, not equipment which Sea Star only "touched."

To the extent this Court does consider this requested declaration, it appears to have three parts. Up to the first semicolon, Sea Star seems to be saying it has no duty to "redeliver, or pay compensation for Emerald Equipment, that was returned to port terminals or

inland depots where Sea Star leased premises." That part of the requested declaration should be denied because it directly conflicts with the Sale Order which requires Sea Star to cooperate in removing equipment from vessels in-transit and store such equipment on leased premises at the final port of destination, to the extent such final destination is a leased premises sold and assigned to Sea Star. The Sale Order has nothing to do with "use." Sea Star does have obligations under the Sale Order for certain equipment unrelated to Sea Star's use of that equipment. The phrase up to the second semicolon turns upon whether Sea Star subsequently used such equipment. Finally, the third phrase concluding the wordy and awkward declaration is a repetition of Sea Star's requested declaration No. 2, which, for the reasons discussed above, should be denied.

> **8.     Sea Star's Requested Declaration:  Sea Star has had no duty to "redeliver" or pay for Emerald equipment involved in Shipments in Transit that third parties, such as consignees, did not return to port terminals or inland depots where Sea Star leased premises.  Any Emerald recourse would be to the NPR bankruptcy estate.**

Sea Star has not met its burden with respect to this declaration. There may exist certain in-transit equipment that arrived at its destination and remained there. To the extent Sea Star refused to accept such equipment back to a leased destination, it would be in violation of the Sale Order. Further, Sea Star was required to pay someone for its use of Emerald Equipment. Sea Star has two choices, it could identify in-transit equipment and pay NPR, or determine that the use wasn't in-transit and pay Emerald. Sea Star apparently believes it could avoid an obligation to pay anyone. Initially, Sea Star avoided paying NPR for the equipment by refusing to acknowledge any in-transit use to NPR, and now Sea Star is denying an obligation to pay Emerald for the equipment by stating to Emerald that the equipment was used in-transit.

Tr1:109-110.  Contrary to the requested declaration, Sea Star has a duty with respect to

equipment it used and this requested declaration should be denied

> **9.      Sea Star's Requested Declaration:  For Emerald equipment involved in Shipments in Transit, any Sea Star on-hire obligation would begin when Sea Star signed a TIR for its use after completion of a  Shipment in Transit.**

This requested declaration is simply a repeat (for the third time) of the Sea Star

requested declaration No. 2.  Pursuant to the Rental Agreement, if Sea Star used the Emerald

Equipment, then its on-hire obligation to pay rent begins when such use commences.  Such use,

and therefore, its on-hire obligation is not dependent on when Sea Star signed a TIR.  See

Emerald response to Sea Star requested declaration No. 2.  This requested declaration should be

denied.

> **10.     Sea Star's Requested Declaration:  Any Sea Star on-hire obligation for Emerald equipment in the possession of third parties, such as depots, shipper pools, shipper warehouses, or former NPR agents or stevedores, as of and after closing would begin when Sea Star signed a TIR removing such Emerald equipment from a depot or shipper pool or acknowledging receipt from a customer or delivering carrier for Sea Star's use.  Otherwise, Sea Star would have no responsibility for such equipment.**

This is Sea Star's fourth attempt to obtain a judicial declaration, contrary to its

contractual and/or common law duties, that it is obligated to pay rent for its use of the Emerald

Equipment only when Sea Star signs a TIR to evidence its use, this time relating to equipment

located in the possession of third parties at the time of the NPR closing.  Again, this requested

declaration is simply contrary to the provisions of the Rental Agreement and to the facts and

circumstances of the parties at the time the Rental Agreement was entered into.  Sea Star cannot

invoke its own breach as a basis to avoid payment.   See Emerald response to Sea Star requested

declaration No. 2.  This requested declaration should be denied.

{M0674740.1}

11.     **Sea Star's Requested Declaration:  Sea Star has no obligation to Emerald for per diem rent.**

Sea Star claims it is entitled to this declaration based on its reading of the Indemnification Agreement (Tr.Ex. 19) and the Assignment Agreement (Tr.Ex. 42).[6]  Ignoring all the extraneous issues addressed by Sea Star on this point, Sea Star's argument boils down to its contention that paragraph 6.3 of the Assignment Agreement precludes any Emerald claim for per diem rent.  That provision states:

> Assignee [Storage] agrees not to assert any entitlement to compensation from Sea Star for use of EMERALD EQUIPMENT during any period for which Sea Star has paid ASSIGNOR [MBC] pursuant to the Sea Star INDEMNITY [MBC-SEA STAR INDEMNITY AGREEMENT].

Sea Star astonishingly claims that this provision means that since Sea Star paid MBC for use of the Emerald Equipment during the April, 2002 – December, 2003 period, any per diem claim for rent for Sea Star's use of Emerald Equipment, <u>even if Sea Star did not pay MBC (or anyone else) for that use</u>, is precluded.  Sea Star states at page 34 of its Opening Brief: "Adhering to the principle of objective contractual interpretation, the provision is unambiguous; the Court gives effect to its plain meaning and does not contemplate any alleged subjective intent at the time of formation."

Any fair and reasonable reading of the Indemnity Agreement (Tr.Ex. 19) referred to in paragraph 6.3 of the Assignment Agreement (Tr.Ex. 42), clearly shows that it was meant to ensure Sea Star that no other parties would make a claim against Sea Star for Sea Star's use of the Emerald Equipment for which Sea Star paid MBC.  Simply put, the Indemnity Agreement

---

[6] Emerald does not agree that Sea Star is entitled to a declaration of rights under these documents which involve non-parties.  The mere fact that the Lease Agreement is subject to the secured lender's lien does not implicate either the Indemnification Agreement or the Assignment Agreement.  These documents are between non-parties to this dispute and a declaration of rights and obligations under those documents is not appropriate.

was to protect Sea Star so that Sea Star did not have to pay twice.  Sea Star knows this is the

case.  This is made clear by a letter dated April 23, 2003 from MBC to Sea Star's counsel (Tr.Ex.

78) whereby MBC reiterates that a claim for which MBC would be responsible to provide

indemnity under the Indemnity Agreement was only to ensure that Sea Star would not have to

pay twice, stating in the second paragraph:

> MBC's initial obligation under the Indemnity Agreement,
> assuming that Sea Star provides it with prompt written
> notice, is an obligation to "defend" any "Proceeding"
> brought by a Competing Claimant against Sea Star.  While
> the term "Proceeding" is defined broadly in the Indemnity
> Agreement, a "Proceeding" still <u>must involve an effort by a</u>
> <u>Competing Claimant to make Sea Star pay for use of</u>
> <u>Emerald Equipment for which it has already paid MBC</u>.
> The e-mails attached to the letter all relate to claims that
> Sea Star used Emerald Equipment after April 27, 2002 and
> failed to pay MBC or anyone else for that use. Tr.Ex. 78
> (emphasis added).

A subsequent letter from MBC's counsel to Sea Star's counsel dated September 25, 2003 again

clearly restated this concept (Tr.Ex. 79), stating in part:

> The mere fact that Emerald Equipment Leasing, Inc.
> ("Emerald") has asserted a claim against Sea Star for use of
> "Emerald Equipment" does not necessarily mean that the
> claim is a "competing claim."
> . . .
> What you omitted from your letter, of course, is that you
> acknowledged that Sea Star does not dispute that it has
> used Emerald Equipment, albeit less than Emerald claims,
> and not paid for that use.  Consequently, Sea Star has
> breached the Indemnity Agreement.  You also failed to
> mention that you declined to provide documentation
> concerning what Sea Star acknowledges it owes or
> documentation demonstrating why the claims asserted by
> Sea Star are not valid or are "competing claims." Tr.Ex. 79.

Paragraph 6.3 of the Loan Sale Agreement with a heading "No Competing Claims

Against Sea Star" (which Sea Star now says bars Emerald's claims) simply reiterates the concept

of "no double payment" contained in the Indemnity Agreement so that Storage Transfer, Inc. (to whom MBC sold its loan) would not assert a "competing claim" against Sea Star, i.e., a claim for Sea Star's use of Emerald Equipment for which Sea Star already paid MBC.  Of course, Emerald's claims are for Sea Star's use of Emerald Equipment for which it did not pay MBC or anyone else.  Sea Star knows this and is simply wasting the Court's time with assertions that are wholly devoid of any merit.  These assertions are bogus arguments which Sea Star raises to divert the attention of the Court from the real issue, i.e., Sea Star's use of Emerald Equipment for which it did not pay rent, and in many instances, did not return the equipment to Emerald.

Sea Star's reading at paragraph 6.3 of the Assignment Agreement, contending that it precludes Emerald's claims for per diem rent for equipment Sea Star used but did not pay MBC, or anyone else, is not a reasonable reading of this provision.  In fact, it is an absurd and irrational reading of that provision.  This argument is wholly without merit and this declaration should be denied.

> **12.    Sea Star's Requested Declaration:  Sea Star has no obligation for Emerald Stipulated Loss Value claims unless a signed TIR discloses Sea Star's on-hire of such Emerald equipment under the Rental Agreement on or after April 29, 2002; and there is no evidence of redelivery under the Rental Agreement.**

Sea Star is not entitled to this requested declaration.  First, Sea Star's responsibility for stipulated loss value claims is not contingent upon assigned TIRs to disclose Sea Star's on-hire of equipment.  This issue has been discussed in Emerald's response to Sea Star's requested declaration No. 2.

Sea Star's obligation to pay stipulated loss value is clearly set forth in paragraphs 10(e) and (f) of the Rental Agreement and includes all equipment which Sea Star used (on-hired)

and which was (a) a total constructive loss; (b) never redelivered to Emerald; (c) redelivered and subsequently taken out or reused by Sea Star and not thereafter returned; or (d) lost.

In San Juan, Puerto Rico, since Sea Star controlled that terminal, redelivery requirements are as set forth in Emerald's response to Sea Star's requested declarations 3 and 4. In addition, Sea Star is responsible for stipulated loss value where there is no evidence to show that Emerald actually received the equipment Sea Star used (even if returned to the J-Lot) unless there was some evidence that Emerald removed that equipment from the Sea Star terminal in San Juan (i.e., that Emerald, or a purchaser of the equipment authorized by Emerald, removed that equipment from the terminal). Gate logs maintained by Sea Star would evidence such removal, evidencing Emerald's receipt of the equipment. If the gate logs maintained by Sea Star do not reflect Emerald's removal of the equipment from the J-Lot, that could only mean that Sea Star reused the equipment after it had placed it in the J-Lot or that the equipment was lost or stolen from the J-Lot while under Sea Star's control.

Given the foregoing, Sea Star is not entitled to its requested declaration.

**13.    Sea Star's Requested Declaration: Sea Star has no obligation for Emerald's adjusted Stipulated Loss Value claims pertaining to Emerald equipment recovered and sold. Emerald admittedly did not give Sea Star notice required by paragraph 13(b)(iii) of the Rental Agreement prior to sales of Emerald equipment for which Emerald alleges Sea Star is responsible.**

Emerald is not entitled to this requested declaration. Sea Star misreads paragraph 13(b)(iii) of the Rental Agreement. Adjusted stipulated loss value charged by Emerald applies to all Emerald Equipment which Emerald contends Sea Star used and failed to return to Emerald in accordance with the Rental Agreement. See paragraph 10(f) of the Rental Agreement. (Tr.Ex. 17). Specifically, any Emerald Equipment that Sea Star used but failed to return to Emerald within 60 days after the termination of the Rental Agreement was properly treated by Emerald as

27

"lost" pursuant to paragraph 10(f),  and for which Sea Star was obligated to pay Emerald the full

stipulated loss value pursuant to the Rental Agreement.  Tr.Ex. 84, 85, 86.  Any such equipment

which Emerald subsequently recovered, Emerald mitigated damages by selling such equipment

and charging Sea Star only the difference between the stipulated loss value and the sale price,

i.e., adjusted stipulated loss value.  Sea Star was not entitled to notice of the sale of any such

equipment pursuant to the Rental Agreement.

## II.     Emerald Is a Real Party in Interest and Has Standing to Prosecute Its Claims Against Sea Star

### A.     Equipment Rental Agreement

Fed.R.Civ.P. 17(a) provides:

> (a)  Real Party in Interest.  Every action shall be prosecuted in the name of the real party in interest.  An executor, administrator, guardian, bailee, trustee of an express trust, a party with whom or in whose name a contract has been made for the benefit of another, or a party authorized by statute may sue in that person's own name without joining the party for whose benefit the action is brought; and when a statute of the United States so provides, an action for the use or benefit of another shall be brought in the name of the United States.  No actions hall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed after objection for ratification of commencement of the action by, or joinder or substitution of, the real party in interest; and such ratification, joinder, or substitution shall have the same effect as if the action had been commenced in the name of the real party in interest.

The Rental Agreement is between Emerald and Sea Star.  By definition, under rule 17(a),

Emerald is a "real party in interest" since it is a party to the contract – the Rental Agreement.

Even if the contract is made for the benefit of another, Emerald may sue in its own name,

without joining the other parties.  As a result, even if Sea Star was right in its contention that the

Rental Agreement was only for the benefit of MBC or Storage Transfer (its lender and successor

lender, respectively) Sea Star's argument would have no merit.

As it is, Sea Star's argument has no merit anyway, since Emerald clearly has substantive legal rights to be enforced. Emerald is a party to the Rental Agreement. The equipment, which is the subject of the Rental Agreement, is Emerald's equipment. The mere fact that the rental payment were being made to MBC is of no moment. MBC was Emerald's lender and had a security interest in the equipment and the Rental Agreement. Its security interest included the rent owed. There is nothing unusual about such an arrangement. Emerald needed to pay down its lender and therefore did not object to the rental payments being made directly to MBC, rather than through Emerald. That doesn't mean Emerald was not and is not entitled to payment of the rent. Sea Star's arguments otherwise are wholly without merit.

Moreover, the "carve out" Sea Star refers to, if anything, enhances Emerald's interest. The purpose of the carve out is to protect Emerald's bankruptcy estate, ensuring that the proceeds of this litigation will go not just to pay Emerald's secured lender, but also to allow funds (i.e., the 15% carveout) for distribution to the estate's other claimants. And further, to the extent recovery is made in excess of the amount of the claims of Emerald's creditors, the surplus will be available for Emerald's own use.

Sea Star's argument regarding "real party in interest" and "standing" are lacking in any reasonable basis. Its assertion is not warranted by existing law, and under the circumstances presented here, wholly frivolous.

### B.    Loan Sale and Assignment Agreement

The arguments presented by Sea Star in this section of its Opening Brief are simply a repetition of the arguments it made in support of its Requested Declaration No. 11 to which Emerald has fully responded. Neither the Indemnity Agreement nor the Assignment Agreement bars Emerald's claims. Sea Star has unreasonably construed those documents. As

above, Sea Star's arguments lack any reasonable basis, are unwarranted by existing law, and under the circumstances presented here, wholly frivolous.

### C.     Reservation of Objections Made at Trial

During the trial in this matter, Emerald voiced various objections to certain testimony and exhibits offered by Sea Star.  Much of hose objections were based on "relevance" and "hearsay." While Emerald does not believe any of the tendered testimony or exhibits to which Emerald objected, bear on any of the merits to be decided herein, Emerald incorporates herein the objections as stated in the record, so as to not waive those objections.

### <u>CONCLUSION</u>

Sea Star is not entitled to various stated "declarations of rights and objections" under the terms of the Rental Agreement. The simple fact is that Sea Star breached the Rental Agreement by substantially underreporting its usage of the Emerald Equipment.  It now seeks some way to try to minimize its breach of the Rental Agreement by not paying for such usage and its additional malfeasance in providing false self-billing reports.  In order to do so, it has proposed requested declarations which ignore the language of the Rental Agreement and intent of the parties, the reasonable interpretation of the Rental Agreement, and the course of conduct of the parties in their dealings, both prior to and subsequent to the Rental Agreement.

The relief sought by Sea Star as stated herein should be denied in all respects. Sea Star should be obligated to pay rental and other charges (e.g., stipulated loss values) for equipment it used.  The starting date for such rental obligations should not be based on any particular document, but rather on any competent evidence which first shows use.  The termination date should be the date such equipment was returned to Emerald and not thereafter reused.  In San Juan, Puerto Rico, that meant redelivery to the J-Lot in the San Juan Terminal

with 72 hours notice to Emerald.  Such equipment could not thereafter be reused or lost by Sea

Star.  Rather, evidence must show that Emerald actually received such equipment by taking it out

of the Sea Star terminal.

Respectfully submitted,

ECKERT SEAMANS CHERIN & MELLOTT, LLC


By: /s/ Margaret F. England
    Ronald S. Gellert, Esquire (No. 4259)
    Tara L. Lattomus, Esquire (No. 3515)
    Margaret F. England (No. 4248)
    300 Delaware Avenue, Suite 1210
    Wilmington, De  19801
    Phone:  302-425-0430
    Fax:     302-425-0432

and

    Gary M. Schildhorn, Esquire
    Alan I. Moldoff, Esquire
    Eckert Seamans Cherin & Mellott, LLC
    Two Liberty Place
    50 South 16th Street, 22nd Floor
    Philadelphia, PA  19102
    Phone:  215-851-8400
    Fax:     215-851-8383

{M0674740.1}