**EXHIBIT 1**

1    IN THE UNITED STATES DISTRICT COURT
     MIDDLE DISTRICT OF FLORIDA
2
     JACKSONVILLE DIVISION
3
     CASE NO. 3:04 CV-146-V-99-HTS
4
5    Sea Star Line, LLC
     a limited liability company,        **ORIGINAL**
6
          Plaintiff,
7
     vs.
8
     EMERALD EQUIPMENT LEASING,
     INC., a corporation,
9
          Defendant.
10

11    _____

12         Deposition of **PHILIP BATES**, taken on behalf

13    of the Defendant, pursuant to Notice of Taking

14    Deposition in the above-entitled action, on Monday,

15    January, 10th, 2005, at 9:45 a.m., at the offices of

16    Powers Reporting, Inc., 220 East Forsyth Street,

17    Jacksonville, Florida, before Sherry Brazier, a Notary

18    Public in and for the State of Florida at Large.

19

20

21

22

23

24

25

```
 1        Q     But you determined that there was some

 2   short-term need for equipment, is that correct, as you

 3   indicated at the time of the aquisition of the NPR

 4   assets?

 5        A     I told you already that prior to the

 6   aquisition we had a lot estimates of cargo and we made

 7   estimates of equipment use that we might require and

 8   with the operation of the additional ships we didn't

 9   require additional equipment.

10        Q     And were any arrangements made with Emerald

11   for the leasing of equipment at that time?

12        A     At what time?

13        Q     At the -- just after the NPR aquisition

14   which was at or about the end of April, correct, of

15   2002?

16        A     Yes, we made -- we made a user agreement.

17        Q     With --

18        A     -- by e-mail --

19        Q     With Emerald?

20        A     -- in early May.

21        Q     And did you have any involvement in that?

22        A     Yes.

23        Q     And that was early May 2002?

24        A     Yes.

25        Q     And did you have any discussions with
```

49

1    someone at Emerald about that?

2        A    I particularly remember Tom Holt, Jr.

3        Q    And what were the nature of your

4    discussions?

5        A    That even though we had not assumed the NPR

6    lease for Emerald equipment that we would pay for

7    equipment we used.

8        Q    Okay.  And you mentioned an e-mail or maybe

9    some e-mails about that in connection with that user

10    agreement, correct?

11        A    Yes.

12        Q    Other than that was there, any formal

13    writing at that time with respect to that agreement

14    that Sea Star would pay for any equipment it used?

15        A    What does formal writing mean?

16        Q    Well, like the -- a -- an actual lease

17    agreement.

18        A    No, there was no lease agreement at that

19    time.

20        Q    Let me show you what we -- what I'm going to

21    have marked as Bates 2.

22            (Bates Exhibit 2 was marked for

23    identification.)

24        A    Okay.

25        Q    Can you identify this document?

1         A       This is my e-mail of May 2nd to Tom Holt,

2    Jr.

3         Q       And does it pertain to that short-term user

4    agreement you just mentioned?

5         A       It pertains to the short-term usage of

6    Emerald equipment, yes.

7         Q       And does it generally state the terms of

8    what your agreement was at that time?

9         A       Yes.

10        Q       And this is based on your conversations with

11   Tom Holt, Jr.?

12        A       Yes.

13        Q       And the user agreement that you mention

14   there says that it's effective May 1st, 2002?

15        A       Yes.

16        Q       And that it pertains to Emerald equipment

17   which Sea Star dispatches out of any port terminal or

18   inland depot for customer use; is that correct?

19        A       Yes.

20        Q       And there are agreed upon per diems for Sea

21   Star's use of that equipment until it ceases to use it

22   and notifies --

23        A       Yes, that's the attached sheet, it includes

24   per diems.

25        Q       Okay.  That's the per diems for the time

1    that Sea Star uses the equipment and then ceases to

2    use it and then notifies them of that, of the

3    termination, I guess; is that correct?

4        A    Yes.

5        Q    And on the bottom of that last paragraph it

6    says the minimum usage period for any unit is 30 days,

7    what -- what does that mean?

8        A    That we agreed that -- that if we use the

9    equipment that we would have a minimum usage period of

10    30 days.

11        Q    So that -- if you use it only for three days

12    you couldn't just pay for three days you had to pay

13    for 30 days?

14        A    That's right.

15        Q    If you used it for more than 30 days, you

16    used it for, say, 40 days, would you have to pay for

17    60 days or for only 40 days?

18        A    40 days.

19        Q    And the attachment that's the equipment user

20    agreement, did you prepare that or somebody at Sea

21    Star?

22        A    Yes.

23        Q    And what does the column on the

24    attachment -- it says S/T market per diem, what does

25    that mean?

1       A       This was an attachment to the e-mail and it

2   came from our discussion.  We had proposed rates and

3   we had shown a column for our estimate of what market

4   value may be.

5       Q       I see.  Do you recall -- what does S/T stand

6   for, short term?

7       A       Yes.

8       Q       And what were the -- what were the values

9   that were agreed to, which column would that be, if

10  any, of these columns as to the agreed to rates?

11      A       The Sea Star proposed short-term rate which

12  is in bold.

13      Q       Okay.  And your position is that that's

14  the -- that was the agreed to rates --

15      A       Yes.

16      Q       -- for the short-term user agreement?

17      A       Yes.

18      Q       Okay.  All right.  Did the parties at this

19  time contemplate a more normal writing to govern their

20  lease arrangements?

21              MR. ARMSTRONG:  Objection to form.

22      A       I'm sorry?

23      Q       Did the parties, did Sea Star and Emerald,

24  do you know whether they contemplated -- that there

25  was contemplated there would be some more formal

1  writing to govern the lease arrangements at that time?

2          MR. ARMSTRONG:  Object to the form.

3      Q    If you know.

4      A    There were additional discussions of a more

5  formal document, yes.

6      Q    And what were those discussions?

7      A    Either at this time or later I believe that

8  there was discussion to write a more extensive and

9  formal document.

10     Q    And was there any particular reason for

11 that?

12     A    Well, this was brief and it was the

13 essential elements of a short-term usage agreement,

14 but, for instance, as it says in the first paragraph

15 there was potential that we might purchase some of

16 their equipment after inspection.

17     Q    And was some equipment purchased?

18     A    Yes.  After some time, yes.

19     Q    And whether or not there was a purchase of

20 equipment, would that have some bearing on whether or

21 not to do a formal lease agreement?

22         MR. ARMSTRONG:  Objection to the form.

23     Q    If you know.

24     A    I don't think so.

25     Q    Okay.  But at some point in time there was

1  some discussion that we should have some formal

2  written lease agreement?

3       A    There was some discussion about that, yes.

4       Q    And why did the parties determine that there

5  should be something more formal than this short-term

6  user agreement?

7            MR. ARMSTRONG:  Objection to the form.

8       A    Repeat that, please.

9       Q    Why did -- did you believe there should be

10  more, you on behalf of Sea Star, believe there should

11  be a more formal written document?

12      A    Usually any type of equipment agreement is

13  expressed in a more formal document.

14      Q    And what I'm asking is, is why did you make

15  a determination that we would now need that -- or that

16  Sea Star would like to have that as opposed to the

17  short-term usage agreement that you had on May 1st,

18  2002?

19      A    A longer agreement would normally include

20  more words.

21      Q    Well, let me ask you this, was there -- at

22  some point in time did it appear to Sea Star that

23  perhaps we would be needing this equipment maybe

24  longer than Sea Star had originally thought as the

25  requirements became more known?

1      A    No.  It says -- I said in here that we will

2  make the best effort to -- equipment use and this --

3  this agreement to their depots.  And we had made it

4  clear that we didn't want to keep any of the sold

5  equipment for a long period of time --

6      Q    Any --

7      A    -- with the exception of chassis, which

8  after inspection we purchased some of the chassis.

9      Q    Well, when you say short term, what do you

10 mean by short term, what point and frame of reference

11 in terms of time would you -- to your mind, short term

12 mean?

13     A    Short term means as a little as one trip,

14 which relates somewhat to the 30 days.

15     Q    Well, did Sea Star subsequently lease

16 equipment from Emerald for more than 30 days?

17         MR. ARMSTRONG:  Object to the form.

18     A    No.  Under the short-term usage agreement we

19 did use equipment for longer than 30 days in some

20 cases.

21     Q    Well, when you say use, you used equipment

22 that you were leasing from Emerald; is that right?

23         MR. ARMSTRONG:  Object to the form.

24     A    No, that's not right.

25     Q    And why is that wrong?

1      A      It's a short-term usage agreement, it's not

2   a lease.

3      Q      Okay.

4      A      And it specifies that we would pay for

5   equipment that we used.

6      Q      And how is that different than a lease?

7             MR. ARMSTRONG:  Object to the form.

8      Q      If you know.

9      A      Most leases are longer term agreements.

10     Q      Leases are more longer term agreements?

11     A      Yes.

12     Q      Okay.  Do leases to your mind pertain to

13  payment of equipment or whatever it is that's being

14  leased during the time the lessee uses the equipment?

15     A      Please repeat that.

16     Q      Do -- does a lease of equipment to your mind

17  mean the same thing as the use of equipment by a

18  lessee for which it pays?

19            MR. ARMSTRONG:  Object to the form.

20     A      Not exactly.

21     Q      And why not?

22     A      There are many different kinds of leases,

23  some are very long-term leases.

24     Q      And long-term leases, would that pertain to

25  equipment that -- a long-term lease of equipment,

1    between Sea Star and Emerald with respect to use of

2    Emerald equipment?

3        A    There was a short-term usage agreement that

4    was written and signed later in 2002.

5        Q    Okay.  But prior to that more formal

6    agreement did Sea Star begin to use Emerald equipment

7    under the short-term user agreement?

8        A    Yes, after 5/02 --

9        Q    Okay.

10       A    -- we used some equipment that was

11   Emerald's.

12       Q    And where was Emerald's equipment which Sea

13   Star began using located on or about May 2nd, 2002?

14       A    Some of it might have been out to a shipper

15   at the time of transition.  Some equipment --

16       Q    When you say a shipper, what do you mean by

17   a shipper, for example?

18       A    A customer that is shipping cargo.

19       Q    All right.

20       A    Some equipment was in the terminals.

21       Q    When you say the terminals, you mean --

22       A    Any of the three --

23       Q    Right.

24       A    -- terminals, Jacksonville NPR terminal to

25   San Juan NPR terminal and the Philadelphia terminal.

1      Q    Okay.

2      A    In addition there was equipment at inland

3   depots --

4      Q    Right.

5      A    -- for NPR.

6      Q    Right.

7      A    There was equipment in Dominican Republic.

8      Q    Okay.  At the time of the aquisition, the

9   NPR aquisition, was there also certain equipment that

10  was in transit?

11     A    Yes.

12     Q    What does that mean?

13     A    That the NPR vessels sailed by Friday and

14  were at sea at the time of the transition.  So there

15  was containers on -- equipment on those ships.

16     Q    Was any of the equipment at that time in

17  Emerald's possession, to your knowledge?

18          MR. ARMSTRONG:  Object to the form.

19     A    Can you explain that?

20     Q    Yeah.  Specifically I'm talking about any of

21  the equipment that Sea Star may have used at or just

22  shortly after the NPR aquisition, was any of that

23  equipment actually in Emerald's possession so that Sea

24  Star called up Emerald and said, you know, we need

25  these containers?

1    A    I don't know what it's for.

2    Q    Okay.  And on the next page just after that

3  there's some circled items, do you know what those

4  circled items are?

5    A    No.

6    Q    Okay.  Is it your understanding that Sea

7  Star is not obligated to pay Emerald for the use of

8  any of the equipment that NPR had been leasing from

9  Emerald which was in transit or in process or in

10  progress at the time of the sale?

11        MR. ARMSTRONG:  Objection to the form.

12    A    We already paid NPR.  My understanding is

13  that until that cargo trip was completed we had paid

14  NPR.

15    Q    And you shouldn't have to pay it twice to

16  anybody else?

17    A    Correct.

18    Q    Other than the in transit or in process or

19  in progress equipment, then that's -- that is dealt

20  with here with respect to this Bates 3 memo, is it

21  your understanding that Sea Star Line would be

22  responsible for the payment of rental to Emerald for

23  other equipment used by Sea Star Line not the

24  in transit equipment?

25        MR. ARMSTRONG:  Object to the form.

1     A    We had -- we agreed to pay for equipment we

2  used.  We were also required by the bankruptcy court

3  to store NPR equipment for all leasing companies

4  including NPR at our terminals which included Emerald

5  so there was equipment that we had to store and

6  receive that we never used.

7     Q    Okay.

8     A    We didn't have to pay for that.

9     Q    The equipment that you say that Sea Star was

10  obligated to -- or had agreed to store, are we talking

11  about this in transit equipment or are we talking

12  about other equipment as well?

13     A    We're talking about other equipment as well

14  as equipment in transit after it completed it's

15  voyage.

16     Q    Well, I think you told me at the time of the

17  aquisition equipment was everywhere, this NPR

18  equipment was -- it could be with a customer, could be

19  at an inland depot, correct?

20     A    And it could be at a terminal.

21     Q    And it could be at a terminal.  Well, if it

22  was at a customer or an inland depot, did Sea Star

23  have any obligation to store that equipment?

24          MR. ARMSTRONG:  Object to the form.

25     Q    If you know.

1    me.   You said that Emerald would request information

2    about equipment and we would then tell them where it

3    was.   On what occasions would that occur?

4         A    One occasion was our self billing reports

5    that we provided to them for the activity during any

6    month, that would include information about their

7    equipment.   They at different times asked for

8    different kinds of information and we tried to provide

9    anything we could.

10        Q    Okay.   But other than that, there was no

11   mass notification of we've now tracked all of your

12   equipment and here's where all of your equipment is at

13   any point in time; is that correct?

14        A    I don't remember that that question was

15   asked.   We provided a lot of information.   We provided

16   inventories to help them.

17        Q    And pursuant to this short-term usage

18   agreement that you had that was agreed to pursuant to

19   your, I think, May 1st e-mail, Sea Star began using

20   some of this equipment; is that correct?

21        A    Some of this equipment being equipment that

22   had been in transit or this equipment being any other

23   Emerald equipment which --

24        Q    Let's take both.   Some of the in transit

25   equipment.

1      A      Yes.  If it -- in some cases if equipment

2   was reloaded by a customer and used again, then we

3   recognize that as use and listed it and paid for it.

4   If it wasn't used again, it came back in empty, we

5   parked it.

6      Q      And if it went to an inland depot it just

7   maybe sat there?

8      A      I believe that a lot of the equipment that

9   went to inland depots was reused.

10      Q      Reused by whom?

11      A      It could be reused by Sea Star.

12      Q      Well would it have been reused by anybody

13   else?  Would anyone else have had the right to use

14   that equipment?

15      A      I don't --

16             MR. ARMSTRONG:  Object to the form.

17      A      -- know.

18      Q      The answer is no, no one else would have

19   been --

20      A      Repeat that question.

21      Q      Would anybody else have had the right to use

22   that equipment?

23             MR. ARMSTRONG:  Object to the form.

24      Q      If you know.

25      A      Maybe Emerald.

78

1     Q    Because Emerald owned that equipment?

2     A    I think that -- that we were the more likely

3 user.

4     Q    Okay.  And you don't know of any other

5 leasing arrangement that Emerald had with anybody else

6 for this equipment, do you?

7     A    I only know they had an agreement with NPR.

8     Q    And then with Sea Star?

9     A    It would be user agreement --

10     Q    Yes.

11     A    -- for equipment we used.

12     Q    Right.

13     A    Yes.

14     MR. MOLDOFF:  Let's mark this Bates 4.

15     (Bates Exhibit 4 was marked for

16 identification.)

17 BY MR. MOLDOFF:

18     Q    All right.  I would ask you to take a look

19 at Bates 4.

20     A    Okay.

21     Q    Can you identify this?

22     A    Yeah.  This is the equipment rental

23 agreement between Emerald Leasing and Sea Star.

24     Q    And did you sign this document on behalf of

25 Sea Star Line, LLC?

79

1          A     Yes.

2          Q     Is that your signature on the back next to

3    the last page?

4          A     Yes, it is.

5          Q     And is this document dated?

6          A     It says as of blank day of July on the front

7    page.

8          Q     July of --

9          A     2002.

10         Q     Do you know when it was executed by both

11   sides?

12         A     I believe the end of September 2002.

13         Q     Do you know why there was a lapse of time?

14         A     There were several drafts prior to the

15   final.

16         Q     Did you participate at all in negotiating

17   the terms of this equipment rental agreement?

18         A     Yes.

19         Q     And with whom?

20         A     Art Davis was involved in the discussion.

21         Q     Anyone else?

22         A     Maybe Tom Holt, Jr., but I'm not sure.

23         Q     Do you recall if there were any terms in

24   particular that were the subject of negotiation?

25         A     Not specifically.

92

```
1        Q    IQSHIP's a computer program of some sort?

2        A    Yes, it is.  It's a software.

3        Q    And is that -- is that something special

4   that only Sea Star uses?

5        A    No.  It's a -- IQSHIP has been used by a

6   number of other lines in the world.  In addition to

7   the others obviously we also use it to track

8   equipment.

9        Q    Do you know if Sea Star Line used any

10  Emerald equipment that wasn't documented by a TIR?

11       A    I don't know of any that would be used

12  without a TIR.

13       Q    If -- is it possible that equipment was

14  being used without a TIR?

15            MR. ARMSTRONG:  Object to the form.

16       Q    If you know.

17       A    No.

18       Q    If Sea Star used certain equipment for which

19  a TIR was not prepared, do you believe that Sea Star

20  would be obligated to pay for that equip- --- the use

21  of that equipment if it actually used it?

22            MR. ARMSTRONG:  Object to the form.

23       A    If we used equipment we agreed to pay.  I

24  also just said that I don't think there could be

25  equipment used without a TIR.
```

1     Q     Yeah.

2     A     -- did we notify them?  No.  We put it on

3   the -- we tracked it and added it to the self billing

4   report.

5     Q     Through the TIRs or the IQSHIP and then a

6   self billing report?

7     A     Yes.

8     Q     But would Emerald have any way of knowing

9   what equipment was being used other than through that

10  process?

11          MR. ARMSTRONG:  Object to the form.

12    A     I don't know.

13    Q     There was no document or receipt that you

14  needed to get from Emerald in order to use any of that

15  equipment, was there?

16    A     No.

17    Q     Okay.  And equipment other than -- that was

18  in transit, Sea Star at some point in time in or about

19  the beginning of May 2002 began using some of

20  Emerald's equipment; is that correct?

21    A     Sometime in May of 2002, yes.

22    Q     And where was this equipment located, the

23  equipment now that wasn't in transit?

24    A     Again, there are many cases.  There may have

25  been a customer who then sent it in loaded and we



Page 1

1                UNITED STATES DISTRICT COURT
                 MIDDLE DISTRICT OF FLORIDA
2                  JACKSONVILLE DIVISION
                 CASE NO. 3:04-CV-146-99HTS
3                      -  -  -

   SEA STAR LINE, LLC,     :
4  a limited liability     :
   company,                :
5            Plaintiff,    :       COPY
                           :
6        vs.               :
                           :
7  EMERALD EQUIPMENT        :
   LEASING, INC., a         :
8  corporation             :
            Defendant.     :
9                      -  -  -
10               January 26, 2005
11                     -  -  -
12               Oral deposition of LORRAINE
   T. ROBINS, held in the offices of
13 Adelman, Lavine, Gold and Levin, Suite
   900, Four Penn Center, Philadelphia,
14 Pennsylvania 19103, commencing at 9:30
   a.m., on the above date, before Pamela J.
15 Gober Bracic, a Federally-Approved
   Registered Professional Reporter and
16 Commissioner for the Commonwealth of
   Pennsylvania.
17                     -  -  -
18
19
20
21
22             ESQUIRE DEPOSITION SERVICES
                     15th Floor
23         1880 John F. Kennedy Boulevard
           Philadelphia, Pennsylvania 19103
24                 (215) 988-9191

Page 118

1    probably, on this.  We didn't go into

2    that, though.

3            Q.    Can you tell from this

4    paragraph what information you had?

5            A.    No, I can't.  I know I had

6    Port Elizabeth, but I can't tell what

7    other information I had.  I had something

8    that had Sea Star touching the container

9    and using the container.  It was not

10   billed.

11           Q.    So if you found that Sea

12   Star touched the container --

13           A.    Used it, used it.

14           Q.    How did you determine

15   whether a container that Sea Star touched

16   was used by Sea Star?

17           A.    Well, look at the next one.

18           Q.    I'm asking you in general,

19   how did you make that determination?

20           A.    In general?

21           Q.    Yes.

22           A.    Again, with the

23   documentation that I had.

24           Q.    What documentation was that?

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

SEA STAR LINE, LLC,                    Civ. No. 05-245-JJF-LPS
a limited liability company,

              Plaintiff/
              Counterclaim Defendant,

vs.                              ORIGINAL

EMERALD EQUIPMENT LEASING, INC.,
a corporation,

              Defendant/
              Counterclaim Plaintiff.

_____

        Deposition of **ANDREW ROOKS**, taken on behalf

of the Defendant/Counterclaim Plaintiff, pursuant to

Re-Notice of Taking Deposition in the above-entitled

action, on Tuesday, March 18, 2008, at 10:03 a.m., at

the offices of Powers Reporting, Inc., 220 East Forsyth

Street, Jacksonville, Florida, before Jennifer

Liberato, Court Reporter and Notary Public in and for

the State of Florida at Large.

```
 1          consignee were the same, so I'll have to find

 2          that out.

 3               MR. MOLDOFF:  I wasn't going to mark this,

 4          but okay.

 5               (SSL's Exhibit No. 16 was marked for

 6     identification.)

 7               (Off-the-record discussion.)

 8     BY MR. MOLDOFF:

 9          Q    I'll show you what we've marked as

10     Exhibit 16.  Can you identify that?

11          A    Yes.

12          Q    And that's -- is what?

13          A    That's the Supplemental Answer to

14     Interrogatory 1.

15          Q    And it's signed by whom?

16          A    Neil Perlmutter.

17          Q    And that has attached to it three

18     schedules?

19          A    That's correct.

20          Q    And the first schedule is the schedule

21     that shows the various pieces of equipment that you

22     have provided start and stop dates?

23          A    That's correct.

24          Q    Did anyone at Sea Star compare the start

25     and stop dates to Emerald's invoices?  Has anybody
```

1    done that analysis?

2        A    On Exhibit A we have, yes.

3        Q    On Exhibit A.  And based on that analysis

4    can you tell me whether or not it indicates that Sea

5    Star owes any money for rent --

6            MR. ARMSTRONG:  Object to the form.

7        Q    -- to Emerald?

8        A    Based on this analysis I can't determine

9    that.

10       Q    Well, an analysis of the comparison

11   between the two, has anyone run that analysis to

12   determine amounts?

13       A    On each individual unit we have.  We

14   determined --

15       Q    So there's a total at some point?

16           MR. ARMSTRONG:  Object to the form.

17       A    What was your question?

18       Q    You said there would be -- so for each --

19   for each piece you have an amount plus or minus, I

20   guess?

21           MR. ARMSTRONG:  Object to the form.

22       Q    And is there --

23       A    That's correct.

24       Q    Is there a total?

25       A    I -- there is.  I don't have it here.

1    Q    But you have it?  Do you have any --

2    A    I --

3    Q    You have no idea what it is?

4    A    I believe we have it, but I don't know

5    what it is right now.

6    Q    Did anyone at Sea Star compare the start

7    and stop dates on that document with the

8    self-billing reports?

9         MR. ARMSTRONG:  Object to the form.

10    A    Yes.  That's part of the -- that's part of

11    our review.

12    Q    And did you find that there were a lot of

13    errors on the self-billing reports?

14         MR. ARMSTRONG:  Object to the form.

15    A    There are errors in Emerald's favor and

16    there's errors --

17    Q    Right.

18    A    -- in our favor.

19    Q    According to Sea Star, correct?

20    A    According to Sea Star, yes.

21    Q    And would you say a lot of errors?

22    A    I don't know.  By looking at this I can't

23    tell.

24    Q    But if we did compare it, we'd be able to

25    know, right?

1       A     Yes.

2       Q     What about Exhibit B?  Exhibit B as I

3  understand it are schedules of equipment that Sea

4  Star says they never used or on-hired --

5       A     That's correct.

6       Q     -- correct?

7       A     That's correct.

8       Q     And how did Sea Star determine what

9  equipment it did not use?

10      A     By comparing the -- the claim spreadsheets

11 that Lorraine has sent with our documentation and

12 our -- our system records.

13      Q     And when you say your documentation, what

14 documents were they?

15      A     TIRs, inventories.

16      Q     Did you look at truck bills?

17      A     We didn't look at trucking invoices, no,

18 we did not.  On -- other than some comparisons we

19 did on a specific account that we've discussed, we

20 didn't look at truck bills.

21      Q     So it was essentially looking at TIRs that

22 have been produced and inventories?

23      A     Well, primarily inventories, TIRs, the --

24      Q     All of which (unintelligible) --

25      A     -- (unintelligible) connection with --

1   it's all in the connection with the terms of the

2   rental agreement.  If it did fall under the terms of

3   the rental agreement, then we did determine that we

4   didn't on-hire.

5        Q    Are you saying there may be items that Sea

6   Star used but Sea Star believes does not fall under

7   the terms of the rental agreement --

8             MR. ARMSTRONG:  Object to the form.

9        Q    -- even though they used it?

10       A    I'm referring to in-transit first four

11  ships.

12       Q    Other than in-transit.  For example, if it

13  was not in transit but on a ship loaded or on a --

14  you know, taken -- delivered by a trucker, would

15  that constitute use by Sea Star for which Sea Star

16  would owe rent?

17       A    I'd have to look at some --

18            MR. ARMSTRONG:  Object to the form.

19       A    I'd have to look at a specific unit,

20  but --

21       Q    Well, let's assume that there is such a

22  unit where it appears on a -- on a ship as -- you

23  haven't produced a TIR?

24            MR. ARMSTRONG:  Alan, do you have a

25       specific unit --

```
 1          MR. MOLDOFF:  I don't have any specific

 2    unit.

 3          MR. ARMSTRONG:  -- for which you can show

 4    anything or are we dealing --

 5          MR. MOLDOFF:  Well, there are --

 6          MR. ARMSTRONG:  -- in hypotheticals?

 7          MR. MOLDOFF:  There are -- there are a

 8    number of them.  I didn't bring any, but there

 9    are a number of them.

10          MR. ARMSTRONG:  Well, if we're dealing in

11    hypotheticals, would you indicate that?

12          MR. MOLDOFF:  Well, it's -- you can -- you

13    can object to the form.

14          MR. ARMSTRONG:  I'll object to the form.

15     A      If during our audits and our review of --

16    of Emerald's claim we determined that we, indeed,

17    utilized that equipment, then we would categorize

18    that as usage in the spirit of the rental agreement.

19     Q      And then let's go to Exhibit C, and

20    that's -- I think that's the one -- and I -- you may

21    -- I think we -- I asked you this, but that's --

22    that's the list of equipment that you're still

23    reviewing?

24     A      That's correct.

25     Q      And is that what you are thinking is going
```