# EXHIBIT A

1

1      IN THE UNITED STATES DISTRICT COURT

2      FOR THE MIDDLE DISTRICT OF FLORIDA

3          JACKSONVILLE DIVISION

4        CASE NO. 3:04-CV-146-99HTS

5

6              - - -

7    SEA STAR LINE, LLC,                    :
     a limited liability company,          :
8        Plaintiff,                        :
              V.                            :
9    EMERALD EQUIPMENT LEASING, INC.,       :
     a corporation,                        :
10       Defendant.                        :

11

12

13              - - -
           December 8, 2004
14              - - -

     Oral deposition of ARTHUR
15   B. DAVIS, held in the offices of Adelman
     Lavine Gold and Levin, Four Penn Center,
16   Philadelphia, Pennsylvania, 19103, commencing
     at 10:00 a.m., on the above date, before
17   Joseph Calavetta, a Federally-Approved
     Registered Professional Reporter and
18   Commissioner for the Commonwealth of
     Pennsylvania.

19
              - - -
20

21

22   ESQUIRE DEPOSITION SERVICES
     Fifteenth Floor
23   1880 John F. Kennedy Boulevard
     Philadelphia, Pennsylvania  19103
24   (215) 988-9191

        ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                    19

1          Let me rephrase that.

2                    What was Tom Holt, Sr.'s

3          position?

4              A.    In what?

5                    MR. MOLDOFF:  Just

6          objection to the question being

7          overbroad.

8              Q.    In what capacity would you

9          report to Tom Holt, Sr?

10             A.    Well --

11                   MR. MOLDOFF:  I

12         object.  There is no time frame,

13         maybe that will help.

14             A.    I am just confused about

15         your question.

16             Q.    As president of Emerald

17         Equipment Leasing, why would you report

18         to Tom Holt, Sr?

19             A.    Tom Holt, Sr was the owner

20         of NPR, Incorporated.

21             Q.    Was he also the owner of

22         Emerald Equipment Leasing?

23             A.    No.

24             Q.    Was Emerald Equipment

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis          45

1          MR. MOLDOFF:  The

2     lawsuit you are talking about is

3     the lawsuit instituted in March of

4     2004 by Sea Star Line?

5     BY MR. ARMSTRONG:

6          Q.    Prior to March of 2004, do

7     you recall looking at paragraph 13 on

8     page 8 of the order?

9          A.    I am sure that I read the

10     order prior to March of 2004.

11          Q.    You don't recall how long

12     prior to March of 2004 you read the

13     order?

14          A.    That is correct.

15          Q.    And what was your purpose

16     in reading the order prior to March of

17     2004?

18          A.    Because this was an order

19     that was handed down by the Bankruptcy

20     Court.

21          Q.    When you read the order,

22     were you aware that Emerald Equipment

23     Leasing would be - Emerald equipment

24     would be stored on property and leased by

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                    46

1        Sea Star Line as a result of the asset

2        sale?

3            A.    Yes.

4            Q.    When did you become aware

5        that equipment would be stored on Sea

6        Star Line property as a result of the

7        asset sale?

8            A.    Whenever it was that I read

9        this order.

10           Q.    Did you ever inventory

11       equipment stored on Sea Star Line

12       property as a result of the asset sale?

13           MR. MOLDOFF:  I just

14       object to the question, the form of

15       the question, to the extent that

16       I don't know whether whether you

17       mean Art Davis or anyone on behalf

18       of Emerald.

19           MR. ARMSTRONG:  I am

20       asking you.

21           THE WITNESS:  Would

22       you then repeat your question.

23           MR. ARMSTRONG:  Read

24       it back.

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                76

1    board the three vessels as of, I think it

2    was two o'clock or three o'clock in the

3    morning on April 27th.

4        Q.    And were you aware that

5    payments for shipments in process would

6    be made to NPR?

7        A.    I became aware of that.

8        Q.    When did you become aware

9    of that?

10       A.    I really don't know the

11   exact time.  Most recently during this

12   litigation.

13       Q.    Did you ever identify

14   equipment involved in shipments in

15   process?

16       A.    That was an impossible task

17   for me to do.

18       Q.    Why was that?

19       A.    Because although we asked

20   that Sea Star provide manifests many

21   times, they refused to do so.

22       Q.    Well, now, the equipment

23   that was on board the vessels as of three

24   o'clock a.m. on April 27th of 2002, was

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                86

1    report -- off that ship, I'm sorry, and

2    be able to compare what he discharged

3    back to the manifests, that's why the

4    manifest is so important.

5        Q.    The discharging stevedore

6    doesn't prepare a manifest, does he?

7        A.    He does not, but he uses

8    the manifests to confirm that he took

9    off.

10       Q.    Let me show you a copy of a

11   letter dated June 10 of 2002 which I will

12   ask the court reporter to mark as exhibit

13   10 for identification.

14               - - -

15           (Whereupon, Exhibit

16       Number 10 was marked for

17       identification.)

18               - - -

19   BY MR. ARMSTRONG:

20       Q.    Do you recognize that

21   document?

22       A.    Yes, I do.

23       Q.    When did Tom Holt, Sr

24   become president of Emerald Equipment

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                    87

1    Leasing?

2            A.    I think March or April of

3    2001.

4            Q.    Is Tom Holt, Sr still

5    president of Emerald Equipment Leasing?

6            A.    Yes.

7            Q.    Did he succeed you as

8    president?

9            A.    Yes.

10           Q.    When did you become aware

11   that payments due for equipment not used

12   in shipments in process or not for a

13   purpose other than completing shipments

14   in process on April 27th, would be made

15   to MBC Leasing, Incorporated?

16           A.    I am not sure exactly.

17           Q.    Did you ever have any

18   discussions with Tom Holt, Sr regarding

19   the contents of this letter?

20           A.    No.

21           Q.    Did you ever have any

22   discussions with Tom Holt, Sr regarding

23   payments for shipments in progress to

24   NPR, Incorporated?

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis              89

1    aware of the payments by Sea Star for

2    shipments in process or progress or

3    transit as of April 27th of 2002 would be

4    made to NPR, Incorporated?

5        A.    Probably when I met with

6    Andy Rooks last August of 2003 at

7    Jacksonville.

8        Q.    When you heard that, did

9    you go back and discuss it with Tom Holt,

10   Sr?

11       A.    No.

12       Q.    Did you discuss it with

13   anyone?

14       A.    I believe I had some

15   discussion with Scott Crieger in that

16   regard.

17       Q.    What did you say to Scott

18   Crieger?

19       A.    I asked him for his

20   understanding of what was happening

21   there.

22       Q.    What did he tell you?

23       A.    He had sent a letter or had

24   Bill Hallam send a letter, I am not

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                    91

1     Q.    Do you recall?

2     A.    I think I did.

3     Q.    When did you first see a

4    copy of the agreement?

5     A.    It was certainly after the

6    August meeting with Sea Star.

7     Q.    Other than for shipments in

8    process, to what entity was Sea Star to

9    make payments for equipment, for Emerald

10   equipment after April 27th of 2002?

11    A.    They were paying the funds

12   to MBC Leasing, Incorporated.

13    Q.    How long was Sea Star to

14   pay the funds to MBC Leasing,

15   Incorporated?

16    A.    I don't understand your

17   question.

18    Q.    Why was Sea Star to pay the

19   funds to MBC Leasing, Incorporated rather

20   than Emerald?

21         MR. MOLDOFF:  If you

22   know.

23    Q.    If you know?

24    A.    My understanding is that

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                    92

1    MBC Leasing, Incorporated held a lien,

2    they were the secured creditor on the

3    equipment, and my recollection is that

4    there was a lifting of the stay and that

5    MBC Leasing, Incorporated was allowed to

6    receive the money to reduce the amount of

7    the loan.

8         Q.    Let me show you a copy of a

9    document dated April 19th of 2002, which

10   I will ask the court reporter to mark as

11   exhibit 11 for identification.

12                 - - -

13                 (Whereupon, Exhibit

14   Number 11 was marked for

15   identification.)

16                 - - -

17   BY MR. ARMSTRONG:

18        Q.    Have you ever seen that

19   document?

20        A.    Yes, I believe I have seen

21   this.

22        Q.    Do you recall when you

23   first saw it?

24        A.    As part of the production

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                    104

1    document.

2         Q.    Do you recognize the

3    signatures on, I believe it would be

4    page -- the last page of the document --

5    of the actual text of the contract?

6         A.    I believe I do.

7         Q.    Whose signatures do you

8    recognize?

9         A.    Philip Bates and Thomas J.

10   Holt.

11        Q.    Is that Thomas J. Holt, Sr?

12        A.    It would be, yes.

13        Q.    At the time was Thomas J.

14   Holt, Sr., President of Emerald Equipment

15   Leasing?

16        A.    Yes.

17        Q.    Prior to Mr. Holt signing

18   had the document, did you have any

19   discussions with him concerning its

20   contents?

21        A.    Yes.

22        Q.    And what were those

23   discussions?

24        A.    Basically went over the

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                105

1    agreement.

2        Q.    So Mr. Holt read the

3    agreement before he signed it?

4        A.    I believe so.

5        Q.    Did you have any

6    communications with Scott Crieger

7    concerning this document?

8        A.    Yes.

9        Q.    What communications did you

10   have with Scott Crieger concerning the

11   equipment rental agreement?

12       A.    I provided the agreement.

13       Q.    After you provided the

14   agreement, did Scott Crieger ask you any

15   questions about it?

16       A.    I don't recall.

17       Q.    Did he give you any

18   instructions regarding the agreement?

19       A.    Only to the extent that he

20   didn't see a problem with it.

21       Q.    Do you recall anything

22   else?

23       A.    No.

24       Q.    Did you have any

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                106

1   communications with Mr. Hallam regarding

2   the equipment rental agreement?

3       A.    Yes.

4       Q.    What communications did you

5   have with him?

6       A.    This was an evolving

7   process, so whatever drafts came up,

8   copies were provided to Mr. Hallam.

9       Q.    Was Mr. Hallam telling you

10  what should be in the agreement?

11      A.    Yes, the same as yourself.

12      Q.    Did Mr. Hallam tell you

13  that signing the agreement would require

14  the authorization of MBC Leasing,

15  Incorporated?

16      A.    Yes.

17      Q.    Did you receive the

18  authorization of MBC Leasing,

19  Incorporated to sign the agreement?

20      A.    Yes.

21      Q.    Did you understand why the

22  authorization of MBC Leasing,

23  Incorporated was necessary to sign the

24  agreement?

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                    107

1        A.    Yes.

2        Q.    What was your

3    understanding?

4        A.    MBC Leasing had a secured

5    lien on the equipment.

6        Q.    MBC Leasing, Incorporated

7    in actuality controlled the equipment, is

8    that correct?

9        A.    I don't understand the term

10   controlled.

11       Q.    You could not do anything

12   with respect to Emerald equipment without

13   MBC Leasing's permission, is that

14   correct?

15              MR. MOLDOFF:  If you

16         know.  To the extent it calls for a

17         legal conclusion I object.

18       A.    I don't know.

19       Q.    You are familiar with the

20   equipment rental agreement; is that

21   right?

22       A.    I am.

23       Q.    Paragraph 1, under

24   paragraph 1 effecting delivery would be

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                108

1    by signed and dated equipment interchange

2    receipts; is that correct?

3         A.    That's correct.

4         Q.    What's an equipment

5    interchange receipt?

6         A.    It is a document that the

7    parties execute to show that a piece of

8    equipment was delivered or seized.

9         Q.    Is that sometimes

10   abbreviated as EIR?

11        A.    I have never heard that.

12        Q.    And, now, is there another

13   type of interchange receipt called a

14   trailer interchange receipt?

15        A.    Yes.

16        Q.    What is a trailer

17   interchange receipt?

18        A.    It would be the same

19   explanation.

20        Q.    Are equipment interchange

21   receipts and trailer interchange receipts

22   forms used to interchange equipment?

23        A.    Say that again please.

24        Q.    Are equipment interchange

Arthur B. Davis                114

1   A.    I think it was

2   approximately three weeks.

3   Q.    Now, subparagraph b of

4   paragraph 10, says in part upon

5   re-deliver of particular equipment the

6   receiving terminal will execute an

7   equipment interchange receipt.  Do you

8   see that?

9   A.    I do.

10   Q.    In Philadelphia the

11   receiving terminal was Greenwich

12   Terminals; is that correct?

13   A.    Yes.

14   Q.    In JAX PORT after

15   approximately August 1st, the receiving

16   terminal was Greenwich Terminals; is that

17   correct?

18   A.    That's correct.

19   Q.    In San Juan the receiving

20   terminal was the Sea Star terminal; is

21   that correct?

22   A.    Yes.

23   Q.    Your understanding of the

24   language equipment interchange receipt in

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis            115

1  that subparagraph would be a TIR; is that

2  correct?

3      A.   Yes.

4      Q.   So when equipment was

5  re-delivered the terminal that took it in

6  would sign a TIR; is that right?

7      A.   It would.  The TIR would be

8  issued at the time that something was

9  happening with that specific piece of

10  equipment.

11      Q.   Would the TIR be issued at

12  the time that the equipment came through

13  the receiving terminal's gate?

14      A.   That's when it is supposed

15  to happen.  That is right.

16      Q.   And that would be in terms

17  of a piece of equipment coming into the

18  terminal, a gate-in procedure?

19      A.   Gate-in, yes.

20      Q.   And with respect to

21  equipment going out of the terminal, it

22  would be a gate-out procedure; is that

23  correct?

24      A.   That is correct.

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis          116

1          MR. ARMSTRONG: Do you

2     want a break for lunch?

3

4

5              - - -

6          ( Whereupon, a luncheon

7     recess wastaken.)

8              - - -

9

10

11     BY MR. ARMSTRONG:

12          Q.     Is gate-in abbreviated as

13     G.I.

14          A.     Yes.

15          Q.     Is gate-out abbreviated as

16     G.O.?

17          A.     I would take it for that,

18     yes.

19          Q.     In this equipment agreement

20     paragraph 15 a, states in part, this

21     agreement contains the entire agreement

22     between the parties and subject to the

23     provisions of section 1, may not be

24     amended altered or modified except by

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                    122

1    by alterations.

2         Q.     The language in the

3    agreement states and I will repeat it

4    this agreement contains the entire

5    agreement between the parties and subject

6    to the provisions of section 1 may not be

7    amended, altered or modified except by a

8    writing signed by the party to be bound.

9              In the context of that

10   language, are you aware of any ways in

11   which the equipment rental agreement was

12   altered on or after July 31st of 2002?

13        A.     No.

14        Q.     Now, moving forward to the

15   independent contractor agreement which I

16   asked the court reporter to mark as

17   exhibit 17 for identification, do you

18   recognize that document?

19        A.     Yes, I have seen this.

20        Q.     When did you first see that

21   document?

22        A.     I am really not sure as to

23   the date.

24        Q.     Did you participate in

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                123

1    negotiating the independent contractor

2    agreement?

3        A.    To some extent, yes.

4        Q.    What was your

5    participation?

6        A.    Talked about minimum

7    pricing on equipment and what we would be

8    able -- what would be able to be done on

9    behalf of MBC Leasing.

10       Q.    Look at the arrangement

11   page, section 21, notices to the

12   contractor?

13       A.    All right.

14       Q.    There's some handwriting

15   under Greenwich Terminals LLC.  Can you

16   read that?

17       A.    Yes.

18       Q.    Is that Thomas J. Holt, Jr?

19       A.    It is.

20       Q.    President 3301 South

21   Columbus Boulevard Philadelphia,

22   Pennsylvania?

23       A.    Yes.

24       Q.    Do you recognize the

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis          124

1  handwriting?

2      A.    I do.

3      Q.    Whose handwriting is it?

4      A.    Tom Holt, Jr.

5      Q.    Was Tom Holt, Jr president

6  of Greenwich Terminals when this contract

7  was signed.

8          MR. MOLDOFF:  We will

9      object.

10     A.    I'm sorry.

11         MR. MOLDOFF:  I object

12     to that question.

13     Q.    All right.  You can go

14  ahead and answer.

15         MR. MOLDOFF:  I object

16     to the extent it's calls for

17     speculation.

18     A.    I don't know.

19     Q.    Look at exhibit D,

20  contractors representatives, do you know

21  who prepared that list?

22     A.    I believe it was MBC

23  Leasing.

24     Q.    Thomas Holt, Jr., Arthur

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis          125

1    Davis, Arthur Davis would be you; is that

2    correct?

3          A.    That's correct.

4          Q.    So you were a

5    representative of Greenwich Terminals

6    under this contract?

7          A.    That is right.

8          Q.    And the third name is

9    Martin McDonald, who is that?

10         A.    Martin McDonald was an

11   employee of NPR, Incorporated.

12         Q.    All right.

13               Was he an employee of NPR,

14   Incorporated on or about June 30th of

15   2002?

16         A.    No.

17         Q.    Do you know who his

18   employer was on or about June 30th of

19   2002?

20         A.    No.

21         Q.    Did he have any

22   relationship with Emerald on or about

23   June 30th of 2002?

24               MR. MOLDOFF:  If you

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis          157

1    Q.    Let me show you a copy of

2    some e-mails dated August 8 and August

3    11th of 2003 which I will ask the court

4    reporter to mark as exhibit 28 for

5    identification.

6              - - -

7              (Whereupon, Exhibit

8    Number 28 was marked for

9    identification.)

10             - - -

11   BY MR. ARMSTRONG:

12   Q.    Do you recognize those

13   documents?

14   A.    I remember this.

15   Q.    The top of the second page

16   Scott Crieger states quote Art, after I

17   got over the shock of seven months of

18   your salary all at once unquote.  Do you

19   see that?

20   A.    I do.

21   Q.    You were submitting bills

22   for your salary to Mr. Crieger?

23   A.    I was.

24   Q.    And MBC Leasing was paying

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                158

1    those bills?

2        A.    They were.

3        Q.    MBC Leasing was paying your

4    salary?

5        A.    They were paying it to

6    Greenwich Terminals.

7        Q.    Were they paying anyone

8    else's salary?

9        A.    They were paying for Marty

10   McDonald.

11       Q.    And you would submit

12   separate bills for Marty McDonald's

13   salary?

14       A.    That is correct.

15       Q.    Were they paying anyone

16   else's salary?

17       A.    Francisco Gonzalez.

18       Q.    Who is that?

19       A.    He's a gentleman in Puerto

20   Rico that was being used to help sell the

21   equipment.

22       Q.    And who was using him?

23       A.    We were.

24       Q.    By me are you --

Arthur B. Davis                    159

1          A.     Greenwich.

2          Q.     Was MBC Leasing,

3     Incorporated paying Tom Holt, Jr's

4     salary?

5          A.     No.

6          Q.     Let me show you a copy of a

7     letter or telefax, telecopy cover sheet

8     dated April 24th of 2003 which I will ask

9     the court reporter to mark as exhibit 29

10     for identification.

11               - - -

12               (Whereupon, Exhibit

13          Number 29 was marked for

14          identification.)

15               - - -

16     BY MR. ARMSTRONG:

17          Q.   Do you recognize that

18     document?

19          A.     Yes, I do.

20          Q.     The upper corner, left-hand

21     corner there is a note Tom, Sr for your

22     information, is that Arthur underneath?

23          A.     Yes.

24          Q.     Did you write that?

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis              175

1      know what units were on board the ships.

2              So is it possible that a

3      unit was billed, yes.  It is possible

4      that a unit was billed for which Sea Star

5      paid into NPR, Incorporated and if they

6      had the manifests as were promised then

7      we would be able to adjust the bill

8      accordingly.

9              Q.     Did you, after receiving

10     that telefax, contact Scott Crieger and

11     say I can't make sure?

12             A.     I am sure I did.

13             Q.     Do you recall specifically

14     telling him that?

15             A.     I think so.

16             Q.     When did you do that?

17             A.     Whenever -- in close

18     proximity to receipt.

19             Q.     Did you call him on the

20     phone?

21             MR. MOLDOFF:  Just to

22     clear up some confusion, I don't

23     think Art understood the question.

24             MR. ARMSTRONG:  I'm

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis          198

1   late April of 2002; is that correct?

2          A.     They had equipment in San

3   Juan.

4          Q.     You knew that Sea Star was

5   inventorying equipment at various

6   terminals including that in San Juan

7   beginning in late April of 2002, is that

8   correct?

9                 MR. MOLDOFF:  Object

10          to the form of the question.

11                THE WITNESS:  They had

12          equipment in San Juan, yes, they

13          did have equipment there.

14          Q.     Were they inventorying

15   equipment that was located there in the

16   Puerto Nuevo terminal in San Juan?

17                MR. MOLDOFF:  Was Sea

18          Star?

19          Q.     Wait a minute.

20                MR. MOLDOFF:  Hold

21          it.  I object.  I object.  You are

22          being argumentative and I object.

23          Q.     You know, do you not, that

24   as of April 27th of 2002 there was

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                199

1    Emerald equipment that had been on lease

2    to NPR, Incorporated located in the

3    terminal at Puerto Nuevo in San Juan; is

4    that correct?

5        A.    That is correct.

6        Q.    You know that one of the

7    things that Sea Star was doing was to

8    then inventory that equipment, is that

9    correct?

10            MR. MOLDOFF:  Object

11        to the form of the question.  Do

12        you know?

13       A.    On April 27th.

14       Q.    On and after April 27th?

15       A.    I can't speak to on April

16    27th.

17       Q.    Can you speak to any date

18    after April 27th?

19       A.    Certainly.

20       Q.    What date can you first

21    speak to?

22       A.    The 22nd of June of 2002.

23       Q.    So as far as you know the

24    first time that Sea Star began to

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis          219

1      A.      Sea Star had already been

2      using all of the equipment that they had

3      in-house on hand since the beginning of

4      May, so by the time we got to this other

5      written agreement, which was to be

6      effective as of 4 / 29 five and a half

7      months had already passed.  It didn't

8      make any difference.  They had and used

9      what they had and what they used.

10     Q.      And how did you tell from

11     the DV schedule that equipment you have

12     listed was not being paid by NPR as of

13     April 26th of 2002, but was missing or

14     POS as of that date?

15     A.      Because there had to be

16     some basis upon which to start to bill it

17     in the first place.

18     Q.      That's fine.

19         Now, tell me what the basis

20     for starting to bill equipment listed on

21     the DV schedule was when you prepared

22     those schedule?

23     A.      It's those same basis as

24     the actual billing that we did.  We took

ESQUIRE DEPOSITION SERVICES

Arthur B. Davis                    222

1    operations?

2         A.    Teddy Hineson, I went to

3    the DV with Marty McDonald and met with

4    Teddy Hineson who said I think that I am

5    entitled to the NPR, Incorporated

6    equipment.

7              We said you are not

8    entitled to the NPR -- I mean Emerald

9    equipment because NPR, Incorporated did

10   not pay you and, in fact, much of that

11   equipment was, in fact recovered and paid

12   for and credit was given to Sea Star if

13   Sea Star had used it.

14        Q.    You knew that there were

15   other vendors unquote that were holding

16   Emerald equipment in the Dominican

17   Republic, did you not?

18        A.    That is the only one that

19   comes to mind.  When we did an invoice to

20   Sea Star, if Sea Star Line used the piece

21   of equipment and didn't return the piece

22   of equipment Sea Star had to pay for the

23   piece of equipment.

24        Q.    You invoiced Sea Star for

ESQUIRE DEPOSITION SERVICES