# EXHIBIT B

Thomas Holt

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

— — —

SEA STAR LINE, LLC, A LIMITED :
LIABILITY COMPANY,                :
                                  : Civil Action No.
        Plaintiff/               :
        Counterclaim Defendant,  : 05-CV-245-JJF (LPS)
                                  :
            vs.                  :
                                  :
EMERALD EQUIPMENT LEASING,       :
INC., a corporation,             :
                                  :
        Defendant/               :
        Counterclaim Plaintiff.  :

Deposition of THOMAS HOLT, SR.
taken at Eckert Seamans Cherin & Mellott, LLC
Two Liberty Place, 50 South 16th Street, 22nd Floor
Philadelphia, Pennsylvania 19102
Tuesday, February 12 2008
9:45 a.m.

Gail L. Inghram Verbano, CSR, RMR, CLR
302.449.0529

Thomas Holt

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

— — —

SEA STAR LINE, LLC, A LIMITED :
LIABILITY COMPANY,                 :
                                   : Civil Action No.
        Plaintiff/                 :
        Counterclaim Defendant,    : 05-CV-245-JJF (LPS)
                                   :
            vs.                    :
                                   :
EMERALD EQUIPMENT LEASING,         :
INC., a corporation,               :
                                   :
        Defendant/                 :
        Counterclaim Plaintiff.    :

Deposition of THOMAS HOLT, SR.

taken at Eckert Seamans Cherin & Mellott, LLC

Two Liberty Place, 50 South 16th Street, 22nd Floor

Philadelphia, Pennsylvania 19102

Tuesday, February 12 2008

9:45 a.m.

Gail L. Inghram Verbano, CSR, RMR, CLR

302.449.0529

Thomas Holt

Page 10

1  there's several hundred pieces of equipment missing
2  that you never returned.
3      Q  I take it that you're using the royal
4  "you"?
5      A  As always, I look at counsel as Sea Star.
6      Q  Thank you.
7          What arrangement was there or is there to
8  compensate Arthur Davis?
9      A  The same answer as Lorraine.
10     Q  What work has John Evans done as a
11 contractor?
12     A  He, as an attorney, assisted Lorraine and
13 Arthur in the correlation and discovery of documents
14 from Sea Star and other entities and advice to me.
15     Q  During what period of time was John Evans
16 a contractor for Emerald Equipment?
17     A  For Emerald Equipment?  Probably sometime
18 in '06 that ended.
19     Q  Do you recall when it started?
20     A  It would have started probably about '02,
21 '03, best guesstimate.
22     Q  What agreement for compensation does
23 Emerald or has Emerald had with John Evans?
24     A  Emerald was paying Mr. Evans; and it got

Page 11

1  to a point in time where it couldn't pay him anymore
2  so we parted company.  Ran out of money.
3      Q  How was Mr. Evans being paid?  Was it by
4  the hour or a salary?
5      A  I think it was more weekly, if I
6  remember.
7      Q  Was it a salary arrangement or an hourly
8  arrangement?
9      A  No, I believe it was more weekly, not
10 hourly.  Might have been per diem.
11     Q  Was there a written contract?
12     A  No, sir.
13     Q  And what work did Mrs. Evans do for
14 Emerald?
15     A  Assisted in the correlation of all the
16 documents.
17     Q  Over what period of time did she do that
18 work?
19     A  Best guess for Emerald would have been
20 probably '05.
21     Q  During the year '05?  No work prior, no
22 work afterwards?
23     A  I don't think so.
24     Q  Was there an arrangement —

Page 12

1      A  I'm sorry.
2      Q  No, I'm sorry.  I cut you off.
3      A  Go ahead.
4      Q  Was there an arrangement to compensate
5  her?
6      A  Yes, sir.
7      Q  And what was that arrangement?
8      A  Again, it was paid on a weekly basis, and
9  I feel it was — the rate was per diem.  It might
10 have been by the hour, but -- it was what it was.
11     Q  Was Emerald Equipment Leasing making the
12 payments to Mr. Evans and Mrs. Evans?
13     A  Was Emerald Equipment Leasing making
14 payments to them?
15     Q  Making the payments.
16     A  Are you talking about payroll?  What kind
17 of --
18     Q  Talking about writing checks, that sort
19 of thing.
20     A  Payments for services they rendered?
21     Q  Yes.
22     A  Emerald was paying them, yes.
23     Q  Do you recall the names of the other
24 people?

Page 13

1      A  No, not off the top of my head.
2      Q  You recall Marty McDonald?
3      A  Okay.  Thank you for reminding me.  But
4  Marty was more in '03 and '04, I think.  But thank
5  you for reminding me.
6      Q  You're welcome.
7          Was he working for Emerald at that time?
8      A  Yes.
9      Q  Was he being paid by Emerald?
10     A  Yes, sir.
11     Q  What were his responsibilities?
12     A  His responsibilities was to assist Arthur
13 and Lorraine in trying to find Emerald's equipment,
14 more towards Jacksonville and Puerto Rico; and trying
15 to recover the equipment; and also to assist in
16 whatever paperwork was required.
17     Q  Does Marty McDonald still do any work for
18 Emerald?
19     A  No, sir.
20     Q  Do you recall a Francisco or Frankie
21 Gonzalez?
22     A  I remember the name Frankie.  He was in
23 Puerto Rico -- or was he in Jacksonville?
24     Q  He was in Puerto Rico.

Thomas Holt

Page 14

1      A   Okay.
2      Q   Was he working for Emerald?
3      A   He was working for Emerald.
4      Q   Over what period of time?
5      A   Probably the same time frame.  From -- I
6  want to say '02, but I think it was probably later
7  part of that, maybe '03 and '04.  Maybe '03, because
8  Storage Transfer came into existence back in those
9  days.
10     Q   What were his responsibilities?
11     A   To find the equipment that was scattered
12 all over.
13     Q   How was he paid?
14     A   He was paid by Emerald.
15     Q   By check?
16     A   Jeez.  I don't know if it was check,
17 cash, wire transfer.  You're going to '03?  '02?  Six
18 years ago.  He was paid.  He wasn't doing it for
19 free.
20     Q   Do you recall the name Joe Maqueda?
21     A   I recall the name.  My mind says he was
22 some sort of salesperson or in the leasing business.
23     Q   Was he working for Emerald?
24     A   He would probably have been working

Page 15

1  through Art Davis or Lorraine for Emerald selling
2  equipment.  That's how I would seem to remember.  I
3  don't know if he was an actual employee.
4      Q   Do you know whether he was paid by
5  Emerald?
6      A   Yes; if he worked for Emerald, he
7  certainly would have been paid.  If he was a
8  salesperson for Emerald, he would have been paid a
9  commission, I would assume.  Or if he just bought
10 equipment from Emerald, that was that story.
11     Q   Who was responsible for actually making
12 the payments to these contractors on behalf of
13 Emerald?
14     A   Myself in a great degree, and Lorraine or
15 Art.
16     Q   Did you actually write Emerald checks?
17     A   I don't think I ever wrote a check in my
18 life.  I always had my people write the checks.
19     Q   Well, who was or were the Emerald people
20 that wrote the checks to these contractors, if there
21 were checks?
22     A   That time frame?
23     Q   Yes, sir.
24     A   If it was checks, it would have been

Page 16

1  Lorraine; and it could have been wire transfers, as I
2  said earlier.
3      Q   Would Lorraine have been responsible for
4  arranging the wire transfers?
5      A   Yes.
6      MR. ARMSTRONG:  Let me show you a copy of
7  a renotice of taking deposition that I'll ask the
8  court reporter to mark as Exhibit 1 for
9  identification.
10     Counsel, before we start, do you want to
11 mark this as Emerald Exhibit 1 or -- do you have any
12 preference?
13     MR. MOLDOFF:  That's fine.  I'm sure we
14 probably used that designation before.
15     (Discussion off the record.)
16     (E.E.L. Exhibit 1 was marked for
17     identification.)
18 BY MR. ARMSTRONG:
19     Q   Have you seen that document before?
20     A   This document I saw today.  I had the
21 other document that you were going to do back in
22 January.  I would think they're one and the same.  I
23 don't know.  You would know.
24     Q   I will say to you that Exhibit A should

Page 17

1  be the same on both.  The original in January was a
2  notice; this is a renotice.  But the Exhibit A's
3  attached should be the same.
4      So look at Exhibit A.  Have you seen that
5  before?
6      A   This document here that says "Exhibit A"?
7      Q   Yes.
8      A   Yes.  I seen it from your prior
9  deposition notice.
10     Q   And have you reviewed it?
11     A   I read it.
12     Q   Are you here to testify as the corporate
13 representative of Emerald Equipment Leasing, Inc., as
14 to all items in Exhibit A?
15     A   To the best of my ability.
16     Q   Are there any other individuals who will
17 testify as corporate representatives of Emerald as to
18 any of the items specified on Exhibit A?
19     A   I am the only corporate representative of
20 Emerald.
21     MR. MOLDOFF:  Well, that's actually --
22 you mean that's actually the official --
23     THE WITNESS:  President.
24     MR. MOLDOFF:  -- officer?

Thomas Holt

Page 22

1  involved in the inventory controls of NPR?
2      A   Well, as its chief executive officer and
3  owner of the company, the period of time that I owned
4  it.
5      Q   What period of time was that?
6      A   I bought the company in '07; and it was
7  liquidated -- at least I was let out in '02.
8      Q   Did you buy the company in '97?
9      A   Yes, sir.
10     Q   And you owned the company until the
11  company -- that is, NPR -- was liquidated in 2002?
12     A   I owned the company until a trustee
13  replaced me in '02, March of '02. The company was in
14  bankruptcy.
15         You will find voluminous testimony on
16  this that I gave you two years ago.
17     Q   So I'm moving on.
18         But my question in regard to the
19  inventory controls is, what was your specific
20  involvement during that period of time?
21     A   Did I run the computer? No. Did I know
22  that the inventories were taken on a daily basis?
23  Yes. Submitted daily to all terminals of NPR,
24  including the home office, where I was.

Page 23

1      Q   And did you ever review those
2  inventories?
3      A   Yes.
4      Q   Who, on behalf of Emerald, reviewed the
5  inventories?
6         MR. MOLDOFF:  Object to the form of the
7  question.
8         THE WITNESS:  Well, on behalf of
9  Emerald -- wearing the same hat as the owner of
10  Emerald in those days -- I was not as interested in
11  the daily inventories of Emerald because Emerald did
12  not truly have one. It was NPR's inventory for
13  Emerald, because it was under a total lease. It was
14  not what you would call a specific unit per-diem
15  lease that was entered into with Sea Star and
16  Emerald.
17         If that can help you, fine. That's the
18  way I saw it.
19  BY MR. ARMSTRONG:
20     Q   In April 2002, there were NPR inventories
21  continuing; correct?
22     A   That's right, on behalf of Emerald.
23     Q   And before the Court authorized the asset
24  purchase by Sea Star from NPR, did Emerald make any

Page 24

1  determination that the inventories of NPR -- that is,
2  the equipment inventories -- were correct?
3      A   That day? No. Did we know them to be
4  correct? As best as NPR's ability and Emerald's, to
5  know where the equipment was, the condition of the
6  equipment and who was using it.
7         The asset sale of NPR did not include
8  Emerald equipment.
9      Q   Would it be fair to say that insofar as
10  Emerald was concerned, the NPR inventories as to
11  types and locations of equipment were correct in --
12  say as of April 25th, 2002?
13     A   We knew them to be correct, because they
14  were doing, prior to April 25th -- or when was the
15  sale? April 26th?
16     Q   The order was entered April 26th; the
17  sale closed on April 27th.
18     A   Well, what I'm trying to tell you is that
19  we knew them to be correct, because it was doing the
20  mission statement of NPR and handling all the cargo
21  requirements of NPR, and we had reports from all the
22  terminals on what equipment was available and not
23  available, as NPR.
24         So Emerald relied upon that, because it

Page 25

1  was a gross lease, not a per-diem lease, as we
2  talked.
3      Q   All right. Now, when you say "all the
4  terminals," were there terminals other than NPR
5  terminals involved in that inventory?
6      A   Well, we had equipment that you took
7  possession of in railroad yards, intermodal yards and
8  trucking company yards. We had equipment under load.
9  We had equipment waiting to be loaded throughout the
10  country. We maintained depots in all those places.
11  That was all there, covered under the NPR inventory
12  controls.
13     Q   The inventory controls covered equipment
14  terminals, inland depots, yards in the continental
15  United States?
16     A   To be very specific what terminals, I
17  couldn't tell you. Did it show where the equipment
18  was? Yes.
19     Q   It showed equipment in Puerto Rico;
20  correct?
21     A   Yes.
22     Q   Showed equipment in the Dominican
23  Republic?
24     A   Yes.

Thomas Holt

Page 26

1  Q  Was the terminal in Puerto Rico reporting
2  as to locations of equipment to NPR or to someone
3  else on behalf of NPR?
4          MR. MOLDOFF:  Object to the form of the
5  question.
6          THE WITNESS:  The inventory controls
7  would have had to come, plus or minus, every day from
8  the various terminals back to the mainframe computer
9  in Madison so that the marketing department would
10  know what equipment was where, for the availability
11  for -- first, to deliver cargo to the consignees; and
12  second, to have equipment available for shippers
13  throughout the territory you speak of.
14  BY MR. ARMSTRONG:
15  Q  What was the procedure in the Dominican
16  Republic?
17          MR. MOLDOFF:  Object to the form of the
18  question.
19  BY MR. ARMSTRONG:
20  Q  With respect to reporting.
21  A  The best I could tell you is that, if I
22  can recall in those days, the Dominican Republic was
23  reporting directly to the mainframe in Madison.
24          Now, did it go through Puerto Rico to get

Page 27

1  there?  It could have.  But certainly they knew what
2  equipment was where.
3  Q  Did Emerald ever audit the equipment
4  inventories reported by NPR?
5  A  Well, it was -- in the possession of NPR?
6  Q  Yes, sir.
7  A  No.  As I told you, it was a grossed-up
8  lease.
9  Q  What is a grossed-up lease?
10  A  It's a lease that NPR and Emerald entered
11  into where the total fleet of Emerald would be leased
12  by NPR for a period of time.
13  Q  Did you have any communications with Sea
14  Star representatives concerning self-billing reports?
15  A  No.  We talked in generalities to that.
16  That was concluded between parties other than I.
17  Q  And who were those parties?
18  A  Well, my best guess right now -- and I
19  can't tell you definitely -- was the Sea Star people,
20  hopefully, because they prepared them:  Art Davis,
21  Lorraine, MBC Bank.
22  Q  Did you ever become aware that
23  self-billing reports by Sea Star were inaccurate?
24  A  To answer that question, I should tell

Page 28

1  you that I was the person authorizing Emerald to
2  enter into these self-billing reports between MBC,
3  Sea Star and Emerald.
4          Now, to answer your question:  Yes.
5  Q  When did you become aware that Sea Star
6  self-billing reports were inaccurate?
7  A  Oh, it had to be the latter part of '02.
8  Q  How did you become aware that Sea Star's
9  billing reports were inaccurate?
10  A  It was an accumulation of information
11  that came into Emerald's office from your
12  self-billing reports and from other marine terminals,
13  truckers, railroad yards, et cetera.  And primarily
14  from your own documents, as we started to see a
15  pattern of equipment not being accounted for.
16  Q  When did Emerald start to see the pattern
17  of equipment not being accounted for?
18  A  I would tell you that once we started
19  receiving your documents -- and I'm going to put a
20  time frame on it -- could be wrong -- sometime in the
21  fall of '02, maybe September/October.
22  Q  How did you personally learn that the Sea
23  Star self-billing reports were inaccurate?
24  A  I reviewed them after they were corrected

Page 29

1  by Lorraine and Arthur.
2          It was nothing that comes as any surprise
3  to the Sea Star people.  We were complaining bitterly
4  about it.
5  Q  And when did Emerald start complaining
6  bitterly about the self-billing reports?
7  A  Once we started to see how you were
8  underpaying.
9  Q  When was that?  Was that in --
10  A  That was -- it could have been --
11  Q  Summer? fall?
12  A  It could have -- well, I'm telling you
13  when I got involved.
14  Q  Okay.
15  A  It could have been sometime in August,
16  July, June of '02, right from the get-go.
17  Q  Did you retain Lorraine Robins as a
18  contractor before you determined that the -- or
19  learned that the Sea Star self-billing reports were
20  inaccurate?
21  A  Before or after?  I retained her from
22  when Emerald needed someone to cover their office
23  activities.  I retained her and Arthur.  And it would
24  have been probably immediately -- I don't know -- in

Thomas Holt

Page 30

1  July or August of that year.
2      Q  July or August of 2002?
3      A  '02. '02, yeah.
4          Now, that's six years ago, so -- five and
5  a half years ago, so I believe that's the time frame.
6      Q  When you learned that the Sea Star
7  self-billing reports were inaccurate, what action did
8  you take?
9      A  Well, I instructed them to communicate,
10 in every instance, back to the Sea Star people. To
11 correct the invoices, send them back to the Sea Star
12 people. I started talking to people at Sea Star --
13 specifically, Bob McGee.
14     Q  Do you know whether Mr. Davis and
15 Ms. Robins followed your instructions?
16     A  Only the facts that bring us here today,
17 yes. Yes, they did follow them.
18     Q  When did you talk to Bob McGee about the
19 self-billing reports?
20     A  You mean the understating of them?
21     Q  Yes.
22         MR. MOLDOFF: If you recall. Again,
23 don't speculate.
24         THE WITNESS: I don't have ability to

Page 31

1  tell you what day I called him on the phone. But it
2  probably was to closer to September/October.
3  BY MR. ARMSTRONG:
4      Q  2002?
5      A  Yes. Had meetings with the man in
6  that -- towards the end of the year.
7      Q  Was the problem ever resolved?
8      A  No, sir.
9      Q  Did you have any communications with
10 anyone from MBC Bank regarding the self-billing
11 reports or MBC leasing?
12     A  Well, back in those days, my contact with
13 the bank was Scott Krieger. And I just said to him,
14 As far as I'm concerned, you weren't paying the right
15 rates -- not the rates, the right per diems. The
16 rates were always proper under the schedule of rates
17 in the Sea Star/Emerald lease, but it was the amount
18 of per diems.
19         In many cases, it was a mistake by your
20 billing people. Many cases you could see there was a
21 pattern over the time frame of several months that
22 equipment was not being reported.
23     Q  In what types of cases, if you can say,
24 was the pattern evident?

Page 32

1      A  In the instance of equipment under load
2  somewhere and not shown on the self-billing report.
3  That really became very evident in '03.
4          The instance of equipment being reported,
5  but underreported, started, as I said to you, to show
6  up, in our minds, through the end of '02.
7          And finally, to finish your -- you go
8  next. I'll wait for you.
9      Q  No, go ahead.
10     A  No.
11     Q  Go with the "finally."
12     A  No, please, you first.
13         MR. MOLDOFF: Ask another question,
14 please.
15         THE WITNESS: You invited me. I'll wait
16 for you.
17 BY MR. ARMSTRONG:
18     Q  Well, thank you.
19         As you were saying, "and finally."
20     A  That would not be an answer to a question
21 that you might give me. Please give me a question,
22 and I'll answer it.
23     Q  Yes, sir. I'll be happy to.
24         When you say you weren't paying the per

Page 33

1  diem, you were referring to Sea Star not paying the
2  per diem; correct? Not MBC?
3      A  MBC was the people that had the loan on
4  the equipment. It was the documents that Sea Star
5  was providing Emerald and MBC, known as your
6  self-billing reports.
7      Q  And those self-billing reports dealt with
8  per-diem payments; correct?
9      A  They dealt with two things: They dealt
10 with per-diem payments, the rate; and they dealt with
11 the amount of days; and a third thing would have been
12 possession. That would have shown possession.
13     Q  You were aware, were you not, that Sea
14 Star was storing equipment?
15     A  For whose benefit? Sea Star's or
16 somebody else's?
17     Q  For MBC.
18     A  That they were physically storing
19 equipment for MBC?
20     Q  Yes.
21     A  Under the Emerald lease?
22     Q  Under the --
23     A  Or is that a separate transaction between
24 Sea Star and MBC?

Thomas Holt

Page 42

1  quite content that your self-billing reports would
2  pay down my loan at MBC.
3          Now, I don't know if that helps you or
4  don't help you. But that's how the foundation was
5  going forward, into that agreement.
6      Q   Payments under the -- under the
7  self-billing reports went to MBC?
8      A   That's correct.
9      Q   Did they ever go to Emerald?
10     A   No, sir.
11     Q   Over what period of time did Emerald
12  receive self-billing reports from Sea Star?
13     A   It went through '03. I think it stopped
14  sometime in August/September of '03. That's a
15  guesstimate.
16     Q   All of the payments under those reports
17  went to MBC during that period of time?
18     A   That was the agreement, that the moneys
19  would be paid to them for Sea Star utilizing Emerald
20  equipment to pay down Emerald's loan with MBC.
21     Q   When you spoke with Scott Krieger about
22  problems with the self-billing reports, what did he
23  say to you?
24     A   It's not his problem.

Page 43

1      Q   Did he say why? Is that all he said?
2      A   He asked me why. And I said, Bob, as far
3  as I know, they probably don't have the right idea on
4  how the clerk makes up the self-billing reports. I
5  don't know why.
6          But the position is, Hey, Tom, I'm a
7  banker; I'm getting my loan reduced. Thank you very
8  much. I'm not involved in your agreement between
9  Emerald and Sea Star.
10     Q   When did you speak with Krieger about
11  that?
12     A   The fall of '02 and then into '03. Then
13  when I tried to find him later on, he had been
14  replaced. He left the bank.
15     Q   And do you recall approximately how many
16  discussions you had with him about the self-billing
17  reports?
18     A   Once he told me it wasn't his problem, I
19  stopped calling him on that issue.
20     Q   On what issues did you call him?
21     A   Then we had other business dealings, the
22  family did, with Mr. Krieger, that --
23     Q   I should say, what other Sea Star issues?
24     A   Well -- Sea Star. Sea Star issues with

Page 44

1  MBC and Emerald?
2          There was a question being raised -- and
3  I don't know what period of time -- about an
4  indemnification meant (sic) that was in an agreement
5  between yourselves, Sea Star, and MBC. I was made
6  aware of it. I got copies of the documentation that
7  flew around.
8          I don't know if that was in '05, '06.
9  Might have been '03. I just didn't -- somebody was
10  misinterpreting the document, and it wasn't my -- my
11  document. It was between MBC and Sea Star.
12     Q   Did you discuss with anyone regarding a
13  claim that information contained in the self-billing
14  reports was false and misleading?
15     A   Did I discuss with anyone?
16     Q   Yes.
17     A   I discussed it with Bob McGee. I
18  discussed it with, as I told you, Scott Krieger.
19          Now, anyone after that? Obviously
20  counsel. Obviously, Lorraine and Arthur, Jack Evans.
21  I certainly did not put it in the Journal of
22  Commerce, if that's your question.
23     Q   When did you have discussions with
24  Lorraine Robins and Arthur Davis concerning the claim

Page 45

1  that information contained in the self-billing
2  reports was false and misleading?
3      A   Literally, every time a self-billing
4  report showed up.
5          And there came a time when I talked to
6  Krieger about the position that Sea Star was taking,
7  that they did not like the idea that their
8  self-billing reports were being ripped apart by
9  Lorraine. And this person complained bitterly to MBC
10  and took the position they weren't going to send any
11  more self-billing reports.
12          Somewhere there's a couple of emails,
13  letters flying around that document that person's
14  position. I think it was somebody in Puerto Rico.
15     Q   How were the self-billing reports false?
16  In other words, what information contained in the
17  self-billing reports was false?
18     A   I thought we covered this about
19  45 minutes ago. But again, I'll tell you.
20          When the self-billing reports would be
21  presented, we would -- "we" being Lorraine and Arthur
22  and the office -- would gather all the information on
23  that, gather the information from where they could
24  find it -- i.e., railroads, truckers, Sea Star,

Thomas Holt

Page 98

1 it is. You'll have to tell me what it means. Then
2 it could refresh my memory.
3     Q You've never seen it before?
4     A To my knowledge, I have not.
5     MR. ARMSTRONG: All right. Can I ask
6 that this be marked as 8.
7     (E.E.L. Exhibit 8 was marked for
8     identification.)
9 BY MR. ARMSTRONG:
10     Q As part of your damage claim --
11     A I'm not done reading it, so give me a
12 minute here.
13     MR. MOLDOFF: For the record, it was a
14 settlement of an issue that arose regarding equipment
15 that was remaining in court or going -- there was a
16 continuing dispute. But it was a settlement that was
17 approved by the bankruptcy court with respect to the
18 disposition of that equipment pursuant to the
19 stipulation.
20     THE WITNESS: Then it is what it is.
21     MR. MOLDOFF: And the document speaks for
22 itself.
23 BY MR. ARMSTRONG:
24     Q Does part of your damage claim relate to

Page 99

1 equipment that was located in the Dominican Republic
2 on April 27th, 2002?
3     A Sitting here, I can't tell you without
4 going into all the documents.
5     We -- you're now talking about equipment
6 you never returned? Is that what you're suggesting?
7     Q I'm not suggesting anything. I'm --
8     A What's your question then?
9     Q I'm asking you a question.
10     Does part of your damage claim --
11     A Right.
12     Q -- that is, Emerald's damage claim --
13     A Right.
14     Q -- relate to equipment that was in the
15 Dominican Republic on April 27th?
16     MR. MOLDOFF: In other words, the
17 question relates to either rental payments and/or --
18     THE WITNESS: Prior to April --
19     MR. MOLDOFF: -- stipulated loss value.
20     I object to the question.
21 BY MR. ARMSTRONG:
22     Q On or before April 27th, 2002.
23     A We would not invoice you on or before
24 April 27th, '02.

Page 100

1     MR. MOLDOFF: Are you saying --
2 BY MR. ARMSTRONG:
3     Q Does part of your claim relating to
4 Emerald equipment cover equipment that was located in
5 the Dominican Republic on or before April 27th,
6 2002?
7     MR. MOLDOFF: Do you mean if it was
8 thereafter used by Sea Star? I object to the form of
9 the question.
10     THE WITNESS: Well, let's first
11 establish, when did you buy the company?
12 BY MR. ARMSTRONG:
13     Q I think we went through that a couple of
14 hours ago.
15     A We went through a lot.
16     Q The document -- the order was entered on
17 April 27th -- I'm sorry -- April 26th, and the
18 closing occurred by the transfer of funds on
19 April 27th.
20     A So April 29th, you had possession of
21 the Emerald equipment.
22     Q That's a comment by you.
23     A Yes.
24     Q Now, I'm asking you --

Page 101

1     A It's a fact.
2     Q -- a question.
3     A You took over Emerald's equipment as of
4 the closing. You either would return it within two
5 weeks after the closing or you were using it. If you
6 returned it, you would not be charged.
7     Q Does part of Emerald's claim relate to
8 equipment that was located in the Dominican Republic
9 on or before April 27th, 2002?
10     MR. MOLDOFF: Object to the form of the
11 question.
12     THE WITNESS: April 29th or 27th?
13 BY MR. ARMSTRONG:
14     Q April 27th.
15     A And that's prior to you buying the
16 company.
17     Q April 27th, 2002.
18     MR. MOLDOFF: Object to the form of the
19 question.
20     THE WITNESS: It is, so -- I don't
21 understand the question. I leave it at that.
22 BY MR. ARMSTRONG:
23     Q You don't understand what Emerald's claim
24 is with respect to equipment located in the Dominican

Thomas Holt

Page 106

1course of business to retrieve equipment that was in
2the possession of Sea Star, they would have went
3there. If it was in the possession of Teddy Heinsen
4on behalf of Emerald, they would have went there.
5    I do know that Mr. Heinsen purchased a
6lot of equipment from Emerald.
7    Q  Do you know when Mr. Heinsen purchased
8that equipment from Emerald?
9    A  Throughout the course of a couple of
10years.
11    MR. ARMSTRONG:  Let me show you a copy of
12a document entitled Notice of Maritime Liens Asserted
13by E. T. Heinsen C Por A and Naves Y Terminales, S.A.
14and I'll ask the court reporter to mark as Exhibit 9
15for identification.
16    (E.E.L. Exhibit 9 was marked for
17identification.)
18    THE WITNESS:  Counsel, what's this have
19to do with why I'm here today?
20BY MR. ARMSTRONG:
21    Q  Have you ever seen that document before?
22    MR. MOLDOFF:  You can answer the question
23if you can.
24    THE WITNESS:  I've never seen this

Page 107

1document. I don't even know what it is. Is it a
2claim for stevedoring? A claim for
3stevedoring-related services.
4    MR. MOLDOFF:  Just answer the question.
5    THE WITNESS:  I never saw the document.
6BY MR. ARMSTRONG:
7    Q  Did you ever become aware that Heinsen
8was claiming maritime liens on Emerald equipment as
9of April 25th, 2002?
10    A  I answered that before: Yes, I knew that
11he was attempting to hold Emerald equipment under a
12lien. What equipment, I don't know what it was, but
13it had been resolved.
14    Q  Do you know when it was resolved?
15    A  I would think within weeks of when they
16claimed it.
17    Q  Do you know how it was resolved?
18    A  The attorneys resolved it. I don't know,
19here sitting today. We'd have to go get the record.
20Whatever it is, it is.
21    Are you suggesting that Emerald had
22equipment in Santo Domingo, and then turned around
23and invoiced you for lost equipment? Are you going
24to say that? Is that what you're saying?

Page 108

1    Q  Did you participate in any resolution of
2a Heinsen maritime lien claim?
3    A  I didn't get an answer to my question.
4We're talking here about equipment that you're making
5an allegation to. I want to know if you know that as
6fact.
7    Q  Did you participate —
8    MR. MOLDOFF:  He doesn't have to answer
9your question.
10BY MR. ARMSTRONG:
11    Q  — in any resolution of the Heinsen
12maritime lien claim?
13    A  I participated between Lorraine and
14Arthur Davis. I did not get involved with the
15lawyers. I did not get involved with Teddy Heinsen.
16    Q  Did Arthur Davis report to you that the
17maritime lien claim asserted by E. T. Heinsen had
18been resolved?
19    A  What I can remember, the issue between
20Heinsen and this document was resolved. How, I don't
21know.
22    Q  Do you know when it was resolved?
23    A  I thought within a matter of weeks of it.
24    Q  How did you gain that information?

Page 109

1    A  My recollection is I was told that by
2Arthur or Lorraine. Whether it was or wasn't, I
3don't know. The record will speak for itself.
4    MR. MOLDOFF:  Let's take a break,
5two-minute break.
6    MR. ARMSTRONG:  That's fine, because I'm
7almost finished.
8    MR. MOLDOFF:  Okay.
9    (Brief recess.)
10BY MR. ARMSTRONG:
11    Q  Mr. Holt, have you ever participated in
12the preparation of the spreadsheet invoices sent to
13Sea Star?
14    A  Physically participate, no.
15    Q  Have you participated in any way?
16    A  The overview and review.
17    Q  Did you review those invoices?
18    A  I did.
19    Q  If Sea Star responded, did you review
20responses?
21    A  I probably did.
22    MR. MOLDOFF:  Objection to the form of
23the question.
24BY MR. ARMSTRONG:

Lorraine Robins

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

—  —  —

SEA STAR LINE, LLC, A LIMITED :
LIABILITY COMPANY,                    :
                                                      : Civil Action No.
        Plaintiff/                              :
Counterclaim Defendant,      : 05-CV-245-JJF (LPS)
                                                      :
        vs.                                          :
                                                      :
EMERALD EQUIPMENT LEASING, :
INC., a corporation,                    :
                                                      :
        Defendant/                            :
Counterclaim Plaintiff.         :

Deposition of Lorraine Robins
taken at Eckert Seamans Cherin & Mellott, LLC
Two Liberty Place, 50 South 16th Street, 22nd Floor
Philadelphia, Pennsylvania
Friday, January 25, 2008
9:05 a.m.

Gail L. Inghram Verbano, CSR, RMR, CLR
302.449.0529

Lorraine Robins

4  (Pages 10 to 13)

Page 10

1  referring?
2      A  The cancelation, yes.
3      Q  Are you here as a representative of
4  Storage Transfer?
5      A  That's correct.
6      Q  And that's the only capacity in which
7  you're here; is that correct?
8      A  That's correct.
9      Q  Are you represented by counsel?
10     A  No.
11         MR. MOLDOFF:  Could I just -- in order --
12  I see we have it marked as Robins Exhibit 1.  Would
13  it make it easier for reference to make it Storage
14  Transfer?
15         MR. ARMSTRONG:  Why don't we make it ST.
16         MR. MOLDOFF:  Something like that, so we
17  don't get confused.  Is ST acceptable?
18         MR. ARMSTRONG:  ST is fine.
19         MR. MOLDOFF:  ST being for Storage
20  Transfer.
21         MR. ARMSTRONG:  That's correct.
22  BY MR. ARMSTRONG:
23      Q  Does Storage Transfer maintain any places
24  of business, other than the one that you identified

Page 11

1  before?
2      A  No.
3      Q  There are no Storage Transfer places of
4  business in Florida?
5      A  No.
6      Q  Do you do work for Storage Transfer when
7  you're in Florida?
8      A  No.
9      Q  Have you brought documents with you?
10     A  Yes.
11     Q  May I see them?
12     A  I have this one, if you want this.
13     Q  Yes.
14     A  I have the loan agreement.
15         MR. ARMSTRONG:  You have handed me a Loan
16  Sale and Assignment Agreement.  Let me ask that the
17  court reporter mark this as Exhibit 2 for
18  identification.
19         (S.T. Exhibit 2 was marked for
20         identification.)
21         MR. ARMSTRONG:  You have handed me a copy
22  of a Security Agreement between Storage Transfer and
23  MBC Leasing Corp.  Let me ask that the court reporter
24  mark this as Exhibit 3 for identification.

Page 12

1         (S.T. Exhibit 3 was marked for
2         identification.)
3         MR. ARMSTRONG:  You have handand me a
4  copy of a Guaranty Agreement.  Let me ask that the
5  court reporter mark this as Exhibit 4 for
6  identification.
7         (S.T. Exhibit 4 was marked for
8         identification.)
9         MR. ARMSTRONG:  You have handed me a
10  document entitled Acknowledgment of Receipt of
11  Original Loan Documents.  Let me ask that the court
12  reporter mark this as Exhibit 5 for identification.
13         (S.T. Exhibit 5 was marked for
14         identification.)
15         THE WITNESS:  You want the rest?
16         MR. ARMSTRONG:  Yeah.
17         THE WITNESS:  Okay.  The bills of sale.
18  There's a lot of them.
19         MR. ARMSTRONG:  You have handed me a
20  package of bills of sale.  Let me ask that the court
21  reporter mark these as composite Exhibit 6 for
22  identification.
23         Counsel, to keep these straight, is it
24  enough to make it a Composite 6, or do you want to go

Page 13

1  A, B, C, D, E?
2         MR. MOLDOFF:  Composite 6 is fine.
3         (S.T. Exhibit 6 was marked for
4         identification.)
5         MR. ARMSTRONG:  You have handed me a bill
6  from the Law Offices of Gebhardt & Smith dated
7  December 17th, 2003.  Let me ask the court reporter
8  to mark this as Exhibit 7 for identification.
9         (S.T. Exhibit 7 was marked for
10         identification.)
11         MR. ARMSTRONG:  You have handed me a
12  United States Department of Justice Quarterly Fees
13  Statement for Chapter 11, Emerald Equipment Leasing,
14  Inc.  Let me ask that the court reporter mark this as
15  Exhibit 8 for identification.
16         (S.T. Exhibit 8 was marked for
17         identification.)
18         MR. ARMSTRONG:  You have handed me a copy
19  of an invoice dated May 17th, 2004, from Ariel
20  Valantin to Storage Transfer, LLC.  Let me ask that
21  the court reporter mark this as Exhibit 9 for
22  identification.
23         (S.T. Exhibit 9 was marked for
24         identification.)

Lorraine Robins

Page 14

1      MR. ARMSTRONG:  You have handed me a copy
2  of a letter dated February 25th, 2004, addressed to
3  Storage Transfer, LLC, care of Lorraine Robins,
4  signed by Gary M. Schildhorn.  Let me ask that the
5  court reporter mark this as Exhibit 10 for
6  identification.
7        (S.T. Exhibit 10 was marked for
8        identification.)
9      MR. ARMSTRONG:  You have handed me a copy
10  of a letter dated February 25th, 2004, Re:
11  Carve-out, addressed to Storage Transfer, LLC, care
12  of Lorraine Robins, signed by Gary M. Schildhorn.
13  Let me ask that the court reporter mark this as
14  Exhibit 11 for identification.
15        (S.T. Exhibit 11 was marked for
16        identification.)
17      MR. ARMSTRONG:  You have handed me a copy
18  of a letter dated August 15th, 2007, addressed to
19  Lorraine Robins, signed by Gary M. Schildhorn.  Let
20  me ask that the court reporter mark this as
21  Exhibit 12 for identification.
22        (S.T. Exhibit 12 was marked for
23        identification.)
24  BY MR. ARMSTRONG:

Page 15

1      Q  When you say that Emerald -- I'm sorry --
2  Storage Transfer is in the business of selling
3  equipment --
4      A  Well, leasing equipment and selling
5  equipment.
6      Q  Does Storage Transfer lease and sell its
7  own equipment?
8      A  No.
9      Q  What equipment does Storage Transfer
10  lease and sell?
11      A  Well, it doesn't lease; it sells Emerald
12  equipment.
13      Q  Then is there any lease business in which
14  Storage Transfer is involved?
15      A  Not at this particular time.
16      Q  Has there ever been any lease business in
17  which Storage Transfer has been involved?
18      A  That Storage Transfer has been the lessee
19  or the lessor?
20      Q  Well, let's say in which Storage Transfer
21  has been the lessee.
22      A  Lessee, no.
23      Q  In which Storage Transfer has been the
24  lessor?

Page 16

1      A  Not at this particular time, no.
2      Q  Has there ever been any lease transaction
3  for equipment in which Storage Transfer has been the
4  lessor?
5      A  No.
6      Q  Does Storage Transfer have any
7  relationship with MBC Leasing Corp. at this time?
8      A  We had an agreement with MBC.
9      Q  Is that agreement still in effect?
10      A  The agreement was for the purchase of the
11  loan.  And since it has been paid off in full, the
12  agreement is -- I don't want to say that the
13  agreement is no longer in effect.  We had purchased
14  the position of MBC.
15      Q  When you indicate that the agreement was
16  for the purchase of the MBC loan --
17      A  That's correct.
18      Q  -- are you referring to the Loan Sale and
19  Assignment Agreement that has been marked as
20  Exhibit 2?
21      A  Yes.
22      Q  Who negotiated that agreement on behalf
23  of Storage Transfer?
24      A  I did.

Page 17

1      Q  When did you begin negotiating that
2  agreement?
3      A  In October of '03.
4      Q  With whom did you negotiate?
5      A  Scott Krieger of MBC.
6      Q  Do you know what Mr. Krieger's position
7  was with MBC at that time?
8      A  I don't know what his title was exactly.
9  I don't remember.  I mean, I did at that time, but I
10  think it should be here in the documents.
11      Treasurer and assistant treasurer --
12  secretary and assistant treasurer -- no, it's
13  treasurer and assistant secretary.  Sorry about that.
14      Q  Are you referring to the signature line?
15      A  On Page 12.
16      Q  On Page 12.
17      On Page 13, do you recognize the
18  signature on behalf of Storage Transfer?
19      A  That's correct.
20      Q  Is that your signature?
21      A  That is my signature.
22      Q  Is Exhibit 2 a true and correct copy of
23  the Loan Sale and Assignment Agreement?
24      A  Best of my knowledge, it is.

Lorraine Robins

**Page 22**

1 Q In terms of the documents, did you
2 communicate with anyone at MBC in regard to
3 preparation?
4 A With Mr. Krieger, Scott Krieger.
5 Q Did you communicate with any MBC
6 attorneys?
7 A I don't recall whether I spoke to Bill
8 Hallam or not.
9 Q Do you know Bill Hallam?
10 A I think I may have spoke to him once or
11 twice. I'm not sure.
12 Q Prior to signing the Loan Sale and
13 Assignment Agreement, did you make any investigation
14 as to what the status of the loan was?
15 A Yes.
16 Q And how did you do that?
17 A Got the information from Mr. Krieger.
18 Q Did you make any independent
19 investigation? That is, independent of Mr. Krieger.
20 A No.
21 Q Did you make any investigation as to what
22 equipment was covered?
23 A Well, I knew what equipment was covered.
24 It was -- because I had the -- I had a list of all

**Page 23**

1 the equipment.
2 Q Where did you get the list?
3 A I had a list from Mr. Krieger; and I have
4 another list of all the equipment. I don't know
5 where that came from.
6 Q Do you know when Mr. Krieger's letter was
7 prepared -- that is, the list he gave you?
8 A Well, I know there was a list that was
9 attached to this.
10 Q Do you know when that was prepared?
11 A No, I do not.
12 Q Did you ask?
13 A No. You have to understand, I had a very
14 good relationship with MBC Bank, and I had explicit
15 trust in what they gave me.
16 Q Did you make any independent inquiry or
17 investigation as to whether all of that equipment was
18 in existence?
19 A No.
20 Q Have you ever investigated whether all of
21 that equipment is in existence?
22 A Well, all that equipment was in
23 existence, because we had a computer printout from
24 the very beginning of the equipment from Naverios.

**Page 24**

1 Q When you say "from the very beginning,"
2 when was the beginning?
3 A I have to check the list of equipment. I
4 don't have it with me. May have dated it.
5 Q Are you referring to an equipment list
6 that was printed out April 29th --
7 A No, I'm not referring to that.
8 Q -- 2002?
9 A No. I'm referring to an equipment list
10 that was printed out that gave the numbers of the
11 container numbers, the equipment numbers, the VIN
12 numbers and license plate numbers.
13 Q When did you first see that list?
14 A I can't recall that.
15 Q When was the list put together?
16 A I don't know that. I don't have the list
17 here. But I believe that list was given -- was a
18 part of the original documents that were given in
19 discovery.
20 Q Part of the --
21 A Documents that were sent in discovery.
22 Q Did you enter into any other assignment
23 agreements with MBC?
24 A No.

**Page 25**

1 Q Were there any assignments, other than
2 those stated in that agreement -- that is, the Loan
3 Sale and Assignment Agreement, Exhibit 2 --
4 A No.
5 Q -- that Storage received from MBC?
6 A No. These are all the documents I
7 received from MBC.
8 Q Did you investigate whether MBC had any
9 other claims against anyone in connection with
10 Emerald Equipment?
11 A I don't understand your question.
12 MR. MOLDOFF: Anyone other than Sea Star?
13 BY MR. ARMSTRONG:
14 Q Against anyone other than claims -- let
15 me rephrase that.
16 Did you investigate whether MBC had
17 claims against anyone other than those claims that
18 are specified in this agreement?
19 A No. MBC gave me -- or signed over all
20 the titles of equipment to me and gave me all the
21 titles.
22 Q Is that a separate document?
23 A Well, that's -- how many pieces of
24 equipment? Every piece of equipment had a title.

Lorraine Robins

Page 26

1      Q  So you received the titles with an MBC
2  assignment on the --
3      A  Right.
4      Q  -- front or the back, wherever the space
5  was?
6      A  That's correct.
7      Q  And was the assignment then to Storage
8  Transfer, LLC?
9      A  They signed -- yes, uh-huh.
10     See, they had a lien against it; and they
11  signed off the lien and turned the titles over to
12  Storage Transfer.
13     Q  All right.  Did you have any
14  communications with Mr. Krieger about any particular
15  provisions of this Loan Sale and Assignment
16  Agreement?
17     A  Such as what?  I don't understand your
18  question.
19     Q  Well, when the Loan Sale and Assignment
20  Agreement was drafted, did you review the draft?
21     A  Yes, I did.
22     Q  Is that the same draft that you reviewed?
23     A  Well, we may have made corrections to it.
24  I don't know.  This is the final draft.  This

Page 27

1  isn't -- may not have been the same draft that I --
2  that I --
3      Q  Do you recall whether you made any
4  corrections to the draft?
5      A  That was four years ago.  Okay?
6      MR. ARMSTRONG:  Let me show you a copy of
7  a document that I'll ask the court reporter to mark
8  as Exhibit 13.
9      (S.T. Exhibit 13 was marked for
10     identification.)
11  BY MR. ARMSTRONG:
12     Q  Do you recognize that document?  It's the
13  indemnity.
14     A  No, I don't really recognize it, huh-uh.
15  No, I don't recognize this.
16     Q  Do you recall ever seeing an Indemnity
17  Agreement before --
18     A  I remember --
19     Q  -- such as that?
20     A  No.  I remember some talk about this
21  Indemnity Agreement.  And I believe that -- I believe
22  that Mr. Hallam sent a letter giving an explanation
23  of what this really meant.
24     Q  Sent a letter to whom?

Page 28

1      A  Sea Star Line -- or maybe to you, Tim.
2      Q  Did he send a letter to you?
3      A  No.  I remember seeing it somewhere in
4  the documents.
5      Q  Do you recall when he sent that letter?
6      A  No.
7      Q  Now, there's -- Exhibit 7 is a statement
8  from Gebhardt & Smith.
9      A  Uh-huh.
10     Q  What is that reference?
11     A  That was Bill Hallam's invoice for
12  setting up the loan agreement, which I agreed to pay.
13     Q  And did you pay that invoice?
14     A  I did.  I think there's a check attached
15  to it.  If there isn't, there should have been.
16     I did pay.  It has been paid by Storage
17  Transfer.
18     Q  Exhibit 10 is a copy of a letter dated
19  February 25th, 2004, Re:  Contribution to the
20  Emerald Estate.
21     A  Uh-huh.
22     Q  Do you recall that letter?
23     A  Yes, I do.
24     Q  Is that a true and correct copy of the

Page 29

1  letter that you received?
2      A  Yes, it is.
3      Q  Did you sign that letter on the second
4  page?
5      A  Yes, I did.
6      Q  And do you recognize your signature?
7      A  I do.
8      Q  What were the circumstances under which
9  you received that letter?
10     A  Well, I think the letter is
11  self-explanatory communications.
12     Q  When did the communications regarding
13  contribution to the Emerald estate first arise?
14     A  I guess it was in February sometime.  I
15  think it was prior to that.  I don't recall.  I see
16  this is dated February, but I don't recall.
17     Q  And why were you discussing -- that is,
18  Storage Transfer discussing -- a contribution to the
19  Emerald estate?
20     A  We agreed to do it.
21     Q  And why did you agree to do it?
22     A  Because evidently, at that particular
23  time, if my conversations with Gary Schildhorn were
24  correct, I felt it was the proper thing to do.

Lorraine Robins

Page 30

1    Q   What was Storage Transfer to receive in
2  return for its contribution to the Emerald estate?
3    A   The 15 percent for the Emerald estate
4  would be paid to the Emerald estate after all
5  expenses.  What was then left after that would go to
6  the secured creditor.  And if anyone was left after
7  the secured creditor received payment, then it would
8  go back to the estate.
9         Storage Transfer was the secured
10  creditor, because it had assumed MBC's secured
11  position.
12    Q   Storage Transfer assumed MBC's position,
13  you understood, under the Loan Sale and Assignment
14  Agreement; is that correct?
15    A   That's correct.  That's correct.
16    Q   Under that Loan Sale and Assignment
17  Agreement, was Storage Transfer obligated to collect
18  moneys from third parties, such as Sea Star, that
19  might have owed money to MBC or to Emerald?
20    A   That's correct, and paid down the loan
21  accordingly.  Whatever Storage Transfer received
22  during that period of time was applied against the
23  loan balance.
24    Q   Against what loan balance?

Page 31

1    A   The MBC loan balance which Storage
2  Transfer now was a holder of.
3    Q   Under the Loan Sale and Assignment
4  Agreement, Storage Transfer would collect money and
5  give part and it to MBC; correct?
6    A   Yes.  They gave 400,000.  That is what
7  the promissory note was about.
8    Q   Storage Transfer also agreed to give MBC
9  20 percent of whatever Storage Transfer collected
10  from Sea Star; correct?
11    A   On -- on the rental equipment after
12  expenses.
13    Q   And what were the expenses involved in
14  this collection?
15    A   Well, expenses were any expenses that
16  Storage Transfer had for office, for salaries, for
17  recovery of equipment.  Any expenses they had for
18  doing business.
19    Q   Did Storage Transfer hire attorneys to
20  collect the money?
21    A   No.
22    Q   How was Storage Transfer to collect the
23  money without attorneys?
24    A   They issued a bill of sale, and they

Page 32

1  had -- when they sold equipment.  Once the
2  equipment -- they received the money, then they would
3  release the titles.  They would not release titles
4  unless they received cash.
5    Q   Did Storage Transfer hire attorneys to
6  deal with Sea Star in regard to collections?
7    A   No.
8    Q   Has Storage Transfer ever hired
9  attorneys?
10    A   I don't think so, other than for
11  incorporation.
12         Well, I may have hired an attorney for --
13  to have my deposition postponed.
14    Q   Other than that, Storage Transfer has
15  never hired attorneys?
16    A   No.
17    Q   So at this point, Storage Transfer has
18  incurred no attorneys' fees in connection with any
19  collections from Sea Star?
20    A   No, we have incurred attorneys' fees,
21  because we have the fees for -- I think for -- well,
22  it was Adelman Lavine.  We were paying those.
23    Q   Did Storage Transfer hire Adelman Lavine
24  to --

Page 33

1    A   No.
2    Q   -- pursue this collection?
3    A   No, not for collection.
4         MR. MOLDOFF:  I believe there were
5  documents relating to the carve-out that goes to
6  that.
7  BY MR. ARMSTRONG:
8    Q   Well, in connection with the collection,
9  how was Storage Transfer to -- or how did Storage
10  Transfer plan to deal with Sea Star?
11    A   What do you mean, how did we plan to deal
12  with Sea Star?
13    Q   Storage Transfer wanted to collect money
14  from Sea Star; correct?
15    A   Yes.  But Emerald is -- Emerald is the
16  one that's dealing with Sea Star, not Storage
17  Transfer.
18    Q   Is Emerald dealing with Sea Star on
19  behalf of Storage Transfer?
20    A   No.  It's -- it's on behalf of the
21  creditors.
22    Q   On behalf of what creditors?
23    A   Whatever creditors Emerald has.
24    Q   And do you know what creditors Emerald

Lorraine Robins

Page 34

1  has?
2      A  No, I don't.
3      Q  Are there any secured creditors other
4  than Storage Transfer of Emerald?
5      A  I don't know.  But I know Storage
6  Transfer is a secured creditor.
7      Q  Has Storage Transfer paid any of
8  Emerald's attorneys' fees?
9      A  They have.
10     Q  Over what period of time has Storage
11  Transfer paid Emerald attorneys' fees?
12     A  I would have to check on that.
13     Q  And does Storage Transfer pay Emerald's
14  attorneys' fees on a regular basis?
15     A  No.
16     Q  Is there a periodic basis during which --
17     A  I haven't paid them for quite a while, so
18  I'm going to say it's periodic.
19     Q  Has Storage Transfer paid Emerald
20  attorneys' fees?
21     A  Yes.
22     Q  And is there a Storage Transfer check
23  showing payment?
24     A  Yes.

Page 35

1      Q  Are there invoices supporting that
2  payment?
3      A  No; the invoices are to Emerald.  Storage
4  Transfer just sent a check on account.
5      Q  And what is the amount of attorneys' fees
6  that Storage Transfer has paid -- that is, Emerald
7  attorneys' fees?
8      A  I would have to check that.  I don't know
9  offhand.  It wasn't too much, I don't think.
10     Q  You don't recall when the payment was
11  made?
12     A  It was probably made in '03 and a little
13  bit in '04.  And it wasn't constant.  It wasn't a
14  monthly thing or anything else like that.  It was
15  give as you could.
16     Q  Have you been receiving bills -- that is,
17  has Storage Transfer been receiving bills from
18  Emerald's attorneys?
19     A  No.
20     Q  Has Lorraine Robins individually been
21  receiving bills from Emerald's attorneys?
22     A  No.
23     Q  Other than attorneys' fees, what
24  collection expenses has Storage Transfer incurred?

Page 36

1      A  Well, I think you have an exhibit there
2  from Ariel.
3      Q  You're referring to Exhibit 9 for
4  identification?
5      A  Yes.
6      Q  What does that exhibit cover?
7      A  That exhibit covers equipment that was
8  located -- Emerald equipment that was located in
9  by Ariel Valentin in Priority Ro/Ro, Pier 15,
10  San Juan.
11     Q  When was that equipment located at
12  Priority Ro/Ro?
13     A  Let me see -- this bill of sale is dated
14  May 17th, 2004.
15     Q  And did Storage Transfer pay that bill?
16     A  Yes, they did.
17     Q  Has Storage Transfer received any other
18  bills?
19     A  No.
20     Q  Storage Transfer has been selling
21  equipment, has it not?
22     A  Yes, it has.
23     Q  Did Storage Transfer sell the equipment
24  covered by this bill -- that is, Exhibit 9?

Page 37

1      A  I think they sold most of that equipment.
2  There's an invoice in there for it.
3      Q  Do you know when Storage Transfer sold
4  the equipment?
5      A  If you'll give me the bills, I'll let you
6  know.
7      Q  These are the rest.
8      A  No, that's not the bills; these are the
9  bills (indicating).
10     Q  You've given me a copy of a Storage
11  Transfer document entitled "Bill of Sale" dated
12  April 16th, 2004, reflecting a transfer to Priority
13  Ro/Ro, LLC, care of E. T. Heinsen.
14         Is that the equipment that's covered by
15  the Ariel Valentin invoice?
16     A  Well, I have to cross-check it with that.
17  I'm sure it is, and there's another one.
18     Q  There's a list of equipment attached to
19  the bill of sale; is that correct?
20     A  That is correct.
21     Q  And who prepared that list?
22     A  I did.  I did.
23     Q  Do you recognize the signatures on the
24  bill of sale?

Lorraine Robins

Page 38

1      A  Priority Ro/Ro and Arthur Davis.
2      MR. ARMSTRONG:  This bill of sale is part
3  of Exhibit 9.  For clarity, I'm going to mark it as
4  9A.
5      THE WITNESS:  And B.
6      MR. ARMSTRONG:  Is that agreeable,
7  Counsel?
8      MR. MOLDOFF:  Yes.
9  BY MR. ARMSTRONG:
10     Q  All right.  You've given me another bill
11 of sale in the amount of $73,750 that I'll mark as
12 9B.  This indicates transfer to Priority Ro/Ro LLC,
13 care of E. T. Heinsen.  There's also an equipment
14 list attached to that.
15     Is that a true and correct copy of the
16 Storage Transfer bill of sale?
17     A  Yes, it is.
18     Q  Do you recognize the signatures on 9A and
19 9B?
20     A  I recognize Arthur Davis' signature.  I
21 don't recognize whoever signed for Heinsen.
22     Q  When that equipment was sold, what was
23 Arthur Davis' position with Storage Transfer?
24     A  He was working as a contractor.

Page 39

1      Q  So did he have authority to sign
2  documents on behalf of Storage Transfer?
3      A  Yes, he did.
4      Q  What negotiations were there with
5  Priority Ro/Ro in regard to sale of the equipment?
6      A  They were made by Mr. Davis.
7      Q  Were you involved?
8      A  No.
9      Q  Did he report to you regarding the
10 negotiations?
11     A  Yes, he did.
12     Q  And what did he tell you?
13     A  Gave me the list of the equipment that
14 the man was buying and the prices he got.
15     Q  When you say "the man," do you know who
16 the --
17     A  Well, I don't know who he was dealing
18 with, whether he was dealing with Priority or dealing
19 with Heinsen, because, see, both names are on the
20 invoice.
21     And I think one was signed by Heinsen.  I
22 don't know who the other one was signed by.  One was
23 signed by Heinsen; one was signed by Priority Ro/Ro.
24 Do you want to see them again?

Page 40

1      Q  Yes.
2      There are check marks on the equipment
3  list.  Do you know what those check marks reference?
4      A  May I see?
5      Q  Yes.
6      A  I guess this is where I -- I don't know.
7  I don't know what they reference.  Huh-uh, I don't
8  know.
9      Q  The list is a document that you've
10 prepared; correct?
11     A  Yes.
12     Q  Where did you get the information
13 necessary to prepare that list?
14     A  From here.
15     Q  From the Ariel invoice?
16     A  That is correct.
17     Q  Let me see the first page of those bills
18 of sale, please.
19     A  You got the one there.  Here's the other
20 one.
21     Q  No -- never mind.
22     On Exhibit 9B, did you prepare the list
23 attached?
24     A  Yes.

Page 41

1      Q  Do you know why the check marks are on
2  that list?
3      A  No.
4      Q  Do you recall how long before the actual
5  sale the negotiations began?
6      A  How long before the sale?
7      Q  Before the actual bill of sale was
8  signed.
9      MR. MOLDOFF:  Object to form.
10     THE WITNESS:  I don't know.
11     It says here it was signed on 4/30/04 on
12 this one.
13 BY MR. ARMSTRONG:
14     Q  Yes.  My question was, do you know how
15 long before the document was signed the negotiations
16 actually started?
17     A  Started on April 7th.
18     Q  Why do you say April 7th?
19     A  Because of the date that we have here on
20 the bill of sale.
21     Q  Are you saying that negotiations --
22     A  Well, this one is the 16th of April,
23 and this one is the 7th of April.
24     Q  All right.  You're saying that 9B is the

Thomas Holt

Page 42

1 quite content that your self-billing reports would
2 pay down my loan at MBC.
3    Now, I don't know if that helps you or
4 don't help you. But that's how the foundation was
5 going forward, into that agreement.
6    Q Payments under the -- under the
7 self-billing reports went to MBC?
8    A That's correct.
9    Q Did they ever go to Emerald?
10    A No, sir.
11    Q Over what period of time did Emerald
12 receive self-billing reports from Sea Star?
13    A It went through '03. I think it stopped
14 sometime in August/September of '03. That's a
15 guesstimate.
16    Q All of the payments under those reports
17 went to MBC during that period of time?
18    A That was the agreement, that the moneys
19 would be paid to them for Sea Star utilizing Emerald
20 equipment to pay down Emerald's loan with MBC.
21    Q When you spoke with Scott Krieger about
22 problems with the self-billing reports, what did he
23 say to you?
24    A It's not his problem.

Page 43

1    Q Did he say why? Is that all he said?
2    A He asked me why. And I said, Bob, as far
3 as I know, they probably don't have the right idea on
4 how the clerk makes up the self-billing reports. I
5 don't know why.
6    But the position is, Hey, Tom, I'm a
7 banker; I'm getting my loan reduced. Thank you very
8 much. I'm not involved in your agreement between
9 Emerald and Sea Star.
10    Q When did you speak with Krieger about
11 that?
12    A The fall of '02 and then into '03. Then
13 when I tried to find him later on, he had been
14 replaced. He left the bank.
15    Q And do you recall approximately how many
16 discussions you had with him about the self-billing
17 reports?
18    A Once he told me it wasn't his problem, I
19 stopped calling him on that issue.
20    Q On what issues did you call him?
21    A Then we had other business dealings, the
22 family did, with Mr. Krieger, that --
23    Q I should say, what other Sea Star issues?
24    A Well -- Sea Star. Sea Star issues with

Page 44

1 MBC and Emerald?
2    There was a question being raised -- and
3 I don't know what period of time -- about an
4 indemnification meant (sic) that was in an agreement
5 between yourselves, Sea Star, and MBC. I was made
6 aware of it. I got copies of the documentation that
7 flew around.
8    I don't know if that was in '05, '06.
9 Might have been '03. I just didn't -- somebody was
10 misinterpreting the document, and it wasn't my -- my
11 document. It was between MBC and Sea Star.
12    Q Did you discuss with anyone regarding a
13 claim that information contained in the self-billing
14 reports was false and misleading?
15    A Did I discuss with anyone?
16    Q Yes.
17    A I discussed it with Bob McGee. I
18 discussed it with, as I told you, Scott Krieger.
19    Now, anyone after that? Obviously
20 counsel. Obviously, Lorraine and Arthur, Jack Evans.
21 I certainly did not put it in the Journal of
22 Commerce, if that's your question.
23    Q When did you have discussions with
24 Lorraine Robins and Arthur Davis concerning the claim

Page 45

1 that information contained in the self-billing
2 reports was false and misleading?
3    A Literally, every time a self-billing
4 report showed up.
5    And there came a time when I talked to
6 Krieger about the position that Sea Star was taking,
7 that they did not like the idea that their
8 self-billing reports were being ripped apart by
9 Lorraine. And this person complained bitterly to MBC
10 and took the position they weren't going to send any
11 more self-billing reports.
12    Somewhere there's a couple of emails,
13 letters flying around that document that person's
14 position. I think it was somebody in Puerto Rico.
15    Q How were the self-billing reports false?
16 In other words, what information contained in the
17 self-billing reports was false?
18    A I thought we covered this about
19 45 minutes ago. But again, I'll tell you.
20    When the self-billing reports would be
21 presented, we would -- "we" being Lorraine and Arthur
22 and the office -- would gather all the information on
23 that, gather the information from where they could
24 find it -- i.e., railroads, truckers, Sea Star,

Lorraine Robins

Page 46

1    Q  This refers to 15 percent of any
2  proceeds, net of expenses or other amounts disbursed
3  to third parties.
4    A  Uh-huh.
5    Q  What were the expenses?
6    A  Telephone, office equipment, office rent,
7  contract employees, my salary.
8    Q  Were you receiving a salary?
9    A  Not yet.
10    Q  Have you ever received a salary?
11    A  No.
12    Q  Is there any writing -- that is, any
13  document -- regarding your salary?
14    A  I have to write myself a letter.
15    Q  What are the other amounts disbursed to
16  third parties, to you knowledge, stated in that
17  letter?
18    A  I would have to look at my books to find
19  that out.
20    Q  Before you signed this letter, did you
21  discuss the contents with an attorney?
22    A  No.
23      (Brief recess.)
24  BY MR. ARMSTRONG:

Page 47

1    Q  You received another letter dated
2  February 25th, 2004, that has been marked as
3  Exhibit 11.
4    A  Yeah, uh-huh.
5    Q  Do you know what the purpose of that
6  letter was?
7    A  It was my agreement to -- I'm not reading
8  it, skimming over it.  Looks like it's my agreement
9  to do the carve-out.
10    Q  Is that carve-out in addition to the
11  contribution to the Emerald estate?
12    A  It's the same thing.  There's only one
13  carve-out.
14    Q  I think you better look at the carve-out
15  letter.  Why don't you read it.
16    A  I was trying to rush.
17    Q  I know.
18    A  Yeah, this is Storage's guarantee of
19  paying the legal fees for Adelman & Lavine.
20    Q  It's entitled "carve-out."
21    A  I didn't write the letter.  I don't know
22  why it's entitled "carve-out."  But it basically
23  refers to the legal fees.
24    Q  Is that a carve-out for a legal fees?

Page 48

1    A  I got to read the next part.
2      Yeah, it's a carve-out for legal fees.
3    Q  Is that in addition to the 15 percent
4  carve-out?
5    A  Yes, it is.
6    Q  So am I correct in understanding that
7  Storage has two carve-outs:  One --
8    A  For legal fees.
9    Q  -- carve-out to Emerald, and the other
10  for legal fees?
11    A  Yes.  One is for the estate, and one is
12  for legal fees.
13    Q  And Exhibit 12 is a copy of a letter
14  dated August 15th, 2007, that you received;
15  correct?
16    A  Uh-huh.
17    Q  Is that a third cash-out?
18    A  No, it is not.  It's Adelman Lavine had
19  merged their firm with Eckert Seamans; and it just is
20  reverting to -- the carve-out of the legal fees is
21  now reverting to Eckert Seamans instead of Adelman
22  Lavine.
23    Q  For the Eckert Seamans bills?
24    A  Yeah.

Page 49

1    Q  You've also given me a Chapter 11
2  quarterly fee statement, Emerald Equipment Leasing,
3  Inc.  That is Exhibit 8.
4      Do you know what that document is?
5    A  Well, this was a document for the
6  trustee.  And they were around -- balances for the
7  trustee -- the trustee for a period of time.  They
8  hadn't been paid by Emerald, because Emerald didn't
9  have any money.  I paid it for them.
10    Q  Do you have any other quarterly fee
11  statements?
12    A  Yeah, I do.  I have another additional
13  $3,000 worth that I haven't paid yet.
14      MR. ARMSTRONG:  Let me show you a copy of
15  a document entitled Motion of MBC Leasing Corp. for
16  Allowance and Payment of Administrative Priority
17  Claims that I'll ask the court reporter to mark as
18  Exhibit 14 for identification.
19      (S.T. Exhibit 14 was marked for
20      identification.)
21  BY MR. ARMSTRONG:
22    Q  Have you ever seen this document before?
23    A  No, I have not.
24    Q  Did you and Mr. Krieger, or anyone else

Lorraine Robins

Page 62

1  At that time, I received April 29th to May 15th;
2  May 15th to May 30th; June and July -- I believe
3  those -- three months.
4          At that particular time, the only thing I
5  did with those was put them on a spreadsheet,
6  reporting the equipment that they showed on there,
7  the amount that was paid.
8          That's the only thing I did. I wasn't
9  checking them against anything; I was just putting
10 them in some semblance of order.
11     Q  When did you begin checking them?
12     A  I began checking them -- I guess it was
13 much, much later, several months later.
14          This transpired when Mr. Davis went down
15 to San Juan several times and found equipment unused
16 on the pier; and he would send a fax or call me up on
17 the telephone and give me a list of equipment that he
18 saw moving with Sea Star tractors on the pier,
19 checking to see if they were on the self-billing
20 reports.
21          He saw a group of our -- of containers
22 that were being used for a shop and offices, fence
23 line and things like that. So that's when I started
24 checking to see if they were on the self-billing

Page 63

1  report.
2      Q  And you were aware that Mr. Davis had
3  complained, in 2002, about alleged discrepancies in
4  the self-billing reports?
5      A  Could have been at that particular time,
6  towards the end of 2002, yes.
7      Q  You never saw any of Mr. Davis'
8  communications to Sea Star regarding self-billing
9  reports?
10     A  No, I don't recall any.
11     Q  As Storage Transfer, have you continued
12 to review self-billing reports?
13     A  I have.
14     Q  Have you made changes in your invoices?
15     A  I have.
16     Q  How do you notify Sea Star when you're
17 making a change in your invoices?
18     A  Well, originally I started sending out
19 invoices in an A, B, C -- an A invoice, B, C, that
20 kind, and it was a mixed-up invoice.
21          Then in August of '03 -- August 21st of
22 '03, I received a 66-page statement from Andy Rooks
23 of Sea Star Line. And when I started checking this
24 against what he said he had for equipment and what I

Page 64

1  said, I found that there were lots and lots of
2  discrepancies.
3          At that particular time, I decided it
4  would be much simpler to take each category, such as
5  20-foot chassis, 40-foot chassis, 45-foot chassis,
6  gen-sets and each type of container and make a
7  separate invoice for each one. So I changed billing
8  systems entirely and set them up that way.
9      Q  When you set them up that way, did you
10 send the invoices to Sea Star on a monthly basis?
11     A  Sent them on a monthly basis. By then it
12 was -- I sent them at the end of the -- let's see.
13 It's -- by the time I got them done, it was probably
14 at the end of that period of time when the lease
15 expired.
16          So I didn't -- so I sent them all out at
17 one time. But I did send them the invoices.
18     Q  Do you recall when you sent them out?
19     A  Not really. They must have dates on them
20 somewhere. Copies were received by Sea Star Line.
21     Q  And how do you know that?
22     A  Well, they didn't come back to me.
23     Q  Did you send them to any particular
24 person at Sea Star Line?

Page 65

1      A  Well, sometimes I sent them
2  electronically to Andy Rooks.
3      Q  When did you begin doing that?
4      A  I don't recall.
5      Q  Your invoices -- well, became Storage
6  Transfer invoices after the change?
7      A  No; they became Emerald invoices over
8  time.
9      Q  Is Emerald acting on behalf of Storage
10 Transfer in regard to these invoices?
11         MR. MOLDOFF: Object to form.
12         THE WITNESS: I don't know what you mean
13 by that.
14 BY MR. ARMSTRONG:
15     Q  Well, am I correct in understanding that
16 Storage Transfer expected to collect the money;
17 correct?
18     A  That's correct.
19     Q  So any invoices that are prepared now
20 would be for Storage Transfer; correct?
21     A  No, they're for Emerald's equipment.
22         Emerald Equipment, when they receive
23 payment for these invoices, at 15 percent carve-out,
24 would go to the estate; the legal fees will be paid;

Lorraine Robins

Page 66

1  the balance will go to the secured creditors; and
2  anything over the secured creditors will revert to
3  the estate.
4        Q  Well, am I correct in understanding that
5  you can't determine what the 15 percent carve-out to
6  Emerald would be until all of this is completed?
7        A  That's correct.
8        Q  So when the money is received in payment
9  of an invoice, that would go to Storage Transfer;
10  correct?
11        A  No; it would go to Emerald.
12        Q  Storage Transfer has to pay MBC; correct?
13        A  No; MBC has been paid.  Storage Transfer
14  has taken MBC's position.  MBC has to receive
15  20 percent of the rental after expenses.
16        Q  So Storage Transfer would have to pay MBC
17  20 percent of any payment received after Storage
18  Transfer's expenses; correct?
19        A  After Storage Transfer's expenses, after
20  the 15 percent carve-out for the estate, and after
21  the legal fees.  Then that money goes to Storage
22  Transfer, who has taken MBC's position.
23        With that money, it will be 20 percent of
24  the revenue for rental of equipment, less Emerald's

Page 67

1  expenses.
2        Q  Does the Loan Sale and Assignment
3  Agreement provide for a carve-out to Emerald?
4        A  What do you mean, a carve-out to Emerald?
5        Q  The Loan Sale and Assignment Agreement
6  between --
7        A  Of the loan?  No, that only comes to --
8        Q  It doesn't say anything about a carve-out
9  to Emerald, does it?
10        A  No.  No, it doesn't.
11        Q  It provides for a 20 percent payment to
12  MBC, as designed in the agreement?
13        A  That's correct.
14        Q  And am I correct in understanding that
15  MBC is not a party to any carve-out agreement between
16  Storage Transfer and Emerald?
17        A  That's correct.
18        Q  Now, have you been adding equipment to
19  these invoices?
20        A  I have.
21        Q  And how have you done that?  What are the
22  circumstances under which you've done that?
23        A  I don't know which invoices you're
24  looking at there.  You say "these invoices."

Page 68

1        MR. ARMSTRONG:  Well, let me say -- let
2  me ask you whether you recognize these documents that
3  I'll ask the court reporter to mark as Exhibit 22.
4        (S.T. Exhibit 22 was marked for
5        identification.)
6  BY MR. ARMSTRONG:
7        Q  I'm going to show you a copy of Emerald
8  Equipment lease invoice to Sea Star Line, Inc.,
9  schedule -- it looks like 40-foot chassis.
10        A  Okay.
11        Q  My old eyes have problems with this.  It
12  starts with document Page No. E06881A?
13        A  Yeah; this is the latest bill.
14        I thought we got this blown up for you.
15  Wasn't this blown up for you?
16        Q  Pardon?
17        A  Wasn't this blown up when you got it?
18        Q  Not for me.  I don't know whether it was
19  blown up --
20        A  If you'll see, there's a little column
21  alongside of each -- right here -- see this little
22  column here?
23        Q  Uh-huh.
24        A  It's marked "AG."  That means it was

Page 69

1  adjusted.
2        Q  That was adjusted from previous invoices;
3  is that correct?
4        A  That's correct.
5        Q  Previous invoices from the beginning?  Or
6  from the first person on?
7        A  Yes.  So this is the most current
8  invoice, I believe.
9        Q  Can you tell from this document when you
10  prepared -- I should say when Storage prepared this
11  invoice?
12        A  It says "amended 8/28/07" -- my copy that
13  I'm looking at.
14        Q  So am I correct in understanding that
15  this document was amended after the amended
16  counterclaim was filed?
17        A  What amended counterclaim?
18        Q  The Emerald Equipment Leasing amended
19  counterclaim against Sea Star.
20        A  Yes, it was amended.
21        Q  Was it amended to include equipment that
22  was not on invoices submitted to Sea Star prior to
23  filing the amended counterclaim?
24        A  It was amended to equipment that was not

Lorraine Robins

19 (Pages 70 to 73)

Page 70

1  on Sea Star's prior invoices; and it was also
2  adjusted, in some cases, down.
3        I mean, if -- we gave them credit for
4  something if we had missed it. It was amended both
5  ways, up and down.
6        Q  Have you continued to amend invoices
7  after Exhibit 22?
8        A  I think I've stopped now.
9        MR. ARMSTRONG: Let me show you a
10 document that I'll ask the court reporter to mark as
11 Exhibit 23. It's Emerald Equipment Leasing Invoice
12 to Sea Star Lines 40-Foot Chassis, Not Terminated As
13 Per Lease Agreement and Additional Rent.
14        (S.T. Exhibit 23 was marked for
15         identification.)
16 BY MR. ARMSTRONG:
17       Q  Is that a document that you prepared?
18       A  Yes, it is.
19       Q  And in regard to Exhibit 22, was
20 Exhibit 23 prepared before Exhibit 22?
21       A  Yes. According to this, it was
22 October 21st, '06.
23       Q  No, that document has, in the far
24 right-hand column, the word "adjusted."

Page 71

1        A  That's correct.
2        Q  -- by several. What does that mean?
3        A  That means that we later -- we later
4  recouped the equipment and sold it.and when we did,
5  we gave a credit for the stipulated value and made it
6  what we received less the stipulated value.
7        Look at the first one. It says $900. So
8  that means that we got $1,300 payment for that
9  chassis.
10       Q  After you recouped the equipment, did you
11 give Sea Star any notice of sale prior to the time
12 that you sold it?
13       A  No; the lease was canceled at this
14 particular time.
15       Q  At what particular time?
16       A  When we sold it.
17       Q  Are you saying that the lease didn't
18 apply to the sale?
19       MR. MOLDOFF: Object to form.
20       THE WITNESS: I'm saying that we didn't
21 give them notice.
22 BY MR. ARMSTRONG:
23       Q  On any of the adjusted sales, do you
24 recall giving Sea Star notice prior to the sale?

Page 72

1        A  No.
2        Q  That document, Exhibit 23, does not have
3  what we call a Bates number, the E followed by the
4  numbers.
5        A  Well, then you should have one with the
6  Bates numbers. I don't know where you got these if
7  they don't have a Bates number.
8        Q  Do you know when that document was
9  furnished to Sea Star?
10       A  No, I don't, because all these invoices
11 should have gone out together, because -- it should
12 have a Bates number on it.
13       MR. ARMSTRONG: All right. I'm going to
14 show you another series of documents -- Emerald
15 Equipment Leasing, Inc.; Schedule 40-Foot Chassis --
16 that I'll ask the court reporter to mark as
17 Exhibit 24 for identification.
18       (S.T. Exhibit 24 was marked for
19        identification.)
20 BY MR. ARMSTRONG:
21       Q  Do you recognize that?
22       A  This looks like a prior bill. What was
23 this one? This is an earlier invoice, I believe.
24       Q  In October 2007, do you recall sending

Page 73

1  Andy Rooks an electronic version of the invoice?
2        A  No, I don't recall. I know I sent them
3  all electronic versions sometime, but I don't know
4  when it was. Is that what this is?
5        Q  I think that's what it is.
6        A  Okay.
7        Q  Is it your understanding that that
8  version is an earlier version of Exhibit 22?
9        A  Yes, it is.
10       This is dated -- amended August 28th,
11 '07; and this is amended May 1st, '06.
12       Q  Have you prepared any invoices after
13 August 2007 or revised any invoices after
14 August 2007?
15       A  Well, I don't know. I'd have to look at
16 all the invoices. They should have been all around
17 the same time, but I'm not sure. What do they say
18 here?
19       Q  I'm not going to show you any more. I'm
20 out of invoices.
21       A  Oh, you're out of invoices.
22       Well, it was during this period of time
23 that I was sending them so -- they all fell around
24 that date.

Lorraine Robins

20 (Pages 74 to 77)

Page 74

1    Q  And did you add equipment to this
2  invoice, Exhibit 22, that had not been on prior
3  invoices?
4      A  I would say so. I'd have to check it
5  against each invoice.
6          I'd said yes, because the total on this
7  invoice is 889,000 and change.
8      Q  Wait. You're referring to Exhibit 24?
9      A  Yeah. And on this one it's 904,000 and
10 change.
11     Q  Did you take equipment off invoices?
12     A  In some cases.
13     Q  What cases would you take equipment off
14 invoices?
15     A  If a document showed me that you had
16 returned it or that it was signed for by a
17 representative of Emerald, I adjusted the bill
18 accordingly. I wouldn't --
19     Q  Was it your understanding that a
20 representative of Emerald had to sign for equipment
21 that was returned?
22     A  Yes.
23     Q  Where did you gain that understanding?
24     A  I gained that, I think, from the lease

Page 75

1  agreement with Emerald.
2      Q  Have you read the complete lease
3  agreement since we were last together?
4      A  Not really. Not really.
5          I also thought I received -- somewhere I
6  read a document from Andy Rooks where he spelled out
7  the fact that the lease agreement has to be -- the
8  Emerald agent had to sign off with -- I have that
9  document somewhere.
10     Q  Okay. Am I correct in understanding that
11 as of today, you have not read the complete equipment
12 rental agreement?
13     A  Oh, I have read it. I just don't
14 remember it right now.
15         MR. ARMSTRONG:  Let me show you a copy of
16 a letter dated August 16th, 2006, that I'll ask the
17 court reporter to mark as Exhibit 25 for
18 identification.
19         (S.T. Exhibit 25 was marked for
20         identification.)
21 BY MR. ARMSTRONG:
22     Q  Do you recognize that letter?
23     A  No, I don't.
24     Q  Do you know what The Corona Group is?

Page 76

1      A  No, I do not.
2      Q  Have you ever heard of it?
3      A  No, I have not.
4      Q  August 16th, 2006, was Mr. Davis a
5  contract representative or employee for Storage
6  Transfer?
7      A  He worked off and on during that year.
8      Q  Have you ever spoken with E. T. Heinsen?
9      A  Spoken with him?  Yes, I spoke to E. T.
10 Heinsen, to Teddy Heinsen.
11     Q  When did you last speak with him?
12     A  I spoke with him in -- about a year ago.
13     Q  What was the subject of your
14 conversation?
15     A  The subject of my conversation was, one,
16 I was -- I wanted to get his -- copies of his
17 electronic data that he -- I wanted to confirm his --
18 rather, how he transmitted his data from his facility
19 to Navieros in Edison.and he told me that this was
20 transmitted daily from him to Edison for all the
21 loading and unloading of ships and movements of cargo
22 directly into their computer.
23     Q  Over what period of time did he tell you
24 that occurred?

Page 77

1      A  When he was an agent.
2      Q  And he had been an agent for NPR
3  beginning in 2000?
4      A  I have no idea how long he was an agent.
5      Q  Did he tell you anything else?
6      A  No.
7      Q  What did you say to him?
8      A  I asked him how he did it.  And he
9  explained it to me, and I said, Thank you.
10     Q  Have you spoken or communicated with any
11 other representatives of E. T. Heinsen C. Por A., the
12 company?
13     A  No.
14     Q  Are there any representatives of Emerald,
15 other than Arthur Davis, to your knowledge?
16     A  I don't know whether Arthur represents
17 Emerald or not.
18     Q  If you had to communicate with Emerald,
19 with whom would you communicate?  Anyone from
20 Emerald.
21     A  I would communicate with Mr. Holt.
22     Q  Have you had any communications with
23 representatives of the NPR bankruptcy trustee?
24     A  No.

Thomas Holt

26 (Pages 98 to 101)

Page 98

1  it is. You'll have to tell me what it means. Then
2  it could refresh my memory.
3       Q  You've never seen it before?
4       A  To my knowledge, I have not.
5       MR. ARMSTRONG:  All right. Can I ask
6  that this be marked as 8.
7       (E.E.L. Exhibit 8 was marked for
8       identification.)
9  BY MR. ARMSTRONG:
10      Q  As part of your damage claim —
11      A  I'm not done reading it, so give me a
12  minute here.
13      MR. MOLDOFF:  For the record, it was a
14  settlement of an issue that arose regarding equipment
15  that was remaining in court or going -- there was a
16  continuing dispute. But it was a settlement that was
17  approved by the bankruptcy court with respect to the
18  disposition of that equipment pursuant to the
19  stipulation.
20      THE WITNESS:  Then it is what it is.
21      MR. MOLDOFF:  And the document speaks for
22  itself.
23  BY MR. ARMSTRONG:
24      Q  Does part of your damage claim relate to

Page 99

1  equipment that was located in the Dominican Republic
2  on April 27th, 2002?
3       A  Sitting here, I can't tell you without
4  going into all the documents.
5       We -- you're now talking about equipment
6  you never returned? Is that what you're suggesting?
7       Q  I'm not suggesting anything. I'm --
8       A  What's your question then?
9       Q  I'm asking you a question.
10      Does part of your damage claim —
11      A  Right.
12      Q  -- that is, Emerald's damage claim --
13      A  Right.
14      Q  -- relate to equipment that was in the
15  Dominican Republic on April 27th?
16      MR. MOLDOFF:  In other words, the
17  question relates to either rental payments and/or --
18      THE WITNESS:  Prior to April --
19      MR. MOLDOFF:  -- stipulated loss value.
20      I object to the question.
21  BY MR. ARMSTRONG:
22      Q  On or before April 27th, 2002.
23      A  We would not invoice you on or before
24  April 27th, '02.

Page 100

1       MR. MOLDOFF:  Are you saying --
2  BY MR. ARMSTRONG:
3       Q  Does part of your claim relating to
4  Emerald equipment cover equipment that was located in
5  the Dominican Republic on or before April 27th,
6  2002?
7       MR. MOLDOFF:  Do you mean if it was
8  thereafter used by Sea Star? I object to the form of
9  the question.
10      THE WITNESS:  Well, let's first
11  establish, when did you buy the company?
12  BY MR. ARMSTRONG:
13      Q  I think we went through that a couple of
14  hours ago.
15      A  We went through a lot.
16      Q  The document -- the order was entered on
17  April 27th -- I'm sorry -- April 26th, and the
18  closing occurred by the transfer of funds on
19  April 27th.
20      A  So April 29th, you had possession of
21  the Emerald equipment.
22      Q  That's a comment by you.
23      A  Yes.
24      Q  Now, I'm asking you --

Page 101

1       A  It's a fact.
2       Q  -- a question.
3       A  You took over Emerald's equipment as of
4  the closing. You either would return it within two
5  weeks after the closing or you were using it. If you
6  returned it, you would not be charged.
7       Q  Does part of Emerald's claim relate to
8  equipment that was located in the Dominican Republic
9  on or before April 27th, 2002?
10      MR. MOLDOFF:  Object to the form of the
11  question.
12      THE WITNESS:  April 29th or 27th?
13  BY MR. ARMSTRONG:
14      Q  April 27th.
15      A  And that's prior to you buying the
16  company.
17      Q  April 27th, 2002.
18      MR. MOLDOFF:  Object to the form of the
19  question.
20      THE WITNESS:  It is, so -- I don't
21  understand the question. I leave it at that.
22  BY MR. ARMSTRONG:
23      Q  You don't understand what Emerald's claim
24  is with respect to equipment located in the Dominican