# EXHIBIT E

1

1    IN THE UNITED STATES DISTRICT COURT
          MIDDLE DISTRICT OF FLORIDA
2         JACKSONVILLE DIVISION

3

     SEA STAR LINE, LLC, a      : CIVIL ACTION
4    limited liability          :
     company,                   :
5      Plaintiff                :
                                :
6      vs.                      :
                          :
7    EMERALD EQUIPMENT  :
     LEASING, INC., a           :
8    corporation,               : NO. 3:04:CV-
       Defendant                : 146-99HTS
9

10          ------
          January 25, 2005
11          ------

12          Oral Deposition of THOMAS J.
       HOLT, SR., held in the law offices of
13   Adelman, Lavine, Gold & Levin, P.C.,
       Four Penn Center, Suite 800, 1600 JFK
14   Boulevard, Philadelphia, Pennsylvania
       19102, beginning at approximately
15   9:34 a.m., before Ann V. Kaufmann, a
       Registered Professional Reporter,
16   Certified Realtime Reporter, Approved
       Reporter of the U.S. District Court, and
17   a Notary Public of the Commonwealth of
       Pennsylvania.
18

19          ------

20

21

22       ESQUIRE DEPOSITION SERVICES
          1880 John F. Kennedy Boulevard
23        15th Floor
          Philadelphia, Pennsylvania  19103
24        (215) 988-9191

25             ESQUIRE DEPOSITION SERVICES

15                    Thomas J. Holt, Sr.

1  position with Greenwich Terminals?

2      A.  No, sir.

3      Q.  Do you know who the

4  officers of Greenwich Terminals are?

5      A.  Officers I would tell you

6  are -- I can't tell you because I really

7  don't know.

8      Q.  Do you know who any of the

9  officers of Greenwich Terminals are?

10     A.  I would not know as

11 officers.  I do know that my son Thomas,

12 is involved in that company.  As to what

13 position he holds, I am not aware.

14     Q.  Do you know who owns the

15 company?

16     A.  I would, again, give you

17 the same answer.  You would have to go

18 ask them.  I'm not involved in that

19 company.

20     Q.  What is your position with

21 Emerald Equipment Leasing?

22     A.  At what period of time?

23     Q.  Well, today.

24     A.  Emerald is owned by me

ESQUIRE DEPOSITION SERVICES

16                         Thomas J. Holt, Sr.

1  today.

2      Q.    Are you an officer of

3  Emerald?

4      A.    I would be the president.

5      Q.    How long have you been

6  president?

7      A.    Approximately since the

8  summer of 2000.

9      Q.    How long have you owned

10  Emerald?

11     A.    Same time frame.

12     Q.    As president, what are your

13  duties and responsibilities with respect

14  to Emerald?

15     A.    Standard procedures of

16  trying to operate the company through a

17  liquidation of its equipment.  Emerald

18  is in bankruptcy.

19     Q.   Is it in Chapter 11?

20     A.   Yes, sir.

21     Q.   How long has Emerald been

22  in Chapter 11?

23     A.   Best guess?

24        MR. MOLDOFF:  If you know.

ESQUIRE DEPOSITION SERVICES

18                    Thomas J. Holt, Sr.

1   A.   Years ago.

2   Q.   When you say "years ago,"

3   can you give me a time frame?

4        MR. MOLDOFF:  Again, if you

5   know.  Don't speculate.

6        THE WITNESS:  When Emerald

7   was formed, whenever that was.  I think

8   that was 1996 or '7, back in those days.

9   BY MR. ARMSTRONG:

10   Q.   How long did Art Davis,

11   Arthur Davis, remain president?

12   A.   I didn't say he was.  If I

13   did, he was president, just to clear up

14   your record. I think if you go back, you

15   might see you jumped a question there.

16   It matters not.

17        He was the president from

18   when the company was formed.  I took it

19   over from he and its other investors I'm

20   going to tell you sometime in the summer

21   of 2000, to my best recollection.

22   Q.   Who were the other

23   investors?

24   A.   Several people that I had

                ESQUIRE DEPOSITION SERVICES

21                    Thomas J. Holt, Sr.

1  she would do for Emerald or in

2  connection with Emerald beginning in

3  '03.

4      A.    I requested Lorraine to try

5  to resolve the differences between Sea

6  Star and Emerald and all the

7  documentation that that ensued.

8      Q.    How did you know Lorraine

9  Robbins?

10     A.    Oh, about 45 years ago she

11  came to work for me.

12     Q.    She has worked in your

13  companies?

14     A.    Yes, sir.

15     Q.    Has she ever been an

16  officer of any of your companies?

17     A.    She was an officer of my

18  company, Holt Cargo Systems.

19     Q.    Was she an officer of Holt

20  Group, Inc.?

21     A.    I don't recall.

22     Q.    Has she ever been a

23  director of any of the companies in

24  which you've been involved?

23                    Thomas J. Holt, Sr.

1    Q.   Did he have any involvement

2  with Emerald?

3    A.   He was long gone before

4  Emerald.  Maybe -- I don't remember.

5  Yeah, he might have.  I don't remember.

6  You are back in 1997 now, I guess, which

7  would be over just about eight years

8  ago.  He might have been.

9        Involved in Emerald as to

10  the extent of -- I would go back and

11  tell you he was involved with Emerald.

12  He was one of the stockholders, to my

13  knowledge, of Emerald when it was

14  formed.

15    Q.   Was Lorraine Robbins a

16  stockholder of Emerald?

17    A.   Not to my knowledge.

18    Q.   Was --

19    A.   She might have been, but

20  not to my knowledge.

21    Q.   Was Arthur Davis a

22  stockholder of Emerald?

23    A.   Yes.

24    Q.   Do you know what percentage

ESQUIRE DEPOSITION SERVICES

29                    Thomas J. Holt, Sr.

1    Q.   Where it was?

2    A.   No, because it was the

3    responsibility of NPR, similar to the

4    Sea Star lease somewhat.

5    Q.   Did NPR report to Emerald

6    concerning the condition of the

7    equipment?

8    A.   No.

9    Q.   When you say that NPR's

10   responsibility was similar to the Sea

11   Star lease, what do you mean?

12   A.   Possession, movement of the

13   equipment, maintenance of the equipment,

14   responsibility for the equipment,

15   whether it be stolen, damaged,

16   whatever.  The documents speak for

17   themselves.

18   Q.   Whatever the written lease

19   or written agreement says is what --

20        MR. MOLDOFF:  Objection.

21   Q.   -- the responsibility was?

22   Is that what you mean when you say "the

23   documents speak for themselves"?

24        MR. MOLDOFF:  Objection to

ESQUIRE DEPOSITION SERVICES

30                          Thomas J. Holt, Sr.

1   the form.

2        THE WITNESS:  We had an

3   objection.

4        MR. MOLDOFF:  I object just

5   to the form of the question.

6        MR. ARMSTRONG:  He is

7   objecting to my form.

8        MR. MOLDOFF:  You can answer

9   the question if you understand what it

10  is that he is asking.

11       THE WITNESS:  Well, what I

12  understand is whatever the document

13  says, it says.

14  BY MR. ARMSTRONG:

15     Q.   Do you understand that the

16  document defines the responsibilities of

17  Emerald?

18       MR. MOLDOFF:  Well, object

19  to the form.  You haven't identified

20  what document we're talking about.

21  BY MR. ARMSTRONG:

22     Q.   What document are you

23  talking about?

24     A.   I'm talking about the

                ESQUIRE DEPOSITION SERVICES

31                          Thomas J. Holt, Sr.

1    document that was put in place for the

2    possession of Sea Star to take over the

3    fleet of Emerald's equipment.

4        Q.    Are you talking about the

5    equipment rental agreement?

6        A.    I'm talking about the

7    equipment rental agreement.  You can

8    call it a rental agreement.  I would

9    call it a lease.

10        You talk about a series of

11    e-mails that were exchanged between

12    people.  Why don't you introduce the

13    documents and read them into the record,

14    and they are self-explanatory.

15        Q.    Other than the equipment

16    rental agreement and the series of

17    e-mails, are you aware of any other

18    documents that define Emerald's

19    responsibilities in connection with the

20    equipment?

21        MR. MOLDOFF:  Object to the

22    form of the question to the extent it

23    asks for a legal conclusion.

24        You can answer whatever you

ESQUIRE DEPOSITION SERVICES

34                          Thomas J. Holt, Sr.

1   use of Sea Star, that we would sell it.

2   Sea Star bought a lot of equipment,

3   also.

4       Q.    And how was MBC Leasing

5   involved in the Emerald equipment?

6       A.    They held the -- without

7   legalese, they held the financial

8   interests on the equipment.

9       Q.    How long had MBC Leasing

10  held the financial interest on the

11  Emerald equipment?

12      A.    A couple years.

13      Q.    Did there come a time when

14  MBC Leasing took control of the Emerald

15  equipment?

16      MR. MOLDOFF:  Object to the

17  form.

18      THE WITNESS:  I don't

19  understand what you mean by "control."

20  Did they physically take possession?

21  Not to my knowledge.  It was always in

22  the possession of Emerald, to my

23  knowledge.

24      Emerald assisted MBC in

ESQUIRE DEPOSITION SERVICES

35                    Thomas J. Holt, Sr.

1   trying to collect monies anywhere they

2   could, including from Sea Star,

3   attempting to properly invoice the

4   leasing of the equipment to Sea Star and

5   the liquidation of equipment that Sea

6   Star was not using so the money could

7   flow to MBC.

8   BY MR. ARMSTRONG:

9       Q.   Was MBC in charge?

10      A.   In charge of what?

11           MR. MOLDOFF:  Objection.

12  BY MR. ARMSTRONG:

13      Q.   Of the liquidation of the

14  equipment.

15      A.   Not to my knowledge.

16      Q.   Who was in charge?

17      A.   Emerald and indirectly MBC,

18  because they also would liquidate

19  equipment and send us notices so we

20  could take it off the inventory control.

21      Q.   How long have you known

22  Robert Magee?

23      A.   Bob?  I have known Bob

24  probably off and on for, guesstimate,

ESQUIRE DEPOSITION SERVICES

57                        Thomas J. Holt, Sr.

1   piece of equipment under the agreement

2   with NPR.  That's standard procedure in

3   the industry.

4       Q.   Are you aware of any

5   prohibitions by Emerald against NPR

6   paying the value of lost equipment?

7       A.   You mean -- "prohibitions"

8   means what?

9       MR. MOLDOFF:  Object to the

10  form.

11      THE WITNESS:  The agreement

12  was the agreement.  Whatever it was, it

13  was.

14  BY MR. ARMSTRONG:

15      Q.   And if NPR paid the value

16  of the lost equipment, did that change

17  the amount of the monthly payment that

18  NPR would make?

19      A.   I don't know of any

20  agreement -- you got a real reach here.

21  Now you are going back several years.  I

22  don't know if the agreement was per day

23  per unit or replacement value if it was

24  lost or it was a flat sum of money over

ESQUIRE DEPOSITION SERVICES

58                          Thomas J. Holt, Sr.

1    a period of years while they had the

2    whole fleet in their possession and

3    responsible for the whole fleet.

4        MR. MOLDOFF: Just as a

5    general instruction, I think

6    Mr. Armstrong would tell you the same

7    thing, you shouldn't speculate. Or if

8    you are, say that you are.

9        THE WITNESS: Then I don't

10   want to comment then. I will just sit

11   here and look stupid.

12       MR. MOLDOFF: You don't have

13   to do that. You are not doing that.

14   BY MR. ARMSTRONG:

15    Q.    Do you know Bob Leetch?

16    A.    I know the name. I'm

17   trying to recall how I know it. Did he

18   work for me?

19    Q.    No. He worked for Sea

20   Star.

21    A.    He worked for Sea Star?

22    Q.    He was Sea Star's CFO.

23    A.    You mean they had two CFOs,

24   Brian and Leetch?

ESQUIRE DEPOSITION SERVICES

77                          Thomas J. Holt, Sr.

1      Q.   How did Emerald know what

2   equipment Sea Star was getting, that is,

3   Emerald equipment Sea Star was getting,

4   after April 26th?

5          MR. MOLDOFF:  Object to the

6   form.

7          THE WITNESS:  Equipment you

8   had in your possession was covered under

9   the Navieras/Emerald inventory.

10  BY MR. ARMSTRONG:

11     Q.   As far as you were

12  concerned, Sea Star was taking all of

13  the equipment covered under the Navieras

14  inventory?

15     A.   You were taking what the

16  Navieras inventory was to Emerald, which

17  was required to operate the NPR traded

18  book of business that was purchased from

19  Tom Hayes, always understanding that

20  sometime in the future the equipment

21  would be returned or purchased.

22     Q.   Was it your understanding

23  that Sea Star was taking all of the

24  equipment —

79                          Thomas J. Holt, Sr.

1     A.   They attempted to use it on

2   the basis of when you return the

3   equipment, that TIR would be instituted.

4     Q.   Was there a mechanism that

5   a TIR be instituted when Sea Star took

6   possession of the equipment?

7     A.   It was impossible.  You

8   could not have initiated TIRs for when

9   you took possession at 3:00 a.m. on a

10  given day.  Nobody would sit down and

11  write several thousand TIRs.  That would

12  be presumptuous.

13    Q.   It is your understanding

14  that as of the closing of the NPR asset

15  sale, Sea Star took possession of all

16  equipment, all Emerald equipment, that

17  NPR had been leasing from Emerald;

18  correct?

19    A.   It was my understanding

20  that you took possession of all Emerald

21  equipment that NPR was leasing in the

22  operation of their business, and when

23  you got done with the equipment, you

24  would return it and a TIR would be

ESQUIRE DEPOSITION SERVICES

80

Thomas J. Holt, Sr.

1  issued by Emerald or authorized or

2  acknowledged by Emerald, which would

3  then stop the leasing of the equipment.

4  And in fact that's what happened.

5      Q.   And am I correct in

6  understanding that your understanding of

7  this is based on the written agreement

8  and the e-mails exchanged?

9      A.   The agreement of what I

10  just said, yes.

11      Q.   Has anyone ever told you,

12  said to you, that your understanding in

13  that regard is incorrect?

14      A.   As to what I just said, no.

15      Q.   As of the closing of the

16  NPR asset sale, were you aware of any

17  equipment on lease to NPR that was being

18  held by third parties, such as vendors

19  or repair yards?

20      A.   There was equipment that

21  was held by vendors on monies that NPR

22  owed to them.  They were not aware that

23  it was not NPR's equipment; it was

24  Emerald's equipment.

ESQUIRE DEPOSITION SERVICES

81                              Thomas J. Holt, Sr.

1      Q.   Do you recall who those

2   vendors were?

3      A.   No.  There were more than

4   several, but I don't know who they were.

5      Q.   Did Emerald take steps to

6   identify the equipment that was being

7   held by these third parties?

8      A.   Can you repeat that,

9   please?

10      Q.   Did Emerald take steps to

11   identify the equipment that was being

12   held by third parties?

13      A.   Eventually.

14      Q.   What steps did Emerald

15   take?

16      A.   Well, as it sorted itself

17   out over a period of months, maybe

18   years, Emerald then proceeded to take

19   the equipment back.  In some cases, we

20   had to get the courts to do it.  But

21   specifically I can't sit here and tell

22   you who, where, and why and how much.

23      Q.   Well, did Emerald make --

24      A.   There is probably still

                ESQUIRE DEPOSITION SERVICES

82                    Thomas J. Holt, Sr.

1    equipment out there that people are

2    holding.

3         Q.   Was that equipment that was

4    included in the NPR inventory?

5         A.   No, no.  You only paid for

6    what you got.  And the way we finally

7    determined what you had is when you

8    returned it.

9         Q.   Now, you are saying that

10   the equipment being held by third

11   parties was not included in the NPR

12   inventory that you received?

13        A.    You are being very

14   specific.  If you can name equipment

15   numbers, I can go back and research it

16   for you.  But there was equipment that

17   was being held by third parties that Sea

18   Star had to have equipment that was

19   required, like chassis to handle the

20   loads that were under load at the time.

21             There was -- I don't

22   know -- a couple thousand loads that

23   were moving then that people could have

24   held.  But whether there was equipment

ESQUIRE DEPOSITION SERVICES

83 Thomas J. Holt, Sr.

1  that was being held by people that was

2  not turned over to Sea Star because of

3  it being held, the answer is yes.

4      Q.    And was that equipment that

5  was not turned over to Sea Star included

6  in the NPR inventories, its lists of

7  equipment?

8      A.    That would have been in the

9  NPR inventory because they had the

10  inventory for Emerald.  But if it wasn't

11  turned over to you then, you weren't

12  charged for it.

13        You were only charged for

14  what was physically in your possession

15  in the taking of the assets of Emerald

16  by you when you purchased Navieras, and

17  that's all based on your records and the

18  records that are supported by the

19  equipment being returned to the depots,

20  the records of equipment being sold,

21  because, obviously, there was equipment

22  that was not in your possession that was

23  sold by MBC.  You were never charged for

24  that stuff.

ESQUIRE DEPOSITION SERVICES

96                    Thomas J. Holt, Sr.

1      A.   I presume he felt he was

2   overpaying for the equipment; I don't

3   know.

4      Q.   Was he buying the

5   equipment?

6      A.   He was talking about buying

7   equipment.  I always thought they were

8   going to buy all of it, but the letter

9   speaks for itself.

10     Q.   You say "We believe that

11  the active equipment" --

12     A.   Where are you now?

13     Q.   The next sentence.  "We

14  believe that the active equipment

15  population can be reconciled fairly

16  easily, and the attached spreadsheet

17  reflects what we feel is the correct

18  reconciliation."

19         Do you see that?

20     A.   Yeah.

21     Q.   Did you participate in

22  preparing the spreadsheet that's

23  attached?

24     A.   I don't think I did.

        ESQUIRE DEPOSITION SERVICES

97                          Thomas J. Holt, Sr.

1    Q.   Do you know who prepared

2   it?

3    A.   Probably would have been

4   the computer section.

5    Q.   And who was in charge of

6   the computer section?

7    A.   In those days, it would

8   have been probably Shalom Cohen or John

9   Whitely.  You see, as I have been

10   telling you all along, what equipment

11   you got, you got.

12   Q.   Well, this spreadsheet

13   specifies "present Emerald equipment

14   fleet 4/12/02.  Number of units:

15   12,837."

16      Do you see that?

17   A.   Uh-huh, yes.

18   Q.   Was that the number of

19   units that you were proposing to

20   transfer to Sea Star?

21   A.   This, to me, says that,

22   yes.

23   Q.   How did you know that the

24   Emerald equipment fleet as of April 12,

ESQUIRE DEPOSITION SERVICES

98                    Thomas J. Holt, Sr.

1  2002, was 12,837 units?

2        MR. MOLDOFF:  If you know.

3        THE WITNESS:  It's what the

4  inventory said.

5  BY MR. ARMSTRONG:

6     Q.   When you say "inventory,"

7  are you referring to the NPR inventory?

8     A.   We have been talking about

9  that inventory now for the last hour or

10  two.

11    Q.   And you were proposing to

12  transfer 899 refrigerated containers to

13  Sea Star?

14    A.   We were proposing to

15  transfer all that equipment to Sea Star

16  and give them an option to buy it, on

17  the bottom line.

18    Q.   Did Sea Star accept that

19  proposal?

20    A.   I don't know.  Obviously,

21  in their opinion, they did not, because

22  we're here talking to you today.

23    Q.   Is it your position that

24  Emerald leased or rented to Sea Star 899

            ESQUIRE DEPOSITION SERVICES

106                    Thomas J. Holt, Sr.

1    had worked out eventually, yes.

2        Q.    Do you recall when he told

3    you what the deal was?

4        A.    Sometime in the two weeks

5    that the equipment was in Sea Star's

6    possession, if I have the time frame

7    proper.

8            The whole theory was you

9    were going to take the entire fleet, but

10    it just wasn't going to be.  You didn't

11    need the entire fleet.

12        Q.    When you say "the whole

13    theory was," whose theory was that?

14        A.    Mine.  I wanted you to take

15    the entire fleet.

16        Q.    And that didn't happen?

17        A.    No, it didn't.

18        Q.    So what did Sea Star take?

19        A.    All the equipment that they

20    had in their possession and eventually

21    returned or purchased.

22        Q.    Was there any inventory,

23    other than the NPR inventory, done of

24    Emerald equipment in the time frame

ESQUIRE DEPOSITION SERVICES

115                    Thomas J. Holt, Sr.

1    Q.   As of June 10, 2002, how

2    much did Emerald owe to MBC?

3         MR. MOLDOFF:  Object to the

4    form.

5         Only if you know.

6         THE WITNESS:  Guesstimate,

7    about 10 million.

8    BY MR. ARMSTRONG:

9    Q.   As of June 10, 2002, did

10   all dispositions of Emerald equipment

11   require MBC's approval?

12   A.   As of June 10th?

13        MR. MOLDOFF:  Object to the

14   form.

15        THE WITNESS:  I don't know.

16   That's a legal question.

17   BY MR. ARMSTRONG:

18   Q.   At any time did sale of

19   Emerald equipment require MBC's

20   approval?

21   A.   No.

22   Q.   At any time did lease of

23   Emerald equipment require MBC's

24   approval?

116                              Thomas J. Holt, Sr.

1          MR. MOLDOFF: Object to the

2    form.

3          THE WITNESS: Only with

4    regards to Sea Star because we weren't

5    leasing to third parties.

6    BY MR. ARMSTRONG:

7          Q.    What persons were employed

8    by Emerald to sell Emerald equipment as

9    of June 10, 2002?

10         A.    They had -- Art went out

11   and got several agents, both in the

12   United States and Puerto Rico, as well

13   as the bank had to start to liquidate

14   this equipment in an orderly fashion,

15   all coordinated through Emerald.

16         The bank would not sell

17   unless Emerald was involved with it for

18   inventory control purposes, they relied

19   very heavily on Emerald.

20         Q.    What do you mean when you

21   say "inventory control purposes"?

22         A.    Emerald ran inventory

23   controls of this equipment.

24         Q.    What Emerald employees were

ESQUIRE DEPOSITION SERVICES

120                    Thomas J. Holt, Sr.

1    form of the question.

2    BY MR. ARMSTRONG:

3        Q.    — under the agreement?

4            MR. MOLDOFF:  Object to the

5    form.

6            THE WITNESS:  Well, this

7    specific paragraph speaks of equipment

8    interchange receipts subject to the

9    terms and conditions of this agreement.

10   BY MR. ARMSTRONG:

11       Q.    What is an equipment

12   interchange receipt, if you know?

13       A.    It is a document

14   traditionally prepared by a marine

15   terminal for when a piece of equipment

16   goes in or out of that marine terminal.

17       Q.    Under that agreement, is

18   that your understanding of how Sea Star

19   was to acquire Emerald equipment?

20       A.    If they wanted a piece of

21   Emerald equipment that they did not have

22   in their possession as of the 31st of

23   July, they would go get that piece of

24   equipment and have a TIR issued, either

ESQUIRE DEPOSITION SERVICES

121                    Thomas J. Holt, Sr.

1   by Emerald or, in some cases, by the

2   third parties where Emerald equipment

3   was stored or from railroads or from

4   their own terminal.

5        As you see, the preamble of

6   the agreement speaks of equipment in use

7   at various times commencing April 29,

8   '02.

9        They had already had the

10  equipment.  This was just memorializing

11  the more formal conditions, redelivery

12  of equipment, maintenance, repairs, all

13  of the things that go into a lease

14  agreement, identification and expenses.

15  This is a written agreement; it speaks

16  for itself.

17      Q.   How did Emerald

18  differentiate between equipment in use

19  and in storage as of April 29, 2002?

20      A.   How did they

21  differentiate?  They did not.  This

22  speaks for equipment going out after

23  July 31, '02.

24        They did not differentiate

ESQUIRE DEPOSITION SERVICES

125                    Thomas J. Holt, Sr.

1    Q.   Is there any provision in

2    this agreement that you recall that

3    requires the signature of, quote, an

4    Emerald representative with respect to

5    equipment redelivered in San Juan?

6        MR. MOLDOFF:  Object to the

7    form of the question.

8        THE WITNESS:  The document

9    speaks for itself on the redelivery of

10   equipment.

11   BY MR. ARMSTRONG:

12   Q.   So if it's there, it's

13   there.  If it's not, then it's not part

14   of the agreement; correct?

15   A.   I didn't say that.

16   Whatever the agreement says, it speaks

17   for itself.

18   Q.   And whatever the agreement

19   says is what the agreement was; correct?

20       MR. MOLDOFF:  Object to the

21   form of the question.

22       THE WITNESS:  As far as

23   Emerald is concerned, yes.

24   BY MR. ARMSTRONG:

        ESQUIRE DEPOSITION SERVICES

126                    Thomas J. Holt, Sr.

1      Q.   Now, with respect to this

2    agreement, is it your position that the

3    agreement applies only to equipment

4    delivered as of and after July 31, 2002?

5      A.   This agreement

6    formalizes --

7          MR. MOLDOFF:  Object to the

8    form of the question.

9          THE WITNESS:  Thank you.

10          This agreement formalizes a

11    previous agreement and it expounds upon

12    it, obviously, for many other issues.

13    BY MR. ARMSTRONG:

14      Q.   Does this agreement apply

15    to all equipment, all Emerald equipment

16    received by Sea Star?

17          MR. MOLDOFF:  Object to the

18    form of the question.

19          THE WITNESS:  This agreement

20    refers to all equipment that Sea Star

21    had of Emerald's.

22    BY MR. ARMSTRONG:

23      Q.   Does it apply to all

24    equipment that Sea Star had of

           ESQUIRE DEPOSITION SERVICES

127                    Thomas J. Holt, Sr.

1   Emerald's?

2       A.   Yes.

3       Q.   Would it be fair to say

4   that this written agreement governs the

5   contractual relationship between Sea

6   Star and Emerald?

7       A.   Yes.

8           MR. MOLDOFF:  Object to the

9   form of the question.

10  BY MR. ARMSTRONG:

11      Q.   Let me show you a copy of a

12  document that's been marked as

13  Exhibit 56 to the Emerald deposition.

14          Have you ever seen that

15  letter dated August 28, 2003, before?

16      A.   I have seen this letter

17  before.

18      Q.   Do you recall when you

19  first saw it?

20      A.   Probably immediately after

21  it came in.

22      Q.   Did you discuss it with

23  anyone?

24      A.   I discussed it with Arthur

128                          Thomas J. Holt, Sr.

1    to go back and find out from the

2    bankruptcy records what they were

3    talking about, and that's when I first

4    learned that you had an in-transit

5    clause from the Court.

6       Q.   By "you," you are referring

7    to Sea Star?

8       A.   I always, when I'm speaking

9    to you, will refer to you as Sea Star,

10   unless you were the author of this

11   document, which it doesn't say you were.

12      Q.   When you learned that there

13   was an in-transit clause from the Court,

14   did you take any action with respect to

15   Emerald billings?

16      A.   I told our -- Lorraine and

17   Arthur to make sure you don't bill for

18   that period of time.

19      Q.   What did Arthur say?

20      A.   He agreed.

21      Q.   Did Lorraine say anything?

22      A.   No.  We followed the letter

23   of the judge.  Whatever the judge said,

24   that's what we followed.

142                    Thomas J. Holt, Sr.

1  this would be equipment that Sea Star

2  would return to Philadelphia to

3  terminate their agreement with Emerald.

4  Greenwich is a depot to receive that

5  equipment under the agreement that

6  Emerald had with Sea Star, known as the

7  Packer-Greenwich terminal, which is

8  operated by Greenwich.

9        This equipment would come

10 in, TIRs would be issued.  That would be

11 a charge.  Storage would be issued; that

12 would be a charge.  Mounting or

13 demounting chassis from containers would

14 be a charge.  Releasing the equipment to

15 people to purchase it would eventually

16 be a charge.  So that's the Greenwich

17 relationship with Emerald.

18    Q.   Let me show you a copy of a

19 letter dated July 19, 2002, which has

20 been marked as Exhibit 18 to the Emerald

21 deposition.

22        Have you ever seen that

23 before?

24    A.   No, but I had heard about

ESQUIRE DEPOSITION SERVICES

143                    Thomas J. Holt, Sr.

1  it. This memorializes the other

2  document that you showed me.

3      Q.   Was Emerald paying

4  Greenwich for any of the services listed

5  in that letter?

6      A.   No. They would have been

7  invoiced to MBC by Greenwich.

8      Q.   Did you become involved in

9  the Sea Star purchase of Emerald

10  chassis?

11      A.   To the extent of value, if

12  we had them, I authorized them to be

13  released to them. They probably bought

14  equipment they did not even have in

15  their possession that we had to release

16  to them.

17      Q.   Did you --

18      A.   I did not negotiate with

19  Sea Star.

20      Q.   Were you involved in

21  negotiations?

22      A.   No. I never negotiated

23  with Sea Star the sale of equipment

24  directly.

ESQUIRE DEPOSITION SERVICES

151                    Thomas J. Holt, Sr.

1   form.

2        THE WITNESS:  If you have

3   properly terminated it in San Juan, as

4   per the agreement, then that's probably

5   why you were charging us storage.

6        But if you did not properly

7   terminate it and you had it there, it's

8   in your possession, it was not available

9   to us to sell, then it's in your

10  possession.

11       All this has been

12  documented, asked and answered, and it

13  continues to be the same answers.

14  BY MR. ARMSTRONG:

15    Q.   Is your position now that

16  Sea Star does not owe Emerald for

17  equipment involved in shipments in

18  transit?

19    A.   If it's in the covered

20  period given to Sea Star by Judge

21  Walrath, you do not owe for that

22  in-transit period and we did not invoice

23  for that in-transit period.

24    Q.   Is it your position that

          ESQUIRE DEPOSITION SERVICES

1   your position that Sea Star would not

2   owe under the equipment rental

3   agreement?

4       A.   If Sea Star did not place

5   it there, then they did not have

6   authority to place it there, so,

7   therefore, you are not responsible.

8           But with Sea Star taking

9   possession of that equipment from those

10  depots, as the documentation you showed

11  me here, it was clearly straightened out

12  subsequently that the depots are given

13  authority to release the product to Sea

14  Star, "product" being chassis,

15  container, gen-set, or whatever you had

16  under load at the time.

17          As the documents show,

18  there were instances where you wanted to

19  pick up equipment and not because of

20  money owed, but because you were a

21  stranger to the depot, that we needed to

22  get an authorized representative to

23  release it to you, which at your request

24  we did at every turn.

155                    Thomas J. Holt, Sr.

1    Q.    And the same would apply

2    with respect to a repair yard, would it

3    not?

4    A.    If it's not covered under

5    the lease to you, you would not be

6    responsible.  If you had possession and

7    it was covered under your lease and you

8    released it to a third party, such as a

9    trucker or a railroad, it is your

10    responsibility.

11          Just for one brief moment

12    here, there is money owed and these kind

13    of questions will probably be a matter

14    of a judge.  But there is money owed.

15    Why don't you just tell your client to

16    pay his bills?  This is really

17    insulting.

18    Q.    You would not be taking the

19    position, would you, that Sea Star owes

20    for equipment in storage under the

21    bankruptcy court's order?

22          MR. MOLDOFF:  Object to the

23    form of the question.

24          THE WITNESS:  Storage where?

          ESQUIRE DEPOSITION SERVICES

159                    Thomas J. Holt, Sr.

1      A.   In April of 2002?

2      Q.   Yes.

3      A.   All the equipment belonged

4   to Emerald that Navieras had on the

5   terminal in that time frame.

6      Q.   Now, with respect to that

7   equipment, do you know whether any of it

8   remained in storage?

9      A.   I'd have to go back and

10   check the records.

11        MR. ARMSTRONG:  Give me two

12   minutes.

13        (Recess.)

14        MR. ARMSTRONG:  No further

15   questions.

16        I'm going to take these with

17   me because we will use -- I don't know

18   whether -- well, we will use some of

19   them over the next two days, so I don't

20   know whether you will be here.

21        MR. MOLDOFF:  I never did

22   speak to Marty McDonald.

23        (Discussion off the record.)

24        (Witness excused.)

ESQUIRE DEPOSITION SERVICES