# EXHIBIT F

1

1    UNITED STATES DISTRICT COURT
     MIDDLE DISTRICT OF FLORIDA
2      JACKSONVILLE DIVISION
     CASE NO. 3:04-CV-146-99HTS
3          - - -
         SEA STAR LINE, LLC,      :
4        a limited liability      :
         company,                 :
5        Plaintiff,               :
                                  :
6        vs.                      :
                                  :
7        EMERALD EQUIPMENT        :
          LEASING, INC., a        :
8        corporation             :
         Defendant.               :
9          - - -

10          January 26, 2005

11             - - -

12    Oral deposition of LORRAINE
      T. ROBINS, held in the offices of
13    Adelman, Lavine, Gold and Levin, Suite
      900, Four Penn Center, Philadelphia,
14    Pennsylvania 19103, commencing at 9:30
      a.m., on the above date, before Pamela J.
15    Gober Bracic, a Federally-Approved
      Registered Professional Reporter and
16    Commissioner for the Commonwealth of
      Pennsylvania.
17             - - -

18

19

20

21

22    ESQUIRE DEPOSITION SERVICES
        15th Floor
23    1880 John F. Kennedy Boulevard
      Philadelphia, Pennsylvania 19103
24    (215) 988-9191

          ESQUIRE DEPOSITION SERVICES

11                    LORRAINE T. ROBINS

1     A.   I was executive

2  vice-president of the Holt Group, Inc.

3     Q.   When did you become

4  executive vice-president of the Holt

5  Group, Inc.?

6     A.   When the group was formed?

7     Q.   When was the group formed?

8     MR. MOLDOFF:  If you know.

9     THE WITNESS:  I don't know.

10    It was in the -- I don't know.  I

11    would have to look it up.

12  BY MR. ARMSTRONG:

13    Q.   Approximately how many years

14  ago was the Holt Group formed?

15    A.   The Holt Group was formed --

16  from today?

17    Q.   Yes.

18    A.   Five.

19    Q.   Five years ago?

20    A.   Mm-hum, yes.

21    Q.   And as executive

22  vice-president, what were your duties and

23  responsibilities?

24    A.   I was Tom Holt, Senior's

ESQUIRE DEPOSITION SERVICES

12                    LORRAINE T. ROBINS

1   assistant.

2        Q.   And what did you do as Tom

3   Holt, Senior's assistant?

4        A.   Different operations.  I did

5   finance, I did sales.

6        Q.   What did you do in

7   operations?

8        A.   A lot of coordination.

9        Q.   What type of coordination?

10       A.   Talking to the managers of

11  the piers, conveying any problems that

12  they would have directly to Tom, Senior,

13  and anything that they came to me with.

14       Q.   What did you do in finance?

15       A.   I set up a lot of payments

16  for various projects that we had.  Also

17  dealt, you know, with meetings with our

18  banks.

19       Q.   Anything else?

20       A.   No.

21       Q.   What did you do in sales?

22       A.   Sales, together with Tom, we

23  basically — all of the container lines.

24  Originally we would do the contracts with

ESQUIRE DEPOSITION SERVICES

15                    LORRAINE T. ROBINS

1    Q.   When did you become

2  executive vice-president of Holt Cargo

3  Systems Inc.?

4    A.   When the company was formed.

5    Q.   When was the company formed?

6    A.   I would have to check that

7  date.

8    Q.   How long did you remain

9  executive vice-president?

10   A.   About 35 years.

11   Q.   Do you recall when you ended

12  your executive vice-presidency with Holt

13  Cargo Systems, Inc.?

14   A.   No, I do not.

15   Q.   As executive vice-president

16  of Holt Cargo Systems, Inc., what were

17  your duties and responsibilities?

18   A.   The same as I described

19  before.

20   Q.   Operations?

21   A.   Mm-hum.

22   Q.   What did you do in

23  operations?

24   A.   Coordinated with the pier

ESQUIRE DEPOSITION SERVICES

48                      LORRAINE T. ROBINS

1    programs related to the Holt Logistics

2    system?

3        A.    I did not think so.  I don't

4    know.

5        Q.    You referred to the loading

6    manifest from the MAYAGUEZ.  Do you

7    recall when that loading manifest was

8    dated?

9        A.    It was dated April 26th to

10   the 27th.

11       Q.    Of what year?

12       A.    2002.

13       Q.    How did you use the loading

14   manifest from the MAYAGUEZ?

15       A.    I took the loads that were

16   on it, and I billed for those.

17       Q.    Have you ever changed your

18   billing for those loads?

19       A.    Yes, I have.

20       Q.    When did you change your

21   billing?

22       A.    Recently, because I couldn't

23   get copies of the manifests.  I didn't

24   find out about the in-transit until

49                    LORRAINE T. ROBINS

1    January of this year.

2        Q.    This year being 2005?

3        A.    No, I'm sorry, 2004.  And I

4    didn't do anything on it, because I

5    didn't have the manifest, so I didn't

6    know what was in transit.

7            And recently in the

8    discovery we got a list that shows --

9    it's a Sea Star Line document that shows

10    what was in transit, where they took

11    credits against MBC Leasing, so I have

12    adjusted the billing from the containers

13    on that list for 14 days credit on each

14    unit.

15            And I would also like to

16    point out that there are a lot of

17    mistakes on that, too.

18        Q.    On what?

19        A.    On the document.

20        Q.    On what document?

21        A.    The in-transit settlement

22    with MBC on monies that were due Sea Star

23    Line for in-transit moves.  I don't have

24    the Bates number on it.

ESQUIRE DEPOSITION SERVICES

58                    LORRAINE T. ROBINS

1     A.   No, I don't.

2     Q.   Do you know when he was last

3 house counsel?

4     A.   No.

5     Q.   After you received these

6 documents regarding the three ships, did

7 you review them?

8     A.   Yes, I did.

9     Q.   And have you made any

10 changes in your claims after reviewing

11 these documents?

12    A.   Yes, I have.

13    Q.   What changes have you made?

14    A.   I gave credit for 14 days on

15 the vessels that we had billed -- I mean

16 on the containers that we had billed.

17    Q.   Did you make any other

18 changes?

19    A.   No.

20    Q.   And how did you determine

21 what the on-hire date was for equipment

22 on board these three vessels after you

23 gave the credit?

24    A.   Do you know, I gave the

ESQUIRE DEPOSITION SERVICES

LORRAINE T. ROBINS        59

1    credit on April 29th, according to the

2    lease, but I really wanted to discuss it,

3    because I think it should have been to

4    the 27th, because they were already en

5    route.

6        Q.    That wasn't my question.

7    How did you determine what the on-hire

8    date for a particular piece of equipment

9    on board one of those vessels was, after

10    you gave that in-transit credit?

11        A.    I don't understand your

12    question.  The billing that -- if I had

13    billing, I had already -- on the billings

14    that I had for Sea Star Line, say on a

15    40-foot container, I already had Sea Star

16    Line's date that they said they put it on

17    hire, or I had the actual date, if you

18    are familiar with the bills.  And then I

19    comment as to how I came to that.

20        Now either -- that didn't

21    change.  So that if it was an on-hire

22    date, in lots of instances I took Sea

23    Star Line's on-hire date, because I

24    didn't have any other information.  If I

ESQUIRE DEPOSITION SERVICES

LORRAINE T. ROBINS     60

1  know the equipment was on the vessel, I

2  gave them 4/29.

3      Q.   You gave them --

4      A.   As an on-hire date, I gave

5  Sea Star Line 4/29 as an on-hire date.  I

6  had no other information.

7      Q.   If the equipment was on

8  board one of these three ships, you have

9  a 4/29 on-hire date?

10     A.   Yes.

11     Q.   Have you ever changed that?

12     A.   I gave credit.

13     Q.   What credit did you give?

14     A.   I gave them credit for two

15 weeks.

16     Q.   Now, did you then set the

17 on-hire date for the day after the

18 two-week credit period?

19     A.   What?  Pardon me?

20     Q.   Correct me if I'm wrong.

21 You say that you billed beginning

22 4/29/2002 for equipment listed on board

23 these three vessels.  You gave credit for

24 14 days.  Did you then set the on-hire

ESQUIRE DEPOSITION SERVICES

LORRAINE T. ROBINS          63

1   started on a certain date.  And TIR

2   numbers were given on that comments

3   section, too.

4       Q.   Okay.

5       A.   The other inventory I had

6   was one from Marty McDonald, which he did

7   sign for, and that was for chassis and

8   gensets.  And I gave credit for that.

9       Q.   How did you give credit in

10   connection with the June 22nd inventory?

11      A.   I just billed it to June

12   22nd.

13      Q.   So if it was on the

14   inventory, you stopped your billing as of

15   June 22nd?

16      A.   That's correct.

17      Q.   Did you make any inquiry as

18   to whether any of the equipment of the

19   June 22nd inventory was in storage or had

20   been in storage prior to June 22nd?

21      A.   When I billed, I didn't bill

22   anything to Sea Star Line unless I had a

23   movement of some kind that they had

24   touched it.  If they had it, I billed it.

ESQUIRE DEPOSITION SERVICES

68                    LORRAINE T. ROBINS

1      A.   I think that it probably

2   will remain about the same, because when

3   we got certain documents, we found

4   several that we have not billed.  And

5   even giving the credits, just checking

6   one or two, it didn't make that much of a

7   difference.

8      Q.   How did you determine what

9   units were in Sea Star Line's possession

10  as of April 27, 2002?

11     A.   April 22nd?

12     Q.   April 27, 2002.

13     A.   I wasn't involved with it at

14  that time.

15     Q.   Did you make any effort to

16  determine what units were in Sea Star

17  Line's possession as of April 27, 2002?

18     A.   As I said, I was not

19  involved in it at that time.

20     Q.   Did you make any effort

21  determine what units were in inland

22  depots -- and I am speaking of Emerald

23  units -- as of April 27, 2002?

24     A.   I was not involved in that.

ESQUIRE DEPOSITION SERVICES

69                    LORRAINE T. ROBINS

1    Q.   I understand.  When you

2  became involved, did you make any effort

3  to determine what Emerald units had been

4  in Sea Star Line's possession as of April

5  27, 2002?

6    A.   The only thing that I

7  received was a list from Mr. Rooks dated

8  the 23rd or the 26th of July, which is a

9  list of containers or equipment that was

10  in various depots.

11    Q.   When did you receive the

12  list from Mr. Rooks?

13    A.   Maybe it was the end of

14  July, beginning of August '02.

15    Q.   When you say depots, are you

16  referring to inland depots?

17    A.   Basically they were trucking

18  companies.  I guess they were depots.

19    Q.   Other than that list, have

20  you made any effort, when you became

21  involved, to determine what Emerald units

22  were in Sea Star Line's possession as of

23  April 27, 2002?

24    A.   I, myself, was not, as I

ESQUIRE DEPOSITION SERVICES

71                    LORRAINE T. ROBINS

1   whether any Emerald equipment had been

2   held by third parties as of April 27,

3   2002?

4        A.   It wasn't being held, but

5   there were several places where Sea Star

6   Line needed equipment that was at

7   various — like Thermo King and various

8   places.  Could be depots.

9            Not being familiar with Sea

10  Star Line, they wouldn't take their

11  releases -- equipment had an NPR release.

12  Or we couldn't give them an NPR release,

13  because they were out of business.

14           But they would talk to me,

15  because I had done a lot of work with

16  these various truckers and depots, and

17  they knew me, and they wanted -- so I

18  would tell them, they can release it to

19  Sea Star Line or else write them, give

20  them written permission to release it.

21       Q.   Did you ever become aware

22  that depots were withholding equipment

23  because of debts that they claimed were

24  owed by NPR?

              ESQUIRE DEPOSITION SERVICES

73                    LORRAINE T. ROBINS

1   was being held in storage at Sea Star

2   facilities?

3       A.   The inventories that I had

4   were the only inventories -- the June

5   22nd, '02, August 15th, '02, July 10,

6   '02, Marty McDonald's and the sands lot.

7   I thought I had them all.

8       Q.   How did you determine what

9   equipment was in storage and what

10   equipment was in use by Sea Star Line?

11      A.   Again, I have to say, I

12   would go to my documents, to the move

13   histories, to my TIRs, and determine

14   whether it was in use or not.

15      Q.   Have you ever read the

16   equipment rental agreement between Sea

17   Star and Emerald?

18      A.   Just sections of it.

19      Q.   What sections do you recall

20   reading?

21      A.   The charges, the rates, per

22   diems, redelivery.

23       MR. ARMSTRONG:  Let's take a

24   break.

ESQUIRE DEPOSITION SERVICES

75                    LORRAINE T. ROBINS

1  value is set forth in lease for each type

2  of equipment.  I have prepared those.

3      Q.   And what was your procedure

4  in preparing those billings?

5      A.   Any equipment that wasn't

6  returned, that was on our self-billing

7  report after the 30th of November, I

8  considered lost.  There had been

9  instances where it was delivered to us

10  later and I've adjusted it.

11      Q.   For purposes of preparing

12  the DV billings, you use self billings

13  reports?

14      A.   What do you mean DV?

15      Q.   I call it depreciated value.

16  You probably call it stipulated value.

17      A.   Yes, stipulated.

18      Q.   For purposes of preparing

19  those reports, you used the self-billing

20  reports to determine what equipment was

21  in Sea Star's possession?

22      A.   I used the schedules and the

23  invoices I sent to Sea Star Line.

24      Q.   How did you determine that

ESQUIRE DEPOSITION SERVICES

76                    LORRAINE T. ROBINS

1    every piece of equipment on your

2    stipulated value billings had been in Sea

3    Star Line's possession?

4        A.    If it was on –

5        MR. MOLDOFF:  Objection to

6        form.

7        THE WITNESS:  If it was on

8        my billings, I had already

9        determined it had been in Sea Star

10       Line's possession.  Again, I show

11       in my comments on my bills how I

12       came to this conclusion.

13   BY MR. ARMSTRONG:

14       Q.    I'm going to show you a copy

15   of a Schedule DV 20-foot container

16   8/23/2004, amended.  I will ask the court

17   reporter to mark this as Exhibit-1 to

18   this deposition.  We will call it

19   Robins-1.

20            - - -

21       (Whereupon, Exhibit Robins-1

22       was marked for identification.)

23            - - -

24   BY MR. ARMSTRONG:

         ESQUIRE DEPOSITION SERVICES

82                    LORRAINE T. ROBINS

1    been marked as Exhibit-4 to the Emerald

2    deposition.

3           Have you ever seen that

4    document before?

5           When I refer to the Emerald

6    deposition, I'm referring to the

7    deposition in which Arthur Davis appeared

8    as Emerald's designee.

9        A.   No, I haven't seen this.

10       Q.   Look at paragraph 13 on page

11   eight, please.

12       A.   (Witness complies.)

13       Q.   Has anyone ever advised you

14   of the storage requirement in the court's

15   order?

16           MR. MOLDOFF:  Objection to

17       form.

18           THE WITNESS:  No.

19   BY MR. ARMSTRONG:

20       Q.   Has anyone ever advised you

21   of the subject matter of paragraph 13 on

22   page eight?

23       A.   No.

24       Q.   I'm going to show you

                ESQUIRE DEPOSITION SERVICES

84                    LORRAINE T. ROBINS

1    A.   I don't recall.

2    Q.   What provisions in that

3    document have you reviewed?

4    A.   I have reviewed the -- I

5    reviewed this, the Schedule A, which

6    gives you the lease rate, the stipulated

7    loss rate and the damage.  I reviewed

8    that.  And I reviewed the redelivery.

9    Q.   Did you ever look at

10   paragraph one?

11   A.   Yes, I've looked at that.

12   Q.   Did you discuss the contents

13   of paragraph one with anyone?

14   A.   This lease was signed in --

15   dated -- I don't know when it was signed,

16   because there is no date on the signature

17   page -- August '02.

18        The equipment that you are

19   talking about was already in evidence,

20   was already in use, so you couldn't get

21   interchanges on it.

22   Q.   How did you determine what

23   equipment was in use on April 29th, 2002,

24   that is, in use by Sea Star?

ESQUIRE DEPOSITION SERVICES

85                    LORRAINE T. ROBINS

1        A.   Well, this is something that

2   we looked at six months after it had

3   already been in use.  So by that time we

4   had the self-billing reports.  I would

5   say June, July, August, September, four

6   to five months, took the equipment that

7   was on the self-billing list and

8   considered that in use.

9        Q.   So every piece of equipment

10  on the self-billing list you considered

11  in use?

12       A.   Yes.

13       Q.   Did you consider any other

14  equipment in use?

15       A.   Well, later on, yes.  In

16  checking the self-billing reports where

17  they had a container in some instances,

18  especially if it came out of Packer

19  Avenue, we could go into the computer and

20  could tell whether it was with a chassis

21  or a container with a chassis or a

22  chassis with a container.

23            So then we would know it was

24  a double move.  So we would bill the

ESQUIRE DEPOSITION SERVICES

89                    LORRAINE T. ROBINS

1    form.

2        THE WITNESS:  In doing my

3    billing I used whatever

4    documentation I had to do the

5    billing.  If I had a TIR, I used

6    it.  If I had a load that was

7    discharged from a vessel and went

8    out the gate, I used that.  If it

9    was on CSX Rail, I used that.

10       I did not get any TIRs from

11   San Juan until discovery.  Well,

12   no, no, I'm sorry, that's wrong.

13   I got some in December.

14 BY MR. ARMSTRONG:

15   Q.   Did Emerald have

16 representatives in San Juan?

17   A.   Yes, they did.

18   Q.   Who were those

19 representatives?

20   A.   Marty McDonald and Frankie

21 Gonzalez.

22   Q.   Did you ever discuss TIRs

23 with Marty McDonald?

24   A.   No.

ESQUIRE DEPOSITION SERVICES

90                    LORRAINE T. ROBINS

1     Q.   Did you ever ask Marty

2   McDonald to get TIRs?

3     A.   Well, Marty McDonald would

4   know to get TIRs.  He was a steamship

5   man.

6     Q.   Did you ask him to get TIRs?

7     A.   No, I did not.

8     Q.   How long did Marty McDonald

9   remain an Emerald representative in San

10   Juan?

11     A.   I do not know the exact

12   date.

13     Q.   Did you ask Frankie Gonzalez

14   to get San Juan TIRs?

15     A.   I didn't, Arthur Davis did.

16     Q.   How do you know that Arthur

17   Davis did?

18     A.   Because he told me.

19     Q.   When did he tell you that?

20     A.   We started getting TIRs in

21   October of '03 and December of '03, and

22   Frankie was assigning them then.  But he

23   was signing out for equipment prior to

24   that.  That was part of his job.

93                LORRAINE T. ROBINS

1    supervising the accounts payable.  And in

2    doing their statements and everything, I

3    got to know these people pretty well.

4    That's why I called.

5         Q.    Have you billed Sea Star for

6    Emerald equipment located at the depots

7    listed in that e-mail for the periods

8    prior to May 10, 2002?

9         MR. MOLDOFF:  If you know.

10         THE WITNESS:  Well, I know

11         that I have billed Illinois Auto

12         as of May 8th, because that's when

13         I wrote a letter telling them to

14         release it to Sea Star.

15    BY MR. ARMSTRONG:

16         Q.    When did you start billing

17    Fastlane?

18         A.    Fastlane I only would have

19    billed if a unit was put in there by Sea

20    Star after the 27th of June or taken out

21    of there -- I mean of April.  On Global,

22    I billed containers with them, because I

23    had information on their loads that they

24    were moving for Sea Star.

ESQUIRE DEPOSITION SERVICES

94                    LORRAINE T. ROBINS

1       Q.   When did you begin billing

2   Global?

3       A.   Various bills.  It depends

4   on whichever container I had information

5   on.

6       Q.   Did you bill Global prior to

7   or for the periods prior to May 10, 2002?

8        MR. MOLDOFF:  Objection to

9        form.

10       THE WITNESS:  I would have

11       to check his bills.

12       MR. MOLDOFF:  You said

13       billed Global.

14   BY MR. ARMSTRONG:

15      Q.   Did you bill for equipment

16   located at Empire for periods prior to

17   May 10, 2002?

18      A.   I believe so.  Prior to

19   when?

20      Q.   May 10, 2002.

21      A.   I would have to check my

22   records on that.

23      Q.   Do you recall?

24      A.   I don't recall.  You

ESQUIRE DEPOSITION SERVICES

95                    LORRAINE T. ROBINS

1  realize, there were a lot of containers

2  moving around.

3      Q.   Let me show you a copy of a

4  document that's been marked Exhibit-35 to

5  the Emerald deposition.  Do you recognize

6  that?

7      A.   I remember -- I don't

8  recognize it, but I remember that they

9  had to have -- they had some sort of a

10  legal question they wanted settled.

11     Q.   Did you bill for equipment,

12  Emerald equipment, located at Illinois

13  Auto prior to May 13, 2002?

14     A.   I billed for it from May

15  8th, the day that I released it.  I sent

16  a letter to Illinois Auto and a copy to

17  Sea Star, releasing the equipment.

18         And the other was a problem

19  that they had to give them some sort

20  of -- I don't know whether it was

21  insurance or what have you.  But I do

22  have a letter that I released it on May

23  8th.  So I billed from Illinois Auto on

24  May 8th.

ESQUIRE DEPOSITION SERVICES

103                    LORRAINE T. ROBINS

1          MR. MOLDOFF:  Objection to

2      form.

3          THE WITNESS:  I don't know

4      what he meant.

5   BY MR. ARMSTRONG:

6      Q.   Do you recognize the

7   handwriting on that document?

8      A.   No, I don't.

9      Q.   Let me show you a copy of an

10  e-mail dated July 12, 2002 that I will

11  ask the court reporter to mark as

12  Exhibit-5 to this deposition.

13          - - -

14          (Whereupon, Exhibit Robins-5

15          was marked for identification.)

16          - - -

17  BY MR. ARMSTRONG:

18      Q.   This e-mail has some

19  underlinings on it that are not part of

20  the original.  Do you recognize this

21  e-mail?

22      A.   I don't recall.  I don't

23  really recall it.

24      Q.   Do you recall any

ESQUIRE DEPOSITION SERVICES

·104                    LORRAINE T. ROBINS

1    communications with anyone at Walt's

2    Drive Away regarding Emerald equipment?

3        A.  I don't recall.

4        Q.  Do you recall communications

5    with anyone at Pier West regarding

6    Emerald equipment?

7        A.  No.

8        Q.  What is Walt's Drive Away?

9        A.  It's a trucking company.

10       Q.   Is it a depot?

11       A.  I don't know if it's a

12   depot.

13       Q.   What is Pier West?

14       A.   Again, a trucking company.

15       Q.   Do you know whether it's a

16   depot?

17       A.   No, I don't.

18       Q.   Let me show you a copy of a

19   document, an e-mail together with

20   attachment that has been marked as

21   Exhibit-43 to the Emerald deposition.

22   Have you ever seen those documents

23   before?

24       A.   I've seen a document similar

110                    LORRAINE T. ROBINS

1      Q.   Have you ever gotten a list

2  of equipment that was in transit overland

3  as of April 26, 2002?

4      A.   No.

5      Q.   Have you ever --

6      A.   Because that would have all

7  been on the ships by then.

8      Q.   Have you ever gotten a list

9  of equipment, loads that had been

10  discharged from NPR vessels and was en

11  route to customers, as of April 26, 2002?

12      A.   No.  The only information I

13  had on discharge is if it was input by

14  Sea Star for the three-week period, from

15  April 27th to whenever they stopped using

16  the systems, because they would put in

17  the name of the customer and the load.

18      Q.   And have you ever requested

19  information from Holt oversight as to

20  equipment loads discharged from NPR

21  vessels prior to April 26, 2002 and in

22  route to customers on April 26, 2002?

23      A.   Pardon me?

24          - - -

ESQUIRE DEPOSITION SERVICES

112                    LORRAINE T. ROBINS

1    Exhibit-10 for identification.

2            - - -

3        (Whereupon, Exhibit Robins-10

4        was marked for identification.)

5            - - -

6    BY MR. ARMSTRONG:

7        Q.   Do you recognize that

8    document?

9        A.   No, I don't recognize it.

10       Q.   Let me show you a copy of a

11   document that's been marked as Exhibit-48

12   to the Emerald deposition.  Do you

13   recognize that document?

14       A.   No, I don't.

15       Q.   Do you know why Emerald

16   would be billing Sea Star for a unit that

17   was gate out Packer on April 22, 2002?

18       MR. MOLDOFF:  Objection to

19       form.

20       THE WITNESS:  I would have

21       to check it, but the -- I would

22       have to check it to see what the

23       load was, because -- I can't tell

24       you from this.  I would have to

ESQUIRE DEPOSITION SERVICES

113                    LORRAINE T. ROBINS

1        check it.

2    BY MR. ARMSTRONG:

3        Q.   As of April 22, 2002, any

4    load would have been an NPR load, would

5    it not?

6        A.   That's true, but they would

7    have gotten the -- the revenue would go

8    to Sea Star Line.

9        Q.   For this load?

10       A.   I don't know.  I have to

11    check it.  But all the revenue for the

12    last week went to Sea Star Line.

13       Q.   Who told you that?

14       A.   Bob Leach told me that.

15    Because I was having a problem, because

16    they -- the truckers had to be paid.  And

17    he guaranteed the payment of the truckers

18    for that week.

19       Q.   When you say that week --

20       A.   The week between whatever it

21    was and ending on April 26th.

22       Q.   When did you have this

23    conversation with Bob Leach?

24       A.   I don't know whether it was

            ESQUIRE DEPOSITION SERVICES

116                    LORRAINE T. ROBINS

1    Q.   I show you a copy of e-mails

2    that I will ask the court reporter to

3    mark as Exhibit-12 to this deposition.

4            - - -

5            (Whereupon, Exhibit Robins-12

6        was marked for identification.)

7            - - -

8    BY MR. ARMSTRONG:

9        Q.   Do you recognize that

10   document?

11       A.   I probably saw this before,

12   yes.  Do you have a specific question?

13       Q.   Yes, look at PRMZ 004250.

14   It states in part, "This unit originally

15   went out of Packer Avenue terminal late

16   March '02 for the account of NPR."

17       A.   Right.

18       Q.   "On May 11, 2002, it

19   delivered a loaded container to Port

20   Elizabeth via your carrier North Star.

21   Based on this information this chassis

22   should have been put on lease from

23   4/27/02 until same is returned in

24   accordance with lease agreement."

ESQUIRE DEPOSITION SERVICES

117                    LORRAINE T. ROBINS

1          Is that information that you

2     provided Port Elizabeth?

3          A.   Yes, I would have provided

4     that.

5          Q.   If the container, loaded

6     container, was delivered to Port

7     Elizabeth on May 11, 2002, what was the

8     basis for saying that this chassis should

9     have been put on lease from 4/27/02?

10         A.   Well, originally -- and I

11    had changed them all -- I was using the

12    wrong date.  It should be 4/29/02.  I

13    would have to check this and -- I know

14    it's been corrected to 4/29/02.  But the

15    other reasons, I would have to check it

16    and see what documentation I had.

17         But at that particular time

18    quite a few containers were delivered to

19    Newark or Port Elizabeth.  This is when Z

20    Star was using CSX Lines to take their

21    cargo up this way, down to Puerto Rico or

22    somewhere, I don't know where.

23         And again, I don't know what

24    kind of -- we had a Maersk gate log,

ESQUIRE DEPOSITION SERVICES

118                    LORRAINE T. ROBINS

1  probably, on this.  We didn't go into

2  that, though.

3      Q.  Can you tell from this

4  paragraph what information you had?

5      A.  No, I can't.  I know I had

6  Port Elizabeth, but I can't tell what

7  other information I had.  I had something

8  that had Sea Star touching the container

9  and using the container.  It was not

10  billed.

11      Q.  So if you found that Sea

12  Star touched the container --

13      A.  Used it, used it.

14      Q.  How did you determine

15  whether a container that Sea Star touched

16  was used by Sea Star?

17      A.  Well, look at the next one.

18      Q.  I'm asking you in general,

19  how did you make that determination?

20      A.  In general?

21      Q.  Yes.

22      A.  Again, with the

23  documentation that I had.

24      Q.  What documentation was that?

ESQUIRE DEPOSITION SERVICES

123                      LORRAINE T. ROBINS

1    A.   Mr. Davis took an inventory

2   of how the units were stacked around to

3   make the fence, at which time we did

4   inform Sea Star Line.  And I believe they

5   have since -- sometime in March or so,

6   broke down the fence.

7    Q.   March of what year?

8    A.   '03.

9    Q.   How did you learn that Sea

10  Star had broken down the fence in March

11  of '03?

12    A.   Mr. Davis was back in Puerto

13  Rico again.  I think that is the date.

14  I'm not positive, because he was there

15  again in July of '03.  It may have been

16  July of '03 rather than March.

17    Q.   Let me show you a copy of

18  e-mails that I will ask the court

19  reporter to mark as Exhibit-14 for

20  identification.

21            - - -

22    (Whereupon, Exhibit Robins-14

23    was marked for identification.)

24            - - -

ESQUIRE DEPOSITION SERVICES

124                        LORRAINE T. ROBINS

1   BY MR. ARMSTRONG:

2       Q.   Do you recall this e-mail?

3       A.   I don't recall the e-mail,

4   but I remember discussing it.

5       Q.   With whom did you discuss

6   it?

7       A.   With Arthur.

8       Q.   What discussion did you

9   have --

10      A.   About the container for the

11  AGA group.

12          The question?

13      Q.   Do you recall those e-mails?

14      A.   Not specifically, but I know

15  that I've read this e-mail before.

16      Q.   Look at the bottom of the

17  page, first reference is PRMC 170211.

18  Was that gate out Philadelphia?

19      A.   7/25.

20      Q.   4/25?

21      A.   4/25, yes.

22      Q.   That's 4/25/2002?

23      A.   Mm-hum.

24      Q.   To Roadway.  What is

ESQUIRE DEPOSITION SERVICES

125                    LORRAINE T. ROBINS

1  Roadway?

2      A.   Trucking company.

3      Q.   And then gate out, 5/7,

4  Elizabeth Roadway?

5      A.   Yes, it is gate out.

6      Q.   Then gate in, 7/26, Houston,

7  First Coast in your pool?

8      A.   Mm-hum.

9      Q.   Based on that information,

10  how would you determine that that chassis

11  should have been put on hire as of April

12  27, 2002?

13      A.   Based on the fact that -- I

14  would really -- I may have even more

15  information on it if I pulled up my

16  records, but based on the fact that

17  Roadway was a trucker that was used by

18  Sea Star, and Elizabeth was a port where

19  they had delivered quite a bit of cargo,

20  and Houston First Coast is definitely a

21  house carrier for them.

22      Q.   Are you saying that PRMC 170

23  211 was gate out Philadelphia on April

24  25, 2002, for Sea Star?

ESQUIRE DEPOSITION SERVICES

126                    LORRAINE T. ROBINS

1     A.   I imagine so, yes.

2     Q.   That was before the closing,

3   was it not?

4     A.   Yes, it was.  But it could

5   have been an empty box.

6     Q.   Was Sea Star using Emerald

7   equipment before the closing?

8     A.   On this one, I have to see

9   what load was with it.

10    Q.   Well, look at PRMC 170318.

11  Gate out Philadelphia 4/16 to CSX

12  Railroad.  Correct?

13    A.   Well, this had to be CSX

14  Railroad Systems, because I would have --

15  if you look at this move history, which

16  we did provide for you, you will see all

17  the various moves it had during that

18  period of time, until it finally ended up

19  in First Coast.

20    Q.   Gate out Philadelphia, on

21  April 16th, was 11 days before the

22  closing, wasn't it?

23    A.   It was.

24    Q.   And that would have been a

ESQUIRE DEPOSITION SERVICES

139    LORRAINE T. ROBINS

1    advised that he had -- that they had

2    equipment -- that Sea Star had equipment

3    at Shaw, and he's saying that he will do

4    what he can to sell the equipment to that

5    place to save them the expense of

6    bringing it back to port.

7        Q.    With respect to equipment

8    that he was selling, when did the

9    off-hire end or on-hire end?

10        A.    In this case it would be

11    when he sold it.

12        Q.    Was that true in every case?

13        A.    As long as it was Sea Star

14    equipment that was placed in depots by

15    Sea Star, it was true.

16        Q.    Would you take equipment off

17    hire if Arthur Davis asked Sea Star to

18    reserve the equipment for sale?

19        A.    No.

20            MR. MOLDOFF:  Objection to

21        form.

22    BY MR. ARMSTRONG:

23        Q.    You would not take it off

24    hire unless it was actually sold?

ESQUIRE DEPOSITION SERVICES

140                LORRAINE T. ROBINS

1     A.   Arthur never reserved for

2   sale.  He either sold it or he didn't

3   sell it.

4     Q.   Look at PRMZ 084059.  Gate

5   out JAX, 4/26/02.  That was before the

6   closing.  Correct?

7     A.   That was the day of the

8   closing.

9     Q.   The closing was on April 27,

10  2002 at three o'clock a.m., was it not?

11    A.   I don't think so.  I think

12  the funds changed hands on the 26th.

13    Q.   Where did you get that

14  information?

15    A.   I don't know.

16    Q.   Assume that 4/26/02 was the

17  day before the closing --

18    A.   It could have been an

19  in-transit load.  Because the last

20  vessel, the MAYAGUEZ, discharged on the

21  26th.  In all probability it was gate

22  out -- I would have to look at the report

23  on that.

24    Q.   It was gate in Shaw,

ESQUIRE DEPOSITION SERVICES

141                    LORRAINE T. ROBINS

1  7/26/02, per Andy Rooks?

2      A.   That was the inventory from

3  Andy Rooks that I spoke to you about, and

4  Shaw is a trucker that NPR never used.  I

5  believe he is a house carrier for Sea

6  Star Line.

7      Q.   And now, why would you

8  charge per diem for the period between

9  April 26, 2002 and July 26, 2002?

10     A.   Well, as I said to you

11  before, Mr. Armstrong, I wasn't aware of

12  the voyaging transit moves, so on this

13  particular one I would have gone back and

14  given them a credit for the 14th days

15  that -- if it was in transit, if it was a

16  load, I would have given them credit for

17  14 days when it was in transit.

18     Q.   And you would have assumed

19  that that piece of equipment was in Sea

20  Star's possession at the end of the 14th

21  days?

22     A.   Absolutely.

23     Q.   And that was the assumption

24  on which you based your revised billing?

ESQUIRE DEPOSITION SERVICES

142                    LORRAINE T. ROBINS

1    A.   If, in fact, I checked this

2  and it was a load discharged from the

3  MAYAGUEZ, who -- and it went out of the

4  terminal, which I should have more

5  information on, because most of my notes

6  were written right on the sheet, I would

7  have, yes.

8    Q.   On what sheet?

9    A.   The move history sheets.

10  Copies of those were given to you.

11    Q.   You show PRMC 151000 in Mr.

12  Davis' e-mail, gate in JAX, 4/26/02.  Is

13  that correct?

14    A.   Correct.

15    Q.   Gate in JAX would have been

16  gate into the NPR terminal.  Correct?

17    A.   That's correct.

18    Q.   Why would something that was

19  gate in JAX 4/26/02 be on Sea Star's

20  self-billing report?

21    A.   Well, it could have been a

22  load that went on this ship, because on

23  the 26th the ship was loading down there,

24  also.  Or the 27th.  I would have to

ESQUIRE DEPOSITION SERVICES

143                    LORRAINE T. ROBINS

1    check the records to see what else I had

2    -- what other documentation I had on this

3    chassis.

4         Q.   There is no other

5    information provided in this September

6    16, 2003 e-mail.  Is that correct?

7         A.   That's correct.  That

8    information would have been provided on

9    the billing.

10        Q.   I show you a copy of an

11   e-mail dated September 16, 2003.  I will

12   ask the court reporter to mark it as

13   Exhibit-21 for identification.

14            - - -

15            (Whereupon, Exhibit Robins-21

16       was marked for identification.)

17            - - -

18   BY MR. ARMSTRONG:

19        Q.   Do you recall receiving a

20   copy of that e-mail?

21        A.   I don't remember it

22   specifically, but I'm sure that I did.

23        Q.   Let me show you a copy of

24   some e-mails dated September 4, 9th and

ESQUIRE DEPOSITION SERVICES

145                     LORRAINE T. ROBINS

1          MR. MOLDOFF:  There is no

2    question pending.

3 BY MR. ARMSTRONG:

4          Q.   Let me show you a copy of an

5    e-mail that has been identified as

6    Exhibit-57 to the Emerald deposition.

7    Have you seen that before?

8          A.   No, I haven't.

9          Q.   Do you know whether you

10   charged per diem for Emerald equipment

11   moved by Sea Star from San Juan to

12   Jacksonville at Arthur Davis' request?

13         A.   That bill has not been paid

14   by Emerald as of yet.

15         Q.   Do you know whether Emerald

16   charged per diem for that?

17         A.   Oh, per diem?  No,

18   absolutely did not.  Not for the move.

19   We may have charged per diem for the

20   equipment if it was on hire prior to the

21   shipping.

22         Q.   When did you take it off

23   hire?

24         A.   When it was returned to

146                    LORRAINE T. ROBINS

1    Arthur Davis in San Juan.

2        Q.   You didn't take it off hire

3    when it entered the Sea Star terminal and

4    a TIR was signed?

5        A.   It was taken off hire when

6    it was given to Arthur with a TIR and he

7    signed it.

8        Q.   Who instructed you to do it

9    that way?

10       A.   Who instructed me?  Arthur

11   did.

12       Q.   Is that what Arthur did?

13       A.   Absolutely.

14       Q.   And that's what Arthur told

15   you to do?

16       A.   No.  You are mixing up what

17   I said.  What I said is the equipment was

18   taken off hire when Arthur signed the

19   TIRs.  Arthur gave me the copies of the

20   TIRs, which I attached to the -- when he

21   came back from Puerto Rico, which I

22   attached to the self-billing reports, and

23   that's when they went off hire.

24       Q.   Now, who told you to keep

ESQUIRE DEPOSITION SERVICES

147                    LORRAINE T. ROBINS

1  the equipment on hire until Arthur Davis

2  signed those TIRs?

3      A.   No one told me that.

4      Q.   You made that decision on

5  your own?

6      A.   No.  I made that decision

7  based upon the documentation I had for

8  each unit.  I did not say -- I may not

9  have billed all of them.  I can't tell

10  you.  I have to check the whole list.

11     Q.   You had read the redelivery

12  section of the equipment rental

13  agreement, had you not?

14     A.   Mm-hum, yes.

15     Q.   You were aware that Sea

16  Star's terminal in San Juan was a

17  designated terminal for redelivery?

18     A.   That's correct.

19     Q.   And you were aware that a

20  TIR signed by Sea Star in San Juan was a

21  redelivery document.  Correct?

22         MR. MOLDOFF:  Objection to

23     form.

24         THE WITNESS:  No, it was

ESQUIRE DEPOSITION SERVICES

148                    LORRAINE T. ROBINS

1    not, because it wasn't a

2    redelivery document unless a

3    representative from Emerald signed

4    it.  There was no notification

5    whatsoever on it.

6  BY MR. ARMSTRONG:

7      Q.   Now, show me in paragraph

8  ten the provision relating to the

9  requirement that a representative of

10  Emerald sign.

11      A.   Paragraph A.  From Puerto

12  Rico and -- I very rarely -- we didn't

13  get redelivery notices.

14          MR. MOLDOFF:  Objection to

15      form.

16  BY MR. ARMSTRONG:

17      Q.   It's a very simple question.

18  Show me the language in paragraph ten,

19  please.

20          MR. MOLDOFF:  You can tell

21      him whatever your understanding

22      is.

23          THE WITNESS:  It's my

24      understanding.

          ESQUIRE DEPOSITION SERVICES

157                    LORRAINE T. ROBINS

1  equipment, would there be any billings

2  for stipulated value?

3      A.   Not if they returned the

4  equipment.

5      Q.   Would there be any billings

6  for anything other than per diem on

7  equipment that Sea Star returned?

8      A.   That Sea Star returned?

9      Q.   Yes.

10     A.   No, there would not be.

11     Q.   In your calculation of the

12  Emerald equipment leasing invoice to Sea

13  Star, dated August 2003, 2004, you billed

14  for, in part, by category, for 40-foot

15  chassis not terminated as per lease

16  equipment and additional rent.  Do you

17  recall that?

18     A.   Yes, I do.

19     Q.   Does that reflect any

20  chassis that Sea Star returned to

21  Emerald?

22     A.   No, it does not.  If there

23  were returns later than that bill, they

24  were adjusted.

ESQUIRE DEPOSITION SERVICES

158                    LORRAINE T. ROBINS

1    Q.   And how were they adjusted?

2    A.   I would have to check it.

3    Q.   Was there any formula that

4    you used for calculating the adjustment?

5    A.   If, in fact, it was a Sea

6    Star return -- I have to see the bill.

7    Q.   I'm just asking whether

8    there was a formula that you used in

9    calculating adjustments.

10   A.   It depends on when it was

11   returned.

12   Q.   Would it be fair to say that

13   any unit that is shown as adjusted was a

14   unit that was returned?

15   A.   I think I gave the reason at

16   the bottom of the last page of that bill

17   that you are looking at, why it was

18   adjusted. I haven't seen that -- did I

19   not?

20   Q.   When you say that chassis

21   were recovered by an outside agency --

22   MR. MOLDOFF:  When she says

23   "where," what were you referring

24   to?

ESQUIRE DEPOSITION SERVICES

159                    LORRAINE T. ROBINS

1          MR. ARMSTRONG:  Would you

2     let me finish the question?

3          MR. MOLDOFF:  No.  I think

4     you should show her the document.

5  BY MR. ARMSTRONG:

6     Q.   Had Emerald appointed any

7  outside agency to recover chassis in San

8  Juan?

9     A.   There was an agent that was

10  working, recovering chassis in San Juan.

11     Q.   Who was that agent?

12     A.   Ariel -- I have to get his

13  name.

14     Q.   Is that his first name?

15     A.   That was his first name.

16  And he recovered quite a bit.  So on

17  those, what we would do is, we would

18  adjust the stipulated value and subtract

19  from that -- if we got, say, $1,000 for

20  the chassis when we sold it, after we got

21  it back, I would take that thousand

22  dollars off.  I would adjust it by that.

23          As far as the per diem

24  charges go, we are still waiting for an

ESQUIRE DEPOSITION SERVICES