UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| SEA STAR LINE, LLC, <br> a limited liability company, <br><br> Plaintiff, <br><br> -vs- <br><br> EMERALD EQUIPMENT LEASING, INC., <br> a corporation, <br><br> Defendant, <br><br> -vs- <br><br> SEA STAR LINE, LLC, <br><br> Counter-Defendant. | Civil Action No. 05-CV-245-JJF(LPS) |

## OBJECTIONS AND MOTION TO VACATE OR SET ASIDE
## MEMORANDUM ORDER REGARDING SANCTIONS

Without notice or hearing, Magistrate Judge Leonard P. Stark has issued a Memorandum Order (D.I. 213) awarding sanctions against an attorney representing Plaintiff/Counter-Defendant, SEA STAR LINE, LLC ("Sea Star"). EMERALD EQUIPMENT LEASING, INC. ("Emerald") filed no motion against the attorney; and none was — or ever had been — pending. Nonetheless, having "ordered the parties to brief whether Sea Star should be sanctioned." Magistrate Judge Stark "now rule[s] that Sea Star's attorney will be sanctioned." D.I. 213 at 2 & n.2.

## **OBJECTIONS**

Pursuant to 28 U.S.C. §636(b)(1)(A) and Fed. R. Civ. P. 72(a), Sea Star and Timothy J. Armstrong object on the following grounds:

1. The Magistrate Judge's Memorandum Order, imposing sanctions on an attorney representing Sea Star in the absence of a motion directed to the attorney, notice of hearing, and hearing is a fundamental violation of substantive and procedural due process. The Magistrate Judge's unilateral action exceeds his jurisdiction and authority under the United States Constitution, as well as governing federal statutes, Federal Rules of Civil Procedure, and Local Rules of the United States District Court for the District of Delaware.

2. The Magistrate Judge's factual findings relating to sanctions against the attorney representing Sea Star are clearly erroneous.

3. The Magistrate Judge's legal conclusions relating to sanctions against the attorney representing Sea Star are are contrary to law.

4. The Magistrate Judge's factual recitation and finding that Sea Star's production "was not fully consistent" and failed to comply with his order to furnish a "list identifying the five (5) largest trucking companies (by volume) used by Sea Star in the United States" and "copies of all invoices exchanged between Sea Star and those companies for services rendered between April 29, 2002 and September 30, 2002" are clearly erroneous.

5. The Magistrate Judge's legal conclusions that Sea Star's production "was not fully consistent" and failed to comply with his order to furnish a "list identifying the five (5) largest trucking companies (by volume) used by Sea Star in the United States" and "copies of all invoices exchanged between Sea Star and those companies for services rendered between April 29, 2002 and

September 30, 2002" are contrary to law.

    6.    The Magistrate Judge's factual finding that Sea Star "unilaterally revised my order" in identifying the five largest truckers by reference to "its account records, including payables and invoices, which show monetary volumes of business with vendors" — *e.g.*, trucking companies — are clearly erroneous.

    7.    The Magistrate Judge's legal conclusions that Sea Star "unilaterally revised my order" in identifying the five largest truckers by reference to "its account records, including payables and invoices, which show monetary volumes of business with vendors" — *e.g.*, trucking companies — are contrary to law.

    8.    The Magistrate Judge's *post facto* reliance on parol argument proffered by Emerald's attorney to create a definition of the term "volume", which had been omitted in the order "adopted...essentially verbatim from one that had been proposed by Emerald", is contrary to law.

    9.    The Magistrate Judge's factual assumptions on which he has based imposition of sanctions on Sea Star's attorney are clearly erroneous.

    10.    The Magistrate Judge's legal conclusions on which he has based imposition of sanctions on Sea Star's attorney are contrary to law.

    11.    Even assuming *arguendo* that the Magistrate Judge could impose sanctions on Sea Star's attorney, his factual determinations as to the amount of sanctions is clearly erroneous.

    12.    Even assuming *arguendo* that the Magistrate Judge could impose sanctions on Sea Star's attorney, his legal conclusions as to the amount of sanctions is contrary to law.

## MEMORANDUM

The Magistrate Judge ordered production of a "list identifying the five (5) largest trucking companies (by volume) used by Sea Star in the United States" and "copies of all invoices exchanged between Sea Star and those companies for services rendered between April 29, 2002 and September 30, 2002"; he "adopted this document essentially verbatim from one that had been proposed by Emerald ...." D.I. 213 at 2. Asserting that he "later learned what Sea Star produced was not fully consistent with what I had ordered", the Magistrate Judge stated:

> First, in identifying the five largest trucking companies it used, Sea Star did not rank the truckers "by volume", as my order required, but instead by dollar amount of the invoices Sea Star exchanged with the truckers. Second, the "invoices" Sea Star produced consisted just of the front pages of the invoices, without the supporting documentation that had been attached to the original invoices and which contained the information Sea Star knew Emerald was seeking. It is these two actions that I find sanctionable.
>
> More specifically with respect to how Sea Star was to determine the five largest trucking companies it used, there can be no doubt that what I intended was that the truckers be ranked by Sea Star by volume of the equipment moved, not by revenues.

D.I. 213 at 3. The Magistrate Judge's factual allegations and assertions are clearly erroneous; his legal conclusions are contrary to law.

The Magistrate Judge's rewriting of the original production order for purposes of sanctions is impermissible. According to the Magistrate Judge, his "order unambiguously required that the truckers be identified 'by volume'" and that Sea Star produce "copies of all invoices exchanged between Sea Star and those companies for services rendered between April 29, 2002 and September 30, 2002." D.I. 213 at 2, 5. Now he contends that Sea Star "unilaterally revised my order" in identifying the five largest truckers by reference to "its account records, including payables

and invoices, which show monetary volumes of business with vendors" — *e.g.*, trucking companies. D.I. 213 at 4-5.[1]

Prepared and maintained in the ordinary course of business, the accounting records relating to revenue volumes enabled Sea Star to identify the five largest trucking companies and to retrieve concomitant invoices. Sea Star was unaware the Magistrate Judge might have intended that "volume" have a unique meaning. Sea Star did not maintain "volume" records as to "number of loads moved and equipment pieces involved" [D.I. 184 at 2] for the period in question. The third-party invoices demanded by Emerald represented truckers' charges for equipment moved, not number of pieces or "amount of equipment moved." D.I. 213 at 5.

Sea Star identified the five largest trucking companies in compliance with the Magistrate Judge's order. Although his order "unambiguously required that the truckers be identified 'by volume'" but does not define "volume", the Magistrate Judge opines "there can be no doubt that what I intended was that the truckers be ranked by Sea Star by volume of the equipment moved, not by revenues." D.I. 213 at 3. He also contends that "[t]o the extent anyone could doubt that 'volume' referred to equipment, and not to money, any such uncertainty was clarified by Emerald's counsel's statement during the December hearing ...." D.I. 213 at 5.

The Magistrate Judge's conclusions beg questions: If the Magistrate Judge "later granted" a request by Emerald's attorney that "by volume" means "not by the dollar amount, but by the amount of the equipment moved", why is this definition not in his order? On what legal and

---

[1] Prior to issuance of the Magistrate Judge's production order, Sea Star's attorney had questioned what identifying "the five truckers by volume" and producing "all of this information" demanded by Emerald would "add to Exhibit G of the [Emerald] reply" but received no answer. D.I. 158 at 80; D.I. 213 at 3-4.

factual bases may the Magistrate Judge decide that "any such uncertainty was clarified" by opposing counsel's prior assertion as to his desires, if he did not incorporate the provision into the order? "[I]f Sea Star thought discovery should be limited to its largest truckers as ranked by financial factors [revenue or monetary volume], rather than by volume [number of pieces] of equipment used in transport", what are the factual and legal bases for the Magistrate Judge's conclusion that Sea Star "should have raised this point with me long before it did"? D.I. 213 at 9 n.4.

Likewise, Sea Star produced "copies of all invoices exchanged between Sea Star and those companies for services rendered between April 29, 2002 and September 30, 2002" in compliance with the Magistrate Judge's order. During the December 20, 2007 hearing, Emerald's attorney stated: "But the client has said, you know what, if we could get the trucker invoice, that will list the chassises (*sic*)." D.I. 158 at 47; D.I. 1908 at 9; D.I. 213 at 6. The Magistrate Judge then said to Sea Star's counsel: "And it just so turns out that your invoices or other documents happen to delineate some of that equipment," to which he responded: "Right." D.I. 158 at 51; D.I. 213 at 6.[2] Subsequently Emerald's attorney reiterated: "We would like the invoices, which will show us...the chassises (*sic*) by which all of those containers, whether they were Emerald containers or not moved." D.I. 158 at 69; D.I. 213 at 6.

When Sea Star retrieved the accounting files from storage and made them available for review, Emerald opted to obtain copies of the trucking companies' invoices. D.I. 187 at 5-7. Sea

---

[2] In fact, Sea Star had produced thousands of the "other documents" relating to equipment moves before the Magistrate Judge issued the original production order. These include equipment interchange receipts ("TIRs"), as well as gate receipts, logs, and other records received from third-party depots. An equipment interchange receipt "is a document that the parties execute to show that a piece of equipment was delivered or seized." EEL 1 108. In the Equipment Rental Agreement, the "equipment interchange receipt" would be a "TIR." EEL 1 114-15; Holt 120; EEL 1 115. Equipment interchange receipts – or TIRs – are not invoices.

Star personnel spent countless hours separating, copying, and producing 5870 invoices received by Sea Star for services rendered during the relevant period. Contrary to its attorney's representations, however, Emerald's representatives found the single-page truckers' invoices do not list chassis.[3] They demanded "the other documents **with** the trucker invoices which show all the equipment used, including chassis." D.I. 184-3 at 5 (emphasis added). Rather than raise issues, Sea Star sent seven boxes of original accounting files to Wilmington for Emerald's inspection. The files contain not only the invoices previously copied by Sea Star but also the other materials furnished by these truckers to evidence their services. D.I. 187 at 8-11.

Nonetheless, the Magistrate Judge found that "Sea Star's counsel had to have understood that the whole point for seeking production of the invoices was to permit Emerald to identify which equipment had been used by Sea Star, including which chassis." D.I. 213 at 5. This accusation ignores not only Emerald's the misrepresentations and the explicit terms of its proposed production order, which the Magistrate Judge adopted "almost verbatim", but also Sea Star's prior production of thousands of documents, such as trailer interchange receipts ("TIRs") that identify cargo equipment, including chassis, transported by truckers. Furthermore, if Sea Star's counsel had understood that the whole point for seeking production of the invoices was actually to obtain documents other than invoices, Sea Star certainly would not have wasted the time and money necessary to retrieve, separate, copy, and produce 5870 trucking company invoices received approximately five and one-half years before the Magistrate Judge ordered production. Sea Star

---

[3]Their surprise is inexplicable. Having both operated and hired trucking companies for many years, Emerald representatives presumably have been aware that a trucker's invoice may identify only a particular cargo unit, such as a container or trailer, transported for a customer, not a chassis or other equipment used by the trucker.

could have produced the stored files pursuant to Fed. R. Civ. P. 34(b)(2)(E).

The Magistrate Judge's rationale for concluding that Sea Star's production of invoices violated his order is contradictory: In the same sentence, he accuses Sea Star of producing only "the front pages of the invoices" and of failing to produce the "supporting documentation that had been attached to the original invoices." D.I. 213 at 3.[4] Further, he states: "If, as apparently turned out to be the case, the equipment was not identified on the first page of the invoices but only on documents attached to the invoice, then the attached supporting documents should also have been produced." D.I. 213 at 5. Predicated on Emerald's abandoned allegations, the Magistrate Judge's suppositions as the what "apparently turned out to be the case" contravene empirical evidence. He cannot cite or quote any order that Sea Star provide "supporting documents", whether "attached" or merely "interspersed". D.I. 189 at 7. That the Magistrate Judge may "fundamentally disagree with [Sea Star counsel's] view that the invoices were just the first page" is incorrect and immaterial. D.I. 187 at 7; D.I. 213 at 6. Even as he made the comment, he knew that the "issue is behind you", D.I. 187 at 7, because Sea Star had made the original boxes available for Emerald's inspection (and Emerald has inspected the boxes) before Emerald filed its discovery motion.

---

[4] After the May 6 telephonic conference, even Emerald abandoned the notion that the invoices copied and produced by Sea Star are only "the front page of the invoices" or "partial invoices" but complained: "When the documents were produced, the invoices were interspersed with the underlying documents and which were in many instances attached thereto, making clear that Sea Star had gone to the extra trouble in its initial production of making sure only the single page invoices were copied without the accompanying documents." D.I. 189 at 7. Applying the accepted definition of the term normally would preclude misunderstanding and facilitate compliance with Emerald's instructions to identify and copy invoices in voluminous files. However, Emerald inexplicably determined that Sea Star's "single page invoice production relying on a Black's Law Dictionary definition of the word 'invoice'" is a "hyper technical focus on 'words', rather than 'substance'." *Id.*

Moreover, the Magistrate Judge's present pronouncement as to "what was understood by me and what was intended at the hearing and what was intended by my order were the invoices plus the stuff that would be attached to it, of course, I didn't know it would be physically attached, but the stuff that would show the chassis, which was the whole point" [D.I. 187 at 7; D.I. 213 at 6-7] certainly is not a legitimate justification for *post facto* revision of the order or evaluation of compliance, much less imposition of sanctions. In fact, "the stuff that would show the chassis" was not necessarily among materials that truckers furnished with their invoices. Sea Star explained and the records reviewed by Emerald reveal the five trucking companies submitted documents they deemed necessary to substantiate their billings to Sea Star for transportation services: in addition to invoices, one trucking company furnished copies of TIRs; others provided documents such as booking notes, which contain little or no information as to equipment. D.I. 186 at 2; D.I. 187 at 8. An invoice may identify a container transported but not a chassis or other equipment used. Documents accompanying an invoice may or may not specify equipment that a trucker used during movements. D.I. 190 at 7.

The chronology of events and results of the "Baxter test" further undermine the Magistrate Judge's conclusions. When the Magistrate Judge issued his original production order, Sea Star timely filed an Objection and Motion to Set Aside Magistrate's Memorandum Order and a Motion to Extend Time. D.I. 160; D.I. 165; D.I. 169. On February 21, 2008, this Court overruled Sea Star's objections and denied its Motion to Set Aside. D.I. 176. The March 3, 2008 Memorandum Order ordered production of documents within ten days. D.I. 177. Sea Star promptly complied.

After receiving Sea Star's production of documents, Emerald's attorney indicated that

he might have some concern with its methodology for volume determination. On March 19, 2008, he wrote:

> My understanding, based on what was disclosed during the deposition yesterday is that Sea Star made a determination of the five largest truckers (by volume) used by Sea Star in the United States, based on the dollar volume of the invoices as opposed to number of loads moved and pieces of equipment involved, which as you know, is really what is at issue in this case. We reserve the right to further address this issue after our analysis of the documents.

D.I. 184-3 at 2. Later, Emerald's attorney acknowledged that he "thought maybe there is some correlation between the dollar amount and the volume in terms of moves and equipment ...." D.I. 187 at 14. If the attorney had objected to the procedure for identifying the five largest truckers, Sea Star would have sought a ruling.

Instead, in contravention of Fed. R. Civ. P. 37(a)(5)(A)(I), Emerald's April 30, 2008 letter [D.I. 184] became its vehicle "to further address the issue." Of the 5870 invoice copies and numerous other documents produced by Sea Star, Emerald alleged that "approximately 500 trucker invoices" disclose "Sea Star's use of Emerald's equipment," that "approximately 223 of these invoices included Emerald chassis which were never shown on Sea Star's self-billing reports," and that "approximately 28 of the chassis which appeared on the trucker invoices involved Emerald equipment which Emerald had not previously identified as equipment used by Sea Star and now must be added to Emerald's claim." D.I. 184 at 3.[5] In other words, the April 30 letter indicates that Emerald might make new claims for chassis comprising less than ½% of the equipment involved in

---

[5]Emerald's Memorandum in Support of Request for Sanctions against Sea Star Line, LLC replaced reference to "approximately 28 of the chassis" in its April 30, 2008 letter, with "a number of additional pieces of Emerald equipment used by Sea Star for which Sea Star has not paid rent." D.I. 189 at 10.

the trucking company invoices.

Several days later, Emerald expanded its accusations from alleging that "only about 20% of the invoices in question had the requested backup documentation" to alleging that "[o]nly about 20% of the invoices produced by Sea Star had any underlying documentation." D.I. 184 at 2; D.I. 189 at 7 n.3. Having had ample opportunity to examine and copy original files, Emerald's misrepresentation that 80% of the invoices lack "any underlying documentation" is unfounded and unjustifiable. D.I. 187 at 10-11; D.I. 190 at 7.

During the May 6, 2008 telephonic conference, Emerald's attorney complained that one of the five largest trucking companies that provided and invoiced Sea Star for transportation services is "not even a trucker". D.I. 187 at 16. "[T]his is what my client says, I have never heard them say, No, that's not right." D.I. 187 at 16. Rather than "have a trial on whether or not these are the five largest", he told the Magistrate Judge:

> I suggested that we be permitted to designate two other truckers and say, rather than let them use the discretion to tell us which are the truckers, we will pick two truckers, and they have given me the names of two truckers, if Your Honor would entertain such a request, and say, Fine, send us the invoices **with the backup** for these two other truckers ....

D.I. 187 at 16-17 (emphasis added). Emerald's attorney agreed with the Magistrate Judge that "that plus what you already received would be sufficient, given the circumstances." D.I. 1870 at 17. Allowing no argument or evidence, the Magistrate Judge ordered Sea Star "to produce the documentation with respect to Palmer Trucking and Aqua Gulf", the two additional entities designated by Emerald. D.I. 187 at 22.

Pursuant to an order issued on May 7, 2008 [D.I. 188], Sea Star produced the Palmer

Trucking and Aqua Gulf documents. Between April 29 and September 30, 2002, Palmer Trucking's principal relationship with Sea Star was as a provider of depot, repair, and shuttle services. Aqua Gulf's primary relationship with Sea Star was as a non-vessel-owning-common-carrier, a shipper for which Sea Star carried cargo. In Emerald terminology, Aqua Gulf would have been "not even a trucker". See D.I. 187 at 16. Like Caribbean Shipping Services Inc., Aqua Gulf billed Sea Star for trucking yet is known in the industry for other services as well. D.I. 184 at 2. Neither of Emerald's chosen truckers furnished trucking services comparable in monetary volume or cargo moves with the five truckers that Sea Star identified. Their billings and other materials reaffirm the common-sense correlation between the truckers' monetary charges and equipment moves for Sea Star. D.I. 190 at 10-11.

If the proof is in the production, Emerald failed the Magistrate Judge's version of Baxter test miserably. Sea Star spent innumerable hours and thousands of dollars to locate, package, and produce documents to comply with the Magistrate Judge's production orders. In addition to the 5870 invoices initially furnished, Sea Star provided ten boxes of original files and numerous other documents for Emerald's examination. At Emerald's direction Sea Star's counsel arranged for copies of 8740 documents. Approximately forty new claims received by Sea Star from Emerald refer to copied and Bates-stamped truckers' documents; these claims total in the $20,000 - $25,000 range.

In its Memorandum in Support of Request for Sanctions against Sea Star Line, LLC [D.I. 189], Emerald predicated its claims for professional fees on Fed. R. Civ. P. 37(a)(4)and(5) and Fed. R. Civ. P. 37(b). In regard to sanctions, the Supreme Court has stated:

> Rule 37(b)(2) contains two standards - one general and one specific - that limit a district court's discretion. First, any sanction must be "just"; second, the sanction must be specifically related to the particular "claim" which was at issue in the order to provide

discovery.

*Insurance Corp. of Ireland, Ltd. v. Compagnie de Bauxites de Guinee*, 456 U.S. 694, 707 (1982).

Although Emerald had not moved for sanctions against Sea Star's attorney, the Magistrate Judge nonetheless decided to impose such sanctions. Unquestionably, the Magistrate Judge afforded Sea Star's attorney neither notice nor an opportunity to be heard before issuing his sanctions order. Thus, the order is invalid. Fed. R. Civ. P. 37(a)(5)(A).

Furthermore, the Magistrate Judge relies on assumptions that are unsupported and, in fact, contradicted by the record evidence and applicable law:

> 1. "Mr. Armstrong is personally responsible for Sea Star's decisions to identify truckers by dollar amounts rather than volume and to produce only the first pages of the invoices without supporting documentation."
>
> 2. "Mr. Armstrong's interpretations of 'volume' and 'invoice' were plainly willful, as he himself explained."
>
> 3. "Emerald's counterclaims are 'meritorious' in the sense that Emerald will prevail in the upcoming trial if it can prove the truth of its allegations."
>
> 4. "The prejudice Emerald has suffered include the increased expenditure of legal fees, the delay in receiving relevant and responsive documents, and the frustration in having to argue and fight with Sea Star for materials that should simply be produced."

D.I. 213 at 8. The Magistrate Judge had held no evidentiary hearing regarding the invoices and other documents produced by Sea Star, choosing instead to rely on self-serving hearsay and double hearsay proffered by Emerald's attorney. D.I. 158 at 47; D.I. 187 at 15-17; D.I. 190 at 14; D.I. 213 at 6.

The Magistrate Judge has failed to sustain his burden of proving that Sea Star's

attorney violated a duty to afford discovery ordered by this Court. *See, e.g., Saudi v. Acomarit Maritimes Servs., S.A.*, 114 Fed. Appx. 449, 456 (3d Cir. 2004), *Cert. denied*, 544 U.S. 976 (2005). The issue is not what the Magistrate Judge subjectively thinks Sea Star's attorney should have "understood" about what he meant or intended to say, but what his production order objectively stated. D.I. 213 at 3, 5. Indisputably Sea Star provided the "list identifying the five (5) largest trucking companies (by volume) used by Sea Star in the United States" and "copies of all invoices exchanged between Sea Star and those companies for services rendered between April 29, 2002 and September 30, 2002". D.I. 160 at 7; D.I. 213 at 2.

Of course, Sea Star's attorney participated in the effort to identify the five largest truckers by monetary volume of services invoiced by trucking companies during the relevant period; for the Magistrate Judge specifically ordered production of copies of their invoices. When Emerald decided to obtain copies of the five largest trucking companies' invoices, rather than review the files Sea Star had retrieved from storage, Sea Star personnel spent countless hours separating, copying, and producing the 5870 invoices received by Sea Star for services rendered during the relevant period. Sea Star produced the single-page invoices, not "only the first pages of the invoices." Responding to Emerald's subsequent demands, Sea Star also packed and sent the original accounting files, as well as voluminous other materials. That the Magistrate Judge may "fundamentally disagree with [Sea Star counsel's] view that the invoices were just the first page" is incorrect and immaterial. D.I. 187 at 7; D.I. 213 at 6. In any event, he recognized that the "issue is behind you." D.I. 187 at 7. Since Sea Star voluntarily had provided the materials without court action [D.I. 213 at 9], Rule 37(a)(5)(A) prohibits the Magistrate Judge from ordering any payment. Fed. R. Civ. P. 37(a)(5)(A).

The Magistrate Judge's parol interpretations of "volume" and "invoice" are unusual.

Among dictionary definitions of "volume" are "mass or quantity" and "amount". An example of "amount" is "volume of sales". *Webster's Encyclopedic Unabridged Dictionary of the English Language* at 1600 (1989). Utilization of revenue or monetary volume to identify the five largest truckers providing services to Sea Star certainly comports with the accepted definition of the term. An "invoice" is a well-defined commercial term — *i.e.,* "[a]n itemized list of goods or services furnished by a seller to a buyer." *Black's Law Dictionary* at 833 (7 ed. 1999). Nevertheless, the Magistrate Judge finds fault in Sea Star references to a dictionary definition responsive to earlier Emerald arguments that Sea Star copied only the "first pages of the invoices" and provided only "partial invoices" received from the five largest trucking companies. D.I. 213 at 6; D.I. 184 at 1; D.I. 186 at 1; *see* n.4 *supra*. Why reference to dictionary definitions concerns the Magistrate Judge remains unexplained. *See, e.g., United States v. Santos,* ___ U.S. ___, ___, 128 S.Ct. 2020, 2024 (2008). Ostensibly he also has confused and conflated "Sea Star's 'invoices'" with the third-party truckers' invoices that Sea Star produced pursuant to his order. D.I. 213 at 6; *see* D.I. 158 at 80.

This Court, not the Magistrate Judge, will decide whether or what aspects of "Emerald's counterclaims are 'meritorious' in the sense that Emerald will prevail in the upcoming trial if it can prove the truth of its allegations." *See* Tr. 2:58-58; D.I. 203. Moreover, Sea Star's Motion for Partial Summary Judgment on the Amended Counterclaim is pending. Under the circumstances the Magistrate Judge is not in a position to determine the legal or factual merits of Emerald's counterclaims.

Aside from reviewing self-serving correspondence and argument by Emerald's attorney, the Magistrate Judge has no basis for finding and concluding that alleged "prejudice Emerald has suffered include the increased expenditure of legal fees, the delay in receiving relevant

and responsive documents, and the frustration in having to argue and fight with Sea Star for materials that should simply be produced." Even assuming an inadvertent violation of the original production order occurred, appropriate weighing of requisite factors would not sustain an award of sanctions. *E.g., Flaherty v. M.A. Bruder & Sons, Inc.*, 202 F.R.D. 137, 141-42 (E.D. Pa. 2001. Furthermore, Sea Star voluntarily provided the materials without court action [D.I. 213 at 9], and Rule 37(a)(5)(A) prohibits the Magistrate Judge from ordering payment. Fed. R. Civ. P. 37(a)(5)(A).

The Memorandum Order "deploys the logic of the Queen of Hearts, substituting [his] desires for the plain text" of his earlier production order. *New Jersey v. E.P.A.*, 517 F.3d 574, 582 (D.C. Cir. 2008); *see In re LTV Steel Co.*, 299 B.R. 863 (N.D. Oh. 2003). No one has questioned that the Magistrate Judge "makes the call". D.I. 213 at 9 n.4. Having done so, however, he is not entitled to recast a written order to comport with his subjective meaning or intent or to mischaracterize Sea Star's volume determination as a "monetary approach", as distinguished from "the Court-ordered volume approach." D.I. 213 at 9 n.4. The Memorandum Order discloses no effort to differentiate the two volume approaches or to refute the "common-sense correlation between the truckers' monetary charges and equipment moves" inherent in Sea Star's utilization of monetary or revenue volume. D.I. 190 at 11; D.I. 213 at 9 n.4. In *Ali v. Sims*, 788 F.2d 954, 957 (3d Cir. 1986), a case cited by the Magistrate Judge, the Third Circuit determined that a district court abused its discretion in imposing sanctions and set aside a money judgement that flowed from it.

Even if the Magistrate Judge had established the essential predicates for sanctions, his award clearly is unreasonable. Emerald sought the imposition of attorney's fees related to the objections to the December 28, 2007 Memorandum Order, the May 6, 2008 teleconference with the Court, preparation of the sanctions motion, and $5,000 for unspecified work in May 2008. As the

Magistrate Judge has noted, sanctions would not be awardable simply because Sea Star did not prevail in objecting to the Memorandum Order. D.I. 213 at 8 n.3. Furthermore, many issues raised by Emerald in connection with the May 6 teleconference were really "non-issues", resolved by Sea Star's representation regarding its prior production. The time included by Emerald also involves discussions with opposing counsel concerning discovery issues. To sanction a party for participating in efforts to resolve discovery disputes would be inappropriate. Fed. R. Civ. P. 37(a)(5)(A). Emerald's fee request also includes time spent in responding to Sea Star's discovery requests. D.I. 183; D.I. 187 at 28-44. There is no allegation, let alone a basis to find, that Sea Star's requests regarding Emerald's discovery deficiencies should subject Sea Star's attorney to sanctions. Manifestly the Magistrate Judge failed to take any of these factors into account. *See* D.I. 213 at 8 & n.3.

## CONCLUSION

In the legal, factual, and procedural context of this case, the Magistrate Judge has failed to show that Sea Star's attorney violated his Memorandum Order [D.I. 160] and that Emerald is entitled to sanctions. Therefore, Sea Star and Timothy J. Armstrong respectfully request that the Court sustain their objections and vacate or set aside the Magistrate Judge's Memorandum Order [D.I. 213].

September 11, 2008                                SMITH, KATZENSTEIN & FURLOW LLP

                                                  /s/Kathleen M. Miller
                                                  Kathleen M. Miller (I.D. No. 2898)
                                                  800 Delaware Avenue, 10th Floor
                                                  P.O. Box 410
                                                  Wilmington, DE 19899
                                                  Telephone: 302-652-8400
                                                  Facsimile: 302-652-8405
                                                  E-mail: Kmiller@skfdelaware.com

OF COUNSEL:
Timothy J. Armstrong
Armstrong & Mejer, P.A.
2222 Ponce de Leon Boulevard
Penthouse Suite
Miami, FL 33134
Telephone: 305-444-3355