```
              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF DELAWARE

SEA STAR LINE, LLC, a limited    :
liability company,               :
                                 :
             Plaintiff,          :
                                 :
        v.                       :  Civ. Act. No. 05-245-JJF
                                 :
EMERALD EQUIPMENT LEASING, INC.,:
a corporation,                   :
                                 :
             Defendant.          :
```

Timothy J. Armstrong, Esquire of ARMSTRONG & MEJER, P.A., Miami,
Florida.
Kathleen M. Miller, Esquire of SMITH, KATZENSTEIN & FURLOW, LLP,
Wilmington, Delaware.

Attorneys for Plaintiff.

Gary M. Schildhorn, Esquire and Alan I. Moldoff, Esquire of
ADELMAN LAVINE GOLD AND LEVIN, A Professional Corporation,
Philadelphia, Pennsylvania.
Ronald S. Gellert, Esquire; Tara L. Lattomus, Esquire and
Margaret F. England, Esquire of ECKERT SEAMANS CHERIN & MELLOTT,
LLC, Wilmington, Delaware.

Attorneys for Defendant.

**O P I N I O N**

September 19, 2008
Wilmington, Delaware

Joseph J. Farnan Jr.
Farnan, District Judge.

## INTRODUCTION

This action was brought by Plaintiff, Sea Star Line, LLC ("Sea Star") against Defendant, Emerald Equipment Leasing, Inc. ("Emerald") seeking a declaratory judgment as to rights and liabilities under two documents: (1) an Equipment Rental Agreement dated July 31, 2002 (the "Rental Agreement"), and (2) an Order Authorizing Sale of the NPR Assets Free and Clear of all Liens, Claims and Encumbrances dated April 26, 2002 (the "Sale Order"). (D.I. 1.) Sea Star also claims damages based on breaches of maritime contracts, open account sums owed, and goods and services provided. (See D.I. 1 at 13-15, Counts II-IV.)

Emerald has advanced several counterclaims against Sea Star in an Amended Counterclaim. (D.I. 79.) The Court bifurcated trial on Sea Star's declaratory judgment claims and Emerald's Amended Counterclaim, and held a two-day bench trial on Sea Star's declaratory judgment claims on July 7-8, 2008, with a few additional hours of testimony taken on July 22, 2008, to accommodate a witness who could not appear earlier. This Opinion constitutes the Court's Findings of Fact and Conclusions of Law on the issues tried before the Court.

## BACKGROUND

On March 1, 2004, Sea Star filed its Complaint against Emerald in the United States District Court for the Middle

1

District of Florida (the "Florida District Court").  Unaware of
Sea Star's filing, Emerald, as a debtor-in-possession in a
pending Chapter 11 in the Bankruptcy Court in this District,
filed an adversary proceeding against Sea Star on March 17, 2004,
asserting claims based on the Equipment Rental Agreement for (1)
post-petition account receivable/breach of lease, (2) post-
petition quantum meruit, (3) turnover/conversion, and (4)
accounting.

     The Bankruptcy Court dismissed without prejudice Emerald's
adversary action based upon the "first filed rule."  However, the
Florida District Court concluded that this case should be
transferred to Delaware, in light of, among other things,
Emerald's Chapter 11 filing.

     Upon transfer to this Court, Emerald filed an Answer,
Affirmative Defenses and Counterclaim.  The Court dismissed
portions of the Counterclaim and granted Emerald leave to amend.
Emerald filed an Amended Counterclaim, and Sea Star filed an
Answer and Affirmative Defenses.  Pretrial proceedings regarding
the Amended Counterclaim were referred to Magistrate Judge Stark,
including adjudication of a Motion For Partial Summary Judgment
On The Amended Counterclaim filed by Sea Star.  Trial on the
Amended Counterclaim will commence following the adjudication of
Sea Star's Motion.

**DISCUSSION**

## I. FINDINGS OF FACT

### A. The Parties and Other Relevant Entities Generally

Sea Star is a Delaware limited liability company headquartered in Jacksonville, Florida, and engaged in the ocean transportation of cargo, primarily between the United States mainland and Puerto Rico. To effectuate this transportation, Sea Star uses several types and sizes of containers, chassis and gen sets. As of April 2002, Sea Star owned or leased approximately 6,500 pieces of cargo equipment. The Chief Financial Officer of Sea Star is Robert Leetch.

Emerald is a Chapter 11 debtor-in-possession with several affiliates including NPR, Inc. ("NPR"), an ocean carrier, and Holt Cargo Systems, Inc. ("Holt"), who are also debtors-in-possession. Emerald's sole stockholder and president is Thomas Holt, Sr. Thomas Holt, Sr. was also the owner and president of NPR. Mr. Holt's son, Thomas Holt, Jr. is the owner and president of Greenwich Terminals LLC ("Greenwich"). MBC Leasing Corp. ("MBC") is a secured lender for Emerald.

### B. The Purchase Money Loan Between Emerald and MBC and the Related Assignment Of Emerald Equipment Lease Agreements with NPR and Holt Cargo to MBC

In 1997, Emerald obtained a $35 million loan from MBC to purchase equipment from NPR and Holt. In exchange, Emerald granted MBC a security interest in all the purchased equipment,

3

together with accounts, contract rights, and other general intangibles arising from the equipment. Emerald functioned as a lessor of cargo transportation equipment such as containers, chassis and gen sets, for its affiliates and co-debtors, NPR and Holt. Emerald also assigned to MBC the Equipment Lease Agreements dated November 18, 1997, that it had entered into with NPR and Holt, as lessees.

C. The Sea Star-NPR Asset Purchase and Sale Order Issued By The Bankruptcy Court Authorizing The Asset Purchase

In April 2002, Mr. Holt, Sr., on behalf of Emerald, sent Mr. Leetch of Sea Star, a letter proposing a lease/purchase of the entire fleet of equipment, which Emerald previously leased to NPR. Sea Star ultimately did not purchase or lease Emerald's entire fleet of equipment.

During this same time, Sea Star had entered into an Asset Purchase Agreement, as amended, with NPR and other affiliates of Emerald. After the Asset Purchase Agreement was consummated, NPR intended to cease operations, and therefore, arrangements needed to be made to ensure that cargo would not be stranded in its various stages of transit ("Shipments in Transit") between points of origin and destination. Shipments in Transit might be at shippers' locations in the process of loading, or in loaded containers dispatched by NPR, onboard NPR vessels, in terminal or depots, or in the possession of truckers or railroads for inland

4

transport to consignees.  Thus, Shipments in Transit would not only involve containers, but also chassis and gen sets.

To alleviate concerns about the Shipments in Transit, Sea Star and NPR agreed to a Memorandum which delineated payment and claim procedures for cargo Shipments in Transit.  Because actual costs for completion of the shipping process and actual cargo volumes could not be ascertained with certainty before the fact, NPR personnel developed volume and rate estimates using a blended rate for containers and chassis based on a fourteen-day average turnaround time for equipment in Puerto Rico.  NPR and Sea Star then established reimbursement procedures to be used if a party's actual costs exceeded the estimated expenses to complete the Shipments in Transit, and those actual costs were to be invoiced and substantiated.

Because of Emerald's pending bankruptcy, NPR sought the Bankruptcy Court's approval for the proposed asset sale.  NPR's counsel also presented to the Bankruptcy Court the parties' agreement for the treatment of Shipments in Transit.  Attorneys for MBC and Emerald objected to the proposed asset sale expressing concerns over the payment obligations for equipment leased by NPR that would be involved in the Shipments in Transit and for storage charges that Sea Star might impose on Emerald and MBC equipment.  The Bankruptcy Court overruled the objection, but

preserved any arguable rights of equipment lessors against the sale proceeds.

On April 26, 2002, the Bankruptcy Court entered the Sale Order authorizing Sea Star's acquisition of the specified NPR assets. In so doing, the Bankruptcy Court found:

> The sale of assets does not amount to a consolidation, merger, de facto merger or similar restructuring of either or both of the Buyer and the Debtor.
>
> Buyer is only buying the Purchases Assets and is not a successor in interest to Debtors, nor does Buyer's acquisition of the Purchased Assets reflect a substantial continuation of the operations of the Debtors' business.

(Exh. 6 at 3-4, ¶ 15, 16.) Because Sea Star did not assume the Equipment Lease Agreement dated November 18, 1997, between Emerald, NPR and Holt as part of the Asset Purchase Agreement, the Sale Order further provided:

> [T]o the extent that any equipment of Emerald Equipment Leasing, Inc. ("Emerald"), or any other lien or lessor creditor whose property is not being sold or transferred to Buyer, is located on property sold or assigned to Buyer under the Asset Purchase Agreement, the Buyer shall cooperate in allowing Emerald . . . to remove such property during normal business hours as long as such removal will not unreasonably disrupt operations of the Buyer. In addition, the Buyer shall cooperate in removing any such equipment from Vessels in transit and store such equipment on leased premises as the final port of destination, to the extent such final destination is a leased premises sold and assigned to the Buyer under the Asset Purchase Agreement . . . .

\* \* \*

6

> Except as expressly provided in the Asset Purchase Agreement, Buyer has not assumed or otherwise become obligated for any of the Debtors' liabilities. Consequently, after closing of the sale to Buyer, all creditors of the Debtors, whether known or unknown, are hereby enjoined from asserting or prosecuting any claim or cause of action against Buyer or the Purchased Assets to recover on account of any liability owned by the Debtors.

(Exh. 6 at 8-9, ¶¶ 13, 15.)  Closing on the Asset Purchase Agreement occurred at 3 a.m. on April 27, 2002.

### D.  Post-Closing Transactions

In compliance with the Sale Order, Sea Star stored equipment belonging to Emerald and other NPR lien or lessor creditors that was located on or returned to property Sea Star acquired under the Asset Purchase Agreement.  Sea Star also immediately began using some Emerald equipment, which had been leased by NPR from Emerald.  The contours for Sea Star's use of Emerald equipment were initially set forth in an e-mail dated May 2, 2002. However, this e-mail was ultimately superseded by a Rental Agreement between Sea Star and Emerald dated July 31, 2002 (the "Rental Agreement") and executed some time after September 10, 2002, which by its terms, covered equipment in use as of April 29, 2002.[1]

By letter dated June 11, 2002, Thomas Holt, Jr., forwarded to Sea Star a letter from MBC Leasing Corp.  In his letter, Mr.

---

[1]   For additional discussion concerning the Rental Agreement, see infra Section I.F of this Opinion.

7

Holt requested that Sea Star "remit a check in accordance with the attached letter from MBC Leasing Corp." (Exh. 8.) The attached letter was from Scott Krieger of MBC to Thomas Holt, Sr. and provides:

> Any money due from Sea Star for use of any containers, gensets and chassis previously leased by Emerald Equipment Leasing to NPR, Inc., and Holt Cargo Systems for purposes other than completing shipments in progress on April 27 when Sea Star purchased certain assets of NPR and Holt Cargo should be paid directly to MBC Leasing. Any money due from Sea Star for use of any of the Emerald equipment to complete shipments in progress on April 27 should be paid in accordance with the memorandum that MBC understands exists between Sea Star, and NPR, Holt Cargo, and possibly other affiliates to be allocated in accordance with the Bankruptcy Court's ruling on the allocation of proceeds of sale to Sea Star.

(Exh. 8.)

On June 30, 2002, MBC entered into an Independent Contractor Agreement with Greenwich, the company headed by Mr. Holt, Jr. In a letter dated July 19, 2002, Mr. Krieger of MBC informed Sea Star that Greenwich was authorized to act as MBC's agent for the purposes of (1) assembling and storing Emerald Leasing's equipment and (2) soliciting purchasers and selling the Emerald Leasing equipment.

On July 22, 2002, the Bankruptcy Court entered an Order Terminating the Automatic Stay as to MBC, effective April 29, 2002. The Order authorized MBC to foreclose its security interest and to remove from Emerald's possession and sell Emerald

8

equipment. Sale proceeds were to be applied to Emerald's indebtedness to MBC.

E. MBC-Sea Star Indemnity Agreement

On September 28, 2002, Sea Star entered into an Indemnity Agreement with MBC by which MBC agreed to indemnify and defend Sea Star against claims of Emerald. The purpose of the Indemnity Agreement was to induce Sea Star to pay MBC directly for Sea Star's use of Emerald equipment, i.e. equipment leased by Emerald to NPR and Holt Cargo pursuant to the November 18, 1997 Lease Agreements.

On October 4, 2002, Sea Star sent MBC a check for per diem use of Emerald equipment from April 27 through July 31, 2002, less storage and handling, pursuant to the Indemnity Agreement.

F. Sea Star-Emerald Rental Agreement

In September 2002, Sea Star and Emerald entered into the Rental Agreement dated July 31, 2002, which superseded the May 2 e-mail for Sea Star's use of Emerald's equipment. By its terms, the Rental Agreement "cover[ed] equipment in use at various times commencing April 29, 2002." The Rental Agreement is governed by Maryland law.

G. MBC-Storage Loan Sale & Assignment Agreement

Effective November 1, 2003, MBC, as assignor, executed a Loan Sale and Assignment Agreement ("Assignment Agreement") with Storage Transfer LLC ("Storage"), as assignee. Pursuant to the

9

Assignment Agreement, Storage agreed to purchase from MBC its outstanding loan of $2,892,662.16 in principle, $821,969.73 in late charges and $915,532.61 in interest for the purchase price of $650,000, plus 20% "of the net amount, after deduction of reasonable attorneys' fees and other reasonable collection expenses" of any amount Storage received from Sea Star. (Exh. 42.) The Assignment Agreement further provides that:

> 6.3 ASSIGNEE [Storage] agrees not to assert any entitlement to compensation from Sea Star for use of EMERALD EQUIPMENT during any period for which Sea Star has paid ASSIGNOR [MBC] pursuant to the Sea Star INDEMNITY [the MBC-Sea Star Indemnity Agreement].

(Id. at ¶ 6.3.) The Assignment Agreement also defines "EMERALD EQUIPMENT" as "certain equipment securing payment of the Loan" from MBC to Emerald, evidenced by defined "ASSIGNED DOCUMENTS." (Id. at ¶ 3.)

H. Carveout

By letter dated February 25, 2004, from Gary M. Schildhorn, an attorney for Emerald, to Lorraine Robins, the sole member of Storage, Mr. Schildhorn stated:

> I am advised that Storage Transfer, L.L.C. ("Storage") has acquired the secured position of MBC Leasing Company in the Estate of Emerald Equipment Leasing, Inc. ("Emerald"). Emerald currently intends to prosecute certain substantial claims against Sea Star Lines LLC. Storage has agreed to contribute to the Emerald estate 15% of any proceeds, net of expenses or other amounts disbursed to third parties, it would otherwise receive on account of its secured claim as a result of

10

> > any settlement the Sea Star claim or the
> > collection of any judgment obtained upon
> > prosecution of this claim . . . .

(Exh. 49.)  Ms. Robins agreed to this carveout from Storage's

secured claim by signing the letter evidencing such agreement.

## II.  CONCLUSIONS OF LAW

### A.  Whether Emerald Is A Real Party In Interest With Standing To Prosecute Its Claims Against Sea Star

As a threshold matter, Sea Star contends that Emerald lacks

standing to prosecute its claims against Sea Star, because it is

not a real party in interest as required by Fed. R. Civ. P.

17(a).  Sea Star contends that Emerald "serves as a stalking

horse, attempting to assert alleged legal rights and interests of

third parties -- e.g. MBC and Storage[.]"  (D.I. 208 at 33.)

Specifically, Sea Star directs the Court to the Rental Agreement

and the "carveout" granted by Storage to Sea Star for the purpose

of initiating this litigation.  Relying on the testimony of Mr.

Holt and Ms. Robins, Sea Star contends that Emerald has not been

acting on its own behalf, but on the behalf of its creditors, and

that Emerald is, in effect, assisting MBC and Storage in

collecting money.

In addition, Sea Star argues that even if Emerald can

demonstrate a legal right to maintain the claims in the Amended

Counterclaim, it cannot be a real party in interest for purposes

of the specific per diem rental claims against Sea Star.  Sea

Star's argument in this regard is based on (1) the provision of

11

the Rental Agreement "subject[ing] and subordinat[ing] [it] to
any lease or security interest in favor of a third-party lessor
or lendor to Lessor," (Exh. 17 at ¶ 4(b)); (2) the provision of
the MBC-Storage Assignment Agreement under which Storage "agrees
not to assert any entitlement to compensation from Sea Star for
use of EMERALD EQUIPMENT during any period for which SEA STAR had
paid ASSIGNOR [MBC] pursuant to the Sea Star INDEMNITY," (Exh.
42, ¶ 6.3); and (3) the Indemnity Agreement between MBC and Sea
Star under which Sea Star contends that MBC, and not Emerald, was
entitled to receive compensation for use of Emerald equipment
during the time period covered by the Rental Agreement (Exhs. 8,
17).

Under Federal Rule of Civil Procedure 17(a), "[a]n action
must be prosecuted in the name of the real party in interest."
Under this rule, "a party with whom or in whose name a contract
has been made for another's benefit" may sue in its own name
without joining the party for whose benefit the action is brought.
See Alan Wright, Arthur Miller & Mary Kay Kane, Federal Practice
& Procedure § 1543 (noting that the purpose of Rule 17(a) is to
ensure that an action is brought by the person entitled to
enforce the right, under the governing substantive law, and
noting that "the action will not necessarily be brought in the
name of the person who ultimately will benefit from the
recovery"). Thus, even if Sea Star's assertion is accepted and

12

Emerald has been acting for the benefit of its lender, MBC, or its successor lender, Storage, the Rental Agreement was made in Emerald's name, and as a named party to the Rental Agreement, Emerald may bring suit under it.

To the extent Sea Star raises constitutional dimensions of standing, the Court likewise concludes that, as a named party to the Rental Agreement, Emerald has satisfied the constitutional standing requirements of (1) injury in fact; (2) traceability; and (3) redressability. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992); Friends of the Earth, Inc. v. Gaston Copper Recycling Corp., 204 F.3d 149, 154 (4th Cir. 2000) (holding in the context of standing that one can "readily recognize" that "a party to a breached contract bears the kind of claim that he may press in court"). Accordingly, the Court rejects Sea Star's argument that Emerald lacks standing to pursue its Amended Counterclaim against Sea Star on the basis of either Fed. R. Civ. P. 17(a) or constitutional standing requirements, and therefore, the Court likewise concludes that Sea Star is also not entitled to a declaratory judgment that Sea Star has no obligation to Emerald for per diem rent under the Rental Agreement to the extent that declaration implicates the Rule 17(a) and standing issues.[2]

---

[2]    See infra Section III.B.11 of this Opinion for further discussion of Sea Star's Requested Declaration No. 11 that Sea Star has no obligation to pay Emerald for per diem rent.

B.   Whether Sea Star Is Entitled To Declarations Of Legal
     Rights And Obligations Under The Rental Agreement And
     The Sale Order

As a threshold matter, the Court notes that Sea Star

premises each of its declaratory judgment claims on the general

theme that this Court, in adjudicating Sea Star's Motions To

Dismiss Emerald's Counterclaim and Amended Counterclaim, held

that the Rental Agreement is unambiguous and that extrinsic

evidence may not be considered to vary its meaning.  In setting

forth this premise, Sea Star selectively quotes from the Court's

previous decisions, missing entirely the context for those

decisions.  Specifically, in its previous decisions, the Court

considered the question of whether Emerald could maintain a

counterclaim based on a breach of the May 2, 2002 e-mail

agreement, which Emerald alleged governed the parties course of

dealings for five months before the Rental Agreement was

memorialized.  In making this determination, the Court looked at

the narrow question of whether extrinsic evidence was required to

determine the parties' intent as to whether the Rental Agreement

was meant to supersede the e-mail agreement.  The Court did not

examine the other provisions of the Rental Agreement for

ambiguity and held only that extrinsic evidence was not required

to illuminate the meaning of the Rental Agreement insofar as

determining whether the e-mail agreement was meant to be subsumed

by the Rental Agreement or whether it could stand on its own for

purposes of a breach of contract claim. Accordingly, Emerald is absolutely correct that the Court did not find the entire Rental Agreement to be unambiguous and did not hold that parol evidence could never be used to determine the intent of the parties in construing other terms of the Rental Agreement.

With this understanding, the Court will address each of the thirteen declarations sought by Sea Star in turn.

> 1. Sea Star's Requested Declaration No. 1: Sea Star has no responsibility or liability for Emerald Equipment subject to previous agreements between Emerald and NPR that Sea Star did not use pursuant to the Rental Agreement after closing of the asset purchase.

Sea Star contends that it has no responsibility for Emerald equipment that it did not use pursuant to the Rental Agreement. In support of its argument, Sea Star contends that it refused to acquire, assume or accept assignment of any equipment agreements between Emerald, NPR or Holt, and it did not purchase or continue NPR's business. Sea Star also cites those portions of the Sale Order which provide for the removal of certain Emerald equipment and which preclude Emerald from asserting or prosecuting any claim or cause of action against Sea Star "to recover on account of any liability owed by [NPR]." (Exh. 6 at ¶ 15.)

In response, Emerald contends that it has never taken the position that Sea Star leased Emerald's entire fleet of equipment that was previously leased to NPR. Emerald also does not contest that Sea Star has refused to acquire, assume or accept assignment

15

of any equipment agreements between Emerald, NPR or Holt.
Rather, Emerald maintains that "[t]his entire litigation, at
least from Emerald's perspective, is to compel Sea Star to
account for and pay for all rental charges or other charges due
and owing under the Rental Agreement for equipment which Sea Star
used." (D.I. 212, emphasis in original).

Emerald is correct. Emerald's Amended Counterclaim relates
to Sea Star's use of Emerald's equipment under the Rental
Agreement between it and Sea Star. The provisions of the Sale
Order, the fact that Sea Star did not purchase the entire fleet
of equipment and Sea Star's refusal to acquire, assume or accept
assignment of equipment agreements between Emerald and NPR or
Holt are simply not in dispute. The Court will make findings in
the course of the second trial on Emerald's Amended Counterclaim
as to whether Sea Star was "using" the equipment forming the
subject of Emerald's counterclaim, or not. That Sea Star is not
liable for equipment it did not use, is not in dispute. Thus,
any declaratory judgment the Court might enter would simply
restate the obvious that Sea Star is not liable for equipment it
did not use, but is liable for equipment it did use. Therefore,
the Court finds no basis upon which to enter the declaratory
judgment sought by Sea Star.

2. Sea Star's Requested Declaration No. 2: Emerald's delivery of each piece of Emerald equipment subject to the Rental Agreement must have been effected and evidenced by an equipment interchange receipt - a TIR- signed and dated on or after April 29, 2002.

Sea Star seeks a declaration that delivery of each piece of Emerald equipment must have been effectuated and evidenced by a signed and dated interchange receipt ("TIR"). In support of its argument, Sea Star directs the Court to paragraphs 1 and 2 of the Rental Agreement, which provide:

1. Equipment. Lessor [Emerald] agrees to lease to Lessee [Sea Star], and Lessee agrees to lease from Lessor, the Equipment. **Delivery of all Equipment to Lessee or its agents by Lessor shall be effected and evidenced by signed and dated equipment interchange receipts and shall be subject to the terms and conditions of this Agreement.**

2. Term. **The lease term for each item of Equipment shall begin on the date when such Equipment is delivered to Lessee or its agent and shall end on the date when such Equipment is taken off hire pursuant to Section 10 below.** Unless the parties otherwise agree in writing, the minimum rental period for each time of Equipment shall be thirty (30) days. All provisions of this Agreement shall apply during any extension or renewal period. Either party may terminate this Agreement on thirty (30) days' prior written notice to the other party.

(Exh. 17 at ¶¶ 1,2) (emphasis added).

Sea Star contends that Emerald did not comply with the above on-hire provisions of the Rental Agreement, despite the fact that MBC and Emerald agents were available in the San Juan terminal to obtain TIRs. Rather, Sea Star maintains that, in contravention

17

of the Rental Agreement, Ms. Robins used whatever documentation she had available to do the billing.

In response, Emerald contends that it acted consistently with paragraph 5 of the Rental Agreement, which provides:

> 5.   Equipment Delivery and Interchange.
> Lessor shall make the Equipment available for
> delivery to Lessee at the locations agreed by
> the parties.  The signature of Lessee's
> representatives on an equipment interchange
> receipt shall constitute conclusive evidence
> that the Equipment to which the receipt
> relates has been delivered to Lessee.

(Id. at ¶ 5.)  Emerald contends that the responsibility to obtain a TIR rested with Sea Star, because at the time the parties entered into the Rental Agreement, Emerald complied with its obligation to make the equipment available to Sea Star because Sea Star already had in its possession or control Emerald equipment, or that equipment was already in ports and transportation centers ready and available for Sea Star's use. Because of its control over and/or access to the equipment, Emerald contends that the obligation to prepare and provide Emerald with a signed TIR rested with Sea Star, and the failure to do so constitutes a breach of paragraph 1 of the Rental Agreement by Sea Star.  Emerald also contends that the Rental Agreement does not preclude other written evidence of Sea Star's use of the equipment, apart from signed TIRs, because while paragraph 5 of the Rental Agreement provides that a TIR is

"conclusive evidence" that the equipment was delivered to Sea Star, it is not the "exclusive evidence." (D.I. 212 at 14-15.)

The parties agree that Maryland law governs the interpretation of the Rental Agreement. Under Maryland law, courts interpreting a contract must consider the contract "in its entirety and, if reasonably possible, effect must be given to each clause or phrase so that a court does not cast out or disregard a meaningful part of the writing." Bausch & Lomb Inc. v. Utica Mut. Ins. Co., 625 A.2d 1021 (Md. 1993). In so doing, Maryland law requires a court to consider "the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution." Pacific Indem. v. Interstate Fire & Cas., 488 A.2d 486, 488 (Md. 1985).

In construing the terms of a contract, the court must consider the language used and afford words their ordinary and accepted meanings. Id. "[W]hen the language of the contract is plain and unambiguous there is no room for construction, and a court must presume that the parties meant what they expressed. In these circumstances, the true test of what is meant is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant." General Motors Acceptance Corp. v. Daniels, 492 A.2d 1306, 1310 (Md. 1985). Language is ambiguous, however, where it is susceptible to two meanings when viewed from the perspective of a reasonably prudent layperson. If language is

19

ambiguous, extrinsic evidence may be considered to determine the intention of the parties. Pacific Indem., 488 A.2d at 489.

In this case, the Court concludes that the Rental Agreement presents an ambiguity in that it does not explicitly identify who is responsible for procuring a TIR. In light of the character of the contract, its purpose, and the facts and circumstances of the parties at the time of its execution; however, the Court is persuaded that this responsibility rests with Sea Star, as the party who had control over the usage of the equipment. The Rental Agreement is a per diem rental agreement for certain pieces of equipment. This equipment was already under the control of Sea Star in some instances, or located in various ports and transportation centers and available for Sea Star's use. In these circumstances, Sea Star was in the unique position of being the party best able to produce the signed TIR evidencing its own usage, and its failure to do so would necessarily constitute a breach of the Rental Agreement.

Having reached this conclusion, the Court cannot grant Sea Star's requested declaration that delivery of the equipment must be evidenced only by a signed TIR. In reaching this conclusion, the Court is aware of the tension between paragraph 5 and paragraph 2 of the Rental Agreement. On the one hand, paragraph 2, in using the word "shall," requires delivery of equipment to be "effected and evidenced" by signed TIRs. On the other hand, however, paragraph 5 indicates that a signed TIR is "conclusive"

20

evidence of delivery, but does not go so far as to say it is the
"exclusive" evidence of delivery. In light of this ambiguity and
given the circumstances, including the parties course of dealing,
as well as Sea Star's own acknowledgment that documents other
than TIRs may evidence its usage[3], the Court concludes that a TIR
is not the sole means by which Emerald can demonstrate Sea Star's
usage of the equipment, and therefore, the Court will deny Sea
Star's second requested declaration.

> 3.  Sea Star's Requested Declaration No. 3:
>     Redelivery of equipment subject to the Rental
>     Agreement may have been at Greenwich terminal,
>     Philadelphia, Pennsylvania; Sea Star terminal,
>     Puerto Nuevo, San Juan, Puerto Rico; Greenwich
>     terminal, Port of Jacksonville, Florida; or any
>     other location as to which the parties have agreed
>     in writing.
>
> 4.  Sea Star's Requested Declaration No. 4:
>     Redelivery of equipment subject to the Rental
>     Agreement may have been effected and evidenced by
>     a TIR signed by Sea Star terminal, Puerto Nuevo,
>     San Juan, Puerto Rico; a designated receiving
>     terminal, at which time Emerald was required to
>     off-hire the equipment.

Sea Star treats its next two requested declarations
together, and therefore, the Court will also address them
together. Specifically, Sea Star contends that the equipment
went "off-hire" within the meaning of paragraph 10 of the Rental
Agreement "when equipment came through the terminal gate and that

---

[3]     See D.I. 1 at ¶ 21(b), (c), (e) (acknowledgment by Sea
Star in its Complaint that not just a TIR, but "other written
evidence" may show Sea Star's usage of the equipment); Exh. 69
(Exh. A to Sea Star's Supplemental Answer to Interrogatory No.
1).

the Sea Star terminal in San Juan was a designated receiving
terminal, where TIRs signed by Sea Star effected return of
Emerald equipment." (D.I. 208 at 24.) Sea Star contends that it
was erroneously charged for Emerald equipment in storage, because
Ms. Robins decided that Emerald equipment was not redelivered,
unless an Emerald representative signed for it.

In response, Emerald contends that a TIR signed by Sea Star
at the San Juan terminal reflecting equipment coming into the
terminal is insufficient to constitute delivery to Emerald as
required by paragraph 10 of the Rental Agreement, because the Sea
Star Terminal in San Juan was controlled by Sea Star. Because
Sea Star cannot return the equipment to itself, Emerald maintains
that designated areas were set up in the San Juan Terminal for
the return of Emerald equipment. These areas were designated as
"J-Lot," and pursuant to paragraph 10 of the Rental Agreement,
Emerald was to be given 72 hours prior notice in writing of the
types and quantities of equipment that Sea Star intended to
redeliver at particular ports. Emerald contends that this
understanding of the Rental Agreement was evidenced by the
parties' course of conduct, including an e-mail from Mr. Rooks to
his subordinates, which states:

Arturo/Manuel/Ricardo:

Our rental agreement with Emerald states that an off
hire TIR and inspection report be provided when a unit
is terminated at the designated depot. In San Juan, as
you know, we are the designated depot. (J14/15). It
is imperative that we start providing a TIR for each

22

unit when it is "terminated" to the J area. I am required to notify Art Davis in advance, but we are also required (as the designated depot), to provide an off hire TIR at time of termination. Any questions?

(Exh. 93; see also Exh. 92, 94, 95.)

In pertinent part, paragraph 10 of the Rental Agreement provides:

10. Redelivery of Equipment.

(a) At its sole expense, Lessee shall redeliver Equipment **to Lessor** at Greenwich Terminal, Philadelphia Pennsylvania, Sea Star Terminal, Puerto Nuevo, San Juan, Puerto Rico, Greenwich Terminal, Port of Jacksonville, Florida, or any other location as to which the parties have agreed in writing. Each redelivery shall be subject to Schedule "A." **At least seventy-two (72) hours prior to actual redelivery, Lessee shall give Lessor a written estimate of types and quantities of Equipment which Lessee intends to redeliver at particular ports.**

(b) Upon redelivery of particular Equipment**, the receiving terminal will execute an equipment interchange receipt** . . . .

(Exh. 17 at ¶ 10) (emphasis added).

Sea Star contends that Emerald inappropriately seeks to introduce extrinsic evidence to alter the meaning of paragraph 10; however, the Court does not believe paragraph 10 is ambiguous. Paragraph 10 provides that the equipment must be returned "to Lessor," which is Emerald. With the understanding that the San Juan terminal is under the control of Sea Star, it is impossible to construe the simple return of the equipment to the terminal generally as a return "to Lessor." Rather, in the case of the San Juan terminal, a return can only be effectuated

by the return of the equipment to J-Lot with 72 hours notice to Emerald of a written estimate of the types and quantities of equipment which Sea Star intended to redeliver.

Indeed, even if the Court were to find an ambiguity in the Rental Agreement, the Court would reach the same conclusion. The extrinsic evidence of the parties' course of dealing, including the understanding of Sea Star representatives like Mr. Rooks and Ms. Forence, confirms that returned equipment must be "'terminated' to the J area" with notice to Emerald in advance. (See, e.g., Exh. 92-97.) Accordingly, the Court concludes that Sea Star is not entitled to its third and fourth requested declarations because they misstate the parties' obligations under the Rental Agreement with respect to redelivery.

> 5. Sea Star's Requested Declaration No. 5: Sea Star has no responsibility or liability to compensate for use of Emerald Equipment prior to or during Shipments In-Transit.

Emerald does not dispute that Sea Star does not have an obligation to pay rental charges to Emerald for equipment which Sea Star "solely used for shipments in transit and for which it paid NPR." (D.I. 212 at 19.) However, Emerald maintains that "[t]he issue of course is an accurate identification of such equipment." (Id.) The Court agrees with Emerald's position. See, e.g., E.I. DuPont de Nemours and Co. v. Ampthill Rayon Workers, Inc. 516 F. Supp. 2d 588, 594 (E.D. Va. 2007) (declining to issue declaration where it would be fruitless in resolving the

parties dispute because the matter for which the declaration was sought was not seriously in dispute). To the extent that Sea Star has disagreements concerning the invoicing practices of Emerald, those disagreements are appropriately considered in the context of Emerald's Amended Counterclaim. Because the legal relationship of Sea Star and Emerald with regard to equipment used solely in transit is not genuinely in dispute, the Court declines, in its discretion, to issue the requested declaration which omits the critical distinction that the equipment must be solely used for shipment in transit, and thus, misstates the parties' obligations.

> 6.   Sea Star's Requested Declaration No. 6: The Sale
>      Order imposes no obligation with respect
>      to any lessor's equipment that on April 27, 2002,
>      was not located on leased property acquired under
>      the Asset Purchase Agreement; that was not
>      involved in shipment to a "final port of
>      destination" where Sea Star leased premises
>      acquired under the Asset Purchase Agreement and
>      Sale Order; that was returned to port or inland
>      facilities by third parties, such as consignees,
>      which had received shipments at final destinations
>      outside ports.

With respect to this requested declaration, Sea Star directs the Court to its argument with respect to the first declaration and to various portions of its factual recitation concerning the MBC-Storage Loan Sale and Assignment Agreement and the Sale Order. Emerald contends that the declaratory relief requested here is not appropriate because it pertains to third parties not before the Court, is contrary to the plain language of the Sale

Order, and has no applicability to Emerald's Amended Counterclaim
which involves claims for equipment Emerald contends was not
being stored by Sea Star for Emerald, but rather, was being used
by Sea Star for its own use.

To the extent that Sea Star's requested declaration
implicates parties not before the Court, the Court declines to
issue it.  A.S. Abell Co. v. Chell, 412 F.2d 712 (4th Cir. 1969)
(recognizing that declaratory relief may properly be withheld for
non-joinder of interested parties).  In addition, the Court
concludes that the requested declaration is contrary to Paragraph
13 of the Sale Order which imposes an obligation of cooperation
on Sea Star as follows:

> 13.  Notwithstanding anything to the contrary in
> the Asset Purchase Agreement, to the extent that any
> equipment of Emerald Equipment Leasing, Inc.
> ("Emerald") or any other lien or lessor creditor whose
> property is not being sold or transferred to Buyer, is
> located on property sold and assigned to the Buyer
> under the Asset Purchase Agreement, **the Buyer [Sea
> Star] shall cooperate in allowing Emerald or such other
> creditors to remove such property during normal
> business hours as long as such removal will not
> unreasonably disrupt operations of the Buyer.  In
> addition, the Buyer shall cooperate in removing any
> such equipment from Vessels in transit and store such
> equipment on leased premises at the final port of
> destination, to the extent such final destination is a
> leased premises sold and assigned to the Buyer under
> the Asset Purchase Agreement.**

(Exh. 6, emphasis added.)  Accordingly, the Court declines to
issue Sea Star's requested declaration because it misstates the
parties obligations under the Sale Order.

26

> 7. Sea Star's Requested Declaration No. 7: Sea Star
> has had no duty to "redeliver" or pay compensation
> for Emerald equipment that Sea Star "touched" but
> did not use, including but not limited to Emerald
> equipment which was involved in Shipments in
> Transit or held by third parties, such as E.T.
> Heinsen and inland depots, and was returned to
> port terminals or inland depots where Sea Star
> leased premises; Emerald equipment which entered
> NPR terminals prior to closing of the asset
> purchase; and Emerald equipment for which delivery
> under the Rental Agreement is not evidenced by a
> TIR, signed and dated by Sea Star for use on or
> after April 29, 2002.

Sea Star contends that this requested declaration is

appropriate based solely on the following statement from Ms.

Robins regarding invoices that she prepared: "When I billed, I

didn't bill anything to Sea Star unless I had a movement of some

kind that they had touched it. If they had it, I billed it."

(ROB at 63.) Sea Star contends that "Ms. Robins' 'touch' test

contravenes explicit on-hire and off-hire provisions in the

Rental Agreement." (D.I. 208 at 27.)

In the Court's view, Sea Star's argument mischaracterizes

Emerald's position in this lawsuit and unfairly characterizes the

testimony of Ms. Robins. Emerald's Amended Counterclaim

arguments concern Sea Star's use of equipment, and not merely

whether Sea Star "touched" the equipment in question. Moreover,

Sea Star may contest its actual use of Emerald's equipment in

opposing Emerald's Amended Counterclaim. Additionally, the Court

notes that, at least a portion of this requested declaration

restates arguments advanced by Sea Star in its second requested

declaration. Accordingly, the Court concludes that no basis
exists upon which to issue Sea Star's seventh requested
declaration.

> 8.  Sea Star's Requested Declaration No. 8: Sea Star
>     has had no duty to "redeliver" or pay for Emerald
>     equipment involved in Shipments in Transit that
>     third parties, such as consignees, did not return
>     to port terminals or inland depots where Sea Star
>     leased premises. Any Emerald recourse would be to
>     the NPR bankruptcy estate.

In advancing this declaration, Sea Star directs the Court to
paragraph 15 of the Sale Order, its argument regarding the third
and fourth requested declarations, and those portions of its
factual recitation pertaining to the Sale Order and the MBC-
Storage Loan Sale and Assignment Agreement. (D.I. 209 at 27.)

The Court has declined to issue Sea Star's third and fourth
requested declarations, and therefore, Sea Star's arguments
related to those declarations are insufficient to establish that
Sea Star's eighth requested declaration is warranted. Moreover,
as the Court has previously pointed out, Emerald's Amended
Counterclaim is not based on in-transit equipment, but on
equipment that was otherwise used by Sea Star. Sea Star has a
responsibility for equipment it used, and the requested
declaration fails to take that responsibility into account.
Further, the terms of the Sale Order require Sea Star to
"cooperate in removing any such equipment from Vessels in transit
and store such equipment on leased premises at the final port of
destination, to the extent such final destination is a leased

28

premises sold and assigned to the Buyer [Sea Star] under the
Asset Purchase Agreement."  (Exh. 6 at ¶ 13.)  Because Sea Star's
requested declaration ignores these responsibilities on the part
of Sea Star, the Court concludes that it is misleading and does
not fairly characterize the parties rights and obligations.
Accordingly, the Court declines to issue the requested
declaration.

> 9.   Sea Star's Requested Declaration No. 9:  For
>       Emerald equipment involved in Shipments in
>       Transit, any Sea Star on-hire obligation would
>       begin when Sea Star signed a TIR for its use after
>       completion of a Shipment in Transit.

> 10.  Sea Star's Requested Declaration No. 10:  Any Sea
>       Star on-hire obligation for Emerald Equipment in
>       the possession of third parties, such as depots,
>       shipper pools, shipper warehouses, or former NPR
>       agents or stevedores, as of and after closing
>       would begin when Sea Star signed a TIR removing
>       such Emerald equipment from a depot or shipper
>       pool or acknowledging receipt from a customer or
>       delivering carrier for Sea Star's use.  Otherwise,
>       Sea Star would have no responsibility for such
>       equipment.

In the Court's view, Sea Star's ninth and tenth requested
declarations are restatements of Sea Star's second requested
declaration.  Accordingly, for the reasons discussed infra with
respect to the second requested declaration, the Court will deny
Sea Star's ninth and tenth requested declarations.

> 11.  Sea Star's Requested Declaration No. 11:  Sea Star
>       has no obligation to Emerald for per diem rent.

In support of this requested declaration, Sea Star directs
the Court to paragraph 4(b) of the Rental Agreement which

provides that the Rental Agreement is "subject and subordinate to any lease or security interest in favor of a third-party lessor or lender to Lessor."  (Exh. 17, ¶ 4(b).)  Sea Star contends that in light of this paragraph, two other MBC contracts become pertinent, specifically, the Indemnity Agreement and the Assignment Agreement.  Sea Star contends that under the terms of the Indemnity Agreement, MBC contracted to indemnify and defend Sea Star "against claims by COMPETING CLAIMANTS [specifically including Emerald] on the terms and conditions set forth in the Indemnity Agreement."  (Exh. 19 at 1-2.)  Sea Star also contends that it is a third party beneficiary with rights to enforce paragraph 6.3 of the Assignment Agreement, which provides:

> 6.3  No Competing Claim Against Sea Star
> ASSIGNEE [Storage] agrees not to assert any
> entitlement to compensation from Sea Star for use of
> EMERALD EQUIPMENT during any period for which Sea Star
> has paid ASSIGNOR [MBC] pursuant to the Sea Star
> INDEMNITY [MBC-Sea Star Indemnity Agreement].

(Exh. 42 ¶ 6.3.)  Sea Star contends that it paid MBC for use of Emerald equipment during the April 2002-December 2003 period, and therefore, the requested declaration, which would effectively preclude Emerald's Amended Counterclaim, is appropriate.

In response, Emerald contends that the fact that the Rental Agreement is subject to the liens of Emerald's secured lenders does not mean that the Indemnification or Assignment Agreement should be used to establish the rights and obligations of Sea Star and Emerald under the Rental Agreement.  Because the

30

Indemnification and Assignment Agreement are between non-parties
to this litigation, Emerald contends that resort to those
documents here is not appropriate.  Emerald also contends that
even if those documents are considered, it is clear that the
relevant provisions of the Indemnity and Assignment Agreements
were meant to protect Sea Star from having to pay twice for use
of Emerald equipment for which it already paid MBC.  However,
Emerald contends that its claims are "claims for Sea Star's use
of Emerald Equipment for which it did not pay MBC or anyone
else."  (D.I. 212 at 26.)  Thus, Emerald contends that Sea Star
is not entitled to the requested declaration.

     In the context of adjudicating Sea Star's standing
arguments, the Court has concluded that Sea Star is not entitled
to a declaratory judgment that it has no obligation to Emerald
for per diem rent under the Rental Agreement to the extent that
requested declaration implicates Fed. R. Civ. P. 17(a) or
constitutional standing issues.  In addition, the Court agrees
with Emerald that the Assignment and Indemnification Agreements
between Sea Star and non-parties are not relevant to this
dispute, and should not be considered in the context of
adjudicating the parties' rights and responsibilities under the
Rental Agreement.  Indeed, the express terms of the provisions to
which Sea Star directs the Court do not encompass claims by
Emerald for equipment Sea Star used, but did not pay anyone,
including MBC.  Section 6.3 of the Assignment Agreement pertains

31

only to claims by Storage, not Emerald, and precludes Storage from "assert[ing] any entitlement to compensation from sea Star for use of Emerald Equipment during any period for which Sea Star has paid ASSIGNOR [MBC] pursuant to the Sea Star INDEMNITY." (Exh. 42.) The Sea Star Indemnity also refers to the obligations of MBC vis-a-vis Sea Star, and does not preclude Emerald from asserting claims for Sea Star's use of equipment, which have been unpaid to anyone. Accordingly, the Court declines to issue Sea Star's requested declaration, because it does not fairly and accurately characterize Sea Star's responsibility for Emerald equipment it used, but has not paid any entity for such use.

> 12. Sea Star's Requested Declaration No. 12: Sea Star has no obligation for Emerald's Stipulated Loss Value claims unless a signed TIR discloses Sea Star's on-hire of such Emerald equipment under the Rental Agreement on or after April 29, 2002; and there is no evidence of redelivery under the Rental Agreement.

In support of this requested declaration, Sea Star directs the Court to Paragraphs 1 and 10 of the Rental Agreement, the Sale Order, the pages of its brief pertaining to the factual recitations concerning the Sale Order and the Rental Agreement, and its argument relating to requested declarations one through ten.

Having concluded that Sea Star is not entitled to requested declarations one through ten, the Court concludes that the arguments in support of those declarations are likewise insufficient to warrant this declaration, which restates and

32

implicates issues already addressed in the context of Sea Star's previously requested declarations, including Sea Star's second, third, and fourth requested declarations. Accordingly, the Court declines to issue Sea Star's twelfth requested declaration.

> 13. Sea Star's Requested Declaration No. 13: Sea Star has no obligation for Emerald's adjusted Stipulated Loss Value claims pertaining to Emerald equipment recovered and sold. Emerald admittedly did not give Sea Star notice required by paragraph 13(b)(iii) of the Rental Agreement prior to sales of Emerald equipment for which Emerald alleges Sea Star is responsible.

Sea Star contends that it is entitled to this requested declaration based on paragraph 13(b)(iii) of the Rental Agreement. Sea Star contends that Emerald never provided notice to Sea Star that it was going to sell equipment it considered "lost" under the provisions of the Rental Agreement, and therefore, Emerald is not entitled to recover on claims for equipment that Emerald recovered, but sold without notice to Sea Star.

In response, Emerald contends that under paragraph 10(f) of the Rental Agreement, Emerald was permitted to treat as lost, equipment that Sea Star used but failed to return to Emerald within 60 days after termination of the Rental Agreement. Emerald contends that Sea Star was obligated to pay Emerald the full Stipulated Loss Value of such equipment under this provision. However, Emerald contends that it mitigated its damages by selling the equipment and charging Sea Star only the

33

difference between the stipulated loss value and the sale price (i.e. the Adjusted Stipulated Loss Value). Emerald contends that its actions were a proper mitigation of damages, and that Sea Star was not entitled to notice of the sale equipment considered "lost" under the Rental Agreement because Sea Star was obligated under paragraph 10(f) of the Rental Agreement to pay the full stipulated loss value.

Paragraph 10(f) of the Rental Agreement provides:

> (f)    If Lessee [Sea Star] fails to return any Equipment for more than sixty (60) days after the return date specified in a Lessor [Emerald] notice, Lessor may elect to treat such Equipment as lost; and Lessee shall pay Lessor the Stipulated Loss Value of such Equipment, together with all accrued rental charges at the contractual daily rate within fifteen (15) days.

(Exh. 17 at ¶ 10(f).) In pertinent part, paragraph 13 of the Rental Agreement also provides:

> 13.    Events of Default.
>
> * * *
>
> (b)    Upon the occurrence of any default by Lessee [Sea Star] under this Agreement, Lessor [Emerald] shall (except to the extent otherwise required by law) be entitled to:
>
> * * *
>
> (iii)    Elect to sell any or all Equipment after giving thirty (30) days' notice to Lessee at one or more public or private sales and recover the sum of the Stipulated Loss Values of such Equipment, all rent owed through the rent payment immediately preceding the date of such notice, all costs and expenses incurred in searching for, taking, removing, keeping, storing, repairing and restoring and selling such Equipment, all other amounts owed by Lessee under this Agreement, whether as additional rent, indemnification, or

34

> otherwise, and all costs and expenses, including
> reasonable legal fees, incurred by Lessor as a result
> of Lessee's default under this Agreement after
> deducting all amounts received by Lessor in connection
> with such public or private sales . . . .

(Exh. 17 at ¶ 13(b)(iii).)

Reading the applicable provisions of the Rental Agreement,
in particular paragraph 13(b)(iii), the Court concludes that
Emerald was required to give Sea Star notice before any public or
private sale of the equipment, and based on the testimony of
Arthur Davis at trial, it appears that Emerald did not give Sea
Star the required notice. However, a basic principle of contract
law is that not every breach of duty by one party to a contract
discharges the duty of performance by the other. John Edward
Murray, Jr., Murray on Contracts § 107 at 678 (4th ed. 2001).
Only breaches which are material may excuse the other's
performance. Id.; Final Analysis Communication Services, Inc. v.
General Dynamics Corp., 253 Fed. Appx. 307, 313, 2007 WL 3230733,
*5 (4th Cir. 2007) (applying Maryland law and noting that "[i]t
is well established that a material breach by one party to a
contract excuses the other party from performance"). At this
juncture, the parties have not briefed this issue, and in the
Court's view, it is an issue best left for resolution in the
context of adjudicating Emerald's Amended Counterclaim, because
it may impact the amount of damages to which Emerald is entitled.
In light of the foregoing, the Court cannot conclude that Sea
Star's requested declaration is an accurate statement of the

parties' rights and obligations under the Rental Agreement, and therefore, the Court declines to issue Sea Star's thirteenth requested declaration.

## CONCLUSION

For the reasons discussed, the Court concludes that Sea Star is not entitled to the requested declarations.  The Court will enter a final judgment order against Sea Star and in favor of Emerald on Sea Star's declaratory judgment claims once Emerald's Amended Counterclaim has been fully adjudicated.