```
                IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF DELAWARE

SEA STAR LINE, LLC, a limited    :
liability company,               :
                                 :
              Plaintiff,          :
                                 :
     v.                          :  Civ. Act. No. 05-245-JJF
                                 :
EMERALD EQUIPMENT LEASING, INC.,:
a corporation,                   :
                                 :
              Defendant.          :
```

Timothy J. Armstrong, Esquire of ARMSTRONG & MEJER, P.A., Miami,
Florida.
Kathleen M. Miller, Esquire of SMITH, KATZENSTEIN & FURLOW, LLP,
Wilmington, Delaware.

Attorneys for Plaintiff.

Gary M. Schildhorn, Esquire and Alan I. Moldoff, Esquire of
ADELMAN LAVINE GOLD AND LEVIN, A Professional Corporation,
Philadelphia, Pennsylvania.
Ronald S. Gellert, Esquire; Tara L. Lattomus, Esquire and
Margaret F. England, Esquire of ECKERT SEAMANS CHERIN & MELLOTT,
LLC, Wilmington, Delaware.

Attorneys for Defendant.

**MEMORANDUM OPINION**

August 27, 2009
Wilmington, Delaware

~~Joseph J. Farnan, District Judge.~~

By an Opinion and Order entered on September 19, 2008, the Court adjudicated the claims advanced by Plaintiff Sea Star Line LLC ("Sea Star") against Defendant, Emerald Equipment Leasing, Inc. ("Emerald"), and denied Sea Star's request for declaratory relief. (D.I. 220, 221). On March 17 and 18, 2009, the Court held a two-day bench trial on Emerald's counterclaims against Sea Star. This Memorandum Opinion incorporates the Court's previous Findings of Fact and Conclusions of law, to the extent they are applicable, and renders additional Findings of Fact and Conclusions of Law on the issues tried before the Court with respect to Emerald's counterclaims specifically.[1]

## I.   FINDINGS OF FACT

Sea Star's use of Emerald's equipment was initially governed by an e-mail dated May 2, 2002. Tr. Exh. 70; Tr. Vol. 1 at 85, 125-126.[2]  This e-mail was superseded by the Rental Agreement executed by the parties on July 31, 2002. Tr. Exh. 17, Tr. Vol. 1 at 86-87, 129. By its terms, the Rental Agreement covered equipment in use by Sea Star as of April 29, 2002.

---

[1]     The background of this litigation is set forth fully in the Court's September 19, 2008 Opinion.

[2]     Trial transcripts and exhibits from the trial on Sea Star's Complaint are designated "Tr." and "Tr. Exh.," respectively. Trial transcripts and exhibits from the trial on Emerald's counterclaim are designated "CCTr." and "CCTr. Exh.," respectively.

Initially, there was a great deal of confusion regarding Sea
Star's use of Emerald's equipment.  Tr. Vol. 1 at 131-132; Tr.
Exh. 71-72.  Sea Star was not required to give Emerald advance
notice before using Emerald's equipment, the equipment was
scattered all over the United States and the Carribean in port
facilities, terminals, on ships, in depots, on trucks, railroad
trains and in customer facilities, and Sea Star was not required
to execute a document or receipt prior to using Emerald's
equipment.  Tr. Vol. 1 at 74-74, 76, 126-127, 131-32; Tr. Vol. 2
at 11.

To provide some type of notice to Emerald and to account for
Sea Star's use of the equipment, Sea Star admits that it
undertook to provide monthly "self-billing reports."  Tr. Vol 1
at 18-20, 77-78, 127-128, Tr. Exh. 61.  Although Sea Star admits
that it had a duty to accurately account for the use of Emerald's
equipment, it also concedes that its self-billing reports were
not accurate.  Tr. Exh. 68 at Request For Admission No. 8, 9, 33;
Tr. Vol. 1 at 79-81; Tr. Vol. 2 at 42.  However, there are
certain documents that provide evidence of Sea Star's use of
Emerald's equipment, including by way of example, trailer
interchange receipts ("TIRs"), gate logs and inventories.  Tr.
Vol. 1 at 75-76, 65-70, 117-118.  Sea Star created these
documents but did not provide them to Emerald at the time Sea
Star used the equipment.  Tr. Vol. 1 at 76-77.

To assist in tracking the equipment, Emerald asked Mark Levins, its computer programmer in the area of equipment control for container terminals, to create a program for Emerald to track the last location of its equipment as of May 31, 2002. CCTr. Vol. 1 at 9, 12. This program provided a snapshot of equipment location on a particular day, and used three files of information: a daily file of information gathered by Sea Star and its predecessor, a file of information gathered by the Packer Avenue Terminal when Emerald equipment passed through its gates, and information gathered by the San Juan terminal in similar circumstances. CCTr. Vol. 1 at 9-14, 17-19, 34. Manual entries could also be made into the report by an Emerald Representative, and the program provided a means for CSX Raiload and the Packer Marine Terminal in Philadelphia to provide Emerald with information. The report generated by Mr. Levins's program is referred to as a "move history." CCTr. Vol. 1 at 16-17.

The move history identifies the shipping lines whose equipment was moving in and out of the terminals in question, and each piece of equipment indicated on the move history has an identifying number or prefix. CCTr. Vol. 1 at 47-48. Because the information used by Mr. Levins to create the move histories came from shipping lines in the ordinary course of their duties, it was in the best interest of those shipping lines to ensure the accuracy of the information provided. CCTr. Vol. 1 at 55-57.

In addition to Mark Levins's role, Emerald enlisted the help
of Lorraine Robins to monitor Emerald's equipment. CCTr. Vol. 1
at 59-60. Ms. Robins initially relied on Sea Star's self-billing
reports to show the rent owed by Sea Star pursuant to the Rental
Agreement; however, Ms. Robins began receiving information that
Sea Star's usage of Emerald Equipment was exceeding that which
was being shown on their self-billing reports. CCTr. Vol. 1 at
62-63. Ms. Robins notified Sea Star of the discrepancies and
began preparing additional bills for this additional usage, as
well as for stipulated losses. CCTr. Vol. 1 at 63.

After receiving the information from Ms. Robins, Sea Star
began preparing its own analysis of its equipment usage (the
"Rooks Analysis"). CCTr. Vol. 1 at 70, CCTr. Exh. 9. Ms. Robins
reviewed the Rooks Analysis and saw that it was inconsistent with
Sea Star's self-billing reports. CCTr. Vol. 1 at 70-72. Ms.
Robins then prepared new invoices incorporating all the
information she had, which included in addition to the Rooks
Analysis and move history information, schedules of certain
equipment acknowledged by Marty McDonald, John Allen Jacksonville
inventories, IQ ship information, truck invoices, files attached
to a George Cervone e-mail showing Schedules of Emerald equipment
which became active in the Sea Star system between April 19, 2002
and May 15, 2002, and the documents provided during the discovery
in this litigation. CCTr. Exh. 8, 10-18; 20-21; Tr. Exh. 9. An

4

invoice was prepared for every piece of Emerald equipment for which "movement" could be ascertained after April 29, 2002. CCTr. Vol. 1 at 90-91, 155-156.  According to Ms. Robins, "movement" meant that she had evidence that an Emerald piece of equipment went in or out of a terminal or depot, or on or off a ship after April 29, 2002 when the Rental Agreement commenced. CCTr. Vol. 2 at 31-32.  For each piece of equipment, Ms. Robins prepared a packet of information containing either references or the actual documents involved to support the invoices.  CCTr. Vol. 1 at 91-103; CCTr. Exh. 22A-D.  The work in preparing Emerald invoices and compiling the data packets encompassed approximately 6,500 pieces of equipment and involved several people working over a five to six year period of time.  CCTr. Vol. 1 at 91.

Despite knowledge that its self-billing reports were inaccurate, Sea Star has never corrected or reissued its self-billing reports.  Tr. Vol. 1 at 225, Vol. 2 at 44, 63; CCTr. Vol. 2 at 63; CCTr. Vol. 1 at 108, Vol. 2 at 44-45, 68.  Sea Star has only responded to specific inquiries from Emerald regarding specific pieces of Equipment identified by Emerald, even though Sea Star maintained its own analysis of equipment entitled, "Evaluations of the Emerald Equipment that sailed from 4/26/02 to 8/31/03 that was not on any Sea Star Self-billing Report or on the Emerald Claims."  CCTr. Vol. 2 at 64-65.  Sea Star has

5

admitted that it never reported more than 60% of what Emerald's

Invoices indicate were uses of Emerald's equipment. CCTr. Exh.

7; CCTr. Vol. 1 at 108-110.

## II. CONCLUSIONS OF LAW

As a threshold matter, the parties appear to agree on the

application of Maryland law to the breach of contract issues

raised by Emerald's counterclaims. In this regard, Paragraph 14

of the Rental Agreement provides that, "[t]his Agreement shall be

interpreted and the rights, liabilities and duties of the parties

determined in accordance with the laws of the State of Maryland."

As for Emerald's tort claims, however, the parties' briefs

are less than clear. In its decision on Sea Star's Motion To

Dismiss, the Court noted that the parties never specifically

alleged which state's substantive law applies to Emerald's tort

claims. 2006 WL 214206, *9 n.5 (D. Del. Jan. 26, 2006). In its

Post Trial Opening Brief, Emerald contends, consistent with its

argument during the motion to dismiss stage of these proceedings,

that the Court should apply federal common law to tort claims in

maritime actions, such as this, and that when no admiralty law is

on point, the Court can look to "other state law." (D.I. 260 at

11 n.5.) Emerald never specifically identifies the "other state

law" it seeks to apply; however, both parties focus their briefs

on Maryland law in the first instance. Accordingly, the Court

will base its decision on the application of Maryland law.

A.   Whether Emerald Has Established A Breach Of The Rental
     Agreement Based On Sea Star's Failure To Pay Rent

Paragraph 3 of the Rental Agreement provides:

     3.   Rental.  Lessee shall pay rent and all
charges under this Agreement on a monthly basis.  Each
payment for particular Equipment will become due on the
tenth day of the month following the month of use,
unless the parties otherwise agree in writing.  In the
event Lessee fails to make timely payment, interest
shall be due on any overdue amount at a rate of
eighteen percent (18%) per annum, commencing ten (10)
days after Lessee receives Lessor's invoice for such
overdue amount.  With respect to particular Equipment,
Lessee's obligations to pay rent and other charges
shall terminate immediately if Lessee purchases and
pays for such Equipment.

The Rental Agreement further describes an event of default

as the "[c]ontinuing failure to pay rent for thirty (30) days

after its due date under this Agreement."

Sea Star has admitted that it has used Emerald's equipment

and failed to pay rental charges for that use.  The Court

concludes that this failure to pay rent constitutes a breach of

the Rental Agreement.  Sea Star reiterates its argument based on

paragraph 4(b) of the Rental Agreement that Emerald is not the

real party in interest for purposes of the per diem rental claims

against Sea Star, but the Court has already rejected Sea Star's

argument in the context of its previous opinion.  578 F. Supp. 2d

679, 686-687 (D. Del. 2008).

With respect to the issue of prejudgment interest, the Court

concludes that the parties have insufficiently briefed this issue

so as to allow the Court to render a decision.  Article III,

7

Section 57 of the Maryland Constitution provides that "The Legal Rate of Interest shall be Six percent per annum; unless otherwise provided by the General Assembly." In its briefing, Sea Star cites to this provision and Stroh v. Omni Arabians, Inc., 748 A.2d 1015 (Md. Ct. Spec. App. 2000), for the proposition that prejudgment interest should be limited in this case to six percent. Emerald does not distinguish Stroh and cites to a case predating Stroh from the same court, MLT Enterprises, Inc. v. Miller, 694 A.2d 497, 505 (Md. Ct. Spec. App.), cert. denied, 699 A.2d 1168 (Md. 1997). Neither party discusses the primary case from Maryland's highest court, United Cable TV of Balt. Ltd. P'shp v. Burch, 354 Md. 658, 675 (Md. 1999), and neither party discusses any legislative enactments that may affect an award of prejudgment interest. See, e.g., MD Code, Commercial Law, § 14-1315. Accordingly, at this juncture, the Court will not award prejudgment interest. To the extent that Emerald wishes to pursue a claim for prejudgment interest, it should file a separate Motion and detailed Opening Brief addressing the pertinent issues, and full briefing should then continue by both parties. If prejudgment interest is ultimately awarded, the Court will amend the Judgment Order entered in this case.

As for reasonable attorneys' fees and costs, the Court concludes that Emerald is entitled to such fees and costs incurred as a result of this litigation pursuant to paragraph 11

of the Rental Agreement.   In pertinent part, Paragraph 11 of the
Rental Agreement provides:

11.   Indemnification and Expenses.

(a)   Lessee shall defend, indemnify and hold
Lessor, its agents and employees, harmless from all
claims, causes of action, liability damages or loss
(including expenses in connection with any claim or
suit, such as reasonable attorneys' fees and court
costs) arising out of (a) failure by Lessee to comply
with its obligations under this Agreement or any
attempt by a third party to impose on Lessor liability
for Lessee's acts or omissions . . .

Although Sea Star contests the payment of attorneys' fees, it
makes no substantive argument to the contrary, focusing instead
on the payment of punitive damages.   Accordingly, the Court finds
no reason to depart from the parties' agreed upon terms of the
Rental Agreement, which clearly provide for the payment of
attorneys' fees to Emerald for breach of the Agreement by Sea
Star.

In sum, the Court concludes that Emerald has established
that Sea Star breached the Rental Agreement, and that as a result
of this breach, Emerald is entitled to attorneys' fees and costs.
Accordingly, the Court will enter judgment in favor of Emerald
and against Sea Star on its breach of contract counterclaim.

B.   Whether Emerald Has Established A Breach Of The Rental
      Agreement Based On Sea Star's Failure To Pay Stipulated
      Loss Values

Paragraph 9(a) of the Rental Agreement provides:

9.   Risk of Loss

        (a) During the term of this Agreement, Lessee
shall bear all risk of loss, damage, theft, or
destruction of the Equipment.  No such loss, damage,
theft, or destruction of equipment in whole or in part,
shall impair Lessee's obligations under this Agreement,
all of which shall continue in full force and effect.
At Lessor's option and subject to Schedule "A," Lessee
shall (i) put the affected Equipment in the condition
that existed upon delivery to Lessor or (ii) pay Lessor
an amount equal to all accrued and unpaid rent due
under this Agreement, together with the Stipulated Loss
Value, with respect to the affected Equipment, less the
amount of all recoveries by Lessor from parties other
than Lessee for such loss, damage, theft or
destruction.

        Paragraph 10(f) of the Rental Agreement further

provides:

10.   Redelivery of Equipment

      (f)  If Lessee fails to return any Equipment for
more than sixty (60) days after the return date
specified in a Lessor notice, Lessor may elect to treat
such Equipment as lost; and Lessee shall pay Lessor the
Stipulated Loss Value of such Equipment, together with
all accrued rental charges at the contractual daily
rate within fifteen (15) days.

      After reviewing the evidence adduced at trial, the Court

finds that Sea Star failed to timely return certain pieces of

Emerald Equipment as required by the Rental Agreement.  The Court

concludes that this establishes a breach of the Rental Agreement

and pursuant to the terms of the Rental Agreement, Emerald was

                                                              10

permitted to treat such equipment as lost and require Sea Star to
pay a stipulated loss value for the equipment plus rental
charges.

Sea Star contends that it should not be required to pay a
stipulated loss value for equipment that Emerald subsequently
sold in violation of Sea Star's notice rights under Paragraph
13(b)(iii) of the Rental Agreement.  In pertinent part, Paragraph
13(b) provides:

13.  Events of Default.

\* \* \*

(b)  Upon the occurrence of any default by Lessee
[Sea Star] under this Agreement, Lessor [Emerald] shall
(except to the extent otherwise required by law) be
entitled to:

\* \* \*

(iii)  Elect to sell any or all Equipment
after giving thirty (30) days' notice to Lessee at one
or more public or private sales and recover the sum of
the Stipulated Loss Values of such Equipment, all rent
owed through the rent payment immediately preceding the
date of such notice, all costs and expenses incurred in
searching for, taking, removing, keeping, storing,
repairing and restoring and selling such Equipment, all
other amounts owed by Lessee under this Agreement,
whether as additional rent, indemnification, or
otherwise, and all costs and expenses, including
reasonable legal fees, incurred by Lessor as a result
of Lessee's default under this Agreement after
deducting all amounts received by Lessor in connection
with such public or private sales . . . .

Because Emerald did not provide Sea Star with notice as required
by this paragraph.  Sea Star contends that if it is charged for
Equipment that Emerald sold in violation of its notice rights

11

under this provision, Emerald will "recover twice -- first by
selling recovered 'lost' equipment without prior notice; second,
by collecting an adjusted stipulated loss values [sic] from Sea
Star . . ." (D.I. 261 at 31).

In response, Emerald points out that any equipment it
recovered was solely the result of Emerald's own efforts, a fact
not disputed by Sea Star. Emerald further contends that it sold
the equipment at fair market value and adjusted the stipulated
loss invoices so that Sea Star was charged "only for the
difference between the full stipulated loss value and the amount
received for such pieces of equipment." (D.I. 260 at 15,
emphasis in original). Emerald explains that although Sea Star
was liable for the full stipulated loss value under the Rental
Agreement, Emerald, by its own actions in locating and recovering
this "lost" equipment, was able to reduce or mitigate any damages
that Sea Star suffered. Thus, Emerald contends that its failure
to give Sea Star notice of the sale is not a material breach
because Sea Star's position was actually enhanced by Emerald's
actions in selling the equipment and adjusting the stipulated
loss value contractually owed by Sea Star.

In adjudicating the claims asserted by Sea Star in its
Complaint against Emerald, the Court concluded that Emerald was
required to give Sea Star notice before any public or private
sale of the equipment, and that Emerald failed to comply with

12

this contractual obligation. However, the Court specifically noted that not every breach of a contractual duty discharges the other party's duty to perform its obligations, and the Court reserved decision on the question of whether Emerald's breach was material such that Sea Star would be excused from its stipulated loss payment obligations under the Rental Agreement.

A breach of contract is considered material if it affects the purpose of the contract in an important or vital way. Shapiro v. Massengill, 661 A.2d 202, 209 (Md. 1995). Materiality is determined in light of the facts and circumstances of each case. Restatement (Second) Contracts § 241. Among the circumstances to be considered are:

(a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;

(b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;

(c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

(d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;

(e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

Id.

Considering the facts and circumstances of this case as a whole and in light of the additional specific circumstances

13

highlighted in the Restatement, the Court concludes that
Emerald's breach of the Rental Agreement is not material.
Emerald's failure to give Sea Star notice of the sale of the
previously designated "lost" equipment did not result in any
injury to Sea Star. Under the Rental Agreement, Sea Star agreed
to pay a stipulated "loss" value for equipment not timely
returned. Upon the sale of the equipment recovered by its own
efforts, Emerald adjusted the agreed upon "loss" value to provide
Sea Star with a credit which benefitted Sea Star by reducing the
stipulated "loss" value it had contractually agreed to pay.
Emerald's conduct in this regard comports with standards of good
faith and fair dealing, and Sea Star cannot be said to have been
deprived of any benefit which it reasonably expected. In fact,
because of Emerald's actions in recovering the "lost" equipment,
Sea Star obtained a benefit it was not contractually entitled to
in the form of a reduction of the loss value it would have
otherwise been required to pay.

In sum, the Court concludes that Sea Star further breached
the Rental Agreement by failing to pay the adjusted stipulated
loss values owed to Emerald under paragraphs 9 and 10 of the
Rental Agreement. Emerald's breach of the notice provision is
not material, and did not excuse Sea Star's performance under the
Rental Agreement. Accordingly, the Court will enter judgment in
favor of Emerald and against Sea Star on Emerald's breach of

contract counterclaim to the extent that claim is based upon Sea
Star's failure to pay the adjusted stipulated loss values.

    C.    Whether Emerald's Invoices Satisfy Its Burden Of
        Proof To Establish Damages For Unpaid Rental
        Charges And Stipulated Loss Values

Sea Star contends that Emerald has failed to carry its
burden of proof on the issues of damages. In support of its
argument, Sea Star contends that the invoices (CCTr. Exh. 8)
prepared by Emerald are inadmissible under the Federal Rules of
Evidence because they are inherently untrustworthy hearsay, and
because they are based upon summaries which were not produced at
trial.[3] Sea Star further contends that the lack of precision in
calculating damages is attributable to Emerald's lack of
expertise, destruction of pertinent materials and unwillingness
to abide by the terms of the Rental Agreement and Sale Order.
Thus, Sea Star contends that Emerald should not be excused from
establishing damages with concrete certainty.

"Under Maryland law, once a plaintiff has proven with
certainty the fact of damages resulting from the defendant's
breach of contract, the amount of those damages 'may be left to
reasonable inference.'" M & R Contractors & Builders, Inc. v.
Michael, 138 A.2d 350, 355 (Md. 1958). In this regard, damages

---

[3]    Because this evidentiary issue was specifically raised
by Sea Star in its substantive briefing on damages, the Court
will address it here. The remaining evidentiary objections
raised by the parties will be addressed in Section III infra of
this Memorandum Opinion.

may not be based on speculation or conjecture, but must be proven

with "reasonable certainty."  Id.  The imposition of the

"reasonable certainty" rule has given rise to several additional

legal principles with particular applicability in this case,

notably the following:  (1) "where a defendant's wrong has caused

the difficulty of proving damage, he cannot complain of the

resulting uncertainty;" (2) "mere difficulty in ascertaining the

amount of damage is not fatal;" (3) "mathematical precision in

fixing the exact amount is not required;" and (4) "it is

sufficient if the best evidence of the damage which is available

is produced."  Id. at 348-349.

        In this case, the evidence demonstrates that Sea Star

breached its obligation to provide Emerald with accurate self-

billing reports.  This breach directly gives rise to Emerald's

inability to ascertain its damages with certainty, and therefore,

Sea Star cannot now complain about that uncertainty.  Based upon

the testimony of Lorraine Robins, which the Court fully credits,

the Court further finds that the Emerald invoices were based upon

the best evidence available to Emerald, and the invoices are

clearly relevant to ascertaining the amount of damages owed to

Emerald.  As Ms. Robins explained, she took painstaking and

almost extraordinary measures to account for each piece of

Emerald equipment, an undertaking which lasted several years, and

Ms. Robins took equally careful measures to ensure that Sea Star

16

was credited for equipment which was later recovered by adjusting the stipulated loss values.  The Court finds this testimony sufficient to lay a proper foundation for the invoice evidence. In addition, the Court notes that Federal Rule of Civil Procedure 1006 permits the use of summaries of voluminous books, records or documents for the convenience of the Court, and as Emerald points out, the Court expected the parties to utilize such summary evidence.  Accordingly, the Court is not persuaded that Emerald's invoices (CCTr. Exh. 8) should be excluded from evidence based upon Federal Rules of Evidence 401, 402, 701, 1002, 1003, and 1006.

As for Sea Star's hearsay objection, the Court concludes that even if the invoices cannot be said to be a business record kept in the ordinary course of business, since they were prepared, in part, with this litigation in mind, the Court is persuaded by Ms. Robins's testimony regarding her detailed collection and preparation methods, that the invoices bear a high degree of trustworthiness such that they should be admissible into evidence.  Fed. R. Evid. 807.  Accordingly, the Court concludes that the Emerald invoices (CCTr. Exh. 8) are admissible into evidence for the purpose of establishing the damages owed to Emerald by Sea Star.

D.    Whether Emerald Has Established That Sea Star's
      Accounting Of Damages Was Substantially Erroneous And
      Whether Emerald's Invoices Are Prima Facie Valid To
      Establish Damages

Having concluded that Emerald's invoices are admissible

evidence, the Court further credits those invoices as evidence

establishing the amount of damages owed by Sea Star to Emerald.

Indeed, the Court finds, by Sea Star's own admission, that its

accounting records are unreliable, and the Court is unpersuaded

by Sea Star's arguments aimed at undercutting the accuracy of the

Emerald invoices.  Accordingly, the Court will accept Emerald's

invoices as evidencing the amount of damages owed by Sea Star to

Emerald as a result of Sea Star's breach of the Rental Agreement.

Having reached this conclusion, the Court further finds that

separate proceedings for an accounting of damages is not

necessary.  Because Emerald has sufficiently established the

amount of damages owed to it by Sea Star, the Court further

concludes that Emerald's counterclaim for an accounting is moot

and its Motion For Partial Summary Judgment for a partial damages

award is likewise moot.

E.    Whether Emerald Has Established Tort Claims Based On
      Breach Of Fiduciary Duty And/Or Constructive Fraud

Under Maryland law, breach of fiduciary duty is not

considered a separate cause of action.  Vinogradova v. Suntrust

Bank, Inc., 875 A.2d 222, 231 (Md. Ct. Spec. App. 2005); Swedish

Civil Aviation Admin. v. Project Management Enterprises, Inc.,

190 F. Supp. 2d 785, 801 (D. Md. 2002).  Rather, a breach of

18

fiduciary duty is incorporated into other causes of action.  Id.
The decision of the Maryland Court of Appeals in Impala Platinum
Ltd. V. Impala Sales (U.S.A.), Inc., 389 A.2d 887, 903 (Md.
1978), is not to the contrary as Emerald contends, because that
case discusses breach of fiduciary duty in the context of a claim
for fraud.  Accordingly, the Court will consider Emerald's
allegations of breach of fiduciary duty in the context of its
constructive fraud claim.

Before addressing Emerald's constructive fraud claim on the
merits, however, the Court must consider Sea Star's threshold
argument under the independent legal duty doctrine.
Specifically, Sea Star contends that Emerald cannot maintain a
separate cause of action based on constructive fraud, because its
fraud allegations are part and parcel of its breach of contract
claim.

Sea Star raised this argument in the context of its Motion
To Dismiss, and in its post-trial response, Emerald contends that
the Court has already ruled on this issue.  However, the Court's
decision to allow Emerald's fraud claims to stand was rendered in
the context of a Rule 12(b)(6) motion for failure to state a
claim, and in so ruling, the Court expressly based its holding on
the case law that was then cited by the parties, which included
case law from Florida, Virginia and New Jersey cited by Emerald
that established an exception to the economic loss doctrine for
cases involving self-billing types of reports.  2006 WL 214206 at

19

*9-10 & n. 5. At this juncture, however, the parties direct the
Court to Maryland law, and the Court is not persuaded that such
an exception exists under Maryland law. The parties have not
identified any Maryland cases creating an exception to the
general principle that the duty giving rise to the tort cause of
action must be independent of the contractual obligation. See,
e.g., Jones v. Hyatt, Ins. Agency, Inc., 741 A.2d 1099, 1107 (Md.
1999). Although the Rental Agreement does not contain a specific
provision providing for Sea Star's self-billing obligation, the
Court is persuaded, in the circumstances of this case and absent
any clear exception under Maryland law, that Sea Star's self-
billing obligation is inextricably intertwined with the Rental
Agreement and Sea Star's obligation to pay rent provided for in
the Rental Agreement. Accordingly, the Court concludes that
Emerald cannot maintain a separate cause of action based on tort
for conduct which is part and parcel of its breach of contract
claim.

In the alternative, however, even if the Court recognizes an
independent cause of action for fraud and/or constructive fraud
under Maryland law, the Court concludes that Emerald has not
established by clear and convincing evidence the elements of
these claims. To establish fraud, Emerald must show:

    (1) that a representation made by the defendant was
false; (2) that either its falsity was known to the
defendant or the misrepresentation was made with such
reckless indifference to truth as to impute knowledge
to him; (3) that the misrepresentation was made for the

> purpose of defrauding the plaintiff; (4) that the
> plaintiff not only relied upon the misrepresentation
> but had the right to rely upon it with full belief in
> its truth, and that he would not have done the thing
> from which damage resulted if it had not been made; and
> (5) that the plaintiff suffered damage directly
> resulting from the misrepresentation.

Appel v. Hutfield, 84 A.2d 94, 95-96 (Md. 1951). These elements

must be proven by clear and convincing evidence. VF Corp. v.

Wrexham Aviation Corp., 715 A.2d 188, 193 (Md. 1998).

Constructive fraud differs from actual fraud in that constructive

fraud "is a breach of legal or equitable duty which, irrespective

of the moral guilt of the fraud feasor, the law declares

fraudulent because of its tendency to deceive others, to violate

public or private confidence, or to injure public interests.

Neither actual dishonesty of purpose nor intent to deceive is an

essential element of constructive fraud." Scheve v. McPherson,

408 A.2d 1071, 1076 (Md. Ct. Spec. App. 1979) (citations

omitted).

   With respect to fraud, the Court concludes that Emerald has

not established by clear and convincing evidence the required

intent to deceive. Emerald suggests that the magnitude of the

misreporting in this case is sufficient alone to establish intent

to deceive, but the Court is not persuaded that the volume of

misreporting, without more, is sufficient to rise to the level of

clear and convincing evidence of intent to deceive.

   Moreover, with respect to both fraud and constructive fraud,

the Court is not persuaded that Emerald has established reliance

by clear and convincing evidence. As Emerald explains in its own proposed findings of fact, Emerald took measures to track its own equipment shortly after Sea Star began leasing it. For example, Emerald hired Mr. Levins to write a computer program to find the last location of Emerald equipment and track the move history for each piece of equipment. Indeed, it was precisely this information that Ms. Robins used, in part, to recreate the invoices for Sea Star's usage. Indeed, Mr. Robins noticed the discrepancies in Sea Star's self-billing reports shortly after reviewing them, and began billing Sea Star directly for its unreported usage.[4] In the Court's view, this evidence undercuts Emerald's purported reliance. Accordingly, the Court concludes, that Emerald has not carried its burden of establishing fraud and/or constructive fraud by clear and convincing evidence. Having concluded that Emerald cannot establish its tort claims, the Court further concludes that Emerald is not entitled to punitive damages. Accordingly, judgment will be entered against Emerald and in favor of Sea Star on Emerald's tort claims.

---

[4] Although Ms. Robins testified that she initially relied on Sea Star's self-billing, it is evident to the Court from the trial testimony that any reliance by Emerald on Sea Star's self-billing was fleeting and was quickly replaced by a hearty skepticism regarding the accuracy of the billing, which in turn led Ms. Robins to notify Sea Star and invoice them directly. In making this observation, the Court is not suggesting that a specific period of reliance is necessary to establish a claim, but rather, that the evidence here undercuts reliance.

22

F.     Whether Emerald's Claims Are Barred By The Statute Of
       Limitations

Sea Star contends that Emerald's claims are barred by the

statute of limitations.  Sea Star raised this argument previously

in the context of Sea Star's Motion To Dismiss and Sea Star's

Motion For Partial Summary Judgment.  In both instances, the

Court concluded that Sea Star failed to demonstrate that

Emerald's claims were barred by the statue of limitations.  Sea

Star Line, LLC v. Emerald Equipment Leasing, Inc., 2008 WL

4761871 (D. Del. Oct. 29, 2008) (Report & Recommendation) (Stark,

Mag. J.), adopted by, 2008 WL 5245346 (D. Del. Dec 16, 2008); Sea

Star Line, LLC v. Emerald Equipment Leasing, Inc., 2006 WL 956902

(D. Del. Apr. 13, 2006).  Sea Star has not raised any new grounds

in its post-trial briefing warranting reconsideration of the

Court's previous conclusions.

## III. EVIDENTIARY OBJECTIONS

A.     Sea Star's Evidentiary Objections

In addition to the objection to the Emerald invoices, Sea

Star raises eight additional evidentiary objections.

Specifically, Sea Star objects to (1) Emerald's Computer Print

Out Move Histories (CCTr. Exh. 10), (2) the Docket for Adversary

Proceeding No. 04-53071 in the United States District Court for

the District of Delaware (CCTr. Exh. 1), (3) the Docket for Civil

Action No. 3:04-146 in the United States District Court for the

Middle District of Florida (CCTr. Exh. 2), (4) the Docket for

23

this action (CCTr. Exh. 3), (5) the Complaint for Recovery of
Post-Petition Account Receivables filed by Emerald against Sea
Star (CCTr. Exh. 4), (6) the Answers and Objections to Emerald's
Interrogatories (CCTr. Exh. 6), (7) Sea Star's Supplemental
Answers to Interrogatories No.1 (CCTr. Exh. 7), and (8) the First
Consolidated Amended Class Action Complaint No. 08-1467 filed in
the United Stats District Court for the District of Puerto Rico
(CCTr. Exh. 33).

In its response, Emerald has withdrawn CCTr. Exh. 33. As
for CCTr. Exhs. 1, 2, 3 and 4, the Court may take judicial notice
of these documents pursuant to Fed. R. of Evid. 201, and the
Court finds the documents to be relevant. Accordingly, the Court
will overrule Sea Star's objections.

As for the objections to CCTr. Exhs. 6 and 7, Sea Star's
answers to Interrogatories, the Court concludes that these
documents are admissible as admissions of a party opponent under
Fed. R. Evid. 801(d)(2). The Court further finds the documents
to be relevant. Accordingly, the Court will overrule Sea Star's
objections.

With regard to the Emerald Move Histories (CCTr. Exh. 10),
the Court concludes that this evidence is admissible under the
business record exception to the hearsay rule based on the
testimony of Mark Levins. (CCTr. Vol. 1 at 8-58.) The Court
further finds the documents to be appropriate summaries under
Fed. Rule of Evid. 1006, and the Court finds those documents to

be relevant to Sea Star's admitted use of the equipment at issue.
Accordingly, the Court will overrule Sea Star's objections.

    B.    Emerald's Evidentiary Objections

    Emerald maintains one evidentiary objection post-trial to
CCTr. Exh. 109 offered by Sea Star, which is an inventory of
equipment.  Emerald contends that "[n]o evidence was presented as
to who, how or when this exhibit . . . was prepared and the
document itself provides no such information."  Emerald further
contends that the document was not authenticated and to the
extent it was offered for the truth of the matter asserted, no
foundation was provided establishing that the business record
exception applies.

    In response, Sea Star contends only that this document is
"[a]n inventory of equipment prepared by the Jacksonville Port
Authority, used to show located [sic] of equipment and that
Emerald did not consider this information."  (D.I. 277 at ¶ 1.)
Sea Star further contends that the document "is reliable for
purposes offered."  (Id.)

    The Court has reviewed the exhibit and the related trial
testimony and finds that Sea Star offered insufficient evidence
to lay a foundation for the authentication and admissibility of
this document.  The document itself contains no information as to
who, how or when it was prepared, and no trial testimony was
offered to establish this information.  In addition, no testimony
was offered to establish that any hearsay exception applies to

25

the document. In this regard, the Court further notes, that Sea
Star has provided no trial citations to support its argument that
the document is reliable for the purpose for which it was
offered. Accordingly, the Court will sustain Emerald's objection
to CCTr. Exh. 109.

## IV. CONCLUSION

For the reasons discussed, the Court will overrule Sea
Star's evidentiary objections and sustain Emerald's objection to
CCTr. Exh. 109. The Court will enter judgment in favor of
Emerald and against Sea Star on Emerald's breach of contract
counterclaim (Count I). The Court will further enter judgment in
favor of Sea Star and against Emerald on Emerald's counterclaims
based on fraud, constructive fraud, fraudulent concealment and
breach of fiduciary duty (Counts IV-VIII). Emerald's request for
an accounting (Count III) is dismissed as moot in light of the
Court's conclusion regarding the credibility of Emerald's
invoices.

With notice to Sea Star, Emerald shall submit a proposed
judgment order, which includes a provision for the total amount
of damages to be awarded to Emerald, to the Court within **five (5)
days** of receipt of this Memorandum Opinion. Sea Star may
stipulate to the proposed judgment order or file any objections
to the proposed judgment order **within five (5) days** of its

receipt of the proposed order.  Emerald shall have **five (5) days** from the receipt of any objections to file a response.

An appropriate Order will be entered.